# 21-1920-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

ARI TEMAN, AKA Sealed Defendant 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 3 of 11 (Pages A-241 to A-480)

KEDAR S. BHATIA
WON S. SHIN
 *Assistant U.S. Attorney*
UNITED STATES ATTORNEY'S OFFICE
 SOUTHERN DISTRICT OF NEW YORK
*Attorneys for Appellee*
One Saint Andrew's Plaza
New York, New York 10007
(212) 637-2200

EDEN QUAINTON
QUAINTON LAW
*Attorneys for Defendant-Appellant*
2 Park Avenue, 20th Floor
New York, New York 10169
(212) 419-0575

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Complaint, filed June 20, 2019 ................................. A-46.2

Notice of Appearance, dated August 27, 2019 ........... A-47

Indictment, filed September 26, 2019 ....................... A-49

Waiver of Appearance for Arraignment, dated
    October 14, 2019 .................................................. A-53

Transcript of Proceedings held before the
    Honorable Paul A. Engelmayer, dated
    October 21, 2019 .................................................. A-55

Supeseding Indictment, filed November 12, 2019 .... A-96.1

Transcript of Proceedings held before the
    Honorable Paul A. Engelmayer, dated November
    21, 2019 ................................................. A-96.7

Opinion and Order of the Honorable Paul A.
    Engelmayer, dated December 20, 2019 ................ A-97

Second Superseding Indictment, filed
    January 3, 2020 ..................................................... A-121

Defendant Teman's Requested Voir Dire Questions,
    filed January 6, 2020 ............................................ A-129

Excerpts of Transcript of Conference Proceedings
    held before the Honorable Paul A. Engelmayer,
    dated January 10, 2020 ......................................... A-137.1

Transcript of Conference Proceedings held before
    the Honorable Paul A. Engelmayer, dated
    January 10, 2020 ................................................... A-137.6

Letter from Kedar S. Bhatia to the Honorable Paul
    A. Engelmayer, dated January 14, 2020 ............... A-137.96

ii

**Page**

Transcript of Trial Proceedings held before the
Honorable Paul A. Engelmayer, dated
January 21, 2020 .................................................... A-138

Transcript of Trial Proceedings held before the
Honorable Paul A. Engelmayer, dated
January 22, 2020 .................................................... A-265

Transcript of Trial Proceedings held before the
Honorable Paul A. Engelmayer, dated
January 23, 2020 .................................................... A-398

Transcript of Trial Proceedings held before the
Honorable Paul A. Engelmayer, dated
January 24, 2020 .................................................... A-672

Transcript of Trial Proceedings held before the
Honorable Paul A. Engelmayer, dated
January 27, 2020 .................................................... A-998

Transcript of Trial Proceedings held before the
Honorable Paul A. Engelmayer, dated
January 28, 2020 .................................................... A-1187

Transcript of Trial Proceedings held before the
Honorable Paul A. Engelmayer, dated
January 29, 2020 .................................................... A-1264

Verdict Sheet, dated January 29, 2020 ...................... A-1298.1

Order of the Honorable Paul A. Engelmayer, dated
January 29, 2020 .................................................... A-1299

Defendant's Motion for Judgment of Acquittal or in
the Alternative, Motion for New Trial, filed
February 26, 2020 ................................................. A-1437

Motion for New Trial Based on Undisclosed Brady
and Jencks Act Evidence, filed April 9, 2020 ....... A-1473

iii

**Page**

Exhibit A to Motion -
Excerpts of Transcript of Proceedings, dated
August 9, 2018....................................................... A-1498

Exhibit B to Motion -
Report of Violations of New York City's Housing
Maintenance Code ................................................. A-1512

Exhibit C to Motion -
Report of Violations of New York City's Housing
Maintenance Code ................................................. A-1513

Exhibit D to Motion -
HPD's Housing Maintenance Code Violations
User Guide ............................................................ A-1514

Exhibit E to Motion -
Report re: New York Civil Litigation – Joseph
Soleimani .............................................................. A-1548

Exhibit F to Motion -
Report re: New York Civil Litigation – Elie
Gabay ................................................................... A-1549

Exhibit G to Motion -
Glossary of Terms for Litigation Status Report
from HPD................................................................ A-1550

Letter from Joseph A. DiRuzzo, III to the Honorable
Paul A. Engelmayer, dated April 9, 2020............... A-1552

Letter from Kedar S. Bhatia, Assistant United States
Attorney to the Honorable Paul A. Engelmayer,
dated May 1, 2020 re: Trial Exhibits ..................... A-1554

Government's Exhibits:

GX 101-
GateGuard Account Opening Documents ............. A-1555

GX 102 -
GateGuard Bank Statements.................................. A-1559

iv

                                                              **Page**

GX 103-
Friend or Fraud Account Opening Documents ...... A-1581

GX 104-
Friend or Fraud Bank Statements .......................... A-1585

GX 105-
Touchless Labs Account Opening Documents ...... A-1609

GX 106-
Touchless Labs Bank Statements........................... A-1613

GX 107 -
Ari Teman Account Opening Document................ A-1629

GX 108-
Ari Teman Bank Statements .................................. A-1631

GX 110-
April 19, 2019 2:37 PM Surveillance
Photographs ........................................................... A-1649

GX 111-
April 19, 2019 6:00 PM Surveillance
Photographs ........................................................... A-1652

GX 112-
May 8, 2019 3_04 PM Surveillance
Photographs ........................................................... A-1655

GX 113-
Bank Records Spreadsheet
(CD-Rom)* ............................................................. A-1657.1

GX 114 -
Returned Check Records ....................................... A-1658

GX 121 -
ABJ Lenox Account Opening Document .............. A-1660

---

* GX 113 is a Microsoft Excel file. CD-Rom with the Excel
spreadsheet provided to Court and Service parties.

v

**Page**

GX 122 -
ABJ Lenox Bank Statements ................................... A-1661

GX 123 -
ABJ Milano Account Opening Documents ........... A-1669

GX 124 -
ABJ Milano Bank Statements................................. A-1670

GX 127 -
May 2, 2019 Letter - ABJ Lenox ........................... A-1678

GX 129 -
May 2, 2019 Letter - ABJ Milano.......................... A-1679

GX 130 -
ABJ Lenox Checks ................................................. A-1680

GX 131 -
ABJ Milano Checks ................................................ A-1682

GX 141 -
18 Mercer Account Opening Documents .............. A-1685

GX 142 -
18 Mercer Bank Statements................................... A-1694

GX 143 -
April 4, 2018 Check from 18 Mercer Equity to
GateGuard................................................................. A-1699

GX 144 -
518 W 204 Account Opening Documents ............. A-1700

GX 145 -
518 W 204 Bank Statements.................................. A-1707

GX 146 -
January 31, 2018 Check from 518 W 204 to
GateGuard................................................................. A-1725

vi

**Page**

GX 147 -
March 28, 2019 Check from 518 West 205 to
GateGuard ................................................................. A-1726

GX 150 -
Affidavit ..................................................................... A-1727

GX 201 -
March 28, 2019 Check from Coney Realty to
GateGuard ................................................................. A-1728

GX 202 -
March 28, 2019 Check from 18 Mercer Equity to
GateGuard ................................................................. A-1729

GX 203 -
April 19, 2019 Check from 518 West 205 to
GateGuard ................................................................. A-1730

GX 204 -
April 19, 2019 Check from ABJ Milano to
GateGuard ................................................................. A-1733

GX 205 -
April 19, 2019 Check from ABJ Lennox to
GateGuard ................................................................. A-1739

GX 206 -
April 19, 2019 GateGuard Counter Deposit .......... A-1757

GX 401 -
September 9, 2017 E-mail - 'We're Live' ............. A-1758

GX 402 -
November 6, 2017 E-mail - 'Current Issues'......... A-1760

GX 403 -
March 9, 2018 E-mail - 'Ending GateGuard' ........ A-1761

GX 404 -
May 7, 2018 E-mail - 'All Communication in
Writing'..................................................................... A-1762

vii

                                                                    **Page**

GX 405 -
May 22, 2018 E-mail - 'GateGuard' ..................... A-1763

GX 406 -
August 26, 2018 E-mail - 'Dispute on Charge...' .. A-1765

GX 407 -
September 18, 2018 E-mail - 'Sublet Spy Hits...' . A-1767

GX 408 -
December 14, 2018 E-mail - 'Notice of Intent' ..... A-1773

GX 409 -
June 14, 2019 GateGuard Invoice ........................ A-1775

GX 409A -
Invoices (1) ............................................... A-1777

GX 409B -
Invoices (2) ............................................... A-1785

GX 409C -
Conversation between Teman and Soleimani ........ A-1786

GX 412 -
January 1, 2018 E-mail - 'Tenant Ana Esterg' ....... A-1787

GX 413 -
January 19, 2018 E-mail - 'Invoice Sent' .............. A-1788

GX 414 -
January 24, 2018 E-mail - 'Form for the 10
Buildings' ............................................... A-1791

GX 415 -
March 25, 2018 E-mail - 'Invoice for 20
Buildings' ............................................... A-1795

GX 416 -
March 26, 2018 E-mail - 'Invoice for 20
Buildings' (1) ........................................... A-1815

viii

**Page**

GX 417 -
March 26, 2018 E-mail - 'Invoice for 20
Buildings' (2) ........................................................ A-1820

GX 418 -
March 27, 2018 E-mail - 'Proof it's Your...' .......... A-1829

GX 431 -
April 4, 2018 E-mail - 'Invoice' ............................ A-1831

GX 441 -
GateGuard Terms and Conditions.......................... A-1834

GX 442 -
April 2, 2018 E-mail - 'References' ...................... A-1856

GX 443 -
January 7, 2019 E-mail - 'Contract' ...................... A-1862

GX 501 -
Bank Records Stipulation ...................................... A-1868

GX 702 -
January 2, 2019 WhatsApp Messages ................... A-1872

GX 704 -
April 2, 2019 WhatsApp Messages ...................... A-1874

GX 727 -
April 2, 2019 Whatsapp Messages (2)................... A-1875

GX 728 -
April 3, 2019 Whatsapp Messages ........................ A-1876

GX 729 -
April 10, 2019 WhatsApp Messages ..................... A-1877

Defense Exhibits:

DX 2 -
Payment Terms (1/27/2019)................................... A-1880

DX 14 -
October 11, 2018 E-mail – 'ABJ Properties'......... A-1887

ix

**Page**

DX 15 -
October 22, 2018 E-mail - 'SubletSpy hits' .......... A-1889

DX 16 -
'Notice of Hold' ..................................................... A-1892

DX 29 -
Affidavit ................................................................ A-1893

DX 36 -
March 28, 2018 E-mail – 'Invoice for 20
Buildings' .............................................................. A-1894

DX 49 -
Declaration ............................................................ A-1902

DX 51 -
Chase Information Request ..................................... A-1903

DX 52 -
Chase Information Request ..................................... A-1904

DC 62 -
March 9, 2018 E-mail Correspondence .................. A-1928

DX 70 -
GateGuard Logs ..................................................... A-1930

DX 71 -
May 22, 2018 E-mail – 'Re: Gateguard' ............... A-1932

Order of the Honorable Paul A. Engelmayer, dated
May 6, 2020 .......................................................... A-1933

Letter from Joseph A. DiRuzzo, III to the Honorable
Paul A. Engelmayer, dated May 8, 2020 ............... A-1935

Opinion and Order of the Honorable Paul A.
Engelmayer, dated June 5, 2020 ............................ A-1937

Letter from Joseph A. DiRuzzo, III to the Honorable
Paul A. Engelmayer, dated June 29, 2020 ............. A-2044

x

**Page**

Sentencing Memorandum and Motion for
   Downward Variance, filed July 7, 2020................. A-2045

Exhibit 1 to Sentencing Memorandum -
   Letter from Dr. Rami Cohen, M.D to the
   Honorable Paul A. Engelmayer, dated
   June 29, 2020 ........................................................ A-2070

Exhibit 2 to Sentencing Memorandum -
   Letter from Juhan Sonin to the Honorable Paul A.
   Engelmayer, dated July 6, 2020 ............................ A-2074

Exhibit 3 to Sentencing Memorandum -
   Letter from Jeffrey Katz to the Honorable Paul A.
   Engelmayer ........................................................... A-2076

Exhibit 4 to Sentencing Memorandum -
   Letter from Oliver Josephs t to the Honorable
   Paul A. Engelmayer, dated June 6, 2020 ............... A-2077

Exhibit 5 to Sentencing Memorandum -
   Letter from Thomas Orosz to the Honorable Paul
   A. Engelmayer ....................................................... A-2079

Exhibit 6 to Sentencing Memorandum -
   Letter from David Diwby to the Honorable Paul
   A. Engelmayer ....................................................... A-2080

Exhibit 7 to Sentencing Memorandum -
   Letter from Nachum Klar to the Honorable Paul
   A. Engelmayer, dated July 6, 2020 ........................ A-2082

Exhibit 8 to Sentencing Memorandum -
   Letter from Anthony Zachariadis to the
   Honorable Paul A. Engelmayer, dated
   July 6, 2020........................................................... A-2084

Exhibit 9 to Sentencing Memorandum -
   eJewish Philanthrophy- Coverage of Teman's
   Award .................................................................... A-2085

xi

**Page**

Exhibit 10 to Sentencing Memorandum -
HarvardX Verified Certificate of Achievement,
issued May 11, 2020 ............................................... A-2094

Exhibit 11 to Sentencing Memorandum -
Letter from Avi Ganz to the Honorable Paul A.
Engelmayer, dated July 7, 2020 ........................... A-2095

Exhibit 12 to Sentencing Memorandum -
Letter from Steven Oved to the Honorable Paul
A. Engelmayer, dated June 15, 2020 ..................... A-2098

Exhibit 13 to Sentencing Memorandum -
Letter from Rabbi Chaim Lipskar to the
Honorable Paul A. Engelmayer, dated
July 7, 2020 ................................................................ A-2099

Exhibit 14 to Sentencing Memorandum -
Letter from Jonathan Lubin to the Honorable
Paul A. Engelmayer ................................................. A-2101

Exhibit 15 to Sentencing Memorandum -
Letter from Talia Reiss to the Honorable Paul A.
Engelmayer ................................................................ A-2103

Exhibit 16 to Sentencing Memorandum -
Letter from Rivka Korf to the Honorable Paul A.
Engelmayer ................................................................ A-2104

Exhibit 17 to Sentencing Memorandum -
Letter from Russell DiBona to the Honorable
Paul A. Engelmayer ................................................. A-2105

Letter from Justin K. Gelfand to the Honorable Paul
A. Engelmayer, dated September 8, 2020 .............. A-2107

Appearance of Counsel, dated November 2, 2020 .... A-2108.1

Letter from Justin Harris to the Honorable Paul
Engelmayer, dated November 2, 2020 ................... A-2108.2

xii

**Page**

Exhibit B to Letter -
Letter from Justine A. Harris to Kedar Bhatia and
Edward A. Imperatore, dated October 23, 2020 .... A-2108.6

Exhibit C to Letter -
Letter from Kedar S. Bhatia to Justine A. Harris,
dated October 29, 2020 ........................................ A-2108.9

Order of the Honorable Paul A. Engelmayer, dated
November 19, 2020 ............................................... A-2109

Letter from Justine Harris to the Honorable Paul A.
Engelmayer, dated November 20, 2020 ................. A-2111

Letter from Justine Harris to the Honorable Paul A.
Engelmayer, dated November 30, 2020 ................. A-2113

Letter from Audrey Strauss to the Honorable Paul
A. Engelmayer, dated November 30, 2020 ............ A-2114

Transcript of Remote Conference Proceedings held
before the Honorable Paul A. Engelmayer, dated
December 1, 2020 ................................................... A-2116

Order of the Honorable Paul A. Engelmayer, dated
January 28, 2021 .................................................... A-2170

Letter Motion from Audrey Strauss to the
Honorable Paul A. Engelmayer, dated
April 23, 2021 ........................................................ A-2173

Exhibit A to Letter -
Proposed Order of Restitution ............................... A-2181

Exhibit B to Letter -
Proposed Preliminary Order of Forfeiture/Money
Judgment ................................................................ A-2185

Exhibit C to Letter -
Document - Finocchiaro 3503-19 .......................... A-2189

Exhibit D to Letter -
Revised Document - Finocchiaro 3503-19 ............ A-2190

xiii

**Page**

Exhibit E to Letter -
Affidavit of Karen Finocchiaro, dated
April 2, 2021 .......................................................... A-2191

Letter from Andrew J. Frisch to the Honorable Paul
A. Engelmayer, dated April 23, 2021 .................... A-2195.1

Attachment to Letter -
*Curriculum Vitae* of Richard M. Fraher ................ A-2195.3

Letter Motion to Vacate Conviction from Andrew J.
Frisch to the Honorable Paul A. Engelmayer,
dated April 28, 2021 ............................................... A-2196

Exhibit A to Letter Motion -
Document - Finocchiaro 3503-19 .......................... A-2211

Exhibit B to Letter Motion -
Revised Document - Finocchiaro 3503-19 ............ A-2213

Exhibit C to Letter Motion -
E-mail Correspondence, dated
November 30, 2020 ................................................ A-2215

Exhibit D to Letter Motion -
E-mail Correspondence, dated March 10, 2021 .... A-2217

Exhibit E to Letter Motion -
E-mail Correspondence, dated March 12, 2021 .... A-2219

Exhibit F to Letter Motion -
Copies of Various Cashier's Checks ...................... A-2221

Order of the Honorable Paul A. Engelmayer, dated
May 5, 2021 ........................................................... A-2223

Letter from Andrew J. Frisch to Kedar Bhatia, dated
May 12, 2021 ......................................................... A-2225

Annexed to Letter -
Declaration of Richard M. Fraher, executed
May 11, 2021 ......................................................... A-2226

xiv

**Page**

Letter from Audrey Strauss to the Honorable Paul
    A. Engelmayer, dated June 9, 2021 ...................... A-2236

Letter from Andrew J. Frisch to the Honorable Paul
    A. Engelmayer, dated June 14, 2021 .................... A-2246.1

Letter from Audrey Strauss to the Honorable Paul
    A. Engelmayer, dated June 29, 2021 .................... A-2246.4

Transcript of Conference Proceedings held before
    the Honorable Paul A. Engelmayer, dated
    July 9, 2021 ........................................................... A-2247

Sentencing Submission Letter from Susan G.
    Kellman to the Honorable Paul A. Engelmayer,
    dated July 16, 2021 ............................................... A-2315

Transcript of Sentencing Proceedings held before
    the Honorable Paul A. Engelmayer, dated
    July 28, 2021 ......................................................... A-2333

Notice of Appeal, dated August 2, 2021 .................... A-2458

Letter Motion from Ari Teman to the Honorable
    Paul A. Engelmayer, dated March 3, 2022 ........... A-2459

Letter Motion from Ari Teman to the Honorable
    Paul A. Engelmayer, dated April 12, 2022 ............ A-2462

Order of the Honorable Paul A. Engelmayer, dated
    April 13, 2022 ....................................................... A-2463

Letter Motion from Ari Teman to the Honorable
    Paul A. Engelmayer, dated April 13, 2022 ............ A-2465

Letter from Eden P. Quainton to the Honorable Paul
    A. Engelmayer, dated April 13, 2022 .................... A-2467

Notice of Appearance, filed April 13, 2022 ............... A-2469

Letter Motion from Ari B. Teman to the Honorable
    Paul A. Engelmayer, dated April 14, 2022 ............ A-2470

xv

**Page**

Order of the Honorable Paul A. Engelmayer, dated
April 15, 2022....................................................... A-2473

Emergency Letter Motion from Ari B. Teman to the
Honorable Paul A. Engelmayer, dated April 20,
2022 ....................................................................... A-2476

Order of the Honorable Paul A. Engelmayer, dated
April 20, 2022....................................................... A-2479

Emergency Letter Motion from Ari B. Teman to the
Honorable Paul A. Engelmayer, dated April 20,
2022 ....................................................................... A-2481

Letter from Kedar S. Bhatia, Asst. United States
Attorney to the Honorable Paul A. Engelmayer,
dated April 21, 2022 ............................................. A-2482

Order of the Honorable Paul A. Engelmayer, dated
April 21, 2022....................................................... A-2483

A-241

104

K1LVTEM3

1  to raise, if you don't have the time to write the usual

2  letter -- and as an aside, I very much have appreciated the

3  letter-writing I've gotten on each side already.  As you can

4  tell, I dig into that immediately and try to resolve things

5  promptly; because my goal is to allow you to be the masters of

6  your cases and to know what my rulings are.

7            If you're unable in the time available to write one of

8  those letters, at least shoot me an email so that my chambers

9  and I, when we get in very early tomorrow morning, have some

10 idea what's coming from each of you.  Okay?

11           MR. BHATIA:  Understood.

12           THE COURT:  All right.  Very good.

13           Anything further from the government before we adjourn

14 for the afternoon?

15           Sorry, from the government.

16           MR. DiRUZZO:  I'm sorry.

17           (Counsel conferred)

18           MR. BHATIA:  Your Honor, earlier when we had met this

19 morning, your Honor had referenced a letter on a few different

20 topics.  Were you still looking for a letter on those topics,

21 your Honor?  I think one of them was whether notice was

22 required, whether there's discovery to be done on the advice of

23 counsel issue.

24           THE COURT:  No, no, I think we're covered on that.

25           My crack staff has run down the law on notice.  And

K1LVTEM3

1   the thrust of it is that while there isn't an affirmative

2   freestanding duty in the federal rules, courts have broad

3   discretion to impose notice and disclosure requirements outside

4   the rules, including with respect to advice of counsel.  I

5   could read into the record a number of citations, but I don't

6   think anyone is disagreeing.

7          I think, in effect, what we did today discharged

8   exactly those -- that authority.  In effect, with the extra day

9   here and the process I've used at least to help break the

10  logjam with respect to documents, you are now on notice that

11  the defense is coming; you've been given a preview that it is

12  substantially anchored in oral as opposed to substantially

13  written communications; you have a notion of where they are

14  going; and you've got, I think, a full production of documents

15  from the parties to the privilege relationship.  We've also

16  confirmed the waiver of the privilege to the full contours of

17  this case.

18         So I think, in practice, I have come to discharge the

19  authority I have here in a way that seems proportionate to the

20  challenge.  I don't need any more law from you, unless there's

21  an issue you've spotted.

22         MR. BHATIA:  That's good.  I just wanted to make sure

23  you weren't waiting for a letter that we didn't file.

24         THE COURT:  You're caught up.

25         Okay.  Defense, anything from you?

A-243

106

K1LVTEM3

1          MR. GELFAND:  Just two discrete, completely unrelated

2     to this, evidentiary issues I just wanted to make the Court

3     aware of just so that the Court, as requested, is not

4     essentially caught in the middle of testimony without advanced

5     notice.

6          There are two records that originate from government

7     premarked exhibits that I would anticipate they intend to

8     introduce into evidence.  One set of records involve

9     "surveillance photos" from various bank cameras.

10          THE COURT:  Yes.

11          MR. GELFAND:  My understanding is that the government

12     intends to -- the government conceives of these -- and I don't

13     want to speak for the government -- as "business records,"

14     which we don't dispute that they came -- meaning the

15     documents -- from Bank of America.  We're not wasting the

16     Court's time on things.

17          There's additional foundation rooted in the case law

18     that has to be set before any photographic evidence is accepted

19     into the record.  And if the government intends to introduce

20     that with someone who can't lay that foundation, I just wanted

21     the Court to be aware that we anticipate objections along those

22     lines.

23          THE COURT:  One moment.

24          (Pause)

25          THE COURT:  So I noticed these as well, the Exhibits

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1LVTEM3

1    110 through 112.  Right?

2          MR. GELFAND:  Yes, your Honor.

3          THE COURT:  You're not making a 403 argument, which

4    would probably be hard here since it's a picture of a person

5    who looks like your client dressed in unremarkable clothing in

6    an unremarkable setting of a bank.  You're laying a foundation

7    for admission as a business record.

8          MR. GELFAND:  It's a 901 basic objection, your Honor.

9    It's an authentication objection.

10          THE COURT:  Right.

11          MR. GELFAND:  The parties have engaged in brief

12    dialogue about this.  But I think there's just a fundamental

13    lack of a meeting of the minds as to what's required to

14    introduce this into evidence.  And I just wanted to --

15          THE COURT:  What, in your view, would be the means of

16    authenticating it?

17          MR. GELFAND:  Testimony from a witness who was either

18    present and can say it fairly and accurately depicts what's in

19    the photo, or testimony from someone who's sufficiently

20    familiar with the recording devices.

21          THE COURT:  I assume that, in fact, there's nobody who

22    necessarily saw Mr. Teman or anyone else who -- it looks like

23    he's using a machine, right?  No?  Is he dealing with a human

24    being or using a machine here?

25          MR. GELFAND:  There's different photographs.  The

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-245

K1LVTEM3

1  beginning -- some originate from ATM machines, some originate

2  from a human interaction, like 111, for example.

3          THE COURT:  Right.

4          Let me turn to the government.

5          Government, I take it there's not a live witness who

6  remembers dealing with a person who looks like this on or about

7  the days indicated?

8          MR. BHATIA:  No, your Honor.

9          THE COURT:  So what's the means by which the photos

10 would be authenticated?

11         MR. BHATIA:  The government will seek to introduce

12 these through senior investigator Karen Finocchiaro, who's a

13 Bank of America investigator.  She, herself -- I believe she,

14 herself, pulled these photographs from their records.  And so I

15 think she'll be able to lay a foundation that these are kept in

16 the ordinary course of Bank of America's business and, sort of,

17 lay the normal business record foundation, which to us seems

18 sufficient to put in the record.

19         THE COURT:  In other words, she will be able to

20 testify based on her familiarity with what she does, that the

21 records are created in the ordinary course of Bank of America's

22 business, and they are maintained in the ordinary course, and

23 that she retrieved them from some -- from a storage area, if

24 you will, the place in which they are routinely maintained?

25         MR. BHATIA:  That's right.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1LVTEM3

1          THE COURT:  Let me ask you, Mr. Gelfand, is there some

2    reason conceptually -- we'll see whether or not the witness is

3    up to the challenge of being a business records custodian, but

4    the government has proffered that she is and then, given her

5    job title, it would not be surprising if she were.

6          Is there some reason why conceptually one means of

7    authenticating a record like this isn't as a business record;

8    in other words, there may be others, but why not?

9          MR. GELFAND:  Two reasons, your Honor.

10         The first is that we had actually reached out directly

11   to Bank of America asking for the video footage itself.  And

12   our understanding from Bank of America -- and I'm

13   paraphrasing -- is that we don't keep that, we don't have that.

14   It's destroyed.

15         THE COURT:  These are stills though.

16         MR. GELFAND:  These are stills, as I understand it,

17   that were directly taken from video footage.

18         THE COURT:  Right.

19         So the witness though presumably will testify that she

20   retrieved these, or at least counsel is representing, from some

21   regularly maintained database.  Whether or not it continues to

22   be maintained, at least as of the time it was taken, these

23   apparently still existed.

24         Taking as true what somebody told you, which is that

25   the database that once kept these records doesn't any longer,

A-247

110

K1LVTEM3

1   what's the relevance there?  There are plenty of databases that

2   override, but there are still business record hubs during the

3   period of time before they are overwritten.

4           MR. GELFAND:  I think it would turn, your Honor, on

5   what she specifically says about the extent to which these were

6   kept and maintained in the ordinary course of business.

7           THE COURT:  Right.

8           MR. GELFAND:  It probably states the obvious; it

9   depends on whether she can lay an accurate foundation.

10          THE COURT:  Right.  I think that's about as far as we

11  can go here.

12          I take it you are not saying to me that, as a concept,

13  something about a security footage like this is out of bounds

14  as a business record.  It's just blocking and tackling; it's

15  can she lay the foundation.  And if you voir dire her about

16  whether the records still exist and why they don't, that may or

17  may not give you some traction in opposing admission.

18          MR. GELFAND:  Correct, your Honor.

19          I just wanted to give the Court a heads-up that this

20  was an issue that might not otherwise be foreseeable.

21          THE COURT:  Okay.  And you've also now given the

22  government a heads-up.  And that's useful, because rather than

23  detaining us, if Ms. Finocchiaro -- if I've mangled the name,

24  don't tell her.  But she now -- the government will now see

25  what it can do to make sure that she, in fact, is qualified to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1LVTEM3

1   say what the government hopes she -- what she needs to say to

2   get this in and, if not, it won't come in, we'll see.  But I'm

3   glad to have the notice; it will save us time in front of the

4   jury.

5           MR. GELFAND:  In that regard, your Honor, there's one

6   other --

7           THE COURT:  But let me just ask you, do you have any

8   reason to think, Mr. Gelfand, that the analysis will differ as

9   between 110, 111, and 112, or are we likely all in or all out

10  based on authentication?

11          MR. GELFAND:  Without knowing what she's going to say,

12  assuming they all come from the same databases and things like

13  that, no I think it would all be --

14          THE COURT:  May I ask you, is there a reason why the

15  parties have been unable to stipulate to this?  She's

16  testifying anyway, so it may not be a big deal; but it's within

17  the ambit of things that people often stipulate to.

18          MR. GELFAND:  Your Honor, we have gone back and forth

19  in terms of proposed written stipulations.  We spoke with

20  government counsel just before the Court took the bench, both

21  this morning and this afternoon.  We're going to speak again on

22  stipulations.  My anticipation is that we can reach

23  stipulations to the majority of bank records.

24          THE COURT:  Okay.

25          MR. GELFAND:  We don't want to waste anyone's time.

A-249

112

K1LVTEM3

1   The government doesn't want to waste anyone's name.  We

2   appreciate that.

3        THE COURT:  And, look, I don't know where this would

4   fit in, but -- and we'll see how much she can say.  It isn't

5   obvious to me that there is -- unless it's really disputed that

6   your client is the one who negotiated the checks, maybe it is,

7   it's not obvious to me that this is a big deal.

8        And so, again, your judgment, you're not obliged to

9   stipulate to anything, eight-plus years of doing this and

10  trials in a prior life tell me that juries are not happy about

11  lawyers in either direction fighting about nonevents.

12       So the question is really whether -- while you're at

13  liberty to insist on your rights that they lay every

14  foundation, the question is just whether it's worthwhile,

15  particularly if it turns out to be an unsuccessful effort and

16  the jury is like, Why did we go through that?

17       MR. GELFAND:  Yes, your Honor.

18       THE COURT:  Your choice, but I'm just saying.

19       MR. GELFAND:  I appreciate that.

20       Most juries hate record custodians, not personally,

21  but --

22       THE COURT:  We won't tell Ms. Finocchiaro that either.

23       MR. GELFAND:  The other exhibit doesn't relate to

24  authenticity.  There's exhibits -- I'm trying to find the

25  government's number, the "interview transcription" with --

K1LVTEM3

1          THE COURT:  You're looking for a government exhibit

2    number?

3          MR. GELFAND:  Yeah.

4          Your Honor, it's Government Exhibit 126 and 128.

5          THE COURT:  Yes, I wondered about these.

6          What are these?

7          MR. GELFAND:  Good question.

8          THE COURT:  Sorry, what's your application?

9          MR. GELFAND:  Our issue, your Honor, is that we are

10   not disputing that these came from the bank; in other words,

11   we're not being crazy.  But what appears here is that there are

12   multiple levels of hearsay that would not make it just readily

13   and easily admissible under just a general business --

14         THE COURT:  What does this reflect, just a call by

15   somebody affiliated with one of the customer accounts

16   claiming -- disputing a check and a charge?

17         MR. GELFAND:  It's unclear who the declarants are.  It

18   appears that Ilana Habibian -- we asked the government about

19   this yesterday by phone -- is a bank employee.

20         THE COURT:  Right.

21         MR. GELFAND:  Then there's reference to Benjamin

22   Soleimani, there's reference to Joseph Soleimani.  And it

23   appears to be kind of notes or a transcription of some sort of

24   question and answer.

25         THE COURT:  Right.

A-251

K1LVTEM3

1      And is the concern authentication or is the concern

2 that there are statements here that you would not want received

3 for the truth of the matter asserted because they are in the

4 nature of the customer denying permission?

5           Looks like the latter.

6           MR. GELFAND:  The latter, your Honor.

7      And to the extent -- this was done with a bank, as

8 opposed to with the government; so I don't think there's any

9 testimonial applications of the confrontation clause.

10           However, it appears that this is basically a way to

11 "back-door" on statements by someone that were actually written

12 down by someone else.

13           THE COURT:  Well, there are a couple of questions

14 here.  But one is authenticating these records; perhaps they

15 are easily authenticated as a business record or otherwise.

16           But then the issue is there is hearsay here to the

17 extent that the statements are taken for the truth of the

18 matter asserted.  The broad point is the customer seems to be

19 alerting the bank to a dispute about a charge.

20           Let me ask the government, by what means will these

21 come in, and for what purpose would they be coming in?

22           MR. BHATIA:  Your Honor, we believe that these would

23 come in through a JPMorgan Chase records custodian.  They could

24 also come in through -- I think they'd come in as a records

25 custodian.

K1LVTEM3

1          THE COURT:  All right.  So who's that?  Is that --

2          MR. BHATIA:  I think I have the name somewhere in my

3     records, but I don't recall the name right now.

4          THE COURT:  But that person would be called as a

5     witness?

6          MR. BHATIA:  They would be called as a witness.

7          THE COURT:  What are these records?  What's the

8     species of records?  How do we refer to these?

9          MR. BHATIA:  So these records are stored, as I

10    understand it, in the JPMorgan Chase loss system.  It's an

11    internal system that they have to record records like these

12    regarding, I think, fraud investigations.  But I believe it's

13    like a regularly kept --

14         THE COURT:  But it's a regularly kept log of customer

15    calls?

16         MR. BHATIA:  In this case it's a customer call, that's

17    right.

18         THE COURT:  All right.

19         So let's assume for argument's sake that your witness

20    is able to say, Here at JPMorgan we prepare a typed synopsis of

21    customer calls, and then we regularly maintain them in a

22    database.  That gets you through one level of hearsay, that

23    these words were said to JPMorgan Chase.  That doesn't get you

24    to the second level of hearsay, which is that what the customer

25    said to JPMorgan Chase can be taken for the truth of the matter

K1LVTEM3

1    asserted.

2              The customer could have also said that, you know,

3    Mr. Imperatore was the shooter on the grassy knoll; it doesn't

4    come in for the truth of the matter asserted.

5              The point is there's a second layer of hearsay here.

6    What do you propose to do about that?

7              (Counsel conferred)

8              MR. BHATIA:  So, your Honor, I think on one hand these

9    are statements -- we believe that these are statements of

10   Joseph Soleimani, one of the witnesses that we expect to call

11   at trial.

12             THE COURT:  Still is hearsay if it's for the truth of

13   the matter asserted, unless there's a hearsay exception.

14             MR. BHATIA:  So we think that's a prior consistent

15   statement.

16             THE COURT:  To rebut a charge of recent fabrication.

17             MR. BHATIA:  We believe that that's going to be one of

18   the -- that could be a line of attack regarding this witness.

19             THE COURT:  Well, let's see.  What's the date -- the

20   Soleimani call appears to be May 2nd, 2019.

21             MR. BHATIA:  That's right.

22             THE COURT:  And when does he go to the authorities?

23             MR. BHATIA:  This is the time when he reported to the

24   bank, at least, that he wanted this to be charged back.

25             THE COURT:  Okay.  And your theory is that this is a

A-254

K1LVTEM3

1    prior consistent statement to rebut a charge by the defense

2    that Mr. Soleimani, some time after this date -- only after

3    this date developed the theory that he -- that the charges were

4    unauthorized?

5            MR. BHATIA:  We believe that it might be argued that

6    Mr. Soleimani is only now saying that he never authorized these

7    checks.  And it's not a genuine belief that he wants these --

8    that he wasn't -- that these checks weren't authorized.  So we

9    believe that it might be challenged that this is a recent

10   fabrication.

11           THE COURT:  But if the defense's view is that all

12   along he's been fabricating it, and that he never authorized

13   it, and that whenever he started to say it, it was a

14   fabrication -- in other words, the idea of the charge -- the

15   exception with respect to prior consistent statements is that

16   there was some motive that developed in between to lie.

