# 21-1920-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

ARI TEMAN, AKA Sealed Defendant 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**JOINT APPENDIX**
**Volume 4 of 11 (Pages A-481 to A-720)**

KEDAR S. BHATIA
WON S. SHIN
  *Assistant U.S. Attorney*
UNITED STATES ATTORNEY'S OFFICE
  SOUTHERN DISTRICT OF NEW YORK
*Attorneys for Appellee*
One Saint Andrew's Plaza
New York, New York 10007
(212) 637-2200

EDEN QUAINTON
QUAINTON LAW
*Attorneys for Defendant-Appellant*
2 Park Avenue, 20th Floor
New York, New York 10169
(212) 419-0575

i

## TABLE OF CONTENTS

**Page**

District Court Docket Entries ................................... A-1

Complaint, filed June 20, 2019 ................................. A-46.2

Notice of Appearance, dated August 27, 2019 .......... A-47

Indictment, filed September 26, 2019 ...................... A-49

Waiver of Appearance for Arraignment, dated
    October 14, 2019 ................................................. A-53

Transcript of Proceedings held before the
    Honorable Paul A. Engelmayer, dated
    October 21, 2019 ................................................. A-55

Supeseding Indictment, filed November 12, 2019 .... A-96.1

Transcript of Proceedings held before the
    Honorable Paul A. Engelmayer, dated November
    21, 2019 ............................................................... A-96.7

Opinion and Order of the Honorable Paul A.
    Engelmayer, dated December 20, 2019 ................ A-97

Second Superseding Indictment, filed
    January 3, 2020 ................................................... A-121

Defendant Teman's Requested Voir Dire Questions,
    filed January 6, 2020 ........................................... A-129

Excerpts of Transcript of Conference Proceedings
    held before the Honorable Paul A. Engelmayer,
    dated January 10, 2020 ........................................ A-137.1

Transcript of Conference Proceedings held before
    the Honorable Paul A. Engelmayer, dated
    January 10, 2020 ................................................. A-137.6

Letter from Kedar S. Bhatia to the Honorable Paul
    A. Engelmayer, dated January 14, 2020 ............... A-137.96

ii

**Page**

Transcript of Trial Proceedings held before the
    Honorable Paul A. Engelmayer, dated
        January 21, 2020 ..................................................... A-138

Transcript of Trial Proceedings held before the
    Honorable Paul A. Engelmayer, dated
        January 22, 2020 ..................................................... A-265

Transcript of Trial Proceedings held before the
    Honorable Paul A. Engelmayer, dated
        January 23, 2020 ..................................................... A-398

Transcript of Trial Proceedings held before the
    Honorable Paul A. Engelmayer, dated
        January 24, 2020 ..................................................... A-672

Transcript of Trial Proceedings held before the
    Honorable Paul A. Engelmayer, dated
        January 27, 2020 ..................................................... A-998

Transcript of Trial Proceedings held before the
    Honorable Paul A. Engelmayer, dated
        January 28, 2020 ..................................................... A-1187

Transcript of Trial Proceedings held before the
    Honorable Paul A. Engelmayer, dated
        January 29, 2020 ..................................................... A-1264

Verdict Sheet, dated January 29, 2020 ...................... A-1298.1

Order of the Honorable Paul A. Engelmayer, dated
    January 29, 2020 ..................................................... A-1299

Defendant's Motion for Judgment of Acquittal or in
    the Alternative, Motion for New Trial, filed
    February 26, 2020 ................................................. A-1437

Motion for New Trial Based on Undisclosed Brady
    and Jencks Act Evidence, filed April 9, 2020 ....... A-1473

iii

**Page**

Exhibit A to Motion -
Excerpts of Transcript of Proceedings, dated
August 9, 2018.................................................... A-1498

Exhibit B to Motion -
Report of Violations of New York City's Housing
Maintenance Code ............................................... A-1512

Exhibit C to Motion -
Report of Violations of New York City's Housing
Maintenance Code ............................................... A-1513

Exhibit D to Motion -
HPD's Housing Maintenance Code Violations
User Guide .......................................................... A-1514

Exhibit E to Motion -
Report re: New York Civil Litigation – Joseph
Soleimani ............................................................ A-1548

Exhibit F to Motion -
Report re: New York Civil Litigation – Elie
Gabay .................................................................. A-1549

Exhibit G to Motion -
Glossary of Terms for Litigation Status Report
from HPD............................................................. A-1550

Letter from Joseph A. DiRuzzo, III to the Honorable
Paul A. Engelmayer, dated April 9, 2020............... A-1552

Letter from Kedar S. Bhatia, Assistant United States
Attorney to the Honorable Paul A. Engelmayer,
dated May 1, 2020 re: Trial Exhibits ..................... A-1554

Government's Exhibits:

GX 101-
GateGuard Account Opening Documents ............. A-1555

GX 102 -
GateGuard Bank Statements................................. A-1559

iv

|  |  | Page |
|---|---|---|
| GX 103- <br> Friend or Fraud Account Opening Documents ...... | A-1581 |
| GX 104- <br> Friend or Fraud Bank Statements ......................... | A-1585 |
| GX 105- <br> Touchless Labs Account Opening Documents ...... | A-1609 |
| GX 106- <br> Touchless Labs Bank Statements........................... | A-1613 |
| GX 107 - <br> Ari Teman Account Opening Document................ | A-1629 |
| GX 108- <br> Ari Teman Bank Statements ................................. | A-1631 |
| GX 110- <br> April 19, 2019 2:37 PM Surveillance <br> Photographs ........................................................... | A-1649 |
| GX 111- <br> April 19, 2019 6:00 PM Surveillance <br> Photographs ........................................................... | A-1652 |
| GX 112- <br> May 8, 2019 3_04 PM Surveillance <br> Photographs ........................................................... | A-1655 |
| GX 113- <br> Bank Records Spreadsheet <br> (CD-Rom)[*]........................................................... | A-1657.1 |
| GX 114 - <br> Returned Check Records ...................................... | A-1658 |
| GX 121 - <br> ABJ Lenox Account Opening Document .............. | A-1660 |

_____

[*] GX 113 is a Microsoft Excel file. CD-Rom with the Excel
spreadsheet provided to Court and Service parties.

v

**Page**

GX 122 -
ABJ Lenox Bank Statements ................................. A-1661

GX 123 -
ABJ Milano Account Opening Documents ........... A-1669

GX 124 -
ABJ Milano Bank Statements................................ A-1670

GX 127 -
May 2, 2019 Letter - ABJ Lenox .......................... A-1678

GX 129 -
May 2, 2019 Letter - ABJ Milano........................ A-1679

GX 130 -
ABJ Lenox Checks ................................................ A-1680

GX 131 -
ABJ Milano Checks .............................................. A-1682

GX 141 -
18 Mercer Account Opening Documents .............. A-1685

GX 142 -
18 Mercer Bank Statements.................................. A-1694

GX 143 -
April 4, 2018 Check from 18 Mercer Equity to
GateGuard............................................................... A-1699

GX 144 -
518 W 204 Account Opening Documents ............. A-1700

GX 145 -
518 W 204 Bank Statements................................. A-1707

GX 146 -
January 31, 2018 Check from 518 W 204 to
GateGuard............................................................... A-1725

vi

**Page**

GX 147 -
March 28, 2019 Check from 518 West 205 to
GateGuard................................................. A-1726

GX 150 -
Affidavit.................................................... A-1727

GX 201 -
March 28, 2019 Check from Coney Realty to
GateGuard................................................. A-1728

GX 202 -
March 28, 2019 Check from 18 Mercer Equity to
GateGuard................................................. A-1729

GX 203 -
April 19, 2019 Check from 518 West 205 to
GateGuard................................................. A-1730

GX 204 -
April 19, 2019 Check from ABJ Milano to
GateGuard................................................. A-1733

GX 205 -
April 19, 2019 Check from ABJ Lennox to
GateGuard................................................. A-1739

GX 206 -
April 19, 2019 GateGuard Counter Deposit.......... A-1757

GX 401 -
September 9, 2017 E-mail - 'We're Live' ............. A-1758

GX 402 -
November 6, 2017 E-mail - 'Current Issues'......... A-1760

GX 403 -
March 9, 2018 E-mail - 'Ending GateGuard' ........ A-1761

GX 404 -
May 7, 2018 E-mail - 'All Communication in
Writing'.................................................... A-1762

vii

**Page**

GX 405 -
May 22, 2018 E-mail - 'GateGuard' ...................... A-1763

GX 406 -
August 26, 2018 E-mail - 'Dispute on Charge...' .. A-1765

GX 407 -
September 18, 2018 E-mail - 'Sublet Spy Hits...' . A-1767

GX 408 -
December 14, 2018 E-mail - 'Notice of Intent' ..... A-1773

GX 409 -
June 14, 2019 GateGuard Invoice ........................ A-1775

GX 409A -
Invoices (1) ............................................. A-1777

GX 409B -
Invoices (2) ............................................. A-1785

GX 409C -
Conversation between Teman and Soleimani ........ A-1786

GX 412 -
January 1, 2018 E-mail - 'Tenant Ana Esterg' ....... A-1787

GX 413 -
January 19, 2018 E-mail - 'Invoice Sent' .............. A-1788

GX 414 -
January 24, 2018 E-mail - 'Form for the 10
Buildings' ............................................... A-1791

GX 415 -
March 25, 2018 E-mail - 'Invoice for 20
Buildings' ............................................... A-1795

GX 416 -
March 26, 2018 E-mail - 'Invoice for 20
Buildings' (1) .......................................... A-1815

viii

**Page**

GX 417 -
March 26, 2018 E-mail - 'Invoice for 20
Buildings' (2) .......................................................... A-1820

GX 418 -
March 27, 2018 E-mail - 'Proof it's Your...' .......... A-1829

GX 431 -
April 4, 2018 E-mail - 'Invoice' ............................ A-1831

GX 441 -
GateGuard Terms and Conditions.......................... A-1834

GX 442 -
April 2, 2018 E-mail - 'References' ...................... A-1856

GX 443 -
January 7, 2019 E-mail - 'Contract' ...................... A-1862

GX 501 -
Bank Records Stipulation ...................................... A-1868

GX 702 -
January 2, 2019 WhatsApp Messages ................... A-1872

GX 704 -
April 2, 2019 WhatsApp Messages ....................... A-1874

GX 727 -
April 2, 2019 Whatsapp Messages (2).................. A-1875

GX 728 -
April 3, 2019 Whatsapp Messages ........................ A-1876

GX 729 -
April 10, 2019 WhatsApp Messages ..................... A-1877

Defense Exhibits:

DX 2 -
Payment Terms (1/27/2019)................................... A-1880

DX 14 -
October 11, 2018 E-mail – 'ABJ Properties'......... A-1887

ix

**Page**

DX 15 -
October 22, 2018 E-mail - 'SubletSpy hits' .......... A-1889

DX 16 -
'Notice of Hold' .................................................... A-1892

DX 29 -
Affidavit ................................................................ A-1893

DX 36 -
March 28, 2018 E-mail – 'Invoice for 20
Buildings' .............................................................. A-1894

DX 49 -
Declaration ............................................................ A-1902

DX 51 -
Chase Information Request .................................... A-1903

DX 52 -
Chase Information Request .................................... A-1904

DC 62 -
March 9, 2018 E-mail Correspondence ................. A-1928

DX 70 -
GateGuard Logs ..................................................... A-1930

DX 71 -
May 22, 2018 E-mail – 'Re: Gateguard' ............... A-1932

Order of the Honorable Paul A. Engelmayer, dated
May 6, 2020 ........................................................... A-1933

Letter from Joseph A. DiRuzzo, III to the Honorable
Paul A. Engelmayer, dated May 8, 2020 ............... A-1935

Opinion and Order of the Honorable Paul A.
Engelmayer, dated June 5, 2020 ........................... A-1937

Letter from Joseph A. DiRuzzo, III to the Honorable
Paul A. Engelmayer, dated June 29, 2020 ............. A-2044

x

                                                         **Page**

Sentencing Memorandum and Motion for
Downward Variance, filed July 7, 2020................. A-2045

Exhibit 1 to Sentencing Memorandum -
Letter from Dr. Rami Cohen, M.D to the
Honorable Paul A. Engelmayer, dated
June 29, 2020........................................................ A-2070

Exhibit 2 to Sentencing Memorandum -
Letter from Juhan Sonin to the Honorable Paul A.
Engelmayer, dated July 6, 2020............................ A-2074

Exhibit 3 to Sentencing Memorandum -
Letter from Jeffrey Katz to the Honorable Paul A.
Engelmayer ............................................................ A-2076

Exhibit 4 to Sentencing Memorandum -
Letter from Oliver Josephs t to the Honorable
Paul A. Engelmayer, dated June 6, 2020 ............... A-2077

Exhibit 5 to Sentencing Memorandum -
Letter from Thomas Orosz to the Honorable Paul
A. Engelmayer ........................................................ A-2079

Exhibit 6 to Sentencing Memorandum -
Letter from David Diwby to the Honorable Paul
A. Engelmayer ........................................................ A-2080

Exhibit 7 to Sentencing Memorandum -
Letter from Nachum Klar to the Honorable Paul
A. Engelmayer, dated July 6, 2020........................ A-2082

Exhibit 8 to Sentencing Memorandum -
Letter from Anthony Zachariadis to the
Honorable Paul A. Engelmayer, dated
July 6, 2020............................................................ A-2084

Exhibit 9 to Sentencing Memorandum -
eJewish Philanthrophy- Coverage of Teman's
Award ..................................................................... A-2085

xi

**Page**

Exhibit 10 to Sentencing Memorandum -
HarvardX Verified Certificate of Achievement,
issued May 11, 2020 .............................................  A-2094

Exhibit 11 to Sentencing Memorandum -
Letter from Avi Ganz to the Honorable Paul A.
Engelmayer, dated July 7, 2020 ...........................  A-2095

Exhibit 12 to Sentencing Memorandum -
Letter from Steven Oved to the Honorable Paul
A. Engelmayer, dated June 15, 2020 .....................  A-2098

Exhibit 13 to Sentencing Memorandum -
Letter from Rabbi Chaim Lipskar to the
Honorable Paul A. Engelmayer, dated
July 7, 2020 .............................................................  A-2099

Exhibit 14 to Sentencing Memorandum -
Letter from Jonathan Lubin to the Honorable
Paul A. Engelmayer ...............................................  A-2101

Exhibit 15 to Sentencing Memorandum -
Letter from Talia Reiss to the Honorable Paul A.
Engelmayer .............................................................  A-2103

Exhibit 16 to Sentencing Memorandum -
Letter from Rivka Korf to the Honorable Paul A.
Engelmayer .............................................................  A-2104

Exhibit 17 to Sentencing Memorandum -
Letter from Russell DiBona to the Honorable
Paul A. Engelmayer ...............................................  A-2105

Letter from Justin K. Gelfand to the Honorable Paul
A. Engelmayer, dated September 8, 2020 ..............  A-2107

Appearance of Counsel, dated November 2, 2020 ....  A-2108.1

Letter from Justin Harris to the Honorable Paul
Engelmayer, dated November 2, 2020 ..................  A-2108.2

xii

**Page**

Exhibit B to Letter -
Letter from Justine A. Harris to Kedar Bhatia and
Edward A. Imperatore, dated October 23, 2020 .... A-2108.6

Exhibit C to Letter -
Letter from Kedar S. Bhatia to Justine A. Harris,
dated October 29, 2020 ......................................... A-2108.9

Order of the Honorable Paul A. Engelmayer, dated
November 19, 2020 ................................................ A-2109

Letter from Justine Harris to the Honorable Paul A.
Engelmayer, dated November 20, 2020 ................. A-2111

Letter from Justine Harris to the Honorable Paul A.
Engelmayer, dated November 30, 2020 ................ A-2113

Letter from Audrey Strauss to the Honorable Paul
A. Engelmayer, dated November 30, 2020 ............ A-2114

Transcript of Remote Conference Proceedings held
before the Honorable Paul A. Engelmayer, dated
December 1, 2020 ................................................. A-2116

Order of the Honorable Paul A. Engelmayer, dated
January 28, 2021 .................................................. A-2170

Letter Motion from Audrey Strauss to the
Honorable Paul A. Engelmayer, dated
April 23, 2021 ...................................................... A-2173

Exhibit A to Letter -
Proposed Order of Restitution ............................... A-2181

Exhibit B to Letter -
Proposed Preliminary Order of Forfeiture/Money
Judgment ............................................................... A-2185

Exhibit C to Letter -
Document - Finocchiaro 3503-19 .......................... A-2189

Exhibit D to Letter -
Revised Document - Finocchiaro 3503-19 ............. A-2190

**xiii**

**Page**

Exhibit E to Letter -
Affidavit of Karen Finocchiaro, dated
April 2, 2021 ......................................................... A-2191

Letter from Andrew J. Frisch to the Honorable Paul
A. Engelmayer, dated April 23, 2021 .................... A-2195.1

Attachment to Letter -
*Curriculum Vitae* of Richard M. Fraher................. A-2195.3

Letter Motion to Vacate Conviction from Andrew J.
Frisch to the Honorable Paul A. Engelmayer,
dated April 28, 2021 ............................................. A-2196

Exhibit A to Letter Motion -
Document - Finocchiaro 3503-19 ......................... A-2211

Exhibit B to Letter Motion -
Revised Document - Finocchiaro 3503-19 ............. A-2213

Exhibit C to Letter Motion -
E-mail Correspondence, dated
November 30, 2020 ............................................... A-2215

Exhibit D to Letter Motion -
E-mail Correspondence, dated March 10, 2021 .... A-2217

Exhibit E to Letter Motion -
E-mail Correspondence, dated March 12, 2021 .... A-2219

Exhibit F to Letter Motion -
Copies of Various Cashier's Checks ...................... A-2221

Order of the Honorable Paul A. Engelmayer, dated
May 5, 2021 .......................................................... A-2223

Letter from Andrew J. Frisch to Kedar Bhatia, dated
May 12, 2021 ........................................................ A-2225

Annexed to Letter -
Declaration of Richard M. Fraher, executed
May 11, 2021 ........................................................ A-2226

xiv

Page

Letter from Audrey Strauss to the Honorable Paul
    A. Engelmayer, dated June 9, 2021 ...................... A-2236

Letter from Andrew J. Frisch to the Honorable Paul
    A. Engelmayer, dated June 14, 2021 .................... A-2246.1

Letter from Audrey Strauss to the Honorable Paul
    A. Engelmayer, dated June 29, 2021 .................... A-2246.4

Transcript of Conference Proceedings held before
    the Honorable Paul A. Engelmayer, dated
    July 9, 2021............................................................ A-2247

Sentencing Submission Letter from Susan G.
    Kellman to the Honorable Paul A. Engelmayer,
    dated July 16, 2021 ................................................ A-2315

Transcript of Sentencing Proceedings held before
    the Honorable Paul A. Engelmayer, dated
    July 28, 2021.......................................................... A-2333

Notice of Appeal, dated August 2, 2021 ................... A-2458

Letter Motion from Ari Teman to the Honorable
    Paul A. Engelmayer, dated March 3, 2022 ........... A-2459

Letter Motion from Ari Teman to the Honorable
    Paul A. Engelmayer, dated April 12, 2022............. A-2462

Order of the Honorable Paul A. Engelmayer, dated
    April 13, 2022........................................................ A-2463

Letter Motion from Ari Teman to the Honorable
    Paul A. Engelmayer, dated April 13, 2022............. A-2465

Letter from Eden P. Quainton to the Honorable Paul
    A. Engelmayer, dated April 13, 2022 .................... A-2467

Notice of Appearance, filed April 13, 2022 ............... A-2469

Letter Motion from Ari B. Teman to the Honorable
    Paul A. Engelmayer, dated April 14, 2022............. A-2470

xv

**Page**

Order of the Honorable Paul A. Engelmayer, dated
    April 15, 2022........................................................ A-2473

Emergency Letter Motion from Ari B. Teman to the
    Honorable Paul A. Engelmayer, dated April 20,
    2022 ....................................................................... A-2476

Order of the Honorable Paul A. Engelmayer, dated
    April 20, 2022........................................................ A-2479

Emergency Letter Motion from Ari B. Teman to the
    Honorable Paul A. Engelmayer, dated April 20,
    2022 ....................................................................... A-2481

Letter from Kedar S. Bhatia, Asst. United States
    Attorney to the Honorable Paul A. Engelmayer,
    dated April 21, 2022 .............................................. A-2482

Order of the Honorable Paul A. Engelmayer, dated
    April 21, 2022........................................................ A-2483

A-481

344

K1ndtem2

1   A.  Yes.

2   Q.  Did Mr. Teman ever direct your attention to language that

3   said you had to pay a fee to remove a device?

4   A.  No.

5   Q.  If you had seen that language, would that have stood out to

6   you?

7   A.  Yes.

8   Q.  And if you had seen language that said you were committing

9   to paying a fee for removing the device, what would you have

10   done?

11         MR. GELFAND:  Objection, your Honor.  It calls for

12   speculation.  The same objection as earlier.

13         THE COURT:  Yes.  Sustained.

14         (Pause)

15         No.  Overruled.  I am going to reverse on that.

16         The witness may answer.

17   BY MR. BHATIA:

18   Q.  You can answer, Mr. Gabay.

19   A.  Repeat the question, please.

20   Q.  If you had seen something that said by buying the one

21   intercom for $3,600, you would be paying a cancellation fee or

22   a device removal fee, what would you have done?

23   A.  I would have removed that language.

24   Q.  Would you have spoken to Mr. Teman about it?

25   A.  Absolutely.

A-482

K1ndtem2

1    Q.  Would you have told him that you didn't agree to that?

2    A.  Yes.

3    Q.  You don't remember ever seeing that language?

4    A.  No.

5    Q.  You never saw that language?

6    A.  That's correct.

7    Q.  Before the break, we spoke about -- you saw an email where

8    you decided to put the negotiations on hold, right?

9    A.  Yes.

10   Q.  And how did Mr. Teman react to that?

11   A.  He sent a very nasty and aggressive email saying -- I don't

12   remember the exact words, but it was kind of unpleasant after

13   that.

14   Q.  When you sent him that message, were you saying that we're

15   never going to do business with you again, or were you

16   conveying that we just need to take some time?

17   A.  We just need to take some time.

18            (Continued on next page)

19

20

21

22

23

24

25

A-483

346

K1NVTEM3                          Gabay – direct

1    BY MR. BHATIA:

2    Q.  And is that because of the issues that you were having with

3    the first device?

4    A.  Yes.

5            MR. BHATIA:  Mr. Magliocco, can we please publish

6    Government Exhibit 417.

7    Q.  And, in particular, I'll direct your attention to an email

8    at the bottom of page 2, which we can blow up, which we'll blow

9    up for you.

10           This is your email that you previously spoke about,

11   right?  This is where you said updated feedback below, and you

12   told him to put the project on hold?

13   A.  Yes.

14   Q.  Okay.  Now, going to page 1 of this document, in response

15   to that, Mr. Teman sent you a message.  And we'll take a look

16   at the -- we can blow up the whole email.

17           He sent this to you on the same day, right?  This is

18   from April 26th, 2019?

19           THE COURT:  Counsel, you said April 26?

20   A.  I don't see --

21           THE COURT:  One moment.

22           MR. BHATIA:  March 26, I'm sorry.

23   A.  Yes.

24   Q.  It's from March 26.  This is a message from Ari Teman to

25   you?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-484

347

K1NVTEM3                          Gabay – direct

1    A.  Yes.

2    Q.  And is this the response he had that you thought was

3    unusual?

4    A.  Yes.

5    Q.  Here he's saying:  I'm going to sue you for -- I'll direct

6    your attention to this.  This is the very last line of the

7    email.  He says:  I'm going to sue --

8           THE COURT:  Sorry.  Do you want to take a moment and

9    let the jury read the email?

10          MR. BHATIA:  Sure.

11          (Pause)

12          THE COURT:  While the jury is reading the email, can I

13   briefly see counsel at the sidebar?  And I'll ask the witness

14   to step down please.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

K1NVTEM3                         Gabay - direct

1          (At sidebar)

2          THE COURT:  There is an extraordinary amount of

3    leading going on.  The questions are almost repeatedly leading

4    and not close.  In the absence of an objection, I'll permit

5    them to stand; they facilitate the examination and the

6    examination moves more quickly.

7          I did want to spot the issue, though, because the

8    amount of leading is really unusual.  Please, do your best,

9    certainly if there is an objection, to abide by the rules about

10   leading questions.  You're consistently putting the answer in

11   the witness's mouth in the form of a question.

12         Mr. Gelfand, I take it that the defense is not

13   objecting to that for strategic reasons to let this move along.

14         MR. GELFAND:  Yes, your Honor.  And when it comes to

15   things like background info, I tend to just ignore the form

16   issues.

17         THE COURT:  That's fine.

18         MR. GELFAND:  When it comes to more substantive

19   things, we'll certainly object.

20         THE COURT:  That's fine.

21         As to the presentation of exhibits to the jury, if

22   you're putting an email in front of the jury that involves the

23   exchange between the witness and the defendant, so as not to

24   frustrate the jury, I think you need to give them the time to

25   at least absorb the email before zipping right to a portion

K1NVTEM3                    Gabay - direct

1    towards the back end.  Otherwise, it's very hard for them to

2    understand the context of what's being asked about.

3              MR. BHATIA:  I understand.

4              THE COURT:  All right.  Thank you.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K1NVTEM3                          Gabay - direct

1              (In open court)

2              THE COURT:  You may proceed.

3     BY MR. BHATIA:

4     Q.  Mr. Gabay, in the second paragraph here, you wrote --

5     Mr. Teman wrote:  You promised to not judge us based on the old

6     device, which I didn't want to install for you because it

7     relies on internet.  And you have Spectrum that always goes

8     offline.

9              What's he referring to there?

10    A.  He's referring to the device that was installed at 518 West

11    204th Street.

12    Q.  Did you ever make any -- what promises, if any, did you

13    make to Mr. Teman regarding evaluating him for future purchase?

14    A.  I don't recall making any promises about anything.

15    Q.  And now going further down this page, in the last paragraph

16    he writes:  Your manager is an idiot and your internet has been

17    off for days.  As I said and as your super told him, I cannot

18    fix your manager being an idiot, but that's not my problem.  My

19    problem is you do not keep your end of contracts.  You waste my

20    time, you make false promises.  This is why they invented

21    attorneys.  I'm done with you.  Pay the bill before you try to

22    talk or it goes to my attorneys.  I'm also going to sue you for

23    interrupting my business for the last two months with your

24    lies.

25              He mentions in here keeping you under contracts.

A-488

351

K1NVTEM3                          Gabay - direct

1              Do you have a contract with Mr. Teman?

2    A.  No.

3    Q.  Did you have any idea what contract he was referring to?

4    A.  No.

5    Q.  And he references false promises.  Had you made any

6    promises to Mr. Teman?

7    A.  Not that I can recall, no.

8    Q.  He says here too:  This is why they invented attorneys.

9    What do you think -- how did you interpret that?

10             MR. GELFAND:  Objection, your Honor.

11             THE COURT:  Sustained.

12   Q.  What did it mean to you when he wrote, This is why they

13   invented attorneys?

14             MR. GELFAND:  Your Honor, same objection.

15             THE COURT:  Sustained.

16   Q.  Mr. Teman wrote:  I'm going to sue you for interrupting my

17   business for the last two months with your lies.  Had he ever

18   spoken to you about a lawsuit before?

19   A.  No.

20   Q.  Do you take this as him threatening to sue you?

21   A.  Threatening some sort of legal action.

22   Q.  After this email, were there other times when Mr. Teman

23   threatened you?

24   A.  I believe so.

25   Q.  Were those on the phone or in email?

A-489

352

K1NVTEM3                    Gabay - direct

1   A.  There are some other emails that I received from him which

2   did have some other threats about placing liens, and I can't

3   remember exactly what else.

4   Q.  And going back to the document that's Government Exhibit

5   417.  At the top of this page and in the first sentence, we'll

6   pull it up, Mr. Teman here writes:  Please pay the full invoice

7   for the GateGuard device you got 100 percent bad faith

8   immediately before we release anything further.

9           Does he attach an invoice here to this email?

10  A.  Yeah, it shows that there's an attachment.

11  Q.  Had you already paid the invoice that you agreed to pay for

12  the one device?

13  A.  Yes.

14  Q.  This is a different invoice?

15  A.  It's got a different invoice number, yeah.

16          THE COURT:  Sorry.  Louder, please.

17  A.  It's got a different invoice number.

18  Q.  I'll direct your attention to page 9 of this document which

19  shows the invoice.  This is the invoice that you received on

20  March 26th after sending him the email about putting your

21  project on hold?

22  A.  Yes.

23  Q.  This is a different invoice, right?

24  A.  Different than what?

25  Q.  This is not the same as the $3,600 invoice?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1NVTEM3                          Gabay - direct

1    A.  No, it's not.

2    Q.  What's the balance due for this invoice?

3    A.  $18,286.

4    Q.  Had you agreed to pay that value of money to Mr. Teman?

5    A.  No.

6    Q.  If we can go through now and look at the items listed in

7    the invoice.  It's listed here, GateGuard Version 1 panel.  And

8    the unit cost is now $14,999.

9           Had you agreed to pay that amount for the GateGuard

10   panels?

11   A.  No.

12   Q.  And you had only at that point purchased one panel?

13   A.  Correct.

14   Q.  Did you ever buy another panel?

15   A.  No.

16   Q.  And here there's also a -- it looks like it says:

17   Installation wired basement Version 1.  And it lists a cost of

18   $1,499.  Had you agreed to pay $1,499 for installation?

19   A.  I don't know what the original $3600 included, what the

20   cost was for installation.  But, no, not like this.

21   Q.  You don't remember paying, on top of $15,000, another $1500

22   for installation?

23           MR. GELFAND:  Objection, your Honor.  Leading.

24           THE COURT:  One moment.

25           Sustained.

A-491

354

K1NVTEM3                           Gabay - direct

1    Q.  There's listed here, as well, a monthly service.  And it

2    says:  First year up front.  And it lists the value of -- the

3    unit cost of $149, quantity of 12, and a total of $1,788.

4           Had you agreed to pay that amount of money to

5    Mr. Teman for monthly service?

6    A.  No.

7    Q.  After this invoice in this email, this was the day you

8    initially put the project on hold; is that right?

9    A.  I believe so.

10   Q.  Did there ever come a time when Mr. Teman threatened to

11   place a lien on one of your buildings?

12   A.  Yes.

13   Q.  I'd like to direct your attention to Government Exhibit

14   418, which we'll pull up for you.  And in particular, I'd like

15   to direct your attention to the second-to-last paragraph.  Why

16   don't we take a look at the second-to-last paragraph.

17          This is an email from Mr. Teman to you and to others.

18          He says:  Take this to your father-in-law or whoever

19   is the adult supervision, and explain that if your end of the

20   contract isn't upheld, we're putting a lien on your building

21   tomorrow.  You will never get the opportunity to invest in our

22   company, but you sure as hell will pay your bill -- pay you

23   bill.

24          He references a lien in this message, right?

25   A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-492

355

K1NVTEM3                         Gabay - direct

1    Q.   What's a lien?

2    A.   A lien is -- I don't know the legal explanation, but a lien

3    is some sort of monetary claim that can be placed against the

4    ownership of a property.

5    Q.   Is a lien something that signals someone owes you money or

6    you owe someone money?

7    A.   You owe someone money.

8    Q.   It's something that if someone believes you owe money, they

9    can try to put on one of your buildings?

10   A.   That's correct.

11   Q.   Is it a significant problem, as someone who manages

12   properties?

13   A.   It is a problem if you have a lien other than the bank on

14   your property.

15   Q.   As far as you know, did he ever actually place a lien on

16   your buildings?

17   A.   Not as far as I know.

18   Q.   It was referenced in this email, but as far as you know, it

19   wasn't actually done?

20   A.   That's correct.

21   Q.   Now, at any time did Mr. Teman ever say that he would issue

22   checks against Coney Management's accounts if it did not pay

23   this invoice?

24   A.   No.

25   Q.   At any point did Mr. Teman ever ask permission to pay

356

K1NVTEM3                    Gabay – direct

1  himself by issuing checks from Coney's bank accounts?

2  A.  No.

3  Q.  And if he had asked your permission to do that, to write

4  checks from your accounts to himself, what would you have said?

5  A.  I would have said no.

6  Q.  Why is that?

7  A.  Because we don't allow other people to write checks on our

8  accounts.

9  Q.  Turning now -- this email is dated March 18, 2018, right?

10 A.  March 27th.

11 Q.  March 27th, that's right.

12       How did your relationship with Mr. Teman continue

13 throughout 2018?

14 A.  Continued to deteriorate and nonexistent.

15 Q.  What do you mean deteriorate?

16 A.  I was getting emails like this and found no reason to

17 continue dealing with him.

18 Q.  I want to understand what was in your head throughout 2018.

19 Would you describe them as threatening or some other way?

20 A.  Definitely threatening, yes.

21 Q.  And that happened throughout 2018?

22 A.  There were few different emails and claims from Mr. Teman

23 and his attorney.

24 Q.  At any point did you ever purchase more intercoms?

25 A.  No.

A-494

357

K1NVTEM3                          Gabay - direct

1    Q.  Did you ever tell him, after he put the project on hold,

2    that you wanted to buy more intercoms?

3    A.  No.

4    Q.  Mr. Gabay, I'd like to direct your attention to April 2019.

5    Did there come a time when you learned about certain activity

6    in the 518 West 204 bank account?

7    A.  Yes.

8    Q.  And did that activity involve checks that you had not

9    authorized?

10   A.  Yes.

11   Q.  How did you learn about those checks?

12   A.  We were notified by our bank that a check had been

13   presented.  And they contacted us to verify whether it was

14   authorized.

15   Q.  Did they send you a picture of that check?

16   A.  Yes.

17        MR. BHATIA:  Mr. Magliocco, if we could publish

18   Government Exhibit 201.  And we'll pull up a check image at the

19   top of this page.

20   Q.  When did you first see this check?

21   A.  Some time in March or April of 2019, I don't remember the

22   exact date.

23   Q.  What was your reaction to seeing it?

24   A.  I was surprised and I was upset.

25   Q.  What about it surprised you?

358

K1NVTEM3                         Gabay - direct

1    A.  I was surprised that somebody would attempt to write up

2    their own check and draw it up from our account.

3    Q.  Had you ever authorized this check?

4    A.  No.

5    Q.  Did you agree that -- had you agreed that any particular

6    person could deposit this check?

7    A.  No.

8    Q.  Did you or anyone else at Coney Management authorized this

9    check?

10   A.  No.

11   Q.  Are you familiar with checks issued from this account?

12   A.  Other checks?

13   Q.  Other checks.

14   A.  Yes.

15   Q.  You've seen them as part of your day-to-day

16   responsibilities?

17   A.  Yes.

18   Q.  And how do those checks compare -- we'll go into detail,

19   but as a general matter, how do those checks compare to this

20   check?

21   A.  They look completely different in their format and layout

22   and text.

23   Q.  And starting at the top left part of this check image, how

24   does the name listed as 518 West 205 LLC compare to what's on

25   your checks?

