# 21-1920-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

ARI TEMAN, AKA Sealed Defendant 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## Volume 5 of 11 (Pages A-721 to A-960)

KEDAR S. BHATIA
WON S. SHIN
   *Assistant U.S. Attorney*
UNITED STATES ATTORNEY'S OFFICE
   SOUTHERN DISTRICT OF NEW YORK
*Attorneys for Appellee*
One Saint Andrew's Plaza
New York, New York 10007
(212) 637-2200

EDEN QUAINTON
QUAINTON LAW
*Attorneys for Defendant-Appellant*
2 Park Avenue, 20th Floor
New York, New York 10169
(212) 419-0575

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Complaint, filed June 20, 2019.................................. A-46.2

Notice of Appearance, dated August 27, 2019........... A-47

Indictment, filed September 26, 2019........................ A-49

Waiver of Appearance for Arraignment, dated
    October 14, 2019 .................................................. A-53

Transcript of Proceedings held before the
    Honorable Paul A. Engelmayer, dated
    October 21, 2019 .................................................. A-55

Supeseding Indictment, filed November 12, 2019 .... A-96.1

Transcript of Proceedings held before the
    Honorable Paul A. Engelmayer, dated November
    21, 2019 ................................................ A-96.7

Opinion and Order of the Honorable Paul A.
    Engelmayer, dated December 20, 2019 ................ A-97

Second Superseding Indictment, filed
    January 3, 2020....................................................... A-121

Defendant Teman's Requested Voir Dire Questions,
    filed January 6, 2020............................................ A-129

Excerpts of Transcript of Conference Proceedings
    held before the Honorable Paul A. Engelmayer,
    dated January 10, 2020 ......................................... A-137.1

Transcript of Conference Proceedings held before
    the Honorable Paul A. Engelmayer, dated
    January 10, 2020.................................................... A-137.6

Letter from Kedar S. Bhatia to the Honorable Paul
    A. Engelmayer, dated January 14, 2020 ............... A-137.96

ii

**Page**

Transcript of Trial Proceedings held before the
    Honorable Paul A. Engelmayer, dated
       January 21, 2020 .................................................... A-138

Transcript of Trial Proceedings held before the
    Honorable Paul A. Engelmayer, dated
       January 22, 2020 .................................................... A-265

Transcript of Trial Proceedings held before the
    Honorable Paul A. Engelmayer, dated
       January 23, 2020 .................................................... A-398

Transcript of Trial Proceedings held before the
    Honorable Paul A. Engelmayer, dated
       January 24, 2020 .................................................... A-672

Transcript of Trial Proceedings held before the
    Honorable Paul A. Engelmayer, dated
       January 27, 2020 .................................................... A-998

Transcript of Trial Proceedings held before the
    Honorable Paul A. Engelmayer, dated
       January 28, 2020 .................................................... A-1187

Transcript of Trial Proceedings held before the
    Honorable Paul A. Engelmayer, dated
       January 29, 2020 .................................................... A-1264

Verdict Sheet, dated January 29, 2020 ...................... A-1298.1

Order of the Honorable Paul A. Engelmayer, dated
    January 29, 2020 .................................................... A-1299

Defendant's Motion for Judgment of Acquittal or in
    the Alternative, Motion for New Trial, filed
    February 26, 2020 ................................................. A-1437

Motion for New Trial Based on Undisclosed Brady
    and Jencks Act Evidence, filed April 9, 2020 ....... A-1473

iii

**Page**

Exhibit A to Motion -
Excerpts of Transcript of Proceedings, dated
August 9, 2018 .......................................................... A-1498

Exhibit B to Motion -
Report of Violations of New York City's Housing
Maintenance Code ................................................. A-1512

Exhibit C to Motion -
Report of Violations of New York City's Housing
Maintenance Code ................................................. A-1513

Exhibit D to Motion -
HPD's Housing Maintenance Code Violations
User Guide ................................................................. A-1514

Exhibit E to Motion -
Report re: New York Civil Litigation – Joseph
Soleimani ................................................................. A-1548

Exhibit F to Motion -
Report re: New York Civil Litigation – Elie
Gabay ....................................................................... A-1549

Exhibit G to Motion -
Glossary of Terms for Litigation Status Report
from HPD .................................................................. A-1550

Letter from Joseph A. DiRuzzo, III to the Honorable
Paul A. Engelmayer, dated April 9, 2020 ............... A-1552

Letter from Kedar S. Bhatia, Assistant United States
Attorney to the Honorable Paul A. Engelmayer,
dated May 1, 2020 re: Trial Exhibits ..................... A-1554

Government's Exhibits:

GX 101-
GateGuard Account Opening Documents ............. A-1555

GX 102 -
GateGuard Bank Statements .................................. A-1559

iv

                                                                    **Page**

GX 103-
Friend or Fraud Account Opening Documents ...... A-1581

GX 104-
Friend or Fraud Bank Statements .......................... A-1585

GX 105-
Touchless Labs Account Opening Documents ...... A-1609

GX 106-
Touchless Labs Bank Statements........................... A-1613

GX 107 -
Ari Teman Account Opening Document................ A-1629

GX 108-
Ari Teman Bank Statements .................................. A-1631

GX 110-
April 19, 2019 2:37 PM Surveillance
Photographs ........................................................... A-1649

GX 111-
April 19, 2019 6:00 PM Surveillance
Photographs ........................................................... A-1652

GX 112-
May 8, 2019 3_04 PM Surveillance
Photographs ........................................................... A-1655

GX 113-
Bank Records Spreadsheet
(CD-Rom)* ........................................................... A-1657.1

GX 114 -
Returned Check Records ...................................... A-1658

GX 121 -
ABJ Lenox Account Opening Document .............. A-1660

---

* GX 113 is a Microsoft Excel file. CD-Rom with the Excel
spreadsheet provided to Court and Service parties.

v

**Page**

GX 122 -
ABJ Lenox Bank Statements ................................. A-1661

GX 123 -
ABJ Milano Account Opening Documents ........... A-1669

GX 124 -
ABJ Milano Bank Statements................................ A-1670

GX 127 -
May 2, 2019 Letter - ABJ Lenox .......................... A-1678

GX 129 -
May 2, 2019 Letter - ABJ Milano......................... A-1679

GX 130 -
ABJ Lenox Checks ............................................... A-1680

GX 131 -
ABJ Milano Checks .............................................. A-1682

GX 141 -
18 Mercer Account Opening Documents .............. A-1685

GX 142 -
18 Mercer Bank Statements.................................. A-1694

GX 143 -
April 4, 2018 Check from 18 Mercer Equity to
GateGuard............................................................ A-1699

GX 144 -
518 W 204 Account Opening Documents ............. A-1700

GX 145 -
518 W 204 Bank Statements................................. A-1707

GX 146 -
January 31, 2018 Check from 518 W 204 to
GateGuard............................................................ A-1725

vi

**Page**

GX 147 -
March 28, 2019 Check from 518 West 205 to
GateGuard................................................................ A-1726

GX 150 -
Affidavit................................................................... A-1727

GX 201 -
March 28, 2019 Check from Coney Realty to
GateGuard................................................................ A-1728

GX 202 -
March 28, 2019 Check from 18 Mercer Equity to
GateGuard................................................................ A-1729

GX 203 -
April 19, 2019 Check from 518 West 205 to
GateGuard................................................................ A-1730

GX 204 -
April 19, 2019 Check from ABJ Milano to
GateGuard................................................................ A-1733

GX 205 -
April 19, 2019 Check from ABJ Lennox to
GateGuard................................................................ A-1739

GX 206 -
April 19, 2019 GateGuard Counter Deposit .......... A-1757

GX 401 -
September 9, 2017 E-mail - 'We're Live' ............. A-1758

GX 402 -
November 6, 2017 E-mail - 'Current Issues'......... A-1760

GX 403 -
March 9, 2018 E-mail - 'Ending GateGuard' ........ A-1761

GX 404 -
May 7, 2018 E-mail - 'All Communication in
Writing'.................................................................... A-1762

vii

**Page**

GX 405 -
May 22, 2018 E-mail - 'GateGuard' ...................... A-1763

GX 406 -
August 26, 2018 E-mail - 'Dispute on Charge...' .. A-1765

GX 407 -
September 18, 2018 E-mail - 'Sublet Spy Hits...' . A-1767

GX 408 -
December 14, 2018 E-mail - 'Notice of Intent' ..... A-1773

GX 409 -
June 14, 2019 GateGuard Invoice ........................ A-1775

GX 409A -
Invoices (1) .............................................. A-1777

GX 409B -
Invoices (2) .............................................. A-1785

GX 409C -
Conversation between Teman and Soleimani ........ A-1786

GX 412 -
January 1, 2018 E-mail - 'Tenant Ana Esterg' ....... A-1787

GX 413 -
January 19, 2018 E-mail - 'Invoice Sent' .............. A-1788

GX 414 -
January 24, 2018 E-mail - 'Form for the 10
Buildings' ............................................... A-1791

GX 415 -
March 25, 2018 E-mail - 'Invoice for 20
Buildings' ............................................... A-1795

GX 416 -
March 26, 2018 E-mail - 'Invoice for 20
Buildings' (1) ........................................... A-1815

viii

**Page**

GX 417 -
March 26, 2018 E-mail - 'Invoice for 20
Buildings' (2) .......................................... A-1820

GX 418 -
March 27, 2018 E-mail - 'Proof it's Your...' .......... A-1829

GX 431 -
April 4, 2018 E-mail - 'Invoice' ........................... A-1831

GX 441 -
GateGuard Terms and Conditions.......................... A-1834

GX 442 -
April 2, 2018 E-mail - 'References' ...................... A-1856

GX 443 -
January 7, 2019 E-mail - 'Contract' ...................... A-1862

GX 501 -
Bank Records Stipulation ...................................... A-1868

GX 702 -
January 2, 2019 WhatsApp Messages ................... A-1872

GX 704 -
April 2, 2019 WhatsApp Messages ...................... A-1874

GX 727 -
April 2, 2019 Whatsapp Messages (2).................. A-1875

GX 728 -
April 3, 2019 Whatsapp Messages ....................... A-1876

GX 729 -
April 10, 2019 WhatsApp Messages ..................... A-1877

Defense Exhibits:

DX 2 -
Payment Terms (1/27/2019)................................... A-1880

DX 14 -
October 11, 2018 E-mail – 'ABJ Properties'......... A-1887

ix

**Page**

DX 15 -
October 22, 2018 E-mail - 'SubletSpy hits' .......... A-1889

DX 16 -
'Notice of Hold' ...................................................... A-1892

DX 29 -
Affidavit ................................................................. A-1893

DX 36 -
March 28, 2018 E-mail – 'Invoice for 20
Buildings' .............................................................. A-1894

DX 49 -
Declaration ............................................................ A-1902

DX 51 -
Chase Information Request .................................... A-1903

DX 52 -
Chase Information Request .................................... A-1904

DC 62 -
March 9, 2018 E-mail Correspondence ................. A-1928

DX 70 -
GateGuard Logs ..................................................... A-1930

DX 71 -
May 22, 2018 E-mail – 'Re: Gateguard' ............... A-1932

Order of the Honorable Paul A. Engelmayer, dated
May 6, 2020 ........................................................... A-1933

Letter from Joseph A. DiRuzzo, III to the Honorable
Paul A. Engelmayer, dated May 8, 2020 ............... A-1935

Opinion and Order of the Honorable Paul A.
Engelmayer, dated June 5, 2020 ........................... A-1937

Letter from Joseph A. DiRuzzo, III to the Honorable
Paul A. Engelmayer, dated June 29, 2020 ............. A-2044

**x**

                                                        **Page**

Sentencing Memorandum and Motion for
Downward Variance, filed July 7, 2020.................. A-2045

Exhibit 1 to Sentencing Memorandum -
Letter from Dr. Rami Cohen, M.D to the
Honorable Paul A. Engelmayer, dated
June 29, 2020 ......................................................... A-2070

Exhibit 2 to Sentencing Memorandum -
Letter from Juhan Sonin to the Honorable Paul A.
Engelmayer, dated July 6, 2020............................. A-2074

Exhibit 3 to Sentencing Memorandum -
Letter from Jeffrey Katz to the Honorable Paul A.
Engelmayer ............................................................. A-2076

Exhibit 4 to Sentencing Memorandum -
Letter from Oliver Josephs t to the Honorable
Paul A. Engelmayer, dated June 6, 2020 ............... A-2077

Exhibit 5 to Sentencing Memorandum -
Letter from Thomas Orosz to the Honorable Paul
A. Engelmayer ........................................................ A-2079

Exhibit 6 to Sentencing Memorandum -
Letter from David Diwby to the Honorable Paul
A. Engelmayer ........................................................ A-2080

Exhibit 7 to Sentencing Memorandum -
Letter from Nachum Klar to the Honorable Paul
A. Engelmayer, dated July 6, 2020 ........................ A-2082

Exhibit 8 to Sentencing Memorandum -
Letter from Anthony Zachariadis to the
Honorable Paul A. Engelmayer, dated
July 6, 2020............................................................. A-2084

Exhibit 9 to Sentencing Memorandum -
eJewish Philanthrophy- Coverage of Teman's
Award ...................................................................... A-2085

**xi**

**Page**

Exhibit 10 to Sentencing Memorandum -
HarvardX Verified Certificate of Achievement,
issued May 11, 2020 ............................................... A-2094

Exhibit 11 to Sentencing Memorandum -
Letter from Avi Ganz to the Honorable Paul A.
Engelmayer, dated July 7, 2020 ............................ A-2095

Exhibit 12 to Sentencing Memorandum -
Letter from Steven Oved to the Honorable Paul
A. Engelmayer, dated June 15, 2020 ..................... A-2098

Exhibit 13 to Sentencing Memorandum -
Letter from Rabbi Chaim Lipskar to the
Honorable Paul A. Engelmayer, dated
July 7, 2020 ............................................................. A-2099

Exhibit 14 to Sentencing Memorandum -
Letter from Jonathan Lubin to the Honorable
Paul A. Engelmayer ............................................... A-2101

Exhibit 15 to Sentencing Memorandum -
Letter from Talia Reiss to the Honorable Paul A.
Engelmayer .............................................................. A-2103

Exhibit 16 to Sentencing Memorandum -
Letter from Rivka Korf to the Honorable Paul A.
Engelmayer .............................................................. A-2104

Exhibit 17 to Sentencing Memorandum -
Letter from Russell DiBona to the Honorable
Paul A. Engelmayer ............................................... A-2105

Letter from Justin K. Gelfand to the Honorable Paul
A. Engelmayer, dated September 8, 2020 .............. A-2107

Appearance of Counsel, dated November 2, 2020 .... A-2108.1

Letter from Justin Harris to the Honorable Paul
Engelmayer, dated November 2, 2020 ................... A-2108.2

xii

**Page**

Exhibit B to Letter -
Letter from Justine A. Harris to Kedar Bhatia and
Edward A. Imperatore, dated October 23, 2020 .... A-2108.6

Exhibit C to Letter -
Letter from Kedar S. Bhatia to Justine A. Harris,
dated October 29, 2020 ......................................... A-2108.9

Order of the Honorable Paul A. Engelmayer, dated
November 19, 2020 ............................................... A-2109

Letter from Justine Harris to the Honorable Paul A.
Engelmayer, dated November 20, 2020 ................. A-2111

Letter from Justine Harris to the Honorable Paul A.
Engelmayer, dated November 30, 2020 ................ A-2113

Letter from Audrey Strauss to the Honorable Paul
A. Engelmayer, dated November 30, 2020 ............ A-2114

Transcript of Remote Conference Proceedings held
before the Honorable Paul A. Engelmayer, dated
December 1, 2020 .................................................. A-2116

Order of the Honorable Paul A. Engelmayer, dated
January 28, 2021 ................................................... A-2170

Letter Motion from Audrey Strauss to the
Honorable Paul A. Engelmayer, dated
April 23, 2021 ....................................................... A-2173

Exhibit A to Letter -
Proposed Order of Restitution ............................... A-2181

Exhibit B to Letter -
Proposed Preliminary Order of Forfeiture/Money
Judgment ............................................................... A-2185

Exhibit C to Letter -
Document - Finocchiaro 3503-19 ......................... A-2189

Exhibit D to Letter -
Revised Document - Finocchiaro 3503-19 ............ A-2190

xiii

**Page**

Exhibit E to Letter -
Affidavit of Karen Finocchiaro, dated
April 2, 2021 ........................................................  A-2191

Letter from Andrew J. Frisch to the Honorable Paul
A. Engelmayer, dated April 23, 2021 ................... A-2195.1

Attachment to Letter -
*Curriculum Vitae* of Richard M. Fraher................ A-2195.3

Letter Motion to Vacate Conviction from Andrew J.
Frisch to the Honorable Paul A. Engelmayer,
dated April 28, 2021 .............................................  A-2196

Exhibit A to Letter Motion -
Document - Finocchiaro 3503-19 .........................  A-2211

Exhibit B to Letter Motion -
Revised Document - Finocchiaro 3503-19 ............  A-2213

Exhibit C to Letter Motion -
E-mail Correspondence, dated
November 30, 2020 ...............................................  A-2215

Exhibit D to Letter Motion -
E-mail Correspondence, dated March 10, 2021 ....  A-2217

Exhibit E to Letter Motion -
E-mail Correspondence, dated March 12, 2021 ....  A-2219

Exhibit F to Letter Motion -
Copies of Various Cashier's Checks .....................  A-2221

Order of the Honorable Paul A. Engelmayer, dated
May 5, 2021 ..........................................................  A-2223

Letter from Andrew J. Frisch to Kedar Bhatia, dated
May 12, 2021 ........................................................  A-2225

Annexed to Letter -
Declaration of Richard M. Fraher, executed
May 11, 2021 ........................................................  A-2226

xiv

**Page**

Letter from Audrey Strauss to the Honorable Paul
A. Engelmayer, dated June 9, 2021 ...................... A-2236

Letter from Andrew J. Frisch to the Honorable Paul
A. Engelmayer, dated June 14, 2021 .................... A-2246.1

Letter from Audrey Strauss to the Honorable Paul
A. Engelmayer, dated June 29, 2021 .................... A-2246.4

Transcript of Conference Proceedings held before
the Honorable Paul A. Engelmayer, dated
July 9, 2021............................................................ A-2247

Sentencing Submission Letter from Susan G.
Kellman to the Honorable Paul A. Engelmayer,
dated July 16, 2021 ................................................ A-2315

Transcript of Sentencing Proceedings held before
the Honorable Paul A. Engelmayer, dated
July 28, 2021.......................................................... A-2333

Notice of Appeal, dated August 2, 2021 .................... A-2458

Letter Motion from Ari Teman to the Honorable
Paul A. Engelmayer, dated March 3, 2022 ........... A-2459

Letter Motion from Ari Teman to the Honorable
Paul A. Engelmayer, dated April 12, 2022............. A-2462

Order of the Honorable Paul A. Engelmayer, dated
April 13, 2022........................................................ A-2463

Letter Motion from Ari Teman to the Honorable
Paul A. Engelmayer, dated April 13, 2022............. A-2465

Letter from Eden P. Quainton to the Honorable Paul
A. Engelmayer, dated April 13, 2022 .................... A-2467

Notice of Appearance, filed April 13, 2022 ............... A-2469

Letter Motion from Ari B. Teman to the Honorable
Paul A. Engelmayer, dated April 14, 2022............. A-2470

xv

**Page**

Order of the Honorable Paul A. Engelmayer, dated
    April 15, 2022......................................................... A-2473

Emergency Letter Motion from Ari B. Teman to the
    Honorable Paul A. Engelmayer, dated April 20,
    2022 ......................................................................... A-2476

Order of the Honorable Paul A. Engelmayer, dated
    April 20, 2022......................................................... A-2479

Emergency Letter Motion from Ari B. Teman to the
    Honorable Paul A. Engelmayer, dated April 20,
    2022 ......................................................................... A-2481

Letter from Kedar S. Bhatia, Asst. United States
    Attorney to the Honorable Paul A. Engelmayer,
    dated April 21, 2022 .............................................. A-2482

Order of the Honorable Paul A. Engelmayer, dated
    April 21, 2022......................................................... A-2483

A-721

584

K1OVTEM1                        Soleimani - cross

1    sometimes it didn't.

2            MR. BHATIA:  Objection.

3            THE COURT:  Sustained.

4    Q.  The GateGuard logs that you personally accessed included

5    images of individuals entering the building; correct?

6    A.  Some of the time.

7    Q.  Okay.  And those were basically -- are you familiar with

8    the term "selfies"?

9    A.  Yes.

10   Q.  In other words, a photograph of essentially just a face or

11   upper part of the body; correct?

12   A.  Right.

13   Q.  Those were basically selfies; correct?

14   A.  Yes.

15   Q.  Now, the information that the devices provided on its

16   online interface allowed you to access and organize it as you

17   deemed appropriate; correct?

18   A.  Correct.

19   Q.  In other words, if you wanted to isolate a particular

20   unit -- I'm making up a number, Apartment 407 -- and identify

21   all of the data that GateGuard had as to who entered that

22   building as that tenant or at least with that tenant's

23   permission, you could access and organize that information

24   using GateGuard's website; correct?

25   A.  Correct.

A-722

585

K1OVTEM1                    Soleimani - cross

1   Q.  And that had a value to your business to determine whether

2   you needed to identify, for example, illegal Airbnb-type

3   situations and the like; correct?

4   A.  Correct.

5   Q.  And that was intriguing to you as one of the benefits of

6   GateGuard when you signed up for GateGuard; correct?

7   A.  Correct.

8   Q.  In other words, it was one of your purposes that you wanted

9   the GateGuard system; correct?

10  A.  Correct.

11  Q.  So to be clear, to state the obvious, it was more than just

12  an intercom; correct?

13  A.  Correct.

14  Q.  Now, you readily agree, sitting here today, that for quite

15  some time your company had a business relationship with

16  GateGuard; correct?

17  A.  Correct.

18  Q.  And, in fact, is it fair to say that with respect to this

19  business relationship -- and I'm talking GateGuard, I'm not

20  talking Sublet Spy, some of the other things that you testified

21  about, although the same would probably apply -- with

22  GateGuard, you were the customer, GateGuard was the vendor;

23  correct?

24  A.  Correct.

25  Q.  And when you became a customer, you chose to become a

A-723

586

K1OVTEM1                    Soleimani - cross

1    customer; correct?

2    A.  Correct.

3    Q.  And you testified a few minutes ago that there was

4    essentially a demonstration of the equipment; correct?

5    A.  Correct.

6    Q.  In fact, you saw the equipment at least on one occasion at

7    a trade show; correct?

8    A.  Correct.

9    Q.  Describe, if you will, for the jury, what GateGuard's

10   presence was at that trade show.

11   A.  GateGuard had a booth.  Mr. Teman was there presenting his

12   GateGuard system.  There were some marketing material.  I

13   believe there were a few other employees or salespeople with

14   him.  And that was -- that's pretty much the extent of it.

15   Q.  And you had the opportunity to personally interact with the

16   system; correct?

17   A.  Correct.

18   Q.  Meaning you could physically -- probably oversimplifying,

19   but touch the devices and see what the online system looked

20   like before you signed up; correct?

21   A.  Yes.

22   Q.  And you took advantage of that opportunity; correct?

23   A.  Yes.

24   Q.  To be clear, at the booth, this was basically a demo;

25   correct?

K1OVTEM1                    Soleimani - cross

1    A.  Correct.

2    Q.  In other words, this wasn't a place to become a GateGuard

3    customer; it's a place to learn about GateGuard?

4    A.  Not necessarily.

5    Q.  Meaning you could become a customer, but GateGuard didn't

6    require you to become a customer to look at its equipment;

7    correct?

8    A.  Correct.

9    Q.  And, in fact, you took advantage of that, and you

10   essentially learned about the system prior to becoming a

11   customer; correct?

12   A.  I believe the trade show was after I became a customer.

13   Q.  Okay.  There was a demo in your office of the GateGuard

14   equipment; correct?

15   A.  Correct.

16   Q.  And who was present for that demo?

17   A.  Ari Teman.

18   Q.  And who was present on your end?

19   A.  Myself and my brother, Benjamin.

20   Q.  Okay.  The two principals of your company; correct?

21   A.  Correct.

22   Q.  And in that demo, Mr. Teman came at your request; correct?

23   A.  Correct.

24   Q.  And this was an opportunity for you to, again, learn about

25   the system and ask questions; correct?

A-725

588

K1OVTEM1                    Soleimani - cross

1    A.  Correct.

2    Q.  Mr. Teman answered your questions; correct?

3    A.  Yes.

4    Q.  And you also had an opportunity at that demo to essentially

5    preview the system, the online interface, the physical devices,

6    the whole nine yards; correct?

7    A.  Yes.

8    Q.  Now, to be clear, to actually sign up for GateGuard, you

9    had to sign up through the GateGuard website; correct?

10   A.  No.

11   Q.  Your testimony under oath is that you became a GateGuard

12   customer without ever signing up on the website?

13   A.  Correct.

14   Q.  Let me ask you in a nonleading way, how did you physically

15   become a GateGuard customer?

16   A.  I spoke with Ari about installing the systems.

17   Q.  And then immediately thereafter you --

18   A.  I received --

19          THE COURT:  Sorry.  Let's wait for the lawyer's

20   question to be finished before you answer.

21          Mr. Gelfand, just get the full question out please.

22          MR. GELFAND:  Thank you.

23   Q.  And then immediately after you just got your devices?

24   A.  We received invoices which we paid for, and then we set up

25   an installation.

A-726

589

K1OVTEM1                          Soleimani – cross

1   Q.  So your testimony is that you never went onto the GateGuard

2   website to become a customer; you never signed up online?

3   A.  Not that I recall.

4   Q.  Let me get this straight for a second.  Is it your

5   testimony that you don't recall doing it or that you didn't do

6   it?

7   A.  As far as I remember, I did not do it.

8   Q.  I'm not trying to be difficult, but I want to really get

9   this straight.  Do you remember whether you did it or are you

10  saying -- or are you denying that you did it?

11          MR. BHATIA:  Objection.  Asked and answered.

12          THE COURT:  Overruled.

13  A.  I don't recall.

14  Q.  Okay.  Now, you bought devices not just for one building,

15  as you testified, but for several buildings.  Seven, I believe

16  you said; correct?

17  A.  Correct.

18  Q.  And as we talked about, GateGuard and its crew installed

19  the devices at all of those buildings; correct?

20  A.  Correct.

21  Q.  And you used the devices for quite some time; correct?

22  A.  Correct.

23  Q.  And I understand that there's a time that essentially

24  communications broke down, which we'll get to in a few minutes.

25  But I want to talk for a few minutes about the time that you

A-727

590

K1OVTEM1                          Soleimani – cross

1    used the devices, in other words, when things were good.

2              During that time period, you always had access to the

3    online interface; correct?

4    A.  Yes.

5    Q.  Meaning GateGuard's online interface; correct?

6    A.  Yes.

7    Q.  You always had access to the data that GateGuard stored;

8    correct?

9    A.  Yes.

10   Q.  You always had access to the physical devices on the

11   buildings; correct?

12   A.  Correct.

13   Q.  And, in fact, at various times, you used that data for

14   various business purposes, for example, to identify tenant

15   issues or things like that; correct?

16   A.  Yes.

17   Q.  So, in other words, the website interface actually had a

18   practical business benefit to you, it wasn't just some esoteric

19   theoretical benefit?

20   A.  Yes.

21   Q.  Okay.  Now, after you became a GateGuard customer, you

22   testified that you obtained -- that you received invoices;

23   correct?

24   A.  Can you repeat that question?

25   Q.  Yes.  After you became a GateGuard customer -- let me

A-728

591

K1OVTEM1                          Soleimani – cross

1    rephrase that.
2              In the process of becoming a GateGuard customer, you
3    received invoices; correct?
4    A.  Yes.
5    Q.  Okay.  And the invoices were generated by GateGuard to you;
6    correct?
7    A.  Correct.
8    Q.  And you paid those invoices; correct?
9    A.  Yes.
10   Q.  The bottom of the invoice expressly said that you agreed to
11   be bound by the terms and conditions; correct?
12   A.  I did not see that at the time.
13   Q.  That wasn't my question.
14             You've seen it since then; correct?
15   A.  Correct.
16   Q.  And you'd agree with me that that's actually what it says;
17   correct?
18   A.  Yes.
19             (Pause)
20             MR. GELFAND:  Your Honor, I'm sorry, this was a late
21   exhibit from the government.  We didn't have a hard copy.
22             THE COURT:  Take your time.
23             MR. GELFAND:  Thank you.
24             THE COURT:  Ladies and gentlemen, if you want to
25   stretch your legs at this momentary break, feel free to do so.

K1OVTEM1                         Soleimani - cross

1           (Pause)

2           THE COURT:  Ready?

3           MR. GELFAND:  Thank you, your Honor.

4           THE COURT:  You may inquire.

5    BY MR. GELFAND:

6    Q.  I'm going to show you what you previously testified to, if

7    I can put the Elmo on.

8           Mr. Soleimani, can you see on the screen in front of

9    you Government Exhibit 409A?

10   A.  Yes.

11          THE COURT:  One moment.

12          (Pause)

13          THE COURT:  Ladies and gentlemen, is it appearing on

14   your screen?

15          THE JURY:  Yes.

16          THE COURT:  It's presented in a somewhat odd way on my

17   screen.  Counsel, is it appearing in a normal way on yours?

18          MR. GELFAND:  It is, your Honor.

19          THE COURT:  Very good.  I'll soldier through.

20          Go ahead.

21          MR. GELFAND:  Thank you.

22          For the record, these were previously admitted by the

23   government.

24          THE COURT:  Yes.

25   BY MR. GELFAND:

K1OVTEM1                    Soleimani - cross

1   Q.  Do you see in the screen in front of you, Mr. Soleimani,

2   Government Exhibit 409A?

3   A.  Yes.

4   Q.  And 409A consists of a series of invoices that you

5   previously identified; correct?

6   A.  Yes.

7   Q.  And to be clear -- we don't need to look at each of them,

8   but I'm happy to show you each of them -- they each refer

9   basically to a different property, a different apartment

10  building; correct?

11  A.  Correct.

12  Q.  And fair to say that's why they are different invoices?

13  A.  Yes.

14  Q.  Okay.  Now, if we look at the bottom -- first of all,

15  you've reviewed these prior to testifying; correct?

16  A.  Yes.

17  Q.  Is it fair to say that other than the different apartment

18  buildings and perhaps some of the pricing, the documents

19  themselves generated by GateGuard are basically identical?

20  A.  Yes.

21  Q.  Okay.  So if we look at the top, first of all, there's a

22  reference and kind of the header, if you will, to the GateGuard

23  website; correct?

24  A.  Yes.

25  Q.  Then there's the pricing; correct?

594

K1OVTEM1                    Soleimani - cross

1   A.  Correct.

2   Q.  And then if we direct your attention to the bottom of each

3   of these, can you please read what it says on the part that I

4   circled?

5   A.  Tax exempt capital improvements --

6   Q.  My apologies.  The part beginning with Payer accepts --

7           THE COURT:  Just one moment, Mr. Gelfand.  Due to the

8   problem with my screen, I can't see what's been circled.  I'm

9   going to wait until it comes up on Mr. Smallman's and look this

10  way.

11          MR. GELFAND:  Yes, your Honor.

12          (Pause)

13          THE COURT:  All right.  So that I can follow along,

14  Mr. Gelfand, until the AV specialist comes and fixes the

15  screen, just narrate what it is you're circling.

16          MR. GELFAND:  Absolutely, your Honor.

17          THE COURT:  Thank you.

18          MR. GELFAND:  For the record, I just circled a

19  sentence beginning with "Payer accepts terms" at the bottom of

20  the first page of 409A.

21          THE COURT:  Thank you.

22  BY MR. GELFAND:

23  Q.  Can you please read that full sentence?

24  A.  "Payer accepts terms at gateguard.xyz/legal/terms.php."

25  Q.  Can you please read what follows after that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1OVTEM1                    Soleimani - cross

1    A.  "This is a three-year contract."

2    Q.  Now, to be clear, if I understood your testimony, I

3    understand that you didn't go to that website; correct?

4    A.  Correct.

5    Q.  But you're not denying that this is the actual invoice that

6    you provided to the government in this case that you received

7    all the way back in 2017, March, to be precise, from GateGuard;

8    correct?

9    A.  Correct.

10   Q.  And you actually provided these documents to the

11   government; correct?

12   A.  Correct.

13   Q.  Now, March of 2017, let's talk dates for a second.  You

14   previously testified that you had met Mr. Teman in connection

15   with Sublet Spy all the way back in 2016; correct?

16   A.  Correct.

17   Q.  And you became a GateGuard customer in March of 2017;

18   correct?

19   A.  Correct.

20   Q.  Now, over time, you testified that there were some problems

21   with the system that you experienced; correct?

22   A.  Correct.

23   Q.  And GateGuard, to be clear, didn't just ignore those;

24   correct?

25   A.  I guess you could say that.

A-733

596

K1OVTEM1                    Soleimani – cross

1   Q.  GateGuard attempted to work with you guys to resolve them;

2   correct?

3   A.  Not all the time.

4   Q.  Let's talk -- instead of generalizing for a second, there

5   were times at the outset when you said there were technical

6   difficulties; correct?

7   A.  Correct.

8   Q.  GateGuard worked with your company or with your staff to

9   fix those; correct?

10  A.  Sometimes.

11  Q.  There were aspects of those technical difficulties, you

12  would agree with me, that GateGuard couldn't control, for

13  example, internet connectivity; correct?

14  A.  Who's to say that was the issue.

15  Q.  Well, let me be clear instead of speaking in the abstract.

16  GateGuard -- whether you agreed or not, GateGuard communicated

17  to you that that appeared to be the issue; correct?

18  A.  Correct.

19  Q.  And GateGuard communicated that to you after essentially

20  troubleshooting certain things on their end with the system;

21  correct?

22  A.  Correct.

23  Q.  And you'd agree with me that GateGuard was not the source

24  of your internet; correct?

25  A.  Correct.

K1OVTEM1                    Soleimani - cross

1    Q.  That was from another provider, a company, whatever it was?

2    A.  Correct.

3    Q.  Okay.  Now, over the course of that time, you testified to

4    a letter that you received from, fair to say, a fairly

5    frustrated Mr. Teman; correct?  An email?

6    A.  Correct.

7    Q.  And the email expressed frustration, and basically said, in

8    paraphrased words, GateGuard is going to shut down.  I'm tired

9    of this.  I'm sick of this.  Correct?

10   A.  Correct.

11   Q.  Immediately after that letter was sent, your brother,

12   Benjamin Soleimani, cc'ing you, immediately replied to that

13   email; correct?

14   A.  Correct.

15   Q.  I'm going to show you what's been marked as Defendant's 48,

16   your Honor.

17            THE COURT:  I'll need you to hand up a copy, given the

18   monitor issue.

19            MR. GELFAND:  Yes, your Honor.

20            THE COURT:  Thank you.

21            (Pause)

22            MR. GELFAND:  Your Honor, I'll just ask the witness

23   some questions while we work through the logistics.

24            THE COURT:  Go ahead.  Thank you.

25   BY MR. GELFAND:

A-735

K1OVTEM1                          Soleimani – cross

1    Q.  You recall that email; correct?

2    A.  Yes.

3    Q.  And you received that email from Ben Soleimani; correct?

4    A.  Correct.

5    Q.  And is it fair to say that the response to the email of

6    essentially GateGuard is shutting down was, No, please don't

7    shut down.  Wait a couple weeks.  Let's talk.

8               MR. BHATIA:  Objection, your Honor.

9               THE COURT:  One moment.

10              Technically, that's correct.  Sustained.

11   Q.  What do you recall the general gist of that email being?

12   A.  Requesting not to shut down.

13   Q.  To be clear, Mr. Teman at one point basically said, I'm

14   going to shut down.  But you guys requested him not to shut

15   down; correct?

16              MR. BHATIA:  Objection, your Honor.

17              MR. GELFAND:  Your Honor, can I show just the

18   witness --

19              THE COURT:  I think this will be facilitated by having

20   the document in front of the witness.

