# 21-1920-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

ARI TEMAN, AKA Sealed Defendant 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

### JOINT APPENDIX
**Volume 6 of 11 (Pages A-961 to A-1200)**

KEDAR S. BHATIA
WON S. SHIN
  *Assistant U.S. Attorney*
UNITED STATES ATTORNEY'S OFFICE
  SOUTHERN DISTRICT OF NEW YORK
*Attorneys for Appellee*
One Saint Andrew's Plaza
New York, New York 10007
(212) 637-2200

EDEN QUAINTON
QUAINTON LAW
*Attorneys for Defendant-Appellant*
2 Park Avenue, 20th Floor
New York, New York 10169
(212) 419-0575

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Complaint, filed June 20, 2019................................. A-46.2

Notice of Appearance, dated August 27, 2019........... A-47

Indictment, filed September 26, 2019....................... A-49

Waiver of Appearance for Arraignment, dated
    October 14, 2019 .................................................... A-53

Transcript of Proceedings held before the
    Honorable Paul A. Engelmayer, dated
    October 21, 2019 .................................................... A-55

Supeseding Indictment, filed November 12, 2019 .... A-96.1

Transcript of Proceedings held before the
    Honorable Paul A. Engelmayer, dated November
    21, 2019 .................................................................. A-96.7

Opinion and Order of the Honorable Paul A.
    Engelmayer, dated December 20, 2019 ................. A-97

Second Superseding Indictment, filed
    January 3, 2020...................................................... A-121

Defendant Teman's Requested Voir Dire Questions,
    filed January 6, 2020............................................. A-129

Excerpts of Transcript of Conference Proceedings
    held before the Honorable Paul A. Engelmayer,
    dated January 10, 2020 .......................................... A-137.1

Transcript of Conference Proceedings held before
    the Honorable Paul A. Engelmayer, dated
    January 10, 2020.................................................... A-137.6

Letter from Kedar S. Bhatia to the Honorable Paul
    A. Engelmayer, dated January 14, 2020 ............... A-137.96

ii

**Page**

Transcript of Trial Proceedings held before the
  Honorable Paul A. Engelmayer, dated
    January 21, 2020 .................................................... A-138

Transcript of Trial Proceedings held before the
  Honorable Paul A. Engelmayer, dated
    January 22, 2020 .................................................... A-265

Transcript of Trial Proceedings held before the
  Honorable Paul A. Engelmayer, dated
    January 23, 2020 .................................................... A-398

Transcript of Trial Proceedings held before the
  Honorable Paul A. Engelmayer, dated
    January 24, 2020 .................................................... A-672

Transcript of Trial Proceedings held before the
  Honorable Paul A. Engelmayer, dated
    January 27, 2020 .................................................... A-998

Transcript of Trial Proceedings held before the
  Honorable Paul A. Engelmayer, dated
    January 28, 2020 .................................................... A-1187

Transcript of Trial Proceedings held before the
  Honorable Paul A. Engelmayer, dated
    January 29, 2020 .................................................... A-1264

Verdict Sheet, dated January 29, 2020 ...................... A-1298.1

Order of the Honorable Paul A. Engelmayer, dated
    January 29, 2020 .................................................... A-1299

Defendant's Motion for Judgment of Acquittal or in
  the Alternative, Motion for New Trial, filed
    February 26, 2020 ................................................. A-1437

Motion for New Trial Based on Undisclosed Brady
  and Jencks Act Evidence, filed April 9, 2020 ....... A-1473

iii

**Page**

Exhibit A to Motion -
Excerpts of Transcript of Proceedings, dated
August 9, 2018...................................................... A-1498

Exhibit B to Motion -
Report of Violations of New York City's Housing
Maintenance Code ................................................ A-1512

Exhibit C to Motion -
Report of Violations of New York City's Housing
Maintenance Code ................................................ A-1513

Exhibit D to Motion -
HPD's Housing Maintenance Code Violations
User Guide ............................................................ A-1514

Exhibit E to Motion -
Report re: New York Civil Litigation – Joseph
Soleimani .............................................................. A-1548

Exhibit F to Motion -
Report re: New York Civil Litigation – Elie
Gabay .................................................................... A-1549

Exhibit G to Motion -
Glossary of Terms for Litigation Status Report
from HPD............................................................... A-1550

Letter from Joseph A. DiRuzzo, III to the Honorable
Paul A. Engelmayer, dated April 9, 2020............... A-1552

Letter from Kedar S. Bhatia, Assistant United States
Attorney to the Honorable Paul A. Engelmayer,
dated May 1, 2020 re: Trial Exhibits ..................... A-1554

Government's Exhibits:

GX 101-
GateGuard Account Opening Documents ............. A-1555

GX 102 -
GateGuard Bank Statements.................................. A-1559

iv

**Page**

GX 103-
Friend or Fraud Account Opening Documents ...... A-1581

GX 104-
Friend or Fraud Bank Statements ......................... A-1585

GX 105-
Touchless Labs Account Opening Documents ...... A-1609

GX 106-
Touchless Labs Bank Statements........................... A-1613

GX 107 -
Ari Teman Account Opening Document................ A-1629

GX 108-
Ari Teman Bank Statements ................................... A-1631

GX 110-
April 19, 2019 2:37 PM Surveillance
Photographs ........................................................... A-1649

GX 111-
April 19, 2019 6:00 PM Surveillance
Photographs ........................................................... A-1652

GX 112-
May 8, 2019 3_04 PM Surveillance
Photographs ........................................................... A-1655

GX 113-
Bank Records Spreadsheet
(CD-Rom)* ........................................................... A-1657.1

GX 114 -
Returned Check Records ....................................... A-1658

GX 121 -
ABJ Lenox Account Opening Document .............. A-1660

---

* GX 113 is a Microsoft Excel file. CD-Rom with the Excel
spreadsheet provided to Court and Service parties.

v

Page

GX 122 -
ABJ Lenox Bank Statements ................................. A-1661

GX 123 -
ABJ Milano Account Opening Documents ........... A-1669

GX 124 -
ABJ Milano Bank Statements................................ A-1670

GX 127 -
May 2, 2019 Letter - ABJ Lenox .......................... A-1678

GX 129 -
May 2, 2019 Letter - ABJ Milano......................... A-1679

GX 130 -
ABJ Lenox Checks ................................................ A-1680

GX 131 -
ABJ Milano Checks............................................... A-1682

GX 141 -
18 Mercer Account Opening Documents .............. A-1685

GX 142 -
18 Mercer Bank Statements.................................. A-1694

GX 143 -
April 4, 2018 Check from 18 Mercer Equity to
GateGuard.............................................................. A-1699

GX 144 -
518 W 204 Account Opening Documents ............. A-1700

GX 145 -
518 W 204 Bank Statements................................. A-1707

GX 146 -
January 31, 2018 Check from 518 W 204 to
GateGuard.............................................................. A-1725

vi

**Page**

GX 147 -
March 28, 2019 Check from 518 West 205 to
GateGuard ................................................................ A-1726

GX 150 -
Affidavit ................................................................ A-1727

GX 201 -
March 28, 2019 Check from Coney Realty to
GateGuard ................................................................ A-1728

GX 202 -
March 28, 2019 Check from 18 Mercer Equity to
GateGuard ................................................................ A-1729

GX 203 -
April 19, 2019 Check from 518 West 205 to
GateGuard ................................................................ A-1730

GX 204 -
April 19, 2019 Check from ABJ Milano to
GateGuard ................................................................ A-1733

GX 205 -
April 19, 2019 Check from ABJ Lennox to
GateGuard ................................................................ A-1739

GX 206 -
April 19, 2019 GateGuard Counter Deposit .......... A-1757

GX 401 -
September 9, 2017 E-mail - 'We're Live' ............. A-1758

GX 402 -
November 6, 2017 E-mail - 'Current Issues' ......... A-1760

GX 403 -
March 9, 2018 E-mail - 'Ending GateGuard' ........ A-1761

GX 404 -
May 7, 2018 E-mail - 'All Communication in
Writing' ................................................................ A-1762

vii

                                                          **Page**

GX 405 -
May 22, 2018 E-mail - 'GateGuard' ...................... A-1763

GX 406 -
August 26, 2018 E-mail - 'Dispute on Charge...' .. A-1765

GX 407 -
September 18, 2018 E-mail - 'Sublet Spy Hits...' . A-1767

GX 408 -
December 14, 2018 E-mail - 'Notice of Intent' ..... A-1773

GX 409 -
June 14, 2019 GateGuard Invoice ........................ A-1775

GX 409A -
Invoices (1) ............................................... A-1777

GX 409B -
Invoices (2) ............................................... A-1785

GX 409C -
Conversation between Teman and Soleimani ........ A-1786

GX 412 -
January 1, 2018 E-mail - 'Tenant Ana Esterg' ....... A-1787

GX 413 -
January 19, 2018 E-mail - 'Invoice Sent' .............. A-1788

GX 414 -
January 24, 2018 E-mail - 'Form for the 10
Buildings' ............................................... A-1791

GX 415 -
March 25, 2018 E-mail - 'Invoice for 20
Buildings' ............................................... A-1795

GX 416 -
March 26, 2018 E-mail - 'Invoice for 20
Buildings' (1) ....................................... A-1815

viii

**Page**

GX 417 -
March 26, 2018 E-mail - 'Invoice for 20
Buildings' (2) .......................................................... A-1820

GX 418 -
March 27, 2018 E-mail - 'Proof it's Your...' .......... A-1829

GX 431 -
April 4, 2018 E-mail - 'Invoice' ............................ A-1831

GX 441 -
GateGuard Terms and Conditions.......................... A-1834

GX 442 -
April 2, 2018 E-mail - 'References' ...................... A-1856

GX 443 -
January 7, 2019 E-mail - 'Contract' ...................... A-1862

GX 501 -
Bank Records Stipulation ...................................... A-1868

GX 702 -
January 2, 2019 WhatsApp Messages ................... A-1872

GX 704 -
April 2, 2019 WhatsApp Messages ....................... A-1874

GX 727 -
April 2, 2019 Whatsapp Messages (2)................... A-1875

GX 728 -
April 3, 2019 Whatsapp Messages ........................ A-1876

GX 729 -
April 10, 2019 WhatsApp Messages ..................... A-1877

Defense Exhibits:

DX 2 -
Payment Terms (1/27/2019)................................... A-1880

DX 14 -
October 11, 2018 E-mail – 'ABJ Properties'......... A-1887

ix

**Page**

DX 15 -
October 22, 2018 E-mail - 'SubletSpy hits' .......... A-1889

DX 16 -
'Notice of Hold' ...................................................... A-1892

DX 29 -
Affidavit ................................................................. A-1893

DX 36 -
March 28, 2018 E-mail – 'Invoice for 20
Buildings' ............................................................... A-1894

DX 49 -
Declaration ............................................................. A-1902

DX 51 -
Chase Information Request..................................... A-1903

DX 52 -
Chase Information Request..................................... A-1904

DC 62 -
March 9, 2018 E-mail Correspondence ................. A-1928

DX 70 -
GateGuard Logs ..................................................... A-1930

DX 71 -
May 22, 2018 E-mail – 'Re: Gateguard' ............... A-1932

Order of the Honorable Paul A. Engelmayer, dated
May 6, 2020 ........................................................... A-1933

Letter from Joseph A. DiRuzzo, III to the Honorable
Paul A. Engelmayer, dated May 8, 2020 ............... A-1935

Opinion and Order of the Honorable Paul A.
Engelmayer, dated June 5, 2020 ............................ A-1937

Letter from Joseph A. DiRuzzo, III to the Honorable
Paul A. Engelmayer, dated June 29, 2020 ............. A-2044

**x**

                                                                    **Page**

Sentencing Memorandum and Motion for
    Downward Variance, filed July 7, 2020.................  A-2045

    Exhibit 1 to Sentencing Memorandum -
    Letter from Dr. Rami Cohen, M.D to the
    Honorable Paul A. Engelmayer, dated
    June 29, 2020........................................................  A-2070

    Exhibit 2 to Sentencing Memorandum -
    Letter from Juhan Sonin to the Honorable Paul A.
    Engelmayer, dated July 6, 2020.............................  A-2074

    Exhibit 3 to Sentencing Memorandum -
    Letter from Jeffrey Katz to the Honorable Paul A.
    Engelmayer ............................................................  A-2076

    Exhibit 4 to Sentencing Memorandum -
    Letter from Oliver Josephs t to the Honorable
    Paul A. Engelmayer, dated June 6, 2020 ...............  A-2077

    Exhibit 5 to Sentencing Memorandum -
    Letter from Thomas Orosz to the Honorable Paul
    A. Engelmayer ........................................................  A-2079

    Exhibit 6 to Sentencing Memorandum -
    Letter from David Diwby to the Honorable Paul
    A. Engelmayer ........................................................  A-2080

    Exhibit 7 to Sentencing Memorandum -
    Letter from Nachum Klar to the Honorable Paul
    A. Engelmayer, dated July 6, 2020 ........................  A-2082

    Exhibit 8 to Sentencing Memorandum -
    Letter from Anthony Zachariadis to the
    Honorable Paul A. Engelmayer, dated
    July 6, 2020...........................................................  A-2084

    Exhibit 9 to Sentencing Memorandum -
    eJewish Philanthrophy- Coverage of Teman's
    Award ....................................................................  A-2085

xi

**Page**

Exhibit 10 to Sentencing Memorandum -
HarvardX Verified Certificate of Achievement,
issued May 11, 2020 ............................................... A-2094

Exhibit 11 to Sentencing Memorandum -
Letter from Avi Ganz to the Honorable Paul A.
Engelmayer, dated July 7, 2020 ............................ A-2095

Exhibit 12 to Sentencing Memorandum -
Letter from Steven Oved to the Honorable Paul
A. Engelmayer, dated June 15, 2020 ..................... A-2098

Exhibit 13 to Sentencing Memorandum -
Letter from Rabbi Chaim Lipskar to the
Honorable Paul A. Engelmayer, dated
July 7, 2020 ............................................................. A-2099

Exhibit 14 to Sentencing Memorandum -
Letter from Jonathan Lubin to the Honorable
Paul A. Engelmayer ............................................... A-2101

Exhibit 15 to Sentencing Memorandum -
Letter from Talia Reiss to the Honorable Paul A.
Engelmayer ............................................................. A-2103

Exhibit 16 to Sentencing Memorandum -
Letter from Rivka Korf to the Honorable Paul A.
Engelmayer ............................................................. A-2104

Exhibit 17 to Sentencing Memorandum -
Letter from Russell DiBona to the Honorable
Paul A. Engelmayer ............................................... A-2105

Letter from Justin K. Gelfand to the Honorable Paul
A. Engelmayer, dated September 8, 2020 ............. A-2107

Appearance of Counsel, dated November 2, 2020 .... A-2108.1

Letter from Justin Harris to the Honorable Paul
Engelmayer, dated November 2, 2020 ................... A-2108.2

xii

**Page**

Exhibit B to Letter -
Letter from Justine A. Harris to Kedar Bhatia and
Edward A. Imperatore, dated October 23, 2020 .... A-2108.6

Exhibit C to Letter -
Letter from Kedar S. Bhatia to Justine A. Harris,
dated October 29, 2020......................................... A-2108.9

Order of the Honorable Paul A. Engelmayer, dated
November 19, 2020 ............................................... A-2109

Letter from Justine Harris to the Honorable Paul A.
Engelmayer, dated November 20, 2020................ A-2111

Letter from Justine Harris to the Honorable Paul A.
Engelmayer, dated November 30, 2020 ............... A-2113

Letter from Audrey Strauss to the Honorable Paul
A. Engelmayer, dated November 30, 2020........... A-2114

Transcript of Remote Conference Proceedings held
before the Honorable Paul A. Engelmayer, dated
December 1, 2020................................................. A-2116

Order of the Honorable Paul A. Engelmayer, dated
January 28, 2021 .................................................. A-2170

Letter Motion from Audrey Strauss to the
Honorable Paul A. Engelmayer, dated
April 23, 2021 ...................................................... A-2173

Exhibit A to Letter -
Proposed Order of Restitution .............................. A-2181

Exhibit B to Letter -
Proposed Preliminary Order of Forfeiture/Money
Judgment.............................................................. A-2185

Exhibit C to Letter -
Document - Finocchiaro 3503-19......................... A-2189

Exhibit D to Letter -
Revised Document - Finocchiaro 3503-19 ........... A-2190

xiii

**Page**

Exhibit E to Letter -
Affidavit of Karen Finocchiaro, dated
April 2, 2021 .......................................................... A-2191

Letter from Andrew J. Frisch to the Honorable Paul
A. Engelmayer, dated April 23, 2021 ................... A-2195.1

Attachment to Letter -
*Curriculum Vitae* of Richard M. Fraher ................ A-2195.3

Letter Motion to Vacate Conviction from Andrew J.
Frisch to the Honorable Paul A. Engelmayer,
dated April 28, 2021 .............................................. A-2196

Exhibit A to Letter Motion -
Document - Finocchiaro 3503-19 ......................... A-2211

Exhibit B to Letter Motion -
Revised Document - Finocchiaro 3503-19 ............ A-2213

Exhibit C to Letter Motion -
E-mail Correspondence, dated
November 30, 2020 ............................................... A-2215

Exhibit D to Letter Motion -
E-mail Correspondence, dated March 10, 2021 .... A-2217

Exhibit E to Letter Motion -
E-mail Correspondence, dated March 12, 2021 .... A-2219

Exhibit F to Letter Motion -
Copies of Various Cashier's Checks ..................... A-2221

Order of the Honorable Paul A. Engelmayer, dated
May 5, 2021 .......................................................... A-2223

Letter from Andrew J. Frisch to Kedar Bhatia, dated
May 12, 2021 ........................................................ A-2225

Annexed to Letter -
Declaration of Richard M. Fraher, executed
May 11, 2021 ........................................................ A-2226

xiv

**Page**

Letter from Audrey Strauss to the Honorable Paul
  A. Engelmayer, dated June 9, 2021 ...................... A-2236

Letter from Andrew J. Frisch to the Honorable Paul
  A. Engelmayer, dated June 14, 2021 .................... A-2246.1

Letter from Audrey Strauss to the Honorable Paul
  A. Engelmayer, dated June 29, 2021 .................... A-2246.4

Transcript of Conference Proceedings held before
  the Honorable Paul A. Engelmayer, dated
  July 9, 2021............................................................ A-2247

Sentencing Submission Letter from Susan G.
  Kellman to the Honorable Paul A. Engelmayer,
  dated July 16, 2021 ................................................ A-2315

Transcript of Sentencing Proceedings held before
  the Honorable Paul A. Engelmayer, dated
  July 28, 2021.......................................................... A-2333

Notice of Appeal, dated August 2, 2021 ................... A-2458

Letter Motion from Ari Teman to the Honorable
  Paul A. Engelmayer, dated March 3, 2022 ........... A-2459

Letter Motion from Ari Teman to the Honorable
  Paul A. Engelmayer, dated April 12, 2022............. A-2462

Order of the Honorable Paul A. Engelmayer, dated
  April 13, 2022........................................................ A-2463

Letter Motion from Ari Teman to the Honorable
  Paul A. Engelmayer, dated April 13, 2022............. A-2465

Letter from Eden P. Quainton to the Honorable Paul
  A. Engelmayer, dated April 13, 2022 ................... A-2467

Notice of Appearance, filed April 13, 2022 .............. A-2469

Letter Motion from Ari B. Teman to the Honorable
  Paul A. Engelmayer, dated April 14, 2022............. A-2470

xv

**Page**

Order of the Honorable Paul A. Engelmayer, dated
April 15, 2022......................................................... A-2473

Emergency Letter Motion from Ari B. Teman to the
Honorable Paul A. Engelmayer, dated April 20,
2022 ........................................................................ A-2476

Order of the Honorable Paul A. Engelmayer, dated
April 20, 2022......................................................... A-2479

Emergency Letter Motion from Ari B. Teman to the
Honorable Paul A. Engelmayer, dated April 20,
2022 ........................................................................ A-2481

Letter from Kedar S. Bhatia, Asst. United States
Attorney to the Honorable Paul A. Engelmayer,
dated April 21, 2022 ............................................... A-2482

Order of the Honorable Paul A. Engelmayer, dated
April 21, 2022......................................................... A-2483

A-961

824

K1odtem7                          Reinitz - cross

1    yes, this was the first time I was advised of those specific

2    checks.

3    Q.  And that's why you said you didn't know the ins and outs of

4    those?

5    A.  No.  I was referring to, again, the manner in which the

6    dispute that had now been started via the chargeback would be

7    resolved between the two banking institutions.

8    Q.  Did you know that one of those checks was drawn on an

9    account that had previously done a chargeback of Mr. Teman's

10   checks?

11   A.  I believe -- I'm not sure.  I think so.  I'm not sure what

12   kind of account you are referring to.  Can you be more

13   specific?

14   Q.  Have you since seen these two checks that are referred

15   here, that are referenced here?

16   A.  I believe so.  I've seen several checks.  I mean, can you

17   show them to me?  Then I can tell you if I've seen them or not,

18   but I think I have.  I'm pretty sure I have.

19            MR. BHATIA:  Could we publish for the witness

20   Government Exhibit 201?

21            THE COURT:  Do you mean for the witness or the jury as

22   well?

23            MR. BHATIA:  For the jury as well.

24            THE COURT:  Sorry.  I think we are looking for 201.

25            (Pause)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K10dtem7                        Reinitz - cross

1           Mr. Bhatia, we only have about five minutes left.  Why

2     don't we -- never mind, saved by the bell, it is here on the

3     screen.

4     BY MR. BHATIA:

5     Q.  This check, you had never seen this check before, right?

6           You had never seen this before you heard about it from

7     Mr. Teman?

8     A.  That's right.  This physical check I had not seen before

9     Mr. Teman informed me he had deposited it, that's correct.

10    Q.  And were you familiar with the 518 West 205 LLC account?

11    A.  I'm sorry.  I'm looking here at the check.  I'm sorry.

12          Am I familiar with the account?

13    Q.  Yes.

14    A.  I was familiar with Coney Realty.

15    Q.  Did you know about the 518 West 205 LLC account?

16    A.  These are real estate entities that I think every building

17    is a different LLC.  EBJ is another example, each building.  So

18    I would say most likely yes, I had seen it, but, you know, if

19    it was Coney Realty, I am familiar with Coney Realty.

20    Q.  But you don't remember the 518 West 205 LLC account today,

21    right?

22    A.  I can't tell you if I remember it or not.  I'm sure I've

23    seen it, but, again, it was -- there are numerous entities

24    under the umbrella, as I understand it, of Coney Realty and

25    that's what I was familiar with.

A-963

K1odtem7                          Reinitz - cross

1    Q.  OK.  And are you familiar with the building at 518 West 205

2    LLC -- or, sorry, 518 West 205?

3    A.  I'm not familiar with the specific building.

4    Q.  Do you know if it is actually 518 West 204?

5    A.  I can't speak to the specific -- a specific building at a

6    specific address, and I'm not familiar with that level of

7    detail, no.

8    Q.  You had only spoken to Mr. Teman generally about Coney,

9    right?

10   A.  I had spoken to Mr. Teman regarding Coney, Mr. Gabay, his

11   business relationships with them, his correspondence with them,

12   their failure to pay the fees that were due to GateGuard, and

13   then I corresponded with Mr. Gabay directly, as I've already

14   testified.

15            MR. BHATIA:  I would like to go back to the Elmo

16   device.

17   Q.  This is Government Exhibit 704 up here.

18            You wrote that:  "If you are hitting their accounts

19   out of the blue, I expect this will become a criminal matter

20   sooner or later."

21            That's what you told Mr. Teman, right?

22   A.  That's what I wrote, yes.

23   Q.  That's because hitting them out of the blue could lead to

24   becoming a criminal matter, right?

25   A.  In the context of what I previously testified and what I

K1odtem7                         Reinitz - cross

1   will tell you now that that's exactly what I was referring to

2   is that I was advising him that practically the way I would

3   suggest -- if I used that word previously -- I suggested that

4   he provide notification.  To be clear -- I also told this

5   directly to Mr. Teman in other discussions -- he didn't have

6   to.  He could have done this on -- you know, if they were one

7   day overdue, he could have drawn the payment.  We tried for

8   months to resolve it amicably, the same way -- well, I won't go

9   through that.

10          But in any event, my suggestion was to notify the

11  customers, and it was in that context I said if you're just

12  going to draw the payment out of the blue without them knowing

13  what it's about, I expect this will become a criminal matter

14  sooner or later because they may report it as such, and you

15  may, as I mentioned in the previous message, have to deal with

16  a criminal allegation even though ultimately the payment terms

17  did authorize him to do so.

18  Q.  You thought he was authorized to do so, but the person

19  whose money he was drawing might consider it a criminal matter?

20  A.  If we're being technical, I told him he was authorized to

21  do so.  I thought that as well.  But I told him he was

22  authorized to do so.

23          With that said, in the context of GateGuard's

24  business, I wasn't -- I was concerned that it would not

25  necessarily be strategically wise to draw these payments if

A-965

Klodtem7                    Reinitz - cross

1    there was any other way to resolve the issue.  And should they

2    draw the payments, I suggested that they notify the customers

3    explicitly in advance, suggested it, but I never told him that

4    absent such suggestion -- absent such advice they would -- the

5    payments would be illegal or criminal.  That was not my --

6    Q.  You told him it could become a criminal matter, right?

7    A.  It could become a criminal matter in the sense that the

8    customers would object, and those objections may raise criminal

9    allegations even though ultimately the payments were

10   authorized.

11   Q.  So you thought that the people who were having their checks

12   drawn, checks drawn from their accounts, might object to this,

13   right?

14   A.  As I wrote, if they were out of the blue --

15            MR. GELFAND:  Your Honor, I'm sorry --

16            THE COURT:  Look, counsel, focus on what the written

17   communications are.  We're way too into his thought process.

18   Let's focus on what was said between him and Mr. Teman.

19            Sustained.  Next question.

20   Q.  When you relayed to Mr. Teman that if you're hitting their

21   accounts out of the blue, you thought that -- you were

22   conveying to him that the person on the other end of this

23   transaction might object to it, right?

24   A.  Yes.  If they were hit out of the blue and there was no

25   context, I was concerned that there may be a criminal

A-966

829

K1odtem7

1    allegation, you know, a suspicion that, hey, something's not

2    right here if there's money coming out of my account and I have

3    no idea why.  That's why I suggested that he notify the

4    customers before he drew the payment.

5              THE COURT:  Mr. Bhatia, is this a good time to break

6    for the weekend?

7              MR. BHATIA:  It is.

8              THE COURT:  All right.  Ladies and gentlemen, I want

9    to wish you a very good weekend, a healthy and a happy one.  I

10   will see you on our usual schedule on Monday.  As you can tell,

11   we're making good progress, and I should be in a position at

12   the end of the day Monday to tell you more about how we stand,

13   but I think we're at least on schedule.

14             Have a great weekend.

15             As always, do not discuss the case.  The usual

16   schedule on Monday, 8:45, free breakfast your call, 9:30 be

17   ready to come into court.

18             Have a great weekend, everyone

19             JURORS:  Thank you.

20             (Continued on next page)

21

22

23

24

25

A-967

830

K1odtem7

1          (Jury not present)

2          THE COURT:  All right.  I'll ask that the witness be

3    removed so that the witness doesn't want to ride in the

4    elevator with the jury.

5          Could somebody bring him into the witness room?

6          MR. GELFAND:  Absolutely.

7          THE COURT:  Let me ask maybe Detective Alessandrino

8    kindly to bring the witness into the witness room over here in

9    the hallway.  It is through here right across the hall.

10          Maybe my law clerk will point out the door to make

11   sure there is no doubt.

12          (Witness not present)

13          THE COURT:  All right.  Counsel have anything to raise

14   about the ongoing examination of this witness?

15          MR. GELFAND:  Your Honor, to the extent that opposing

16   counsel is intending to elicit questions and answers beyond

17   what Mr. Reinitz communicated and instead is asking questions

18   probing into why he communicated that or what he believes, I

19   have no objection to that.  However --

20          THE COURT:  Of course you don't.

21          MR. GELFAND:  However, I do believe that they have

22   opened the door to or they are opening the door to it, and I

23   wanted to just raise that issue.

24          THE COURT:  To what?

25          MR. GELFAND:  To the basis -- there are essentially

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-968

K1odtem7

1  two discrete issues.  I'm sure there is a better way of

2  articulating it, but any reliance -- I think in the tax context

3  often, if someone says I told the defendant he can do X, that's

4  different from I believed X and therefore I told the defendant

5  he can do X.

6          THE COURT:  Right.  Look, right now the witness is

7  taking the latitude that government counsel's questions are

8  giving.  When government counsel says "That was why you said

9  X," a literal answer would be yes or no.  The witness chooses

10  because there is a "why" tucked into the question to give more

11  information.  Mr. Bhatia is not inviting that.  He is not

12  opening the door.  His questions are needlessly leaving the

13  door open for the witness to wiggle through it.

14          A better set of questions would have elicited the

15  criminal Q and A in the text exchange and not asked the why

16  because it does nobody -- it does the government's interest no

17  good and it opens the door to a lengthier examination.  But it

18  is also the case that Mr. Bhatia is assuredly not opening the

19  door in the sense that you mean, and I have every expectation

20  on Monday, with the benefit of focused examination, there will

21  be fewer why questions that invite the witness to riff, as he

22  is apt to do.

23          So I don't think the door has been opened at this

24  point.

25          Mr. Bhatia, a sense of how much longer you will be in

A-969

832

K1odtem7

1   this -- I am not limiting you, he is an extremely important

2   witness, but just for planning purposes, any sense of how much

3   longer you will be?

4           MR. BHATIA:  I think in the 20- to 30-minute range.

5           THE COURT:  OK.  I am not limiting you.  I appreciate

6   the importance of the witness.

7           And then, Mr. Gelfand, you will be able to do the

8   redirect that is occasioned, and I won't hold you to it.  I am

9   not going to make you estimate in the middle of the cross.

10          All right.  Defense, putting aside the question of

11  Mr. Teman's potential testimony, at this stage of the game,

12  without holding you to it, should we expect other defense

13  witnesses?

14          MR. GELFAND:  Can I confer with my client for a

15  moment?

16          THE COURT:  Of course.  Of course.

17          (Pause)

18          MR. GELFAND:  Your Honor, putting aside the

19  possibility of Mr. Teman testifying, without waiving any right

20  to change our mind, we don't anticipate any further witnesses.

21          THE COURT:  All right.  I appreciate you not waiving

22  any right.

23          Look, I will then -- assuming that stays the case, I

24  will need an answer from you promptly upon the conclusion of

25  this witness' testimony as to whether Mr. Teman is going to

833

K1odtem7

1    testify.  I don't ever require, of course, defense counsel to

2    make that call until all information is in.  It does have a

3    bearing on our planning for the day.

4              Can you give me any sense, because I would do a charge

5    conference right at the end of the conclusion of the close of

6    the evidence -- let me try it this way.  Without holding it to

7    you, to anything, are we likely to have a charge conference in

8    the morning or the afternoon on Monday?

9              MR. GELFAND:  I hate it to give you a lawyerly answer,

10   but 50/50, your Honor.

11             THE COURT:  Fair enough.  OK.  Well played.  That's

12   fine.

13             What I would say is if there comes a point at which

14   you have a more determinate sense, even though you are not

15   bound, if only for planning purposes, because it affects the

16   break we are going to take with the jury, it affects a variety

17   of things, it would be useful to know.  I expect my chambers

18   and I will have a charge drafted, and there is a good

19   likelihood we will give it to you on your tables -- I'm not

20   committing to this -- at the beginning of the day so that we

21   can swing right into a charge conference as soon as the

22   evidence is completed.  If not, I need to give you at least a

23   half hour to absorb it, and so I may well do that because I do

24   want to make good use of our time with the jury.

25             MR. GELFAND:  One more question.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-971

K1odtem7

1      The Court's local rules, when we were preparing our

2  proposed jury instructions, basically advised not to submit

3  the, quote-unquote, standard instructions on reasonable doubt,

4  etc.

5      THE COURT:  Right.

6      MR. GELFAND:  Which is totally fair enough.

7      Would it be possible if there someplace that I could

8  get a copy of the Court's reasonable doubt instruction prior to

9  Monday?

10      THE COURT:  I imagine we can send you the charge in

11  the criminal case that we had this fall, and I expect that that

12  should substantially track what I have.

13      MR. GELFAND:  That will be great.

14      THE COURT:  That is fine.  I am happy to do that.  I

15  am sure the U.S.'s Attorney Office has it as a party to that

16  case, so I am happy to even scales in that way.  I expect that

17  directionally will give you a sense of the basic familiar

18  general instructions, including but not limited to reasonable

19  doubt.

20      MR. GELFAND:  Thank you, your Honor.

21      THE COURT:  Look, in that vein, let's just go through,

22  while I have you, a handful of issues which may assist me and

23  my staff in excising things that we thought might be relevant

24  but we're not sure.

25      Law enforcement witnesses, I usually have an

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-972

835

K1odtem7

1    instruction on that.  I take it nobody at this point intends to

2    call any law enforcement witness?

3              MR. BHATIA:  That is right.  We don't intend to.

4              MR. GELFAND:  That is correct, your Honor.

5              THE COURT:  All right.  One second.  Off the record.

6              (Discussion off the record)

7              THE COURT:  Expert witnesses also out, correct?

8              MR. BHATIA:  Yes, your Honor.

9              MR. GELFAND:  Yes, your Honor.

10             THE COURT:  Character witness, out, right?  We are

11   nothing going to have on redirect some character testimony from

12   this witness here, correct?

13             MR. GELFAND:  No, your Honor.  I expressly avoided it.

14             THE COURT:  We had stipulations of fact.  We have not,

15   however, had any stipulation testimony, correct?

16             MR. BHATIA:  Correct.

17             THE COURT:  OK.  Charts and summaries.  It looks like

18   the charts that were created were inherent bank record charts,

19   not charts created by counsel for purposes of litigation,

20   right?

21             MR. BHATIA:  Correct.

22             THE COURT:  So there is no need for a charts and

23   summary instruction?

24             MR. GELFAND:  Correct, your Honor.

25             THE COURT:  All right.  Redaction of evidentiary

A-973

836

K1odtem7

1    items.  I think you are going to fix that one redaction?

2              MR. BHATIA:  That is right.

3              THE COURT:  I will get rid of that.

4              Use of evidence obtained pursuant to a search.  That

5    we've never -- the check stuff is out, right?

6              Persons not on trial.  Almost always, but not always,

7    there is an instruction admonishing the jury to disregard why

8    other people haven't been charged.  This doesn't feel like that

9    kind of case.  There is generic testimony about other people at

10   the defendant's companies.  There is, of course, Mr. Reinitz.

11   I just don't think anyone here is close enough to the issue to

12   merit that, and I assume there is no jury argument that's

13   likely to touch close to that point.  So, I'm inclined to get

14   rid of that standard instruction.

15             Anyone disagree?

16             MR. GELFAND:  We do not disagree.

17             MR. BHATIA:  That sounds fine.

18             THE COURT:  All right.  OK.

19             As to substantive instructions, I had received the

20   government's letter with respect to the unanimity instruction

21   and the special verdict.  Without binding myself, my present

22   inclination is to split the baby in this respect.  I don't

23   think there is really a good reason for a special verdict here.

24   Nobody has asked me to do it.

25             But -- Mr. Gelfand is whispering to his co-counsel --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1odtem7

1    nobody has asked me to do that, and I have repeatedly been

2    stirring the pot on that issue.  My present inclination,

3    though, is I think the following.  I think there is probably a

4    value for a unanimity instruction.  And specifically what I

5    would envision at this point is that it would require unanimity

6    as to the particular, in effect, customer -- not at the level

7    of the check but at the level of the customer.  But let's take

8    a moment and talk through that because I'm open to being

9    persuaded.  But here's the thought.

10       The way this case has played out, the central issue

11   involves whether the defendant had the requisite state of mind,

12   and that in turn turns on the defendant's views about whether

13   or not the particular customer group authorized or didn't

14   authorize him not generically to do remotely created checks

15   necessarily but to do these checks, these remotely created

16   checks.  And I expect there will be further examination about

17   the particular checks and not the concept of it.

18       Each of the three customer relationships is its own

19   narrative.  There is no reason to think that those analyses

20   necessarily rise or fall together, and different jurors may

21   have different views about the different relationships.  And

22   you can have the scenario in which four jurors find for guilt

23   for each of the three relationships and there is no overlap,

24   and in that theoretical situation, you could have -- without a

25   unanimity instruction, you could have a conviction even though

A-975

838

K1odtem7

1   you don't even have half of the jury agreeing on a particular
2   person who was defrauded.

3          It was the government's choice to press the multiple
4   customers into individual counts, and that was not
5   impermissible.  It was understandable why it was done,
6   particularly insofar as the checks were commonly presented at
7   the same time and they had a similar manner of presentation and
8   the like.  It was a valid charging decision.  I would note that
9   the charges could have, for example, taken the April conduct
10  and broken it into three separate bank fraud counts directed at
11  the individual customer.

12         It is not my business why the government proceeds as
13  it does, but where I am left is in effect with, for example, a
14  bank fraud count that has three different customers embedded in
15  it and three different narratives relating to authorization in
16  fact or perceived authorization on the part of the defendant.
17  In the interest of care, in the interest of making sure that
18  there is no doubt that if there is a conviction here it is
19  based on unanimity as to a particular customer relationship, a
20  unanimity verdict is helpful here.

21         Otherwise, government, I will make the obvious point,
22  which is in the event that I do not have a unanimity
23  instruction and in the event that there is, for example, a
24  sufficiency issue as to one set of customers and not the
25  others, at that point your verdict is imperiled.  In contrast,

K1odtem7

1   if there is a unanimity instruction, the issue becomes whether

2   or not there is sufficient evidence as to any one of the three.

3   See <u>U.S. v. Garcia</u>.

4          So my rather strong inclination here is whatever the

5   academic argument is here about the distinction between bank

6   and wire fraud, what is decisive here are the facts of this

7   case in which we have three very different narratives that

8   happen to be legitimately but electively joined in the same

9   count.  I think the greater interest of prudence is requiring

10  forcing the jury to focus at the level of the customer

11  relationship to make sure that the defendant had the intent to

12  defraud that specific customer relationship.

13         Let me begin with the defense.  Defense counsel, I

14  take it you are not asking for specificity at the check level;

15  there is really no basis for differentiating by check, it's at

16  the customer level, right?

17         MR. GELFAND:  Correct, your Honor.  We would ask that

18  the customer level, they all group together, in our view, based

19  on what the evidence has actually shown.

20         THE COURT:  What is your view about the unanimity

21  instruction at the customer level as opposed to none at all?

22         MR. GELFAND:  We would request a unanimity

23  instruction.

24         THE COURT:  For wire as well as bank fraud?

25         MR. GELFAND:  Yes, your Honor, because based on how

A-977

840

K1odtem7

1    the case is charged, there is a very real risk of the jury not

2    unanimously, to state the obvious, agreeing that there is, in

3    the event of a conviction, on what they are actually agreeing

4    on.