17           In this case, though, I'm not sure why that works.

18   The victims are the ones who catalyze the whole case, and they

19   apparently do so with a call like this.  So why is it that this

20   is really to rebut a charge of recent fabrication?  Is there

21   something that happens in between?

22           MR. BHATIA:  So, of course, we aren't exactly sure

23   what the defense's cross-examination and arguments might be.

24   But we also believe that under this rule, under -- I want to

25   pull up the right rule, it's 801(d)(1)(B), it's also

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1LVTEM3

1  appropriate to rehabilitate a declarant's credibility as a

2  witness when attacked on other grounds.

3          THE COURT:  Right.  Go ahead.

4          MR. BHATIA:  And so we believe that, in particular, if

5  the argument here is that this isn't a genuinely held belief,

6  then it's also relevant that Mr. Soleimani made the same claim

7  on a different date.

8          THE COURT:  Why is it important that these statements,

9  as opposed to Mr. Soleimani's testimony, come in for the truth

10 of the matter asserted?  They clearly come in for other

11 purposes.  They explain the bank's later conduct; they

12 essentially unspool the events in this case.  The issue is

13 solely for the truth of the matter asserted.  I'm assuming here

14 that a business records foundation comes in for the fact of the

15 complaint by Soleimani.  Presumably he's going to testify to

16 the same effect at trial, right?

17         MR. BHATIA:  That's right.

18         THE COURT:  So why does it matter if his earlier

19 statements to the bank come in for the truth of the matter

20 asserted as opposed to simply to reflect the fact that he first

21 made the claim at a particular date and then that's what caused

22 the bank to act?  What difference does it make?

23         MR. BHATIA:  I think it might affect the weight given

24 to the evidence by the jury.  I think we're entitled to say

25 that he made a true statement before, and he's making a true

K1LVTEM3

1    statement today that you can credit fully.  And I think we're

2    entitled to under 801.

3            THE COURT:  One possibility you're offering is

4    801(d)(1)(B)(i).  But that requires a recent fabrication or a

5    recent improper influence or motive in so testifying.  Again,

6    we'll see whether or not the testimony supplies that.

7            But the defense may simply be all along he was making

8    this up for the oldest motive known to man, he wanted more

9    money.  And it's not that there is something recent; it's just

10   that all along he's telling a falsehood that Teman didn't have

11   a right to create or negotiate these checks.  It's not that

12   something recent happened, he just -- he doesn't like the deal

13   he struck with Teman and he wants his money back.

14           That's one possibility.

15           I don't know whether you're going to get a recent

16   fabrication claim here as opposed to a wholesale, all along

17   fabrication claim here.

18           The other argument is to rehabilitate the declarant's

19   credibility as a witness when attacked on another ground.

20           What might that ground be that properly triggers this?

21           MR. BHATIA:  I think that other ground might be that

22   this is not a generally held belief, which is like what you've

23   referenced earlier, that he doesn't genuinely believe these

24   were unauthorized, but he's welshing on a deal.

25           So I think there his credibility is being attacked as

K1LVTEM3

1    sort of not giving truthful --

2            THE COURT:  On the grounds that he's been saying this

3    all along, in effect.

4            MR. BHATIA:  It is rehabilitative to say he's been

5    saying this all along.

6            THE COURT:  Or, I guess, the argument would be the

7    fact that he made the statement soon after getting the account

8    statement revealing the deduction or the charge is an indicator

9    that he meant what he said; he reacted quickly.

10           MR. BHATIA:  That's right.

11           THE COURT:  Defense counsel, for what it's worth, I

12   would think that it does tend to support the witness's

13   credibility to the extent that soon after receiving the account

14   statement with the disputed charge, he reacted to it in the way

15   that one would argue a person who felt that the charge was

16   bogus did.

17           So I'm happy to hear argument at the time, but

18   assuming authentication, I think that latter point supplies a

19   good reason to allow this to come in for the truth.  It's not

20   that it's recent fabrication; it's that it is credibility

21   enhancing that he made the statement soon after getting the

22   account statement.

23           MR. GELFAND:  Can I just clarify something and perhaps

24   a government proffer would help with this.

25           At first and second reading of this document, it was

121

K1LVTEM3

1    unclear to me whether the declarant was Benjamin Soleimani,

2    because there's a thing that says "authentication known

3    customer."

4            THE COURT:  Right.

5            MR. GELFAND:  And it actually occurs twice.  And then

6    it just says, Signer to contact Joseph Soleimani.  And then

7    it's unclear who's actually calling, at least from the face of

8    the record.

9            THE COURT:  Right.

10           Who is Benjamin Soleimani, government counsel?

11           MR. BHATIA:  Benjamin Soleimani and Joseph Soleimani

12   are the two principals of ABJ; they are brothers.

13           THE COURT:  Right.

14           MR. BHATIA:  We believe though that the declarant in

15   these records -- and this is what I expect the evidence will

16   show -- was Joseph Soleimani.

17           THE COURT:  It looks so.  Right.

18           MR. GELFAND:  Okay.

19           THE COURT:  Anything follow from that or just --

20           MR. GELFAND:  Obviously if it wasn't Joseph Soleimani,

21   and Benjamin Soleimani is not testifying.

22           THE COURT:  Right.  Understood.

23           Look, they are both principals of ABJ.  The thesis

24   here you are presumably suggesting is that ABJ made this up

25   after the fact.  And to the extent that ABJ gets the account

K1LVTEM3

1    statement and one of its principals calls fraud on it right

2    away is not irrelevant in formulating a judgment about whether

3    ABJ, through whichever principal, genuinely believed it never

4    agreed to this.

5         We'll see if it's authenticated.  But my instinct at

6    this point is that it likely does come in for the truth of the

7    matter asserted.  We'll see.

8         Appreciate your raising the issue early.

9         MR. GELFAND:  Understood.

10        There's one other brief issue.

11        Some of the government's more recent *Jencks* material

12   that's been disclosed in more recent discovery within the last

13   week or so includes statements by witnesses -- in particular,

14   bank-type witnesses, bank investigators, things like that --

15   that these were deemed to be "fraudulent" or fraud.  And I

16   would ask that those witnesses not opine in front of the jury

17   that something is or isn't fraud, because ultimately that's

18   what this trial is about.

19        THE COURT:  Why isn't the right answer for me to

20   just -- well, what would be the purpose of their saying that

21   government counsel -- in other words, how is that integral to

22   the narrative here?

23        MR. BHATIA:  I think it's important to show the steps

24   that different parties took in triggering the chargebacks in

25   question here.  We expect that -- as I think I've mentioned, we

A-260

K1LVTEM3

1     expect that one of the defenses might be the victims were just

2     looking out for themselves and were trying to get their money

3     back.  In fact, I think it will be shown that they went through

4     a process, and some of those process involves flagging

5     fraudulent activity.

6              THE COURT:  Wait a minute.

7          The fact that some munchkin at JPMorgan Chase

8     concludes that something is fraud doesn't make it so.  They

9     haven't done a full investigation.

10             Did anyone at JPMorgan Chase, for example, ever look

11    at any of the contracts between a Teman company and a customer?

12    Probably not.

13             MR. BHATIA:  They didn't, your Honor.

14             THE COURT:  Right.

15             So the real issue is if they use the label "fraud" in

16    the course of their work, the most important thing is that I

17    instruct the jury that whatever label JPMorgan Chase uses must

18    be disregarded by you as simply -- as anything other than

19    simply describing the internal label they put on it.  In the

20    end, it is for the jury to determine whether or not the

21    elements of the types of fraud here are established.  That's

22    the relevant point.

23             MR. BHATIA:  That's right.

24             THE COURT:  Defense counsel, the word "fraud" is all

25    over the case.  It's going to be in my voir dire.  So I'm not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-261

124

K1LVTEM3

1    sure it's quite like saying heroin or something.

2             So it seems to me that the fact that the bank made

3    that conclusion, which is presumably derivative of what the

4    customer told them, if anything, it gives you an opportunity --

5    it allows you to say, Did the customer tell you that there was

6    a contract, or whatever your cross would be.  But I think the

7    right answer is for you to ask me to give a limiting

8    instruction to the jury that whatever label the bank put on

9    this is of no moment.

10            MR. GELFAND:  We appreciate that.

11            We'll propose a limiting instruction.

12            THE COURT:  That's fine.

13            I'm certainly prepared to do one with or without

14   particular wording, but I think that's the right call.

15            It's hard, where the bank has a nomenclature for a

16   process like this to -- for me to police their grammar.  And

17   sometimes doing that suggests, when the word slips out, that

18   there's actually some importance to it.  So it seems to me the

19   defense's interest is better protected by my giving a firm

20   instruction rather than making it look like it's all that

21   radioactive.

22            MR. GELFAND:  I think that's fair.

23            Our concern, as I think the Court understands, is that

24   the jury goes back and says, Well, these seasoned bank

25   investigators say this is fraud; it must be bank fraud.

A-262

K1LVTEM3

1            THE COURT:  Look, that plays into your defense of a

2   rush to judgment, right?

3            MR. GELFAND:  Sure.

4            THE COURT:  You're then going to treat the bank as

5   synonymous with the government as having rushed to judgment and

6   not looked at the contract before making a decision.  So

7   another way to look at this is an opportunity for you.

8            MR. GELFAND:  Understood.

9            THE COURT:  All right.

10           Anything further?  Go ahead.  Yes.

11           MR. DiRUZZO:  I have one thing, Judge.

12           In thinking about the privilege issues, would the

13  Court be amenable for the parties submitting protective and a

14  clawback order?  Because obviously the privilege issues that

15  we're talking about are going to be waived.  But in the

16  production that the government is going to get, there very well

17  could be a straight email.  And I don't want unrelated civil

18  litigation --

19           THE COURT:  I see.

20           Let me just say this:  You want to make sure that in

21  litigating advice of counsel here, you're not waiving any more

22  than is necessary.

23           MR. DiRUZZO:  Correct.

24           THE COURT:  The parties can negotiate what they want

25  to negotiate.  I'm certainly not understanding your waiver with

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1LVTEM3

1    respect to this case as intending to waive as to any other

2    controversy.  But as it relates to potential civil litigation,

3    hypothetically, with the banks or whatnot, it's hard for me to

4    see how there isn't a waiver here that runs to this

5    controversy.  So I'm not --

6         MR. DiRUZZO:  To be a little more precise, Judge, I'm

7    worried about that Mr. Reinitz is going to divulge an email on

8    unrelated civil litigation that has nothing to do with bank

9    fraud, RCCs --

10        THE COURT:  I see.  You want to make sure that if

11   there's an overproduction here, you have a right to claw back

12   the document or at least make sure that a production of

13   privileged material on an exogenous subject isn't treated as a

14   waiver.

15        MR. DiRUZZO:  Exactly.

16        THE COURT:  All right.  I'm happy to just announce now

17   that you have the right -- if you act promptly -- to claw back

18   unrelated materials if they are produced in the course of your

19   forthcoming production of attorney-client materials.  But, as

20   with all issues with respect to errant productions, fortune

21   favors the well-prepared and the swift, meaning an attempt to

22   claw back a document is more likely to be respected if it's

23   done sooner rather than later.

24        MR. DiRUZZO:  Okay.  Understood.  Thank you, Judge.

25        THE COURT:  Does that give you the comfort you need?

K1LVTEM3

1           MR. DiRUZZO:  Yes, it does.

2           THE COURT:  Okay.  Very good.

3           Anything further from anyone?

4           MR. DiRUZZO:  No, Judge.

5           MR. BHATIA:  No, your Honor.

6           THE COURT:  All right.

7           I'll see you at 8:30.

8           And again, I expect an email, copying the other side,

9    to my chambers if there's anything of any consequence that you

10   intend to raise tomorrow morning.

11           Thank you.  See you at 8:30.

12           (Adjourned to January 22, 2020 at 8:30 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

K1M7TEM1 CORRECTED

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4              v.                        19 CR 696 (PAE)

 5    ARI TEMAN,

 6              Defendant.                JURY TRIAL

 7    ------------------------------x

 8                                        New York, N.Y.
                                          January 22, 2020
 9                                        8:30 a.m.

10
      Before:
11
                       HON. PAUL A. ENGELMAYER,
12
                                          District Judge
13

14                          APPEARANCES

15
      GEOFFREY S. BERMAN,
16         United States Attorney for the
           Southern District of New York
17    KEDAR S. BHATIA
      EDWARD A. IMPERATORE
18         Assistant United States Attorneys

19    JOSEPH A. DiRUZZO, III
      JUSTIN GELFAND
20         Attorneys for Defendant

21    ALSO PRESENT:  DANIEL ALESSANDRINO, NYPD
                     WILLIAM MAGLIOCCO, Paralegal, USAO
22

23

24

25
```

A-266

K1M7TEM1  CORRECTED

1              (In open court)

2              THE COURT:  All right.  Good morning, counsel.  Be

3     seated.

4              Thank you, everyone, for the hard overnight work.  Oh,

5     Mr. Teman is not here.

6              MR. GELFAND:  He just went to the restroom.

7              THE COURT:  All right.  Do you waive his appearance?

8     We've got business to take care of.  He really needs to be in

9     his seat.

10             MR. GELFAND:  Absolutely.

11             THE COURT:  There are a handful of issues that came in

12    overnight.  Before turning to the two specific issues raised by

13    the government's letters, let me just take care of one item

14    which should be self explanatory and obvious, but I want to

15    make absolutely sure there is no misapprehension among counsel.

16             Defense counsel, there are a handful of subjects that

17    obviously should not be properly included in a defense opening

18    here, but insofar as you're out of district and we have had a

19    hiccup or two, I want to make absolutely sure that the Court's

20    pretrial rulings are not to be commented on in an opening; the

21    defendant spending time in jail after his arrest is not

22    properly part of an opening; the speedy trial violation that

23    the court found is not properly part of an opening; good

24    character evidence, you know, per the commentary before doesn't

25    belong in the opening.  I don't know if you're planning to say

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1M7TEM1  CORRECTED

1    something about whether Mr. Teman does or doesn't have a

2    criminal record, but I don't know whether that's going to be

3    coming into evidence somehow or on what theory, but unless

4    you've got a coherent theory under which that's going to be

5    received in evidence, it shouldn't be commented upon.  All

6    agree?

7          MR. DIRUZZO:  Yes, your Honor.  I will be giving

8    opening, and I understand what you said, and it's not a

9    problem.

10          THE COURT:  Great.  I just want to make sure you're

11   sticking to the facts and the issues here and not courting

12   objections.  I don't like objections during an opening, but if

13   there is something that's well over the line, I will sustain

14   it, and that doesn't ever make anybody happy.

15          So I have received two letters from the government.

16   One I think is quite straightforward, which just involves a

17   specific exhibit from Bank of America's records, exhibit 34.

18          Defense, were you actually offering this document?

19   The government's letter at docket 84 raises the issue of

20   whether Defense Exhibit 34 -- which appears to involve some

21   other customer -- is being offered.  Obviously you haven't had

22   a chance to respond.  I can't imagine what the theory of

23   relevance would be.

24          MR. DIRUZZO:  Your Honor, our theory is that it goes

25   to Mr. Teman's intent, because this is another RCC with the

K1M7TEM1  CORRECTED

 1    same language, drop our contract, no signature required, in the

 2    bottom right-hand side.  It was drawn on Signature Bank, one of

 3    the banks that I believe --

 4          THE COURT:  Why does it go to his state of mind that

 5    he engaged in the same conduct?  It doesn't mean that it's

 6    legal or illegal.  It could be ripping off the other customer

 7    or not, but it just means he did the same thing.  I mean it's

 8    not like somebody advised him at the bank, yeah, this is a

 9    great thing to do, and you must have gotten the customer's

10    permission.

11          MR. DIRUZZO:  No, but it goes towards his concept that

12    RCCs are permissible under the law.

13          THE COURT:  One moment.

14          Mr. Teman, you need to be in your seat at 8:30.  Your

15    counsel waived your appearance so I could proceed, but you need

16    to be here.

17          Go ahead.

18          MR. DIRUZZO:  It goes towards his belief that RCCs

19    were permissible under the law, there is nothing nefarious or

20    improper with an RCC.

21          THE COURT:  Wait.  Because he has a check that he

22    deposits as an RCC to some other customer doesn't go to his

23    belief.  It doesn't make it more likely that he believes that

24    these are legal or illegal.  It could be that he ripped off

25    another customer, or it could be that another customer gave him

A-269

K1M7TEM1 CORRECTED

1   authorization that these customers did not.  We're not going to

2   try the case of Gold Management.

3          First of all, it should have been obvious under the

4   principles that I set out earlier in response to the

5   government's motion in limine that quote unquote good character

6   evidence, specific instances, are not admissible.  But beyond

7   that, this invites a trial within a trial because who knows

8   what the course of dealings were with this other customer who

9   is not the subject of an indictment.  The dealings with Gold

10  may or may not situate Gold in a different position from the

11  landlords who are entities 1, 2, 3 and 4, and so whatever he

12  did or didn't do with respect to Gold, A, it appears to be in

13  the nature of quote unquote good character evidence; but, B,

14  beyond that would only be potentially germane if the fact

15  pattern was on all fours with the other customers.  And we're

16  not going to have a trial within a trial about his business

17  relationship involving a customer who is not a subject of the

18  charges here.

19          MR. DIRUZZO:  I understand, your Honor, and I

20  understand your ruling, and I would just submit that you take

21  Defense Exhibit 34 as our offer of proof.

22          THE COURT:  Very good.  So, Exhibit 34 is out; I will

23  grant the government's motion at docket 84.

24          All right.  The second issue involves the scope of the

25  waiver.  As expressed yesterday, the defendant in order to

K1M7TEM1   CORRECTED

1    facilitate his advice of counsel defense, made a subject matter

2    waiver scope with respect to lawyer Reinitz with respect to

3    advice and communications with Reinitz with respect to the

4    issues in this case, i.e., involving the use of RCCs and the

5    like.  The government raises the issue of whether the defense

6    intends to assert a temporal limit to that waiver, with the

7    limit being the date of the defendant's arrest.  The government

8    notes that at least for some period of time Mr. Reinitz appears

9    to have represented the defendant in connection with the

10   initial proceedings in this case.

11            So, let me ask the defense a few factual questions.

12   When, if at all, did Mr. Teman terminate the representation of

13   himself or his companies by Mr. Reinitz?  Or does that

14   representation continue to this day?

15            MR. GELFAND:  It continues to this day, your Honor.

16            THE COURT:  So Mr. Reinitz continues to represent the

17   defendant and his companies?

18            MR. GELFAND:  Yes, your Honor.

19            THE COURT:  In a business way.

20            MR. GELFAND:  Yes, your Honor.

21            THE COURT:  And when, if at all, did Mr. Reinitz

22   represent the defendant in connection with the criminal case?

23            MR. GELFAND:  Your Honor, when Mr. Teman was arrested

24   out of state, my understanding is Mr. Teman advised the

25   authorities arresting him, you know, Mr. Reinitz is my lawyer.

A-271

K1M7TEM1   CORRECTED

1    He didn't have a reason to believe he needed a criminal defense

2    lawyer at the time.  He didn't have a criminal defense lawyer

3    at the time.

4              THE COURT:  Well, he obviously needed a criminal

5    defense attorney if he was arrested.  You're simply saying he

6    didn't have one yet.

7              MR. GELFAND:  The arrest was a surprise to Mr. Teman.

8              THE COURT:  Right.  But once he's arrested he needs a

9    criminal defense lawyer.

10             MR. GELFAND:  No, of course, your Honor.  But I'm

11   saying it's not like he had someone lined up prior to.

12             THE COURT:  So what happens?

13             MR. GELFAND:  So, as I understand it -- I wasn't

14   involved in the case at the time -- Mr. Reinitz makes initial

15   contact with Detective Alessandrino, who ultimately gives him

16   the prior assistant U.S. attorney's name and contact info,

17   Mr. Gutwillig, and there is some very early conversations of

18   essentially where is he, what's the charge, what is the

19   charging document, and then Mr. Reinitz works to facilitate

20   getting Mr. Teman criminal counsel initially in Florida for the

21   initial matters, and ultimately here, ultimately culminating in

22   Mr. Teman retaining Mr. DiRuzzo and I initially.

23             THE COURT:  You two are the next lawyers in after

24   Mr. Reinitz?

25             MR. GELFAND:  We're the next lawyers to formally

K1M7TEM1 CORRECTED

1    represent Mr. Teman.  Mr. Reinitz facilitated or participated

2    in some discussions with other potential lawyers.

3            THE COURT:  Understood, right.  And then the issue and

4    to what degree did Mr. Reinitz participate formally or

5    informally in the representation of Mr. Teman in connection

6    with this matter by which I mean the arrest forward?

7            MR. GELFAND:  Your Honor, can I have one minute,

8    please?

9            THE COURT:  Sure.  I would -- sure.

10           MR. BHATIA:  Your Honor?

11           MR. GELFAND:  Your Honor, my understanding is that

12   Mr. Reinitz did not represent Mr. Teman in the criminal matter,

13   but as essentially civil counsel or corporate counsel

14   Mr. Reinitz was involved -- including with us -- on certain

15   discussions relevant to diligence, about possible defenses,

16   understanding the underlying facts, things like that.

17           THE COURT:  Well, that complicates things then because

18   for obvious reasons.  I mean he is a fact -- you obviously

19   would like to use him as a fact witness.  You can't have this

20   as a sword and a shield.  His communications with Mr. Teman

21   relating to this subject matter are fair game.  You can't be

22   drawing lines within that.

23           MR. GELFAND:  We agree, your Honor.  The issue is

24   the -- I think there is a very --

25           THE COURT:  I mean he continues to represent the Teman

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1M7TEM1   CORRECTED

 1    companies to this day and Mr. Teman in a business level.

 2              MR. GELFAND:  Yes, your Honor.

 3              THE COURT:  So, is there anything -- I appreciate that

 4    communications about the terms of bail are separate; that's a

 5    different subject matter.  Communications that don't relate to

 6    the business practices at issue are a different story, but the

 7    waiver here relates to the business practices at issue.  You

 8    aren't trying to limit any inquiry about that by time, are you?

 9              MR. GELFAND:  No, your Honor.  What we are limiting,

10    to be very precise, is communications that are not about

11    essentially reliance on the contracts, the RCCs, the subject

12    matter related to these entities, but that are about you may

13    want to hire this lawyer, you may want to hire this lawyer.

14              THE COURT:  There may not be a controversy here.  If

15    what you're saying is Mr. Reinitz provided advice -- whether we

16    call it legal or business -- he has provided advice about the

17    retention of counsel or things like that, that's outside of the

18    scope of a waiver because it's a different subject matter.  But

19    to the extent that Mr. Reinitz spoke with Mr. Teman at any

20    point before or after last July 3 relating to RCCs, checks, his

21    dealings with entities 1 through 4, those subjects are fair

22    game for inquiry given the waiver.

23              MR. GELFAND:  We don't disagree, your Honor.

24              THE COURT:  OK.  So I think that moots the

25    government's motion.  In other words, you are not in fact

A-274

K1M7TEM1 CORRECTED

1    drawing a temporal limit within the subject matter, to wit, Mr.

2    Teman's business dealings with entities 1 through 4, his RCCs,

3    the check, creation and negotiating practices at issue both

4    historically and going forward.  That's within the scope of the

5    waiver.  What you want to make sure is that the government

6    doesn't get into issues involving, for example, the selection

7    of legal representatives or the negotiation of bail terms or

8    the like, or consideration of a guilty plea or not.

9              MR. GELFAND:  Correct, your Honor.

10             THE COURT:  Have I articulated the line correctly?

11             MR. GELFAND:  Yes, your Honor.  And, to be clear,

12   we -- what teed up this issue was actually not the defense's

13   approach to the Court's order yesterday, but was a separate

14   subpoena that the government issued to Mr. Reinitz last night.

15   And there was a second draft of it, as I understand it.

16   Mr. Reinitz sent us a copy of the subpoena, the trial subpoena.

17   The subpoena added -- initially it was for all intents and

18   purposes, essentially the scope of the Court's order with a

19   couple extra things of dates -- records of dates when he spoke

20   with Mr. Teman, things that I'm sure Mr. Reinitz will respond

21   to.  The additional aspect was any communications that

22   Mr. Reinitz had with Mr. Teman about the complaint or the

23   indictment, and that involves communications that we believe

24   are outside the limited waiver.

25             THE COURT:  Well, the answer is it may include some,

K1M7TEM1  CORRECTED

1   but it may include ones that are within the scope of the

2   waiver.  If Mr. Reinitz and Mr. Teman spoke about the business

3   practices that are implicated by the complaint, that's clearly

4   within the scope of the waiver, correct?

5           MR. GELFAND:  Yes, your Honor.

6           THE COURT:  Whereas if they spoke about the

7   implications of being a federal felon, or being arrested, or

8   having an ankle bracelet, or a particular cosigner, or the

9   terms of engagement of a criminal defense specialist, that's

10  outside the scope of the waiver.

11          MR. GELFAND:  That's our theory.

12          THE COURT:  But you would agree that conversations he

13  had with Mr. Teman about the conduct at issue, including Mr.

14  Teman's dealings with the four entities, the charged conduct,

15  regardless of the date and time of those communications, are

16  within the scope of the subject matter waiver.

17          MR. GELFAND:  Yes, your Honor.

18          THE COURT:  OK.  Government, have we cleared up the

19  issue?  Is there some scenario that you think has been left

20  blurry?

21          MR. BHATIA:  I think your Honor has covered most of

22  it.  I just want to be clear just so there isn't some confusion

23  down the road.  It is our view that a conversation like

24  regarding the indictment -- in Count One we charged certain

25  checks, you told me in Count One -- I think -- let me rephrase

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1M7TEM1 CORRECTED

1    that.  Conversations regarding the complaint or the indictment

2    and the substance of it I think would still be covered by the

3    waiver.

4            THE COURT:  Well, the substance of it certainly, but

5    the legal implications from a criminal defense perspective of,

6    let's say, pleading guilty, or going to trial, or who to hire,

7    that's a different story.  And so I think the line here

8    involves if they are looking back retrospectively about the

9    conduct at issue and discussing that, Mr. Gelfand is candidly

10   saying that's within the scope of the waiver -- and he is

11   nodding now.  And, similarly, if they continue to discuss these

12   business practices going forward -- for whatever relevance that

13   theoretically might have or not -- that's within the scope of

14   the waiver; it's a subject matter waiver.

15           But Mr. Teman -- presumably not knowing any other

16   lawyer -- got his business lawyer involved in the early process

17   of staffing his case, and although presumably Mr. Reinitz knows

18   little about criminal law, he knew enough to work the phone and

19   try to spot talent.  That hunt for a legal team doesn't seem to

20   me to be within the scope -- and I don't think you're saying

21   otherwise -- even though one can imagine conversations about

22   the complaint influencing that:  Who is a good white collar

23   lawyer?  Who has had experience with bank fraud?  In that

24   respect it's glancingly touching the complaint, but it's

25   clearly not what any of us understand to be the scope of the

K1M7TEM1   CORRECTED

1    waiver.  Do you agree with that?

2             MR. BHATIA:  I agree with part of what you said, that

3    I would call it maybe the administrative part of finding a good

4    lawyer, negotiating terms of engagement wouldn't be covered.

5    In fact I'm not sure that would be relevant to this case

6    anyway.

7             But conversations about should I take a guilty plea or

8    should I not take a guilty plea to the conduct that you

9    previously advised me about, I do think would be covered.  What

10   I want to make clear is that it is the government's position

11   that --

12            THE COURT:  Let's see if this is an academic issue or

13   not.

14            Defense counsel, without giving me the content -- if

15   we need to go into the robing room for an in camera discussion,

16   we will -- can you tell me declaratively now whether Mr. Teman

17   had any discussions with Mr. Reinitz at any point about whether

18   or not to take a plea in this case?

19            MR. GELFAND:  Based on my client's recollection and

20   everything I know about the case, never.

21            THE COURT:  Did Mr. Reinitz continue to be any part of

22   the defense group here after present counsel were retained?

23   Did he assist in any way in shaping the representation of Mr.

24   Teman in this case?  If so, we have an issue.

25            MR. GELFAND:  No, your Honor, but I want to caveat

K1M7TEM1 CORRECTED

1    that with one small caveat, and that's at various times

2    Mr. Reinitz directly provided us information, documents, no

3    different from any other witness.

4               THE COURT:  But that's in his capacity as a fact

5    witness as to advice of counsel.  But did he play any role in

6    shaping the defense in this case?  You would not be asserting

7    an attorney/client privilege based on a common interest

8    communication.  The privilege you have is the waived one, here

9    involving your communications with a fact witness, and you have

10   now waived a privilege as to that.  Do I have that right?

11              MR. GELFAND:  You do, your Honor.  He did not

12   participate in any way other than as a fact witness.  And, to

13   be precise, some communications, Mr. Reinitz in the ordinary

14   course of his practice may have used phrases like "privileged"

15   and "confidential" in giving them to us, but I don't draw any

16   significance to that in our analysis.

17              THE COURT:  You are not claiming he has ever been part

18   of the defense team of this case.

19              MR. GELFAND:  No, your Honor.

20              THE COURT:  And when was the first of you or

21   Mr. Gelfand retained in this case?

22              MR. GELFAND:  I am Mr. Gelfand.

23              THE COURT:  Forgive me.  When was the first of you and

24   Mr. DiRuzzo retained in this case?

25              MR. GELFAND:  Very soon after Mr. Teman was released

A-279

K1M7TEM1  CORRECTED

1    on bond in Florida.

2            THE COURT:  So late in the first half of July, July 8,

3    9 or 10.

4            MR. GELFAND:  Yes, your Honor.  As a technical matter

5    maybe just a week or two later.

6            THE COURT:  But you are saying from the point in which

7    you were retained forward, the only communications you have

8    had -- speaking now about you and Mr. DiRuzzo -- with

9    Mr. Reinitz bear on in effect his role as a fact witness as

10   opposed to shaping the criminal defense effort here.

11           MR. GELFAND:  Yes, again with one caveat, and that's

12   there is some related civil -- not related at all -- unrelated

13   civil issues, and Mr. Reinitz in representing Mr. Teman or his

14   companies in those completely unrelated matters at various

15   times inquired about whether or not certain things might have

16   an impact on the criminal case.

17           THE COURT:  What are the unrelated matters?

18           MR. GELFAND:  There is a civil litigation involving a

19   company called MVI.  It's a dispute over a rival intercom

20   system.

21           THE COURT:  So that's a competitor dispute, not a

22   dispute with a customer.

23           MR. GELFAND:  Correct.  It's a trade secret case, as I

24   understand it.

25           THE COURT:  So, I understand Mr. Reinitz I gather

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-280

K1M7TEM1  CORRECTED

1    represents Mr. Teman in connection with competitor disputes.

2            MR. GELFAND:  Yes, your Honor.

3            THE COURT:  And the reason that became a germane

4    subject with the criminal defense team here -- again be

5    careful, I don't want you to inadvertently comprise unrelated

6    legal interests of Mr. Teman.  I just want to make sure that

7    I'm setting clear ground rules.  Can you explain what led that

8    to be a germane subject for you?

9            MR. GELFAND:  Yes, your Honor.  Generally, not limited

10   to that matter, but matters completely unrelated to the

11   entities in this case, and to the RCCs or anything like that,

12   as with any ongoing litigation there was some general

13   discussion, matter of, you know -- I am going to phrase this

14   broadly -- but if we do something in the civil case, could that

15   have a negative impact on the other case.

16           THE COURT:  Right.

17           MR. GELFAND:  As a practical matter, just to be clear

18   with the Court, Mr. Reinitz -- when we got involved in the

19   case -- me being Mr. Justin Gelfand -- I went to college with

20   Mr. Teman.  That's how I know Mr. Teman.

21           THE COURT:  What college?

22           MR. GELFAND:  Brandeis University.  As a practical

23   matter we were certainly not in touch on a daily basis or

24   anything like that from college, but Mr. Teman with Mr. Reinitz

25   initially retained counsel that I don't know who represented

K1M7TEM1 CORRECTED

```
 1   him in the bond hearings and things like that.

 2                THE COURT:  In Florida.

 3                MR. GELFAND:  In Florida.  And Eric Irons in another

 4   attorney who played a minimal role in the very early stages of

 5   the criminal case.  There are some communications that I am

 6   aware of between Mr. Reinitz and those two attorneys.  Then Mr.

 7   Teman reached out directly to me.

 8                THE COURT:  Right.

 9                MR. GELFAND:  And doing my diligence I had some

10   initial conversations with Mr. Reinitz, who I understood had

11   been in very broad strokes essentially quote unquote corporate

12   counsel quite some time, to obviously do my diligence, educate

13   myself about the case.  And understanding all those things,

14   there are some early communications between Mr. Reinitz and his

15   other attorneys that preceded my involvement in the case that

16   we are aware of, and then there is communications from the time

17   I got involved.

18                I mean candidly, your Honor, the nature -- and I am

19   happy to speak in very general terms -- the nature of the

20   conversations about what I'm calling the unrelated litigation

21   fell into the category of, to be blunt, generally if a

22   defendant facing criminal charges, you know, can avoid being

23   put under oath, that's a good thing.