A-496

359

K1NVTEM3                         Gabay - direct

1    A.  518 West 205 LLC is not an entity that we operate.

2    Q.  Is there one that you operate with a similar name?

3    A.  518 West 204 LLC.

4    Q.  204 versus 205?

5    A.  Correct.

6    Q.  And this check says care of Coney Realty, right?

7    A.  That's correct.

8    Q.  What's the association with being Coney Realty and 518 West

9    205 LLC?

10   A.  There is no association.

11   Q.  Is there an association between another Coney entity and

12   518 West 205 -- West 204?

13   A.  Yes, Coney Management.

14   Q.  Coney Management oversees West 204, right?

15   A.  Yes.

16   Q.  Not Coney Realty?

17   A.  Correct.

18   Q.  In addition, if you go to the bottom now right corner of

19   this check, it has what looks like maybe a signature.  Is that

20   any signature -- are you familiar with -- you said you're

21   familiar with other checks from this account?

22   A.  I am.

23   Q.  You've seen the other checks from other people who write

24   from that account?

25   A.  No other people write checks from this account, just our

A-497

360

K1NVTEM3                      Gabay - direct

1    office.

2    Q.  Does that signature appear to be any of the -- does that

3    signature appear like any of the people who write checks from

4    your account?

5    A.  No.

6    Q.  Further below it says:  "Draw per contract, no signature

7    required."  Is that language that appears on the checks that

8    you issue from your account?

9    A.  No.

10   Q.  It says:  "Draw per contract."  Did you have a contract

11   with Mr. Teman?

12   A.  No.

13   Q.  In the memo line it says:  "Device removal fee."  Prior

14   to -- before seeing this check, had you ever heard of a device

15   removal fee?

16   A.  In his emails to me.

17   Q.  In his emails to you after -- was that after the

18   relationship deteriorated?

19   A.  Yes.

20   Q.  Had you ever told him -- had you ever given him authority

21   to draw -- to pay a device removal fee?

22   A.  No.

23   Q.  Had you authorized anyone from your company to pay a device

24   removal fee?

25   A.  No.

K1NVTEM3                           Gabay - direct

1   Q.  Had you told Mr. Teman that he was authorized to draw a

2   check for a device removal fee?

3   A.  No.

4   Q.  Prior to seeing this check, what conversations, if any, did

5   you have with the defendant in which he said that he was

6   authorized to draw this check?

7   A.  We didn't have any conversations authorizing him to draw

8   checks from the account.

9   Q.  If you had a conversation where Mr. Teman had told you, I'm

10  authorized to draw a check from your account, would that have

11  stood out in your memory?

12  A.  Yes.

13  Q.  Why would that have stood out?

14  A.  Because we don't allow vendors outside of specific ones to

15  draw funds from our account, to draw any sort of funds or make

16  checks from our account.

17  Q.  If he had told you in an email that he had the authority to

18  draw checks from your account, would that have stood out in

19  your mind?

20  A.  Yes.

21  Q.  And what would you have said -- what would you have done in

22  response to seeing that in an email?

23  A.  I would have told him that he was unauthorized.

24  Q.  Did you learn about additional checks from the same

25  account?

A-499

362

K1NVTEM3                        Gabay - direct

1   A.  Yes.

2   Q.  I should say this one is dated March 28th, 2019; is that

3   right?

4   A.  Yes.

5   Q.  And so did you learn about additional checks after March

6   28th, 2019?

7   A.  Yes.

8   Q.  How did you learn about those checks?

9   A.  We were notified by our bank that additional checks had

10  been presented to be cashed on this account.

11  Q.  For the March 2018 checks, what did you tell your bank --

12  now I'm going back to the March ones.  In the March 2019

13  checks, I should say, what did you tell your bank about --

14          THE COURT:  One moment, counsel.  I think you said the

15  March 2018 checks.  Are you referring to this check that's on

16  the screen or something else?

17          MR. BHATIA:  Let me rephrase that.  I'm referring to

18  this check.

19          THE COURT:  That's 2019.

20  Q.  March 2019.  What did you tell your bank with regards to

21  this check?

22  A.  That it was unauthorized.

23  Q.  And why did you tell your bank that?

24  A.  Because it was unauthorized.

25  Q.  And what did your bank do in response to that?

A-500

363

K1NVTEM3                    Gabay - direct

1   A.  They declined to cash it from whoever presented it; and

2   instructed us that since fraud -- fraudulent activity was on

3   the account, they instructed us to close the account.  Or they

4   actually closed the account.

5   Q.  As far as you know, they did close the account?

6   A.  Yes.

7   Q.  So someone would not be able to draw checks on that account

8   in the future?

9   A.  That's correct.

10  Q.  Did there come a time when you learned that someone did try

11  to draw checks from that account?

12  A.  Yes.

13  Q.  How did you hear about that?

14  A.  Also we were notified by the bank that additional checks

15  were attempting to be cashed from this account.

16  Q.  Did they send you any images of those checks?

17  A.  Yes.

18  Q.  I'd like to direct your attention to Government Exhibit 203

19  which we'll pull up on the screen.

20       By way of example, let's look at the first page of

21  this document.  Is this a check image that your bank had given

22  to you?

23  A.  Yes.

24  Q.  And is this also drawn from the 518 -- it lists here 518

25  West 205 LLC?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-501**

K1NVTEM3                    Gabay - direct

1    A.  Yes.

2    Q.  That's not an entity associated with Coney at all, right?

3    A.  That's correct.

4    Q.  That would be 518 West 204 LLC?

5    A.  That's right.

6    Q.  And this check looks a little different; is that right?

7    A.  Yes.

8    Q.  It says:  "Draw per contract.  No signature required."  Is

9    that right?

10   A.  Yes.

11   Q.  And below that it says:  "This is a valid check.  You are

12   required by law to honor it."  It says:  "Contract at

13   gateguard.xyz/legal/terms.php accepted by above client."

14        Had you accepted that contract?

15   A.  No.

16   Q.  Did you have any contract with Mr. Teman?

17   A.  No.

18   Q.  It says:  "Contact us at 212-203-3714 with questions."

19        Is that your phone number?

20   A.  No, it's not.

21   Q.  Do you know whose phone number that is?

22   A.  I don't know offhand.

23   Q.  In the bottom left corner of this is what's called a

24   chargeback fee.  Do you see that?

25   A.  Yes.

A-502

365

K1NVTEM3                         Gabay - direct

1   Q.  Prior to this check, had you ever heard of a chargeback

2   fee?

3   A.  No.

4   Q.  Had you ever agreed to pay a chargeback fee?

5   A.  No.

6   Q.  The check at the bottom lists a bank number -- sorry, a

7   routing number and account number.  Are those numbers that come

8   back to the 518 West 204 LLC account?

9   A.  I would assume so.

10  Q.  That's how checks would get to that account, right?

11  A.  Correct.

12  Q.  Had you ever given Mr. Teman your bank account number or

13  bank routing number?

14  A.  No.

15  Q.  Did he ever ask you for a form that would give it to you?

16  A.  No.

17  Q.  In which you would give to him?

18  A.  No.

19  Q.  If he had asked you for a form authorizing withdrawals from

20  your bank account, how would you have reacted?

21  A.  He did ask and we said no.

22  Q.  Why did you say no?

23  A.  Because it's not the way we operate.  We only do things by

24  invoice where we issue the check.  He had requested that we

25  enter an order using a CH, and we asked him for invoices only.

A-503

366

K1NVTEM3                        Gabay - direct

1    Q.  You mentioned that you do business via invoice.  Why do you

2    do business via invoice?

3    A.  We feel that it allows for better records and checks and

4    balances, and it's just the way we've decided to run our

5    business process.

6    Q.  What does it mean that you require an invoice?

7    A.  If somebody wants to get paid, they have to send us an

8    invoice.  When they send us an invoice, we write out a check.

9    Q.  Do you receive an invoice -- so that happens with other

10   vendors, right?

11   A.  That happens with all vendors.

12   Q.  And with people who need to get paid by Coney Management,

13   right?

14   A.  Correct.

15   Q.  And in some cases, do you have contracts with those people?

16   A.  In some cases, yes.

17   Q.  And in the cases where you have a contract with them, do

18   they still send you an invoice?

19   A.  Yes.

20   Q.  Why is that?

21   A.  Because a contract is a contract.  And there is an invoice

22   which has an invoice number, sometimes there are payment terms.

23   So there will be an initial payment, and then a subsequent

24   invoice for a first installment or and monthly payment or

25   something like that.

**A-504**

K1NVTEM3                         Gabay - direct

1    Q.  Do you ever just pay because -- do you pay expenses because

2    they are identified in an invoice -- in a contract alone?

3    A.  No.

4    Q.  You need an invoice as well?

5    A.  Correct.

6    Q.  Did you authorize anyone to deposit this check shown here

7    in Exhibit 203?

8    A.  No.

9    Q.  You can flip through in the binder there.  There are other

10   checks in Exhibit 203.  Did you authorize any of those?  Take a

11   look and that will be my question.

12   A.  No, I didn't authorize these.

13   Q.  In fact, at the time of these checks, that's April 19th,

14   2019, was this bank account open?

15   A.  I don't believe it was.

16   Q.  Why had it been closed?

17   A.  Because we had received notification that a fraudulent

18   check had been created and cashed against the account.

19   Q.  The date on those checks is April 19th, 2019?

20   A.  That's correct.

21   Q.  Do you observe a holiday that began on that date?

22   A.  I do.

23   Q.  What holiday?

24   A.  Passover.

25   Q.  And had you spoken with Mr. Teman in the past about your

K1NVTEM3                          Gabay - direct

1   observance of religious holidays?

2   A.  No, I don't think so.

3   Q.  That's a formal way of saying you and Mr. Teman talked

4   about some of the Jewish holidays; is that right?

5              MR. GELFAND:  Objection.  Leading.

6              THE COURT:  The witness said no.  Next question.

7   Q.  When you observed --

8              THE COURT:  Sorry.  The witness said, No, I don't

9   think so.  So it assumes a fact not in evidence.

10             Next question.

11  Q.  When you observe this holiday, what is your practice with

12  respect to electronic communications?

13             MR. GELFAND:  Objection.  Relevance, your Honor.  403.

14             Object to relevance and 403.

15             THE COURT:  Overruled.

16             THE WITNESS:  Answer?

17             THE COURT:  You may answer.

18  A.  For the first two days and the last two days of the

19  holiday, I am completely disconnected from any electronics and

20  don't use them.

21  Q.  And this check was deposited on that first day of that

22  holiday?

23  A.  No, this check was deposited on the eve of that holiday.

24  Q.  So for the next two days, you wouldn't be accessing your

25  electronic devices?

A-506

K1NVTEM3                          Gabay - direct

1   A.  Correct.

2   Q.  Do other people in your office observe that holiday?

3   A.  Yes.

4   Q.  Do they have similar practices?

5   A.  Yes.

6   Q.  When you were a customer of Sublet Spy or GateGuard, did

7   you meet with Mr. Teman in person?

8   A.  I met with him in person, yes.

9   Q.  And did you speak with him over the phone?

10  A.  I did.

11  Q.  When, if ever, did Mr. Teman tell you that he would deposit

12  checks that he wrote from the 518 West 204 LLC account?

13          MR. GELFAND:  Objection, your Honor.

14          Asked and answered.

15          THE COURT:  One moment.

16          Overruled.

17  A.  Never.

18  Q.  When, if ever, have you ever allowed any vendor to write

19  checks on their own behalf from the 518 West 204 LLC account?

20          MR. GELFAND:  Objection, your Honor.

21          Asked and answered.

22          THE COURT:  Sustained.

23          MR. BHATIA:  One moment, your Honor.

24          (Counsel conferred)

25          MR. BHATIA:  No further questions, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-507

370

K1NVTEM3                          Gabay - cross

1           THE COURT:  All right.  Cross-examination.

2           Mr. Gelfand.

3    CROSS-EXAMINATION

4    BY MR. GELFAND:

5    Q.  Good afternoon, Mr. Gabay.

6    A.  Good afternoon.

7    Q.  Mr. Gabay, my name is Justin Gelfand.  I'm an attorney for

8    Mr. Teman.  You and I have never met; correct?

9    A.  That's correct.

10   Q.  You and I have never spoken; correct?

11   A.  Correct.

12   Q.  Mr. Gabay, you testified that your company owns and manages

13   properties, you said commercial properties, in New York City;

14   correct?

15   A.  Manages.

16   Q.  Okay.  And when you say "commercial properties," just to be

17   clear, these are apartment buildings that people live in, they

18   are commercial properties in the sense that they are owned?

19   A.  They are apartment buildings, yes.

20   Q.  And in doing so and operating the company, you regularly

21   enter into business relationships with vendors; correct?

22   A.  That's correct.

23   Q.  And you regularly enter into contracts and other agreements

24   with those vendors; correct?

25   A.  Yes.

A-508

371

K1NVTEM3                    Gabay - cross

1    Q.  Is it fair to say that just in the ordinary course of the

2    business of your company, those business relationships can

3    often take different forms in the sense of how the agreements

4    are entered into?

5    A.  In our company they usually have a similar form.

6    Q.  To be clear, sometimes the terms of contracts will be

7    negotiated; correct?

8    A.  Yes.

9    Q.  Sometimes the company will accept terms and become a

10   customer; correct?

11   A.  Sometimes.

12   Q.  And the point here is that different business

13   relationships, different transactions, inevitably just take

14   different form, depending on who the vendor is that you're

15   dealing with; correct?

16   A.  Okay.

17   Q.  Now, you agree that your company did, in fact, have a

18   business relationship with GateGuard; correct?

19   A.  That's correct.

20   Q.  And you agree that you chose to become a customer of

21   GateGuard; correct?

22   A.  Yes.

23   Q.  And you agree, as you testified while the prosecutor was

24   asking you questions, that at the time that you did,

25   GateGuard's system was unique based on what was on the market;

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1NVTEM3                    Gabay - cross

1    correct?

2              MR. BHATIA:  Objection, your Honor.

3              THE COURT:  Sustained.

4    Q.  When you became a customer of GateGuard, were you familiar

5    with other available possible intercom and technology systems?

6    A.  Yes, we had looked at others.

7    Q.  Is it fair to say GateGuard's system was cutting-edge?

8    A.  It claimed to be.

9    Q.  And, in fact, you expressed an interest in it because it

10   was cutting-edge; correct?

11   A.  That's correct.

12   Q.  Now, to be clear, at the time you knew that GateGuard had

13   customers all over New York City; correct?

14   A.  That's what I was told.

15   Q.  Okay.  And, in fact, as you testified, you actually met

16   personally with Ari Teman at a trade show; correct?

17   A.  Correct.

18   Q.  And just generally speaking, what do you mean by "trade

19   show"?

20   A.  A trade show is a place where people in and around a

21   specific industry will come and exhibit products or services.

22   Q.  And the trade show that you -- that GateGuard was -- or had

23   a presence in, do you recall what that trade show was?

24   A.  I don't remember which one it was.

25   Q.  Okay.  GateGuard had a booth, in essence, at that trade

373

K1NVTEM3                          Gabay - cross

1   show; correct?

2   A.  Yes.

3   Q.  And in that trade show, you had an opportunity to see at

4   least a demo of GateGuard's technology at the time; correct?

5   A.  Part of it, yeah.

6   Q.  And after that trade show, you had actually asked Mr. Teman

7   to do a personal demo of the GateGuard equipment and

8   technology; correct?

9   A.  That's correct.

10  Q.  And you said that that happened, I believe, at your office

11  in greater New York?

12  A.  Yeah.

13  Q.  Now, that meeting, Mr. Teman was present on behalf of

14  GateGuard; correct?

15  A.  Correct.

16  Q.  And who else was present on behalf of your company, if

17  anyone?

18  A.  We had some of the managers there.

19  Q.  During this meeting, you had an opportunity to see what

20  GateGuard's intercom system was; correct?

21  A.  Part of the functionality.  We were told that there was

22  some other things which were in development.

23  Q.  And, in fact, is it fair to say that when you initially

24  bought the GateGuard -- or became a customer of GateGuard, it

25  wasn't just an intercom, there was a website interface as well?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1NVTEM3                    Gabay - cross

1   A.  Correct.

2   Q.  And the website interface enabled you or others in your

3   company to actually see time-stamped logs and photographs of

4   who was entering your building at any given time; correct?

5   A.  Yes.

6   Q.  And that was valuable to you because you could actually use

7   that information for whatever business purpose you have;

8   correct?

9   A.  Yes.

10  Q.  So, for example, if you wanted to see if the same person

11  was going into Unit 110, you would have pictures of the dates

12  and times of everyone that was going into Unit 110; correct?

13  A.  I believe so, yeah.

14  Q.  And you had an opportunity throughout your entire business

15  relationship with GateGuard to log into that web-based system

16  and access those logs for your building; correct?

17  A.  Yeah, I believe so, yeah.

18  Q.  And you or others in your company did, in fact, do that;

19  correct?

20  A.  Yes.

21  Q.  In doing that, there's not only photographs and time stamps

22  that are taken, but there's ways to basically organize the data

23  on your end; correct?

24  A.  I'm not familiar with the complete functionality of the

25  interface.

A-512

375

K1NVTEM3                    Gabay - cross

1   Q.  Now, to log into the system at GateGuard, did you need a

2   user name/password type setup?

3   A.  Yeah.

4   Q.  So to be clear, some random person off the street couldn't

5   get access to the data that GateGuard was storing for you;

6   correct?

7   A.  That's correct.

8   Q.  And GateGuard was storing that data indefinitely for you;

9   correct?

10  A.  I don't know if it was indefinite or not.

11  Q.  Was there a limit?

12  A.  I don't know.

13  Q.  Were there ever times that you logged on and couldn't see

14  certain records because it was too old?

15  A.  Not that I recall.

16  Q.  The point is, is it fair to say that when you were a

17  customer of GateGuard, it was more than just a physical device;

18  there was an entire web-based application of technology there?

19  A.  Yes.

20  Q.  And data storage?

21  A.  I'm sorry?

22  Q.  And data storage.

23  A.  Yes.

24  Q.  Now, you testified that you had basically bought

25  essentially the 1.0 version of the intercom device; correct?

**A-513**

K1NVTEM3                    Gabay - cross

1    A.  Yes.

2    Q.  And you testified that at the time you were aware that

3    GateGuard overseas was manufacturing essentially the next

4    generation of the system; correct?

5    A.  I was told that the funds from our deposits were going to

6    be used to get the manufacturing off the ground.

7    Q.  And your understanding or at least what was communicated to

8    you was that that manufacturing was happening in China;

9    correct?

10   A.  Correct.

11   Q.  And you were interested in getting the first system,

12   essentially getting in early, but ultimately, at the time,

13   upgrading when the new technology was available; correct?

14   A.  No.  We had an immediate need, and so we spoke with

15   Mr. Teman about putting in that version 1.0 on a temporary

16   basis.

17   Q.  To become a GateGuard customer when you did -- we're going

18   to get to the other stuff later -- so we're on the same page,

19   you readily admit that you bought the system that you claim you

20   believed you paid $3600 for; correct?

21   A.  I paid $3600.

22   Q.  And you got a device?

23   A.  To use the system, yes.

24   Q.  To become a customer of GateGuard at that time, you had to

25   do so on GateGuard's website; correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1NVTEM3                          Gabay - cross

1    A.  I don't know.

2    Q.  You're saying no or you're saying you don't remember?

3    A.  I'm saying I don't know.

4    Q.  Okay.  Do you know if it was you or someone else at your

5    company that actually signed up for GateGuard?

6    A.  I don't recall.

7    Q.  So your testimony, if I understand it, is that it could

8    have been someone else at your company that signed up for

9    GateGuard on the website?

10           MR. BHATIA:  Objection, your Honor.  Foundation.

11           THE COURT:  Sustained.

12           Assumes a fact not in evidence.

13   Q.  Do other people at your company have the authority to sign

14   up for vendors like GateGuard?

15   A.  No.

16   Q.  So sitting here today, to be clear, you're not denying that

17   you signed up online, you're just saying you don't remember?

18   A.  That's correct.

19           THE COURT:  Mr. Gelfand, can you just clarify what you

20   mean by "signed up online"?  I think it's unclear to me what

21   that is conveying, just for clarity for the jury.

22           MR. GELFAND:  Sure.

23   Q.  To actually become a GateGuard customer, you had to provide

24   GateGuard certain information about your building; correct?

25   A.  I guess so.

A-515

378

K1NVTEM3                          Gabay - cross

1    Q.  And in doing so, you had to, if you recall, check a box on

2    the website to become a customer?

3    A.  I don't recall.

4    Q.  You don't recall.  Okay.

5            To be clear -- well --

6    A.  Do you want me to explain my answer?

7    Q.  Sure, I'm happy to have you explain your answer.

8    A.  Okay.  So the reason I don't recall doing this is because

9    had I filled out a form, I would have put in the correct owning

10   entity in that form.  But as you can see from the invoice, the

11   invoices were not made out to our owning entity, they were made

12   out to a prior owner.  I would have not put in that prior

13   owner's entity in the form if I signed up for the service.

14   Q.  Let me get this straight for a second.  I appreciate your

15   explanation, but is it your testimony under oath that you

16   remember how it was you became a customer of GateGuard?

17   A.  No, it's not.  My testimony is if I would have signed up, I

18   would have put in our entity information.

19   Q.  Now, at least at some point, as the prosecutor asked you,

20   you went on to the GateGuard website and downloaded the terms

21   and conditions; correct?

22   A.  That's correct.

23   Q.  And you actually downloaded them and put them into a

24   Microsoft Word document; correct?

25   A.  That's correct.

A-516

K1NVTEM3                    Gabay - cross

1    Q.  And you essentially took that document and used redlining

2    or markup revision features to show proposed edits to that

3    document; correct?

4    A.  That's correct.

5    Q.  Okay.  Do you see Exhibit 415 in front of you?

6    A.  Yes.

7    Q.  Now, Exhibit 415, as you went over with the prosecutor --

8             THE COURT:  Can the ladies and gentlemen of the jury

9    see it now?  Okay.  Very good.  Thank you.

10   Q.  This was a March 25th, 2018 email from you to Mr. Teman,

11   cc'ing Yoni, or Jonathan, Irom, and including a document;

12   correct?

13   A.  Correct.

14   Q.  That document was your markup of the terms and conditions;

15   correct?

16   A.  Correct.

17   Q.  And to be clear, you identified that this document that the

18   prosecutor put into evidence is a document that you personally

19   downloaded and then marked up; correct?

20   A.  That's correct.

21   Q.  Okay.  So this is from you.  It's not from the defense, for

22   lack of a better way of putting it; correct?

23   A.  That's correct.

24   Q.  Tell me the date that appears on the revision or last

25   revision on these terms and conditions.

A-517

380

K1NVTEM3                    Gabay - cross

1    A.  It was last revised November 30th, 2017 at 3:30 p.m.

2    Q.  And to be clear, you agree with me that that date was

3    before you ever became a GateGuard customer; correct?

4    A.  I'm not sure.

5    Q.  Would that first email from support.teman refresh your

6    memory as to the date?

7    A.  I'm sorry, say again?

8    Q.  I'm showing you Exhibit 412.  Was this the first

9    correspondence that you essentially received confirming the

10   system worked?

11   A.  It must have been early on.  I don't know if it's the

12   first.

13   Q.  Fair to say that's January of 2018?

14   A.  Correct.

15   Q.  After the November 2017 date on the terms and conditions;

16   correct?

17   A.  Correct.

18   Q.  On the document that you marked up, first of all, you

19   initially sent a draft to Mr. Teman and an attorney; correct?

20   A.  I responded to an email from Mr. Teman who had cc'd his

21   attorney on his initial discussions with me.

22   Q.  Okay.  And you had basically sent a follow-up saying,

23   Sorry, I didn't mean to cc your attorney.  Paraphrased.

24   A.  That's correct.  I didn't know if he wanted that to be.

25   Q.  Okay.  In this markup that you did, on this November 2017

K1NVTEM3                          Gabay - cross

1   revision, do you see there's a Section 5?

2   A.  I do.

3   Q.  And Section 5, if I can zoom in for you, refers to orders

4   and fees, pricing; correct?

5   A.  Correct.

6   Q.  And could you read the beginning of this paragraph?

7   A.  You may purchase subscriptions to services by submitting

8   orders via the site.  All orders are subject to acceptance by

9   GateGuard.  The applicable fees shall be stipulated in the

10  price list made available by GateGuard on the site from time to

11  time and subject to the additional payment terms stipulated

12  at --

13  Q.  The website?

14  A.  -- the website a/k/a pricing.

15  Q.  From time to time; correct?

16  A.  From time to time, yes.

17  Q.  Okay.  And at least at the time that you were doing the

18  markup, you obviously read this paragraph because you proposed

19  a change to "reasonably," and then you proposed deleting some

20  language at the bottom of that paragraph; correct?

21  A.  That's correct.

22  Q.  But your testimony is that you didn't click on the payment

23  URL?

24  A.  My testimony is that I don't recall clicking on it.

25  Q.  Now, in becoming -- back up for a second.

K1NVTEM3                    Gabay - cross

1          We talked briefly about the logs that GateGuard

2     maintained for your building on its website; correct?

3     A.  Yes.

4     Q.  And is it fair to say there are thousands of pages of logs

5     of people coming into and out of the building in that related

6     data?

7     A.  I don't know how many pages there are.

8     Q.  Is it a large number?

9     A.  I don't know.

10    Q.  You testified that there were instances early on whether

11    some troubleshooting was necessary; correct?

12    A.  Correct.

13    Q.  And GateGuard provided that tech support; correct?

14    A.  Correct.

15    Q.  GateGuard was responsive to problems that it could fix;

16    correct?

17    A.  Correct.

18    Q.  And there was a time when there was a problem at your

19    building with Spectrum; correct?

20    A.  I believe so.

21    Q.  And to be clear, the early iteration of GateGuard did not

22    have a 4G router; correct?

23    A.  I don't believe it did.

24    Q.  It relied on you to have viable internet --

25    A.  Correct.

A-520

K1NVTEM3                          Gabay - cross

1    Q.   -- to work; correct?

2    A.   Yes.

3    Q.   And GateGuard couldn't control whether your internet

4    worked; correct?

5    A.   Correct.

6    Q.   That building at the time at least obtained its internet

7    from Spectrum; correct?

8    A.   Correct.

9    Q.   So through some troubleshooting with your -- whatever the

10   title is, but the on-site property manager, it was brought to

11   your attention that there was a problem with the internet

12   connection and that it wasn't actually a problem with

13   GateGuard; correct?

14   A.   At one point, yes.

15   Q.   And at the time, GateGuard -- even though it turns out it

16   wasn't able to fix that because it was a separate internet

17   problem, GateGuard was working with your company to figure that

18   out and to fix it, if at all possible; correct?

19   A.   Yes.

20   Q.   Now, throughout a fairly lengthy period of time, that

21   building used the GateGuard intercom; correct?

22   A.   What do you mean by "lengthy period of time"?

23   Q.   How long did you use the intercom system?

24   A.   Probably for a few months.

25   Q.   And during that time, it was used every day; correct?

A-521

384

K1NVTEM3                     Gabay - cross

1    A.  Yes.

2    Q.  And the government showed you, you testified, it's Exhibit

3    413, the initial invoice correspondence for becoming a

4    GateGuard -- when you became a GateGuard customer; correct?

5    A.  I'm not seeing anything here.  Oh.

6    Q.  Do you see on the top the correspondence you previously

7    testified to?

8    A.  Yes.

9    Q.  Okay.  And what's the date there?

10   A.  January 19, 2018.

11   Q.  Again, after the November 2017 date; correct?

12   A.  That's right.

13   Q.  And if you look through this correspondence, initially

14   there was supposed to be a $3600 fee and a security deposit of

15   $849; correct?

16   A.  Mr. Teman notified me of the 849 for the first time in this

17   email.  Our discussions previously had been $3600 only.

18   Q.  And you had asked him to basically waive the security

19   deposit; correct?

20   A.  I had asked him to agree to our original discussion price

21   of $3600.

22   Q.  And the invoice reflects zero dollars charged to you for

23   the security deposit; correct?

24   A.  Correct.

25   Q.  With a unit cost, meaning not charged to you, of $849;

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-522

385

K1NVTEM3                    Gabay - cross

1    correct?

2    A.  Correct.

3    Q.  And what's the date of the invoice?

4    A.  January 19th, 2018.

5    Q.  At the bottom of this invoice, where it says "terms," can

6    you tell me -- can you read what that says?

7    A.  Buyer accepts terms and conditions at a website,

8    gateguard.xyz.

9    Q.  And you paid this invoice; correct?

10   A.  Yes, it was paid.

11   Q.  Now, you testified -- to be clear, that invoice we just

12   said was January 19th of 2018; correct?

13   A.  Correct.

14   Q.  Then Government Exhibit 414 is additional email

15   correspondence between you and Mr. Teman; correct?

16   A.  Correct.

17   Q.  The prosecutor asked you about this email from you saying:

18   Sections 5K and 5L of your terms and conditions are pretty

19   brutal.  I stopped reading after I saw them.  Correct?

20   A.  Correct.

21   Q.  That email was within days that the invoice was sent;

22   correct?

23   A.  Correct.

24   Q.  So this wasn't some discussion when you were marking this

25   up months later; correct?

K1NVTEM3                    Gabay - cross

1   A.  This was a discussion related to the larger order.

2   Q.  My question was on timing.  It was a couple of days after

3   the invoice was sent; correct?

4   A.  That's right.

5   Q.  And, in fact, the way you paid the invoice was by check;

6   correct?

7   A.  That's right.

8           MR. GELFAND:  Counsel, what exhibit number was that

9   check?  Exhibit 146?

10  Q.  I'm showing you what's been previously admitted as

11  Government's Exhibit 146.  Can you see that on the screen in

12  front of you, Mr. Gabay?

13  A.  Yes.

14  Q.  Now, you testified previously that this was your check, in

15  other words, your company's check?

16  A.  That's correct.

17  Q.  And this was for the payment for the invoice of $3600 that

18  we just discussed; correct?

19  A.  Correct.

20  Q.  What's the date on that check?

21  A.  January 31st, 2018.

22  Q.  Is it fair to say January 19th, the invoice is generated;

23  correct?

24  A.  Yes.

25  Q.  January 23rd, you send a markup of terms and conditions

K1NVTEM3                    Gabay – cross

1    with proposed changes; correct?

2    A.  Yes.

3    Q.  January 31st, eight days after that, you send in the check

4    for the invoice?

5    A.  That is accurate.

6    Q.  And the invoice expressly says that you agree to the terms

7    and conditions that we just read?

8    A.  That's what the invoice says.

9    Q.  That's on the bottom; correct?

10   A.  That's what it says, yes.

11   Q.  And the invoice obviously predates you sending the check;

12   correct?

13   A.  Yes.

14   Q.  Now, if I understood your testimony correctly, is it your

15   testimony that you believe that you paid 3600 bucks for this

16   device, and then you can use it and GateGuard's web-based

17   interface forever?

18   A.  I think this device and this $3600 was part of a larger

19   pending deal.

20   Q.  Meaning that you understood that additional monies would be

21   owed; correct?

22   A.  I understood that this device would be replaced for a newer

23   device which had more functionality, which is what we had -- we

24   were in discussions to sign up for.  But that this device was

25   going to be put in on a temporary basis, because we had an

A-525

388

K1NVTEM3                          Gabay - cross

1   immediate need.

2   Q.   And the point -- and you knew at the time that, as we've

3   previously talked about, that the newer device was being

4   manufactured at the time; correct?

5   A.   That's what I was told, yes.

6   Q.   Okay.  And so you understood that to have GateGuard on an

7   ongoing basis, it was going to cost you more than 3600 bucks;

8   correct?

9   A.   Once the deal was finalized, yes.

10  Q.   And you expected to pay more money to GateGuard; correct?

11  A.   When the deal was finalized.

12  Q.   Yes?

13  A.   Yes.

14  Q.   Okay.  Now, you testified that in March, essentially

15  communications broke down between you and Mr. Teman; correct?

16  A.   Correct.

17  Q.   And the government asked you questions about some email

18  correspondence regarding those communications; correct?

19  A.   Correct.

20  Q.   The government showed you, so we can get some dates

21  straight, Government Exhibit 416.  Do you see that in front of

22  you?

23  A.   Yes.

24  Q.   This email, I'll zoom in so we can all see it, where you

25  said that the quotes, if I understood your testimony correctly,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-526

389

K1NVTEM3                        Gabay - cross

1   was basically, what, a general consensus within the office?

2   A.  Yeah.

3   Q.  Okay.  The email was from you to Mr. Teman; correct?

4   A.  Correct.

5   Q.  And it references an invoice for 20 buildings and a

6   document called a convertible note; correct?

7   A.  It references an email with that title.

8   Q.  And there was previous correspondence that you testified

9   about involving this initial correspondence where Mr. Teman had

10  cc'd a lawyer; correct?

11  A.  I'm sorry, can you repeat that?

12  Q.  Yes.  Prior to this correspondence -- this was a response

13  to an email; correct?

14  A.  Correct.

15  Q.  March 13th of the same exhibit, there's the initial email

16  from Mr. Teman to you, cc'ing an attorney; correct?

17  A.  Yes.

18  Q.  And the prosecutor had you read this, or part of it, into

19  the record.  And it references the bottom enumerated No. 2.

20  Can you read that?  Can you see that?

21  A.  Yes.

22  Q.  Okay.  This references a note for Friend or Fraud, Inc.,

23  identifying it as essentially the parent company for GateGuard

24  Incorporated, among other companies; correct?

25  A.  Correct.

K1NVTEM3                        Gabay - cross

1    Q.  And it says:  If you have any questions, contact this guy

2    that represented Waze; correct?

3    A.  Correct.

4    Q.  Who is cc'd on the email; correct?

5    A.  Correct.

6    Q.  And the reason you were getting this is because at the time

7    you were actually interested in investing in GateGuard;

8    correct?

9    A.  That's correct.

10   Q.  And you were interested in investing in GateGuard because

11   it was cutting-edge; correct?

12   A.  Correct.

13   Q.  So to keep our dates straight -- I'm sorry.  To keep our

14   dates straight, you send this email on March 26th of 2018,

15   responding to that basically saying, my words, Time out.  We're

16   not moving forward.  Correct?

17   A.  Correct.

18   Q.  And that's at approximately 5 p.m. on March 26th?

19   A.  Correct.

20   Q.  Soon thereafter, you testified that you received email

21   correspondence from Mr. Teman's or GateGuard's attorney;

22   correct?

23   A.  Correct.

24   Q.  And that was an individual named Ariel Reinitz; correct?

25   A.  Yes.

A-528

391

K1NVTEM3                    Gabay - cross

1          MR. GELFAND:  Your Honor, may I show just the witness

2     a document?

3          THE COURT:  You may.

4     Q.  I'm showing you just for the record what's been previously

5     marked as Defendant's Exhibit 36.  Can you see that on the

6     screen in front of you?

7          THE COURT:  A little larger please.

8          MR. GELFAND:  Yes.

9          JUROR:  Can we see?

10         THE COURT:  It's not in evidence.

11         MR. GELFAND:  May I proceed, your Honor?

12         THE COURT:  One moment.

13         Go ahead.

14         One moment.

15    Q.  Do you recognize --

16         THE COURT:  One moment.

17         MR. GELFAND:  I'm sorry.

18         THE COURT:  All right.  Counsel, you need to tilt your

19    monitor so it's not visible to the jury as to exhibits that are

20    not yet in evidence.