21              MR. GELFAND:  Could I show it through the Elmo?

22              THE COURT:  Yes, you may.

23              I just need a copy, but, yes.

24              MR. GELFAND:  Yes.

25              THE COURT:  Go ahead.

599

K1OVTEM1                        Soleimani - cross

1          MR. GELFAND:  It's Defendant's Exhibit 62, your Honor.

2          MR. DiRUZZO:  May I approach, your Honor?

3          THE COURT:  Thank you.

4          MR. GELFAND:  This is not visible to the jury, just

5     the witness.

6          THE COURT:  Just the witness.  All right.

7          Thank you, counsel.

8     BY MR. GELFAND:

9     Q.  Can you tell me, Mr. Soleimani, if you recognize this email

10    from Benjamin Soleimani on March 9th, 2018?

11    A.  Yes.

12    Q.  Is this the email you received -- cc'd from him to

13    Mr. Teman in response to the email that you had introduced

14    on -- that you testified on on direct examination?

15    A.  Yes.

16          MR. GELFAND:  Your Honor, at this point I move

17    Defendant's Exhibit 62 into evidence.

18          THE COURT:  Any objection?

19          MR. BHATIA:  Yes, your Honor.

20          THE COURT:  Basis?

21          MR. BHATIA:  801.

22          THE COURT:  Government counsel, am I correct that the

23    embedded email from Mr. Teman on March 9th, 2018 at 7:46 a.m.,

24    the embedded email is already in evidence, is it not?

25          MR. BHATIA:  That's right.

A-737

K1OVTEM1                    Soleimani - cross

1          THE COURT:  So the only issue in dispute is the top

2    email?

3          MR. BHATIA:  That's right.  I think that's also the

4    subject of the question.

5          THE COURT:  That's what?

6          MR. BHATIA:  I think the top email is also the subject

7    of the question.

8          THE COURT:  Right.

9          Overruled.  I'll receive it.

10          (Defendant's Exhibit 62 received in evidence)

11          MR. GELFAND:  Thank you.

12          May I publish it to the jury?

13          THE COURT:  You may.

14          MR. GELFAND:  Everything working?

15          THE COURT:  Ladies and gentlemen, can you at least see

16    it?

17          THE JURY:  Yes.

18          THE COURT:  Okay.  Very good.

19          That's ultimately what matters.

20          MR. GELFAND:  May I proceed?

21          THE COURT:  Very good.  Yes, you may.

22          MR. GELFAND:  Thank you.

23    BY MR. GELFAND:

24    Q.  Do you see Defendant's Exhibit 62 on the screen?

25    A.  Yes.

601

K1OVTEM1                    Soleimani - cross

1    Q.  And the prosecutor showed you the bottom part of this email

2    from Mr. Teman on March 9th of 2018; correct?

3    A.  Correct.

4    Q.  The prosecutor did not ask you about --

5            THE COURT:  Mr. Gelfand, not about the prosecutor, ask

6    about the evidence.

7            MR. GELFAND:  Fair enough.

8    Q.  The top part of this email -- looks like dates for a

9    second.  The evidence at the bottom part of the email is March

10   9th at 7:46 a.m.; correct?

11   A.  Correct.

12   Q.  On March 9th at 8:21 a.m., there's a response from Benjamin

13   Soleimani to Ari Teman and to you at your email address;

14   correct?

15   A.  Correct.

16   Q.  So approximately -- I went to law school to avoid math, but

17   40 minutes or later or something; correct?

18   A.  Correct.

19   Q.  And can you please read what Mr. Benjamin Soleimani said in

20   the body of this email?

21   A.  Ari, I'm not too involved here, but I understand we have a

22   dinner scheduled --

23           THE COURT:  A little more slowly so that the court

24   reporter can pick up the words.

25           THE WITNESS:  Sure.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1OVTEM1                    Soleimani - cross

1    A.  Ari, I'm not too involved here, but I understand we have a
2    dinner scheduled for next week that Joe and I wanted to discuss
3    certain things with you.  Please don't do anything yet with the
4    system.  Let's keep it going how it was before, the update.
5    And let's discuss next week what we can do together to improve
6    it.
7    Q.  To be clear, this was March 9th of 2018; correct?
8    A.  Correct.
9    Q.  So this was approximately one year after -- I show you
10   409A, briefly -- that you became a GateGuard customer on March
11   2nd of 2017; correct?
12   A.  Correct.
13   Q.  And over the course of that one year, you obviously had and
14   used your GateGuard equipment; correct?
15   A.  No.
16   Q.  Your testimony is you didn't have and use GateGuard
17   equipment during that one year?
18   A.  For one year, no.
19   Q.  Now, towards the end of 2018, a billing dispute arose
20   between your company and GateGuard; correct?
21   A.  Correct.
22   Q.  And --
23          THE COURT:  Just a moment, Mr. Gelfand.
24          (Pause)
25          THE COURT:  One moment.

K1OVTEM1                        Soleimani - cross

1               MR. GELFAND:  Sure.

2               (Pause)

3          THE COURT:  Ladies and gentlemen, ignore the tech

4     activity under my desk.  We'll proceed ahead in the interest of

5     using time effectively.

6               Go ahead.

7          MR. GELFAND:  Thank you, your Honor.

8     BY MR. GELFAND:

9     Q.  I'm sorry.  Just to back up for a second, in October of

10    2018, a billing dispute arose between you and GateGuard;

11    correct?

12    A.  Correct.

13    Q.  And you communicated directly with GateGuard's attorney in

14    the context of that billing dispute; correct?

15    A.  Correct.

16    Q.  And that attorney was an Ariel Reinitz at a law firm called

17    FisherBroyles; correct?

18    A.  Correct.

19    Q.  And you not only spoke with him by phone, but you emailed

20    with him; correct?

21    A.  Correct.

22              MR. GELFAND:  Your Honor, may I show the witness

23    Defense Exhibit 14, but not the jury?

24              THE COURT:  Yes, you may.  I'll need a copy.

25              MR. GELFAND:  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

604

K1OVTEM1                         Soleimani - cross

1          May I show this to the witness, your Honor?

2          THE COURT:  You may.

3   BY MR. GELFAND:

4   Q.  Do you see Defendant's Exhibit 14 in front of you?

5   A.  Yes.

6   Q.  Okay.  Do you recognize this as email or correspondence

7   from Mr. Reinitz to you in the context of the GateGuard billing

8   dispute?

9   A.  Yes.

10          MR. GELFAND:  Your Honor, at this point I would move

11  Defendant's Exhibit 14 subject to the same limiting instruction

12  the Court gave with respect to Mr. Gabay.

13          THE COURT:  Any objection?

14          MR. BHATIA:  Yes, your Honor.  801.

15          THE COURT:  Let me see you at the sidebar.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

A-742

605

K1OVTEM1                          Soleimani - cross

1            (At sidebar)

2            THE COURT:  All right.  Defense Exhibit 14 for

3      identification is an email exchange between Reinitz and this

4      witness on October 11, 2018.

5            And actually, the initial email is on September 6,

6      2018 from Mr. Reinitz, in which he introduces himself to

7      Mr. Soleimani and says:  I'm an attorney representing

8      GateGuard.  He says:  I understand there are outstanding fees

9      due under the service agreement.  Let me know who I can

10     coordinate with at ABJ to ensure that these fees are paid and

11     resolve any other issues.

12           And then on October 11th, Reinitz writes again to

13     Mr. Soleimani:  Further to our discussion yesterday, attached

14     is one of GateGuard's invoices for panel services provided to

15     you.  It goes on to say:  The invoice indicates that your

16     agreement with GateGuard is subject to the terms available here

17     and here.  Those are hyperlinks.  He goes on to write:  I'm

18     reviewing the terms now and will circle back shortly re your

19     request to discontinue GateGuard service.  And it's signed by

20     Ariel Reinitz.

21           Government counsel, what's your application?

22           MR. BHATIA:  This is under 801 we have an objection.

23           THE COURT:  You didn't need to explain that.  He's

24     impeaching the witness.  The witness claims not to have

25     authorized these fees.  This is communication between the

K1OVTEM1                    Soleimani — cross

1    witness and an agent of the defendant on the very issue of

2    authorization.  How is this not proper impeachment?

3         MR. BHATIA:  I think there's also a 403 issue here;

4    it's coming from a lawyer.

5         THE COURT:  Be that as it may, I mean, if you want me

6    to limit the statements made here so that they are not taken

7    for the truth, that's one thing.  But the heart of the dispute

8    here involves whether or not the witness authorized various

9    services, and whether or not Mr. Teman believed the witness had

10   done so.  Here we have Mr. Teman's agent engaging with some --

11   with an allegedly authorizing or nonauthorizing customer on at

12   least some services.

13        Now, I'm not going to receive this without attaching

14   the invoice.  You can't offer this without the invoice because

15   it's misleading.  It may well be that the invoice is a far cry

16   from the very substantial number of costs that are later put

17   through.  The invoice may be for five or $10,000 and not for

18   180 or $190,000.  I assume the invoice will tell the tale.  I'm

19   not going to allow this to be admitted with that very

20   significant area of mystery excised from it.  That would be

21   misleading.

22        But assuming that you can attach the invoice here, it

23   seems to me it very much bears on the course of dealings and,

24   in turn, presuming that Mr. Reinitz is able to connect the dots

25   here, it may well bear on the defendant's state of mind.

K1OVTEM1                        Soleimani – cross

1          MR. GELFAND:  Your Honor, the government has been

2     provided a copy of the invoice.

3          THE COURT:  Be that as it may --

4          MR. GELFAND:  I understand.  What I would ask is for

5     leave to supplement this exhibit for the jury's --

6          THE COURT:  No, no, no.  If you can't offer an

7     incomplete exhibit, it's misleading, because -- look, tell me,

8     how much does the attached invoice -- how much does it come to?

9          MR. GELFAND:  Off the top of my head, your Honor, I

10    don't recall.  I believe this was the original invoice.

11         THE COURT:  Are we talking less than $10,000?

12         MR. GELFAND:  No, your Honor.  I believe it was --

13         MR. BHATIA:  I think it was --

14         THE COURT:  Sorry, you can't speak over each other.

15    I'm actually speaking to defense counsel.

16         MR. GELFAND:  Could we see if we can pull it real

17    quick, your Honor?

18         THE COURT:  Yes.  But, look, here's the important

19    thing.  On a macro level, if you have the invoice attached so

20    we have a complete document, it seems to me it's appropriate.

21    The subject of the examination goes to a central issue here,

22    which is the conversations between the defendant and his

23    customer about what fees were authorized or not.  I think it's

24    entirely appropriate that this be ventilated in the interest of

25    allowing a full defense here.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1OVTEM1                     Soleimani - cross

1          However, the communications are also not for the truth

2     of the matter asserted; they are as they bear on the state of

3     mind of the witness and potentially as they bear on the state

4     of mind of the defendant, if they are ultimately shown to the

5     defendant.  We'll see about that.

6          But you can't introduce this -- the references of

7     attached invoice and leave out the invoice, because you may

8     then suggest or the jury may be misled to think that the

9     invoice involves the amounts at issue in this case, where it

10    may involve a far cry from that.

11         MR. GELFAND:  Your Honor, I believe this invoice is --

12    and perhaps the government can shed light on it, is one of the

13    invoices the government actually introduced into evidence.

14         THE COURT:  It's on you to establish what was sent to

15    Reinitz.  Because the government did not establish -- excuse

16    me.  Reinitz is the one who says to Joe, Attached is one of

17    your invoices.  You're offering this evidence; it's on you to

18    attach the invoice.  You've selectively presented the exhibit

19    and not the invoice.  It's your witness.  You've got Reinitz

20    coming later today.  You need to do this.

21         MR. GELFAND:  We'll do that.

22         Can I, for now, just question the witness about the

23    substance --

24         THE COURT:  No, just go find your invoice.

25         I'm not going to receive -- I don't think you

K1OVTEM1                          Soleimani – cross

1    understand what I'm saying.

2            MR. GELFAND:  I understand.

3            THE COURT:  You're misleading the jury to say there is

4    this invoice that we claim is valid and not attach it.  And I'm

5    not going to allow you, quote, for now to present half of the

6    exhibit.  So go find the invoice.

7            MR. GELFAND:  Understood, your Honor.

8            THE COURT:  I will receive it subject to a

9    not-for-the-truth limiting instruction, but only when it's a

10   complete document.

11           MR. GELFAND:  Understood, your Honor.

12           THE COURT:  Thank you.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

K1OVTEM1                    Soleimani – cross

1           (In open court)

2           MR. GELFAND:  May I proceed, your Honor?

3           THE COURT:  Just one moment.

4           (Pause)

5           THE COURT:  Go ahead.  You may proceed.

6  BY MR. GELFAND:

7  Q.   Now, Mr. Soleimani, in terms of dates, approximately

8  September --

9           THE COURT:  One moment.

10          I took the sidebar when there is an objection to an

11 exhibit.  Are you, for the time being, not offering the

12 exhibit?

13          MR. GELFAND:  Correct, your Honor.

14          THE COURT:  All right.  Very good.

15          That's obviously without prejudice to your ability to

16 offer it when it's in complete form.

17          MR. GELFAND:  Thank you, your Honor.

18 BY MR. GELFAND:

19 Q.   In approximately September and October of 2018, a billing

20 dispute arose between you and GateGuard; correct?

21 A.   Correct.

22 Q.   And you engaged in discussions with GateGuard about that

23 billing dispute; correct?

24 A.   Correct.

25 Q.   And to be clear, GateGuard was claiming to you that money

611

K1OVTEM1                    Soleimani - cross

1    was owed under a contract; correct?

2    A.   Correct.

3    Q.   And you obviously disagreed with that; correct?

4    A.   Correct.

5    Q.   Is it fair to say that that was the heart of the dispute?

6    A.   Yes.

7    Q.   In October of 2018, you discussed essentially purchasing

8    GateGuard's next iteration; correct?

9    A.   I believe so.

10   Q.   And to be clear, by "next iteration," I mean essentially

11   the -- I don't know if it's literally, but the 2.0 versus the

12   1.0; correct?

13   A.   Yes.

14   Q.   And you were interested in essentially the new GateGuard

15   device and technology that was on or soon to be on the market;

16   correct?

17   A.   Yes.

18   Q.   And you engaged in discussions with Mr. Teman and other

19   agents of GateGuard about buying that device and technology;

20   correct?

21   A.   Yes.

22   Q.   And in doing so, is it fair to say that in October of 2018,

23   you were interested in GateGuard's new technology and new

24   system?

25   A.   Give me a moment for a second.  I don't believe it was --

K1OVTEM1                          Soleimani - cross

1    it was in October of '18.

2    Q.  Would an email from you to Mr. Reinitz in October of 2018

3    refresh your memory?

4    A.  Possibly.

5              MR. GELFAND:  May I approach the witness and show it

6    to him?

7              THE COURT:  You may.  You are at liberty to put it, as

8    long as it's not on the jury's monitor, and Mr. Smallman has

9    turned that off, you are at liberty to show it to him on the

10   Elmo.

11             MR. GELFAND:  Thank you.

12             Is the jury's monitor off?

13             THE COURT:  Yes.  Go ahead.

14             I'm pleased to say that I'm now functional -- or at

15   least my monitor is functional again.

16   BY MR. GELFAND:

17   Q.  Just take a moment just to read that to yourself, sir.

18   A.  Okay.

19   Q.  Does that refresh your memory?

20   A.  Yes.

21   Q.  Okay.  I can take this off the screen.

22             So in October of 2018, is it fair to say that that's

23   when you were interested in exploring the new tablets; correct?

24   A.  The new tablets or the new --

25   Q.  The new system.

K1OVTEM1                    Soleimani – cross

1    A.  Correct.

2    Q.  And your understanding at the time was that there was some

3    manufacture activity in China on GateGuard's end; correct?

4    A.  Correct.

5    Q.  And you had actually asked for a general release from

6    GateGuard to Mr. Reinitz in October of 2018; correct?

7    A.  Correct.

8    Q.  So to be clear, when you asked for a release, you were

9    asking to be relieved from any prior obligations that might

10   have existed; correct?

11   A.  Any prior obligations he was claiming.

12   Q.  And your request for a release was in the context of trying

13   to move forward with this new GateGuard system, essentially,

14   the second generation of it or the next generation of it?

15   A.  Correct.

16   Q.  Okay.  Now, just speaking generally for a second, you're

17   aware that Mr.  -- you've known Mr. Teman for quite some time;

18   correct?

19   A.  Correct.

20   Q.  You're aware that he is not an attorney; correct?

21   A.  Correct.

22   Q.  And as you previously testified, is it fair to say that at

23   least as far as you were concerned in terms of what you

24   received in terms of communication, Mr. Teman had handed off

25   the billing dispute to his attorney?

K1OVTEM1                          Soleimani - cross

1    A.   He handed off what?

2    Q.   The billing dispute to his attorney to deal with?

3    A.   I believe he was still involved.

4    Q.   Fair enough.  But I'm saying the communications you started

5    to receive were from his attorney; correct?

6    A.   No, he was emailing as well.

7    Q.   Okay.  But you received -- let me ask the question more

8    precisely.

9         You began to receive communications about this topic

10   from his attorney; correct?

11   A.   Correct.

12   Q.   And you had some phone calls with his attorney,

13   Mr. Reinitz; correct?

14   A.   Correct.

15   Q.   Now, you testified that in May of 2019, you became aware of

16   the checks or the RCCs drawn on your account; correct?

17   A.   Correct.

18   Q.   And if I understood your testimony correctly, you became

19   aware of this directly from your bank; correct?

20   A.   No.

21   Q.   How did you become aware of this?

22   A.   We were doing monthly reconciliations in our office, and

23   that's how we became aware of it.

24   Q.   Okay.  So let me ask this more precisely:  Meaning you were

25   looking at bank records generated from your bank in your

K1OVTEM1                    Soleimani - cross

1  office?

2  A.  Correct.

3  Q.  Okay.  And then you basically saw these checks and then, if

4  I understood your testimony correctly, you alerted your bank;

5  correct?

6  A.  Correct.

7  Q.  And who was your bank?

8  A.  Chase.

9  Q.  Just for purposes of our record, that's the same as

10  JPMorgan Chase?

11  A.  Correct.

12  Q.  Okay.  You had actually had a -- let's back up for a

13  second.

14        Between October and -- of 2018 and May of 2019, there

15  were continued discussions about the billing dispute; correct?

16  A.  I don't recall the exact dates, but there were discussions.

17  Q.  Okay.  At the very least you recall there were discussions

18  in October of 2018; correct?

19  A.  I don't recall the dates.

20  Q.  But what we just showed you on the screen --

21  A.  Okay.

22  Q.  -- that was October of 2018; correct?

23  A.  Fair enough.  Yup.

24  Q.  Okay.  Can you speak into the microphone?

25  A.  Sure.

K1OVTEM1                    Soleimani - cross

1   Q.  Okay.  Now, you testified that by April of 2019, GateGuard

2   had placed certain liens on properties owned by ABJ entities;

3   correct?

4   A.  Correct.

5   Q.  And GateGuard had essentially threatened, but not

6   initiated, litigation against ABJ or its entities; correct?

7   A.  Correct.

8   Q.  And to be clear, ABJ had not initiated any sort of

9   litigation against GateGuard; correct?

10  A.  Correct.

11  Q.  Okay.  Now, your company had a longtime business

12  relationship with JPMorgan Chase; correct?

13  A.  Correct.

14  Q.  If you know, who is Ilana Habibian?

15  A.  She's a banker at Chase.

16  Q.  And how do you know Ilana Habibian?

17  A.  I met with her several times to open accounts, discuss any

18  issues.

19  Q.  Okay.  And is this basically your personal contact at

20  JPMorgan Chase or is this just some random person you talked to

21  once or twice?

22  A.  Personal contact.

23  Q.  You were working with Ms. Habibian at JPMorgan Chase for

24  quite some time over business banking activities; correct?

25  A.  Correct.

617

K1OVTEM1                    Soleimani - cross

1   Q.  Do you know her outside of a professional business context

2   at all?

3   A.  No.

4   Q.  Now, you called her on May 2nd of 2019; correct?

5   A.  Correct.

6   Q.  And you were then asked by the bank to sign a document

7   called a Declaration of Unauthorized Remotely Created Check or

8   an affidavit of some sort; correct?

9   A.  I don't recall what I signed.

10  Q.  Now, to be clear for a second, if I show you Government

11  Exhibit 204, you were asked about a subset of these documents;

12  correct?

13  A.  Correct.

14  Q.  And this was the subject of your discussion with JPMorgan

15  Chase; correct?

16  A.  Correct.

17  Q.  All checks generated on April 19th of 2019; correct?

18  A.  Not all checks.  Certain checks.

19  Q.  No, I'm saying all of the checks at issue were generated as

20  to ABJ on April 19th of 2019; correct?

21  A.  Yes.

22  Q.  Yes?  Okay.

23         And when you communicated with JPMorgan Chase, you had

24  obviously by that point seen the checks themselves; correct?

25  A.  Correct.

618

K1OVTEM1                    Soleimani - cross

1    Q.  All of them say, "Draw per contract.  No signature

2    required."  Correct?

3    A.  Correct.

4    Q.  All of them reference the same URL on the invoice that you

5    received back in 2017; correct?

6    A.  Correct.

7    Q.  And all of them reference a 212-203-3714 telephone number;

8    correct?

9    A.  Correct.

10   Q.  Do you know whose number that is?

11   A.  To my knowledge, that number belongs to GateGuard.

12   Q.  Did you have any discussions with JPMorgan Chase in the

13   context of whether this check was authorized about the legal

14   terms at this URL?

15   A.  I don't recall my exact conversation.

16   Q.  Did you ever tell your bank or show that about the invoices

17   or show them copies of the invoices?

18   A.  No.

19   Q.  Did you discuss that you had a longtime business

20   relationship with GateGuard, Incorporated?

21   A.  Yes.

22        MR. GELFAND:  Your Honor, can I confer with Mr. Bhatia

23   for a minute?

24        THE COURT:  You may.

25        (Counsel conferred)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

619

K1OVTEM1                    Soleimani - cross

1          MR. GELFAND:  Your Honor, at this point, by

2    stipulation with the government, I move into evidence Defense

3    Exhibit 49.

4          THE COURT:  May I have a copy please?

5          MR. GELFAND:  Yes, your Honor.

6          THE COURT:  Any objection?

7          MR. BHATIA:  No, your Honor.

8          THE COURT:  Mr. Gelfand, I think -- is there a

9    stipulation as to what this is?

10         MR. GELFAND:  Yes, your Honor.  There's a stipulation

11   that these are true and correct authentic business records of

12   JPMorgan Chase.

13         THE COURT:  We're looking at Exhibit 49, which is a

14   form that is not completed.

15         MR. GELFAND:  Correct, your Honor.

16         THE COURT:  Very good.  It is received as such.

17         MR. GELFAND:  Thank you, your Honor.

18         (Defendant's Exhibit 49 received in evidence)

19         MR. GELFAND:  May I publish it?

20         THE COURT:  You may.

21   BY MR. GELFAND:

22   Q.  Did you ever complete this declaration and provide a copy

23   of it to JPMorgan Chase?

24   A.  I don't recall doing that, no.

25   Q.  You don't recall doing that; correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1OVTEM1                    Soleimani - cross

1   A.  No.

2   Q.  The truth is your bank never required you to file some sort

3   of affidavit or declaration attesting to whether or not these

4   RCCs were authorized; correct?

5   A.  Correct.

6   Q.  And because they never required you to do it, you never

7   did; correct?

8   A.  Correct.

9   Q.  So is it fair to say the extent of your conversations with

10  the bank were essentially a phone call with -- about this

11  topic, were essentially a phone call with Ilana Habibian,

12  H-A-B-I-B-I-A-N, your contact, personal banker, if you will, at

13  the bank?

14  A.  Yes.

15  Q.  Now, in communicating with JPMorgan Chase, your

16  communications occurred prior to ever -- to you ever personally

17  going to law enforcement; correct?

18  A.  Yes.

19  Q.  And if I understood your testimony on direct correctly, you

20  went to law enforcement at the request or recommendation of

21  JPMorgan Chase; correct?

22  A.  Yes.

23  Q.  And the first time you went was in person on May 6 of 2019;

24  correct?

25  A.  I don't recall the exact date.

K1OVTEM1                    Soleimani – cross

1   Q.  Does that sound approximately accurate?

2   A.  It was probably around there.

3   Q.  Do you recall speaking in person with a Detective Angelo

4   Morales of the New York Police Department, the NYPD?

5   A.  I don't recall the person I spoke with.

6   Q.  Do you recall having a conversation with someone at the

7   NYPD?

8   A.  Yes.

9   Q.  In person?

10  A.  Yes.

11  Q.  And you claimed in that conversation that $180,000 was not

12  authorized; correct?

13  A.  Correct.

14  Q.  And you acknowledge that; correct?

15  A.  Correct.

16  Q.  And the number you provided was $180,000; correct?

17  A.  I said ballpark figure.

18  Q.  That's the number you provided; correct?

19          MR. BHATIA:  Objection, your Honor.

20          THE COURT:  Sustained.

21          He said he provided it as a ballpark figure.

22          MR. GELFAND:  Fair enough, your Honor.

23  Q.  Approximately two weeks later you were interviewed by

24  Detective Alessandrino at the NYPD; correct?

25  A.  Correct.

K1OVTEM1                          Soleimani – cross

1   Q.  And in that interview with Detective Alessandrino, you

2   answered questions about the very topic of your testimony

3   today; correct?

4   A.  Correct.

5   Q.  You told Detective Alessandrino that your company ended all

6   business with Mr. Teman in October of 2017; correct?

7   A.  No, not that I recall.

8   Q.  Do you deny making that statement to Mr.  -- to Detective

9   Alessandrino?

10  A.  I don't believe I made that statement.

11  Q.  You also told Detective Alessandrino, did you not, that no

12  checks were authorized after October of 2017?

13  A.  I don't recall the date.

14  Q.  Do you deny making that statement to Mr. Alessandrino --

15  Detective Alessandrino?

16  A.  No.

17          MR. BHATIA:  Objection.

18          THE COURT:  One moment.

19          Overruled.  You may answer.

20  A.  Can you repeat the question.

21          THE COURT:  Can you repeat the question.

22          MR. GELFAND:  Yes, your Honor.

23  Q.  Do you deny making that statement, in particular, that no

24  checks were authorized after October 2017, to Detective

25  Alessandrino when he interviewed you?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-760

623

K1OVTEM1                          Soleimani - cross

1   A.  I don't recall what date I gave him.

2   Q.  It's probably my fault.  I think we're having a

3   miscommunication.

4           I'm not asking you about the date, I'm asking whether

5   you made that statement to Detective Alessandrino?

6           THE COURT:  I'm sorry, but he answered your question,

7   he doesn't recall the date.

8           MR. GELFAND:  Okay.

9           Your Honor, subject to quick consultation with the

10  government, I also move Defense Exhibit 51 into evidence.

11          THE COURT:  I'll need a copy please.

12          (Counsel conferred)

13          MR. GELFAND:  Same stipulation, your Honor.

14          THE COURT:  One moment.

15          Sorry.  Is this pursuant to a stipulation?

16          MR. GELFAND:  Yes, your Honor.

17          THE COURT:  What is the stipulation?

18          MR. GELFAND:  That Defendant's Exhibit 51 is a true

19  and accurate, authentic record of JPMorgan Chase, and it's a

20  business record.

21          THE COURT:  Government, you so stipulate?

22          MR. BHATIA:  Yes.

23          THE COURT:  I will receive Exhibit 51.

24          (Defendant's Exhibit 51 received in evidence)

25          MR. GELFAND:  May I publish it, your Honor?

624

K1OVTEM1                    Soleimani - cross

1        THE COURT:  You may.

2        MR. BHATIA:  I'm sorry, your Honor.  To be clear,

3    these were subject to the stipulations that I read on the first

4    day of trial.

5        THE COURT:  Very good.

6        That's right.  Thank you.  Thank you.

7    BY MR. GELFAND:

8    Q.  Can you see on the screen in front of you Defendant's

9    Exhibit 51, Mr. Soleimani?

10   A.  Yes.

11   Q.  The recipient of this document was ABJ Milano LLC; correct?

12   A.  Correct.

13   Q.  And this was a letter that ABJ received from JPMorgan Chase

14   dated May 2nd of 2019; correct?

15   A.  Correct.

16   Q.  That was the same date you testified you spoke with your

17   personal banker, Mrs. Habibian; correct?

18   A.  Correct.

19   Q.  Okay.  And to be clear, you recall receiving this letter

20   from your bank; correct?

21   A.  I don't recall, but it looks like it was mailed to me.

22   Q.  That's the address of ABJ Milano; correct?

23   A.  Yes.

24   Q.  Okay.  Now, it says:  Action needed.  Please provide us

25   more information about your claim.  Do you see that?

K1OVTEM1                    Soleimani - cross

1   A.  Yes.

2   Q.  Okay.  And it says:  Dear ABJ Milano LLC, we reviewed your

3   claim and need more information to complete our research.

4           Correct?

5   A.  Yes.

6   Q.  It then says:  Your claim is now closed, but we'll reopen

7   it as soon as you respond.  Correct?

8   A.  Correct.

9   Q.  And then it says in bold:  Here's what we need from you.

10           Correct?

11  A.  Correct.

12  Q.  And then it says -- highlighted on the screen:  Please

13  return the completed affidavit or declaration.  Correct?

14  A.  Correct.

15  Q.  And it provides info as to how you can send those

16  documents; correct?

17  A.  Correct.

18  Q.  In other words, you can fax them, you can mail them, you

19  can call with questions, etc.; correct?

20  A.  Yes.

21  Q.  But as you previously testified, you never did that;

22  correct?

23  A.  I don't recall.

24  Q.  Now, after -- well, in the context of your discussions with

25  JPMorgan Chase, you essentially requested that JPMorgan Chase

A-763

626

K1OVTEM1                        Soleimani - cross

1   not process those checks, in other words, not charge them to

2   you; correct?

3   A.  Correct.

4   Q.  And you asked that chargebacks -- you might not have used

5   this word, but that chargebacks be issued; correct?

6            MR. BHATIA:  Objection, your Honor.

7            THE COURT:  Overruled.

8   A.  I did not use that term "chargeback."

9   Q.  What was your request of JPMorgan Chase with respect to

10  these checks?

11  A.  I requested the money to be refunded back into my account.

12  Q.  Now, I'm showing you Government Exhibit 127 which was

13  previously admitted.  This is a virtually identical letter

14  issued to ABJ Lenox LLC; correct?

15  A.  Yes.

16  Q.  And, in fact, the document we just looked at from JPMorgan

17  Chase was issued to ABJ Milano; correct?

18  A.  Correct.

19  Q.  And ABJ Milano was a business that had -- I'm sorry, was an

20  apartment building, if you will, that had a relationship with

21  GateGuard; correct?

22  A.  Correct.

23  Q.  And ABJ Lenox also had a business relationship with

24  GateGuard; correct?

25  A.  Correct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

627

K1OVTEM1                    Soleimani – cross

1    Q.  And those were the entities that the ABJ checks were drawn

2    on; correct?

3    A.  Correct.

4    Q.  This letter, also dated May 2nd, 2019, states that the bank

5    on the same day determined that the checks were unauthorized;

6    correct?

7    A.  Correct.

8    Q.  But it included a caveat, if you will.

9            Can you read that next sentence underlined?

10   A.  "We may reverse the credit if we receive information that

11   your transactions were authorized."

12   Q.  So, in other words, JPMorgan Chase communicated to you that

13   if it turns out these were authorized, they reserve the right

14   to basically do a 180; correct?

15   A.  Correct.

16           MR. BHATIA:  Objection.

17           THE COURT:  One moment.

18           MR. GELFAND:  I can withdraw the question.

19           THE COURT:  Overruled.

20   Q.  Was that correct?

21   A.  Yes.

22   Q.  Okay.  And you understood as of May 2nd, 2019, that if, in

23   fact, your bank concluded that these checks were, in fact,

24   authorized, your company would be on the hook for the money;

25   correct?

A-765

628

K1OVTEM1                         Soleimani - cross

1    A.  Correct.

2    Q.  Showing you Government Exhibit 129, previously admitted,

3    take a look at it for a minute.  Can you see it on the screen?

4    A.  Yeah.

5    Q.  Is this literally the same letter with the same date, but

6    instead issued to ABJ Milano LLC?

7    A.  Yes.

8    Q.  So fair to say that with respect to all of these checks

9    that you were disputing at JPMorgan Chase, what JPMorgan Chase

10   is saying to you is if it turns out it's authorized, you're on

11   the hook, right?

12   A.  Correct.

13   Q.  Fair to say that you don't want to be on the hook for this

14   money?

15   A.  Yes.

16            THE COURT:  Mr. Gelfand, I'm looking for a natural

17   place for our mid-morning break.  How close are you to the end

18   of the exam?

19            MR. GELFAND:  Now is a good place, your Honor.

20            Probably 15, 20 minutes.

21            THE COURT:  Very good.

22            Ladies and gentlemen, we'll take our mid-morning

23   recess, 15 minutes.  Mr. Smallman will come get you.

24            As always, please don't discuss the case.

25            (Jury not present)

K1OVTEM1                    Soleimani - cross

1          THE COURT:  The witness should step down.

2          (Witness steps down)

3          THE COURT:  Let's have the witness step out please.  (

4          (Witness not present)

5          THE COURT:  All right.  Be seated.

6          Government, I'm permitting this line over several

7    objections, because it seems to me it has clear relevance as

8    impeachment.

9          The defense theory is evidently that the witness's

10   hesitant or incomplete engagement with the bank in the course

11   of its inquiries reflects some doubt in the witness's mind

12   about whether or not there was, in fact, authorization.

13   Relatedly, that the witness has an economic interest in the

14   bank concluding -- even if inaccurately -- that the checks were

15   unauthorized.

16         For better or worse, it's appropriate impeachment.

17   And I think it's appropriate that a fulsome recounting of the

18   witness's dealings with the bank at or around the time that the

19   observation of the checks was made be put before the jury.  And

20   both of you will make what arguments you make as to whether or

21   not the witness's conduct really does or doesn't speak to the

22   witness's views about authorization.

23         The one thing I would say for all of you -- but this

24   goes for you particularly, Mr. Gelfand -- is there is a

25   complete indistinctness right now about dollar amounts.  And

K1OVTEM1                          Soleimani - cross

1    I'm not getting in the way here, you will all lawyer your case,

2    but you've made generalized references to disputes, left

3    completely unstated as anything that suggests a dispute

4    remotely approaching the dollar amounts that, in fact, hit the

5    ABJ accounts in spring of 2019.

6         And that was principally why at the sidebar I refused

7    to allow in the incomplete document that attaches an invoice

8    without the invoice being attached.  It otherwise is

9    extraordinarily misleading, because it might imply that, in

10   fact, the invoice had a number on it that bore some

11   relationship to the numbers in dispute in this case.

12        Presumably, you are intending to represent to the jury

13   that that is so; and that the attached invoice, in connection

14   with that dispute, captures a large amount or all of the

15   disputes at issue.  If it's a minor amount, you're still at

16   liberty to put the invoice before them.  But I'm not going to

17   let the jury be misled to think that a small amount that was

18   disputed in 2018, is, in fact, secretly the large amount that's

19   in dispute now.

20        So it's your call how to proceed, but I'm in the truth

21   business here.  And giving a document from the lawyer with the

22   witness about an amount in dispute that hides the amount in

23   dispute is no route to truth.

24        MR. GELFAND:  I understand, your Honor.

25        What I represent to the Court is we're going to

confirm with Mr. Reinitz, who obviously was the author of that email. My understanding is that the invoices themselves were, full disclosure, smaller amounts. The reference to them in the email -- which obviously goes to the facts and can be considered -- was the language about the contract on the bottom.

THE COURT: Be that as it may, the misleading implication is that there was a business dispute about 180 or $190,000, and that is, as you have suggested to the jury, just a civil dispute masquerading as a fraud case. And the problem is if, in fact, the attached invoice is a much smaller dollar amount, that thesis goes away.