5              THE COURT:  Right.

6              MR. GELFAND:  That is the --

7              THE COURT:  It sounds like you and I are on the same

8    page based on what I put forward to you, but I wanted to test

9    it with everyone.

10             You are not asking for anything more than that and you

11   don't want less?

12             MR. GELFAND:  Correct, your Honor.

13             THE COURT:  OK.  Government, I read your letter with

14   interest, but it seemed to be more theoretical than real.  It

15   doesn't engage with the unique facts of this case in which

16   Bonnie Soon-Osberger may present, for example, a stronger

17   argument for the government than one or both of the other

18   customer relationships, and I want to make sure just that the

19   jury doesn't pick and choose and mix and match and come to 12

20   on different theories.

21             MR. BHATIA:  Your Honor, you know, I understand and I

22   hope you don't think that we're banging our head against the

23   wall.

24             THE COURT:  I'm not, but I want to make sure you are

25   engaged at a practical level here.

K1odtem7

1      MR. BHATIA:  So the practical point is real.  As

2  Mr. Imperatore and I in our offices were thinking about how to

3  draft the proposed instruction, I think that exposed some of

4  the problems here with giving a unanimity instruction.  Here,

5  the victim is Bank of America, undoubtedly, for the bank fraud

6  charge, and, therefore, it does seem awkward to put the focus

7  on which of the three entities is -- and you mentioned just

8  now --

9      THE COURT:  Wait.  I am going to interrupt you and

10  just indulge this hypothetical.

11      Jurors 1 through 4 believe that Mr. Teman intended to

12  defraud by pretending he had authorization as to one customer.

13  5 through 8, another customer.  9 through 12 another customer.

14  None of that is good, but in what sense can we really say that

15  there is an agreement -- an intent to defraud that embraces the

16  same conduct?  I understand that four separate people think he

17  had intended to defraud with respect to different conduct, but

18  it's ultimately the fact that you can stitch together 12 people

19  who believe that he intended to defraud by different actions

20  rips apart the mens rea and the actus reus requirements.

21      MR. BHATIA:  We see that, though, your Honor, as

22  really the means of meeting the elements.  Here they would be

23  unanimous -- of course they should be unanimous as to the

24  elements, but they don't necessarily need to be unanimous as to

25  the means under which this scheme to defraud is executed.

A-979

842

K1odtem7

1          THE COURT:  That presuppose that it is a unitary

2    scheme, and the problem is that there is no symbiosis among the

3    interaction with different customers.  It is not as if to make

4    the Soon-Osberger fraud go, you need the Soleimani fraud to go.

5    They are operating temporally in tandem, but there is no

6    interrelationship among them.  Your argument would be stronger

7    if there was some way in which these interlock but it is

8    essentially parallel conduct.

9          MR. BHATIA:  I think they do interlock, your Honor, in

10   the sense that he deposits -- let's take April for example --

11   27 checks at once, moved that money out of the account before

12   Bank of America could get it back, and then Bank of America

13   suffered a loss.  So I think the idea of -- we don't think that

14   needs to be unanimous as -- that the jury needs to be unanimous

15   as to a particular counterparty here.  Ultimately, they are all

16   of the means under which this scheme is accomplished.

17         THE COURT:  That seems very academic to me.  I mean,

18   in other words, if there is no, you know -- there are two means

19   of bank fraud, for example.  There is scheme to defraud and

20   there is false statements.  Let's suppose we go off on the

21   false representations version of it.  You would in that

22   situation literally have a situation in which the bank is being

23   told separate false statements, distinct ones according to

24   which quartet of jurors we are talking about, where the bank is

25   being told a false statement about customer A in the view of

A-980

843

Klodtem7

1    jurors 1 through 4 and customer B in the view of 5 through 8

2    and customer C in the view of 9 through 12. In that omniscient

3    situation, which is exactly what the Second Circuit would play

4    out and envision on well-briefed appeal, you've got a huge

5    problem proceeding on that theory of bank fraud.

6            So at a minimum, if you are not going to have a

7    unanimity instruction, that theory, the false representation

8    theory of bank fraud, goes out the window because those are

9    distinctly false statements.

10           The scheme to defraud theory of bank fraud perhaps is

11   a little bit different insofar as you may be saying to

12   yourself, well, it depends what the solvency is of the bank

13   account. I'm not sure that justifies dispensing with what

14   seems to be a well-conceived instruction here.

15           I'm also, if I may, unclear why you are fighting about

16   this. I mean, just even from a strategic perspective, why do

17   you care?

18           MR. BHATIA: I think it is our view that the focus

19   here in the bank fraud charges should be on Bank of America as

20   the victim.

21           THE COURT: Sure.

22           MR. BHATIA: And I think it is difficult to write a

23   unanimity instruction that keeps the focus on Bank of America

24   as the victim here while also --

25           THE COURT: You have insufficient confidence in my

844

K1odtem7

1  crack legal staff.  We've got that one covered.  I mean, we

2  will work on the language, but we will keep the focus on the

3  fact that the victim here as alleged is the bank insofar as it

4  was falsely told -- made a representation about authorization

5  and the end result of it was exposing it to the risk of loss.

6  I got that.  But in the end, there is a grave risk of, in a

7  very real sense, a lack of unanimity, and the different

8  narratives that came out from each customer group, regardless

9  of how one sorts them in terms of stronger or less strong from

10  each side's perspective, are nevertheless different.  Each has

11  its own little story to tell.

12          MR. BHATIA:  Understood, your Honor.  I mean --

13          THE COURT:  I would have expected a different take

14  from you, which is why would we be playing with fire?

15          MR. BHATIA:  No.  We consulted with Appeals, including

16  our Chief of Appeals, and we spoke to the office and to get the

17  sense of what's the right charge here, and the sense was that

18  there does not need to be unanimity as to the particular means

19  under the bank fraud statute.

20          THE COURT:  Let me ask you, under wire fraud, the

21  victim is still the banks, right?

22          MR. BHATIA:  That is right.

23          THE COURT:  OK.  I mean, so you in effect would want a

24  wire fraud unanimity instruction not I take it because there

25  are different victims but because there are different wirings?

A-982

845

K1odtem7

1          MR. BHATIA:  Your Honor, one moment.

2          THE COURT:  Yes.

3          (Pause)

4          MR. GELFAND:  Your Honor, Mr. Reinitz, as I understand

5     it, observes shabbat.

6          THE COURT:  Sorry.  The Terry stop is over.  He is

7     free to leave.  Get him out of here.

8          MR. GELFAND:  Thank you.  I was just concerned about

9     the shabbat.

10         THE COURT:  Sorry about that.  You've got it.

11         Counsel, am I keeping you as well?

12         MR. GELFAND:  No.

13         THE COURT:  And, Mr. Teman, are you observant?

14         THE DEFENDANT:  I am --

15         THE COURT:  We will have you out of here soon.

16         MR. BHATIA:  I'm sorry, your Honor, what was the

17    question?

18         THE COURT:  We are on wire fraud.  Now, the victim of

19    the bank, the victim is the bank as to wire fraud.  As to that,

20    you do not resist a unanimity instruction, but I take it it is

21    not because of the separate victims, it is because each

22    separate victim implicates a separate wire or wires.

23         MR. BHATIA:  That's right.  There the buyers are one

24    of the elements.  But I think we're fine if your Honor is going

25    to give a unanimity instruction as to one, it is fine to give

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Klodtem7

1    it.

2          THE COURT:  Yes.  I take it if over your stout

3    resistance I give a unanimity instruction for all counts, you

4    agree that the right unit of measure is the customer

5    relationship, not the individual check?

6          MR. BHATIA:  Well, I think, your Honor, I think that

7    was part of the difficulty with writing that instruction.  I'm

8    not sure I have a principled reason why it should be the

9    customer as opposed to the check, but I think as a practical

10   matter it seems reasonable to pick the customer but --

11         THE COURT:  If there was a meaningful -- within the

12   universe of each customer, if there really were significant

13   differences among the checks, I think one could have that

14   debate.  Under the circumstances here, maybe there is a smaller

15   check which somehow or other can be justified as a payment that

16   has been announced to the customer and had never been paid.

17   But I am quite confident that your argument would be as to each

18   customer, at least the vast majority of these checks were never

19   announced, never invoiced, and he well knew that the customer

20   was never -- would resist the claim of authorization, whatever.

21         So it seems to me that for the most part, the

22   customer -- the checks rise and fall together by customer

23   group.  But even if one was to hive off a smaller check within

24   that universe, the argument still stands that as to that

25   customer relationship, you have the arguments and inferences.

K10dtem7

1    You will argue that why most or all as to each customer group

2    are unauthorized and the defense has its counterarguments.

3         MR. BHATIA:  I think that is right, your Honor.  I

4    think what you said is exactly right.  If there is a unanimity

5    instruction, then I think it makes sense to do it at the entity

6    level.

7         THE COURT:  OK.  Let me just offer a thought just as

8    to the charge.  I mean, this will be a very familiar -- the

9    charge will be a very familiar bank and wire fraud charge here,

10   which is really right down the middle in the standard SDNY

11   charge.  You should not -- as you are thinking about

12   potentially summing up, which could easily happen on Monday,

13   you should be expecting a very familiar charge.

14        With respect to bank fraud, I will instruct them that

15   the first element is the existence of the scheme, and I will

16   break out the two means in which that can be done.  But many of

17   the concepts are the same across the two schemes.  So I would

18   not spend a great deal of time -- it is up to you -- being

19   terribly academic about the distinctions here between the two

20   species of bank fraud.  I will do my duty and instruct them on

21   it, but the nature of the charge does not, you know, sort of

22   hive them radically apart.  It's a very familiar charge.  The

23   second element, of course, is the state of mind element, and

24   the third involves the federally insured financial institution.

25        The wire fraud charges in turn pick up a lot of the

A-985

848

K1odtem7

1    earlier language, including the concept of a scheme to defraud;

2    knowing, willful participation; and the use of the -- in this

3    case, the use of the wires.

4              I will have an intent instruction.  I assume that that

5    was questioned and that is sought.

6              Government, correct.

7              MR. BHATIA:  That's right.

8              THE COURT:  And after that, there would be a unanimity

9    instruction, words to be finalized.

10             And then I expect in the following sequence I will

11   have good faith, advice of counsel, and conscious avoidance, if

12   that is still sought.

13             Is that still sought?

14             MR. BHATIA:  One moment, your Honor.

15             THE COURT:  Mm-hmm.

16             (Pause)

17             MR. BHATIA:  Your Honor, we'll think further about it,

18   but we're inclined at this point to include it.

19             THE COURT:  To include it?

20             MR. BHATIA:  To include it.

21             THE COURT:  Without holding you to it, what is the

22   easiest factual basis for a conscious avoidance charge at this

23   point?

24             MR. BHATIA:  I think the easiest factual basis is that

25   the defendant deliberately avoided asking his clients' express

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

849

K1odtem7

1    permission to withdraw the funds to avoid knowledge that they

2    do not approve that.

3         THE COURT: In other words, to give him, from your

4    perspective, the fig leaf of being able to recite the fact of

5    terms and conditions knowing full well that Bonnie, you know,

6    Soon-Osberger was not -- her co-op wasn't approving an $18,000

7    charge?

8         MR. BHATIA: Right. He is not asking for explicit

9    authority so that you can have a defense that there is some

10   ambiguity there.

11        THE COURT: Of the charges that are at issue, if I may

12   ask you, how many, if any of them, were actually invoiced ever

13   by the defendant to the customer groups? There are 29 checks

14   in total, 27 plus two. How many of them, if any, were

15   invoiced?

16        MR. BHATIA: My recollection is that none of them were

17   invoiced for the values -- prior to being charged, none of them

18   were invoiced for the values of the checks.

19        THE COURT: And had prior debts of those customers

20   been invoiced?

21        MR. BHATIA: Prior -- for some of the customers, some

22   of the prior debts had invoices. Some prior debts had been

23   invoiced but they weren't in the values --

24        THE COURT: Right. I'm playing with the conscious

25   avoidance question. And if the theory is that the defendant's

A-987

850

Klodtem7

1    conduct towards the customers reflects conscious avoidance by

2    denying the customers the obvious, to declare as to

3    authorization, the factual predicate is stronger if as to

4    the -- if the amounts previously paid, those had all been

5    invoiced as to the RCC checks, there had been no preceding

6    invoice.  Is that factually what the record shows?

7              MR. BHATIA:  I believe for at least some -- some of

8    the three -- one or two or three of the three customers, there

9    had been intervening invoices between the initial payment for

10   an intercom and then the unexpected chargeback, unexpected --

11             THE COURT:  Sorry.  Does it track any of the specific

12   amounts of the checks that were RCCs?

13             MR. BHATIA:  No.  I believe they do not.

14             THE COURT:  To the extent that that is uniformly true,

15   I would think it supplies -- although I would be happy to hear

16   arguments from the defense on Monday -- a basis, a factual

17   basis for a conscious avoidance charge.  To the extent that

18   that pattern doesn't generally apply, it's on a weaker basis.

19   So to the extent to which there is a non-sending of invoices in

20   the amounts and for the purposes that the RCC checks are there

21   and to the extent that the defendant's historical business

22   practice had been to invoice for amounts that were in fact

23   paid, it seems to me that's the stronger argument for a

24   conscious avoidance charge.

25             You need to do your homework to confirm factually how

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-988

851

K1odtem7

1    much that is true.

2         MR. BHATIA:  Your Honor, I think the invoices are only

3    one part of the conscious avoidance.  I think the other parts

4    are that the evidence showed from the testimony of the

5    witnesses that the defendant threatened them with law suits or

6    liens or reporting to a District Attorney's office, but never

7    said "If you don't pay me, I'm just going to take it," and I

8    think that missing piece is, I think that is also --

9         THE COURT:  But that is consciousness of guilt, that

10   is not conscious avoidance.  Conscious avoidance is avoiding

11   information.  Consciousness of guilt is the dog isn't barking;

12   it is the things he is not saying.

13        MR. BHATIA:  Understood.

14        THE COURT:  The issue is the factual predicate for the

15   conscious avoidance charge.  I think you answered the question

16   straight up initially, which is it is the lack of notice to the

17   victims either of the pending RCC or the claim of the debt due

18   in contrast to the prior behavior.

19        MR. BHATIA:  Understood.

20        THE COURT:  All right.  Let me ask just on the

21   advice-of-counsel defense.  Government, I appreciate the cross,

22   you are in the middle of it.  I am not going to ask you to

23   front the balance of it.  At this point, government, is there

24   any real dispute that a charge of advice of counsel tracking

25   Scully is merited regardless of your argument about whether the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

852

K1odtem7

1    defendant made or didn't make, say, full disclosure?

2            MR. BHATIA:  We do not oppose a charge on advice of

3    counsel.

4            THE COURT:  All right.  Then counsel should expect as

5    you are preparing for jury argument a charge that resembles

6    very closely the first variant that appears in <u>Scully</u>.

7            All right.  Any other way I can be useful to you?  I

8    am happy to give you some, you know, generic preview of the

9    charge.  It is useful just because I am mindful that hard

10   working counsel will be preparing over the weekend.

11           One moment.

12           (Pause)

13           Sorry.  My law clerk tells me the following -- and I

14   hadn't picked this up; good for you to catch this -- that there

15   is no Section 2 charge with respect to bank fraud.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

k1ovtem8

1          THE COURT:  There's no Section 2 charge, I am told, in

2    the indictment for either count, bank or wire fraud.  That

3    would get an aiding and abetting.

4          For attempt, what's the legal basis for an attempt

5    charge, and are you seeking it for both categories of charges

6    or just one?  I think we thought in your proposed requests to

7    charge, you had it for just bank fraud attempt?

8          THE LAW CLERK:  The defense requested for bank fraud.

9          THE COURT:  Sorry, the defense?

10          THE LAW CLERK:  Yes.

11          THE COURT:  Sorry.  Defense counsel, you sought

12    attempt for bank fraud?

13          MR. GELFAND:  Your Honor, I think that was probably

14    just an inadvertent inclusion.

15          THE COURT:  So 1344, bank fraud, includes the words

16    "attempt" within it.  There's a charging basis for attempt.

17          And wire fraud, curiously, does not by terms include

18    the word "attempt."  What are counsel's views about an attempt

19    charge in the case?

20          MR. GELFAND:  Your Honor, speaking for the defense, I

21    think that with respect to wire fraud, there's no basis for an

22    attempt charge.

23          THE COURT:  Because it's not in this statute.

24          MR. GELFAND:  It's not in the statute or the

25    indictment.

k1ovtem8

1    THE COURT:  It's not in the statute.  And I think

2    Section 2 would provide a freestanding basis for attempt, but I

3    don't think it's charged.

4    MR. GELFAND:  It's not in the indictment, your Honor.

5    THE COURT:  No.  In fact, actually, Section 2 is

6    purely aiding and abetting, not -- it's secondary liability,

7    not attempt liability.  So it's really a statutory issue.

8    MR. GELFAND:  I think, as far as bank fraud, in

9    theory, one could envision a scenario.  I don't think, based on

10   the facts that have actually been brought out in this case this

11   is an attempt versus not attempt case.

12   THE COURT:  Well, suppose if he had had enough money

13   in the account, the bank might not have been left holding the

14   bag if they could have drained his account and made everybody

15   whole.

16   Government, what's your view?

17   MR. BHATIA:  I think there is a factual predicate,

18   your Honor.  I think the fact of the chargebacks sort of puts

19   it on its face.  The defendant may not have wanted the

20   chargebacks to happen and wanted to keep the money outright in

21   his main account.  Because of the chargebacks, he had to give

22   some of it back.  I think that's, on its face, the factual

23   predicate.

24   THE COURT:  All right.  Look, I'm going to reflect on

25   this.  I think my starting premise -- I'm trying to be as

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-992

855

k1ovtem8

1    transparent as I can for everybody's planning purposes -- is

2    that I likely would include an attempt charge, but only as to

3    bank fraud insofar as this statute provides a statutory hook

4    for it.

5            Any other questions, anything I can be useful for you

6    on before we adjourn?

7            MR. BHATIA:  Your Honor, we'd just like to ask the

8    Court to make clear its view on defense counsel conferring with

9    witnesses while they are on cross-examination.  It's our view

10   that's not appropriate.

11           THE COURT:  Defense counsel, I'm sure I don't need to

12   tell you this, but Mr. Reinitz is on cross; he is not to be

13   conferred with, save making sure that he gets to court on time.

14           MR. GELFAND:  Not an issue, your Honor.

15           THE COURT:  Right.  I assumed as much.

16           Fair point.  All right.

17           MR. DiRUZZO:  And one thing, your Honor.  Given that

18   it's New York and it's January, inclement weather is obviously

19   a real possibility.  How do we go about checking to make sure

20   that we're going forward and in the event that there is bad

21   weather, there's a possibility that you would effectively

22   override that and we would still have to show up.

23           THE COURT:  Sorry.  Is this a case or controversy?  Is

24   there a bad-weather forecast?

25           MR. DiRUZZO:  Honestly, I haven't checked, your Honor.

A-993

k1ovtem8

1   But I'd rather ask it.

2          THE COURT:  All right.

3          We have your email addresses, right?

4          MR. DiRUZZO:  Yes.

5          THE COURT:  We'll be in touch with you.

6          MR. DiRUZZO:  Okay.

7          THE COURT:  But generally, through rain or snow or

8   sleet or hail, we try to keep the jury trial going.  So unless

9   there's something really, you know, millennially bad about the

10  weather, we'll be going forward on Monday.  Okay?

11         Very good.

12         MR. GELFAND:  One local practice question, your Honor.

13         THE COURT:  One what?

14         MR. GELFAND:  One quick local practice question.

15         For closing argument, it's my understanding from your

16  comments before that you instruct the jury after closing

17  arguments.

18         THE COURT:  Right.  Right.

19         MR. GELFAND:  I presume that it's fair game for us to

20  reference anticipated instructions.

21         THE COURT:  Yes.  Thank you for asking.  Yes.

22         So in civil cases, I have taken to charging the jury

23  before closing argument for just the reasons you acknowledge,

24  which is essentially that although we always tell the jury that

25  they are the finders of the facts, in fact, what they are also

A-994

857

k1ovtem8

1    doing is applying the law to the facts.

2            In civil cases I feel comfortable to give them the

3    charge and then let the -- and that empowers everybody to

4    literally apply the judge's words to the facts in their

5    argument to the jury.

6            In a criminal case I don't do that, largely because in

7    the event that subsequent issues arise, I don't want the jury

8    to assign undue weight to the one instruction that I give after

9    the closing arguments.  There's just too much risk in a

10   criminal case.

11           But I don't want you quoting me directly.  But

12   relative to many judges, I give you more latitude so that, in

13   concept, you should say, Look, as I expect Judge Engelmayer

14   will instruct you, there are three elements of wire fraud.  You

15   are at liberty to do that, just be super-duper careful.  You

16   don't want to be in a situation where you are saying something

17   that is characterizing or incorrect.  And I ask you not to make

18   direct quotes, but I give you a fair amount of latitude because

19   I want you to be able to argue the application of law to fact.

20           MR. GELFAND:  Thank you.

21           THE COURT:  And so in particular, as a true advice of

22   counsel, it would be fair game for you to say, as long as it's

23   accurate, I expect that Judge Engelmayer will instruct you that

24   under certain circumstances, a defendant may -- fill in the

25   dots.  And you'll have the instruction, and it will be the

A-995

858

k1ovtem8

1    first *Scully* version, so you'll be able to use that in

2    formulating what you do.

3                MR. GELFAND:  Thank you.

4                THE COURT:  All right.

5                Anything further from the government?

6                MR. BHATIA:  Nothing further.

7                THE COURT:  Anything further from the defense?

8                MR. GELFAND:  No, your Honor.

9                THE COURT:  All right.  Thank you for a very

10   efficient, interesting week.  And I appreciate the caliber and

11   vigor and dedication of the advocacy on both sides.

12               You can leave your stuff here.  I would urge you to

13   just tidy it up a bit.  I'm not indemnifying anybody, but

14   you're welcome to keep your stuff here.

15               Please do, defense counsel, just as a professional

16   courtesy, without binding you in any way, to the extent you can

17   give all of us by informal chambers' email some sense, if you

18   have any sense of when I may be charging the jury, we'll put it

19   that way, that would be useful, because it affects

20   Mr. Smallman, it affects food ordering, it affects a variety of

21   things.  Okay?

22               MR. GELFAND:  Will do, your Honor.

23               THE COURT:  Very good.  Thank you.

24               Have a good weekend, everybody.

25               (Adjourned to January 27, 2020 at 9 o'clock a.m.)

```
 1                    INDEX OF EXAMINATION

 2    Examination of:                           Page

 3    JOSEPH SOLEIMANI

 4    Direct By Mr. Bhatia . . . . . . . . . . . . 560

 5    Cross By Mr. Gelfand . . . . . . . . . . . . 576

 6    Redirect By Mr. Bhatia . . . . . . . . . . . 647

 7    JOHN MOTTO

 8    Direct By Mr. Bhatia . . . . . . . . . . . . 651

 9    Cross By Mr. DiRuzzo . . . . . . . . . . . . 686

10    ARIEL REINITZ

11    Direct By Mr. Gelfand . . . . . . . . . . . 730

12    Cross By Mr. Bhatia . . . . . . . . . . . . 798

13                    GOVERNMENT EXHIBITS

14    Exhibit No.                           Received

15     121-124, 127, 129, 130 and 131 . . . . . . 560

16     147  . . . . . . . . . . . . . . . . . . . 674

17     702  . . . . . . . . . . . . . . . . . . . 817

18     704  . . . . . . . . . . . . . . . . . . . 821

19                    DEFENDANT EXHIBITS

20    Exhibit No.                           Received

21     62  . . . . . . . . . . . . . . . . . . . 600

22     49  . . . . . . . . . . . . . . . . . . . 619

23     51  . . . . . . . . . . . . . . . . . . . 623

24     70  . . . . . . . . . . . . . . . . . . . 642

25     14  . . . . . . . . . . . . . . . . . . . 768
```

A-997

860

 1    15    . . . . . . . . . . . . . . . . . 783

 2    2    . . . . . . . . . . . . . . . . . 787

K1RVTEM1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                v.                         19 CR 696 (PAE)

5   ARI TEMAN,

6                Defendant.                 JURY TRIAL

7   ------------------------------x

8                                           New York, N.Y.
                                            January 27, 2020
9                                           9:00 a.m.

10

    Before:
11
                    HON. PAUL A. ENGELMAYER,
12
                                            District Judge
13

14                      APPEARANCES

15

    GEOFFREY S. BERMAN,
16       United States Attorney for the
         Southern District of New York
17  KEDAR S. BHATIA
    EDWARD A. IMPERATORE
18       Assistant United States Attorneys

19  JOSEPH A. DIRUZZO, III
    JUSTIN GELFAND
20       Attorneys for Defendant

21  ALSO PRESENT:  DANIEL ALESSANDRINO, NYPD
                   WILLIAM MAGLIOCCO, Paralegal, USAO
22

23

24

25

A-999

K1RVTEM1

1          (Trial resumed; jury not present)

2          THE COURT:  All right.  Good morning, everyone.

3      This morning I had my law clerk drop off to the

4  courtroom at 8:15 two copies for each side of the present draft

5  of the jury instructions.  And I'm going to give one copy to

6  Mr. Smallman to mark as Court Exhibit 1.  And I did so in

7  recognition of what appears to be a likelihood that we will

8  have a charge conference today, and perhaps on the early side

9  today.

10     In that regard, I was helpfully guided by an email

11 that I received from Mr. DiRuzzo projecting the likelihood of a

12 charge conference this morning.  And, Mr. DiRuzzo, I thank you

13 for that; because it certainly sharpened our understanding of

14 what the necessary schedule would be and, in turn, got me to

15 make sure that we had the charge to you earlier today so you'd

16 have some time to absorb it.  So thank you for that.

17          MR. DiRUZZO:  You're welcome, Judge.

18          THE COURT:  And again, not holding you to it, but I

19 take it that that is the defense's current intention.

20          MR. DiRUZZO:  Yes.

21          THE COURT:  Let me ask you this then, defense counsel:

22 Right now we have Mr. Reinitz still on the stand.  After he is

23 done with his testimony, am I correct to infer that right now

24 you do not expect to call any other witness?

25          MR. DiRUZZO:  As it currently stands, obviously

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1RVTEM1

1    subject to --

2              THE COURT:  I'm sorry.

3              MR. DiRUZZO:  As it currently stands, but subject to

4    consultation with our client --

5              THE COURT:  Right.

6              MR. DiRUZZO:  -- there will be no witnesses other than

7    potentially Mr. Teman.

8              THE COURT:  Than what?

9              MR. DiRUZZO:  Mr. Teman.

10             THE COURT:  Right.  Understood.

11             From your email, I inferred that at this point it is

12   relatively less likely than 50 percent that he would be

13   testifying and, hence, that there would be a charge conference

14   this morning.  Were Mr. Teman to testify, it almost would seem

15   to be a certainty that the charge conference would be, at the

16   earliest, this afternoon.

17             MR. DiRUZZO:  I agree.

18             THE COURT:  So I want to make sure I was reading those

19   tea leaves correctly.

20             MR. DiRUZZO:  You were.

21             THE COURT:  Okay.

22             Given that, may I ask this:  Does it make sense for me

23   now to allocute Mr. Teman on his right to testify?

24   Understanding that I will check in again with defense counsel

25   after the DiRuzzo testimony.  The reason I had this thought is

K1RVTEM1

1    that if I don't do that now, after Mr. DiRuzzo testifies, I

2    will need to bring you all to the sidebar -- sorry, not

3    Mr. DiRuzzo, Mr. Reinitz.  Forgive me.  I would need to then

4    bring you to the sidebar, confirm that Mr. Teman was not

5    testifying, kick the jury out for a five-minute, at most,

6    colloquy with Mr. Teman, bring them back in for you to rest,

7    and then likely kick them out again.

8              That seemed cumbersome.

9              And so if you're okay with my inquiring of Mr. Teman

10   now of his right to testify so that he understands that it's

11   his choice, and that doesn't in any way lock you in, but at

12   least that way we can get that exercise over with now and make

13   sure that it's clear on the record he knows that this is his

14   decision.  Is that okay with you, defense counsel?

15             MR. DiRUZZO:  Yes.

16             THE COURT:  Yes, both of you?

17             MR. DiRUZZO:  Yes.

18             THE COURT:  Okay.  Very good.

19             And have you had a chance to review this colloquy with

20   Mr. Teman?  I don't want him to be caught off guard.

21             MR. GELFAND:  Yes, your Honor.

22             We've discussed with Mr. Teman extensively the

23   decision of whether or not to testify.  It can certainly be

24   guided by the advice that he receives from his attorneys;

25   however, that decision is ultimately his, and his alone.

A-1002

865

K1RVTEM1

1      I'm confident that he understands that.  I'm confident

2      that he still understands that even if he changes his mind

3      after Mr. Reinitz finishes his testimony, that he understands

4      that the Court will obviously permit him to testify or not to

5      testify as he chooses.

6           THE COURT:  Very good.  All right.

7           I think that answers all of those questions.

8           Let me just take this up with Mr. Teman.

9           Mr. Teman, good morning.

10           THE DEFENDANT:  Good morning, your Honor.

11           THE COURT:  I hope you had a restful weekend.

12           THE DEFENDANT:  As best you could under the

13      circumstances.

14           THE COURT:  Of course.  Of course.

15           So I'm obliged to have an on-the-record discussion

16      with you making sure that you understand that ultimately the

17      decision whether to testify on your own behalf is your

18      decision, not your counsels'.  So I just need to go

19      step-by-step through a few questions with you.

20           Have you discussed with your counsel -- just yes or

21      no -- whether or not you ought to testify in this case?

22           THE DEFENDANT:  Yes.

23           THE COURT:  And has counsel made clear to you that

24      ultimately that is your decision, not counsels' decision?

25           THE DEFENDANT:  Yes.

A-1003

866

K1RVTEM1

1          THE COURT:  Do you understand that it is ultimately

2   your decision, not counsels' decision?

3          THE DEFENDANT:  Yes.

4          THE COURT:  And even if counsel were to recommend a

5   different course, it is your call, not theirs, whether to

6   override them.

7          THE DEFENDANT:  Yes.

8          THE COURT:  Do you have any questions for me about

9   that issue, as to whose decision it is?

10          THE DEFENDANT:  No, your Honor.

11          THE COURT:  All right.

12          At this point -- counsel has represented to me that at

13   this point your decision is not to testify.  Understanding that

14   developments during the balance of the Reinitz examination, or

15   if something else happens during that part of the trial, could

16   change your mind, at this point, is it your determination not

17   to testify?

18          THE DEFENDANT:  That's correct, your Honor.

19          THE COURT:  All right.

20          And is that something that you have given substantial

21   thought to?

22          THE DEFENDANT:  Very much, your Honor.

23          THE COURT:  Is that something you've spent substantial

24   time speaking with your able counsel about?

25          THE DEFENDANT:  Yes, your Honor.

A-1004

K1RVTEM1

1         THE COURT:  All right.

2         And to be clear, the decision at this point not to

3    testify is yours; it is not something that's being forced on

4    you, but it's an independent decision that is yours to make and

5    that you are making.

6         THE DEFENDANT:  Yes, your Honor.

7         THE COURT:  Okay.

8         In the event that, at the close of the defense case --

9    let me try -- let me back that up.

10         After Mr. Reinitz testifies, I will turn to the

11    defense and say, Defense, or defense counsel.  And I expect,

12    based on your current inclination, that defense counsel would

13    then say:  The defense rests.

14         If that is so, I will be taking that as connoting that

15    you have checked in again with them, and have reaffirmed your

16    decision not to testify; and that you continue to understand

17    that it's your decision.

18         THE DEFENDANT:  Yes, your Honor.

19         THE COURT:  Understand.

20         So that's how I'm going to interpret it if the defense

21    says that you are -- that the defense rests.  Okay?

22         THE DEFENDANT:  Yes.

23         THE COURT:  Anything else any counsel believes I need

24    to take up with Mr. Teman with respect to his right to testify?

25         MR. GELFAND:  Just briefly, your Honor, I just make a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1005

868

K1RVTEM1

1   record that Mr. Teman has discussed this independently with

2   Mr. DiRuzzo and with me, and jointly with Mr. DiRuzzo and with

3   me.  We've had many discussions.

4               THE COURT:  Very good.

5               Mr. Teman, is that correct?

6               THE DEFENDANT:  Yes, your Honor.

7               THE COURT:  Good.  I'm glad to hear it.

8               I take it, Mr. Teman, you are satisfied, as well, with

9   the representation you've had at this trial?

10              THE DEFENDANT:  Extremely satisfied, your Honor.

11              THE COURT:  You should be.

12              THE DEFENDANT:  Thank you.

13              THE COURT:  Okay.  Very good.

14              All right.  Then just walking through this process,

15  defense counsel, if you need more time, if, after the Reinitz

16  testimony ends you're not prepared at that moment to rest, but

17  need some time with your counsel, when I turn to you and say,

18  Defense, I'm certainly happy to excuse the jury briefly because

19  I'm mindful of the gravity of this moment in the case.  And if

20  you need to check back in with Mr. Teman, I'll give you the

21  opportunity to do so; I'd ask you to only do that if there is

22  actually really something to be discussed.

23              MR. GELFAND:  Absolutely.

24              THE COURT:  Okay.

25              But I certainly will honor that request.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1RVTEM1

1      All right.  Let me just cover some ground that I asked

2   my law clerk just to remind counsel of when she came

3   downstairs.

4      There are a number of documents that need to go to the

5   jury in connection with their deliberations.  There are, of

6   course, the charges.  And once I have the charge in final, I

7   will have a copy of the charge for each juror.  That's for my

8   chambers to prepare.

9      We've also prepared a verdict sheet, a verdict form,

10  which is as simple as can be; it literally reads:  All verdicts

11  must be unanimous.  Please indicate your verdict with a

12  checkmark, and even draws a picture of a checkmark.  And then

13  afterwards, for each of the four counts says "guilty or not

14  guilty," and it essentially tracks the verdict form that had

15  been provided to me earlier.

16     In contrast to that though, I've included signatures

17  for all 12 jurors, as is my practice.

18     I'll hand a copy to counsel momentarily.  In fact,

19  I'll have Mr. Smallman do that right now as we proceed.

20     Next.  And these are creations that I look to the

21  government to prepare.

22     We will need a one-sheet -- one-page witness list that

23  lists in chronologic order the witnesses who testified.  All I

24  need is just their names; but it's a guide to the jury so they

25  don't forget who testified, and it's an easy menu option they

A-1007

870

K1RVTEM1

1    can use in requesting testimony.

2            I'm looking at Mr. Magliocco on the assumption that

3    this likely falls to him.

4            Second, I will need an exhibit list. And counsel, let

5    me ask this: Counsel have been very helpfully providing to me

6    a daily updated exhibit list that lists by exhibit number the

7    description, the witness through whom the exhibit was received,

8    and the date that it was received. The list now includes

9    defense exhibits as well.

10           Before this gets to the jury, we will need to

11   eliminate any exhibit that was not received. And I assume,

12   Mr. Magliocco, that's a very quick computer operation; correct?

13           You can speak.

14           MR. MAGLIOCCO: Yes.

15           THE COURT: Okay. Very good.

16           Okay. Defense counsel, let me just confirm with you

17   that if we prepare an exhibit list that essentially is using

18   the government's form here and just deletes the unadmitted

19   exhibits, you're fine with it; there's no editorializing or

20   something in here that you're concerned going to the jury.

21           MR. DiRUZZO: Agreed, your Honor.

22           THE COURT: All right. Fine.

23           So I will need then, Mr. Magliocco, as soon as you

24   can -- as soon as we're done with Reinitz, a final version --

25   if you email it to my chambers, we'll take care of the copying.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1008

871

K1RVTEM1

1          All right.  It looks like we're in good shape on that.

2          I will need, as well, copies of exhibits.  I don't

3    personally need them; but in the expectation that the jury asks

4    for exhibits, you either need to have several copies handy -- I

5    usually ask for three -- or be in a position where, in very

6    quick order, you are able to make copies of anything that is

7    requested.

8          I don't, on my own initiative, send particular

9    exhibits to the jury.  But my experience is, very early on, we

10   get a menu list, a note that requests specific exhibits.  I can

11   imagine in my own mind ones that would be of more or greater

12   interest here.  But either way, I need the government to be

13   ready to have those copies.

14         In the same vein, to the extent that there are

15   requests for testimony -- and because I've had a trial with

16   Mr. Magliocco and Mr. Imperatore, I'm sure they're familiar

17   with this -- what will ordinarily happen is I will ask counsel

18   looking at the transcripts to confer and identify the

19   responsive portions of the transcript.  More often than not,

20   counsel agree on almost everything that's responsive, and I am

21   left to referee the very, very few, if any, disputes.

22         But, in any event, once that's identified, the

23   government usually has on its system the software that enables

24   it to extract the responsive pages and line numbers and to

25   auto-redact the balance of pages on which some parts, but not

A-1009

K1RVTEM1

1  all parts, are relevant.  I'll be looking to the government to

2  do the physical preparation of the pages.

3        Rather than bringing the jury out for an extended

4  readback, my practice is instead to send in the transcripts to

5  the jury, while admonishing them that the mere fact that those

6  portions are before them should not lead them to give outsized

7  weight to those transcript pages.

8        I take it nobody has any objection to that efficient

9  procedure?

10        MR. DiRUZZO:  No, your Honor.  Although I just assumed

11  that we'll have a quick moment to review, just to make sure

12  that there's no errors on the transcript, effectively just an

13  errata check.

14        THE COURT:  Oh, sure.  Sure.  In other words,

15  you'll -- absolutely.  Both parties will agree or not on what

16  portions are responsive, I'll referee any disputes, and you'll

17  get a chance to check, in effect, Mr. Magliocco's work in

18  making sure that what he has pulled is responsive to what's

19  either been agreed or court-ordered.

20        MR. DiRUZZO:  Great, your Honor.

21        THE COURT:  And then finally, the indictment.

22        Of course, the indictment here needs to be redacted to

23  strike Exhibits 5 and 6.  And I had my law clerk ask government

24  counsel to make sure that they have sent us a redacted

25  indictment that gets rid of Counts Five and Six.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1010

K1RVTEM1

1           I don't think there's anything else though in this

2   indictment that is extraneous; there isn't forfeiture language

3   or there isn't, you know, references to excluded evidence or

4   anything like that.  Correct about that, counsel?

5           MR. BHATIA:  That's correct, your Honor.  I don't

6   believe there's anything that needs to be struck.

7           THE COURT:  I think it's a very bare-form indictment.

8           MR. DiRUZZO:  Your Honor, I'm actually --

9           THE COURT:  Sorry.  You need to speak into the mic.

10          MR. DiRUZZO:  I'm scrolling through it right now, and

11  there is a forfeiture allegation starting at page -- bottom of

12  page 7.