24                THE COURT:  I see.  In other words, the concern -- for

25   example, in those cases there is an interplay, because if Mr.
```

K1M7TEM1  CORRECTED

 1   Teman is deposed in those cases he may say something, he may be

 2   questioned about the pending criminal case here.  If he invokes

 3   his Fifth Amendment privileges in that case, that may hurt him

 4   in that case in order to protect him here, and so somebody was

 5   mediating the relationship between his interests in the two

 6   cases.

 7        MR. GELFAND:  Yes, your Honor.  And there were

 8   discussions that were not fact witness discussions but

 9   lawyer-to-lawyer discussions in that vein.

10        THE COURT:  I think we have gotten to a point where

11   there ought to be clarity here.  Mr. Gelfand, as always, you

12   have been gracious and clear.

13        I want to make sure, government, that at this point

14   there is clarity, and it seems to me that what you are seeking

15   you have gotten that which is reasonable, which is to say that

16   the subject matter of the conduct here -- regardless of time

17   scope -- is covered by the waiver as to the Teman/Reinitz

18   communication, but there may be a limited subset of

19   Reinitz/Teman conversations that are out of bounds, what you

20   call the administrative or bail subjects, or advice about, for

21   example, the interplay between this action and other

22   litigations that Reinitz represents Teman on.  I don't think

23   that's really in play here.

24        Do you need any more clarity from the court?

25        MR. BHATIA:  Can I just have a moment to confer with

K1M7TEM1  CORRECTED

1      defense counsel for a moment?

2              THE COURT:  Yes, you may.

3              OK, counsel have conferred with each other and amongst

4      themselves.  Mr. Bhatia, anything further?

5              MR. BHATIA:  Yes, thank you, Judge Engelmayer.

6      Apologies for the delay.

7              THE COURT:  No worries.

8              MR. BHATIA:  I spoke to defense counsel.  I was

9      prompted to have this conversation because as part of the

10     discovery of the conversations involving Mr. Reinitz we

11     received this morning one draft of a letter dated January 22

12     from Mr. Reinitz and then another draft --

13             THE COURT:  January 22 this year.

14             MR. BHATIA:  That's today.  We received a letter dated

15     today from Mr. Reinitz sent to defense counsel, and then we

16     received a second version of that letter, a final draft maybe.

17     We wanted to make sure that there weren't conversations that

18     would say make version one look like version two.  Defense

19     counsel has represented that there weren't those

20     communications.  But we think conversations like that would be

21     fair game to get into.

22             THE COURT:  It depends on the context.  If they're

23     taking about baseball, that's one thing.  If they are talking

24     about the implications of a different civil litigation on this,

25     that's also out of bounds.  If they are talking about the

K1M7TEM1  CORRECTED

1   content of the charges in this case or the business practices

2   at issue, things like that, that's within the scope.  Think

3   we've covered that.

4        MR. BHATIA:  I think it does have to do with the scope

5   here, so I think those would be germane, and they would be fair

6   for us to get into and then be subject to the waiver.  So I

7   think at this point, without more specifics about what exact

8   areas we would get into, I think we are all on the same page.

9        THE COURT:  My goal with all of these rulings is to

10  let counsel try their case without interruption in front of the

11  jury by me.  I want you to have clarity as to the ground rules

12  so we fight it out beforehand with enough notice so that you

13  can organize your courtroom advocacy.

14       Have we achieved the necessary clarity as to the

15  advice of counsel issue?

16       MR. BHATIA:  I think so.

17       THE COURT:  All right.

18       Look, given the sensitivity of counsel issues --

19  although as a general matter I love to have issues addressed

20  other than at side bars when at all possible -- as the trial

21  moves on, if we see that you're in an area where you have any

22  sense that there could be anything ticklish, you may ask for a

23  sidebar about that, and I will be solicitous of that,

24  particularly where it involves Mr. Reinitz, because I want to

25  make sure in areas involving attorney/client and waiver that we

Case 21-1920, Document 80, 05/25/2022, 3321484, Page61 of 256

K1M7TEM1  CORRECTED

 1    don't inadvertently have something coming up in front of the

 2    jury that was outside the scope of the waiver.  But I think you

 3    have the necessary clarity.

 4            I understood the main spirit of your letter to be

 5    resisting the idea of a temporal sunset on the waiver -- on the

 6    subject matter waiver -- and you have gotten clarity both from

 7    me and from Mr. Gelfand that there is no temporal sunset on the

 8    subject matter waiver.

 9            MR. BHATIA:  Thank you.

10            THE COURT:  All right.  I think we have now taken care

11    of the matters that were the subject of letters.

12            Beginning with the government -- I would like to give

13    you a break before the jury comes -- does anyone have anything

14    else to raise begin with the government?

15            MR. BHATIA:  No, your Honor.

16            THE COURT:  Mr. DiRuzzo?

17            MR. DIRUZZO:  Yes, your Honor.  Just so it's clear and

18    for purposes of the record.

19            THE COURT:  Sorry, just a little clearer.  This is an

20    old and wonderful but a fun house of a courtroom, so please

21    always speak loudly and into the mics.

22            MR. DIRUZZO:  Sure.  So, your Honor, in complying with

23    this Court's order, we do have a binder of the privileged

24    information to give to you.

25            THE COURT:  These are the materials that were given to

K1M7TEM1 CORRECTED

 1    the government, right?  I'm not getting something that the

 2    government doesn't already have.

 3              MR. DIRUZZO:  Correct, your Honor.

 4              Your Honor, last night -- yesterday asked for

 5    materials both in paper and electronically.  I provided to your

 6    chambers the documents electronically.  I also provided those

 7    same documents to the government electronically.  The problem

 8    that I have with this binder is this binder, the paper, is

 9    incomplete.  There are a couple tranches that got to both your

10    chambers and the government 2 o'clock in the morning, and as

11    you can imagine --

12              THE COURT:  All is forgiven; I appreciate that.

13    That's fine.  So, can you just top it up so that by tomorrow

14    morning I have whatever the balance is?

15              MR. DIRUZZO:  Sure.  I will give it to you all at one

16    time.

17              THE COURT:  Well, why don't you give me what you have,

18    give it to my law clerk.  I don't know that any of it is likely

19    to be germane today, but I try to keep ahead of things so that

20    to the extent I can flip through it, it just gives me more

21    insight into the case, and I will take the balance when you get

22    it.

23              MR. DIRUZZO:  Counsel for the government did mention

24    those letters.

25              THE COURT:  Those letters?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1M7TEM1  CORRECTED

1              MR. DIRUZZO:  The letters from Mr. Reinitz that are

2      dated today.

3              THE COURT:  Right.

4              MR. DIRUZZO:  The first letter I received at

5      approximately 2:15 in the morning.  I immediately included that

6      in the production electronically to chambers, because I was

7      having a problem with the USA FX, my log-in.  I was using

8      cocounsel's long-in who was asleep at the time.  I was unable

9      to upload them to the government.  In the morning I uploaded

10     them, but I also had received from Mr. Reinitz an updated, a

11     final version, so to speak, of the letter, and that's why there

12     are two letters dated the same that look very similar but are

13     not.  Just so it's clear, between 2 o'clock in the morning and

14     6:15 or so neither myself or Mr. Gelfand had any conversations

15     with Mr. Reinitz.

16             THE COURT:  I am relieved to hear that, that's good.

17             MR. DIRUZZO:  So if there was any confusion as to

18     these documents.

19             THE COURT:  No, I didn't infer anything nefarious, but

20     I appreciate the clarity.

21             Anything else from the defense?

22             MR. GELFAND:  No, your Honor.

23             THE COURT:  Let me check with Mr. Smallman.

24             Go ahead, Mr. Bhatia.

25             MR. BHATIA:  One more thing.  I just want to note for

K1M7TEM1   CORRECTED

1    the record that in reviewing some of the documents produced

2    yesterday by the defense I did identify some documents that I

3    think might remain privileged and might not be part of the

4    waiver in this case, so I just want to note for the record I

5    alerted defense counsel this morning.

6              THE COURT:  That's professional and good for you to do

7    that.  Defense counsel raised the possibility of a claw back.

8    Particularly given the warp speed this has arisen, it's not

9    surprising.  And I appreciate your professionalism in spotting

10   the issue, alerting the defense and alerting the Court.

11             If no one else has anything, let me just check with

12   Mr. Smallman about the earliest possible time that our venire

13   could get here.

14             Mr. Smallman estimates that we won't have anybody

15   before 9:45.  So, you are, as we say in Fourth Amendment law,

16   free to leave until 9:40.  I will be apt to be here any time

17   from 9:40 or thereafter, depending on what I hear from Mr.

18   Smallman and the jury clerk.  Thank you.

19             (Recess)

20             (Continued on next page)

21

22

23

24

25

K1MVTEM2

1            THE COURT:  Mr. Smallman tells me that the venire is

2    here; he's just waiting for one or two of them to finish

3    comfort break and then we'll bring them in.

4            I'm joined on the bench by Judge Lewis Liman, who is

5    new to the S.D.N.Y. and will be sitting here for whatever

6    guidance he can get from watching a jury selection.  I'll

7    introduce him to the jury as such, but he'll be here for jury

8    selection, but not the balance of the trial.

9            MR. BHATIA:  Your Honor?

10            THE COURT:  Yes.

11            MR. BHATIA:  We can just discuss one matter before the

12    jury comes here.

13            We agreed to a bank records stipulation, and I just

14    wanted to let the Court know about that.  And we'll read that

15    out -- I expect to read that out with the first witness.

16            THE COURT:  Very good.

17            MR. BHATIA:  Is a Bank of America representative.

18            THE COURT:  Very good.

19            Just to remind you, just given the old courtroom, just

20    speak a little louder.

21            MR. BHATIA:  Excuse me.

22            THE COURT:  Thank you.

23            I think I mentioned this at an earlier pretrial

24    conference, but each day I value getting an updated exhibit

25    list with a mark annotating what's been received and through

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1MVTEM2

1    what witness.  So make sure that's added to the list.

2             MR. BHATIA:  We will.

3             THE COURT:  Okay.  Mr. Gelfand.

4             MR. GELFAND:  Your Honor, I just wanted to note for

5    the record that on behalf of Mr. Teman, as his legal counsel,

6    we signed the stipulation.  He's well aware of it.  He fully

7    agrees with it.

8             THE COURT:  Very good.  Thank you.

9             (Jury selection commenced)

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K1M7TEM3

```
 1              (A jury was selected and sworn)

 2              THE COURT:  All right.  Counsel is there anything to

 3    raise while we have this break?

 4              MR. DIRUZZO:  Yes, your Honor.  The defense would

 5    invoke the rule of sequestration.

 6              THE COURT:  What does that mean?

 7              MR. DIRUZZO:  That means that when a potential witness

 8    has yet to testify, that they can't sit in the room to hear

 9    other witnesses, or opening statements, or something of that

10    nature.

11              THE COURT:  I have not heard it referred to as that,

12    but you're invoking your rights under Rule 615.

13              MR. DIRUZZO:  Yes.

14              THE COURT:  Very good.  Government, are there any -- I

15    take it, Detective Alessandrino as a party agent is permitted

16    under 615 to be at the table.

17              MR. BHATIA:  That's right.

18              THE COURT:  But the other witnesses you have will in

19    fact have been sent from the courtroom during other testimony.

20              MR. BHATIA:  That's right.

21              THE COURT:  And I assume you are making the same

22    application with respect to the defense.

23              MR. BHATIA:  Yes.

24              THE COURT:  Very good, I am happy to grant that.  It's

25    not the nomenclature I ordinarily around here but the concept
```

K1M7TEM3

1    of course equally applies.

2              Anything else to raise with me?  No, Judge.

3              THE COURT:  Government?

4              MR. BHATIA:  Your Honor, briefly, we have learned that

5    in the last few days the defendant has make public statements

6    on social media -- various social media platforms -- about this

7    case.

8              THE COURT:  What comments has he made?

9              MR. BHATIA:  He made a comment I think about how he is

10   going to come here and beat the United States government, and

11   something about eating the government's case for lunch and

12   stuff like that.

13             THE COURT:  Do you have an application?

14             MR. BHATIA:  Yes, we would request that the Court ask

15   the defendant not to make public comments on social media about

16   the case during the pendency of the trial.

17             THE COURT:  Defense?

18             MR. BHATIA:  I'm sorry.  And to take down the comments

19   that have been posted.

20             THE COURT:  Defense?

21             MR. GELFAND:  We have no objection to that.

22             THE COURT:  Look, I didn't think to order it because

23   it struck me as obviously inappropriate for the defendant or

24   his lawyers to be making statements about the case on social

25   media.  Please take those down forthwith, and please do not

K1M7TEM3

1    continue to advocate your position on social media about the

2    case.  The case will be tried in the courtroom.

3           OK.  I mean any time, Mr. Teman, you do that you

4    create a risk that somebody who is not abiding by my rules will

5    stumble upon your statements.  It may be to your benefit, it

6    may be to your detriment, but certainly it's to the detriment

7    of the system of justice, anything which will give weight to

8    something that's being said about the case out of court.  The

9    government I'm sure is independently heeding that admonition,

10   but it's important that the case be tried in the courtroom

11   only.  All right, thank you.  And defense, I understand you

12   too consent to that.

13           MR. GELFAND:  Yes, your Honor.

14           THE COURT:  Let me ask, government, after we have the

15   opening statements, who will your first witness be?

16           MR. BHATIA:  The government's first witness will be

17   Karen Finocchiaro.  She is the investigator from Bank of

18   America.

19           THE COURT:  OK.  And I have of course two limiting

20   instructions that I have read to you and you are all fine with.

21   One of them involving the check stock is clearly not implicated

22   by her testimony, but the other involving the RCCs may or may

23   not be.  Do you expect there to be testimony from her

24   referencing the concept of a remotely created check?

25           MR. BHATIA:  She might get into the concept of

K1M7TEM3

```
 1    remotely created checks, and I have spoken to defense counsel,

 2    and I understand that they will request -- they have requested

 3    that the instruction be read as soon as the witness makes the

 4    first comment about RCCs.

 5              THE COURT:  Look, you are the master of the direct

 6    examination.  Does your examination cover that topic?

 7              MR. BHATIA:  I believe it does, yes.  I'm sorry, it

 8    does, your Honor.

 9              THE COURT:  All right.  Look, I mean I'm happy as soon

10    as you have put a question to the witness that elicited an

11    answer referring to that, I am happy for either counsel to give

12    me a prompt that this is a good moment for the RCC instruction.

13              Thinking ahead as well to Ms. Finocchiaro's testimony,

14    are there any other areas where anyone can imagine a limiting

15    instruction being warranted?

16              MR. BHATIA:  Not from the government.

17              THE COURT:  Defense?

18              MR. GELFAND:  No, your Honor.  The only other area is

19    the surveillance photo issue, depending on the foundation.

20              THE COURT:  Was there any progress made among counsel

21    overnight about that issue?

22              MR. GELFAND:  We agreed on every other Bank of America

23    exhibit; we did not agree on that.  I'm not saying that we're

24    going to necessarily object; it just depends on the testimony.

25              THE COURT:  In other words, it's not stipulated to.
```

A-295

K1M7TEM3

1         And, Mr. Bhatia, again you're not obliged to tip your

2    hand, but were you able to shore up or make progress with

3    respect to the authentication issue that was addressed

4    yesterday?

5         MR. BHATIA:  We do believe that she will be able to

6    lay the proper foundation.

7         THE COURT:  Very good.  OK.  Then take a five minute

8    comfort break.  I will be back in five minutes.  Mr. Smallman

9    will reposition the podium here before we resume.

10        (Recess)

11        THE COURT:  Members of the jury, now that you have

12   been sworn, I want to give you some preliminary instructions to

13   guide you in your participation in this trial.

14        To begin with, you are here to administer justice in

15   this case according to the law and the evidence.  You are to

16   perform this task with complete fairness and impartiality, and

17   without bias, prejudice or sympathy for or against the

18   government or the defense.

19        It will be your duty to find from the evidence what

20   the facts are.  You and you alone will be the judges of the

21   facts.  You will then have to apply those facts to the law as

22   the Court will give it to you.  You must follow that law

23   whether you agree with it or not.  Nothing the Court may say or

24   do during the course of this trial is intended to indicate or

25   should be taken by you as indicating what your verdict should

K1M7TEM3