21         MR. GELFAND:  Oh, sorry about that.

22         THE COURT:  That goes for both tables.

23         Okay.  Ladies and gentlemen, this may or may not be

24    received in evidence, but until it is, it's properly kept from

25    you.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-529

392

K1NVTEM3                         Gabay - cross

1              Go ahead.

2              JUROR:  We don't see that far away.

3              THE COURT:  All the better then.  Very good.

4              So go ahead, Mr. Gelfand.

5    BY MR. GELFAND:

6    Q.  Mr. Gabay, do you recognize the email that's in front of

7    you?

8    A.  I do.

9    Q.  And is this an email -- a true and accurate copy of email

10   correspondence between you and Mr. Reinitz?

11   A.  It appears so, yes.

12   Q.  And the same thread that you previously testified about,

13   re-invoice for 20 buildings and convertible note?

14   A.  Correct.

15             MR. GELFAND:  Your Honor, I move Defendant's Exhibit

16   36 into evidence.

17             THE COURT:  Any objection?

18             MR. BHATIA:  No objection.

19             THE COURT:  Received.

20             (Defendant's Exhibit 36 received in evidence)

21             MR. GELFAND:  May I publish it for the jury?

22             THE COURT:  You may.

23             You're not publishing; you've taken it off the Elmo.

24             MR. GELFAND:  Yes, I was getting ready to --

25             THE COURT:  Okay.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1NVTEM3                    Gabay - cross

1    Q.  Okay.  So just to back up for a second, we just testified

2    about a chain, a string of emails, if you will, re-invoice for

3    20 buildings; correct?

4    A.  That's correct.

5    Q.  And you testified earlier about a March 26, 2018,

6    essentially, approximately, 5 o'clock email from you saying --

7    again, my words, not yours -- Time out.  Correct?

8    A.  Yes.

9    Q.  Okay.  About a day and-a-half later, March 28th, at

10   approximately 1:40 p.m., you received this email, Defendant's

11   Exhibit 36, from Ariel Reinitz; correct?

12   A.  Yes.

13   Q.  And Ariel Reinitz identifies himself as a partner at the

14   law firm of FisherBroyles, with a New York address and about, I

15   don't know, 15 or so cities at the bottom; correct?

16   A.  Yes.

17   Q.  And the email identifies to you that Mr. Reinitz is an

18   attorney representing GateGuard; correct?

19   A.  Yes.

20   Q.  Could you please read this paragraph that I've highlighted

21   on the screen.  It's the one beginning "As outlined below."

22   A.  As outlined below --

23        THE COURT:  Read it, sorry, a little bit more slowly

24   for the benefit of the court reporter and the jury.

25   A.  Sorry.  As outlined below, GateGuard has provided materials

K1NVTEM3                    Gabay – cross

1    and performed labor on one or more of Coney Realty's buildings,

2    and the corresponding invoices are now past due.  Coney Realty

3    has also entered into agreements with GateGuard for devices and

4    services, payments for which are now due.

5    Q.  And then if we jump forward, first of all, just so everyone

6    is clear, the next paragraph basically says that these invoices

7    and agreements are important to GateGuard; correct?

8    A.  Correct.

9    Q.  And then Mr. Reinitz says, essentially, Let's see if we can

10   reach a mutual amicable resolution.  Correct?

11   A.  Correct.

12   Q.  And to that end, he makes a request of you; correct?

13   A.  He does.

14   Q.  He says:  Please reply with a prompt introduction to the

15   appropriate personnel at Coney Realty or your counsel having

16   authority to resolve this matter.  Correct?

17   A.  Correct.

18   Q.  And then he says:  Absent a prompt response from Coney

19   Realty, GateGuard may initiate further legal action, including,

20   but not limited to, the filing of a mechanic's lien.

21   Sincerely, Ariel Reinitz, and his signature block.  Correct?

22   A.  Correct.

23   Q.  You didn't respond to this email, did you?

24   A.  I don't recall if I responded.

25            MR. BHATIA:  Judge Engelmayer, we believe there's

A-532

395

K1NVTEM3                          Gabay - cross

1    hearsay in this document --

2              THE COURT:  Sorry, you're speaking --

3              MR. BHATIA:  Excuse me.

4              We believe there's hearsay in this document, and we'd

5    request an appropriate instruction.

6              THE COURT:  Sorry.  You didn't object on that ground

7    when it was received.  It's in evidence.

8              Next question.

9    BY MR. GELFAND:

10   Q.  Now, after this email -- I'm sorry, I think you just

11   answered it, but I didn't hear you.

12             THE COURT:  Sorry.  Let me just clarify something.

13             The document is in evidence.

14             Ladies and gentlemen, you may consider this document

15   as it reflects upon the discussions between the lawyer,

16   Reinitz, and the witness, Gabay.

17             To the extent there are statements of fact, however,

18   that are in this document, you may not take them as necessarily

19   true or false; they are just simply being put before you to

20   capture the discussions between the lawyer and Mr. Gabay.

21             But the fact that something is said by the lawyer in

22   the document does not necessarily make it so, and you may not

23   consider what is in the document for the truth of the matter

24   asserted.

25             Counsel, in the future, if a document that embeds

A-533

396

K1NVTEM3                         Gabay – cross

1    hearsay like that is being offered, you need to object at the
2    time rather than exceed to its receipt.
3              MR. BHATIA:  I understand.
4              THE COURT:  Go ahead.
5    BY MR. GELFAND:
6    Q.  And I'm sorry, I just didn't catch your answer before as to
7    whether or not you responded to this email.
8    A.  I don't recall if I responded.  I'm not sure.  I'd have to
9    check.
10   Q.  Now, you testified, jumping ahead, that you were made aware
11   by your bank of the checks, the RCCs, that were deposited into
12   the Bank of America account of GateGuard and directed
13   ultimately to your bank; correct?
14   A.  Yes.
15   Q.  And to be clear, your bank was Signature Bank; correct?
16   A.  Correct.
17   Q.  And if I understood your testimony correctly, your bank
18   essentially brought these RCCs to your attention and asked
19   whether they were authorized, in essence; correct?
20   A.  That's correct, my office.
21   Q.  Your office?
22   A.  Yeah.
23   Q.  And your office provided a response to Signature Bank, in
24   essence, saying that they weren't authorized; correct?
25   A.  That's correct.

K1NVTEM3                          Gabay - cross

1   Q.  And when you say your office, who are the -- I'm not asking

2   for everyone, but who are essentially the main players that

3   would have been involved in this?

4   A.  Involved in this how?

5   Q.  Communications with Signature Bank, those kinds of things.

6   A.  It might be Michael Haas, who's a signer on the account.

7   Q.  You said Michael Haas?

8   A.  Correct.

9   Q.  Okay.  And who is Michael Haas?

10  A.  He's one of the principals of Coney Management.

11  Q.  Fair to say you and Michael Haas work very closely

12  together?

13  A.  Yes.

14  Q.  You testified at the way beginning of your direct

15  examination with the prosecutor that essentially you take on

16  responsibility for the financial operations of Coney; correct?

17  A.  Some of them, yes.

18  Q.  And Michael Haas is just as involved in that; correct?

19  A.  Correct.

20  Q.  Now, I was asking you about the checks that say, Draw per

21  contract.  No signature required, that your bank brought to

22  your attention.  Correct?

23  A.  I'm sorry, say again?

24  Q.  I was asking you about the checks that say, Draw per

25  contract.  No signature required, that were brought to your

K1NVTEM3                    Gabay - cross

1  attention; correct?

2  A.  Correct.  That you asked me about them?

3  Q.  Yes.

4  A.  Yes, you did ask me about them.

5  Q.  And your company informed Signature Bank that you didn't

6  authorize them; correct?

7  A.  That's correct.

8  Q.  Now, let's back up for a second.

9          Signature Bank asked your company questions about this

10  to find out if it should credit your account or charge back the

11  checks; correct?

12  A.  They sent an email asking if this check was authorized by

13  our office, and we said no.

14  Q.  And you would agree with me that it wouldn't be true to

15  tell Signature Bank that your company didn't even know

16  GateGuard or what GateGuard was; correct?

17  A.  We knew what GateGuard was, yes.

18  Q.  So it would be a lie to say you didn't know that; correct?

19  A.  That I didn't know what?

20  Q.  What GateGuard was.

21  A.  Correct.

22  Q.  Okay.  And you'd agree with me that it would also be a lie

23  to tell your bank that your company has no recollection or

24  record of ever owing GateGuard any money; correct?

25  A.  At that point in time we had no recollection of owing

399

K1NVTEM3                    Gabay - cross

1    GateGuard any money at that point in time; correct.

2    Q.  Ever owing money.

3    A.  Well, we owed them money between January 19th and January

4    31st.

5    Q.  Yes.

6    A.  And we paid that invoice.

7    Q.  Yes.  You knew exactly who GateGuard was, as you've

8    previously testified about?

9    A.  Correct.

10   Q.  And at some point you owed GateGuard money; correct?

11   A.  Correct.

12            MR. GELFAND:  Your Honor, pursuant to our stipulation

13   with the government, at this point I move Defense Exhibit D-29

14   into evidence.

15            THE COURT:  D?

16            MR. GELFAND:  I'm sorry, I just said D dash, for

17   defense exhibit.  Exhibit 29.

18            THE COURT:  Defense Exhibit 29.

19            Any objection?

20            MR. BHATIA:  No objection.

21            THE COURT:  I don't believe I have a copy of that,

22   counsel.

23            MR. GELFAND:  I can approach, your Honor.

24            THE COURT:  Thank you.

25            MR. GELFAND:  Can you see this on the screen?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1NVTEM3                    Gabay - cross

1           THE COURT:  One moment.

2           MR. GELFAND:  I'm sorry.

3           THE COURT:  Received.

4           (Defendant's Exhibit 29 received in evidence)

5           THE COURT:  Do you wish to publish it to the jury?

6           MR. GELFAND:  Yes, your Honor.

7           THE COURT:  You may do so.

8           MR. GELFAND:  Thank you.

9    BY MR. GELFAND:

10   Q.  Can you see this on the screen in front of you, sir?

11   A.  Yes.

12   Q.  Okay.  This is an affidavit.  The bank calls it an

13   affidavit of counterfeit or stolen check business; correct?

14   A.  Correct.

15   Q.  And specifically this references the check to GateGuard,

16   Inc. in the amount of $18,000, Check No. 1; correct?

17   A.  Correct.

18   Q.  Now, to be clear, this is a form -- let me just back up so

19   that the jury has some context.

20           It's a one-page form; correct?

21   A.  It appears so.

22   Q.  And if we look at it, you identified Michael Haas.  For the

23   court reporter, it's H-A-A-S.

24   A.  Correct.

25   Q.  And this is the owner of the entity that we're talking

A-538

K1NVTEM3                          Gabay - cross

1    about; correct?

2    A.  One of them, yes.

3    Q.  I'm sorry, you said one of them, yes?

4    A.  Yes.

5    Q.  Okay.  Can you please read what No. 6 says?

6    A.  Neither I nor the company knows the payees on these checks

7    or have any recollection or record of the company ever owing

8    these payees any money whatsoever.

9    Q.  The payee is GateGuard, Inc.; correct?

10   A.  Yes.

11   Q.  And your company is telling the bank that you don't know

12   who GateGuard is; correct?

13   A.  That's what it says.

14   Q.  Can you please read the bottom paragraph, beginning with

15   "Affiant is aware"?

16   A.  Affiant is aware that this affidavit is being provided to

17   the bank to obtain for the company reimbursement of the amounts

18   of these checks.  The bank will rely on this affidavit to

19   recover the amounts paid with respect to these checks.  And any

20   false statement made in this affidavit is a violation of the

21   law.  Affiant represents and warrants that all statements

22   contained in this affidavit are true and complete in all

23   respects.

24   Q.  And this is dated and notarized on April 4th of 2019;

25   correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-539

K1NVTEM3                          Gabay - cross

1    A.  That's correct.

2    Q.  And the notary is Ephraim Niehenberg; correct?

3    A.  Yes.

4    Q.  Do you know that person?

5    A.  I do.

6    Q.  Who is that?

7    A.  That is a manager in my office.

8    Q.  I'm sorry?

9    A.  A manager in my office.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K1ndtem4a                     Gabay - cross

1           MR. GELFAND:  May I proceed?

2           THE COURT:  You may inquire.

3           MR. GELFAND:  Thank you.

4    BY MR. GELFAND:

5    Q.  To the best of your knowledge, to this day, have you or

6    anyone else at your company ever made any efforts to correct

7    any false statements to Signature Bank in connection with this?

8           MR. BHATIA:  Objection, your Honor.

9           THE COURT:  Overruled.

10   A.  Are you referring to any specific --

11          THE COURT:  Sorry.  Let me rephrase the question for

12   you.  Get rid of the word "false."  It assumes a fact not in

13   evidence.

14          You may ask whether there has been any attempt to make

15   any revisions to this document.

16          MR. GELFAND:  Fair enough.

17   BY MR. GELFAND:

18   Q.  To this day, have you on your company ever revised this

19   affidavit or a similar document?

20   A.  I'm not aware.

21          MR. GELFAND:  Your Honor, I have no further questions.

22          THE COURT:  All right.  Ladies and gentlemen, this is

23   a good time, I think, for our lunch break.  Mr. Smallman will

24   come get you at 2 o'clock and bring you into the jury box.

25          Have a good lunch.  As always, please do not discuss

k1ndtem4a

1    the case.

2              THE CLERK:  All rise.

3              (Jury not present)

4              THE COURT:  All right.  Be seated.

5              Counsel, I have an item or two, very small, for you,

6    but before I go, does anybody have anything to raise with me?

7              MR. BHATIA:  No, your Honor.  May the witness be

8    excused?

9              THE COURT:  Yes, please, actually.

10             MR. GELFAND:  No, your Honor.

11             THE WITNESS:  Do I need to come back?

12             THE COURT:  You absolutely will need to come back.

13   Government counsel will give you instructions about where to be

14   and when, but I will need you here by 2 o'clock.

15             So, stay outside.  Government counsel will explain the

16   logistics.

17             (Witness not present)

18             All right.  Just a couple of things.

19             Counsel, this goes for everybody but I think

20   especially for government counsel:  When you are reading a

21   document, the natural impulse is to speed up, but it becomes

22   very hard for the jury and especially hard for the court

23   reporter to absorb what is being said.  So just take the time

24   to slow down anytime you are reading a document to be picked up

25   by the court reporter.

k1ndtem4a

1        MR. BHATIA:  Yes.  Thank you.

2        THE COURT:  All right.  Defense Exhibit 36 is,

3   although clearly admissible, also clearly embedded with a lot

4   of hearsay.  I was surprised there was no objection by

5   government counsel.

6        Mr. Imperatore, I am speaking to your co-counsel here.

7   It is unhelpful for me for him to be unable to hear me.

8        MR. IMPERATORE:  I apologize, your Honor.

9        THE COURT:  Mr. Bhatia, I was very surprised there was

10  no objection to the exhibit.  It's full of hearsay.  It is

11  clearly admissible to explain the course of dealings between

12  the witness and the defendant, and it may yet bear on advice of

13  counsel, as it will later emerge.  Notwithstanding the lack of

14  timely objection to it, ultimately I rethought my first

15  instinct and agreed it made sense to instruct the jury what we

16  all I think would agree is correct, which is that the

17  statements that are in that document can't be treated for the

18  truth of the matter asserted.  But, please, be more attentive.

19  Just because a document can be received for a limited purpose

20  doesn't mean it can be received for all purposes, and in the

21  end it is on you to police that by your objections so that I

22  know that there is a limiting instruction to be given.  OK?

23        MR. BHATIA:  Understood.

24        THE COURT:  One thing that is becoming quite clear to

25  me is that the defense request for a unanimity instruction with

k1ndtem4a

1    respect to the counts here that embed multiple customers is

2    almost certainly a wise instruction.  I don't know yet what the

3    other narratives will be, but it seems to me clear that each

4    customer has its own narrative with respect to Mr. Teman, and,

5    therefore, it seems to me extremely likely that a unanimity

6    instruction will be needed.  And it may well be as well, and I

7    increasingly think this is possible, that something on the

8    verdict form will be needed to specify vis-a-vis particular

9    victims -- not victims but particular customers whose checks

10   are at issue on particular accounts.  I think that will help

11   assure, essentially, that the unanimity instruction is needed.

12        So I will ask counsel overnight to confer about the

13   verdict form that the government has previously submitted and

14   see if you can agree on, assuming that I am to ask for

15   specification vis-a-vis particular accounts, how the

16   specification by customer ought to be done.  I don't know that

17   it is needed by check.  It may be that the customers can be

18   treated as a unity with respect to these accounts.  I'm seeing

19   Mr. Gelfand nodding.  But it is almost certainly the case that

20   something fruitful could be done there, and I would rather you

21   get started on that discussion sooner rather than later.

22        Again, I am not committing that we would revise the

23   verdict form in that way, but given the likely need for a

24   unanimity instruction, I can see logic to the verdict form

25   similarly focusing the jury's attention on a customer-specific

A-544

407

k1ndtem4a

1    basis.

2           Mr. Blais, I take it, will be stepping in for you,

3    Mr. Imperatore, at 2 o'clock?

4           MR. IMPERATORE:  That is correct.

5           THE COURT:  That is fine.  I will introduce him to the

6    jury.  When do you think you will be back?

7           MR. IMPERATORE:  It is a pretrial conference, your

8    Honor.  I expect it could last anywhere from 30 minutes to an

9    hour or so.

10          THE COURT:  I take it you will be substituting for

11   Mr. Blais as soon as you can get here?

12          MR. IMPERATORE:  Yes.

13          THE COURT:  Very good.

14          And, finally, just on the daily exhibit list, I'll ask

15   the government's legal assistant to the please include the

16   defense exhibits.

17          And defense, you gave me some exhibits today but they

18   didn't include Exhibit 36, and they didn't include I think the

19   one -- Exhibit 29, a subset of the exhibits that you handed up

20   to me.

21          MR. GELFAND:  Yes, your Honor.

22          THE COURT:  So I will need a running set of the

23   exhibits that you are offering.

24          MR. GELFAND:  Absolutely.

25          THE COURT:  Very good.

k1ndtem4a

1          Have a good lunch.  I will see you five minutes before

2    2.  Thank you.

3          (Luncheon recess)

K1ndtem4b

1                    **A F T E R N O O N   S E S S I O N**

2                              1:59 p.m.

3          (Jury, witness, and Mr. Imperatore not present)

4          (AUSA Brian Blais present)

5          THE COURT:  All right.  Welcome back, counsel.

6   Mr. Smallman tells me we are waiting on two jurors.

7          Government, without holding you to it, short or long

8   redirect for this witness?

9          MR. BHATIA:  Very short.

10         THE COURT:  OK.  Very good.

11         And the next witness is who

12         MR. BHATIA:  Bonnie Soon-Osberger.

13         THE COURT:  OK.  Very good.  That person is waiting

14  and ready to be brought in?

15         MR. BHATIA:  She is coming up in the elevator.  Is she

16  out there.

17         A VOICE:  She is on her way up.

18         THE COURT:  Very good.  Anyone have anything to take

19  up with me before we get the jury once Mr. Smallman tells me

20  they are here?

21         MR. GELFAND:  No, your Honor.

22         THE COURT:  OK.  Counsel, in the course of the

23  examination, Mr. Bhatia asked me for a limiting instruction on

24  Defense Exhibit 36, which I gave, but I gave it, I realize, on

25  the spot.  Does anybody believe any clarification is needed

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

**A-547**

K1ndtem4b

1   with respect to the instruction I gave?

2         MR. GELFAND:  Not from the defense, your Honor.

3         MR. BHATIA:  No, your Honor.  We'll take another look

4   when we get the transcript.  If we think there is something

5   else, but my recollection is it is fine.

6         THE COURT:  OK.  In the event there are further

7   documents of this nature, for example, communications between

8   Ms. Reinitz and another customer as to whom the defendant's

9   dealings are in dispute, presumably there would be occasion for

10  a similar limiting instruction, and at that point if you have

11  something concrete to recommend, I will hear you at the sidebar

12  and I can surely formulate it at that point to be broad enough

13  up to pick up, looking backwards, Exhibit 36 as well.  I am

14  mindful of that.  As I gave it, I gave it, you know, on the

15  spur of the moment with little chance to reflect.  I want to

16  make sure that something like that is -- that an instruction

17  like that is well tailored.

18        MR. BHATIA:  Thank you.

19        THE COURT:  All right.  Let's get the witness.

20        THE CLERK:  Everybody is here.

21        THE COURT:  Let's bring them in.

22        (Continued on next page)

23

24

25

A-548

411

K1ndtem4b                    Gabay - redirect

1           (Witness and jury present)

2           THE COURT:  All right.  Welcome back, ladies and

3    gentlemen.  Please be seated.

4           I hope you all had a good lunch.

5           You'll note a new face at the government table.

6    Mr. Imperatore has a court appearance in another matter and

7    will be back rejoining us a little later this afternoon, and in

8    his stead is Assistant United States Attorney Brian Blais,

9    whose name I mentioned to you during the course of jury

10   selection.  So that's the explanation for the change in party

11   personnel.

12          We are ready to resume with the trial.

13          Mr. Gabay, I will remind you that you are still under

14   oath.

15          THE WITNESS:  Yes.

16          THE COURT:  And, Mr. Bhatia, you may inquire with

17   redirect examination.

18          MR. BHATIA:  Thank you.

19          Your Honor, the government offers Government Exhibit

20   150 into evidence pursuant to the stipulation.

21          THE COURT:  One?

22          MR. BHATIA:  1-5-0.

23          THE COURT:  Any objection?

24          MR. GELFAND:  No objection, your Honor.

25          THE COURT:  It is received.

K1ndtem4b                    Gabay - redirect

1            (Government's Exhibit 150 received in evidence)

2            MR. BHATIA:  Mr. Magliocco, if we can pull up

3    Government Exhibit 150 for Mr. Gabay.

4            (Pause)

5            Just a moment, your Honor.  It looks like we are --

6            THE COURT:  Take your time.  There we go.  I saw

7    something for a moment.  There we go.

8            MR. BHATIA:  There we go.

9    REDIRECT EXAMINATION

10   BY MR. BHATIA:

11   Q.  Mr. Gabay, you were asked a few questions about this

12   document during your direct examination -- during your

13   cross-examination, is that right?

14   A.  Yes.

15   Q.  This looks like an affidavit signed by Michael Haas, is

16   that right?

17   A.  That is correct.

18   Q.  Is he also the person who had signed the check issued to

19   Mr. Teman by Coney Management?

20   A.  Not by Coney Management, by 518 West 204 Street.

21           THE COURT:  I'm sorry.  Just one moment.

22           I'm just going to remind Mr. Gabay, please, to keep

23   your voice up.  Thank you.

24           THE WITNESS:  Sure.  My apologies.

25   BY MR. BHATIA:

413

K1ndtem4b                    Gabay - redirect

1    Q.  You were shown Government Exhibit 146, which is a check

2    written from 518 West 204 to Mr. Teman, to GateGuard.

3          Was Mr. Haas the one who signed that check?

4    A.  Yes.

5    Q.  And he is the person who signed this affidavit here?

6    A.  Yes.

7          THE COURT:  Mr. Bhatia, before you continue, this

8    document is marked and it has been received as Government

9    Exhibit 150.  The witness was questioned on a document that at

10   least in my first look appears to be identical but which was

11   marked as Defense Exhibit 29.  Just for everyone's benefit, are

12   those in fact identical documents?

13         MR. BHATIA:  Yes, your Honor.

14         THE COURT:  Very good.  Thank you.

15   BY MR. BHATIA:

16   Q.  You are familiar with some of the business records of Coney

17   Management, is that right?

18   A.  Yes.

19   Q.  You have seen them around the office?

20   A.  Yes.

21   Q.  Is this a record that -- is this a common record of Coney

22   Management's?

23   A.  What do you mean by "common"?

24   Q.  Is this a document from Coney Management or is this a

25   document that came from Signature Bank?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

414

K1ndtem4b                    Gabay – redirect

1   A.  The document form came from Signature Bank.

2   Q.  OK.  I will direct your attention to the boxes for 5 and 6,

3   or numbers 5 and 6 below.

4          In question number 5, there is a check box, right?

5   A.  Yes.

6   Q.  And Mr. Haas selected, "The checks were written on check

7   forms that were not authorized by the company," is that right?

8   A.  Yes.

9   Q.  And in number 6, are there any check boxes?

10  A.  No.

11  Q.  OK.  You said this is a document from Signature Bank,

12  right?

13  A.  That is correct.

14         MR. BHATIA:  Your Honor, no further questions.

15         THE COURT:  All right.  Any recross?

16         MR. GELFAND:  No, your Honor.

17         THE COURT:  All right.  Then, Mr. Gabay, you can step

18  down.  Your testimony is complete.  Thank you.

19         THE WITNESS:  Thank you.

20         (Witness excused)

21         THE COURT:  Government, call your next witnesses.

22         MR. BHATIA:  The government calls Bonnie

23  Soon-Osberger.

24  BONNIE SOON-OSBERGER,

25      called as a witness by the government,

K1ndtem4b                    Soon-Osberger - direct

1        having been duly sworn, testified as follows:

2              THE CLERK:  Thank you.  Please be seated.

3              Use the microphone as best you can, please.

4              State and spell your full name for the record.

5              THE WITNESS:  My full name is Bonnie.  My last name is

6    Soon-Osberger.

7              THE COURT:  How do you spell your last name?

8              THE WITNESS:  Sure, S-o-o-n - O-s-b-e-r-g-e-r.

9              THE COURT:  All right.  Good afternoon, Ms.

10   Soon-Osberger.  Welcome to court.

11             THE WITNESS:  Good afternoon.

12             THE COURT:  I will ask you to just keep your voice up.

13   If you need, bend the microphone close to you, but just keep

14   your voice up so it can be heard in this large courtroom.

15             THE WITNESS:  Sure.

16             THE COURT:  Thank you.

17             Mr. Bhatia, you may inquire.

18   DIRECT EXAMINATION

19   BY MR. BHATIA:

20   Q.  Ms. Soon-Osberger, where do you live?

21   A.  I live on 18 Mercer Street.

22   Q.  And is that in Manhattan?

23   A.  That's in Manhattan, that's correct.

24   Q.  And is that a cooperative building, or is it some other

25   type of building?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-553

416

K1ndtem4b                    Soon-Osberger - direct

1    A.   It IS a cooperative building.

2    Q.   Are those sometimes called co-ops?

3    A.   Yes, co-ops, cooperatives.

4    Q.   Have you ever had a role on your co-op's board of

5    directors?

6    A.   Yes.

7    Q.   When?

8    A.   From October 2017 to January 2019.

9    Q.   And what was your role on the board of directors?

10   A.   I was the treasurer for the board.

11   Q.   What were some of your day-to-day responsibilities?

12   A.   Maintain the expenditures, the budgets, make sure that all

13   expenditures doesn't exceed our budget.  And also for that

14   particular year when we had a board meeting there was a bunch

15   of projects that was voted for, so I was to manage those

16   projects, look for the vendor, and submit bids for those

17   projects to my board members and get it approved and

18   implemented.

19   Q.   Did you have responsibilities involving purchasing devices

20   for the building?

21   A.   Sure.  I was -- I had the responsibility to go and obtain

22   bids, look for vendors and obtain bids, submit bids for

23   approval.

24   Q.   And did you also work with a management company for 18

25   Mercer?

K1ndtem4b                    Soon-Osberger - direct

1    A.   Yes, I did.  I worked with a management company.

2    Q.   While you were on the board of directors, who was the

3    management company?

4    A.   It was Crystal Real Estate Management.

5    Q.   Who were the individuals who you worked with at Crystal

6    Real Estate Management?

7    A.   I worked with Jackie Morton and I worked with Gina Hom; I

8    think that is her last name, H-o-m.

9    Q.   Are you familiar with the term, 18 Mercer Equity Inc.?

10   A.   Yes.

11   Q.   What is 18 Mercer Equity Inc.?

12   A.   That's our corporation.  That's our incorporation for the

13   co-op.

14   Q.   If I refer to that as 18 Mercer Equity --

15   A.   Yes, you can.

16   Q.   -- you will know that I am referring to the corporate

17   entity?

18   A.   Yes.

19   Q.   All right.  In 2019 -- in 2018, 2019, who was managing the

20   bank accounts for --

21   A.   It was Crystal Real Estate Management.

22   Q.   And what do they do involving the finances of the company?

23   A.   They pay all of our bills.  They collect all of our

24   maintenance, and then from the maintenance they pay our bills.

25   And whatever project we have going on, we would submit for --

A-555

418

K1ndtem4b                    Soon-Osberger - direct

1   once we get the approval, we submit the invoice for them to

2   pay.

3   Q.   What's the name -- what is the title you use to describe

4   people who live in the building?

5   A.   We're shareholders and we're leasees, so the incorporation

6   required that if we buy the floor or we buy into the shares, we

7   have a right to live there, so we become a leasee to the

8   building.

9   Q.   Were any shareholders or leasees authorized to sign checks

10  on behalf of 18 Mercer Equity Inc.?

11  A.   No.

12  Q.   Who wrote the checks for the company?

13  A.   The real estate company.

14  Q.   Is that Crystal Real Estate Management?

15  A.   That's Crystal Real Estate, yeah, who we employ.

16  Q.   They were the only ones authorized to sign for that

17  account?

18  A.   Yes.

19  Q.   What about board members?  Were board members authorized to

20  sign?

21  A.   No, we have no access to checks and we don't sign checks

22  either, access or sign checks.

23  Q.   Why didn't Crystal Real Estate, as opposed to a shareholder

24  or board of director, have authority to sign for the account?

25  A.   I mean, it existed before me, but it's just so that it

K1ndtem4b                    Soon-Osberger - direct

1    keeps the separation of duties.  We have board members that

2    vote for a specific expenditures, and then from there it gets

3    submitted for approval so that there is a layer of checks and

4    balances.

5    Q.  Can you elaborate on that?  What are the checks and

6    balances?

7    A.  Checks and balances is, like I said, there is a budget that

8    we started with, and then there is bills that goes against

9    those budgets.  So once we approve it, instead of one of us

10   writing the check, we have a third party like Crystal

11   Management write the check, but we approve it before they can

12   write the check.  So that is the checks-and-balances approval

13   and then issuing the checks.  So that way with the checks and

14   balances, if a third party entity like a management company, if

15   they write the check, then there is a checks and balances that

16   the shareholders then get access to that, writing the check and

17   approving the issuing of the checks.

18   Q.  Let's change topics for a moment.

19            Did there come a time when you met Ari Teman?

20   A.  Yes, I did.

21   Q.  How did you meet Mr. Teman?

22   A.  I was at the cooperative, the condo cooperative trade show.

23   Q.  Do you remember approximately when that was?

24   A.  That was approximately October 2017.

25   Q.  What were you doing at that convention?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1ndtem4b                     Soon-Osberger - direct

1   A.  We were approved for some projects, which is putting in a

2   new intercom, security systems, and then renovating the lobby.

3   So since I was a new board member, that was the first place

4   that the president and myself started to look for vendors.

5   That's why we attended that show.

6   Q.  What was Mr. Teman doing at the convention?

7   A.  He had a booth -- he had a trade show booth at the trade

8   show.  So there is a lot of vendors and they have their booths,

9   and they have their product and demonstrating their products

10  there.

11  Q.  Did he talk to you about any particular products at the

12  trade show?

13  A.  He was showing his intercom panel, so he was demonstrating

14  it to people that came by to the booth.  So my president and my

15  husband and myself, we saw it and we went by there and we

16  talked to Ari about the panel, the intercom system.

17  Q.  Did there come a time when you were considering buying a

18  GateGuard intercom?

19  A.  I mean, yeah.  We talked to a lot of intercom companies, so

20  GateGuard was one of them that attracted to us because of the

21  smart technology.  So, yes, we took away their information and

22  brochure, and then we looked at all the intercom systems that

23  we gathered information on from the show.

24  Q.  What conversations, if any, did you have with Mr. Teman

25  about pricing for an intercom device?

A-558

421

K1ndtem4b                    Soon-Osberger - direct

1    A.  He mentioned that to purchase a panel, the pricing, I think

2    the price point was about $2,500 for a panel, a system, like

3    that was there, that was being displayed.

4    Q.  When you spoke to him about pricing, did he mention

5    anything about a cancellation fee?

6    A.  No.

7    Q.  And did he mention anything about a device removal fee?

8    A.  No.

9    Q.  When you spoke to him about pricing, did he say anything

10   about an attorney use fee if he had to bring in an attorney in

11   a dispute?

12   A.  No.

13   Q.  When he spoke to you, based on your conversations with him,

14   what did you understand your agreement might be with him if you

15   purchased the device?

16   A.  What it sounded like was that we would purchase that unit

17   that was there, and it has all the capability of a facial

18   recognition, it opens for delivery people, it monitored people

19   coming in and out of the building, and that they would charge a

20   service fee for the monitoring service.

21   Q.  For the monitoring service.

22           Did there come a time when you saw any terms and

23   conditions on Mr. Teman's website?

24   A.  Not at the show, no.

25   Q.  Following the show, when you were thinking about purchasing

K1ndtem4b                          Soon-Osberger - direct

1    an intercom, did there come a time when you saw the terms and

2    conditions?

3    A.  Yes.

4    Q.  What was your reaction to them?

5    A.  It was very lengthy and I went through all of it.  A couple

6    of things -- three things that caught me, my attention, was

7    that there was no specific pricing on there.  And then the

8    second thing was that there was going to be a 300-percentage

9    markup the next year.  And then lastly I had a question also

10   about there is no mention about the annual service, what kind

11   of service it includes.

12   Q.  Ms. Soon-Osberger, there is a binder to your left.  Would

13   you take a look at Government Exhibits 441, 442, 443, and 431,

14   and my question is just going to be do you recognize those

15   documents?

16   A.  441, and then what else?

17   Q.  It is 441, 442, 443 and 431.

18   A.  431.

19          (Pause)

20          OK.

21   Q.  Do you recognize those documents?

22   A.  Yes.

23   Q.  As a general matter, what do they reflect?

24   A.  There is the terms and conditions of GateGuard.  And then

25   there is communications between Ari, myself.  And then there is

A-560

423

K1ndtem4b                    Soon-Osberger - direct

1   communication between Jackie and myself, the management

2   company.  And then there is a copy of the invoice.

3              MR. BHATIA:  Your Honor, the government offers

4   Government Exhibits 441, 442, 443 and 431.

5              THE COURT:  Is there an objection?

6              MR. DiRUZZO:  None.

7              THE COURT:  They are all received.

8              (Government's Exhibits 431, 441, 442, 443 received in

9   evidence)

10  BY MR. BHATIA:

11  Q.  Ms. Soon-Osberger, I would like to direct your attention to

12  Government Exhibit 441.

13             MR. BHATIA:  Mr. Magliocco, can you put it up on the

14  screen.

15  Q.  If you can read the top three lines here.

16  A.  The top three lines?

17             THE COURT:  Read it slowly and loudly, please.

18  A.  "Hi there.  Please read these terms carefully as they

19  contain important information regarding your legal rights,

20  remedies and obligations."