I understand you have some separate argument, which is that the lawyer, you know, through the hyperlinks here -- quote, here, and, quote, here, is attaching what perhaps the lawyer will later claim was the terms and conditions.

When Mr. Reinitz testifies, have him attach the invoice. Offer the email and attach the invoice, and it comes in. And you're at liberty then to focus on the portion of the email that you like, which is the hyperlinks. And you don't need to focus on the fact that the invoice is a small fraction of what's in dispute. But I'm not going to let the document go in and create the misleading impression about the amount of the invoice.

(Continued on next page)

K1odtem3                    Soleimani - cross

1         MR. GELFAND:  We understand.  We appreciate that.

2         THE COURT:  All right.

3         Anything from anyone before we take a brief recess?

4         MR. BHATIA:  Nothing, your Honor.

5         THE COURT:  All right.  Thank you.

6         We stand adjourned.

7         (Recess)

8         (Jury not present)

9         THE COURT:  All right.  Mr. Smallman, let's get the

10   jury.

11        MR. BHATIA:  Your Honor, I have one very brief point.

12        THE COURT:  Before we get the jury, let me hear from

13   government counsel.

14        MR. BHATIA:  On the next witness' examination --

15   that's John Motto.

16        THE COURT:  Remind me who Motto is again.

17        MR. BHATIA:  He is a fraud investigator at Signature

18   Bank.

19        THE COURT:  Right.

20        MR. BHATIA:  We will offer Government's Exhibits 147,

21   148 and 149.  Those are screenshots of one of their internal

22   databases, and it says words like "fraud" in red flags.

23        THE COURT:  Right.

24        MR. BHATIA:  We can get there.  I think they are

25   important business records to show the history of these checks,

A-770

633

K1odtem3                    Soleimani - cross

1    but we're also fine with the Court -- we think it is

2    appropriate for the Court to give the instruction on just

3    because it says fraud doesn't mean it is fraud.

4           THE COURT:  I think I said that in some other context

5    involving some other bank representative's use of the term, and

6    I will be happy to do that.

7           MR. BHATIA:  It may come up in the witness' testimony,

8    as well.  So if you want to give the instruction on this

9    record --

10          THE COURT:  Yes.  I mean, defense, I will give that as

11   many times as is reasonable to make sure that they don't ever

12   use a witness' label as usurping their role.

13          MR. GELFAND:  Yes, your Honor.  Just to make a

14   complete record, we do object to the admission of those

15   particular documents.  They bear -- under 403 in particular,

16   they bear adjectives all over the place.

17          THE COURT:  All right.  Alas, nobody has raised this

18   with me until we are about to get the jury.  If we need to take

19   a sidebar, we'll do that.  While we are waiting for the jury,

20   I'm not going to litigate it and nobody has put it in front of

21   me.

22          All right.  Thank you.  I take the point that there is

23   an objection, and I will need to resolve it at that point.

24          MR. GELFAND:  That is all I ask.

25          THE COURT:  Very good.  Thank you.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-771

634

K1odtem3                    Soleimani - cross

1          Let's get the witness in the box.

2          MR. DiRUZZO:  Your Honor, may we approach with the

3    exhibit we intend to --

4          THE COURT:  I'm sorry.  You are not speaking into the

5    mic.  What is it?

6          MR. DiRUZZO:  May I approach?  We have a potential

7    exhibit.

8          THE COURT:  Sure.  I welcome getting the exhibit

9    beforehand so as not to detain us during the trial.  Thank you.

10         All right.  Counsel have handed up an exhibit known as

11   Defense Exhibit 70.  We'll see.  OK.  Thank you.

12         (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

K1odtem3                    Soleimani - cross

1           (Jury present)

2           THE COURT:  Welcome back, ladies and gentlemen.

3           Please be seated.

4           Mr. Soleimani, I will remind you that you are still

5  under oath.

6           And, Mr. Gelfand, you may inquire.

7           MR. GELFAND:  Thank you, your Honor.

8           Would you turn the Elmo back on, please.

9           Thank you.

10  BY MR. GELFAND:

11  Q.  Mr. Soleimani, you testified earlier in your examination

12  that your business relationship with GateGuard began in

13  approximately March of 2017, is that correct?

14  A.  Correct.

15  Q.  OK.  And that was the date reflected on the invoices that

16  you provided to the government, correct?

17  A.  Correct.

18  Q.  And that's the date that you started using GateGuard's

19  devices, correct?

20  A.  No.  Incorrect.

21  Q.  When did you start using GateGuard's devices?

22  A.  I believe it was September of 2017.

23  Q.  September of 2017, OK.

24          So you received invoices after you started using the

25  devices, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K10dtem3                     Soleimani - cross

1   A.  No.

2   Q.  I am confused on dates for a second.

3        The invoices were March of 2017, correct?

4   A.  Correct.

5   Q.  And I think I'm just confused.  Is it your testimony that

6   even though the invoices were March of 2017, you actually

7   started using the devices later on in the year?

8   A.  Correct.

9   Q.  OK.  I appreciate the clarification.

10       After you received the invoice, your company wrote

11  checks to GateGuard -- the invoices, your company wrote checks

12  to GateGuard, correct?

13  A.  Correct.

14  Q.  I'm showing you what's been admitted as Government's

15  Exhibit 131.  Do you see that on the screen in front of you?

16  A.  Yes.

17  Q.  Can you tell me what this first page is?

18  A.  That's a copy of the check.

19  Q.  And to be clear, this is a check for approximately

20  $6,510 -- or exactly $6,510, correct?

21  A.  Correct.

22  Q.  And that's check number 1133, correct?

23  A.  Correct.

24  Q.  And what is the date that -- this was -- you agree that

25  this was a check issued by your company, correct?

K1odtem3                    Soleimani – cross

1   A.  Yes.

2   Q.  What's the date that this check was issued?

3   A.  April 28, 2017.

4   Q.  What does it say in the memo line there?

5   A.  "New intercom."

6   Q.  Are if we look at the next page of this same exhibit, the

7   second page, is this also a check that your company issued?

8   A.  Yes.

9   Q.  What is the date of this check?

10  A.  March 10, 2017.

11  Q.  And what does the memo reflect?

12  A.  "New intercom."

13  Q.  This is a check for approximately 8700 bucks, correct?

14  A.  Correct.

15  Q.  And the last page of this exhibit, that's check number --

16  I'm sorry, I forgot to ask you the check number.

17          On the second page of the exhibit, the one you were

18  just looking at, what is the check number there?

19  A.  1098.

20  Q.  Then if we look at the last page of this exhibit, what are

21  we looking at?

22  A.  A check.

23  Q.  Is this a check that you acknowledge was in fact issued by

24  your company?

25  A.  Yes.

A-775

638

K1odtem3                    Soleimani - cross

1    Q.  To be clear, the date on this one is October 19th of 2017,

2    correct?

3    A.  Correct.

4    Q.  And the amount payable to GateGuard is $1,743, correct?

5    A.  Correct.

6    Q.  This is check number 1271, correct?

7    A.  Correct.

8    Q.  And then each of these checks I just showed you are all

9    payable to GateGuard Incorporated, correct?

10   A.  Correct.

11   Q.  This last check, can you please read -- it has got perhaps

12   a weird thing here, I will try to zoom it in -- what the memo

13   says?

14   A.  "GGXYZ ABJ 16B."

15   Q.  OK.  What does that reference, if you recall?

16   A.  I believe that referenced an invoice.

17   Q.  From GateGuard, correct?

18   A.  Correct.

19   Q.  Did you sign that check or do you recognize that signature?

20   A.  Yes.

21   Q.  I just asked you a compound question and I apologize.

22           Did you sign this check?

23   A.  Yes, I did.

24   Q.  That is your signature?

25   A.  Yes.

K1odtem3                    Soleimani – cross

1   Q.  And, in fact, you signed each of these checks, correct?

2   A.  That's correct.

3   Q.  Delivered each of them to GateGuard in essentially a

4   seven-month span of 2017, correct?

5   A.  That's correct.

6   Q.  Now, you testified a few minutes ago -- I'm sorry, before I

7   get there, for a second:  When you delivered checks to

8   GateGuard, you -- those checks were all drawn on your JPMorgan

9   Chase account, correct?

10  A.  That is correct.

11  Q.  I'm not trying to trick you.  I will show you 131.

12  A.  Yes.

13  Q.  Do you see JPMorgan Chase?

14  A.  Yes.

15  Q.  The second page?

16  A.  Yep.

17  Q.  Third page?

18  A.  Yes.

19  Q.  OK.  When you delivered all of these checks to GateGuard,

20  your understanding at that time was that Mr. Teman was

21  obviously the principal of GateGuard, correct?

22  A.  That's correct.

23  Q.  OK.  And over the course of your relationship with

24  GateGuard, you've communicated not only with Mr. Teman but with

25  other GateGuard representatives, correct?

640

K1odtem3                    Soleimani – cross

1    A.  No.

2    Q.  The people, for example, that installed all of your units

3    at the apartment buildings, were you present for the

4    installations?

5    A.  Some of them.

6    Q.  OK.  Was it always Mr. Teman?

7    A.  He was -- when I was there, he was there.

8    Q.  OK.  Were others there, too?

9    A.  Yes.

10   Q.  OK.  And did you interact with any of the sales folks?

11   A.  No.

12   Q.  And you previously testified you interacted with

13   GateGuard's attorney, Ariel Reinitz, correct?

14   A.  Correct.

15   Q.  OK.  Now, changing topics, you testified earlier in your

16   examination about the logs that you were able to access from

17   GateGuard's online interface, correct?

18   A.  Correct.

19   Q.  And to access those, you logged onto something called

20   PropertyPanel, correct?

21   A.  Yes.

22   Q.  OK.  And describe for the jury, if you will, how it is you

23   accessed PropertyPanel.  In other words, how could you access

24   the data you wanted to see?

25   A.  I had a login.

A-778

641

K1odtem3                    Soleimani - cross

1   Q.  So it is a unique username and password assigned to you,

2   correct?

3   A.  Correct.

4   Q.  And obviously you could provide it to whoever you wanted,

5   but essentially it is designed to be private just for your

6   benefit, correct?

7   A.  Yes.

8   Q.  OK.  And you testified earlier that that would give you

9   access to certain information, correct?

10  A.  Correct.

11  Q.  And you personally reviewed PropertyPanel on numerous

12  occasions, as you testified, correct?

13  A.  Yes.

14          MR. GELFAND:  Your Honor, may I just show just the

15  witness Defendant's Exhibit 70?

16          THE COURT:  You may.

17  Q.  I want you to just take a look at that.  I'm going to show

18  you the second page, too.  Tell me when you have had a chance

19  to just look at this.

20  A.  Yes.

21  Q.  Have you had a chance to see that?

22  A.  Yes.

23  Q.  OK.  Do you recognize this as the PropertyPanel interface

24  related to one of your buildings?

25  A.  Yes.

A-779

642

K1odtem3                    Soleimani – cross

1   Q.  Do you recognize the photo of the person on the front?

2   A.  Yes.

3           MR. GELFAND:  Your Honor, at this point I move

4   Defendant's Exhibit 70 into evidence.

5           THE COURT:  Any objection?

6           MR. BHATIA:  Objection, your Honor.  401 and

7   foundation.

8           THE COURT:  Why don't you ask him briefly how he

9   recognizes this as a portion of the database relating to one of

10  the buildings.

11  BY MR. GELFAND:

12  Q.  How do you recognize this as a portion of the database

13  related to one of your buildings?  And I can zoom in if it is

14  helpful.

15  A.  The address.

16          THE COURT:  Does the appearance of this document track

17  the appearance that you saw when you would access

18  PropertyPanel?

19          THE WITNESS:  Yes.

20          THE COURT:  All right.  I will receive it.

21          (Defendant's Exhibit 70 received in evidence)

22          MR. GELFAND:  Thank you.

23          May I publish it to the jury?

24          THE COURT:  You may.

25  BY MR. GELFAND:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1odtem3                    Soleimani - cross

1    Q.  I am going to actually start with the second page for a

2    minute.

3            So "PropertyPanel.xyz" do you see on top?

4    A.  Yes.

5    Q.  There is something that says "Analytics Dash," that's

6    basically a menu, if you will, that you could access, correct?

7    A.  I don't recall what pops up there.

8    Q.  OK.  That's fair enough.

9            On the left side, do you see something that says

10   "Dashboard"?

11   A.  Yes.

12   Q.  And a search functionality?

13   A.  Yes.

14   Q.  And something that specifically references GateGuard?

15   A.  Yes.

16           THE COURT:  Mr. Gelfand, maybe move it to the right so

17   that the jury can see the full words -- no, the other

18   direction -- so the jury can see the full words in that

19   left-hand vertical column.  Thank you.

20   BY MR. GELFAND:

21   Q.  Just for the benefit of the jury, do you see "Dashboard" on

22   top?

23   A.  Yes.

24   Q.  "Search" just below it?

25   A.  Yes.

K10dtem3                        Soleimani - cross

1   Q.  And then "Sublet Spy" and "GateGuard" and the chat box?

2   A.  Yes.

3   Q.  Now, just to the right of that, you said you recognized

4   this by an address.

5           Can you tell me what 342 Lenox Avenue is?

6   A.  It is an address.

7   Q.  What address is that?

8   A.  It is one of the properties that had the GateGuard system.

9   Q.  OK.  And then to the right -- to be clear, when you would

10  access these logs, they were very voluminous, correct?

11  A.  They were what?

12  Q.  Voluminous, they had a number of different entries?

13  A.  Yes.

14  Q.  OK.  To the right, do you see there is a box of names?  You

15  don't need to enter them into the record, but names?

16  A.  Yes.

17  Q.  Do those, just generally speaking, refer to either tenants

18  or other individuals who might have accessed the intercom?

19  A.  Yes.

20  Q.  Then to the right, there is a line about having an app and

21  being enrolled or not having an app, correct?

22  A.  Correct.

23  Q.  And that refers to essentially the GateGuard app that

24  correlates with the GateGuard system that you bought, correct?

25  A.  Correct.

645

K10dtem3                    Soleimani - cross

1   Q.  And then there is a visitor buzz, correct?

2   A.  Yes.

3   Q.  And then, for example, there is a requested door unlock in

4   this case from Ari Teman, correct?

5   A.  Correct.

6   Q.  Then to the right, just so we understand this, there is a

7   whole series of dates and times, including the hour, the minute

8   and the second, correct?

9   A.  Correct.

10  Q.  And these reference when, for example, the visitor buzz

11  happens.  Just, for example, the top one, this is October 3rd

12  of 2017, correct, if I am reading that correctly?

13  A.  Correct.

14  Q.  OK.  At it looks like 9:41 p.m. and 44 seconds, correct?

15  A.  That's correct.

16  Q.  Then the picture is the person that essentially did that

17  activity, correct?

18  A.  Correct.

19  Q.  Directing your attention to the top page, can you tell us

20  who that person is?

21  A.  That's me.

22  Q.  Do you recognize anyone else in the photo?

23  A.  Yes.

24  Q.  Do you recognize the person in the photograph to the left

25  of you?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K10dtem3                    Soleimani - cross

1    A.  Yes.

2    Q.  To be clear, just for the record, are you the main subject

3    of the photograph, essentially the larger photo?

4    A.  Yes.

5    Q.  Who is the person next to you?

6    A.  That is Joseph Itzani.

7    Q.  And who is that in connection with your --

8    A.  He's a former employee of ABJ Properties.

9    Q.  OK.  And so was this essentially a screenshot or a selfie,

10   if you will, of you accessing the GateGuard panel?

11   A.  Yes.

12   Q.  To be clear, if we -- does that appear to be essentially an

13   enlarged portion of the photograph that is reflected in

14   smaller -- the thumbnail size on the second page?

15   A.  Yes.

16   Q.  And that was October of 2017, correct?

17   A.  That's correct.

18          MR. GELFAND:  Your Honor, may I have a moment, please?

19          THE COURT:  You may.

20          (Pause)

21          MR. GELFAND:  I have no further questions.  Thank you,

22   your Honor.

23          THE COURT:  All right.  Thank you.

24          Mr. Bhatia, any redirect?

25          MR. BHATIA:  Yes, your Honor.

K10dtem3                    Soleimani – redirect

1            THE COURT:  Go ahead.

2    REDIRECT EXAMINATION

3    BY MR. BHATIA:

4    Q.  Mr. Soleimani, you were asked some questions on

5    cross-examination about when you started using GateGuard

6    devices.  Do you recall those?

7    A.  Yes.

8    Q.  And you paid some checks to Mr. Teman in March and

9    April 2017?

10   A.  Yes.

11   Q.  When you paid those checks, when did you expect to receive

12   the intercoms?

13   A.  I expected to receive them by May 1st I believe was the

14   date promised.

15   Q.  And what happened?

16   A.  I was told several times that they're being delayed,

17   they're being delayed, they're coming, and they never actually

18   arrived until September.

19   Q.  Is that when you started using them?

20   A.  Yes.

21   Q.  How soon after -- now, turning to the checks that you

22   testified about.

23            How soon after you learned about the checks did you

24   tell JPMorgan?

25            THE COURT:  Sorry.  Counsel, you are talking about

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1odtem3                         Soleimani - redirect

1    2019 now?

2              MR. BHATIA:  Moving forward now to 2019.

3    Q.  You said in May 2019, you saw some checks in an account.

4    How soon after you saw those checks did you tell your bank,

5    JPMorgan Chase?

6    A.  Right away.

7    Q.  And what did you tell them?

8    A.  I told them they were unauthorized checks that were cashed

9    from my account.

10   Q.  Was there any doubt in your mind that you and your company

11   had not authorized those checks?

12   A.  No, there was no doubt.

13   Q.  And when you -- how soon after you contacted JPMorgan did

14   you go into the JPMorgan branch?

15   A.  I believe I went in either the same day or the next day --

16   Q.  When you went there, you went with Ms. --

17             THE COURT:  Sorry.  Let's let the witness finish the

18   answer.

19   A.  My recollection was either that day or the next day.

20   Q.  When you went there, did you meet with Ms. Habibian?

21   A.  Yes.

22   Q.  And did Ms. Habibian require you to sign any more documents

23   other than the ones you did that you signed there?

24   A.  No, not to my recollection.

25   Q.  To complete the chargebacks, she didn't say you need to do

K10dtem3                    Soleimani - redirect

1  another X, Y and Z?

2  A.  I don't recall that, no.

3  Q.  After you spoke -- after you went to JPMorgan Chase did you

4  also go to the precinct?

5  A.  Yes.

6  Q.  And there did you provide the actual checks that had been

7  deposited into your accounts?

8  A.  Copies of the checks, yes.

9  Q.  And you also gave them the ballpark figure?

10  A.  Yes.

11  Q.  You were asked on cross whether you wanted to be -- in sum

12  and substance, you were asked whether you wanted to be

13  responsible for the checks that were deposited into your

14  account in April 2019 by Mr. Teman; do you remember that?

15  A.  Yes.

16  Q.  You said no, right?

17  A.  Correct.

18  Q.  Had you ever authorized Mr. Teman to draw those checks?

19  A.  No.

20  Q.  Had you ever agreed to pay those fees?

21  A.  No.

22  Q.  When you purchased the intercoms, were you aware that you

23  could be subject to those fees?

24  A.  I was not aware.

25         MR. BHATIA:  No further questions, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-787

650

K1odtem3

1           THE COURT:  All right.  Any recross, Mr. Gelfand?

2           MR. GELFAND:  No, your Honor.

3           THE COURT:  All right.  Mr. Soleimani, you may step

4    down.  Thank you.

5           (Witness excused)

6           THE COURT:  Government, please call your next witness.

7           MR. BHATIA:  The government calls John Motto,

8    M-o-t-t-o.

9           THE COURT:  Let me just ask while we wait for that

10   witness, there had been a discussion about two exhibits at the

11   sidebar.  Are those being offered now, later, or not at all?

12          MR. BHATIA:  The government is not offering them at

13   this time.

14          THE COURT:  Very good.

15   JOHN MOTTO,

16        called as a witness by the government,

17        having been duly sworn, testified as follows:

18          THE CLERK:  Please be seated.

19          State and spell your full name for the record, please.

20          THE WITNESS:  That is John Motto, J-o-h-n M-o-t-t-o.

21          THE COURT:  Good morning, Mr. Motto.

22          THE WITNESS:  Good morning, your Honor.

23          THE COURT:  I will ask you kindly to keep your voice

24   up and really project your voice so that the ladies and

25   gentlemen and everyone here in this large old courtroom can

A-788

651

K1odtem3                    Motto - direct

1    hear you.

2            Counsel, you may inquire.

3    DIRECT EXAMINATION

4    BY MR. BHATIA:

5    Q.  Mr. Motto, where do you work?

6    A.  I work for Signature Bank.

7    Q.  And what's your title there?

8    A.  Operations manager.

9    Q.  And how long have you had the title of operations manager?

10   A.  It's almost eight years.

11   Q.  And where did you work prior to Signature Bank?

12   A.  Bank Hapoalim.

13   Q.  How long were you there?

14   A.  I was there for 30 years.

15   Q.  As an operations manager, what are your day-to-day

16   responsibilities?

17   A.  My day-to-day responsibilities is to I manage a team of 22

18   people.  Out of that team -- or the team of 22 people consists

19   of four other teams, one of them being an Oasis team, one of

20   them being a reconciliations team, return deposit team, and an

21   ATM debit card team.

22   Q.  One of the teams you oversee is the Oasis team, is that

23   right?

24   A.  That is correct.

25   Q.  What is the Oasis team?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K10dtem3                    Motto - direct

1    A.  The Oasis team is a team that consists of six people that

2    monitors incoming checks on a screen that's -- it is an Oasis

3    system where they actually view checks that are coming in for

4    payment I guess to client's accounts.

5    Q.  Where is the Oasis team located?

6    A.  In new York City.

7    Q.  You don't have to give an exact address but where in New

8    York City?

9    A.  They're on Broadway.

10   Q.  What does Oasis stand for?  What is Oasis?

11   A.  Oasis is a third-party system that actually captures --

12   they capture check images and they scrub -- to say, for

13   instance, 30,000 checks come in to Signature, it scrubs images

14   against clients' accounts from previously paid checks, and then

15   my team monitors or reviews the output of those checks.  So

16   there may be 4,000 checks that they're reviewing on a given

17   day.

18   Q.  As a general matter, what is the Oasis system reviewing for

19   when it looks at all these checks?

20   A.  It is looking -- it is essentially reviewing for suspicious

21   activity or suspicious checks that are coming into clients'

22   accounts, and it reviews checks that were previously paid, good

23   checks.

24   Q.  If a check is deposited at another bank and then it's drawn

25   on a Signature Bank customer account, so it is taking money

K1odtem3                    Motto - direct

1    from a Signature Bank customer account, when does Signature

2    first hear about that check?

3    A.   The night before.

4    Q.   And how does Signature hear about it?

5              THE COURT:   The night before what?

6    Q.   The night before what?

7    A.   The date -- the previous business day is when we hear about

8    it.

9    Q.   Is that the previous day before the Oasis review?

10   A.   Yes, that's correct.

11   Q.   So --

12   A.   And day two -- so last night checks will come in for

13   payment.   Today those checks are reviewed.

14   Q.   Let's take this maybe more step-by-step here.

15             Let's say someone deposits a check at another bank but

16   it's drawing money from a Signature Bank customer account.   How

17   does Signature first hear about that check?

18   A.   Actually, the client's account is debited -- when the

19   client's account is debited is when we hear about it.   If

20   everything is fine, if everything is fine with that check, it

21   is transparent to my team.

22   Q.   And are the checks routed through the Federal Reserve?

23   A.   That is correct.

24   Q.   Where is the main branch of the Federal Reserve?

25   A.   To my knowledge, it is in New York be city.

K1odtem3                    Motto - direct

1          MR. DiRUZZO:  Objection.  Hearsay.  It calls for

2   speculation.

3          THE COURT:  Sustained.

4   BY MR. BHATIA:

5   Q.  Mr. Motto, do your day-to-day responsibilities include

6   overseeing payments of checks at Signature Bank?

7   A.  That is correct.

8   Q.  And operations involving receiving checks?

9   A.  That is correct.

10  Q.  Do you have to be -- do you have to learn about how the

11  checks get to the bank?

12  A.  Yes.

13  Q.  And what systems are used?

14  A.  Yes.

15  Q.  Through the course of your work, have you learned where the

16  Federal Reserve is located?

17         MR. DiRUZZO:  Objection.

18         THE COURT:  Just a yes or no.

19  A.  Yes.

20  Q.  Where is it located?

21         THE COURT:  No.  By what means has he learned that?

22  Q.  By what means have you learned about that?

23  A.  Through -- one is through my correspondence with the

24  Federal Reserve Bank.

25         MR. DiRUZZO:  Objection.  Hearsay, your Honor.

K10dtem3                          Motto - direct

1          THE COURT:  Well, there is no objection to the

2    question and answer that were put.  You made an objection to a

3    future question but we're not there yet.

4    Q.  Does he --

5          THE COURT:  You may inquire at what address, if he

6    writes the Federal Reserve, he writes them.

7    BY MR. BHATIA:

8    Q.  Have you corresponded with the Federal Reserve at a

9    particular location?

10   A.  At two locations.

11   Q.  What are the two locations?

12   A.  One is in East Rutherford, New Jersey, and the other one is

13   at -- is in downtown Manhattan.

14   Q.  Have you learned which one -- through the course of your

15   communications, have you learned which is the main branch of

16   the Federal Reserve?

17          MR. DiRUZZO:  Objection.

18          THE COURT:  Sustained.

19          I'll see counsel at the sidebar.

20          (Continued on next page)

21

22

23

24

25

A-793

656

K1odtem3                    Motto - direct

1         (At the sidebar)

2         THE COURT:  Putting aside the hearsay issue for a

3    moment, what is the relevance of this?

4         MR. BHATIA:  It is a venue question.

5         THE COURT:  What is the venue issue here that hasn't

6    already been established?

7         MR. BHATIA:  I think it is further venue.  It is not

8    an important --

9         THE COURT:  Sorry.  Just articulate for me what count

10    the location of the Federal Reserve is salient to for venue

11    purposes.

12         MR. BHATIA:  In order for the checks to be drawn and

13    the money to be transferred to Bank of America, they have to go

14    through the Federal Reserve.

15         THE COURT:  Right.

16         MR. BHATIA:  And the branch is here in New York.

17         THE COURT:  Right but --

18         MR. BHATIA:  I believe it is relevant for the bank

19    fraud charges.

20         THE COURT:  Sorry.  What else independent of this?  If

21    this witness wasn't competent to answer the question, what do

22    we already have as to venue with respect to the bank fraud

23    charges?

24         MR. BHATIA:  Over the course of the two charges, the

25    March checks and the April checks.  In the March checks, there

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

657

K1odtem3                    Motto - direct

1   is at least --

2           THE COURT:  Just walk me through what happens with

3   each.

4           MR. BHATIA:  In the March 2019 checks, they are

5   deposited via mobile deposit in New York, and that was

6   established by Karen Finocchiaro.

7           THE COURT:  Right.

8           MR. BHATIA:  There is at least that.  For the

9   April 2019 checks, Mr. Motto testified that the review team is

10  here in New York to detect the fraud.  At Signature Bank they

11  look for the fraud here in New York.

12          THE COURT:  So the checks are -- just slow it down.

13  The April checks are deposited by hand in Florida?

14          MR. BHATIA:  Florida.

15          THE COURT:  That is at Bank of America?

16          MR. BHATIA:  That is right.

17          THE COURT:  What was the testimony within Bank of

18  America about what happens there?

19          MR. BHATIA:  There is also the withdrawal of the

20  $4,000 from Bank of America.

21          THE COURT:  Which occurs where?

22          MR. BHATIA:  In New York, in Manhattan.

23          THE COURT:  Right.  I think you had proffered before

24  trial some other form of activity I thought in New York in

25  connection with the April checks.  What was that?

A-795

K1odtem3                    Motto - direct

1           MR. BHATIA:  One moment.

2           THE COURT:  Perhaps it was your prior counsel.

3           MR. BHATIA:  So the withdrawal, one gives us venue and

4    the --

5           THE COURT:  Just walk me through the facts, please.

6           MR. BHATIA:  Sure, the facts.  They were deposited in

7    Florida.

8           THE COURT:  By hand?

9           MR. BHATIA:  By hand.  Then they were transferred

10   through accounts, and then those funds were withdrawn from

11   another account in Manhattan.

12          THE COURT:  By $4,000 and change?

13          MR. BHATIA:  $4,000.

14          THE COURT:  In cash or bank check?

15          MR. BHATIA:  Right.

16          THE COURT:  Is there anything else?  Apart from what

17   this witness may be about to testify to, is there any other

18   basis for venue for the bank fraud as to the April, anything

19   else happen in Manhattan?

20          MR. BHATIA:  I would have to go back and look at my

21   records, but the withdrawal is the primary method that we would

22   use to establish venue.

23          THE COURT:  Because the withdrawal contributes

24   ultimately to the loss experienced by Bank of America insofar

25   as Bank of America is left holding the bag here, and if the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1odtem3                    Motto - direct

1    account had been more flush, it would be -- the loss would be

2    that much less; that is essentially the theory?

3              MR. BHATIA:  That's right.  But I also think even

4    outside of Bank of America, the fact that the fraud was

5    reviewed within Signature Bank here in Manhattan I think is

6    still an essential fact that contributes to the bank fraud and

7    that allows the bank fraud to take place.

8              THE COURT:  How is that?

9              MR. BHATIA:  Because the review is less -- you know,

10   it has to go through that review in order for it to get cleared

11   and in order for it to then get clawed back, and by clawing it

12   back is really what caused Bank of America to suffer the loss.

13             THE COURT:  We'll deal with that at a later point.

14             Then what you are trying to establish now is through

15   this witness precisely what?  That the bank -- Federal Reserve,

16   I think you asked where they are based.  I want to understand

17   specifically what information you are trying to elicit, and

18   then we'll talk about what his basis is.

19             MR. BHATIA:  Checks are drawn -- in order for a check

20   to be routed, it has to go through -- for Signature Bank, it

21   has to to go through the Federal Reserve.

22             THE COURT:  Right.

23             MR. BHATIA:  And here the checks were deposited at a

24   branch of Bank of America.

25             THE COURT:  In Miami, in Florida?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

660

K1odtem3                    Motto - direct

1          MR. BHATIA:  In Florida, and then they ultimately went

2     to Signature basically to get approval to be paid.

3          THE COURT:  Right.

4          MR. BHATIA:  And to do that they went through

5     Signature Bank, they went to the Federal Reserve in Manhattan.

6          THE COURT:  Sorry.  It has to get approval to be paid

7     within Signature Bank?

8          MR. BHATIA:  That's right.

9          THE COURT:  And that you're saying he can testify to

10    where Signature Bank's review process is.  You're saying -- I

11    think your question had to do with the Federal Reserve, though,

12    and that is what was objected to, so let's focus on that.

13         MR. BHATIA:  That is what I am referring to.  It goes

14    through the Federal Reserve to get to Signature Bank.

15         THE COURT:  Where does the Signature Bank review take

16    place?

17         MR. BHATIA:  He testified that that also happened in

18    New York.

19         THE COURT:  In Manhattan?

20         MR. BHATIA:  In Manhattan.

21         THE COURT:  All right.  So what you would like to have

22    in Manhattan, or elicit, is not just that Signature Bank does

23    its review but that the Federal Reserve had at least custody of

24    the check in some sense before in between Florida and when

25    Signature reviews it?

K10dtem3                    Motto - direct

1           MR. BHATIA:  That is right.

2           THE COURT:  And what is his factual basis for knowing

3    that?

4           MR. BHATIA:  As I understand, it is because he is --

5    he works in operations, and part of his role is how do the

6    checks get to Signature and then we review them, and he has

7    like a pretty detailed -- as I understand it, a fairly detailed

8    technical knowledge of where those check images come from,

9    where the checks themselves come from.

10          THE COURT:  Then be my guest and establish that.  But

11   early on in the case with your predecessor counsel, I raised

12   venue as an issue.

13          MR. BHATIA:  Sure.

14          THE COURT:  I'm sure you spent time blocking and

15   tackling on that.  Rather than go through the conclusion, you

16   know, walk us through what happens and how he knows it.

17          I don't mean you, I mean on the stand with the

18   witness.

19          MR. BHATIA:  We're going to establish how he knows

20   they go through the Federal Reserve, how he knows the Federal

21   Reserve is here in Manhattan.

22          THE COURT:  Look, he can visit it.  I'm sure he has

23   had correspondence with it.  That's fine.  But in the end, if

24   there are alternatives brick-and-mortar buildings that we call

25   the Federal Reserve and one of them would give you venue and

K10dtem3                    Motto - direct

1    one of them would not, I think it is still on you, if that's

2    the point of your venue analysis, to lock down that the

3    activity relevant in this case is sited within the S.D.N.Y.

4    Federal Reserve as opposed to some other brick-and-mortar part

5    of the Federal Reserve.  You need to do that.

6             MR. BHATIA:  Right.

7             THE COURT:  If he is part of the communications

8    process, that's fine.  I'm not being a technocrat here about

9    it, but we do need to actually get it established other than by

10   conclusion.

11            MR. BHATIA:  I understand.

12            THE COURT:  Thank you.

13            MR. DiRUZZO:  Your Honor, just so it is clear, I am

14   not waiving or acceding that the government has proven venue,

15   so we intend to put the government to their proof on venue.

16            THE COURT:  Yes.  I didn't assume otherwise.

17            MR. DiRUZZO:  I just want to make it clear.

18            (Continued on next page)

19

20

21

22

23

24

25

A-800

663

K10dtem3                          Motto - direct

1              (In open court)

2              THE COURT:  All right.  Mr. Bhatia, you may resume the

3      examination.

4              MR. BHATIA:  Thank you.

5      BY MR. BHATIA:

6      Q.  Mr. Motto, you said that one of the offices that you've

7      corresponded with of the Federal Reserve is in New York?

8      A.  Yes.

9              MR. DiRUZZO:  Objection.  Leading.

10             THE COURT:  Overruled.  He is resituating the witness

11     in the examination we had a moment ago.

12     Q.  What interactions have you had with the branch here in New

13     York?

14             THE COURT:  Sorry.  When you say "New York," although

15     we here in Manhattan often think of New York as just Manhattan,

16     I think you probably need to be more specific with your

17     question.

18     BY MR. BHATIA:

19     Q.  You said there was one branch in Manhattan?

20     A.  There is one.  There is one main office in Manhattan, that

21     is correct.

22     Q.  And what interactions have you had with that office?

23     A.  We may have, or we have an executive account manager that

24     is assigned to every -- several banks in New York City having

25     an executive account manager, and that we correspond directly

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

664

K10dtem3                    Motto - direct

1    with that executive account manager who will resolve situations

2    for the bank.  If somebody needs something or if something is

3    not correct, we would go directly to him.

4    Q.  And -- go ahead.

5            THE COURT:  Sorry.  Because you have used the word

6    "New York" several times, counsel, I need you to be alert to

7    specifying when he says "New York," where in New York and

8    whether he means Manhattan.

9    Q.  Do you mean in Manhattan?

10   A.  Yes.

11           THE COURT:  Sorry.  When you same you mean in

12   Manhattan, is that where this executive account manager is

13   based?

14           THE WITNESS:  He's based in New York and he is based

15   in New Jersey.

16           THE COURT:  All right.  Let's go back to the New York

17   part.  When you say New York, is he based in Manhattan in New

18   York?

19           THE WITNESS:  Umm, I'm not a hundred percent sure

20   where his exact office is.

21           MR. DiRUZZO:  Objection, your Honor.

22           THE COURT:  Counsel, I'm in the middle of listening to

23   the witness' answer.  Please.

24           Go ahead.

25           THE WITNESS:  I'm not a hundred percent sure of where

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

665

K10dtem3                          Motto - direct

1    the account manager exactly is, but he both is in New York and

2    New Jersey.

3              THE COURT:  New York where?

4              THE WITNESS:  Somewhere in New York.  Actually, it is

5    downtown.  I don't know the exact address, I apologize.