13          THE COURT:  All right.  Government, I take it you'll

14  eliminate the forfeiture allegation?  That's not a jury issue

15  here, right?

16          MR. BHATIA:  We'll take that out as well.

17          THE COURT:  Everyone agree that that is not a jury

18  issue?

19          MR. BHATIA:  Yes, your Honor.

20          MR. DiRUZZO:  Your Honor, given that -- it's my

21  understanding that a forfeiture provision is something that the

22  jury could consider.  Your Honor, if you give me -- I haven't

23  looked at that portion of the criminal rules in a while.

24          THE COURT:  Take a moment.

25          (Pause)

A-1011

874

K1RVTEM1

1           THE COURT:  Let me just break in by asking government

2    counsel -- I may put Mr. Imperatore on the spot here.

3           The one trial I've had which involved a forfeiture

4    allegation going to the jury was his trial, an insider trading

5    case.  And there, the government had seized the proceeds of the

6    bank account that was used by -- or the securities account that

7    was used by the alleged insider trader, the defendant.  We had

8    a two-stage process in which, after a conviction, we had a

9    separate forfeiture trial.

10          Nobody has given me jury instructions as to that

11   point.  I'm not aware of anything that's been seized here

12   either, although maybe I've missed something.

13          Mr. Imperatore, let me just look to you, just because

14   you've been down this road before.  Is this a case in which

15   there's any need to go to the jury on forfeiture?

16          MR. IMPERATORE:  There is not, your Honor.

17          So your Honor is correct that the defendant has a

18   right to request that in the event that he's convicted, that

19   the jury -- after it reaches its jury verdict on the counts in

20   the indictment, the defendant is entitled to have the jury

21   consider the forfeiture issue.

22          However, for obvious reasons, it's extremely unusual

23   for a defendant to make such a request.  And in any event, the

24   jury is not allowed to consider the forfeiture allegations at

25   the time it is deliberating on whether the defendant has

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1RVTEM1

1    committed the crime --

2            THE COURT:  That much I understand.

3            There's no question that at the time this goes to the

4    jury, the forfeiture allegation would be struck while the jury

5    resolves guilt or innocence.

6            The question is whether -- assuming a conviction on

7    any or all counts -- the defense has a right to go to the jury

8    on the forfeiture allegation.  It's, candidly, government, not

9    clear to me what you would be pursuing here, whether you would

10   really be pursuing forfeiture on top of restitution in the

11   context of a case such as this.

12           In your insider trading case, there was an issue

13   because the fruits of the insider trading had been grown by

14   multiple fold; and so the forfeiture recovery outstripped, in

15   some sense, the restitutionary recovery.

16           In contrast here, it appears to be just a unitary pot

17   of money; there's no change in it.  I don't know, in a moment

18   I'll ask defense counsel whether in the event of a conviction

19   they really would be asking me to retain the jury so we could

20   have a new set of evidence and arguments relating to

21   forfeiture, in which case I don't know why nobody has given me

22   any instructions as to that or whether the government at that

23   point realistically would be seeking restitution, which turns

24   out to be the same song.

25           MR. IMPERATORE:  We agree, your Honor.  There has been

K1RVTEM1

1  no specific property, that -- unlike in the insider trading

2  case that your Honor has presided over, there's been no

3  specific property that has been held or seized by the

4  government.  To the government's understanding, any proceeds

5  the defendant had were dissipated, so it does not strike the

6  government as a case for which the jury should be detained to

7  make a forfeiture determination.

8         THE COURT:  Right.  But I mean there's a different

9  consequence here, which is if that's the position you're

10 taking, and the defense is asking for a jury verdict on

11 forfeiture, it would seem to follow that at the time of a

12 hypothetical sentencing -- assuming a conviction here -- you

13 would be seeking restitution, but not forfeiture.  Because

14 either you're prepared to pursue forfeiture in front of the

15 jury, which doesn't strike me as adding any obvious value to

16 the government here, or you're pursuing restitution.

17        MR. IMPERATORE:  That's correct, your Honor.

18        But I think let's see what the defense requests.  I

19 think the government would reserve its right to seek

20 forfeiture.

21        THE COURT:  Well, then in that case, government, you

22 need to get me charges for -- let's see what the defense

23 requests.  But I note that nobody here appears, until I raised

24 this, to have thought of this as even a conceivable jury issue.

25        Mr. DiRuzzo.

A-1014

877

K1RVTEM1

1          MR. DiRUZZO:  Your Honor, we would agree.  I don't

2    think that there is anything to forfeit.  I think any amount

3    would be restitutionary in nature.  So in that sense, I don't

4    think there's anything there.  I think this is a somewhat

5    academic exercise.

6          However, given my client's right under 32.2(b)(5), we

7    would be asking for a jury determination if the government

8    actually believes that there is something to forfeit.

9          THE COURT:  All right.  Let me put it this way then:

10         Defense counsel is correct that if you are pursuing

11   forfeiture, they have a legal right to have the jury, I think,

12   make that determination.  It's the very rare criminal case

13   where defense counsel invokes that right.  And in the context

14   of this case, it's not obvious to me that there's any

15   additional factual matter to be resolved.  I would simply be

16   giving jury charges on the basis of the evidence that's gone in

17   about whether a finite sum is forfeitable.

18         I do note though that neither side has given me

19   proposed instructions on that, even instructions as to what to

20   say to the jury in the first phase, letting them know that

21   there might be an additional question or two that I need to

22   send them back with, in the event of -- depending on their

23   verdict.  I could easily caret in a sentence to that effect.

24         Government, it's my hope -- and I think I'm reading

25   the body language right here -- that you are not, in fact --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1015

878

K1RVTEM1

1   bless you -- pursuing forfeiture here.  If so, I need proposed

2   instructions within an hour, because we may be going to the

3   jury very soon.

4            MR. IMPERATORE:  Your Honor, this is the first the

5   defense has ever raised this issue.

6            THE COURT:  No, no, no.  You indicted on this; you

7   indicted the case.  This is your case to indict.  They never

8   waived a jury right as to forfeiture.

9            The issue has gone unspotted.  You can't throw it on

10  the defense.

11           MR. IMPERATORE:  Your Honor, respectfully, I think it

12  is -- it is the defense's right to request a jury verdict on

13  forfeiture, but this is the first they've ever raised this

14  issue.  It's extremely unusual.  I think we reserve the right

15  to consider whether we want to seek forfeiture.

16           THE COURT:  Then please tell the U.S. Attorney's

17  Office that by 10:30 I want proposed instructions as to

18  forfeiture or I will regard the issue as waived.

19           Counsel, you know, you got the email last night also

20  saying that we are likely to get to the jury -- to a charge

21  conference this morning.  You put forfeiture in the indictment.

22  I appreciate that it is rare that forfeiture issues are

23  litigated by a jury.  It looks as if that was included and then

24  lost sight of.  But, in the end, as counsel at government table

25  knows as well as anyone having tried one of these cases, I need

A-1016

879

K1RVTEM1

1   to be prepared, if the defense is insisting on its right to a

2   jury trial on forfeiture, to put a question to the jury.  I

3   need a proposed charge.  And I don't propose to have our jury

4   waiting while we figure that out.

5         What I, in all likelihood, will wind up doing, if

6   nobody stands down here, as soon as the jury deliberates,

7   begins to deliberate, we'll have a separate charge conference

8   as to what would be a very discrete, narrow instruction as to

9   forfeiture.  It's my hope that saner heads will prevail here

10  and that the reality of the situation here, which is that this

11  is a restitution case and the forfeiture seems duplicative,

12  will sink in and there won't be a need to pursue that.

13        But in the end, the government is continuing to insist

14  on forfeiture and the defense is insisting on its right to have

15  a jury make that determination, I need charges from you.  So

16  please email somebody in appeals to get me whatever charge

17  would be apt to this situation so that I'm in a position

18  promptly to have a charge conference on that point.  I don't

19  want to detain the jury because nobody thought about this

20  issue.  Okay?

21        MR. IMPERATORE:  Yes, your Honor.

22        THE COURT:  I'm sorry.  I apologize for the abruptness

23  of the request, but neither side flagged this as an issue for

24  me; neither side appears to have thought about it till I

25  mentioned the idea of redacting the indictment.  But one way or

K1RVTEM1

1    the other, the defense has the legal rights that it has; it

2    doesn't appear to have waived them.  The government, until it

3    forgoes the forfeiture, can't assume that the defense has

4    waived that right.  So there it is.

5           All right.  That, I think, then lists everything I

6    have for this morning.  Before we talk about a potential charge

7    conference, is there anything else that anyone wants to take up

8    with me?

9           MR. DiRUZZO:  No, your Honor.

10          MR. BHATIA:  No, your Honor.

11          THE COURT:  All right.

12          Counsel, may I suggest -- we have about five minutes

13   together, and I am eager to not waste the jury's time

14   needlessly later on -- let us get started then with the

15   potential charge conference.  It may be that there's relatively

16   little ground to cover.  And we'll stop as soon as I'm notified

17   by Mr. Smallman that we have all jurors here and that it is

18   9:30.

19          My practice is not to jump around throughout the

20   charge, but to ask each of you the first page on which you have

21   proposed changes to the charge and roll forward through the

22   proposed charge from there.

23          Mr. DiRuzzo, I'm mindful that at 12:17 a.m. I got a

24   document from the defense, docketed at docket 90, that raises a

25   concern about, quote/unquote, constructive amendment.  Your

A-1018

881

K1RVTEM1

1    letter appears to track a motion *in limine* that I denied

2    earlier relating to your conception of what the word

3    "counterfeit" means in the to wit clause of the indictment.  I

4    will take up that issue when we get to the page of the charge

5    that implicates that concern.

6            All right.  So with that, government, what is the

7    first page in the charge that you have any comment on?

8            (Counsel conferred)

9            MR. BHATIA:  Your Honor, Mr. Imperatore and I are sort

10   of still reviewing the charge.  At this point we don't have any

11   comments on it.

12           THE COURT:  That was a good answer.

13           Okay.  Thank you.  Very good, Mr. Bhatia.

14           Defense, what's the first page on which you have an

15   issue?

16           MR. DiRUZZO:  15P, particular investigative techniques

17   not required.

18           THE COURT:  Let's turn to page 15.

19           Yes, what's the concern?

20           MR. DiRUZZO:  In the first line it says:  During the

21   trial, your testimony of witnesses and argument by counsel that

22   the government did not utilize specific investigative

23   techniques, I don't believe we've ever made that argument,

24   because there's been no government witness called in this case.

25   The case agent --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1019

K1RVTEM1

1          THE COURT:  This is a good question.  This is a

2    standard charge.  I guess the question is is there any factual

3    predicate for this, government?

4          MR. BHATIA:  Your Honor, the closest one that comes to

5    mind is I recall a line of cross-examination with

6    Ms. Finocchiaro about investigation done by the bank.  I don't

7    recall -- of course, there wasn't a government agent called.

8    So I don't think that there is a factual predicate.  I don't

9    think there is a factual predicate for it.

10          THE COURT:  I alerted them, of course, in jury

11    selection that I would instruct them to this -- on this point.

12    And I think it's worth doing, because *sua sponte* juries

13    sometimes will meditate on this issue.  But I think Mr. DiRuzzo

14    may well be factually correct that the lead-in sentence here is

15    just -- is not accurate; that there isn't a factual prompt.

16    Obviously we'll see what happens in closing argument.  It may

17    be that there is some faulting of the government for how it

18    built its case.

19          Defense, I take it your concern is less about the

20    concept of the instruction and more that the first sentence is

21    factually not correct.  The instruction itself is

22    unobjectionable, I take it.

23          MR. DiRUZZO:  As a general matter, I would agree.  But

24    given that there is no government witness to say that -- you

25    know, that there's argument by counsel the government did not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1020

K1RVTEM1

1    use specific investigative techniques is just untethered to the

2    record.

3              THE COURT:  Right.

4              Government, what's your view about what to do with P?

5              MR. BHATIA:  Your Honor, I think this instruction is

6    still appropriate.

7              THE COURT:  Right.  But I mean not the first -- the

8    first sentence would need to be revised, would it not?

9              MR. BHATIA:  I think that's right.  I think it

10   would -- well, of course, we don't know how the rest of the

11   argument --

12             THE COURT:  I assuming that Mr. DiRuzzo's implicit

13   representation sticks, which is that there won't be argument on

14   that point in summation, we'll see how that goes.  Then the

15   first sentence does need to be revised, does it not?  There

16   hasn't been any line of examination of a witness about what was

17   or wasn't -- was there any examination of any witness, a bank

18   or a customer, about what the government asked them or sought

19   from them?  Was that ever probed?  I thought there was

20   something like that.

21             MR. BHATIA:  I believe with Ms. Finocchiaro it was

22   brought up, like, whether we brought this to the bank or the

23   bank brought it to us.  And then I think there were some

24   questions about -- I recall some questions about what kinds of

25   work they had done and who they had asked, if they had asked

A-1021

884

K1RVTEM1

1    customers or if they just relied on representations.  And there

2    were questions as well about the surveillance video, if I

3    recall correctly.

4            MR. GELFAND:  Your Honor, I can help.

5            THE COURT:  Just remind me what was -- there is

6    something out there that Mr. Bhatia is alluding to that I have

7    a similar memory of.  I can't put my finger on it.

8            MR. GELFAND:  I'm going 100 percent off memory, your

9    Honor.  But on my cross-examination of Ms. Finocchiaro for Bank

10   of America, I did inquire of her as to whether or not Bank of

11   America essentially, phrased differently, but basically went to

12   the government or went to law enforcement versus whether law

13   enforcement went to her, "her" being the bank.  And that was,

14   as I recall, kind of the extent of that line of questioning.

15           THE COURT:  Was there anything further about her

16   interactions with the government, Mr. Gelfand?

17           MR. GELFAND:  There was a preliminary question or two

18   right at the outset of cross-examination about her meeting with

19   the government, not meeting with us.

20           THE COURT:  That's a little different.  That's

21   preparation.

22           MR. GELFAND:  Yes, your Honor.

23           THE COURT:  All right.  One moment.

24           (Pause)

25           THE COURT:  All right.  Here's how I would propose to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1022

K1RVTEM1

1    reformulate the first sentence, which I think uses the passive

2    voice to solve the problem:

3            During the trial you have heard testimony of witnesses

4    bearing on the investigative techniques used in this case.

5            I think that is broad enough to pick up the concept

6    without misleading anybody as to factually what happened here.

7            Anyone have a problem with that?

8            MR. DiRUZZO:  No, your Honor.

9            THE COURT:  Government?

10           MR. BHATIA:  No.

11           THE COURT:  All right.  Let's solve the P problem that

12   way.  Thank you, counsel.  Good catch by the defense.

13           All right.  Next page, defense?

14           MR. GELFAND:  Fairly obvious, your Honor, but on page

15   16, the issue about the defendant's testimony.

16           THE COURT:  Yes.  Quite right.

17           I take it you're fine with either paragraph.  And I

18   will at this point get rid of R and get rid of, under S, "if

19   applicable," if the current intention of the defendant sticks.

20           MR. GELFAND:  Yes, your Honor.

21           THE COURT:  Okay?  Thank you.  Good catch.

22           Next, defense?

23           MR. GELFAND:  Pages 18, your Honor.

24           THE COURT:  All right.  Before you get to -- let's

25   start on 18.  That's where I have -- I wanted to respond to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1023

886

K1RVTEM1

1    Mr. DiRuzzo's letter of early this morning.  So let me take

2    care of that.

3         Mr. DiRuzzo, your claim is that there is a

4    constructive amendment here.  Based on the same theory of your

5    earlier motion *in limine*, you conceive of a counterfeit check

6    in a particular distinct way.

7         Based on my resolution of that earlier argument and my

8    colloquy of the government, I understand the use of the word

9    "counterfeit" in the to wit clause here to be in the

10   vernacular; to wit, that the defendant created these checks and

11   that they were unauthorized by the account holder, not that

12   there were some other technical features of the check that

13   meets or don't meet somebody else's definition of counterfeit.

14        As a result -- I'm just waiting for counsel to stop

15   talking.  As a result, I have formulated the count here on

16   pages 18 and later on -- as to bank fraud, and later on as to

17   wire fraud, to track what I understand to be the meaning of

18   "counterfeit" as used in the indictment, to wit, that the

19   defendant created the checks and that they were not authorized

20   by the account holder.  And that is why the description of

21   Counts One and Two on page 18, and later on the wire fraud

22   counts, I have formulated that way.

23        I therefore deny the motion for terming this

24   indictment for relief on the grounds that there is a

25   constructive amendment.  The government did not define

A-1024

887

K1RVTEM1

1    "counterfeit" in the to wit clause in some specialized,

2    stylized, technical way.  They have represented -- consistent

3    with the common sense use of the term -- that counterfeit in

4    this case means created by the defendant without the

5    authorization of the account holder, meaning the authorization

6    of this particular check or the particular checks in question.

7         And as a result, I've formulated the charge in the

8    indictment as I have so as to state that the defendant, quote,

9    allegedly -- it says here:  Count One charges the defendant

10   with committing a bank fraud scheme in connection with the

11   deposit in April 2019 of 27 checks allegedly by creating,

12   comma, and then making the false pretense and representation to

13   the bank that he had the account holder's authority to deposit,

14   comma, these checks.  That aligns with my understanding of the

15   government's meaning of "counterfeit" as presented to the grand

16   jury.

17        Mr. Bhatia, do I have that correct?  That is, in fact,

18   the theory of bank fraud liability that the indictment captures

19   and was presented to the grand jury?

20        MR. BHATIA:  That's right, your Honor.  That's the lay

21   sense of being inauthentic or not authorized.

22        THE COURT:  Right.  In any event, Mr. DiRuzzo, you

23   have your objection.  But I wanted to, at that point, address a

24   constructive amendment, because that is how I understand, as

25   previously ruled, the to wit clause's use of the word

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1025

K1RVTEM1

1    "counterfeit."  And I think you've operated throughout the

2    trial on that understanding as well.

3                MR. GELFAND:  Can we just, just to preserve the issue,

4    make a further record on this, your Honor?

5                THE COURT:  You may.  And then I want to just finish

6    your objection on 18, and we need to get the jury, because they

7    are here.

8                MR. GELFAND:  Yes, your Honor.

9                THE COURT:  Go ahead.

10               MR. GELFAND:  Obviously we would incorporate

11   everything that we wrote in the letter to the Court

12   anticipating this issue and wanting to preserve this issue.

13               All we would note for the record, in addition, your

14   Honor, is that obviously we have no independent -- on the

15   defense, no independent way of knowing what was actually

16   communicated to the grand jury.  Obviously we have government

17   counsel's representations; government counsel is an officer of

18   the Court.  We appreciate all of those parameters.

19               But what we do have in this case is the grand jury's

20   words, if you will, as formulated in the indictment.  That's

21   certainly what the grand jury handed down, presumably with a

22   sufficient vote.  And those words, we believe, speak for

23   themselves and should be the words that the jury ultimately has

24   to --

25               THE COURT:  Look, let me offer this thought:  If what

K1RVTEM1

1    you're suggesting is that there might have been a

2    mischaracterization of what was put before the grand jury, in

3    the event of a conviction in this case, I expect there will be

4    post-trial motions.  You're at liberty to seek the Court's --

5    to invite the Court to review the grand jury transcript to test

6    that proposition.

7           MR. GELFAND:  Thank you, your Honor.

8           All we would ask -- and I appreciate -- I know where

9    the Court is going to go with this, but we would formally ask

10   that the jury in this case be instructed that it has to find

11   that these were counterfeit checks, without any sort of

12   characterization, using the exact words in all four counts of

13   the indictment.

14          THE COURT:  All right.  Thank you.

15          I don't think that's an element of bank fraud here.

16   And I think I have captured the to wit clause by putting it in

17   the English prose that I read aloud a moment ago.

18          All right.  Anything else on page 18?  And then we'll

19   take a one-minute comfort break for all.

20          MR. GELFAND:  No.

21          THE COURT:  All right.

22          Defense counsel, just for my planning purposes, we're

23   obviously in mid charge conference, how much more do you have

24   in terms of objections or issues to raise with the charges?  Is

25   there a lot or a little?

A-1027

K1RVTEM1

1        MR. GELFAND:  Approximately two issues, your Honor.

2   Not a lot.

3        THE COURT:  Very good.  All right.  Then very good.

4        Look, I'll give counsel a two-minute comfort break.

5   But be back in your seats in two minutes, and have the witness

6   here in two minutes.  Thank you.

7        MR. IMPERATORE:  Your Honor?  Apologies.  I want to

8   raise an issue about the forfeiture determination.

9        In Rule -- I'm just looking at the rule once again

10  with fresh eyes.  In Rule 32.2(b)(1)(A) --

11       THE COURT:  32.2(b) --

12       MR. IMPERATORE:   -- (b)(1)(A).  It sets out --

13       THE COURT:  One moment.  Go ahead.

14       MR. IMPERATORE:  So it sets out how forfeiture

15  determinations are made.  And I read this rule to have

16  different requirements with respect to what the specific

17  forfeiture determination is.

18       As set out here, it says that -- it says that the

19  Court must determine -- when it comes to the personal money

20  judgment, it says that the Court must determine the amount of

21  money that the defendant will be ordered to pay.

22       THE COURT:  Where are you looking?

23       MR. IMPERATORE:  I'm sorry, at the very bottom of Rule

24  32.2(b)(1)(A).

25       THE COURT:  Right.

A-1028

K1RVTEM1

1          MR. IMPERATORE:  So I'm trying to recall from our

2     prior trial whether the jury's determination is one that goes

3     to whether there is specific property that is forfeitable, as

4     opposed to the --

5          THE COURT:  Your indictment does not identify specific

6     property.

7          MR. IMPERATORE:  Correct.

8          THE COURT:  Because nothing has been, in fact, seized

9     here.

10         MR. IMPERATORE:  That's correct.

11         THE COURT:  You'd be seeking, in effect, a defined

12    sum, but not a specific piece of property to forfeit.

13         MR. IMPERATORE:  Yes.

14         THE COURT:  Well, look, I mean, if your judgment is

15    ultimately that a jury verdict is not needed here, you're at

16    liberty to preserve your right to forfeiture.  But you're

17    running the risk that if you're wrong about your assessment

18    that a jury verdict is not needed, you will have forgone that

19    opportunity.

20         I will tell you that the only trial in my eight-plus

21    years' experience in which a forfeiture trial was had before a

22    jury was yours.  And there, there was a specific property; it

23    was an investment account in which the fruits of the alleged

24    illegal insider trading scheme had grown some after the scheme

25    was -- the charged scheme was complete.  There was good reason

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1029

892

K1RVTEM1

1    to forfeit that.

2              So you may well be right that the trigger here for the

3    jury trial right is specific property.  It has not been

4    researched by anybody here.  I'm happy -- if your judgment is

5    you'll run that risk and not pursue a jury proceeding, that's

6    fine, in which case you're still pursuing forfeiture, but you

7    may lose that right if your legal premise is wrong that the

8    defense wasn't entitled to a jury verdict.  I'm happy to go

9    that way.  That makes ample sense.

10             MR. IMPERATORE:  Your Honor, I think we'll have the

11   opportunity to research this while --

12             THE COURT:  Okay.  But if, ultimately, your -- and

13   what you say aligns with experience, but it doesn't -- it's not

14   something I've had occasion to research.  And apparently this

15   is -- was an unanticipated issue.

16             All right.  Let's get Mr. Reinitz in the box.  And

17   Mr. Smallman, as soon as I'm back, we'll get the jury.

18             (Recess)

19             THE COURT:  All right.  Mr. Smallman, please get the

20   jury.

21             (Jury present)

22             THE COURT:  Good morning, ladies and gentlemen.

23   Welcome back.  I hope everyone had a very good weekend.

24             Please be seated.

25             We'll resume now with the trial, in particular, with

A-1030

K1RVTEM1                    Reinitz - cross

1    the cross-examination of Mr. Reinitz.

2           Mr. Reinitz, I'll remind you that you're still under

3    oath.

4           Government counsel, you may inquire.

5    ARIEL REINITZ, resumed.

6    CROSS-EXAMINATION  (continued)

7    BY MR. BHATIA:

8    Q.  Mr. Reinitz, good morning.

9    A.  Good morning.

10   Q.  When we were talking on Friday, you were testifying about

11   some text messages you had exchanged with Mr. Teman; is that

12   right?

13   A.  That's correct.

14   Q.  Let's take a look.

15          MR. BHATIA:  Publishing for the jury Government

16   Exhibit 702 in evidence.

17   Q.  Mr. Reinitz, this is an excerpt of a WhatsApp conversation

18   you had with Mr. Teman, right?

19   A.  Before we get too far, I can't see it on the monitor here.

20   I'm sorry.

21          THE COURT:  Sorry.  That's on us.

22          Okay.  There we go.

23   A.  Can you repeat the question?  I'm sorry.

24   Q.  This is a WhatsApp conversation you had with Mr. Teman,

25   right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1031

894

K1RVTEM1                          Reinitz - cross

1    A.  Yes.

2    Q.  And this is dated January 2nd, 2019; is that right?

3    A.  Yes.

4    Q.  And just so we can orient ourselves in this chat,

5    Mr. Teman's messages are on the left, right?

6    A.  Yes.

7    Q.  He says -- Mr. Teman says to you:  I have ABJ checks

8    photos.  Our contract allows me to draw their account.  I

9    should just deposit checks from them.  Totally legal, I think.

10           Those are his words, right?

11   A.  Yes.

12   Q.  Those aren't your words?

13   A.  No, they are not.

14   Q.  And you wrote back:  No.

15           Is that right?

16   A.  Yes.

17   Q.  Those are your words to him?

18   A.  That was my word to him, yes.

19   Q.  Your word to him.  That's right.

20           And he responded with a question mark, right?

21   A.  That's right.

22   Q.  And your response is:  Bad idea.

23           Those are your words?

24   A.  Those are my words.

25   Q.  And further down, you quote his message; is that right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1RVTEM1                    Reinitz – cross

1    A.  Yes.

2    Q.  And then you say again:  Bad idea.

3    A.  Yes.

4    Q.  Those are your words?

5    A.  Yes.

6    Q.  Further down this page, Mr. Teman says to you:  Why?  They

7    entered into a contract allowing us to draw from their

8    accounts, so we are not breaking any law.

9         Those are his words to you, right?

10   A.  Yes.

11   Q.  And he references a contract; is that right?

12   A.  Yes.

13   Q.  He's referencing a contract when he's talking to you?

14   A.  Yes.

15   Q.  And you say, a few lines down:  Because they are likely to

16   call the police.

17        Those are your words, right?

18   A.  Yup.

19   Q.  You told him that you thought the customers were likely to

20   call the police?

21   A.  Yes.

22   Q.  And you said:  And you will be arrested.

23        Right?

24   A.  Mm-hmm.  Yes.

25   Q.  And you were telling him that --

A-1033

896

K1RVTEM1                          Reinitz – cross

1          THE COURT:  Sorry.  Just wait for Mr. Reinitz to

2    finish his answer.

3    A.  Yes.

4          THE COURT:  Go ahead.

5    Q.  You were telling him that he would be arrested, right?

6    A.  Yes.

7    Q.  And you said:  And you will have a criminal case to deal

8    with.  And then you can start explaining about your contract.

9          You're referencing a contract now to him, right?

10   A.  Yes.

11   Q.  You reference your contract?

12   A.  Yes.

13   Q.  And then you say, in quotes, "and not breaking any laws,"

14   right?

15   A.  Yes.

16   Q.  You put "not breaking any laws" in quotes, right?

17   A.  Yes, I was quoting Mr. Teman's -- I don't know if it was an

18   exact quote -- yeah, effectively an exact quote from his

19   message above.

20   Q.  You were quoting what he said about not breaking any laws?

21   A.  That's right.

22   Q.  Mr. Teman, further down this message, says:  I don't think

23   they will.  They owe the money.  And I'll put on the memo,

24   payment drawn per contract.

25          And he puts a hyperlink, right?

A-1034

897

K1RVTEM1                    Reinitz - cross

1   A.  Yes.

2   Q.  That's his proposal to you?

3   A.  That was his proposal, yes.

4   Q.  And you wrote, further down this page:  You asked my

5   opinion.  I gave it.  Maybe you're right.  Maybe they'll just

6   throw up their hands.

7           We'll continue.

8           That's your message, right?

9   A.  Yes.

10  Q.  You asked my opinion.  I gave it.  Maybe you're right.

11  Maybe they'll just throw up their hands and say, Oh, well, we

12  tried to stiff him, but Teman outsmarted us.  Too bad.  Have

13  fun, Ari.  Don't spend it all in one place.

14          That's what you're saying to him, right?

15  A.  Yes.

16  Q.  Excuse me.

17  A.  Yes, that's what I wrote to him, yes.

18  Q.  And you're telling him how they might respond if he does

19  draw these checks?

20  A.  To be frank, at least the second portion of what I intended

21  as a bit of a sarcastic -- you could say almost a joke, in the

22  sense that of course I didn't expect his customers, after those

23  deposits were deposited, to, again, throw up their hands, as it

24  were, and not to, you know, dispute the charge.

25          But, yes, that's what I wrote.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1035

898

K1RVTEM1                    Reinitz – cross

1  Q.  Right.  Because what you really told him was, "Bad idea,"

2  right?

3  A.  That's right.  I wrote it was a bad idea.  As I mentioned,

4  I believe, testified on Friday, my suggestion was that it was a

5  bad idea because I expected that the customer may dispute it

6  and there may be, you know, a criminal accusation.

7  Q.  You said he will be arrested, right?  That's what you wrote

8  on the page before?

9  A.  That's right.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-1036

899

K1R7TEM2                    Reinitz - cross

1  BY MR. BHATIA:

2  Q.  A few lines down from that Mr. Teman says to you, "Yes.  Or

3  they'll just accept a loss and ask for the intercoms, like, OK,

4  well, at least we'd like to get the intercoms for that money."

5  Right?  That's what he's saying to you?

6  A.  That's what he wrote, yes.

7  Q.  He is saying to you that they'll just accept the loss and

8  ask for the intercoms," right?

9  A.  That's what he wrote, yes.

10  Q.  You tell Mr. Teman, "My opinion is that you are greater

11  than 50 percent likely to be arrested for the activities you

12  propose.  How you chose to proceed is up to you."  Those are

13  your words to him, right?

14  A.  Yes.

15  Q.  And this is in January 2019?

16  A.  That's right.  Yes, those are my words to him.

17  Q.  In January 2019 you wrote "greater than 50 percent likely

18  to be arrested," right?

19  A.  That's right.

20  Q.  And the activities he is proposing here you say "for the

21  activities you propose," you mean drawing a check on a

22  customer's account, right?

23  A.  That's right.  I expected that the customers may call the

24  police, and under the circumstances Mr. Teman may have to go

25  deal with a criminal accusation, even if ultimately the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1037

K1R7TEM2                         Reinitz - cross

1    accusation was resolved in his favor based on his agreement and

2    my advice to him regarding his ability to legally draw the

3    checks under his agreement with the customers.

4    Q.  My question was:  What you're writing here is the activity

5    you proposed, right?

6    A.  That's right.

7            MR. BHATIA:  I would like to show for the witness only

8    Government Exhibit 727.

9            THE COURT:  727?

10           MR. BHATIA:  727.

11           THE COURT:  One moment.

12   Q.  Mr. Reinitz, do you recognize this?

13           THE COURT:  One moment.  Go ahead.

14   Q.  Mr. Reinitz, do you recognize this?

15   A.  Yes.

16   Q.  What is it?

17   A.  If you could slide the page up.

18           THE COURT:  It's not in evidence so don't read from

19   it.

20   A.  Sure.  That's a message from Mr. Teman to me dated April 2,

21   2019.

22   Q.  How do you recognize this?

23   A.  I believe that's a copy that I provided to you.

24           MR. BHATIA:  Your Honor, the government offers

25   Government Exhibit 727.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1038

901

K1R7TEM2                    Reinitz - cross

1          THE COURT:  Any objection?

2          MR. GELFAND:  No, your Honor.

3          THE COURT:  Received.

4          MR. BHATIA:  If we can publish this to the jury.

5          THE COURT:  Ladies and gentlemen, can everyone see the

6     monitors?

7          (Government Exhibit 727 received in evidence)

8     Q.  On Friday you testified about a part of this message, so I

9     want to go through the whole thing.  This is Mr. Teman's

10    message to you; is that right?

11    A.  Yes.

12    Q.  He says, "Meanwhile Bank of America put a hold on two

13    $18,000 checks we drew from people's accounts who remove

14    devices (as our contract explicitly allows) from us we'll see

15    if we get that hold released but we're in the hole about 30

16    grand."  Is that right?

17    A.  That's what the message says.

18    Q.  He is writing to you "as our contract explicitly allows,"

19    right?

20    A.  Yes.

21    Q.  He is telling you -- I am showing you will the exhibit

22    again -- he is referencing these checks after he created them,

23    right?

24    A.  In this message, yes, it was after he deposited them.

25    Q.  And he is also referencing these checks after he deposited

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1039

902

K1R7TEM2                          Reinitz - cross

1   them, right?

2   A.  In this message, yes.

3   Q.  And this is after the charge-back, right?

4   A.  Can you clarify what you mean by the charge-back?

5   Q.  There is after two of those checks were subject to a

6   charge-back?

7   A.  Based on Mr. Teman's message, yes, that's my understanding.

8   Q.  And this is also after the message we saw from January 2019

9   where you said it was a bad idea, right?

10  A.  Yes.

11  Q.  Let's take a look at your response.

12          THE COURT:  What document?

13          MR. BHATIA:  This is now Government Exhibit 704 in

14  evidence.

15          THE COURT:  One moment.  Go ahead.

16  Q.  I am showing to the witness Government Exhibit 704 in

17  evidence.  At the top here, Mr. Reinitz, is Mr. Teman's message

18  to you, right?  It's quoted.

19  A.  Yes.

20  Q.  And you say, "Not sure I follow but this sounds bad."

21  Those are your words to him, right?

22  A.  Yes.

23  Q.  On April 2, 2019 you said "not sure I follow"  Right?

24  A.  Yes.

25  Q.  And then you told him, "This sounds bad."

A-1040

903

K1R7TEM2                    Reinitz - cross

1    A.  Yes.

2    Q.  Moving down the page Mr. Teman says, "Yes, very."  And then

3    writes, "Our contract states explicitly if you remove devices

4    there is an $18K fee, and then we can draw your account, again

5    outright saying we can print a check and draw your account (a

6    bank draw -- very common in real estate)."

7            This is Mr. Teman talking to you, right?

8    A.  Yes.

9    Q.  He is talking to you about "our contract states

10   explicitly"?

11   A.  Yes, those are his words.

12   Q.  And your response is "Understood.  I don't know all the ins

13   and outs of this but sounds like a bad idea.  I suggest you

14   provide them with advanced, explicit notification of the

15   charge, amount, and specific basis in the agreement for doing

16   so."  You wrote to him "I don't know all the ins and outs,

17   right?

18   A.  Yes I was referring to --

19            THE COURT:  Yes or no.

20   A.  Yes.

21   Q.  On this page you wrote "I don't know all the ins and outs

22   of this."  Right?

23   A.  Those are the words I wrote, yes.

24   Q.  And you wrote "but sounds like a bad idea."  Right?

25   A.  Yes, I did.

A-1041

K1R7TEM2                         Reinitz - cross

1    Q.  Bad idea is the same thing you told him in January 2019,

2    right?

3    A.  The same words?

4    Q.  Actually the same exact words.

5    A.  Yes.

6    Q.  And I'd now like to show the witness -- actually scroll

7    down the page a bit.  You say, "If you are hitting their

8    accounts out of the blue" --

9             THE COURT:  Slow down.  When you are reading it you

10   are speeding up.

11   Q.  You wrote.  "If you are hitting their accounts out of the

12   blue, I expect this will become a criminal matter sooner or

13   later."  Those are your words, right?

14   A.  Yes.

15   Q.  You told him again in this chat "this will become a

16   criminal matter sooner or later.

17   A.  Yes.

18   Q.  We're in a criminal matter today, right?

19   A.  We sure are.

20   Q.  This is what actually happened, right?

21   A.  It's exactly what happened.

22   Q.  I'd like to show for the witness only Government Exhibit

23   728.

24             Mr. Reinitz, do you recognize this document?

25   A.  Yes.

A-1042

K1R7TEM2                    Reinitz - cross

1   Q.  Are these messages between you and Mr. Teman?

2   A.  Yes.

3   Q.  Do you recognize these?

4   A.  Yes.

5   Q.  How do you recognize them?

6   A.  I provided them to you.

7        MR. BHATIA:  Your Honor, the government offers

8   Government Exhibit 728.

9        THE COURT:  Any objection?

10       MR. GELFAND:  No, your Honor.

11       THE COURT:  Received.

12       (Government Exhibit 728 received in evidence)

13       MR. BHATIA:  You can publish this to the jury.

14  Q.  Mr. Reinitz, these are more conversations but these are

15  dated April 3, 2019; is that right?

16  A.  Yes.

17  Q.  At the top.  And this is Mr. Teman on the left and you on

18  the right?

19  A.  Yes.

20  Q.  Mr. Teman writes to you in the first message, "I think

21  maybe we invoice ABJ the device removal fees, they have like 7

22  buildings at 18K each and then draw their accounts."  A few

23  lines down your response to him --

24       Do you see that?  Is that Mr. Teman talking to you?

25  A.  Yes, at the top, that's correct.

K1R7TEM2                    Reinitz - cross

1   Q.  And a couple lines down you respond, "I've already told you
2   I think it's a bad idea.  You've been back and forth with ABJ
3   several times now."  You're saying bad idea, right?
4   A.  Yes, those are my words.
5   Q.  That's actually the same words you used the day before,
6   right?
7   A.  Yeah.
8   Q.  And the same words you used in January 2019?
9   A.  Sure is.
10  Q.  Bad idea.
11  A.  Bad idea.
12  Q.  And you said that he has been back and forth with ABJ
13  several times now; is that right?
14  A.  That's what I wrote.
15  Q.  Your words?
16  A.  Those are my words.
17  Q.  Further down this page you wrote, "Your threats carry
18  little weight at this point and they have indicated they don't
19  believe they owe you money."  Is that right?
20  A.  That's what I wrote, that's correct.
21  Q.  And you were telling him that ABJ has indicated they don't
22  believe they owe you money, right?
23  A.  That's correct.
24  Q.  And your next line is "If you hit their accounts I think
25  50/50 they call cops."  Those are your words?

K1R7TEM2                         Reinitz - cross

1    A.  Yes.

2    Q.  And when you said "if you hit their accounts" you mean

3    drawing a check from their bank accounts, right?

4    A.  Yeah, among other options, yes, that would be included,

5    yes.

6    Q.  You think that could cause them to call the cops.

7    A.  I think that's what they might do.  That's what I thought

8    at the time and what I wrote to Mr. Teman.