```
 1    be.
 2                The evidence from which you will find the facts will
 3    consist of the testimony of witnesses, documents and other
 4    things received into the record as evidence, as well as any
 5    facts that the parties agree or stipulate to, or that the Court
 6    may instruct you to find.
 7                Certain things are not evidence and must not be
 8    considered by you, and I'm going to list them for you now.
 9                First of all, statements, and argument and questions
10    by lawyers are not evidence, nor are my own statements to you
11    evidence.  Only the answers given by witnesses are evidence.
12                Second, objections to questions are not evidence.  The
13    lawyers have an obligation to their clients to make an
14    objection when they believe evidence being offered is improper
15    under the rules of evidence.  You should not be influenced by
16    the Court's ruling on an objection.  If I sustain an objection,
17    you should ignore the question.  If I overrule the objection,
18    you should treat the answer just like any other.  If you are
19    instructed that some type of evidence is being received for a
20    limited purpose only, you must follow that instruction.
21                Third, testimony the Court has excluded or told you to
22    disregard is not evidence and must not be considered.
23                Finally, anything you may have seen or heard outside
24    the courtroom is not evidence and must be disregarded.  You are
25    to decide this case solely on the evidence presented here in
```

K1M7TEM3

1    this courtroom.

2         Now, when you are determining the facts, keep in mind

3    that there are really two types of evidence:  Direct evidence

4    and circumstantial evidence.  Direct evidence is direct proof

5    of a fact, such as the testimony of an eye witness.

6    Circumstantial evidence is proof of facts from which you may

7    infer or conclude that other facts exist.  And the word "infer"

8    or the expression to draw an inference simply means to find

9    that a fact exists from proof of another fact.  An inference is

10   to be drawn only if it's logical and reasonable to do so, not

11   by speculation or guesswork.  In a moment I will give you an

12   example that I think will make this all very clear.

13        In deciding whether to draw an inference, you must

14   look at and consider all of the facts in light of reason,

15   common sense and experience.  Whether a given inference is or

16   is not to be drawn is entirely a matter for you the jury to

17   decide.  Circumstantial evidence doesn't necessarily prove less

18   than direct evidence, nor does it necessarily prove more.

19        And here is an example to help you think about the

20   difference between direct and circumstantial evidence.  Let's

21   assume that when you came into the courthouse this morning, the

22   sun was shining and it was a nice day outdoors, and let's also

23   assume that the courtroom blinds here were closed, they were

24   drawn, so you couldn't look outside.  And let's assume further

25   that as you were sitting here somebody walked in with an

K1M7TEM3

1    umbrella that was dripping wet and a few moments later someone

2    else walked in with a raincoat that was dripping wet.

3         Now, because you couldn't look outside the courtroom,

4    and you couldn't see whether it was raining, because there is

5    no witness on the witness stand saying it's raining outside,

6    you wouldn't have any direct evidence of the fact that it was

7    range, but on the combination of facts that I have asked you to

8    assume it would be reasonable and logical for you to conclude

9    that it had begun to rain.

10        That's all there is to circumstantial evidence.  You

11   are inferring on the basis of reason, experience and common

12   sense from one established fact -- all these dripping, wet

13   raincoats and umbrellas -- the existence or nonexistence of

14   some other fact it's begun to rain.  I will give you more

15   instructions on this, as well as other matters, at the end of

16   the case.  The important point right now to keep in mind is

17   that you can consider both types of evidence.

18        One of most important tasks as jurors is to evaluate

19   the credibility of the witnesses who will appear before you --

20   that is, how truthful and believable they are.  Listen

21   carefully as each witness testifies during both direct and

22   cross-examination, and consider whether the witness is telling

23   the truth.  It will be up to you to decide which witnesses to

24   believe, which witnesses not to believe, and how much of any

25   witness's testimony to accept or to reject.

Case 21-1920, Document 80, 05/25/2022, 3321484, Page75 of 256

A-299

K1M7TEM3

1          Now, how do you decide what to believe and what not to

2    believe?  You are going to listen to the witnesses, observe

3    their testimony, and then decide as you would decide such

4    questions in your own life.  Did they know what they were

5    talking about?  Were they candid, honest, open and truthful?

6    Did they have a reason to falsify, exaggerate or distort their

7    testimony?  Sometimes it's not what a witness says but how he

8    or she says it that may give you a clue as to whether or not to

9    accept that witness's version of an incident or an event as

10   credible and believable.

11         In short, the way a witness testifies may play an

12   important part in your reaching a judgment as to whether or not

13   you can accept the witness's testimony as reliable.

14         Under the law, as I mentioned earlier, a defendant in

15   a criminal case is presumed innocent and cannot be found guilty

16   of the crimes charged unless a jury, having heard all of the

17   evidence in the case, unanimously decides that the evidence

18   proves the defendant guilty beyond a reasonable doubt.

19         In a criminal case the burden of proof always remains

20   with the prosecution -- the government.  For the jury to return

21   a verdict of guilty as to the defendant, the government must

22   prove that the defendant is guilty beyond a reasonable doubt.

23   A person charged with a crime has absolutely no burden to prove

24   that he is not guilty, and if the defendant chooses not to

25   present any proof, that decision cannot be held against him and

K1M7TEM3

1   may not enter into your deliberations at all.

2        Now, a few words about your conduct as jurors.

3        First, during the trial you are not to discuss the

4   case with anyone, nor are you to permit anyone to discuss it

5   with you.  This includes posting anything on the Internet about

6   the case, whether it be on personal blogs, Facebook or Twitter.

7   Until you retire to the jury room at the end of the case to

8   deliberate you simply are not to talk about this case with

9   anyone, including your partner, family or close friends.  Do

10  not even discuss the case with each other until you begin your

11  actual deliberations at the end of the trial.

12        Second, please do not while you are serving as jurors

13  in this trial have any conversations with the parties, the

14  attorneys, or any witnesses in this case, whether in the

15  courtroom, the hallways, the elevators, outside or anywhere

16  else.  And by that I mean not only avoid talking about the

17  case, don't talk to them at all, even to say good morning or to

18  acknowledge any of these people.  As I explained briefly

19  earlier, somebody seeing a juror in conversation with a party,

20  a lawyer or a witness might think that something improper was

21  being discussed, and to avoid even the appearance of

22  impropriety avoid any such contact or conversation.  And so I

23  can tell you that when the parties, lawyers and witnesses pass

24  you in the hall without even acknowledging your presence, they

25  don't mean to be rude; they are simply following my

K1M7TEM3

 1    instruction.

 2              Third, do not read or listen to anything outside the

 3    courtroom that relates to this case in any way.  And,

 4    similarly, you are not to allow anyone to speak with you about

 5    the case.  If you were approached by anyone to speak about it,

 6    politely but firmly tell them that the judge has directed you

 7    not to do so.  If any person seeks to contact you about this

 8    case, you are required to report the incident promptly to me by

 9    sending me a note through my courtroom deputy Mr. Smallman.

10              Also, please be sure that I'm informed if any person

11    you know comes into this courtroom.  This is a public trial,

12    and so at least in theory that could happen.  But it's

13    important that you do not hear from them about what may have

14    happened in the court while the jury was not present.  If you

15    should see a friend or relative come into court, send me a note

16    through Mr. Smallman at your first opportunity.

17              Fourth, do not try to do any research or make any

18    investigation about the case or the issues presented by the

19    case.  For example, do not go onto the Internet tonight and

20    research any matters relating to this case.  Do not call up

21    your lawyer friends and ask about the type of matters at issue

22    in the case.

23              Fifth, I know that many of you use cell phones,

24    iPhones, BlackBerries, the Internet, and all sorts of other

25    tools of technology.  You must not use these tools to

K1M7TEM3

1    communicate electronically with anyone about the case.  That

2    includes your family and friends.  You may not communicate with

3    anybody about the case on your cell phone, meaning iPhones,

4    e-mails, text messaging, Twitter, any blog or website, any

5    Internet chat room, or by any way or any social networking

6    website.  That means nothing on Facebook, LinkedIn, Youtube,

7    the full gamut.  If I haven't listed a website, it doesn't mean

8    can you go access the case or communicate about it.  The answer

9    is it's a complete no, you can't do that.

10          And, finally, do not form any opinion until all of the

11   evidence is in.  The case can be presented only step by step,

12   witness by witness, until all the evidence is before you.  Keep

13   an open mind until you start your deliberations at the end of

14   the case.

15          Now, note taking.  Mr. Smallman has given each of you

16   a note pad and a pen, and you are permitted take notes during

17   the trial.  Please write your name on the cover of the pad.  If

18   you do take notes, please do so only in these pads.

19          Remember that any notes you take are for your use

20   only, and they are only to be used as an aid for your memory.

21   Your memory controls.  If you do take notes, be careful not to

22   get so involved or wrapped up in the note-taking process that

23   you're not listening to the evidence.  Once you are in your

24   deliberations, if there is a disagreement between one juror's

25   notes and another juror's notes, or between one juror's notes

A-303

K1M7TEM3

1    and another juror's recollection, or one juror's recollection

2    and another juror's recollection, there is a solution for that.

3    You can ask to have the court reporter read back the portion of

4    the testimony that is germane to the disagreement you are

5    having, or we can have that portion of the transcript sent back

6    to you to the jury room, because ultimately it's the official

7    court transcript that controls, not any juror's notes.

8           During the course of the trial, exhibits will be

9    received into evidence, and they will be marked by exhibit

10   number.  So, if there is an exhibit that are you particularly

11   interested in seeing, or seeing more of than you have seen here

12   in the courtroom, write down the exhibit number, and when you

13   are in your deliberations, you will be able to ask to see the

14   exhibit.  We will also be giving you a list of all witnesses

15   who testified during the trial as well as a list of all

16   exhibits that were received during the trial, and that will in

17   turn help you in calling for or identifying any material you

18   want to see while you are in your deliberations.

19          We are now going to begin the evidence portion of the

20   trial.  As I said earlier this morning, we are going to begin

21   each day promptly at 9:30 and continue until approximately 5

22   p.m.  Please, please be on time.  If any of you are late, we

23   have to wait because we can't start until all of you are here.

24   And all of us -- meaning me, the lawyers, the parties, and the

25   witnesses and your fellow jurors -- will have to wait.  If we

A-304

K1M7TEM3

1   lose ten, 20 minutes each day because somebody is late, we may

2   not be able to get the trial completed on the day that we

3   otherwise would have been able to do so.

4          Let me tell you now how the trial will proceed.

5   First, we're going to have opening statements.  The government

6   is going to make an opening statement, and after that I expect

7   the attorney for the defendant will make an opening statement

8   as well, but they are not required to do so.  The opening

9   statements are neither evidence nor argument.  They are simply

10  outlines of what the attorneys believe the evidence will show,

11  and they are given to help you follow the evidence as it is

12  presented.

13         After the opening statements, the government will

14  present its case.  The government will call its witnesses, and

15  after each witness testifies on direct examination, counsel for

16  the defendant will have an opportunity to cross-examine the

17  witness.  After the cross-examination, there may be a little

18  bit of what we call redirect and recross examination.

19         After the government's case, the government will rest.

20  The defendant may then present a defense case if he wishes.

21  But, again because of the presumption of innocence, the

22  defendant is not required to present or offer any proof.  If

23  the defendant does present the defense case, the defense

24  witnesses will testify, and the government will have an

25  opportunity to cross-examine them.

1          After the evidence is completed and all sides have

2      rested, the attorneys will give their summations, and this is

3      the opportunity for the lawyers to summarize the evidence and

4      to give their closing arguments to you about what it has or has

5      not shown.

6          After the summations, I will give you instructions on

7      the law, and you will then finally retire to deliberate on your

8      verdict.

9          You have a tremendously important task as jurors, it

10     is to determine the facts.  You, and not the court, are the

11     sole judge of the facts.  The Constitution itself recognizes

12     your unique role in our system of justice, and so, please, pay

13     careful attention to the witnesses and the evidence received at

14     trial as well as my instructions on the law.

15         With that, we will now begin with counsel's opening

16     statements.  Mr. Smallman, would you put the microphone by the

17     lectern, and we will hear first from the government.

18         Mr. Bhatia, you may proceed.

19         MR. BHATIA:  This is a case about greed, fraud and

20     theft.  This is a case about how this man, the defendant, Ari

21     Teman, carried out a brazen scam to steal his own clients'

22     money.  You see, the defendant had a business, and he decided

23     that some of his customers owed him money.  And what did he do?

24     He decided to steal it right out of their bank accounts.

25         The defendant created dozens of checks, fake checks,

K1M7TEM3                        Opening - Mr. Bhatia

1    drawn against his customers' bank accounts.  He pretended that

2    his customers had authorized him to deposit those checks, but

3    that was a blatant lie.  None of the customers even knew he was

4    going to take the checks out of their account, and none of them

5    had ever told him that he was able to do that.  It was all part

6    of the defendant's scheme to treat his customers' bank accounts

7    as his own personal piggy bank.  It was theft, plain and

8    simple.

9         Using these fake checks, the defendant stole hundreds

10   of thousands of dollars from his customers, money that was not

11   his, money that he did not have permission to take, and money

12   that he used to line his own pockets.

13        Ladies and gentlemen, this opening statement is the

14   government's opportunity to outline what the evidence will

15   show, so let's discuss in more detail what you will hear and

16   see during the trial.

17        You will learn that the defendant had a business where

18   he sold intercom units to apartment buildings.  The defendant

19   told the customers that these intercoms would allow residents

20   to speak with people who were at the door and hear what they

21   were saying.  After hearing the defendant's sales pitch some

22   customers, including some here in New York, decided to buy one

23   of his intercom systems.  They paid him a few thousand dollars

24   for each intercom, and they paid him using checks from their

25   own bank accounts.  You will hear that after the customers paid

K1M7TEM3                          Opening - Mr. Bhatia

1    the defendant they immediately started having problems with the

2    intercom.  The intercoms didn't work properly, and the

3    customers complained to the defendant.  Some of them decided

4    they had to stop using the intercoms.

5            How did the defendant react?  He got angry, very

6    angry.  You called them names, he called them liars.  He wasn't

7    happy they were doing business with him.  He still wanted their

8    money.

9            Did the defendant try to resolve this dispute in a

10   civilized way?  No.  Did he file a lawsuit saying they owed him

11   money, like he said he would do over and over?  No.  Instead

12   the defendant the evidence will show that the defendant came up

13   with a scam to steal their money, a blatant scam to take

14   thousands and thousands of dollars right out of their bank

15   accounts, without their knowledge and without their permission.

16           You will learn that the defendant created these

17   checks -- these fake checks -- from scratch, entirely from

18   scratch, 29 checks in total.  The defendant knew the customers'

19   bank accounts numbers because they had written him checks, and

20   at the bottom of those checks was the account number.  He took

21   that number and put them on the checks that he created.

22           Using those checks, these fake checks, he deposited

23   them into his own bank account.  Some of the checks were worth

24   $5,000, some were worth $10,000, and some of the checks were

25   worth $18,000; more than $300,000 in total, $300,000.

K1M7TEM3                        Opening - Mr. Bhatia

1          The defendant pretended that the checks were issued

2     with his customers' permission.  That was a blatant lie.  Did

3     the defendant ask his customers if he could create or deposit

4     the checks?  No.  Did he ask for their permission to take this

5     money out of their bank account?  No.  Instead, he created the

6     checks without their knowledge and without their permission and

7     then deposited the checks into his own bank account.

8          You will hear that the defendant came up with a false

9     cover story to try to trick the banks into thinking that these

10    were authorized checks.  On some of the checks he scribbled a

11    fake signature and wrote that the checks were authorized by a

12    so-called contract.  That was a lie.  On other checks he put a

13    link to his website.  Buried in that link was another link, and

14    there, in a long list of fine print, was the way the defendant

15    created a false appearance that he was allowed to take this

16    money.  In reality, these were lies and the checks were fake,

17    checks the defendant created from scratch without his

18    customers' knowledge and without their permission.  It was a

19    blatant fraud.

20         And the defendant used other tricks to fool the banks.

21    You will see that he put his own phone number on the checks and

22    told the banks to call him, not the customers, if the banks had

23    any questions.  You will see that the defendant falsely stated

24    on the memo line of these checks -- that's where you can put a

25    description of what the check is for -- that these were for

A-309

K1M7TEM3                              Opening - Mr. Bhatia

1    payments for bogus fees that the customers had never agreed to

2    pay.  All of these were lies to trick the bank into accepting

3    the check.

4           Some of the defendant's customers -- now his

5    victims -- eventually saw the fraudulent checks when they

6    looked into their bank records.  Some of them heard about the

7    checks when their banks reached out about potentially

8    fraudulent activity.

9           When they saw the checks -- when the customers saw the

10   checks -- they were shocked.  They realized that someone had

11   written fake checks from their account without their

12   authorization, without their permission, and without ever

13   telling them.

14          When the defendant deposited these fake checks, the

15   money came out of his customers' account, and money was put

16   into the defendant's account.  Again, more than $300,000 in

17   total.  The defendant drained the money out of his bank account

18   where he deposited the checks and sent it to other accounts

19   that he owned.  Those accounts included his personal bank

20   account.  You will see that he also withdrew some of the money

21   in cash.  In one case he had withdrawn $4,000 from a bank

22   teller here in Manhattan.

23          Not surprisingly, the defendant's scheme came crashing

24   down and he got caught.  The banks learned that the defendant's

25   checks were fake and that the customers had never given

K1M7TEM3                           Opening - Mr. Bhatia

1    authorization for him to create and issue checks without

2    telling them.  But Bank of America -- this is where the

3    defendant deposited the checks -- was stuck holding the bag.

4    Bank of America found out about the fraud, and it had to pay

5    back money to the defendant's customers.

6            Now, ordinarily they might take that money out of the

7    money he deposited and send it back, but in this case the

8    defendant had already transferred that money into his other

9    accounts, so Bank of America wasn't able to get that money.

10   And you will see records and hear testimony that Bank of

11   America had to pay about $260,000 out of its own money to repay

12   the defendant's customers.  That's $260,000 because of the

13   defendant's fraud.

14           So that's an overview of what we expect the evidence

15   will show:  The defendant created fake checks from scratch

16   without his customers' knowledge, without their permission, and

17   deposited them into his own bank account.

18           Let me now tell you how we are going to prove it to

19   you.  As a general matter, during this trial you will hear from

20   witnesses and you will see documents.  You will hear testimony

21   that the defendant's customers -- the people the defendant

22   stole from -- they will tell you about their dealings with the

23   defendant and how the defendant demanded money.  You will hear

24   about his threats.  You will learn about their shock and

25   distress when they learned that the defendant had issued checks

K1M7TEM3                        Opening - Mr. Bhatia

1   for tens of thousands of dollars written right out of their

2   accounts and without telling them.

3         The defendant never asked if he could take that money.

4   In fact, the customers will tell you that if the defendant had

5   ever asked, if they had given him permission to take money out

6   of their accounts whenever he thought he deserved it, they

7   would never have given it to him.

8         You will also hear from bank representatives.  A Bank

9   of America employee will testify, and she will tell you how the

10  defendant created fake checks, show you what the defendant did

11  with that money, and explain how Bank of America lost hundreds

12  of thousands of dollars by having to pay the defendant's

13  customers.

14        You will also hear from employees at other banks where

15  the defendant's customers had their own bank accounts.  Those

16  individuals will tell you how the banks -- at first unaware of

17  the defendant's fraud -- had processed the checks, sent money

18  out of those accounts, causing hundreds of thousands of dollars

19  to be withdrawn from the customers' accounts without their

20  permission.

21        You will also see documents during the course of this

22  trial.  You will see for yourselves the fake checks that the

23  defendant created.  You will see the way the defendant crafted

24  those checks to create the false appearance that his customers

25  had authorized them.

K1M7TEM3                        Opening - Mr. DiRuzzo

1           You will see bank records showing the hundreds of

2     thousands of dollars that were taken out of the customers'

3     accounts and put into the defendant's accounts.  You will also

4     see the way the defendant transferred the money out of that

5     account where he deposited it, and you will see how he spent

6     and withdrew the money.

7           You will also see e-mails.  You will see e-mails

8     between the defendant and his customers.  You will see how the

9     defendant got angry when his customers complained about their

10    product.  You will see how he got angry when they told him that

11    they were done with it.  You will also see how he crafted his

12    fake, bogus cover story to try to cover up his scheme and to

13    get away with it.

14          So that's an overview of the types of evidence you

15    will see and hear about the defendant's fraud scheme.  I am

16    going to sit down in a moment.  At the end of this trial, after

17    you have seen all the evidence and heard from all the

18    witnesses, I will have another opportunity to speak with you.

19    Until then, I ask you to do three things:

20          First, pay close attention to the evidence.  Second,

21    follow Judge Engelmayer's instructions on the law.  Finally,

22    use your common sense, the same common sense that you use in

23    your everyday lives.

24          If you do those three things, you will reach the only

25    verdict that is consistent with the evidence, with the law and

 1   with your common sense:  That the defendant, Ari Teman, is

 2   guilty as charged.

 3              THE COURT:  All right.  Thank you, Mr. Bhatia.

 4              Mr. DiRuzzo.

 5              MR. DIRUZZO:  Thank you, your Honor.  May it please

 6   the Court, counselors, ladies and gentlemen of the jury.

 7              I am Joseph DiRuzzo.  Along with Mr. Gelfand we

 8   represent Mr. Ari Teman.

 9              Ladies and gentlemen, this criminal case is about one

10   thing:  Did Ari Teman have the criminal intent to commit the

11   four crimes alleged in the indictment?  The answers are clear:

12   No.

13              The evidence will show that Mr. Teman had no criminal

14   intent, which is a complete defense to all four crimes,

15   because, one, his company, GateGuard, had written contracts

16   with express payment terms with all of its customers, including

17   the ones at issue in this case, that permitted GateGuard to

18   create and deposit remotely created checks when money was due

19   and owing to GateGuard; and, two, that before doing the acts

20   that the government claims were crimes, Mr. Teman took the

21   extra cautious step of consulting with his long-time attorney

22   to make sure that what he was doing was legal.  But each of

23   these two important facts reflect what this case is really

24   about:  That Mr. Teman never intended to defraud any bank nor

25   defraud any of GateGuard's customers, and that whether he had

K1M7TEM3                        Opening - Mr. DiRuzzo

1    any intention of fraud is what this entire case is about.  This

2    is not a civil case.

3         While the events that occurred in March and April of

4    last year form the events that are alleged in the indictment,

5    like all stories there is a bit of background information that

6    you need to know.  Ari Teman has a college education and an

7    entrepreneurial spirit, but he is not a lawyer.  He has never

8    attended law school.  By day he runs start-up tech companies,

9    and on the side he performs as a stand-up comedian.

10         One of Mr. Teman's tech start-ups is called GateGuard,

11   and the evidence will show that GateGuard was formed by Mr.

12   Teman in 2016.  GateGuard is a technology company that provides

13   an integrated hardware and software platform for use in

14   apartments, co-ops and condo apartments.

15         GateGuard integrated facial recognition, the Internet

16   and an intercom system to allow for more secure entry and exit

17   into buildings.  Individuals would have their face scanned,

18   which would in turn allow the building to know exactly who was

19   entering and when.  This allowed buildings to be sure that

20   people who were on the lease were the actual tenants, that

21   illegal Airbnbs weren't occurring, and that guests and delivery

22   people coming and going into buildings were properly logged and

23   tracked.  This information was provided to the building/clients

24   of GateGuard as a function of the GateGuard platform.

25         When Mr. Teman formed GateGuard there were no face

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1M7TEM3                    Opening - Mr. DiRuzzo

1    recognition/point of entry systems on the market, and with most

2    new technology companies getting GateGuard up and running from

3    proved concept to the market cost Mr. Teman a lot of money.

4    But when GateGuard was up and running, Mr. Teman marketed

5    GateGuard throughout the country, and you will hear evidence --

6    and I don't believe it will be in dispute -- that GateGuard had

7    clients throughout the country, major metropolitan areas, and

8    in particular New York City.

9            During the time period alleged in the indictment, and

10   continuing to today, GateGuard has several hundred customers

11   using its products; however, we fully admit that in the

12   beginning there were certain bugs in the product that required

13   troubleshooting.  However, you will also hear that GateGuard

14   actively worked to resolve these bugs, and Mr. Teman himself

15   was active in the product improvement.

16           Now, of the several hundred customers that GateGuard

17   had -- or has -- like all businesses there are a few problem

18   clients, and you will hear about the three problem customers in

19   this case:  ABJ, Coney Realty and Mercer Realty, which

20   represent approximately one percent of GateGuard's customers.

21           You will also hear that ABJ, Coney and Mercer were

22   some of the first customers of Gateway.  The evidence will show

23   that anyone who wanted to sign up as a customer of GateGuard --

24   including the three at issue here -- had to sign up at

25   GateGuard's website.  There was no other way to be a GateGuard

K1M7TEM3                          Opening - Mr. DiRuzzo

1    customer.

2          The way that it works is that everyone input their

3    information into the computer system via the website, just like

4    do for iTunes, just like you do for Netflix.  There were no

5    exceptions.

6          Further, you will hear that when someone signed up for

7    GateGuard there was a prompt that informed the customer that it

8    was bound by GateGuard's terms and conditions and GateGuard's

9    payment conditions, which I will collectively refer to as the

10   GateGuard contract.  You will see that the terms and condition

11   and payment terms as it governed the nature of the contractual

12   relationship between GateGuard, Coney, ABJ and Mercer.

13   Further, in the event the government doesn't show you the

14   GateGuard terms and conditions -- the GateGuard payment

15   terms -- we will introduce these documents into evidence

16   ourselves for your consideration.

17         Now, turning to the terms and conditions.  That

18   document is 17 pages and is relevant here.  Section 5 addressed

19   orders and fees.

20         Pricing:  GateGuard customers expressly agreed to the

21   pricing terms which were referenced in Section 5 and

22   hyperlinked to GateGuard's website.  Additionally, the

23   GateGuard terms and conditions had a severability clause that

24   meant if any provision of the terms and conditions was

25   unenforceable, the rest of the contract was still valid.

K1M7TEM3                          Opening – Mr. DiRuzzo

1         Now, turning to the pricing.  The pricing is listed

2    out in painful detail, all the fees that a GateGuard customer

3    will be responsible for.  There were sections including, among

4    others, court appearances, charge-back fees, nonpayment fees,

5    cancellation fees, etcetera.  And as is especially important

6    here, the pricing terms included a section on payment and a

7    section on authorization to make bank withdrawals.

8         Now, these two interlocking provisions detail not only

9    how GateGuard could obtain payment from its not-paying clients

10   but the reasoning behind it.  Specifically, the pricing

11   agreement allowed GateGuard to charge its clients via ACH or

12   debit, and it also expressly gave GateGuard "permission to

13   write and sign checks with your checking and/or savings account

14   information to do a bank draw against your entity (or entities)

15   for the amount it or they owe."

16        A check from another person's account or another

17   business' account based on advanced authorization is known as a

18   remotely created check.  You will hear it referred to in this

19   case as an RCC.  And we anticipate at some point you will hear

20   a little more from the judge about the definition of an RCC.

21   But you will hear testimony, and you will see e-mails from Mr.

22   Teman to the three customers at issue -- ABJ, Coney and

23   Mercer -- informing each that there was a contract, and that

24   the contract allowed GateGuard to receive payments from each

25   customer.

1           As to Coney, you will see an e-mail from Mr. Elie

2    Gabay to Mr. Teman where Mr. Gabay e-mails Mr. Teman with

3    proposed changes -- what attorneys refer to as a markup or a

4    red lined document -- to the GateGuard terms and conditions.

5    While none of these edits or mark-ups or changes to the

6    GateGuard terms and conditions were accepted by Mr. Teman,

7    Mr. Gabay clearly read the terms and conditions and even marked

8    up Section 5 that addressed the pricing.

9           Now, as to Mercer, you will see an e-mail from Bonnie

10   Soon-Osberger where she acknowledges she reviewed the terms and

11   conditions.  She e-mailed Mr. Teman with questions about the

12   terms and conditions.  Mr. Teman responded via e-mail and

13   replied to her, and Ms. Soon-Osberger begged Mr. Teman for his

14   timely reply, and she acknowledged that Mr. Teman had addressed

15   Mercer's concerns about the terms and conditions.

16          Now, as to ABJ, you will see invoices from GateGuard

17   to ABJ, where at the bottom of each invoice is a prominent

18   display that "payor accept terms at

19   GateGuard.XYZ4/legal/4/turns.php."

20          Further, you will also see that Mr. Teman's attorney,

21   Mr. Ariel Reinitz, e-mailed Joe Soleimani, one of ABJ's

22   principals, and Mr. Reinitz reiterated to ABJ that ABJ had a

23   binding contract with GateGuard.  And Mr. Reinitz, on behalf of

24   GateGuard, even provided hyperlinks to Mr. Soleimani of both

25   GateGuard's terms and conditions and the pricing document

K1M7TEM3                          Opening - Mr. DiRuzzo

1    itself.

2           So you will see -- and the if the government does not

3    introduce it, we intend to introduce this document ourselves --

4    the RCCs that the government alleges were counterfeit checks.

5    But you will see on every single check, every single RCC, on

6    the bottom right-hand side, a statement "draw per contract, no

7    signature required."

8           You also will see in the majority of these checks the

9    government alleges to be counterfeit, the RCCs, that the

10   language is even more transparent in that "draw per contract,

11   no signature required.  Note to bank:  Call me.  This is a

12   valid check.  You are required by law to honor it.  Contact at

13   GateGuard.XYZfor/legal/for/terms.phb accepted by the above

14   client.  Contact us at 212-203-3714 with questions."

15          The evidence will show that before these RCCs were

16   created, Mr. Teman sought and obtained the legal advice of his

17   attorney -- his long-time attorney, Mr. Aerial Reinitz -- and

18   Mr. Reinitz conducted his review of the GateGuard terms and

19   conditions and pricing, and Mr. Reinitz concluded that there

20   was a valid contract, that the contract was enforceable, and

21   that the contract allowed for GateGuard to be paid via RCC, the

22   very RCCs that the government alleges are counterfeit.

23   Mr. Reinitz provided this legal advice to Mr. Teman.  Mr. Teman

24   justifiably relied on his legal advice, and Mr. Teman acted in

25   accordance with the legal advice that he was given by his

K1M7TEM3                         Opening - Mr. DiRuzzo

1     attorney.

2              Consequently, Mr. Teman deposited these checks in a

3     banker of America branch in Miami Beach, Florida, where its

4     company headquarters were located.

5              Now, Mr. Teman did not hide his identity, he didn't go

6     in there with any type of disguise, and he used his driver's

7     license to identify himself.  Bank of America placed a one-week

8     hold on the deposit, and unfortunately ABJ disputed the

9     validity of these checks.  In response, GateGuard and Mr.

10    Teman's attorney, Mr. Reinitz, proactively reached out to Bank

11    of America and informed Bank of America that all the RCCs were

12    fully agreed to by GateGuard's customers and were consistent

13    with the GateGuard payment plans.  Mr. Reinitz e-mailed Bank of

14    America with copies of the terms and condition, the payment

15    terms, and provided a detailed explanation of why the RCCs were

16    appropriate, and in all events this was a billing dispute

17    between GateGuard and GateGuard's customers.  If The government

18    does not introduce this e-mail into evidence, we intend to show

19    it to you so you can review it and consider it yourself.

20             Now, at the end of the day everything that GateGuard

21    and Mr. Teman did was transparent and authorized with

22    GateGuard's terms, conditions and payment terms, the GateGuard

23    contract.

24             Now, ladies and gentlemen of the jury, I will end

25    where I began:  Mr. Teman is not guilty of any crime because

A-321

K1M7TEM3                              Opening – Mr. DiRuzzo

1  the checks were not counterfeit; instead, ABJ, Coney and Mercer

2  all provided GateGuard with the contractual authorization to

3  issue the RCCs that are at issue here, and moreover, Mr. Teman

4  had no criminal intent as he sought and obtained legal advice

5  from Mr. Reinitz, who specifically informed Mr. Teman that he

6  was legally able to issue the RCCs as provided for in the

7  pricing portion of the GateGuard contract.

8          Now, at the end of this trial, ladies and gentlemen,

9  we are going to be asking for you to return a not guilty

10 verdict, because we do not believe -- nor will the government

11 be able to show -- that Mr. Teman committed a crime here.

12         THE COURT:  Thank you, Mr. DiRuzzo.

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

A-322

K1MVTEM4                        Finocchiaro - direct

1                MR. BHATIA:  The government calls Karen Finocchiaro.

2      KAREN FINOCCHIARO,

3           called as a witness by the Government,

4           having been duly sworn, testified as follows:

5                THE COURT:  Good afternoon, Ms. Finocchiaro.

6                Welcome to the Court.

7                I'll ask you to please project your voice.  This an

8      old and big courtroom and the acoustics aren't great.

9                Counsel, you may inquire.

10     DIRECT EXAMINATION

11     BY MR. BHATIA:

12     Q.  Ms. Finocchiaro, where do you work?

13     A.  Bank of America.

14     Q.  What's your title there?

15     A.  A vice president and senior fraud investigator.

16     Q.  And how long have you been at Bank of America?

17     A.  Twenty-three years.

18     Q.  And prior to being a senior investigator, what role did you

19     have at the bank?

20     A.  I was a strategic analyst.

21     Q.  As a senior fraud investigator, what are your day-to-day

22     responsibilities?

23     A.  I conduct our fraud investigations for our enterprise, for

24     everything from our credit card portfolio, our checking

25     accounts, and savings accounts.

K1MVTEM4                        Finocchiaro - direct

1   Q.  Approximately how many investigations have you conducted

2   involving fraudulent checks?

3   A.  Thousands.

4   Q.  And what about investigations involving returns of checks

5   between banks?

6   A.  Thousands.

7   Q.  Senior Investigator Finocchiaro, what is a check at a very

8   basic level?

9   A.  A check is a paper item.  The check typically has the

10  maker's information in the upper left-hand corner, date, it has

11  a signatory line, a memo line, and a pay to the order line.

12  Q.  And what does it mean for a check to be deposited?

13  A.  It's when a check is negotiated at a financial institution

14  or an ATM or cashed by a subject.  So it would be -- to be

15  negotiated is to be signed, made out to, made payable to, and

16  conducted.

17  Q.  Is a deposit essentially when someone gives the check to

18  the bank to start the payment process?

19  A.  That is correct.

20  Q.  And when a check is deposited, what happens next?

21  A.  So once the check is deposited, we have two processes:  For

22  larger financial institutions, the checks will go through a

23  bank-to-bank process.  In other situations, for smaller

24  financial institutions, they do go through the Federal Reserve

25  versus going through the clearinghouse.

A-324

K1MVTEM4                          Finocchiaro - direct

1    Q.   Is JPMorgan one of those larger banks?

2    A.   Yes, it is.

3    Q.   So that goes through the interbank process?

4    A.   Right, it goes through the interbank clearing.

5    Q.   What about Signature Bank?

6    A.   Signature Bank is a smaller financial institution, so those

7    checks will process through the Federal Reserve.

8    Q.   And ultimately, does a check transfer money between one

9    account to another account?

10   A.   Yes, it does.

11   Q.   And can it also be used to transfer money between banks?

12   A.   Yes, it is.

13            MR. BHATIA:  Your Honor, with the Court's permission,

14   I'd like to read Government Exhibit 501, which is a stipulation

15   between the parties.

16            THE COURT:  Very good.

17            Before Mr. Bhatia reads a stipulation, let me just

18   explain for a moment what a stipulation is.

19            A stipulation is an agreement between the parties that

20   a particular fact or facts is true.  You are required to accept

21   that stipulation as true, as accurate, what is contained

22   therein.  The lawyers have agreed that these facts are true.

23            It is for you, the jury, to decide what weight, if

24   any, you give to the fact that the parties have agreed upon.

25            Counsel, you may do so.

A-325

K1MVTEM4                        Finocchiaro - direct

1           MR. BHATIA:  Government Exhibit 501, bank record

2     stipulation.

3           It is hereby stipulated and agreed, by and between the

4     United States of America, by Geoffrey S. Berman, United States

5     Attorney, Kedar S. Bhatia and Edward Imperatore, Assistant

6     United States Attorneys, of counsel, and Ari Teman, the

7     defendant, by and through his counsel, Justin Gelfand, Esq. and

8     Joseph DiRuzzo, Esq., that:

9           Government Exhibits 101, 102, 201, 202, 203, 204, 205,

10    and 206; and Defense Exhibits 17, 34, and 52 are true and

11    correct copies of bank records from bank accounts at Bank of

12    America North America in the name of GateGuard Inc., with

13    account number ending in 8085.

14          Government Exhibits 103 and 104 are true and correct

15    copies of bank records from a bank account at Bank of America

16    North America in the name of Friend or Fraud, Inc., with

17    account number ending in 0351.

18          Government Exhibits 105 and 106 are true and correct

19    copies of bank records from a bank account at Bank of America

20    North America in the name of Touchless Labs LLC, with account

21    number ending in 1046.

22          Government Exhibits 107 and 108 are true and correct

23    copies of bank records from a Bank of America account at Bank

24    of America North America in the name of Ari Teman, with account

25    number ending in 5580.

K1MVTEM4                        Finocchiaro - direct

1          Government Exhibit 113 is a true and correct copy of

2     bank records from bank accounts at Bank of America North

3     America in the name of GateGuard, Inc., with account number

4     ending in 8085; in the name of Friend or Fraud, Inc., with

5     account number ending in 0351; in the name of Touchless Labs

6     LLC, with account number ending in 1046; and in the name of Ari

7     Teman, with account numbers ending in 7673 and 5580.

8          Government Exhibits 121, 122, 126, 127, and 130, and

9     Defense Exhibits 50 -- and Defense Exhibit 50, are true and

10    correct copies of bank records from bank accounts at JPMorgan

11    Chase Bank North America in the name of ABJ Lenox LLC, with

12    account number ending in 9100.

13         Government Exhibits 123, 124, 128, 129, and 131, and

14    Defense Exhibits 49 and 51, are true and correct copies of bank

15    records from bank accounts at JPMorgan Chase Bank North America

16    in the name of ABJ Milano, with account number ending in 1672.

17         Government Exhibits 141, 142, and 143, and Defense

18    Exhibit 29, are true and correct copies of bank records from

19    bank accounts at Signature Bank North America in the name of 18

20    Mercy Equity, Inc., with account number ending in 8293.

21         Government Exhibits 144, 145, 146, and 150, and

22    Defense Exhibit 29, are true and correct copies of bank records

23    from bank accounts at Signature Bank North America in the name

24    of 518 West 204 LLC, with account number ending in 6525.

25         The records I described in paragraphs 1 through 9

K1MVTEM4                        Finocchiaro - direct

1    above were made at or near the time of the occurrence of the

2    matter set forth in the records by or from information

3    transmitted by a person with knowledge of those matters; B,

4    kept in the course of regularly conducted business activity;

5    and C, made by the regularly conducted business activity as a

6    regular practice.

7              It is further stipulated and agreed that Government

8    Exhibits 101 through 108, 114, 121 through 124, 126 through

9    131, 141 through 146, 150, and 201 through 206, and Defense

10   Exhibits 17, 29, 34, 52, 49, 50, and 51, consist of records

11   that constitute business records pursuant to Rule 803(6) of the

12   Federal Rules of Evidence.

13             The defendant reserves any Rule 10(c) objection to the

14   admission for the truth of the matter asserted of any statement

15   contained in Government Exhibits 126 and 128.

16             Your Honor, with that, I'd offer Government Exhibits

17   101 through 108, 114, 201 through 206 into evidence.

18             THE COURT:  Sorry.  Give me those numbers again

19   kindly.

20             MR. BHATIA:  Government Exhibits 101 through 108, 114,

21   and then Government Exhibits 201 through 206.

22             THE COURT:  Is there any objection?

23             MR. GELFAND:  No objection, your Honor.

24             THE COURT:  All right.  I'll receive those exhibits.

25             (Government's Exhibits 101 through 108, 114, 201

Case 21-1920, Document 80, 05/25/2022, 3321484, Page104 of 256

K1MVTEM4                         Finocchiaro - direct

1    through 206 received in evidence)

2              THE COURT:  And Mr. Bhatia, are you also offering the

3    stipulation itself, Exhibit 508?

4              MR. BHATIA:  Yes, your Honor.

5              THE COURT:  All right.  That's received as well.

6              MR. BHATIA:  It's 501.

7              THE COURT:  501.  Forgive me, 501 is also received.

8              (Government's Exhibit 501 received in evidence)

9    BY MR. BHATIA:

10   Q.  Ms. Finocchiaro, back to you.

11   A.  Yes.

12   Q.  All right.

13             MR. BHATIA:  Mr. Magliocco, could you publish

14   Government Exhibit 201 for the jury and for the Court.

15             Mr. Magliocco, could you zoom in on the top portion of

16   the page here.

17             THE COURT:  Let me just ask the ladies and gentlemen

18   of the jury, can everybody see the exhibit on your screen?  If

19   at any point during the trial you are unable to see something

20   that's being shown to the members of the jury, raise your hand,

21   get my attention and Mr. Smallman's, and we'll be on it.

22   BY MR. BHATIA:

23   Q.  Ms. Finocchiaro, are you able to see the check on the

24   screen over there?

25   A.  Yes, I am.

K1MVTEM4                          Finocchiaro - direct

 1   Q.  Is this an example of a check?

 2   A.  Yes, it is.

 3   Q.  And who is this check addressed to?

 4   A.  The check is addressed to GateGuard, Inc.

 5   Q.  And is that shown here on the maybe middle left side of the

 6   check?

 7   A.  Yes, it is.  It's in the "pay to the order" section.

 8   Q.  And does that mean it's written to be deposited into that

 9   account?

10   A.  Yes, it is.

11   Q.  And where is the money -- what account is the money meant

12   to come from?

13   A.  It's coming from 518 West 205 LLC, drawn on Signature Bank,

14   account number is in the bottom right-hand corner, as

15   1503226525.

16   Q.  And is the account number at the bottom -- what's the

17   relevance of the account number at the bottom in drawing the

18   check?

19   A.  That is the account that the funds are to be drawn from and

20   placed into the Bank of America account.

21   Q.  So is the bottom number what allows the check to be

22   processed from a given account?

23   A.  Yes, it is.

24   Q.  Okay.

25           THE COURT:  Mr. Bhatia, I'm looking for a good

Case 21-1920, Document 80, 05/25/2022, 3321484, Page106 of 256

**A-330**

K1MVTEM4                         Finocchiaro – direct

1    stopping point because the jury's mid-afternoon snack has

2    arrived.  Let me know when you're at a good you point.

3              MR. BHATIA:  I think this is a fine stopping point.

4              THE COURT:  All right.

5              Ladies and gentlemen, we'll take a 15-minute recess.

6              As I told you during jury selection, every afternoon

7    we have coffee and treats, if you will.  So by all means enjoy

8    in the jury room.

9              As you'll get used to my hearing me say, please do not

10   discuss the case.  I'll see you in 15 minutes.  Mr. Smallman

11   will bring you out.

12             (Jury not present)

13             THE COURT:  Counsel, anything to raise before we take

14   a brief recess?

15             MR. GELFAND:  No, your Honor.

16             THE COURT:  All right.  I'll see you in 12 minutes.

17   Thank you.  Just a minute or two before the jury comes down.

18   Thank you.

19             The witness may step down.

20             (Witness steps down)

21             (Recess)

22             THE COURT:  Mr. Smallman, let's get the jury.  And

23   let's have the witness in the box please.

24             (Jury present)

25             THE COURT:  Welcome back, ladies and gentlemen.  I

K1MVTEM4                          Finocchiaro - direct

1     hope you had a good break.

2            Ms. Finocchiaro, I will remind you you're still under

3     oath.

4            Mr. Bhatia, you may inquire.

5     BY MR. BHATIA:

6     Q.  Ms. Finocchiaro, I'm going to hop back into exhibits for a

7     moment.  Do you have in the binder in front of you a disk

8     marked as Government Exhibit 113?

9     A.  I do, yes.

10    Q.  And have you reviewed the contents of that disk?

11    A.  Yes, I have.

12    Q.  How do you know that's the disk that you reviewed?

13    A.  It is the disk -- I signed the disk, actually.

14    Q.  And is there one file on that disk or is there more than

15    one?

16    A.  There's multiple files.

17    Q.  What's the substance of the files on that disk?

18    A.  It's actually one spreadsheet.  It has multiple tabs.  It

19    has tabs containing customer information, specific

20    account-level detail that would be seen on a statement, but