21  Q.  I'm sorry.  Above that it says, "Terms & Conditions,

22  GateGuard Inc. last revised:  November 30, 2017, 3:30 p.m.,"

23  right?

24  A.  Yes.

25  Q.  If we can zoom out.  In the bottom right corner of this

A-561

K1ndtem4b                    Soon-Osberger - direct

1    page, we will zoom in there, it says "March 23, 2018" in the

2    very bottom.

3    A.  Mm-hmm.

4    Q.  Do you know why it says that on that document?

5    A.  Likely, that is when the document was downloaded.

6    Q.  Is this a document that you -- how did you come to have

7    this document?

8    A.  Well, there's some transaction before this.  I contacted

9    Ari after the show and told him that I was interested in the

10   product, can you send some information.  And so he pointed out

11   to his website, and I went in there and looked at some videos.

12        And then I said further if we'll continue to be

13   interested, how do we proceed to the next step.  And that's

14   when he said you go onto the site and then you can sign up and

15   order the product.  And so I went on the site.  I ordered the

16   product, looked at it.

17        Before I ordered -- well, I had to submit some sort of

18   ordering process or some sort of interest process, because

19   that's when I can get more information from him about the

20   product.  So that's when there is a terms -- I asked him about

21   a contract, you know, can I see a contract, and that's when he

22   said that there is a terms and conditions in that ordering

23   process.

24   Q.  So you were directed to this Terms & Conditions.

25        What was your -- you mentioned earlier that there was

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1ndtem4b                    Soon-Osberger - direct

1   nothing specific to 18 Mercer.  Why was that significant to

2   you?

3   A.  When we went to the cooperative show, there was a special

4   deal that was going on, and so that was a deal that I went and

5   that was the one that I sought out that applied to us was that

6   particular offering that he had at the show.  Some of this

7   information I thought could be not pertaining to a cooperative

8   or it may be a management type of scenario.  To my

9   recollection, this is what it was for, just because I realized

10  that when we went to the show we were co-op owners.

11  Q.  So you thought there was, if I'm understanding you

12  correctly, there was something about this agreement that you

13  thought might not reflect -- that might make it not applicable

14  to a co-op board?

15  A.  Yeah.

16  Q.  What was that?

17  A.  We weren't leasing the product, we were purchasing the

18  product, so the product was informed by us that we would buy

19  the panel, the unit.

20  Q.  You were buying the product outright, is that right?

21  A.  Yeah.  That was my recollection, that it was offered to us,

22  that this is the amount for the product, to buy the product?

23  Q.  In your conversations with Mr. Teman, did the topic of

24  buying the product outright come up?

25  A.  Yeah.  I mean he told me the price is -- this unit is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-563

426

K1ndtem4b                         Soon-Osberger - direct

1    approximately 2500 for the -- to purchase this product, or this
2    panel, that is the price of this panel.
3    Q.  To buy the product outright?
4    A.  Yes.
5    Q.  And did anything else -- what, if anything, did you take
6    from the fact that this was a Web page as opposed to a written
7    document -- as opposed to a memorialized document?
8    A.  Well, one thing that caught my attention was that this
9    was -- it could be edited.  It could be edited, so that if at
10   anytime he wants to change something, it could be changed and I
11   wouldn't know about that.  There was not a process of an
12   editing version that was going to mention -- inform me that
13   there is going to be changes to that.
14   Q.  Have you previously entered signed written contracts with
15   other vendors?
16   A.  Yes.
17   Q.  And how did those contrast with a Web page like you are
18   seeing here?
19   A.  The previous contracts we have, the pricing, the terms,
20   payments, and then terms and conditions listed out attached to
21   that particular document, and then there would be signature
22   required by myself and then the vendors, so we agree on the
23   pricing and the terms and conditions.
24   Q.  Ms. Soon-Osberger, I would like to direct your attention to
25   page 5 of this document and to the second full paragraph.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1ndtem4b                    Soon-Osberger - direct

1          Just a little bit further down, after that.  It is

2     under the header for 5, the first paragraph.

3     A.  Yes.

4     Q.  So this paragraph here is labeled price of -- there is a

5     reference to pricing in this paragraph, right?

6     A.  Mm-hmm.

7     Q.  Had you spoken to Mr. Teman about the price of the device

8     you were purchasing?

9     A.  At the show he told me an approximate amount.  So I asked

10    him for the specific amount, because when we do bidding, I have

11    to have exact amount.  So I asked him to send me the pricing.

12    Q.  Did he send you a price?

13    A.  He sent me an invoice.

14    Q.  And on that invoice it listed a specific price?

15    A.  Yeah, it has a price.  I think it is 431.  Or something

16    like that.  Yes.

17    Q.  Did you believe that there were additional payment terms in

18    addition to the price that you were paying?

19    A.  No.  Because he told me he wouldn't submit the invoice, it

20    was just the amount, the installation, and then the service

21    fee, which he billed me in advance for an entire year.

22    Q.  So you read this agreement -- sorry.  You read the Terms &

23    Conditions page, right?

24    A.  Yes.

25    Q.  And there is -- you can see here in the middle of this

K1ndtem4b                    Soon-Osberger - direct

1   paragraph, there is -- it says, "The applicable fees shall be

2   as stipulated in the price list made available by GateGuard on

3   the site from time to time and subject to the additional

4   payment terms stipulated out," and then there is a Web page.

5            Did you click on that link?

6   A.  I didn't because the pricing was what he mentioned to me at

7   the show.  That's why I contacted him and asked him to give me

8   the specific pricing for our deal or for what we discussed at

9   the show, to send me a price that was told to me.

10  Q.  Did there ever come a time when you saw an agreement that

11  referenced a 30-year contract with Mr. Teman?

12  A.  No.

13  Q.  Did there ever come a time when you saw a document that

14  would allow Mr. Teman to write a check on behalf of 18 Mercer?

15  A.  No.

16  Q.  Would either of those terms have stood out in your mind?

17  A.  If I read it, absolutely.  Absolutely.

18  Q.  If you had read those terms, what would your reaction have

19  been?

20  A.  I would not agree to that.  It's not a practice that our

21  co-op would abide by.  We wouldn't do that.  The only people

22  that can write checks is our management, approved by the board.

23  All the invoices are submitted, approved, and then handed over

24  to the management to write the check.

25  Q.  If you had seen either of those provisions, what, if

K1ndtem4b                    Soon-Osberger – direct

1   anything, would you have said to Mr. Teman?

2   A.  I'm not in a position to do something like that.  I

3   couldn't be able to sign something like that or approve

4   something like that.

5   Q.  I would like to direct your attention to page 3 of this

6   document.  It is an email message beginning on page 3 and

7   continuing onto page 4.

8           I'm sorry.  This is Government Exhibit 442.

9           THE COURT:  We are now in 442?

10          MR. BHATIA:  Yes.  I am now in Government Exhibit 442.

11          It starts on this page and it goes onto the next page.

12          I'm sorry.  I am going to change one more time.  This

13  is a document on page 5 of the same --

14          THE COURT:  The same document on page 5?

15          MR. BHATIA:  Government Exhibit 442 and it is page 5,

16  and it is this message on the screen.

17  Q.  Ms. Soon-Osberger, did there come a time when you spoke --

18  when you messaged with Mr. Teman about your thoughts on the

19  terms and conditions?

20  A.  Yes.

21  Q.  And is this before or after you purchased an intercom

22  device from him?

23  A.  This was before.

24  Q.  This was before?

25  A.  Yes.

A-567

430

K1ndtem4b                    Soon-Osberger - direct

1    Q.  And in this message, you're including a couple clauses that

2    you have questions about, is that right?

3    A.  Yes.

4    Q.  And did you -- if you had -- you testified previously that

5    you never saw a provision about -- you did not see a provision

6    about allowing him to draw checks from your account.

7    A.  That's true.

8    Q.  If you had seen that, would that have been something you

9    would have included in this message?

10   A.  Absolutely.  I just don't have authority to allow people to

11   write checks; I don't have authority for that, so, yes.

12   Q.  If you had seen a provision requiring your company to pay

13   fees for 30 years, is that something that you might have raised

14   with Mr. Teman?

15   A.  Yes.

16   Q.  As a general matter, what are you relating to Mr. Teman in

17   this message?

18   A.  These are points that I have concern about the terms and

19   conditions as it applied to us.

20   Q.  These are the terms and conditions that you testified about

21   a minute ago?

22        THE COURT:  A little louder, now, counsel, for the

23   members of the jury, please.

24   Q.  You are referring to the terms and conditions that you

25   testified about a moment ago, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-568

K1ndtem4b                    Soon-Osberger - direct

1   A.  Yes.

2   Q.  And I would now like to direct your attention to the email

3   message now beginning on page 3 and continuing onto page 4.

4           At the bottom of this page it says:  "On Thursday,

5   March 29, 2018 at 2:12 p.m. Ari Teman wrote:  Hi, Bonnie."

6           And on the next page, he has some text.

7   A.  Mm-hmm.

8   Q.  What was Mr. Teman relating to you here?

9   A.  Realizing we were asking for some references.  The bottom

10  is thanking him for the condition -- addressing the concerns.

11          THE COURT:  Sorry.  I don't think the witness is

12  looking at the document on the screen.  She is referring to a

13  different part of this document.  Please direct her attention.

14  BY MR. BHATIA:

15  Q.  Ms. Soon-Osberger, you can look at it on the screen here

16  just so that we are all on the same page.

17  A.  OK.

18  Q.  Is he responding to your comments from below?

19  A.  Mm-hmm.

20  Q.  And what was your reaction on seeing his comments?

21  A.  Well, he was addressing, adjusting, and directing the items

22  that I had about -- the concerns I have, so this is the reply,

23  his reply.

24  Q.  And was one of the terms that you had questions about

25  relating to increasing prices?

A-569

432

K1ndtem4b                    Soon-Osberger - direct

1   A.  Yes.

2   Q.  What was in the terms and conditions you had seen about

3   raising prices?

4   A.  He was going to increase -- he would increase over

5   300 percent next year and the following year, and point one is

6   addressing that.

7            THE COURT:  Ms. Soon-Osberger, if you could speak into

8   the microphone, please?

9   A.  The point one is addressing, replying to the 300 percent

10  increase for the following year after we signed up with them.

11  So, that's addressing that.

12  Q.  Were you generally -- were you satisfied with Mr. Teman's

13  responses?

14  A.  Yeah.  Yeah.

15  Q.  OK.  And I'm going to direct your attention to an email

16  message on page 6 of this document.  It is at the bottom of the

17  page.

18            THE COURT:  Counsel, page 6?

19            MR. BHATIA:  Page 6.

20            THE COURT:  Of 442?

21            On the version you have given the Court, it just has a

22  couple of address tabs.

23            MR. BHATIA:  One moment, your Honor.

24            (Pause)

25  BY MR. BHATIA:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-570

433

K1ndtem4b                    Soon-Osberger - direct

1    Q.  Ms. Soon-Osberger, you email respond -- did you respond to

2    Mr. Teman and his comments to you?

3    A.  Yes, I did.

4    Q.  Did you tell him that you agreed -- well...

5    A.  Yes.

6           THE COURT:  I'm sorry.  There is no question.  I think

7    counsel retracted the question.

8    Q.  Turn to page 3 of this document in the middle of the page.

9    A.  Mm-hmm.

10   Q.  You write to him, and we'll pull it up, you write -- I'll

11   give the jury a moment to read this.

12          (Pause)

13   A.  Did you want me to read it?

14          THE COURT:  There is no question pending.

15   Q.  No, nothing for you to read.

16          (Pause)

17          The first line here, you say:  "thank you so much for

18   your replies and you have addressed our concerns related to the

19   terms and conditions."

20          When you wrote that, were you agreeing to a provision

21   about -- that would allow Mr. Teman to draw checks from your

22   account?

23   A.  No.

24   Q.  Were you agreeing to a provision that would require you to

25   pay monthly fees for 30 years?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-571

434

K1ndtem4b                    Soon-Osberger - direct

1    A.  No.

2    Q.  And were you at that point agreeing to an $18,000 device

3    removal fee?

4    A.  No.

5    Q.  At that point, had you heard of a device removal fee?

6    A.  No.

7    Q.  You had testified earlier about owning the device.  How did

8    that affect your view of whether there should be a device

9    removal fee?

10   A.  If I owned the device, I have the option to not use the

11   device if the device doesn't work for me, so I wouldn't think

12   that there is any removal of the device -- unless I hired him

13   specifically to remove the device, then I would inquire with

14   him the pricing of that service.  If there is a removal fee, I

15   would ask for the amount of that removal fee, if that service

16   was deemed necessary.

17   Q.  Did there come a time when you agreed to actually buy the

18   device?

19   A.  When I -- when I paid for that invoice, the 2,500, that was

20   my device.  Because there is a point that I asked him the terms

21   and conditions about the leasing.  I concerned with leasing.

22   He said it was a tax loophole, to my understanding, so --

23            MR. BHATIA:  If we can publish Government Exhibit 431

24   and page 3 of that document.  We can talk about the invoice.

25   A.  Mm-hmm.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-572

435

K1ndtem4b                    Soon-Osberger – direct

1    Q.  If we can look at the line items listed on this invoice.

2    A.  Mm-hmm.

3    Q.  The first item here, it's a little bit hard to read, but it

4    says, "GateGuard 2.0 panel, cooperative show price."  And it

5    lists the unit cost of $2,499.

6            What did you believe you were buying for $2,499?

7    A.  The panel, the intercom system.  That was exactly what it

8    says, cooperative show price; when we talked about it at the

9    show, it was the purchase of this unit.

10   Q.  What role did the actual price of this device play in your

11   decision to purchase it?

12   A.  What's that?

13   Q.  This may not be an obvious question, but how did the price

14   of $2,499 affect your decision to buy it or not?

15   A.  We compared to another system that was compared to this and

16   it was like a $5,000 system, so we felt that this was -- this

17   is $2,500 and we own it.  So if something happened, it's

18   $2,500, so we thought that this is the right decision to go

19   with this unit.

20   Q.  When you bought this, did you believe you were buying the

21   device outright?

22   A.  Yes.

23   Q.  Did you relay this invoice to Crystal Real Estate

24   Management?

25   A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1ndtem4b                    Soon-Osberger - direct

1    Q.  And what happened next?

2    A.  They proceed to pay the invoice for this amount.  Of

3    course, this was submitted to our board for approval to pay.

4    So then management have this invoice to pay based on approval

5    by our board members.

6    Q.  Did the board members approve that?

7    A.  Yes.

8    Q.  Then you relayed it to Crystal Real Estate?

9    A.  To -- yeah.

10   Q.  Did there come a time when the intercom was installed in

11   the building?

12   A.  Yes.

13   Q.  What was your experience with the intercom?

14   A.  From day one, it was -- it was surprising because when this

15   install was done, he removed our old system and he had left a

16   hole but he put his system on top of our mailbox.  It kind of

17   stuck out, and it was very low, so it didn't make sense to --

18   anybody couldn't see the person who is coming to ring the

19   doorbell, you couldn't see the face because it really is that

20   low.  And Ari said that it was disability approval, it has to

21   be at that height.

22        I had a couple of concerns because it doesn't look

23   like it could capture the facial, and also it is right on top

24   of our mailbox so our mail -- our mail person can't get into

25   the key box, and that day it didn't work.  So, I had concerns

A-574

437

K1ndtem4b                    Soon-Osberger - direct

1   about how we are going to get in and out of the building.

2   Q.  Did the GateGuard device work as you expected it to?

3   A.  No.

4   Q.  Did you relay those concerns to Mr. Teman?

5   A.  Yes.

6   Q.  What was his reaction when you told him about your concerns

7   about the device?

8   A.  He mentioned something about the Internet access, that the

9   Internet was not the appropriate Internet service for the

10  system.

11  Q.  And ultimately was there a time that you decided it was

12  time to move on from the GateGuard device?

13  A.  Yeah, after a lengthy time, after we tried multiple -- two

14  different Internet services, it still didn't work, and so

15  finally we had to just replace the system, because it was from

16  August to January we had no access -- the mailman had no

17  access, our delivery people had no access, our gas had no

18  access.  We had to come down from the building to receive

19  anybody that needed to come into the building.  So we worked

20  with them as long as we can, but just after a length of time,

21  everyone in the building just got impatient and then we decided

22  we have to move on.

23  Q.  What happened -- did there come a time when you relayed

24  that information to Mr. Teman, that you needed to move on?

25  A.  Yes, I did.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1ndtem4b                    Soon-Osberger - direct

1    Q.  How did he react?

2           THE COURT:  Back up.  How was it conveyed, please?

3    Q.  How was it conveyed to Mr. Teman?

4    A.  By email.  I mentioned to him that it's not working; the

5    system, we plug it in, it's not working.  We tried the IP

6    addresses he was asking, just multiple requests he had related

7    to our services and each time it just didn't work.  And so at

8    one point I said we need to move on, we do need to have the

9    system removed, and that's when he was sending an email that we

10   would be charged.  And in that one email he said he would put a

11   lien on the building.

12   Q.  I would like to direct your attention to Government Exhibit

13   443, and I would like to direct your attention to an email

14   message at the bottom of page 6 and continuing onto page 7.

15          I'm sorry.  The bottom of page 5 and continuing on

16   page 6.

17          Who is this email from?

18   A.  It was from Ari.

19          THE COURT:  Just one moment.  I am trying to find it.

20          (Pause)

21          Counsel, you said this is Exhibit 44?

22          MR. BHATIA:  443.

23          THE COURT:  One moment.  Sorry.  Apologies.

24          (Pause)

25          Yes.  Go ahead.

K1ndtem4b                    Soon-Osberger - direct

1    BY MR. BHATIA:

2    Q.  Ms. Soon-Osberger, this is an email from Ari Teman and it's

3    to Jackie Monzon, Shelley Pecot and you, is that right?

4    A.  Yes.

5    Q.  And in the first sentence, he writes:  "As a reminder, you

6    are not allowed to touch or move our device and there's an

7    $18,000 fine for removing it."

8           What was your reaction upon reading that?

9    A.  I was shocked.

10   Q.  Why were you shocked?

11   A.  Why would we be fined --

12          THE COURT:  Sorry.  Start again.  Please speak into

13   the microphone.

14   A.  I was shocked because that we're going to be charged an

15   $18,000 fine for removing a product that doesn't work.

16   Q.  How did the $18,000 fine compare to the price of the device

17   itself?

18   A.  The panel is 2,500, which is what we purchased.  So this

19   $18,000 doesn't make any -- doesn't make any sense.  It is --

20   it's -- I mean, to me it was a bullying type of scenario when

21   someone sends an email like that to me.

22   Q.  And in the next line, he says, "We will enforce the

23   contract, and we will remove anything placed on the building

24   against it and restore service."

25          How did you react to the references to removing

A-577

440

K1ndtem4b                    Soon-Osberger - direct

1   anything placed on the building against it and restoring

2   service?

3   A.  Well, that's exactly what I said.  It's why would he remove

4   something that we were going to implement, something that

5   works, replace something that we much needed.  Again, we left

6   that system many months and tried to work with him.  We have

7   Verizon DSL.  We had Spectrum put in.  We spent a lot of money

8   on different services, Internet services -- Spectrum Internet

9   services just so we can help to make the system work and it

10  never worked.

11  Q.  Outside of this email, were there any instances where

12  Mr. Teman threatened to sue -- what instances, if any, were

13  there where Mr. Teman threatened to sue you or 18 Mercer?

14  A.  I believe there is another email that has I'm going to

15  place a lien on your building if this is -- if we are going to

16  remove the system.

17  Q.  What would be the significance of a lien on your building

18  at 18 Mercer Street?

19  A.  What I understand a lien is, that it would put -- you can't

20  move any money in or out, you can't make any transaction for

21  the co-operation.

22  Q.  Did there ever come a time when Mr. Teman threatened to sue

23  you or other members of the board?

24  A.  I think that -- I recollect -- it is my recollection that

25  there was other emails that he had threatened us if we

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-578

K1ndtem4b                    Soon-Osberger - cross

1   didn't -- if we were to remove this system.

2   Q.  Ms. Soon-Osberger, I would now like to direct your

3   attention to Government Exhibit 202.

4         At the top of this page, it says, "18 Mercer Equity

5   Inc."

6         Is that the corporation that owns the building at 18

7   Mercer Street?

8   A.  Mm-hmm.

9   Q.  And this is a check for $18,000, dated March 28, 2019.

10         Did you authorize Mr. Teman to deposit this check?

11  A.  Absolutely not.

12  Q.  Did you authorize anyone else to deposit a check for

13  $18,000 to GateGuard Inc.?

14  A.  Absolutely not.

15  Q.  In the bottom left corner there is a reference to "Device

16  Removal Fee."  Had you ever agreed to an $18,000 device removal

17  fee?

18  A.  Absolutely not.

19         MR. BHATIA:  Your Honor, no further questions.

20         THE COURT:  All right.  Cross-examination.

21         MR. DiRUZZO:  Thank you, your Honor.

22         THE COURT:  Yes.  Mr. DiRuzzo, you may inquire.

23  CROSS-EXAMINATION

24  BY MR. DiRUZZO:

25  Q.  Good afternoon, ma'am.

A-579

442

K1ndtem4b                    Soon-Osberger - cross

1    A.  Good afternoon.

2    Q.  I'm going to ask you a series of questions.  If I go too

3    fast, don't speak loud enough, or you don't understand a

4    question, just let me know.  I will either repeat or rephrase

5    the question.  OK?

6    A.  Yep.

7    Q.  Ma'am, we've never talked before, correct?

8    A.  No.

9    Q.  And let me start with trying to get a little background

10   here.

11          I have some emails of yours.  After your name there is

12   an acronym, "PMP"?

13   A.  Yes.

14   Q.  What is that, ma'am?

15   A.  Project management professional.

16   Q.  And are you a project manager, is that your occupation?

17   A.  It was.

18   Q.  So would managing projects like talking to vendors and

19   doing modifications to a building, that would be something that

20   you are used to doing?

21   A.  No.  I manage business solution teams.  So what I do is I

22   work for IBM.  We go and sought out solutions for a company

23   that does have issues.  And then what we do is locate the

24   system, the process, or the equipment, the technology.  And

25   once we identify where the problem area is, we build a team

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-580

443

K1ndtem4b                    Soon-Osberger – cross

1    to -- we hire a team and build a team to solve those issues,

2    whether it is in the process people or equipment or technology.

3    Q.  OK.  So you are pretty comfortable with modern technology;

4    isn't that fair to say?

5    A.  Yeah.  Yeah.

6    Q.  OK.  So, now, in your direct testimony, you mentioned that

7    you were the treasurer for your co-op board, is that correct?

8    A.  Mm-hmm.  Mm-hmm.

9    Q.  And part of your duty is, of course, representing the

10   board, but you also represent everyone in the co-op

11   collectively, right?

12   A.  Yeah.

13   Q.  And it is your job to make sure that you do things that are

14   in the best interest of the co-op, correct?

15   A.  That's right.

16   Q.  And in that vein, you went to -- if I get it correctly, you

17   went to a trade show with other individuals to try to look at

18   some intercom systems; that was your testimony?

19   A.  Mm-hmm.  Mm-hmm.

20   Q.  And you testified on direct that what attracted you, at

21   least in part, to Mr. Teman's GateGuard system was that it had

22   some cutting-edge technology; is that fair to say?

23   A.  Yes.

24   Q.  Could you explain to the jury what exactly was that

25   cutting-edge technology that differentiated it from other

K1ndtem4b                    Soon-Osberger – cross

1   systems in the same space?

2   A.  For sure.  The system had face recognition, and that was

3   surprising to me because that was very cutting edge in America,

4   anyway.  We had attended a trade show, it was very popular, and

5   I recognized what it is.  So I went over to see this technology

6   that has face recognition.  So that attracted me along with

7   having the access to call your phone whenever somebody

8   accessed, like a delivery person or a guest.  So those type of

9   functionalities was very attractive.

10  Q.  OK.  So you would agree with my characterization, that was

11  an integrated hardware and software platform; does that sound

12  right to you?

13  A.  Yes, I think so because you need Internet services and,

14  yeah.

15  Q.  And as a result, Mr. Teman's system, it collected data, and

16  that data would be available to the Mercer co-op board,

17  correct?

18  A.  Mm-hmm.  Mm-hmm.

19  Q.  And that was part of the appeal of the GateGuard system was

20  the ability of the system to, in essence, collect this data and

21  make it available upon demand, correct?

22  A.  Yeah.  Most of the technology, it collects data, yeah.

23  Q.  And this -- the interface was a Web-based interface; you

24  would agree with me?

25  A.  Yes.

A-582

445

K1ndtem4b                    Soon-Osberger - cross

1    Q.  You had to go on the Internet, your had to go on your

2    browser, Firefox, put in the website, go on the login password

3    in order to get into the GateGuard website, correct?

4    A.  Yeah -- well, more like a mobile device that we were

5    attracted to.  You can use a mobile device to unlock the door

6    or to see somebody who are in front of your door, yeah.

7    Q.  To be a little more specific, not so much the individuals

8    that have a co-op would be able to let someone in via mobile

9    device.  I am talking for the co-op board, the management, that

10   it would be able to login through the GateGuard website,

11   correct, in order to see what's going on?

12   A.  That was up to the management.  The management would have

13   access to do that.

14   Q.  OK.  But the management corporation or business, Crystal,

15   that you referred to, those are the ones that effectively did

16   it on behalf of the co-op board?

17   A.  Yeah.  What we were interested in if we wanted information

18   about who came in and out of the building or data, then, yes,

19   we would go to them for that information.

20   Q.  Now, you also testified that one of the things that

21   attracted you was the price.  You said the price was -- this is

22   my characterization not yours -- it was half the price of the

23   next competitor?  Did you say Mr. Teman's was 2,500 and the

24   next competitor was 5,000?

25   A.  I think it was like somewhere around 5,000, yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-583

446

K1ndtem4b                    Soon-Osberger - cross

1    Q.  So that was a pretty good deal?

2    A.  I think so, yes.

3    Q.  Now, you knew that, when you were getting this deal, that

4    in order for the device to work, it had to be connected to the

5    Internet and it had to have service for a long period of time.

6    In other words, you aren't just going to buy the device,

7    install it yourself, and expect it to work because it wouldn't;

8    you would agree with that?

9    A.  Of course.  Of course.

10   Q.  In other words, you would have, or your board would have an

11   ongoing relationship with GateGuard not only once the device

12   was installed but days, months, years in the future in order to

13   make sure that the device connectivity and activity still

14   worked?

15   A.  If they were -- if they were to continue service on an

16   ongoing basis for the system, yes.

17   Q.  Now, when you talked to Mr. Teman at the trade show, he

18   pointed you to the GateGuard website, is that correct?

19   A.  I think he said you can go in there and find more

20   information, yes.

21   Q.  And I assume -- correct me if I am wrong -- you actually

22   went to the GateGuard website and looked around a little bit,

23   correct?

24   A.  When he pointed me to it, yes, I went in to look at the

25   Channel 5 interview that took place.

A-584

447

K1ndtem4b                    Soon-Osberger - cross

1    Q.  And that was the video that you mentioned on your direct

2    examination, was it?

3    A.  I took a look at it, yeah.  Yes.

4    Q.  And part of the -- now, let's talk -- I want to switch

5    gears a little bit and talk about the terms and conditions.

6            Showing you what's been marked as and entered into

7    evidence as Government Exhibit 441.

8            And this is the document that we were just talking

9    about not too long ago on direct examination, correct?

10   A.  Mm-hmm.  Mm-hmm.

11   Q.  You would admit, this is a fairly long -- a fairly long and

12   involved, 22-page document, correct, ma'am?

13   A.  Mm-hmm.

14   Q.  With a lot of, for lack of better terms, like contract

15   language, legalese, correct?

16   A.  Mm-hmm.

17   Q.  And you actually -- you yourself, you looked at and you

18   reviewed this document, correct?

19   A.  Mm-hmm.

20   Q.  And --

21           THE COURT:  Sorry.  Just try and answer questions

22   "yes" or "no."

23   A.  Yes.  Sorry.  Yes.

24   Q.  And there were other members of your co-op board that also

25   looked at this document, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-585

448

K1ndtem4b                    Soon-Osberger - cross

1   A.  Yes.

2   Q.  And could you tell the jury who those individuals were?

3   A.  The president, Stephanie Phillips.

4   Q.  Anyone else?

5   A.  No, but we did make it available for all the board members.

6   Q.  And for the jury's edification, could you tell the jury who

7   the other board members were?

8   A.  The other board member at that time was Roberta -- I forgot

9   her last name, she is an Italian lady.  She just moved in.  And

10  then it was Margaret Cummings, and then -- who else was that on

11  that board?  Phillips, me --

12  Q.  If you can't remember, ma'am, that is fine.

13  A.  Yeah, there is only five board members.

14  Q.  So there is five board members?

15  A.  Yes.

16  Q.  OK I assume -- correct me if I am wrong -- that in order

17  for the board to approve something, you probably need three out

18  of five board members to agree?

19  A.  That's correct.  We sent out -- usually we sent out

20  documents for them to look at and then we ask for approval.

21  Q.  OK.  Now, ma'am, I'm going to flip to -- ma'am, can you see

22  Section 5, "Orders"?

23              THE COURT:  Do you want this published to the jury?

24              MR. DiRUZZO:  Yes, please, your Honor.  Sorry.  It has

25  been admitted into evidence.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1ndtem4b                    Soon-Osberger - cross

1  Q.  OK.  Ma'am, do you see that there?

2  A.  Mm-hmm.

3  Q.  So this is the orders and fees pricing quotes.  Do you see

4  that section there?

5  A.  That's right.

6  Q.  And, now, part of your discussion on direct examination was

7  that you took issue with this little portion right here, about

8  talking about raising the monthly fees of a hundred percent per

9  year but no more than 350 percent.  Do you see that there,

10  ma'am?

11  A.  Mm-hmm.

12  Q.  So that's a portion of at least the terms and conditions

13  that you or the board collectively took issue with; you would

14  agree with that?

15  A.  Mm-hmm.  Mm-hmm.

16  Q.  But it says right here that this document is subject to the

17  additional payment terms stipulated at, and there is a URL.  Do

18  you see that there, ma'am?

19  A.  Mm-hmm.  Mm-hmm.

20  Q.  And, ma'am, is it your testimony that you did not click on

21  that URL?

22  A.  We have to collect information for bidders.  We need either

23  a contract that we can sign with the other party or specific

24  pricing.  So, this doesn't give me all that information.  He

25  could have a generic, default pricing for whatever he's

A-587

450

K1ndtem4b                         Soon-Osberger - cross

1    offering, but I need -- I asked Ari for pricing so that I can

2    have specific -- I can't just submit this to my board.  I have

3    to have the exact pricing that he gives me so that I can line

4    up, which I did after he gave me the invoice, to line up with

5    other vendors the costs of all the specific bids.  So clicking

6    on that doesn't give me information directly that I can submit

7    for board approval.

8    Q.  I understand, ma'am, but my question is just a little more

9    direct and simple.

10   A.  Mm-hmm.

11   Q.  Did you click on that URL?

12   A.  I did not.

13   Q.  And as the next follow up, you could have, though, if you

14   wanted to?  You had the ability, correct?

15   A.  I could.  And I could, yes, but --

16   Q.  But you chose not to?

17   A.  Not that I choose not to, but the way we do our job,

18   bidding for a job, is a pricing and a signed contract and --

19   Q.  I understand, ma'am, but --

20           THE COURT:  Let the witness finish her answer, please.

21   A.  Yes.  So I need exact pricing, and the contract and the

22   pricing, especially the pricing to put together the bid, and

23   that's when Ari gave me that particular invoice, that is what

24   we are approving.  That's what we're paying.  That's our

25   pricing.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1ndtem4b                    Soon-Osberger - cross

1    Q.  Ma'am, I understand.  But you would agree with me that

2    Mr. Teman is not on your board and wasn't privy to the internal

3    rules and mechanisms of your co-op board; you would agree with

4    that?

5    A.  I agree, but he knew that I was trying to collect prices

6    for bids to make a determination to move forward with the

7    intercom system.

8    Q.  Ma'am, during your course of interaction with Mr. Teman,

9    you reviewed the terms and conditions and submitted it to the

10   board for the board's approval, which the board did approve,

11   correct?

12   A.  Mm-hmm.

13          THE COURT:  One moment.

14          Counsel, I think there is a compound question.  You

15   submitted -- you said she submitted the terms and conditions

16   and you submitted it for approval.  Break those down into

17   separate questions so it is clear what you were asking was

18   submitted, please.

19          MR. DiRUZZO:  Sure.

20   BY MR. DiRUZZO:

21   Q.  Ma'am, you submitted the terms and conditions to the board,

22   correct?

23   A.  Yes.

24   Q.  And the board approved the terms and conditions, correct?

25   A.  They approved the contract and they approved the pricing,

A-589

452

K1ndtem4b                    Soon-Osberger – cross

1   yes.

2   Q.  I want to be very specific with my terminology here now.

3   When I say "terms and conditions," I'm referring to this

4   document right here, which is Government Exhibit 441.

5   A.  So what we do is we submit the bids and we submit whatever

6   documents that we have, which is these documents included, for

7   the board to review, and then we take a vote and we have the

8   majority to move forward.

9   Q.  Correct me if I am wrong, but I don't think there is a

10  dispute, this is the document, Government Exhibit 441, that was

11  submitted to your board?

12  A.  That's right.

13  Q.  And that the board approved?

14  A.  That's right.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

A-590

453

K1NVTEM5                        Soon-Osberger – cross

1    BY MR. DiRUZZO:

2    Q.  Ma'am, I'm showing you what's been marked as -- admitted in

3    evidence, Government Exhibit 442.  Starting at the top, ma'am,

4    that right there, that's your email address; correct?

5    A.  That's right.

6    Q.  And then you say here that:  Ari, we were reviewing your

7    terms and conditions, and have inquiries regarding the

8    following.  And then it goes on.

9            That's your email to Mr. Teman; correct?

10   A.  That's right.

11   Q.  And this portion right here, this first part in quotes,

12   about the 100 percent per year and no more than 350 percent,

13   that language actually comes from Section 5 of the terms and

14   conditions, which is Government Exhibit 441.  You would agree

15   with me that that's where that language comes from?

16   A.  Mm-hmm.  Mm-hmm.

17   Q.  Now, going down a little farther, this language right

18   here -- and I'm not going to read it all, but has a bunch of

19   hyperlinks in it to at least the GateGuard and the related

20   company property panel websites.  Do you see that there, ma'am?

21   A.  Number --

22           THE COURT:  Please answer yes or no, kindly, as

23   opposed to "mm-hmm."

24   A.  I was just going to ask, is this --

25           THE COURT:  One moment.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-591

454

K1NVTEM5                     Soon-Osberger - cross

1    A.   Okay.  Okay.  That's fine.

2           THE COURT:  Just for the record, counsel has circled

3    the paragraph that begins, "You agree that GateGuard will run."

4           Go ahead, counsel.

5    BY MR. DiRUZZO:

6    Q.   So, ma'am, that's -- you cut-and-pasted that portion of the

7    terms and conditions into your email that you sent Mr. Teman;

8    correct?