6              THE COURT:  All right.  When you say in New York, do

7    you mean New York State or New York City?

8              THE WITNESS:  New York City.

9              THE COURT:  When you mean New York City, can you

10   isolate it to a borough?

11             THE WITNESS:  Yes.

12             THE COURT:  What borough?

13             THE WITNESS:  To Manhattan borough.

14             THE COURT:  How do you know that the executive account

15   manager is based in Manhattan, the borough?

16             THE WITNESS:  Based upon my dealings -- my years of

17   dealings and my correspondence that come back from the Federal

18   Reserve that will have either 33 Liberty Street or it will have

19   East Rutherford, New Jersey.  It is either one of the two.

20             THE COURT:  Counsel, you are going to need to follow

21   up on it.

22   BY MR. BHATIA:

23   Q.  What interactions have you had with this executive account

24   manager at their Manhattan office?

25   A.  If we -- if there is a problem with ordering cash for --

A-803

K1odtem3                    Motto - direct

1   I'm the -- I'm the EUAC for Signature Bank in which I am in

2   charge of the all the Fedline certificates, so if there is an

3   issue, I would have to reach out to him in order to resolve the

4   issue.

5   Q.  And would you reach out to him in --

6   A.  In an email.

7   Q.  Have you had occasion -- have you had a reason to go to

8   their Manhattan office?

9   A.  No.

10  Q.  At all times when you were dealing with the Federal

11  Reserve, was your office -- were you located in Manhattan?

12          MR. DiRUZZO:  Objection, your Honor, to the scope, "at

13  all times."

14          THE COURT:  Sustained.

15  BY MR. BHATIA:

16  Q.  As an operations manager at Signature Bank, is your office

17  located in Manhattan?

18  A.  Yes.

19          MR. DiRUZZO:  Objection, your Honor.  Relevance and it

20  is an injection of temporal scope.

21          THE COURT:  All right.  Overruled.

22          Establish where his office is now and establish where

23  it has been during his time at Signature Bank.

24  BY MR. BHATIA:

25  Q.  Where is your office now?

K1odtem3                    Motto - direct

1    A.  In New York City.

2    Q.  And how long have you been at that location?

3    A.  Eight years -- almost eight years.

4    Q.  You said "New York City."  I should say, is that in

5    Manhattan?

6    A.  Yes.

7    Q.  How long has it been in Manhattan?

8    A.  For eight years -- me, eight years.

9    Q.  OK.  While you have been in Manhattan at Signature Bank, is

10   that where you've reviewed checks as part of your role as an

11   operations manager?

12   A.  Yes.

13   Q.  And is that where the Oasis team is based?

14   A.  Yes.

15   Q.  The various members of the Oasis team who do the review,

16   which office are they based in?

17   A.  In the New York City location.

18   Q.  And that's the Manhattan location?

19   A.  Yes.

20   Q.  So if there is a review by the Oasis team of a particular

21   check, where would it be done?

22   A.  That would be done at Broadway in New York City.

23          THE COURT:  Sorry.  Broadway is in multiple boroughs.

24   Let's just nail this down for a hundred percent sure.

25          What Broadway are you talking about?  What borough?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-805

668

K1odtem3                      Motto - direct

1            THE WITNESS:  In New York City.

2            THE COURT:  What borough?

3            THE WITNESS:  I'm sorry.  In Manhattan, your Honor.

4            THE COURT:  There are five boroughs.

5            THE WITNESS:  I apologize.

6            THE COURT:  Thank you.  Go ahead.

7            Sorry.  I don't mean to be difficult --

8            THE WITNESS:  That is OK.  I live in New Jersey.

9            THE COURT:  -- but in court we need precision.  Thank

10   you.

11           THE WITNESS:  I apologize.  Manhattan borough.

12   BY MR. BHATIA:

13   Q.  Let's go back to the substance of the Oasis team.

14           What is the Oasis review looking for?

15   A.  The Oasis team is looking for suspicious checks that are

16   coming into a queue to be reviewed.

17   Q.  What does it mean that they are suspicious?

18   A.  It means that the Oasis system flags this particular check

19   that it flagged this particular check against previous checks

20   that came against a client's account.

21   Q.  And what is it looking for signs of?

22   A.  It is looking for signs of checks that were -- if a client

23   had only issued checks for $5,000 over a period of time and all

24   of a sudden a very high-volume check came in, it will flag that

25   as a check that is a high-dollar check that's out of his -- the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K10dtem3                    Motto - direct

1   client's, what he normally does.

2   Q.  You mentioned that a check could be flagged.  What does

3   that mean?

4   A.  It means that it came into -- the system flagged that check

5   as that it needed to be reviewed by somebody on the team.

6   Q.  And what type of review would that person do?

7   A.  What they do is that, one, actually in the Oasis system, it

8   will tell the -- it will tell my team what the check was

9   flagged for.  It could be flagged for a check out of sequence,

10  that the image of the check did not match the previous checks

11  that were coming in, the Signature was irregular.  So what my

12  team does is what they would do is they have -- they would

13  actually take the client's signature card and match it up

14  against the actual check that came in for review.

15  Q.  And as a general matter, what does that -- sort of at a

16  high level, what is that person looking for?

17  A.  That person is looking for irregularities in the check.  So

18  they -- so they're saying if the system says that the

19  background is not -- that the background is irregular, so it

20  failed for a hundred percent background, what my team will do

21  is that they -- the system has the past X amount of checks that

22  came into the client's account that was actually good.  So my

23  team will do an overlay of that image against the reference

24  image that's coming in against checks that were previously

25  paid, and they can do -- from that overlay they can tell if a

A-807

670

K1odtem3                         Motto - direct

1   check is -- if something is wrong with that check.

2   Q.  And why are you looking for something that might be wrong

3   with a check?

4   A.  Because they're looking -- if a check is -- if the system

5   is coming in that is possibly deemed suspicious, they want to

6   take that check and move it over to the branch for further

7   review.

8   Q.  By the time a check reaches the Oasis system, has it

9   already been paid?

10  A.  Yes.

11  Q.  And does that mean money has left the customer account?

12  A.  Yes.

13  Q.  As a general matter, what is the purpose of the Oasis

14  review team?

15  A.  To prevent -- to prevent possible fraud on clients'

16  accounts.

17          MR. BHATIA:  Your Honor, this may be an appropriate

18  time for a limiting instruction.

19          THE COURT:  Sure.

20          Ladies and gentlemen, the witness has just used the

21  word "fraud," and I am advised by counsel that the word fraud

22  may come up at other points in his examination.  You are

23  entitled to consider that as reflecting the words that were

24  used either by the witness or colleagues of his in dealing with

25  the events as to which he'll testify.

A-808

671

K1odtem3                    Motto - direct

1          To state the obvious, it is ultimately your decision

2    whether or not the elements of the fraud charges, bank fraud

3    and wire fraud in this case, are established.  The fact that a

4    witness may have used that term or somebody else may have does

5    not entitle it to any weight.  It doesn't establish that there

6    was or wasn't fraud.  It is just the way that people spoke in

7    the course of the events at issue.

8          Go ahead.

9    BY MR. BHATIA:

10   Q.  When you used the words "fraudulent activity," are you

11   looking for just signs that this check needs follow up?

12   A.  That is correct.

13   Q.  And signs that you might need to look for some sort of

14   specific activity?

15   A.  Yes.

16   Q.  OK.  And does the Oasis review also have a purpose in

17   protecting the bank?

18   A.  Yes.

19   Q.  How so?

20   A.  Because to prevent a fraud loss or a monetary loss to

21   Signature Bank.

22   Q.  How can Signature Bank suffer a loss based on a fraudulent

23   check?

24   A.  Fraudulent checks -- the responsibility of fraudulent

25   checks is on Signature.  It's -- all fraudulent checks are on

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1odtem3                    Motto - direct

1   the bank that it cleared upon.  It is our responsibility to

2   return it within 24 hours per Reg CC rules.

3   Q.  Have you encountered cases in the past where checks have

4   not been returned in a timely manner?

5   A.  Yes.

6   Q.  And how can that result in -- can that result in a loss to

7   the bank?

8   A.  Yes, it can result in a loss.

9   Q.  How so?

10  A.  If the -- all of a sudden a month goes by and a client is

11  reviewing his check statement, he realizes that he has a

12  fraudulent check in his account statement where he looks at it

13  and he says there is an image in there that's fraudulent, he

14  will contact -- he will contact my team to audit to try to

15  recover that team -- I apologize, recover those funds from the

16  bank of first deposit.

17  Q.  Let's talk about -- let's change topics and talk about some

18  specific checks.

19          MR. BHATIA:  I would like to show for the witness only

20  Government Exhibit 147.

21          THE COURT:  Mr. Bhatia, you may want to enlarge this

22  for the witnesses.

23          THE WITNESS:  The image is bad.

24  BY MR. BHATIA:

25  Q.  Mr. Motto, are you able to see this document now?

673

K10dtem3                        Motto - direct

1    A.  Yes.

2    Q.  And how -- do you recognize this document?

3    A.  Yes, I do.

4    Q.  How do you recognize it?

5    A.  I made the actual image of this document.

6    Q.  As a general matter, what is it?

7    A.  This is an actual -- this document is showing the red --

8    the reference check, which is the red image, is the actual item

9    that came in for payment through the client's account from the

10   night before.  The reference -- the dark image or the black

11   image is the actual -- one of the reference images, a good

12   check that actually cleared the client's account.

13   Q.  Looking at the whole document, is this an image -- is this

14   from a system at Signature Bank?

15   A.  Yes.

16   Q.  And are those records kept in the ordinary course of

17   business?

18   A.  Yes.

19   Q.  And are those records maintained by people who are

20   knowledgeable about them at the time they were made?

21   A.  Yes.

22        MR. BHATIA:  Your Honor, the government offers

23   Government Exhibit 147.

24        THE COURT:  Any objection?

25        MR. DiRUZZO:  403, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-811

674

K1odtem3                    Motto - direct

1          THE COURT:  Overruled.  It is received.

2          (Government's Exhibit 147 received in evidence)

3    BY MR. BHATIA:

4    Q.  Mr. Motto -- we can publish this for the jury.  It is a

5    little bit hard to read so let's focus in on some parts of it.

6          Can you focus in on just the top left corner.

7    A.  Yes.  That top left corner, the top left corner is stating

8    the amount of -- the dollar amount of the check that came in,

9    that it was either a debit or a credit.  In this particular

10   case, it is a debit, which is a check.  It is saying that the

11   amount of the check is for $18,000, and it has a -- there is a

12   trace number that's associated with that.

13   Q.  Is this a check that was received by JP -- sorry, excuse

14   me, by Signature Bank?

15   A.  Correct.

16          MR. BHATIA:  Mr. Magliocco, could you please blow up

17   the red check image in the middle left.

18   Q.  What does this show, Mr. Motto?

19   A.  This is showing the actual check that came in from clearing

20   from the previous business day's work.

21   Q.  Where does this image come from?

22   A.  This check -- this image comes from the Federal Reserve

23   Bank.

24   Q.  And the electronic version of this check --

25   A.  The electronic version of the check -- the electronic

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-812

675

Klodtem3                          Motto - direct

1    version of the check comes into a system -- comes into our

2    third-party processor, who then imports these images into the

3    Oasis system.

4    Q.  Thank you.  And looking at this check, is the -- the name

5    at the top is 518 West 205 LLC.  That would be where the

6    Signature Bank customer would be?

7    A.  That is correct.

8    Q.  And this check value is for $18,000?

9    A.  Yes.

10   Q.  The date is March 28, 2019?

11   A.  Yes.

12   Q.  OK.  And is this a check that was flagged by the Oasis

13   team?

14   A.  That is correct.

15   Q.  Can you identify based on this document why it was flagged?

16   A.  If you reduce the image, I can do it.

17   Q.  The amount on the top, right?

18   A.  If you continue to blow up where it says "value," just

19   below that.  Yes.  Perfect.

20          So it was flagged for -- the Oasis system said that

21   there was five things that were irregular with this check.  One

22   is that it failed for a hundred percent signature verification.

23   It failed for a hundred percent background.  The check number

24   was out of range of what our client normally uses.  The daily

25   amount range was out -- or the daily amount was out of range.

A-813

676

Klodtem3                    Motto - direct

1   So if the client, his daily amount was say a thousand dollars,

2   $18,000, the system has the intelligence to say that something

3   is wrong with that.  And also the transaction amount pattern is

4   out of range, which -- so it failed for every criteria it

5   failed for 100 percent.

6           So my team, during their examination of this check,

7   they will review that note -- they will review that alert box,

8   which gives them a -- gives them some sort of a history of why

9   Oasis is saying that something is wrong with it.

10  Q.  OK.  And just taking a step back, is Signature Bank insured

11  by the Federal Deposit Insurance Corporation?

12  A.  Yes, it is.

13          MR. DiRUZZO:  Objection.  Hearsay.  Lack of --

14          THE COURT:  Overruled.

15          You may answer.

16  A.  Yes.

17  Q.  Is that sometimes called the FDIC?

18  A.  Excuse me?

19  Q.  Is that sometimes called the FDIC?

20  A.  Yes.

21  Q.  OK.  Now, turning back to what's here in the value field,

22  what does it mean to fail for a check number out of range?

23  A.  Out of range.  So if the client -- if the client was using

24  checks 1, 2, 3, 4, 5, 6 and all of a sudden check number 200

25  came in, the system realizes -- it has the intelligence to know

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-814

677

K1odtem3                              Motto - direct

1   that the next -- the check number is out of sequence or it's

2   out of a particular range.

3   Q.  So once a check is flagged by the system, by the computer,

4   what happens next in the process?

5   A.  What happens is that somebody on my team during the review

6   process -- they will review this item.  They will bring up the

7   client's signature card electronically on the system, and match

8   it up against the actual signature that is on that check.

9          If my team -- if somebody who is doing the actual

10  review feels that this check is suspicious, they will go ahead

11  and -- they will actually route it to the branch for further

12  review.

13  Q.  OK.  So let's take a look at the bottom of this screen.

14  There is a field called, "Item Review History."  It is sort of

15  scanned at the bottom of the page.

16  A.  Yes.

17  Q.  It can be a little bit hard to read.

18          In the first row, it says -- there is a date/time.

19  A.  Yes.

20  Q.  It looks like it is April 1, 2019.

21          THE COURT:  Mr. Bhatia, is there a way of blowing it

22  up yet further?  I realize it is very faint.

23          MR. BHATIA:  One moment, your Honor.

24          THE COURT:  Yes.

25          (Pause)

A-815

678

K10dtem3                          Motto - direct

1          THE COURT:  There you go.

2          (Pause)

3          MR. BHATIA:  We'll try to put this in a way that

4     everyone can see it.

5          THE COURT:  Thank you.

6     BY MR. BHATIA:

7     Q.  So here, in the date field, it says April 1, 2019,

8     10:13:30, and under the user column, it says "Mgray."

9          Who is Mgray?

10    A.  Mgray is someone on the Oasis team.

11    Q.  And is that person based in Manhattan?

12    A.  Yes.

13    Q.  And the Manhattan office of Signature Bank?

14    A.  Yes.

15    Q.  What does it mean that it shows up as Mgray in the user

16    field?

17    A.  It shows that it was actually reviewed by -- she did the

18    actual review on this item.  It actually gives the time of when

19    she actually looked at it.

20    Q.  OK.  And now moving to the right, there is a "Disposition"

21    field and a "Notes" field.

22         Under "Disposition," it says, "Defer to 001 - defer."

23    What does that mean?

24    A.  That means that the -- can I say her name?

25    Q.  You can say her name.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K10dtem3                    Motto - direct

1    A.  Muzette, who is on my team, she took that check and

2    deferred it by hitting a button on the actual system to send it

3    over to the branch for further review.

4    Q.  OK.  And now -- and so let's go to the second row now.

5            The second, third and fourth rows all have similar

6    fields so we can look at all of those.

7            There are three entries for April 1st, and there is

8    the name -- or there is the username "mtorohernandez."  Does

9    that mean anything to you?

10   A.  Yes.

11   Q.  Who is that?

12   A.  She works in the branch location.

13           THE COURT:  Sorry.  The "branch location."  Please

14   specify.

15   Q.  Where is the branch location?

16   A.  I don't know where this branch is located.  We have 30

17   locations.  I don't know where this particular one is.

18   Q.  It would be where the customers --

19   A.  Where the customer account is located is where the branch

20   location is.

21   Q.  OK.  Now, moving to the right, the same column, information

22   is in the "Disposition" and "Notes" field.  It says, "Reject,"

23   and then it says, "Reject fraud, confirmed with client Monday,

24   4/1/2019, 12:47 p.m."

25           What does "Reject" mean in red?

K10dtem3                    Motto - direct

1    A.  It means that the -- that the person in the branch

2    location, they hit the radio -- they hit the button to reject

3    this item.  When they did that, the system gives the user of

4    the system, who is on there right at the branch, the

5    opportunity to put a historical note in there and to enter the

6    system of what happened.

7           In this particular case, it is saying that this is

8    that they confirmed with the client and that they've said that

9    it rejected for fraud.  So this remains -- once they do that,

10   it remains as a historical document within the actual Oasis

11   system itself, so any given time, a year from now, we can go

12   back and review this document and see the history of what

13   happened.

14   Q.  When a person at the branch office -- does the person at

15   the branch office determine whether to reject or accept the

16   check?

17   A.  Based on someone usually speaking to the client.

18   Q.  I'm sorry, you said someone speaks to the client?

19   A.  Yes.

20   Q.  After they speak to the client, what do they do?

21   A.  Then from after speaking with the client, that's when the

22   determination is made whether to pay or return this check.

23   Q.  And what happens if they decide to return the check?

24   A.  If they decide return the check, they will hit the radio --

25   they will hit the button that's in the Oasis system and hit

A-818

681

Klodtem3                         Motto - direct

1   "Send."  Then from there they will email my team to actually

2   return the check.

3   Q.  And this is your team based in Manhattan?

4   A.  Yes.

5   Q.  And what would your team do?

6   A.  My team then would do -- what they would do is that, one,

7   is that they would pull up the actual image from another

8   system.  That other system gives the actual history of what

9   happened with the check, sequence numbers, because the Federal

10  Reserve needs these sequence numbers in order to do the actual

11  return.

12          My team will then return the money back to the client,

13  and they would debit the Federal Reserve Bank.  They would

14  debit each bank -- each bank across the country has an account

15  with the Fed, and they use the Federal Reserve as an

16  intermediary between banks.  That's how money moves.

17  Q.  And at that point would Signature Bank be done with the

18  chargeback?

19  A.  Yes.

20  Q.  OK.  I would like to show you -- in the case of this check,

21  do you know if a chargeback was completed?

22  A.  Yes.

23  Q.  I would like to direct your attention to Government Exhibit

24  145 at page 17.

25          There is an entry in the middle of the page.

K1odtem3                    Motto - direct

1          THE COURT:  This is in evidence, correct?

2          MR. BHATIA:  This is in evidence.

3          THE COURT:  Thank you.

4    BY MR. BHATIA:

5    Q.  There is an entry -- is this -- let me rephrase that.

6          Is this a bank statement?

7    A.  Yes.

8    Q.  Is this from the same user whose check we just saw?

9    A.  Yes.

10   Q.  OK.  And if we go further down this page, there is a

11   section for transactions.

12         This second transaction here, it says, April 1,

13   returned check, and it looks like it has a value of $18,000.

14   What does that mean to you?

15   A.  That means that this check was returned by my team.

16   Q.  OK.  Mr. Motto, let's look at another check.  Let's look at

17   Government Exhibit 148.

18         We can blow up the check image on the right, the red

19   image.

20         Is this another check that was drawn from a Signature

21   Bank customer account?

22   A.  Yes.

23   Q.  Does it say "18 Mercer Equity Inc." on the top?

24   A.  Yes.

25   Q.  And it also has the same date of March 28, 2019, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-820

683

K1odtem3                    Motto - direct

1    A.  Yes.

2    Q.  Let's go down to the item review history.  Well, let's me

3    ask this first.

4         Was this check also flagged for potential fraudulent

5    activity?

6    A.  Yes.

7    Q.  OK.  Now, let's look at the item review history.

8         In the first row there is a username "AMercado."  Who

9    is that?

10   A.  She is on the team -- she is on the Oasis team in

11   Manhattan.

12   Q.  OK.  And what does this record show her doing?

13        If we can go to the right a little bit.

14        It says, "Defer" -- again, it says, "Defer to 001 -

15   defer."  And what does that mean again?

16   A.  She deferred this -- she sent this image to the branch for

17   further review.

18   Q.  It says, "Sign on this check is not what's on card."  What

19   does that mean to you?

20   A.  It means that the signature that's on this check is not

21   what is on the card.

22   Q.  Do you know if this check was ultimately subject to a

23   chargeback?

24   A.  Yes.

25   Q.  How do you know that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1odtem3                    Motto - direct

1    A.   This check -- this check hit another system besides Oasis.

2    Q.   And what happened then?

3    A.   What happened then was this check came in -- this check

4    came in and it hit an overdraft system simultaneously when it

5    hit the Oasis system.  So what happens is that a lot of times

6    the private client branch will not -- they do not return an

7    item on Oasis and on an overdraft -- an overdraft system.  So

8    it's -- so in order to avoid confusion with my team, a lot of

9    times they will pay the item on this Oasis system and on the

10   actual overdraft system they'll actually do the return.

11   Q.   There was a return of this check, right?

12   A.   That is correct.

13   Q.   I would now like to direct your attention to Government

14   Exhibit 149.

15           Looking at the check image here, there is an item

16   check that is in red?

17   A.   Yes.

18           MR. BHATIA:  Can you pull it up for a moment.

19   Q.   This shows a check drawn on the account of 518 West 205

20   LLC, at least according to the check?

21   A.   Yes.

22   Q.   And it is dated April 19, 2019?

23   A.   Yes.

24   Q.   For $18,000?

25   A.   Yes.

K1odtem3                    Motto – direct

1   Q.  Let's go to the item review history again.

2          Do you recognize the username "JGutierrez"?

3   A.  Yes.  She is in my Oasis team in Manhattan.

4   Q.  OK.  You know the drill.

5          Under the "Designation" and the "Notes" field, what do

6   you see?

7   A.  Well, I only see -- you have to go to the other image.

8   Q.  This was also subject to a "Defer to 001 – defer"?

9   A.  Correct.

10  Q.  In the next four rows, it says, "Fraudulent item – account

11  closed."

12  A.  Yes.

13  Q.  What does that mean?

14  A.  That means that the branch put that notation in the "Notes"

15  field history.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

K1OVTEM4                    Motto - cross

1   BY MR. BHATIA:

2   Q.  Is that because this account had already been closed?

3   A.  That is correct.

4   Q.  Okay.

5            MR. BHATIA:  One moment, your Honor.

6            (Counsel conferred)

7            MR. BHATIA:  No further questions, your Honor.

8            THE COURT:  Cross-examination, Mr. DiRuzzo.

9   CROSS-EXAMINATION

10  BY MR. DiRUZZO:

11  Q.  Good afternoon, sir.

12           My name is Joseph DiRuzzo; I represent Mr. Teman.

13           We've never met before; correct?

14  A.  That is correct.

15  Q.  This is the first time we're talking; correct?

16  A.  Correct.

17  Q.  I'm going to ask you a series of questions.  If you don't

18  understand the question or I go too fast or not loud enough,

19  just let me know.

20  A.  Just talk loud; my ear is clogged.

21  Q.  Okay.  Is this a little better?

22  A.  Yes.

23  Q.  Now, sir, you testified that your Oasis System -- this is

24  my words, not yours, but it's basically a first review;

25  correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-824

687

K1OVTEM4                    Motto - cross

1   A.  Yes.

2   Q.  So your Oasis System and your team, you don't make the

3   final determination, you just make an initial review and

4   effectively flag some checks for further investigation?

5   A.  Yes.

6   Q.  So that's why -- showing you Government Exhibit 147 -- let

7   me turn the Elmo on -- 147, which I believe is already entered

8   in evidence.

9           Now, I know it's real hard, but that right there,

10  that -- well, you're familiar with the system.  That's defer

11  2001, defer -- I think that's what -- that's what it says or

12  something to that effect?

13  A.  It says that.

14  Q.  And that's effectively your bank's system saying that it

15  needs to go out to a branch for an actual person to talk to the

16  account holder; correct?

17  A.  Yes.

18  Q.  And the reason that happens is because your initial review

19  is just that, an initial review; it's not a final determination

20  by any stretch of the imagination.  Correct?

21  A.  It is our review, yes.

22  Q.  So then when an individual from Signature Bank reaches out

23  to a Signature Bank customer, they have a conversation to

24  discuss a check or checks that the system flagged; correct?

25  A.  I do not work in the branch.

688

K1OVTEM4                    Motto - cross

1           THE COURT:  Sorry.  A little louder please.

2    A.  I do not work in the branch.

3    Q.  Are you familiar with how it works generally at branches?

4    A.  Yes, they -- I don't know the method of contact.

5    Q.  Sir, I'm going to show you Government Exhibit 150 that's

6    already admitted into evidence.

7           Do you see Government Exhibit 150?

8    A.  Yes.

9    Q.  Sir, this is a Signature Bank Affidavit of Counterfeit or

10   Stolen Check-Business.  Have you ever seen a document -- a form

11   like this from Signature Bank before?

12   A.  Yes.

13   Q.  And the reason that a form like this is produced or made by

14   Signature Bank is, at least at some level, to collect more

15   information from a customer; correct?

16   A.  I'm not an attorney.  I don't know that answer.

17   Q.  Well, sir, do you have any idea why Signature Bank would

18   want to get more information from a customer regarding possibly

19   fraudulent or bad checks?

20   A.  Yes.

21   Q.  And why would Signature do that?

22   A.  Repeat the question.

23   Q.  Why would Signature want more information from their

24   customer?

25   A.  I don't know who was requesting that further information.

A-826

689

K1OVTEM4                        Motto - cross

1    That contact -- that -- that -- that communication is coming

2    from the branch, not from the Oasis team.

3    Q.  I'm just -- big picture.  It seems to me that --

4              THE COURT:  Not what it seems to you please.

5    Q.  Signature Bank -- let me step back.

6              You would agree that, in general, people do not always

7    tell the truth; correct?  People can lie?

8              THE COURT:  Sustained.  Sustained.

9              Mr. DiRuzzo, irrelevant question.  Come on.

10   Q.  Sir, you don't know or a Signature Bank employee wouldn't

11   know whether any of the representations on a document like this

12   which was filled out by a Signature Bank customer is actually

13   true?

14             MR. BHATIA:  Objection.

15             THE COURT:  Sustained.

16             You haven't established that this witness deals with a

17   document like this or what the interactions are with a customer

18   in the course of this creation.  You haven't established his

19   competence to address the circumstances involving a document of

20   this nature.

21   Q.  Now, sir, I'm going to switch topics to RCCs.  Have you

22   ever heard of the acronym "RCC"?

23   A.  Yes.

24   Q.  And that stands for remotely created check; correct?

25   A.  Correct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

690

K1OVTEM4                    Motto - cross

1    Q.  And a remotely created check is something that Signature

2    Bank would deal with at least from time to time; correct?

3    A.  That is correct.

4    Q.  And again, I'm showing you Government Exhibit 147 that's

5    admitted in evidence.

6          See that language right there, "Draw per contract.  No

7    signature required"?  Can you read that?

8    A.  Yes, I can.

9    Q.  Sir, that language is consistent with a remotely created

10   check; correct?

11   A.  Yes.

12   Q.  And by definition, a remotely created check would not have

13   a signature that is the same as an individual or business that

14   had an account with Signature Bank; correct?

15   A.  Correct.

16   Q.  So by definition, your system would always or perhaps close

17   to always flag a remotely created check as atypical?

18   A.  Remotely created checks that come into Oasis System are --

19   if my team does not -- if my team does not recognize this, they

20   will defer it over to the branch for further review to contact

21   the client.

22   Q.  Okay.  And then it's the branch's job or someone at the

23   branch's job to run down that lead?

24   A.  Correct.

25   Q.  And it's not your job or anyone at the Oasis group --

A-828

691

K1OVTEM4

1  A.  It's not part of the departmental procedures to do that.

2  Q.  And as a result, your group has no idea whether the actual

3  representation on this check that is "Draw per contract.  No

4  signature required" is true or not true, you just don't know?

5  A.  We do not know that.

6          MR. DiRUZZO:  One moment, your Honor.

7          THE COURT:  Yes.

8          (Counsel conferred)

9          MR. DiRUZZO:  Yield the witness, your Honor.

10          THE COURT:  Any redirect examination, Mr. Bhatia?

11          MR. BHATIA:  Can we just have a moment, your Honor?

12          THE COURT:  Yes.

13          (Counsel conferred)

14          MR. BHATIA:  No further questions.

15          THE COURT:  All right.  Mr. Motto, you may step down.

16          THE WITNESS:  Thank you.

17          THE COURT:  Your testimony is complete.

18          (Witness excused)

19          THE COURT:  All right.  Government?

20          MR. BHATIA:  The government rests.

21          THE COURT:  All right.  Ladies and gentlemen, you just

22  heard the government rest.  That means that the government's

23  presentation of evidence on its case is complete.  This is,

24  therefore, a perfect time for us to take our lunch break.  And

25  I'm going to add about 15 minutes to our usual lunch break

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1OVTEM4

1    because at this stage of the case there are certain

2    administrative matters, legal matters I always need to take up

3    with counsel.

4            So right now it's almost a quarter of one.  I will see

5    you at 2 p.m.  Be ready to be brought out at 2 p.m.

6            As always, please don't discuss the case.

7            (Jury not present)

8            THE COURT:  All right.  Be seated.

9            All right.  The government has rested.

10           Defense, anything from you at this point?

11           MR. DiRUZZO:  Yes, your Honor.

12           The defense moves for a judgment of acquittal under

13   Rule 29(a).

14           I start with venue.

15           It is our position the government has not proven

16   venue.  The Bank of America employee testified generally to New

17   York.  The Excel spreadsheet or file that is in evidence, I

18   want to say is Government Exhibit 113, was nondescript.  It had

19   a description of New York, and there was no further testimony

20   from the Bank of America witness as to which borough.

21           THE COURT:  As to what?

22           MR. DiRUZZO:  Which borough.

23           THE COURT:  But I'm not understanding what reference

24   point you have.  Which borough of what happened in?

25           MR. DiRUZZO:  Correct, your Honor.

K1OVTEM4

1          THE COURT:  No, no, no, no.

2          You are not being clear; it's not the witness not

3    being clear.  I need an action, a verb.  Which borough in which

4    what event happened?

5          MR. DiRUZZO:  The mobile deposits.

6          THE COURT:  The what?

7          MR. DiRUZZO:  The mobile deposits, which, I believe,

8    form the basis of Count One -- Count One and Count Three.

9          So the mobile deposits, there was testimony from the

10   witness about some IP addresses.  And then she testified the IP

11   addresses linked up to -- via the spreadsheet, via the

12   government exhibit, to New York, without any reference to any

13   particular borough.

14         It is our position that with that nondescript

15   testimony, it could have been Brooklyn, it could have been

16   Queens and, as a result, the government has not carried the day

17   in respect to venue.

18         THE COURT:  All right.  So let me just pause.

19         The point you just made relates to all four counts or

20   only the bank fraud counts or only the bank fraud count that

21   relates to mobile deposits, which I think is Count Two, the

22   March-related one, right?

23         MR. DiRUZZO:  The March-related bank --

24         THE COURT:  Counts Two and Four are the March

25   deposits.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1OVTEM4

1          MR. DiRUZZO:  Yes.

2          THE COURT:  Okay.  So is the argument you are making

3     now, does that run to all four counts or only the mobile

4     deposit counts or only the mobile deposit bank fraud count?

5          MR. DiRUZZO:  No, the mobile deposit, bank, and wire

6     fraud count, your Honor.

7          THE COURT:  So Counts Two and Four.

8          MR. DiRUZZO:  Correct.

9          THE COURT:  And I take it your argument is there's no

10    other S.D.N.Y. venue basis, other than the mobile deposit IP

11    addresses which are not factually synched to a portion of New

12    York that is within the Southern District, Manhattan or the

13    Bronx.

14         MR. DiRUZZO:  Correct.

15         THE COURT:  Okay.

16         MR. DiRUZZO:  Now, as to Counts One and Three, it's

17    our position that to the extent there was any crime, that crime

18    was complete upon the deposit of the RCCs in Miami Beach,

19    Florida.  And as a result, the venue for those counts should

20    have been and is the Southern District of Florida and, by

21    necessary extension, not the Southern District of New York.

22         THE COURT:  And unpack that.  Why is that?

23         MR. DiRUZZO:  Because when Mr. Teman went into the

24    Bank of America branch with the RCCs, the act of depositing the

25    RCCs with Bank of America in a Bank of America branch would

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-832

695

K1OVTEM4

1  establish venue in Florida, specifically, the Southern District

2  of Florida.

3  THE COURT:  Sure.  But venue can be in multiple

4  districts.  Why is venue confined to the Southern District of

5  Florida?

6  MR. DiRUZZO:  I believe the testimony also from the

7  Bank of America employee was that the money wire went from

8  Florida to someplace in Texas.  There was no testimony from the

9  witness that would have linked -- as far as my recollection

10  goes, that would have linked it back to the Southern District

11  of New York.

12  THE COURT:  And for Counts One and Three, these are

13  the in-person deposits.  One is a bank fraud, one is a wire

14  fraud.  There's different conduct; although obviously it

15  relates to the same background human story, but there's

16  different conduct that would make out the elements of those

17  respective offenses.

18  What conduct can count in determining whether there is

19  venue?

20  MR. DiRUZZO:  It is our position, your Honor, the

21  conduct and the crimes are complete upon the deposit.  It

22  doesn't -- the government can't carry the day for venue to say

23  that once you put money into a particular account via a check

24  deposit, that, in essence, as long as the money stays in the

25  account or you access the account at some future point in time,

A-833

696

K1OVTEM4

1    *ad infinitum*, there is venue, wherever you may have accessed

2    that money at some future point in time, given one week, one

3    month --

4               THE COURT:  Your theory is that the crime is -- there

5    is no venue created by any activity after the point -- after

6    the point of deposit?

7               MR. DiRUZZO:  Yes, your Honor.

8               THE COURT:  Do you have a case that says that?

9               MR. DiRUZZO:  No, your Honor.

10              THE COURT:  Do you have a case that addresses that?

11              MR. DiRUZZO:  No, your Honor.

12              THE COURT:  Have you researched that?

13              MR. DiRUZZO:  Not particularly well, your Honor, so

14   no.

15              THE COURT:  Would that be no?  "Not particularly well"

16   sounds like no.

17              MR. DiRUZZO:  Yes.

18              THE COURT:  All right.

19              May I ask you -- I'm about to ask the government, and

20   we'll see, but, as you know, I spotted this issue at the very

21   first conference in the case that the central activity occurs

22   at least in Florida, that doesn't mean there's not venue

23   elsewhere.  How can you not have researched it in the

24   intervening months?

25              I'm going to hear from the government in a moment,

K1OVTEM4

1   but, with respect, this has been out there from our initial

2   conference in the case.

3       MR. DiRUZZO:  Your Honor, with the exception of -- let

4   me back up.  Obviously we filed a motion to dismiss under Rule

5   12.

6       THE COURT:  Right.  But this is not a civil case.  And

7   the venue as pled included the S.D.N.Y.  The issue, as I said

8   in my ruling, was a factual one.  Nonetheless, if your theory

9   at all times was that nothing that happens after Mr. Teman

10  loses physical control of the checks matters, you must have a

11  case that says that or you must have run it to ground as

12  opposed to declaring it to me and asking me to throw out the

13  case.  Why have you not researched it?

14      MR. DiRUZZO:  Your Honor, we thought the research in

15  the motion was sufficient, and I have no further good answer

16  for it.

17      THE COURT:  Do you have any other basis for ruling

18  for -- seeking relief under Rule 29 other than venue?

19      MR. DiRUZZO:  Yes, your Honor.

20      There is a Second Circuit case which, in turn, cites

21  to a Supreme Court case that establishes that a check by itself

22  is not a factual assertion.