9    Q.  And your next line is "If I was advising them, that's

10   probably what I would tell them to do"?  Right?

11   A.  That's right.

12   Q.  That's what you wrote to him.

13   A.  That's what I wrote to him.

14   Q.  That if you were advising ABJ, you would tell them to call

15   the cops.

16   A.  In their position, understanding what they had -- you know,

17   their position was regarding their status with GateGuard,

18   that's what I wrote, if I were advising them, yes, I might tell

19   them to do that.

20         MR. BHATIA:  Your Honor, I would like to show for the

21   witness only Government Exhibit 729.

22         THE COURT:  Go ahead.

23   Q.  Mr. Reinitz, do you recognize this?

24   A.  Yes.

25         MR. BHATIA:  Your Honor, may I approach the witness to

A-1045

908

K1R7TEM2                    Reinitz - cross

1    hand him some documents?

2         THE COURT:  Yes, you may.

3    Q.  Mr. Reinitz, I am handing you what has been marked as

4    Government Exhibit 729 for identification purposes only, and

5    Exhibit 731 for identification purposes only.

6    A.  OK.

7    Q.  Mr. Reinitz, was the date of the chats in Government

8    Exhibit 729 April 10, 2019?

9    A.  I mean as I'm looking at it now, I'm not sure.

10   Q.  Can Government Exhibit 731 refresh your recollection?

11   A.  Yes.

12   Q.  Do you recognize these chats?

13        THE COURT:  I think you've asked if it refreshes his

14   recollection, but you haven't established what the refreshed

15   recollection is.

16   Q.  Does this refresh your recollection that these chats were

17   sent on April 10, 2019?

18   A.  Yes, they were sent on April 10, 2019.

19   Q.  And what are these?  What is this chat?

20   A.  Those are two messages from myself to Mr. Teman.

21   Q.  The next page of this conversation, do you recognize these

22   chats?

23        THE COURT:  What document number?

24        MR. BHATIA:  This is the same document but the next

25   page.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1R7TEM2                        Reinitz – cross

1          THE COURT:  Very good.  Thank you.

2   A.  Yes.

3   Q.  Are these further messages between you and Mr. Teman?

4   A.  Yes.

5   Q.  Do you recognize what's on the third page of this document?

6   A.  Yes.

7   Q.  What is this?

8   A.  It's another message from myself to Mr. Teman.

9          MR. BHATIA:  Your Honor, the government offers

10  Government Exhibit 729.

11         THE COURT:  Any objection?

12         MR. GELFAND:  No, your Honor.

13         THE COURT:  It's received.

14         (Government Exhibit 729 received in evidence)

15         MR. BHATIA:  You can publish this exhibit for the

16  jury.

17  Q.  Mr. Reinitz, this is a message from you, right?

18  A.  Two messages from me, yes.

19  Q.  Two.  And these are to Mr. Teman, right?

20  A.  Yes.

21  Q.  These were sent on April 10, 2019?

22  A.  Yes.

23  Q.  OK.  And you told Mr. Teman on April 10, 2019 this banking

24  stuff is no joke, right?

25  A.  "The banking stuff is not a joke"  Yes, that's what I

K1R7TEM2                    Reinitz - cross

1  wrote.

2  Q.  And you wrote to him "There are federal regulations on this

3  stuff.  You can't just hit someone's bank account if you know

4  they dispute the charge."  Those are your words, right?

5  A.  That's right.

6  Q.  You were telling Mr. Teman that.

7  A.  Yes.

8  Q.  You also wrote to Mr. Teman a message on the top left here;

9  is that right?

10  A.  Yes.

11  Q.  You wrote "Honestly, I don't know anything about this

12  stuff."  That's from you, right?

13  A.  Yes, that's what I wrote.

14  Q.  Those are your words on April 10, 2019?

15  A.  Yes.

16  Q.  You wrote "I honestly don't know anything about this stuff,

17  right?

18  A.  There is more, but, yeah, that's what I wrote.

19  Q.  And then you said, "But there are serious state and fed

20  regulations on this.  You claim that your contract allows you

21  to debit their accounts even after they explicitly protest.

22  I'm just not sure it's that simple."  That's you talking,

23  right?

24  A.  Yes.

25  Q.  You told Mr. Teman on April 10, 2019 that you claim that

A-1048

K1R7TEM2                        Reinitz - cross

1   your contract allows you to debit their accounts.  That's what

2   you wrote to him?

3   A.  Yes, to debit their accounts using -- yes, that's what I

4   wrote.

5   Q.  Your words here are "to debit their accounts"?

6   A.  Yes, in reference to debit payments.

7   Q.  Debit payments means withdrawing money, right?

8   A.  It's a more specific form.  There is debit cards, credit

9   cards, so that is in referencing to debiting using a debit

10  payment.

11  Q.  And you wrote "I'm just not sure it's that simple."  Those

12  are your words?

13  A.  That's right.

14  Q.  Further down this page you also wrote to Mr. Teman, "And it

15  also may be (again speaking out of ignorance) a clear violation

16  of some federal banging violation, in which case your "simple

17  can't miss idea" is now a federal crime."  That's what you

18  wrote to Mr. Teman, right?

19  A.  In reference to his prior messages.

20  Q.  Mr. Reinitz, I'm asking are those your words?

21  A.  Those are my words, yes.

22  Q.  Those are your words on April 10, 2019, right?

23  A.  Yes.

24  Q.  And you were speaking to Mr. Teman?

25  A.  Yes, I was.

A-1049

K1R7TEM2                          Reinitz - cross

1    Q.  And you wrote "speaking out of ignorance," right?

2    A.  Those are my words, yes.

3    Q.  And you wrote "a clear violation of some federal banking

4    regulation"  Is that right?

5    A.  That's right.

6    Q.  You also then wrote "simple can't miss idea" in quotes.

7    Right?  Those are your quotes?

8    A.  Those are my quotes.

9    Q.  Your quotes to Mr. Teman.

10   A.  Yes.

11   Q.  And you wrote "now a federal crime," right?

12   A.  Yeah.

13   Q.  You wrote federal crime, not federal arrest, right?

14   A.  Again in reference to Mr. Teman's previous messages, yes,

15   that's what I wrote.

16   Q.  And that's actually what happened, right, he was charged

17   with a crime?

18   A.  That's what I understand.

19   Q.  That's why we're here?

20   A.  You can tell me but, yeah, that's what I understand.

21   Q.  Mr. Reinitz, you testified on Friday that you were not part

22   of any negotiations between 18 Mercer, Coney Management and ABJ

23   and Mr. Teman over the purchase of the intercoms, right?

24   A.  Purchase?  No.  That's correct, I did not -- I was not

25   involved in any purchase.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1050

K1R7TEM2                          Reinitz - cross

1   Q.  And you never saw any contracts -- and you never saw any

2   agreements between Mr. Teman and any of those parties with a

3   signature at the bottom, right?

4   A.  I saw several -- I saw contracts.  I didn't see a contract

5   with a signature at the bottom, no, that's correct.

6   Q.  That's my question.  You didn't see any sort of document

7   with signatures at the bottom of that page?

8   A.  Signatures as we lawyers would refer to it?  No, not an ink

9   signature on a page, no.

10  Q.  You testified about terms and conditions on Friday, right?

11  A.  As I recall, yes.

12  Q.  You were shown a document called terms and conditions?

13  A.  I was shown several documents, but among them out of there

14  I think there were several sets of terms.

15  Q.  And along with the terms and conditions is a link to

16  something called payment terms, right?

17  A.  There was a link contained -- if we're talking about the

18  same thing, Mr. Bhatia, there is a link contained within the

19  terms and conditions that references payment terms, yes -- is a

20  link to another page which contains payment terms.

21  Q.  Right.  Just so we're on the same page, there is one

22  document called terms and conditions, right?

23  A.  That is correct.

24  Q.  And there is another document called payment terms, right?

25  A.  That's right.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1051

914

K1R7TEM2                          Reinitz - cross

1    Q.   Those are both web pages; is that right?

2    A.   Yes.

3    Q.   They are pages on Mr. Teman's website?

4    A.   On GateGuard's website, yes.

5    Q.   That's right.  And there is a link from the terms and

6    conditions to the payment terms, right?

7    A.   Yes.

8    Q.   There is an URL that you can click on?

9    A.   Yes.

10   Q.   You don't know for a fact whether any of the individuals in

11   this case actually clicked on that link, do you?

12   A.   Do I know for a fact?  I do not know for a fact if they

13   clicked on the link.  I know for a fact that they --

14   Q.   I am only asking if you know for a fact yes or no whether

15   they clicked on that link?

16   A.   I don't know for a fact, no.

17   Q.   Mr. Reinitz, you testified on Friday about when you first

18   started having conversations with Mr. Teman about the payment

19   terms.  Do you remember that?

20   A.   Roughly, yeah.

21   Q.   And you are an attorney, right?

22   A.   Yes.

23   Q.   You bill for your time?

24   A.   Sometimes.

25   Q.   You have billed GateGuard for their work, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1052

915

K1R7TEM2                          Reinitz - cross

1    A.  Yes.

2    Q.  For your work on their behalf, I should say.

3    A.  Some of it.

4    Q.  And you received a subpoena in this case, right?

5    A.  I did.

6    Q.  And you produced documents pursuant to that subpoena?

7    A.  I did.

8    Q.  Some of those documents were invoices, right?

9    A.  They were.

10   Q.  Invoices from your firm to GateGuard, right?

11   A.  Yes.

12   Q.  The first time you sent an invoice listing "consult on

13   payment and ACH issues" was May 2019, right?

14   A.  Yes, that's right.

15   Q.  You had sent him bills before that, right?

16   A.  On other matters, yes.

17   Q.  Mr. Reinitz, you testified on Friday that you received

18   thousands of dollars in legal fees from Mr. Teman, right?

19   A.  Yes.

20   Q.  From GateGuard, I should say.

21   A.  From GateGuard, yes.

22   Q.  I'd like to direct your attention to Government Exhibit 102

23   in evidence, and in particular page 7 of that document.  Do you

24   see a deposit of $297,000 on 4/19/2019?

25   A.  If you can zoom in a little.  Yes, I see that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1053

K1R7TEM2                         Reinitz - cross

1   Q.  Do you see that?  $297,000 is the value of the 27 checks

2   Mr. Teman deposited on April 19, 2019, right?

3   A.  I take your word for it.  I don't know for certain, but if

4   you can show them to me, I can add them up.

5   Q.  But you're not certain.

6   A.  You're asking me to tell you -- that's my understanding and

7   my recollection.

8   Q.  OK, understood.  I will just say you see the $297,000 here,

9   right?

10  A.  I don't have a reason to dispute what you're telling me.

11  I'm just saying if you are asking me to tell you exactly how it

12  was itemized, if it was 27 or -- I mean I can't tell you right

13  not.  If you show me the checks, and can tell you for certain.

14  Q.  So here at the top of the page it says GateGuard, Inc.  Do

15  you see that?

16  A.  I do, yes.

17  Q.  And this is an account ending in 8085?

18  A.  Yes.

19  Q.  Going further down this page do you see a transfer -- a

20  withdrawal, I should say, listed here for $225,000?

21  A.  Yes.

22  Q.  And that's dated April 26, 2019, right?

23  A.  Yes.

24  Q.  And it looks like it's going to transfer to checking 0351?

25  A.  Yes, I see that.

K1R7TEM2                    Reinitz - cross

1          MR. BHATIA:  I am showing the witness Government

2    Exhibit -- I am publishing for the witness Government Exhibit

3    104 in evidence, and this is page 9 of that document.

4    Q.  Do you see at the top of this page it has account ending

5    0351?

6    A.  Yes.

7    Q.  And this is a Friend or Fraud account, right?

8    A.  Yes.

9    Q.  And that's another one of Mr. Teman's companies?

10   A.  Yes.

11   Q.  And on this page you see a deposit of $225,000?

12   A.  Yes.

13   Q.  That's April 26, 2019?

14   A.  Yes.

15   Q.  And you can see on the same date April 26, 2019 a transfer

16   of $180,000 to checking account ending in 1046.  Do you see

17   that?

18   A.  Yes.

19   Q.  That's $180,000?

20   A.  Yes.

21          MR. BHATIA:  I'm publishing for the witness Government

22   Exhibit 106 in evidence, and this is page 7 of that document.

23   Q.  Do you see account ending in 1046 at the top?

24   A.  Yes.

25   Q.  Touchless Labs LLC?

A-1055

918

K1R7TEM2                           Reinitz - cross

1    A.  Yes.

2    Q.  That's another one of Mr. Teman's companies?

3    A.  Yes.

4    Q.  Do you see here a deposit of $180,000?

5    A.  Yes.

6    Q.  And that's on April 26, 2019?

7    A.  Yes.

8    Q.  Is that right?

9    A.  Yes.

10   Q.  And further down the page on April 29, 2019 it says

11   "Transfer Touchless Labs LLC:  Fischer Broyles.  Is that your

12   firm?

13   A.  Yes.  It's misspelled but that's my firm.

14   Q.  And there is one transfer for $15,000, right?

15   A.  Yes.

16   Q.  And there's another transfer for $1500?

17   A.  Yes.

18   Q.  And those are both on April 29, 2019, right?

19   A.  Yes.

20           MR. BHATIA:  Your Honor, may I have a moment?

21           THE COURT:  Yes, you may.

22           THE WITNESS:  Should I step down?

23           THE COURT:  No.

24           MR. BHATIA:  Nothing further, your Honor.

25           THE COURT:  All right.  Any redirect examination,

A-1056

K1R7TEM2                      Reinitz – redirect

1   Mr. Gelfand?

2           MR. GELFAND:  Yes, your Honor.  Thank you.

3   REDIRECT EXAMINATION

4   BY MR. GELFAND:

5   Q.  Good morning, Mr. Reinitz.

6   A.  Hi.

7   Q.  Mr. Reinitz, on cross-examination you were asked a bunch of

8   questions about the WhatsApp chats, correct?

9   A.  Several, yes.

10  Q.  Are WhatsApp chats basically a form of text messaging?

11  A.  That's how I use them.

12  Q.  OK.  How, if at all, between January 2019 and March and

13  April of 2019 did you communicate with Mr. Teman outside of

14  WhatsApp?

15  A.  E-mail, phone, in addition to WhatsApp.  I would say

16  between the three of those, that's where most of our

17  communications went.

18  Q.  I am going to ask you more specifically, but just generally

19  yes or no, did you discuss the subject matter that you

20  testified about this morning about the WhatsApp chats with Mr.

21  Teman by telephone?

22  A.  Yes.

23  Q.  Now, I want to show you some of the documents that the

24  prosecutor showed you last Friday and today.

25          MR. GELFAND:  Could I publish for the jury Government

A-1057

K1R7TEM2                          Reinitz – redirect

1   Exhibit 702, your Honor?

2           THE COURT:  What number?

3           MR. GELFAND:  702.

4           THE COURT:  In evidence?  Yes, you may.

5   Q.  You were asked about this document this morning, correct?

6   A.  Yes.

7   Q.  Just to refresh our recollection, what is the date of this

8   conversation?  And I will zoom in for you so you can see.

9   A.  January 2, 2019.

10  Q.  On January 2nd of 2019 could you please read what Mr. Teman

11  writes to you.

12  A.  "I have ABJ checks (photos).  Our contract allows me to

13  draw their account.  I should just deposit checks from them

14  (totally legal I think)."

15  Q.  Then Mr. Teman continues down there, correct?

16  A.  Yes.

17  Q.  So even though it's different colors, just so we're not

18  confused, the statement you just read and the statement that I

19  just circled, is that both Mr. Teman's statements?

20  A.  Yes.

21  Q.  Can you please read the next Mr. Teman statement beginning

22  with "Why".

23  A.  "Why?  They entered into a contract allows us to draw from

24  their accounts."

25  Q.  Now, that was on January 2, correct?

A-1058

921

K1R7TEM2                    Reinitz - redirect

1    A.  Yes.

2    Q.  Between January 2nd of 2019 and March 28, 2019, what if any

3    advice did you give Mr. Teman about whether or not it was legal

4    to deposit RCCs against the accounts of Coney, ABJ and Mercer?

5    A.  My advice to Mr. Teman was that it was technically legal.

6    His agreement, GateGuard's terms and payment terms gave

7    GateGuard the explicit authority to deposit the RCCs drawn on

8    the accounts of those entities you mentioned, Coney, ABJ and

9    Mercer, but I was concerned that practically there may be

10   consequences that Mr. Teman may encounter if the dispute from

11   those customers was escalated by them.

12   Q.  First of all, how often during that time period, meaning --

13   let's be very precise, January of 2019 to March 28th of 2019 --

14   how often during that time period did you speak to Mr. Teman by

15   phone or in any format other than WhatsApp?

16   A.  Roughly, you know, maybe two to four times a week.  Pretty

17   frequently.  Maybe less, but I would say -- I'm sorry, at

18   minimum once a week.

19   Q.  In those phone conversations did you discuss this subject

20   matter?

21   A.  Yes.

22   Q.  What if anything did you discuss -- did you explain to Mr.

23   Teman about your legal advice in contrast with your pragmatic

24   concerns?

25   A.  My legal advice was, you know, again, as I just testified.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1R7TEM2                    Reinitz - redirect

1   Legally the payment -- my advice to Mr. Teman, direct and

2   unambiguous advice, was legally he had the authority to draw

3   the payments, specifically to deposit RCCs drawn on the

4   accounts of the entities we've mentioned, but I had practical

5   concerns about what the consequences would be.  In other words,

6   once the payments were deposited I was concerned that there

7   would be a further dispute whether it was with the banking

8   institutions or with the customers, and I was concerned where

9   that might lead.

10  Q.  Now, if you look at Government Exhibit 702, you testified

11  that was January 2, 2019; is that correct?

12  A.  You're referring to an exhibit number?  I'm sorry.

13  Q.  I'm sorry, the one that's on the screen in front of you.

14  A.  Yes, January 2, 2019.

15  Q.  Then I want to show you --

16          Your Honor, these are all in evidence.  I'm going to

17  publish Government Exhibit 727.

18          THE COURT:  You may.

19  Q.  What is the date on the next WhatsApp chat the government

20  showed you?

21  A.  April 2, 2019.

22  Q.  Now, you were asked about the statement here "Meanwhile

23  Bank of America put a hold ..."  Correct?

24  A.  Yes.

25  Q.  To be clear, prior to April 2nd of 2019 were you aware that

K1R7TEM2                    Reinitz - redirect

1    Mr. Teman intended to deposit the two checks that were

2    deposited on March 28th of 2019?

3    A.  Yes.

4    Q.  And what if any advice did you give Mr. Teman prior to

5    March 28th of 2019 about whether depositing those RCCs in the

6    name of Mercer and Coney respectively was legal?

7    A.  My legal advice was that it was legal, that the terms --

8    GateGuard's terms and payment terms -- authorized Mr. Teman to

9    deposit those checks.

10   Q.  I am showing you what has been marked as -- I'm sorry --

11   what has been introduced as Government Exhibit 728.  Do you see

12   Government Exhibit 728 in front of you?

13   A.  Yes.

14   Q.  What is the date of these WhatsApp chats?

15   A.  April 3, 2019.

16   Q.  Who is speaking in this top section of the box that I've --

17   the top left white and color that I've marked on the screen?

18   A.  Mr. Teman.

19   Q.  Could you please read what Mr. Teman says to you.

20   A.  "I think maybe we invoice ABJ the device removal fees, they

21   have like 7 buildings at $18K each and then draw their

22   accounts.  We can put into the invoice a reminder link to the

23   terms and a reminder that collections cases add additional fees

24   as outlined at _ "

25         "I think we also send a lawyer letter to Signature

A-1061

924

K1R7TEM2                    Reinitz - redirect

1   Bank and their other bank saying these assets owe us hundreds

2   of thousands of dollars in fees and were, we believe, knowingly

3   involved in fraud and federal perjury and trade secret theft."

4   Q.  The government then refreshed your recollection as to the

5   date of Government Exhibit 729.  To be clear, was that April

6   10th of 2019?

7   A.  Yes.

8   Q.  Who is speaking on Government Exhibit 729?

9   A.  I am.

10  Q.  Could you please read exactly what you write.

11  A.  "The banking stuff is not a joke.  There are federal

12  regulations on this stuff.  You can't just hit someone's bank

13  account if you know they dispute the charge."

14  Q.  Was this part of an ongoing conversation you were having

15  with Mr. Teman by phone?

16  A.  Yes.

17  Q.  What specifically did you communicate to Mr. Teman by phone

18  on or before April 10th of 2019 about federal regulations?

19  A.  In this instance, as I recall, I was referring to the --

20  excuse me -- debit and credit card charges, which as I

21  understand it there are regulations regarding whether a credit

22  or debit card charge can be charged after a customer disputes

23  it.  That's what I was referencing.  And he and I had discussed

24  that by phone, and that's what I was referencing in this

25  message.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1062

925

K1R7TEM2                    Reinitz - redirect

1   Q.  Was this conversation about RCCs?

2   A.  No.

3   Q.  If you look at the next page.

4          THE COURT:  Which exhibit?

5          MR. GELFAND:  The next page, still Exhibit 729, page

6   2.

7          THE COURT:  Very well.

8   Q.  Is this a continuation of that same conversation?

9   A.  I would need to see the full message, I guess, but I

10  believe -- if it's the same set that Mr. Bhatia just showed me,

11  then, yes, it's a continuation.

12  Q.  At 7:09 a.m. on April 10 you write "You claim that your

13  contract allows you to debit their accounts even after they

14  explicitly protest.  I'm just not sure it's that simple."  Was

15  that in the context of a discussion about RCCs?

16  A.  No.

17  Q.  What was that discussion about with Mr. Teman?

18  A.  As it says, debit charges or the equivalent -- I believe in

19  most cases credit card charges -- we were discussing -- or I

20  was referring to, and we were discussing in that context

21  whether if a customer disputes and you have their credit card

22  on file, was GateGuard authorized to continue to charge their

23  credit card -- or debit their debit card.

24  Q.  Approximately two minutes later --

25          Your Honor, this is the same exhibit,  bottom of page

K1R7TEM2                    Reinitz - redirect

1    2, for the record.

2            When you referenced "a federal crime," was that in

3    connection to credit or debit card transactions?

4    A.  Yes.  Yes.

5    Q.  And in fact if we go to the last page -- page 3 of 3 for

6    the record, of Government Exhibit 729 -- first of all, who is

7    speaking there?

8    A.  I am.

9    Q.  Could you please read what you write to Mr. Teman.

10   A.  "There are regulations around automatic debit agreements.

11   Including, if the payer tells you to stop, you must stop."

12   Q.  Prior to March 28th of 2019, what if any advice did you

13   give Mr. Teman about whether that same rule applies to RCCs?

14   A.  My advice to Mr. Teman was that it did not, to my

15   knowledge -- and based on my research -- apply to RCCs.

16   Q.  Now, you were asked about your communications with Joseph

17   Soleimani and Elie Gabay.  Did you personally communicate by

18   phone and e-mail with Joseph Soleimani and Elie Gabay --

19   meaning ABJ and Coney -- about debts owed to GateGuard back in

20   2018?

21   A.  I personally communicated with Mr. Soleimani by phone and

22   e-mail.  I personally communicated with Mr. Gabay, to the best

23   of my recollection, only by e-mail.

24   Q.  Prior to March 28th of 2019 did Mr. Teman provide to you

25   his written e-mail correspondence with these two individuals as

K1R7TEM2                    Reinitz - redirect

1   it related to billing disputes?

2   A.  E-mails, yes.  He provided e-mails, as well as additional

3   communications, I believe, text message, WhatsApp messages as

4   well.

5   Q.  Now, did any of the correspondence that Mr. Teman provided

6   you regarding his communications with Joseph Soleimani

7   specifically reference the fees that were ultimately the

8   subject of the RCCs?

9   A.  To the best of my recollection, yes.

10  Q.  Would it refresh your recollection to see that e-mail

11  correspondence?

12  A.  Yes.

13          MR. GELFAND:  Your Honor, may I show just the witness?

14  I just want to make sure I'm showing just the witness.

15          THE COURT:  I don't know what exhibit.

16          MR. GELFAND:  Defense Exhibit 71.

17          THE COURT:  Have you given me a copy?

18          MR. GELFAND:  I haven't.

19          THE COURT:  Please hand it up.

20          MR. GELFAND:  May I?

21          THE COURT:  Yes.

22          You may show it to the witness.

23          MR. GELFAND:  Thank you, your Honor.

24  Q.  Without reading any of it into the record, can you tell me

25  if you see what has been marked as Defendant's 71, Mr. Reinitz?

A-1065

K1R7TEM2                        Reinitz - redirect

1    A.  Yes, I see it.

2    Q.  Just generally speaking, just by topic what is it?

3    A.  It's an e-mail between Mr. Teman and Mr. Soleimani.

4    Q.  What is the date of that e-mail?

5    A.  May 22, 2018.

6    Q.  Was this e-mail provided to you by Mr. Teman prior to March

7    28th of 2019.

8    A.  Yes?

9            MR. GELFAND:  Your Honor, I move Defendant's Exhibit

10   71 into evidence.

11           THE COURT:  Any objection?

12           MR. BHATIA:  Yes, your Honor, objection.  801.

13           THE COURT:  Did this e-mail, Mr. Reinitz, form any

14   part of the legal advice you later gave to the defendant?

15           THE WITNESS:  Yes.

16           THE COURT:  Overruled.  I will receive it.

17           (Defendant's Exhibit 71 received in evidence)

18           MR. GELFAND:  Thank you, your Honor.  May I publish

19   this?

20           THE COURT:  Let me reformulate the question.

21           Did this e-mail inform the legal advice that you gave

22   subsequently to the defendant?

23           THE WITNESS:  Yes, your Honor.

24           THE COURT:  Yes, you may publish it.

25           MR. GELFAND:  Thank you, your Honor.

K1R7TEM2                    Reinitz - redirect

1   Q.  I am going to zoom in.  Can you see this on the screen in
2   front of you?
3   A.  Yes.
4   Q.  Can you tell me first of all who this e-mail is from.
5   A.  Ari Teman, Ari@teman.com.
6   Q.  Who is this e-mail to?
7   A.  Joseph Soleimani.
8   Q.  What is the date of this e-mail?
9   A.  May 22, 2018.
10  Q.  Could you please read the first paragraph beginning with
11  "Joe," and then "When you ..."
12          THE COURT:  Mr. Gelfand, let me just use this
13  opportunity to remind the jury of a limiting instruction I gave
14  last week.
15          You are in the process again of hearing communications
16  between Mr. Teman and Mr. Reinitz, and you may consider these
17  communications to the extent they bear on Mr. Teman's state of
18  mind and his intentions at the times of the events at issue,
19  but there are various factual representations that are embedded
20  in these e-mails, statements that Mr. Teman makes to Mr.
21  Soleimani, for example.  You may not treat those as necessarily
22  true or false.  You are not to consider them for the truth or
23  falsity of what Mr. Teman is stating in the e-mail.  You're
24  receiving this e-mail communication because it's part and
25  parcel of the information that was given to Mr. Reinitz before

K1R7TEM2                    Reinitz - redirect

1   Mr. Reinitz says he gave legal advice to the defendant.

2          Go ahead.

3          MR. GELFAND:  Thank you, your Honor.

4   Q.  Mr. Reinitz, can you please read the brief paragraph

5   beginning after "Joe".

6   A.  "Joe, when you signed up for GateGuard you signed a

7   contract that includes steep fines for removing or disabling

8   devices ($18,000 per device) and includes a multi-year contract

9   to pay for service.  There are no cancellations or early

10  terminations.  Monthly bills past-due incur a major collection

11  fee.  The bill per device is the 10 years of service minus the

12  6 months paid up front (6 months times $99 plus $149 times 9

13  years times 12 months), and the $18,000 fee for removing power

14  from the devices disabling their use.  The amount we sent to

15  collections last week is $268,116 (44,686/device)."

16  Q.  Approximately when did you first become aware of this

17  e-mail correspondence between Mr. Teman and Mr. Soleimani?

18  A.  To the best of my recollection, it would have been maybe

19  September -- August or September 2018.

20  Q.  I am showing you what has been previously admitted as

21  Defendant's Exhibit 14.  Who is this correspondence from?

22  A.  Me.

23  Q.  To whom?

24  A.  Joseph Soleimani.

25  Q.  On what date?

K1R7TEM2                    Reinitz - redirect

1    A.  October 11, 2018.

2    Q.  Could you please read this sentence that I have circled.

3    A.  "The invoice indicates that your agreement with GateGuard

4    is subject to the terms available here" -- with a hyperlink --

5    "and here" with a second hyperlink.

6    Q.  Were the hyperlinks to the contracts?

7    A.  The hyperlinks, as I recall -- I mean we can look at the

8    e-mail itself -- the GateGuard terms and conditions was the

9    first hyperlink, and the GateGuard payment terms was the second

10   hyperlink.

11   Q.  You testified on cross-examination that you did not know

12   whether any of the three entities -- meaning Coney, ABJ or

13   Mercer -- actually clicked on the payment terms link, correct?

14   A.  I don't know firsthand.

15            THE COURT:  The question is what you testified to on

16   cross-examination.

17            THE WITNESS:  I apologize, your Honor.

18   A.  That's correct.

19   Q.  OK.  Prior to March 28th of 2019 -- and for ABJ April 19th

20   of 2019 -- what, if anything, did you communicate to Mr. Teman

21   about how that fact, whether they actually clicked on the

22   payment terms, impacts the legality of the RCCs?

23   A.  My advice to Mr. Teman with regard to whether or not a

24   particular customer clicked on the terms was that in having

25   reviewed GateGuard's sign-up process, having reviewed

A-1069

932

K1R7TEM2                    Reinitz - redirect

1    correspondence with the individual customers, it was my legal

2    opinion and my advice specifically to him that the customers at

3    minimum had what was called constructive notice.  They had been

4    provided numerous opportunities to click on the terms.  Mr.

5    Teman and GateGuard were very up front and direct about

6    notifying them of the terms.  And it was possible they had not

7    clicked on the terms, but my advice was legally they had enough

8    notice that the terms were binding and effective on those

9    customers.

10   Q.  You testified that there was an invoice in May of 2019 from

11   your firm about payment terms and ACH matters, if I heard your

12   testimony correctly.  Correct?

13   A.  Yes, that's correct.

14   Q.  Did you provide invoices to the government from your law

15   firm in connection with invoices generated to GateGuard in

16   connection with this case?

17   A.  Yes.

18        MR. GELFAND:  Your Honor, I guess I'm going to remark

19   this a defense exhibit, 72.

20        THE COURT:  What is it in my binder?

21        MR. GELFAND:  Government Exhibit 732.

22        THE COURT:  Go ahead.  You may inquire.

23        MR. GELFAND:  May I show it just to the witness?

24        THE COURT:  Just to the witness.

25   Q.  Mr. Reinitz, just for your benefit so you can see what

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

933

K1R7TEM2                    Reinitz - redirect

1   Defendant's Exhibit 72 is, I'm going to show you a series of

2   papers and then I'm going to ask you a couple questions about

3   it.

4   A.  OK.

5   Q.  Tell me if I'm going too fast.  Do you recognize what I've

6   marked as Defendant's Exhibit 72?

7   A.  Yes.

8   Q.  What is Defendant's Exhibit 72?

9   A.  It's a collection of several invoices from my firm to

10  GateGuard.

11          MR. GELFAND:  Your Honor, I move Defendant's Exhibit

12  72 into evidence.

13          THE COURT:  Any objection?

14          MR. BHATIA:  Yes, your Honor.  401, 403, 801.

15          THE COURT:  Sustained for now.  You may be able to lay

16  a better foundation, but for now there is a valid 801

17  objection.

18  Q.  Between November 2018 and March 10th of 2018 -- and I can

19  refresh your recollection if it would help -- I may have

20  misspoke.  Let me rephrase.

21          Between November 9th of 2018 and May 10 of 2019, in

22  that time period how many invoices did Fisher Broyles issue to

23  GateGuard Inc.?

24  A.  I would have to review the materials that you just showed

25  if you want an exact number.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1071

K1R7TEM2                          Reinitz - redirect

1            MR. GELFAND:  May I approach, your Honor?

2            THE COURT:  Yes.

3            MR. GELFAND:  Would that refresh your recollection?

4            THE WITNESS:  If you can repeat the question.

5    Q.  Between let's say November 1, 2018 and May 10, 2019, how

6    many invoices did your firm send to GateGuard for legal work?

7    A.  I'm sorry.  The packet I just counted four invoices there.

8            MR. BHATIA:  Objection, your Honor.

9            THE COURT:  Sustained.  That was not the question.

10           MR. BHATIA:  Move to strike.

11           THE COURT:  The issue is do you have a memory of how

12   many invoices your firm sent during that period?

13           THE WITNESS:  I don't have a memory of the exact

14   number.  I provided them all, and I can count them.

15   Q.  Are you familiar --

16           THE COURT:  Mr. Gelfand, you're welcome to elicit

17   whether there is a minimum number, but he can't tell from what

18   you handed him whether that's the entirety, and he has so

19   testified.

20           MR. GELFAND:  I can move on.

21           THE COURT:  Let's do that.

22   Q.  On May 10, 2019 did your firm generate an invoice to

23   GateGuard?

24   A.  Yes.

25   Q.  Did that invoice reference reviewing contract and terms and

A-1072

K1R7TEM2                          Reinitz - redirect

1    conditions for same?

2    A.  Yes.

3    Q.  When was the work reflected in that May 10th invoice

4    actually conducted by members of your firm?

5    A.  The work that's referenced there, I would have to look

6    back.  I believe it would have been in that instance in April

7    of 2019.

8    Q.  Did you bill GateGuard for every minute or hour that you

9    worked for them?

10   A.  I wish, but no I didn't.

11   Q.  Mr. Reinitz, you testified that you are a licensed

12   attorney, correct?

13   A.  Yes.

14   Q.  If I understood your testimony correctly, you testified

15   that you have been GateGuard's counsel and Mr. Teman's counsel

16   for several years, correct?

17   A.  Yes.

18   Q.  Mr. Teman -- I'm sorry.  Mr. Reinitz, when you gave Mr.

19   Teman the advice that you testified about prior to March 28th

20   of 2019 involving the RCCs to these three entities -- ABJ,

21   Coney and Mercer -- did you believe that you had all of the

22   information you needed to give that advice?

23   A.  Yes.

24          MR. GELFAND:  Your Honor, may I have one moment?

25          THE COURT:  Yes.

A-1073

936

K1R7TEM2                              Reinitz - recross

1              MR. GELFAND:  I have no further questions, your Honor.

2    Thank you.

3              THE COURT:  Any recross?

4              MR. BHATIA:  Very briefly, your Honor.

5              THE COURT:  Go ahead.

6    RECROSS EXAMINATION

7    BY MR. BHATIA:

8    Q.  Mr. Reinitz, you testified just a moment ago that you had

9    given Mr. Teman certain advice over the phone, right?

10   A.  Yes.

11   Q.  So you had chats and you also had advice that you gave him

12   over the phone?

13   A.  Chats, phone, e-mail, yes.

14   Q.  You don't have recordings of those phone conversations, do

15   you?

16             THE COURT:  Speak a little louder so everyone can hear

17   you.

18             MR. BHATIA:  Your Honor, I will ask a different

19   question.

20   Q.  What you told Mr. -- I am showing you what has been marked

21   as Government Exhibit 729 in evidence.

22             What you told Mr. Teman on April 10, 2019, at the

23   bottom of this page is, "in which case your 'simple, can't miss

24   idea' is now a federal crime."  That's what you said, right?

25   A.  Yes.

A-1074

937

K1R7TEM2

1          MR. BHATIA:  No further questions, your Honor.

2          THE COURT:  All right.  Any re-redirect?

3          MR. GELFAND:  No, your Honor.

4          THE COURT:  Mr. Reinitz, you may step down.  Your

5     testimony is completed.

6          THE WITNESS:  Thank you, your Honor.

7          (Witness excused)

8          THE COURT:  Defense?

9          MR. GELFAND:  May we just have ten seconds?

10          THE COURT:  Of course.

11          MR. GELFAND:  Your Honor, the defense rests.

12          THE COURT:  All right.  Ladies and gentlemen, you have

13     just heard defense counsel represent that the defense rests.

14     That means that the defense case is now complete.  We are at an

15     important juncture at the trial in which I need to spend a

16     little time with counsel.

17          What I'm going to do for the time being is just give

18     you your midmorning 15 minute break and bring you back in.  At

19     that point I will be in a better position to tell you where

20     we're headed over the course of the balance of the day, but I

21     need to take a little more time with the lawyers.  I will see

22     you in 15 minutes.  Please don't discuss the case.

23

24          (Continued on next page)

25

K1R7TEM2

1           (Jury not present)

2           THE COURT:  All right.  Be seated.  To begin with, let

3    me just confirm, Mr. Teman, that that was in fact your decision

4    not to testify.

5           THE DEFENDANT:  Yes, your Honor.

6           THE COURT:  And you understood that it was your

7    decision and yours alone to make.

8           THE DEFENDANT:  Yes, your Honor.

9           THE COURT:  OK.  With the defense having rested, there

10   are a handful of things we need to take up.

11          First of all, with respect to forfeiture -- go ahead.

12          MR. GELFAND:  I just didn't want to waive anything,

13   but I'm happy to take up our Rule 29 motion at whatever time

14   the Court would prefer.  I just wanted to notify the Court that

15   we were moving pursuant to Rule 29 at the close of the defense

16   case for judgment of acquittal.

17          THE COURT:  Very good.

18          MR. GELFAND:  We would incorporate all of the

19   arguments previously raised, and we would just assert as a

20   general matter that as to all counts and all elements of all

21   counts there is no reasonable basis that a reasonable jury even

22   in the light most favorable to the government could convict Mr.

23   Teman.  We would ask the Court to enter a judgment of acquittal

24   as to all possible counts.

25          THE COURT:  Is there any particular element you are

K1R7TEM2

1    drawing to my attention now?

2         MR. GELFAND:  Your Honor, no differently than what we

3    previously referenced.  We are obviously happy to reargue it.

4         THE COURT:  It's not necessary.  I mean, look, having

5    found sufficient evidence on which a jury could convict on all

6    elements of all counts, including with respect to venue, which

7    was a significant focus -- not an element but a significant

8    focus of the discussion before -- that evidence has not been

9    removed from the pile.  There therefore remains sufficient

10   evidence, in my judgment, on which a jury could return a

11   verdict for the government.  I therefore deny the Rule 29

12   motion.

13        MR. GELFAND:  Thank you.

14        THE COURT:  Again depending on the direction the case

15   takes, there may or may not be any occasion for defense counsel

16   to make a post-verdict motion along those same lines, and you

17   are absolutely at liberty if that series of events comes to

18   pass to do so, and I will be happy to reassess afresh arguments

19   you make based on a closer view of the transcript and the

20   record.

21        MR. GELFAND:  Thank you.  I just wanted to preserve

22   the record.

23        THE COURT:  Having taken care of that, government,

24   where are we on forfeiture?