21    it's in a ledger format.  It has online banking details.  And

22    it has wire transfer information as well.

23           MR. BHATIA:  The government offers Government Exhibit

24    113.

25           THE COURT:  Any objection?

K1MVTEM4                          Finocchiaro - direct

1           MR. GELFAND:  No, your Honor.

2           THE COURT:  Received.

3           (Government's Exhibit 113 received in evidence)

4           MR. BHATIA:  Mr. Magliocco, if you could pull back up

5    Government Exhibit 201.  We could take a look again at the

6    check image.

7    Q.  Is there a signature featured on this account, on this

8    check?

9    A.  There is a signature.  There's a squiggly line.

10   Q.  And what's the check number that you see?

11   A.  The check number is Check No. 1.

12   Q.  As a general matter, what is a check number?

13   A.  It's the number -- it's the series that we -- that we issue

14   the checks.  So you can have Checks 1, 1000, 101.  It's just

15   the number of the check.

16   Q.  Do checks typically go in a sequence?

17   A.  They typically go in a sequence.

18   Q.  What's the date listed on this check?

19   A.  3/28 of 2019.

20   Q.  Does it identify -- you may have mentioned this earlier,

21   but does it identify the bank where these funds are being drawn

22   from?

23   A.  Signature Bank.

24   Q.  Is there another way to know which bank the funds are

25   coming from?

K1MVTEM4                       Finocchiaro - direct

1    A.  The ABA routing number, which is the set of numbers in the

2    middle.  That also identifies the financial institution that

3    owns that account.

4    Q.  According to Government Exhibit 101, who is the -- who is

5    the person authorized to sign on the GateGuard, Inc. account?

6    A.  On the GateGuard, Inc. account, the sole signer is Mr. Ari

7    B. Teman.

8    Q.  Okay.  Is there a signatory other than Mr. Teman on that

9    account?

10   A.  No, there is not.

11   Q.  And according to Exhibit 201, was this check deposited into

12   an account at Bank of America?

13   A.  Yes, it was.

14   Q.  Into what account was this check deposited?

15   A.  It was into the GateGuard, Inc. account.

16   Q.  And what was the date on which it was deposited?

17   A.  The date of deposit was of 3/28 of 2019.

18          MR. BHATIA:  Mr. Magliocco, could you please publish

19   Government Exhibit 202.  And can we take a look at the check

20   image at the top.

21   Q.  Ms. Finocchiaro, who is this check addressed to?

22   A.  This check is made out to GateGuard, Inc.

23   Q.  That's the same company as the first one, right?

24   A.  That is correct.

25   Q.  And who is this -- who are the funds purportedly coming

K1MVTEM4                         Finocchiaro - direct

1    from?

2    A.   They are coming from 18 Mercer Equity, Inc.  And the check

3    is drawn off of Signature Bank.

4    Q.   Okay.  Is there something listed in the memo line?

5    A.   There is.  So this one indicates "device removal fee."

6    Q.   As a general matter, what is a memo line on a check?

7    A.   So a memo line is kind of a description.  You can just put

8    in a small note of what the actual transaction is relating to.

9    Q.   And what's the date listed on this check?

10   A.   The date is 3/28 of 2019.

11   Q.   And what was the date that this check was actually

12   deposited?

13   A.   3/28 of 2019.

14   Q.   And what's the amount stated on this check?

15   A.   For 18,000.

16   Q.   Is that the same as the amount of the last check?

17   A.   Yes, it is.

18   Q.   Okay.  Have you reviewed records that show how these past

19   two checks were deposited?

20   A.   Yes, I have.

21        MR. BHATIA:  Mr. Magliocco, could you please publish

22   Government Exhibit 113.  And in particular, I'll direct you to

23   the device removal tab -- excuse me, the device tab.

24        Let's take a look at the extended detail tab, and rows

25   38 to 46, if you could highlight those.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-335

K1MVTEM4                          Finocchiaro - direct

1   Q.  So this is a lot of data.  What is -- as a general matter,

2   what does this table show?

3   A.  So what this data shows is anytime someone logs into online

4   banking, it does show in the session ID, there's also listed on

5   here the date and the time of the exact login.  Column C is an

6   access ID, so it shows the online banking access ID that the

7   customer uses to login.

8          Column D shows the type of browser that's being

9   utilized.  Column E would give us a numeric number for a

10  session ID.  So column F actually indicates whether it was --

11  what was done within that session, so corresponding to column,

12  I believe, E.

13  Q.  A lot of columns.

14  A.  It's moving, so -- and then column J gives a detailed

15  description of what was done.  So if there's funds that are

16  being transferred, it would show the to and from account

17  number, and it gives IP information as well.

18  Q.  Do the highlighted rows here correspond to the checks that

19  you just testified about?

20  A.  Yes, they do.

21  Q.  Okay.  And are you able to see from here how those

22  checks -- how they were literally deposited?

23  A.  They were mobile deposit checks.

24  Q.  What does "mobile deposit" mean?

25  A.  It means that you can capture an image from your mobile

A-336

K1MVTEM4                         Finocchiaro - direct

1   device and upload that into the online banking environment.

2   And it loads that image into the account.

3   Q.  What's the step-by-step process for doing mobile deposit?

4   A.  So you would log into your online banking.  You would

5   authenticate as being the client.  You would then go in, you

6   see your accounts listed.  You choose the account that you

7   would like to take action in, so whether you would like to view

8   the deposit history or if you'd like to choose to make a

9   deposit.  You would choose the specific account that you'd make

10  the deposit into, and then you'd load the mobile image.

11  Q.  Have you -- as part of your role as a senior fraud

12  investigator, have you handled matters involving mobile

13  application?

14  A.  Yes, I do.

15  Q.  And have you become familiar with what information is

16  available from the mobile application?

17  A.  Yes.

18  Q.  When an individual logs into the mobile application, what

19  information is presented to them?

20  A.  Their current balance information is available to them in

21  that mobile application.

22  Q.  Do they see the balance of different accounts or just one

23  account?

24  A.  If the profile is set up having multiple different accounts

25  in it, then you can see multiple different accounts and the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-337

K1MVTEM4                          Finocchiaro - direct

1    balance information.

2    Q.  According to this table that we're looking at here, what's

3    the user ID for the person who deposited the checks?

4    A.  It is Ari B. Teman.

5    Q.  And is that shown in column C here?

6    A.  Yes, it is.

7          MR. BHATIA:  Mr. Magliocco, could you zoom in a little

8    bit on maybe rows 38 and 46.

9    Q.  Okay.  So that's shown in column C; is that right?

10   A.  That is correct.

11   Q.  And in column B, what's shown there?

12   A.  In column B, it is the date and time.

13   Q.  Okay.  So what's the date and time of the two transactions

14   that are highlighted here?

15   A.  3/28 of 2019, the first one was at 17:08:37, and the second

16   one was at 17:12:08.

17   Q.  And are you able to see here in column -- right after I,

18   what the amount of these deposits was?

19   A.  The amount of the deposit is shown, so it's -- it says:

20   Action equal make deposit amount equals 18,000.

21          So they were both shown there.

22   Q.  Is the amount 18,000, does that mean an $18,000 deposit?

23   A.  In this case there was two $18,000 deposits, there's one

24   memo line for each.

25   Q.  And are you able to see into what account these were

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1MVTEM4                         Finocchiaro - direct

1    deposited?

2    A.  Yes.  So it shows it in -- it's so small.

3    Q.  We'll take a look at another table.

4    A.  So, yeah, it does show the account number in which the

5    funds are going into.  So this is -- just to give indication,

6    this is all done in a code environment.  So it's pulled -- so

7    the data is pulled from our sequel servers.

8              THE COURT:  Can I ask the witness just to keep your

9    voice up so the ladies and gentlemen can hear you better, of

10   the jury?  Thank you.

11   Q.  Is there a table that would show you which IP address is

12   associated with these transactions?

13   A.  Yes.  And actually, the information is on this table.  It's

14   located in the same string, so between the two highlighted

15   yellow versions.  It's over -- it will say IP, and it's listed

16   as 74.203.64.198.

17   Q.  Where is that on the screen?

18   A.  So it is located in line 42, all the way to the right-hand

19   side.  So it's right kind of where that pink blip is.

20   Q.  Is there a tab that will show you what physical location is

21   associated with that IP address?

22   A.  I'm sorry?

23   Q.  Is there a table that would show you what physical location

24   is associated with that IP address?

25   A.  Yes.  That information is on the OLB detail tab, but it's

K1MVTEM4                         Finocchiaro - direct

1   also listed on the device tab.  So I think you're going to look

2   at the device tab.

3          MR. BHATIA:  Mr. Magliocco, can we go to the device

4   tab.

5   Q.  And why don't you draw our attention to the rows that

6   involve the transactions here.

7   A.  So row 79, down to 83.  So you'll see the IP address is

8   listed in column E, and it lists it as being in column P as

9   being --

10         THE COURT:  May I just ask government counsel --

11  A.  It's column P, and it's listed as New York, New York.

12         THE COURT:  The type here is microscopic.  The jury is

13  struggling to see it.  If you intend to draw their attention to

14  lines here, you would do best to have the lines that you're

15  focusing on magnified just to facilitate the jury's review.

16         MR. BHATIA:  Okay.  Let's zoom in even further then.

17  A.  So I draw our attention to column E which has the IP.  And

18  then over -- column E, which has the IP location, and then the

19  physical location in column P.

20  Q.  And is that physical location in column P based off of the

21  IP address?

22  A.  Yes, it is.

23  Q.  And what is it listed here as the location?

24  A.  New York, New York.

25  Q.  Okay.  And I should ask this question:  What is an IP

A-340

K1MVTEM4                    Finocchiaro - direct

1   address?

2   A.  It's an internet protocol address.  So it gives a distinct

3   location in which an online banking login is being conducted.

4   Q.  Have you become familiar with the process for how Bank of

5   America handles mobile deposits?

6   A.  Yes.

7   Q.  And the process through which a check is submitted through

8   a mobile deposit?

9   A.  Yes.

10  Q.  Describe that process.

11  A.  So the process through the mobile deposit we went through.

12  Basically, you login through the online banking, you would

13  upload the image, and it would make the deposit into your

14  account, so versus going to a teller or an ATM, you can do that

15  through the mobile application.

16  Q.  And there are, sort of, the electronic communications sent

17  from the bank when doing mobile deposit; is that right?

18  A.  That is correct.

19  Q.  And is there one state where electronic communications are

20  routed for a mobile deposit?

21  A.  Can you restate?

22  Q.  Is there a location through which electronic communications

23  are routed associated with mobile deposit?

24  A.  The information flows through our servers which are located

25  in Texas.

K1MVTEM4                         Finocchiaro - direct

1    Q.  So if someone does a mobile deposit, there's some

2    communication sent to Texas?

3    A.  That is correct.

4    Q.  Okay.  I'll direct your attention to the tab ending in 8085

5    of this document, and rows 50 and 53 in particular.

6            MR. BHATIA:  And we can zoom way in.

7    Q.  Okay.  Ms. Finocchiaro, have you reviewed this record

8    before?

9    A.  Yes, I have.

10   Q.  And are these the two rows that correspond to the checks

11   that you testified about?

12   A.  Yes, they are.

13   Q.  Okay.  And starting here in column D for both of these

14   checks, these are the highlighted rows, what's the account into

15   which these were deposited?

16   A.  They were into the GateGuard, Inc. account.

17   Q.  Okay.  And are you able to see what the value of those

18   transactions was?

19   A.  They were $18,000 each.

20   Q.  And what's shown in column G?

21   A.  Column G is the ledger balance once the checks are

22   deposited into the account.

23   Q.  So at the end of the day, after these checks were

24   deposited, there was 38,995.96 in that account; is that

25   correct?

K1MVTEM4                      Finocchiaro - direct

1    A.  Yes, that's correct.

2    Q.  Okay.  And does this table -- if we go up or down, are we

3    going to see what happened before or afterwards?

4    A.  Yes.  So the information is in a daytime descending order.

5    So the information below would be anything that happened prior,

6    and the information above would be anything that happened after

7    the deposit was completed.

8    Q.  Okay.  If we look at transactions going up this

9    spreadsheet, those happened after these checks?

10   A.  That is correct.

11   Q.  Okay.  I'll direct your attention to row 48.

12         MR. BHATIA:  Mr. Magliocco, if you could highlight row

13   48.

14   Q.  What transaction do you see happening in that row?

15   A.  On 3/29, there was an online banking transfer; and it was

16   transferring $35,000 from the GateGuard, Inc. account to the

17   account that ends in 0351.

18   Q.  So is that the day after these two deposits?

19   A.  Yes, it is.

20   Q.  Is that $35,000 leaving the account?

21   A.  Yes, it is.

22   Q.  And it's going to another account?

23   A.  It is going into the 0351.

24   Q.  And based on your review of records, including Government

25   Exhibit 103 and 104, have you identified the account holder for

A-343

K1MVTEM4                      Finocchiaro - direct

1   the account ending in 0351?

2   A.  Yes, I have.

3   Q.  Who is it?

4   A.  That account is held in the name of Friend or Fraud, and

5   the sole signer was Mr. Ari B. Teman.

6   Q.  Based on -- was there any other signer on that account?

7   A.  No, there's not.

8   Q.  I'll direct your attention to the next tab here ending in

9   0351.  That's for the Friend or Fraud account.  And directing

10  your attention now to row 74, if we can zoom in on that.  73

11  rather.

12         And does row 73 here, we'll zoom in, does that show

13  the money coming into that account?

14  A.  Yes, it does.  In column E it lists it as a deposit of

15  35,000, and it's coming from the 8085 account, which was

16  GateGuard.

17  Q.  Okay.  And is there another -- so I'll direct your

18  attention now to row 74.  That's the one right below it.  Are

19  you able to see there what transactions have been taking place

20  in row 74?

21  A.  Yes.  In row 74, there was a $20,000 movement; it was a

22  withdrawal, and the funds were being placed into the account

23  that ends in 1046.

24  Q.  So you were able to see $35,000 coming into this account,

25  and then $20,000 going to a third account?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 21-1920, Document 80, 05/25/2022, 3321484, Page120 of 256

**A-344**

K1MVTEM4                         Finocchiaro - direct

1    A.  That is correct.

2    Q.  And were you able to identify, based on Government Exhibit

3    105, who is the account holder for the account ending in 1046?

4    A.  Yes, account 1046 --

5    Q.  You can take a look.  It's Government Exhibit 105.

6    A.  That would be the account in the name of Touchless Labs

7    LLC.

8    Q.  And have you reviewed records showing who the signatory is

9    for that account?

10   A.  Yes.

11   Q.  And is that in the same record that you're looking at now?

12   A.  Yes, it is.

13   Q.  Who's the authorized signer for that account?

14   A.  That's Ari B. Teman as well.

15   Q.  And is he the only authorized signer?

16   A.  Yes, he is.

17   Q.  So is he the only authorized signer for all three accounts

18   we talked about?

19   A.  Yes, he is.

20   Q.  Okay.  Now we'll go to a third spreadsheet.

21           I'll direct your attention to the tab ending in 1046

22   at the bottom here and, in particular, row 32.

23           Does row 32 reflect money coming into that account?

24   A.  Yes, it does.  It shows the deposit located in column E,

25   $20,000 on 3/29; and it was coming from the account 0351.

K1MVTEM4                         Finocchiaro - direct

1    Q.  Okay.  Now, going back to the first spreadsheet we looked

2    at, 8085, I'll direct your attention back to row 48.  We looked

3    at this one before.  That shows the -- does that show the

4    $35,000 leaving that account?

5    A.  Yes, it does.

6    Q.  The day after the deposits?

7    A.  Yes.

8    Q.  And how much money is left in that account at the end of

9    the day after that transfer?

10   A.  4,000 -- or at the end of the day it would be $3,995.96.

11   Q.  I'd like to change topics for a moment and ask you

12   something about a chargeback.  Are you familiar with the term

13   "chargeback"?

14   A.  Yes.

15   Q.  What is a chargeback?

16   A.  A chargeback is essentially when a check is returning, so

17   it's when the check is presented to the financial institution.

18   However, the maker bank has established that for some reason

19   the check is no good, so it could be -- whether it would be

20   nonsufficient funds, altered or fictitious, or a counterfeit

21   check.

22   Q.  Is a chargeback one way to unwind a transaction?

23   A.  Correct.

24   Q.  What are some examples of things that could trigger

25   chargebacks?

K1MVTEM4                          Finocchiaro - direct

1    A.  Counterfeits, checks that are -- have been -- had a stop

2    payment that was placed on those, or checks that have been

3    deemed by the customer to not be legitimate checks.

4    Q.  And how does Bank of America decide whether to honor a

5    chargeback request from another bank?

6    A.  Banks honor each other's chargebacks.  So if we receive a

7    chargeback, it is honored based on the fact that the maker

8    financial institution is indicating that the check for any

9    reason is not good.

10   Q.  So if there's a chargeback in an account, where does the

11   money come from to fund the money going back?

12   A.  If there's -- if the funds have been removed from the

13   account and we don't have a right to offset, the bank would be

14   standing at that time at a loss and there would be a negative

15   balance.

16   Q.  That's in an instance where there isn't enough money in the

17   account to fund the chargeback.  But if there is enough money

18   in the account, what happens?

19   A.  If there's enough money in the account, then the funds

20   would just be deducted from the available balance.

21   Q.  So in the instance where there's -- there are $100 in the

22   account, and there's a $50 chargeback, what happens?

23   A.  It would leave $50 in the account and it would recourse

24   that 50.

25   Q.  What happens if there's only $10 in that account and

K1MVTEM4                          Finocchiaro - direct

1    there's a $50 chargeback?

2    A.   It's going to leave the account in a deficit of $40.

3         THE COURT:  Sorry, a little louder please.

4    A.   It's going to leave the account in a deficit of $40.

5    Q.   And who would be responsible for those $40?

6    A.   So it's the responsibility of the customer to make good on

7    the balance in the account; so if the account's in a negative,

8    that it is brought to a positive balance.

9    Q.   Would the bank pay that $40 first?

10   A.   It does.  It does honor the chargeback, and it recourses

11   the money back to the maker bank.

12   Q.   And then what are the bank's options to try to get those

13   $40 back?

14   A.   We do -- we look for the right to offset between accounts,

15   which means that we have the right to recover money that would

16   have been transferred from one account to another.  And then

17   after we've completed the process of the investigation, it

18   would go to collections at that time.  The only time that we

19   don't file for collections is when the account is being worked

20   actively by law enforcement in regards to a criminal

21   investigation.

22        MR. BHATIA:  Mr. Magliocco, if we could scroll up this

23   page just a bit to row 30.

24   Q.   What's the date of the transaction in row 30?

25   A.   It's on 4/2 of 2019.

K1MVTEM4                    Finocchiaro - direct

1    Q.  Is that a couple of days after the other -- the deposits we

2    talked about?

3    A.  Yes, it is.

4    Q.  And what transactions are you seeing happen in row 30?

5    A.  In row 30, this is 36,000, and it was for the returned item

6    chargeback.  Basically, it lumped the two together.  So when

7    they came through on the same day, instead of doing two $18,000

8    chargebacks, it does put those together and recourses the

9    account for a lump sum of 36,000.

10   Q.  How much money was in this account on the day before the

11   chargeback?

12   A.  On the day before the chargeback, there was $4,695.30.

13   Q.  And after the chargeback, how much was left in the account?

14   A.  The account was sitting at a negative balance of

15   $29,036.56.

16   Q.  And so how did Bank of America come up with the funds to

17   pay the $36,000 chargeback if there was only $4,695.30 before?

18   A.  Bank of America has the responsibility to make -- to

19   provide the funds back to the maker bank.  So we're sitting at

20   a loss at that time.

21   Q.  So Bank of America had to pay those extra funds?

22   A.  Correct.

23   Q.  Okay.  Ms. Finocchiaro, I'd like to direct your attention

24   now to some activity in April 2019.

25            MR. BHATIA:  Mr. Magliocco --

K1MVTEM4                          Finocchiaro - direct

1    Q.  Actually, Ms. Finocchiaro, I'm going to show you Government

2    Exhibits 110 through 112.  They should be in a binder in front

3    of you.  Do you recognize those documents?

4    A.  Yes, I do.

5    Q.  As a general matter, what are they?

6    A.  These are still frame images from our video surveillance

7    system.

8    Q.  And how do you recognize those documents in particular?

9    A.  I created the document.

10   Q.  Are you familiar with how electronic surveillance records

11   are created at Bank of America?

12   A.  Yes.

13   Q.  And how are you familiar with that?

14   A.  I use our video retrieval system.  So there are -- it's an

15   active running system.  It captures all of our images at all of

16   our ATMs, including our banking centers and our ATMs.

17   Q.  If you want to find the photograph or a video associated

18   with a given transaction, what do you do?

19   A.  I would pull the specific account for the date, time, and

20   location.  I would enter the video retrieval system, and I

21   would choose the specific location and the specific machine or

22   teller that the transaction would have occurred.

23   Q.  Does the bank collect photographs or surveillance of many

24   transactions or does it pick transactions in particular?

25   A.  No.  So it's a live-stream feed.  And we're able to go back

K1MVTEM4                        Finocchiaro – direct

1    in from a 120-day period and review all transactions second by

2    second, minute by minute, and for specific locations.

3    Q.  Are you a custodian of records for Bank of America?

4    A.  Yes, I am.

5    Q.  When these records, that is, Government Exhibits 110, 111,

6    and 112 -- were these records created and maintained by Bank of

7    America in the ordinary course of business?

8    A.  Yes, they were.

9    Q.  Were they made at or near the time of the acts described in

10   them by someone with knowledge of them?

11   A.  Yes, they were.

12            MR. BHATIA:  Your Honor, the government offers

13   Government Exhibits 110, 111, and 112.

14            THE COURT:  Is there an objection?

15            MR. GELFAND:  No, your Honor.

16            THE COURT:  All right.

17            They are all received, 110, 111, and 112.

18            (Government's Exhibits 110, 111, 112 received in

19   evidence)

20            MR. BHATIA:  Mr. Magliocco, could you please publish

21   Government Exhibit 111 in evidence.

22   Q.  Ms. Finocchiaro, what does the first page of this document

23   show?

24   A.  This is a transaction that was being completed at our

25   Lincoln Road Financial Center.  It was on 4/19 of 2019 at 18:00

K1MVTEM4                          Finocchiaro - direct

1   hours.  And it was listed as our LT1, so it was a transaction

2   that was being conducted with our Teller No. 1.

3   Q.  Quickly flipping to page 2, what does page 2 show?

4   A.  It's a transaction in the same sequence.  It's on 4/19 of

5   2019 at 18:05.  And again, it was at our Lincoln Road Financial

6   Center.

7   Q.  That's about five minutes later?

8   A.  That is correct.

9   Q.  And what about page 3?

10  A.  It was on 4/19/2019 at 18:05, so it was just a different

11  angle and the same minute.

12  Q.  Have you reviewed account records and identified

13  transactions happening around the same time these photographs

14  were taken?

15  A.  Yes, I did.

16          MR. BHATIA:  Mr. Magliocco, could you please publish

17  Government Exhibit 205 in evidence.

18  Q.  What does this document show?

19  A.  So this is a check that was being deposited.  It was -- the

20  maker bank was JPMorgan Chase.  And it was from account ABJ

21  Lenox LLC.  The account number on the bottom right-hand corner

22  is 833579100.

23  Q.  And have you reviewed bank records showing whether this was

24  taken around the same time as those photographs?

25  A.  Yes, it was.

K1MVTEM4                          Finocchiaro - direct

1   Q.   Into what account -- what account is this check addressed

2   to?

3   A.   GateGuard, Inc.

4   Q.   Is that the same one we talked about before?

5   A.   Yes, it is.

6   Q.   Who is the check written from -- or who is the account

7   holder that it's drawn from?

8   A.   ABJ Lenox LLC.

9   Q.   And what's the bank where these funds would come from?

10  A.   JPMorgan Chase.

11  Q.   That's listed up there in the top middle of the check?

12  A.   That is correct.

13  Q.   Okay.  And in the memo line, what do you see there?

14  A.   In the memo line it lists device removal, 539 Lenox Avenue

15  (gate).

16  Q.   And in the signature line, do you see a physical signature?

17  A.   There is not.

18  Q.   What do you see instead?

19  A.   There is a notation that indicates:  Draw per contract.  No

20  signature required.  Note to bank, this is a valid check.  You

21  are required by law -- contract at -- oh, contact at GateGuard

22  XYZ, legal terms, PHP accepted by above client.  Contact us

23  212-203-3714 with questions.

24  Q.   And you can take a look at the hard copy in front of you.

25  How many checks do you see in Government Exhibit 205?

K1MVTEM4                          Finocchiaro - direct

1    A.  Eighteen.

2    Q.  Okay.  And are all 18 of those checks addressed to

3    GateGuard, Inc.?

4    A.  All 18 are addressed to GateGuard, Inc., yes.

5    Q.  And are they all written from ABJ Lenox?

6    A.  Yes, they are.

7    Q.  Let's look at another example check.

8            MR. BHATIA:  Can we turn to the second page of this

9    document.

10   Q.  Okay.  Is this another check from ABJ Lenox LLC?

11   A.  Yes, it is.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

K1mdtem5                          Finocchiaro - direct

1    Q.  And is this one also for $18,000?

2    A.  It is for 18,000.

3    Q.  And what is listed in the memo line here?

4    A.  Device removal fee, 102 West 138th Street, gate.

5    Q.  Let's look at another example.

6           Mr. Magliocco, could we go to page 7 of this document.

7           In this check, what is listed in the memo line?

8    A.  Attorney use fee, 539 Lenox Avenue, Gate.

9    Q.  What is listed as the value of this check?

10   A.  $5,000.

11   Q.  OK.  That's different than the two we looked at a moment

12   ago?

13   A.  That is correct.

14   Q.  And, Mr. Magliocco, could we go to page 13 for another

15   example.

16          What's listed here in the memo line of this check?

17   A.  Collection fee, 539 Lenox Avenue, Gate.

18   Q.  And what about the value of this check?

19   A.  It was for $10,000.

20   Q.  OK.  This one is also from the ABJ Lenox account to the

21   GateGuard Inc. account?

22   A.  That is correct.

23          MR. BHATIA:  Mr. Magliocco, could you please publish

24   Government Exhibit 204.

25   Q.  Ms. Finocchiaro, are you able to identify which account

K1mdtem5                          Finocchiaro - direct

1    these checks were drawn from?

2    A.   It's ABJ Milano LLC.

3    Q.   Is that true for all the checks in this exhibit?

4    A.   Yes, it is.

5    Q.   Now, are these all addressed to the GateGuard Inc. account?

6    A.   Yes, they are.

7    Q.   How does the signature area compare to the previous check?

8    A.   It is the same.  It lists, "Draw per contract, no signature

9    required."

10   Q.   Ms. Finocchiaro, were these checks deposited at the same

11   time as the 18 that we just talked about?

12   A.   Yes, they were.

13   Q.   And at the same branch?

14   A.   Yes, they were.

15   Q.   OK.  Who is the -- which bank is sending the money for

16   these checks?

17   A.   These checks in this series are JPMorgan Chase.

18   Q.   How many checks are in this exhibit?

19   A.   Six.

20   Q.   And are these all made out from an ABJ Milano account at

21   the top?

22   A.   Yes, they are.  Yes.

23   Q.   OK.  And last set of checks for now.  I will direct your

24   attention to Government Exhibit 203.  I'll direct your

25   attention to the check image at the top here.

K1mdtem5                         Finocchiaro - direct

1              How many checks are in this set of government exhibit?

2    A.   There are three.

3    Q.   Are they all made out from 518 West 205 LLC at the top?

4    A.   Yes, they are.

5    Q.   And are they all made out to the GateGuard Inc. account?

6    A.   Yes, they are.

7    Q.   And these were deposited at the same time as the last two

8    sets of checks we talked about?

9    A.   Yes, they are.

10   Q.   OK.  When checks are deposited at a Bank of America branch,

11   what steps are taken to digitize the image of the check?

12   A.   The checks are scanned into our system and added to our

13   image view system and housed, so anytime we need to view the

14   images, that we can view the images of all deposits.

15   Q.   Are these scanned at the bank where they are first

16   deposited?

17   A.   Yes, they are.

18   Q.   And what happens with that picture from there?

19   A.   There are sent into the video imaging system.  It is a

20   record of the account, and at any time, like I said, if we need

21   to be able to see that image, we can view that image.

22   Q.   Are the checks also transmitted to the Federal Reserve or

23   through the interbank clearing process?

24   A.   Yes.  So in this case these are drawn on signature banks,

25   so they would have gone through the Federal Reserve.  The

K1mdtem5                         Finocchiaro - direct

1   JPMorganChase go through an interbank clearing system.

2   Q.  The check image in addition to sort of the information from

3   the transaction?

4   A.  Correct.

5   Q.  OK.  I will now direct your attention back to the

6   spreadsheet that we were looking at earlier.  That is

7   Government Exhibit 113, and the tab underneath 805.

8         So the tab underneath 805, that is the GateGuard Inc.

9   account?

10  A.  8085 is GateGuard Inc. yes.

11  Q.  Thank you, 8085.

12        And this is the same account that was left with a

13  negative balance on April 2, 2019?

14  A.  That is correct.

15  Q.  OK.  Now, if we can scroll up to row 16, Mr. Magliocco.

16        I'm sorry.  That's right.

17        What do you see in row 16?  What transaction is taking

18  place in row 16?

19  A.  So in the 8085 GateGuard account, there was a deposit that

20  was completed for $297,000.  And it is a counter credit, which

21  means that it was a transaction that was done at a financial

22  center with a teller.

23  Q.  And is this transaction listed in row 16, did that

24  transaction happen around the same time as this photograph was

25  taken?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-358

K1mdtem5                          Finocchiaro - direct

1    A.  Yes, it was.

2    Q.  And is the $297,000 the total value of the checks that you

3    testified about?

4    A.  Yes.

5    Q.  The three?

6    A.  The 203, 204 and 205 exhibits.

7    Q.  And at the end of the day, after that transaction, what is

8    the value of the account?

9    A.  Once the checks were deposited, the ending balance was

10   $271,803.12.

11   Q.  And what is the date of the deposit there?

12   A.  It was on 4/19/2019.

13   Q.  Based on your review of Government Exhibits 203, 204 and

14   205, is the date on the check the same as the date of the

15   deposit?

16   A.  Yes, it is.

17   Q.  OK.

18          Let's take a look at row 13, which is just three rows

19   up from where we were looking.  So that means it happens later,

20   right?

21   A.  That is correct.

22   Q.  OK.  And what is the date of the transaction in row 13?

23   A.  In row 13, it is a withdrawal and it was on 4/24.  It is

24   indicating a return item chargeback is completed.

25   Q.  What does a return item chargeback mean?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-359**

K1mdtem5                          Finocchiaro - direct

1   A.  It means that a few of the checks from that bulk deposit of

2   the $297,000 was returned, that they were indicating

3   counterfeit.

4   Q.  Is there a record that would show you which of those checks

5   from that 27-check deposit were the subject of a chargeback

6   here?

7   A.  On this tab, no.

8   Q.  Would that be in Government Exhibit 114 or somewhere else?

9   A.  It would be, yes.

10           MR. BHATIA:  Mr. Magliocco, could we go to Government

11  Exhibit 114 for a moment.

12           I will direct your attention to the third page at the

13  bottom.

14           Can you zoom in on the last two rows there.  I'm

15  sorry.  It is the three rows above that.

16  Q.  So looking at I think the bottom three rows that are zoomed

17  in here, what is the date of these transactions?

18  A.  The date of the transactions were, again, 4/19 of 2019.

19  Q.  And what is shown in this record?

20  A.  So this record from left to right, it is the date of the

21  returned item chargeback, so it is the date that Bank of

22  America is notified that the checks are returning for

23  counterfeit.  It tells us the dollar amount per item, and it

24  tells us the reason that those checks are returning.

25  Q.  What is the listed reason here?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1mdtem5                          Finocchiaro - direct

1    A.  It is counterfeit check.

2    Q.  Is that a description that you get from another bank, or is

3    that something that Bank of America would apply?

4    A.  No, that is something that -- they have to apply a return

5    reason code when they are sending us the chargeback.

6    Q.  Is the chargeback in this instance requested by Bank of

7    America or does the other -- does the other bank say I would

8    like to undo this transaction?

9    A.  It is the other bank indicating that their customer has

10   indicated that the transaction is not a legitimate transaction,

11   so it is them requesting.

12   Q.  The chargebacks that are shown here were initiated outside

13   of Bank of America?

14   A.  That is correct.

15   Q.  Is that true of all the transaction in this document?

16   A.  That is correct.

17   Q.  OK.

18           MR. BHATIA:  Mr. Magliocco, I would like to -- if you

19   could please go back to Government Exhibit 113.  That is the

20   spreadsheet.

21   Q.  So row 13 here shows the $33,000 chargeback, is that right?

22   A.  That is correct.

23   Q.  And then if you go up to row 12, what transaction do you

24   see there?

25   A.  On row 12 it is indicating that from the GateGuard Inc.

A-361

Klmdtem5                         Finocchiaro - direct

1    account, it is withdrawing $225,000 on 4/26 of 2019.  It is an

2    online banking transfer that's being completed to the account

3    that is checking account 0351.

4    Q.  So it shows $225,000 being sent to the account ending in

5    0351?

6    A.  That is correct.

7    Q.  Is that the Friend or Fraud account that you testified

8    about previously?

9    A.  Yes, it is.

10   Q.  Who is the author or signer for that account?

11   A.  It is Ari B. Teman.

12   Q.  Ms. Finocchiaro, one row above it, so row 11, what

13   transaction do you see take place in that row?

14   A.  That is an online banking transfer that's being completed

15   out of GateGuard into -- from online banking into checking

16   account 5580.

17   Q.  And based on your review of Government Exhibit 107, do you

18   know who the account holder is for the account ending in 5580?

19   A.  That is the account for -- it is a personal account for Ari

20   B. Teman.

21   Q.  Is there an authorized signer for that account?

22   A.  He is the sole signer for this account.

23   Q.  That one is a personal account instead of a business

24   account, is that right?

25   A.  That is correct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1mdtem5                        Finocchiaro - direct

1    Q.  So on the day before these two transfers, what is the total

2    value of the account?

3    A.  On the day prior to that transfer, it was 200 and --

4    $10,167.12.

5    Q.  After those transactions, it is $10,167.12, right?

6    A.  That is -- no.  I'm sorry, on the day after.  So it would

7    be on 4/29, and it would be a ledger balance of 4,624.51.

8    Q.  OK.  So with those two transactions, it goes from

9    approximately $238,000 to $10,000, is that right?

10   A.  It goes down to -- it goes, yes, correct.

11          MR. BHATIA:  OK.  Mr. Magliocco, I would like to

12   direct your attention to the tab ending in 0351, which is the

13   tab associated with the Friend or Fraud account.  And row 36,

14   scroll up to it.

15   Q.  What transaction do you see happening in row 36, Ms.

16   Finocchiaro?

17   A.  That is the $225,000 being transferred from account 8085 in

18   the name of GateGuard.

19   Q.  That is the money going from the GateGuard account to the

20   Friend or Fraud account?

21   A.  That is correct.

22   Q.  I would like to direct your attention now to row 34 -- let

23   me step back.

24          What is the date of the transaction you just testified

25   about in row 36?

K1mdtem5                         Finocchiaro - direct

1    A.   4/26 of 2019.

2    Q.   Now looking at row 34, what is the date of that

3    transaction?

4    A.   4/26/2019.

5    Q.   And what transaction is happening there?

6    A.   It is a $4,500 cash withdrawal that's being completed from

7    the online banking transferring the funds from GateGuard -- I'm

8    sorry, from Friend or Fraud over to account 5580.

9    Q.   And based on your review of Government Exhibit 107, who is

10   the account holder for that account?

11   A.   For 5580, it is Ari Teman.  Actually, 5580 is Touchless --

12            (Pause)

13            5580 is Ari B. Teman.

14   Q.   And isn't there another transaction on the same day,

15   according to this spreadsheet?

16   A.   On 4/26 --

17   Q.   That is right.

18   A.   -- there is a transaction via online banking.  It's a

19   withdrawal transferring 180,000 to account -- checking account

20   1046.

21   Q.   OK.  And do you see another transaction from that account

22   in row 29?

23   A.   There was -- on 4/29, there was a transaction which was a

24   deposit of $125,400, and it was an online banking transfer from

25   checking account 1046.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-364

K1mdtem5                         Finocchiaro - direct

1   Q.  So are you seeing the money going into the account 1046 and

2   then coming back three days later?

3   A.  That is correct.

4   Q.  OK.  I'll direct your attention to row 32 here.

5          Are you seeing -- there a wire transaction in that

6   row?

7   A.  Yes, there is.  It is an international wire that's

8   conducted on 4/29.

9   Q.  And are you able -- is there any more information you can

10  get about where it is being sent to -- the beneficiary, I

11  should say?

12  A.  Yes.  It was -- I can't pronounce it, but Zuhuhai Taichiuan

13  Cloud Tech ID -- Tech and then there is an ID number.

14  Q.  In row 24 -- scroll up just a bit -- is there another wire

15  transaction there?

16  A.  There is another wire transaction.  It is being conducted

17  on 5/1, and it is going to beneficiary of ZBT International

18  Limited.

19  Q.  And now I will direct your attention to row 10.

20         This is all under the Friend or Fraud account, is that

21  right?

22  A.  I do believe so.  If you can scroll over --

23         THE COURT:  A little louder, please.

24  A.  It is in the Friend or Fraud Inc. account, yes.

25  Q.  This is the account where money was transferred from the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-365

K1mdtem5                          Finocchiaro - direct

1   GateGuard account to this account?

2   A.  That is correct.

3   Q.  OK.  So in row 10, what transaction do you see here taking

4   place?

5   A.  That is on 5/8, there was a $4,000 withdrawal, and it is a

6   customer withdrawal image.  So it was a transaction that was

7   taking $4,000 out of a physical teller.

8   Q.  Ms. Finocchiaro, I would like to direct your attention to

9   Government Exhibit 112. in evidence.

10          What's the date listed here on this document?

11  A.  5/8 of 2019.

12  Q.  What is this?

13  A.  This is showing a cash withdrawal transaction at our 1 Penn

14  Plaza location on 5/8 at 15:04.

15  Q.  Based on your review of this record and the account record,

16  what is the connection between the $4,000 transaction and this

17  photograph?

18  A.  This is the photograph of Mr. Teman completing the

19  transaction for the cash withdrawal.

20  Q.  All right.  Let's switch topic now.  We'll talk about

21  chargebacks again.

22          Based on your review of the Bank of America records,

23  was there a chargeback of some of the funds deposited into the

24  GateGuard account in April 2019?

25  A.  Yes, there was.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1mdtem5                         Finocchiaro – direct

 1   Q.  OK.  Let's take a look again at Government Exhibit 114, and

 2   I will direct your attention to the first page.

 3             If we can zoom in on just the first row.

 4             Ms. Finocchiaro, what is listed here as the -- what is

 5   the description listed here for why this chargeback took place?

 6   A.  RCC breach of warranty.  So that is a remotely created

 7   check breach of warranty.

 8             MR. BHATIA:  One moment.

 9             (Pause)

10             Your Honor, this might be an appropriate time for the

11   instruction regarding relief credit checks.

12             MR. GELFAND:  I would join in that request.

13             THE COURT:  Counsel, has the expression been used yet

14   in the receipt of evidence?

15             MR. BHATIA:  The witness just used it.

16             THE COURT:  All right.  Very good.

17             Ladies and gentlemen, you have just heard reference to

18   something called a remotely created check, also known for short

19   as an "RCC."  A remotely created check is a check that is not

20   created by the paying bank and that does not bear a signature

21   applied or purported to be applied by the person on whose

22   account the check is drawn. I instruct you that the banking

23   laws of this country do permit the use of remotely created

24   checks under certain circumstances, provided, of course, that

25   the customer on whose account the check is drawn has authorized

K1mdtem5                     Finocchiaro - direct

1    the check.  However, this case does not involve whether or not

2    the checks in question here meet the technical definition of a

3    remotely created check, and you should not concern yourself

4    with that.  The question for you will be whether the government

5    has proven beyond a reasonable doubt the elements of the

6    offenses charged, which, again, are bank fraud and wire fraud.

7            I will instruct you on the elements of those offenses

8    later in the trial after all of the evidence has been received.

9            And that ends the instruction.  Go ahead.

10           Thank you, counsel.

11   BY MR. BHATIA:

12   Q.  As you understand it, what does "RCC warranty breach" mean

13   as a reason for a chargeback?

14   A.  It means that the maker has disputed at this point that

15   there is a breach of warranty, so there is an agreement and

16   that the agreement has failed.

17   Q.  And based on your review of these records, was all of the

18   $297,000 deposited from the 27 checks subject to a chargeback?

19   A.  They were all subject to a chargeback, correct.

20           MR. BHATIA:  Mr. Magliocco, could we go back to

21   Government Exhibit 113.

22           If you could go to row 3.  I'm sorry, in the tab

23   ending in 8085.

24   Q.  Ms. Finocchiaro, what is happening in row 3?

25   A.  On 5/7, we received a return item chargeback for a total

A-368

K1mdtem5                          Finocchiaro - direct

1   aggregate amount of $264,000.

2   Q.  And is that another chargeback?

3   A.  It is.  It is a chargeback for all of the items totaling

4   264,000.

5   Q.  So between this $264,000 chargeback and the one in row 13,

6   are those all -- does that cover all the 27 checks?

7   A.  Yes, it does.

8   Q.  OK.  And we don't need to switch tabs, but we saw a few

9   photographs from the $4,000 transaction, is that right?

10  A.  Yes.

11  Q.  The $4,000 was withdrawn from the teller?

12  A.  Yes, it was.

13  Q.  Was that transaction done at a bank here in Manhattan?

14  A.  Yes, it was.

15  Q.  OK.  After this chargeback for $264,000, the one here, so

16  after all the chargebacks for all the checks, what is the value

17  of the account?

18  A.  We are sitting at a negative amount of $260,319.81.

19  Q.  How is Bank of America able to return $264,000 if there was

20  only about $4,000 in the account?

21  A.  We are currently sitting on a total loss amount in regards

22  to that.

23  Q.  Bank of America had to pay the money out?

24  A.  That is correct.

25  Q.  It had to cover it?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1mdtem5                         Finocchiaro - direct

1   A.  That is correct.

2   Q.  We mentioned earlier that chargeback requests can come from

3   another bank, right?

4   A.  Correct.

5   Q.  So the other bank is saying we need to get the money back.

6        What happens if Bank of America's customer says this

7   transaction is authorized but the other bank says it is not

8   authorized, what does Bank of America do?

9   A.  So we look at the information.  However, it was indicated

10  that it was looked at as a dispute between the customer, the

11  maker and the depositor, and at that point it is not -- it's

12  not within our decision to rectify that matter.

13  Q.  In that scenario where the other bank says it is not

14  authorized, Bank of America's customer says it is, does the

15  transaction go through or does it not go through?

16  A.  So the chargeback does remain on the account.  We do remain

17  in the negative.  It is the customer's responsibility to make

18  the balance whole.

19  Q.  So the practice of Bank of America is to honor the

20  chargeback?

21  A.  That is correct.

22  Q.  Did there come a time when the GateGuard account was

23  closed?

24  A.  Yes, there was.

25  Q.  And what was the value remaining in the account when it was

Klmdtem5                          Finocchiaro - direct

 1   closed?

 2   A.   In the GateGuard account, the total negative balance was

 3   $260,319.81.

 4   Q.   And you testified about two other accounts, the Friend or

 5   Fraud account and the Touchless Labs account?

 6   A.   Correct.

 7   Q.   Were those accounts closed as well?

 8   A.   Yes, they were.

 9   Q.   And was there a positive balance or a negative balance in

10   those accounts?

11   A.   Can we look at the --

12   Q.   Let's take a look at those tabs.  I will direct your

13   attention to the tab ending in 0351.  That is for the Friend or

14   Fraud account that you testified about?

15   A.   Correct.  So at that time when the account was closed, it

16   was at a positive balance of $8,386.

17   Q.   And what about the account ending in 1046?  That is the

18   Touchless Labs account.

19   A.   We were sitting at a positive balance of $86,558.18.

20   Q.   What did Bank of America do with the money in those

21   accounts?

22   A.   So those fund were immediately sent to hold harmless in

23   regard -- it is a holding -- it is a holding account that the

24   bank has.  We review the account for offset to see if we're

25   able to utilize the funds from the transfer to offset the loss

K1mdtem5                            Finocchiaro - direct

1     that was incurred based on the returned item chargeback.

2     Q.  Before that, did there come a time when the bank, or Bank

3     of America, tried to return the deposited balance funds in

4     those accounts?

5     A.  Yes.

6     Q.  What happened?

7     A.  So the funds were -- the checks were cut for the individual

8     accounts and the physical check was mailed.

9     Q.  Let's unpack that.  So in this account, for example, there

10    is $86,558.18 at the time of closing, is that right?

11    A.  That is correct.

12    Q.  Approximately?

13             What did Bank of America do with that $86,000?

14    A.  The funds were placed into an official item and they were

15    mailed to the customer.

16    Q.  A check was mailed to the customer?

17    A.  Correct.

18    Q.  Is the same true of the other account?

19    A.  That is correct.

20    Q.  OK.  What happened with those checks?

21    A.  The checks were returned in the mail for the address.

22    Q.  You mentioned something about -- you mentioned something

23    called an offset.  I want to unpack that a little bit.

24             If there is a negative account -- if there is a

25    negative balance when a chargeback happens, does Bank of

K1mdtem5                          Finocchiaro - direct

1   America try to take some steps to get some of that money so it

2   can pay for the chargeback?

3   A.  We do.  So we look at the events that occurred, so the

4   transactions that were incoming, what was the trail of events

5   after that, so we look to see where the funds were transferred

6   to to see if we can offset to bring those funds back to cover

7   the loss that's being sustained.

8   Q.  If an individual had three accounts at the bank, for

9   example, and there was a chargeback from one, could the bank

10  try to use the funds in the other account to pay for it?

11  A.  So we do not have the right to offset when the tax

12  identification number is different from one entity to the

13  other.

14  Q.  So if it was an individual -- three personal accounts,

15  would the bank typically be able to draw funds from the other

16  accounts?

17  A.  Yes.

18  Q.  If it was for three different businesses, for three

19  different tax numbers, would the bank typically be able to use

20  the funds?

21  A.  We cannot offset our loss when it is a different tax

22  identification number.

23  Q.  And based on your review of the records admitted into

24  evidence earlier today, do you know if the three accounts that

25  you talked about had different tax ID numbers?

K1mdtem5                          Finocchiaro - cross

1   A.  They did.

2   Q.  So as a general matter, is the bank able to recover funds

3   from those three accounts?

4   A.  We were not.

5          MR. BHATIA:  Nothing further, your Honor.

6          THE COURT:  All right.  Thank you.

7          Cross-examination, Mr. Gelfand.

8          MR. GELFAND:  Thank you, your Honor.

9          THE COURT:  Yes.  You may inquire.

10  CROSS-EXAMINATION

11  BY MR. GELFAND:

12  Q.  Good afternoon, Ms. Finocchiaro.

13  A.  Good afternoon.

14  Q.  Did I pronounce that right?

15  A.  Yes.

16  Q.  Ms. Finocchiaro, you and I have never met, correct?

17  A.  That is correct.

18  Q.  You and I have never spoken, correct?

19  A.  That is correct.

20  Q.  You did, on the other hand, meet several times with the

21  prosecutors to prepare for your testimony, correct?

22  A.  I did.

23  Q.  And you spoke with them several times by phone, correct?

24  A.  I did.

25  Q.  OK.  Now, you testified that you are the senior fraud

Klmdtem5                          Finocchiaro - cross