9    A.   That's right.

10   Q.   And in that portion that you cut-and-pasted into your email

11   included hyperlinks also from the terms and conditions;

12   correct?

13   A.   Mm-hmm.

14   Q.   Because you had concerns with this section and the

15   hyperlinks that this section incorporates; correct?

16          THE COURT:  Sorry.  We need an answer.

17   A.   I was referring to the monthly fee here.

18   Q.   I understand that, ma'am.  But this -- this paragraph that

19   you put in quotes, you did that; correct?

20   A.   Yes.

21   Q.   Because you had concerns about that language; correct?

22   A.   About the monthly fees, yes.

23   Q.   I'm not asking about the monthly fees.  I'm asking about --

24   A.   You're asking if I accept the entirety of this paragraph

25   when I paste that on there and had that increase.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-592

455

K1NVTEM5                    Soon-Osberger - cross

1    Q.  I'm asking you did that because you had concerns about that

2    language that you personally quoted and pasted into your email?

3    A.  Yes, I have -- I have concern about that, that -- yes, that

4    paragraph or the -- yes.

5    Q.  Then you would also agree with me that Mr. Teman

6    responded -- and it goes on to the next page.  And he responded

7    to you and asked at the very bottom, "Does that help?"  You

8    would agree with that, right, ma'am?

9    A.  Yes, yes.

10   Q.  To which you replied that he addressed your concerns

11   related to the terms and conditions; correct?

12   A.  Yup, related to those topics of the terms and conditions,

13   yes.

14   Q.  So you would agree that Mr. Teman was responsive to your

15   emails and the concerns that you expressed to him?

16   A.  Yes.

17           THE COURT:  Mr. DiRuzzo, I'm looking for a natural

18   break for our mid-afternoon -- natural point for our

19   mid-afternoon break.  Is this a good point or do you --

20           MR. DiRUZZO:  This is fine, Judge.

21           THE COURT:  All right.  Ladies and gentlemen, I'm

22   informed by Mr. Smallman that the mid-afternoon coffee, etc.,

23   has arrived.  So we'll take a 15-minute recess.  In 15 minutes,

24   Mr. Smallman will come get you.

25           As always, please don't discuss the case.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-593

456

K1NVTEM5                              Soon-Osberger - cross

1                (Jury not present)

2                THE COURT:  Okay.  Anyone have anything to raise

3       before we take the break?

4                MR. BHATIA:  No.

5                THE COURT:  All right.  I'll see you just a few

6       moments before 15 minutes.  Have a good break, everyone.

7                I'll need the witness back in the box before the jury

8       comes out.

9                (Recess)

10               THE COURT:  Let's get the witness in the box and let's

11      get the jury.  Welcome back, Mr. Imperatore.

12               MR. IMPERATORE:  Yes, your Honor.  Thank you.

13               THE COURT:  Mr. DiRuzzo, for planning purposes, how

14      much further on cross, approximately?

15               MR. DiRUZZO:  Best guess, 10 to 15.

16               THE COURT:  Very good.  Thank you.

17               (Jury present)

18               THE COURT:  Ms. Soon-Osberger, I'll remind you that

19      you are still under oath.

20               And Mr. DiRuzzo, you may inquire.

21      BY MR. DiRUZZO:

22      Q.  Okay, ma'am.  I'm going to shift gears a little bit.  I'm

23      going to turn your attention to -- show this to the jury and to

24      the witness, Government Exhibit 431, which is already in

25      evidence.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-594

457

K1NVTEM5                        Soon-Osberger - cross

1            And ma'am, this is an email from you to board, and cc

2    Caroline, Gina, and Jackie, with the subject of Invoice for the

3    New Intercom System.  So this is an email that you sent to

4    those individuals; correct?

5    A.  Mm-hmm.

6            THE COURT:  Sorry.  You need to answer yes or no and

7    speak into the microphone.

8            THE WITNESS:  I'm sorry.  Yes.

9    Q.  And that listed out particularly here the one-year annual

10   amount, which is just under $600; correct?

11   A.  That's correct.  Yes.

12   Q.  And that information that you relayed in the body of your

13   email -- I know it's probably a little difficult for everyone

14   to see right here, but this is the invoice that you receive

15   from Mr. Teman's business GateGuard; correct?

16   A.  It look different from the other invoice.

17   Q.  It looks different.  How does it look different, ma'am?

18   We'll start off --

19           THE COURT:  I think, Mr. DiRuzzo, it would be helpful

20   if you -- if I'm correct, you've just gone two pages beyond the

21   email you showed her in the same exhibit.  If you identify it

22   that way, we can speed things along.  Why don't you have her

23   flip through that or something.

24           MR. DiRUZZO:  Sure.

25           THE COURT:  Rather than detaining us.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

458

K1NVTEM5                    Soon-Osberger – cross

1          MR. DiRUZZO:  Sure.

2     Q.  Take a look at the binder, Government Exhibit 431.  It

3     should be a three-page document.

4          So, ma'am, this document which is on the screen right

5     now, the document that you have in the binder on your lap in

6     paper form?

7     A.  It's missing the information.  I assume it's just not on

8     here, displayed here.

9     Q.  Okay.  But this document, is that in the binder that you

10    have?

11    A.  It's just missing the information, but, yeah, I think it's

12    the same thing.  Right?

13         THE COURT:  Sorry.  First of all, please keep your

14    voice up.

15         What do you mean by it's missing the information?

16    This document is the attachment to the email that counsel was

17    asking you about.

18         THE WITNESS:  Yeah, it's just –– it's just information

19    here that's not clear on the screen.  I just want to make sure

20    that it's a different document, so I just want to make sure.

21         THE COURT:  I see.  All right.

22         Then let me ask defense counsel just to show the

23    witness the entire document.  Her point is that only a portion

24    of the invoice is being portrayed on the screen.  So show her

25    the entire thing.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-596

459

K1NVTEM5                    Soon-Osberger - cross

1          MR. DiRUZZO:  I understand.

2          THE COURT:  I'm just trying to move us past this

3     confusion.

4          MR. DiRUZZO:  Okay.

5     BY MR. DiRUZZO:

6     Q.  Is that better ma'am?

7     A.  Yup.

8     Q.  Okay.  So now, ma'am, so let's talk about this portion

9     right here.  First year paid up front, that's basically $50 a

10    month for a year, just under $600; correct?

11    A.  That's -- yes.

12    Q.  And the reason that your co-op board was billed per years

13    worth $50 a month is because there was going to be reoccurring

14    fees that the board -- for your co-op building was going to be

15    responsible for, to use the functionality of the GateGuard

16    system, the device, for the first year, and then you would have

17    to pay for it again for the second year and the third year;

18    correct?

19    A.  Like most monitoring and hosting services, if we decide to

20    go with -- continue that type of monitoring services or that

21    particular equipment, then, yes, we renew another year.

22    Q.  Okay.  Now, ma'am, I'm going to switch gears again to a

23    little discussion about Crystal Management.

24          So based on your direct testimony, Crystal Management

25    was the management company that was in charge of the building,

A-597

460

K1NVTEM5                          Soon-Osberger - cross

1   for lack of a better term?

2   A.  Yes.

3   Q.  And like all management companies, I assume Crystal

4   collected the co-op or the HOA fees from everyone on a monthly

5   basis?

6   A.  Yes.

7   Q.  And then Crystal would dispense money to the vendors,

8   whoever the co-op would have an expense to?

9   A.  Yes.

10  Q.  So my understanding on your direct testimony was that the

11  condo or the co-op board itself didn't write checks; instead,

12  it directed Crystal on its behalf to issue checks to pay bills

13  for your co-op board.  Is my understanding correct?

14  A.  Yes.

15  Q.  So, in other words, you couldn't write a check off of

16  whatever bank account, because the co-op board didn't actually

17  have a bank account in its own name.  Is that my understanding?

18  A.  It has checking account its own name.

19  Q.  Okay.  So it had a checking account in its own name, but

20  Crystal wrote checks off of the board's bank account, or did

21  Crystal write checks off of Crystal's own bank account?  If you

22  could clarify that for us.

23  A.  What my recollection is that we approve for bank account to

24  be opened on our behalf when we transition over to Crystal so

25  we have our own bank account.

A-598

461

K1NVTEM5                         Soon-Osberger - cross

1    Q.  Okay.  So what I'm hearing, correct me if I'm wrong, the

2    board had its own bank account, but Crystal had signatory

3    authority over that bank account?

4    A.  That's right.

5    Q.  Okay.

6    A.  That's right.

7    Q.  And Crystal -- given that it had signatory authority over

8    the bank account, you would agree with me that, as a result,

9    Crystal had the legal capacity to pay bills on behalf of the

10   board?

11   A.  They only pay bill on everything we approve, yes.

12   Q.  I understand that.  But Crystal though had the ability, the

13   authority, to pay bills on behalf of the co-op?

14   A.  That's right.

15   Q.  On behalf of the board?

16   A.  That's right.  That's right.

17   Q.  And as far as signatory authority goes, no one on the board

18   at the co-op, for example, yourself, had that signatory

19   authority to issue checks?

20   A.  No.

21   Q.  That's not correct?

22   A.  Oh, we don't have -- right, we don't sign checks, no, we

23   don't have authority to sign checks.

24   Q.  I just want to make sure there's no confusion.

25            So, for example, you, yourself, you could not write a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1NVTEM5                          Soon-Osberger - cross

1   check on behalf of the co-op board; is that correct?

2   A.  That's correct.

3   Q.  Now, ma'am, I'm going to switch gears again to the actual

4   device.

5           Now, it's my understanding that the device was in --

6   you know what?  Can you just explain -- paint a little picture

7   to the jury as to what the building looks like, like when you

8   enter, where the device was when you first came in?

9   A.  It's on the right-hand side.  So you come up to the

10  entrance.  We have a -- we have our front door, and then we

11  have a panel -- we have a side panel on the right to the left.

12  And so the intercom system is on the right-hand side of the

13  building.

14  Q.  Okay.  So when an individual walks up, you walk up, and

15  then the device is to the right?

16  A.  The device is on the right-hand side, yes.

17  Q.  Okay.  Now, it's my understanding that your testimony was

18  it was too low and that was a problem?  The device was too low?

19  A.  That was one of the problem.

20  Q.  Okay.  Let's talk about that problem.

21          But the reason that the device was too low, at least

22  from your point of view, is that people had to, like, bend down

23  in order to get their face -- a snapshot taken, is that my

24  understanding?

25          THE COURT:  She doesn't know what your understanding

A-600

463

K1NVTEM5                    Soon-Osberger - cross

1    is.

2    Q.  Let me phrase it this way, ma'am:  The device is too low,

3    so the complaints were that people had to bend down in order to

4    look at the device?

5    A.  The device was positioned where it doesn't capture the

6    person's face.  If it's a FaceNet recognition, it's not

7    capturing the person's face, period.

8    Q.  I understand.  But why wasn't it capturing the face?  My

9    understanding -- and correct me if I'm wrong -- that part of

10   the complaint was that the device was too low so that when

11   people walked up to it, it wouldn't capture their face, it

12   would capture their chest or something like that?

13              MR. BHATIA:  Objection, your Honor.

14              THE COURT:  Sorry.  What's the objection?

15              MR. BHATIA:  Compound question.

16              THE COURT:  Yes.  Also cease asking about your

17   understanding.  It's complicating the question.  Just ask her

18   what the facts are.

19              MR. DiRUZZO:  Sure.

20   Q.  Ma'am, was the device too low in that it took a picture of

21   someone's chest instead of their face?

22   A.  That's my assessment.  And I was looking for Ari.  Is it

23   because it's low, because my concern was it's not capturing the

24   first person's face.  Could it be it's too low.  I don't know.

25   That's why I was looking for him to give me an answer.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-601

464

K1NVTEM5                    Soon-Osberger - cross

1    Q.  But, ma'am --

2    A.  Why isn't it capturing the face of the person?

3    Q.  But, ma'am, wasn't the reason that it was positioned where

4    it was was the device had to be Americans with Disability Act

5    compliant?

6    A.  That's what Ari is saying.

7    Q.  And you would agree with me that the Americans with

8    Disabilities Act, also known as the ADA, that's a federal law?

9            MR. BHATIA:  Objection, your Honor.

10           THE COURT:  Sustained.  There's no evidence that that

11   is, in fact, true.  Then this case is not about the Americans

12   with Disabilities Act.  Counsel, move on.

13   BY MR. DiRUZZO:

14   Q.  Now, ma'am, the device was moved from its initial position

15   to a different position on the building; is that correct?

16   A.  I believe that happen in January, maybe it was December or

17   January.  Months we were working with Ari on it.  And we had to

18   move it because the mailman can't -- it's illegal -- the

19   mailman can't get to the mailbox.  And we just could not have

20   that there anymore.

21           And there's a hole, there's a big hole where the old

22   panel was.  So the person that we had come and do our lobby,

23   just move it, cover the panel, and so that the mailman can

24   access to the -- to the mailbox.  And so if Ari can't explain

25   where its positioning is not capturing the face, and there's a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-602

465

K1NVTEM5                        Soon-Osberger - redirect

1    hole in the panel, we move that onto where the hole is, and so

2    that the mailman can get to that.

3           And then right from the start, Ari knows, he said,

4    When you're -- he said that you can have your contractor move

5    that -- that panel.

6    Q.  Just so we're clear, ma'am, it was a contractor that the

7    board hired or Crystal hired to move the device?

8    A.  It was a contractor to the corporation, yes.

9    Q.  Just for clarity, it wasn't GateGuard and Mr. Teman that

10   moved it, it was the co-op board that moved it?

11   A.  Not co-op board, but contractor to the co-op board, yes.

12   But that was January, after months and months of working with

13   Ari.

14          MR. DiRUZZO:  The Court's indulgence, your Honor.

15          (Counsel conferred)

16          MR. DiRUZZO:  Yield the witness, your Honor.

17          THE COURT:  All right.  Any redirect?

18          MR. BHATIA:  Briefly, your Honor.

19          THE COURT:  Go ahead.

20   REDIRECT EXAMINATION

21   BY MR. BHATIA:

22   Q.  Ms. Soon-Osberger, you were asked a few questions about

23   what Mr. Teman promised you regarding the device, right?  Some

24   of the features of it and how it would -- how it involved

25   facial recognition?  Did the device work?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-603

466

K1NVTEM5                    Soon-Osberger - redirect

1    A.   There's no such thing as facial recognition in that device.

2              THE COURT:   One moment.

3              Counsel, the witness was shaking her head, I think,

4    intending to convey either a no or yes.

5              You need to use words.

6    A.   No, it did not have.

7    Q.   It did not.  What was wrong with it?

8    A.   What's that?

9    Q.   What was wrong with the device?

10   A.   What was wrong?

11             First of all, it was not facial recognition at all.

12   Facial recognition means your face goes into that system and

13   opens the door.  That never even existed.

14             Secondly, there's no -- it never did a handshake to

15   our intercom, our network system, to open the door, to dial

16   somebody if somebody's at the door and they press the button to

17   the guest.  The delivery person, you give them access to it,

18   they can't access because it isn't opening the door for them.

19   Q.   How long did you have the intercom installed in the

20   building?

21   A.   We had it August to almost about January 10th.

22   Q.   So that's several months?

23   A.   Five, six months.

24   Q.   How long did it actually work?

25   A.   How long did it work?  It didn't -- I think it worked like

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1NVTEM5                    Soon-Osberger - recross

1   it will -- it will open up one time, and then you do a second

2   time, it doesn't work anymore.

3   Q.  Why did you keep -- I'm sorry.

4   A.  Sorry.  It keep looking for the internet service the second

5   time.

6   Q.  Why did you keep it installed so long if it didn't work?

7   A.  Because we were trying to work with Ari.  He keep giving us

8   reason why it doesn't work.  So we tried different things and

9   we tried different things.  And we try a different network

10  services.  We pay a lot of money to get Spectrum in there to

11  install the network system.  We got the Spectrum, we connected

12  it, and it didn't work.  Nothing worked.

13  Q.  And did he tell you what would happen if you removed the

14  device?

15  A.  He was threatening, yeah, that he would charge the $18,000.

16  Q.  Was that part of the reason you kept it so long?

17  A.  Yeah, yeah, it's all these threats were -- yeah.

18            MR. BHATIA:  No further questions, your Honor.

19            THE COURT:  All right.

20            Any recross, Mr. DiRuzzo?

21            MR. DiRUZZO:  Quickly, your Honor.

22            THE COURT:  Go ahead.

23  RECROSS EXAMINATION

24  BY MR. DiRUZZO:

25  Q.  Ma'am, the system worked insofar as, at a minimum, it

A-605

468

K1NVTEM5                    Soon-Osberger - recross

1    provided a bunch of data or information when you go onto the

2    site, you could login and view the logs of people coming and

3    going into the building; correct?

4    A.  It logged the system trying to come in and go out.  It

5    never opened the door for anybody.

6    Q.  Okay.  But my question was though the system did collect

7    data, and that data was available to the board; correct?

8    A.  The foremost reason we bought the system is so that people

9    can access the building, delivery people, guests of the

10   shareholders, anybody that need a virtual key to access or not

11   have to use a key, that was another functionality that we were

12   looking for.  It's a functionality of exiting, entering.

13          The data really didn't -- we weren't even have access

14   to it.  Management have access.  If we needed information, we

15   go to them for it.  It's not something that was a priority when

16   we look for the system.  It was the entering and exiting

17   capability.

18   Q.  Now, ma'am, you testified that Mr. Teman threatened to

19   start litigation against the board; correct?

20   A.  Yes.

21   Q.  But the board was more than able to start its own

22   litigation to contest the validity of the contract; correct?

23   A.  I'm not understanding, that something I didn't --

24   Q.  Let me ask it a different way:  Mr. Teman threatened to

25   sue; correct?

K1NVTEM5                    Soon-Osberger - recross

1    A.   Mm-hmm.

2    Q.   The board could have sued Mr. Teman and GateGuard, but it

3    chose not to?

4              MR. BHATIA:  Objection, your Honor.

5              THE COURT:  Sustained.  Beyond the scope.

6              MR. DiRUZZO:  Nothing further, your Honor.

7              THE COURT:  All right.

8              Any re-redirect?

9              MR. BHATIA:  No.

10             THE COURT:  All right.

11             Ms. Soon-Osberger, you may step down.  Your testimony

12   is complete.  Thank you.

13             (Witness excused)

14             THE COURT:  Government, call your next witness.

15             MR. BHATIA:  The government calls Gina Hom.

16   GINA HOM,

17        called as a witness by the Government,

18        having been duly sworn, testified as follows:

19             THE COURT:  All right.  Good afternoon, Ms. Hom.

20             Welcome to court.

21             I'll ask you kindly to keep your voice up.  So lean

22   into the mic and really shout it out so that everyone in this

23   large old courtroom can hear you.

24             THE WITNESS:  Okay.

25             THE COURT:  All right.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-607

470

K1NVTEM5                          Hom - direct

1          Counsel you, may inquire.

2     DIRECT EXAMINATION

3     BY MR. BHATIA:

4     Q.   Ms. Hom, where do you work?

5     A.   Crystal Real Estate Management.

6     Q.   What's your title there?

7     A.   Vice president.

8     Q.   What are your day-to-day responsibilities as a vice

9     president?

10    A.   I oversee all the finances on all the properties that we

11    manage.

12    Q.   And are you familiar with the building at 18 Mercer Street?

13    A.   Yes.

14    Q.   What's your familiarity with it?

15    A.   We used to manage that property about a year ago.

16    Q.   At Crystal Real Estate Management, you were the management

17    company for 18 --

18    A.   Correct.  Correct.

19    Q.   And what kind of work did you do on behalf of 18 Mercer

20    Street?

21    A.   We oversaw the day-to-day operations.

22    Q.   What kind of work did you do with regards to finances?

23    A.   We collected the maintenance, we paid vendor bills, we paid

24    the mortgage, we paid utilities, repair bills.

25    Q.   You say "we."  Who else --

A-608

471

K1NVTEM5                    Hom - direct

1   A.   Real estate management, I'm sorry.

2   Q.   At Crystal Real Estate Management, what kind of work did

3   you do with regard to paying expenses?

4   A.   As invoices came in, we would pay the repair bills or any

5   of the maintenance bills, "maintenance" meaning elevator,

6   boiler.

7   Q.   At Crystal Real Estate Management, who is authorized to

8   sign for the 18 Mercer account?

9   A.   It was myself and my partner, Jackeline Monzon.

10  Q.   Okay.  Are you familiar with the entity 18 Mercer Equity,

11  Inc.?

12  A.   Yes.

13  Q.   What is that?

14  A.   That is a cooperative that Crystal Real Estate Management

15  was hired to manage.

16  Q.   And did you manage the account for -- the bank account for

17  18 Mercer Equity, Inc.?

18  A.   Yes, we did.

19  Q.   What kind of funds went into that account?

20  A.   The funds were any maintenance collected for the property

21  on a monthly basis.

22  Q.   So those are the shareholders' monthly maintenance

23  payments?

24  A.   Correct.

25  Q.   What was the process for approving expenses on the 18

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1NVTEM5                          Hom – direct

1   Mercer Equity account?

2   A.  Any invoices that comes in for any day-to-day operations of

3   the property, the managing agent, which was my partner,

4   Jackeline Monzon, would review the invoice and approve it.

5   Q.  And would you require any other approvals in order to pay

6   out an expense?

7   A.  If it was a major repair or expense, then the board would

8   have to approve it as well.

9   Q.  Were invoices required to pay expenses?

10  A.  I'm sorry?

11  Q.  Were invoices required in order to pay expenses?

12  A.  Yes, they were.

13  Q.  Shifting gears now, are you familiar with the GateGuard

14  intercom?

15  A.  Yes, I am.

16  Q.  I'm sorry.  Go ahead.

17  A.  I'm sorry.  That was a company that was hired to install

18  new intercom system.

19  Q.  And did they install one at 18 Mercer Street?

20  A.  To the best of my knowledge, yes.

21  Q.  What was the experience of the shareholders of 18 Mercer

22  with the GateGuard intercom?

23          MR. DiRUZZO:  Objection.  Hearsay.

24          THE COURT:  Sustained.

25  Q.  Did there come a time when you were approved to pay an

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-610

473

K1NVTEM5                          Hom - direct

1    invoice for the 18 Mercer Equity account to GateGuard?

2    A.  Yes, I was.

3    Q.  I'd like to direct your attention to Government Exhibit 143

4    in evidence.  Is this a check that you issued to GateGuard,

5    Inc.?

6    A.  Yes, it is.

7    Q.  How do you know that?

8    A.  Because that is my signature on the bottom.

9    Q.  And does this look like the checks you issued on behalf of

10   18 Mercer Equity, Inc.?

11   A.  Yes, it is.

12   Q.  And this is a check for $3,947.88.  Walk us through the

13   process from getting an invoice to paying out this check.

14   A.  Okay.  With regard to this particular invoice, it was

15   emailed out by the board saying that this was a deposit needed

16   in order for GateGuard to install the new intercom system.

17   Q.  What happens after you get an --

18   A.  After I get -- I'm sorry.  After I get the invoice, I enter

19   into the system, and then I issue the check.  And I do not

20   recall if the check was mailed or if it was picked up.

21   Q.  You mentioned two things, you mentioned an invoice and you

22   mentioned an email.

23   A.  Correct.

24   Q.  Are both of those things required in order to pay that

25   expense or is only one of them required?

A-611

474

K1NVTEM5                         Hom – direct

1   A.  On this particular case, yes.

2   Q.  I'm sorry, are both required?

3   A.  The email was sent by the board with their approval to pay

4   this invoice.  And attach the email was a copy of an invoice.

5   Q.  In order to pay an invoice for a vendor like GateGuard, you

6   would require both an invoice and a board approval?

7   A.  Correct.

8   Q.  Okay.  I'd like to direct your attention to Government

9   Exhibit 143, also in evidence.

10          I'm sorry.  I'll direct your attention to Government

11  Exhibit 201 and 202.  Let me look at 202 first.

12          Is this a check that you issued from the 18 Mercer

13  Equity account?

14  A.  No, it is not.

15  Q.  Did you authorize this check?

16  A.  No, I did not.

17  Q.  And how do you know that?

18  A.  Because the font and the whole entire look of the check is

19  not what I'm familiar with.  And that is not my signature on

20  the bottom of the check.

21  Q.  Did there come a time in March 2019 when you learned about

22  an unauthorized -- when you reported an unauthorized check in

23  the 18 Mercer Equity account?

24  A.  Yes.

25  Q.  How did you find out about that check?

A-612

475

K1NVTEM5                      Hom - direct

1    A.   After we -- Crystal Real Estate Management terminated the

2    contract of 18 Mercer, which would have ended March 31st, on or

3    about the 15th of March.  I was checking the bank account on a

4    daily basis to make sure that any outstanding checks that we

5    had issued on behalf of 18 Mercer has cleared so I can close

6    the account.  At that point I noticed an $18,000 check from the

7    night before had gone through the bank.  And I know I did not

8    issue an $18,000 check.

9    Q.   Is this the check that you saw?

10   A.   Yes.

11   Q.   What was your reaction to seeing it?

12   A.   Shocked.  And at that point I called the bank and had them

13   place a stop payment on it.

14   Q.   Why were you shocked?

15   A.   Because I did not issue a check.  And it overdrew my

16   account.  I'm sorry, not my account, 18 Mercer's account.

17   Q.   It overdrew the account?

18   A.   Correct.

19   Q.   And when you reported this check as unauthorized -- is that

20   right?  You did that?

21   A.   Yes, I did.  I emailed the bank.

22   Q.   Did you ask the board first whether this was authorized?

23   A.   No.

24   Q.   Why not?

25   A.   Because the only people that were authorized to issue any

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-613

476

K1NVTEM5                         Hom – cross

1    payments on this would have been myself or Jackeline.  And

2    neither one of us had done it.

3    Q.  Fair to say that because you didn't authorize the check,

4    you were able to report it as unauthorized?

5    A.  Correct.

6             MR. BHATIA:  One moment, your Honor.

7             (Counsel conferred)

8    Q.  Did you ever see an invoice in connection with this check?

9    A.  With this –– the $18,000 check?

10   Q.  Yes.

11   A.  No, I did not.

12   Q.  Did you ever receive –– did there ever come a time when you

13   received an invoice for $18,000 from GateGuard, Inc.?

14   A.  No, I did not.

15   Q.  Did there ever come a time when you had approval from

16   Bonnie to write a check for $18,000?

17   A.  No, I did not.

18             MR. BHATIA:  No further questions, your Honor.

19             THE COURT:  All right.

20             Cross-examination.  Mr. DiRuzzo.

21   CROSS-EXAMINATION

22   BY MR. DiRUZZO:

23   Q.  Good afternoon, ma'am.

24   A.  Good afternoon.

25   Q.  My name is Joseph DiRuzzo.  I represent Mr. Teman.

A-614

477

K1NVTEM5                              Hom - cross

1                We've never spoken before; correct?

2    A.  Correct.

3    Q.  And so I'm going to ask you a couple questions.  If I speak

4    too fast, don't speak loud enough, just let me know.  I'll

5    either repeat or rephrase.

6    A.  Okay.

7    Q.  Ma'am, I'm going to start off with talking about Crystal's

8    relationship with 18 Mercer.  It's my understanding that you,

9    "you" being Crystal, were the management company for 18 Mercer;

10   correct?

11   A.  Correct.

12   Q.  And you did for Mercer what I assume you do for most co-op

13   or condo buildings, you accept monthly fees and then you pay

14   monthly bills; is that correct?

15   A.  Correct.

16   Q.  And in doing so, you would issue checks.  And I'm going to

17   show you an example of a check.  Government Exhibit 143 is

18   already admitted in evidence.  And this is the document that

19   you just testified about.

20          Ma'am, this is -- is this your signature, is that my

21   understanding?  Did you write this check?

22          THE COURT:  Please don't ask about your understanding.

23   She doesn't know it.  Just ask whether it's her signature.

24   Q.  Is that your signature, ma'am?

25   A.  That one, yes.

A-615

478

K1NVTEM5                          Hom - cross

1   Q.  Now, to be clear, this check off of this bank account, that

2   wasn't Crystal's money, that was Mercer's money; correct?

3   A.  That's correct.

4   Q.  So it's a Mercer bank account that you manage, run; that

5   fair to say?

6   A.  Correct.

7   Q.  Now, ma'am, I'm showing you what's been marked as

8   Government Exhibit 202, which is already in evidence.

9           Do you see that in front of yourself, ma'am?

10  A.  There's nothing on my screen.

11  Q.  Are you able to see that, ma'am?

12  A.  Yes.

13  Q.  Now, ma'am, on the bottom right-hand side, do you see this

14  language right there, "Draw per contract.  No signature

15  required"?

16  A.  Yes.

17  Q.  Ma'am, you were aware that Mercer had a contract with

18  GateGuard; correct?

19  A.  No.

20  Q.  You weren't aware of that?

21  A.  I was not aware they had a contract.  I know that they had

22  an agreement with them.

23  Q.  Okay.

24  A.  As far as I know.

25  Q.  Well, what's your understanding of the agreement that you

A-616

479

K1NVTEM5                              Hom – cross

1    believed Mercer had with GateGuard?

2    A.  That they hired -- 18 Mercer hired GateGuard to install the

3    new intercom system.

4    Q.  Okay.  But that was the extent of your understanding of the

5    business relationship between Mercer and GateGuard?

6    A.  Correct.

7    Q.  I'm showing you a document that's been admitted in

8    evidence, Government Exhibit 431.  And bottom of the first page

9    here, can you see that?  Are you able to read that, ma'am?

10   Would you like me to blow it up a little bit?

11   A.  No, that's okay.  I see it.

12   Q.  Okay.  Ma'am, is that your email address?

13   A.  Yes, it is.

14   Q.  So you received this email from Ms. Soon-Osberger; correct?

15   A.  Yes.

16   Q.  And this email had an attachment.  Are you able to see that

17   there, ma'am?

18   A.  A little blurry, but --

19          THE COURT:  Can you zoom it, counsel?  Thank you.

20   Q.  Is that a little better, ma'am?

21   A.  Yes.

22   Q.  And you would agree with me that that's -- this is the

23   attachment that came with the email that I just referenced that

24   you received from Ms. Soon-Osberger; correct?

25   A.  Yes.

A-617

480

K1NVTEM5                          Hom - cross

1    Q.  And, ma'am, do you see that right there:  Buyer accepts

2    terms and conditions at, then there's a website?

3    A.  Yes.

4    Q.  Ma'am, you actually saw this document, because you signed

5    the check in the amount of just under $4,000; correct?

6    A.  Correct.

7    Q.  And, ma'am, did you bother to take a look at the terms and

8    conditions that were referenced in this invoice?

9    A.  No, because it was -- I was instructed by the board to pay

10   on their behalf.

11   Q.  So, ma'am, I'm showing you what's been marked and admitted

12   in evidence as Government Exhibit 441.

13           Ma'am, can you see that in front of you?

14   A.  Yes.

15   Q.  Ma'am, this is a GateGuard terms and conditions.  So is it

16   your testimony that you never saw -- or let me say it another

17   way.  Is your testimony that you were never provided this

18   document by anyone at the board of 18 Mercer?

19   A.  I never saw this, no.

20   Q.  I understand.

21   A.  I never saw the terms and conditions.

22   Q.  But my question was were you ever provided it by anyone at

23   18 Mercer?

24   A.  No.

25   Q.  And, ma'am, when you communicated with Signature Bank that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-618

481

K1NVTEM5                              Hom – redirect

1    there was no authorization -- well, let me back up a step.

2              Returning your attention to Government Exhibit 202,

3    this portion right here, "Draw per contract," you never went to

4    the board at 18 Mercer to inquire if the board had entered into

5    a contract with GateGuard that would have allowed GateGuard to

6    issue this check?

7    A.  No.

8    Q.  And I just want to make sure it's clear, because I phrased

9    my question in the negative.  So I asked you, you never went

10   to --

11   A.  I never went to the board with regard to this check.

12   Q.  And because you've never seen the terms and conditions, you

13   were never provided the terms and conditions, you obviously

14   didn't have the opportunity to read the terms and conditions;

15   correct?

16   A.  That's correct.

17             MR. BHATIA:  Objection.

18             THE COURT:  Overruled.

19             MR. DiRUZZO:  Yield the witness, your Honor.

20             THE COURT:  Any redirect?

21             (Counsel conferred)

22   REDIRECT EXAMINATION

23   BY MR. BHATIA:

24   Q.  Ms. Hom, you were one of the authorized signers for the 18

25   Mercer Equity account?

A-619

482

K1NVTEM5                          Hom - recross

1    A.  I'm sorry?

2    Q.  You were one of the authorized signers for the 18 Mercer

3    Equity account?

4    A.  Yes.

5    Q.  And you paid certain vendors when there's a contract

6    between the board and that vendor, right?

7    A.  Correct.

8    Q.  In those instances, was there an invoice?

9    A.  Yes.

10   Q.  Was an invoice required even if there was a contract?

11   A.  At all times, yes.

12   Q.  Why was an invoice required?

13   A.  Because that was proof of what the vendor did.  And in this

14   case, the board would have had to approve any installation of

15   any agreement that they made with them.

16   Q.  Did you ever pay checks based on a contract alone?

17   A.  No.

18           MR. BHATIA:  No further questions, your Honor.

19           THE COURT:  Any recross?

20           MR. DiRUZZO:  Yes, your Honor.

21   RECROSS EXAMINATION

22   BY MR. DiRUZZO:

23   Q.  Ma'am, the vendors of 18 Mercer, they would have been privy

24   to your relationship with Crystal -- let me say this -- phrase

25   it this way:  The requirement that you had that you needed an

A-620

K1NVTEM5                         Hom - recross

1    invoice before you would issue a check on behalf of 18 Mercer,

2    that requirement was between Crystal and 18 Mercer; correct?

3    A.  No.

4    Q.  Where did that requirement come from?

5    A.  We -- Crystal Real Estate Management always has invoices.

6    Any vendors that we pay, any checks that we issue, we always

7    have an invoice.

8    Q.  So is that Crystal's rule or is that 18 Mercer's rule?

9    A.  Both.

10   Q.  So you both have the same rule?

11   A.  Yes.

12   Q.  But you would agree with me that the vendors of 18 Mercer

13   might not know about that rule; correct?

14   A.  They would if they were -- they want a check issued, yes.

15   If they wanted a check issued, we would ask them to submit

16   invoice for payment.

17   Q.  Well, ma'am, if someone from the board of 18 Mercer

18   informed an 18 Mercer vendor that an invoice was not needed,

19   you wouldn't have been able to control that, would you?

20   A.  We would need receipts of anything that was done.

21              MR. DiRUZZO:  No further questions.

22              THE COURT:  Any re-redirect?

23              MR. BHATIA:  No, your Honor.

24              THE COURT:  Ms. Hom, you may step down.  Your

25   testimony is complete.  Thank you.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-621

484

K1NVTEM5

1          (Witness excused)

2          THE COURT:  Government, call your next witness.

3          MR. BHATIA:  The government calls Joseph Soleimani.

4          (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-622

485

K1ndtem6                        Soleimani - direct

1          THE COURT:  Ladies and gentlemen, if you want to take

2     a moment and stretch your legs, this is a good moment while we

3     wait for the witness.