23      THE COURT:  That's *Williams*?

24      MR. DiRUZZO:  The case is *United States v. Rodriguez*,

25  140 F.3d, 163 (2d Cir. 1998), which, in turn, cites to -- I

K1OVTEM4

1    believe it's the *Williams* case out of the Supreme Court.  And,

2    yes, the *Williams* case out of the Supreme Court, your Honor.

3         THE COURT:  *Williams* is a check kiting case.  And the

4    notion is that the check is not a representation of the

5    existence of money in the account.

6         Why are the checks in this case not distinct?  Why is

7    it that they are not an implicit representation that the check

8    is being written by or with the authority of the account

9    holder?  Including the references to contract and so forth, why

10   isn't there an implicit representation all in that the account

11   holder has authorized this?

12        Because if the factual premise here is the account

13   holder didn't authorize it, which is not the element you're

14   engaging on, the issue is isn't the writing of the check and

15   its presentation a representation that this has been authorized

16   either because it's written on the account -- the purported

17   stationery of the payee.

18        It's a totally different fact pattern from *Williams*,

19   where the only factual representation that was theorized was

20   does a check represent that there are sufficient funds in the

21   account.  Completely different representation.

22        MR. DiRUZZO:  Well, your Honor, the *Rodriguez* case

23   cites to *Williams* and it quotes *Williams*:  "Technically

24   speaking, a check is not a factual assertion at all, and

25   therefore cannot be characterized as true or false."

K1OVTEM4

1         Taking that language from the Supreme Court, the

2    factual assertion on the check can't count for an element of

3    bank fraud.  There has to be a factual assertion on the check,

4    your Honor.  And it's our position there is no factual

5    assertion on the check.

6         THE COURT:  Thank you.

7         Any other bases for moving for relief under Rule 29?

8         MR. DiRUZZO:  And just as a general, your Honor, we

9    believe the government has put insufficient evidence into the

10   record to allow this case to proceed and be submitted to the

11   jury.

12        THE COURT:  Under any element for any count?

13        MR. DiRUZZO:  Correct.

14        THE COURT:  In other words, you're preserving your

15   rights.

16        MR. DiRUZZO:  Correct.

17        THE COURT:  All right.  But you've isolated the

18   arguments that you think are most worthy of my attention at

19   this point.

20        MR. DiRUZZO:  Correct, your Honor.

21        THE COURT:  All right.

22        Government, let's start in the reverse order.  Let's

23   just start with the *Williams*-based argument.

24        What's your response?

25        MR. BHATIA:  Here on all four counts, alleged schemes

A-837

700

K1OVTEM4

1   to defraud, and therefore we believe that there doesn't --

2   *Williams* is inapplicable here.  Here, there is a scheme to

3   defraud.  They were deposited as we believe, and we think it

4   should go to a jury.

5            THE COURT:  Louder.  Move into the mic.

6            MR. BHATIA:  We think this should go to the jury that

7   the defendant was not authorized, knowingly deposited these

8   checks without authorization.  And then --

9            THE COURT:  Right.  I understand.

10            There are two independent dimensions of bank fraud:

11   There's scheme to defraud and there's a false statement or

12   representation.  Put aside scheme to defraud or false statement

13   or representation.  Is this case distinct from *Williams* where

14   the Supreme Court says a check is not a representation about

15   the sufficiency of the money in the bank account?  Why is this

16   case different?

17            Presumably you are bringing this case as consistent

18   with your requests to charge on both prongs of the bank fraud

19   statute.  I understood it that way, so I'm inviting you to

20   distinguish *Williams* and tell me why the checks here, in fact,

21   contain either a statement, representation, or pretense.

22            MR. BHATIA:  Here, your Honor, the statement is that

23   the defendant has authorization, as opposed to does not have

24   authorization.  Stretching back to my memory, but I recall that

25   there are check cases where there wasn't enough money in the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1OVTEM4

1    account, the check was deposited, and that was the alleged

2    misrepresentation.

3         Here, the misrepresentation goes to his underlying

4    authority.  And I think this case goes even a step further,

5    because it's not implicit authority, it's written on the

6    checks.  All 29 of the checks say "Draw per contract.  No

7    signature required."  Twenty-seven of them go even further and

8    make very much a factual assertion.

9         THE COURT:  Okay.  Look, I'm going to rule -- first of

10   all, sit down -- on that issue.

11        It seems to me it's quite clear that the checks here

12   could be found by the jury to contain a false statement or be

13   false pretense.  The physical portrait of the check is clearly

14   designed to convey that the checks were drawn on the account of

15   the customer in question and with the authority, which is the

16   key pretense here, of the customer.

17        The overall attempt here in look and feel is to convey

18   that.  That's true pictorially from the check, it's true from

19   the memo line which purports to so indicate, and especially the

20   "Draw per contract.  No signature required."  That is a factual

21   representation, essentially, that the remote authorization here

22   has been authorized by the account holder.  It is all about

23   authorization.  And so I find the *Williams* line of authority to

24   be distinct.

25        Obviously, independent of that, you've got the whole

K1OVTEM4

1    separate other prong of bank fraud which talks about a scheme

2    to defraud which doesn't require a false statement,

3    representation, or pretense.  But there is a clear misleading

4    representation and pretense here that these checks were created

5    with the contractual authority of the account holder, and there

6    is a factual basis on which the jury could find that not to be

7    true.  To be sure, the jury could find that Mr.  -- they could

8    discredit what the witnesses all say -- counsel?

9            MR. BHATIA:  I'm sorry.

10           THE COURT:  The jury could discredit the witnesses on

11   the issue of a lack of authority or they could conclude that a

12   reasonable person in Mr. Teman's shoes perhaps misapprehended

13   the existence of authority.

14           But there's no question in my mind that the

15   representations here, "Draw per contract.  No signature

16   required," are present there to convey the idea that the

17   remotely created check here is pursuant to an existing source

18   of authority.  That's the critical factual dimension of this

19   case that's in dispute.

20           So as to Rule 29, on that element, I emphatically

21   reject the *Williams*-based theory of the defense.

22           Now let's turn to venue.

23           MR. BHATIA:  Yes, your Honor.

24           The government believes that it's established venue on

25   all four counts.  I think we can take them in order.

K1OVTEM4

1          THE COURT:  I think under the circumstances, taking

2     them in order, because you've got two different statutes and

3     two different modes of deposit, would be useful.

4          MR. BHATIA:  Certainly.

5          THE COURT:  You can take them in whatever order is

6     most useful to you.

7          MR. BHATIA:  We can go temporally.

8          So with the March 19 checks, those are in Counts Two

9     and Count Four.  That's bank fraud and wire fraud.  And there,

10     we've established venue because we believe -- because the

11     evidence shows that they were deposited in New York, New York,

12     in Manhattan.

13          THE COURT:  Walk me through that.  How is that?

14          MR. BHATIA:  I can be more specific.

15          In the exhibit that the defense references, Exhibit

16     113, there's a column that lists location.

17          THE COURT:  One moment.

18          MR. BHATIA:  It's a spreadsheet, so I'm not sure it's

19     going to be in a binder.

20          THE COURT:  Oh, okay.

21          MR. BHATIA:  I can describe it.

22          THE COURT:  Go ahead.

23          MR. BHATIA:  It lists -- and this is consistent with

24     Investigator Finocchiaro's testimony.  It shows an IP address

25     for various transactions, including the mobile deposits in

A-841

K1OVTEM4

1    question.  So there's an IP address.  Ms. Finocchiaro testified

2    that the IP address is essentially the physical location

3    associated with the transaction.

4          There's another field in the spreadsheet that lists

5    the location in sort of verbal terms, in terms of an actual

6    physical location.  And there, for these transactions, it lists

7    New York, New York.

8          Other entries in the same field --

9          THE COURT:  New York, New York, as we've just

10   established, includes, but isn't limited to, the Southern

11   District of New York.

12         MR. BHATIA:  Right.

13         Other entries in the same column list Bronx, New York;

14   Brooklyn, New York.  And accordingly, we believe that this can

15   go to the jury, that the jury could find by a preponderance of

16   the evidence that where some fields say Bronx, New York, and

17   some say Brooklyn, New York, saying "New York, New York" means

18   New York County.

19         THE COURT:  Because New York County is Manhattan.

20         MR. BHATIA:  Because New York County is Manhattan.

21         THE COURT:  Was there a reason that question was not

22   put to Ms. Finocchiaro?  I understand the basis for the

23   inference and I understand that venue is by a preponderance.

24   For heaven's sake, why wasn't that question put to her?

25         (Counsel conferred)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-842

705

K1OVTEM4

1          MR. BHATIA:  We also don't agree that New York, New

2     York can necessarily -- could be everywhere.  We think New

3     York, New York is Manhattan.

4          THE COURT:  Well, but -- sorry.

5          MR. BHATIA:  Yes.

6          THE COURT:  "New York, New York," in the abstract, may

7     well be -- it certainly is Manhattan.  The question is whether

8     it can refer to some other part of New York City.  In other

9     words, if I said to you "New York City, New York," you would

10    agree that it extends beyond just Manhattan and the Bronx.

11         MR. BHATIA:  That's right.

12         THE COURT:  "New York, New York" leaves off the word

13    city; and I understand why there's a fair inference that that

14    is just Manhattan.  But if the question is whether there's a

15    human universal here or whether the way in which people slop

16    around the expression "New York," in some automatic definite

17    way necessarily means Manhattan.

18         The relevant issue is not how you or I or anybody else

19    might fine-tune our locution, it is how what the records here

20    connote.  Ms. Finocchiaro was not asked that question, which

21    presumably would have been a determinable fact within her

22    employer; and all the more so because I spotted this issue from

23    conference one.  Why was she not asked the question of what, in

24    that column, "New York, New York," in contrast, say, to Bronx,

25    New York, means?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-843

K1OVTEM4

1        MR. BHATIA:  We believe that the record -- one moment,

2   your Honor.

3        THE COURT:  Yes.

4        (Counsel conferred)

5        MR. BHATIA:  Your Honor, we didn't ask the question

6   because it was -- I think it's clear on the face of the record

7   that references to other counties establish that New York, New

8   York is Manhattan, and that's because of the contrast with the

9   other ones.

10        THE COURT:  Did you ask her that behind the scenes in

11   prep?

12        MR. BHATIA:  I don't recall asking her that.

13        THE COURT:  May I ask you if the candid answer was

14   that the distinction between the other counties didn't come to

15   your attention until later, after her testimony was complete?

16        MR. BHATIA:  Candidly, your Honor --

17        THE COURT:  Yes, I appreciate that.

18        MR. BHATIA:  No, no.  Candidly, I did notice that.

19   Because venue, of course, has been front in mind for us.  And

20   so I noticed that --

21        THE COURT:  You took it as a given that because the

22   other boroughs are listed, New York is -- let me ask you the

23   money question, there it is:  Is Manhattan ever listed by name?

24   If not, your inference is stronger.  Because if Manhattan isn't

25   listed by name and the other boroughs are, it would seem

K1OVTEM4

1    demonstrable by a preponderance, anyway, that "New York" is the

2    code name here for Manhattan.

3        MR. BHATIA:  We're going to -- we let the monitor

4    freeze, so we're going to just pull it up.  We can tell you in

5    just a few seconds.

6        (Pause)

7        MR. BHATIA:  No, your Honor, "Manhattan, New York" is

8    not listed.

9        THE COURT:  How many entries are there in total,

10   approximately?  Just give me -- are we talking hundreds here?

11       MR. BHATIA:  There are approximately 187 entries.  And

12   there are references to various cities and states, including

13   Bronx, New York; Brooklyn, New York; and New York, New York.

14       THE COURT:  Do you happen to know, just for idle

15   curiosity, whether Staten Island or Queens are listed?

16       MR. BHATIA:  I believe they are not listed.

17       THE COURT:  All right.

18       So putting aside the theory of venue that the mobile

19   deposits -- let me just get this right.  If you are right, that

20   New York connotes Manhattan, what does that mean happened in

21   Manhattan *vis-à-vis* the mobile deposits?

22       MR. BHATIA:  That means the actual -- the person was

23   located in Manhattan when they were on their phone and hit send

24   to send the checks to Bank of America.

25       THE COURT:  "The person" meaning?

A-845

708

K1OVTEM4

1         MR. BHATIA:  Here, the defendant.

2         THE COURT:  Presumably, Mr. Teman; theoretically, some

3  agent of his.

4         MR. BHATIA:  I think we would say that it's actually

5  the defendant.  And I think -- defense counsel actually

6  elicited, these are behind a password; you need a password to

7  log into this.  And the user name is listed as Ari B. Teman.

8         THE COURT:  And what other evidence is there in the

9  case circumstantially that tends to situate Mr. Teman at some

10  point during the relevant events in Manhattan?  He does a lot

11  of business here.

12         MR. BHATIA:  I think that's exactly what it is.

13         We heard testimony from at least Mr. Soleimani, that's

14  just front in mind because it happened right now.  But I think

15  other witnesses also testified that he worked out of New York,

16  they met him in New York, he came to install devices at

17  buildings in Manhattan.  I should keep saying "Manhattan."

18  Manhattan is what I mean.  He's installed units in buildings in

19  Manhattan.

20         So I think there's also a circumstantial case that if

21  it says "New York, New York," what it really means is --

22  combined with "New York, New York" on the list, plus evidence

23  that he was in Manhattan for his business, I think, also

24  supports our --

25         THE COURT:  I take it we don't have cell site

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1OVTEM4

1    information here on Mr. Teman's device or anything like that?

2              MR. BHATIA:  We do not.

3              And there's an additional grounds for venue.

4              THE COURT:  I'm sure there is.  I'm just trying to

5    nail this one down.  I can imagine multiple alternative grounds

6    for venue, but I just want to come to ground with this one.

7              This one, if you infer that "New York" means

8    Manhattan, it means that Mr. Teman's IP address -- that

9    Mr. Teman was in Manhattan at the time.  And you would contend

10   that is corroborated by the fact that Manhattan is -- he is no

11   stranger to Manhattan; that the rest of the evidence in the

12   case shows that that, at least at points in time, has been a

13   place he travels to for business, so it's not like we're

14   situating him somewhere where it's improbable that he would be.

15             MR. BHATIA:  And I should say --

16             THE COURT:  Am I correct about that?

17             MR. BHATIA:  That's right.

18             And I should also say that all of the checks, all 29

19   of the checks, identify GateGuard as being in Manhattan, New

20   York.  They actually identify it on 32nd Street here in New

21   York.

22             THE COURT:  Okay.

23             MR. BHATIA:  So he was depositing a check via mobile

24   deposit to an address in Manhattan from a record that shows he

25   was in New York, New York.  So all that together, I think,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-847

710

K1OVTEM4

1    helps --

2              THE COURT:  Well, the record doesn't show that he was

3    in New York, New York; it shows that, consistent with the

4    testimony of multiple witnesses that he was in Manhattan, that

5    he has a business presence in New York which he appears to be

6    representing he maintained as of March and April of 2019.

7              MR. BHATIA:  That's right.

8              THE COURT:  All right.

9              What's the alternative theory for venue on Counts Two

10   and Four?  Two and Four, again, we're now talking about the

11   March event.

12             MR. BHATIA:  So this applies to all four of the

13   counts --

14             THE COURT:  Right.

15             MR. BHATIA:  -- in addition to those two, is the fact

16   that the Signature Bank review -- Signature Bank was the home

17   of both victims in Count Two and Four.

18             THE COURT:  Sorry.  That's the co-op -- that's the

19   Mercer Street?

20             MR. BHATIA:  That's Mercer Street.

21             THE COURT:  That's Ms. --

22             MR. BHATIA:  That's Ms. Soon-Osberger and Gina Hom

23   were both affiliated with that account.

24             THE COURT:  Right.

25             MR. BHATIA:  And then Signature Bank -- Coney Realty

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-848

711

K1OVTEM4

1    was Elie Gabay.

2            THE COURT:  Right.  So those two victims, who are the

3    second and third victims by size of -- quantum of checks,

4    right?

5            MR. BHATIA:  That's right.

6            THE COURT:  Those two both bank at Signature.

7            Go ahead.

8            MR. BHATIA:  That's right.

9            And as we just heard from Mr. Motto, all of the checks

10    in question were reviewed through Signature Bank's Oasis team.

11    It's a fraud detection group.

12            THE COURT:  Right.

13            MR. BHATIA:  They look for red flags on particular

14    checks, and then they can elevate it to go to another stage of

15    review.  And that Oasis team, the evidence shows, is based on

16    Broadway Street in Manhattan -- a Broadway Street location in

17    Manhattan, New York.  And we also established that the

18    individual reviewer -- all the reviewers on the Oasis team are

19    in Manhattan.

20            THE COURT:  The theory here though is that ultimately

21    Signature is a -- the signature review is ultimately what, in

22    part, causes Bank of America to be left holding the bag.  And

23    so that, in effect, this is, in the end, a fraud on Bank of

24    America.  But given the accounts that the defendant chose to

25    draw the checks on, a necessary or, in this case, an actual

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-849

712

K1OVTEM4

1   step in the process that leaves Bank of America to be losing

2   the game of musical chairs here occurs in New York.  That's

3   where the checks are rejected and, therefore, it's bounced or

4   charged back to Bank of America.

5              MR. BHATIA:  That's right.  That is exactly right.

6              THE COURT:  All right.  I understand that.

7              And then you had a third theory as to the $4,000,

8   right?

9              (Counsel conferred)

10             MR. BHATIA:  I'm sorry.

11             THE COURT:  Sorry.  Let's back up.

12             The first theory involving the mobile deposits runs to

13   the March checks.

14             MR. BHATIA:  That's the March checks.

15             THE COURT:  The second theory involving the locale of

16   the Signature Bank review runs to all four checks -- all four

17   counts, but only because either the -- remind me what the

18   entity is that Soon-Osberger is affiliated with?  What's it

19   called?

20             MR. BHATIA:  18 Mercer Street.

21             THE COURT:  That either because 18 Mercer or Coney is

22   implicated by all four counts.

23             MR. BHATIA:  Coney is implicated by all four counts.

24             THE COURT:  Coney is -- right.

25             You had a third theory that was articulated briefly at

A-850

713

K1OVTEM4

1      the sidebar.  And the theory had to do with the fact that the

2      defendant at some point removes $4,000 --

3                 MR. BHATIA:  That's right.

4                 THE COURT:  -- in New York --

5                 MR. BHATIA:  Right.

6                 THE COURT:  -- sorry, Manhattan, we'll get to that in

7      a moment.  And that that essentially leaves Bank of America

8      exposed to that incremental extra sum.

9                 Walk me through the venue theory on that one and what

10     counts it refers to.

11                MR. BHATIA:  We believe under both the bank fraud --

12     under both the bank fraud statute and the wire fraud statute,

13     we've established that there was -- we've obviously charged

14     these as schemes.  And therefore, when the defendant withdrew

15     $4,000 from Bank of America -- and here we can show, based on

16     the bank records, money -- a large sum of money went from one

17     account to another account, and then from the other account, a

18     large sum of money was withdrawn, we can say that's all part of

19     the scheme.  And we believe that a jury could -- reasonable

20     jury could find that the $4,000 being taken out of the Bank of

21     America account was part of the scheme and for the defendant to

22     get and use the money that he obtained.

23                THE COURT:  Well, sorry.  I'm missing the Manhattan

24     part of all this.  What does he do -- what happens in

25     Manhattan?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-851

714

K1OVTEM4

1          MR. BHATIA:  The $4,000 were withdrawn at a teller in

2     Manhattan.

3          THE COURT:  All right.

4          And so he takes the -- and that you've proved how?

5          MR. BHATIA:  There was surveillance photographs.  And

6     Ms. Finocchiaro -- I know she said that it was at an address in

7     Manhattan.

8          THE COURT:  Okay.  Accept that for argument's sake.

9          So as to the bank fraud theory, where you've alleged,

10    among other things, a scheme to defraud, I get that, in the

11    sense that the $4,000, quite literally, means that there is --

12    the account is $4,000 more in the red or there's less there

13    to -- for Bank of America to draw on when it realizes that it's

14    been victimized in this way.  I understand that from the

15    perspective of a bank fraud theory.

16         Wire fraud though we usually think of venue, I

17    thought, but perhaps I'm wrong.  Jurisdiction certainly we'd be

18    looking at the -- we'd need a wire going -- starting at, ending

19    at, or going through the S.D.N.Y., right?

20         MR. BHATIA:  That's right.

21         THE COURT:  I think that's right.  Well, no, for wire

22    fraud we'd need the interstate wire, that's the relevant point.

23         MR. BHATIA:  Correct.

24         THE COURT:  Venue though is a different issue.  And I

25    want to make sure I'm not confusing jurisdiction and venue

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1OVTEM4

1   here.

2          So for wire fraud, for there to be federal

3   jurisdiction, it needs to be an interstate wire.

4          MR. BHATIA:  That's right.

5          THE COURT:  Is it required for venue for wire fraud

6   though that the -- that the wire go through New York, or is it

7   sufficient under the law that there be conduct in -- sorry, I

8   shouldn't have said "New York" -- that there be conduct in

9   Manhattan, even if the wire is circumventing Manhattan?

10         MR. BHATIA:  I believe I know the answer.  Can I

11  confer with Mr. Imperatore for a second?

12         THE COURT:  Yes.  Go ahead.

13         (Counsel conferred)

14         MR. BHATIA:  Your Honor, Mr. Imperatore confirmed my

15  belief too, is that the wire itself does not have to touch New

16  York, there just has to be --

17         THE COURT:  Manhattan.

18         MR. BHATIA:  Manhattan.  There has to be an interstate

19  wire and then, of course, we have to have venue under --

20         THE COURT:  All right.  So remind me what the

21  interstate wires are that support Counts Two and Four -- Two

22  and Four are the wire counts?

23         MR. BHATIA:  That's right.

24         THE COURT:  No, no, no, I'm sorry.  Three and Four are

25  the wire fraud counts.

K1OVTEM4

1          MR. BHATIA:  Three and Four are the wire fraud counts.

2          THE COURT:  What are the interstate wires that support

3     those?

4          MR. BHATIA:  Ms. Finocchiaro testified that at the

5     bank of first deposit, so that's -- here, that's in Miami

6     Beach, Florida.

7          THE COURT:  Right.

8          MR. BHATIA:  They scanned the check images.

9          THE COURT:  Right.

10          MR. BHATIA:  And what they do with those images is --

11     this is her testimony -- they then send those off to the

12     Federal Reserve or through the interbank clearing process.

13     They send the check images, along with the sort of data that

14     makes a check exchange money.

15          Mr. Motto testified today that they pull those check

16     images from the Federal Reserve.  And they review those at

17     Signature Bank here in Manhattan.

18          THE COURT:  But I mean the flow of money is ultimately

19     going from one state to another.  And the -- as to Miami, in

20     any event, for the -- I guess that's for Counts One and Three.

21          MR. BHATIA:  That applies to Counts One and Three.

22          THE COURT:  That's an easy wire fraud, right?

23     Because -- but you've got electronic signals, in effect, going

24     from Florida to New York State.

25          MR. BHATIA:  Right.

A-854

717

K1OVTEM4

1          THE COURT:  As it relates to the wire fraud for the

2   in-person deposit -- so we're talking Count Three here, right?

3   It's the large deposit in April that's made in person.  I'm not

4   focusing right now on venue, but just jurisdiction.  Just give

5   me the interstate wire that is implicated by Count Three.

6          MR. BHATIA:  So that is -- the wire is the one that I

7   mentioned, where the checks are digitized at the bank of first

8   deposit.  So that's in Miami Beach.  The government alleges

9   that the defendant deposited checks at a branch in Miami Beach,

10  Florida.

11         THE COURT:  Right.

12         MR. BHATIA:  Ms. Finocchiaro's testimony is that at

13  that branch they scan the images and then they send those to

14  the Federal Reserve.

15         THE COURT:  One moment.

16         (Pause)

17         THE COURT:  Right.  The usual instruction in this

18  district as to venue is:  It is sufficient to satisfy this

19  element if any act in furtherance of the crime occurred in this

20  district, confirming Mr. Imperatore's instinct that that's

21  disconnected from the jurisdictional element.

22         May I ask you, look, the elephant in the room is that

23  the victims here have a lot to do with Manhattan.  Walk me

24  through that.  We're having a very technical area of discussion

25  about all this stuff, but kind of the elephant in the room is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1OVTEM4

1  that, in a real sense, there's a fakeout here involving the

2  authorization, given or not given, by the victims.  How does

3  that play into the venue analysis?

4  　　　　MR. BHATIA:  The easiest one is for Ms. Soon-Osberger,

5  who testified that her building is on 18 Mercer Street in

6  Manhattan.

7  　　　　THE COURT:  Right.

8  　　　　MR. BHATIA:  And she had communications with Mr. Teman

9  via email.

10  　　　　With Mr. Soleimani, I think it's most in focus.  He

11  testified that he has an office in Manhattan.  And he had phone

12  and text and email communication with Mr. Teman, who sometimes

13  referenced the fact that he was in Florida.

14  　　　　THE COURT:  But is there some way that Mr. Teman's

15  dealing with the customers here facilitates the fraud?  I

16  understand that he makes a decision to time this for Pesach;

17  and that he says, basically, at various points, I'm going to do

18  X, Y, Z on Pesach.  And I think you crossed one witness about

19  that, but there is language in another witness's communications

20  chain in which that's explicitly said.  In that respect,

21  there's a lulling dimension; there's a choice to commit this

22  offense on a day when the victim is off the grid.

23  　　　　I'm not sure that that inaction though gets you

24  somewhere from a venue perspective.  Is there something that

25  actually -- that his treatment of the victims in some way that

K1OVTEM4

1    facilitates either of these frauds?

2            MR. BHATIA:  Your Honor, installing the device in

3    apartment buildings in Manhattan, which they all testified to,

4    and then, of course, his threats and saying, If you remove it

5    from a building in Manhattan, I'll charge you a device fee, I

6    think at least a few, I believe, witnesses may have testified

7    he came to install the devices.  All of that, I think,

8    establishes, sort of, a central conduct for the scheme here in

9    Manhattan.

10           THE COURT:  All right.

11           Look, I'm going to reserve and I'll make a judgment

12   when I come back after the lunch break.  I want to give you a

13   half hour for lunch.

14           The safe assumption here is that I am not going to be

15   dismissing any count at this point without prejudice to a

16   post-trial motion being made in the event that any part of the

17   case comes out against the defendant.  But I will want to think

18   about it over the lunch break.

19           Mr. DiRuzzo, what's the defense's intention after 2

20   p.m.?

21           MR. DiRUZZO:  Your Honor --

22           THE COURT:  You should operate on the assumption that

23   all four counts remain intact and that I've respectfully denied

24   the motion.

25           MR. DiRUZZO:  I understand, your Honor.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

A-857

720

K1OVTEM4

1    I believe the government's response to venue has just

2    created a jurisdictional problem under Article III.  If the

3    government's position for the mobile deposits is that they

4    happened in Manhattan, and Signature Bank is in Manhattan, how

5    are the wires in interstate commerce?

6        THE COURT:  I don't think that's what they said at

7    all.

8        Look, I want to give you a half-hour break for lunch.

9    The question is what -- after 2 o'clock, when I turn to the

10   defense case -- let us assume, as you should assume, that the

11   motion -- the Rule 29 motion will be denied, that is my very

12   strong lean, but I want to take a moment and reflect on it.

13   Assuming that it is denied and, therefore, you have the right

14   to make it again at a later stage, what happens at 2 o'clock?

15       MR. GELFAND:  We intend to call Ariel Reinitz as our

16   first witness, your Honor.

17       THE COURT:  All right.

18       I've previously read aloud to you a proposed limiting

19   instruction.  I took you all to be fine with that instruction.

20       MR. GELFAND:  Yes, your Honor.

21       THE COURT:  Please give me a prompt as soon as you

22   believe there's a factual predicate for that.

23       Is there anything else I need to be sensitive to with

24   respect to the Reinitz examination?

25       MR. BHATIA:  No, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-858

721

K1OVTEM4

1              THE COURT:  All right.

2              Have a good lunch.  I'll see you a moment or two

3       before 2 o'clock.

4              (Luncheon recess)

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-859

722

K1odtem5

1              **A F T E R N O O N   S E S S I O N**

2                          2:01 p.m.

3         (Jury, government, and witness not present)

4         THE COURT:  Be seated.  Be at ease.  We will wait

5     until everyone else gets here.

6         (Pause)

7         (Mr. Imperatore present)

8         MR. IMPERATORE:  Your Honor, we apologize.  We

9     understood it was --

10        THE COURT:  I gave you all very little time.  But be

11    that as it may.

12        All right.  I want to put on the record rulings as to

13    the Rule 29 motion.  I would like to wait for Mr. Bhatia.

14        Will he be here imminently?

15        MR. IMPERATORE:  He is on his way.  We understood it

16    was 2:15.  We apologize.

17        THE COURT:  Don't worry.  I just want to make sure he

18    is here given that he is lead counsel.

19        (Pause)

20        OK.  All counsel are here.

21        I want to very briefly put on the record my

22    disposition of reasons for my disposition of the Rule 29

23    motion.

24        I previously indicated that I was denying the motion

25    to the extent it was based on the theory that the conduct here

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-860

723

Klodtem5

1    under the Williams case and its progeny is not bank fraud.

2    Williams, I should point out to begin with, was a case, as I

3    recall, that was under 18 U.S.C. Section 1014, the

4    false-statement-to-banks statute.  It was Williams in part that

5    is the reason why we have the modern bank fraud statute under

6    which this case has been in part brought.  In that case, the

7    modern bank fraud statute criminalizes not merely statements

8    and representations and pretenses but schemes to defraud.

9         So, to begin with, independent of the facts of this

10   case, the bank fraud statute is pointedly in place precisely to

11   get rid of the necessary requirement of a statement or a

12   representation; a scheme to defraud is actionable to begin

13   with.

14        In any event, for the reasons I briefly indicated,

15   this case is amply distinguishable factually from Williams.

16   The assembled conduct by the defendant, including the notations

17   that the evidence shows he deliberately chose to include on the

18   check, amount to conduct that a jury could easily find

19   consisted of a false representation of the fact of customer

20   authorization.

21        Now, as to venue, I'm going to deny the Rule 29 motion

22   as well, although it obviously presents a harder analytic

23   question.  It seems to me clear that the question would have

24   been substantially easier had the government chosen to pursue

25   this case in Florida, but venue can exist in multiple districts

A-861

724

K1odtem5

1    and it's ultimately not my decision where the government brings

2    its case.  The issue is whether, by a little or a lot, the

3    facts support venue.

4         So I'm about to give you my reasons, but what I would

5    say at the outset is this.  I am mindful that we have moved

6    quickly in this case.  In the event of a guilty verdict on one

7    or more counts, I would be happy to reassess a new post-trial

8    Rule 29(c) motion with respect to venue on that point, a

9    thoughtfully briefed motion.  But I am persuaded largely by the

10   government's argument, or on the basis of the government's

11   argument, there is venue here, and, briefly, here's why:

12        To begin with, the $4,000 withdrawal in Manhattan by

13   the defendant of money from the ultimate victim bank account,

14   the JPMorgan -- excuse me, the Bank of America account it seems

15   to me is significant.  That money is there -- had that money

16   not been removed, the bank would have been exposed to a lesser

17   risk of loss on account of all the chargebacks.  And that, it

18   seems to me, is conduct by the defendant demonstrably in

19   Manhattan in this course of the scheme.  The scheme as alleged

20   ultimately exposes the bank to the risk of loss, and the reason

21   it is exposed to the risk of loss is because there is not

22   enough money in the account ultimately to cover all the

23   chargebacks.

24        With respect to Counts Two and Four, the March checks,

25   I am also persuaded, based on my colloquy with Mr. Bhatia (a)

K1odtem5

1   that there is evidence by which a jury could find by a

2   preponderance that Mr. Teman was in New York at the time that

3   he made the mobile deposits that are the basis for Counts Two

4   and Four.  It seems to me that the inference from the way the

5   chart reads does strongly support that New York, New York, in

6   the circumstance indicated, meant Manhattan.  As such, the

7   defendant literally would have been engaged in a mobile deposit

8   of remotely created checks while in Manhattan.  And there is

9   nothing improbable about the thesis that the defendant was in

10  Manhattan.  That was a significant place in which he did

11  business, as the testimony of two of the three customer

12  entities here and other evidence revealed.

13          I also think the Signature Bank review is a viable

14  basis for venue.  It seems to me that in the end, the theory

15  here is that the financial institution that was victimized was

16  not Signature Bank, it was a bank later, if you will, in the

17  chain of events -- Bank of America.  It was necessary that

18  somebody undertake the review to catch that there wasn't --

19  that there was a lack of a claim of customer authorization and

20  that it was going to cause the defendant's bank from which he

21  had drained 260-plus thousand dollars to be left holding the

22  bag.  It seems to me that the Signature review is a step in

23  that chain.

24          Finally, I'll just point out the following and I'm not

25  relying on this:  But for the way the case was charged here, I

K1odtem5

1    think there would be a substantial argument of an entirely

2    different theory of venue.  The case has been charged as a

3    scheme that occurred either in March of 2019 as it relates to

4    Counts Two and Four and/or April through June 2019 as it

5    relates to Counts One and Three.  As such, I am, I think,

6    limited in considering venue to conduct that occurred in those

7    time windows.  There is, however, a very substantial amount of

8    conduct between the defendant and at least two of the three

9    customers, or customer groups, that occurs in this district at

10   an earlier time.

11          And there is a quite substantial argument that this

12   fraud was long in the germinating, and that essentially what

13   happened here was that the defendant's dealings with victims

14   created the -- were there to create a record that would give

15   the illusion of customer consent in the event the defendant

16   later did what he ultimately the evidence suggests he may have

17   done, which is to draw checks on the customer accounts knowing

18   full well that they had no intention of authorizing any of

19   these amounts.

20          The evidence that the victims here did not authorize

21   this money is, you know, substantial.  It consists of the

22   victims' testimony.  It consists of the lack of invoices for

23   any of the expenses.  It consists of the disproportion between

24   the scale of the monies withdrawn and the scale of the monies

25   historically withdrawn.

A-864

727

K1odtem5

1        And given the small print and tiny way in which there

2    are faint illusions to terms and conditions here and there,

3    there is not an insubstantial record that this was a

4    long-planned way of giving the defendant an opportunity, if he

5    ever decided he needed to or wanted to draw checks from the

6    customer accounts beyond their consent, to do so in a way that

7    would look like they had consented.

8        Because, however, the government has charged this case

9    tightly focused around March or April through June, I think all

10   of those historical dealings which occur largely in 2017 and

11   '18 are not really fair game for venue.  So the government is

12   at liberty to argue what it is going to argue, but I don't

13   think any of those customer dealings prior to the dates charged

14   in the Indictment can be found as a basis for venue.

15       Therein lies my ruling.

16       Defense, call your -- before you call your first

17   witness and we get the jury, is there anything you need to

18   bring to my attention without Mr. Reinitz?  Any issues that

19   occurred over the lunch break?

20       MR. GELFAND:  No, your Honor.  We did instruct Mr.

21   Reinitz, consistent with your earlier ruling this morning, to

22   not -- and, also, I will direct my questions accordingly -- to

23   focus on what he communicated to Mr. Teman and what Mr. Teman

24   communicated to him, as opposed to his mental thinking.

25       THE COURT:  And I take it you are going to be putting

A-865

728

K1odtem5

1    the witness on?

2              MR. GELFAND:  Yes, your Honor.

3              THE COURT:  To the extent you need to lead, look, he

4    is an attorney, he ought to understand the ground rules, but if

5    you need to lead in order to avoid unexpressed legal advice

6    coming out or his thought process coming out or things that are

7    a matter of judgment, I give you a little more latitude to do

8    that because I want to make sure we don't inadvertently step

9    into that.  And if at any point you need to approach, you ask

10   for a sidebar.  I am giving you more latitude with this witness

11   than otherwise just because it is a little more fraught.

12             MR. GELFAND:  Absolutely, your Honor.

13             THE COURT:  All right.  Very good.

14             Can we get the jury?  Does anyone have anything to

15   raise?