25        MR. BHATIA:  Yes, your Honor.  Having reviewed Rule

K1R7TEM2

1    32.2, we believe under 32.2B5 there is no right to a jury

2    determination unless there is an issue of forfeiture as to a

3    specific property.  Here at this time the government is not

4    seeking forfeiture of specific property, and accordingly we

5    don't believe there is that right to jury determination.

6            THE COURT:  Defense counsel, in my limited review that

7    I have been able to undertake since the subject unexpectedly

8    came up earlier this morning, that aligns with my understanding

9    as well that the right to a jury verdict with respect to

10   forfeiture is triggered by a claim as to specific property, as

11   to which none is made here.  Do you have a different view of

12   the law?

13           MR. DIRUZZO:  Your Honor, it's my understanding that

14   the government is seeking to forfeit the money that's in -- and

15   I could be wrong -- the Bank of America accounts that are in

16   essence not in GateGuard or Mr. Teman's --

17           THE COURT:  That does not appear in the indictment

18   though, does it?

19           MR. DIRUZZO:  No it doesn't.  That's my understanding

20   of what they're getting at.

21           THE COURT:  They may be getting at a quantum, some

22   dollar amount of money, but I didn't understand the indictment

23   to seek to forfeit the specific contents of a specific account.

24           MR. DIRUZZO:  That is correct.

25           THE COURT:  Government, is that correct?

A-1078

K1R7TEM2

1          MR. BHATIA:  Your Honor, we considered forfeiting

2     those as substitute assets.

3          THE COURT:  That's a different story.

4          MR. BHATIA:  Defense counsel is correct.

5          THE COURT:  OK.

6          MR. BHATIA:  I'm sorry, your Honor is correct, we're

7     not seeking specific property here.  We were considering those

8     as substituted assets.

9          THE COURT:  Defense, given that, is there a basis for

10    a jury determination here as to forfeiture?

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-1079

942

K1RVTEM3

1    MR. DiRUZZO:  I don't think so, Judge.

2    THE COURT:  All right.  Look, so as to be clear, the

3  government, to the extent that you prove wrong in your

4  assessment of what a jury determination is needed for with

5  respect to forfeiture, in not pursuing a jury determination,

6  you are forgoing that right.  I don't think that means you have

7  forgone anything here because, in fact, the indictment doesn't

8  seek any specific property to be forfeited.  But just for

9  clarity's sake, that is what has just happened, agree?

10    MR. BHATIA:  Yes, your Honor.

11    THE COURT:  All right.  Very good.

12    All right.  So forfeiture will not go to the jury.

13  And that means, in particular, in any event, the indictment

14  that goes to the jury can't include forfeiture language.  And

15  there won't be a second stage of deliberations in the event of

16  a guilty verdict.

17    All right.  I need to complete the charge conference.

18  But I think, regardless, the better judgment here will be to

19  give everybody some break so that you can get ready for closing

20  arguments.

21    Let me do this -- so you will get a break after this,

22  the question will just be how long.

23    Let's see if we can finish the charge conference

24  promptly now, which, in turn, will give me a much better idea

25  how much time we need to allocate, once I bring the jury in,

A-1080

943

K1RVTEM3

1    for a break before closing arguments.

2           We were on page 18, and nobody had anything further on

3    18.  Government, I think you had indicated, without prejudice,

4    that thus far you have no other changes.

5           Defense, what's your next page?

6           MR. GELFAND:  It's page 33, your Honor.

7           THE COURT:  Cooking with gas.  All right.  We're up to

8    page 33.  Good.

9           And that is on which instruction?

10          MR. GELFAND:  It's the conscious avoidance

11   instruction, your Honor.

12          THE COURT:  Yes.

13          MR. GELFAND:  We would object to the inclusion of a

14   conscious avoidance instruction on the grounds that there is no

15   basis.  However, in the event the Court gives a conscious

16   avoidance instruction, we would specifically focus on the

17   language starting at the bottom of page 33, your Honor,

18   beginning with:  Here, the government argues that the defendant

19   consciously avoided.  And it continues as to what the defendant

20   argues.

21          At this point, nobody has argued anything.

22          THE COURT:  I appreciate that.  And nor has the --

23   nobody has had an argument -- an opportunity to do so.  But I

24   was drawing on our colloquy on Friday, when I asked the

25   government what the basis was for a conscious avoidance charge.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1RVTEM3

1    And I understood Mr. Bhatia to articulate the argument here.

2    And you, in turn, to -- at least implicitly -- articulate the

3    response.  I'm happy to fine-tune those to make sure they

4    accurately capture your contentions.

5         But the reason for specifying what the basis is here

6    is as follows.  Otherwise, I think there is a risk of a

7    conscious avoidance charge running amuck and potentially being

8    used to the defendant's detriment to address other issues or

9    arguments that counsel are not making.

10        I understood Mr. Bhatia to be making one argument, and

11   one argument alone, relative to conscious avoidance, which is

12   that the defendant, before, quote/unquote, hitting the accounts

13   of his customers, didn't say to them, by invoice or otherwise,

14   you know, You owe $18,000 for the following.  And Mr. Bhatia's

15   point, which aligns well with some of the text messages with

16   Mr. Reinitz, is that that was a deliberate attempt not to have

17   the customer say, You can't do that.

18        Again, you have a counterargument, perhaps more than

19   the one that's summarized here.  But I think there's value in

20   sharpening for the jury the distinct factual context in which

21   this instruction -- to which it's relevant, lest the

22   instruction otherwise be rooted around with or used to -- as

23   mischievously to cover other scenarios that it's not intended

24   for.

25        So on Mr. Bhatia's previous proffer, Mr. Gelfand, I do

A-1082

945

K1RVTEM3

1    think this is a case in which there is a factual basis for a

2    conscious avoidance instruction.  I was personally struck by

3    the fact that there are a lot of invoices for other services in

4    the case; and that the dog that doesn't appear to bark here are

5    invoices for the most -- or perhaps even all -- of the RCCs

6    here.

7         And frankly, particularly in light of the

8    communications with counsel, there's a significant argument

9    that that looks strategic; that Mr. Teman is trying to avoid

10   having a customer categorically object to the charge, with

11   counsel having advised him that banking laws look unkindly on

12   an attempt unilaterally to dock somebody for a charge which the

13   customer has objected to.

14        I understand on redirect that you attempted to

15   recontextualize that as involving a credit card charge,

16   presumably.  But the jury would be entitled to disbelieve

17   Mr. Reinitz, to say the least, and to regard his advice as --

18   which doesn't say credit cards only, as equally applicable to

19   hitting a customer with an unnoticed RCC.  So it seems to me

20   that there's a factual basis for a conscious avoidance

21   instruction and you have a response.  Now the challenge is to

22   make sure that I've accurately captured each side's

23   contentions.

24        Mr. Bhatia, does the paragraph on page 33 that begins

25   with "Here" accurately capture your contention?

A-1083

946

K1RVTEM3

1          MR. BHATIA:  It does, your Honor.  Although I believe

2     there's also a factual predicate based on the fact that, as

3     alleged, the operative provision about withdrawing funds was

4     itself nestled within contracts.  So I think there's a second

5     ground for a conscious avoidance, a factual predicate there as

6     well, for the idea that the initial provision itself might not

7     be objected to.

8          Let me rephrase that.

9          If a customer had seen it, they would have objected to

10     it.  If the defendant nestled it within contracts, then the

11     defendant -- the witness might not -- the customer might not

12     object to it.

13          THE COURT:  You're saying that independent of the

14     invoices from March and April, that the defendant chose a

15     roundabout way of trying to put his customers on notice of the

16     payment provisions.

17          MR. BHATIA:  That's right.

18          THE COURT:  Defense counsel, understanding that you

19     factually controvert the argument, why is that also not a

20     legally viable theory on which a conscious avoidance

21     instruction is valid?  I appreciate that -- I'm happy to

22     summarize your counterargument if I include that, but why is

23     that also not something that a jury could apply a conscious

24     avoidance instruction to?

25          MR. GELFAND:  Let me make sure that I understand --

A-1084

947

K1RVTEM3

1      THE COURT:  The point is that Mr. Teman used fine

2  prints and hyperlinks to alert the jury to the whole RCC

3  avenue, rather than doing so more frontally.

4      MR. GELFAND:  First of all, without litigating the

5  facts right now, I don't think that's accurate.  It's the same

6  size font, it's -- the whole idea that this is, quote/unquote,

7  fine print we would take issue with.

8      But I think more to the point of the conscious

9  avoidance analysis, I don't think that directly speaks to good

10  faith or conscious avoidance.  In other words, the documents

11  speak for themselves.

12      THE COURT:  I think, Mr. Bhatia, I'm going to leave

13  that one out.  You're at liberty to argue the point that

14  Mr. Teman wasn't trying very hard to draw his clients'

15  attention to the RCC formulation.  But it seems to me that the

16  really more substantial argument for conscious avoidance is the

17  one that's articulated here.

18      MR. BHATIA:  I understand, your Honor.

19      I think what you said yesterday is right, which is

20  that the earlier conduct is bound up in consciousness of guilt

21  and some other issues.  So I understand why it might not be

22  appropriate.

23      THE COURT:  Right.

24      There's a lot of evidence here that forms a basis of

25  consciousness of guilt.  But conscious avoidance involves

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1085

948

K1RVTEM3

1    denying a knowledge of a fact.  And here, I think the -- I

2    think as the draft jury instruction captures it, that is a

3    valid instruction as to whether the customers would reject the

4    charge.

5            And if anything, Mr. Reinitz's testimony made that

6    even more relevant as a theory, insofar as Mr. Reinitz, on one

7    reading of this advice, tells Mr. Teman, banking laws say if

8    the customer rejects a check, you can't simply unilaterally

9    take from them.  Given that, the conscious avoidance charge as

10   to that set of facts has particular traction.

11           MR. BHATIA:  That's right.

12           THE COURT:  So with no edit, then, I take it, to the

13   conscious avoidance instruction, Mr. Bhatia, as I put it, from

14   the government's perspective; correct?

15           MR. BHATIA:  That's what I was going to say.

16           THE COURT:  All right.  So, defense counsel, just give

17   me -- I'm happy to consider a tweak as to how you'll

18   recapitulate this.

19           MR. GELFAND:  Your Honor, we're happy to propose that

20   now or --

21           THE COURT:  I'd rather now, because I will be giving

22   you a break and then getting into the print function with

23   respect to the charge.

24           MR. GELFAND:  Your Honor, what we would propose in the

25   alternative to our objection -- obviously in general to the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1086

949

K1RVTEM3

1    instruction -- is that the sentence on page 34 that begins with

2    "The defendant disputes" --

3          THE COURT:  Right.

4          MR. GELFAND:  -- "that he consciously avoided learning

5    such information," we would ask that the Court add the

6    following language to the end of that sentence:  Comma and

7    communicated with his customers, comma, both personally and

8    through his attorney, comma, Ariel Reinitz.

9          THE COURT:  What's the end of the sentence?

10   Communicated what?

11         MR. GELFAND:  Communicated about the relevant facts.

12   In other words, I want to be careful in not having the Court

13   basically comment on the facts.

14         THE COURT:  All right.  I'll just say the relevant

15   facts.  That's fine.  I'm happy to include that clause.

16         I mean, look, I did note that the dog that didn't bark

17   in Mr. Reinitz's testimony for all of the approvals of RCCs

18   conceptually was that Mr. Reinitz was presented with the

19   specific charges in advance of the RCCs being hit.  The

20   questions were tightly phrased by counsel to discuss RCCs as a

21   generic matter, not about the specific charges.  That was not a

22   subject of cross-examination.  But you're welcome to go at

23   that.  In any event, I think your clause is well-taken.

24         Government, any objection to my refining the defense

25   statement of its counter-theory this way?

K1RVTEM3

1           MR. BHATIA:  What's the exact language that --

2           THE COURT:  The defendant disputes that he consciously

3   avoided learning such information.  He contends -- he argues

4   that he communicated with his customers, both personally and

5   through his attorney, the relevant facts.

6           MR. BHATIA:  Your Honor, I'm not sure it's appropriate

7   there to build that in.  I think it seems to not encompass all

8   the conduct that could be covered by a conscious avoidance.  I

9   think it might mislead.

10          THE COURT:  I think, as I read that aloud,

11  Mr. Gelfand, I too actually was having a balkiness about it.

12          The issue here is -- I think the right way to do this

13  is if you want to get in the idea of the communications he had,

14  I'm happy to say, He argued that -- argues that he believes in

15  good faith, comma, based on communications with his customers,

16  comma.  I'm happy to do that.  I think that's a better way to

17  capture it.

18          So would you like me to do that?  In other words,

19  after the word "good faith," to caret in the idea that you

20  want, that there were communications he had with customers and

21  the like?

22          MR. GELFAND:  Yes, your Honor.  We would also add "and

23  his attorney."

24          THE COURT:  Okay.  Based on communications with his

25  customers.

A-1088

K1RVTEM3

1          (Pause)

2          THE COURT:  All right.  How about this:  The defendant

3     disputes that he consciously avoided learning such information.

4     He argues that he believes in good faith, based on his

5     communications with his customers and his understanding of

6     communications he believes his attorney had had with his

7     customers, that the customers had given him advance approval

8     for these charges and also advance approval to remotely create

9     checks on their accounts as a means of paying the debts that

10    they owed him.

11         That captures your concept.

12         MR. GELFAND:  That works.

13         THE COURT:  Government?

14         That is the defense argument, even though you refute

15    it.

16         MR. BHATIA:  I don't take objection there to that part

17    of it.  I don't recall if Mr. Reinitz testified that he had

18    communications with the witnesses in which -- the customers in

19    which they acknowledged the agreement and then he relayed that

20    to Mr. Teman.  I recall him testifying that he had

21    conversations with Mr. Soleimani and with Mr. Gabay.  I don't

22    recall him testifying that he then relayed those to the

23    defendant in a way that would negate a conscious avoidance

24    instruction.  I only want to make sure the factual predicate is

25    there.

A-1089

952

K1RVTEM3

1     MR. GELFAND:  Your Honor, there's the email about the
2  release from Mr. Soleimani that Mr. Reinitz expressly shared
3  with --
4     THE COURT:  I think there's enough here to justify the
5  defense formulation.
6     All right.  I need to get the jury just to give them
7  some instructions.  Defense, I understood you only had one
8  other thing to go with respect to the charge?
9     MR. GELFAND:  One other objection and one request for
10  an additional charge that we submitted.
11     THE COURT:  All right.  Just what is -- just in a
12  sentence, what is that other charge, just so I have a sense of
13  how long we're going to take?
14     MR. GELFAND:  An RCC charge, your Honor.
15     THE COURT:  All right.  We'll get to that.
16     All right.  Counsel, it's 11:15.  I need to finish the
17  charge conference.  And then obviously we have a little bit of
18  a document production process, both us and Mr. Magliocco.  And
19  I'm hopeful that he is well on his way on what he needs to do.
20     Government, I take it you're confident that
21  Mr. Magliocco will be able to attend to what he needs to by,
22  let us say, 1 o'clock; correct?
23     MR. BHATIA:  I think that's right, your Honor.  If we
24  find out otherwise, we'll let the Court know immediately.
25     THE COURT:  Here is my proposal, which is:  I bring

A-1090

953

K1RVTEM3

1    the jury out, excuse them till 1.  It's 11:15.  I'm hopeful

2    that our business together won't take more than a half hour.

3    In any event, it will give you an hour and-a-quarter both to

4    wolf down some food and to prepare final thoughts on summation.

5            Does that give everyone the time they need?

6            MR. BHATIA:  I think so, your Honor.

7            But we do have a few points that we flagged for the

8    request to charge.  I just wanted to let your Honor --

9            THE COURT:  You do now?

10           MR. BHATIA:  We do actually.

11           THE COURT:  All right.  I will be glad to take that

12   up.  Nevertheless, just the schedule that I've just proposed

13   works, should I give another 15 minutes to counsel and have the

14   jury come back at 1:15?  I want to make sure you have enough

15   time to eat and reflect, but I also want to make good use of

16   the jury's time.

17           MR. BHATIA:  It works for the government.

18           THE COURT:  1 or 1:15, do you care?

19           MR. BHATIA:  I think 1:15 might be better.  I think as

20   long as it lets us finish all the summations and rebuttals

21   today, then I think 1:15 works.

22           THE COURT:  How long do you expect your main summation

23   to be?

24           MR. BHATIA:  I think about an hour, your Honor.

25           THE COURT:  Defense, how long do you think yours will

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1091

954

K1RVTEM3

1   be?

2          MR. GELFAND:  Probably shorter, your Honor, but I

3   would ask for the same amount of time.

4          THE COURT:  I think at 1:15, if it's an hour and an

5   hour, even with a break, how long is rebuttal going to take,

6   half hour?

7          MR. BHATIA:  I think that's right.

8          THE COURT:  I think if we do 1:15, we should be fine.

9   Don't you agree?

10          MR. GELFAND:  Yes, your Honor.

11          THE COURT:  All right.  So let's bring in the jury.

12   I'll have them ready to go at 1:15.  They should have had

13   lunch.  All right.  While the jury comes in, may I just see one

14   lawyer from each side at the sidebar?  Just one housekeeping

15   matter.  I don't need the court reporter.

16          (Pause)

17          (Jury present)

18          THE COURT:  All right, ladies and gentlemen, be

19   seated.

20          You've now completed hearing all the evidence in the

21   case.  And the next step in the case with respect to the jury

22   will be hearing closing arguments from counsel.

23          Before the lawyers present their closing arguments,

24   they are entitled to know precisely the legal instructions that

25   I will give to you after their closing arguments.  I'm still in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1092

955

K1RVTEM3

1    the process of working out issues with them, as is customary in

2    a case like this.

3          So what we are going to do is take an extra long lunch

4    break now.  And I'm going to ask you all to be back and ready

5    to come out at 1:15.  It's now 11:18.  And at 1:15, when you

6    come out, you'll hear closing arguments from the lawyers.  The

7    government goes first; then the defense; and then, because the

8    government bears the burden of proof, the government gets a

9    rebuttal summation.  So you'll hear all those arguments from

10   counsel this afternoon beginning at 1:15.

11         But as you can see, we're making smart progress with

12   respect to the case.

13         So have a good lunch.  As always, don't discuss the

14   case, but be ready for Mr. Smallman to bring you out at 1:15.

15         (Jury not present)

16         THE COURT:  Just before going back to the charge, I

17   just want to make sure that, Mr. Magliocco, we're on all fours

18   with him.

19         I will be needing from him the exhibit list, the

20   witness list, and the redacted indictment.  I assume also, as

21   well, he'll be ready with copies of exhibits.  But I need those

22   three things.  I will ask that he, one by one, email them to

23   our chambers.  I'm assuming with respect to everything the --

24   you should copy defense counsel.  I'm assuming defense counsel

25   won't have any objection to these rather unremarkable

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1093

956

K1RVTEM3

1    documents.  But, defense counsel, look immediately what you

2    get, in the event there is an objection.

3            I'd like to get this soon, because I don't know

4    whether I'll begin charging the jury today; depends on the

5    length of closing arguments.  But if I do, I want to have handy

6    with me the handouts, which are 12 of all of the same documents

7    for each juror.  So I don't want my chambers to still be

8    copying and producing while we are hearing closing arguments.

9    I want my staff to be able to be here during summations.  So

10   please have Mr. Magliocco get us those things seriatim.

11           MR. BHATIA:  We will.

12           THE COURT:  So let's continue through the proposed

13   charge.  We're on page 34.  And I know that at the end I have

14   to come back to the RCC request that I gather the defense will

15   give.

16           All right.  What's the next page that the defense has

17   after page 34?

18           MR. GELFAND:  35, your Honor, instruction J, false

19   exculpatory statements.

20           THE COURT:  Right.

21           MR. GELFAND:  There weren't any false exculpatory

22   statements in this case.

23           THE COURT:  Government, you had asked for this

24   instruction, I believe.  What are the false exculpatory

25   statements in the record, if any?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1RVTEM3

1          MR. BHATIA:  Your Honor, I believe there are some in

2     the chats that were admitted through Mr. Reinitz.  There are

3     some statements in there in which the defendant is stating his

4     authority -- you know, his professed authority to deposit the

5     checks.  So we think that under that rubric, this is

6     appropriate.

7          THE COURT:  That's what I assumed this referred to,

8     which is the defendant's claim that customers had approved

9     various charges.  Again, the defense is entitled to dispute

10    that.

11          This is a customary formulation of the charge.

12    Assuming, Mr. Gelfand, that I am to give it, is there anything

13    you want me to say here?  For example, these are the post hoc

14    statements he makes to his lawyers about what just happened.

15          MR. GELFAND:  I understand.  I'm just reviewing it.

16          THE COURT:  Say again?

17          MR. GELFAND:  I understand.  I'm just reviewing it

18    just to make sure.

19          Would the Court be willing to add in the second

20    sentence, where it says:  The government claims that these

21    statements in which the defendant exculpated himself are false,

22    the government claims, comma, and the defense disputes, comma?

23          THE COURT:  Why don't I just say, The defense disputes

24    this, just at the end -- an additional sentence.

25          MR. GELFAND:  Sure.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1095

K1RVTEM3

1          THE COURT:  That adds balance.  That's fine.

2          All right.  With that change, understanding that you

3     oppose giving such an instruction generally, are you okay with

4     the wording of the instruction?

5          MR. GELFAND:  Yes, your Honor.

6          THE COURT:  Government?

7          MR. BHATIA:  The addition is fine.

8          THE COURT:  All right.  Defense, do you have anything

9     else apart from the RCC instruction?

10          MR. GELFAND:  No, your Honor.

11          THE COURT:  All right.  Before we get to that,

12     government, I think you came up with several additional --

13     several objections.  Just in order, what page are they on?

14          MR. BHATIA:  18 is the first one, your Honor.

15          THE COURT:  Sorry, 18?

16          MR. BHATIA:  Page 18.

17          THE COURT:  Go ahead.

18          MR. BHATIA:  This is in Counts One and Two, bank

19     fraud.

20          THE COURT:  Right.

21          MR. BHATIA:  In the second paragraph, there's a

22     statement there saying:  Deposit an April 2019 of 27 checks.

23     And then I think our concern is about the rest of that

24     sentence:  Allegedly by creating and then making the false --

25          THE COURT:  Right.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1096

959

K1RVTEM3

1          MR. BHATIA:  That seems a bit too narrow, your Honor.

2    That's focused there on pretenses and representations, at least

3    under the bank fraud statute --

4          THE COURT:  I appreciate that.  How else is the bank

5    being defrauded, except by the deposit of checks that are being

6    deposited based on a false claim of authorization?  I mean, I

7    appreciate that the fraud statute has different dimensions, but

8    there are cases in which the same conduct, if established,

9    makes out both variants.

10          How else is the bank being defrauded, except that it's

11   being told that the customer has approved this, when it hasn't?

12   I mean, an RCC is a not inherently illegal thing; so it's not

13   that he is claiming these are other than RCCs.

14          MR. BHATIA:  I think that our concern is, in

15   particular, about focusing the case on authority.  That could

16   convey that this boils down to a contract dispute, and that

17   nominal authority would obviate criminal culpability.

18          THE COURT:  The case has been tried entirely on the

19   basis of the dispute about whether the defendant believed he

20   had authority or was pretending that he had authority.  If that

21   wasn't the theory of liability, if there's something else,

22   that's news to me.  In other words, I don't understand what the

23   alternative theory is here.

24          If the defendant believed he had authority to do what

25   he did, why is there a bank fraud?  He deposited the money and

A-1097

960

K1RVTEM3

1    he took it out when it cleared.  He's innocent under those

2    circumstances.

3          MR. BHATIA:  The defendant could have a belief that he

4    is nominally legally authorized under a contract dispute.  But

5    he knows the customer is going to dispute it and, as a result,

6    that results in --

7          THE COURT:  Sorry.  But that goes under the intent to

8    defraud; but that ultimately is about the authority.

9          If, in fact, he has the right, legally, the authority,

10   to dispute this -- to deposit the checks, he doesn't have

11   intent to defraud here.  What else is he representing to the

12   bank?

13         If, in fact -- if you could look into his mind and

14   conclude that Mr. Teman believed he had the authority to

15   deposit the checks, he's not then making a false statement to

16   the bank; there's no freestanding obligation in that

17   circumstance to tell the bank that this is a fairly arguable

18   legal question or something like that.  Then it's just a civil

19   dispute.

20         The issue here is whether he falsely pretended to the

21   bank that he had the customer authority to create and deposit

22   the checks.  That's what the case has always been about.

23         And witness your use of the word "counterfeit."  Now,

24   I agree with you that there is no basis known to me under which

25   some additional theory of counterfeit, some technical

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1098

K1RVTEM3

1   definition applies; but when you and I discussed this last

2   week, it was understood that the term "counterfeit" as returned

3   in this case meant created and without authority.

4           So, I mean, I just don't get what you're saying,

5   except as a theoretical matter, what the theory of fraud here

6   is other than the false pretense and representation to the bank

7   that he had the customer's authority.  It's entirely the way

8   the case has been charged and litigated.

9           Articulate for me some other theory of fraud, assuming

10  that those facts are untrue and they run in Mr. Teman's favor.

11          MR. BHATIA:  Your Honor, if we may have a moment.

12          (Counsel conferred)

13          MR. BHATIA:  Your Honor, I think as far as the theory

14  of criminal culpability, I think you're right.  You're right

15  that ultimately that's what the case came down to, that's how

16  the evidence came in, about whether the defendant was

17  authorized and knew he was authorized or not.

18          We have a separate concern with this language here,

19  which is that by focusing --

20          THE COURT:  All right.  So you agree that whether we

21  are talking about the scheme to defraud or the false pretenses

22  or representations theory, it ultimately comes down to the

23  false pretense of customer authorization.

24          MR. BHATIA:  That's right.

25          THE COURT:  Okay.  Go ahead.

A-1099

962

K1RVTEM3

1          MR. BHATIA:  The separate concern is that by focusing

2     on the false pretense and representation, it could be conveyed

3     to the jury that this is reading out the scheme to defraud

4     element of bank fraud.

5          THE COURT:  So you don't want to necessarily track the

6     statutory language.  Well, what's the alternative language you

7     want?  It seems to me that this captures what your theory is

8     and avoids editorializing and using, in fact, statutory prose.

9     But I'm open to an alternative tweak.  I'm trying to neutrally

10    capture your theory here, what the indictment alleges.

11         MR. BHATIA:  I think we could stop after 27 checks.

12    So deposit in April 2019 of 27 checks.

13         THE COURT:  No, no.  Sorry.  Mr. Bhatia, I'm trying to

14    be a force for clarity for the jury.  All that does is to

15    mystify them as to what the theory of liability is here, by

16    getting rid of an articulation of the theory of liability.  And

17    particularly where the indictment uses the word "counterfeit,"

18    but it's not brought under a counterfeiting statute, and you

19    have explained -- and it's consistent with the balance of the

20    indictment -- that that means creation of checks without

21    customer authority, I think I need to articulate that for them.

22    The problem here is that eliminating the explanation here

23    ultimately deprives the jury of useful guidance.

24         If you can't prove to the -- persuade the jury beyond

25    a reasonable doubt that the defendant falsely pretended to the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1100

963

K1RVTEM3

1   bank that he had customer authority to deposit these checks,

2   you lose the case.  That's what the case is about.  And if you

3   prevail on that, which implicitly means that the advice of

4   counsel defense fails, subject to the other technical elements,

5   you likely win this case.  But that's what the case has always

6   been about.

7           I don't understand why you'd want to deprive the jury

8   of a clear articulation of what you have said to me is the

9   theory here.  That was in your opening statement.  My job is to

10  add clarity here, not to turn this into a battle of equitable

11  arguments.  The theory of fraud here is about pretending to

12  have customer authority, knowing he didn't have it.

13          MR. BHATIA:  I think that's what the fact -- I mean

14  that's, I think, what the fact -- that's what the witnesses

15  testified about.  I just want to make sure that the language

16  here doesn't read out the first element and convey to the

17  jury --

18          THE COURT:  It says "committing a bank fraud scheme"

19  in the very first sentence of the paragraph.  And the later

20  instructions make it clear that both species of bank fraud

21  liability can often collapse -- overlap, as they clearly do in

22  this case.

23          MR. BHATIA:  Your Honor, this is --

24          THE COURT:  In the event there is a defense argument

25  that tends to make the suggestion that why I've read out the

A-1101

964

K1RVTEM3

1    scheme liability, I will very forcefully correct that,

2    Mr. Gelfand or Mr. DiRuzzo, who's ever doing the jury argument,

3    don't do that.  That's clearly not what I'm intending to do.

4    I'm trying to explain in explain English the theory of fraud

5    here.

6            But Mr. Bhatia's point is well-taken.  If counsel were

7    to attempt to suggest that my shorthand for describing the

8    scheme here was reading out the scheme to defraud means of

9    establishing 1344, I will correct that in unequivocally firm

10   terms.

11           MR. GELFAND:  We're not going to do that.

12           THE COURT:  I didn't think you were.

13           All right.  Government, anything else?

14           MR. BHATIA:  Yes, your Honor, on page 20.

15           THE COURT:  Yes.

16           MR. BHATIA:  This is in the first full paragraph.

17   There's a sentence:  However, you must be unanimous in your

18   view as to the type of scheme or artifice that existed.

19           I think we wanted to change that to say that:  In your

20   view as to at least one -- I think at least one of the types of

21   scheme or artifice that existed.  I think it's not that

22   there's --

23           THE COURT:  That's fine.

24           So as to say:  As to at least one type of scheme or

25   artifice that existed.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1102

965

K1RVTEM3

1           That's fine.  I understand.  The point is well-taken.

2           Defense, no objection?

3           MR. GELFAND:  No objection.

4           THE COURT:  All right.  Very good.  Good catch.

5           MR. BHATIA:  Your Honor, this is on page 31.

6           THE COURT:  One second.

7           MR. BHATIA:  It's right before the good-faith

8   instruction.

9           THE COURT:  Yes.  This is unanimity.

10          MR. BHATIA:  That's right.

11          THE COURT:  The subject we covered last week.

12          MR. BHATIA:  We did.

13          The last line says:  Unanimous agreement as to either

14  entity.

15          We wanted to -- we propose changing that to at least

16  one entity -- "unanimous agreement as to at least one entity,"

17  just to imply it's not either/or.

18          THE COURT:  It means the same thing; you just think

19  it's clearer prose.

20          MR. BHATIA:  That's right.

21          THE COURT:  Defense, I think that's fine.

22          MR. GELFAND:  That's fine, your Honor.

23          I just want to make sure that sentence is not

24  confusing, because this is kind of a hypothetical involving two

25  entities as opposed to three.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1103

K1RVTEM3

1          THE COURT:  I used Count Two to make it easier,

2    because it's fewer entities involved.

3          MR. GELFAND:  Sure.  I'm just saying so when you say

4    as to either entity, that makes sense within the context of

5    that hypothetical.

6          THE COURT:  Yes.  But in the context of -- it says

7    here one entity.  I think that's fine.  Mr. Bhatia's point is

8    just as a matter of prose, "one" is clearer than "either."

9          MR. GELFAND:  That's fine.

10          THE COURT:  Okay.  Good.

11          Anything else?

12          MR. BHATIA:  The last one is on the next page, your

13    Honor.  The first line --

14          THE COURT:  But otherwise, look, we spent a little

15    time discussing unanimity.  I'm not going to give a special

16    verdict, but I did want to make sure, given the way the case

17    was tried, that the jury is in agreement as to a particular

18    entity.  You were skeptical of my chambers' ability to

19    formulate a unanimity instruction that's key to the customer.

20    With the change you've made, I think it does clearly enough

21    capture the concept.  Do you have a problem with the way it is

22    wordsmithed?

23          MR. BHATIA:  No, your Honor.  I think it's good.

24          THE COURT:  Okay.  Go ahead.

25          MR. BHATIA:  The next one, your Honor, is on page 32.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1104

967

K1RVTEM3

1    It's the first line of the advice of counsel --

2            THE COURT:  Right.

3            MR. BHATIA:  -- instruction.

4            We propose changing in the first line:  "You have

5    heard evidence that the defendant received advice from a

6    lawyer," to, "You have heard evidence that the defendant

7    consulted with a lawyer."

8            THE COURT:  That's fine.  That's fine.

9            MR. BHATIA:  And that's it from the government.

10           THE COURT:  That's what?

11           MR. BHATIA:  Oh, one moment, your Honor.

12           THE COURT:  That's fine.

13           Defense, I take it, no problem with that, right?

14           MR. GELFAND:  We're fine with that.

15           THE COURT:  I thought so.  Okay.

16           MR. BHATIA:  And it's come up through the testimony of

17   various witnesses, in cross-examination in particular, that

18   there may be some argument that there was carelessness on

19   behalf of some of the customers in this case.  For that reason

20   we think it may be appropriate to have a sort of form

21   instruction on how the carelessness or gullibility of a witness

22   is no defense.

23           THE COURT:  Where -- did you propose that?

24           MR. BHATIA:  I'd have to take a look at our

25   instructions.  Actually, I think it might have been part of our

K1RVTEM3

1    good-faith instruction, your Honor.

2            Your Honor, I don't believe it was in our request --

3            THE COURT:  I have to say though, you know, it's a

4    terrific jury argument, if the focus is to dump on the

5    customers here, it's a terrific response to remind them that

6    the focus of the instructions is on the defendant's state of

7    mind, and that the customers aren't on trial.  You've got

8    plenty of bases to argue that there were sharp practices with

9    respect to the customers.

10           But defense counsel is also at liberty to impeach the

11   customers and to claim that they've got a monetary interest;

12   and that they regret the agreement they entered into and feel

13   like fools for doing so, but they entered into the agreement;

14   and that the defendant had a good-faith basis to believe that

15   they were thereby bound.

16           One moment.

17           (Pause)

18           THE COURT:  And my law clerk aptly points out that

19   with respect to the bank fraud charge, we do say:  If you find

20   that a scheme or artifice existed, it is irrelevant whether you

21   believe that the bank was careful, careless, gullible, or even

22   negligent.

23           Insofar as the bank is actually the victim here, that

24   language gives you the cover you need as to the bank; and that

25   language is, I believe, picked up as well in the wire fraud

A-1106

K1RVTEM3

1    charges.  I'm not sure it's necessary, since the customers

2    aren't the victims here, to replicate that language as it

3    relates to the customers.  You are both at liberty to argue

4    what the customers' behavior connotes; and you are at liberty

5    to -- if the defense tries to blame any of the victims here,

6    that opens a lot of doors.

7          If you're looking at -- it opens the door to arguing

8    that that's an irrelevancy and a distraction and another means

9    of taking advantage.  There's a lot of stuff that's been

10   admitted in the case without objection in which the defendant

11   was taking advantage of his customers or at least claiming to

12   by doing bad things to them on High Holy Days.  That's a door

13   the defense may not want to open; but if they go there, you'll

14   both go there.

15         MR. BHATIA:  Understood.

16         THE COURT:  But it doesn't seem to me that's a legal

17   charge.

18         Okay.  Anything further from the government?

19         MR. BHATIA:  Nothing further.

20         THE COURT:  Defense, other than RCCs, anything from

21   you?

22         MR. GELFAND:  No, your Honor.

23         THE COURT:  So, look, just to cut to the chase and get

24   you to lunch, we discussed the RCCs prior to trial.  And I

25   resolved the dispute there by not permitting expert witnesses

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1107

970

K1RVTEM3

1    as to RCCs or professor or whatever.  And you had -- I think

2    that wisdom has been borne out that the relevant point is that

3    the jury needs to understand that an RCC is a lawful thing;

4    that this case is not about the small points of RCC compliance,

5    but ultimately is about authorization or not.

6         My instructions make it clear that they should heed

7    the instructions I've given during the course of the case.  I

8    don't see a need though to repeat that in my final instructions

9    any more than any of the other instructions -- limiting

10   instructions and the like I've given along the way.

11        Is there something -- some different content you are

12   seeking about RCCs other than what I have already instructed

13   them?

14        MR. GELFAND:  Your Honor, different content, no.  But

15   I think that because RCCs surfaced as much as we anticipated

16   before trial they would, and there are exhibits, there's

17   testimony about RCCs as recently as the last Signature Bank

18   witness, the Bank of America witness.

19        Perhaps a way to make it easy, because this isn't

20   really a hearsay limiting instruction, it's a more important

21   substantive instruction.  We're just concerned that if it's not

22   in writing to the jury, that we're really depriving the jury of

23   some clarity on that issue.  And maybe just including somewhere

24   other the Court's previous instruction to the jury in writing

25   would solve that concern instead of reinventing the wheel.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1108

971

K1RVTEM3

1        THE COURT:  One moment.

2        I'm reluctant to highlight that particular

3   instruction, but I'm happy to find a way to capture in my

4   instructions a reminder that they are to heed the instructions

5   I've given them over the course of this short trial.  Delighted

6   to find a way to do that, but I am reluctant to elevate the RCC

7   instruction.

8        It may be of importance to you because you would like

9   to portray the case in a way that's more focused on the RCCs.

10  I suspect the government would like to focus the case more on

11  the -- not the formality of how an RCC works, but more the idea

12  that the customers didn't approve these particular charges.

13       Be that as it may, I'm not going to shift -- I'm not

14  going to tilt the terrain in one direction by isolating a

15  particular instruction.  But I'm delighted to remind them that

16  they are to follow all the instructions I've given.

17       Do you have a thought as to where to put that concept?

18       MR. GELFAND:  Perhaps even at the outset of the

19  introductory remarks.  Now it is time for me to instruct you as

20  to the law that governs the case.

21       THE COURT:  Right.

22       MR. GELFAND:  It could be phrased a lot better, but

23  essentially:  I remind you that during this trial I gave you

24  instructions.

25       THE COURT:  Right.  Okay.  One moment.

A-1109

972

K1RVTEM3

1        In that paragraph.

2        (Pause)

3        THE COURT:  I could add a sentence right at the

4   beginning of B along the following lines:  I've instructed you

5   during the trial as to various matters, and you should of

6   course continue to follow those instructions.

7        And then pick up with what I have.  It's pretty hard

8   to argue with that.  But that incorporates by reference all

9   that comes before without hyping the RCC instruction.

10       MR. GELFAND:  We certainly have no objection to that

11  language.

12       MR. BHATIA:  No objection.

13       THE COURT:  All right.  I realize, Mr. Gelfand, it

14  doesn't highlight the RCCs as much as you've wanted, but it

15  does provide a hook for reminding them that all my

16  instructions, which necessarily picks up that one, apply.

17       MR. GELFAND:  I understand, your Honor.

18       Just for the record, we would just request that the

19  Court give our requested RCC instruction and include that

20  instruction in the Court's final instructions.

21       THE COURT:  All right.  Look, again, I don't think

22  that is warranted.  I'm not by any means persuaded that the

23  instruction is, on its own terms, fair and balanced.  But

24  beyond that, it doesn't seem to me necessary here in the

25  context of a charge about the elements of two criminal statutes

A-1110

973

K1RVTEM3

1   to be hyping that area of technical civil banking law.