```
 1   investigator, or a senior fraud investigator at Bank of

 2   America, correct?

 3   A.  Yes.

 4   Q.  And you have been there for quite some time, correct?

 5   A.  Yes.

 6   Q.  You testified that in your job, you've conducted thousands

 7   of investigations; those were your words, correct?

 8   A.  Correct.

 9   Q.  OK.  Could I ask you to speak up a little bit?

10   A.  Yes, that is correct.

11   Q.  Now, obviously, you're not law enforcement.  When you say

12   "investigations," you mean investigations on behalf of the

13   bank, correct?

14   A.  That is correct.

15   Q.  And your job is to protect, if possible, the bank's

16   interests, correct?

17   A.  Correct.

18   Q.  OK.  And would you agree with me that when conducting any

19   sort of investigation, it is important to obtain all relevant

20   information, to the extent possible?

21   A.  Yes, that is correct.

22   Q.  And so, in other words, just to speak simply, if there are

23   two sides to a story, it is important to actually get both of

24   those sides, correct?

25   A.  Correct.
```

A-375

Klmdtem5                              Finocchiaro - cross

1   Q.   OK.   The contracts that are referenced on the checks that

2   you've testified about, you testified that there is a URL,

3   correct?

4   A.   That is correct.

5   Q.   And just to be clear, what is a "URL"?

6   A.   It's a hyperlink that would take you to -- you can take

7   that link and Google that and you can identify the subject of

8   that link.

9   Q.   So it is very simple to access that website; you just take

10  it into a Web browser, correct?

11  A.   That is correct.

12  Q.   Did you do that over the course of your investigation?

13  A.   Early on in the investigation, I do believe that I did,

14  yes.

15  Q.   And that took you to GateGuard's website and terms and

16  conditions and payment terms, correct?

17  A.   So the bank actually blocks the links, so I was not able to

18  view that, but I would have attempted to do that.

19  Q.   When you say the bank blocks the links, meaning your

20  computer security?

21  A.   Computer security or IT department does not allow certain

22  links to be processed.

23  Q.   OK.   Did you take an iPhone, for example and, just look up

24  the website?

25  A.   I did not.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1mdtem5                          Finocchiaro - cross

1    Q.  So to this day, have you actually read the GateGuard

2    contract?

3    A.  I did not.

4    Q.  Now, you testified about a number of what the government

5    called checks, basically these 29, quote-unquote, checks or

6    RCCs, correct?

7    A.  Correct.

8    Q.  OK.  Now, in total there were initially, as you testified,

9    two mobile deposits into the GateGuard account in March,

10   March 28th of 2019, correct?

11   A.  That is correct.

12   Q.  And two mobile -- I'm sorry, and 27 checks deposited

13   physically at a bank branch in Miami, Florida?

14   A.  That is correct.

15   Q.  And that was in April, essentially three weeks later,

16   April 2019, correct?

17   A.  Correct.

18   Q.  OK.  And we looked at a number of those checks.  I'm not

19   going to show you all of them but I want to ask you a couple of

20   questions about them.

21          MR. GELFAND:  If I can turn on the Elmo, please?

22          Your Honor, I'm showing the witness Government's

23   Exhibit 201, which was previously admitted.

24          THE COURT:  Very good.

25   BY MR. GELFAND:

Klmdtem5                          Finocchiaro - cross

1   Q.  Now, can you, just to refresh our memory, you've testified

2   to Government's Exhibit 201.  It was one of the first documents

3   that the prosecutor showed you, correct?

4   A.  That is correct.

5   Q.  OK.  This was one of the March 28, 2019 mobile deposits,

6   correct?

7   A.  That is correct.

8   Q.  OK.  And you would agree with me, would you not, that this

9   expressly includes the phrase, "Draw per contract, no signature

10  required," correct?

11  A.  Correct.

12  Q.  OK.  And you testified that there is essentially, I'll use

13  your phrase, a squiggly line, correct?

14  A.  Correct.

15  Q.  In fact, that is the same squiggly line, if you will, as on

16  the endorsement section of the check, correct?

17  A.  That is correct.

18  Q.  Now, when you sign an endorsement of a check, we all have

19  this life experience, you are signing that you are the one

20  depositing the check, correct?

21  A.  Correct.

22  Q.  So it is pretty clear that if in fact Ari Teman was the one

23  depositing this check and then signing on the back, that,

24  quote-unquote, signature squiggly line represented is Ari

25  Teman's signature, correct?

**A-378**

K1mdtem5                          Finocchiaro - cross

1   A.  Yes.

2   Q.  OK.  Just to be clear, when we look at, for example, the

3   only other one introduced into evidence deposited that day --

4   for the record, this is Government Exhibit 202 -- do you see

5   that in front of you?

6   A.  Yes, I do.

7   Q.  OK.  And that, too, includes the same squiggly line in both

8   sections of the check, correct?

9   A.  There is a squiggly line for the signature on the top.  It

10  looks like a straight line across the bottom underlining

11  "Deposit only."

12  Q.  OK.  Can we agree that all four of these squiggly lines

13  look awfully similar?

14  A.  They do look awfully similar.

15  Q.  OK.  Both of these include, "Draw per contract, no

16  signature required," correct?

17  A.  Correct.

18  Q.  And, in fact, you testified that these two -- I am going to

19  loosely use the word checks -- these two documents were

20  deposited into the Bank of America account for GateGuard Inc.,

21  correct?

22  A.  Correct.

23  Q.  OK.  And GateGuard had been a longtime customer of Bank of

24  America as of March of 2019, the day that they were deposited,

25  correct?

K1mdtem5                          Finocchiaro - cross

1    A.  Correct.

2    Q.  OK.  And you've reviewed in preparing for your testimony

3    today and in investigating this case for the bank, you've

4    reviewed extensive bank records, it sounds like, correct?

5    A.  Correct.

6    Q.  So is it fair to say that you are at least probably more

7    familiar than the average person with GateGuard's banking

8    activity at Bank of America?

9    A.  Yes.

10   Q.  OK.  And in fact, GateGuard opened its account -- I'm

11   talking about GateGuard specifically -- in 2016 with Bank of

12   America, correct?

13   A.  I would have to refresh but I do believe that is correct.

14   Q.  OK.  And when a customer opens an account with a bank, the

15   customer fills out some paperwork with the bank, correct?

16   A.  That is correct.

17   Q.  OK.  And what's the purpose, just generally speaking, of

18   the paperwork that the customer fills out?

19   A.  There is a signature card that's required, so it houses the

20   customer's signature.  It's the deposit agreement, and the

21   rights and responsibilities of the customer.

22   Q.  You used the phrase "signature card."  That is a kind of

23   pretty important document in banking lexicon, correct?

24   A.  That is correct.

25   Q.  The signature card is basically the bank's way of knowing

K1mdtem5                              Finocchiaro - cross

1    who the person authorized to conduct business for this account

2    is, correct?

3    A.   Correct.

4    Q.   And you testified on direct examination that with respect

5    to GateGuard, the Friend or Fraud Incorporated account, the Ari

6    Teman individual account, essentially all the accounts that you

7    have testified to at Bank of America, the one person with

8    signature authority Was Ari Teman correct?

9    A.   That is correct.

10   Q.   And bank of America obviously knew that because Bank of

11   America had the signature card and the other depository

12   documents -- my word not yours -- in its possession, correct?

13   A.   Correct.

14   Q.   So I'm showing you, for example, what's been introduced as

15   Government Exhibit 101.

16            Can you just tell me generally what this document is

17   at Bank of America?

18   A.   It is just indicating that the account is being opened

19   under the name of GateGuard, that the -- it is being opened

20   with a corporation out of Delaware.  It is indicating that it

21   was being opened on the 17th of November of 2016, with Ari B.

22   Teman as the president.

23   Q.   OK.  So to be clear, it's -- in March of 2019, in April of

24   2019, the dates that are relevant to this case for purposes of

25   Bank of America, Bank of America clearly knows that GateGuard

K1mdtem5                          Finocchiaro - cross

1    is a company, of course, but it is Ari Teman at least as far as

2    Bank of America is concerned?

3    A.   Correct.

4    Q.   And, in fact, there is a signature -- forgive my phrase for

5    using the word signature card but it is not literally a card.

6    What are we looking at on the screen here on page Bates number

7    173?

8    A.   It would be the account number ending in 8085, and the

9    signature, the squiggly line indicating he is the president.

10   Q.   OK.  So we've used the commonly used phrase "signature

11   card."  Is this, even though it is a document, not a card, is

12   this a signature card?

13   A.   Yes, it is.

14   Q.   OK.  And this contains the same squiggly line that we see

15   on these checks, correct?

16   A.   Correct.

17   Q.   Fair to say that the squiggly line on those checks, clearly

18   if Bank of America looked at any of its documents, it would

19   know that's Ari Teman's signature, correct?

20   A.   Correct.

21   Q.   OK.  Now, if we look back at the March deposits, you

22   testified that these were deposited through online banking,

23   correct?

24   A.   Correct.

25   Q.   And online banking, to access an account, you testified

Klmdtem5                        Finocchiaro - cross

1    that you are familiar with that system at Bank of America,

2    correct?

3    A.   Correct.

4    Q.   OK.  It's obviously not easy from a bank security

5    standpoint for someone to log into an online banking

6    application, correct?

7            In other words, if I wanted to log into your online

8    banking interface, I would have to know your username and

9    password, correct?

10   A.   That is correct.

11   Q.   There might even be other futures of authentication, there

12   might not, but is that fair to say?

13   A.   It is.

14   Q.   OK.  In other words, logging into online banking is, for

15   all intents and purposes, the practical equivalent of walking

16   into a bank and introducing yourself, correct?

17   A.   It's logging in with your specific username and your

18   specific password, also from a known device, so we capture the

19   device information as well to know that it is a known device

20   that you typically log into.

21   Q.   OK.  So, in other words, there is no concealing by the

22   depositing of these two RCCs that you've identified as

23   Government's Exhibits 101 and 102 in March of 2019, that those

24   are deposited through GateGuard's specific security features,

25   correct?

K1mdtem5                          Finocchiaro - cross

 1   A.  Correct.

 2   Q.  So whoever deposited them --

 3          I know you weren't physically standing there, correct?

 4   A.  Correct.

 5   Q.  -- had to have access to those features, correct?

 6   A.  Exactly, yes.

 7   Q.  And Bank of America's reasonable assumption is that must be

 8   the person who's, first of all, endorsing the check, right?

 9   A.  Correct.

10   Q.  And it must be the person who at least has signature

11   authority or some sort of authority over the account?

12   A.  Correct.

13   Q.  OK.  Now, to be clear, these two RCCs, as you testified,

14   clearly use the language "Draw per contract, no signature

15   required," correct?

16   A.  Correct.

17   Q.  OK.  And that's not hidden somewhere; that's essentially

18   front and center on the check, correct?

19   A.  Correct.

20   Q.  OK.  And both of these include the check number.  For

21   example, 201 includes check number 1, correct?

22   A.  Correct.

23   Q.  202 includes check number 1, correct?

24   A.  Correct.

25   Q.  Fair to say that these specifics documents, 201 and 202,

K1mdtem5                        Finocchiaro - cross

1    clearly indicate to Bank of America that these are RCCs

2    regardless of whether they were drawn with authority or not?

3    A.  Correct.

4    Q.  OK.  In other words, that's not a secret to the bank,

5    correct?

6    A.  Correct.

7    Q.  It's front and center, it is on the document, there is no

8    hiding it, correct?

9    A.  Correct.

10   Q.  OK.  And Bank of America obviously understood that these

11   were RCCs, correct?

12   A.  When they were deposited, the checks are imaged, so we

13   would have known at that time that the checks were from the

14   maker bank, but we wouldn't have seen that they were remotely

15   created checks without physically looking at the checks.

16   Q.  OK.  Let me break that down for a second.

17          When Bank of America physically looks at the checks,

18   Bank of America clearly knows they are RCCs, corrects?

19   A.  Right.  If the item is viewed when it is deposited, they

20   would know that it was an RCC.

21   Q.  OK.  And in fact, you testified in total about 29

22   documents, correct?

23   A.  Correct.

24   Q.  They all clearly indicate to anyone looking at them who

25   knows what an RCC is that they are an RCC, correct?

K1mdtem5                        Finocchiaro - cross

1    A.  Correct.

2    Q.  And Bank of America readily acknowledges that, correct?

3    A.  Correct.

4    Q.  OK.  The catch, as I understood your testimony on direct

5    examination, is that Bank of America had no way of controlling

6    what another bank's customer tells the other bank, correct?

7    A.  We do not, no.

8    Q.  So, for example, if I understood your testimony correctly,

9    if ABJ, for example, tells I don't remember whether it was ABJ

10   or it was JPMorgan's signature, but you know what I am talking

11   about, right?

12   A.  Yes.

13   Q.  If ABJ tells its bank that is not Bank of America that

14   these were not authorized, that there is no contract, in

15   essence, Bank of America doesn't independently kind of

16   arbitrate that dispute, correct?

17   A.  Do we dispute that?  Is that what you are asking?

18   Q.  Yes.

19   A.  We would review -- we may review that, but there was not a

20   dispute.

21   Q.  In other words, Bank of America is not essentially

22   adjudicating that billing dispute between GateGuard, defender,

23   and its customer, correct?

24   A.  Correct.

25   Q.  So if the customer is wrong, either intentionally or

A-386

K1mdtem5                        Finocchiaro - cross

1    otherwise, and actually there is a contract authorizing this,

2    then Bank of America can't control the fact that it is a

3    chargeback, correct?

4    A.  Correct.

5            MR. BHATIA:  Objection to form.

6            THE COURT:  Overruled.

7    BY MR. GELFAND:

8    Q.  You can answer the question.

9    A.  Correct.

10   Q.  OK.  Now, you testified that in April, Mr. Teman -- I'll

11   just connect the dots -- walks into a Bank of America branch,

12   and you testified there is surveillance footage and other

13   documents from that day, correct?

14   A.  Correct.

15   Q.  So we've got two days.  We talked about the mobile deposits

16   on those two initial checks, correct?

17   A.  Correct.

18   Q.  And then there is this 27 other checks that are broken down

19   into a couple of government exhibits.

20   A.  Correct.

21   Q.  I am happy to show you any of them that you would like.

22   I'm certainly not trying to trick you or anything.  But can we

23   agree that all of those checks include the exact same RCC link

24   which is on those 27 checks?

25   A.  They do, yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1mdtem5                        Finocchiaro - cross

1    Q.  And you've reviewed those prior to testifying, correct?

2    A.  Yes.

3    Q.  So if we just look, for example, at one of them -- we'll

4    look in a minute.

5           You testified that Bank of America captured

6    essentially video -- I am going to probably make it sound more

7    exciting than it is -- video surveillance footage, correct?

8    A.  Correct.

9    Q.  OK.  In capturing video surveillance footage, if I

10   understood your testimony correctly, you were actually the one

11   who within, whatever amount of days, 120 days or something,

12   went and physically got the screenshots that have been

13   introduced into evidence, correct?

14   A.  That is correct.

15   Q.  OK.  And in doing that, you did that -- how many days is it

16   stored?

17   A.  It's stored for 120 days.

18   Q.  OK.  And so within essentially the first couple of months,

19   after that happens -- four months I guess -- you or someone

20   with your similar position at Bank of America can go out and

21   actually access the whole video, not just screenshots, correct?

22   A.  That is correct.

23   Q.  OK.  And I presume that you watched the whole video in

24   capturing the screenshots?

25   A.  I did, yes.

A-388

K1mdtem5                         Finocchiaro - cross

1    Q.  OK.  The truth is at the bank that day, Mr. Teman was

2    actually there for quite some time, correct?

3    A.  Correct.  It takes time to process that amount of checks.

4    Q.  And Mr. Teman, as you have seen these, quote-unquote,

5    surveillance footage, the clips that you have, when Mr. Teman

6    walked into the bank, he interacted with a number of different

7    people, correct?

8    A.  Correct.

9    Q.  There was actually a manager who was involved in the

10   transaction, correct?

11   A.  I'm not sure if it was a manager or who the other person

12   was.

13   Q.  Did it appear that someone brought in someone else's

14   assistance?

15   A.  Yes.

16   Q.  OK.  And throughout the entire interaction, Mr. Teman

17   clearly identified himself, correct?

18   A.  Correct.

19   Q.  He showed his driver's license, correct?

20   A.  Correct.

21   Q.  He signed a deposit slip, correct?

22   A.  Correct.

23   Q.  And obviously on the deposit slip is the correct

24   information, correct?

25   A.  Yes.

**A-389**

K1mdtem5                          Finocchiaro - cross

1   Q.  OK.  So Mr. Teman is walking in plain view into Bank of

2   America on April 19th of 2019, if I have the date right?

3   A.  April 19th, yes.

4   Q.  OK.  And clearly identifying himself to the bank as

5   himself, correct?

6   A.  Correct.

7   Q.  Now, in processing these particular checks, Mr. Teman

8   actually goes physically to a teller, correct?

9   A.  Correct.

10  Q.  Just so we're speaking the same language, literally the

11  same kind of teller you would get if you walked into any branch

12  today and cashed a check?

13  A.  Correct.

14  Q.  Or got cash or whatever?

15  A.  Correct.

16  Q.  If we looked, for example, at Exhibit 111 -- to refresh our

17  memory, do you see 111 in front of you on the screen?

18  A.  Yes, I do.

19  Q.  I'm going to show the black-and-white version, but the one

20  in evidence is the color one, correct?

21  A.  Correct.

22  Q.  OK.  Fair to say that this -- as you testified, this is on

23  April 19th.  This reflects the interaction with the deposit,

24  correct?

25  A.  That is correct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1mdtem5                         Finocchiaro - cross

1   Q.  With the teller, correct?

2   A.  Correct.

3   Q.  And whoever this person is, this is obviously the teller,

4   correct?

5   A.  That is correct.

6   Q.  OK.  Now, fair to say that if you look at this, Mr. Teman

7   made no efforts at all to disguise his identity?

8   A.  Correct.

9   Q.  OK.  He was not wearing a hat?

10  A.  No.

11  Q.  He doesn't have like a silly mustache or anything, correct?

12  A.  Correct.

13  Q.  OK.  In fact, this branch of Bank of America, you had to

14  have an opportunity to research which branch that was, correct?

15  A.  That is correct.  It was our Lincoln Road Financial Center.

16  Q.  In fact, that is directly across the street from

17  GateGuard's office at the time in Florida, correct?

18  A.  I do believe that is directly across the street.

19  Q.  OK.  And obviously you have that address; you've

20  investigated this for quite some time, correct?

21  A.  Correct, yes.

22  Q.  So fair to say Mr. Teman was also a regular customer at the

23  bank?

24  A.  I do believe that he has done some other activity in our

25  financial center there, yes.

K1mdtem5                    Finocchiaro - cross

1   Q.  OK.  Now, if we look at just one of those other batches of

2   checks --

3           THE COURT:  Mr. Gelfand, I am looking for a natural

4   break point for the evening.  You let me know when you are at

5   one.

6           MR. GELFAND:  Whenever the Court would like.

7           THE COURT:  I don't want to interrupt the sequence.

8   If this is a good time?

9           MR. GELFAND:  Now is a fine transition time, your

10  Honor.

11          THE COURT:  All right.  Very good.

12          Ladies and gentlemen, we are going to adjourn for the

13  evening.  We've made good progress today, and I appreciate how

14  attentive all of you have been.  I want to wish you a good

15  evening.  And I will remind you, as I did earlier, please do

16  not discuss or research the case.

17          As to our schedule, at 8:45 tomorrow Mr. Smallman has

18  arranged for breakfast for you in the jury room.  As he will

19  explain to you, you should come straight to the jury room.  You

20  are at liberty to take us up on the invitation of free food;

21  you are not obliged to do so.  But I need to have you here at

22  9:30 promptly.  As soon as you are all here at 9:30, I will

23  bring you all out and we'll have a full day of work and make

24  some real headway.

25          Have a good evening.  I look forward to seeing you

K1mdtem5                     Finocchiaro - cross

1    tomorrow.

2            Sorry, one other thing.  Please, take your notepads

3    and pens to the jury room but do not take them home.  Leave

4    them in the jury room.  Thank you.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K1mdtem5

1              (Jury not present)

2              THE COURT:  All right.  Counsel, be seated.

3              Just for planning purposes, Mr. Gelfand, without

4    holding you to it, how much longer do you expect on cross?

5              MR. GELFAND:  20 minutes.

6              THE COURT:  20 minutes, OK.

7              And Ms. Finocchiaro just whispered to me that she has

8    a flight tomorrow.  Counsel will coordinate about that.  But in

9    any event, she is our first witness tomorrow, and hopefully the

10   jury will be here on time and you will get out promptly.

11             OK.  You may step down.

12             (Witness excused)

13             THE COURT:  Before we adjourn for the evening, let me

14   just go around and ask if anyone has anything to raise.

15             Government?

16             MR. BHATIA:  Nothing, your Honor.

17             THE COURT:  All right.

18             Defense?

19             MR. GELFAND:  No, your Honor.

20             THE COURT:  All right.  In terms of just small

21   homework assignments you still have from day one is, from the

22   government, just to get me the updated daily exhibit list, and

23   I am still expecting advice of counsel written proposed

24   instructions from each of you.

25             Very good.  If you could -- I am taking a guilty plea

A-394

K1mdtem5

1    here momentarily.  You don't have to clear off the whole table,

2    but clear off enough space so that there are, let's say, two

3    spots at each table.  Thank you.

4              MR. IMPERATORE:  Your Honor, I'm sorry.  With the

5    Court's permission, I would like to request to attend a

6    pretrial conference tomorrow at 2 o'clock before Judge Rakoff.

7    Brian Blais will be taking my place.

8              THE COURT:  My permission isn't needed but I am happy

9    to grant it, of course.  That is fine.  And I will introduce

10   Mr. Blais to the jury.

11             Sorry.  May I ask, just for my preparation overnight,

12   government, without holding you to it but it will be useful for

13   all concerned, after this witness, who are your next several

14   witnesses?

15             MR. BHATIA:  So we've given the defense sort of the

16   balance of our list.

17             THE COURT:  But for my benefit?

18             MR. BHATIA:  Yes, for your benefit now:  Elie Gabay,

19   he is an individual associated with Coney LLC, one of the

20   customers.

21             Bonnie Soon-Osberger, she is an individual associated

22   with 18 Mercer Equity, another one of the customers.

23             THE COURT:  Right.

24             MR. BHATIA:  And then Joseph Soleimani could be

25   tomorrow.  He is the individual associated with ABJ Properties.

1          THE COURT:  Right.

2          MR. BHATIA:  Jackson Hom and Gina -- I'm sorry,

3    Jacquie Monzon and Gina Hom, who are both from Crystal Real

4    Estate.

5          THE COURT:  Terrific.  OK.  That gives me enough to

6    work on.

7          You should expect at the end of tomorrow I will be

8    taking stock with everyone of how we are doing and how we are

9    looking in terms of time.  It is usually my practice at the end

10   of each week to alert the jury how we're doing, and in a

11   shorter trial like this, I want to generally keep them abreast.

12   So as soon as I have a good sense of how we are doing, that

13   might be useful.

14         Have a good evening, counsel

15         MR. GELFAND:  Can we safely not have any witnesses

16   tomorrow?

17         THE COURT:  Government, it sounds like it is a

18   completely safe thing, correct?

19         MR. BHATIA:  I think that's right.

20         THE COURT:  Yes.

21         MR. GELFAND:  Thank you, your Honor.

22         THE COURT:  Thank you for asking.

23         Thank you.  We stand adjourned.

24         Off the record.

25         (Pause)

A-396

K1mdtem5

1                THE COURT:  Counsel, 9 o'clock tomorrow for counsel

2     and the court reporter.

3                (Adjourned to 9 a.m., January 23, 2020)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2     Examination of:                          Page

 3     KAREN FINOCCHIARO

 4     Direct By Mr. Bhatia . . . . . . . . . . . . 185

 5     Cross By Mr. Gelfand . . . . . . . . . . . . 236

 6                        GOVERNMENT EXHIBITS

 7     Exhibit No.                              Received

 8      101 through 108, 114, 201 through 206   . . . 190

 9      501   . . . . . . . . . . . . . . . . . 191

10      113   . . . . . . . . . . . . . . . . . 195

11      110, 111, 112  . . . . . . . . . . . . . 213

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

K1NVTEM1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        19 CR 696 (PAE)

5    ARI TEMAN,

6                   Defendant.           JURY TRIAL

7    ------------------------------x

8                                        New York, N.Y.
                                         January 23, 2020
9                                        9:05 a.m.

10
     Before:
11
                       HON. PAUL A. ENGELMAYER,
12
                                         District Judge
13

14                          APPEARANCES

15
     GEOFFREY S. BERMAN,
16        United States Attorney for the
          Southern District of New York
17   KEDAR S. BHATIA
     EDWARD A. IMPERATORE
18        Assistant United States Attorneys

19   JOSEPH A. DIRUZZO, III
     JUSTIN GELFAND
20        Attorneys for Defendant

21   ALSO PRESENT:  DANIEL ALESSANDRINO, NYPD
                    WILLIAM MAGLIOCCO, Paralegal, USAO
22

23

24

25
```

A-399

K1NVTEM1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning, everybody.

3          I have nothing of my own initiatives to take up with

4   you this morning.  I note that I received an email late

5   yesterday, shortly after the end of the court day, from

6   Mr. Bhatia stating that it was at least possible that the

7   government would rest today.

8          THE DEPUTY CLERK:  Judge, one moment please.

9          (Pause)

10          THE COURT:  We'll see.  But, either way, I've

11  previously given the defense dispensation not to have to call

12  any witnesses today, and that stands.

13          All right.  With that, just going around the horn,

14  government, do you have anything to raise this morning?

15          MR. BHATIA:  Nothing, your Honor.

16          We noticed that defense filed -- made a filing

17  yesterday with the -- with their proposed advice of counsel

18  defense.  I wanted to let the Court know that we're vetting it

19  and looking into it and we'll get something to the Court.

20          THE COURT:  Great.

21          Scully gives you a pretty good roadmap.  I would be

22  interested in seeing if there's any go-by from a colleague

23  since *Scully*, but it seems to me that *Scully* couldn't be more

24  useful guidance on the subject.  But obviously I'm eager to see

25  what you come up with.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1NVTEM1

1          MR. BHATIA:  Thank you.

2          THE COURT:  Do you have the just updated exhibit list

3      for me?

4          MR. MAGLIOCCO:  Yes.  It's in the binder.

5          THE COURT:  Where is it?

6          MR. MAGLIOCCO:  It's in your binder.

7          THE COURT:  Oh, I'm sorry, no, no.  I prefer to just

8      have it by hand so that I can have it by my side as I work.

9          Thank you.  Thank you very much, Mr. Magliocco.

10          All right.  So, government, anything to raise from

11      you?

12          MR. BHATIA:  Nothing, your Honor.

13          THE COURT:  Defense?

14          MR. GELFAND:  Two very short matters, your Honor.

15          THE COURT:  Yes.  Go ahead.

16          MR. GELFAND:  The first, the parties are in agreement

17      on, I just wanted to advise the Court on that, and that is that

18      there were -- in discovery, within the past week or so, there

19      were -- and it was appropriately disclosed to us; we appreciate

20      it.  There were allegations by two government witnesses, one

21      involving charges via credit card to Sublet Spy, which is

22      another business not the subject of this trial.

23          THE COURT:  Another business run by Mr. Teman?

24          MR. GELFAND:  Yes, your Honor.

25          THE COURT:  I'm sorry, when you say "charges," just, I

K1NVTEM1

1   don't know what you mean by -- allegations or --

2         MR. GELFAND:  There were allegations that we would

3   dispute, but there were allegations that Sublet Spy

4   essentially, on a monthly basis, charged a certain witness's

5   credit card that the witness claimed shouldn't have been

6   charged.

7         THE COURT:  Right.

8         MR. GELFAND:  We would move to exclude that.  The

9   government has no intention of getting into it, so it's beyond

10   dispute.

11         THE COURT:  All right.  In other words, both sides

12   agree that that's not a proper subject for examination?

13         MR. GELFAND:  Yes, your Honor.

14         THE COURT:  Government, is that correct?

15         MR. BHATIA:  That's right.  At this time we don't have

16   an intention of getting into it.

17         THE COURT:  All right.  Then in the event that events

18   change that, the door is opened by something that is elicited,

19   please seek a sidebar before anybody going there.  But I'll

20   take that as off limits, unless somebody raises it with me.

21         MR. GELFAND:  The second issue falls under the same

22   category, also not a dispute between the parties.  And that's

23   that one of the government's anticipated witnesses, Joseph

24   Soleimani, via *Jencks*, for lack of a better way of putting it,

25   basically made -- he has a theory that Mr. Teman contacted

K1NVTEM1

1     tenants of his on one occasion and had them send rent checks

2     somewhere else, not clear exactly where.  We also would ask

3     that that theory or that testimony, that allegation, be

4     excluded from trial.

5          THE COURT:  Have you taken that up with the

6     government?

7          MR. GELFAND:  We have.  And that falls under the same

8     category, your Honor.  There's no dispute.

9          THE COURT:  All right.  Mr. Bhatia, is that correct?

10          MR. BHATIA:  That's right, your Honor.

11          And also, subject, of course, to facts changing during

12     trial, and also the defense's representation that they don't

13     intend to get into that on cross, we wouldn't intend to get

14     into it in our --

15          THE COURT:  All right.  Well, then I will heed what

16     both of you are jointly saying, which is you both believe this

17     is either irrelevant or its relevance is outweighed by

18     countervailing 403 factors.

19          So as with the first subject, in the event that

20     anyone's mind changes because something has happened at trial,

21     raise it with me first; don't go there without affirmative

22     permission from the Court.

23          MR. GELFAND:  Yes, your Honor.

24          The third thing is really just for the record.

25          Obviously, this day and age, *Jencks* material is

K1NVTEM1

1  disclosed in advance of trial, has been disclosed in advance of

2  trial.  We appreciate that.  But we would just ask the Court to

3  permit us to make a continuing request throughout trial at the

4  close of every government witness for full disclosure of *Jencks*

5  material.

6          THE COURT:  Right.  I took as a given that if the

7  government meets with a witness after the court day and

8  generates additional 3500 material, that is subject to the

9  ongoing obligation.  I doubt the government disputes that.

10         MR. GELFAND:  Yes.  We just wanted to be on the record

11 requesting *Jencks*.

12         THE COURT:  Mr. Bhatia, you're in agreement, correct?

13         MR. BHATIA:  That's right, your Honor.

14         We're producing on a rolling basis.

15         THE COURT:  Very good.

16         MR. GELFAND:  Thank you, your Honor.

17         THE COURT:  Mr. Smallman advised me that the defense

18 might want to bring to my attention exhibits that it may or may

19 not use today, something -- I couldn't quite follow what the

20 specific request was.

21         MR. GELFAND:  It was a pure housekeeping matter, your

22 Honor.

23         In the ordinary course of just trial preparation, we

24 have premarked certain exhibits that we obviously might or

25 might not introduce at trial.  All relative have been disclosed

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-404

K1NVTEM1

1  to the government in discovery, some with exhibit stickers on

2  it, some without.  But there's going to be no surprises there.

3         What I was wanting to know is whether the Court

4  basically wanted an advanced copy of those or whether we should

5  just take it up as the witnesses testify.

6         THE COURT:  If you're not going to offer it, I don't

7  need to see it.

8         MR. GELFAND:  Okay.

9         THE COURT:  If you are going to offer it, I'd be happy

10  to have it with the exhibit number as marked, if only to just

11  keep my papers in order.  And if it's not clear, I leave it to

12  your good judgment.  But, either way, at the time that you

13  present the exhibit to the witness, I'll need a copy.  I'd like

14  one for my law clerk as well.

15         Your call.  I'm happy to have it if you're going to be

16  offering it.

17         MR. GELFAND:  Okay.  I just wanted to raise that.

18         We'll get it organized ourselves with that guidance

19  and provide it accordingly.

20         THE COURT:  Very good.

21         One moment.

22         All right.  I don't have anything further.

23         Anyone?  Nothing to raise?

24         MR. BHATIA:  No, your Honor.

25         MR. GELFAND:  No, your Honor.

A-405

K1NVTEM1

1        THE COURT:  Defense, is it still your expectation --

2   not holding you to it -- that Ms. Finocchiaro will be on cross

3   for approximately 20 more minutes or so?

4        MR. GELFAND:  It is, your Honor.  And I've had that

5   opportunity to get it even more organized, so hopefully that

6   saves some time.

7        THE COURT:  Very good.

8        Why don't we have her in the box before the jury comes

9   in so that they are not wasting time watching her march

10  forward.

11        And government, your next witness will still be Elie

12  Gabay?

13        MR. BHATIA:  That's right.

14        THE COURT:  Very good.

15        And that witness will be here and ready to go as soon

16  as Finocchiaro is done?

17        MR. BHATIA:  That's right.

18        THE COURT:  Terrific.

19        All right.  I will be ready to take the bench at 9:30,

20  or as soon as Mr. Smallman tells me thereafter that the jury is

21  here.  Thank you, see you at 9:30.

22        (Recess)

23        MR. GELFAND:  Your Honor, may I approach and provide

24  you two copies of exhibits?

25        THE COURT:  You may.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1NVTEM1                    Finocchiaro – cross

1          These are defense exhibits that may or may not be used

2     during this witness's examination?

3          MR. GELFAND:  Correct, your Honor.

4          THE COURT:  Very good.

5          MR. GELFAND:  Thank you.

6          THE COURT:  Is this one set or two?

7          MR. GELFAND:  That's one set, your Honor.  I was not

8     aware of the request for the law clerk.

9          THE COURT:  Oh, okay.  Going forward, that would be

10    great.  Thank you.

11         (Jury present)

12         THE COURT:  I hope you all had a good evening.

13         We're about to resume with the trial.

14         Ms. Finocchiaro, I'll remind you that you're still

15    under oath.

16         THE WITNESS:  Yes.

17         THE COURT:  Mr. Gelfand, you may inquire.

18         MR. GELFAND:  Thank you, your Honor.

19    KAREN FINOCCHIARO, resumed.

20    CROSS-EXAMINATION (continued)

21    BY MR. GELFAND:

22    Q.  Good morning, Ms. Finocchiaro.

23    A.  Good morning.

24    Q.  Can I ask you to speak up a little bit in the mic.

25    A.  Good morning.

A-407

K1NVTEM1                        Finocchiaro - cross

1    Q.  Good morning.

2             Ms. Finocchiaro, when we left off yesterday, we had

3    ended our discussion on the March 28th, 2019 RCCs; correct?

4    A.  Correct.

5    Q.  And as you testified, those were two of the 29 total RCCs

6    that are at issue in this case; correct?

7    A.  That is correct.

8    Q.  And you're familiar with all of the RCCs, not just the two

9    that we discussed; correct?

10   A.  Correct.

11   Q.  Okay.  And as we talked about yesterday, all 29 of those

12   RCCs clearly bear indicia to the bank that they are, in fact,

13   RCCs; correct?

14   A.  Correct.

15   Q.  Okay.  Now, directing your attention to the April 19th --

16   if I have the date right -- 2019, deposits, there were 27

17   deposits in the bank that you testified -- I'm sorry, the

18   deposits of 27 RCCs into the bank that you testified about

19   yesterday; correct?

20   A.  Correct.

21   Q.  And we talked about what actually happened in the bank

22   itself; correct?

23   A.  Correct.

24   Q.  And the screenshots that you provided from the video

25   footage that you collected early on in this matter; correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-408

271

K1NVTEM1                          Finocchiaro - cross

1    A.  Correct.

2    Q.  And to be clear, the video itself is no longer available;

3    correct?

4    A.  Correct.

5    Q.  Are you aware that we have requested the video, but that

6    your bank told us that it's no longer available?

7    A.  Correct.  If it's after 120 days, it's no longer available.

8    Q.  Okay.  And to be clear, early on, as far as you know, at

9    least, no one on the bank took any efforts to preserve the

10   video itself, as opposed to the screenshots that we've all

11   seen; correct?

12   A.  As far as I'm aware, there was not a preservation letter

13   that was requested to save the film.

14   Q.  Okay.  During that time period, you were in contact with

15   the NYPD detective; correct?

16   A.  That is correct.

17   Q.  And the NYPD never requested that that be preserved;

18   correct?

19   A.  That is correct.

20   Q.  Did the film video footage have audio as well or is it just

21   soundless?

22   A.  It does not have audio.

23   Q.  Okay.  So based on your review of the film -- well, just to

24   be clear, you've watched the whole film; correct?

25   A.  Correct.

A-409

K1NVTEM1                    Finocchiaro - cross

1   Q.  Based on your review of the film, as you described

2   yesterday, it was -- and I'm approximating, but approximately a

3   one-hour video of Mr. Teman physically in the Miami bank

4   branch; correct?

5   A.  I don't recall the duration, but there was a lengthy

6   period.

7   Q.  In other words, this wasn't some two-minute episode of

8   going to a bank teller; correct?

9   A.  Not that I recall.

10  Q.  Now, I want to direct your attention to some of those April

11  19th RCCs.  I'm showing you what's been previously admitted as

12  Government's Exhibit 205.

13          THE COURT:  Ladies and gentlemen, can everyone see the

14  monitor okay?

15          THE JURY:  Yes.

16          THE COURT:  Good.

17  Q.  And you recognize this document; correct?

18  A.  I do.

19  Q.  Okay.  When the prosecutor asked you about some of these

20  RCCs yesterday, is it fair to say that the numbers might be

21  different and the entities are the three entities identified in

22  this case, but that substantively these are virtually identical

23  documents?

24  A.  They are similar.  Some of them are different, with the

25  disclosure that's read.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-410

K1NVTEM1                          Finocchiaro - cross

1    Q.  To be clear, on each of these April 19th, 2019 documents,

2    the same language appears on the bottom; correct?

3    A.  I believe -- without looking at all of the checks in that

4    series, I do believe that they are all similar with this, this

5    disclosure.

6    Q.  Okay.  I'm happy to show you them, but it sounds like

7    you're fairly confident?

8    A.  Yes.

9    Q.  Okay.  So if we look at just any of them, for example, this

10   is the top page, Bates No. 35 of Exhibit 205, they all clearly

11   say, "Draw per contract.  No signature required."  Correct?

12   A.  Correct.

13   Q.  They all include the URL that you testified about

14   yesterday; correct?

15   A.  Correct.

16   Q.  They indicate that the above client, referring in this

17   case, for example, to ABJ Lennox LLC, accepted the terms;

18   correct?

19   A.  They do -- that's what the check indicates, that draw per

20   contract.

21   Q.  I'm just asking you what it says.  To be clear, you don't

22   know one way or the other whether or not those individuals

23   accepted the terms or didn't; correct?

24   A.  That is correct.

25   Q.  To this day, Bank of America is not taking a position on

A-411

274

K1NVTEM1                         Finocchiaro - cross

1   whether that's a true statement or a false statement; correct?

2   A.  That is correct.

3           THE COURT:  Ms. Finocchiaro, just kindly keep your

4   voice up.  Speak a little more into the microphone.

5   A.  That is correct.

6           THE COURT:  Thank you.

7   Q.  And then there is the contact info that you testified about

8   that is GateGuard's contact number; correct?

9   A.  I would believe that would be GateGuard's contact

10  information if it was provided on the document.

11  Q.  You testified that you couldn't access the URL just because

12  of, essentially, Bank of America's IT filter?

13  A.  Correct.

14  Q.  Correct.

15          And you didn't make any efforts to look through other

16  avenues, like your phone or home computer or anything like

17  that; correct?

18  A.  Correct.

19  Q.  Did you ever call this number with questions?

20  A.  I did not.

21  Q.  You described, based on your experience in the banking

22  industry, various characteristics of checks or RCCs in general;

23  correct?