4          (Pause)

5     JOSEPH SOLEIMANI,

6          called as a witness by the government,

7          having been duly sworn, testified as follows:

8          THE CLERK:  Please be seated.

9          State and spell your full name for the record, please.

10         THE WITNESS:  Joseph Soleimani, J-o-s-e-p-h

11    S-o-l-e-i-m-a-n-i.

12         THE COURT:  All right.  Good afternoon, Mr. Soleimani.

13    All right.  Welcome to the court.

14         I can already tell that you have a soft voice.  That

15    won't work.  I need you to really bellow it out.  So lean into

16    the mic.  Keep your voice up so that everyone here can hear

17    you.

18         Counsel, you may inquire.

19    DIRECT EXAMINATION

20    BY MR. BHATIA:

21    Q.  Mr. Soleimani, where do you work?

22    A.  ABJ Properties.

23    Q.  And what is your title there?

24    A.  Vice president.

25    Q.  How long have you had the title of vice president?

A-623

486

K1ndtem6                        Soleimani - direct

1    A.   14 years.

2    Q.   What kind of work does ABJ Properties do?

3    A.   It is a property management company.

4    Q.   And what does it mean to be a property management company?

5    A.   We oversee operations of several properties.

6    Q.   You may have to speak up just a little bit louder.

7    A.   We oversee operations of several properties.

8    Q.   Thank you.

9            What types of properties does it manage?

10   A.   Multifamily and mixed use.

11   Q.   As a general matter, where are those buildings located?

12   A.   Northern Manhattan and Bronx.

13   Q.   And focusing on you now, as vice president, what are your

14   duties?

15   A.   I oversee building managers, the accounting, the legal, and

16   overall day-to-day operations.

17   Q.   About how many buildings does ABJ Properties manage?

18   A.   50.

19   Q.   And so do you play that role for all of those buildings?

20   A.   Yes.

21   Q.   In the finances, are you involved in budgeting?

22   A.   Yes.

23   Q.   Do you have responsibilities over writing checks?

24   A.   Yes.

25   Q.   And do you have a role in invoicing and paying expenses?

A-624

487

K1ndtem6                    Soleimani - direct

1    A.   Yes.

2    Q.   What is your role with regards to negotiating and approving

3    contracts?

4    A.   I'm authorized to approve and negotiate those contracts.

5    Q.   Are you familiar with a company called ABJ Milano LLC?

6    A.   Yes.

7    Q.   What is it?

8    A.   ABJ Milano LLC is an entity that owned several properties

9    which ABJ Properties managed.

10   Q.   Are you familiar with a term -- the name ABJ Lenox LLC?

11   A.   Yes.

12   Q.   And what is ABJ Lenox?

13   A.   ABJ Lenox also owns several properties that were managed by

14   ABJ Properties.

15   Q.   OK.  And what is the connection between -- I promise you we

16   won't keep using the long names all the time, but ABJ

17   Properties, ABJ Lenox and ABJ Milano, what is the connection

18   between the three of those?

19   A.   ABJ Properties managed the properties owned by the other

20   two entities.

21   Q.   And who are the owners of ABJ Properties?

22   A.   Myself and my brother Benjamin.

23   Q.   How do you and your brother divide day-to-day

24   responsibilities at ABJ Properties?

25   A.   He handles more of the acquisitions, dispositions.  I

K1ndtem6                    Soleimani - direct

1   handle more of the day-to-day operations.

2   Q.  If there was a contract between -- or if there is an

3   agreement between ABJ Properties and a vendor, who would enter

4   into that agreement?

5   A.  I would.

6   Q.  Changing topics now.

7           How did you first meet Mr. Teman?

8   A.  I reached out to him regarding his Sublet Spy software.

9   Q.  When did you first meet -- when did you first meet

10  Mr. Teman?

11  A.  It was late 2016, around November/December.

12  Q.  And is there a person in this courtroom today that you

13  recognize as Mr. Teman?

14  A.  Yes.

15  Q.  Can you identify him by an article of clothing?

16  A.  Sure.  He's wearing a silver tie, blue suit.

17          MR. BHATIA:  Your Honor, I would like the record --

18  with the Court's permission, I would like the record to reflect

19  that the witness has identified the defendant.

20          MR. GELFAND:  No objection.

21          THE COURT:  The record so reflects.

22  BY MR. BHATIA:

23  Q.  Is that a person you had done business with in the past?

24  A.  Yes.

25  Q.  When you first met Mr. Teman, was there a product he was

A-626

489

K1ndtem6                        Soleimani - direct

1  selling?

2  A.  Yes.

3  Q.  What was that product?

4  A.  He was selling the Sublet Spy software.

5  Q.  And what did he tell you was Sublet Spy?

6  A.  Sublet Spy was software that would catch people who were

7  using their apartment for Airbnb or other short-term sublet

8  services.

9  Q.  Did you ultimately subscribe to Sublet Spy?

10  A.  Yes.

11  Q.  When was that?

12  A.  That was soon after I met him.

13  Q.  Did there come a time when ABJ Properties purchased another

14  product from Mr. Teman?

15  A.  Yes.

16  Q.  What was that product?

17  A.  That was the GateGuard system.

18  Q.  And what did he tell you was GateGuard?

19  A.  GateGuard is an intercom and door entry system.

20  Q.  What did he tell you were the features of the device?

21  A.  People could enter a code or would be able to enter the

22  building using facial recognition.  It would also act as an

23  intercom.  Someone could ring on the intercom, it would go to

24  your phone, tablet, or your computer.

25  Q.  Did there come a time when you agreed to purchase some

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-627

490

K1ndtem6                          Soleimani - direct

1   intercom devices?

2   A.  Yes.

3   Q.  In how many properties?

4   A.  Seven.

5   Q.  If you could take a look at -- and there is a binder to

6   your left -- Government Exhibits 401 through 409.  I am just

7   going to ask you if you recognize them.

8           (Pause)

9   A.  Yes, I recognize these.

10  Q.  How do you recognize them, as a general matter?

11  A.  They're either pictures I recognize or emails that I was

12  part of.

13  Q.  And are the emails with or to or from a particular person?

14  A.  Yes.

15  Q.  Who?

16  A.  Ari Teman.

17          MR. BHATIA:  Your Honor, the government offers

18  Government Exhibits 401 through 409.

19          THE COURT:  Any objection?

20          MR. GELFAND:  May I have one minute?

21          THE COURT:  Of course.

22          (Pause)

23          MR. GELFAND:  May I confer with Mr. Bhatia for a

24  moment?

25          THE COURT:  Go ahead.

A-628

491

K1ndtem6                        Soleimani - direct

1            (Pause)

2            MR. GELFAND:  Your Honor, can we approach the sidebar

3    for a minute?

4            THE COURT:  Sure.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-629

492

K1ndtem6                          Soleimani - direct

1              (At the sidebar)

2              MR. GELFAND:  Your Honor, there is a rule of

3      completeness issue.  I don't want to get into the narrative in

4      front of the jury.  One of the emails that the government is

5      seeking to admit is an email from Mr. Teman that basically says

6      GateGuard is closing down.

7              THE COURT:  What email is it, what document?

8              MR. BHATIA:  403.

9              THE COURT:  All right.  This is document 403, and it

10     is an email from Mr. Teman to Mr. Soleimani on March 9, 2018.

11             Go ahead.  What is the issue?

12             MR. GELFAND:  There is a follow up to that email

13     immediately responding from Ben Soleimani, cc'ing Joseph

14     Soleimani and Mr. Teman, basically saying don't shut it down,

15     and we would move to admit that under the rule of completeness

16     if this is coming in.

17             THE COURT:  Is there any objection to that?

18             MR. BHATIA:  Yes, your Honor.  I don't think the out

19     of court statement of Mr. Soleimani should be able to come in

20     just because this one is.  Mr. Ben Soleimani is not likely to

21     be called as a witness.

22             THE COURT:  Let me ask you this question.  Is that

23     email from Mr. Ben Soleimani to -- it is a reply, so it will be

24     to, among others, this witness, correct?

25             MR. GELFAND:  Yes, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-630

493

K1ndtem6                    Soleimani - direct

1          THE COURT:  Why do I need to address it now?  Why

2     can't I address it on cross?

3          MR. GELFAND:  I can move it in on cross.

4          THE COURT:  Hand me a copy, and on cross I will make

5     an independent informed by the direct.  I will reserve on that.

6          MR. GELFAND:  Thank you.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-631

494

K1ndtem6                          Soleimani - direct

1            (In open court)

2            THE COURT:  I will receive Government Exhibits 401

3     through 409.

4            Counsel, you may inquire.

5            (Government's Exhibits 401 through 409 received in

6     evidence)

7            MR. BHATIA:  One moment, your Honor.

8            (Pause)

9     BY MR. BHATIA:

10    Q.  Mr. Soleimani, can you also take a look at Government

11    Exhibits 409A through 409B?

12    A.  OK.

13    Q.  Do you recognize those?

14    A.  409A appears to be invoices I received.  409B I do not

15    recognize.

16    Q.  I'm sorry?

17    A.  409B I do not recognize.

18            MR. BHATIA:  One moment, your Honor.  May I approach

19    the witness?

20            THE COURT:  You may.

21            (Pause)

22    Q.  All right.  Now, you are looking at 409B?

23    A.  Yes.

24    Q.  Do you recognize 409B?

25    A.  Yes.

A-632

495

K1ndtem6                         Soleimani – direct

1   Q.  What are the two of those documents?

2   A.  These are invoices for the GateGuard system.

3   Q.  Are those invoices that were sent to you?

4   A.  Yes.

5   Q.  And are they invoices that you paid?

6   A.  Yes.

7           MR. BHATIA:  Your Honor, the government moves to admit

8   409A and 409B.

9           THE COURT:  Any objection?

10          MR. GELFAND:  No objection.

11          THE COURT:  Those are both received.

12          (Government's Exhibits 409A and 409B received in

13  evidence)

14  BY MR. BHATIA:

15  Q.  Getting back to substance, did you end up purchasing any

16  GateGuard devices?

17  A.  Yes.

18  Q.  And did you convey that to Mr. Teman, that you wanted to

19  buy them?

20  A.  Yes.

21  Q.  How did you pay for the intercom devices?

22  A.  Via check.

23  Q.  And did you receive an invoice for those devices?

24  A.  Yes.

25  Q.  I'd like to display on the screen Government Exhibit

A-633

496

K1ndtem6                          Soleimani – direct

1    409A -- you can take a look at it -- in evidence.

2              So, 409A, is this document a set of invoices to you?

3    A.  Yes.

4    Q.  And they are made out to ABJ Properties, right?

5    A.  Correct.

6    Q.  And your name is Joseph Soleimani below that?

7    A.  Yes.

8    Q.  And it has your email address as well?

9    A.  Correct.

10   Q.  So could we look at now the items listed in this invoice.

11             In the first row it says:  Quantity one, GateGuard.xyz

12   Panel.  There is a unit price of 500, and an amount 500.

13             There is also lines for installation and monthly

14   service.

15             Did you pay this invoice in full?

16   A.  Yes.

17   Q.  Did you pay all the invoices in Government Exhibits 409A

18   and 409B?

19   A.  To my recollection, yes.

20   Q.  Did the price that you paid for your GateGuard devices

21   include service?

22   A.  Yes.

23   Q.  How much service did it include?

24   A.  Six months.

25   Q.  Did you own the intercoms when you purchased them?

K1ndtem6                     Soleimani – direct

1    A.  As far as I knew, yes.

2    Q.  At the time you believed you owned them?

3    A.  Yes.

4    Q.  And had you had conversations with Mr. Teman about

5    purchasing those devices?

6    A.  Yes.

7    Q.  You guys had a back and forth?

8    A.  Yes.

9    Q.  Did you meet in person at any time?

10   A.  Yes.

11   Q.  What conversations, if any, did you have over the phone?

12           THE COURT:  In person, is that your question?

13           MR. BHATIA:  I asked him previously about in person.

14   Now I am asking about the phone.

15           THE COURT:  Very good.

16   A.  I don't recall the details of the phone conversations.

17   Q.  Did your conversations include pricing?

18   A.  Yes.

19   Q.  Did they include what you would pay for the device?

20   A.  Yes.

21   Q.  During those conversation, what, if anything, did Mr. Teman

22   tell you about whether he would have the authority to draw

23   checks on behalf of ABJ Properties?

24   A.  That was never mentioned.

25   Q.  What, if anything, did he say during those conversations --

K1ndtem6                          Soleimani - direct

1   let me be more specific.

2          When you were talking to him about buying these first

3   devices, what, if anything, did Mr. Teman tell you about

4   whether you would be committed to a ten-year contract?

5   A.   There was no discussion about any kind of contract.

6   Q.   And during these same conversations -- and I am going to

7   make it specific to those conversations -- what, if anything,

8   did he tell you about his authority to write checks on behalf

9   of ABJ Properties?

10  A.   He never mentioned anything of that sort.

11  Q.   At the time you purchased the intercoms, the ones listed in

12  Government Exhibits 409A and 409B -- let me rephrase that.

13         After you paid the invoices for 409A and 409B, did

14  Mr. Teman tell you that you had not paid in full?

15  A.   At some very later point, yeah.

16  Q.   But right after you paid it, you didn't hear anything from

17  him about that?

18  A.   No.

19  Q.   At the time you -- prior to paying for these intercoms, had

20  Mr. Teman ever told you anything about paying a fee if you

21  wanted to stop using the devices?

22  A.   No.

23  Q.   Did he mention anything to you about a device removal fee?

24  A.   No.

25  Q.   Could you take another look at 409A?

A-636

K1ndtem6                         Soleimani - direct

1    A.  Sure.

2    Q.  What is the date on this invoice?

3    A.  March 2nd, 2017.

4    Q.  OK.  I would like to direct your attention to Government

5    Exhibit 401.

6          MR. BHATIA:  If we can zoom in on just the top, the

7    subject, the attachment line.

8    Q.  Is this an email from Ari Teman to you and your brother,

9    Benjamin?

10   A.  Yes.

11   Q.  And the date on this email is September 25, 2017?

12   A.  Correct.

13   Q.  He writes -- the subject line is, "We're live."  What does

14   that mean to you?

15   A.  That means that the first system was installed.

16   Q.  This is September 2017?

17   A.  Yes.

18   Q.  Let's talk about the intercoms that were installed.

19          How did they perform?

20   A.  They did not perform well.

21   Q.  What issues did you have with the intercoms?

22   A.  The system would very often shut down and have to restart.

23   The facial recognition wouldn't work.  The intercom wouldn't

24   work.  And that was pretty much the major issues.

25   Q.  Did you receive complaints from tenants?

A-637

500

K1ndtem6                    Soleimani - direct

1    A.  Yes.

2    Q.  And what was the gist of those -- what was the substance of

3    those complaints?

4              MR. GELFAND:  Objection, your Honor.

5              THE COURT:  Counsel.

6              MR. BHATIA:  Your Honor, I believe they are admissible

7    not for the truth of the matter asserted.

8              THE COURT:  For what separate purpose are they

9    admissible?

10             MR. BHATIA:  For the intent on the witness here.

11             THE COURT:  All right.  I will receive the -- ladies

12   and gentlemen, the witness is about to relate conversations he

13   had with tenants about the intercoms.  I'm admitting the

14   statements by the tenants to the witness solely to explain the

15   witness' understanding and state of mind and his later

16   behavior, but you shouldn't take as necessarily true or not

17   true what the tenants said.  They are not here to testify.  So

18   it is, as we say in the law, hearsay.  You can consider what

19   the tenants said solely as it further reflects on the witness'

20   understanding and state of mind and his later actions.

21             Go ahead.

22   BY MR. BHATIA:

23   Q.  What did the tenants tell you about the GateGuard -- about

24   the issues with the GateGuard device?

25   A.  They were say8ing that they oftentimes were locked out of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-638

K1ndtem6                         Soleimani - direct

1   the building because they couldn't get in.  There was no way to

2   get in without using the system, the GateGuard system.

3   Oftentimes, they couldn't get packages because the intercom

4   wasn't working.  These were not doorman buildings, there is no

5   package room, so they had no way to get those packages if the

6   intercom was not working.

7   Q.  And did you observe any problems with the intercom

8   yourself?

9   A.  Yes.

10  Q.  What problems did you observe yourself?

11  A.  I observed similar problems.

12  Q.  And did there come a time when you relayed those concerns

13  to Mr. Teman?

14  A.  Yes.

15  Q.  What did he say?

16  A.  Oftentimes he would blame it on either the Internet not

17  working, the power not strong enough, or simply me or the

18  tenants did not know how to use it.

19  Q.  When you received complaints from tenants, is that a

20  problem for you as somebody who manages those buildings?

21  A.  Yes.

22  Q.  Can it result in regulatory issues?

23  A.  Yes.

24  Q.  And have you dealt with problems in the past -- have you

25  sort of had to deal with tenant issues in the past?

K1ndtem6                          Soleimani - direct

1   A.   Yes.

2   Q.   In 2018, did the housing court find in one case that your

3   company had misled a tenant about whether he could renew his

4   lease?

5   A.   Yes.

6   Q.   And did you misrepresent anything to the tenant or was it

7   others in your company?

8   A.   It was others.

9   Q.   And did you and ABJ resolve that matter?

10  A.   Yes.

11  Q.   And did that have anything to do with GateGuard or

12  Mr. Teman?

13  A.   No.

14  Q.   OK.  But regarding GateGuard, you did receive complaints

15  from tenants?

16  A.   Yes.

17  Q.   And you relayed those to Mr. Teman?

18  A.   Yes.

19  Q.   Did there come a time when Mr. Teman told you that he was

20  shutting down GateGuard?

21  A.   Yes.

22  Q.   Did he tell you that in text messages?

23  A.   He said it several times I believe by email and text

24  message.

25  Q.   He said it more than once?

A-640

503

K1ndtem6                    Soleimani – direct

1    A.  Yes.

2            MR. BHATIA:  Mr. Magliocco, could you please publish

3    for the witness Government Exhibit 403.

4    Q.  Mr. Soleimani, you may want to follow along on the screen

5    so that we can all be sure that we are looking at the same

6    thing.  If you are having trouble seeing it, though, you can

7    look at the binder.

8            At the top of this email, it shows that it is -- if

9    you can zoom in a little bit on just the header -- it shows

10   that it's an email from Mr. Teman to you and your brother,

11   right?

12   A.  Yes.

13   Q.  And it is dated March 2018?

14   A.  Yes.

15   Q.  Was Mr. Teman telling you that he was shutting down his

16   system?

17   A.  Yes.

18   Q.  And why was that significant to you as somebody who had his

19   devices installed in your buildings?

20   A.  Because it would mean that the tenants would be locked out

21   permanently until the system is changed.

22   Q.  Did you -- what did you tell Mr. Teman when he said he was

23   shutting down GateGuard?

24   A.  I tried to convince him not to shut down.

25   Q.  Did you try to reassure him?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-641

504

K1ndtem6                     Soleimani - direct

1    A.  I guess you could say that.

2    Q.  At that point, how would you describe your relationship

3    with Mr. Teman?

4    A.  It was OK.  There were a lot of issues that we were still

5    dealing with on the system, but we were trying to maintain that

6    relationship.

7    Q.  Would you describe it as otherwise friendly?

8    A.  Yes.

9    Q.  Did you or your brother make comments to Mr. Teman to ask

10   him to keep the GateGuard devices in place?

11   A.  Yes.

12   Q.  What effect would it have on a building if GateGuard shut

13   down unexpectedly?

14   A.  We would be getting a lot of complaints.  We would be

15   issued housing violations, possible fines.

16   Q.  Did there come a time when GateGuard was installed in your

17   buildings when you saw something called the Terms & Conditions

18   on a website?

19   A.  No.

20   Q.  Did there come a time when through a WhatsApp message

21   Mr. Teman directed you to the terms Web page?

22   A.  Yes.

23   Q.  Could you take a look at Government Exhibit 409C.  I'm

24   going to ask you if you recognize it.

25           (Pause)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-642

505

K1ndtem6                    Soleimani - direct

1    A.  I don't have a 409C.

2    Q.  Mr. Magliocco will bring one up for you.

3            THE COURT:  Sorry.  Is 409C in evidence?

4            MR. BHATIA:  It is not in evidence, your Honor.

5            THE COURT:  Let's get it up.  Thank you.

6            (Pause)

7    Q.  Do you recognize this?

8    A.  Yes.

9    Q.  As a general matter, what is this document?

10   A.  This is a WhatsApp chat between me and Ari Teman.

11           MR. BHATIA:  Your Honor, the government offers

12   Government Exhibit 409C.

13           THE COURT:  Any objection?

14           MR. GELFAND:  No, you Honor.

15           THE COURT:  It is received.

16           (Government's Exhibit 409C received in evidence)

17           MR. BHATIA:  You can pull this up on the screen.

18   BY MR. BHATIA:

19   Q.  I'm going to direct your attention to the line starting --

20   the third line from the top, it says:  "Joe S. This is

21   happening way too often."

22           Mr. Teman said, "It's restarting."

23           And you responded, "That's not good enough for me.  I

24   can't have tenants/visitors waiting for the system to restart.

25   it either works or it doesn't."

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-643

506

K1ndtem6                    Soleimani - direct

1          What were you relaying to Mr. Teman here?

2    A.  That we were getting complaints still that the system was

3    not functioning properly and we needed it to work 24/7, not

4    only part of the time.

5    Q.  OK.  Further down on this page, at 9:45:20, Mr. Teman says:

6    "The actual terms our clients are responsible to have CAT5 at

7    the door.  We did it for you but it's not the terms."

8          Then you respond:  "Send me the terms I signed for.  I

9    will review it."

10          Two rows down, Mr. Teman sends you a URL.

11          Why did you say, "Send me the terms I signed for, I

12    will review it"?

13    A.  Because I knew I never signed any kind of terms.

14    Q.  You have not had any agreement with Mr. Teman other than to

15    buy the devices and for him to install them?

16    A.  Correct.

17    Q.  And did you go to the URL shown here on this page?

18    A.  At a later point.

19    Q.  So looking down on the screen for a moment, further in this

20    chat, you say, "I don't see a signature there."

21          And then you list some things that you had agreed to.

22          You say, "I also agreed to a May 1st guarantee.  I

23    also agreed to tablets.  Should we keep going?"

24          What were you relaying to Mr. Teman here?

25    A.  Originally the intercom was supposed to be installed by

A-644

507

K1ndtem6                    Soleimani - direct

1  May 1st, and I paid for tablets to put in individual apartments

2  in full, which I believe is around $8,000, which never arrived.

3  Q.  At this point, had you agreed to any terms and conditions

4  with Mr. Teman?

5  A.  No.

6  Q.  So you talked a little bit earlier about your problems with

7  the GateGuard device.  Did there ever come a time when you

8  started looking for other alternatives?

9  A.  Yes.

10  Q.  What did you do?

11  A.  Sorry?

12  Q.  What did you do to look for other alternatives to

13  GateGuard?

14  A.  I looked into other systems.

15  Q.  And did there come a time when you installed one of those

16  alternatives in your building?

17  A.  Yes.

18  Q.  What happened?

19  A.  We installed a device in a different building, where my

20  office was located, so that we could test it out ourself on a

21  daily basis and make sure we didn't have similar problems

22  should we choose to replace these systems.

23  Q.  Did there come a time when Mr. Teman learned about the

24  device you had installed that was not a GateGuard intercom?

25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-645

508

K1ndtem6                          Soleimani – direct

1    Q.  How did he react?

2    A.  He was not happy about it.

3    Q.  What, if anything, did he say to you?

4    A.  I believe I received some threats to remove the system.  He

5    sent someone to take a picture of it.  And he told us we had to

6    take it off.

7         MR. BHATIA:  I would like to publish for the witness

8    Government Exhibit 404.  We can zoom in on the text part of

9    this document.

10        I will give the jury just a moment to read it.

11        (Pause)

12   Q.  The first line of this document is:  "Because you're a

13   dishonest snake, a fraud, and a thief, all communication will

14   be in writing."

15        What was Mr. Teman referring to?  Why was Mr. --

16        MR. GELFAND:  Objection.

17        THE COURT:  Sustained.

18   Q.  Did something happen prior to this email that could have

19   prompted Mr. Teman to write this to you?

20        THE COURT:  Did something happen prior to this email

21   is the question?

22   Q.  Did something happen prior to this email?

23   A.  Yes.

24   Q.  What happened?

25   A.  I installed a different device in a different building.

A-646

509

K1ndtem6                    Soleimani - direct

1    Q.  Was there any contract that limited your ability to install

2    a different device in one of your buildings?

3    A.  No.

4    Q.  In your conversations with Mr. Teman around this time, did

5    he say anything about why he thought you should not have

6    installed that device?

7    A.  Not that I recall.

8    Q.  Did he say anything about an agreement that you had with

9    him to not install devices?

10            MR. GELFAND:  Your Honor, I object to this line of

11   questioning as leading.

12            THE COURT:  Sustained.

13   BY MR. BHATIA:

14   Q.  Did there come a time when Mr. Teman said that you owed him

15   money?

16   A.  Yes.

17            MR. BHATIA:  Your Honor, I would like to publish for

18   the witness Government Exhibit 405.

19            THE COURT:  You may.

20            MR. BHATIA:  And I'll direct your attention to an

21   email, the email at the bottom of the first page.

22            THE COURT:  You will need to blow this up.  It is

23   tiny.

24            MR. BHATIA:  The middle and bottom, I should say.

25            (Pause)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1ndtem6                    Soleimani - direct

1   Q.  There is a lot of text here so I will direct your attention

2   to a part of it.

3         At the end of the first paragraph, Mr. Teman says to

4   you:  "The amount we sent to collections last week is 268,116,"

5   and then he lists an amount per device.

6         Had you agreed to pay that amount to Mr. Teman?

7   A.  No.

8   Q.  In fact, how much had you agreed to pay Mr. Teman per

9   device?

10  A.  $1,743.

11  Q.  And that was the amount reflected on those invoices we

12  looked at earlier?

13  A.  Yes.

14  Q.  Had you ever agreed to pay Mr. Teman more than the value of

15  those invoices?

16  A.  No.

17  Q.  The second-to-last line of this email is:  "Now, decide if

18  you want to fight me or pay" me -- excuse me.

19         "Now, decide if you want to fight me or pay, but if

20  you fight, you will pay more."  how did you interpret that?

21  A.  I interpreted that as he was going to sue us.

22  Q.  Is that something that he had said on more than one

23  occasion or just once?

24  A.  Yes, he said that multiple times.

25  Q.  Did he say that to you in text messages or emails, or how

A-648

511

K1ndtem6                          Soleimani - direct

1   did he say it?

2   A.  I believe both.

3   Q.  I would like to direct your attention now to the email at

4   the top of this page.

5           This is your response to him.  And the first sentence

6   is:  "can you please send me the invoices which you are

7   claiming we owe you?"

8           THE COURT:  Can you just blow up the text a little

9   more for the benefit of our jury?

10          (Pause)

11          You can do the entire first email.  Even as blown up,

12  it starts so small that it is hard for them to read on those

13  monitors.  Thank you.

14          (Pause)

15          MR. BHATIA:  I will read again the first -- now I will

16  read the second sentence, too.

17          "Can you please send me the invoices which you are

18  claiming we owe you?  Not sure why we owe you money but I'm

19  glad to look into it."

20  Q.  Why were you asking Mr. Teman to send you invoices?

21  A.  I wanted to see what he was claiming.

22  Q.  Did you know why he was asking you to pay more than

23  $200,000?

24  A.  No, I have no idea.

25  Q.  Had you ever agreed to pay him that amount of money?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1ndtem6                          Soleimani - direct

1    A.  No.

2    Q.  I would like to direct your attention to Government Exhibit

3    406, and there is an email on the top of the first page.

4           At the very top of this email, we can keep this part

5    blown up, but it is from Ari Teman to Eric Schutzer, Ben

6    Soleimani, and it looks like Joe, Joe Soleimani's email.

7           Now, in the text of this email, the first line is

8    Mr. Teman saying:  "Let's get the liens on ABJ buildings by

9    Wednesday."

10          How did you interpret that?

11   A.  I interpreted that as he was going to put liens on several

12   properties.

13   Q.  Several of your properties?

14   A.  Yes.

15   Q.  He mentioned in this second line, "They've now stolen from

16   Sublet Spy over $12,000."

17          Did he tell you anything more about that?

18   A.  Not that I recall.

19   Q.  Had you ever agreed to pay Sublet Spy $12,000?

20   A.  Yes.

21   Q.  Further down this page, he says, "Let's go ahead with the

22   District Attorney's Office on Monday regarding the criminal

23   fraud charges.  Their fraud is now nearing half a million

24   dollars."

25          As far as you know, did he ever report you to the

A-650

513

K1ndtem6                         Soleimani - direct

1    District Attorney's Office?

2    A.  Not that I know of.

3    Q.  Did you receive other messages that you would -- in which

4    Mr. Teman threatened you with legal action?

5    A.  Yes.

6    Q.  What was the substance of those communications?

7    A.  There were liens he was going to file.  He was going to

8    report --

9          MR. GELFAND:  Your Honor, I would object to just the

10   general narrative of the substance of a bunch of ambiguous

11   communications.  If he wants to ask about specific

12   communications, that's fine.

13         THE COURT:  Overruled.

14         You may answer.

15   A.  He said he was going to report us to the Mayor's Office,

16   report us to the Attorney General's Office.  I believe those

17   were the extent.

18   Q.  He mentioned -- did he mention putting liens on any

19   buildings?

20   A.  Yes.

21         MR. GELFAND:  Objection.  Asked and answered, your

22   Honor.

23         THE COURT:  Overruled.

24   Q.  And did he in fact put liens on any of your buildings?

25   A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-651

514

K1ndtem6                          Soleimani - direct

1    Q.   Which ones?

2    A.   342, 346 Lenox Avenue, and 100 West 138th Street.

3    Q.   And what happened with those liens, as far as you know?

4    A.   As far as I know, they're no longer in existence.

5             THE COURT:  Speak louder, please.

6    A.   They are no longer in existence as far as I know.

7    Q.   I know you are not a lawyer, but can you tell us anything

8    more about those?

9    A.   Yes.  From what I understand --

10            MR. GELFAND:  Objection, your Honor.

11            THE COURT:  Sustained.  He is in the process of

12   reporting hearsay.

13            Next question.

14   BY MR. BHATIA:

15   Q.   This message is from August 2018.  Can you describe your

16   relationship with Mr. Teman in the second half of 2018?

17   A.   It was not good at that point.

18   Q.   Can you elaborate?

19   A.   Yeah.  We removed all the systems.  We replaced them with

20   another system, a competitor.  And our relationship was

21   completely sour.

22   Q.   Were you communicating regularly with him?

23   A.   No.

24            THE COURT:  Mr. Bhatia, is this a good stopping point?

25   I am looking for a good one to break for the day.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-652

515

K1ndtem6

1          MR. BHATIA:  It is.

2          THE COURT:  All right.  Ladies and gentlemen, it is a

3     few minutes before 5.  We've made a lot of progress today, and

4     I think it is a good time for a break.  So I'm going to wish

5     you well and wish you a very good, safe trip home and a good

6     evening tonight.

7          The same schedule for tomorrow.  We'll have breakfast

8     for you at 8:45.  I'll need you in your seats and ready in

9     there so I can bring you out at 9:30 so we can get going

10    tomorrow.  The attorneys tell me we are making good time, and

11    that should be apparent to all.  They are working very hard.

12         I wish you a good evening.  I'll see you tomorrow.

13         THE CLERK:  All rise.

14         (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

A-653

K1ndtem6

1          (Jury not present)

2          THE COURT:  Mr. Smallman, would you close the door.

3          All right.  The witness may step down and step out.  I

4    have a few questions for counsel outside the witness' presence.

5          Witness, you should stick around so that counsel can

6    tell you where to be, including tomorrow morning.

7          (Witness not present )

8          THE COURT:  All right.  Counsel, just -- we obviously

9    made a lot of progress today, although we didn't quite carry

10   through on the promise to, or the hope of finishing today.

11   Without holding you to it -- I know this is an important

12   witness -- approximately how much longer is there in the

13   direct?

14         MR. BHATIA:  I would say around 20 to 30 minutes.

15         THE COURT:  Very good.  How many other government

16   witnesses at this point do you anticipate?

17         MR. BHATIA:  At this point I think there might only be

18   one more witness after this.

19         THE COURT:  Is that Ms. Monzon?

20         MR. BHATIA:  No.  That is John Motto from Signature

21   Bank.

22         THE COURT:  Ah, OK.  All right.  No other --

23         MR. BHATIA:  Obviously, we have to go back and think

24   about it, but I think there should be one or two witnesses.

25         THE COURT:  Again, barring an unexpected development

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-654

517

K1ndtem6

1   and even budgeting a fair amount of time for cross of this

2   witness and the next witness, there is every likelihood that

3   the government will rest before the middle of the day tomorrow?

4           MR. BHATIA:  That is I think a fair expectation.

5           THE COURT:  If not conservative?

6           MR. BHATIA:  Obviously, we will go back and sort of

7   think about it --

8           THE COURT:  Right.  I'm not telling you what to do or

9   not do.  I am just trying to get a sense of where we stand.

10          May I ask you, on Exhibit 406 there is a redaction, or

11  an apparent redaction after the word "Joe."

12          MR. BHATIA:  We redacted his email address at an

13  earlier stage of this proceeding, and I think we gave the

14  government stamp for that exhibit.  We can --

15          THE COURT:  I ask only because it is attention

16  getting.  The natural question that arose for me is whether

17  there is an expletive or something like that there.  But given

18  that everyone else's email address is all over the documents,

19  it seemed that's not clear what the point of that is.

20          Be that as it may, you may want to unredact it and

21  receive it in unredacted form, or at least elicit what is

22  underneath it, just because it creates a natural question.

23  Nothing else has been redacted, as I understand it, in the

24  entire case.

25          MR. BHATIA:  You are right, your Honor.  When we leave

A-655

518

K1ndtem6

1   the court, we will --

2           THE COURT:  You will have leave to do that, OK.

3           All right.  Defense, anything to -- government,

4   anything to raise before we adjourn?

5           Do you have anything to raise with me before we

6   adjourn?

7           MR. BHATIA:  We do, your Honor.  One thing -- we would

8   like -- since we might be resting tomorrow morning, we would

9   like to ask for the defense's witnesses or at least the ones

10  they expect to call tomorrow.

11          THE COURT:  Well, the defense of course has no

12  obligation to call witness -- you may be seated -- but defense

13  counsel, the point is well taken.  In the event that the

14  government rests tomorrow, as seems likely, if this follows a

15  form in many criminal cases, there will be a brief motion from

16  the defense and whatever limited adjournment is needed for me

17  to hear that.  Following that, assuming the motion is not

18  granted or granted in full, we would move on to the defense

19  case.

20          I think it's fair, without asking you to commit what

21  you presently anticipate, understanding that you have a range

22  of motion here and you are not bound by what you say.

23          MR. GELFAND:  We anticipate, as we've told government

24  counsel, calling Ariel Reinitz as a witness.  We have a handful

25  of other witnesses under subpoena that depending on the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1ndtem6

1    testimony that we hear between now and the rest of the case

2    will determine whether we call them.  Those witnesses would be

3    two-minute witnesses.