16             MR. GELFAND:  Not for the defense.

17             MR. BHATIA:  Not for the government.

18             THE COURT:  Let's get the jury.

19             (Continued on next page)

20

21

22

23

24

25

Klodtem5

1          (Jury present)

2          THE COURT:  All right.  Welcome back, ladies and

3    gentlemen.  I hope you had a good lunch.

4          To begin with, I want to apologize.  I took more of

5    your time than I expected.  I just needed to take more time

6    with the lawyers tending to things relating to the trial, but

7    I'm sorry that the lunch break was as long as it was.

8          In any event, we are ready to resume.

9          Mr. Gelfand.

10          MR. GELFAND:  Your Honor, the defense calls Ariel

11    Reinitz as its first witness.

12          THE COURT:  Go ahead.

13    ARIEL REINITZ,

14        called as a witness by the defendant,

15        having been duly sworn, testified as follows:

16          THE CLERK:  Thank you.  Please be seated.

17          State and spell your full name for the record.

18          THE WITNESS:  Ariel, A-r-i-e-l, Reinitz,

19    R-e-i-n-i-t-z.

20          THE COURT:  All right.  Good afternoon, Mr. Reinitz.

21          THE WITNESS:  Thank you, your Honor.

22          THE COURT:  I will ask you kindly just to lean into

23    the mic.  Keep your voice up so that everyone here in this old,

24    large courtroom can here you.

25          Counsel, you may inquire.

K1odtem5                    Reinitz - direct

1              MR. GELFAND:  Thank you, your Honor.

2    DIRECT EXAMINATION

3    BY MR. GELFAND:

4    Q.  Good afternoon.  Would you please state your name for the

5    record?

6    A.  Ariel Reinitz.

7    Q.  Mr. Reinitz, how are you currently employed?

8    A.  I'm an attorney at the law firm of FisherBroyles.

9    Q.  How long have you been an attorney?

10   A.  Over ten years.

11   Q.  Just very generally, what is FisherBroyles?

12   A.  It's a law firm -- a midsized law firm, I would say about

13   250 attorneys.

14   Q.  Does it have offices in New York and other cities

15   throughout the country?

16   A.  We have about 20-some-odd offices throughout the U.S., and

17   if I'm not mistaken we just opened one in the U.K.

18   Q.  What is your position at FisherBroyles?

19   A.  I am a partner.

20   Q.  And what are your duties and responsibilities as a partner

21   at the law firm?

22   A.  I provide legal advice to my clients.

23   Q.  Is a partner a higher level position than associate?

24   A.  It's at most law firms, including FisherBroyles, the

25   highest, most senior position at the firm.

K1odtem5                    Reinitz - direct

1    Q.  Just very generally, what is the nature of your practice?

2    A.  I advise almost exclusively technology companies on many of

3    the legal issues that they encounter, intellectual property,

4    corporate matters, disputes in litigation when they arise, a

5    few other things but that is the primary focus of my practice.

6    Q.  What is your educational background?

7    A.  I have a degree in computer science and a law degree.

8    Q.  Where did you go undergraduate?

9    A.  Sure.  I attended Yeshiva University for undergraduate and

10   Cardozo Law School for law school.

11   Q.  Where are you licensed to practice?

12   A.  I'm currently licensed in New York State.  I was licensed

13   in New Jersey.  I've let that go inactive.  I just don't

14   practice there anymore.  I'm also admitted to the federal bars

15   and several courts, and I'm also licensed to practice before

16   the United States Patent Office as a patent attorney.

17   Q.  Without getting into any of these cases, have you handled

18   cases in this courthouse?

19   A.  Yes.

20   Q.  Do you know an individual named Ari Teman?

21   A.  Yes.

22   Q.  And do you see Mr. Teman in the courtroom?

23   A.  Yes.

24   Q.  Could you please identify Mr. Teman?

25   A.  He's the handsome gentleman with the blue tie right there.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-869

732

K1odtem5                    Reinitz - direct

1    Q.  How do you know Mr. Teman?

2           THE COURT:  The record will reflect that the witness

3    has identified the defendant.

4           MR. GELFAND:  Thank you, your Honor.

5    BY MR. GELFAND:

6    Q.  How do you know Mr. Teman?

7    A.  He and I first met through a mutual friend, a former

8    colleague of mine at the law firm of Lowenstein Sandler, and

9    through that relationship I did some legal work for him at

10   Lowenstein Sandler and we've sort of been in contact ever

11   since.

12   Q.  Prior to the existence of GateGuard, did you provide any

13   legal representation to Mr. Teman or any entities that

14   Mr. Teman owned?

15   A.  Yes.

16   Q.  Did you represent an entity named Friend or Fraud?

17   A.  Yes.

18   Q.  Just very generally, what, if anything, is the relationship

19   between Friend or Fraud and GateGuard Incorporated?

20   A.  If I'm not mistaken, Friend or Fraud is the parent company

21   of GateGuard, which means essentially that Friend or Fraud owns

22   the entirety, all of GateGuard.

23   Q.  At any point over your course of dealings with Mr. Teman,

24   did you from a legal standpoint represent GateGuard?

25   A.  Yes.

A-870

K1odtem5                        Reinitz - direct

1    Q.  And in doing so, did you also represent Mr. Teman?

2    A.  Yes.

3    Q.  Approximately when did you first begin representing

4    GateGuard?

5    A.  It was 2018, I want to say maybe in March.  Sometime in

6    March 2018, approximately.

7    Q.  What is GateGuard?

8    A.  GateGuard is a technology company that provides intercom

9    devices for multi-tenant properties and related services to

10   both the tenants that live in those apartment buildings and the

11   landlords, the owners of the properties.

12   Q.  Where does GateGuard have its presence in terms of devices

13   that are being used by apartment buildings?

14   A.  GateGuard's devices are installed throughout New York City.

15   I see them, you know, fairly frequently as I walk around the

16   city.  I know they are installed in other parts of the country.

17   I haven't seen those personally but I believe in Connecticut,

18   California, Florida.  I think -- I believe elsewhere as well.

19   Q.  When you began representing GateGuard, were you provided

20   access to business documents of GateGuard?

21   A.  Yes.

22   Q.  When you began representing GateGuard -- first of all, who

23   provided you the documents from the company?

24   A.  Mr. Teman.

25   Q.  And from approximately March of 2018, when you began

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-871

734

K1odtem5                    Reinitz - direct

1   representing GateGuard, to the present, is it Mr. Teman who has

2   provided you the records of GateGuard?

3   A.  I would say almost exclusively.  I've been in touch at

4   various points in time with maybe one or two other GateGuard

5   personnel, but really I would say almost exclusively, yes,

6   Mr. Teman provided me those documents.

7   Q.  Have you personally over the course of your representation

8   of GateGuard become familiar with its business activities?

9   A.  Yes.

10  Q.  Are you generally familiar with its customer base?

11  A.  Yes.

12  Q.  Approximately how many customers does GateGuard have?

13  A.  It's -- the number is in the hundreds.  I would say

14  probably low -- low hundreds.

15  Q.  Are you familiar with how a customer signs up for

16  GateGuard?

17  A.  Yes.

18  Q.  Can you please describe that process?

19          MR. BHATIA:  Objection.

20          THE COURT:  Basis?

21          MR. BHATIA:  Foundation.

22          THE COURT:  Sustained.

23  BY MR. GELFAND:

24  Q.  How, if at all, do you know how a customer signs up for

25  GateGuard?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K10dtem5                          Reinitz - direct

1    A.  I've reviewed GateGuard's website.  I've interacted with

2    many of GateGuard's customers, discussed at length the process

3    with Mr. Teman, and to the extent it is relevant, this issue

4    we're litigating in another court actually --

5              THE COURT:  Sorry.  Sustained.

6              Mr. Reinitz -- all right, look, I will permit a brief

7    discussion briefly to address in general how a customer signs

8    up.  You need to limit it for timeframe because the witness

9    indicated that he first assumed any advisory role in March or

10   so 2018.  You need to be precise about timeframes.

11   BY MR. GELFAND:

12   Q.  From the moment --

13             THE COURT:  Mr. Reinitz, you are not to refer to other

14   litigations.

15             THE WITNESS:  I apologize, your Honor.

16             MR. GELFAND:  Thank you, your Honor.

17   BY MR. GELFAND:

18   Q.  From the moment you've represented GateGuard to the

19   present, can you please describe the process of how customers

20   sign up for GateGuard?

21   A.  A customer would go to GateGuard's website.  If I'm not

22   mistaken, it is actually on the front page, the homepage, there

23   is a form that the customer provides information, contact

24   information, information regarding their properties that they

25   wish to purchase -- subscribe to GateGuard for those

K10dtem5                         Reinitz - direct

1    properties.  There is a link or a reference to GateGuard's

2    terms that's included in that form.  And there is a -- I would

3    say a submit or, you know, an accept button, like many Web

4    forms, where the customer, you know, ultimately clicks to,

5    again, accept the agreement, and then to, you know, in this

6    case to order GateGuard for their building.  That's the only

7    way that I've known GateGuard to be able to -- customers to be

8    able to access GateGuard -- I'm sorry, to subscribe and to

9    order GateGuard.

10   Q.  You referenced the terms and conditions.  Are you familiar

11   with that document?

12   A.  Yes.

13        MR. GELFAND:  Your Honor, may I show just the witness

14   what's been marked as Defendant's Exhibit 1?

15        THE COURT:  Defense Exhibit what?  What number?

16        MR. GELFAND:  1.

17        THE COURT:  Yes.

18   Q.  Can you just tell me very generally if you are familiar

19   with Defense Exhibit 1?

20   A.  Yes.

21   Q.  Had does Defense -- first of all, have you had an

22   opportunity to review Defense Exhibit 1 prior to testifying?

23   A.  Yes.

24   Q.  Is it a true and correct copy of the terms and conditions

25   of GateGuard as reflected on the last revision date?

A-874

737

K1odtem5                    Reinitz - direct

1   A.  Yes.

2           MR. GELFAND:  Your Honor, I move Defense Exhibit 1

3   into evidence.

4           MR. BHATIA:  Objection.  401.

5           THE COURT:  I think the -- in the first instance, it

6   is objectionable because it states that it was revised in

7   February of 2019, so I will sustain it.  It is just simply out

8   of time.  If you want it, I am happy for you to introduce a

9   version that might be germane here.

10          MR. GELFAND:  Your Honor, may we approach?

11          THE COURT:  Yes.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

A-875

738

K1odtem5                          Reinitz - direct

1          (At the sidebar)

2          THE COURT:  Look, the document, Document Exhibit 1, by

3    its terms is not the document that was in place at the time any

4    of these customer relationships got started or apparently were

5    active.  I think in one degree or another each of the customers

6    has described some form of dissolution or wind down or whatnot

7    predating that date.

8          In any event, I'm happy to have the terms and

9    conditions at the time that a customer entered into or was

10   active with the agreement with GateGuard, but this is a

11   February 7, 2019 document.  So go back and just get me the --

12   offer the one that was timely.

13         MR. GELFAND:  Your Honor, the prior iteration of the

14   terms and conditions is already in evidence.

15         THE COURT:  Fine.

16         MR. GELFAND:  It references a -- what we intend to

17   offer as Defendant's Exhibit 2, with the foundation, which it

18   references pricing terms.  These were the pricing terms,

19   Defendant's Exhibit 2, that were in effect on the date of the

20   alleged RCC deposits.

21         THE COURT:  Sorry.  One moment.

22         This is --

23         MR. GELFAND:  We are offering Defendant's Exhibit 2.

24         THE COURT:  You offered beforehand Defense Exhibit 1?

25         MR. GELFAND:  Correct, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-876

739

K1odtem5                         Reinitz - direct

1          THE COURT:  Defense Exhibit 1 are terms and conditions

2     that are in effect right before the fraud but not -- the fraud

3     counts as alleged, March and April, but not before.  Why can't

4     you just do what you need to do with respect to -- by using

5     Exhibit 2 which appears to have been in place at the time of

6     the events at issue?

7          MR. GELFAND:  Exhibit 2 is the payment terms that were

8     in place at the time.  I can move on from Exhibit 1.

9          THE COURT:  Here's the thing.  I'm delighted for you

10    to offer the terms and conditions that are central to the

11    document.  You just can't use the February 2019 terms and

12    conditions.  Put before him the terms and conditions that were

13    in place at the time that the three relevant customers engaged

14    with GateGuard, which was 2017 and 2018.

15          You have been planning an advice of counsel defense

16    for some time.  The very first line on this document tells you

17    it is out of date, so just use the --

18          MR. GELFAND:  I understand, your Honor.  I am talking

19    about a separate issue.

20          THE COURT:  I am talking about the issue here.

21          MR. GELFAND:  I appreciate that.

22          THE COURT:  The issue here is do you have terms and

23    conditions for the times that the customers engaged GateGuard?

24          MR. GELFAND:  Yes, they are in evidence.

25          THE COURT:  Then use those.

K1odtem5                          Reinitz - direct

1          Now, what is the separate -- this is irrelevant

2    because it is out of time.  What is the separate issue?

3          MR. GELFAND:  The separate issue is that the

4    applicable terms and conditions, the prior terms and

5    conditions, which have been read into the record --

6          THE COURT:  Right.

7          MR. GELFAND:  -- reference the payment terms that are

8    essentially amended from time to time.  The payment terms that

9    we intend to introduce as Defendant's Exhibit 2 are the payment

10   terms that were provided by Mr. Teman to Mr. Reinitz --

11         THE COURT:  Well --

12         MR. GELFAND:  -- for that purpose.

13         THE COURT:  Let's break that down.

14         Do you have the payment terms that were in place at

15   the time that each customer entered into the terms and

16   conditions that apparently represent -- reference payment

17   terms?

18         MR. GELFAND:  The document, no, your Honor, not for

19   lack of looking.  However, the payment terms that were provided

20   by Mr. Teman to Mr. Reinitz to elicit advice, consistent with

21   the terms of the terms and conditions that say that they are

22   essentially amended from time to time, are the payment terms

23   that are Defendant's Exhibit 2.

24         THE COURT:  If you can establish from the terms and

25   conditions that were in place at the time that the customer

A-878

741

K1odtem5                        Reinitz – direct

1    signed on, that the text of those binds the customers to

2    evolving payment terms, then what you've proposed may well

3    work.  But until you do that in evidence by showing that the

4    customers' acceptance of the terms and conditions in place at

5    the time that they accepted, that they entered into work with

6    GateGuard, commits them to an evolving set of payment terms, I

7    think it is premature.

8              MR. GELFAND:  Yes, your Honor.

9              THE COURT:  Mr. Bhatia.

10             MR. BHATIA:  I was only going to raise the same issue

11   with regards to Defense Exhibit 2 because I think it is coming

12   up in a moment, but I think you have addressed it.

13             THE COURT:  If ultimately the terms and conditions by

14   their terms incorporate by reference a dynamic document

15   changing the payments terms, the defense is entitled to put

16   that in evidence, so it is a matter of -- well, you are

17   entitled to cross on that, and you can argue it is a sharp

18   practice, or whatever you can argue, but it is ultimately the

19   document that incorporates the evolving document of payment

20   terms by reference is fairly before the jury.

21             MR. BHATIA:  Your Honor, I believe the payment terms

22   actually say at the bottom -- so Defense Exhibit 2 -- that they

23   apply if you make a new purchase.  So I think by the payment

24   terms themselves, they do not apply.

25             THE COURT:  We'll take this step-by-step, and if we

K10dtem5                    Reinitz - direct

1    need to go to the sidebar, I would be happy to.

2           Why is Mr. Reinitz referring to another litigation?

3    Has he been advised about the basic rules of 403 here?

4           MR. GELFAND:  Yes, your Honor.

5           THE COURT:  About 30 seconds out of the gate he is

6    referencing something completely inadmissible, and it is not

7    clear to me that that is helpful to your client's clause by him

8    volunteering that somebody else has a controversy.

9           MR. GELFAND:  I agree, your Honor.  The question I

10   asked certainly didn't elicit that.

11          THE COURT:  Look, he is not here as an advocate.  OK.

12   Thank you.

13          MR. GELFAND:  Thank you.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

A-880

743

Klodtem5                    Reinitz - direct

1          (In open court)

2          THE COURT:  All right.  Mr. Reinitz, I'll remind you

3    that you are still under oath.

4          Ladies and gentlemen, at the sidebar I excluded -- I

5    did not receive -- Defense Exhibit 1.

6          (Pause)

7          MR. GELFAND:  I am just confirming that 441 was

8    received in evidence, your Honor.

9          Your Honor, may I show Government Exhibit 441 to the

10   jury?

11         THE COURT:  It is in evidence?

12         MR. GELFAND:  It is, your Honor.

13         THE COURT:  Very good.

14   BY MR. GELFAND:

15   Q.  Can you see Exhibit 441?

16   A.  Yes.

17   Q.  What is Exhibit 441?

18   A.  The terms and conditions of GateGuard Inc., last revised

19   November 30, 2017.

20   Q.  Thank you.  Are you familiar with this document?

21   A.  Yes.

22   Q.  Now, "Acceptance of the Terms," can you please read the

23   first sentence?

24   A.  "By using the site and/or the services, you agree to comply

25   with and be legally bound by the terms and conditions of these

A-881

744

K1odtem5                    Reinitz - direct

1    terms of service ("Terms"), whether or not you become a

2    registered user of the services."

3    Q.  At the top of this, can you please read the portion that I

4    have marked on the screen?

5    A.  "Hi there!  Please read these terms carefully as they

6    contain important information regarding your legal rights,

7    remedies and obligations."

8    Q.  Directing your attention to Section 5, can you see that

9    clearly on the screen in front of you?

10   A.  Yes.

11   Q.  What is Section 5?

12   A.  "Orders and fees ("pricing")."

13   Q.  Can you please read the portion -- the first couple of

14   sentences of that paragraph that I've circled?

15   A.  "You may purchase subscriptions to services by submitting

16   orders via the site.  All orders are subject to acceptance by

17   GateGuard.  The applicable fees shall be as stipulated in the

18   price list made available by GateGuard on the sites from time

19   to time, and subject to the additional payment terms stipulated

20   at:  Http.//gateguard.XYZ/legal/payment.php (a/k/a pricing)

21   from time to time."

22   Q.  And the URL that you identified, is that a hyperlink?

23   A.  Yes.

24   Q.  Are you familiar with the document that was in effect in

25   March and April of 2019 that is referenced in that hyperlink,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-882

K1odtem5                    Reinitz - direct

1    the pricing list?

2    A.  Yes.

3         MR. GELFAND:  Your Honor, may I show the witness

4    Defendant's Exhibit 2?

5         THE COURT:  Sorry.  Would you kindly speak into the

6    microphone?

7         MR. GELFAND:  Can I show the witness Defendant's

8    Exhibit 2?

9         THE COURT:  Yes.

10   Q.  Can you just tell me generally if those are the payment

11   terms that were in effect in March and April of 2019?

12   A.  Yes.

13        MR. GELFAND:  Your Honor, at this point I would move

14   in Defendant's Exhibit 2.

15        THE COURT:  Government?

16        MR. BHATIA:  Objection.

17        THE COURT:  Yes.  Mr. Gelfand, this document says it

18   takes effect January 27, 2019.  The provision in paragraph 5

19   would make that applicable only in the event of an additional

20   purchase or renewal after that date.  Absent a factual

21   predicate for that, this is also an out-of-time document.  So,

22   I will deny the application to receive it.

23        You are at liberty to put the payment terms in that

24   were in place at the time of purchases or renewals.

25        MR. GELFAND:  Your Honor, may we just briefly

A-883

746

K1odtem5                    Reinitz - direct

1    approach?

2            THE COURT:  This was just covered at the sidebar but,

3    yes, you may.

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K1odtem5                         Reinitz - direct

1          (At the sidebar)

2          THE COURT:  Look, I'll make it brief.

3          Mr. Gelfand, let's go customer by customer.  Let's

4     begin with the co-op one, Bonnie, what is her name?

5          MR. BHATIA:  Soon-Osberger.

6          THE COURT:  What did they purchase or renew after

7     January 27, 2019?

8          MR. GELFAND:  Your Honor, I don't believe any

9     customers did.

10          THE COURT:  The problem is that I'm not going to

11     permit this document.  You had loads of time to prepare for a

12     advice-of-counsel defense.  Get the document in evidence that

13     bound these customers.  They did not buy into payment terms

14     that were revised on January 27, 2019.  This is lawyering 101.

15          MR. GELFAND:  Your Honor, here's the issue.  The issue

16     is this was the document -- and I will lay a foundation to this

17     effect -- this was the document that Mr. Teman gave to Mr.

18     Reinitz when seeking his advice --

19          THE COURT:  Mr. Reinitz surely didn't rely on a

20     document that did not exist at the time that the customers

21     bought this information.

22          MR. GELFAND:  Mr. Reinitz would testify that he

23     advised Mr. Teman that these payment terms were in effect in

24     March and April of 2019 because of paragraph 5.  If that was

25     right or wrong is not the issue.

A-885

748

K1odtem5                          Reinitz - direct

1        THE COURT:  You had better have those records in

2    evidence.  Put those in evidence, because there is no proof of

3    that in the record right now that the payment terms that were

4    in place beginning in late January 2019 matched the others.

5    There is no way for the jury or the government to test the

6    proposition, and, by definition, the payment terms evolve over

7    time.  That's why they are revised.

8        MR. GELFAND:  Your Honor, we don't have the original

9    payment terms, not for lack of trying, or for lack of

10   availability, we haven't been able to actually obtain them.

11        What I can represent to the Court, though, is I think

12   it is admissible, even with a limiting instruction, based on

13   foundation that this is what was provided to Mr. Reinitz and

14   that Mr. Reinitz gave Mr. Teman advice based on these terms.

15   And that goes to his -- whether Mr. Reinitz's legal advice is

16   right or wrong is not relevant to the advice-of-counsel

17   defense.

18        THE COURT:  Well, then you are going to have to lay

19   the foundation, because what you have just said before me may

20   get you closer, but by putting in evidence payment terms that

21   don't take effect until January 2019 is by definition

22   irrelevant.  It may become relevant if working backwards you

23   lay the foundation that Mr. Teman represented that these are

24   identical to the earlier payment terms and that that was the

25   basis for the advice.  That then provides a more secure

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-886

749

K10dtem5                    Reinitz - direct

1    foundation for getting this in, but not because these are

2    payment terms that exist today.

3           So let's go by that route.  I'm willing to have you

4    try that.  At least that way, although, you know, if it is

5    substantially impeaching as it relates to reasonable reliance

6    on the advice or the truth telling by Mr. Teman, at least there

7    is a more secure foundation.  But right now there is nothing in

8    evidence that suggests this bears a relationship to the advice

9    given or to what the terms in fact were in place.

10          So you are welcome to approach this in a different way

11   by telling the narrative, including him giving a point of

12   advice.  And when you ask what information was provided, you

13   are at liberty then to elicit that he gave you payment terms

14   and claimed that they were in effect at the times at issue, if

15   that was in fact the conversation.  Let's see if we get there.

16   The fact that they are in place today is irrelevant.

17          MR. GELFAND:  I understand, your Honor.

18          THE COURT:  You are not disagreeing with that; your

19   theory of relevance is that they were incorporated by reference

20   by Mr. Teman, who represented, without documentary

21   corroboration, that they are unchanged from earlier?

22          MR. GELFAND:  And Mr. Reinitz would testify that he --

23   well, I anticipate that there is sufficient testimony that will

24   get us there so that the Court can rule.

25          THE COURT:  Let me ask you, the dates that the various

A-887

750

K1odtem5                          Reinitz - direct

1   people last purchased the services in 2017 for -- who was the

2   last one?

3           MR. BHATIA:  Soleimani was in '17.  The other ones

4   were 2018.

5           THE COURT:  Those both predate Reinitz, March 2018?

6           MR. BHATIA:  I believe he might have been right around

7   the time it started.

8           THE COURT:  We'll see whether or not there is a

9   factual basis on which he can independently testify that the

10  terms and conditions were the same.  But if you can't even find

11  them, the likelihood that he is in a position to actually say

12  that he compared and contrasted is questionable, but let's try

13  it.  I am not ruling it out, but not by the means you are

14  trying, which is just putting in a current one.

15          MR. GELFAND:  I will approach it through the lens of

16  what was provided to him on the basis of the advice that he

17  gave.

18          THE COURT:  Without getting into the content of the

19  advice, you can try to get this in by showing that this is what

20  Teman gave him, and if Teman says these are the same, we'll

21  see.  We'll take it from there.

22          Government.

23          MR. BHATIA:  Your Honor, to avoid another sidebar --

24          THE COURT:  I will take them as I need them.  This is

25  important.

A-888

K1odtem5                         Reinitz - direct

1           MR. BHATIA:  We concur in the 401 analysis, but we

2    also think there is a substantial 403 problem here, because if

3    this is sort of what the defense hangs on and it is not even in

4    time, I think there is a big 403 issue here as well.

5           THE COURT:  Explain.  Articulate that better.

6           MR. BHATIA:  I think there is a risk of confusing the

7    jury, or misleading the jury, that this is the document that

8    was in effect at the time -- this is the only thing that they

9    have to see, and this is the only thing that has been produced.

10          THE COURT:  Look, if the witness himself didn't do a

11   comparison, then ultimately the cross turns on it.  It is as

12   good as what Teman represented.

13          Teman, whatever the government thinks of him, is a

14   witness who is allowed to make a factual representation to his

15   attorney.  Now, the fact that either this witness or Teman

16   can't come forward with the document and the fact that it came

17   from Teman are obviously very substantial pieces of impeachment

18   that you will have on cross of this witness, or argument to the

19   jury.  But in the end, if Teman represented to his lawyer that

20   the document is identical -- we'll see if he does -- it seems

21   to me that that probably gets before the jury and everything

22   else goes to weight.  OK?

23          MR. BHATIA:  Thank you.

24          (Continued on next page)

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1odtem5                              Reinitz - direct

1           (In open court)

2           THE COURT:  Mr. Gelfand, you are at liberty to

3    continue to attempt to lay a proper foundation for this

4    document.

5           MR. GELFAND:  Thank you, your Honor.

6    BY MR. GELFAND:

7    Q.  Mr. Reinitz, prior to March 28th of 2019, did Mr. Teman

8    seek your advice about whether specific customers owed money to

9    GateGuard, in particular, Coney, ABJ and Mercer?

10   A.  Yes.

11   Q.  And did you give Mr. Teman advice?

12   A.  Yes.

13   Q.  What advice did you give Mr. Teman in the sense of what did

14   you communicate to Mr. Teman?

15          THE COURT:  I'm sorry.  I'm not going to -- there is

16   no factual basis or legal basis for that yet.

17          Without telling us whether -- what the content of the

18   advice was, you can ask him whether, without telling us what

19   the answer is, whether he gave advice on that subject.

20          MR. GELFAND:  Yes, your Honor.

21          THE COURT:  Not what it was.

22   Q.  Did you in fact give Mr. Teman advice on that subject?

23   A.  Yes.

24   Q.  And to be clear, did you give him advice on that subject

25   prior to March 28th of 2019?

K10dtem5                         Reinitz - direct

1   A.  Yes.

2   Q.  What specifically did you communicate to Mr. Teman?

3            THE COURT:  Sorry.

4            MR. BHATIA:  Objection.

5            THE COURT:  Mr. Gelfand, you were going to try to lay

6   a foundation about a document that was shared.  We can't get to

7   the advice unless there is a legal basis for that.  You are not

8   anywhere close to that yet.

9   BY MR. GELFAND:

10  Q.  Did Mr. Teman provide you documents in your capacity as

11  counsel for GateGuard?

12           THE COURT:  Timeframe.

13  Q.  In connection -- prior to March 28th of 2019, in connection

14  with seeking your advice about whether those customers owed

15  GateGuard money.

16  A.  Yes.  I recall specifically --

17           THE COURT:  It is just a "yes" or "no" was the answer.

18  A.  Yes.

19  Q.  What document did Mr. Teman provide you?

20  A.  I recall several discussions on the issue of --

21           THE COURT:  What documents did he provide you?

22           Mr. Reinitz, listen to counsel's question.  He asked

23  you what documents were provided.

24           THE WITNESS:  I apologize, your Honor.

25  A.  Mr. Teman provided me with GateGuard's terms and I believe

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-891

K10dtem5                         Reinitz - direct

1    the payment terms as well.

2    Q.  You have seen what we just identified but did not introduce

3    into evidence, the payment terms reflected in Defendant's

4    Exhibit 2, correct?

5    A.  Yes.

6    Q.  What, if anything, did Mr. Teman represent to you about --

7    I'm sorry?

8            THE COURT:  Why don't you establish which payment

9    terms were provided by Mr. Teman to the witness, please?

10           MR. GELFAND:  Yes, your Honor.

11   Q.  Which payment terms were provided to you?

12   A.  On or about I would say mid-2018, Mr. Teman sent me --

13           THE COURT:  Mr. Gelfand.

14           MR. GELFAND:  Yes, your Honor.

15           THE COURT:  Mr. Gelfand is asking you about what was

16   provided in advance of March 28, 2019.

17           That was your question, correct?

18           MR. GELFAND:  Yes, your Honor.

19           THE COURT:  Please focus the witness more so that we

20   don't get answers drawing on other timeframes.

21   A.  I received a link to GateGuard's payment terms directly

22   from Mr. Teman.  I accessed the link and reviewed the terms,

23   again, as they were in 2018 -- mid-2018, I would say.  March

24   and April 2018, more specifically.

25   Q.  Did you -- did the terms that you reviewed include a

755

Klodtem5                    Reinitz - direct

1    section -- can I show just the witness a portion of Defendant's

2    Exhibit 2?

3            THE COURT:  Sorry.  One moment.

4            I'm confused.  What you represented at the sidebar is

5    different from what he just testified to.  Let me see if I can

6    make sure we're on the same page.

7            Did you speak on this subject to Mr. Teman shortly

8    before March 28, 2019?

9            THE WITNESS:  As well, yes, your Honor.

10           THE COURT:  All right.  At that time, did he give you

11   a copy of the payment terms?

12           THE WITNESS:  I don't recall specifically.  I do

13   recall that at that point I was very familiar with the terms,

14   the website, and had accessed them and reviewed them several

15   times myself, and at that point would have gone back and

16   reviewed them again without Mr. Teman needing to provide them

17   to me.

18           THE COURT:  And those were the terms as they existed

19   in sometime just before March 28, 2019?

20           THE WITNESS:  That's correct, your Honor.

21           THE COURT:  All right.  Now, counsel, if you are going

22   to try to get these documents in -- now you need this document

23   in -- now you need to link that back up to the period of time

24   relevant to the customers.

25           MR. GELFAND:  Yes, your Honor.

A-893

K1odtem5                     Reinitz - direct

1   BY MR. GELFAND:

2   Q.  Prior to March 28th of 2019, did Mr. Teman provide you

3   terms and conditions and payment terms -- terms and conditions

4   that were in effect prior to January of 2019?

5   A.  Yes.

6   Q.  Did Mr. Teman in between January 2019 and March 28th of

7   2019, when seeking your legal advice on the issue that you

8   testified about, provide you a copy of Defendant's Exhibit 2?

9            THE WITNESS:  I'm sorry.  Can I see Exhibit 2 before I

10  answer?

11           THE COURT:  You may.

12           Counsel, put it up.

13  A.  Yes.

14  Q.  Without reading any of it, do you see a portion of

15  Defendant's Exhibit 2 referencing what's on the screen, just

16  beginning with the word "Permission"?

17  A.  I see that section, yes.

18  Q.  Did Mr. Teman represent to you, when seeking that advice,

19  that those terms were in prior iterations of the payment terms?

20           MR. BHATIA:  Objection.

21           THE COURT:  Basis?

22           MR. BHATIA:  Leading.

23           THE COURT:  Sustained.

24  BY MR. GELFAND:

25  Q.  What, if anything, did Mr. Teman represent to you about the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1odtem5                    Reinitz - direct

1    existence of those terms in prior iterations of the payment

2    terms?

3    A.  Mr. Teman told me that that section, the payment section

4    that you are referencing, was included in previous iterations,

5    previous versions of the terms as well.

6    Q.  And did you base the advice -- without getting into it yet,

7    did you base the advice that you gave him in part on that

8    representation?

9    A.  Yes.

10         MR. GELFAND:  Your Honor, I'm going to come back to

11   the Defense Exhibit 2 issue.

12         THE COURT:  May I just say, just so we doesn't lose

13   the thread, there are specific dates that are germane here in

14   which it would be relevant for admission whether those terms

15   were in place.  The word "previous" was contained in the

16   witness' answer, but we're not at the point yet in which there

17   is a factual basis on which -- I would like you to explore

18   whether the witness was advised whether this existed at the

19   times that you understand to be germane to this case.

20   BY MR. GELFAND:

21   Q.  Mr. Reinitz, did Mr. Teman represent to you that those

22   terms were in effect --

23         THE COURT:  Whether.  Whether.  Come on.

24   Q.  -- whether those terms were in effect in 2017 and 2018?

25         MR. BHATIA:  Objection.

K1odtem5                         Reinitz - direct

1            THE COURT:  Overruled.

2    A.  Yes.

3    Q.  What, if anything, did Mr. Teman represent to you about

4    that?

5    A.  Mr. Teman told me those terms were in I would say every

6    version of the prior payment terms and were specifically in the

7    terms that the customers that you had mentioned before had

8    accepted when they signed up for GateGuard.

9    Q.  Thank you.

10            MR. GELFAND:  Your Honor, I would like to back up, if

11    I can, and come back to this stuff.

12            THE COURT:  By all means.  Thank you, Mr. Gelfand.

13    BY MR. GELFAND:

14    Q.  Now, when you began representing GateGuard, did you

15    personally engage in any efforts to collect money owed to

16    GateGuard from Coney?

17    A.  Yes.

18    Q.  I show you what's been previously admitted into evidence,

19    Defendant's Exhibit 36.

20            MR. GELFAND:  If I can publish that for the jury?

21            THE COURT:  By all means.  It is on the screen.

22    BY MR. GELFAND:

23    Q.  Do you recognize Defendant's Exhibit 36?

24    A.  Yes.

25    Q.  What is Defendant's Exhibit 36?

A-896

759

K1odtem5                          Reinitz - direct

1   A.  That is an email I sent to Mr. Gabay on March 28, 2018.

2   Q.  And in particular, the email includes your signature block,

3   correct?

4   A.  Yes, it does.

5   Q.  Could you please read that email slowly into the record?

6   A.  Sure.

7          "Dear Mr. Gabay, I am an attorney representing

8   GateGuard, Inc.

9          "As outlined below, GateGuard has provided materials

10  and performed labor on one or more of Coney Realty's buildings,

11  and the corresponding invoices are now past due.  Coney Realty

12  has also entered into agreements with GateGuard for devices and

13  services, payments for which are now due.

14         "As you can imagine, these invoices and agreements are

15  of substantial commercial significance to GateGuard.  Coney

16  Realty's conduct has thus caused considerable harm to

17  GateGuard's business (and threatens to cause further harm yet).

18         "I expect that amicable resolution is of mutual

19  interest to GateGuard and Coney Realty.  To that end, please

20  reply with a prompt introduction to the appropriate personnel

21  at Coney Realty (or your counsel) having authority to resolve

22  this matter."

23         "Absent a prompt response from Coney Realty, GateGuard

24  may initiate further legal action, including but not limited to

25  the filing of a mechanic's lien."

A-897

K1odtem5                        Reinitz – direct

1           "Sincerely," and that's my name, Ariel Reinitz.

2           (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-898

761

K1OVTEM6                          Reinitz - direct

1   BY MR. GELFAND:

2   Q.  Did you send this email to Mr. Gabay?

3   A.  Yes.

4   Q.  What agreements were you referencing in the email?

5   A.  GateGuard's terms and conditions, and GateGuard's payment

6   terms.