2          I think RCCs, as relevant here, are really more of a

3   factual matter than anything; and they've been, I think, ably

4   ventilated before the jury.  I'd be surprised if any juror was

5   of the view at this point that an RCC was in some sense

6   inherently unlawful, which is no doubt your concern.  I think

7   it's clear from my instruction and clear from the banking

8   witnesses' testimony that RCCs are a recognized thing.

9          One moment.

10          (Pause)

11          THE COURT:  All right.  Anything else from either side

12   as to my instructions?

13          MR. BHATIA:  Nothing from the government.

14          MR. GELFAND:  No, your Honor.

15          THE COURT:  All right.  Again, who will be doing --

16   Mr. Bhatia, I take it you'll be doing both jury addresses for

17   the government?

18          MR. BHATIA:  That's right.

19          THE COURT:  And who will be doing it for the defense?

20          MR. GELFAND:  I will, your Honor.

21          THE COURT:  All right.  So, again, you'll be speaking

22   from the portable podium with the portable mic.  Please stay

23   close to the mic, just so that your words are picked up.

24          And I'll say this to both of you, although with

25   particular regard to Mr. Bhatia:  In reading, your natural

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1111

974

K1RVTEM3

1    impulse is both to speak softly, but to really speed up the

2    pace.  It's hard -- if not impossible -- for the court

3    reporter, and I don't want to interrupt you to slow you down to

4    make sure that you're speaking at a normal rate of speed, but

5    it also becomes hard for the jury to follow.

6             So I'm not limiting your time; I'm confident we'll get

7    in all the jury addresses if we start promptly at 1:15.  But

8    please, just speak at a -- modulate yourself to speak at a

9    slower rate of speed.

10            And Mr. Imperatore, perhaps, so that I don't need to

11   butt in, because I really like to be quiet during summations,

12   slip Mr. Bhatia a note if you sense that things are going a

13   little too 45 RPM, as we used to say.

14            All right.  Anything further before we take a lunch

15   break?

16            MR. GELFAND:  Just quick clarity, your Honor.

17            Obviously for the substance of summation, I'll stay

18   behind the podium.  There are some exhibits that I'm going to

19   want to show via the Elmo.  Would the Court be okay if

20   Mr. DiRuzzo basically just assists with that?

21            THE COURT:  Of course.  Of course.

22            And, look, your voice is loud enough that if you need

23   to speak while you're operating the Elmo, I imagine you'll find

24   a way through it.  But, as a general matter, stick to the mic,

25   because as you can see just from the experience we've had here

A-1112

975

K1RVTEM3

1    when people go away from the mic or speak softly, either a

2    juror can't hear or I need to butt in or the court reporter

3    can't hear, and Mr. Smallman starts passing me notes about the

4    court reporter's difficulties in hearing.  So I try to be

5    attentive to that.

6            MR. GELFAND:  Thank you.

7            THE COURT:  All right.  So, government, please have

8    Mr. Magliocco firing us off those things.

9            We have a jury snack coming at the usual time.

10   Depending on when Mr. Smallman tells me it arrives, the jury

11   will either be fed between the first and second summation or

12   the second and third.  But my expectation is I will give a

13   short break between both summations so as to allow each

14   responding advocate a little bit of time to adapt.

15           So the jury lunch -- the jury snack won't unfairly

16   favor one side or another; there will be a break between both

17   summations.

18           Thank you.  Have a good lunch.

19           Why don't you be in your seats at 1:10, as opposed to

20   1:15.  Thank you, counsel.

21           MR. GELFAND:  Thank you.

22           (Luncheon recess)

23           (Continued on next page)

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1113

K1R7TEM4                    Summation - Mr. Bhatia

1                        AFTERNOON SESSION

2                            1:15 p.m.

3           (Jury not present)

4           THE COURT:  Does anyone have anything to raise with

5      me?

6           MR. BHATIA:  Nothing from the government.

7           MR. GELFAND:  Nothing from the defense.

8           THE COURT:  And, Mr. Magliocco, thank you for being an

9      active correspondent with my chambers.  I think we have a full

10     set of all the materials we need for the jury's care package,

11     and I thank you for that.

12           I am told by Mr. Smallman we still need two jurors, so

13     we will wait.

14           (Jury present)

15           THE COURT:  Welcome back, ladies and gentlemen.

16     Everyone may be seated.  I hope you all had a good and long

17     lunch break.  We are now about to move to the part of the case

18     in which counsel will give you their closing arguments, in

19     which they share with you their views about what the evidence

20     has shown.  We will begin with the government.

21           Mr. Bhatia.

22           MR. BHATIA:  Ladies and gentlemen, the evidence has

23     proven that the defendant carried out a scheme to steal money

24     from his own customers.  He wrote dozens of checks, fake

25     checks, in order to make money and to take money out of their

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1114

K1R7TEM4                      Summation - Mr. Bhatia

1   bank accounts.  He pretended that his customers had authorized

2   him to issue those checks.  That was a lie.  The evidence has

3   shown you that none of his customers ever allowed him to take

4   money out of their bank accounts or ever even knew that he was

5   going to take it, and through his fraud the defendant lined his

6   own pockets with more than $300,000 that he wasn't entitled to,

7   and because of the defendant's scheme, his bank, Bank of

8   America, lost more than a quarter million dollars.  In short,

9   ladies and gentlemen, the evidence proves beyond a reasonable

10  doubt that the defendant, Ari Teman, committed a blatant fraud,

11  a brazen fraud, and that he is guilty of all the charges in the

12  indictment.

13          This is the government's summation.  It's our

14  opportunity to tie together for you all of the evidence that

15  came in during this trial.  This summation will have four

16  parts.  First, I will talk about what is not really in dispute

17  here.  Second, I will talk about one of the issues that might

18  be in dispute, which is whether the defendant had criminal

19  intent when he deposited the checks.  Third, we will talk about

20  the defendant's supposed defenses -- what I think they might

21  be -- and why they fail.  And, finally, I will specifically

22  talk about some of the elements of the charged offenses.

23          What's not in dispute?  There is quite a bit that's

24  not in dispute in this case.  Ladies and gentlemen, you have

25  heard that the defendant sold intercoms to three customers.

K1R7TEM4                    Summation - Mr. Bhatia

1    Those customers:  18 Mercer -- which you heard about, and you

2    heard about Bonne Soon-Osberger.  You also heard testimony from

3    Gina Hom, who is from Crystal Real Estate, the real estate

4    company that managed the 18 Mercer account.  You also heard

5    from Elie Gabay.  He's the first customer you heard from.  He

6    is from Coney Management.  They operate the account for 518

7    West 204 LLC.  And you will also heard from Joseph Soleimani.

8    He worked at ABJ Properties.  And two of his companies, ABJ

9    Lenox and ABJ Milano own some buildings that had GateGuard

10   intercoms.

11        There is no dispute that all three of these customers

12   bought intercom devices.  Mr. Teman sent them invoices, and

13   using checks from their own bank accounts they paid those

14   invoices.  For a couple thousand dollars they got a few

15   intercoms.  For Mr. Gabay, he got one.  For Ms. Soon-Osberger,

16   she got one for her building.  And in Mr. Soleimani's case he

17   received 7 for several of his buildings.

18        And there is no dispute that the customers were not

19   satisfied.  They weren't happy with the intercom devices.  You

20   heard from Mr. Gabay and Mr. Soleimani that they got

21   complaints, and ultimately they decided to stop using the

22   intercoms.

23        Ladies and gentlemen, there is no dispute that after

24   those three customers decided to stop using the intercoms they

25   bought, the defendant issued checks against their bank

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

979

K1R7TEM4                    Summation - Mr. Bhatia

1    accounts, a total of 29 checks totaling $333,000. And there is

2    no dispute that the defendant -- not the customers -- created

3    those checks from scratch and deposited them in his bank

4    account, the GateGuard account at Bank of America.

5             You saw the checks. And we will take a look at them

6    on the screen. They represented to the defendant's bank, Bank

7    of America, that the defendant was depositing the checks with

8    the permission of his customers. Here is a check made out for

9    $18,000 from the 518 West 205 LLC account -- that's Elie

10   Gabay's Coney Management account -- to GateGuard. Instead of a

11   signature -- you normally see a signature at the bottom right

12   corner of a check -- here Mr. Teman wrote "Draw per contract.

13   No signature required." Those were the words of Mr. Teman.

14   Those were not his customers' words. And by depositing these

15   checks, money was taken of his customers' accounts and

16   transferred to Mr. Teman's account at Bank of America. The

17   defendant spent that money by moving it out of his account and

18   then spending it however he wanted to. And ultimately the

19   customers' banks told Bank of America that these were

20   fraudulent transactions. Accordingly, Bank of America had to

21   send back the money. But because Mr. Teman had already taken

22   it out of his account, there wasn't enough money for Bank of

23   America to repay it, so Bank of America had to spend $260,000

24   of its own money to repay those other customers. So that's

25   what is not really in dispute

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1R7TEM4                    Summation - Mr. Bhatia

1          What is in dispute here is whether the defendant acted

2     with criminal intent when he cut and deposited those checks.

3     Ladies and gentlemen, the evidence proves beyond a reasonable

4     doubt that the defendant represented to the banks that he was

5     issuing checks with the permission of his customers and that

6     was a lie.  The defendant had no permission to issue these

7     checks and he knew it.  Let me talk you through some of the

8     ways that we know he knew he didn't have permission.

9          First, you know from the customers themselves that

10    they never gave the defendant permission to write or deposit

11    these checks.  The defendant knew it.  All three of the

12    customers -- Mr. Gabay, Ms. Soon-Osberger and Mr. Soleimani --

13    told you squarely and told you without hesitation that they did

14    not give Mr. Teman any permission to write those checks.  They

15    all told you the exact same thing, and in fact their stories

16    were largely pretty similar:  Mr. Teman absolutely did not have

17    permission to create and deposit those checks.  And they told

18    you they had no idea he was going to do it.

19          Let's take a look first at some of Mr. Gabay's

20    testimony.  He told you -- and this is on his questioning:

21    "Q.  At any point did Mr. Teman ever ask permission to pay

22    himself by issuing checks from Coney's bank accounts?

23    "A.  No.

24    "Q.  And if he had asked your permission to do that, to write

25    checks from your accounts to himself, what would you have said?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1118

981

K1R7TEM4                         Summation - Mr. Bhatia

1    "A.  I would have said no."

2            And what did Mr. Soleimani say?  Mr. Soleimani told

3    you the same thing:

4    "Q.  What did he ever tell you during those conversations about

5    his authority to draw checks on behalf of those entities?

6    "A.  He never mentioned anything.

7    "Q.  And if he had mentioned them, would that have stuck out to

8    you?

9    "A.  Yes.

10   "Q.  And what would have been your reaction if you had heard

11   about them?

12   "A.  I would have denied it.

13   "Q.  What do you mean denied it?

14   "A.  Denied his authority to draw any checks out of my

15   account."

16           That's what Mr. Soleimani told you.  He told you the

17   same thing all the other witnesses did, which is that if Mr.

18   Teman had ever asked those customers can I draw a check from

19   your account when I think I deserve money, of course they would

20   have said no.  Of course they would have said no.

21           You heard Ms. Bonnie Soon-Osberger tell you the same

22   thing.  I asked her:

23   "Q.  You testified previously that you never saw any provision

24   about -- you did not see a provision about allowing him to draw

25   checks from your account.

K1R7TEM4                    Summation - Mr. Bhatia

1    "A.  That's true.

2    "Q.  If you had seen that, would that have been something you

3    would have included in this message?"  That was the message

4    where she sent comments on the terms and conditions.  She said:

5    "A.  Absolutely.  I just don't have the authority to allow

6    people to write checks; I don't have authority for that, so

7    yes."

8           And then she was asked when shown the check that Mr.

9    Teman wrote:

10   "Q.  Did you authorize Mr. Teman to deposit this check?

11   "A.  Absolutely not.

12          Those are the three customers:  Mr. Gabay, Mr.

13   Soleimani and Ms. Soon-Osberger.  But you also heard from Gina

14   Hom.  She testified on Thursday.  She said she worked at

15   Crystal Management.  That was the management company for the 18

16   Mercer account, and she is actually one of the authorized

17   signers on that account.  Here is what she told you.  She was

18   asked:

19   "Q.  Did you ask the board first whether this was authorized?"

20   That was when she found out about Mr. Teman's check.

21   "A.  No.

22   "Q.  Why not?

23   "A.  Because the only people that were authorized to issue any

24   payments on this would have been myself or Jackeline.  And

25   neither one of us had done it."

K1R7TEM4                          Summation - Mr. Bhatia

1          She didn't even need to ask the board.  It was so

2     obvious to her if Jackeline or I didn't sign this check, it's

3     not authorized.  It doesn't matter what contract is out there.

4     It doesn't matter what Mr. Teman thinks he is owed.  If I

5     didn't write the check, if Jackeline didn't approve the check,

6     it's not an authorized check.  It's that simple.

7          In fact, you heard that from a lot of the witnesses.

8     The defendant never asked them for permission to issue the

9     checks and withdraw money from their bank accounts, and they

10    all told you the same thing.  And this is obvious; this is

11    common sense.  If the defendant had ever asked them for

12    authorization, if he had ever asked them when I think I'm owed

13    money can I draw from your bank account, of course they would

14    have said no.

15         Earlier on when we opened this case last week I said

16    we will ask you to pay attention to the law, pay attention to

17    the facts and use your common sense.  Your common sense also

18    tells you if someone had asked for your corporate account, can

19    I draw money when I think I deserve it, of course you would

20    have said no.  If somebody had asked you that, of course that

21    would stand out in your mind.  And you also know, why because

22    these defendants told you.  They wanted total control over

23    their bank accounts, and they didn't want outside vendors to

24    have access to them.  They decide when check gets paid.  If an

25    invoice comes in, they can decide to pay it.  In fact, you

A-1121

984

K1R7TEM4                    Summation - Mr. Bhatia

1    heard the defendant at one point actually did ask Mr. Gabay for

2    permission to use what is called an ACH.  You heard some

3    testimony about how that is used to withdraw funds.  And what

4    did Mr. Gabay say?  No, you can't take money out of my bank

5    account.  Here is what he said:

6    "Q.  If he had asked you for a form authorizing withdrawals

7    from your bank account, how would you have reacted?

8    "A.  He did ask and we said no.

9    "Q.  Why did you say no?

10   "A.  Because it's note the way we operate.  We only do things

11   by invoice where we issue the check.  He had requested that we

12   enter an order using ACH, and we asked him for invoices only."

13          How else do you know that the customers didn't

14   authorize these checks?  You know it from their reaction when

15   they realized the checks were issued against their account.

16   They were shocked.  They were horrified someone had written a

17   fake check, pretending that they had authorized it, and

18   deposited into their own account.  The victims immediately told

19   their banks, and they told the banks these checks weren't

20   authorized.  Mr. Gabay immediately informed his bank and closed

21   his account.  Ms. Hom immediately told her bank and closed the

22   account.  Mr. Soleimani told the bank, closed the account and

23   then even reported the fraud to the police.

24          Now, let me ask you a basic common sense question:

25   Why didn't the defendant just ask his customers for permission?

A-1122

K1R7TEM4                    Summation - Mr. Bhatia

1    Why didn't he say, "Can I draw this out of your account?"

2    Because he knew they would say no.  Of course they would say

3    no.  Mr. Gabay, Ms. Soon-Osberger and Mr. Soleimani told you

4    that they would have never agreed to let him write these

5    checks.  The fact that he never asked though is devastating

6    proof that he knew this was a fraud, that he had fraudulent

7    intent, and that he knew he didn't have permission.  He knew if

8    he had asked, they would have said no.

9         You didn't see a single e-mail or message where Mr.

10   Teman told a customer if you don't pay, I'm going to write a

11   fake check from your account and address it to myself.  He knew

12   this was a fraud.  He didn't want them to say explicitly no, no

13   way.  If he had asked the customers and they had said no, then

14   the defendant could never have claimed after the fact that he

15   had their authorization.  And he knew it, so he never asked

16   them.  The defendant knew he was committing a fraud plain and

17   simple.  So that's the first reason you know the defendant

18   acted with criminal intent.  Another reason you know that is

19   because he tried and failed and then tried again.

20        You saw the defendant tried to take money from the 518

21   West 204 account even after the customer had reversed those

22   charges.  Let me take this piecemeal.

23        In March 2019 Mr. Teman created a fake check from the

24   518 account worth $18,000 and deposited it into his GateGuard

25   bank account.  He claimed it was for a device removal fee.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1R7TEM4                    Summation - Mr. Bhatia

1    That was the March 2019 check that we talked about. You have

2    seen it a couple times now. He claimed it was for a device

3    removal fee, and Mr. Gabay quickly found out about it and told

4    his bank and the charge was reversed. In fact, Mr. Gabay

5    closed his account.

6         Did the defendant stop? Of course not. Three weeks

7    later -- and these are the April 2019 checks -- Mr. Teman

8    doubled down. On the same account he wrote three more checks.

9    After these ones had been reversed, after the customer had

10   said, no, no way, wrote three more checks. In fact, one of

11   those checks was again for a device removal fee. He tried to

12   get the fee the first time; the customer said this is not

13   authorize and reversed it; and then he tried again for the same

14   fee, except this time it wasn't enough to write one check for

15   $18,000; this time he added another check for $10,000 for a

16   cancellation fee and another check for $5,000 for an attorney

17   use fee.

18        So, you know that the defendant had fraudulent intent,

19   that he had criminal intent, because he tried once, knew the

20   customer didn't want it, and then he tried again. So, that's

21   the second reason.

22        Now the third reason. You know from the fact that the

23   defendant never sent invoices for any of the fees that he

24   charged. You know because the defendant did not send invoices

25   for $18,000, for $10,000 and for $5,000 before he wrote checks

K1R7TEM4                    Summation - Mr. Bhatia

1    from their accounts.

2         Ladies and gentlemen, you heard about how the

3    defendant sent invoices to each of these three customers when

4    they actually bought devices.  That was 2017 for Mr. Soleimani

5    and in early 2018 for Mr. Gabay and Ms. Soon-Osberger.  He sent

6    them real invoices; they said I agree to these; and they paid

7    him with checks out of their account.

8         You heard each of the witnesses tell you how an

9    invoice is how they decide whether to pay for something.  They

10   needed Mr. Teman to send him an invoice so they could decide

11   whether they were going to pay.  In fact, the defendant did

12   send them those invoice and they did pay.  But you heard the

13   defendant did not once send his customers any invoices for the

14   fraudulent checks that he deposited in March 2019 and April

15   2019.  He never sent them any invoices for $18,000 for a device

16   removal fee, and then $10,000 for a cancellation fee, and

17   $5,000 for an attorney use fee.  Why not?  Because he knew that

18   his customers would dispute the payments and tell him that he

19   wasn't entitled to collect them.

20        You saw the e-mail where Mr. Teman told Mr. Soleimani

21   that he owed more than $260,000 -- an incredible amount of

22   money considering that Mr. Soleimani paid a couple thousand

23   dollars for seven intercoms.  Mr. Soleimani responded when Mr.

24   Teman told him he owed him that much money:  "Can you send me

25   the invoices which you are claiming we owe you?  Not sure why

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1R7TEM4                    Summation - Mr. Bhatia

1    we owe you money but I'm glad to look into it." That's the way

2    you do business. If somebody owes you money, you can send them

3    an invoice, and they can decide I'm going to pay it or I'm

4    going to contest it. He did that. He did that with the

5    earlier intercoms. But what he never did was send them

6    invoices for the money that he stole. And that's another

7    reason you know that he had criminal intent.

8            You saw another invoice. With Mr. Gabay he sent him

9    an invoice for $18,286 for a GateGuard panel. This was the

10   same day that Mr. Gabay told him we need to put the project on

11   hold. Mr. Teman got upset and said, you know what, you owe me

12   a lot more money. So, he sent him a new invoice; this was for

13   $18,286. That was another way he sent him an invoice.

14   Mr. Gabay decided I don't owe this and he didn't pay it. But

15   again he never sent him the invoices for the money that he

16   ended up stealing. So, that's one way you know that the

17   defendant had criminal intent, because he knew how to really do

18   business -- send someone an invoice -- and he didn't do it with

19   the checks he stole.

20           So, what's another way you know the defendant had

21   criminal intent? The fees that the defendant tried to take --

22   here totaling more than $300,000 -- were totally

23   disproportionate to what the people had paid in the first

24   place. You heard from each of these customers that they paid a

25   couple thousand dollars for their intercoms. Mr. Gabay paid

K1R7TEM4                    Summation - Mr. Bhatia

1   $3600.  Later Mr. Teman wrote a check for a device removal fee

2   for a device he already owned that was on his own building for

3   $18,000, so a $3600 device and a $18,000 fee that the customer

4   never agreed to pay.

5          The same was true for the other customers here.  Ms.

6   Soon-Osberger paid -- sorry -- paid about $3,947 for a device

7   and installation and some service.  That's about $4,000.  And

8   then what did Mr. Teman do?  He wrote a check -- a fake

9   check -- for $18,000 based on her account, again under a

10  so-called device removal fee.  That's how you know this wasn't

11  normal business practice.  That's how you know this wasn't

12  above board, and that's how you know this was fraud.

13         The same thing was true for Mr. Soleimani.  He bought

14  seven devices, and he paid about $1700 for each device.  In

15  April 2019 Mr. Teman wrote checks worth $33,000 for each of

16  those devices, almost $200,000 in total, after Mr. Soleimani

17  paid just a few thousand dollars for each device.  There is

18  absolutely no way -- no way -- that the defendant believed

19  these were legitimate fees.  There is absolutely no way he

20  thought he was really entitled to them.  And for you there is

21  absolutely no way he thought he had permission to take almost

22  $200,000 in fees off of a device that Mr. Soleimani paid a

23  couple thousand dollars for.  That's fraud.  So that's the

24  fourth reason.

25         You also know that the defendant had criminal intent

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1R7TEM4                    Summation - Mr. Bhatia

1   because he knew the lawful ways to recover money.  You heard

2   each of the witnesses in this case, each of the customers, tell

3   you that Mr. Teman when he got upset threatened them with

4   lawsuits; he threatened them with liens; he threatened to send

5   them to a collection agency.  He even threatened to foreclose

6   on some of Mr. Soleimani's buildings.  But did he do that in

7   the end?  No.  He knew he could file a lawsuit.  He knew he

8   could file a lien.  He knew he could send it to collections.

9   He knew he could do all of those things.  But in the end he

10  stole their money using fake checks.  That's how you know Mr.

11  Teman had fraudulent intent, because he knew the right way to

12  do things.  He knew what was available, and in fact he

13  threatened them.  You heard Ms. Soon-Osberger tell you he

14  threatened lawsuits.  You heard Mr. Soleimani and Mr. Gabay say

15  the same thing.  So, there is the sixth way you know the

16  defendant had criminal intent.

17         Look at the checks themselves.  It's plain as day from

18  the face of the checks that they're fake and that Mr. Teman did

19  everything he could to make them look real.

20         Let's take a look at an example.  This is a March 2019

21  check from 518 West 205 LLC account.  Of course by now you know

22  there is no such thing as 518 West 205 LLC -- you know it's

23  West 204 -- and Coney Realty has nothing to do with this -- you

24  know it's actually Coney Management -- but there is a lot of

25  features of this check that show that Mr. Teman did his

K1R7TEM4                    Summation - Mr. Bhatia

1    darndest to make it look real.  There is a squiggle.  That's

2    designed to make it look like a person, like the customer, had

3    authorized these checks.

4           You also see the fine print.  "Draw per contract."

5    You can see that right below the squiggle.  You can see "Draw

6    per contract.  No signature required."  Those are Mr. Teman's

7    words; those are not the words of his customer.  Those are not

8    the words of the person losing money in this scheme.  Those are

9    the words of Mr. Teman.  Fine.  He thinks there is a draw per

10   contract.  This check is made to look like the customer

11   approved that contract and that the customer thought no

12   signature was required.  If you asked Ms. Soon-Osberger was a

13   signature required for her checks -- yes.  If you ask Mr. Gabay

14   was a signature required for his checks -- yes.  If you asked

15   Mr. Soleimani was a signature required for his checks -- yes.

16          So, this is one of the March 18 checks.  Let's take a

17   look at the April 2019 checks; they look a little bit

18   different.  In these checks -- this is one in particular again

19   from 518 West 205 LLC -- he is trying to do a little better

20   this time, after the earlier March 2019 checks were canceled.

21   The checks themselves show the defendant knew this was fraud

22   and tried to get away with it.  He changed the check number --

23   the last ones were check number one -- to check number 19001.

24   You heard testimony from Mr. John Motto from Signature Bank --

25   he was the last government witness you heard -- and he told you

K1R7TEM4                    Summation - Mr. Bhatia

1   that one of the red flags that the bank looks for is the check

2   number, whether the check is in sequence.

3           So, Mr. Teman thought a check 001 might be a little

4   suspicious, and instead, with the April 2019 checks he put

5   check 190001, 19002 and 19003.  Now let's look at the

6   disclaimer at the bottom of these checks.  Mr. Teman is telling

7   the bank "Draw per contract.  No signature required."  Those

8   are his words; those are not the words of his customer.  Those

9   are not Gina Hom's words.  In this case those were not Elie

10  Gabay's words.  Those were not Mr. Soleimani's words.  He

11  said -- oh, he goes even further and says this is a valid

12  check -- again, his words, not his customers.  He said you are

13  required by law to honor it -- also his words.  He writes

14  accepted by above client -- also his words -- and contact us

15  with questions.

16          Now, he is not saying contact the customer.  He is not

17  saying call Mr. Soleimani.  He's not saying call Mr. Gabay.

18  He's not saying call the clients who agreed to this contract.

19  Instead what he is saying is call me; I will tell you that this

20  is approved; I will tell you this is authorized.  Ladies and

21  gentlemen, that's fraud.  It shows you fraudulent intent.

22          So, there is another reason you know the defendant

23  acted with criminal intent:  Look at when he timed his

24  deposits.  You heard Mr. Gabay and Mr. Soleimani testify that

25  they observed the Passover holiday.  That's the holiday that

K1R7TEM4                    Summation - Mr. Bhatia

1    started on the very day after the April 2019 checks which were

2    drawn on their accounts.  And they told you that as part of

3    their observance of that holiday they don't use electronic

4    devices for two days.  When did Mr. Teman deposit these checks?

5    The day before.  That's fraudulent intent, ladies and

6    gentlemen.  That shows you the defendant knew he didn't have

7    permission.  It shows you the defendant wanted a lead time to

8    get these checks cleared.  Why did he deposit that day of all

9    days?  Because he knew it was a fraud.  So there is another way

10   you know the defendant had criminal intent.  Those are seven

11   ways.

12         We will do an 8th.  The defendant moved the money

13   around his accounts.  I should say you should follow the money.

14   Look at the way he moved the money around his Bank of America

15   accounts before the bank would freeze it.  The defendant

16   deposited the March 2019 checks via mobile deposit the same day

17   he deposits checks, March 28, 2019.  Critically the very next

18   day -- that's March 29, 2019 -- he transferred almost all of

19   that money into another account when there is a chargeback on

20   April 2.  So, March 28 he deposits, March 29 he transfers.  On

21   April 2 Bank of America finds out that the customers didn't

22   really authorize this.  They had to return that money.  But of

23   course they couldn't get it back from Mr. Teman because he had

24   already transferred it into other accounts.  That's important

25   for two reasons.  First, that sort of explains to you how Bank

K1R7TEM4                    Summation - Mr. Bhatia

1    of America suffered the loss.  He transferred the money out of

2    the account so they couldn't return it.  But, second, it also

3    shows that he absolutely knew these checks would be rejected,

4    and he absolutely knew they would be subject to a chargeback

5    because he absolutely knew that his customers had never

6    authorized these payments.  He knew the moment he deposited

7    these checks on March 28 and the moment he moved the money out

8    of his account on March 29 so that Bank of America couldn't get

9    it back, so that his customers couldn't get it back.  That's

10   fraudulent intent.

11          And these were also fees apparently earned by

12   GateGuard, right?  These might be fees for a device removal for

13   a GateGuard device.  Why would he transfer them to his Friend

14   or Fraud account, or his Touchless Lab account, except to get

15   them out of the account where Bank of America would be able to

16   get the money back.  That shows fraudulent intent.  That's what

17   he did in March of 2018.  He did it again in April of 2019.

18   The defendant did the exact same thing; he deposited the 27

19   checks worth $297,000 on April 19, 2019 -- the same day he put

20   on the checks.

21          You heard Ms. Finocchiaro tell you about the seven day

22   hold.  So, he deposited the checks -- and you can see it here

23   on the screen -- on April 19, 2019.  There is a $297,000

24   deposit.  Those fees became available on April 26.

25   Unfortunately, before then $33,000 were subject to a

K1R7TEM4                    Summation - Mr. Bhatia

1    chargeback.  So on April 26, the day the money became

2    available, Mr. Teman transferred nearly all the money in that

3    account to another account.  He only left $10,000.  So that

4    again shows you fraudulent intent.  The defendant knew that

5    this money would get charge backed and he transferred almost

6    all of it out of that account.  The day, the very day it became

7    available to him.  That's fraudulent intent.

8            So those are the eight reasons -- at least eight

9    reasons -- you know that there was fraudulent intent and that

10   the overwhelming evidence proves beyond a reasonable doubt that

11   the defendant knew he was committing a fraud.

12           Now let me turn to some of the defense arguments that

13   you've heard about.  I don't know what the defense will say in

14   their summation, but I think based on some of the questioning

15   and some of the testimony we've heard we can guess that there

16   will be at least two.

17           But let me be clear, the defendant -- the government

18   bears the burden of proof in this case, and we embrace that

19   burden.  The defendant has no obligation to cross-examine

20   witnesses, or to put on any evidence, or to call any witnesses,

21   but in this case they have.  They have cross-examined

22   witnesses.  They have called their own witness, and they have

23   put in evidence.  So, you have the responsibility to evaluate

24   the defendant's arguments and their evidence just as you would

25   any other.  You have a responsibility to review the evidence

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1R7TEM4                    Summation - Mr. Bhatia

1    and see whether it makes any sense.  So let's turn to the

2    defendant's main arguments.

3         First, the defendant will argue -- may argue that he

4    was authorized by a so-called contract to issue these checks.

5    Second, you may hear about an advice of counsel defense.

6    Ladies and gentlemen, for the reasons we're about to discuss,

7    those defenses are not only meritless but they are two more

8    reasons that you know that the defendant had fraudulent intent.

9         Let's talk about the contract first.  The defense has

10   argued that there is a term or a disclaimer put on a website

11   buried deep in Mr. Teman's GateGuard website that somehow gave

12   him authorization to issue these checks.  But critically none

13   of the customers in this case ever saw those provisions.  None

14   of the defendant's customers ever actually laid eyes on

15   anything saying that Mr. Teman could take money out of their

16   accounts.  None of them had ever seen those payment terms, and

17   their actions back that up.

18        Mr. Gabay and Ms. Soon-Osberger gave Mr. Teman

19   feedback on parts of the terms and conditions.  On Mr. Gabay's

20   part that was when he was negotiating for a broader order.  On

21   Ms. Soon-Osberger's part, that was when she was trying to

22   figure out whether to buy the device.  And they told you they

23   gave him comments on the parts that caused them concern.  They

24   didn't comment on the most offensive part of the payment terms,

25   and that's because they didn't see it.  They told you they

K1R7TEM4                    Summation - Mr. Bhatia

1    didn't see it, and I think that action backs that up.  They

2    gave him comments, but of course they didn't give him comments

3    on parts they didn't see.

4         In November 2017, when Mr. Soleimani was a brand new

5    GateGuard customer, he exchanged messages with Mr. Teman where

6    he showed also himself that he had never seen these terms and

7    conditions.  If they didn't see the payment terms, how could

8    they possibly have agreed to them?  And if they didn't see the

9    terms, how could they have given Mr. Teman authorization to

10   write these checks to himself?  The answer is that they never

11   agreed.

12        So, ask yourselves this:  Why didn't the defendant

13   bring any of these terms to his customers' attention?  Because

14   he knew they would never have agreed to them.  All the victims

15   said that.  They were crystal clear.  And if you knew that they

16   had seen those terms, they absolutely would told him that he

17   did not have authority to draw money from those accounts.

18        Another thing.  You know that the payment terms

19   website -- that's a web page -- was buried deep within a series

20   of links; it was buried deep in the terms and conditions of Mr.

21   Teman's website.  First you had to go to the website.  Then you

22   had to go to the terms and conditions.  Then you had to go to

23   the payment terms.  From there, buried deep on the seventh page

24   in paragraph 5 was a link on the terms and conditions, another

25   website, and buried in there was this provision that

A-1135

K1R7TEM4                    Summation - Mr. Bhatia

1   purportedly said Mr. Teman could take funds whenever he wanted

2   them; that he could draw from their account if he thought he

3   was owed money.

4         Why was that key provision -- that key term -- buried

5   in a series of websites?  Because the defendant was hiding it

6   to build his own cover story.  The defendant buried that clause

7   deep in his payment terms where no one would ever see it, and

8   no one would ever object to it, and then later used it as a

9   fake justification to draw checks from their accounts.  He kept

10  it there to later give himself a license to deal.  Ladies and

11  gentlemen, the payment terms on Mr. Teman's website are not a

12  license to steal, and the way the defendant buried it is

13  important here.

14        Part of your decision will be to evaluate whether the

15  defendant had fraudulent intent.  Ask yourselves, if the

16  defendant really thought he was authorized to do this, really

17  thought he was going to draw funds from someone's account as a

18  normal way to do business, would he have buried it deep in

19  payment terms deep in the terms and conditions?  No, it's

20  fraud.  It's fraudulent intent, and it's information that you

21  can use to determine that the defendant had the fraudulent

22  intent to meet all the elements of the crimes we've talked

23  about.

24        Keep in mind regarding the payment terms as well that

25  there is no evidence in this case -- not a single shred of

K1R7TEM4                    Summation - Mr. Bhatia

1    it -- that shows you the payment terms that might have been in

2    effect -- if they were -- at the time these customers bought

3    their devices.

4         You heard Mr. Soleimani's testimony that he bought his

5    devices in the spring of 2017 and bought another one later

6    2017.  You heard from Ms. Soon-Osberger and Mr. Gabay that they

7    purchased their devices in early 2018.  The only copy of the

8    payment terms you have seen in this case came in when Mr.

9    Reinitz was on the stand and it's dated 2019.  So, the evidence

10   in this case does not show at all what the defendant might want

11   it to, which is that there were these payment terms that let

12   him draw funds from their accounts.  In fact, you have heard

13   quite the opposite, you have heard testimony from the three

14   customers in this case that they never saw anything that would

15   let him take money out of their accounts.  So that's the

16   contract.

17        Now let's talk about the advice of counsel.  The

18   defendant may also argue that he didn't have the necessary

19   criminal intent because he consulted with a lawyer and he

20   relied in good faith on the advice of that lawyer.  Now, Judge

21   Engelmayer will instruct you on the law and the elements of the

22   so-called advice of counsel defense.

23        Here the defendant's advice of counsel defense fails

24   for three reasons:  First, he did not seek his attorney's

25   advice in good faith; second, he did not present all the facts

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1R7TEM4                    Summation - Mr. Bhatia

1   to his attorney; and, three, he did not follow his attorney's

2   advice before he took action.  So, he didn't seek the advice in

3   good faith; he didn't present all the facts to his attorney;

4   and he didn't follow his attorney's advice before he took

5   action.

6           Now, Mr. Reinitz -- that was the attorney who

7   testified -- got up on the stand and told you supposedly that

8   Mr. Teman -- Mr. Reinitz told Mr. Teman that he had

9   authorization to issue the checks.  But you've also seen the

10  chats.  You have seen the WhatsApp chats where Mr. Teman and

11  Mr. Reinitz are actually talking about the advice, where Mr.

12  Reinitz is really telling him what is going on, where he really

13  tells him whether this is a good idea.  We introduced those

14  chats on cross-examination.  They undermine everything Mr.

15  Reinitz told you, and there is not a shred of evidence to

16  support his story.

17          Let's take a look.  So this is a chat exchange that

18  took place on January 2, 2019.  Mr. Teman told Mr. Reinitz, "I

19  have ABJ checks (photos).  Our contract allows me to draw their

20  account.  I should just deposit checks from them" -- and this

21  is Mr. Teman's words -- "(totally legal I think)."

22          What does Mr. Reinitz say?  Not what he said on the

23  stand, not that this is OK, not that this is authorized.  He

24  says "No." Mr. Teman says question mark.  Mr. Reinitz responds

25  "Bad idea."  Bad idea.  You remember he keeps using the same

A-1138

K1R7TEM4                    Summation - Mr. Bhatia

1    phrase over and over, it's a bad idea.

2          When Mr. Teman was going to deposit the checks from

3    his customers without telling them, Mr. Reinitz again told him,

4    no, bad idea.

5          So, What do these chats show?  What's the punch line?

6    Contrary to what Mr. Reinitz and defense counsel want you to

7    believe, a lawyer never sanctioned Mr. Teman's plans.  A lawyer

8    never said it was legal and didn't say it was a good idea; he

9    said bad idea; he said no.

10         When Mr. Teman tells Mr. Reinitz that the customers

11   entered into a contract, he said that the contract allows him

12   to draw from their accounts.  And Mr. Teman says on the stand

13   that he is not the breaking any law -- I'm sorry -- Mr. Teman

14   says in the chats he is not breaking any law.  And how did Mr.

15   Reinitz respond?  He said "Because they're likely to call the

16   police and you will be arrested.  And you have a criminal case

17   to deal with.  And then you can start explaining about your

18   contract and not breaking any laws."

19         So here is the chat.  You can see Mr. Teman asking

20   Ryan. "why?  They entered into a contract allowing us to draw

21   from their accounts.  So we're not breaking any law."  What

22   does his attorney say when he asked him about this?  "Because

23   they are likely to call police and you will be arrested and

24   have a criminal case to deal with.  And then you can start

25   explaining about your contract and 'not breaking any laws'".

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1139

1002

K1R7TEM4                    Summation - Mr. Bhatia

1   That's the advice he got from his lawyer.  That's what his

2   lawyer told him.  His lawyer didn't say this is OK.  His lawyer

3   didn't say go ahead and do it.  I think Mr. Reinitz actually

4   said that he had said you can do this from any customer

5   accounts.  That's not what he is saying in these chats.  In

6   these chats he is saying because they're likely to call the

7   police and you will be arrested.

8           That was Mr. Reinitz's advice to Mr. Teman.  He didn't

9   say great idea.  He didn't say it was totally lawful.  He

10  didn't even say it's lawful.  He said you will be arrested.

11          Then Mr. Teman keeps pushing.  He tells the lawyer, "I

12  don't think they will, they owe the money."  He says he will

13  put in the memo line of the check "payment drawn per contract"

14  and the link to his terms and conditions.