24  A.  Correct.

25  Q.  And one of the things that you testified about was the memo

K1NVTEM1                          Finocchiaro - cross

1  line; correct?

2  A.  Correct.

3  Q.  Is it fair to say that the memo line, as far as Bank of

4  America is concerned, is not a particularly important line?

5  A.  It's a description line, so it's not -- I mean, it does

6  give a description of what the check may be for, but it's

7  typically in reference for the -- if the customer were to have

8  viewed the check, so the maker, that they would have a

9  description of what that was for.

10 Q.  Okay.  Basically, a shorthand convenience factor for the --

11 A.  Correct.  It's not required.

12 Q.  Okay.  And so fair to say when it comes to whether the bank

13 honors or doesn't honor -- and when I say "the bank," I mean

14 Bank of America, honors or doesn't honor a check, the memo line

15 itself is not a factor?

16 A.  It is not.

17 Q.  Now, these 27 RCCs do not include or purport to include any

18 sort of check number; correct?

19 A.  They do not.

20 Q.  They don't contain any signature; in fact, they say that in

21 very clear terms.  Correct?

22 A.  Correct.

23 Q.  And just to be clear, for the benefit of all of us, there's

24 some notations on the top.  Those are bank notations; correct?

25 A.  That is correct.

K1NVTEM1                          Finocchiaro - cross

1    Q.  In other words, this was not -- whatever handwriting up

2    here is on the top left corner of some of these checks, I don't

3    mean this in a bad way, but that's something the bank wrote on

4    it, not what either Mr. Teman wrote --

5    A.  I do believe that it's something that the teller has -- has

6    signed or put their initials on.

7    Q.  Now, you testified yesterday when the government showed you

8    that voluminous spreadsheet --

9    A.  Yes.

10   Q.  -- that there was a reference to counter credit on April

11   19th of 2019; correct?

12   A.  Correct.

13   Q.  Okay.  To be clear, that's also reflected in Government

14   Exhibit 102, which is admitted.

15          Can you just tell me, do you recognize what this

16   document is, just so we can contextualize ourselves?

17   A.  That is the customer statement for GateGuard.

18   Q.  I'm sorry?

19   A.  For GateGuard.

20   Q.  These are Bank of America's bank statements, if you will,

21   for GateGuard for a select period of time?

22   A.  That is correct.

23   Q.  You provided these to the government; correct?

24   A.  I did.  That is correct.

25   Q.  And if we look through this statement just briefly, we see

K1NVTEM1                          Finocchiaro - cross

1    the relevant time frame for April; correct?

2    A.   That is correct, yes.

3    Q.   And we see on April 19th of 2019 the counter credit

4    referenced in the amount of $297,000; correct?

5    A.   That is correct.

6    Q.   And even though this is a different document, this is

7    essentially the document or the same data from which the

8    spreadsheet was populated; correct?

9    A.   That is correct.

10   Q.   To be clear, when the deposit was made, a deposit slip was

11   completed and kept in the ordinary course and practice of the

12   bank; correct?

13   A.   That is correct.

14   Q.   Okay.

15           And just so we all understand, what is a deposit slip?

16   A.   A deposit slip is something that the customer fills out

17   when they are making the deposit.  It has the customer's name,

18   account number that it's being deposited to, and the amount

19   that is being deposited.  It describes whether you're

20   depositing cash or whether you're depositing checks.

21   Q.   I'm showing you what's been admitted as Government's

22   Exhibit 206.  Can you tell us what that is?

23   A.   That is the deposit slip on 4/19 for the deposit to

24   GateGuard for the amount of $297,000.

25   Q.   Okay.  So to be clear, just in simple English, this is the

K1NVTEM1                    Finocchiaro - cross

1   deposit slip that correlates with the deposit that you've been

2   testifying about; correct?

3   A.   That is correct.

4   Q.   And you pulled this and provided it for the government;

5   correct?

6   A.   That is correct.

7   Q.   It references April 19th, the date; correct?

8   A.   Correct.

9   Q.   It references the same amount; correct?

10  A.   That is correct.

11  Q.   And it references GateGuard and its business location in

12  Miami Beach on that same road as the bank branch, Lincoln Road;

13  correct?

14  A.   That is correct.

15  Q.   Now, if we look -- it's a little bit tough to see.  I'm

16  showing you on the bottom -- I'm going to zoom in as much as I

17  can.  Can you see that on the screen in front of you, ma'am?

18  A.   I can, yes.

19  Q.   Okay.  This text that appears on the bottom, that's

20  generated by the bank; correct?

21  A.   That is correct.

22  Q.   Okay.  And it references the date, the time, the deposit;

23  correct?

24  A.   That is correct.

25  Q.   The available balance of approximately 20-some thousand

K1NVTEM1                          Finocchiaro - cross

1    dollars; correct?

2    A.   That is correct.

3    Q.   And then can you read the part that I've circled on the

4    screen, beginning with "holds"?

5    A.   "Holds applied see hold notice deposit."

6    Q.   Okay.  What does that mean?

7    A.   It means that applicable holds were placed on the checks

8    that are coming in.

9    Q.   When you say "holds were placed," that means that

10   GateGuard, Mr. Teman, whoever you want to say, didn't have

11   access to this money until the holds were lifted; correct?

12   A.   That is correct.

13   Q.   Okay.  So to be clear, when we see things like counter

14   credit of $297,000 on April 19th, no one actually had access to

15   that money on that day; correct?

16   A.   On that day, he would not have had access to that; he would

17   have only had access to what is indicated as the available

18   balance.

19   Q.   Which was the amount of money previously in the account

20   that has nothing to do with these deposits; correct?

21   A.   That is correct.

22   Q.   So, in other words, he would have access to the money he

23   had, he wouldn't have access to the money that was deposited

24   via these RCCs?

25   A.   Right.  He can see the deposit and he can see the amount in

A-417

K1NVTEM1                    Finocchiaro - cross

1    there, but he's not able to access the account at that time.

2    Q.  And, in fact, as a bank employee of Bank of America, an

3    investigator for two decades plus, are you familiar with bank

4    forms?

5    A.  Yes.

6    Q.  Are you familiar with -- this says "see hold notice."  Are

7    you familiar with Bank of America notices of hold?

8    A.  Typically, yes.  Our holds are for two days if they are an

9    on-us check, meaning that it's a Bank of America check that's

10   being deposited.  Obviously we have the ability at that time to

11   see the source of funds in another account.  Our hold notices

12   are, in fact, typically seven days for a check that is another

13   bank.  So in this case, Signature or JPMorgan Chase, we would

14   apply a seven-day hold.

15   Q.  Okay.  And, in fact, that's exactly what happened here;

16   correct?

17   A.  That is correct.

18   Q.  And this notice of hold, that's basically a receipt that's

19   given to the person making the deposit; correct?

20   A.  That is correct.

21   Q.  Okay.  And have you seen the notice of hold that was issued

22   in this case?

23   A.  I did not see -- I mean, I noticed that there was a hold

24   that was applied, it's a standard typical hold; but I didn't

25   see any additional documentation in regards to the hold.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1NVTEM1                    Finocchiaro - cross

1          MR. GELFAND:  Okay.  If I may approach and show the

2    witness what's been premarked as Defense Exhibit 16.

3          THE COURT:  This is just for the witness right now,

4    it's not in evidence.

5          MR. GELFAND:  Yes.

6          THE COURT:  All right.

7          Ladies and gentlemen, from time to time, a document

8    will be shown or an exhibit will be shown to the witness and

9    will be accessible to counsel and not to you.  The reason

10   that's happening is that until I rule that the exhibit can be

11   received in evidence, you can't see it.

12         So I need to look at it, the witness needs to look at

13   it, the lawyers may need to ask questions to the witness about

14   it.  Once I decide it can properly be received in evidence,

15   Mr. Smallman pushes a button, and then it's accessible to you.

16   We're not trying to hide anything from you; I just need to go

17   through the hoops of making sure that it's properly received in

18   evidence.

19         Go ahead.

20         MR. GELFAND:  Thank you.

21         THE COURT:  Mr. Smallman.  Yes.  Very good.

22         Go ahead.

23   BY MR. GELFAND:

24   Q.  I'll zoom in on the text, but just so that we're clear for

25   the record, can you see the whole context of this document

K1NVTEM1                    Finocchiaro – cross

1    right now?

2    A.  It's cut off on the side.

3    Q.  To be clear, this was not directly provided by the bank;

4    correct?

5    A.  I did not provide this.

6    Q.  Okay.

7         MR. GELFAND:  Your Honor, can I show the witness a

8    hard copy of this?  I think it's pretty tough --

9         THE COURT:  I'm sorry, Mr. Gelfand, a little louder.

10        MR. GELFAND:  Can I show the witness a hard copy of

11   this?

12        THE COURT:  You may.  It appears though what's on the

13   screen is cut off on the document itself.

14        MR. GELFAND:  Yes, your Honor.

15   BY MR. GELFAND:

16   Q.  Does that appear to be a photograph of a notice of hold

17   form issued by Bank of America?

18   A.  It does appear to be.

19   Q.  And specifically, if you look -- without reading it into

20   the record, if you look at the dates, the total deposit number,

21   and the hold code, does this appear to correlate with the

22   deposit slip and the April 19th deposit?

23   A.  Yes, it does.

24        MR. GELFAND:  Your Honor, at this point I would move

25   Defense Exhibit 16 into evidence.

A-420

K1NVTEM1                    Finocchiaro - cross

1              THE COURT:  Any objection?

2              MR. BHATIA:  No objection, your Honor.

3              THE COURT:  Defense Exhibit 16 is received.

4              (Defendant's Exhibit 16 received in evidence)

5              THE COURT:  Do you now want that published to the

6   jury?

7              MR. GELFAND:  Yes, your Honor.

8              THE COURT:  Mr. Smallman.  Thank you.

9              MR. GELFAND:  Thank you.

10             THE COURT:  All right.  Ladies and gentlemen, it

11  should now be on your monitors.

12             Sorry.  It should now be on your monitors.

13             MR. GELFAND:  When I do my job.

14  BY MR. GELFAND:

15  Q.  So this is a little bit tough to read on just the

16  presentation of it, but can you just read for all of us the

17  date of the notice of hold?

18  A.  4/19/2019.

19  Q.  And then the amount is the same, $297,000?

20  A.  That is correct.

21  Q.  This is unfortunately going to be very difficult for the

22  jury to read, but can you tell us when the $292,000 will be

23  available?

24  A.  On 4/26 of 2019.

25  Q.  So seven days later; correct?

K1NVTEM1                          Finocchiaro – cross

1    A.  Correct.

2    Q.  And that's consistent with what you testified you

3    anticipated the hold would be; correct?

4    A.  Correct.

5    Q.  Fair to say that's what happened here?

6    A.  Correct.

7    Q.  So between April 19th and April 26th, the money was not

8    available to anyone; correct?

9    A.  Correct.

10   Q.  Okay.  And, in fact, based on your review of what actually

11   happened at the bank branch, Mr. Teman was actually handed this

12   notice of hold; correct?

13   A.  It should have been -- it was provided, yes.

14   Q.  Okay.  And there wasn't any pushback by Mr. Teman of, Hold

15   on.  If it's not available right now, let me have these RCCs

16   back, or anything crazy like that, right?

17   A.  I wasn't present.  I'm unaware.

18   Q.  Based on what you observed on the video that you watched

19   that's no longer available, does anything like that appear?

20   A.  There's no audio, so I'm unable to indicate.

21   Q.  The deposits maintained -- I'm sorry, the RCCs were

22   maintained in Bank of America's possession after that

23   interaction with the teller; correct?

24   A.  Correct.

25   Q.  Now, you then testified that --

K1NVTEM1                          Finocchiaro – cross

1           THE COURT:  Mr. Gelfand, can the witness put the

2    exhibit down?

3           MR. GELFAND:  Yes, your Honor.

4           THE COURT:  Okay.

5           MR. GELFAND:  Thank you.

6    Q.  The purpose of the hold is to confirm that the funds should

7    be made available; correct?

8    A.  Right.  It levels as an expectation for the customer that

9    the funds are on hold and when the funds would be available.

10   Q.  Now, the government showed you what's been marked as

11   Exhibit 114.  Do you recognize that document?

12   A.  I do, yes.

13   Q.  Over and over on this document there's the text "RCC

14   warranty breach"; correct?

15   A.  Correct.

16   Q.  And that's under the column "Reason"; correct?

17   A.  That is correct.

18   Q.  Does Bank of America populate that column?

19   A.  This is something that is digitally sent to us with the

20   reason code and the explanation of the reason code from the

21   maker bank.

22   Q.  Okay.  So to be clear, Bank of America is not

23   characterizing the event as an RCC warranty breach; in this

24   case, Signature Bank and JPMorgan are doing that.  Correct?

25   A.  That is correct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-423

286

K1NVTEM1                    Finocchiaro – cross

1    Q.  Bank of America is just reporting what's told to Bank of

2    America; correct?

3    A.  That is correct.

4    Q.  And if we look through this document, these RCC warranty

5    breach notations are correlated with many of the RCCs that were

6    received in evidence; correct?

7    A.  That is correct.

8    Q.  And on the second page of this document, we see that

9    language again, and then the prosecutor asked you questions

10   about the five or four, quote/unquote, counterfeit check

11   designations at the bottom; correct?

12   A.  That is correct.

13   Q.  And this was the same reason code column; correct?

14   A.  Correct.

15   Q.  Okay.  So again, this is not Bank of America saying this is

16   a counterfeit check; correct?

17   A.  That is correct.

18   Q.  This is the reason or the code generated by, you said, the

19   maker bank, I just want to be very precise, Signature and/or

20   JPMorgan?

21   A.  That is correct.

22   Q.  And is it fair to say that what's basically being

23   communicated to Bank of America in this instance is that those

24   banks' customers are saying that this is an unauthorized RCC?

25   A.  That is correct.

K1NVTEM1                    Finocchiaro - cross

1    Q.  In charging back -- I think that's the term you used

2    yesterday; correct?

3    A.  A chargeback; correct.

4    Q.  In requesting or insisting on chargebacks from Bank of

5    America, none of these other banks provided the GateGuard terms

6    and conditions or payment terms to Bank of America; correct?

7    A.  That is not required.

8    Q.  Fair enough.  But I'm just asking if that happened?

9    A.  They did not.

10   Q.  Okay.  Now, when you testified yesterday, you testified to

11   that document.  But the bank also sends individuals -- in this

12   case account holders like GateGuard -- correspondence if checks

13   are basically returned; correct?

14   A.  That is correct.  It is provided.

15            MR. GELFAND:  Your Honor, at this point, pursuant to

16   the stipulation read by government counsel yesterday, I would

17   move into evidence Defense Exhibit 52.

18            THE COURT:  Any objection?

19            MR. BHATIA:  No objection.

20            THE COURT:  Received.

21            (Defendant's Exhibit 52 received in evidence)

22            MR. GELFAND:  May I publish it, your Honor?

23            THE COURT:  You may.

24   Q.  Do you see Exhibit 52?

25   A.  Yes, I do.

A-425

K1NVTEM1                          Finocchiaro - cross

1    Q.  Okay.  And these use the same language, "RCC breach" on

2    them; correct?

3    A.  Correct.

4    Q.  And then on the side, Bank of America says:  "Return

5    reason-4 RCC warranty breach"; correct?

6    A.  That is correct.

7    Q.  And they reference copies, in this case, of 24 checks;

8    correct?

9    A.  I haven't seen all of the checks, but most of the checks

10   should be present on the document.

11   Q.  Okay.  I'll ask it another way.

12           The bank provided copies of each of the RCCs that are

13   at issue in --

14   A.  That is correct.  Yes.

15   Q.  And that would be inclusive in the document; correct?

16   A.  Correct.

17   Q.  Okay.  And what does "return reason-4" mean, if you know?

18   A.  I don't know the code right offhand.

19   Q.  But, again, what this is communicating to the customer,

20   GateGuard, is that these were RCCs that were basically not

21   honored by the customer, for example, ABJ or the others on

22   here?

23   A.  That is correct.

24   Q.  So Bank of America is not saying to Mr. Teman or GateGuard,

25   These are counterfeit checks, these are fake checks, anything

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-426

K1NVTEM1                          Finocchiaro - cross

1    along those lines.  They are saying, We processed them as RCCs.

2    And the banks that they were drawn on said that their customers

3    are saying we didn't authorize this?

4    A.  In regards to the RCCs, their return reason is RCC.

5    However, some of them are listed as counterfeit.

6    Q.  By those banks; correct?

7    A.  That is correct.

8    Q.  Okay.  Now, in processing the RCCs, you testified that

9    there was the seven-day hold.  And then yesterday the

10   prosecutor walked you through transfers within Bank of America

11   of money that followed, started on April 26th and followed the

12   next couple of weeks; correct?

13   A.  That is correct.

14   Q.  Okay.  And, in fact, each of those transfers were made from

15   GateGuard's Bank of America account to other Bank of America

16   accounts; correct?

17   A.  That is correct.

18   Q.  And each of those accounts, starting with, for example, the

19   corporate accounts, Friend or Fraud Incorporated, Touchless

20   Labs LLC, those are other businesses that Bank of America holds

21   accounts for, held accounts for, that were associated with Ari

22   Teman; correct?

23   A.  Correct.

24   Q.  And the bank was on notice for quite some time that these

25   were Ari Teman's businesses; correct?

K1NVTEM1                         Finocchiaro – cross

1   A.  Correct.

2   Q.  So I showed you, for example, the signature card yesterday

3   for GateGuard; correct?

4   A.  Correct.

5   Q.  I'm going to show you Government Exhibit 103 real briefly.

6   Is this the signature card for Friend or Fraud?

7   A.  It is, yes.

8   Q.  And does it reference that Friend or Fraud is controlled by

9   Ari Teman, at least as far as the bank is concerned, since

10  April of 2016?

11  A.  That is correct.

12  Q.  And similarly, I'm going to show you Government Exhibit

13  105.  Again, just at least as far as the bank is concerned,

14  does it show you Touchless Labs LLC as controlled by Ari Teman

15  since March of 2016?

16  A.  Yes, it does.

17  Q.  And these are Delaware entities; correct?

18  A.  That is correct.

19  Q.  So to be clear, when money was moved, money was moved

20  essentially from one account that Ari Teman controlled to other

21  accounts that Ari Teman controlled as far as Bank of America is

22  concerned?

23  A.  That is correct.

24  Q.  And have you reviewed the bank records of these entities?

25  A.  Yes, I have.

A-428

291

K1NVTEM1                          Finocchiaro – cross

1   Q.  Fair to say that they are operating entities, at least they

2   appear to be based on the transactions?

3   A.  Yes.

4           MR. BHATIA:  Objection, your Honor.

5           THE COURT:  One moment.

6           Sustained.

7   Q.  Are there deposits into these accounts?

8   A.  I'd need to see the records for each of those accounts, but

9   based on my recollection, I do believe that there was other

10  deposits and other transactions in those accounts.

11  Q.  In other words, unrelated to GateGuard?

12  A.  Correct.

13  Q.  Now, you testified that on April 26, some money was moved

14  from the Friend or Fraud corporate account to an individual

15  account also at Bank of America held in the name of Ari Teman;

16  correct?

17  A.  Correct.

18  Q.  And, in fact, there were some questions about money from

19  that account.  And a couple of days later, on April 29th and

20  May 1st, the prosecutor asked you about international wire

21  transfers to China; correct?

22  A.  Correct.

23  Q.  And you read -- well, rack your brain on what the company

24  was, but there was a Chinese entity bank account that those

25  checks were sent to; correct?

K1NVTEM1                    Finocchiaro - cross

1  A.  Correct.

2  Q.  Are you aware that that company is a supplier for

3  GateGuard?

4            MR. BHATIA:  Objection.

5            THE COURT:  Sustained.

6  Q.  You testified on May 8th that $4,000 was withdrawn in cash;

7  correct?

8  A.  That is correct.

9  Q.  To be clear, what's a cashier's check?

10  A.  A cashier's check is an official item that the customer can

11  purchase from their account so the cash is withdrawn, it's

12  turned into an official item.

13  Q.  Okay.  And to be clear, what happened here is that,

14  quote/unquote -- let's back up for a second.

15            If I walk into a Bank of America branch and I purchase

16  a $4,000 cashier's check, for example, the bank's not

17  physically handing me $4,000 of cash and I'm not physically

18  handing it back; correct?

19  A.  Correct.

20  Q.  The bank is basically treating it as a, quote/unquote, cash

21  withdrawal, but, for all intents and purposes, just giving me a

22  cashier's check to whomever I ask it be written out to;

23  correct?

24  A.  Correct.

25  Q.  And the reason that a cashier's check is significant is

A-430

K1NVTEM1                         Finocchiaro - cross

1   that the person receiving it has security that the bank will

2   honor it?

3   A.  It's an official item that's then drawn on the bank.  And

4   it's not specific to that account any longer, it's -- it's an

5   official item that's issued by the bank.

6   Q.  Okay.  In this particular case, if you know, was a

7   cashier's check issued to a Levi Herman on that day in the

8   amount of $4,000?

9   A.  I'm unable -- I do not have that information.

10  Q.  Okay.  That wouldn't be reflected in the bank statements

11  though; correct?

12  A.  It would not.

13  Q.  It would just be reflected as a, quote/unquote, cash

14  withdrawal; correct?

15  A.  Correct.

16  Q.  Is it fair to say, based on the bank statements you've

17  reviewed, you can't say one way or the other whether Mr. Teman

18  walked out of the bank with cash or walked out of the bank with

19  a cashier's check to an individual?

20  A.  Unless it's an exhibit, I'm unable to.

21  Q.  And it's not something that was provided to the government;

22  correct?

23  A.  Not that I recall.

24  Q.  Okay.  Now, after the bank received the RCC chargebacks

25  from Signature Bank and JPMorgan Chase, the bank had

K1NVTEM1                    Finocchiaro - cross

1   interactions with Ariel Reinitz on GateGuard's behalf; correct?

2   A.  Can you say the name again?

3   Q.  Let me ask this:  Are you aware that GateGuard's attorney

4   had communications with Bank of America in May of 2019 about

5   the nature of what you've testified about, about these RCCs?

6            MR. BHATIA:  Objection, your Honor.  401, 403.

7            THE COURT:  Foundation.  Sustained.

8   Q.  Ms. Finocchiaro, the bank -- the government asked you

9   questions on direct examination about how the bank was

10  considering the offset issue yesterday; correct?

11  A.  Correct.

12  Q.  In the context of those discussions, did the bank have

13  communications with GateGuard's legal counsel, Ariel Reinitz?

14           MR. BHATIA:  Objection.

15           THE COURT:  Sustained.  Lack of foundation.

16           She's a records custodian.  You can ask her if she had

17  those communications.

18  Q.  Have you seen records of communications held by the bank

19  with any attorney on behalf of GateGuard?

20           MR. BHATIA:  Objection.

21           THE COURT:  Just a yes or no.

22  A.  Yes.

23  Q.  And based on your review of those records, were there

24  communications -- I'm not asking about the substance of them.

25  Were there communications between GateGuard's legal counsel and

K1NVTEM1                    Finocchiaro - cross

1    Bank of America about the offset issue?

2            THE COURT:  Just a yes or a no.

3    A.  Trying to recall.  I do not believe that there was any

4    questions in regards to the offset.

5            THE COURT:  Mr. Gelfand, if the records are not in

6    evidence, it would be hearsay for her to be speaking about

7    their content.  Let's move on.

8    Q.  Now, you testified yesterday that the bank essentially is

9    holding a significant amount of money from GateGuard and other

10   accounts that you've testified about, Touchless Labs, etc.;

11   correct?

12   A.  The bank has the funds that are in -- being -- that are in

13   an account; they are not being held.  The checks were -- in

14   fact, I had indicated yesterday -- sent to the mailing address

15   for Mr. Ari B. Teman in regards to each and every account.  And

16   the checks were returned to the bank based on the address

17   provided.

18   Q.  Now, during this whole time period, what I mean by "this

19   whole time period" is between March and April of 2019, when the

20   RCCs were deposited and when Bank of America was made aware

21   that there was a criminal investigation, the bank had processed

22   these as basically breach warranty RCCs; correct?

23   A.  They were processed as breach of warranty and counterfeit,

24   yes.

25   Q.  And is it fair to say that the government, meaning law

296

K1NVTEM1                           Finocchiaro - cross

1    enforcement, came to Bank of America requesting information

2    about this as opposed to Bank of America going to law

3    enforcement?

4              MR. BHATIA:  Objection.

5              THE COURT:  Foundation.  Sustained.

6    Q.  When did you first become involved in providing information

7    to the government, meaning law enforcement, in connection with

8    this case?

9    A.  It was on April the -- or, I'm sorry, May the 15th.

10   Q.  Did you contact them or did they contact you?

11   A.  They were in contact with me.

12   Q.  I'm sorry, I couldn't hear you.

13   A.  They were in contact with me.

14   Q.  Okay.  Who initiated the contact?

15             MR. BHATIA:  Objection.  401 and 403.

16             THE COURT:  Sustained.  Relevance.

17   Q.  Over the course of the next several months, you provided

18   information to the government in connection with this case from

19   the bank; correct?

20             MR. BHATIA:  Objection.

21             THE COURT:  Overruled.

22   A.  I was in contact and I did provide information in regards

23   to the account.

24   Q.  Finally, just showing you, just briefly, again, for

25   example, Defense Exhibit 52, just an example of one of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1NVTEM1                    Finocchiaro - cross

1   RCCs, as far as -- well, to be clear for a second, these were

2   all made payable to GateGuard, Inc., the corporation; correct?

3   A.   That is correct.

4   Q.   Fair to say the bank doesn't know one way or the other

5   whether there's anything on here that is false?

6   A.   When the check is presented, we're not aware at that time.

7   Q.   And to be clear, as you previously testified, you don't

8   know whether anything in this "draw per contract" box is false;

9   correct?

10  A.   Correct.

11  Q.   And the rest of the RCCs basically just include the payor,

12  the payee, the dollar amount, the memo line, and the date;

13  correct?

14  A.   Correct.

15          MR. GELFAND:  Your Honor, may I have one minute?

16          THE COURT:  You may.

17          (Counsel conferred)

18          MR. GELFAND:  I have no further questions.

19          Thank you, ma'am.

20          THE COURT:  All right.

21          Thank you, Mr. Gelfand.

22          Any redirect, Mr. Bhatia?

23          MR. BHATIA:  Excuse me?

24          THE COURT:  Any redirect?

25          MR. BHATIA:  Yes, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1NVTEM1                        Finocchiaro - redirect

1   REDIRECT EXAMINATION

2   BY MR. BHATIA:

3   Q.   Ms. Finocchiaro, you testified -- you were asked some

4   questions about Bank of America's financial responsibilities,

5   right?

6   A.   That is correct.

7   Q.   And do you recall being asked some questions on

8   cross-examination about how Bank of America reviews checks?

9   A.   Yes.

10  Q.   And its obligations when funds are coming out of accounts?

11  A.   Correct.

12  Q.   And are accounts at Bank of America insured by the Federal

13  Deposit Insurance Corporation?

14  A.   Yes, they are.

15  Q.   That's the FDIC?

16  A.   Yes, they are.

17  Q.   And when Bank of America is trying to determine if a check

18  is authorized, if it's legitimate, is it trying to find out if

19  the person receiving the money is authorized to receive it or

20  if the person sending the money authorized the money to be

21  sent?

22  A.   It's authorizing was the money authorized to be sent and

23  received.

24       MR. BHATIA:  Could we pull up as an example Government

25  Exhibit 201.  We can go to the top of this page.  Thank you.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1NVTEM1                      Finocchiaro - redirect

1  Q.  So just to get a little bit more specific, this was a check

2  deposited at Bank of America?

3  A.  That is correct.

4  Q.  And you were asked some questions about whether this

5  signature is Ari Teman's; is that right?

6  A.  Correct.

7  Q.  Or whether it looks like the ones on the signature cards?

8  A.  Correct.

9  Q.  And Ari Teman is GateGuard -- or is the signatory for

10 GateGuard, right?

11 A.  Yes.  Correct.

12 Q.  What information -- so he was the one getting the money,

13 right?

14 A.  He was the one receiving the funds, essentially, on behalf

15 of GateGuard.

16 Q.  The person receiving the funds is usually happy to get

17 them?

18         MR. GELFAND:  Objection, your Honor.

19         THE COURT:  One moment.

20         Sustained.

21 Q.  The person who was sending -- the person who was going to

22 have less money than they had before was up here, right, 518

23 Coney 205 LLC?

24 A.  In this check case, yes.

25 Q.  And what information did the bank receive about whether

K1NVTEM1                    Finocchiaro - redirect

1    that person had authorized the check?

2    A.  If the initial deposit we didn't have any information, it

3    goes to the clearinghouse process, the Federal Reserve.  And

4    then we receive back the information.  So at the time of the

5    deposit we did not.

6    Q.  And at the time, what -- subsequently, what information did

7    the bank get about whether that person, 518 West 205 LLC, had

8    approved the check?

9    A.  We received the information that they were not approving

10   this check; that essentially it was a breach of warranty and,

11   in some cases, they were counterfeit.

12   Q.  And is that true of all of the 29 checks that you testified

13   about?

14   A.  That is correct.

15   Q.  So you received information that the person sending the

16   money had not authorized it?

17   A.  Correct.

18   Q.  And the bank wasn't as interested in whether the person

19   receiving the money was authorized to receive it?

20   A.  Correct.

21   Q.  Do you recall answering some questions about a hold, a

22   seven-day hold?

23   A.  Yes.

24   Q.  Do you recall that the day that checks were deposited in

25   April was April 19, 2019?

K1NVTEM1                          Finocchiaro – redirect

1    A.  It was April 19th, 2019.

2    Q.  There's a seven-day hold, right?

3    A.  That is correct.

4    Q.  And so that would be, I think -- seven days -- April 26th?

5    A.  That is correct.

6    Q.  Okay.

7              MR. BHATIA:  Mr. Magliocco, could you pull up

8    Government Exhibit 102 and page 3 of that document.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K1ndtem2                    Finocchiaro - redirect

1              (Pause)

2              MR. BHATIA:  Excuse me.  It is the document with Bates

3    number 958 at the bottom.

4              THE COURT:  This is a part of Exhibit 102?

5              MR. BHATIA:  That is right.

6    BY MR. BHATIA:

7    Q.  If I can direct your attention to the bottom of this page,

8    to the section titled, "Withdrawals and other Debits.

9              Do you recall testifying yesterday about the account

10   035 -- 0351 is the Friend or Fraud account?

11   A.  That is correct.

12   Q.  And 5580 is Ari Teman's personal account?

13             You can take a look at the exhibits in front of you,

14   Government Exhibits 107 or 108.

15             (Pause)

16   A.  5580 is the personal account for Ari Teman.

17   Q.  OK.  So the hold on the $297,000, the balance of that was

18   released on April 26, 2019, right?

19   A.  That is correct.

20   Q.  That's the date he was able to -- that was the date most of

21   those funds were available?

22   A.  That is correct.

23   Q.  And is it right that on this document if it shows that on

24   April 26, 2019, the day those funds were available, there was

25   that day a transfer of $225,000 to the Friend or Fraud account?

K1ndtem2                    Finocchiaro - recross

1   A.  Yes, there was.

2   Q.  On that same day there was a transfer of $3,600 into the

3   Ari Teman's personal account?

4   A.  That is correct.

5   Q.  And then three days later there is a transfer of 5,500 in

6   the same account?

7   A.  That is correct.

8   Q.  So those were all within three days of when those funds

9   became available, right?

10  A.  The same day and three days later, yes.

11          MR. BHATIA:  No further questions, your Honor.

12          THE COURT:  All right.  Any recross, Mr. Gelfand?

13          MR. GELFAND:  Very briefly, your Honor.

14          THE COURT:  Of course.

15  RECROSS-EXAMINATION

16  BY MR. GELFAND:

17  Q.  The prosecutor just asked you a few minutes ago whether the

18  bank had received information that the checks were not

19  authorized, correct?

20  A.  Correct.

21  Q.  OK.  To be Crystal clear, when you said that the bank got

22  information, is it fair to say that what you mean is that the

23  other banks told you that that's what their customers told

24  you -- told them?

25  A.  Correct.  We received the return item chargeback indicating

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1ndtem2                      Finocchiaro – recross

1    that they were counterfeit and in breach of warranty.

2    Q.  As opposed to Bank of America making an independent

3    determination of whether that was true or not true?

4    A.  We received the information from the corresponding

5    financial institution, and we rely on that information to be

6    factual.

7    Q.  Do you know someone named Cheryl Harrison?

8    A.  I do, yes.

9    Q.  Who is Cheryl Harrison?

10   A.  She is in our compliance and regulatory compliance filing

11   department.

12   Q.  And what is compliance within Bank of America's context?

13            MR. BHATIA:  Objection, your Honor.  Scope.

14            THE COURT:  Sustained.  Beyond the scope.

15            MR. GELFAND:  Your Honor, may we approach for

16   additional context?  May we approach because I think --

17            THE COURT:  For a brief sidebar, yes.

18            (Continued on next page)

19

20

21

22

23

24

25

305

K1ndtem2                          Finocchiaro - recross

1          (At the sidebar)

2          THE COURT:  What is the issue?

3          MR. GELFAND:  Your Honor, the government disclosed

4     over the weekend to us, and we actually disclosed to the

5     government, correspondence from Cheryl Harrison, who is a Bank

6     of America employee, consisting of a single email between her

7     and Ariel Reinitz on May 28th of 2019, and the email

8     correspondence directly relates to a question that the

9     prosecutor asked on redirect about what information the bank

10    got essentially as to whether these were authorized or not.

11    The information in the course of the email that was maintained

12    by the bank and provided to this witness -- and then, by

13    extension, to the government and then to us -- clearly

14    indicates that these were authorized by GateGuard's customers.

15          THE COURT:  This is out of bounds for several reasons.

16    First of all, it is out of the timeframe that the witness is

17    speaking about.

18          Second of all, this is hearsay.  This is a

19    communication from Ariel Reinitz, the attorney for the

20    government, to somebody else from the bank after the fact.  She

21    is not part and parcel of some close investigation, and that is

22    not what the redirect is about.  You are at liberty to pursue

23    this with Mr. Reinitz.  You are at liberty to pursue it with

24    the other bank employee.  But this witness is essentially a

25    custodian of records who is explaining the bank's holding

K1ndtem2                    Finocchiaro – recross

1    processes.  The follow-along conversation between a lawyer for

2    Mr. Teman and somebody else are well outside the scope of the

3    inquiry that has been put here and are outside of the witness'

4    competence to address.  So, sustained.

5            MR. GELFAND:  OK.  Thank you, your Honor.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K1ndtem2                    Finocchiaro – recross

1           (In open court)

2           THE COURT:  At the sidebar, I continued to sustain the

3    objection.

4           Mr. Gelfand.

5    BY MR. GELFAND:

6    Q.  Finally, Ms. Finocchiaro, the prosecutor asked you

7    questions about whether or not the bank was insured by the

8    FDIC, correct?

9    A.  Correct.

10   Q.  OK.  And to be clear, you also testified –– I just want to

11   make sure we are not confused on terminology –– that some of

12   these checks were processed through the Federal Reserve System,

13   correct?

14   A.  Correct.

15   Q.  And the FDIC and the Federal Reserve system are two totally

16   separate concepts, correct?

17   A.  Correct.

18   Q.  OK.  Just to be clear, when you testified that these checks

19   were processed through the Federal Reserve System, to the

20   extent you know, that's basically just a way that banks in

21   American banking process checks; they don't independently

22   confirm the veracity of what is on checks or anything like

23   that, correct?

24   A.  Correct.

25           MR. GELFAND:  Your Honor, I have no further questions.

308

K1ndtem2

1    Thank you.

2              THE COURT:  All right.  Any reredirect?

3              MR. BHATIA:  No, your Honor.

4              THE COURT:  All right.  Ms. Finocchiaro, you may step

5    down.  Your testimony is complete.  Thank you.

6              (Witness excused)

7              THE COURT:  Government, please call your next witness.

8              MR. BHATIA:  The government calls Elie Gabay.

9              THE COURT:  Ladies and gentlemen, while we wait for

10   the next witness, if you want to stretch your legs, feel free

11   to do so, or not.