4              THE COURT:  They are all, I take it, in New York?

5              MR. GELFAND:  Yes, your Honor.

6              THE COURT:  All right.  Have you alerted the

7    government to who they are?

8              MR. GELFAND:  There is an NYPD detective whose name is

9    escaping me.  I assume we could issue a subpoena to him and to

10   Detective Alessandrino.  The only reason we would call him is

11   if Mr. Soleimani denies making a statement to him, as reflected

12   in the police report.

13             THE COURT:  What is the statement?

14             MR. GELFAND:  He claimed that $180,000 was

15   unauthorized in terms of the checks at issue.

16             THE COURT:  How many checks, defense counsel, were in

17   fact drawn on the Soleimani or the ABJ, if that is the right

18   way to put it, accounts that are at issue in March and April of

19   2019?

20             MR. GELFAND:  JPMorganChase credited their account

21   $196,000.

22             THE COURT:  And so you are concerned that the witness

23   will not acknowledge making a statement to law enforcement that

24   180,000 was unauthorized?

25             MR. GELFAND:  Yes, your Honor.  To be clear, I am not

A-657

520

K1ndtem6

1    saying that -- I have no idea -- in the event that he flat out

2    denies making that statement to the law enforcement officer --

3              THE COURT:  Right.

4              MR. GELFAND:  -- I think we would be entitled to call

5    the law enforcement officer.

6              THE COURT:  Solely taking skepticism, just confusion

7    as to what the purpose is.  In other words, I'm assuming that

8    the witness, consistent with what I have been able to divine so

9    far from his examination, will dispute that he ever authorized

10   any of the 2019 checks that were drawn on ABJ.  You are telling

11   me those add up to about 190.  The witness apparently told law

12   enforcement that the 180 is unauthorized.

13             Is your point that he is implicitly acknowledging the

14   $10,000 is authorized?  I am trying to understand what the

15   purpose is of that.  It sounds like he is making, in effect, a

16   statement that is consistent with his testimony here, to wit, I

17   didn't authorize that.

18             MR. GELFAND:  Your Honor, I think that is a jury

19   question, yes, your Honor, but it is inconsistent with what the

20   government is alleging is unauthorized.

21             THE COURT:  Because the witness is underballing it by

22   $10,000 and therefore is tacitly admitting that at least 10,000

23   of the 190 or so was authorized; is that the purpose?

24             MR. GELFAND:  Yes, your Honor.  I'm not exactly clear

25   on the math, but I could represent that there is a disparity in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-658

521

K1ndtem6

1    the math.

2              THE COURT:  But that is the point.  The relevance lies

3    in the delta between the total of the checks and the witness'

4    statement.

5              MR. GELFAND:  Yes, your Honor.

6              THE COURT:  We'll take that up as it comes.

7              What about Alessandrino, where does he fit in?

8              MR. GELFAND:  Well, the government represented to us,

9    unless that's changed, that they intended to call Detective

10   Alessandrino.

11             THE COURT:  So far that is not in the tentative order.

12   Maybe it will happen.  But I thought you were reserving the

13   right to call him, and I am trying to understand what that is

14   for.  Maybe not.  I thought you were saying he was a defense

15   witness.

16             MR. GELFAND:  It would be a different statement.

17   Detective Alessandrino also interviewed Mr. Soleimani.

18   Mr. Soleimani made statements to Detective Alessandrino.  In

19   particular, Mr. Soleimani represented that his company ended

20   all business with Mr. Teman in October of 2017, and said that

21   no checks were authorized after October of 2017.

22             THE COURT:  All right.  Look, I'm not going to rule

23   about a hypothetical.  It should go without saying that to the

24   extent that a line of inquiry like this might be authorized,

25   you would need to squarely confront the witness with the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-659

522

K1ndtem6

1    contrary proposition and we'll see where we go.  I will leave

2    it at that.  OK.

3          But, in other words, we're looking at Reinitz for sure

4    and then a possibility of one or two law enforcement witnesses,

5    putting aside the possibility of Mr. Teman's testimony?

6          MR. GELFAND:  Yes, based on where we presently stand.

7          THE COURT:  OK.  I ask only that you keep government

8    counsel apprised of your intentions, without locking you in.

9    And the only reason is that otherwise we have at least some

10   possibility of, you know, a lapse of time enabling counsel to

11   prepare.  Much as you had quite substantial notice of who

12   they're calling, I want to make sure that, you know, the

13   truth-seeking process is respected and there is at least some

14   degree of notice here.

15         MR. GELFAND:  Yes.  The one thing I should say is

16   that -- I apologize, I had assumed, albeit I guess incorrectly,

17   that because Detective Morales is an NYPD colleague of

18   Detective Alessandrino, that our subpoena to Detective Morales

19   was known to the government.  Apparently it wasn't.

20         THE COURT:  So it is a large organization.  I don't

21   know why --

22         MR. GELFAND:  I appreciate that, but certainly that

23   would be the limited scope of his testimony.  So there is no,

24   you know --

25         THE COURT:  All right.  They are now on notice.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-660

523

K1ndtem6

1        OK.  Be sure that you have the searching conversation

2    you need to with your client about it being his right, as

3    opposed to counsel's, whether or not to testify.  In the event

4    that Mr. Teman doesn't testify, chooses not to, I will need to

5    allocute him outside the presence of the jury to confirm that

6    he understands that that is his right and that he has made a

7    thoughtful decision about that.  Obviously, he may choose the

8    opposite course and testify, but I want to make sure that there

9    is no doubt that Mr. Teman understands that that in our system

10   is his call.

11       MR. GELFAND:  Absolutely.  We certainly explained that

12   to Mr. Teman.  We will continue to have that discussion.

13       THE COURT:  All right.  So just playing out the

14   schedule for tomorrow, we're going to get almost certainly to

15   the defense case.  It is unclear whether we will get through

16   the defense case.  Without holding you to it, assuming that

17   Mr. Reinitz testifies, purely ballparking in terms of

18   approximate length, what length witness would you envision him

19   to be on direct?

20       MR. GELFAND:  I think the direct examination would be

21   somewhere in the vicinity of an hour.

22       THE COURT:  OK.  That's about what I would have

23   expected.  That is helpful to know and that is useful, I'm

24   sure, for the government in its preparations.  So I guess the

25   open question then is how far we could possibly get if we

A-661

524

K1ndtem6

1    possibly end the defense case tomorrow.  And I assume the

2    question on all your minds is would we go any farther than

3    that.  And I think the government will obviously have an

4    opportunity to have a rebuttal case, so you ought to be

5    prepared for that, if that's the direction things are going and

6    I don't know what you have been thinking about.  But if the

7    question is is there any scenario in which we would get to jury

8    arguments, it is unimaginable that we would.  And I certainly

9    want you to feel comfortable knowing that we are not going to

10   do that.

11         We obviously need to have a charge conference in

12   between.  My staff and I will be taking a look at the charge

13   overnight.  And my best guess is that it is more likely we

14   would do that on -- assuming the defense case was to end and

15   there was to be no rebuttal case, or a short one, either way,

16   that would wrap up on Friday.  More likely than not, we would

17   do that early on Monday morning, but it's not out of the

18   question we'll do it tomorrow.  We'll see.  My best guess is I

19   want to take some time.

20         Given how fast we are moving, I think it is all the

21   more important that I get the government's advice of counsel

22   instruction and that I get your -- defense, you have given me

23   your unanimity instruction.  I assume that is unchanged.

24   Government, I need some language from you.  I assume that is a

25   sentence or two, but I need to make sure we get that.  But I

A-662

525

K1ndtem6

1     really would like a proposed, ideally jointly, verdict form,

2     but now that we're into the third customer narrative, it's

3     clear to me that each customer narrative is its own story and

4     they don't necessarily travel up or down together.  In any

5     event, I think there is likely value -- although I will be glad

6     to hear from you at the time of the charge conference -- there

7     is likely value in a verdict form that reinforces the unanimity

8     instruction by asking for customer-specific findings.  I am

9     keeping an open mind, but at a minimum, on the assumption that

10    I went that route, I will want your guidance to me as to what a

11    verdict form would look like.

12            MR. BHATIA:  Your Honor.

13            THE COURT:  Yes.

14            MR. BHATIA:  On this topic, Mr. Imperatore and I have

15    conferred within our office with people who have handled this,

16    including Mr. Blais, who was here earlier.  It is our sense

17    that a unanimity instruction may not be required.  On the bank

18    fraud counts, the victim here is Bank of America, and as a

19    result we don't think that there needs to be a special --

20    either a unanimity instruction --

21            THE COURT:  You are telling me that if the jurors do

22    not agree unanimously on any single check, the defendant can be

23    convicted?

24            MR. BHATIA:  I think they have to believe that the

25    victim here, Bank of America, was defrauded, but I'm not sure

526

K1ndtem6

1   they have to agree on a single check as the subject.

2          THE COURT:  Why don't you get me a legal memo on that

3   overnight, because it would surprise me if that were the case.

4   And it would seem to me to be inviting an appellate issue, if

5   the case comes out the way you want, to not have some form of

6   unanimity instruction here.  It's hard for me to imagine a

7   scenario here in which within each customer relationship the

8   jury splits the baby as to particular checks.  It is likely

9   that each set of customer checks travels up or down together.

10         I'm not sure what the value is here, though, of an

11  instruction that would permit the jury hypothetically to

12  convict if, you know, four of them believe that JPMorgan was --

13  or that Bank of America, rather, was defrauded with respect to

14  ABJ and four believe that they were defrauded with respect to

15  Gabay and four believe they were defrauded with respect to

16  Soon-Osberger.

17         Maybe you are technically right.  I am skeptical of

18  that.  I'm not sure that the government really has any interest

19  other than some arid academic technical one in pursuing that

20  argument.  I can't imagine why you wouldn't want an instruction

21  that requires them to convict to -- at least be unanimous on at

22  least a check or a customer relationship.  We'll see.  But I

23  would be very surprised if you put it that way to your

24  department chiefs if anybody thinks that is a rational way to

25  go.

527

K1ndtem6

```
 1          MR. BHATIA:  We will of course confer with them.  We
 2   will do that more.  We did.  And I just didn't want the Court
 3   to be surprised.  We will put in a letter, but we understand.
 4          THE COURT:  I'm urging that a degree of common sense
 5   break out here.  I don't know why -- it's hard for me to
 6   imagine that a unanimity instruction, at least at the level at
 7   which I am envisioning it, doesn't at least guard against some
 8   degree of legal risk, and I can't imagine what the practical
 9   harm would be under the fact patten here.  It is just hard for
10   me to see why you would sail into that where you would at that
11   point have to be arguing harmless error.  I don't understand
12   that.
13          MR. BHATIA:  Understood.
14          THE COURT:  And the defense has been, you know,
15   rightly -- I mean, has been early in identifying to you a
16   unanimity instruction that is wise here.
17          All right.  I will see you all at 9 o'clock tomorrow.
18   Thank you.
19          MR. BHATIA:  Your Honor, there is one more thing.
20          We had requested Rule 26.2 materials on several
21   occasions.  The defense has identified a few 26.2 materials
22   they have produced.  We just want to get --
23          THE COURT:  What do you mean by "26.2 materials"?
24          MR. BHATIA:  That is written statements of the
25   witnesses that they intend to call.
```

528

K1ndtem6

1           THE COURT:  Jencks Act?

2           MR. BHATIA:  Yes.

3           THE COURT:  Reverse Jencks.  Right.

4           Defense, when are you going to produce that?

5           MR. GELFAND:  We have produced it.  With respect to

6   the two NYPD detectives, that's government discovery.

7           THE COURT:  Right.  But with respect to Reinitz --

8           MR. GELFAND:  With respect to Mr. Reinitz, we have

9   produced early letters.  We have also given the Court a copy of

10  it.

11          THE COURT:  But is that a comprehensive production of

12  your 3500 material as exists as of now?

13          MR. GELFAND:  Yes, your Honor.

14          Just for the record, we produced recordings that

15  Mr. Reinitz had with Bank of America which would fall within

16  that reverse Jencks.

17          THE COURT:  Do you have -- look, I mean, to the extent

18  counsel took notes of witness interviews, as the government

19  took notes of its witness interviews, have those all been

20  produced as to Reinitz?

21          MR. GELFAND:  Our own notes have been not.  I will go

22  back and check to see --

23          THE COURT:  Have been produced or have not been

24  produced?

25          MR. GELFAND:  Have not been produced, your Honor.

A-666

529

K1ndtem6

1           THE COURT:  Do they exist?

2           MR. GELFAND:  I don't know.  I have to go back and

3   check.

4           THE COURT:  Sorry.  Counsel, you are an officer of the

5   court.  Have you interviewed Reinitz?

6           MR. GELFAND:  Your Honor, we have interviewed Reinitz.

7           THE COURT:  Did you take notes?

8           MR. GELFAND:  I'm sure we took notes, your Honor.

9           THE COURT:  I'm sure you did.  Then the answer is

10  you've got --

11          MR. GELFAND:  I'm not saying I'm not identifying off

12  the top of my head right now specific -- it is not that we are

13  holding back.

14          THE COURT:  I understand that.  But if you took notes

15  that qualify as 3500 material when interviewing Reinitz, much

16  as the government took notes that qualify as 3500 material when

17  interviewing Gabay, refers Jencks applies.  And so, you know,

18  be prepared to produce it.  And if you hold it back, you know,

19  the last minute, there may be a need for some delay to enable

20  the government to absorb it.

21          MR. GELFAND:  Yes, your Honor.

22          THE COURT:  It is disquieting in particular because of

23  the background here, where, you know, there was no reference in

24  otherwise comprehensive instructions to an advice of counsel

25  instruction.  I continue to regard that as a -- you called it

A-667

530

K1ndtem6

1    an academic decision, I call it gamesmanship. To be sure, the

2    government should have spotted this one, too, but in the end it

3    was on you to include that if you thought it was a possible

4    here. And I am not going to be happy to find that the reverse

5    Jencks is untimely produced or late produced, more to the

6    point, requiring an adjournment and, you know, so that the

7    government can absorb it.

8         MR. GELFAND: Your Honor, what I can represent is that

9    in assembling the information that we provided regarding Mr.

10   Reinitz to the government, we veered on the side of including

11   things that do not fall within the category of, quote-unquote,

12   privileged communications but would fall into the category of

13   reverse Jencks for that purpose.

14        THE COURT: Very good. We have a privilege waiver as

15   it relates to Reinitz. So this is a Jencks issue at this

16   point, right? In other words, if you interviewed Reinitz, just

17   like the government interviewed Gabay, 3500 material applies

18   symmetrically, right, the obligation?

19        MR. GELFAND: Yes, your Honor, I understand. What we

20   need to do, and will do, your Honor, and will do immediately is

21   go back -- it would be the category of our notes.

22        THE COURT: Just as you've gotten notes from

23   Mr. Bhatia of his notes or perhaps the prior A.U.S.A. I'm

24   sure -- I mean, I've read the 3500 binder. You've got those

25   from the prior A.U.S.A. They have been painstaking in getting,

A-668

531

K1ndtem6

1   marking the 3500 material.  The legal obligation is reciprocal

2   upon a government demand, which Mr. Bhatia represents has been

3   made and upon your forming the intention to call the witness.

4           MR. GELFAND:  Yes.  I just want to be clear with the

5   Court that we've been very inclusive for that reason.

6           THE COURT:  So far.

7           MR. GELFAND:  Yes.

8           THE COURT:  But probably the thing that they may care

9   about most is actually counsel's notes of the witness, which is

10  almost always the 3500 material that the defense most eagerly

11  awaits from the government as to its witnesses.  I'm just

12  saying I appreciate that you've not ignored your obligations on

13  that in its entirety; you have produced some, and that's great.

14  The obligation applies to your own notes, and I'm asking you

15  not to needlessly cause us an adjournment.

16          MR. GELFAND:  We will not, your Honor.

17          THE COURT:  All right.

18          Anything further from the government?

19          MR. BHATIA:  Your Honor, we also believe that emails

20  between Mr. Reinitz and counsel could also fall under that.

21          THE COURT:  Sure.  I mean, it is just typed versus

22  handwritten.  Jencks doesn't differentiate.  Just as you had

23  all of those scheduling emails and the like that you produced

24  for your witnesses, the logic is if Jencks applies in one

25  direction, it applies in the other.  I'm sure defense counsel

A-669

532

K1ndtem6

1    knows that.

2              Anything else from the government?

3              MR. BHATIA:  Nothing else.

4              THE COURT:  Anything else from the defense?

5              MR. GELFAND:  No, your Honor.

6              THE COURT:  I will see you all at 9 o'clock.  Thank

7    you for a productive day.  I will see you tomorrow.

8              (Adjourned to 9 a.m. January 24, 2020)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-670