7   Q.  In October of 2018, did you personally participate in

8   attempts -- or, first of all, did you communicate with an

9   individual named Joseph Soleimani in your capacity as

10  GateGuard's counsel?

11  A.  Yes.

12  Q.  Why did you begin communicating with Mr. Soleimani?

13  A.  Mr. Teman and I discussed on several occasions, as I

14  understood it and understand it today, Mr. Soleimani was a

15  principal or an owner of ABJ Realty.  GateGuard had

16  agreements -- had provided devices and services to ABJ and

17  coordinated those orders with Mr. Soleimani.

18          As Mr. Teman told me, Mr. Soleimani was not paying the

19  fees that he was obligated to -- ABJ was obligated to pay under

20  the agreements.  And at that point, once Mr. Teman felt he kind

21  of -- Mr. Soleimani wasn't taking him seriously and wasn't

22  paying him, he asked me to step in to attempt to resolve the

23  issue directly with Mr. Soleimani on behalf of GateGuard.

24          I'm sorry, is it possible to get some water?

25          MR. GELFAND:  May I approach, your Honor?

A-899

K1OVTEM6                          Reinitz - direct

1           THE COURT:  You may.

2           Mr. Gelfand, given the testimony that's just been had,

3    is this an appropriate moment for me to give the instruction

4    that I discussed with counsel?

5           MR. GELFAND:  Sure, your Honor.

6           THE COURT:  All right.

7           Ladies and gentlemen, you have heard testimony -- and

8    I expect you'll hear more -- that the defendant had

9    communications with this witness, Mr. Reinitz, who is an

10   attorney, with respect to matters at issue in this case.  As

11   with any witness, it is for you to determine whether and to

12   what extent to credit this testimony as truthful.

13          I want to give you a limiting instruction as to the

14   purposes to which you may put this testimony, to the extent you

15   credit it.

16          You may consider the defendant's communications with

17   Mr. Reinitz, to the extent, if any, that you find they bear on

18   the defendant's state of mind and his intent at the times of

19   the events at issue.

20          At the end of the case in my final instructions, I

21   will give you detailed instructions about the elements of the

22   offenses with which the defendant is charged, including as to

23   the intent that is required for a person to be found guilty of

24   these offenses.  And I will also then give you instructions as

25   to how, in assessing a defendant's intent, you may consider

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-900

763

K1OVTEM6                         Reinitz - direct

1    evidence of the advice that an attorney gave to the defendant.

2              To the extent that Mr. Reinitz testifies about

3    statements that the defendant, Mr. Teman, made to him, I

4    instruct you that you may consider these statements only for

5    limited purposes.  You may consider Mr. Teman's statements to

6    Mr. Reinitz as they bear upon the advice that the attorney,

7    Mr. Reinitz, gave to Mr. Teman.  You may also consider these

8    statements as they bear upon Mr. Teman's state of mind.

9              However, you may not consider Mr. Teman's statements

10   to his attorney for the truth of the matters asserted by

11   Mr. Teman.  Whether the statements Mr. Teman made to his

12   attorney were or were not truthful, are matters which, if

13   relevant, you would have to determine based on other evidence

14   in the case.  You may not assume that the representations that

15   Mr. Teman made to his attorney were true merely because

16   Mr. Teman made those statements to an attorney.

17             And therein ends my instruction.

18             Thank you.

19             MR. GELFAND:  Thank you, your Honor.

20   BY MR. GELFAND:

21   Q.  Now, you testified initially about your March efforts to

22   collect monies from -- due to GateGuard from Elie Gabay, from

23   Coney; correct?

24   A.  Yes.

25   Q.  And you just testified about who Joseph Soleimani was;

A-901

K1OVTEM6                    Reinitz – direct

1    correct?

2    A.  Yes.

3    Q.  Did you personally engage in any communications with

4    Mr. Soleimani?

5    A.  Yes.

6    Q.  Did you write Mr. Soleimani any email correspondence about

7    that topic?

8    A.  Yes.

9    Q.  Did you also engage in telephone calls with Mr. Soleimani?

10   A.  One or two.  I believe two.

11            MR. GELFAND:  Your Honor, if I can show just the

12   witness Defendant's Exhibit 14.

13            THE COURT:  You may.

14            JUROR:  We can see it.

15            THE COURT:  Oh, sorry.  Mr. Smallman is getting your

16   snack.  Thank you, ladies and gentlemen.

17            All right.  It's off now.

18            MR. GELFAND:  Thank you.

19            THE COURT:  One moment.

20            MR. GELFAND:  May I put it on the Elmo?

21            THE COURT:  One moment.

22            (Pause)

23            THE COURT:  You may inquire.

24   BY MR. GELFAND:

25   Q.  Directing your attention to the bottom --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-902

765

K1OVTEM6                        Reinitz - direct

1           THE COURT:  Sorry.  It's not in evidence yet.

2           MR. GELFAND:  Correct.

3           THE COURT:  Okay.

4    Q.  Directing your attention to the bottom of this document, do

5    you see an email dated September 6, 2018?

6           THE COURT:  One moment.  It will come back up.

7    A.  Technical difficulties here.  Yes, I'm sorry.

8    Q.  Is that an email from you to Mr. Soleimani?

9    A.  Yes.

10   Q.  On the top, is there another email dated October 11th of

11   2018?

12   A.  Yes.

13   Q.  And is that an email from you to Mr. Soleimani?

14   A.  Yes.

15   Q.  Is there an attachment to the email?

16   A.  Yes.

17   Q.  And is the second page the attachment to that email?

18   A.  If you could just move it down a little bit so I could

19   check to see the top.  The other way.  Yes, that's it.

20          MR. GELFAND:  Your Honor, at this point I move

21   Defendant's Exhibit 14 into evidence.

22          THE COURT:  Can you just establish whether this was

23   shared with the defendant?

24          MR. GELFAND:  This was an exhibit previously

25   discussed, your Honor, with respect to the --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1OVTEM6                    Reinitz - direct

1          THE COURT:  Let me see counsel at the sidebar.

2          (At sidebar)

3          THE COURT:  Here's the issue:  Assuming that -- was

4    this shared with the defendant?  That makes this easy.  Do you

5    know whether or not the witness shared this exchange --

6          MR. GELFAND:  Yes, your Honor, I believe that it was.

7          What I also was going to represent though is that we

8    discussed this exhibit previously and it was subject to the

9    invoice being attached.

10         THE COURT:  Right.  And I appreciate that you appeared

11   to have cleaned up that issue and that's great.  The issue is

12   for this to bear on the defendant's state of mind, which is

13   ultimately what we care about here, this presumably was

14   shared -- would have been shared with the defendant.

15         MR. GELFAND:  I anticipate that that's what the

16   testimony would be.

17         THE COURT:  That's fine.

18         Before offering it, let's establish whether that was

19   so, that's all.  In other words, remember, the bogey here is --

20   the relevant issue here is the defendant's state of mind and,

21   therefore, communications -- one moment -- outside the field of

22   you or the defendant might come in under some other theory.

23   But on the central theory here of informing what the

24   defendant's state of mind is, we need to make the defendant

25   aware of the exhibit before it comes in, unless there's some

A-904

K1OVTEM6                      Reinitz – direct

1   other independent basis.

2           I imagine we're going to be able to establish in one

3   way or the other this was shared with the defendant, at which

4   point you're fine.  Why don't you try that.

5           MR. GELFAND:  Got it.  Thank you.

6           (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-905

K1OVTEM6                        Reinitz - direct

1          (In open court)

2          THE COURT:  You may inquire.

3          MR. GELFAND:  Thank you.

4    BY MR. GELFAND:

5    Q.  Defendant's Exhibit 14, the emails you just testified

6    about, Mr. Reinitz?

7    A.  Is there a question?

8    Q.  Did you share this correspondence with Mr. Teman over the

9    course of your representation and prior to March 28th of 2019?

10   A.  Yes.

11         MR. GELFAND:  Your Honor, I move Defendant's Exhibit

12   14 into evidence.

13         THE COURT:  It's received.

14         (Defendant's Exhibit 14 received in evidence)

15         MR. GELFAND:  If I can publish that for the jury

16   please.

17         THE COURT:  You may.

18   BY MR. GELFAND:

19   Q.  Can you please read the bottom email -- first of all, what

20   is the date?

21   A.  Sent Thursday, September 6, 2018, 10:58 a.m.

22   Q.  And who was it sent to?

23   A.  Joe@abjny.com.

24   Q.  Can you please read the short email.

25   A.  "Subject:  ABJ Properties/GateGuard, Inc.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-906

K1OVTEM6                    Reinitz - direct

1          "Dear Mr. Soleimani, I am an attorney representing

2    GateGuard, Inc.  I understand there are outstanding fees due

3    under your service agreement with GateGuard.  Please let me

4    know who at ABJ I can coordinate with to ensure these fees are

5    paid and resolve any other issues with your agreements with

6    GateGuard.  Thanks.  Ariel Reinitz."

7    Q.  After sending this email, did you have a telephone call

8    with Mr. Soleimani?

9    A.  Yes.

10   Q.  Did you communicate the substance of that telephone call

11   with Mr. Teman?

12   A.  Yes.

13   Q.  What specifically did you tell Mr. Teman about that call?

14   A.  I told Mr. Teman that Mr. Soleimani had asked for -- he

15   wanted to see the specifics of the terms that we were -- I

16   referenced in my email.  And he also had raised one or two, I

17   guess you would call them, issues that some of his tenants had

18   had with GateGuard's devices that he was interested to resolve

19   and was concerned about.

20   Q.  After that phone call, did you follow up with this email at

21   the top?

22   A.  Yes.

23   Q.  Did you indicate that you were attaching an invoice for

24   panels and services provided to Mr. Soleimani?

25   A.  Yes.

K1OVTEM6                    Reinitz – direct

1    Q.  If we go to the second page, is this the invoice that was

2    attached?

3    A.  Yes.

4    Q.  Can you please read the bottom, "Payer accepts"?

5    A.  "Payer accepts terms at gateguard.xyz/legal/terms.php."

6    Q.  Prior to March 28th of 2019, did Mr. Teman disclose a

7    billing dispute to you with respect to Mercer?

8    A.  Yes.

9    Q.  What, if anything, did Mr. Teman tell you?

10   A.  He mentioned on a few occasions that the 18 Mercer, I

11   believe is the number, 18 Mercer, but the Mercer company that

12   you reference owed him fees under their agreement with

13   GateGuard.

14   Q.  What, if anything, did Mr. Teman disclose to you about

15   Mercer's position on those fees?

16   A.  He disclosed that they were not paying, and that he was

17   concerned about how that was affecting GateGuard's business as

18   with other nonpaying customers.

19   Q.  Prior to March 28th of 2019, did Mr. Teman ever seek your

20   legal advice on whether GateGuard could deposit RCCs to collect

21   money that was owed?

22   A.  Yes.

23   Q.  Approximately when was the first time that subject was

24   broached by Mr. Teman to you?

25   A.  March or April or May.  I mean I would say mid 2018 we

A-908

771

K1OVTEM6                          Reinitz - direct

1    discussed the issue.

2    Q.  What specifically did Mr. Teman ask you?

3    A.  Mr. Teman asked me, in the context of us discussing

4    GateGuard's terms of -- customer terms, terms of use, I

5    apologize, and payment terms, Mr. Teman asked me whether the

6    various payment methods that were outlined that are listed in

7    GateGuard's payment terms, whether he would -- GateGuard had

8    the authority, legal authority, to use those various payment

9    methods to collect payments that were due under GateGuard's --

10   from GateGuard's customers to GateGuard.

11   Q.  Did those conversations continue for approximately the next

12   year?

13   A.  Continue, the -- the issue came up on several occasions.

14   Obviously it wasn't something we discussed on an ongoing basis

15   over a year, but we discussed it on several occasions, you

16   know, for over a period of about a year, that's correct.

17   Q.  Directing your attention specifically to January 2019, did

18   Mr. Teman expressly ask you whether he could deposit RCCs for

19   monies owed by Coney, Mercer, and ABJ?

20   A.  Yes.

21   Q.  What specifically did Mr. Teman ask you in January of 2019?

22   A.  We were discussing sort of more generally, just to explain,

23   and maybe to frame it with some of those emails that were

24   shown, Mr. Teman attempted --

25              MR. BHATIA:  Objection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1OVTEM6                          Reinitz - direct

1            THE COURT:  One moment.

2            MR. BHATIA:  I'm not sure he's answering the question.

3            THE COURT:  Focus just please on the question counsel

4     asked.

5     A.  We discussed the fact that GateGuard had the authority to

6     collect payments from each of those customers via any and all

7     of the methods that were listed in the payment terms.  And we

8     were revisiting the issue, I would say, from a strategic

9     standpoint as to -- given that no payment had been forthcoming

10    after several months of attempts by Mr. Teman and by me,

11    whether it was strategically in GateGuard's interest to utilize

12    one of the methods that were listed in the payment terms to

13    collect the fees that were due.

14    Q.  You referred to several methods.  Other than RCCs, what

15    methods did you review?

16    A.  We discussed ACH payments --

17    Q.  Let me rephrase that question.

18           What other methods did you discuss with Mr. Teman?

19    A.  I discussed with Mr. Teman -- I mean I would say we

20    discussed the specifics of the terms; any payment method listed

21    in the terms would we have discussed.  From recollection, I'm

22    not seeing it in front of me, we discussed ACH payments --

23           MR. BHATIA:  Objection.  I believe the witness is

24    referencing a document not in evidence and describing the

25    contents of it.

K1OVTEM6                         Reinitz - direct

1           THE COURT:  I think that's right.

2           Why don't you reformulate the question.  And I'll

3   admonish the witness, please focus your answer tightly on being

4   responsive only to the question put to you.

5   Q.  What specifically did you tell Mr. Teman about the methods

6   of payment -- if anything, about the methods of payment that

7   were available to GateGuard?

8   A.  I told Mr. Teman that the methods of payment, which

9   included ACH payments, credit card charges, RCCs or check

10  drafts, were all authorized, and GateGuard had authority under

11  its payment terms to utilize those --

12          MR. BHATIA:  Objection.

13          THE COURT:  Overruled.

14  A.  I told Mr. Teman GateGuard was authorized under its terms

15  to utilize any of those payment methods to collect payments due

16  from any customer of GateGuard, including specifically Coney,

17  ABJ, and Mercer.

18  Q.  And to be clear, did that discussion occur prior -- dates

19  are important -- to March 28th of 2019?

20  A.  Yes.

21  Q.  To be clear, in January of 2019, when you testify Mr. Teman

22  asked you advice on RCCs, what was your initial reaction?

23          Let me rephrase that.

24          What did you initially disclose to Mr. Teman?

25          THE COURT:  Let me just be clear to the witness.

A-911

774

K1OVTEM6                    Reinitz - direct

1      All that you should be answering here is what was

2   communicated to Mr. Teman, not what was in your mind.

3   A.   What I communicated to Mr. Teman was that I had practical

4   concerns about certain payment methods, including RCCs; and

5   that it would be in GateGuard's interest to be cautious about

6   the use of those methods.

7   Q.   What, if anything, did you communicate to Mr. Teman about

8   whether RCCs were legal?

9   A.   I communicated to Mr. Teman that under GateGuard's terms,

10  the RCCs in general -- yes, I communicated to him, and we

11  discussed that the RCC payment method was a legitimate, legal

12  method of payment, as were ACH payments, as were credit card

13  payments under GateGuard's terms.  And our discussions were

14  really on the practical level of whether or not, at which

15  point -- which payment method would or would not be a good idea

16  to -- to utilize to collect payments from those specific

17  customers.

18  Q.   During the content -- during the scope of those early 2019

19  discussions, how frequently were you and Mr. Teman

20  communicating with each other about this topic?

21      THE COURT:  Just define "this topic" please.

22  Q.   About RCCs and payment methods as you've previously

23  explained them.

24  A.   We had several, I would say, detailed discussions about it

25  over -- I don't recall specifically, but maybe over several

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1OVTEM6                    Reinitz – direct

1   days or a week or two.  We discussed it at some length, I would

2   say.

3   Q.  Were these discussions -- were any of these discussions

4   in-person discussions?

5   A.  Not that I recall, no.

6   Q.  Were any of these discussions telephonic discussions?

7   A.  I think I would assume so.  We spoke on the phone

8   frequently.  It's a little while ago, but, yes, I would -- I

9   would say that it's -- we would have spoken about this issue --

10  we certainly spoke about this issue by phone, yes.

11  Q.  And to be clear, you spoke about this issue by phone -- is

12  it your testimony that you spoke about this issue by phone

13  prior to March 28th of 2019?

14  A.  Certainly.  Yes.

15  Q.  When you and Mr. Teman -- let me back up.

16       You testified about discussions in January of 2019.

17  Did those discussions continue between January of 2019 and

18  March 28th of 2019?

19  A.  Yes.

20  Q.  Did Mr. Teman expressly ask you whether he could use RCCs

21  to collect monies from Coney, ABJ, and Mercer?

22  A.  Yes.

23  Q.  And what, if anything, did you tell him in response to that

24  question?

25  A.  I told him GateGuard, under its payment terms, was

K1OVTEM6                      Reinitz – direct

1    authorized to collect fees due from Coney, ABJ, Mercer, and,

2    frankly, any other customer of GateGuard via RCC.

3    Q.  Prior to March 28th of 2019, when you were having these

4    discussions about RCCs with Mr. Teman, did you ask Mr. Teman

5    questions?

6    A.  Yes.

7    Q.  Did Mr. Teman answer all of your questions?

8    A.  Yes.

9    Q.  Did you ask Mr. Teman for any documents or information?

10   A.  Yes.

11   Q.  Did Mr. Teman provide everything that you requested?

12   A.  Yes.

13   Q.  Is there anything that you asked of Mr. Teman that he did

14   not provide to you or answer?

15   A.  No.

16            THE COURT:  Mr. Gelfand, I'm looking for a good moment

17   to break for the jury's afternoon snack.  Is this a good time

18   or do you want a few more questions?

19            MR. GELFAND:  This is a good time.

20            THE COURT:  Very good.

21            Ladies and gentlemen, we'll take a 15-minute recess.

22            As always, don't discuss the case.  Enjoy your snack.

23            (Jury not present)

24            THE COURT:  Let's excuse the witness please.

25            (Witness not present)

K1OVTEM6                         Reinitz - direct

1          THE COURT:  Be seated.

2          All right.  I'm permitting counsel to lead much more

3     than usual, but that is with my authorization, and it is for

4     good reason.  Given the sensitive nature of the subject matter

5     involving privileged communications, I want to make absolutely

6     sure that the witness is led to the topic and doesn't go to

7     other places, particularly since the witness's evident

8     disposition is to be more loquacious than he ought to be,

9     notwithstanding his status as a member of the bar.

10          So, Mr. Gelfand, you are doing it just right in terms

11    of the leading to situate the witness up to a particular place;

12    and I appreciate the nuance with which you're navigating that.

13          MR. GELFAND:  I'm certainly trying, your Honor.

14          THE COURT:  How much more do you have in the direct?

15          MR. GELFAND:  Ten minutes.

16          THE COURT:  Okay.  May I just ask you -- and I imagine

17    this will come up on cross, but you asked a couple of

18    conclusory questions a moment ago.  Did you ask him for

19    documents; did he give everything that you asked for.

20    Depending on what the definition is, of course, the witness may

21    not know whether there was other responsive material.

22          Will you be authenticating the documents that were

23    provided by Mr. Teman in response to the witness's question of

24    him?

25          MR. GELFAND:  Your Honor, I intend to ask the witness

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1OVTEM6                          Reinitz - direct

1   questions about what was provided. But the documents at issue

2   are either in evidence or --

3          THE COURT: Sorry. Whether they are in evidence is

4   not the issue, because they are not in evidence as the

5   communications between Teman and Reinitz. And I want to make

6   sure that -- look, I assume you've identified for the

7   government in the production from Reinitz -- he's a lawyer, I

8   imagine he kept the records he got from his client less than a

9   year ago. I want to make sure that we have a clear record of

10  what was provided and what was not, because it's integral to

11  the degree of weight given to the advice of counsel.

12         Do we have that? Do we have a record of what was, in

13  fact, provided by Teman to Reinitz?

14         MR. GELFAND: Your Honor, yes and no. What we have is

15  that Mr. Reinitz would testify that he had full access to all

16  of GateGuard's records.

17         THE COURT: Sorry, sorry.

18         By telephone, Reinitz asks for information and Teman

19  provides it. That's great as an abstract. I don't know what

20  "access" means, but if -- and I don't know what the -- because

21  it's been done in a very conclusory way, I don't know what the

22  nature of the questions were.

23         I want to make sure that you have produced to the

24  government or that the witness has gone through his files to

25  identify that which Teman, in fact, sent him.

K1OVTEM6                    Reinitz - direct

1        Do we -- that has been -- that has been produced

2   pursuant to the subpoena we talked about a few days ago?

3        MR. GELFAND:  Yes, your Honor, both pursuant to the

4   subpoena by discovery and from a subpoena they issued --

5        THE COURT:  Fine.  As long as it's capable of

6   reconstruction, that's what matters here.  You're free to

7   conduct your examination as you want.  But the purpose of the

8   delay of the trial by a day was, in part, to make sure that

9   this very important issue of an advice of counsel line of

10  questioning was ventilated with full knowledge.

11       And so I want to make sure -- and I'm taking your

12  representation as an officer of the Court -- that you have --

13  that Reinitz has searched his records and has produced to you

14  and you've produced to the government the materials that Teman

15  gave to Reinitz during the time period that's been the subject

16  of questioning.

17       MR. GELFAND:  Yes, your Honor.

18       And there was some documents directly from Mr. Reinitz

19  to the government that he then gave us copies of.  So --

20       THE COURT:  Very good.

21       All right.  I'll see you in ten minutes.

22       MR. BHATIA:  Your Honor?

23       THE COURT:  Yes.

24       MR. BHATIA:  One quick thing.

25       We're concerned that the witness is essentially

A-917

K1OVTEM6                    Reinitz - direct

1    reading into evidence the document that's been kept out of

2    evidence thus far.  He's testifying with some authority that

3    this is what they say and that's why I instructed --

4           THE COURT:  He's testified that he gave the advice to

5    Teman about the payment terms.  Now, the payment terms are not

6    in evidence; but, in the end, I think the witness did get

7    there.  Mr. Gelfand got there in the end when he testified that

8    Mr. Teman said that the terms that were in effect in 2017 and

9    '18 were in every version.

10          So I think, in fairness to Mr. Gelfand, he

11   ultimately -- it took a little while, but he laid the

12   foundation.  You're at liberty to go at that, but I think the

13   foundation has been laid.

14          I do think it probably behooves somebody to put the

15   document in evidence.  And Mr. Gelfand, you may want to do

16   that; because you've now, I think, created a satisfactory

17   foundation.

18          I take your point, Mr. Bhatia, that Mr. Gelfand laid

19   the foundation and didn't ultimately ask the final question to

20   admit the document and got right to the advice.  But I will now

21   admit the document, because there's a factual predicate in

22   evidence.

23          (Counsel conferred)

24          MR. BHATIA:  Also that he's testifying in generalities

25   about the advice he's given --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1OVTEM6                    Reinitz – direct

1          THE COURT:  And that's –– and you should see an

2     opportunity knocking.  That's an open door to kick open.  But

3     that's how you conduct your cross.  He's allowed to do his

4     direct as he wants.

5          MR. BHATIA:  Okay.

6          THE COURT:  Okay?  Thank you.  I'll see you in a few

7     minutes.

8          (Recess)

9          THE COURT:  All right.

10         Let's get the witness and the jury.

11         (Jury present)

12         (Witness present)

13         THE COURT:  I hope you enjoyed your snack break.

14         Mr. Reinitz, I'll remind you that you are still under

15    oath.  Mr. Gelfand, you may inquire.

16         MR. GELFAND:  Thank you, your Honor.

17    BY MR. GELFAND:

18    Q.  Mr. Reinitz, I want to rewind the clock for a minute or two

19    and go back to the topic of your discussions with Mr. Soleimani

20    at ABJ.

21    A.  Okay.

22    Q.  In 2018, in particular, October of 2018, did you engage in

23    further email correspondence with Mr. Soleimani at ABJ?

24    A.  Further to?  I'm sorry, Mr. Gelfand.

25    Q.  To what you previously testified about.

782

K1OVTEM6                    Reinitz – direct

1          THE COURT:  It's not on the screen.

2     A.  Oh, yes.

3     Q.  And did you share those communications with Mr. Teman?

4     A.  Yes.

5          MR. GELFAND:  Your Honor, if I can show just the

6     witness Defendant's Exhibit 15.

7          THE COURT:  15.  Yes, you may.

8     Q.  Can you just tell me if you recognize Defendant's Exhibit

9     15?

10    A.  Yes.

11         THE COURT:  Sorry.  Do I have a copy of this, counsel?

12         MR. GELFAND:  You do, your Honor.  I can give you

13    another copy if you'd like.

14         THE COURT:  I've got 14.

15         I stand corrected.  I do have it.

16         Go ahead and show it to him.

17         MR. GELFAND:  Thank you.

18    Q.  Can you just describe generally what this document is?

19    A.  It's an email from Joseph Soleimani to myself.

20    Q.  And to be clear, are there a series of emails in this

21    chain?

22    A.  Yes.

23    Q.  Are they true and authentic?

24    A.  Do you want to scroll all the way to the bottom just so I

25    can confirm?  They look good so far.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-920

K1OVTEM6                          Reinitz – direct

1          Yes, they are true and authentic.

2     Q.  Did you provide this correspondence to Mr. Teman?

3     A.  Yes.

4          MR. GELFAND:  Your Honor, at this point I move

5     Defendant's Exhibit 15 into evidence.

6          THE COURT:  Any objection?

7          MR. BHATIA:  No objection.

8          THE COURT:  Received.

9          (Defendant's Exhibit 15 received in evidence)

10         MR. GELFAND:  May I publish it for the jury please?

11         THE COURT:  You may.

12    Q.  We begin with the email on the bottom.  I want to direct

13    your attention -- first of all, do you see the email on the

14    bottom dated October 17, 2018?

15    A.  Just move my chair here.  Yes.

16    Q.  Could you please read the portion beginning with "The

17    tablets we discussed."

18    A.  The tablets we discussed were delayed in China,

19    parentheses, needed FCC certification before being shipped.

20    They are currently on track to arrive in about two months.  I

21    think that's a tilde is the character as I use it, it means

22    approximately, December 15th.  Ari is happy to maintain the

23    order or apply your payment towards current GateGuard

24    installation/service.  Let me know your preference.  Thanks.

25    Q.  And on the top, is this the response to that email that you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1OVTEM6                          Reinitz – direct

1   received from Mr. Soleimani?

2   A.  Yes.

3   Q.  Okay.  Just to be clear for dates, what was the date of the

4   email you sent to him?

5   A.  The email I sent to Mr. Soleimani that I just read a

6   portion of is Wednesday, October 17th, 2018.

7   Q.  And are there other portions of the email that I'm not

8   asking you about involving Sublet Spy?

9   A.  If you can slide it back down.  I'm sorry.

10          Yes, that's correct.

11  Q.  Okay.  With respect to GateGuard, could you please read

12  what Mr. Soleimani responded.

13  A.  We will also require a general --

14  Q.  I'm sorry.  I'm sorry.  Beginning with "Also," just before

15  that.

16  A.  Sure.

17          "Also, please lay out the details of the new GateGuard

18  moving forward.  We will also require a general release for

19  anything he is claiming and an agreement that he will no longer

20  continue to file complaints through various government agencies

21  as an act of retaliation.  Thank you and looking forward."

22  Q.  Now, directing your attention to the 2019 time period that

23  you previously testified about regarding the advice you gave

24  Mr. Teman, during that time period, how would you describe the

25  access to the GateGuard documents that you had direct access

K1OVTEM6                        Reinitz - direct

1   to?

2   A.  I had direct access to GateGuard's website which contained

3   its terms.  I had direct access in terms of what Mr. Teman had

4   provided me in emails and other correspondence, documents

5   relating to the customers we've discussed, communications with

6   them between Mr. Teman and then directly invoices, other

7   business records that documented aspects of the relationship,

8   logs of GateGuard showing the use of GateGuard's devices on the

9   properties that the names, companies we've mentioned, were

10  using.

11  Q.  Just to be clear on that last topic, when you say "logs,"

12  can you just describe for the jury what -- just generally what

13  you're referring to?

14  A.  Sure.  What I reviewed and Mr. Teman and I -- Mr. Teman

15  provided to me on several occasions were portions of logs --

16  GateGuard's device is attached to, in most cases, the front

17  door of an apartment building.  And in different ways, user --

18  tenants can access the building using access codes, in some

19  cases using facial recognition.  These instances or those

20  activities are logged.

21         And, among other things, GateGuard is able to track

22  and to document how its devices are being used, where they are

23  being used.  And in the case of these customers, those logs

24  show that the devices were being used and --

25         THE COURT:  Sorry, sorry.  The witness is now beyond

A-923

786

K1OVTEM6                    Reinitz – direct

1    the scope of the question substantially.

2            MR. GELFAND:  Thank you, your Honor.

3    Q.  Mr. Reinitz, you testified --

4            THE COURT:  I'll instruct the jury to disregard the

5    witness's commentary on what the logs showed.

6            You can put those in evidence if you want.

7            MR. GELFAND:  Thank you, your Honor.

8    Q.  With respect to information that you requested of

9    Mr. Teman, did he provide information to you by telephone?

10   A.  Yes.

11   Q.  Did he provide information to you in person?

12   A.  Yes.

13   Q.  Did he provide information to you by text messaging or

14   WhatsApp-type platforms?

15   A.  Yes.

16   Q.  And did he provide information to you by emails?

17   A.  Yes.

18           THE COURT:  Time frame, counsel?

19   Q.  Between the time that you began representing GateGuard and

20   the -- March 28th of 2019 --

21   A.  Yes.

22   Q.  -- did you provide information?

23   A.  Yes.

24   Q.  Did he provide that information to you?

25   A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1OVTEM6                      Reinitz - direct

1   Q.  Now, you testified previously about payment terms.

2         MR. GELFAND:  Your Honor, at this point I would move

3   Defendant's Exhibit 2 into evidence and ask that it be

4   published to the jury.

5         THE COURT:  Any objection?

6         MR. BHATIA:  This is the exhibit we previously spoke

7   about.  So except for that objection, no --

8         THE COURT:  All right.  I will receive Exhibit 2.

9         (Defendant's Exhibit 2 received in evidence)

10         MR. GELFAND:  Thank you.

11         May I publish it, your Honor?

12         THE COURT:  You may.

13   Q.  Can you just tell me what Exhibit 2 is?

14   A.  Exhibit 2 is a copy of GateGuard's payment terms last

15   revised January 27, 2019.

16   Q.  Could you please read the highlighted portion on the

17   screen, beginning with this document?

18   A.  This document is an integral part of our terms of service

19   which are available at https://gateguard.xyz/legal/terms.php.

20         THE COURT:  Can I ask counsel just to clarify for the

21   jury whether the highlighting is part of the document or has

22   been done by counsel?

23         MR. GELFAND:  I apologize, your Honor.  It's done by

24   counsel, your Honor.

25         THE COURT:  The document itself is devoid of the

788

K1OVTEM6                          Reinitz – direct

1    yellow highlighting?

2            MR. GELFAND:  Yes, your Honor.

3            THE COURT:  Go ahead.

4    BY MR. GELFAND:

5    Q.  I'm sorry, you read a php -- I'm sorry, a URL.

6    A.  That's right.

7    Q.  And then does it say "and is incorporated into the terms by

8    reference"?

9    A.  "And is incorporated into the terms by reference," yes.

10           THE COURT:  Mr. Gelfand, just can you put up a clean

11   copy of the document?  I think it's not a good practice to have

12   your highlightings on a document before the jury.

13           MR. GELFAND:  No problem, your Honor.

14   Q.  Can you see that in front of you?

15   A.  Yes.

16           MR. GELFAND:  May I proceed, your Honor?

17           THE COURT:  Yes.

18   Q.  Okay.  Is there a section referencing monthly fees?

19   A.  Yes.

20   Q.  If you go through this document -- let me ask you a quick

21   question for a second.  Did you write this document?

22   A.  No.

23   Q.  Is there a section for various fees and pricing that

24   customers -- are there sections for fees and pricing terms?

25   A.  Yes.

A-926

K1OVTEM6                    Reinitz – direct

1    Q.  Can you please read the sentence that I've marked on the

2    screen beginning with "chargeback"?

3    A.  Chargeback, refund, and nonpayment fees.  If at any time

4    you file a credit or debit card chargeback or other refund

5    request via your financial services provider, including any

6    fraud claims after placing an order, you agree to pay a $10,000

7    USD fine for violating the no-refund and no-cancellation

8    clauses.

9    Q.  Are there labor rates at the bottom of page 2 of the

10   document?

11   A.  Yes.

12   Q.  Could you please read just the heading of what is circled

13   on the screen?

14   A.  GateGuard panel, parentheses, intercom service pricing.

15   GateGuard panel default pricing:  $14,999.  GateGuard panel

16   current retail sales price:  $5600.  GateGuard discount price

17   for buildings not qualified for a free unit:  $3600.

18   Q.  Finally, will you just read the security deposit?

19   A.  Sure.  GateGuard security deposit on free units, $849,

20   parenthesis, see terms.

21   Q.  Is there a payment section?

22   A.  Yes.

23   Q.  Could you please read slowly what it says, beginning with

24   "Our payment terms are simple"?  I'm sorry, I can zoom in, if

25   that's helpful.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-927

K1OVTEM6                          Reinitz - direct

1   A.  Sure.

2          Our payment terms are simple:  If you pay us on time

3   the amount owed and you leave our devices up and running, you

4   do not incur penalties or fees.  However, due to the nature of,

5   unfortunately, many property owners who run on the assumption

6   they will not pay vendors in full or partially, we have

7   instituted strict and harsh penalties to make up for the

8   massive cost of these attempted nonpayments.

9   Q.  And then can you please read beginning with "Because we

10  finance."

11  A.  Because we finance against your monthly fees, failing to

12  pay causes great damage and expense, harms our reputation with

13  creditors and investors, and makes growth difficult and

14  stressful, if not impossible.  Therefore, we have included a

15  number of ways by which we can collect against folks who do not

16  pay their bills, and ways we can draw payment without needing

17  the actions of even well-meaning, but slow and disorganized,

18  operators who might otherwise pay late.

19         We wish -- I'm sorry.

20  Q.  I'm sorry.  If we continue on to the next page -- I'm

21  sorry, that's page 4 of 7; correct?

22  A.  Yes.

23  Q.  The page we were reading was page 4 of 7?

24  A.  Page 4 of 7, that's right.

25  Q.  And then if we look at 5 of 7, can you see that on the

K1OVTEM6                          Reinitz - direct

1    screen in front of you?

2    A.  I see it, yes.

3    Q.  Could you please read the paragraph beginning "You agree to

4    provide"?

5    A.  You agree to provide both an ACH, parentheses, checking

6    account number, routing number, name on account, account name,

7    address, etc., and debit, parentheses, or credit card,

8    parentheses -- excuse me -- number, expiration, security code,

9    address, etc., for each property.

10   Q.  I direct your attention lower.  What is the heading of this

11   section?

12   A.  Permission to make bank draws and other account draws.

13   Q.  Can you please read under the bank draw section the first

14   paragraph, the first sentence.

15   A.  You give us permission to write and sign checks with your

16   checking and/or savings accounts information to do a bank draw

17   against your entity or entities for the amount it or they owe

18   or owes.

19   Q.  And beginning a few sentences down, "To put it in plain

20   English," can you please read that?

21   A.  To put it in plain English, you agree that if anything you

22   own owes us money or if you owe us money, we may draw that

23   amount from any bank account or savings or investment account

24   you own in full or in part, and it's 100 percent your

25   responsibility to pay that other account back, not us.

K1OVTEM6                    Reinitz – direct

1    Q.  And if we go to the next page, do you see on the screen

2    page 6 of 7?

3    A.  Yes.

4    Q.  Can you please read that last sentence, beginning with "You

5    agree we may place," just before the paragraph beginning

6    "Guaranties and Liens"?

7    A.  You agree we may place a lien on any of your or your entity

8    or entities' property and force a sale in the event you refuse

9    to pay these fees.