15          Ladies and gentlemen, the defendant kept pushing.  You

16  will see in these chats -- they are in evidence -- they are in

17  the 700 series -- that Mr. Teman kept pushing.  He kept pushing

18  and kept pushing.  He wanted his lawyer to bless this idea.  He

19  wanted his lawyer to sanction this idea.  And of course Mr.

20  Reinitz said no.

21          These chats are crystal clear.  Mr. Reinitz told him:

22  "You asked me opinion, I gave it.  Maybe you're right."  Then

23  he said on the stand, he sarcastically said maybe they'll just

24  throw up their hands up and say, oh, well, we tried to stiff

25  Teman but he outsmarted us.  Too bad.  Have fun, Ari, don't

K1R7TEM4                    Summation - Mr. Bhatia

1   spend it all in one place.  Mr. Reinitz is making fun of Mr.

2   Teman's idea.  He's being sarcastic.  He's saying I think your

3   customers are going to be upset, I think they're going to call

4   the police, I think you're going to be arrested.

5           Mr. Reinitz also told him in the same conversation "My

6   opinion is that you are greater than 50 percent likely to be

7   arrested for the activities you propose.  How you choose to

8   proceed is up to you."  That's how Mr. Teman's attorney leaves

9   the conversation in January 2019.  In January 2019 -- before

10  Mr. Teman ever deposits the check -- his lawyer tells him "My

11  opinion is that you are greater than 50 percent likely to be

12  arrested for the activities you propose."  Greater than 50

13  percent.

14          So those were the communications before the March 2019

15  checks.  The checks were then deposited -- as you've now heard

16  a million times -- on March 28, 2019.  Mr. Teman sought his

17  attorney's advice, gave misleading advice, pushed back on the

18  advice, and then ultimately did not follow what his lawyer told

19  him to do.  That's not much of an advice of counsel defense,

20  and it fails here.

21          Now let's go to April 2019.  This is after those

22  initial two checks that were drawn on the 18 Mercer account and

23  the Coney Realty account.  The government also introduced into

24  evidence those chat exchanges.  They took place after those

25  checks.  Let's take a look at the first one.

A-1141

K1R7TEM4                    Summation - Mr. Bhatia

1          In this chat Mr. Teman had just told Mr. Reinitz what

2    happened.  He told him about the two $18,000 chargebacks.  How

3    does Mr. Reinitz respond?  "Not sure I follow but this sounds

4    bad."  Mr. Teman then pushes, he says, "Our contract lets me do

5    it."  Again he references a contract, by the way.  Mr. Teman

6    here is completely misrepresenting to his attorney the status

7    of this relationship.  There is no contract.  You've seen it.

8    There is no piece of paper signed by the two parties; there are

9    terms and conditions on his website.  But Mr. Teman tells his

10   attorney when he is seeking advice "our contract states

11   explicitly".  And what does Mr. Reinitz say in response?

12   "Understood.  I don't know all the ins and outs of this but it

13   sounds like a bad idea."

14          Mr. Reinitz in this chat is telling you two things:

15   First, he wasn't consulted before these checks were filed.  He

16   doesn't know all the ins and outs.  But he also tells you Mr.

17   Reinitz didn't give him solid legal advice; he is still trying

18   to figure out the ins and outs.  And Mr. Reinitz is also

19   telling you -- and you can see this from the chat -- that even

20   after these first two checks are deposited, it sounds like a

21   bad idea.  Sounds like a bad idea.

22          He later told him "After hitting their accounts out of

23   the blue, I expect this to become a criminal matter sooner or

24   later."  That's not much of an advice of counsel defense, and

25   it fails.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1R7TEM4                    Summation - Mr. Bhatia

1      Now, there are further conversations on the same day.

2   This is a similar conversation that took place also in April

3   2019.  Mr. Reinitz says "I've already told you I think it's a

4   bad idea.  You've been back and forth with ABJ several times

5   now.  Your threats carry little weight at this point and they

6   have indicated they don't believe they owe you money.  If you

7   hit their accounts I think 50/50 they call cops.  If I was

8   advising them that's probably what I would tell them to do."

9      Ladies and gentlemen, it's more proof that Mr. Reinitz

10  did not sanction this idea.  He did not bless this idea.  He

11  didn't say it's lawful if you go out and draw checks from

12  anyone's accounts.  He says it's a bad idea, and he says that

13  50/50 they're going to call the cops, and he is specifically

14  referencing ABJ.  That's Mr. Soleimani.  Those are the checks

15  he went and deposited in April 2019.

16      He goes on.  Mr. Reinitz says, "Honestly, I don't know

17  anything about this stuff.  But there are serious state and fed

18  regulations on this.  You claim" -- that's Mr. Teman claiming

19  -- "that your contract allows you to debit their accounts even

20  after they explicitly protest.  I'm just not sure it's that

21  simple".

22      Again, Mr. Reinitz is saying I don't know anything

23  about this stuff.  That's his lawyer -- after he has already

24  deposited two fake checks and gotten chargebacks -- saying I

25  don't know anything about this stuff.  That's not an advice of

K1R7TEM4                    Summation - Mr. Bhatia

1    counsel defense, ladies and gentlemen.  That's his lawyer

2    saying I don't know anything about this.  And then his lawyer

3    says, look, maybe if I did know something, there are serious

4    state and federal regulations on this.

5           Mr. Reinitz goes on "And it also may be (again ...

6    speaking out of ignorance) a clear violation of some federal

7    banking regulation.  In which case your "simple can't miss

8    idea" is now a federal crime."  That's not Mr. Reinitz saying

9    it's OK.  That's Mr. Reinitz saying, I don't know much, I'm

10   speaking out of ignorance, but my hunch it it's a federal

11   crime.  And again Mr. Reinitz is mocking Mr. Teman's "simple

12   can't miss idea".

13          Ladies and gentlemen, we talked all about these chats,

14   so I will just tell you this:  The advice of counsel defense

15   fails absolutely.  In fact, these chats with Mr. Reinitz also

16   show you that the defendant had fraudulent intent.  The

17   defendant consulted his attorney.  His attorney told him you're

18   going to be arrested; it's a federal crime; if I was

19   representing your customers I would tell them to call the

20   police.  That's what his attorney says.  And that's after he

21   does two of the checks and before he does 27 more checks.

22   Ladies and gentlemen, this is fraudulent intent.  This is proof

23   that the defendant knew this was wrong, knew he didn't have

24   permission to do it.

25          So now that I've talked about the two defenses, let me

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1R7TEM4                    Summation - Mr. Bhatia

1    talk about the charges in this case.

2         Count One charges the defendant with one count of bank

3    fraud in connection with the 27 checks that he deposit in the

4    April 2019.  Those were the checks he created from Elie Gabay

5    and Joseph Soleimani's bank accounts.

6         Count Two listed here charges the defendant with one

7    count of bank fraud in connection with the two checks he

8    deposited in March of 2019.  So, Counts One and Two are both

9    bank fraud.  Count One relates to the April checks, Count Two

10   relates to the March checks.

11        Count Three charges the defendant with one count of

12   wire fraud in connection with the 27 checks from April 2019,

13   and then Count Four -- also charging wire fraud -- charges him

14   in regards to the two checks from March of 2019.

15        So the first two counts are bank fraud, the second two

16   counts are wire fraud.

17        You have heard overwhelming evidence that proves the

18   defendant's guilt on each of these charges.  In a bit Judge

19   Engelmayer will give you instructions on the law.  Let me say a

20   few words about a couple of these elements though.

21        I expect Judge Engelmayer will instruct you that for

22   the two bank fraud counts the government must prove that the

23   bank that was the subject of the fraud was insured by the

24   Federal Deposit Insurance Corporation.  You heard from

25   witnesses at Bank of America and Signature Bank that those

K1R7TEM4                    Summation - Mr. Bhatia

1    banks were insured by the FDIC, so that takes care of the FDIC

2    requirement of the two bank fraud counts.

3         In addition, I expect you will be instructed that the

4    government must prove that the interstate wires were used in

5    furtherance of the wire fraud counts, so that's Counts Three

6    and Four.  The government is required to prove there were

7    interstate wires used for those two counts.

8         For Count Three -- those are the checks from April

9    2019 -- you heard Ms. Finocchiaro tell you -- she was the

10   witness who testified very first from Bank of America -- that

11   all the checks are scanned when they are first deposited at a

12   branch.  That was a branch in Florida.  Then you heard

13   Mr. Motto say -- Ms. Finocchiaro told you those checks go to

14   the Federal Reserve.  Then you heard Mr. Motto say at the very

15   end say that Signature Bank pulls those images from the Federal

16   Reserve and looks at them as part of their review here in

17   Manhattan.  So, that's the wire for Count Four, and that's

18   quite clear.

19        In Count Four your heard there were checks deposited

20   via mobile deposit.  Ms. Finocchiaro told you that all the

21   communications for mobile deposits are routed through Texas.

22   So, you know that the communications started in Manhattan --

23   you knew that because of the spreadsheet that Ms. Finocchiaro

24   testified about -- they went to Texas because they're mobile

25   deposits.

K1RVTEM1                    Summation - Mr. Gelfand

1    I expect you will be instructed that the government

2    must prove venue for each offense by a preponderance of the

3    evidence.  That is proven as well.  For the April 2019 checks

4    charged in Counts One and Three you heard that Signature Bank

5    reviewed the checks here in Manhattan as part of their fraud

6    review.  You also heard and you saw surveillance photos showing

7    that Mr. Teman withdraw $4,000 from a bank teller here in

8    Manhattan that he received because of his fraud scheme.

9         For the March 2019 checks charged in Counts Two and

10   Four -- those are the two checks -- you heard that the

11   defendant deposited those checks via mobile deposit from here

12   in Manhattan.

13        Ladies and gentlemen, make no mistake, this is not a

14   close case.  It's a simple case, and the proof is overwhelming.

15   Ari Teman created fake checks worth hundreds of thousands of

16   dollars, lied about having permission from his customers, and

17   then deposited those checks into his account.  Then he moved

18   that money into another account before Bank of America could

19   get it back.  When you evaluate all the evidence, you will

20   return the only verdict that is consistent with the evidence,

21   the law and your common sense:  The defendant Ari Teman is

22   guilty as charged.

23        THE COURT:  Thank you Mr. Bhatia.

24        Ladies and gentlemen, we are going to take a 15 minute

25   break in between each jury arguments.  So, we will take a

K1RVTEM1                    Summation - Mr. Gelfand

1   15 Minute recess now, and when you come back we will hear from

2   the defense.

3            Ladies and gentlemen, as always, do not discuss the

4   case.  I will see you in 15 minutes.

5            (Jury not present)

6            THE COURT:  All right, counsel.  Anything to raise

7   before I give you a brief recess?

8            MR. GELFAND:  No, your Honor.

9            THE COURT:  I will see you a minute or two before the

10  jury is ready.  Are you going to be needing the monitor here?

11           MR. GELFAND:  It will probably be helpful.

12           THE COURT:  OK, very good, we will keep it up.  I will

13  see you in a few minutes.

14           (Recess)

15           THE COURT:  Mr. Smallman, let's get the jury.

16           (Jury present)

17           THE COURT:  Welcome back, ladies and gentlemen.

18  Please be seated.  We will hear from the defense.

19           Mr. Gelfand.

20           MR. GELFAND:  Thank you, your Honor.

21           Good afternoon.  Members of the jury, this case, as

22  Mr. DiRuzzo told you a few days ago, last week, ultimately

23  boils down to one fundamental question:  Did Ari Teman act with

24  the criminal intent that differentiates what you could

25  basically call a billing dispute from a banking crime?  In

K1RVTEM1                    Summation - Mr. Gelfand

1    other words, is there not even reasonable doubt -- much less

2    solid proof -- that Mr. Teman believed that he had the

3    authority to deposit the RCCs at issue when he deposited those

4    RCCs on March 28 and on April 19 of last year, of 2019?

5              Now, members of the jury, the question before you in

6    this case is not about whether Mr. Teman, or GateGuard, or

7    Coney, or ABJ, or Mercer, or Bank of America is ultimately on

8    the hook for this money.  This is a federal criminal trial, and

9    what brings us here together is that one question, whether Mr.

10   Teman acted with the intent necessary to actually make this

11   bank fraud or wire fraud.

12             Now, members of the jury, at the beginning of this

13   case we told you that obviously we don't have the burden of

14   proving anything in this case.  Our Constitution doesn't impose

15   that on anyone charged with a crime.  But we told you that we

16   would bring important evidence to you in this case if it didn't

17   come out through the government's case.  And we did.  We

18   delivered on our promise.  We brought to you the full

19   contracts, the terms and conditions and the payment terms that

20   are referenced on the face of the RCCs.  We brought to you the

21   invoices which are time stamped going all the way back to 2017

22   and 2018 which clearly reference the URL, the Internet web

23   address for the terms and conditions and the payment terms on

24   the GateGuard website.  We brought to you e-mail correspondence

25   that's time stamped going all the way back to 2018, way before

K1RVTEM1                    Summation - Mr. Gelfand

1   there was ever any sort of allegation, way before any of the

2   activity alleged to be criminal in this case even occurred.

3   And we brought those to you because it's important, because you

4   can't understand this case without seeing all of the relevant

5   facts from essentially a 360 degree perspective.  You need to

6   see it from all angles to actually understand what happened.

7           Now, members of the jury, I want to start where the

8   prosecutor spent a large part of his case -- of his closing

9   argument -- and that is on this issue of criminal intent.

10  Because I submit to you, members of the jury, that Mr. Teman --

11  and the evidence clearly shows it -- lacked the criminal intent

12  necessary to commit bank fraud or wire fraud.

13          Now, the story begins, not surprisingly, with the

14  terms and conditions that were publicly available to the world

15  and certainly to the customers, the one percent approximately

16  of GateGuard's hundreds of customers that came into this

17  courtroom and testified in this case.

18          Understand one thing, members of the jury, the copy of

19  the terms and conditions that you have in evidence in this case

20  as you heard from that witness stand actually came from one of

21  the government witnesses, one of the people the government

22  calls the quote unquote victims.  The terms and conditions are

23  dated all the way back to 2017, and they clearly reference

24  payment terms on the GateGuard's website.

25          I want to show you the government exhibit.  It's

K1RVTEM1                    Summation - Mr. Gelfand

1    Government Exhibit 441.  And if you flip through to Section 5,

2    to be clear, there is no fine print.  It's normal text.  Orders

3    and fees "pricing" and then something if you just look at this

4    jumps off the page, a URL, a/k/a pricing, in other words

5    something to click on to see the payment terms on the website.

6         You have seen the payment terms that expressly in no

7    uncertain terms in simple English -- it's Defendant's Exhibit

8    2 -- give GateGuard the right to draw and deposit remotely

9    created checks.  You have heard that term throughout this case,

10   RCCs.

11        You have seen the payment terms, if you look at

12   Defendant's Exhibit 2.  To be clear, Ariel Reinitz -- and I'm

13   going to talk a lot more about him in a few minutes --

14   testified from that witness stand -- he's the attorney for

15   GateGuard from Fisher Broyles the law firm -- he testified in

16   no uncertain terms that this section, permission to make bank

17   draws and other account draws, was always, since has been

18   involved, part of the GateGuard payment terms; and he testified

19   that he not only heard that from Mr. Teman, but he testified

20   that he personally reviewed those hyperlinks.  In fact, there

21   is an e-mail that you have in evidence that you can reference

22   that expressly says by Mr. Reinitz to Mr. Soleimani, all the

23   way back in 2018, Mr. Reinitz actually includes a link himself

24   to the terms and conditions and the payment terms, actually

25   includes two hyperlinks.  And he told us this morning on the

K1RVTEM1                    Summation - Mr. Gelfand

1   witness stand what those were for.

2        Defendant's Exhibit 2 clearly states -- not in some

3   legalese fine print, hereto indemnify nonsense -- it says in

4   simple English "You give us permission to write and sign checks

5   with your checking and/or savings accounts information to do a

6   bank draw against your entity (or entities) for the amount it

7   (or they) owe."

8        And this document which you have in evidence -- it's

9   Defendant's Exhibit 2 for those of you taking notes -- this

10  document clearly identifies and enumerates the payment terms.

11  In other words, if you remove the device, it's X; if we have to

12  talk to a lawyer, it's Y.

13       So at its core, members of the jury, that document is

14  critically important, and that's why we introduced it in our

15  case.

16       Now, members of the jury, use your common sense for a

17  second, your life experience.  That's why we have juries.

18  That's why juries are so important, to protect people charged

19  with crimes in our country.  The payment terms document on its

20  face eviscerates what the government is trying to sell to you,

21  which is that there is no basis, none whatsoever, for Mr. Teman

22  to have believed in March and April of 2019 that he had the

23  authority to do what his company's contract expressly gave him

24  the authority to do.

25       Now, members of the jury, I want you to think about

K1RVTEM1                    Summation - Mr. Gelfand

1    something for a second.  Look at Mr. Teman's actions in this

2    case.  Look at what he did at the bank branch in Florida when

3    he walked in with 27 remotely created checks.  He walked into

4    the bank himself.  He didn't send some underling or someone

5    else.  You saw the quote unquote surveillance pictures.  He

6    wasn't disguised in any way.  He wasn't wearing a hat; he

7    wasn't wearing one of those silly mustaches or something

8    absurd.  He sat and stood with the teller and someone else,

9    possibly the manager.  The Bank of America witness told you

10   that he provided his driver's license even though he was a

11   known customer to Bank of America because this was literally

12   the branch across the street from his office in Miami,

13   GateGuard's office.  You saw that he deposited the RCCs with a

14   seven day hold.  It's Defendant's Exhibit 16 that we introduced

15   into evidence.  He didn't push back on the idea that it was

16   going to take seven days to process this.  And you saw that on

17   the RCCs themselves he wrote on the face of all 29 checks

18   language that the Bank of America witness, Ms. Finocchiaro --

19   and even the Signature Bank witness whose name is escaping me,

20   but the gentleman who essentially looks for those kinds of

21   checks -- they both acknowledged readily that these 29 checks

22   that bring us here together in this courtroom clearly and at

23   first glance indicate that these are remotely created checks,

24   RCCs.  They told you that the language on the checks -- I'm

25   showing you Defendant's Exhibit 52.  This is a Bank of America

K1RVTEM1                    Summation - Mr. Gelfand

1    record -- not only indicates that this is an RCC, the whole

2    "Draw per contract.  No signature required" -- but if you

3    actually look at Bank of America's own records -- not to

4    mention the testimony in this case -- they actually processed

5    this as an RCC immediately, and for good reason, because they

6    recognized at face value that they were RCCs, and she explained

7    when I asked her questions on cross-examination that they

8    processed this as this return reason for RCC warranty breach,

9    in essence, that the other banks -- JP Morgan Chase and

10   Signature Bank -- had been told by their customers that these

11   weren't authorized.

12           Now, members of the jury, the important thing here

13   that clearly demonstrates the complete lack of criminal intent

14   is that these are not some pathetic attempts at counterfeit

15   checks.

16           By the way, the two signatures, the whole sideshow on

17   the March RCCs, you saw the bank records.  You saw as the Bank

18   of America witness clearly identified -- you saw yourselves --

19   that Ari Teman's same signature appears on the front of those

20   checks and on the back, the deposit portion of the check, they

21   appear on the signature cards and Bank of America's records

22   since 2016 -- there is nothing fraudulent.  There is no intent

23   to deceive on the face of these documents.  What Mr. Teman's

24   actions show is that he thought what he was doing was legal.

25           Now, members of the jury, that's important, because

K1RVTEM1                    Summation - Mr. Gelfand

1    obviously Judge Engelmayer is going to instruct you on the law,

2    but for all four counts -- the wire fraud counts and the bank

3    fraud counts -- I anticipate the judge is going to explain to

4    you what the intent is, and it includes acting willfully.  I

5    anticipate that the judge is going to explain to you that

6    willfully means in essence that you're doing something to

7    either disobey or disregard the law.

8            Now, members of the jury, we're going to get to the

9    most important testimony in this whole trial, and that's Ariel

10   Reinitz, but I submit to you that if you look at Mr. Teman's

11   actions, and if you look at the words in 2018 by Mr. Teman,

12   time stamped in e-mailed that came into evidence that you have

13   to look at when you go back into that jury room, I encourage

14   you to look at them because it's going to show you something

15   important.  It's going to show you that throughout the entirety

16   of this time period, going way back before 2019, Mr. Teman

17   clearly articulated to customers that there were contracts that

18   governed GateGuard's business relationship.

19           Now, members of the jury, you also saw that Mr.

20   Teman's lawyer, Ariel Reinitz, also directly communicated with

21   two of the three customers at issue -- Mr. Soleimani, ABJ, and

22   Mr. Eli Gabay, Coney.

23           (Continued on next page)

24

25

K1RVTEM5                    Summations - Mr. Gelfand

1       MR. GELFAND:  You have two very important emails in

2  evidence in that regard.  If you're taking notes, it's

3  Defendant's Exhibit 14 and Defendant's Exhibit 36.  And I

4  apologize that we never make it easy with the numbering.

5       But those emails from March of 2018 and October 2018

6  respectively, clearly show, for example, Defendant's 36, Ariel

7  Reinitz telling Mr. Gabay that Coney Realty entered into

8  agreements with GateGuard; that these invoices and agreements

9  are of substantial commercial significance to GateGuard.

10 Mr. Reinitz told you he obviously, not surprisingly, shared

11 this information with Mr. Teman.

12      Fast forward a couple of months to Mr. Soleimani,

13 October of 2018, Defendant's Exhibit 36 -- I'm sorry,

14 Defendant's Exhibit 14.  Attached is one of GateGuard's

15 invoices.  The invoice indicates that your agreement with

16 GateGuard is subject to the terms available here and here,

17 hyperlinked.  You heard the testimony.  Mr. Gabay never even

18 responded to that email.

19      And you saw one of the most interesting emails entered

20 into evidence in this trial:  The response in that dialogue

21 from Mr. Soleimani in which he asks GateGuard's attorney, Ariel

22 Reinitz, for a release.  Remember, members of the jury, when

23 Mr. Soleimani was testifying, Mr. Soleimani, approximately a

24 year after he started using the GateGuard system, even though

25 he claimed that he didn't like the system, wanted to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1RVTEM5                    Summations - Mr. Gelfand

1    essentially get the 2.0 version, quote/unquote.  And he was

2    communicating directly about that.  And what he said is, in

3    essence, If I'm going to do that, I need a release.

4            Now, members of the jury, use your common sense.

5    People ask for a release from liability when they believe it's

6    at least possible, if not plausible, that there are contracts

7    that subject them to responsibilities.  That's what they are

8    asking to be released from.

9            So I ask you the million-dollar question, members of

10   the jury:  If Mr. Soleimani even believed that that was

11   possible, why is it so crazy to believe that Mr. Teman believed

12   that it was possible, when Mr. Reinitz told you himself that he

13   shared that request, that email, with his client, Mr. Teman?

14           Members of the jury, everything Mr. Teman said and did

15   reflects Mr. Teman's belief that what he did was legal.

16   Whether it was a good idea or a bad idea is not the issue.

17   Whether he was right or whether he was wrong is not the issue.

18   The issue, members of the jury, is whether Mr. Teman believed

19   that he was violating the law.  And the evidence clearly

20   demonstrates otherwise.

21           Now, I want to talk for a minute about the

22   government's eight arguments for criminal intent.  I want to

23   talk very briefly about these.  It's important to understand

24   that there's no there there.

25           So first the government says customers never gave

A-1157

K1RVTEM5                          Summations - Mr. Gelfand

1    permission.  Members of the jury, that argument falls apart

2    like a house of cards at the second you bring into the equation

3    the contracts clearly giving authority; and that the second you

4    clearly bring in the under-oath testimony in this courtroom on

5    Friday afternoon and this morning by Ariel Reinitz.

6           Number two, the government claims that Mr. Teman tried

7    and failed and tried again.  First of all, as Ariel Reinitz

8    explained to you, the dialogue continued.  And before March

9    28th of 2019 and continuing to April 19th of 2019 -- the two

10   dates that ultimately matter in this case -- he consistently

11   told Mr. Teman that what he was doing, the RCCs in this case,

12   was legal.

13          Now, members of the jury, there's an important kind of

14   side note here, and that's a document you have in evidence from

15   Signature Bank.  Elie Gabay testified as the only witness that

16   you heard from for Coney Realty.  But Elie Gabay told you who

17   Michael Haas was.  He told you that Michael Haas was

18   essentially the other principal.

19          You saw, by the way, Government's Exhibit 150 that you

20   have in evidence, the affidavit that Michael Haas submitted to

21   Signature Bank about the Coney RCC paid to GateGuard or payable

22   to GateGuard on March 28th.  You see in here number six,

23   under-oath affidavit:  Now neither I nor the company knows the

24   payees on these checks -- that's GateGuard -- or have any

25   recollection or record of the company ever owing these payees

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1158

K1RVTEM5                    Summations - Mr. Gelfand

1    any money whatsoever.

2         So Signature Bank, as you heard the testimony,

3    processes a chargeback because Michael Haas, on behalf of Coney

4    Realty, submits an under-oath affidavit to them basically

5    saying, among other things, We don't even know who GateGuard

6    is, even though Eli Gabay testified under oath in no uncertain

7    terms not only that they knew who GateGuard was -- remember,

8    Eli Gabay was so into the cutting-edge technology that

9    GateGuard has, he told you from the witness stand he actually

10   at one point wanted to invest in GateGuard.

11        They clearly knew who GateGuard was.

12        The government says there's no invoices.  Members of

13   the jury, let's think about this for a second.  First of all,

14   when you get to late March of 2019 and mid-to-late April of

15   2019, Mr. Teman clearly had from his lawyer direct

16   communications from his lawyer, Ariel Reinitz, to Joseph

17   Soleimani and Eli Gabay, ABJ and Coney, written attempts that

18   you have in evidence trying to collect the money that was owed.

19        This was not a surprise.  This was not hidden.  But

20   you do have prior invoices that reference in no uncertain terms

21   any customer on the bottom, it's not fine print, it's one of

22   the very few lines of text on those invoices, a reference to go

23   to a publicly available website.

24        Now, members of the jury, this isn't some abstract,

25   esoteric, publicly available website.  Eli Gabay testified that

A-1159

K1RVTEM5                    Summations - Mr. Gelfand

1  that website is where he downloaded the terms of conditions

2  that he marked up approximately two and-a-half days -- in other

3  words, he marked it up and then sent the markup approximately

4  two and-a-half days after the first invoice from GateGuard was

5  issued.

6          Bonnie Soon-Osberger, you have emails in evidence,

7  they are asking Mr. Teman questions, all of which he answered,

8  about the terms of conditions.  Look at Eli Gabay's markup, by

9  the way.  He adds the word "reasonably," literally one sentence

10 after the payment terms URL.  To suggest that this was somehow

11 not something that any of these people had the opportunity to

12 at least click on, much less they have clicked on, it's pretty

13 obvious.

14         And then you have ABJ again asking for release.

15         The sideshow about the fees being disproportionate,

16 first of all, that's not evidence of any sort of intent.  But

17 even if you assume for the sake of argument it is, the fees are

18 not at all disproportionate; the fees are reflected in the

19 pricing terms, but they are not actually disproportionate when

20 you understand the business model that you heard testimony

21 about.

22         This was cutting-edge technology.  All of these

23 customers -- not to mention the hundreds of others -- wanted

24 it.  They paid very little up front.  It's the old school cell

25 phone model.  You pay a little up front, but you're

K1RVTEM5                          Summations - Mr. Gelfand

1    contractually bound to basically spread the overall cost over

2    time.  Every single one of those witnesses that came into

3    court, the customers, told you from that witness stand that

4    they benefited from and accessed the logs that GateGuard

5    stored, the data, essentially the tech interface.  This is not

6    just an intercom where you push a button; it's an organizable,

7    technological interface.

8          Mr. Soleimani, for whatever reason he would do this,

9    told you -- by the way, it works.  You can see Mr. Soleimani on

10   Defendant's Exhibit 70.  But, in any event, he told you that he

11   actually used the logs to evict tenants that, I guess, he

12   believed, were violating the law or whatever, were subject to

13   eviction.

14         The point is they used all of this.  That's not -- use

15   your common sense.  That's not paid 3600 bucks once and then

16   forever you have access to unlimited photo/video storage, etc.,

17   organizable on the GateGuard website.

18         The government says, number five, that Mr. Teman knew

19   how to lawfully recover money.  Members of the jury, Ariel

20   Reinitz, GateGuard's lawyer, Mr. Teman's lawyer, testified

21   under oath that he told Mr. Teman before March 28th of 2019

22   that this was a lawful way to recover money.  And members of

23   the jury, the government wants you to ignore that testimony.

24         They say, Look at the checks themselves.  That's

25   number six.  Please look at the checks themselves.  They are

K1RVTEM5                    Summations - Mr. Gelfand

1    the best evidence of a lack of intent.  It's Mr. Teman saying

2    to the bank, in obvious words, This is not some counterfeit

3    nonsense check that I hope just slides through.  This is an

4    RCC, draw per contract, no signature required.  Bank of America

5    never looked at the URL to this day?  Nobody decided to pick up

6    the phone to call GateGuard with questions?  Those are not the

7    kinds of things you put on a check that you hope just slides

8    under the radar because you're pulling a fast one.  Those are

9    the kinds of things you're essentially screaming and writing to

10   the bank saying, I'm giving you RCCs; they are authorized per

11   contract.  Here's the contract, by the way.  Please look at it.

12   And if you have any questions, call me.  That's not the sign of

13   someone acting with criminal intent.

14          The timing.  They talk about this two-day holiday.

15   Members of the jury, Defendant's Exhibit 16, a seven-day hold

16   that the bank gave Mr. Teman on the 19th, the day that they

17   were deposited.

18          And then this last sideshow about moving money around.

19   Members of the jury, this makes no sense.  Think about this for

20   a second.  We took time with the Bank of America witness to

21   show you that each of the accounts, the Friend or Fraud

22   Incorporated account Mr. Reinitz told you is the parent company

23   of GateGuard; Touchless Labs LLC, we walked through the bank

24   records.  Bank of America knew, there's no hiding it, all of

25   these companies were clearly, since 2016 in Bank of America's

A-1162

K1RVTEM5                    Summations - Mr. Gelfand

1   records that you have in evidence, controlled by Ari Teman.  So

2   there's no moving money around to other bank accounts or

3   getting large amounts of cash and putting them in some storage

4   unit or something.  The money stayed at Bank of America in

5   accounts expressly associated with Ari Teman.

6           Now members of the jury, I want to talk about what I

7   submit to you is the most important testimony that you heard at

8   this trial, testimony from Ariel Reinitz, the attorney.

9           Now, I anticipate when Judge Engelmayer instructs you

10  in a few minutes, he's going to tell you that advice of counsel

11  is a complete defense to all four charges in this case -- both

12  wire fraud counts and both bank fraud counts -- as long as

13  Mr. Teman in good faith sought the advice of his attorney, the

14  attorney was provided all of the relevant material information,

15  and then he followed the advice.

16          The logic is simple:  In this country, we're not all

17  experts on everything.  Mr. Teman is a tech entrepreneur that

18  had really cool cutting-edge technology, and might have been

19  very good at that.  But from early on, this wasn't some one-off

20  lawyer he once talked to in March.  Early on he went to his

21  longtime lawyer at a law firm with a New York presence, with

22  approximately 250 attorneys, and he sought legal advice.

23          Now, members of the jury, understand one thing:  What

24  the government is really asking you to do, because you have to,

25  for the government, to obtain a conviction on any of these

K1RVTEM5                    Summations - Mr. Gelfand

1    counts, is to find that Mr. Reinitz, when he testified under

2    oath in no uncertain terms that he gave Mr. Teman the advice

3    before March 28th of 2019 that depositing these RCCs was legal,

4    they are asking you to find that he is lying; that this New

5    York attorney didn't actually say that.

6         Members of the jury, one of your jobs as jurors is to

7    consider the credibility of all witnesses.  When you come to

8    jury service, there's a lot of things you have to kind of leave

9    behind, if you will; but your common sense, your life

10   experience, isn't one of them.

11        So I want you to ask yourself a simple question when

12   you're evaluating Mr. Reinitz's testimony:  What's his motive

13   to come into court and lie and say that he told Mr. Teman,

14   prior to March 28th of 2019, that this was legal?  What's the

15   motive of this partner at a New York law firm, a licensed

16   professional who practices in this very courtroom?  For what?

17   $15,000 of legal fees?  Really?

18        Members of the jury, as Mr. Reinitz explained this

19   morning, when you look at those WhatsApp chat snippets, it's

20   like any text message conversation that doesn't tell the

21   totality of the communications.  Mr. Reinitz told you that the

22   real important communications -- as you can imagine would

23   happen anyway -- happened by phone, not a little one word here

24   and there.  And that a large chunk of these snippets that you

25   were shown in evidence by the government involved conversations

K1RVTEM5                        Summations - Mr. Gelfand

1    about debit deposits or debit withdrawals that, by the way, you

2    want to talk about Mr. Teman following his lawyer's advice?

3    Mr. Reinitz told you on that issue, he said, No, these are

4    complicated banking regs.  Don't do it.  You know Mr. Teman

5    never did that?

6            Mr. Reinitz also told Mr. Teman in no uncertain terms,

7    as he told you this from that witness stand, that he always

8    told Mr. Teman that this was legal and that he believed that he

9    had all of the relevant information.  By the way, not only from

10   Mr. Teman, including from Mr. Teman, but also from being

11   GateGuard's lawyer for as long as he was, and having direct

12   access to some of the important documents, not to mention being

13   a player.

14           So, members of the jury, the sideshow about do you

15   have an inked contract, a signed contract, try that with

16   iTunes, try that with NetFlix.  Members of the jury, this is a

17   digital company that you heard testimony the way you sign up --

18   you heard this not only from Eli Gabay, from Bonnie

19   Soon-Osberger, you heard this from Ariel Reinitz.  The way you

20   sign up is you go online, you plug in information, and you

21   acknowledge the terms and conditions.

22           So, members of the jury, I want to talk for a few

23   minutes about kind of the three customers, if you will.  I want

24   to start with the first one you heard testimony from, Eli

25   Gabay.

K1RVTEM5                    Summations - Mr. Gelfand

1      Two and-a-half days after the invoice that you have in

2    evidence is dated -- they presumably received it sometime soon

3    thereafter -- he emails Mr. Teman a marked-up contract, a

4    redlined contract, in other words, proposed edits.  And what he

5    says is that he wants parts of that contract to be modified.

6    One of those parts, as we talked about a few minutes ago.  Was

7    in Section 5, the pricing terms.  And he says in no uncertain

8    terms that he wants the word "reasonably" added literally the

9    line below the hyperlink, the big blue hyperlink.

10      Now, members of the jury, he told you that a billing

11    dispute arose in March of 2019 with GateGuard, with Mr. Teman.

12    And he told you that within a day or two of that billing

13    dispute arising, Mr. Teman did what he does:  He turned it over

14    to his lawyer, Ariel Reinitz.  You have an email from Ariel

15    Reinitz directly to Mr. Gabay about that billing dispute

16    referencing Mr. Gabay's or Coney's contractual obligations, the

17    agreement.

18      Mr. Reinitz actively tries to collect the debt from

19    Coney, the debt that's the subject of the RCCs.  Mr. Teman is

20    obviously aware of this.

21      Then, when the RCCs are ultimately drawn, his business

22    partner, the other principal, Michael Haas, submits a false

23    under-oath affidavit to Signature Bank saying they don't even

24    know who GateGuard is, even though Mr. Gabay testified that at

25    one point he thought GateGuard's cutting-edge technology was so

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1RVTEM5                    Summations - Mr. Gelfand

1   cool, he wanted to invest in it, well before they told their

2   bank in connection with the RCCs at issue in this case that

3   they didn't even know who GateGuard was.

4           Now, members of the jury, the next two witnesses, but

5   the customer that you heard from was Mercer.  Bonnie

6   Soon-Osberger told you something very important.  She not only

7   saw the terms and conditions before they voted on their

8   five-member board to essentially become a GateGuard customer,

9   to agree to the terms and conditions, she told you that she saw

10  them on GateGuard's website.  She provided it to the members of

11  her five-member board.

12          But then Gina Hom from Crystal Management, whatever

13  it's called, comes in.  And Gina Hom says that when she's asked

14  by the bank, Did you authorize these RCCs or this one RCC, Gina

15  Hom says, I didn't even know that there was a contract, even

16  though there's a clear disconnect.  I'm not saying it's

17  malicious, but there's a clear disconnect between the board

18  which votes -- they needed at least three votes, as you heard

19  the testimony -- on the terms and conditions, and then she

20  actually asks Mr. Teman questions, all of which Mr. Teman

21  addresses in writing to her satisfaction.

22          So then we've got Joseph Soleimani.  He testified that

23  he used the system.  There were glitches with it, but it

24  obviously worked.  You have Defendant's Exhibit 70 in evidence;

25  it's a close-up of Mr. Soleimani and his -- behind him someone,

A-1167

K1RVTEM5                    Summations - Mr. Gelfand

1    I believe he said it was a staff member or something, one of

2    his colleagues.  You have the second page of this, which is the

3    logs that clearly are from one of the ABJ apartments, the Lenox

4    Avenue one or one of the Lenox Avenue ones, that's the subject

5    of this.

6         And what Mr. Soleimani said, and it was very

7    important, I asked him point-blank what we call a nonleading

8    question:  When you signed up for GateGuard, is it your

9    testimony that you don't remember whether you signed up online

10   or are you denying that you signed up online?  And remember

11   what he said.  He thought about it for a second.  And he said

12   that he didn't recall signing up online.

13        Members of the jury, the invoices that ABJ were sent

14   predate the checks that ABJ sent in to pay those initial

15   GateGuard fees clearly on the invoices indicating an agreement

16   and the URL.  And about a year later, when you actually look at

17   the chronology of this and reconstruct the timeline, as we've

18   tried to do here, you have Joseph Soleimani essentially wanting

19   the next generation and, as we talked about, a release from

20   GateGuard.  And he's asking this not even to Mr. Teman

21   directly, but to Mr. Teman's lawyer, based on Mr. Teman's

22   lawyer's representations that there are contracts, terms and

23   conditions, and payment terms that were hyperlinked in that

24   email.

25        Now, members of the jury, you heard from Bank of

K1RVTEM5                    Summations - Mr. Gelfand

1   America that, at the end of the day, they saw these for what

2   they were:  RCCs.  They saw them immediately as RCCs.  And they

3   processed them in real time as RCCs, as you can see in

4   defendant's Exhibit 52.

5           So members of the jury, what we're asking you, when

6   you go back into that jury room, I'm asking you to engage with

7   the evidence, to really think about what these witnesses told

8   you and what the documents show you, all of them.  Because we

9   submit that when you look at this from a 360-degree angle,

10  you'll see a couple of clear facts:

11          Number one, this was not a split-second decision by

12  Ari Teman.  There were months of deliberations and

13  communications between him and his attorney that he clearly

14  believed, based on the evidence that you have, outside of any

15  communications with his attorney, that the contracts authorized

16  GateGuard to draw RCCs and these fee amounts on the account.

17          But number two, that he didn't just go to a bank and

18  do this.  He took the extra step and made sure to contact and

19  consult his longtime lawyer at a reputable law firm to make

20  sure that what he was doing was legal.