12   ELIE GABAY,

13        called as a witness by the government,

14        having been duly affirmed, testified as follows:

15             THE CLERK:  Please be seated.

16             State and spell your full name for the record.

17             THE WITNESS:  Elie Gabay, E-l-i-e G-a-b-a-y.

18             THE COURT:  All right.  Good morning, Mr. Gabay.  I

19   will ask you to please speak close to the mic, and keep your

20   voice up so that everyone can hear you in this old large

21   courtroom.

22             Counsel, you may inquire.

23   BY MR. BHATIA:

24   Q.  Mr. Gabay, where do you work?

25   A.  Coney Management.

K1ndtem2

1   Q.  And what is your title there?

2   A.  Managing director.

3   Q.  How long have you had that title?

4   A.  About eleven years.

5   Q.  And what kind of work does Coney Management do?

6   A.  Manages commercial properties.

7           THE COURT:  A little louder, please.

8   A.  Manages commercial properties.

9   Q.  And about how many buildings does it manage?

10  A.  About 60.

11  Q.  And as a general matter, where are the properties that it

12  manages?

13  A.  In New York City.

14  Q.  You are a managing director there.  What are your

15  day-to-day responsibilities?

16  A.  Overseeing the management of the properties on site and

17  overseeing the back office functions involving managing those

18  properties.

19  Q.  In 2018, what role did you have in managing and overseeing

20  the financial activity of those entities?

21  A.  The same as I have today.  Overseeing income, rents,

22  receipts coming in, expenses, checks going out to vendors.

23  Q.  Do you generally oversee the financial activity of those

24  entities?

25  A.  Yes.

K1ndtem2

1    Q.  And does that involve approving expenses?

2    A.  Yes.

3    Q.  Do you also have -- what role do you have involving

4    contracts?

5    A.  I negotiate contracts when necessary.

6    Q.  And are you also authorized to approve them?

7    A.  Yes.

8    Q.  What role do you have in coordinating vendors?

9    A.  I coordinate with vendors in all matters involving the

10   management of the properties.

11   Q.  OK.  And what role do you have involving the checking

12   accounts of those companies?

13   A.  I'm a signer on some of them, and I oversee the monthly

14   reporting that we do when we reconcile those bank accounts

15   against our books.

16   Q.  Are you familiar with the building at 518 West 204 Street?

17   A.  Yes.

18   Q.  Where is that generally?

19   A.  In northern Manhattan.

20   Q.  And how are you familiar with that building?

21   A.  We manage the building.

22   Q.  So all the things you talked about managing, do you also do

23   those for 518 West 204?

24   A.  Yes.

25   Q.  And are you familiar with 518 West 204 LLC?

K1ndtem2

1   A.   Yes.

2   Q.   What is the LLC?

3   A.   It's the entity that owns the property 518 West 204 Street.

4   Q.   Does Coney Management itself own 518 West 204 LLC?

5   A.   No.

6   Q.   Who owns the company?

7   A.   It's made up of a group of partners, individuals and some

8   entities.

9   Q.   What is the relationship between Coney Management, where

10  you work, and the corporation 518 West 204 LLC?

11  A.   We are the managing agent.  Coney Management is the

12  managing agent of 518 West 204.

13  Q.   What does it mean to be a managing agent?

14  A.   To do all the tasks that I described earlier, to manage the

15  day-to-day operations, to oversee all financial matters

16  relating to the property.

17  Q.   Do you see anyone in this courtroom who you recognize from

18  your previous business dealings?

19  A.   I do.

20  Q.   Who do you recognize?

21  A.   Ari Teman, standing up there.

22  Q.   And would you please identify Mr. Teman by an article of

23  clothing he is wearing?

24  A.   A blue suit, purplish tie.

25           MR. BHATIA:  Your Honor, may the record reflect that

K1ndtem2

1    that witness has identified the defendant?

2              THE COURT:  The record will so reflect.

3    BY MR. BHATIA:

4    Q.  How did you first meet Mr. Teman?

5    A.  I had met him at some trade shows relating to some of the

6    products that he was selling.

7    Q.  Around when do you think you met him?

8    A.  Sometime in 2016, 2017, around that time.

9    Q.  You said he was selling some products.  What products was

10   he selling?

11   A.  He was selling technology -- my first discussions with him

12   were relating to technology to identify illegal subleases.

13   Q.  What was the name of the product he was selling?

14   A.  Sublet Spy.

15   Q.  Did you later enroll -- did you later subscribe to Sublet

16   Spy?

17   A.  I did.

18   Q.  And did there come a time when you purchased another

19   product from Mr. Teman?

20   A.  Yes.

21   Q.  And what was that product?

22   A.  GateGuard.

23   Q.  What does GateGuard sell?

24   A.  GateGuard is an intercom system which is placed at the

25   entrance door of commercial properties, and it was supposed to

K1ndtem2

1    add an additional layer of verification and identification for

2    any parties trying to come into the building who are

3    unauthorized.

4    Q.   What role does an intercom have in the safety of a building

5    at its entrance?

6    A.   It makes sure that only people that are authorized to enter

7    the building enter the building and keeps anyone else out by

8    not buzzing the door unless either they are buzzed in from

9    somebody upstairs or they have a code or something like that.

10   Q.   When did you first hear about GateGuard?

11   A.   Sometime in late 2016, early 2017.

12   Q.   And did you -- did there come a time when you met Mr. Teman

13   to discuss buying an intercom?

14   A.   Yes.

15   Q.   Describe that meeting.

16   A.   We first discussed it at a trade show where he was showing

17   me some of the functionality and how it worked.  We later had a

18   meeting in my office with some other members of my team in

19   order to get a little bit more intimately acquainted with how

20   it works and just get to know it better.

21   Q.   Based on -- fair to say he gave you the sales pitch?

22   A.   Yes.

23   Q.   So after the sales pitch, what did you tell Mr. Teman about

24   moving forward with GateGuard?

25   A.   We were considering rolling it out on a large scale across

A-451

314

K1ndtem2

1    a big chunk of our properties, but because it was a fairly new

2    product, we would want to test it out first to see how it

3    worked.

4    Q.  Just taking a step back for a minute.  Where was that

5    meeting with Mr. Teman?

6    A.  There was a meeting at the trade show, and that may have

7    been in Manhattan, I think, but the meeting in our office was

8    in Brooklyn.

9    Q.  OK.  So when you were talking about rolling it out on a

10   larger scale, what commitments did you make to Mr. Teman?

11   A.  There were no commitments made at the meeting.  It was

12   conceptual:  This is what we think.  This is how we would like

13   to see it happen.

14          Nothing was firm partially because Mr. Teman said that

15   he had a newer version that was in development which he needed

16   to fly to some other place in order to oversee the

17   manufacturing of, so the final product wasn't really in place

18   yet.

19   Q.  And was there -- did you have a need for a particular

20   intercom before those later models would be available?

21   A.  Yes.  There came a time when we had an immediate need for

22   an intercom system at 518 West 204th Street, and that happened

23   during the time that we were having discussions.  And rather

24   than put in a temporary intercom and wait for the updated model

25   to come out, we decided to talk to Mr. Teman about putting a

A-452

K1ndtem2

1   system in since we had an immediate need.

2   Q.  So the later model might come out later but there was an

3   immediate need for an intercom now?

4   A.  Right.  So we would put this one in on a temporary basis

5   and eventually swap it out.

6   Q.  OK.  Mr. Gabay, I'd like to direct your attention to

7   Government Exhibits 412 through 418.  They are in a binder to

8   your right.  If you could take -- to your left, I'm sorry.  My

9   right.  If you could take a look at 412 through 418 and look up

10  at me for a moment when you are finished.

11          (Pause)

12  A.  412?

13  Q.  412 through 418.

14          (Pause)

15          Mr. Gabay, just to give you an idea, I am going to ask

16  you if you recognize those documents.  That is my question for

17  now.

18  A.  Yes, I do.

19  Q.  OK.  How do you recognize 412 through 418?

20  A.  These are emails that either I sent or I received.

21          MR. BHATIA:  OK.  And, your Honor, the government

22  offers Government Exhibits 412 through 418.

23          THE COURT:  I think he needs to be more precise about

24  who the emails were with.

25          MR. BHATIA:  OK.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1ndtem2

1   Q.  Who were the emails with?

2       All of those emails were to or from you, right?

3   A.  Yes.

4   Q.  And who were the emails with?

5   A.  412 is an email from -- which is auto-generated from the

6   intercom panel, and the others are from Ari Teman.

7   Q.  OK.  Mr. Gabay -- your Honor, the government now offers

8   Exhibits 412 through 418.

9       THE COURT:  Any objection?

10      MR. GELFAND:  No, your Honor.

11      THE COURT:  They are all received.

12      (Government's Exhibits 412 through 418 received in

13  evidence)

14      MR. BHATIA:  Mr. Magliocco, I would like to publish

15  Government Exhibit 412.

16      Mr. Gabay, we are going to call up an exhibit for you.

17      THE COURT:  Can you enlarge the exhibit?  The jury is

18  struggling with it a little bit.  Thank you.

19  Q.  Mr. Gabay, who is this email from?

20  A.  This email is from the intercom system.

21  Q.  And who is this email to?

22  A.  To me.

23  Q.  As a general matter, what information are you getting in

24  this email?

25  A.  It's a notification that Ana Esterg, from Apartment 22 at

K1ndtem2

1  518 West 204th Street, got a buzz but didn't log into the

2  apartment.

3  Q.  Does this message tell you that the intercom is working?

4  A.  Yes.

5  Q.  Did you ever receive an invoice related to this purchase?

6  A.  Yes.

7  Q.  I would like to direct your attention to Government Exhibit

8  413.

9  A.  413.

10  Q.  So I would like to direct your attention to the top of this

11  email.

12  A.  OK.

13  Q.  Who is this email from?

14  A.  Ari Teman.

15  Q.  And who is it to?

16  A.  To me.

17  Q.  What is the date of this email?

18  A.  January 19, 2018.

19  Q.  That is the same day as you got the email saying that your

20  device is working, right?

21  A.  Yes.

22  Q.  And so --

23  A.  Yeah, sorry.

24  Q.  Is there an attachment to this email?

25  A.  There is.

A-455

318

K1ndtem2

1    Q.  And is that an invoice?

2    A.  Yes.

3    Q.  I would like to direct your attention to page 3 of this

4    document.

5            You can follow along on the screen, if that is

6    helpful.  We will blow it up for you.

7            So I would like to first direct your attention to the

8    top of this email -- of this invoice, I should say.

9            Who is this email from -- who is this invoice from?

10   A.  GateGuard Inc., a division of Teman.

11   Q.  And is it to you?

12   A.  It has my email address on it, but it's got another entity

13   on it.

14   Q.  This is the invoice that was emailed to you?

15   A.  Yes.

16   Q.  What is the balance on this invoice?

17   A.  $3,600.

18   Q.  And if we go further down that page, we can take a look at

19   what you are being invoiced for.

20           What is the first entry on this invoice?

21   A.  GateGuard Version 1 Panel.

22   Q.  What is it listed here in the description?

23   A.  "To be credited to Panel 2.0 monthly fees when installed."

24   Q.  And the cost is $3,600?

25   A.  Yes.

A-456

K1ndtem2

1   Q.  And in the far right column, it says, "Line Total."

2           You are not being charged for anything else, right?

3   A.  That is correct.

4   Q.  The total value of this invoice was $3,600, right?

5   A.  Yes.

6   Q.  What did you think you were buying when you received this

7   invoice?

8   A.  I was buying the version one panel as a temporary solution,

9   and eventually it will be credited against the newer panel once

10  that came in.

11  Q.  I would like to direct your attention to the bottom of this

12  page now.

13          In the bottom left corner, there is something that

14  says, "Terms."  It says, "Buyer sets Terms & Conditions at

15  https://GateGuard.xyz."  Do you see that?

16  A.  I do.

17  Q.  Did you click on that link?

18  A.  I don't recall clicking on that link.

19          THE COURT:  Sorry.  A little louder, please.

20  A.  I don't recall clicking on that link.

21  Q.  Why not?

22  A.  Why don't I recall it?

23  Q.  Do you recall why you might not have clicked on that link?

24  A.  No.

25  Q.  I would now -- did there come a time when you paid for

A-457

320

K1ndtem2

1  this -- when you paid this invoice?

2  A.  Yes.

3  Q.  After receiving this invoice, did there come a time when

4  you did go to Mr. Teman's website?

5  A.  Yes.

6  Q.  And when was that?

7  A.  It was later on, as we were negotiating the larger

8  agreement.

9  Q.  So that was -- this is just an invoice for one device, is

10 that right?

11 A.  Correct.

12 Q.  When you received this invoice, what did you think that you

13 were buying with just this invoice?

14 A.  Just that one device.

15 Q.  OK.  At the same time, were there conversations about other

16 purchases?

17 A.  There were conversations.

18 Q.  What were those conversations?

19 A.  Discussions and negotiations about how to structure the

20 terms of the larger purchase.

21 Q.  I'll direct your attention to Government Exhibit 414, and

22 there is an email message on the third page of that document.

23 A.  Do I still need this binder?

24 Q.  You don't need the binder.

25      In this message, Mr. Teman says:  "Here is the form to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-458

321

K1ndtem2

1    complete the order for the 10 Version 2.0 devices you put into

2    PropertyPanel.xyz," and then he later includes a hyperlink.

3    What was Mr. Teman sending you?

4    A.   He was sending me an online order form.

5    Q.   And did you go to that link?

6    A.   I believe so.

7    Q.   And did there come a time after going to that link when you

8    saw so-called "Terms & Conditions" on Mr. Teman's website?

9    A.   Yes.

10   Q.   When did you first see those terms and conditions?

11   A.   It must have been around the time of this email.

12   Q.   What was your reaction to seeing them?

13   A.   I was pretty surprised by many of them and felt that they

14   needed to be negotiated.

15   Q.   What about them seemed surprising?

16   A.   They seemed very one-sided and aggressive in nature.

17   Q.   And at the time you saw those terms, did you feel that you

18   had been bound by them?

19   A.   No.

20   Q.   Did you feel you had agreed to those terms?

21   A.   No.

22   Q.   Why not?

23          MR. GELFAND:  Your Honor, I object to the question

24   about the way he felt.

25          THE COURT:  Sustained.

322

K1ndtem2

1   Q.   In your mind, were you bound by those terms?

2   A.   No.

3        MR. GELFAND:  The same objection.

4        THE COURT:  Sustained.

5   Q.   In your mind, did you agree to those terms?

6        MR. GELFAND:  I am going to object, your Honor.

7        THE COURT:  Sustained.

8   Q.   Did there come a time when you expressed your views about

9   those terms and conditions to Mr. Teman?

10  A.   Yes.

11  Q.   And so going back to this document, I will direct your

12  attention to an email message at the bottom of the first page,

13  dated January 23, 2018.  You wrote here:  "Section 5K and 5L or

14  your terms and conditions are pretty brutal.  I stopped reading

15  after I saw them.  I don't usually get nitpicky but we need to

16  discuss these."

17       What were you telling Mr. Teman?

18  A.   I was telling him that we needed to discuss the terms and

19  conditions.

20  Q.   And was that a reference to a page on his website?

21  A.   Yes.

22  Q.   What did you mean, that they were pretty brutal?

23  A.   I'd have to see them to remember it, but judging by my

24  language, they seemed one-sided and very aggressive.

25  Q.   When you said that they were pretty brutal, were you

A-460

323

K1ndtem2

1   conveying anything about whether you agreed to those terms?

2   A.  My next sentence says that we need to discuss them, so I

3   meant we need to negotiate them.

4   Q.  What was the date of that email to Mr. Teman?

5   A.  January 23, 2018.

6   Q.  And at that point Mr. Teman had installed a GateGuard

7   device at 518 West 204, right?

8   A.  Yes.

9   Q.  I'll direct your attention to an email above this one that

10  says -- let's pull it up.  He wrote back:  "Sure.  Call me."

11          Did you have a subsequent call with Mr. Teman?

12  A.  Yes.

13  Q.  On that call, what, if anything, did Mr. Teman say about

14  payment terms?

15  A.  I don't recall specifics about that conversation.

16  Q.  On that conversation, did you commit to abiding by the

17  terms and conditions?

18          MR. GELFAND:  Your Honor, objection.  The witness has

19  testified he doesn't recall.

20          THE COURT:  Overruled.

21          You may answer it.

22          THE WITNESS:  Repeat the question.

23  BY MR. BHATIA:

24  Q.  On that call that says, "Sure, call me," did you say

25  anything about committing to the terms and conditions?

K1ndtem2

1  A.  I don't think so, no.

2          THE COURT:  Please speak louder.

3          THE WITNESS:  Sure.

4          THE COURT:  Just repeat the answer.

5  A.  I don't think so, no.

6  Q.  At any time did you have a phone call with Mr. Teman where

7  you told him you agreed to the terms and conditions?

8  A.  No.

9  Q.  So you didn't have one after this either?

10  A.  No.

11  Q.  OK.  Did there come a time when you actually paid the

12  invoice for -- when you actually paid the invoice that you

13  testified about earlier today?

14  A.  Yes.

15  Q.  So I'll direct your attention now to Government Exhibit

16  146.

17          MR. BHATIA:  Your Honor, at this point, I think we

18  need to offer that into evidence.

19          If I could have one moment?

20          One moment, your Honor.

21          (Pause)

22          MR. BHATIA:  Your Honor, the government offers into

23  evidence, pursuant to a stipulation that we read off yesterday,

24  Exhibits 141 through 146.

25          THE COURT:  Any objection?

A-462

325

Klndtem2

1          MR. GELFAND:  No objection.

2          THE COURT:  Those are all received.

3          (Government's Exhibits 141 through 146 received in

4     evidence)

5     BY MR. BHATIA:

6     Q.  Mr. Gabay, I would like to direct your attention to

7     Government Exhibit 146.  We'll put it up on the screen.

8          On the top right here is a check image, is that right?

9     A.  Yes.

10    Q.  Do you recognize this check?

11         THE COURT:  Can you enlarge it, please, for the

12    benefit of the jury?

13    A.  I do.

14    Q.  And is this check issued by 518 West 204 LLC?

15    A.  Yes, it is.

16    Q.  Is this the check that you issued for the invoice that you

17    had received?

18    A.  Yes.

19    Q.  When you issued this check, what were you agreeing to do

20    with GateGuard?  What were you agreeing to purchase from

21    GateGuard?

22    A.  The intercom panel.

23    Q.  Had you spoken on the phone with Mr. Teman about GateGuard?

24    A.  I had.

25    Q.  And you described meetings with GateGuard?

326

K1ndtem2

1  A.  Yes.

2  Q.  During those phone calls and meetings, did Mr. Teman tell

3  you anything about authority to draw checks on behalf of 518

4  West 204 LLC?

5  A.  No.

6  Q.  Did he tell you anything about a ten-year commitment to

7  paying him monthly fees?

8  A.  No.

9  Q.  At the time you issued this check, had Mr. Teman told you

10  anything about paying a device removal fee if you removed the

11  device?

12  A.  No.

13  Q.  This check is dated January 31, 2018, is that right?

14  A.  Yes.

15  Q.  At the time you paid this check, had you -- did you believe

16  that you were buying a GateGuard intercom?

17  A.  Did I what?

18  Q.  Did you believe that you were purchasing and owning a

19  GateGuard intercom?

20  A.  Yes.

21  Q.  Did you believe that you would be subject to a fee if you

22  decided to remove the intercom and do something else?

23  A.  No.

24  Q.  At the time you issued this check, what commitments had you

25  made to GateGuard about future purchases?

K1ndtem2

1    A.  There were no commitments, there were just negotiations.

2    Q.  At the time you issued this check, were you giving Mr. --

3    had you given Mr. Teman authority to draw checks from your

4    accounts?

5    A.  No.

6    Q.  If Mr. Teman had said I'd like authority to issue checks on

7    your behalf, why don't you give me a check, what would you have

8    said?

9            MR. GELFAND:  Objection, your Honor.  It calls for

10   speculation.

11           THE COURT:  Overruled.

12           THE WITNESS:  That means I can answer it?

13           THE COURT:  You may answer it.  Thank you.

14   A.  I would have said no.

15   Q.  Why would you have said no?

16   A.  Because we don't authorize anyone to draw on our

17   accounts -- any of our vendors to draw funds from our accounts

18   other than specific categories, such as utilities or mortgages.

19   Q.  So what are the categories where you do allow people to

20   draw funds?

21   A.  Only mortgage payments or utilities.

22   Q.  And why do you not let other people draw funds from your

23   accounts?

24   A.  That's just the way our policy is structured.  We like to

25   see invoices come in.  We like to authorize each payment and go

A-465

K1ndtem2

1    through our accounts payable process.

2    Q.  Is there a practical effect -- is there a practical reason

3    you don't want people automatically drawing funds from that

4    account?

5    A.  Practical reason?  I don't understand what you mean.

6    Q.  Is there a reason you want to manually approve expenses

7    going out of that account?

8    A.  Yeah, to make sure that they are authorized.

9    Q.  At the time you paid this check, did you have any contract

10   with Mr. Teman?

11   A.  No.

12   Q.  And at the time you issued this check, had you signed

13   anything called the terms and conditions?

14   A.  No.

15   Q.  After paying for this first device, did you have other

16   conversations with Mr. Teman about other purchases after paying

17   this?

18   A.  Yes.

19   Q.  What was the substance of those conversations?

20   A.  It was negotiating the rollout of Version 2.0 across

21   multiple properties.

22   Q.  I'll direct your attention to Government Exhibit 415, which

23   we will pull up on the screen for you.

24           I will direct your attention to an email at the bottom

25   of the first page.

K1ndtem2

```
1              We can scroll up a little bit, and we can see this is
2    from -- this is a message from Ari Teman?
3    A.  Yes.
4    Q.  And it is an email to you?
5    A.  Yes.
6    Q.  And who is Yoni Irom?
7    A.  That is an attorney.
8    Q.  OK.  In this message -- now go to the contents of it --
9    what was Mr. Teman sort of conveying to you?
10             THE COURT:  Let's let the jury read the message first.
11             MR. BHATIA:  OK.
12             (Pause)
13             THE COURT:  OK.  Go ahead.
14   BY MR. BHATIA:
15   Q.  At this point, is Mr. Teman giving you a proposal?
16   A.  He's directing me to fill out some sort of template to go
17   through the process of finalizing the order for the 20 -- for
18   the units for the 20 buildings.
19   Q.  Now, if we go further up this page on this document, you
20   send a message to Mr. Teman, and in that message you write --
21   and now we have it up here -- you write:  "Proposed changes to
22   terms and conditions attached.  Let's discuss once you've had a
23   chance to review."
24             What were you sending Mr. Teman?
25   A.  Red lines terms and conditions.
```

A-467

K1ndtem2

1    Q.  So let's turn to page 3 of this document.

2         These are the same terms and conditions that you

3    described as pretty brutal earlier?

4    A.  Yes.

5    Q.  So on page 3 of this document -- if we pull it up.  You can

6    zoom in on the text on this page.

7         Can you read the top three lines?

8    A.  "Terms & conditions, GateGuard Inc.  Last revised:

9    November 30, 2017, 3:30 p.m."

10   Q.  Are these the terms and conditions that you had seen

11   before?

12   A.  I believe so.

13   Q.  And where did you get this document from?

14   A.  From his website.

15   Q.  And what you are sending him, is that like a Microsoft Word

16   document?

17   A.  Yes.

18   Q.  Did you send it with any edits in this document?

19   A.  I did.

20   Q.  When you sent it to him, why did you make edits?

21   A.  Because I felt the terms and conditions were brutal.

22   Q.  And did you believe that these terms and conditions had any

23   effect on the intercom that you had already purchased?

24   A.  Had any effect?

25   Q.  Were these terms and conditions related to that earlier

A-468

K1ndtem2

1   intercom?

2   A.  I didn't think so, no.

3   Q.  What intercoms might these terms and conditions relate to?

4   A.  The ones that we were negotiating to purchase.

5   Q.  Turn your attention now to the seventh page of this

6   document, and I will direct your attention to a paragraph right

7   under the heading 5.

8           Pull it up.

9           Fair to say this is a long document?

10  A.  Yes.

11  Q.  OK.  So this section is called "Orders and Fees," right?

12  A.  Yes.

13  Q.  And, in quotes, "Pricing"?

14  A.  Yes.

15  Q.  You made two edits here, right?

16  A.  I did.

17  Q.  What is the edit -- the second edit further down this page,

18  you struck some language.  We don't need to get into legalese,

19  but what would you say that you were striking out here?

20  A.  I was striking out the language that enabled GateGuard to

21  increase pricing at a rate of 100 percent per year.

22  Q.  Was that an unusual provision for you?

23  A.  Highly unusual.

24  Q.  Why?  Why did you think that might be an issue?

25  A.  I think it would be an issue if pricing can be doubled on

A-469

332

K1ndtem2

1   an annual basis at his discretion.

2   Q.  Further up this page, there is a URL.  Do you see that URL?

3   A.  I do.

4   Q.  And did you click on that link?

5   A.  I don't recall.

6   Q.  Do you recall ever seeing another Web page that had similar

7   conditions?

8   A.  Similar conditions to what?

9   Q.  Do you recall ever seeing another page like a Terms &

10  Conditions?

11  A.  No.

12  Q.  OK.  To the best of your memory, did Mr. Teman ever draw

13  your attention to that website?

14  A.  No.

15  Q.  And to the best of your memory, did he ever send you a copy

16  of that website?

17  A.  A copy of the website?

18  Q.  Did he ever send you the text of what's in that link?

19  A.  No, I don't think so.

20  Q.  By sending back these terms and conditions, were you

21  agreeing to them?

22  A.  No.  It was a negotiation.

23  Q.  You would say this is mid-negotiation, right?

24  A.  Yes.

25  Q.  Going back to your email now, so that is page 1 of this

K1ndtem2

1    document, towards the top.

2            (Pause)

3            THE COURT:  Do you need to put it up on the screen.

4            MR. BHATIA:  We will play it.

5    Q.  In this email where you attached these terms and

6    conditions, you wrote:  "Proposed changes to terms and

7    conditions attached.  Let's discuss once you've had a chance to

8    review."

9            By saying you wanted to discuss, were you conveying

10   anything about whether you had already agreed to these

11   conditions?

12   A.  No.

13   Q.  What did you mean to tell Mr. Teman about the terms?

14   A.  That I had proposed some changes and we should discuss

15   further.

16   Q.  And you didn't agree to them as is?

17   A.  Absolutely not.

18   Q.  Did you hear from Mr. Teman after you sent this email?

19   A.  I believe we spoke, yes, and I think in response to some of

20   my comments.

21   Q.  You continued to talk to Mr. Teman about the GateGuard --

22   about buying more GateGuard product, is that right?

23   A.  I did.

24   Q.  Did there come a time when you decided that you did not

25   want to purchase more GateGuard intercoms?

A-471

334

K1ndtem2

1    A.  Yes.

2    Q.  What led you to that conclusion?

3    A.  We were having some challenges with the unit that had been

4    installed, and during the troubleshooting process I

5    communicated with Mr. Teman that until some of these issues

6    were resolved, we'd like to put a hold on any further

7    discussions on the larger order.

8    Q.  Let's just take a step back.

9          You said that you had some issues with the device.

10   What kind of issues?

11   A.  Connection issues.  We got some feedback from tenants that

12   either felt like they weren't able to get in when they needed

13   to get in or weren't able to buzz people in when they needed to

14   buzz people in.  The last piece which I remember was that there

15   was a connectivity issue where the unit wasn't working as

16   promised.

17   Q.  How many times a day would you say an intercom is used in

18   one of your buildings?

19   A.  It depends on the size of the building.

20   Q.  If there were ten tenants in the building, how many times a

21   day do you think the intercom would be used?

22   A.  It would be tough to say.  It depends on how many guests

23   they have and so many other factors.

24   Q.  It could be dozens of times?

25   A.  Yes.

A-472

335

K1ndtem2

1  Q.  So is it a problem for you if the intercom is not working
2  properly?
3  A.  Yes, it is.
4  Q.  And did tenants complain to you?
5  A.  Yes.
6  Q.  And did you relay complaints to Mr. Teman?
7  A.  Yes.
8  Q.  What did he say in response to those complaints?
9  A.  He worked on the issues that were coming up, and we worked
10  together in order to resolve them.
11  Q.  Did you find that despite his work, there were still
12  problems coming up?
13  A.  Yes.
14  Q.  And ultimately what happened to your discussions about
15  buying more GateGuard intercoms?
16  A.  When I relayed the intention to put the larger order on
17  hold, I got a very nasty email from Mr. Teman and the
18  relationship deteriorated after that.
19  Q.  I would like to direct your attention to Government Exhibit
20  416.  And at the top of this page, there is a message between
21  you and Mr. Teman.
22        You wrote:  "Updated feedback on my end below.
23        "'Given all of the issues we are having with Teman's
24  system, I am very hesitant to move forward with him.  I think
25  we need to put this entire project on hold.  And wait.'"

K1ndtem2

1           What were you relaying to Mr. Teman?

2    A.   I was relaying to him that due to the challenges and the

3    issues that we had with the system, we would be suspending any

4    further discussion about the larger order until they were

5    resolved.

6    Q.   You are describing feedback on your end and then quoting

7    some language.  Are you quoting someone else here?

8    A.   Just probably quoting just the general feedback that I'm

9    getting.

10   Q.   So in the office there was a conclusion to put this on

11   hold?

12   A.   Yeah.

13   Q.   It was not just your decision?

14   A.   No.

15   Q.   After --

16           THE COURT:  Counsel, I am looking for a good moment

17   for a mid-morning break.  Is this it, or would you like to go

18   on a little longer?

19           MR. BHATIA:  I have a few more questions on this top.

20           THE COURT:  Very good.

21           MR. BHATIA:  And then I will let you know.

22           THE COURT:  Keep going.

23   BY MR. BHATIA:

24   Q.   Did you ever -- after saying that you were hesitant to move

25   forward, did you ever buy any intercoms?

A-474

337

K1ndtem2

1  A.  Did I ever?

2  Q.  After sending this message, did you buy any other

3  intercoms -- intercoms from Mr. Teman?

4  A.  No.

5  Q.  OK.  Did you buy anything else from Mr. Teman?

6  A.  No.

7      MR. BHATIA:  Your Honor, this might be a good point

8  for a break.

9      THE COURT:  All right.  Ladies and gentlemen, we're

10  going to take our mid-morning break.  Mr. Smallman will come

11  get you in 15 minutes.

12      Enjoy your break and, as always, do not discuss the

13  case.

14      (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

K1ndtem2

1          (Jury not present)

2          THE COURT:  All right.  The witness may step down.

3          Counsel, anything to raise before we take our break?

4          MR. BHATIA:  No, your Honor.

5          THE COURT:  All right.  I will see you just before the

6     jury comes back.  Thank you.  Have a good break.

7          (Recess)

8          (Jury not present)

9          THE COURT:  All right.  Let's get the witness and the

10    jury.

11         Government counsel, so that I don't have to keep

12    reminding the witness, do encourage him to speak up.  He speaks

13    very softly.

14         And government counsel, to the extent that -- there

15    you go, here he is.  Please repeatedly just keep your voice up

16    and speak right into the mic.

17         May I just suggest to the government table, given the

18    size of some of the type on some of the documents, so that I

19    don't have to keep interjecting, as a general matter, let's

20    blow up the relevant language so the jury can see it without

21    straining.  Thank you.

22         MR. BHATIA:  Understood.

23         (Continued on next page)

24

25

K1ndtem2

1          (Jury present)

2          THE COURT:  All right.  Welcome back, ladies and

3    gentlemen.

4          Please be seated.

5          Mr. Gabay, I will remind you that you are still under

6    oath.

7          And, counsel, you may inquire.

8    BY MR. BHATIA:

9    Q.  Mr. Gabay, to be clear, were there problems with the one

10   GateGuard device that you owned?

11   A.  Yes.

12   Q.  There were problems with the one at 518 West 204?

13   A.  Yes.

14   Q.  What were those problems?

15   A.  We were having issues connecting.  There were a variety of

16   issues with getting tenants to use it properly or get it to run

17   the way we needed it to run.

18   Q.  Did the tenants seem upset about it?

19   A.  They did.

20   Q.  And they were relaying those concerns to you?

21   A.  Yes.

22   Q.  And having a faulty intercom, does that also lead to

23   getting complaints with the city?

24   A.  Yes.

25   Q.  It can be a big problem for you, is that right?

A-477

340

K1ndtem2

1    A.  Yes.

2    Q.  And did you relay those concerns to Mr. Teman?

3    A.  I did.

4    Q.  These were reoccurring problems, is that right?

5    A.  Yes.

6    Q.  Ultimately, was he able to stop the problems from

7    reoccurring?

8    A.  Many of them were taken care of.  The connectivity issues

9    were still not resolved.

10   Q.  Connectivity means the ability of the intercom -- the

11   ability of the intercom to connect to the Internet?

12   A.  Yes, and for us to connect to the intercom remotely to

13   update or --

14   Q.  Is that the main purpose of the intercom, as far as you can

15   tell?

16   A.  No, that's not the main purpose.

17   Q.  Is it an important part of the product?

18   A.  Yes.

19   Q.  And it wasn't working?

20   A.  Correct.

21   Q.  And you told Mr. Teman, right?

22   A.  Yes.

23   Q.  And you said -- you kept having these problems?

24   A.  Yes.

25   Q.  Would you describe yourself as a satisfied customer?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-478

341

K1ndtem2

1   A.  No.

2   Q.  Did there come a time after the first device when you

3  bought more of them?

4   A.  No.

5   Q.  Why not?

6   A.  Because we weren't happy with the first one.

7   Q.  You sent over -- you testified about some edits you made to

8  the terms and conditions.

9   A.  Yes.

10   Q.  As part of your negotiations, right?

11   A.  Yes.

12   Q.  And at the time -- at any time, did you ever have an

13  agreement with Mr. Teman?

14   A.  About what?

15   Q.  About these terms and conditions.

16   A.  No.

17   Q.  Did you ever have any agreement about purchasing more

18  devices?

19   A.  No.

20   Q.  Did you feel that you had any agreement -- excuse me.

21        Did you have any agreement beyond buying the one

22  device that you paid for?

23        MR. GELFAND:  Objection, your Honor.

24        THE COURT:  One moment.

25        (Pause)

A-479

342

K1ndtem2

1          THE COURT:  Overruled.

2          You may answer.

3          THE WITNESS:  Can you repeat the question?

4   BY MR. BHATIA:

5   Q.  Did you have any agreement with Mr. Teman other than paying

6   for the one device that you owned and the invoice that you

7   received?

8   A.  No.

9          THE COURT:  Wait.  Just to be more precise, is the

10  question other than in connection with the first intercom, did

11  he have any agreement with Mr. Teman?  Is that the question?

12          That's the way I understood what you were asking, but

13  I want to make sure there is clarity in your question.

14          MR. BHATIA:  I mean other than -- let me rephrase the

15  question.

16          THE COURT:  Thank you.

17  Q.  Mr. Teman installed one intercom in one of your buildings,

18  right?

19  A.  Correct.

20  Q.  And you paid $3,600 for that intercom?

21  A.  Correct.

22  Q.  Did you have any agreement with Mr. Teman beyond him

23  installing the device and you paying $3,600 for that device?

24  A.  No.

25  Q.  Did you have any agreement called Terms & Conditions?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-480

K1ndtem2

1    A.  No.

2    Q.  Did you have any written signature with both of your

3    signatures at the bottom?

4    A.  No.

5    Q.  Did Mr. Teman at any time, ever, tell you about fees for

6    removing that device?

7    A.  Yes, after -- once the relationship deteriorated, he

8    started sending me emails about these fees that I supposedly

9    owed him.

10   Q.  Prior to when the relationship deteriorated, when you put

11   that -- is that after you decided to put the negotiations on

12   hold?

13   A.  Yes.

14   Q.  Prior to that, had Mr. Teman ever told you about a fee for

15   removing a device from your own building?

16   A.  Not that I recall.

17   Q.  You thought you owned the device -- you owned the device,

18   right?

19   A.  Well, it was a temporary device that we owned until the new

20   one would come in.

21   Q.  Does it make sense to you to pay a fee to remove your own

22   device from your own building?

23   A.  No.

24   Q.  Is that something that would have stood out to you if you

25   had agreed to pay that fee?