533

1                        INDEX OF EXAMINATION

2     Examination of:                        Page

3     KAREN FINOCCHIARO

4     Cross By Mr. Gelfand . . . . . . . . . . . . 269

5     Redirect By Mr. Bhatia . . . . . . . . . . 298

6     Recross By Mr. Gelfand . . . . . . . . . . 303

7     ELIE GABAY

8     Cross By Mr. Gelfand . . . . . . . . . . . 370

9     Redirect By Mr. Bhatia . . . . . . . . . . 412

10    BONNIE SOON-OSBERGER

11    Direct By Mr. Bhatia . . . . . . . . . . . 415

12    Cross By Mr. DiRuzzo . . . . . . . . . . . 441

13    Redirect By Mr. Bhatia . . . . . . . . . . 465

14    Recross By Mr. DiRuzzo . . . . . . . . . . 467

15    GINA HOM

16    Direct By Mr. Bhatia . . . . . . . . . . . 470

17    Cross By Mr. DiRuzzo . . . . . . . . . . . 476

18    Redirect By Mr. Bhatia . . . . . . . . . . 481

19    Recross By Mr. DiRuzzo . . . . . . . . . . 482

20    JOSEPH SOLEIMANI

21    Direct By Mr. Bhatia . . . . . . . . . . . 485

22                      GOVERNMENT EXHIBITS

23    Exhibit No.                           Received

24     412 through 418   . . . . . . . . . . . . 316

25     141 through 146   . . . . . . . . . . . . 325

A-671

534

```
1    150  . . . . . . . . . . . . . . . .  412

2    431, 441, 442, 443  . . . . . . . . . . .  423

3    401 through 409  . . . . . . . . . . .  494

4    409A and 409B  . . . . . . . . . . . .  495

5    409C  . . . . . . . . . . . . . . . .  505

6                    DEFENDANT EXHIBITS

7    Exhibit No.                         Received

8    16  . . . . . . . . . . . . . . . . .  283

9    52  . . . . . . . . . . . . . . . . .  287

10   36  . . . . . . . . . . . . . . . . .  392

11   29  . . . . . . . . . . . . . . . . .  400

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

535

K1odtem

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          19 CR 696 (PAE)

5   ARI TEMAN,

6              Defendant.                  JURY TRIAL

7   ------------------------------x

8                                          New York, N.Y.
                                           January 24, 2020
9                                          9:08 a.m.

10

11  Before:

12                  HON. PAUL A. ENGELMAYER,

13                                         District Judge

14                       APPEARANCES

15

16  GEOFFREY S. BERMAN,
         United States Attorney for the
17       Southern District of New York
    KEDAR S. BHATIA
    EDWARD A. IMPERATORE
18       Assistant United States Attorneys

19  JOSEPH A. DIRUZZO, III
    JUSTIN GELFAND
20       Attorneys for Defendant

21  ALSO PRESENT:  DANIEL ALESSANDRINO, NYPD
                   WILLIAM MAGLIOCCO, Paralegal, USAO
22

23

24

25

A-673

536

K1odtem

1              (Trial resumed; jury not present)

2              THE COURT:  All right.  Good morning.

3              COUNSEL:  Good morning.

4              THE COURT:  I'll note for the record that

5    Mr. Imperatore is not here.  I assume he will be due here

6    shortly?

7              MR. BHATIA:  He just stepped out for a moment, your

8    Honor.

9              THE COURT:  All right.  Very good.

10             Good morning, everybody.  You may all be seated.

11             Good morning, Mr. Imperatore.

12             All right.  I have a handful of items to take up, but

13   before I do, I just wanted to take stock of the batting order

14   to the extent it has been refined by the government today.

15   Right now we have Mr. Soleimani on the stand, and your estimate

16   is, I take it, broadly the same as to the duration of his

17   remaining direct?

18             MR. BHATIA:  That is right.

19             THE COURT:  All right.  What do you anticipate coming

20   next?

21             MR. BHATIA:  Next we anticipate John Motto, M-o-t-t-o,

22   who is an employee of Signature Bank, and I think that will be

23   relatively short.

24             THE COURT:  That would what?

25             MR. BHATIA:  That would be relatively short, your

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-674

537

K1odtem

1    Honor.

2              THE COURT:  OK.  And then?

3              MR. BHATIA:  I think we expect -- you know, I need to

4    talk to Mr. Imperatore, but we might rest after that.

5              THE COURT:  You have made a big deal about check stock

6    evidence and presumably requiring a law enforcement witness to

7    testify.  Is that now out?

8              MR. BHATIA:  I'll speak to Mr. Imperatore but we may

9    not call Detective Alessandrino.

10             THE COURT:  So that issue would go out of the case?

11             MR. BHATIA:  That is right.

12             THE COURT:  OK.  All right.  Very good.

13             Defense counsel, anything as to batting order?

14             MR. DiRUZZO:  Yes, your Honor.  Well, it directly

15   relates to Mr. Soleimani's testimony.  Your Honor, late last

16   night, at about 11:30, we got an email from counsel for the

17   government that there was additional 3500 material.  We looked

18   at the 3500 material, and it became clear to us that counsel

19   for the government, along with the lead agent, was on a phone

20   call with Mr. Soleimani.

21             It appears to us that the phone call, which happened

22   yesterday, which we confirmed, via email with opposing counsel,

23   that the phone call with counsel for the government and the

24   lead agent discussed not only Mr. Soleimani's testimony but

25   fronted, disclosed our potential cross-examination which we

A-675

538

Klodtem

1    discussed with your Honor after the witness had left the stand

2    yesterday.  Specifically, you asked us about who are the

3    potential witnesses that we would call, and we referred to the

4    two possible NYPD detectives.  We then discussed why we might

5    call them, for purposes of impeachment and potential out

6    cross-examination.

7          Well, it appears that the government has stolen our

8    thunder by telling the witness what our potential

9    cross-examination is, and we believe this is highly improper.

10   It violates the rules of sequestration, which we expressly

11   invoked, and we would ask that his -- the witness' testimony be

12   struck in toto.

13         THE COURT:  Government, response?

14         MR. BHATIA:  Your Honor, the witness is still on

15   direct.  I think it was appropriate for us to have a

16   conversation with him about some facts that we thought might

17   come up in the trial, and we did it in part so that we could

18   give the Court and the parties some more information about

19   possible prior inconsistent statements.  We actually don't

20   think there were any inconsistent statements, and we are happy

21   to sort of tell the Court more about that.

22         THE COURT:  Why don't you tell me a little more about

23   that?

24         MR. BHATIA:  Sure.  So one of the alleged inconsistent

25   statements is that he told Detective Alessandrino that he lost

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-676

539

Klodtem

1    $180,000 when in fact I think the value of the chargeback was
2    $198,000.  We understand that Mr. Soleimani went to the police
3    station, gave them the checks that were fraudulently deposited,
4    and then told them I lost about $180,000.  And I think he gave
5    that as a ballpark estimate.  So, I am not sure there is any
6    inconsistent statement.  If he gave them the checks and said I
7    lost about this much --
8            THE COURT:  You're saying that there is never any
9    context in which the witness pinned himself down to a cap in
10   the 180 range as opposed to an estimate?
11           MR. BHATIA:  That's right.
12           THE COURT:  All right.  Mr. DiRuzzo, I appreciate the
13   vigor of the advocacy.  The answer is no.  There are a number
14   of reasons for it.  First of all, you are welcome to examine on
15   the point, which is ultimately the best antiseptic, the best
16   evidence.  You are at liberty to examine him on his
17   conversations with the government.  I find the whole area of
18   potential impeachment elusive, to say the least, but you are
19   welcome to go at it.  It strikes me as quite tertiary at best.
20           But as to the claim of misconduct, there was no
21   misconduct here.  The witness was on direct.  It is cardinal
22   that the government is entitled to question the witness and
23   continue to work with the witness while the witness -- you may
24   be seated -- is on direct examination.  You were certainly at
25   liberty to ask for some additional relief to the extent that

540

K1odtem

1    you thought something coming up in court ought to be embargoed.

2    You didn't seek that.

3            But, you know, for avoidance of doubt, the government

4    is always, as would be the defense, working with witnesses on a

5    dynamic, interactive basis as the trial goes forward to follow

6    up with witnesses as to matters that are coming to their

7    attention during the trial.

8            You were not obliged to, if you thought it was going

9    to create some issue for you, answer my inquiry as to the

10   relevance of a witness at the level of specificity you did.

11   I'm glad that you did.  It was helpful to me, and it gave me a

12   better understanding of what was to follow.  But you had every

13   right and every ability to say, your Honor, that's something I

14   prefer to do in camera or I'd like to do it ex parte or I'd

15   like to do it on the condition that the government not include

16   that in its continued conversations with Mr. Soleimani.  No

17   such request was made.  No impropriety happened here.

18           All right.  Anything else with respect to batting

19   order?

20           MR. DiRUZZO:  Your Honor, I just ask, for purposes of

21   appellate review, I be given a quick opportunity to make a

22   record.

23           Your Honor, I believe that yesterday, when we talked

24   specifically about the delta --

25           THE COURT:  About the?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-678

541

K1odtem

1           MR. DiRUZZO:  The delta, that is the term that you

2     used.

3           THE COURT:  Between the 180 and the 190 or so?

4           MR. DiRUZZO:  Yes.  With the clear anticipation that

5     the delta would lead us into grounds that there is the

6     possibility that some of the charges were actually authorized,

7     which then in turn at least allows us to make the argument that

8     perhaps all of these charges in fact were authorized.  That

9     vein of cross-examination, that line, you know, was

10    appropriately disclosed to your Honor, but at the same time the

11    government should not have disclosed that to the witness.

12          THE COURT:  So you say.  But the reality is that was

13    on you to ask -- to answer my question either not at all or in

14    camera or with a condition put on the government's follow up to

15    the witness.  You chose not to do so.  The witness is on

16    direct; you knew the government is at liberty to speak with the

17    witness.

18          The whole issue strikes me as, you know, although not

19    irrelevant, exceedingly tangential.  But the bottom line was

20    there was no rule of ethics or practice or no order specific to

21    this case that limited Mr. Bhatia from doing what he did.  A

22    responsible lawyer in his shoes would of course follow up with

23    the witness to understand what the nature of prior statements

24    were.  I don't know concretely what happened, and you are at

25    liberty to cross-examine the witness about the communications.

542

K1odtem

1          MR. DiRUZZO:  Your Honor, as an alternative basis for

2     leave, I would ask that the witness' -- that his testimony be

3     precluded on a going-forward basis and we just start with the

4     cross-examination.

5          THE COURT:  No.  Sorry.  I mean, there is no -- you

6     are asking for relief for a wrong that didn't happen.

7          MR. DiRUZZO:  I understand.

8          THE COURT:  There is no relief to be had here.  The

9     government is allowed to complete its examination.  Good try.

10         MR. DiRUZZO:  I understand.  That's why I made the

11    point for purposes of appellate review, I would like to make a

12    record.

13         THE COURT:  All right.  You are making a record, but,

14    I mean, there was no wrong here.  This was on you to ask that

15    some preclusion be placed on the go government.  It didn't --

16    and no such application was made.

17         Government, it looks like you have something to raise.

18         MR. BHATIA:  Your Honor, I guess while we're building

19    a record, I want to make clear I think to say that we prepped

20    with him would be an overstatement on this.  We asked him -- I

21    said, you know, Mr. Soleimani, what happened on so and so, what

22    did you say, what do you remember.  And then at the end I might

23    have said you might hear some questions about this.  I think

24    that was like -- that's probably the extent of the

25    conversation, so I think it's probably overstating it --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-680

543

Klodtem

1      THE COURT:  Whether or not even that last bit happened

2   seems to me a nonevent.  There was nothing improper about what

3   happened either on the darkest characterization of it that has

4   been given.

5      MR. BHATIA:  Thank you.

6      THE COURT:  OK.  All right.  Anything else to raise?

7   I have some things to raise with you.

8      Yes.

9      MR. IMPERATORE:  Your Honor, just a couple of issues

10  that we would urge the Court to consider when Mr. Reinitz takes

11  the stand, a couple of evidentiary issues that we -- the first

12  of which we have conferred with the defense on.

13      First of all, there is a potential hearsay issue to

14  the extent the defense seeks to introduce a number of

15  materials.  One is two versions of a letter.  The second are

16  various chat messages the defendant exchanged with the lawyer.

17      Obviously, to the extent the defendant is seeking

18  legal advice and the lawyer is providing legal advice, there

19  can be limited -- there could be limited occasions where those

20  chat messages or emails could be introduced to go to the

21  defendant's state of mind --

22      THE COURT:  I have an instruction on that point.  Why

23  don't I right now read that to you, because I anticipated the

24  same issue.  Here's what I propose to address on that point.

25  You let me know, counsel, how you feel about this.  But I think

544

Klodtem

1    Mr. Imperatore's insight of course is correct that while there

2    is a proper purpose for these communications coming in, certain

3    things can't come for the truth of the matter asserted.

4         Here it goes, and I would propose to give this at some

5    point early in the Reinitz testimony:

6         You have heard testimony that the defendant had

7    communications with this witness, Mr. Reinitz, who is an

8    attorney, with respect to matters at issue in this case.  As

9    with any witness, it is for you to determine whether and to

10   what extent to credit this testimony as truthful.  I want to

11   give you a limiting instruction as to the purposes to which you

12   may put this testimony, to the extent you credit it.

13        You may consider the defendant's communications with

14   Mr. Reinitz to the extent, if any, that you find they bear on

15   the defendant's state of mind and his intent at the times of

16   the events at issue.  At the end of the case, in my final

17   instructions, I will give you detailed instructions about the

18   elements of the offenses with which the defendant is charged,

19   including as to the intent that is required for a person to be

20   found guilty of these offenses.  I will also then give you

21   instructions as to how, in assessing a defendant's intent, you

22   may consider evidence of the advice an attorney gave to the

23   defendant.

24        To the extent the witness, Mr. Reinitz, testifies

25   about statements that the defendant, Mr. Teman, made to him, I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-682

545

K1odtem

1    instruct you -- I instruct you that you may consider these

2    statements only for limited purposes.  You may consider

3    Mr. Teman's statements to Mr. Reinitz as they bear upon the

4    advice that the attorney, Mr. Reinitz, gave to Mr. Teman.  You

5    may also consider these statements as they bear upon

6    Mr. Teman's state of mind.

7            However, you may not consider Mr. Teman's statements

8    to his attorney for the truth of the matters asserted by

9    Mr. Teman.  Whether the statements Mr. Teman made to his

10   attorney were or were not truthful are matters which, if

11   relevant, you would have to determine based on other evidence

12   in the case.  You may not assume that the representations that

13   Mr. Teman made to his attorney were true merely because

14   Mr. Teman made those statements to his attorney.

15           Mr. Imperatore, does that do the trick?

16           MR. IMPERATORE:  Yes, your Honor.

17           THE COURT:  Defense counsel?

18           MR. GELFAND:  We are fine with that charge.

19           MR. IMPERATORE:  Your Honor, there is one related

20   issue.

21           THE COURT:  I take it that what I didn't capture in

22   that instruction involves writings that were shared by

23   Mr. Teman with the attorney.

24           MR. IMPERATORE:  Correct.  We've conferred with the

25   defense on this, and we understand, based on that, that they do

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-683

546

Klodtem

1   not intend to introduce the chat messages on his direct.

2                THE COURT:  Very good.  All right.  So let's play that

3   by ear.

4                MR. IMPERATORE:  Yes, your Honor.

5                There is a related issue, evidentiary -- excuse me.

6                THE COURT:  Sorry.  If there is a separate issue, I

7   see Mr. Gelfand is rising.  It is limited to this particular

8   discussion.

9                MR. GELFAND:  I just wanted for the benefit of the

10  Court to know that I anticipate Mr. Reinitz's testimony to

11  basically fall into two general categories.

12               THE COURT:  Right.

13               MR. GELFAND:  One is the advice of counsel category

14  that this instruction obviously would apply to.  The other is

15  just general fact testimony about GateGuard that would not

16  implicate any of these issues, in other words, discussions with

17  Mr. Teman about --

18               THE COURT:  And so he would not be relating

19  conversations with Mr. Teman about GateGuard but just

20  operational things he did as a business attorney for GateGuard?

21               MR. GELFAND:  I think there is a crossover, but there

22  is also some testimony that he has firsthand involvement.

23  Basically, he's a fact witness and an advice of counsel

24  witness.

25               THE COURT:  As a fact witness, he is just talking

A-684

547

K1odtem

1     about operationally what GateGuard was to the extent he is a

2     percipient witness.

3             MR. GELFAND:  Yes, your Honor.

4             THE COURT:  Be careful to lay a foundation for that.

5     He is not a 30(b)(6) witness, as we say in civil litigation,

6     and so he is not able to speak omnisciently as a representative

7     of the company.  He may well have performed business functions

8     for GateGuard, but please be very careful to lay a foundation

9     as to his basis and personal knowledge to the extent he is

10    speaking as a fact witness.

11            MR. GELFAND:  Absolutely.  I just wanted to raise that

12    so that the Court has the --

13            THE COURT:  I always appreciate that.  OK.

14            Mr. Imperatore.

15            MR. IMPERATORE:  Your Honor, there are two related

16    issues that could arise in Mr. Reinitz's testimony.  One is to

17    the extent Mr. --

18            THE COURT:  Will you be cross-examining Mr. Reinitz?

19            MR. IMPERATORE:  No, Mr. Bhatia will.  But I want to

20    flag these issues.  I hadn't had a chance to talk to Mr. Bhatia

21    about them.

22            One is, first of all, what's important here obviously

23    is Mr. Teman's state of mind and what Mr. Reinitz told

24    Mr. Teman.  To the extent the defense intends to elicit

25    questions that go to Mr. Reinitz's state of mind and his

A-685

548

K1odtem

1    formulation of his view of the law, it's only relevant to the

2    extent he actually communicates that to Mr. Teman.

3            THE COURT:  I agree with that, and Mr. Gelfand is

4    nodding.

5            MR. GELFAND:  We agree with that.

6            THE COURT:  Just to be clear Mr. Gelfand, as you

7    approach the examination, because we especially can't have Mr.

8    Reinitz opining on the law, be careful that the examination

9    doesn't loop through the why and what were you thinking and is

10   focused tightly on what was extrinsically communicated to

11   Mr. Teman.

12           MR. GELFAND:  Yes, your Honor.

13           THE COURT:  Sometimes different examinations are

14   structured different ways, but particularly where we have a

15   lawyer weighing in on the law, there is an outsized risk of

16   confusion.  So make sure the examination is tightly focused on

17   the communications with Mr. Teman.  OK?

18           MR. GELFAND:  Yes, your Honor.

19           MR. IMPERATORE:  On that issue, your Honor, and your

20   Honor may have seen it in Rule 26.2 material that was

21   disclosed, there are questions that were asked by counsel to

22   Mr. Reinitz that really go to his state of mind about the law,

23   and it's not clear to what extent it was actually communicated.

24           THE COURT:  I don't know what you are referring to in

25   the 26.2.  I don't think I've gotten something.  What are you

A-686

549

Klodtem

1    talking about?

2            MR. IMPERATORE:  After midnight last night, your

3    Honor, the defense disclosed notes of a phone conversation with

4    Mr. Reinitz where he purports to opine on his view of UCC law

5    and whether certain contractual -- whether certain hyperlinks,

6    to the extent they were disclosed to individuals, could create

7    a contract.

8            THE COURT:  Right.

9            MR. IMPERATORE:  It is not at all clear, you know,

10   whether they can connect the dots.

11           THE COURT:  Right.  It would be surprising if that

12   level of detail were shared with a client but not unheard of.

13           The important point is that Reinitz should be

14   testifying only about what he actually communicated to Teman

15   about what was going on in his mind.  In other words -- I think

16   you get the point.

17           Mr. Gelfand, you agree?

18           MR. GELFAND:  I understand.  For the record, your

19   Honor, what we disclosed, based on the Court's instruction

20   yesterday, was an earlier phone call with Mr. Reinitz where I

21   did cover that territory, and so I thought it was appropriate

22   to disclose it.

23           THE COURT:  Sure.  It is helpful for you to understand

24   what Reinitz's reasoning was, but, obviously, in terms of what

25   is aerated in court, we'll limit it to that which was not in

550

Klodtem

1   his mind but his overt communications with Mr. Teman.

2          MR. GELFAND:  Yes, your Honor.

3          THE COURT:  We're all on the same page.

4          Mr. Imperatore, anything further?

5          MR. IMPERATORE:  No, your Honor.  Just, obviously, to

6   the extent that Mr. Reinitz is formulating his views on the law

7   from the stand, to the extent he communicates it to Mr. Teman,

8   there may come a point where it may make sense to have a

9   limiting instruction about his testimony.  Your Honor will

10  instruct the jury on the law --

11         THE COURT:  Right.

12         MR. IMPERATORE:  And his testimony does not at all go

13  to that issue.

14         THE COURT:  I mean, I take it in the end, you know,

15  let's suppose Reinitz says something to Teman about the civil

16  law of contracts, if that's what we're talking about here.  In

17  the end, there is not going to be any occasion for the jury to

18  be making a judgment about those matters.  This is not a

19  contract case; it is a criminal case.  The relevant legal tests

20  here will be set by the elements of the offenses, and so I

21  don't actually expect I will be instructing them, heaven

22  forbid, about the UCC or something like that.

23         MR. IMPERATORE:  Your Honor, we're simply mentioning

24  it sort of from the standpoint of issues by --

25         THE COURT:  Right.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1odtem

1          MR. IMPERATORE:  -- it could become an issue down the

2     road.  Obviously, we'll see how the testimony comes in.

3          THE COURT:  Very good.  Anything else that anyone has

4     to raise?

5          MR. GELFAND:  Not for the defense.

6          THE COURT:  Government?

7          MR. BHATIA:  Nothing, your Honor.

8          THE COURT:  All right.  While we wait -- Mr. Smallman

9     will check on our jury -- I just wanted to take up an issue

10    here.

11         Government, I appreciated your letter about unanimity.

12    One thing that confused me is the basis for differentiating,

13    though, between the bank and wire fraud counts.  I appreciate

14    your advocacy that I shouldn't have a unanimity instruction at

15    all.  I am rather strongly inclined to disagree, but I will

16    reserve on that for now.  The issue to my mind is what the

17    basis is for differentiating among the two bank frauds as

18    opposed to the two wire fraud counts.

19         If there is a risk that some jurors could convict

20    based entity one and others on entity two, hypothetically, as

21    they comprise a common count, that risk is equally there, I

22    would think, for bank fraud as wire fraud.  And it seems to me

23    that agree or disagree about the ultimate outcome here, but the

24    logic is equally as strong for wire fraud as it is for bank

25    fraud to give such an instruction.  Why not?  Is that wrong?

A-689

552

K1odtem

1            MR. IMPERATORE:  Your Honor, if I may?

2            I think there is both a conceptual difference between

3    the bank fraud and the wire fraud counts and a difference in

4    terms of what the elements are to those offenses.  I think we

5    understand your Honor may be focused on <u>Dupre</u> and other cases

6    where courts have determined it is appropriate to give a

7    unanimity instruction in the context of wire fraud, and your

8    Honor, of course, did that in the <u>Afriyie</u> case.

9            THE COURT:  Which you are well familiar with.

10            MR. IMPERATORE:  Yes.  And I think it is appropriate

11    in the context of wire fraud because an interstate wire is an

12    element of the offense.  That's really what <u>Richardson</u> speaks

13    to.  So, that distinguishes this from the bank fraud context in

14    a couple of ways.

15            THE COURT:  I'm sorry.  Your instruction, I'm trying

16    to understand what you are proposing here.  I thought that you

17    were proposing -- you are agreeing to a unanimity instruction

18    as to wire fraud, or not?  I'm not sure.  I thought you were --

19    the only proposed instruction you've given me is as to bank

20    fraud.

21            MR. IMPERATORE:  Correct, your Honor.

22            THE COURT:  I took you to be under no circumstances --

23    I thought you were saying that there is a strong argument for a

24    unanimity instruction as to bank as opposed to wire fraud.  Am

25    I reading it wrong?

A-690

553

K1odtem

1          MR. IMPERATORE:  No, your Honor, and we did not intend

2     to communicate that.

3          I think -- so the issue -- I think what distinguishes

4     bank fraud and wire fraud are a couple of things here.  One is

5     an interstate wire is an element of the offense.

6          (Pause)

7          One is an interstate wire is an element of the

8     offense.

9          THE COURT:  Right.

10          MR. IMPERATORE:  And under <u>Richardson</u> and cases like

11     it, it is appropriate where, you know, a particular transaction

12     is actually an element to give a limiting instruction.

13          THE COURT:  Right.

14          MR. IMPERATORE:  What distinguishes bank fraud here is

15     that the issues of the customers are really means by which the

16     transaction -- the bank fraud is proven, the scheme to defraud

17     is proven.  We understand your Honor's concerns, so we've

18     proposed a limiting instruction in the event that the Court

19     elected to give one in that context.

20          But I think the concern is the jury is allowed to

21     consider various means by which a crime can be proven.  It's

22     not required to make specific findings as to means.  But there

23     is no scenario in which in a single scheme to defraud Bank of

24     America, that a transaction with a customer is an element of

25     the offense.

A-691

554

K1odtem

1        THE COURT:  Because the jury is here, I'm going to

2   deflect the conversation to later.  My present inclination is

3   to formulate a common unanimity instruction that would span all

4   four counts, but it would probably be pegged, as your proposed

5   instruction would be, at the level of unanimity as to which

6   entity.  It just strikes me that that's likely the most prudent

7   course here.

8        I am going to take a one-minute comfort break.

9   Mr. Smallman, get the jury.

10        (Recess)

11        (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-692

555

K1odtem

1          (Jury present)

2          THE COURT:  All right.  Good morning, ladies and

3    gentlemen.  Please be seated.

4          All right.  We'll resume now with the testimony of

5    Joseph Soleimani.

6          Mr. Soleimani, I'll remind you that you are still

7    under oath.

8          Mr. Bhatia, you may inquire.

9    JOSEPH SOLEIMANI,

10       Resumed, and testified further as follows:

11          MR. BHATIA:  Your Honor, at this time, the government

12    offers, pursuant to the stipulation from before, Government

13    Exhibits 121 through 124 and 126 through 131.

14          THE COURT:  Is there an objection?

15          MR. GELFAND:  You said 121?

16          (Pause)

17          Your Honor, I have 126 and 128 as previously raised

18    with the Court.  There is a stipulation with multiple layers

19    of --

20          THE COURT:  One moment.

21          MR. GELFAND:  And the others no objection.

22          THE COURT:  126 and 128?

23          MR. GELFAND:  Correct, your Honor.

24          THE COURT:  All right.  Let me see counsel at the

25    sidebar for a moment.

A-693

556

K1odtem

1          I will ask the witness to step down.

2          (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-694

557

K1odtem

1          (At the sidebar)

2          THE COURT:  Counsel, I just want to make sure that I'm

3    measuring my words correctly.  126 and 128 are what's the right

4    way to call this, is this a chat?  Some sort of --

5          MR. BHATIA:  It looks like a bank record regarding a

6    call to the bank.

7          THE COURT:  A bank record regarding a call to the

8    bank.  Is this a record that this witness has ever seen?

9          MR. BHATIA:  No.  We don't plan to show it to this

10   witness.

11         THE COURT:  All right.  And will you be -- what is the

12   purpose of offering it during the middle of this examination if

13   you are not going to show it to the witness?

14         MR. BHATIA:  We are offering it pursuant to the

15   stipulation -- as part of the JPMorgan records, but we can

16   bring it up later.

17         THE COURT:  Well, the only issue is at the time I

18   receive it, I ought to give a limiting instruction.  It's a

19   little bit awkward if it is not being shown to the witness or

20   the jury at this moment.

21         MR. BHATIA:  What I will get into during his testimony

22   is the fact of the call, and so maybe it might be appropriate

23   for us to say -- maybe I can offer it then.

24         THE COURT:  I think it depends.  You are not objecting

25   to its receipt; you want to make sure there is a limiting

A-695

558

K1odtem

1   instruction as to its use?

2          MR. GELFAND:  Our initial objection is to its receipt

3   and on multiple layers of hearsay, especially, your Honor,

4   without testimony from someone at JPMorgan about this

5   particular subject matter.  It is not -- we accept that it is a

6   business record, we accept that it is from JPMorgan, but I

7   don't think that is the end of the inquiry for this particular

8   kind of exhibit.

9          THE COURT:  Right.  What does the stipulation say as

10  it relates to business record?

11         MR. BHATIA:  It says that these are business records,

12  essentially.

13         MR. GELFAND:  And we reserved our objection on the

14  multiple lawyers of hearsay that we previously articulated to

15  the Court.

16         THE COURT:  My inclination would be, unless there is a

17  real reason to receive it now, I take it it doesn't really

18  affect the flow of testimony because you are not going to be

19  putting it in front of the jury.

20         MR. BHATIA:  That is right.

21         THE COURT:  Let's take this up at the next break or at

22  the close of the witness' testimony, and I'll formulate a

23  limiting instruction at the time.  I welcome each table to

24  formulate the right response as to how to put it, but it seems

25  to me it would be (a) distracting for me to do it in the middle

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-696

K1odtem

1   of the exam if you are not going to be putting it up on the

2   screen to the witness, and (b) this gives me little more time

3   to reflect on the issue.

4           MR. BHATIA:  Understood.

5           MR. GELFAND:  Thank you.

6           (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-697

560

K1odtem1                         Soleimani - direct

1          (In open Court)

2          THE COURT:  Mr. Gelfand.

3          MR. GELFAND:  Your Honor, as to the other exhibits

4    that the government counsel is offering, we have no objection.

5          THE COURT:  All right.  I will receive Exhibits 121

6    through 124 and 127, 129, 130 and 131.

7          As to Exhibits 126 and 128, they will be offered later

8    at a time that I have been able to formulate a limiting

9    instruction as to them.  So for the time being I won't receive

10   them without prejudice to your right to offer them later.

11         Go ahead.

12         MR. BHATIA:  Thank you.

13         (Government's Exhibits 121-124, 127, 129, 130 and 131

14   received in evidence)

15   DIRECT EXAMINATION (Resumed)

16   BY MR. BHATIA:

17   Q.  Good morning, Mr. Soleimani.

18         As part of your responsibilities at ABJ, did you

19   review activity in the company's bank accounts?

20   A.  Yes.

21   Q.  And did that involve oversight of checks that were paid out

22   of the account?

23   A.  Yes.

24   Q.  What was your day-to-day responsibilities involving

25   expenses in and out of the account?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-698

561

K1odtem1                    Soleimani - direct

1   A.  I was authorized to write the checks, pay any bills,

2   receive any payments, and look over general operation.

3   Q.  And I'll direct your attention now to April of 2019.

4           At that time, what was the state of your relationship

5   with Mr. Teman?

6   A.  It was not good.

7   Q.  Can you elaborate?

8   A.  Yes.  Liens had been placed on several properties.  We were

9   no longer using his systems or his software, and he had

10  threatened a couple of times to sue us, report us to several

11  agencies, etc.

12  Q.  Did there come a time in April 2019 when you reported

13  unauthorized activity in your bank account?

14  A.  Yes.

15  Q.  Tell us, when was the first time that you learned of the

16  activity that you later reported as unauthorized?

17  A.  I actually think it was the first couple of days of May,

18  when we were doing reconciliations for the month of April and

19  we noticed that there were a bunch of checks that were cashed

20  from our accounts.

21  Q.  I would like to direct your attention to Government Exhibit

22  205, in evidence.  This exhibit is several pages long so let's

23  look at the first page as an example.

24          Do you recognize this image?

25  A.  Yes.

K1odtem1                    Soleimani - direct

1   Q.  Is this the -- is this one of the checks that you saw in

2   May of 2019?

3   A.  Yes.

4   Q.  What was you're reaction upon seeing this check, or these

5   checks in this exhibit?

6   A.  My initial reaction was these checks are fraud and I need

7   to report it to the bank.

8   Q.  Why did you think that these were fraud?

9           MR. GELFAND:  Your Honor, I would object to the

10  witness' characterization of fraud and ask that it be stricken.

11          THE COURT:  Yes.  Ladies and gentlemen, I will

12  instruct you that at the end of the case I will be giving you

13  instructions as to the elements of the offenses here, which

14  are, as alleged here, bank fraud and wire fraud.  The witness'

15  label that he put on it is just the witness' label that he put

16  on it.  That should not of course be any substitute for my

17  instructions as to what these types of fraud offenses consist

18  of or your independent determination as to whether there was or

19  wasn't those types of fraud here.

20          Go ahead.

21  BY MR. BHATIA:

22  Q.  Why did you think that these were not authorized?

23  A.  Because they don't look like our checks.  I certainly

24  didn't sign them, and I would not have paid out these sums.

25  Q.  Was there anything about the value of these checks that

A-700

563

K1odtem1                    Soleimani – direct

1   stood out to you?

2   A.  Just they don't look like our checks.  They certainly were

3   not authorized.

4   Q.  Are they typical of the checks authorized out of your

5   account?

6   A.  No.

7   Q.  In the bottom left corner of, or bottom left part of this

8   check, there is a memo line that says "Device Removal Fee."

9   Prior to seeing this check, were you familiar with a device

10  removal fee?

11  A.  No, I was not.

12  Q.  And had you agreed to pay a device removal fee?

13  A.  No.

14  Q.  At the time you purchased the intercoms that you testified

15  about yesterday, what conversations with Mr. Teman had you had

16  about a device removal fee?

17  A.  I did not have any conversations about it.

18  Q.  During your conversations with him, did he ever tell you

19  that you could be subject to a device removal fee?

20  A.  At a later point in time, after the systems were off or

21  close to then.

22  Q.  But not -- what about at the time you purchased the

23  devices?

24  A.  No.

25  Q.  In the bottom right corner of this check, it says:

K1odtem1                          Soleimani - direct

1    "Contact us at 212-203-3714 with questions."

2            Is that your phone number?

3    A.  No, it is not.

4    Q.  If a bank had contacted you with questions about this

5    check, what would you have told the bank?

6    A.  I would have told them it is not authorized.

7    Q.  In the top left corner of this check, it says, "ABJ Lennox

8    LLC."  That's "Lennox" with two Ns.  Is there something about

9    that label that stands out to you?

10   A.  Yes.

11   Q.  What about it?

12   A.  It's spelled incorrectly.

13   Q.  What is the proper spelling?

14   A.  It's L-e-n-o-x.

15   Q.  With one N for Lenox?

16   A.  With one N, correct.

17   Q.  What is the date of the check -- date listed here in the

18   top right corner of these checks?

19   A.  April 19, 2019.

20   Q.  Do you observe a holiday beginning on that date?

21   A.  Yes.

22   Q.  What is it?

23   A.  It was Passover.

24   Q.  And when you observe Passover, what is your practice with

25   regards to electronic communications?

A-702

565

K1odtem1                    Soleimani - direct

1    A.  I do not have any electronic communication for the first

2    two days and the last two days.

3    Q.  And do other people in your office observe that holiday?

4    A.  Yes.

5    Q.  I'll direct your attention to page 7 of this document.

6            Is this another one of the checks that you saw in May

7    of 2019?

8    A.  Yes.

9    Q.  And in the bottom left portion of this check, there is a

10   memo line that says "Attorney Use Fee."

11           Had you agreed to a $5,000 attorney use fee?

12   A.  No.

13   Q.  And during your conversations with Mr. Teman, had he ever

14   alerted you to a $5,000 attorney use fee?

15   A.  No.

16   Q.  I'll direct your attention now to page 13 of this document.

17   In the bottom left corner of this check, there is a -- the memo

18   line says "Collections Fee."

19           At the time you purchased your intercoms, had you

20   agreed to a $10,000 collections fee?

21   A.  No.

22   Q.  During your conversations with Mr. Teman, had he ever

23   alerted you to a $10,000 attorney use fee -- excuse me, had he

24   ever alerted you to a $10,000 collections fee that you could be

25   subject to?

K1odtem1                    Soleimani – direct

1    A.  No.

2    Q.  When you paid Mr. Teman for those intercoms, did you

3    believe that you were purchasing the devices or something else?

4    A.  I believed I was purchasing the devices.

5    Q.  Did there come a time when you told Mr. Teman that he could

6    deposit any of these checks in this government exhibit that's

7    Government Exhibit 205?

8    A.  No, I did not.

9    Q.  And I would now like to direct your attention to Government

10   Exhibit 204.  There are also several checks here, but let's

11   look at the first one for example.

12        What do you see in the top left corner?  It says, "ABJ

13   Milano LLC."  Is that an entity associated with ABJ Properties?

14   A.  Yes.

15   Q.  And in the bottom left corner there is a collections fee.

16   Have you heard of that fee before?

17   A.  No, I have not.

18   Q.  And these are checks to ABJ Milano.  If the bank had

19   contacted you instead of this phone number on this check, what

20   would you have told the bank about these checks?

21   A.  I would have told them not to cash them, they're not

22   authorized.

23   Q.  After you saw the checks identified in Government Exhibit

24   204 and 205, the ones you just talked about, what happened

25   next?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

567

K1odtem1                          Soleimani - direct

1    A.  I called my bank right away.  I told them that there were a

2    bunch of checks cashed out of my account that were not

3    authorized.  They told me to come into the branch and go to the

4    local precinct to report it.

5    Q.  When you went to the branch, what happened?

6    A.  They filled out some paperwork.  They froze the accounts

7    from any further checks being cashed.  I was told to give them

8    a list of any outstanding checks to make sure those clear, and

9    then I opened new accounts.

10   Q.  Did you in fact go to a precinct after talking with the

11   bank?

12   A.  Yes.

13   Q.  What did you tell them?

14   A.  I printed out all the checks -- the check images.  I told

15   them someone cashed checks from my accounts, they were not

16   authorized.  They don't look like my checks.  I didn't

17   authorize them, and my bank told me to come in and file a

18   report.

19   Q.  Had you authorized any of the checks that you found in --

20   in Government Exhibit 204 and 205?

21   A.  No.

22   Q.  While you were a GateGuard customer, did you speak with

23   Mr. Teman on the phone?

24   A.  Yes.

25   Q.  Approximately how often?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-705

568

K1odtem1                    Soleimani - direct

1   A.  I would say every couple of days.

2   Q.  And when you were a GateGuard customer, how often -- did

3   you meet with him in person?

4   A.  Maybe two or three times early on.

5   Q.  Did you communicate via text message or something similar

6   to that?

7   A.  Yes.

8   Q.  What platform did you use?

9   A.  WhatsApp.

10  Q.  During those calls, during those communications, did you

11  ever tell Mr. Teman that he was authorized to write checks on

12  behalf of ABJ Milano or ABJ Lenox?

13  A.  No, I did not.

14  Q.  And what did he ever tell you during those conversations

15  about his authority to draw checks on behalf of those entities?

16  A.  He never mentioned anything.

17  Q.  If he had mentioned them, would that have stuck out to you?

18  A.  Yes.

19  Q.  And what would your reaction have been if you had heard

20  about them?

21  A.  I would have denied it.

22  Q.  What do you mean, denied it?

23  A.  Denied his authority to draw any checks out of my account.

24  Q.  At ABJ Properties, are you authorized to enter into

25  contracts with vendors?

A-706

569

K1odtem1                    Soleimani – direct

1   A.  Yes.

2   Q.  And have you done that?

3   A.  Yes.

4   Q.  How often do you do that as part of your work?

5   A.  I'd say every couple of months, possibly.

6   Q.  During the course of your work at ABJ Properties, have you

7   ever agreed to a contract that allowed someone doing work for

8   ABJ Properties to write checks from the company's accounts?

9   A.  No.

10  Q.  Why not?

11  A.  Because I'd like to have approval for each transaction.  I

12  like to make sure the amounts are correct, and it is not our

13  business practice to do so.

14  Q.  Mr. Soleimani, where is your office located?

15  A.  1652 Park Avenue.

16  Q.  And how long have you been in that location?

17  A.  About two years.

18  Q.  Is that in Manhattan?

19  A.  Yes.

20  Q.  And while you were in your office, did you have

21  communications with Mr. Teman?

22  A.  Yes.

23  Q.  Did you have -- were they phone conversations or text

24  message conversations?

25  A.  I had both.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

570

K1odtem1                         Soleimani - direct

1    Q.  OK.  And where did you understand Mr. Teman was during

2    those conversations?

3    A.  Sometimes in New York, sometimes in Florida.

4    Q.  And were those concerning ABJ Properties and ABJ Milano?

5    A.  Yes.

6           MR. BHATIA:  One moment, your Honor.

7           (Pause)

8    Q.  When you were in your office in Manhattan, did your

9    communications with Mr. Teman on the phone and text messages

10   involve GateGuard devices?

11   A.  Yes.

12   Q.  It did involve your purchase of GateGuard and Sublet Spy?

13   A.  Yes.

14   Q.  Did you also have communications with him via email?

15   A.  Yes.

16   Q.  What were the nature of those communications?

17   A.  Often, it was some complaints that we received from tenants

18   or from ourselves trying the system where it wouldn't work.

19   That was the majority of the conversations.

20   Q.  During the conversations with Mr. Teman via phone or email

21   or text message, did he ever reference that he was in Florida?

22   A.  Sorry.  What?

23   Q.  Did he ever tell you that he was in Florida?

24   A.  Possibly several -- a couple of times maybe.

25           MR. BHATIA:  Your Honor, no further questions.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-708

571

K1odtem1                    Soleimani – direct

1          THE COURT:  All right.  Just one moment.

2          Can I see counsel at the sidebar?  I will ask the

3    witness to step down.

4          (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-709

572

K1OVTEM1

1           (At sidebar)

2           THE COURT:  I'm just returning to Exhibits 126 and

3     128.  If there's no chance that you will be examining the

4     witness about those, I will defer the offer of those till after

5     the conclusion of the examination.  If, however, there's any

6     possibility that you'll be going there with respect to the

7     witness, so on cross-examination, I think it appropriate for

8     the government to be able to offer them and my to receive them

9     subject to the limiting instruction now.

10          MR. GELFAND:  I guess what I would say -- and I think

11    I know where the Court is going to go with this -- is that I

12    don't want to -- it depends on what the witness says.  And I

13    don't want to represent to the Court that I'm not going to get

14    into it.

15          THE COURT:  Okay.  You don't have the present

16    intention, but you might go there.

17          MR. GELFAND:  Depending on his answers, correct.

18          THE COURT:  Give me one moment.

19          Let me draft a proposed limiting instruction, because

20    I think it's more fair for the government to be able to own the

21    exhibit by offering it rather than your offering it on cross.

22          Give me one moment.

23          (Pause)

24          THE COURT:  Who are the speakers for ABJ in Exhibit

25    126 and 128?  One is Benjamin.

A-710

K1OVTEM1

1          MR. BHATIA:  Mr. Soleimani.

2          THE COURT:  This Mr. Soleimani?

3          MR. BHATIA:  Joseph Soleimani.

4          THE COURT:  I thought there was a Benjamin.

5          MR. BHATIA:  I think it refers to Benjamin, but

6    Mr. Soleimani -- we understand that only Mr. Soleimani went to

7    the bank.  It was a call from the bank.

8          THE COURT:  The bank is Bank of America?

9          MR. BHATIA:  JPMorgan Chase.

10         (Pause)

11         THE COURT:  Let me just read this to you.

12         I've received into evidence Government Exhibits 126

13   and 128 pursuant to a stipulation between the parties.  As the

14   stipulation reflects, these are business records of the bank

15   that reflect communications between Mr. Soleimani and JPMorgan

16   Chase in or around May 2019.

17         I have a limiting instruction as to these

18   communications.  You may consider them as evidence of what

19   Mr. Soleimani said to the bank and what the bank said to him at

20   the time of these communications.  You may not, however,

21   consider the statements made -- the statements reflected in

22   Government Exhibits 126 and 128 for the truth of what was said

23   either by Mr. Soleimani to the bank or the bank to

24   Mr. Soleimani.

25         MR. BHATIA:  So this hasn't happened yet, the cross

A-711

574

K1OVTEM1

1    hasn't happened, but it could be also prior consistent

2    statement to rehabilitate the witness's credibility under the

3    second prong of that rule.  So depending on what happens on

4    cross, it might come in.

5              MR. IMPERATORE:  What I propose, your Honor, is

6    assuming the defense opens the door in the cross, the

7    government is going to offer this at a later time.  And I

8    think, assuming the elements are met of the prior consistent

9    statement to rebut attacks on the witness's credibility, they

10   can be offered for their truth, but let's see what happens.

11             THE COURT:  Let me try it this way:  Is what you're

12   saying then, Mr. Imperatore, rather than it being offered now

13   at all, simply everyone hold fire, and you'll take the risk

14   that defense counsel, Mr. Gelfand, will be the first one to

15   offer this for any purpose.  And I'll give an instruction

16   later, depending on whether or not there's a prior inconsistent

17   statement that allows broader use of the document.

18             In other words, you don't want to offer it now.  I'm

19   offering you the chance to do so subject to this limiting

20   instruction.

21             MR. IMPERATORE:  Right.

22             I think the issue from the government's perspective is

23   we expect that there may be attacks on the witness's

24   credibility that will trigger the application of the prior

25   consistent statement hearsay exception.  So we're going to hold

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-712

575

K1OVTEM1

1     fire now.

2              THE COURT:  You're not going to offer them now.

3              MR. IMPERATORE:  Correct.

4              THE COURT:  Very good.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-713

K1OVTEM1                         Soleimani - cross

1           (In open court)

2           THE COURT:  All right.  Mr. Soleimani, I'll remind you

3    that you're still under oath.

4           And Mr. Gelfand, you may inquire.

5           MR. GELFAND:  Thank you.

6    CROSS-EXAMINATION

7    BY MR. GELFAND:

8    Q.  Good morning, Mr. Soleimani.

9    A.  Good morning.

10   Q.  Mr. Soleimani, you and I have never met; correct?

11   A.  Correct.

12   Q.  You and I have never spoken; correct?

13   A.  Correct.

14   Q.  Now, you testified that your company owns and manages

15   apartment buildings, if I understood it correctly, in New York

16   City; is that correct?

17   A.  Which company?

18   Q.  You tell me.

19   A.  ABJ Lenox and ABJ Milano owns properties in New York City.

20   Q.  Okay.  And ABJ Properties, if I'm tracking you, basically

21   is kind of the management entity?

22   A.  Yes.

23   Q.  Are these all essentially owned by the same people?

24   A.  No.

25   Q.  Okay.  The properties during the time frame that we're

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-714

577

K1OVTEM1                    Soleimani - cross

1    talking about, when you were interacting with GateGuard and

2    Mr. Teman, were apartment buildings in New York City; correct?

3    A.  Yes.

4    Q.  In other words, residential buildings, many of which had

5    multiple entrances and exits; correct?

6    A.  Correct.

7    Q.  Can I ask you to just speak up a little bit?

8    A.  Sure.

9    Q.  Now, in your capacity as a principal at ABJ, you regularly

10   enter into business relationships with vendors; correct?

11   A.  Correct.

12   Q.  And you regularly enter into contracts and other agreements

13   with those vendors; correct?

14   A.  Yes.

15   Q.  As the prosecutor asked you, you're personally authorized

16   to approve and negotiate contracts; correct?

17   A.  Yes.

18   Q.  But you're not the only one at your company that has that

19   authority; correct?

20   A.  Correct.

21   Q.  Others in your company have the authority to enter into

22   contracts; correct?

23   A.  Yes.

24   Q.  And others in your company have the authorization to

25   negotiate contracts; correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-715

578

K1OVTEM1                    Soleimani - cross

1   A.  Yes.
2   Q.  And that includes your -- I believe it's your brother,
3   Benjamin Soleimani; correct?
4   A.  Yes.
5   Q.  Now, Benjamin Soleimani is also a principal at ABJ;
6   correct?
7   A.  Correct.
8   Q.  Is it fair to say that you and Benjamin essentially are
9   partners and running the entity?
10  A.  Yes.
11  Q.  Now, when ABJ enters into contracts, these contracts
12  sometime include the ability of vendors to create checks for --
13  on your account; correct?
14  A.  No.
15  Q.  So your testimony under oath is that ABJ has never
16  authorized a vendor to draft RCCs or create checks on your
17  account?
18  A.  No.
19  Q.  No, meaning that is your testimony?
20  A.  Yes.
21  Q.  What is Advantage Wholesale Supply?
22  A.  It's a supply house.
23  Q.  Is it your testimony that you have never given Advantage
24  Wholesale Supply the ability to draw RCCs on your account?
25  A.  Not to my recollection.

A-716

579

K1OVTEM1                    Soleimani - cross

1   Q.  Now, you testified that you previously knew Mr. Teman

2   through another start-up company of his; correct?

3   A.  Correct.

4   Q.  That company was called Sublet Spy; correct?

5   A.  Yes.

6   Q.  And as I understood your testimony, you met Mr. Teman in

7   approximately 2016; correct?

8   A.  Yes.

9   Q.  And you subscribed to Sublet Spy soon thereafter; correct?

10  A.  Correct.

11  Q.  And Sublet Spy -- let me rephrase that.

12          You used information from Sublet Spy to evict tenants,

13  to basically operate your business activities in the building;

14  correct?

15  A.  Correct.

16  Q.  Now, after you had already had a business relationship with

17  Sublet Spy, you asked Mr. Teman to demo the GateGuard device;

18  correct?

19  A.  Correct.

20  Q.  Okay.  And so to be clear, obviously at that time you were

21  very interested in the GateGuard device; correct?

22  A.  Yes.

23  Q.  And the reason you were very interested is because at the

24  time it was fairly cutting-edge; correct?

25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-717**

K1OVTEM1                    Soleimani - cross

1   Q.  And when we say "cutting-edge," based on -- were you

2   familiar with similar intercom systems and other tech devices

3   on the market?

4   A.  Yes, I was.

5   Q.  And the GateGuard device was different in many ways;

6   correct?

7   A.  Not necessarily.

8   Q.  But you said it was cutting-edge.  It was advanced;

9   correct?

10  A.  Yes.

11  Q.  Okay.  And would you agree with me that you became familiar

12  with the intricacies of the GateGuard system?

13  A.  Yes.

14  Q.  So let's start simple for a second.  The system includes

15  physical devices, physical panels or tablets, if you will;

16  correct?

17  A.  Yes.

18  Q.  In other words, just in lay speak, the physical things that

19  a tenant or perhaps you, yourself, would, you know, either look

20  into the camera or touch buttons; correct?

21  A.  Correct.

22  Q.  And each entrance or exit to every building where you have

23  the GateGuard device that people are coming into and out of

24  needs some physical equipment of GateGuard; correct?

25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-718

K1OVTEM1                    Soleimani – cross

1    Q.  In other words, the system makes no sense if it doesn't

2    apply to all entrances and exits; correct?

3    A.  Correct.

4    Q.  And GateGuard provided all of those physical devices for

5    all of the entrances and exits to the seven buildings that you

6    testified you subscribe to; correct?

7    A.  Correct.

8    Q.  Okay.  And just approximately -- take perhaps the largest

9    of those buildings, whichever one that is, approximately how

10   many entrances and exits are we talking about?

11   A.  One.

12   Q.  Which of the seven buildings has the most entrances and

13   exits?

14   A.  They all have one entrance.

15   Q.  And they also have other ways to enter the building;

16   correct?

17   A.  If you consider a fire escape an entrance, then, yes.

18   Q.  And GateGuard provided the physical device infrastructure

19   that you needed; correct?

20   A.  Yes.

21   Q.  And to do so, GateGuard worked with you to figure out where

22   the devices need to be placed and things like that; correct?

23   A.  Correct.

24   Q.  Okay.  In other words, this doesn't just get, like, shipped

25   in a box or something; correct?

A-719

582

K1OVTEM1                    Soleimani - cross

1            THE COURT:  Sorry, I didn't hear what you said.

2   Q.  In other words, this doesn't just get, like, shipped in a

3   box for you to install; correct?

4   A.  Correct.

5   Q.  Okay.  GateGuard physically sent a crew to install each of

6   these devices on the entrances and exits; correct?

7   A.  Yes.

8   Q.  And in addition to the physical devices, GateGuard provided

9   your company with an online web-based interface; correct?

10  A.  Correct.

11  Q.  And to be clear, you could login using a password and user

12  name, such as security credentials, to access the information

13  that GateGuard held on its servers about your building;

14  correct?

15  A.  Correct.

16  Q.  And that included logs that you personally accessed over

17  various times; correct?

18  A.  Correct.

19  Q.  And to be clear, the information that GateGuard held, this

20  was data that GateGuard stored; correct?

21  A.  Yes.

22  Q.  In other words, it wasn't stored on your server, it was

23  stored on GateGuard's; correct?

24  A.  Correct.

25  Q.  And it was stored indefinitely; correct?  In other words,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1OVTEM1                          Soleimani - cross

1    it didn't disappear after seven days or something like that?

2    A.  Not as far as I know.

3    Q.  Well, as far as what you actually accessed it over the

4    period that you had and used your GateGuard devices, the info

5    was always available; correct?

6    A.  Correct.

7    Q.  From beginning to the end, meaning the date that you were

8    accessing it; correct?

9    A.  Correct.

10   Q.  Okay.  And that information included not only time-stamped

11   data points, in other words, dates and times when, essentially,

12   doors were opened; correct?

13   A.  Correct.

14   Q.  It actually included photographs of the individuals who

15   were entering at those particular times; correct?

16   A.  It was supposed to.

17   Q.  And it did; correct?

18   A.  Not all the time.

19   Q.  Well, did much of the time; correct?

20   A.  No.

21   Q.  Your testimony under oath is that the logs that you

22   identified did not include photographs most of the time?

23   A.  Sometimes it did not.

24   Q.  So you just said -- I want to understand your testimony for

25   a sec.  You said not most of the time, now you just said