10   Q.  Is there a cancellation provision?

11   A.  Yes.

12   Q.  Could you please read the first sentence of that?

13   A.  Canceling.  You may not cancel this agreement for ten

14   years.

15   Q.  This is an approximately seven-page document?

16   A.  As you just printed it, I mean, it's seven pages, yes.

17   Q.  In 2019, before March 28th of 2019, when you were giving

18   Mr. Teman advice on the RCC issues that you previously

19   testified about, did you also independently look at that

20   document on GateGuard's website?

21   A.  Yes.

22   Q.  Now, I'm showing you what's been previously admitted into

23   evidence as Government's Exhibits 203, 204 -- I'm sorry, 201,

24   203, 204, and 202 and 205, just very generally.  Do you see a

25   series of RCCs on the screen in front of you?

K1OVTEM6                         Reinitz - direct

1   A.  Yes.

2   Q.  Have you seen these documents prior to testifying today?

3          THE COURT:  Sorry, not before testifying today, before

4   March 28th.

5          MR. GELFAND:  He wouldn't have seen these before March

6   28th, your Honor.

7          THE COURT:  I'm sorry.  Pin down -- whether he saw it

8   in the run-up to the trial is not relevant.

9   Q.  Prior to testifying today, have you seen these documents?

10  A.  Yes.

11  Q.  What, if any, advice prior to the March 28th date and the

12  April 19th, 2019 date reflected on these documents did you give

13  Mr. Teman as to whether he could legally deposit these RCCs?

14         THE COURT:  Sustained.

15         Did you see these documents before the checks were

16  transacted I think is the question.

17  Q.  Did you see the documents themselves before the --

18         THE COURT:  I'm sorry, I asked the question.  I think

19  that's what you're intending to ask, but not for his

20  reflections.

21         Did you see these checks before they were transacted?

22         THE WITNESS:  I'm sorry, your Honor, to clarify --

23         THE COURT:  It's a yes-or-no question.

24         THE WITNESS:  Do you mean deposited?

25         THE COURT:  Before they were deposited, did you see

K1OVTEM6                         Reinitz – direct

1    these checks?

2          THE WITNESS:  Not the ones that were showed, no, I did

3    not see those physical checks.

4          THE COURT:  All right.  Counsel, you can't ask what

5    his advice was reflected.  You either ask him for his advice or

6    not, but that's a jury argument you can make.

7    Q.  What, if any, advice did you give Mr. Teman about whether

8    he could deposit -- or prior to -- let me get the dates right.

9          Prior to March 28th of 2019, what, if any, advice did

10   you give Mr. Teman about whether he could deposit RCCs drawn on

11   the accounts of Mercer and Coney?

12   A.  I told Mr. Teman that under GateGuard's payment terms,

13   GateGuard was authorized and could legally deposit RCCs drawn

14   on the accounts of Coney, ABJ, and Mercer prior to March 28th,

15   2019.

16   Q.  Thank you.

17         MR. GELFAND:  Can I just have a moment, your Honor?

18         THE COURT:  Yes.

19         (Counsel conferred)

20         MR. GELFAND:  Thank you.

21         I have no more questions for this witness.

22         THE COURT:  All right.  Ladies and gentlemen, we're

23   going to take just a five-minute recess so I can take up a

24   matter with counsel.  Mr. Smallman will get you as soon as we

25   can.

A-932

795

K1odtem7

1    (Jury not present)

2    THE COURT:  All right.  Be seated.

3    Mr. Gelfand, the reason I jumped in there was that it

4    was an invitation to this witness to do what he wants to do,

5    which is to editorialize.  What advice he sees reflected on the

6    checks, there is literally no advice on the checks.  There are

7    notations on the checks.  As it turns out he didn't see the

8    checks beforehand.  It is what it is.

9    The only issue is what advice he gave.  And it's an

10   argument for counsel whether or not the defendant's behavior

11   was consistent with the advice, whether the right disclosures

12   were made.  As you know, the only relevant issue here is what

13   he conveyed to the defendant.  That's what's relevant about his

14   testimony, not his opinions about whether or not the checks

15   accord or not with his advice.  This is not a malpractice case.

16   MR. GELFAND:  Your Honor, it was a poorly phrased

17   question and I apologize.

18   THE COURT:  Very good.

19   I took the break, though, really because given the

20   fraught nature of questioning an attorney, I thought it better

21   to take a moment and see whether before we embark on counsel's

22   cross-examination there are any issues that anybody needs to

23   raise about scope or anything like that.

24   Is there anything -- take a moment, but I just want to

25   make sure before we get going that we stop what we can to avoid

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Klodtem7

1   needless sidebars.

2           MR. BHATIA:  There is one point that comes to mind,

3   your Honor.  I think I do intend to ask the witness whether he

4   represents GateGuard in other matters, and I'm not going to get

5   into the specifics of it.  I know you didn't want him to go

6   into litigation, so I wasn't planning to go into litigation.

7           THE COURT:  You are at liberty to establish his bias

8   and interest in terms of whether he represents GateGuard in

9   other matters.  You are not to be asking him about content of

10  the other matters.  You are at liberty to ask about payment

11  arrangements, that sort of thing.

12          But the best answer is to ask a tightly leading

13  question that does not permit the witness to riff on the nature

14  of the other matters.  OK?

15          Any other issue that you can raise that might involve

16  any sensitivity like that?  I appreciate your flagging that.

17          MR. GELFAND:  No, your Honor.  We think that the prior

18  issue as articulated by the Court about asking about any, you

19  know, do you represent GateGuard in other issues, without

20  getting into the substance of that --

21          THE COURT:  Right.  It is clearly germane as to bias

22  or interest, but the content is not important.  Obviously, if

23  he expects to have a long-running representation with GateGuard

24  or it's affiliates, that is a fair question.  But Mr. Bhatia is

25  well advised to be leading throughout to avoid any risk of the

K10dtem7                    Reinitz - cross

1    witness going to a place that he oughtn't be going.  OK?

2              Mr. Bhatia, anything else to raise or should we get

3    the jury?

4              MR. BHATIA:  There is one more thing.

5              We were produced a few nights ago a series of WhatsApp

6    conversations between Mr. Teman and the witness, just chat

7    communications.  We intend to introduce excerpts of those for

8    the witness.

9              THE COURT:  Just as long as you've got a copy for me

10   because there may or may not be an argument about lack of

11   completeness, and if you are excerpting it, I will need to make

12   a judgment on the spot.

13             MR. BHATIA:  Understood.

14             THE COURT:  All right.  Very good.

15             Any reason not to get the jury?

16             (Pause)

17             Let's get the jury.

18             MR. GELFAND:  No, your Honor.

19             THE COURT:  Will defense counsel please get the

20   witness.

21             (Continued on next page)

22

23

24

25

A-935

K1odtem7                      Reinitz - cross

1          (Jury present)

2          THE COURT:  All right.  Welcome back, ladies and

3    gentlemen.  Be seated.

4          Mr. Reinitz, I will remind you that you are still

5    under oath.

6          Mr. Bhatia, you may inquire.

7          MR. BHATIA:  Your Honor, may I approach a moment --

8          THE COURT:  You may.

9          MR. BHATIA:  -- with an exhibit?

10   CROSS-EXAMINATION

11   BY MR. BHATIA:

12   Q.  Mr. Reinitz, you and I have never met, right?

13   A.  No.

14   Q.  We asked to interview you before today?

15   A.  I got a couple of emails and phone calls from you, yes.

16   Q.  And you declined to meet with us?

17   A.  I was expecting to be here today and that's when I expected

18   we would meet.

19          THE COURT:  I'm going to direct the witness.  You are

20   on cross-examination.  Please answer the question.

21   A.  I declined, yes.

22   Q.  And you have spoken with defense counsel before today,

23   right?

24   A.  Several times.

25   Q.  And you have spoken with them about your expected testimony

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K10dtem7                        Reinitz - cross

1  today?

2  A.  I've spoken to them about the facts of this case and

3  provided them with the documents that -- some of which we've

4  seen relating to Mr. Teman and GateGuard.

5  Q.  Did they do a practice Q-and-A with you?

6  A.  We did some basic discussion about my testimony.  Some of

7  that was in Q-and-A format, yes.

8  Q.  Did they do something where they practiced a

9  cross-examination like we're doing now?

10  A.  I wouldn't call it that.  I mean, we discussed, you know,

11  at a high level what, you know, the facts -- the evidence I had

12  provided, and we discussed how that would be presented in

13  court.

14  Q.  And you talked about what questions you might expect on

15  cross-examination right now, right?

16  A.  At a high level, yes.

17  Q.  And you are an attorney, right?

18  A.  Yes.

19  Q.  You work at FisherBroyles, is that right?

20  A.  Yes.

21  Q.  And you represent GateGuard, correct?

22  A.  Yes.

23  Q.  You represent GateGuard today?

24  A.  I do.

25  Q.  And you represent Mr. Teman, right?

A-937

800

K1odtem7                    Reinitz - cross

1   A.  Yes.

2   Q.  You represent -- you've represented Mr. Teman for a while,

3   haven't you?

4   A.  As I previously testified, we met five years ago.  I did

5   legal work for him, again, starting about five years ago, and

6   including for GateGuard for the past two, about two years give

7   or take.

8   Q.  For your legal work, you bill GateGuard, right?

9   A.  Yes.

10  Q.  And they pay your fees?

11  A.  Yes.

12  Q.  And you billed them as recently as November of last year,

13  right?

14  A.  Yes.

15  Q.  And you -- when you represent them in court cases -- do you

16  represent them in court cases from time to time?

17  A.  The answer is yes.  I mean --

18          THE COURT:  That's the answer.  Really, you need to

19  answer a "yes" or "no" question yes or no.

20  A.  Yes.

21  Q.  And you've billed them thousands of dollars, right?

22  A.  Yes.

23  Q.  And they've paid you thousands of dollars?

24  A.  Yes.

25  Q.  You represented them at an earlier stage than this case,

K10dtem7                          Reinitz - cross

1   didn't you?

2   A.  I would -- no, I did not.

3   Q.  Did you communicate with our office about Mr. Teman's case?

4   A.  I communicated immediately when I was notified I think the

5   day of Mr. Teman's arrest in Miami, I was the first -- as far

6   as I know, the first contact of his that was notified, and I

7   communicated with a detective and with I think the individual's

8   name was Jacob Gutterlich (phonetic).

9          THE COURT:  Government counsel, if you are asking a

10  yes or no question, I have to admonish the witness again.

11         Counsel is asking you "yes" or "no" questions.

12  A.  Yes, I communicated with a representative.

13  Q.  You did that work on behalf of Mr. Teman, right?

14  A.  Yes.

15  Q.  You represented him, right?

16  A.  I communicated with a representative.  I did not intend any

17  of that representation -- any of that communication, excuse me,

18  to be in the capacity of a legal representative of Mr. Teman.

19  Q.  You are a lawyer?

20  A.  I sure am.

21  Q.  And you spoke to members of the United States Attorney's

22  Office on behalf of Mr. Teman, but you are saying you didn't

23  represent him?

24  A.  I communicated with them with respect specifically to

25  finding out where Mr. Teman was and how I could coordinate with

K1odtem7                          Reinitz - cross

1    counsel in Miami to represent him at his hearing.  That was the

2    extent of my involvement in that, those communications.

3    Q.  You talked to defense counsel over the last several months,

4    haven't you?

5    A.  Yes.

6    Q.  That's Mr. DiRuzzo here?

7    A.  Yes.

8    Q.  And Mr. Gelfand right there?

9    A.  Yep.

10   Q.  And you sent them emails about this case, right?

11   A.  Yes.

12   Q.  In November of last year, Mr. Gelfand sent you an email to

13   see if you had some helpful case law that could help Mr. Teman

14   in this case, right?

15   A.  We corresponded about I would say the finer points of New

16   York civil law, that's correct.

17   Q.  And you regularly have communications with Mr. Gelfand

18   about New York civil law?

19   A.  Regularly?  I'm not sure what you mean by "regularly."  No.

20   Q.  Was it outside the context of this case?

21   A.  It related to this case, yes.

22   Q.  And you wanted to be helpful, right?

23   A.  Sure.

24   Q.  You provided Mr. Gelfand your best thoughts?

25   A.  I did.

K1odtem7                    Reinitz - cross

1   Q.  And you also in December of last year sent Mr. Gelfand an

2   email about some case law that you found that could be helpful

3   for Mr. Teman, right?

4   A.  Yes.

5   Q.  You thought you might be able to help out Mr. Teman's

6   defense?

7   A.  I thought it was interesting certainly in the context of

8   the prior communications you mentioned.  I came across

9   something unrelated to this case and was sharing it with him,

10  as I would with any colleague.

11  Q.  Because in December of 2019, you still wanted to be helpful

12  to Mr. Teman's defense, right?

13  A.  Sure.

14  Q.  And last week -- last week last Thursday, I should say, you

15  sent Mr. Gelfand and Mr. DiRuzzo an email updating them on a

16  civil -- on some matters you were involved in, is that right?

17              MR. GELFAND:  I object.  This deals with --

18              THE COURT:  Sustained.

19  Q.  You sent Mr. Gelfand and Mr. DiRuzzo an email last week in

20  which you were trying to be helpful to this case, right?

21  A.  I'm -- I need more -- can you be more specific as to what

22  it was that you are referring to?

23  Q.  You were trying to provide some information that you

24  thought would be helpful to Mr. Teman's defense?

25              MR. GELFAND:  Your Honor, I would object to that.

K1odtem7                        Reinitz - cross

1           THE COURT:  Sustained.

2    BY MR. BHATIA:

3    Q.  Let's change topics.

4           You testified on direct examination about the work you

5    have done for GateGuard in 2018 and '19, is that right?

6    A.  Yes.

7    Q.  You testified about the legal advice you gave Mr. Teman

8    regarding payment terms, right?

9    A.  Yep.

10   Q.  And you didn't negotiate sales of intercoms to

11   Mr. Soleimani, right?

12   A.  Sales, no.

13   Q.  You didn't negotiate the sale to Mr. Soleimani?

14   A.  No.

15   Q.  You were involved once he had already installed the

16   devices, right?

17   A.  That's right.

18   Q.  You were involved in trying to collect money from

19   Mr. Soleimani that you thought he owed Mr. Teman?

20   A.  Yes.

21   Q.  And you weren't involved in selling an intercom to

22   Mr. Gabay, right?

23   A.  No.

24   Q.  You weren't involved in selling an intercom to

25   Ms. Soon-Osberger?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1odtem7                         Reinitz - cross

1    A.  No.

2    Q.  You weren't a part of those conversations?

3    A.  I was not involved in the sale of intercoms to any of those

4    individuals or entities you mentioned.

5    Q.  You had to get all your information from Mr. Teman, right?

6    A.  I'm going to say as an attorney, no, because, for example,

7    there was public information at GateGuard's website which, as I

8    mentioned and testified previously, was a source from which I

9    got information regarding GateGuard's terms of use service and

10   payment terms, for example.

11   Q.  If you needed information about what went on during the

12   sale of intercoms to Mr. Soleimani, you could only get that

13   through Mr. Teman, right?

14   A.  That would be one source, yes, which is one source that I

15   could get that information from, yes.

16   Q.  Were you aware that Mr. Soleimani and Mr. Teman had phone

17   calls?

18   A.  Sure.

19   Q.  So were you able to access those phone calls in any other

20   way than talking to Mr. Teman?

21   A.  I don't follow what you mean by access the phone calls.

22   Q.  If there were phone calls involved in the sale of

23   intercoms, were you able to get information about those phone

24   calls any other way than talking to Mr. Teman?

25   A.  I suppose I could ask Mr. Gabay.  I communicated with him.

A-943

806

K1odtem7                         Reinitz - cross

1   Q.  Did you talk to Mr. Gabay about the sale of intercoms?

2   A.  I think we -- I communicated with him by email regarding

3   his intercoms, his GateGuard intercoms, yes.

4   Q.  You testified during your direct examination about

5   customers buying GateGuard devices through the website, right?

6   A.  Yes.

7   Q.  You said customers who go through the website have to click

8   on the terms of service?

9   A.  I believe -- I mean, I suppose we can ask the reporter, but

10  what I recall testifying is that there is a link or other

11  reference to the payment -- the terms that is contained within

12  the form which all customers must use to order GateGuard via

13  the website.

14  Q.  Are there other ways that customers can order devices

15  through GateGuard?

16  A.  Not that I'm aware of.

17  Q.  So if someone purchased a device by talking to Mr. Teman

18  instead of going to the website, you wouldn't know about that,

19  right?

20  A.  I would.  I mean, Mr. Teman mentioned -- could and has

21  mentioned to me, that, yes, there were other -- there were

22  orders that, yes, could be initiated.  They were then, I would

23  say, routed through the website.  But, yes, a customer could

24  call Mr. Teman, for example, and say can I have -- you know,

25  can you give me a GateGuard intercom.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1odtem7                        Reinitz - cross

1   Q.  So not all the customers went through the website, right?

2   A.  I would say just about all the customers did, yes.

3   Q.  How do you know just about all the customers did?

4   A.  I believe there were one or a handful of customers that may

5   have initially contacted Mr. Teman and requested GateGuard

6   devices, and he subsequently would have, I would say, referred

7   them to go through the website in order to provide the

8   information to sign up.

9            THE COURT:  Let me just ask the witness to please

10  focus on the question.  The question was how do you know.

11           THE WITNESS:  From discussions with Mr. Teman.

12  Q.  You had spoken to Mr. Teman about how he needed money,

13  right?

14  A.  I'm not sure I understand.

15  Q.  Have you spoken to Mr. Teman about how GateGuard needed

16  money?

17  A.  I had several conversations over my representation of

18  GateGuard regarding GateGuard's financial state.

19  Q.  You testified on direct examination that it was in -- I

20  think you testified something to the effect it was in

21  GateGuard's strategic interest to think about ways to recover

22  money, right?

23  A.  What I testified, if I may characterize it, is that

24  GateGuard payment options gave it several different methods --

25  there were several different methods that GateGuard could

A-945

K1odtem7                          Reinitz - cross

1    collect fees, and I had discussions with Mr. Teman regarding

2    which method would or would not be in GateGuard's strategic

3    interest.

4    Q.   That was because in 2019 GateGuard needed money, right?

5    A.   In 2019?  GateGuard was -- had some financial struggles,

6    that's correct.

7    Q.   And GateGuard was looking for ways to get money without

8    having to raise funding, you know, if there is -- let me

9    rephrase that.

10          Charging customers through an ACH or a drawn check was

11   a good way to raise money, route?

12   A.   No.

13   Q.   It wasn't a good way to raise money?

14   A.   I mean, as an attorney who worked with a lot startups, when

15   you use -- to characterize something as raising money, that is

16   generally used in the context of an investor providing, as I

17   would use it in my practice, an investor providing money to a

18   company, here a startup company, in exchange for I would say an

19   interest in the company.  I would not characterize any of the

20   payments that you just referenced as a method of raising money

21   for GateGuard.

22   Q.   You testified on direct that it was lawful for Mr. Teman to

23   write a check to himself because of the language and the

24   payment terms on his website, right?

25   A.   I don't know what you mean with respect to writing a check

A-946

K1odtem7                          Reinitz – cross

1   to himself.

2   Q.  You're not sure if Mr. Teman is authorized to write a check

3   from a customer's account to himself?

4   A.  The payment terms that I believe we're all discussing

5   authorize, and my direct advice and communication of what I

6   told Mr. Teman, to be frank, is that the payment terms

7   authorize GateGuard to deposit RCCs, remotely created checks,

8   drawn on accounts of his customers, specifically GateGuard --

9   excuse me, specifically Coney, ABJ and Mercer, payable to

10  GateGuard.

11  Q.  You said that it was legal for him to write a check from a

12  customer's account to his own account because of the terms --

13  because of the payment terms, right?  Is that your testimony?

14  A.  I wouldn't characterize it -- again, I'm sorry to be

15  technical, but I wouldn't characterize it as writing a check to

16  himself.  It was a check that was authorized by customer via

17  the terms, and Mr. Teman and GateGuard were acting on that

18  authorization and depositing the RCC.

19  Q.  All the information you have about the terms and about the

20  customers' negotiations with Mr. Teman you got from Mr. Teman,

21  right?

22  A.  Honestly, I would have to answer no in the sense that, as I

23  referenced, I got information via the website, and also, as

24  I've already testified, I communicated with several of the

25  customers, including Mr. Gabay and Mr. Soleimani, regarding

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-947

810

K1odtem7                    Reinitz - cross

1  their business relationships and their agreements with

2  GateGuard.

3  Q.  Let's use Ms. Soon-Osberger as an example, right?  She

4  lives in the building at 18 Mercer Street, is that right?

5  A.  Yes, that is my understanding.

6  Q.  That is your understanding, but you're not sure?

7  A.  I've never spoken to Ms. Osberger directly.

8  Q.  That's right, you never spoke to her on the phone?

9  A.  Nope.

10  Q.  You wouldn't know what she looks like, right?

11  A.  I believe I may have seen a picture of her but I never met

12  her or communicated directly with her, no.

13  Q.  You never heard her side of the story?

14  A.  Her side of the story?  I don't know what you mean by that.

15  Q.  Have you ever spoken to her about her agreement with

16  Mr. Teman?

17  A.  I've never spoken to her about anything.

18  Q.  So if she told you I've never been to the website, I don't

19  even own a GateGuard device, you wouldn't know that?

20  A.  As I testified, I have never spoken to her and I have no

21  information -- direct information from Ms. Osberger regarding

22  anything regarding GateGuard.

23        I will add that I have reviewed and received from

24  Mr. Teman correspondence and also, as you said, I had

25  discussions with him regarding communications he had with

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1odtem7                         Reinitz - cross

1    Ms. Osberger, but, again, I have not communicated with Ms.

2    Osberger directly at any point in time.

3    Q.  You spoke about payment terms that you think authorize

4    those checks, right?  I won't call them checks he wrote to

5    himself, I will call them the checks.  Those were based on the

6    payment terms, right?

7    A.  I'm sorry?

8    Q.  The authority to issue those checks is from the payment

9    terms, right?

10   A.  That's correct.

11   Q.  And you said that you were engaged with Mr. -- with

12   GateGuard in mid-2018, right?

13   A.  That's right.

14   Q.  And you testified that you saw the payment terms around

15   then?

16   A.  That's right.

17   Q.  Do you have a copy of those payment terms that you saw in

18   2018?

19   A.  I don't have a copy; certainly not with me, no.

20   Q.  You were served a subpoena in connection with this case,

21   right?

22   A.  That's right.

23   Q.  And a subpoena is a serious obligation?

24   A.  It sure is.

25   Q.  Do you take it seriously?

K1odtem7                    Reinitz - cross

1   A.  I absolutely do.

2   Q.  And one of the requirements of the subpoena was to produce

3   documents, all terms and conditions and payment terms for

4   GateGuard since January of 2016, right?

5   A.  That's right.

6   Q.  And you didn't produce any payment terms that you have,

7   right?

8   A.  I, to the best of my recollection and as -- and with

9   respect, Mr. Bhatia, to the documents I have produced to you,

10  the government, I don't recall ever having a copy of the

11  payment terms if we are speaking about a document or an

12  electronic document, let's say, in pdf format.  I reviewed the

13  terms, and I would say almost all of my discussions of many

14  discussions regarding the terms have been in reference to the

15  terms as they appear on the website.  So I would have pulled up

16  the website.

17  Q.  Let me be more specific.  Right now you don't have -- you

18  don't know the exact words of the payment terms as you saw them

19  in 2018?

20  A.  Do I know them by heart?  No.

21  Q.  So you don't know them, right?

22  A.  I am familiar with them, very familiar with them, but I

23  don't know them; I can't recite them verbatim.

24  Q.  OK.  So it is fair to say you don't have a copy of the

25  payment terms from 2018?

A-950

813

K1odtem7                    Reinitz - cross

1   A.  I am not in possession of a copy of the payment terms from

2   2018, but I -- like I said, I'm familiar with it, familiar with

3   them.

4   Q.  2018 was the first time you saw them, right?

5   A.  That's right.

6   Q.  So you didn't even see them for 2017, right?

7       And that is a "yes" or "no" answer.  Did you see them

8   or not?

9   A.  I definitely didn't see them in 2017.

10  Q.  Did you see them after 2017?

11  A.  I'm hemming and hawing here regarding a matter that your

12  Honor mentioned that I should not reference.  However, what I

13  can say is that, in a general sense, I have reviewed versions

14  and copies of GateGuard's terms, including those prior to my

15  representation of him.

16  Q.  Mr. Soleimani paid for his devices in 2017, right?

17  A.  I'm sorry, can you repeat the question?

18  Q.  Mr. Soleimani paid for his devices in 2017, right?

19  A.  That's my understanding.

20  Q.  And Ms. Soon-Osberger paid for her devices in 2018, right?

21  A.  That's my understanding.

22  Q.  You don't know when they actually paid for their devices?

23  A.  I was not involved on -- you know, on the basis of, you

24  know, Mr. Teman and I wouldn't discuss when customers paid.  I

25  mean, when he was getting lawyers involved was when they

A-951

814

K1odtem7                          Reinitz - cross

1   weren't paying.

2   Q.  Those kind of details aren't important to you, are they?

3   A.  I mean, frankly, no.  If GateGuard has I would say hundreds

4   of happy customers and I don't hear almost anything, if

5   anything, about them because, you know, things are fine,

6   there's no need for me to know about that.

7            MR. BHATIA:  Your Honor, move to strike.

8            THE COURT:  Sustained.

9            The jury will disregard the witness' last answer.

10  BY MR. BHATIA:

11  Q.  You testified that any GateGuard employee -- any GateGuard

12  customers had authorized Mr. Teman to draw checks from their

13  accounts, right?

14           MR. GELFAND:  Your Honor, is the question what he

15  disclosed to Mr. Teman or what he thinks?  I'm fine with either

16  but I want to be clear.

17           THE COURT:  Mr. Bhatia, I think if you are asking him

18  about contact between people that he was not privy to, your

19  question needs to get at his source of information.

20  BY MR. BHATIA:

21  Q.  Mr. Teman told you that the terms and conditions -- the

22  payment terms on the website from 2017 were the same as the

23  ones from later years, or did he say they were similar?

24  A.  I would say substantially the same.

25  Q.  But you don't recall -- you don't recall what they said,

815

K1odtem7                       Reinitz - cross

1    right?

2    A.   I recall reviewing, as I testified, several versions,

3    including as far back, if we're going there, as 2016 regarding

4    GateGuard's terms and payment terms.  I have reviewed and seen

5    them, and, yes, in my direct discussions with Mr. Teman, he

6    communicated to me that they were substantially similar.

7    Q.   You can't tell us the exact words of the 2017 version,

8    though, can you?

9    A.   I can't tell you the exact words.

10   Q.   You saw the 2019 version, right?

11   A.   I -- if we can be more specific, I saw several versions

12   that I have already testified to that, yes, I reviewed.

13   Q.   You saw only one exhibit during your testimony today that's

14   called "Payment Terms," right?

15   A.   Yes.

16   Q.   And that was dated from 2019, right?

17   A.   Yep.

18   Q.   So for that one we can see the exact words, right?

19        You don't have that for 2018, do you?

20   A.   I don't have a copy of it, no.

21   Q.   You did not produce it pursuant to a subpoena, right?

22   A.   The answer is no.  Like I said, I don't have a physical --

23   a pdf copy of it.  I did review it and I have seen it.

24   Q.   Do you have a non-physical, non-pdf copy of it?

25   A.   I do not, no.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1odtem7                          Reinitz - cross

1   Q.  So you don't have it?

2   A.  No.

3   Q.  Do you have a 2017 copy of the payment terms?

4   A.  Not -- I have not found one, no.  I don't have one.  Like I

5   mentioned, I reviewed it but I have not found it.

6            (Pause)

7   Q.  There came a time in April 2019 when Mr. Teman talked to

8   you about checks that he deposited into his account, right?

9   A.  Yep.

10  Q.  And those checks were then subject to a chargeback, is that

11  right?

12  A.  That's right.

13  Q.  And when you first heard about that, you said it was a bad

14  idea, right?

15  A.  Yep.

16  Q.  And you said it was a bad idea twice, right?

17  A.  Yep.

18  Q.  You said it was a bad idea because they were likely to call

19  the police, didn't you?

20  A.  I sure did.

21  Q.  And you said that you might be arrested?

22  A.  I did.

23            MR. BHATIA:  Your Honor, I would like to show for the

24  witness only Government Exhibit 702.

25            THE COURT:  You may show it to the witness only.

K1odtem7                     Reinitz - cross

1    Q.  Do you recognize this document?

2    A.  Yes.

3    Q.  What is it?

4    A.  It's a -- I would say a portion of a WhatsApp chat

5    correspondence between Mr. Teman and I.

6    Q.  And how do you recognize this document?

7    A.  I provided it to the government.

8              MR. BHATIA:  Your Honor, the government offers

9    Government Exhibit 702.

10             THE COURT:  One moment.

11             (Pause)

12             Let me just ask if there is an objection first?

13             MR. GELFAND:  No, your Honor.

14             THE COURT:  Let me just read it.

15             (Pause)

16             MR. BHATIA:  Your Honor --

17             THE COURT:  One moment.  I am just reading.

18             (Pause)

19             Received.

20             (Government's Exhibit 702 received in evidence)

21             MR. BHATIA:  I would like to publish for the jury

22    Government Exhibit 702.

23             THE COURT:  You may.

24    BY MR. BHATIA:

25    Q.  Mr. Teman tells you -- this is a chat between you and

K1odtem7                          Reinitz - cross

1    Mr. Teman?

2    A.  Mm-hmm.

3    Q.  It is on January 2, 2019.

4    A.  That's correct?

5    Q.  Mr. Teman says, "I have ABJ checks, photos" --

6          THE COURT:  Sorry.  Mr. Bhatia, I think for the

7    benefit of the jury, not all of whom may be familiar with how

8    to interpret a document like this, just please set out for the

9    witness what color is coded and in what color, if that's the

10   right way to put the question, just to assist everyone in

11   following along.

12         MR. BHATIA:  Certainly.

13   Q.  At the top of the page, is that the date of the

14   communication?

15   A.  That is correct.

16   Q.  And on the left side, are those messages from Mr. Teman?

17   A.  That's right.

18   Q.  And on the right side is your communications to him?

19   A.  Yep.

20   Q.  So on the left side, Mr. Teman says:  "I have ABJ checks

21   photos.  Our contract allows me to draw their account.  I

22   should just deposit checks from them.  Totally legal I think."

23         What did you say in response?

24   A.  "No."

25   Q.  He wrote back with a question mark, and how did you

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

A-956

K1odtem7                          Reinitz - cross

1    respond?

2    A.  "Bad idea."

3    Q.  Did you say "bad idea" again?

4    A.  Yes.

5    Q.  Mr. Teman says that:  "They entered into a contract

6    allowing us to draw from their accounts.

7              THE COURT:  Read a little more slowly for the court

8    reporter.

9              MR. BHATIA:  Excuse me.

10   Q.  Mr. Teman says:  "Why?  They entered into a contract

11   allowing us to draw from their accounts so we're not breaking

12   any law.  What can they say?  We owed this guy money, he took

13   it, and he had permission to do so, but we want it back so

14   there's nothing to say."

15             And then you said -- why don't you read what you said?

16   A.  Sure.

17             "Because they are likely to call police.  And you will

18   be arrested.  And have a criminal case to deal with.  And then

19   you can start explaining about your contract and 'not breaking

20   any laws.'"

21   Q.  Did there come a time when Mr. Teman told you that there

22   had actually been a chargeback in his accounts?

23   A.  I'm sorry.  Can you repeat the question?

24   Q.  Did there come a time when Mr. Teman you that there had

25   been a chargeback in his accounts?

K10dtem7                    Reinitz - cross

1    A.  Yes.

2    Q.  And that chargeback had been based on two checks that he

3    created, right?

4    A.  I mean, to be clear, Mr. Bhatia, Mr. Teman and I --

5    Mr. Teman has told me on numerous occasions that customers --

6    yes, he has had to deal with chargebacks from certain

7    customers.  So, I'm not sure if you are referring to a specific

8    chargeback.

9    Q.  Sure.  On April 2, 2019, did he contact you about

10   chargebacks?

11   A.  I believe so, yes.

12   Q.  Two chargebacks worth $18,000?

13   A.  Yes.

14   Q.  And those were from one of his accounts at Bank of America,

15   right?

16   A.  I mean, if we're being technical, the chargeback were fees

17   that were deposited -- funds that were deposited into his

18   account in Bank of America that were then reversed, yes.

19   Q.  So you know what I'm talking about?

20   A.  Yes.

21   Q.  OK.

22   A.  I believe so, yes.

23           MR. BHATIA:  I would like to show for the witness only

24   Government Exhibit 704.

25           THE COURT:  One moment.

A-958

821

K1odtem7                    Reinitz - cross

1          (Pause)

2          One moment.

3          (Pause)

4          You may.  Well, any objection?

5          MR. GELFAND:  No objection, your Honor.

6          THE COURT:  Received.

7          (Government's Exhibit 704 received in evidence)

8          MR. BHATIA:  I would like to publish for the jury

9    Government Exhibit 704.

10         THE COURT:  You may.

11   BY MR. BHATIA:

12   Q.  This is a conversation from April 2, 2019.

13         At the top of this page is Mr. Teman's -- are you

14   quoting a message from Mr. Teman?

15   A.  That's right.

16   Q.  And it says:  "Meanwhile Bank of America put a hold" --

17         THE COURT:  Slow down the reading, please, for the

18   court reporter.

19         MR. BHATIA:  Excuse me.

20   Q.  It says:  "Meanwhile Bank of America put a hold on the two

21   $18,000 checks we we drew from people's accounts who remove

22   devices (as our contract)," and then it trails off.

23         You responded:  "Not sure I follow but this sounds

24   bad."

25         Is that right?

A-959

K1odtem7                          Reinitz – cross

1   A.  Yes, that's what I wrote.

2   Q.  And then he wrote:  "Yes, very."

3          Further down the page, you wrote:  "Understood.  I

4   don't know all the ins and outs but this sounds like a bad

5   idea."

6          You didn't know the ins and outs of these facts,

7   right?

8   A.  I'm not sure what you are referring to with respect to the

9   facts.

10  Q.  You said you didn't know the ins and outs?

11  A.  I said I don't know all the ins and outs, and what I was

12  referring to is the protocols with respect to the banks and how

13  a chargeback would be negotiated between -- resolved, I would

14  say, between two banking institutions who were -- there was a

15  dispute I would say between the customers on either side.

16  Q.  You wrote that -- you suggested that he provide them with

17  advanced, explicit notifications of the charge, amount, and

18  specific basis in the agreement for doing so, right?

19  A.  That's right.

20  Q.  You advised him to provide advance notice, right?

21  A.  That was my suggestion.

22  Q.  Provide notice before he did the chargeback?

23  A.  That's right.

24  Q.  And --

25  A.  I'm sorry, Mr. Bhatia, but when you say before he did the

A-960

823

K1odtem7                          Reinitz - cross

1    chargeback, these chargebacks are when the banks reverse the

2    charge, so I am not sure.

3    Q.  This is advance notice before he wrote the checks?

4    A.  That was my suggestion.

5    Q.  And he should provide explicit notification of the charge,

6    right?  That's what you wrote?

7    A.  If we're being technical, that was my suggestion.  Just as

8    my suggestion was it was a bad idea, that was, as with much of

9    the discussions I had with him, you know, a practical advice

10   for the same reason I thought it was a bad idea.  I didn't, you

11   know, he was -- as far as I was concerned --

12          THE COURT:  I'm sorry.  The witness is way beyond the

13   question.

14          Witness, please, he is asking you about whether you

15   wrote certain things.

16          THE WITNESS:  I wrote, "It was a bad idea."

17   BY MR. BHATIA:

18   Q.  This message was the first time that you had heard about

19   these two specific $18,000 checks, right?

20   A.  These specific checks, yes.

21   Q.  These specific checks?

22   A.  Yes.

23   Q.  You didn't know about these specific checks before they

24   were cashed, right?

25   A.  The physical specific checks that were shown previously,