21          And number three, that Mr. Teman, when he did it, did

22  so in broad daylight, clearly conveying to Bank of America and

23  to anyone else that would ever look at these documents that

24  what he was representing to the bank is that these were RCCs

25  based on contracts that are available publicly to anyone who

1032

K1RVTEM5                    Summations - Mr. Gelfand

1    wants to click on a single website; and that if you have any

2    questions, call GateGuard.

3          Now, members of the jury, when you go back into the

4    deliberation room, I encourage you to start with asking

5    yourself one question, and that is, was Mr. Reinitz telling the

6    truth when he testified from that witness stand that he gave

7    Mr. Teman the advice that he told you he gave him?  Because I

8    submit to you that when you apply the legal instruction on

9    advice of counsel that you'll have in writing that Judge

10   Engelmayer is going to give to you, that unless you unanimously

11   agree somehow that Mr. Reinitz was lying to you when he said

12   that, that's the end of the case.  Because you can't possibly

13   be guilty of any of these crimes unless you believe that he

14   lied to you.

15         Now, members of the jury, this trial, over the last

16   five days or so, has reminded me a little bit of a short story

17   about a young lawyer in Springfield, Illinois.

18         The lawyer goes to his friend and says, How many legs

19   does a pig have?

20         The friend says, Four.

21         The lawyer says, What if I were to tell you a tail is

22   a leg?

23         The friend says, Well, then I guess it would be five

24   legs.

25         And that young lawyer, Abraham Lincoln, tells his

A-1170

K1RVTEM5                         Summations - Mr. Gelfand

1    friend, No.  Just because I tell you that a tail is a leg, that

2    doesn't mean a tail is a leg.

3         Members of the jury, no matter how many times the

4    government wants to tell us that this was fraud, this was

5    fraud, this was fraud, the bottom line is the actual facts, the

6    evidence, clearly bears otherwise.

7         Members of the jury, I want to leave you with

8    something that's very important to me, and that's that when

9    Judge Engelmayer instructs you on the law, he's going to tell

10   you something that's important.  He's going to tell you that

11   all -- obviously on the defense we have no burden of proof.

12   What that means is that all of the evidence in this case has to

13   come from the prosecution.  They have to dispel every

14   reasonable doubt that still remains in your mind for you to

15   find Mr. Teman guilty of anything.  Not one of them, not two

16   reasonable doubts, not 17 of them, but the raft of reasonable

17   doubts that continue to remain at the end of this trial have to

18   somehow disappear in each of your minds unanimously.

19        Members of the jury, each of you, when you go back and

20   deliberate, each of you has the power and the duty and the

21   responsibility to have the courage to say no and to end this

22   nightmare for Mr. Teman.  We can't choose in this country

23   whether we're charged with a crime, but we have juries like you

24   to protect us from unjust allegations.

25        Members of the jury, I'm not going to get a chance to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1RVTEM5                    Summations - Mr. Gelfand

1    address you again.  That's completely normal.  The prosecution

2    gets the first word and the last word.  But I want you to

3    engage with what you hear from the prosecutor.  Because you

4    know we have something to say about it.  And I want you to

5    think about what we would say.  I don't want you to just take

6    it at face value, because we're not going to have a chance to

7    address it directly.

8            Members of the jury, you've paid incredibly great

9    attention throughout the last week.  You've taken notes, you've

10   watched the witnesses.  There's nobody who appreciates that

11   more than Mr. Teman.  When you go back to that jury room, I'm

12   going to ask that you do the one thing and the only thing that

13   the evidence warrants, and that is to find Mr. Teman not guilty

14   of each and every one of these counts.  Because when you

15   consider the advice of counsel, when you consider Mr. Teman's

16   intent, I submit to you, members of the jury, that all four of

17   these counts on those issues, at least, rise and fall together.

18           Thank you very much for your time.  Thank you for your

19   consideration.  Mr. Teman greatly appreciates it.

20           Thank you, your Honor.

21           THE COURT:  Thank you, Mr. Gelfand.

22           Ladies and gentlemen, Mr. Smallman tells me that your

23   afternoon coffee and snack has arrived.  I'll see you in 15

24   minutes.  As always, please don't discuss the case.

25           (Jury not present)

A-1172

K1RVTEM5

1    THE COURT:  All right, counsel.

2    Anyone have anything to raise before we take a recess?

3    MR. BHATIA:  No, your Honor.

4    MR. GELFAND:  No, your Honor.

5    THE COURT:  For your planning purposes, given the

6 hour, I'm not going to charge them today; it does not make any

7 sense to start after 4 o'clock reading them a long charge, when

8 I would like them fresh when they absorb it.

9    So I will excuse them, I expect, at the end of the

10 rebuttal summation, I'll take care of a little bit of

11 housekeeping with you, and then I'll excuse you.

12    Thank you.

13    (Recess)

14    THE COURT:  Okay.  Let's get the jury.

15    Counsel, insofar as I will be excusing the jury for

16 the day after the last summation, I'll give you an opportunity

17 just by show of hands if you have anything to raise with me at

18 the sidebar.  Limit that to things that need to be taken up

19 before I excuse the jury.  There will be plenty of time

20 together afterwards.

21    (Jury present)

22    THE COURT:  All right.  Welcome back, everyone.

23    Please be seated.

24    I hope you all had a good break.

25    We'll hear now the government's rebuttal.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1173

1036

K1RVTEM5                    Rebuttal - Mr. Bhatia

1           Mr. Bhatia.

2           MR. BHATIA:  Ladies and gentlemen, you now know the

3   defendant created 29 checks from scratch.  He took the number

4   right off of the check that his customers had given him and put

5   it on his own check.  And then he created them, 29 checks in

6   total, worth more than $300,000.  The defense is that his

7   lawyer had blessed this; his lawyer had blessed this like a

8   fairy godmother might say, You have criminal intent, but now

9   it's A-OK.

10          That's not what happened.

11          Ladies and gentlemen, a lawyer can't turn the

12  defendant's criminal intent on its head.  You know through the

13  eight things that I mentioned the defendant had fraudulent

14  intent.  He moved the money around, he never told his

15  customers, he made the checks look like his customers had

16  approved them, he put his own photo on the checks.  None of

17  that -- absolutely none of that -- is negated by what you heard

18  from Mr. Reinitz.

19          Let's get into it.

20          So the defendant talked a lot about -- excuse me,

21  defense spoke about the advice of counsel defense.

22          As Judge Engelmayer, I suspect, will instruct you,

23  there are essentially three elements to the advice of counsel

24  defense.

25          First, that the defendant, in good faith and honestly,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1RVTEM5                    Rebuttal - Mr. Bhatia

1  sought the advice of an attorney; second, that he fully and

2  honestly laid out the material facts; and then finally, he

3  followed that advice.

4         All three of those are missing here.

5         Here, the defendant didn't seek the advice of counsel

6  before he acted.  You saw in the chats -- they are in the 700

7  series -- that he sought the advice of his lawyer way after the

8  fact.  In fact, when he sought his advice, his lawyer's advice

9  in January of 2019, his lawyer said, Don't do it.  Bad idea.

10 Then he went back, after he got the chargebacks, and his lawyer

11 said the same thing:  Bad idea.  His lawyer said, If I was

12 advising your customer, I would tell them to call the police.

13        You saw the chats and so you know what happened.  The

14 chats are the only thing from Mr. Reinitz that you know to be

15 true.  And I submit that the advice of counsel defense fails on

16 its face, whether you believe Mr. Reinitz or not.

17        But I do think when you go back to the jury room

18 you'll be tasked with the responsibility to evaluate all the

19 witnesses, to evaluate what they had to gain, what they had to

20 lose from testifying, what their motives might be, how they

21 presented, how they testified on the stand, like your

22 subjective view of how they did.

23        Mr. Reinitz was, by far, the least credible witness

24 that you heard from during this trial.  I submit that

25 Mr. Reinitz is actually the only witness in this entire trial

K1RVTEM5                         Rebuttal - Mr. Bhatia

1    who had any motive to lie, any motive to lie at all.

2         First, you know that Mr. Reinitz is billing GateGuard.

3    You know that Mr. Reinitz is GateGuard's attorney.  He's paid

4    by them, he invoices them, he represents them in other matters,

5    he wants to keep getting paid.

6         You also know that in this very case, he got paid from

7    the defendant's fraud scheme.  I showed you those exhibits, and

8    you can take a look at them.  They are the invoices, they are

9    the bank statements in the 100 series.  And there's also the

10   big spreadsheet in Government Exhibit 113.  And it shows you

11   the defendant moved money from one account to another to

12   another, and then paid Mr. Reinitz $16,000 from the money that

13   he stole from his customers and the money that Bank of America

14   had to front to him.

15        Mr. Reinitz is the only one in this whole case who had

16   anything on the line, and he lied to you.  He lied to you once,

17   and he lied to you again, and he lied to you again.

18        Ladies and gentlemen, I think this advice of counsel

19   defense fails; and I submit to you that it fails on the

20   elements.  But I also believe you should have a very difficult

21   time trusting Mr. Reinitz and believing his testimony and

22   ultimately crediting it.

23        Mr. Reinitz is also essentially a member of the

24   defense Teman.  You heard that last year he was emailing

25   helpful cases to the defense.  You heard that as recently as

K1RVTEM5                         Rebuttal - Mr. Bhatia

1    the week before the trial he was giving them ideas and tips.

2    He's GateGuard's lawyer.  It's not incredible.  Of course he's

3    their lawyer; of course he wants them to win.  And because of

4    that, the testimony that he gave you should not be credited.

5              Now, I'll tell you about some specific lies that

6    Mr. Reinitz made.

7              First is that on Friday, he testified that he didn't

8    know about the March 2019 checks.  Those are the two checks,

9    the one from Mercer and one from the Coney account.  He

10   testified on Friday that he didn't know about those checks

11   until Mr. Teman messaged him on WhatsApp.  And you saw those

12   messages; we've gone through them now a couple of times.  Those

13   messages, he says, I'm not sure I follow, but it doesn't sound

14   good.  He says, I don't know the ins and outs, but it sounds

15   like a bad idea.  Those were his messages when he first heard

16   about the scheme.  Those were his messages when he first heard

17   that Mr. Teman deposited those checks and when he first heard

18   that there were chargebacks.

19             But sometime over the weekend -- I don't know how it

20   was or why it was -- Mr. Reinitz decided that that wasn't

21   helpful testimony for Mr. Teman.  You heard Mr. Reinitz today,

22   this morning, on that stand right there, tell you that he had

23   heard about the checks beforehand; that Mr. Teman had talked to

24   him about the checks and about drawing accounts from Coney and

25   18 Mercer beforehand.

1040

K1RVTEM5                     Rebuttal - Mr. Bhatia

1      Ladies and gentlemen, you've seen the chats.  You've

2  actually seen with your own eyes how Mr. Reinitz responded when

3  he first heard about the checks.  He said, I don't know the ins

4  and outs.  He said, I don't follow, but it doesn't sound good.

5  That was his response.  We've seen that.  His testimony on

6  Friday was sort of consistent with that.  And then today he had

7  an about-face.  Today he decided he needed to tell you

8  something else.

9      You've also seen another lie from Mr. Reinitz.  He

10  testified on Friday that he consulted with Mr. Teman about

11  payment terms and about ACH deposits as long ago as mid 2018.

12  That was around the time he was hired.  He said, We spoke about

13  that and we spoke about it on several occasions since then.

14  That's what he told you.

15      Today though, I asked about the invoices.  I asked

16  him, Did you bill for that time?  When did you first bill him

17  for anything having to do with ACH?

18      And what did he tell you?  May of 2019, a year later,

19  once Mr. Teman had started getting chargebacks.

20      And then Mr. Gelfand asked him, Well, when did that

21  work happen?  You billed in May '19, when did you actually bill

22  for it?

23      He said, April 2019.  That was the time when all those

24  text messages or those website messages where Mr. Teman is

25  telling him I had these chargebacks, and Mr. Reinitz tells him,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1178

K1RVTEM5                    Rebuttal - Mr. Bhatia

1    Stop.  Bad idea.

2          So he did the work then and he billed for it after

3    Mr. Teman had already deposited the checks.  That's not what he

4    told you on Friday.

5          So I submit that you should have a very difficult time

6    crediting Mr. Reinitz's testimony in the face of the

7    overwhelming evidence that Mr. Teman knew what he was doing was

8    fraudulent.  And the only person -- the only thing you've heard

9    that contradicts that is Mr. Reinitz's uncorroborated

10   testimony.  It's totally uncorroborated.

11         He said in the chats, Bad idea.  I don't know much

12   about this.  I don't know the ins and outs.

13         His testimony about any proof, about any messages,

14   about any emails, about any recordings, is that, On the phone I

15   told him it was perfectly lawful.  That's what he told you.

16         The chats say, Bad idea.  Don't do it.  I don't know

17   the ins and outs.  On the stand he told you, On the phone

18   though I told him it was okay.  Don't worry about it.

19         Ladies and gentlemen of the jury, I think you should

20   have a very difficult time crediting that testimony.

21         Ultimately, he still fails -- Mr. Teman still fails to

22   meet the elements of the good-faith defense.

23         First, that in good faith he sought the testimony of a

24   lawyer.  You've seen in the chats he sought the advice of a

25   lawyer after he already deposited the checks.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1179

K1RVTEM5                    Rebuttal - Mr. Bhatia

1      You've also seen that he didn't fully and honestly lay

2  out the facts.  You've seen the chats.  Over and over he tells

3  Mr. Reinitz, We have a contract.  We have a contract.  They

4  agreed to the contract.

5      There's no contract.  There's not one contract in this

6  case.  And certainly there's not a contract if you were to ask

7  the customers.  So Mr. Teman's representations to his own

8  lawyer did not fully and honestly lay out the facts and,

9  therefore, it fails the second element of the advice of counsel

10 defense.

11     And finally, that Mr. Teman in good faith followed

12 that advice.  You've seen the chats that his lawyer told him,

13 Don't do it.  I would call the -- I would tell someone to call

14 the police.  They are going to call the police.  A greater than

15 50 percent chance you'll be arrested.  That's what his attorney

16 told him to do.  And, of course, he went ahead and deposited

17 the checks.

18     Ladies and gentlemen of the jury, I submit that all

19 three elements of the good-faith defense are not met here.

20     Now, ultimately what this case comes down to, as

21 defense counsel acknowledged, is criminal intent.  The proof of

22 criminal intent here is overwhelming.  The defendant showed it

23 once, he showed it twice, he showed it again.

24     And I submit that perhaps the most obvious proof here

25 of criminal intent is that there's a $260,000 hole right now at

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1180

K1RVTEM5                    Rebuttal - Mr. Bhatia

1    Bank of America.  There's $260,000 -- more than a quarter

2    million dollars -- missing.  Someone else had to pay for that.

3    Bank of America had to pay for that.

4         The defense wants you to believe that Mr. Teman did

5    not have fraudulent intent when he set that course of action in

6    motion.  They want you to believe that somehow, in a perfectly

7    lawful, perfectly reasonable, perfectly blessed course of

8    action, Mr. Teman ripped the bank account numbers off of his

9    customers' checks, put them on his own checks, wrote on those

10   checks that his customers were okay with it, that there was a

11   contract, that his customers thought there was no signature

12   required.  Then he deposited those checks, he deposited two of

13   them.  Both of them got returned because the customer

14   disagreed.  Then he tried 27 more, including some on the same

15   customer, and those got returned.  And Mr. Teman and the

16   defense wants you to believe that there was no criminal intent.

17        Ladies and gentlemen, we walked through a couple

18   reasons.  I think all eight of those reasons apply.  But it's

19   quite simple:  There's $260,000 missing from $300,000 that

20   customers say they never approved.  That's criminal intent.

21        The defendant stole from his own customers and left

22   Bank of America holding the bag.  He did it out of greed and he

23   did it to steal every last dollar.  And he thought he could get

24   away with it because of some fine print listed on a website.

25        The defendant wanted his lawyers one day in a criminal

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1RVTEM5

1    proceeding to be able to say there is a contract.  He wanted

2    his lawyers to get up in court, maybe in federal court,

3    Mr. Reinitz told you it might be a federal crime, and tell a

4    jury this was blessed because of a contract.  This was in the

5    payment terms, the payment terms that none of these customers

6    had ever heard of or seen.  He wanted his lawyer to be able to

7    get up here and tell you that it was all blessed because of a

8    contract.  It wasn't.

9            Ladies and gentlemen of the jury, it was the

10   defendant's fraud scheme.  The evidence of the defendant's

11   guilt is overwhelming and it's compelling.  Hold Ari Teman

12   accountable.  Find him guilty.

13           THE COURT:  All right.  Thank you, Mr. Bhatia.

14           All right.  Ladies and gentlemen, in a few moments

15   we're going to break for the day, and let me explain why.

16           The next step in the case will involve my giving you

17   detailed instructions on the legal principles, as well as the

18   procedures that will govern your deliberations.  This will take

19   a little bit of time.  And I want to make sure that you're

20   fresh to hear what I have to say; and that you begin your

21   deliberations promptly upon the completion of what I have to

22   say.

23           It's now closing in on 4 o'clock, and it has been a

24   long day, and it's been a day when I can tell that you've all

25   been actively listening to the series of jury addresses you

A-1182

1045

K1RVTEM5

1    heard, and beforehand you heard testimony.  I think the

2    interests of justice and sanity favor giving you an early

3    adjournment today so that you can come in fresh tomorrow.

4          So we're about to adjourn.  The usual instruction

5    applies.  Please do not discuss the case.  Do not research the

6    case.

7          Let me tell you a little bit about the schedule

8    tomorrow.  The same schedule applies in the sense that we'll

9    have breakfast available for you at 8:45, and I'll need you to

10   be ready to come out promptly at 9:30.

11         At that point I will give you instructions as to the

12   law and, as I said, that will take a little bit of time.

13         At the end of my giving you the instructions, I will

14   give you as well through Mr. Smallman a care package.  It will

15   include a full courtesy copy for each of you of the

16   instructions that I've just read, it will include a list of

17   exhibits, it will include a list in order of the witnesses who

18   testified, it will include a verdict form that will help you in

19   guiding your deliberations.  You'll each have a full set of

20   that.  And then I'll send you into the jury room to deliberate.

21         Unlike the usual day though when we sit in court,

22   lunch is on us.  I want to make sure that if you're

23   deliberating, you're able to power through lunch and take a

24   break in the room as you wish, but I want you to be able to

25   work through lunch to the extent you want.

A-1183

1046

K1RVTEM5

1     So when you come in tomorrow morning, Mr. Smallman

2     will have a menu to fill out, and please fill it out.  So that

3     as soon as I begin to give you instructions, he can go deliver

4     your takeout menus.

5         You're not obliged to still be deliberating at

6     lunchtime, but the lunch will be there for you if you are

7     deliberating at that point in the day.

8         We'll continue on.  There will be a -- mid afternoon

9     there will be, as you continue to deliberate, the usual

10    afternoon food.  And if you're still deliberating at the end of

11    the day, you'll adjourn at 5 o'clock to resume on what would

12    then be Wednesday.

13        So that's the schedule for tomorrow.  I hope that is

14    clear.

15        Have a good evening.  I'll see you here promptly at

16    9:30 tomorrow.  Thank you.

17        Sorry.  Let me just see a show of hands.

18        Counsel, anything to raise before -- that we need the

19    jury for?

20        Very good.  You're excused.  See you tomorrow.

21        (Jury not present)

22        THE COURT:  All right.  Be seated.

23        Counsel, I have very little to take up with you.

24        First of all, let me just confirm with the defense

25    that you are fine with the various documents that the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1184

1047

K1RVTEM5

1   government prepared:  The redaction of the indictment, the

2   witness list, and the exhibit list.

3          MR. GELFAND:  Yes, your Honor.

4          THE COURT:  All right.

5          With respect to the charges, the only change I intend

6   to make is a typographical error.  I think I referred to the

7   address as West 205th; it's, in fact, as I was reminded by

8   Mr. Bhatia's summation, West 204th.

9          Is there anything else, with the benefit now of

10  reflection and having heard closing arguments, that anyone

11  thinks needs to be changed in the instructions?

12         MR. BHATIA:  Not from the government, your Honor.

13         If we identify anything overnight, we'll let you know

14  promptly.

15         THE COURT:  All right.  We're about to hit the print

16  button upstairs; so overnight, you're not going to be getting a

17  very responsive chambers.  So if you're going to focus on that

18  at all, please do so immediately.

19         MR. BHATIA:  We don't intend to.  No edits from us.

20         MR. GELFAND:  Not for the defense, your Honor.

21         THE COURT:  All right.

22         And government, you are prepared -- I'm looking at

23  Mr. Magliocco.  To the extent that the jury wants copies of

24  exhibits, you'll have at the ready or promptly preferable,

25  three copies of any hard copy exhibit?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1RVTEM5

1        MR. MAGLIOCCO:  Yes, your Honor.

2        THE COURT:  Very good.

3        And you've got the wherewithal to prepare redacted

4   versions of the transcript.  And each of you should have the

5   transcript from each day of court so far; correct?

6        MR. MAGLIOCCO:  Yes, your Honor.

7        THE COURT:  All right.  I think that's all I've got.

8        All right.  We stand adjourned.  Thank you.

9        See you at -- be here at 9 tomorrow in case something

10  does come up.  Okay?

11        (Adjourned to January 28, 2020, at 9 o'clock a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-1186

1049

INDEX OF EXAMINATION

Examination of:                                    Page

ARIEL REINITZ

Cross By Mr. Bhatia . . . . . . . . . . . . 893

Redirect By Mr. Gelfand . . . . . . . . . . 919

Recross By Mr. Bhatia . . . . . . . . . . . 936

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 727  . . . . . . . . . . . . . . . . . . 901

 728  . . . . . . . . . . . . . . . . . . 905

 729  . . . . . . . . . . . . . . . . . . 909

DEFENDANT EXHIBITS

Exhibit No.                                    Received

 71  . . . . . . . . . . . . . . . . . . . 928

A-1187

K1S7TEM1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                         19 CR 696 (PAE)

5   ARI TEMAN,

6            Defendant.                 JURY TRIAL

7   ------------------------------x

8                                       New York, N.Y.
                                        January 28, 2020
9                                       9:00 a.m.

10

11  Before:

12               HON. PAUL A. ENGELMAYER,

                                        District Judge
13

14                     APPEARANCES

15

    GEOFFREY S. BERMAN,
16       United States Attorney for the
         Southern District of New York
17  KEDAR S. BHATIA
    EDWARD A. IMPERATORE
18       Assistant United States Attorneys

19  JOSEPH A. DiRUZZO, III
    JUSTIN GELFAND
20       Attorneys for Defendant

21  ALSO PRESENT:  DANIEL ALESSANDRINO, NYPD
                   WILLIAM MAGLIOCCO, Paralegal, USAO
22

23

24

25


                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

A-1188

K1S7TEM1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning everyone.  All counsel is

3    present but Mr. Teman is not.

4          MR. GELFAND:  I think he might be going through

5    security.  I was in touch with him.  Obviously he is aware of

6    the time and has not responded to his phone, so I can't comment

7    to anything I don't know other than he is not here and not

8    responding, so when we went through security this morning the

9    line was really lengthy.  We waive his appearance.

10          THE COURT:  I only have housekeeping to take up.  From

11    my perspective I have marked the following as court exhibits:

12    Court Exhibit 2 will be the final version of the charge.  Court

13    Exhibit 3 will be the witness list that counsel have approved.

14    Court Exhibit 4 is the exhibit list that counsel have prepared

15    and approved.  Court Exhibit 5 is the indictment with one

16    important change:  Counsel, you included the back page which

17    included Section 1028(a).  That's no longer in the case.  The

18    back page also reflected -- good morning, Mr. Teman -- the

19    superseder return date.  My judgment is they didn't need to

20    know that, so I simply tore off the back page which is after

21    the signature of the foreperson.  It's really just the back.  I

22    assume that's fine with everybody.

23          MR. BHATIA:  That's fine.

24          MR. GELFAND:  Yes, your Honor.

25          THE COURT:  Court Exhibit 6 is the verdict form.  And

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1S7TEM1

1    Court Exhibit 7 is the PowerPoint that the government used in

2    summation.  Put aside the PowerPoint, the other items will be

3    going to the jury today.  And we have prepared a substantial

4    care package of 12 of each of them -- the charge, the witness

5    list, the exhibit list, the indictment and the verdict form --

6    so when the time comes Mr. Smallman will be giving that to the

7    jury as its care package.

8              With that, I've got nothing else to take up with you

9    today, but I wanted to give counsel an opportunity -- in the

10   event overnight something has arisen -- to raise any issue.

11   Government?

12             MR. BHATIA:  Nothing from the government.

13             THE COURT:  Defense?

14             MR. GELFAND:  No, your Honor.

15             THE COURT:  So, today once the jury has begun to

16   deliberate, I will need somebody from each table to be here.

17   And you should be in a position to be in touch with the balance

18   of your team, prosecution or defense.  I would urge you at the

19   beginning to stick around.  We will likely get a note

20   identifying who the foreperson is but, if experience teaches me

21   anything, it's within 30 or 45 minutes there is a high

22   likelihood of a note just asking for materials, using the

23   exhibit list as a menu.  So, I would like to be able to be

24   quick on the uptake as to that.  But the important thing is

25   during the course of the day I need somebody here and in a

A-1190

K1S7TEM1

1  position to respond from each team.  OK.  Anything else before

2  we adjourn until 9:30?

3          MR. GELFAND:  Not for the defense.

4          MR. BHATIA:  Nothing.

5          THE COURT:  I will see you at 9:30.  Thank you.

6          (Recess)

7          THE COURT:  Mr. Smallman, let's bring in the jury.

8          (Jury present)

9          THE COURT:  Good morning, ladies and gentlemen.

10  Please be seated.

11          I am about to read to you my instructions to guide you

12  in your deliberations, and as you will hear in a moment, you're

13  going to have a copy of these for you to you use as you

14  deliberate.

15          Members of the jury, you have now heard all of the

16  evidence in the case as well as the final arguments of the

17  parties.  You have paid careful attention to the evidence, and

18  I am confident that you will act together with fairness and

19  impartiality to reach a just verdict in the case.

20          Now it's time for me to instruct you as to the law

21  that governs this case.  There are three parts to these

22  instructions.  First, I'm going to give you some general

23  instructions about your role, and about how you are to decide

24  the facts of this case.  Those instructions really would apply

25  to just about any trial.  Second, I'm going to give you some

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1191

K1S7TEM1

1    specific instructions about the legal rules applicable to this

2    particular case.  Third, I will give you some final and brief

3    instructions about procedure.

4            Listening to these instructions may not be easy.  It's

5    important, however, that you listen carefully and concentrate.

6    I ask you for patient cooperation and attention.  You will

7    notice I am reading these words from a prepared text.  It would

8    be more lively, no doubt, if I just improvised, but it's

9    important that I not do so.  The law is made up of words, and

10   those words are very carefully chosen, and so when I tell you

11   the law, it's critical that I use exactly the right words.

12           You will have copies of what I'm reading in the jury

13   room to consult.  Don't worry if you miss a word or two.  For

14   now just listen carefully and try to concentrate on what I'm

15   saying.

16           First of all, as to the role of the Court:  I have

17   instructed you during the trial as to various matters, and you

18   should of course continue to follow those instructions.  My

19   duty at this point is to instruct you as to the law.  It's your

20   duty to accept these instructions of law and to apply them to

21   the facts as you determine them.  With respect to legal

22   matters, you must take the law as I give it to you.  If any

23   attorney has stated a legal principle different from any that I

24   state to you in my instructions, it is my instructions that you

25   must follow.  You must not substitute your own notions or

K1S7TEM1

1   opinions of what the law is or ought to be.

2           As to the role of the jury:  As members of the jury,

3   you are the sole and exclusive judges of the facts.  You pass

4   upon the evidence.  You determine the credibility of the

5   witnesses.  You resolve such conflicts as there are or may be

6   in the testimony.  You draw whatever reasonable inferences you

7   decide to draw from the facts as you have determined them, and

8   you determine the weight of the evidence.

9           Do not conclude from any of my questions or any of my

10  rulings on objections or anything else that I have done during

11  this trial that I have any view as to the credibility of the

12  witnesses or how you should decide the case.

13          It is your sworn duty, and you have taken the oath as

14  jurors, to determine the facts.  Any opinion I might have

15  regarding the facts is of absolutely no consequence.

16          As to the role of counsel:  It's the duty of the

17  attorneys to object when the other side offers testimony or

18  other evidence that the attorney believes is not properly

19  admissible.  It's my job to rule on those objections.

20  Therefore, why an objection was made or why I ruled on it the

21  way I did is not your business.  You should draw no inference

22  from the fact that an attorney objects to any evidence.  Nor

23  should you draw any inference from the fact that I might have

24  sustained or overruled an objection.

25          The personalities and the conduct of counsel in the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1193

K1S7TEM1

1    courtroom are not in any way at issue.  If you formed reactions

2    of any kind to any of the lawyers in the case, favorable or

3    unfavorable, whether you approved or disapproved of their

4    behavior as advocates, those reactions should not enter into

5    your deliberations.

6            From time to time, as you know, the lawyers and I had

7    conferences out of your hearing.  Those conferences involved

8    procedural and other matters, and none of the events relating

9    to those conferences should enter into your deliberations at

10   all.

11           Sympathy or Bias:  Under your oath as jurors, you are

12   not to be swayed by sympathy or prejudice.  You are to be

13   guided solely by the evidence in this case, and the crucial,

14   bottom-line question that you must ask yourselves as you sift

15   through the evidence is:  Has the government proven the guilt

16   of the defendant beyond a reasonable doubt?

17           It is for you alone to decide whether the government

18   has proven that the defendant is guilty of the crimes charged.

19   You must decide solely on the basis of the evidence presented,

20   subject to the law as I explain it to you.  It must be clear to

21   you that once you let fear or prejudice, or bias or sympathy

22   interfere with your thinking, there is a risk that you will not

23   arrive at a true and just verdict.

24           If you have a reasonable doubt as to the defendant's

25   guilt, you should not hesitate for any reason to find a verdict

A-1194

K1S7TEM1

1  of acquittal for the defendant.  But on the other hand, if you

2  should find that the government has met its burden of proving

3  the defendant's guilt beyond a reasonable doubt, you should not

4  hesitate because of sympathy or any other reason to render a

5  verdict of guilty for the defendant.

6        The question of possible punishment of the defendant

7  is of no concern to the jury and should not enter into or

8  influence your deliberations.  The duty of imposing sentence

9  rests exclusively upon the Court.  Your function is to weigh

10  the evidence in the case and to determine whether or not the

11  defendant is guilty beyond a reasonable doubt, solely upon the

12  basis of such evidence.  Under your oath as jurors, you cannot

13  allow a consideration of the punishment which may be imposed

14  upon the defendant, if he is convicted, to influence your

15  verdict, in any way, or, in any sense, enter into your

16  deliberations.

17        Similarly, it would be improper for you to allow any

18  feelings that you might have about the nature of the crime

19  charged to interfere with your decision-making process.  Your

20  verdict must be based exclusively upon the evidence or the lack

21  of evidence in the case.

22        In reaching your verdict, you must remember that all

23  parties stand equal before a jury in the courts of the United

24  States.  The fact that the government is a party and the

25  prosecution is brought in the name of the United States does

A-1195

K1S7TEM1

1  not entitle the government or its witnesses to any greater

2  consideration than that accorded to any other party.  By the

3  same token, you must give it no less deference.  The government

4  and the defendant stand on equal footing before you.

5      It would be improper for you to consider, in reaching

6  your decision as to whether the government sustained its burden

7  of proof, any personal feelings you may have about the

8  defendant's race, national origin, sex, or age.  Again, all

9  persons are entitled to the same presumption of innocence, and

10  the government has the same burden of proof with respect to all

11  persons.  Your verdict must be based solely on the evidence or

12  the lack of evidence.

13      Now, I will instruct you on the presumption of

14  innocence -- the government's burden of proof in this case.

15  The defendant has pled not guilty.  By doing so, he denies the

16  charges in the indictment.  Thus, the government has the burden

17  of proving the charges against him beyond a reasonable doubt.

18  A defendant does not have to prove his innocence.  On the

19  contrary, he is presumed to be innocent of the charges

20  contained in the indictment.  This presumption of innocence was

21  in the defendant's favor at the start of the trial, it

22  continued in his favor throughout the entire trial, it is in

23  his favor even as I instruct you now, and it continues in his

24  favor during the course of your deliberations in the jury room.

25      It is removed if and only if you, as members of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1S7TEM1

1    jury, are satisfied that the government has sustained its

2    burden of proving the guilt of the defendant beyond a

3    reasonable doubt.

4         So, the question that naturally comes up is:  What is

5    a reasonable doubt?  The words almost define themselves.  It is

6    a doubt founded in reason and arising out of the evidence in

7    the case, or the lack of evidence.  It is doubt that a

8    reasonable person has after carefully weighing all the

9    evidence.  Reasonable doubt is a doubt that appeals to your

10   reason, your judgment, your experience, your common sense.

11   Reasonable doubt does not mean beyond all possible doubt.  It

12   is practically impossible for a person to be absolutely and

13   completely convinced of any disputed fact which by its nature

14   is not susceptible to mathematical certainty.  In consequence,

15   the law in a criminal case is that it is sufficient if the

16   guilt of the defendant is established beyond a reasonable

17   doubt, not beyond all possible doubt.

18        If, after a fair and impartial consideration of all of

19   the evidence, you are not satisfied of the guilt of the

20   defendant, and if you do not have an abiding conviction of the

21   defendant's guilt -- in sum, if you have such a doubt as would

22   cause you, as prudent persons, to hesitate before acting in

23   matters of importance to yourselves -- then you have a

24   reasonable doubt, and in that circumstance it is your duty to

25   acquit the defendant.

A-1197

K1S7TEM1

1        On the other hand, if after a fair and impartial

2   consideration of all of the evidence, you do have an abiding

3   belief of the defendant's guilt -- such a belief as you would

4   be willing to act upon without hesitation in important matters

5   in the personal affairs of your own life -- then you have no

6   reasonable doubt, and under such circumstances it is your duty

7   to convict the defendant.

8        The government is not required to prove the essential

9   elements of an offense by any particular number of witnesses.

10  The testimony of a single witness may be sufficient to convince

11  you beyond a reasonable doubt of the existence of the essential

12  elements of the offense you are considering if you believe that

13  the witness has truthfully and accurately related what he or

14  she has told you.

15       In determining the facts, you must rely upon your own

16  recollection of the evidence.  The evidence in this case is the

17  sworn testimony of witnesses, the exhibits received into

18  evidence, and the stipulations of the parties.

19       However, testimony that I have stricken or excluded or

20  told you to disregard is not evidence and may not be considered

21  by you in rendering your verdict.  Also, if certain testimony

22  was received for a limited purpose, you must follow the

23  limiting instructions I have given and use the evidence only

24  for the purpose or purposes that I indicated.

25       The only exhibits that are evidence in this case are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1198

1061

K1S7TEM1

1    those that were received into evidence.  Exhibits marked for

2    identification but not admitted are not evidence, nor are

3    materials that were used only to refresh a witness's

4    recollection.

5           As I told you at the start of the case, statements and

6    arguments by lawyers are not evidence, because the lawyers are

7    not witnesses.  What they have said to you in their opening

8    statements and in their summations is intended to help you

9    understand the evidence to reach your verdict.  However, if

10   your recollection of the facts differs from the lawyers'

11   statements, it is your recollection that controls.

12          For the same reasons, you are not to consider a

13   lawyer's questions as evidence.  It is the witnesses' answers

14   that are the evidence, not the lawyers' questions.

15          Finally, any statements that I may have made do not

16   constitute evidence.  It is for you alone to decide the weight,

17   if any, to be given to the testimony you have heard and the

18   exhibits you have seen.

19          Generally, as I mentioned at the start of the case,

20   there are two types of evidence that you may consider in

21   reaching your verdict.  One type of evidence is direct

22   evidence.  Direct evidence is testimony by a witness about

23   something he knows by virtue of his own senses -- something he

24   has seen, felt, touched, or heard.  For example, if a witness

25   testified that when he left his house this morning it was

A-1199

1062

K1S7TEM1

1    raining, that would be direct evidence about the weather.

2            Circumstantial evidence is evidence from which you may

3    infer the existence of certain facts.  To use the example I

4    used last Wednesday when we got started at the start of the

5    trial, assume again that when you came into the courthouse this

6    morning the sun was shining and it was a nice day.  Assume that

7    the courtroom blinds were drawn and you couldn't look outside.

8    And assume that as you were sitting here, someone walked in

9    with an umbrella that was dripping wet, and then someone else a

10   few minutes later entered with a wet raincoat.  Now, you can't

11   look outside the courtroom, and you can't see whether or not

12   it's raining, and so you wouldn't have any direct evidence of

13   that fact, but on the combination of facts that I have asked

14   you to assume, it would be reasonable and logical for you to

15   conclude that it had been raining.

16           That is all there is to circumstantial evidence.  You

17   infer on the basis of reason and experience and common sense

18   from one established fact the existence or the nonexistence of

19   some other fact.

20           As you can see, the matter of drawing inferences from

21   facts in evidence is not a matter of guesswork or speculation.

22   An inference is a logical, factual conclusion that you might

23   reasonably draw from other facts that have been proven.  Many

24   material facts -- such as what I person was thinking or

25   intending -- can rarely be proved by direct evidence.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-1200

K1S7TEM1

1      Circumstantial evidence is as valuable as direct

2  evidence.  The law makes no distinction between direct and

3  circumstantial evidence, but simply requires that before

4  convicting a defendant, the jury must be satisfied of a

5  defendant's guilt beyond a reasonable doubt, based on all of

6  the evidence in the case, circumstantial and direct.

7      There are times when different inferences might be

8  drawn from the evidence.  The government asks you to draw one

9  set of inferences.  The defendant asks you to draw another.

10  Again, it's for you, and you alone, to decide what inferences

11  you will draw.

12      Let's turn now to witness credibility.  You have had

13  the opportunity to observe the witnesses.  It is now your job

14  to decide how believable each witness was in his or her

15  testimony.  You are the sole judges of the credibility of each

16  witness and of the importance of his or her testimony.

17      You should carefully scrutinize all of the testimony

18  of each witness, the circumstances under which the witness

19  testified, the impression the witness made when testifying, the

20  relationship of the witness to the controversy and the parties,

21  the witness's bias or impartiality, the reasonableness of the

22  witness's statement, the strength or weakness of the witness's

23  recollection when viewed in the light of all of the other

24  testimony, and any other matter in evidence that may help you

25  decide the truth and the importance of each witness's