# 21-1920-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

ARI TEMAN, AKA Sealed Defendant 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## Volume 11 of 11 (Pages A-2201 to A-2483)

KEDAR S. BHATIA
WON S. SHIN
  *Assistant U.S. Attorney*
UNITED STATES ATTORNEY'S OFFICE
  SOUTHERN DISTRICT OF NEW YORK
*Attorneys for Appellee*
One Saint Andrew's Plaza
New York, New York 10007
(212) 637-2200

EDEN QUAINTON
QUAINTON LAW
*Attorneys for Defendant-Appellant*
2 Park Avenue, 20th Floor
New York, New York 10169
(212) 419-0575

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Complaint, filed June 20, 2019 .................................. A-46.2

Notice of Appearance, dated August 27, 2019 ........... A-47

Indictment, filed September 26, 2019 ........................ A-49

Waiver of Appearance for Arraignment, dated
    October 14, 2019 .................................................... A-53

Transcript of Proceedings held before the
    Honorable Paul A. Engelmayer, dated
    October 21, 2019 .................................................... A-55

Supeseding Indictment, filed November 12, 2019 .... A-96.1

Transcript of Proceedings held before the
    Honorable Paul A. Engelmayer, dated November
    21, 2019 ................................................................. A-96.7

Opinion and Order of the Honorable Paul A.
    Engelmayer, dated December 20, 2019 ................. A-97

Second Superseding Indictment, filed
    January 3, 2020 ...................................................... A-121

Defendant Teman's Requested Voir Dire Questions,
    filed January 6, 2020 ............................................. A-129

Excerpts of Transcript of Conference Proceedings
    held before the Honorable Paul A. Engelmayer,
    dated January 10, 2020 .......................................... A-137.1

Transcript of Conference Proceedings held before
    the Honorable Paul A. Engelmayer, dated
    January 10, 2020 .................................................... A-137.6

Letter from Kedar S. Bhatia to the Honorable Paul
    A. Engelmayer, dated January 14, 2020 ............... A-137.96

ii

**Page**

Transcript of Trial Proceedings held before the
    Honorable Paul A. Engelmayer, dated
      January 21, 2020 ................................................... A-138

Transcript of Trial Proceedings held before the
    Honorable Paul A. Engelmayer, dated
      January 22, 2020 ................................................... A-265

Transcript of Trial Proceedings held before the
    Honorable Paul A. Engelmayer, dated
      January 23, 2020 ................................................... A-398

Transcript of Trial Proceedings held before the
    Honorable Paul A. Engelmayer, dated
      January 24, 2020 ................................................... A-672

Transcript of Trial Proceedings held before the
    Honorable Paul A. Engelmayer, dated
      January 27, 2020 ................................................... A-998

Transcript of Trial Proceedings held before the
    Honorable Paul A. Engelmayer, dated
      January 28, 2020 ................................................... A-1187

Transcript of Trial Proceedings held before the
    Honorable Paul A. Engelmayer, dated
      January 29, 2020 ................................................... A-1264

Verdict Sheet, dated January 29, 2020 ...................... A-1298.1

Order of the Honorable Paul A. Engelmayer, dated
    January 29, 2020 ................................................... A-1299

Defendant's Motion for Judgment of Acquittal or in
    the Alternative, Motion for New Trial, filed
    February 26, 2020 ................................................. A-1437

Motion for New Trial Based on Undisclosed Brady
    and Jencks Act Evidence, filed April 9, 2020 ....... A-1473

iii

**Page**

Exhibit A to Motion -
Excerpts of Transcript of Proceedings, dated
August 9, 2018 ...................................................... A-1498

Exhibit B to Motion -
Report of Violations of New York City's Housing
Maintenance Code ................................................. A-1512

Exhibit C to Motion -
Report of Violations of New York City's Housing
Maintenance Code ................................................. A-1513

Exhibit D to Motion -
HPD's Housing Maintenance Code Violations
User Guide ............................................................ A-1514

Exhibit E to Motion -
Report re: New York Civil Litigation – Joseph
Soleimani .............................................................. A-1548

Exhibit F to Motion -
Report re: New York Civil Litigation – Elie
Gabay .................................................................... A-1549

Exhibit G to Motion -
Glossary of Terms for Litigation Status Report
from HPD ............................................................... A-1550

Letter from Joseph A. DiRuzzo, III to the Honorable
Paul A. Engelmayer, dated April 9, 2020 ............... A-1552

Letter from Kedar S. Bhatia, Assistant United States
Attorney to the Honorable Paul A. Engelmayer,
dated May 1, 2020 re: Trial Exhibits ..................... A-1554

Government's Exhibits:

GX 101-
GateGuard Account Opening Documents ............. A-1555

GX 102 -
GateGuard Bank Statements .................................. A-1559

iv

**Page**

GX 103-
Friend or Fraud Account Opening Documents ...... A-1581

GX 104-
Friend or Fraud Bank Statements .......................... A-1585

GX 105-
Touchless Labs Account Opening Documents ...... A-1609

GX 106-
Touchless Labs Bank Statements........................... A-1613

GX 107 -
Ari Teman Account Opening Document................ A-1629

GX 108-
Ari Teman Bank Statements .................................. A-1631

GX 110-
April 19, 2019 2:37 PM Surveillance
Photographs ........................................................... A-1649

GX 111-
April 19, 2019 6:00 PM Surveillance
Photographs ........................................................... A-1652

GX 112-
May 8, 2019 3_04 PM Surveillance
Photographs ........................................................... A-1655

GX 113-
Bank Records Spreadsheet
(CD-Rom)*............................................................ A-1657.1

GX 114 -
Returned Check Records ....................................... A-1658

GX 121 -
ABJ Lenox Account Opening Document .............. A-1660

---

* GX 113 is a Microsoft Excel file. CD-Rom with the Excel
spreadsheet provided to Court and Service parties.

v

**Page**

GX 122 -
ABJ Lenox Bank Statements ................................. A-1661

GX 123 -
ABJ Milano Account Opening Documents ........... A-1669

GX 124 -
ABJ Milano Bank Statements................................ A-1670

GX 127 -
May 2, 2019 Letter - ABJ Lenox ........................... A-1678

GX 129 -
May 2, 2019 Letter - ABJ Milano......................... A-1679

GX 130 -
ABJ Lenox Checks ................................................ A-1680

GX 131 -
ABJ Milano Checks .............................................. A-1682

GX 141 -
18 Mercer Account Opening Documents .............. A-1685

GX 142 -
18 Mercer Bank Statements.................................. A-1694

GX 143 -
April 4, 2018 Check from 18 Mercer Equity to
GateGuard............................................................. A-1699

GX 144 -
518 W 204 Account Opening Documents ............. A-1700

GX 145 -
518 W 204 Bank Statements................................. A-1707

GX 146 -
January 31, 2018 Check from 518 W 204 to
GateGuard............................................................. A-1725

vi

**Page**

GX 147 -
March 28, 2019 Check from 518 West 205 to
GateGuard.................................................. A-1726

GX 150 -
Affidavit.................................................... A-1727

GX 201 -
March 28, 2019 Check from Coney Realty to
GateGuard.................................................. A-1728

GX 202 -
March 28, 2019 Check from 18 Mercer Equity to
GateGuard.................................................. A-1729

GX 203 -
April 19, 2019 Check from 518 West 205 to
GateGuard.................................................. A-1730

GX 204 -
April 19, 2019 Check from ABJ Milano to
GateGuard.................................................. A-1733

GX 205 -
April 19, 2019 Check from ABJ Lennox to
GateGuard.................................................. A-1739

GX 206 -
April 19, 2019 GateGuard Counter Deposit .......... A-1757

GX 401 -
September 9, 2017 E-mail - 'We're Live' ............. A-1758

GX 402 -
November 6, 2017 E-mail - 'Current Issues'......... A-1760

GX 403 -
March 9, 2018 E-mail - 'Ending GateGuard' ........ A-1761

GX 404 -
May 7, 2018 E-mail - 'All Communication in
Writing'................................................... A-1762

vii

**Page**

GX 405 -
May 22, 2018 E-mail - 'GateGuard' ..................... A-1763

GX 406 -
August 26, 2018 E-mail - 'Dispute on Charge...' .. A-1765

GX 407 -
September 18, 2018 E-mail - 'Sublet Spy Hits...' . A-1767

GX 408 -
December 14, 2018 E-mail - 'Notice of Intent' ..... A-1773

GX 409 -
June 14, 2019 GateGuard Invoice ........................ A-1775

GX 409A -
Invoices (1) ............................................. A-1777

GX 409B -
Invoices (2) ............................................. A-1785

GX 409C -
Conversation between Teman and Soleimani ........ A-1786

GX 412 -
January 1, 2018 E-mail - 'Tenant Ana Esterg' ....... A-1787

GX 413 -
January 19, 2018 E-mail - 'Invoice Sent' .............. A-1788

GX 414 -
January 24, 2018 E-mail - 'Form for the 10
Buildings' ............................................. A-1791

GX 415 -
March 25, 2018 E-mail - 'Invoice for 20
Buildings' ............................................. A-1795

GX 416 -
March 26, 2018 E-mail - 'Invoice for 20
Buildings' (1) ....................................... A-1815

viii

**Page**

GX 417 -
March 26, 2018 E-mail - 'Invoice for 20
Buildings' (2) ......................................................... A-1820

GX 418 -
March 27, 2018 E-mail - 'Proof it's Your...' .......... A-1829

GX 431 -
April 4, 2018 E-mail - 'Invoice' ........................... A-1831

GX 441 -
GateGuard Terms and Conditions.......................... A-1834

GX 442 -
April 2, 2018 E-mail - 'References' ...................... A-1856

GX 443 -
January 7, 2019 E-mail - 'Contract' ...................... A-1862

GX 501 -
Bank Records Stipulation ...................................... A-1868

GX 702 -
January 2, 2019 WhatsApp Messages ................... A-1872

GX 704 -
April 2, 2019 WhatsApp Messages ...................... A-1874

GX 727 -
April 2, 2019 Whatsapp Messages (2)................... A-1875

GX 728 -
April 3, 2019 Whatsapp Messages ........................ A-1876

GX 729 -
April 10, 2019 WhatsApp Messages ..................... A-1877

Defense Exhibits:

DX 2 -
Payment Terms (1/27/2019).................................. A-1880

DX 14 -
October 11, 2018 E-mail – 'ABJ Properties'......... A-1887

ix

Page

DX 15 -
October 22, 2018 E-mail - 'SubletSpy hits' .......... A-1889

DX 16 -
'Notice of Hold' ..................................................... A-1892

DX 29 -
Affidavit ................................................................. A-1893

DX 36 -
March 28, 2018 E-mail – 'Invoice for 20
Buildings' .............................................................. A-1894

DX 49 -
Declaration ............................................................. A-1902

DX 51 -
Chase Information Request ..................................... A-1903

DX 52 -
Chase Information Request ..................................... A-1904

DC 62 -
March 9, 2018 E-mail Correspondence ................. A-1928

DX 70 -
GateGuard Logs ..................................................... A-1930

DX 71 -
May 22, 2018 E-mail – 'Re: Gateguard' ............... A-1932

Order of the Honorable Paul A. Engelmayer, dated
May 6, 2020 .......................................................... A-1933

Letter from Joseph A. DiRuzzo, III to the Honorable
Paul A. Engelmayer, dated May 8, 2020 ............... A-1935

Opinion and Order of the Honorable Paul A.
Engelmayer, dated June 5, 2020 ........................... A-1937

Letter from Joseph A. DiRuzzo, III to the Honorable
Paul A. Engelmayer, dated June 29, 2020 ............. A-2044

x

**Page**

Sentencing Memorandum and Motion for
  Downward Variance, filed July 7, 2020................. A-2045

Exhibit 1 to Sentencing Memorandum -
  Letter from Dr. Rami Cohen, M.D to the
  Honorable Paul A. Engelmayer, dated
  June 29, 2020........................................................ A-2070

Exhibit 2 to Sentencing Memorandum -
  Letter from Juhan Sonin to the Honorable Paul A.
  Engelmayer, dated July 6, 2020............................. A-2074

Exhibit 3 to Sentencing Memorandum -
  Letter from Jeffrey Katz to the Honorable Paul A.
  Engelmayer ............................................................. A-2076

Exhibit 4 to Sentencing Memorandum -
  Letter from Oliver Josephs t to the Honorable
  Paul A. Engelmayer, dated June 6, 2020 ............... A-2077

Exhibit 5 to Sentencing Memorandum -
  Letter from Thomas Orosz to the Honorable Paul
  A. Engelmayer ........................................................ A-2079

Exhibit 6 to Sentencing Memorandum -
  Letter from David Diwby to the Honorable Paul
  A. Engelmayer ........................................................ A-2080

Exhibit 7 to Sentencing Memorandum -
  Letter from Nachum Klar to the Honorable Paul
  A. Engelmayer, dated July 6, 2020 ........................ A-2082

Exhibit 8 to Sentencing Memorandum -
  Letter from Anthony Zachariadis to the
  Honorable Paul A. Engelmayer, dated
  July 6, 2020............................................................ A-2084

Exhibit 9 to Sentencing Memorandum -
  eJewish Philanthrophy- Coverage of Teman's
  Award ...................................................................... A-2085

xi

**Page**

Exhibit 10 to Sentencing Memorandum -
HarvardX Verified Certificate of Achievement,
issued May 11, 2020 ............................................... A-2094

Exhibit 11 to Sentencing Memorandum -
Letter from Avi Ganz to the Honorable Paul A.
Engelmayer, dated July 7, 2020 ............................ A-2095

Exhibit 12 to Sentencing Memorandum -
Letter from Steven Oved to the Honorable Paul
A. Engelmayer, dated June 15, 2020 ..................... A-2098

Exhibit 13 to Sentencing Memorandum -
Letter from Rabbi Chaim Lipskar to the
Honorable Paul A. Engelmayer, dated
July 7, 2020 ............................................................. A-2099

Exhibit 14 to Sentencing Memorandum -
Letter from Jonathan Lubin to the Honorable
Paul A. Engelmayer ............................................... A-2101

Exhibit 15 to Sentencing Memorandum -
Letter from Talia Reiss to the Honorable Paul A.
Engelmayer ............................................................. A-2103

Exhibit 16 to Sentencing Memorandum -
Letter from Rivka Korf to the Honorable Paul A.
Engelmayer ............................................................. A-2104

Exhibit 17 to Sentencing Memorandum -
Letter from Russell DiBona to the Honorable
Paul A. Engelmayer ............................................... A-2105

Letter from Justin K. Gelfand to the Honorable Paul
A. Engelmayer, dated September 8, 2020 .............. A-2107

Appearance of Counsel, dated November 2, 2020 .... A-2108.1

Letter from Justin Harris to the Honorable Paul
Engelmayer, dated November 2, 2020 ................... A-2108.2

xii

**Page**

Exhibit B to Letter -
Letter from Justine A. Harris to Kedar Bhatia and
Edward A. Imperatore, dated October 23, 2020 .... A-2108.6

Exhibit C to Letter -
Letter from Kedar S. Bhatia to Justine A. Harris,
dated October 29, 2020 ........................................ A-2108.9

Order of the Honorable Paul A. Engelmayer, dated
November 19, 2020 ............................................... A-2109

Letter from Justine Harris to the Honorable Paul A.
Engelmayer, dated November 20, 2020 ................ A-2111

Letter from Justine Harris to the Honorable Paul A.
Engelmayer, dated November 30, 2020 ................ A-2113

Letter from Audrey Strauss to the Honorable Paul
A. Engelmayer, dated November 30, 2020 ........... A-2114

Transcript of Remote Conference Proceedings held
before the Honorable Paul A. Engelmayer, dated
December 1, 2020 ................................................. A-2116

Order of the Honorable Paul A. Engelmayer, dated
January 28, 2021 .................................................. A-2170

Letter Motion from Audrey Strauss to the
Honorable Paul A. Engelmayer, dated
April 23, 2021 ...................................................... A-2173

Exhibit A to Letter -
Proposed Order of Restitution .............................. A-2181

Exhibit B to Letter -
Proposed Preliminary Order of Forfeiture/Money
Judgment .............................................................. A-2185

Exhibit C to Letter -
Document - Finocchiaro 3503-19 ......................... A-2189

Exhibit D to Letter -
Revised Document - Finocchiaro 3503-19 ............ A-2190

xiii

**Page**

Exhibit E to Letter -
Affidavit of Karen Finocchiaro, dated
April 2, 2021 ........................................................ A-2191

Letter from Andrew J. Frisch to the Honorable Paul
A. Engelmayer, dated April 23, 2021 ................... A-2195.1

Attachment to Letter -
*Curriculum Vitae* of Richard M. Fraher ................ A-2195.3

Letter Motion to Vacate Conviction from Andrew J.
Frisch to the Honorable Paul A. Engelmayer,
dated April 28, 2021 ............................................. A-2196

Exhibit A to Letter Motion -
Document - Finocchiaro 3503-19 ......................... A-2211

Exhibit B to Letter Motion -
Revised Document - Finocchiaro 3503-19 ............ A-2213

Exhibit C to Letter Motion -
E-mail Correspondence, dated
November 30, 2020 ............................................... A-2215

Exhibit D to Letter Motion -
E-mail Correspondence, dated March 10, 2021 .... A-2217

Exhibit E to Letter Motion -
E-mail Correspondence, dated March 12, 2021 .... A-2219

Exhibit F to Letter Motion -
Copies of Various Cashier's Checks ...................... A-2221

Order of the Honorable Paul A. Engelmayer, dated
May 5, 2021 .......................................................... A-2223

Letter from Andrew J. Frisch to Kedar Bhatia, dated
May 12, 2021 ........................................................ A-2225

Annexed to Letter -
Declaration of Richard M. Fraher, executed
May 11, 2021 ........................................................ A-2226

xiv

**Page**

Letter from Audrey Strauss to the Honorable Paul
    A. Engelmayer, dated June 9, 2021 ...................... A-2236

Letter from Andrew J. Frisch to the Honorable Paul
    A. Engelmayer, dated June 14, 2021 .................... A-2246.1

Letter from Audrey Strauss to the Honorable Paul
    A. Engelmayer, dated June 29, 2021 .................... A-2246.4

Transcript of Conference Proceedings held before
    the Honorable Paul A. Engelmayer, dated
    July 9, 2021 ............................................................ A-2247

Sentencing Submission Letter from Susan G.
    Kellman to the Honorable Paul A. Engelmayer,
    dated July 16, 2021 ................................................ A-2315

Transcript of Sentencing Proceedings held before
    the Honorable Paul A. Engelmayer, dated
    July 28, 2021 .......................................................... A-2333

Notice of Appeal, dated August 2, 2021 ................... A-2458

Letter Motion from Ari Teman to the Honorable
    Paul A. Engelmayer, dated March 3, 2022 ........... A-2459

Letter Motion from Ari Teman to the Honorable
    Paul A. Engelmayer, dated April 12, 2022............. A-2462

Order of the Honorable Paul A. Engelmayer, dated
    April 13, 2022........................................................ A-2463

Letter Motion from Ari Teman to the Honorable
    Paul A. Engelmayer, dated April 13, 2022............. A-2465

Letter from Eden P. Quainton to the Honorable Paul
    A. Engelmayer, dated April 13, 2022 .................... A-2467

Notice of Appearance, filed April 13, 2022 ............... A-2469

Letter Motion from Ari B. Teman to the Honorable
    Paul A. Engelmayer, dated April 14, 2022............. A-2470

xv

**Page**

Order of the Honorable Paul A. Engelmayer, dated
    April 15, 2022......................................................... A-2473

Emergency Letter Motion from Ari B. Teman to the
    Honorable Paul A. Engelmayer, dated April 20,
    2022 ........................................................................ A-2476

Order of the Honorable Paul A. Engelmayer, dated
    April 20, 2022......................................................... A-2479

Emergency Letter Motion from Ari B. Teman to the
    Honorable Paul A. Engelmayer, dated April 20,
    2022 ........................................................................ A-2481

Letter from Kedar S. Bhatia, Asst. United States
    Attorney to the Honorable Paul A. Engelmayer,
    dated April 21, 2022 .............................................. A-2482

Order of the Honorable Paul A. Engelmayer, dated
    April 21, 2022......................................................... A-2483

The Honorable Paul A. Engelmayer
April 28, 2021
Page 6 of 15 Pages

Q. So if it was an individual - three personal accounts, would the bank typically be able to draw fund from the other accounts?

A. Yes.

Q. *If it was three different businesses, for three different tax numbers, would the bank typically be able to use the funds?*

A. *We cannot offset our loss when it is a different tax identification number.*

Q. And based on your review of the records admitted into evidence earlier today, do you know if the three accounts that you talks about had different tax ID numbers?

A. They did.

Q. *So as a general matter, is the bank able to recover funds from those three accounts?*

A. *We were not.*

MR. BHATIA:  Nothing further, your Honor.

T232-36 (emphasis added).

The government elicited these legal opinions without providing the required notice, notwithstanding its assurances to the Court that it "does not intend to elicit any expert testimony from Finocchiaro's testimony," and despite the Court's admonition that the government not be emboldened to elicit expert opinions from her.  Absent notice and an opportunity to prepare for Ms. Finocchario as an expert (or seek preclusion), the full import of the above-highlighted testimony was not immediately plain.  We expect that Professor Fraher's report will establish that a bank *can* recover funds from a customer's related accounts to cover its losses when the customer has defrauded it or acted in bad faith.

The manner in which Ms. Finocchario's legal opinions were presented, coupled with the government's post-trial disclosures, raises more questions.  While Finocchario 3503-19 appeared to establish that BOA had attempted to return the positive balance of $13,477.37 in Mr. Teman's personal account when it had unsuccessfully attempted to return the positive balances in all of Mr. Teman's accounts, her above-quoted testimony was, in fact, silent as to the status of that $13,477.37 at the time of trial.  The testimony focused on "those three accounts," a reference to the three *corporate* accounts, each with different tax identification numbers, not Mr. Teman's three BOA accounts including Mr. Teman's personal account apart from GateGuard.  Only multiple readings of this testimony by undersigned counsel, triggered by the post-trial disclosure described below, makes clear in retrospect that the government

The Honorable Paul A. Engelmayer
April 28, 2021
Page 7 of 15 Pages

never asked Ms. Finocchario about the then-status of the $13,477.27 in Mr. Teman's personal account.

   B.   *The disclosure on the eve of Mr. Teman's scheduled sentencing about BOA's keeping the balance in Mr. Teman's personal account*

On November 30, 2020, the eve of Mr. Teman's scheduled sentencing, the government advised the Court by letter (Docket 174) that it had learned that day that "*certain money* held in a hold-harmless account had been applied to the bank's losses, and that the bank eliminated certain fees from its loss calculations." Docket 174 at 1 (emphasis added). According to the government, BOA's loss was not $259,988.17 as apparently initially reported, but $245,862.95. The government did not identify the nature of the "certain money" or otherwise explain the delta of $14,125.22 (the difference between $259,988.17 and $245,862.95). A proposed Preliminary Order of Forfeiture/Money Judgment" for $245,862.95 [Docket 174-1] was enclosed with the government's letter with Finocchiaro 3503-19 [Docket 174-2] attached to the proposed order.

Also on November 30, 2020, the literal eve of sentencing, the government disclosed for the first time, via email to the Court and defense counsel, an apparently updated version of Finocchiaro 3503-19 (Exhibit B), which contained the following new data points:

   1.   Corresponding to the document's reference to Mr. Teman's personal account, it says:"$13,477.37 - Amount offset with funds from Hold Harmless;"

   2.   Corresponding to the document's reference to Mr. Teman's GateGuard account, it refers to a "credit-Misc adjustment" of $359,85;

   3.   Corresponding to the document's reference to Mr. Teman's GateGuard account, it refers to two balances, one of $259,988.17, and one of $259.700.17. The difference between those two numbers is $288.

The updated version of Finocchiaro 3503-19 did not indicate when these updates were added to Finocchario 3503-19, or whether someone at BOA had decided to offset its loss with Mr. Teman's $13,477.37 by the time of trial.

Upon receiving the updated version of the document, Mr. Teman's then-counsel Noam Biale emailed the government and inquired about the new numbers:

   **Mr. Biale:** I'm confused about this. The attachment indicates there is $108,801.77 in the hold harmless account, so why isn't the net number $151,186.40? Also, if that's the case, it potentially affects the Sentencing Guidelines, so I am confused why we are

The Honorable Paul A. Engelmayer
April 28, 2021
Page 8 of 15 Pages

just learning about this now.  Can you please provide ASAP whatever underlying documents you have from the bank that account for the numbers in your attachment?

Exhibit C.  AUSA Bhatia responded as follows:

**Mr. Bhatia**:  As you know, after Mr. Teman deposited fraudulent checks into the GateGuard account, he promptly transferred that money into other accounts he controlled at BOA (and then transferred some of that money outside the bank). When BOA froze his various accounts, they were not able to offset losses in the GateGuard account using the money from those other accounts, since the other accounts are held by different corporate entities.  Because that money cannot be used to offset the bank's losses, they do not minimize the forfeiture/restitution amount.  My understanding is that at some point prior to trial, the bank tried to return to Mr. Teman the money in the hold-harmless accounts but the checks were returned undeliverable. There was testimony at trial about funds left in hold-harmless account.

This has no bearing on the Guidelines, since the Guidelines loss was driven by the total value of the checks he created and deposited into his accounts – $330,000.  *See* PSR ¶ 32. You are not just learning about this now – as you can see from the stamp in the bottom left corner of the document, the document was produced in § 3500 material and reflects transactions in the bank statements introduced (and at the heart of) the trial.

Exhibit C.

In March 2021, Mr. Teman's current counsel revisited this issue with the government.  During a telephone conversation, the government told Ms. Kellman that BOA had subtracted bank fees from its calculation of loss.  Ms. Kellman and the government then had the following email exchange:

**Ms. Kellman**:  Thanks for the update -- so if I understand correctly -- is this the updated document that was turned over on the "sentencing" date?  Will check in later with more questions -- am trying to get a handle on the chronology of banking events. BTW, do you know when the check with the funds from BOA to [Mr. Teman] was sent? and returned?  And do we know why -- why sent? and why returned?  I didn't get the impression from our conversation yesterday that there was much clarity on those points . . . would appreciate whatever direction/info you've got on those points.

The Honorable Paul A. Engelmayer
April 28, 2021
Page 9 of 15 Pages

    **Mr. Bhatia**:  Hi Susan, we disclosed the reduced restitution in our filings that you've seen, and then we produced this record listing the same reduced amount on the morning of sentencing (we sent it to defense counsel first, and then later to the court as well).  The trial testimony regarding the hold harmless status and offsets is in the transcript at 233-236.  I think this testimony makes the situation quite clear – the funds were held in different corporate accounts so they could not be used to offset losses in the GateGuard account.  They were returned to the account holder as physical checks but the physical checks were returned in the mail.  Has Mr. Teman tried to get the funds back from the bank?

Exhibit D.  Ms. Kellman next communicated with the government in an email on March 12, 2021, as follows:

    **Ms. Kellman**:  I very much appreciated your time the other day — and am wondering if I can ask a follow up question.  You mentioned that during your conversation with the bank the day before sentencing, that the bank explained that it attributed the discrepancy in the loss numbers to removing its fees from the total loss.  I'm wondering if you wouldn't mind send[ing] me a copy of the fee breakdown. [My co-counsel] Andy & I are still struggling to wrap our arms around all of the moving pieces here.

Exhibit E.  Despite the government's position that Ms. Finocchario's "testimony makes the situation quite clear," the government never responded to this email before its filing on April 23, 2021 [Docket 215], nor provided the requested breakdown of the bank's purported fees.

Thereafter, as undersigned counsel continued to analyze the updated version of Finocchario 3503-19, they determined, completely on their own, that the delta of $14,125.22 ($259,988.17 - $245,862.95) appears to be comprised of the following components, including the bank's offset of its loss from Mr. Teman's personal account:

| | |
|---|---|
| Mr. Teman's personal account: | $13,477.37 |
| The "credit-Misc adjustment:" | $   359.85 |
| The $288 described above: | $   288.00 |
| | $14,125.22 |

This determination, which undersigned counsel only reached by trying to back into the $14,125.22, was the first time in this case that it appeared indisputable that BOA at some point had decided to keep the money in Mr. Teman's personal account.

The Honorable Paul A. Engelmayer
April 28, 2021
Page 10 of 15 Pages

C.    *The irreparable prejudice to Mr. Teman from the manner and timing of the disclosure*

Upon realizing that BOA had apparently used Mr. Teman's personal account to recovery a
portion of its loss, undersigned counsel each re-read Ms. Finocchiaro's testimony at least a
dozen times.  Armed with the updated version of Ms. Finocchiaro 3503-19, undersigned
counsel realized after continuing analysis and multiple conversations with each other that Ms.
Finocchiaro's above-quoted testimony at trial did not address the use of Mr. Teman's personal
account to offset the bank's loss.  Whether or not the money had been first used by BOA as an
offset before or after trial, the government's disclosure raised questions about the accuracy of
Ms. Finocchario's testimony.

Undersigned counsel thereafter spoke to multiple highly-credentialed experts in banking law,
ultimately including Professor Fraher.  Counsel knew that it would take time to retain
Professor Fraher and for him to review relevant documents and prepare a report.  Rather than
wait for Professor Fraher to conclude his work and cause undue delay, on April 2, 2021,
counsel emailed a twelve-page letter to the government, on which this letter to the Court is
based.  We did so in part as a matter of professional courtesy to permit the assigned
prosecutor to address his apparent violation of the command of Rule 16(a)(1)(G) and this
Court's associated order and what appeared to be his calculated refusal to shed light on
BOA's use of Mr. Teman's personal account to recover its losses.  The prosecutor did not
shed light on what appeared to be his apparent hiding the ball about BOA's use of the
personal account as a partial recovery.  Instead, while defense counsel were awaiting
Professor Fraher's report, and despite our request that the government join us in a request for
a further adjournment of the Court's briefing schedule, the government filed a letter with a
supplemental affidavit of Ms. Finocchiaro.  *See* Docket 215.

As we advised the government in our letter of April 2, 2021, we expect Professor Fraher to
opine, in substance, at least as follows:  While the contractual concept of mutuality of
obligation might prevent a bank from seeking redress from a customer's other accounts to
offset a loss caused by a mere overdraft, fraud or bad faith changes the landscape.  Where a
bank is defrauded (or even disadvantaged by malfeasance that does not constitute fraud),
banks can use a customer's other personal and corporate accounts to recover its loss on the
equitable theory of unjust enrichment:  a customer should not be permitted unjustly to enrich
himself at the bank's expense.  Where a bank invokes the equitable remedy of unjust
enrichment, however, it is vulnerable to equitable defenses such as unclean hands.

Ms. Finocchario's opinion that BOA could not offset a loss from Mr. Teman's other accounts
does not apply to this case because Mr. Teman is charged with defrauding BOA.  The
government nonetheless made Ms. Finocchario's improper opinion a centerpiece of its

The Honorable Paul A. Engelmayer
April 28, 2021
Page 11 of 15 Pages

arguments:  the government argued that BOA was left "holding the bag" because Mr. Teman knew that the money would be beyond BOA's reach if he transferred the deposited RCC's out of his GateGuard account.  As Mr. Bhatia argued to the jury in summation:

> And I submit that perhaps the most obvious proof here of criminal intent in that there's a $260,000 hole right now at Bank of America.  There's $260,000 - more than a quarter million dollars - missing.  Someone else had to pay for that, Bank of America had to pay for that . . . The defendant stole from his own customers and he left Bank of America holding the bag.

T1042-43 (emphasis added).

> [I]t's a simple case, and the proof is overwhelming.  Ari Teman created fake checks worth hundreds of thousands of dollars, lied about having permission from his customers, and then deposited those checks into this account.  *Then he moved that money into another [Bank of America] account before Bank of America could get it back.*

T1009 (emphasis added); *see* T993 (BOA "couldn't get it back from Mr. Teman because he had already transferred it into other [BOA] accounts . . . *[Mr. Teman] knew the moment he deposited these checks on March 28 and the moment he moved the money out of his account on March 29 that Bank of America couldn't get it back . . . That's fraudulent intent"*) (emphasis added).  *See also* Govt's Memo of Law in Opposition to Mr. Teman's Motion for a Judgment of Acquittal, Docket 112 at 20-21, 23 (Mr. Teman "moved the funds to other accounts he controlled") and 27 ("Teman moved money out of his GateGuard account immediately after depositing it so that Bank of America would not return it through a chargeback").

The government's arguments were false.  If it was fair to impute knowledge of the law of offset to Mr. Teman, the inference was exculpatory:  it is precisely when a customer defrauds a bank or acts in bad faith that corporate formalities attendant intra-bank transfers are rendered meaningless.  Mr. Teman's transfers were, in fact, evidence of a regular course of business:  he transferred some funds to his other businesses, and other funds to a GateGuard supplier in China.  The government nonetheless argued to the jury that the transfers constituted "*the most obvious proof here of criminal intent,*" but it was nothing of the sort.

In a footnote to the government's letter to the Court of April 23, 2021, it quoted a portion of Finocchiaro 3503-19 in an apparent attempt to set the stage for a later argument that it had been incumbent on Mr. Teman's trial counsel to engage the issue when Ms. Finocchiaro

The Honorable Paul A. Engelmayer
April 28, 2021
Page 12 of 15 Pages

testified or otherwise object. Any such argument would blame the defense for not
recognizing the consequences of the government's ambush and calling it out sooner. It took
Mr. Teman's current counsel virtually daily conversations with each other and a number of
experts over a period of weeks, together with multiple reviews of the relevant potions of the
record, to figure out what the government had done. Current counsel had the luxury of
reviewing the record from the respective comfort of their home offices and the unfettered
ability to confer and research the underlying legal issues. Upon reaching out to Mr. Biale and
Ms. Harris (the lawyers from Sher Tremonte who appeared with Mr. Teman at his scheduled
sentencing), current counsel learned that they had not figured out what the government had
done even after specifically questioning the government about its filing on November 30,
2020. Upon reaching out to Mr. Teman's trial counsel, current counsel likewise learned they
had not figured it out. The government cannot persuasively claim that this issue is much ado
about nothing especially when it continued to hide the ball in response to separate specific
inquiries from Mr. Biale and Ms. Kellman as described above. It was the government's
submission on November 30, 2020, that caused Sher Tremonte and current counsel to start the
digging that unearthed what had previously been buried. The government attempted damage
control only on April 23, 2021, three weeks after it was provided with an earlier iteration of
this letter.

D.    *BOA was not defrauded*

While the government argued in summation that Mr. Teman's fraud was "blatant" and
"brazen" [T977], it was not sufficiently blatant or brazen – or fraudulent at all – to convince
BOA to invoke its equitable remedies. Its failure to do so helps explain why, even after a jury
found that Mr. Teman had defrauded BOA, and notwithstanding BOA's right to offset its loss,
it returned the positive balances in all of Mr. Teman's other accounts.   Exhibit F. This fact
alone requires dismissal of the case. It is no longer only that Ms. Finocchiaro testified at trial
that "it was looked at as a dispute between the customer, the maker and the depositor, and at
that point it is not – it's not within out decision to rectify the matter." Trial Transcript at 232.
We now know that BOA returned the positive balances in Mr. Teman's accounts *after a jury
found him guilty of defrauding BOA*. If that fact alone does not establish the legal
insufficiency of the case against Mr. Teman, it is at least an exculpating fact which Mr.
Teman should have been permitted to present to the jury in the context of the truth about a
bank's rights to recover losses from a customer's other accounts.

The government advised the Court on November 30, 2020, that BOA had offset its loss with
$14,125.22, including the $13,477.27, the positive balance in Mr. Teman's personal account.
Ms. Finocchiario's recent affidavit states that she was "notified by another Bank of America
employee that the bank was able to offset its loss in the GateGuard Account with the funds in

The Honorable Paul A. Engelmayer
April 28, 2021
Page 13 of 15 Pages

the Ari Teman Account totaling $13,477.37." That statement contradicts the implication of
her testimony at trial that BOA could not reach Mr. Teman's other accounts, but more,
contradicts that prosecutor's sweeping arguments in summation. BOA's internal back and
forth about what it could or should do only adds to the problems with this case. By November
30, 2020, when the government was advising the Court that BOA had kept the $13,477.27,
BOA *had already returned the $13,477.27 to Mr. Teman* just as it had apparently done so in
2019 when it returned to BOA with the other checks as undeliverable. If BOA with its
expertise could not figure out what to do with the $13,477.27, Mr. Teman could not have been
expected to figure it out or know that BOA did not have the right to keep the positive balances
in all of his accounts. The government's purported "$260,000 hole" at BOA was neither "the
most obvious proof here of criminal intent," nor any proof of criminal intent at all.

*E. The Case Should Be Dismissed or a New Trial Should be Ordered*

We expect that Professor Fraher's report will contribute to the quantum of arguments that the
government's evidence did not establish fraud and that Ms. Finocchario in fact provided
expert opinions which she was not qualified to give, were not properly noticed, and were
wrong. At the very least, the verdict should be vacated, and a new trial ordered. "It is the
duty of the government to present its case against the defendant fairly. Little can be added to
Justice Traynor's statement – 'A defendant has hardly had a fair trial if he has been denied the
opportunity to discover evidence or information crucial to his defense.'" *United States v.
Baum*, 482 F.2d 1325, 1332 (2d Cir. 1973), *quoting* Traynor, Ground Lost and Found in
Criminal Discovery, 39 N.Y.U.L. Rev. 228, 242 (1964). On facts less compelling than those
presented here, the Court of Appeals in Baum ordered a new trial because the government had
failed to provide advance notice of a prospective witness's identity: "[W]e would rather give
the defendant the benefit of the doubt than let the Government reap even a slight possibility of
benefit from what we regard as a lack of candor unworthy of a prosecutor." In another case,
where the government failed to provide timely disclosure of expert evidence, the Court of
Appeals ordered a new trial, finding that "[t]he course of the government smacks too much of
a trial by ambush, in violation of the spirit of the rules." *United States v. Kelly*, 420 F.2d 26,
29 (2d Cir. 1969).

The Advisory Committee Notes to the 1993 Amendment to Rule 16 provide, and it is the
general consensus, that the expanded disclosure requirements related to expert opinion
testimony are intended to "minimize surprise that often results from unexpected expert
testimony" and "to provide the opponent with a fair opportunity to test the merit of the
expert's testimony through focused cross-examination." The Advisory Committee aptly notes
that "one of counsel's most basic discovery needs is to learn that an expert is expected to
testify." "To keep faith with the letter and spirit of Rule 16(a)(1)(G), '[m]erely identifying the
general topics about which the expert will testify is insufficient; rather, the summary must
reveal the expert's actual opinions.'" *United States v. Baker*, No. 14-cr-356 (ENV), 2016 U.S.

The Honorable Paul A. Engelmayer
April 28, 2021
Page 14 of 15 Pages

Dist. LEXIS 170089, at *4 (E.D.N.Y. Dec. 6, 2016) (internal citations omitted). "[A]s a salutary adjunct, [Rule 16(a)(1)(G)] 'creates an incentive for the government to limit its use of experts to proper subject matters of expert testimony, lest broader expert testimony require broader pre-trial disclosure." *Id. quoting United States v. Dukagjini*, 326 F.3d 45, 56 (2d Cir. 2002).

Thus, the government does not have "carte blanche [] to spring a surprise expert witness [or expert testimony] on an unsuspecting defendant[]." *United States v. Tin Yat Chin*, 476 F.3d 144, 146 (2d Cir. 2007). "For no defense counsel, no matter how experienced, can fairly be asked to cross-examine on a moment's notice a witness who comes clothed with all the impressive credentials and specialized training of an expert and whose opinions and methods with respect to the case at hand have been subject to no prior scrutiny." *Id.* Although a new trial is not required when the prejudice caused by the government's failure to provide adequate notice of expert testimony has been cured, *see, e.g., Tin Yat Chin*, 476 F.3d at 146, it certainly was not here; to the contrary, the government's summation made the prejudice irreparable.

The government avoided its statutory duty by representing that Ms. Finocchiaro would not provide expert opinions in direct contravention of your Honor's prohibition on any such testimony. The government elicited from Ms. Finocchiaro that the bank *could not* use the funds in other accounts controlled by Mr. Teman. It then used that erroneous expert testimony, which had been barred by the Court, to advance *what the government acknowledged* was central to its theory of the case.

A new trial may be granted if "the interest of justice so requires," Fed. R. Crim. P. 33(a), and the motion is based on newly discovered evidence. Fed. R. Crim. P. 33(b)(1). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). A motion for a new trial may be predicated on numerous grounds "including prosecutorial misconduct and late disclosure of material evidence." *United States v. Washington*, 263 F. Supp. 2d 413, 420 (D. Conn. 2003), *citing* 3 Charles Alan Wright, Nancy J. King & Susan R. Klein, Federal Practice and Procedure § 555-56 (2d ed. 1982 & Supp. 2003). *See, e.g. United States v. Valentine*, 820 F.2d 565, 570-571 (2d Cir. 1987) ("when a prosecutor's tactics cause substantial prejudice to the defendant and thereby serve to deprive him of his right to a fair trial, reversal is mandated); *United States v. Bowen*, 799 F.3d 336, 349 (5th Cir. 2015) (granting new trial based on newly discovery evidence of prosecutorial misconduct). A new trial may also be predicated on newly discovered evidence that discredits testimony that the prosecution relied heavily upon. *United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991) (new evidence impeaching the government's central witness was powerful enough to require a new trial). Denial of a motion for a new trial is an abuse of discretion where the defendant was not

A-2210

The Honorable Paul A. Engelmayer
April 28, 2021
Page 15 of 15 Pages

afforded reasonable time" to do a "thorough review" of a potential source of new evidence. *United States v. Ljibo*, 730 F. App'x 52, 56 (2d Cir. 2018).

    *F.   Mr. Teman Should Be Granted Bail Pending Appeal*

The issue described herein adds to earlier arguments made in support of Mr. Teman's post-verdict motions (incorporated by reference herein) that establish that Mr. Teman should be granted bail pending appeal.  Before Mr. Teman is required to surrender to serve any custodial sentence or pay any monetary penalty, the Court of Appeals should have an opportunity to determine whether the facts of this case establish a federal fraud or sufficient evidence thereof.  It should also be afforded an opportunity to determine whether the government's violation of the command of Rule 16(a)(1)(G) and this Court's associated order, and the government's false arguments flowing therefrom, served to deny Mr. Teman a fair trial.  *See United States v. Randell*, 761 F.2d 122, 124 (2d Cir. 1985) (the Bail Reform Act does not require a trial judge to assess the odds that a panel of appellate judges will disagree with him, but requires instead issues that are real, substantial, at least fairly debatable, and not frivolous).  If Mr. Teman is required to surrender for any imprisonment that might be imposed, he will likely have served his sentence, or most of it, by the time the Court of Appeals issues its ruling.  Meanwhile, Mr. Teman has complied with the terms of his release and poses neither a risk of flight nor a danger to the community.

Upon receipt of Professor Fraher's report, we will provide it to the government and submit further briefing pursuant to the Court's Order

                    Respectfully submitted,

                    *s/ Andrew J. Frisch*
                    Andrew J. Frisch

                    *s/ Susan G. Kellman*
                    Susan G. Kellman
                    25 Eighth Avenue
                    Brooklyn, New York 11217

Attachments

cc: AUSA Kedar Bhatia

A-2211

# EXHIBIT A

A-2212

GATEGUARD, INC
Party ID: ▮▮▮▮5094
▮▮▮▮8085
$-259,988.17
Loss incurred

Ari Teman
Party ID: ▮▮▮▮1102
▮▮▮▮5580
$13,477.37
Sent funds to customer, received in return mail, funds are in Hold Harmless (funds were transferred from account 8085 & 0351)

Friend or Fraud
Party ID: ▮▮▮▮7658
▮▮▮▮0351
$8,411.00
Sent funds to customer, received in return mail, funds are in Hold Harmless (Funds were transferred from account 8085)

Friend or Fraud
Party ID: ▮▮▮▮7658
▮▮▮▮7673
$2.69
Sent funds to customer, received in return mail, funds are in Hold Harmless

TOUCHLESS LABS LLC
Party ID: ▮▮▮▮1003
▮▮▮▮1046
$86,910.71
Sent funds to customer, received in return mail, funds are in Hold Harmless (Funds were transferred from account 0351)

Total loss: $259,988.17
Total in Hold Harmless/Potential seizure: $108,801.77

A-2213

# E X H I B I T   B

A-2214

GATEGUARD, INC
Party ID: 10012245094
483067038085
$-259,988.17
Loss incurred
(359.85 credit-Misc adjustment)

Ari Teman
Party ID: 35024831102
483066615580
$13,477.37
Sent funds to customer, received in return mail, funds are in Hold Harmless (funds were transferred from account 8085 & 0351)

Friend or Fraud
Party ID: 10010097658
483056100351
$8,411.00
Sent funds to customer, received in return mail, funds are in Hold Harmless (Funds were transferred from account 8085)

Friend or Fraud
Party ID: 10010097658
483063787673
$2.69
Sent funds to customer, received in return mail, funds are in Hold Harmless

TOUCHLESS LABS LLC
Party ID: 10010031003
483056101046
$86,910.71
Sent funds to customer, received in return mail, funds are in Hold Harmless (Funds were transferred from account 0351)

Total loss: $259,988.17
Total in Hold Harmless/Potential seizure: $108,801.77

A-2215

# EXHIBIT C

**A-2216**

| | |
|---|---|
| **From:** | Bhatia, Kedar (USANYS) <Kedar.Bhatia@usdoj.gov> |
| **Sent:** | Monday, November 30, 2020 3:58 PM |
| **To:** | Noam Biale |
| **Cc:** | justin_margulisgelfand.com; Justine Harris |
| **Subject:** | RE: 19 Cr. 696 - United States v. Teman |

Hi Noam,

As you know, after Mr. Teman deposited fraudulent checks into the GateGuard account, he promptly transferred that money into other accounts he controlled at BOA (and then transferred some of that money outside the bank). When BOA froze his various accounts, they were not able to offset losses in the GateGuard account using the money from those other accounts, since the other accounts are held by different corporate entities. Because that money cannot be used to offset the bank's losses, they do not minimize the forfeiture/restitution amount. My understanding is that at some point prior to trial, the bank tried to return to Mr. Teman the money in the hold-harmless accounts but the checks were returned undeliverable. There was testimony at trial about funds left in hold-harmless account.

This has no bearing on the Guidelines, since the Guidelines loss was driven by the total value of the checks he created and deposited into his accounts = $330,000. See PSR ¶ 32. You are not just learning about this now – as you can see from the stamp in the bottom left corner of the document, the document was produced in § 3500 material and reflects transactions in the bank statements introduced (and at the heart of) the trial.

Best Regards,
Kedar

**From:** Noam Biale <NBiale@shertremonte.com>
**Sent:** Monday, November 30, 2020 3:12 PM
**To:** Bhatia, Kedar (USANYS) <KBhatia@usa.doj.gov>
**Cc:** justin_margulisgelfand.com <justin@margulisgelfand.com>; Justine Harris <JHarris@shertremonte.com>
**Subject:** Re: 19 Cr. 696 - United States v. Teman

Hi Kedar,

I'm confused about this. The attachment indicates there is $108,801.77 in the hold harmless account, so why isn't the net number $151,186.40? Also, if that's the case, it potentially affects the Sentencing Guidelines, so I am confused why we are just learning about this now. Can you please provide ASAP whatever underlying documents you have from the bank that account for the numbers in your attachment?

Thanks,
Noam

**From:** "Bhatia, Kedar (USANYS)" <Kedar.Bhatia@usdoj.gov>
**Date:** Monday, November 30, 2020 at 2:41 PM
**To:** Noam Biale <NBiale@shertremonte.com>, Engelmayer NYSD Chambers <EngelmayerNYSDChambers@nysd.uscourts.gov>, "Imperatore, Edward (USANYS)" <Edward.Imperatore@usdoj.gov>, Justine Harris <JHarris@shertremonte.com>, "justin_margulisgelfand.com" <justin@margulisgelfand.com>
**Subject:** RE: 19 Cr. 696 - United States v. Teman

1

A-2217

# EXHIBIT D

---------- Forwarded message ---------
From: **Bhatia, Kedar (USANYS)** <Kedar.Bhatia@usdoj.gov>
Date: Wed, Mar 10, 2021 at 9:58 AM
Subject: RE: FW: 19 Cr. 696 - United States v. Teman
To: SUSAN KELLMAN <sgk@kellmanesq.com>


Hi Susan, we disclosed the reduced restitution in our filings that you've seen, and then we produced this record listing the same reduced amount on the morning of sentencing (we sent it to defense counsel first, and then later to the court as well). The trial testimony regarding the hold harmless status and offsets is in the transcript at 233-236. I think this testimony makes the situation quite clear – the funds were held in different corporate accounts so they could not be used to offset losses in the GateGuard account. They were returned to the account holder as physical checks but the physical checks were returned in the mail. Has Mr. Teman tried to get the funds back from the bank?


---

Kedar S. Bhatia

Assistant United States Attorney

Southern District of New York

One Saint Andrew's Plaza

New York, New York 10007

Tel: (212) 637-2465

kedar.bhatia@usdoj.gov


From: SUSAN KELLMAN <sgk@kellmanesq.com>
Sent: Wednesday, March 10, 2021 8:20 AM
To: Bhatia, Kedar (USANYS) <KBhatia@usa.doj.gov>
Subject: Re: FW: 19 Cr. 696 - United States v. Teman

Thanks for the update -- so if I understand correctly -- is this the updated document that was turned over on the "sentencing" date? Will check in later with more questions -- am trying to get a handle on the chronology of banking events. BTW, do you know when the check with the funds from BOA to AT was sent? and returned? And do we know why -- why sent? and why returned? I didn't get the impression from our conversation yesterday that there was much clarity on those points...would appreciate whatever direction/info you've got on those points.

Thanks...talk later.

Susan

A-2219

# EXHIBIT E

A-2220

---------- Forwarded message ----------
From: sgk@kellmanesq.com <sgk@kellmanesq.com>
Date: Fri, Mar 12, 2021 at 2:31 PM
Subject: Ari Teman
To: Kedar Bhatia <kedar.bhatia@usdoj.gov>

Kedar,

 I very much appreciated your time the other day — and am wondering if I can ask a follow up question. You mentioned that during your conversation with the bank the day before sentencing, that the bank explained that it attributed the discrepancy in the loss numbers to removing its fees from the total loss. I'm wondering if you wouldn't mind send me a copy of the fee breakdown. Andy & I are are still struggling to wrap our arms around all of the moving pieces here.

A-2221

# EXHIBIT F



Bank of America, N.A.
Phoenix, Arizona

DATE

PAY BANK OF AMERICA

"* Eight Thousand Four Hundred Thirteen and 69/100 Dollars **" **$8,413.69**

To The Order Of

Void Over $ 8,413.69
Void Over 90 Days

AUTHORIZED SIGNATURE

BANK OF AMERICA — Cashier's Check — No. 4441100106

Bank of America, N.A.
Phoenix, Arizona

DATE

PAY BANK OF AMERICA

"* Thirteen Thousand Four Hundred Seventy Seven and 37/100 Dollars **" **$13,477.37**

To The Order Of: ARI B TEMAN
850 WEST AVE #903
MIAMI BEACH, FLORIDA 33139

Void Over $ 13,477.37
Void Over 90 Days

Remitter: 113227, NNY, 0351

AUTHORIZED SIGNATURE

BANK OF AMERICA — Cashier's Check — No. 44411001

Bank of America, N.A.
Phoenix, Arizona
1101000020

DATE

PAY BANK OF AMERICA

"* Eighty Six Thousand Nine Hundred Ten and 71/100 Dollars **" **$86,910.71**

To The Order Of: TOUCHLESS LABS LLC
850 WEST AVE #903
MIAMI BEACH, FLORIDA 33139

Void Over $ 86,910.71
Void Over 90 Days

Remitter: 113227, NNY, 1046

AUTHORIZED SIGNATURE

A-2223

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                  -v-

ARI TEMAN,

                           Defendant.

19-CR-696 (PAE)

ORDER

---

PAUL A. ENGELMAYER, District Judge:

In light of new defense counsel's recent filing putting at issue, *inter alia*, whether Bank of America will be entitled to restitution, Dkt. 218, the Court, in an excess of caution, notifies counsel of the following. The Court does not have a financial holding in Bank of America. However, as reflected in the Court's annual financial disclosure reports, the Court's family owns stock in Berkshire Hathaway, Inc., which is a beneficial owner of more than 10% of Bank of America's outstanding common stock.

The Court's considered judgment is that this circumstance—in which the Court may be called upon to resolve Bank of America's entitlement to restitution—is not one in which this judge's "impartiality might reasonably be questioned," so as to require recusal. *See* 28 U.S.C. § 455(a); *United States v. Ravitch*, 421 F.2d 1196, 1205 (2d Cir. 1970).[1] However, to the extent that any party takes a different view, counsel are at liberty to so advocate.

SO ORDERED.

---

[1] Nor does the Court have a financial interest in a party to this criminal proceeding within the meaning of 28 U.S.C. § 455(b)(4). *See Ravitch*, 421 F.2d at 1205 ("This was not an action by the Franklin National Bank but a criminal prosecution by the United States.").

A-2224

_____

PAUL A. ENGELMAYER
United States District Judge

Dated: May 5, 2021
       New York, New York

A-2225

Andrew Frisch
Partner

212-344-5400
afrisch@schlamstone.com

**SCHLAM STONE & DOLAN LLP**

26 Broadway, New York, NY 10004
Main: 212 344-5400   Fax: 212 344-7677
schlamstone.com

May 12, 2021

Kedar Bhatia
Assistant U.S. Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

*Re:    United States v. Ari Teman, 19 CR 696 (PAE)*

Dear Kedar:

Pursuant to the Court's Order of April 26, 2021 [Docket No. 217 at 3], enclosed please a Declaration of Richard M. Fraher in the above-referenced case.

Very truly yours,

*s/ Andrew J. Frisch*
Andrew J. Frisch

*s/ Susan G. Kellman*
Susan G. Kellman
25 Eighth Avenue
Brooklyn, New York 11217

Enclosure

cc: Hon. Paul E. Engelmayer

A-2226

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | **No. 19-CR-696 (PAE)** |
| | : | |
| **ARI TEMAN.** | : | **DECLARATION OF RICHARD M.** |
| | : | **FRAHER** |

I, RICHARD M. FRAHER, declare the following under penalty of perjury and pursuant to 28

U.S.C. § 1746:

1. My name is Richard M. Fraher.

2. My current address is 1434 Brookcliff Drive, Marietta, Georgia 30062.

3. I have received the following undergraduate and graduate degrees, all in history: Bachelor
   of Arts, Wright State University; Master of Arts, University of Wisconsin-Milwaukee;
   Doctor of Philosophy, Cornell University.  I received the degree of Juris Doctor magna
   cum laude from Harvard University School of Law.  I have been admitted to the practice
   of law in Pennsylvania, attorney ID number 61913, since 1991.

4. I started my career in financial services law in 1991 at the Federal Deposit Insurance
   Corporation ("FDIC"), in the Atlanta Regional Office, where I supported the Division of
   Supervision's bank examination and enforcement functions and litigated administrative
   enforcement actions on behalf of the FDIC.  I became an FDIC expert on the provisions of
   the Federal Reserve Act that regulate affiliate transactions, providing training to other
   FDIC attorneys and providing legal memoranda on that topic at the request of the chair of
   the FDIC. At the time of my departure from the FDIC in 1998, I was a Senior Attorney.

5. I joined the Legal Department of the Federal Reserve Bank of Atlanta in June, 1998, when
   the Federal Reserve System (the "Fed") moved the Retail Payments Office to Atlanta.  The

1

A-2227

Retail Payments Office managed all of the retail payments services provided by the twelve Federal Reserve Banks, specifically, check collection and return services and the Federal Reserve's automated clearing house services. I served as legal counsel to the Retail Payments Office until I retired from the Federal Reserve in 2019. At that time, my title was Vice President & Counsel to the Retail Payments Office at the Federal Reserve Bank of Atlanta.

6. As counsel to the Retail Payments Office, I was responsible for coordinating legal support for payments services across the legal departments of the twelve Federal Reserve Banks and the Legal Division of the Board of Governors. To carry out that function, in 2000, I organized and, until I retired, chaired the Fed's Payments Advisory Group, which met monthly to identify and brainstorm emergent issues related to all Federal Reserve payments related services to depository institutions. As the primary legal counsel for the Fed's check and automated clearing house ("ACH") services, I bore primary responsibility for Federal Reserve Operating Circular Number 3, Check Collection and Return, Federal Reserve Operating Circular Number 4, FedACH Service, the documentation of the Fed's procedures for the adjustments service, and all of the service agreements that the Reserve Banks used as a provider of the check service and the ACH service. I also advised and represented the Retail Payments Office in disputes involving checks, adjustments, and ACH items.

7. After Congress enacted the Check 21 Act, I was the lead attorney in drafting the Fed's rules and agreements for image-based check collection. I created the rules and agreements for the Fed's same day ACH service. When the Fed expanded its ACH service to an international service, I was one of the primary architects of the resultant FedGlobal service, participating in the design, drafting the rules and service agreements and negotiating the Fed's agreements with foreign gateway banks. I designed the initial policies and procedures for the FedGlobal service's compliance with the United States sanctions regime administered by the Office of Foreign Assets Control ("OFAC") and with the Bank Secrecy Act's anti money laundering ("AML") requirements. For several years, I was the Fed's representative on the Global Payments Forum run by Nacha, the organization that administers the rules and formats used in the ACH. I served as special advisor to the

2

steering committee that created the International Payments Framework Association, for which I designed the initial rule set for cross border credit transfers.   I authored and delivered several training programs for Federal Reserve attorneys. I presented on payments law issues at industry conferences, typically several times each year.

8. Currently, I am an Adjunct Professor at the Emory University School of Law, where I teach Law of Payment Systems.  I am also the Founder and Principal of Payment Innovation & Regulation LLC, through which I offer expert advice to financial institutions and fintechs at the intersection between innovative financial services and law, regulation, and public policy.  These consulting services relate to the provision of traditional banking services, emerging financial services, disputes arising from payment transactions, and the regulation of fintech.  I currently serve on the Board of Regents of The Payments Institute, where I teach courses each year on payments law and emergent issues in payments. I continue to present at industry conferences on topics related to payments law and public policy.

9. In preparing this declaration, I reviewed case materials including the following: portions of the transcript of Mr. Teman's trial, trial exhibits, and the government's submission to the Court on April 23, 2021.

10. Legal Counsel for Ari Teman have engaged me to provide a declaration with respect to the following situation:

An individual ("Mr. Smith") opens four accounts at a banking institution in the United States. Three of the accounts are in the names of separate corporate entities, 1corp, 2corp, and 3corp, through which Mr. Smith does business, and each of these accounts is identified by the Tax ID number of the corporate account owner.  The fourth account is Mr. Smith's personal account opened with Mr. Smith's individual social security number.  Mr. Smith is the sole signatory on all four accounts.

In March 2019 two deposits of remotely created checks are made into the account of 1corp. In April 2019, Mr. Smith visits a branch of the bank to deposit remotely created checks into the business account of 1corp. Mr. Smith engages in conversation with the teller and the teller's supervisor, at the end of which the bank accepts the deposit, subject to a seven day hold on the proceeds. Mr. Smith's bank thereby becomes the bank of first deposit with respect to the remotely created checks. As soon as the hold expires and the funds become available, Mr. Smith, acting as signatory for the 1corp account into which the checks were

3

A-2229

deposited, transfers funds into other accounts at the same bank for which Mr. Smith is the sole signatory

The remotely created checks are presented to the banks on which they were drawn. The banks on which the remotely created checks were drawn return or request chargebacks from the bank of first deposit. The bases for the chargeback requests are that the remotely created checks were fraudulent or were not authorized, a claim which gives the paying banks a warranty claim against the bank of first deposit under Regulation CC, 12 CFR section 229.34(b). The bank of first deposit honors the chargeback requests and repays the paying banks the amount of the allegedly unauthorized remotely created checks. In turn, the bank of first deposit debits the 1corp account into which the remotely created checks were deposited, causing a negative balance in that account. Positive balances remain in the other accounts on which Mr. Smith is the signatory, into which the proceeds of the deposit of the remotely created checks have been transferred.

The question presented is: what standard industry practices could the bank of first deposit follow to recover the proceeds from the remotely created checks?

11. My declaration with respect to the question presented is as follows.

12. It is standard banking practice as well as a legal requirement that when a customer deposits a check into a bank account, the bank of first deposit makes the proceeds of the deposited check available to the customer in accordance with the funds availability schedule set forth in Regulation CC subpart B, 12 C.F.R. Part 229 subpart B. Typically the proceeds must be made available to the depositor not later than two banking days after the day on which the check was deposited. Many banks make the proceeds of check deposits available immediately. Alternatively, Regulation CC permits the bank of first deposit to place a hold on funds availability for a large dollar check deposit, a check that raises doubts regarding collectability, or a check deposited into a new account or into an account that has been overdrawn frequently. In the present case, the bank of first deposit placed a seven day hold on the deposits made in April 2019.

13. Under standard banking practices, a bank of first deposit has the right to recover from its customer the amount of any check that the bank has accepted for deposit if the check is returned or charged back to the bank. The Uniform Commercial Code gives this right to the bank as the transferee of a negotiable instrument from the customer whenever the customer deposits a check that turns out to be "bad" and results in a return or a chargeback resulting from the breach of a transfer warranty that the customer made to the bank. The

4

amount of a returned or charged back check is a debt of the customer to the bank, a debt
that is immediately due and payable.

14. If the account into which the "bad" check was originally deposited no longer has a balance
sufficient to pay the debt that the customer incurs to the bank when the "bad" check is
returned or charged back, and the customer has multiple accounts at the bank, the bank
may be able to recover its loss by means of a set off.  The right to set off is limited by the
principle that a bank may use set off only to the extent that there is mutuality of obligation
between the bank and the indebted customer.  The bank may recover the customer's debt
by set off against only that customer's interest in other accounts or assets held at the bank.

15. In the present instance, the remotely created checks were deposited into an account owned
by 1corp, a business entity controlled by Mr. Smith.  When the checks were charged back,
the bank had the right to debit only the account of the business entity into which the checks
had been deposited.  The bank did not have the right to set off against the other accounts
controlled by Mr. Smith.

16. As applied to the facts in the Teman case, the foregoing analysis of set off accords with
Ms. Finocchiaro's testimony specifically about Bank of America's inability to recover
funds by set off from other accounts.  (Finocchiaro testimony pp. 235-236.)  In fact, Bank
of America's right to set off extended no further than the account of GateGuard.

17. In contrast, Ms. Finocchiaro's explicit statement that the bank as a general matter lacked
the ability to recover funds from Mr. Teman's other accounts was incorrect, and so was the
government's argument to the jury that the bank's alleged lack of remedies was evidence
of criminal intent on the part of Mr. Teman.

18. Ms. Finocchiaro's testimony in direct examination ended as follows:

Q. So as a general matter, is the bank able to recover funds from those other three accounts?

A.  We were not. (Transcript p. 236, lines 2-6)

19. In fact, as a general matter, under applicable law and generally accepted banking practices,
Bank of America had means to recover funds from the other accounts even if it had no right
of set off.  Therefore, Ms. Finocchiaro's testimony amounted to a misleading legal
conclusion.

5

A-2231

20. Based on Ms. Finocchiaro's statement that the bank was not able to recover funds from the other accounts, Mr. Bhatia told the jury, among other similar things: "But of course they couldn't get it back from Mr. Teman because he had already transferred it into other accounts." (Transcript p. 993, 22-24)

21. Mr. Bhatia further told the jury, "That's important for two reasons. First, that sort of explains to you how Bank of America suffered the loss. He transferred the money out of the account so they couldn't return it." (Transcript p. 993-994) And further, "He knew the moment he deposited these checks on March 28 and the moment he moved the money out of his account on March 29 so that Bank of America couldn't get it back….. That's fraudulent intent." (Transcript p. 994, 6-10)

22. In effect, Mr. Bhatia told the jury that by transferring the funds out of the GateGuard account into the other accounts, Mr. Teman moved the money beyond the bank's ability to recover it when the checks were charged back. Mr. Bhatia argued that Mr. Teman knew that transferring the money would prevent Bank of America from recovering the funds, and that this was evidence of fraudulent intent.

23. In fact, the bank had different means to recover funds from the other accounts available to it other than set off. And as a result, Mr. Bhatia's argument that transferring the funds into the other accounts deprived the bank of any means of recovery was based on a false premise.

24. When a bank suffers a loss because it accepted a check for deposit and that check was subsequently returned or charged back as an unauthorized item, generally accepted banking practices extend to a range of practical and equitable remedies beyond just set off. Normal banking practice includes the possibility of sequestering or freezing not only the assets of the depositor but also the assets of the depositor's related interests if the related interests were used in furtherance of the depositor's bad conduct. Specifically, a bank is well within its rights to decide either to remove the proceeds of the "bad" check into a separate account held by the bank or even to freeze the accounts into which the proceeds of the "bad" check have been moved. Funds that are sequestered or frozen by the bank are "held harmless" until the bank, the account holders, and possibly other claimants to the funds have had an opportunity to present and resolve their claims.

25. In the situation presented for the present discussion, the bank had the right to freeze all of the accounts of the individual and the businesses into which the proceeds of the "bad" checks were transferred. Alternatively, the bank had the right to sequester the proceeds of the "bad" checks by debiting each of the accounts for an amount equal to the lesser of the amount of the check proceeds that had been transferred into that account or the remaining balance of funds in the account, and putting those funds into a segregated "hold harmless" account pending the resolution of the bank's and the depositors' claims to ownership.

26. If, after sequestering or freezing the funds, the bank was unable to resolve the customer's debt, the bank could initiate a legal action seeking to retain the funds. More simply, the bank could have simply seized and kept the funds and risked that the negatively impacted accountholders might take legal action to recover the funds from the bank. The bank's actions in these situations would not be limited by the principle of mutuality of obligation that limits the scope of the bank's right to set off.

27. In taking the legal action described in the preceding paragraph, the bank would be seeking an equitable remedy, and might have to respond to equitable defenses. Here, defenses might arise from the very fact that the "bad" checks were remotely created checks.

28. A remotely created check is a check that is not signed by an authorized signatory on the account against which the item is drawn. Legally a remotely created check means "a check that is not created by the paying bank and that does not bear a signature applied, or purported to be applied, by the person on whose account the check is drawn." Federal Reserve Regulation CC, 12 CFR 229.2(fff). Historically, remotely created checks have been used legitimately by certain businesses such as bill payment services, credit card companies, utilities, and telemarketers, which obtained authorization from an accountholder to issue a remotely created check rather than incur the delay involved in having the accountholder write and sign a check that would then need to be delivered to the payee by mail or by some other means of physical delivery.

29. Remotely created checks are generally understood among bankers to be high risk instruments, subject to their own unique set of rules. The rules that uniquely apply to remotely created checks impose significant risk on a bank that accepts such a check for deposit. In the case under discussion, when the bank accepted the remotely created checks for deposit, the bank accepted a higher than normal level of risk.

7

30. In response to the perceived risks associated with remotely created checks, two fairly recent legal changes have shifted the risk related to unauthorized remotely created checks. Historically and typically, the paying bank and not the bank of first deposit is liable if the paying bank takes presentment of and honors a check that was not authorized by the account holder. With respect specifically to remotely created checks, recent changes in the law have shifted this risk from the paying bank to the bank of first deposit. For example, an amendment to Uniform Commercial Code Section 4-208 was the first effort to reallocate to the bank of first deposit the risk that a remotely created check was not authorized by the accountholder.

31. Because of the perceived failure of the Uniform Commercial Code to create a uniform mechanism for allocating the risk of unauthorized remotely created checks to banks of first deposit, the Federal Reserve Board created a uniform national rule regarding these instruments by amending Regulation CC effective July 1, 2006, to reallocate the risk of loss. The Federal Reserve added a new provision to Regulation CC, 12 CFR 229.34(b), under which any financial institution that transfers or presents a remotely created check warrants to every bank that subsequently handles the check, that the person on whose account the check is drawn authorized the issuance of the check in the amount and to the payee stated on the remotely created check. Unlike UCC Section 4-208, the warranty set forth in section 229.34(b) of Regulation CC extends to remotely created checks drawn against business accounts. The Regulation CC provision regarding remotely created checks thus applies to the remotely created checks in the present discussion, which were drawn against corporate accounts.

32. Because Regulation CC applies to all checks collected or returned between banks in the United States, Regulation CC's rule regarding remotely created checks effectively supersedes the narrower provision in UCC 4-208. Since the 2006 amendment to Regulation CC, banks in the United States have generally understood the risk that a bank of first deposit takes on when it accepts remotely created checks as deposits and transfers or presents a remotely created check to another bank. In response to that risk, some banks refuse to take remotely created checks as deposits. Banks that do accept remotely created checks for deposit typically take additional steps to manage the resulting risk.

33. In recent years, it has become standard practice in the banking and payments processing industry to operate under agreements with depositors that either completely prohibit a customer from depositing a remotely created check, or impose additional risk mitigating limitations or conditions on deposits of remotely created checks.  Such additional risk mitigants typically include restrictions on the dollar volume of remotely created check deposits, and provisions that require the depositor of remotely created checks to provide the bank with collateral and/or to maintain clearing balances at the bank in amounts sufficient to protect the bank against returns or warranty claims that the remotely created checks were not authorized.  Typically, before a bank accepts remotely created checks as deposits from its customer, the bank requires the customer to agree to terms that protect the bank from the unique risks that the bank faces when it transfers a remotely created check to another bank for collection or presentment.

34. Based on the facts of this case, the defendants in an action by the bank seeking ownership of the sequestered or frozen funds might claim that the bank acquiesced in the depositor's conduct when the depositor and the bank's employees spoke before the bank agreed to accept the remotely created checks for deposit.  If the bank failed to obtain any of the contractual protections that a bank typically requires before accepting deposits of remotely created checks, the bank may have failed to protect itself against the known risks involved in sending remotely created checks forward for collection.

35. These types of potential defenses may or may not have prevailed had the bank invoked an equitable remedy to recover the proceeds of the remotely created checks.  But practical, legal, and equitable remedies were available to the bank, contrary to Ms. Finocchiaro's misleading conclusion at trial and the government's argument that the bank had no remedies after the funds were transferred into the other accounts, that Mr. Teman supposedly knew that the bank had no remedies other than set off, and that the supposed lack of remedies together with Mr. Teman's supposed knowledge that the bank had no remedies was evidence of criminal intent.

A-2235

Executed on May 11, 2021.

_____

Richard M. Fraher, Ph.D, J.D.

A-2236

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 9, 2021

**BY CM/ECF**

The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

     Re:    *United States v. Ari Teman*, S2 19 Cr. 696 (PAE)

Dear Judge Engelmayer:

    The Government respectfully writes in opposition to Ari Teman's ("Teman" or the "defendant") letters dated April 28, 2021 (Dkt. No. 218, the "April 28 Letter") and May 14, 2021 (Dkt. No. 222, the "May 14 Letter") seeking vacatur of his conviction, a new trial, and/or bail pending appeal, and in further support of the Government's request for restitution and forfeiture in this matter. As set forth in further detail below, the Government has amply established the bases and amounts of restitution and forfeiture in this matter and no further hearing is warranted. The defendant's untimely challenges to his conviction and related request for bail pending appeal fare no better. The Bank of America ("Bank of America" or the "Bank") witness offered proper and accurate lay witness testimony concerning the Bank's understanding that it could not cover its losses from the defendant's other accounts. And the Government made proper arguments concerning the significance of the transfers by the defendant from one account to another that prevented the Bank from covering its losses. Having failed to timely object to the testimony or the Government's arguments, the defendant's latest effort to claim that the Bank could have covered its losses is both untimely and irrelevant. Accordingly, the defendant's motions must be dismissed.

    **A.  Procedural History**

    On January 29, 2020, a jury convicted the defendant on all counts of Indictment S2 19 Cr. 696 (PAE). Since that time, there has been extensive post-trial litigation. On February 26, 2020, the defendant moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29 or, in the alternative, for a new trial under Rule 33. (Dkt. No. 111). While that motion was pending, on April 9, 2020, the defendant made a second Rule 33 motion, alleging that a new trial also was warranted because of disclosure failures by the Government. (Dkt. No. 118). On June 5, 2020, this Court issued a lengthy opinion denying all of the defendant's post-trial motions.

    Sentencing initially was scheduled to proceed on December 1, 2020, but was adjourned so that the parties could address issues relating to restitution and forfeiture, among others. On January 28, 2021, the Court requested that the parties submit briefing on the issues of bail pending appeal

and restitution and forfeiture. On April 2, 2021, the Government submitted a letter detailing its position on forfeiture and restitution. (Dkt. No. 215, the "Restitution-Forfeiture Letter"). By Order dated April 26, 2021, the Court set a modified briefing schedule, directing the parties to address certain specific issues and specifically noting that it "[did] not authorize any additional submissions." (Dkt. No. 217, the "April 26 Order" at 3). Thereafter, the defendant submitted the April 28 and May 14 Letters, which fail to meaningfully address the issues specified in the April 26 Order, and instead request post-trial dismissal of the indictment or, in the alternative, a new trial. The defendant explicitly describes the May 14 Letter as a "supplement [to the defendant's] previous submission in support of vacatur of Mr. Teman's conviction." (May 14 Letter at 1). In effect, he has made a third, untimely, Rule 33 motion.

The briefing schedule set forth by the April 26 Order directed that the Government's response be submitted by May 26, 2021. However, in view of the wide-ranging issues raised by the defendant's April 28 and May 14 Letters and not contemplated by the April 26 Order, the Government requested, and the Court' granted, a two-week extension of the Government's deadline to respond. (*See* Dkt. Nos. 223, 224).

A.    **Restitution and Forfeiture**

The defendant has offered neither substance nor law that undermines the facts and arguments set forth in the Government's Restitution-Forfeiture Letter and, more specifically, Vice-President and Senior Fraud Investigator Karen Finocchiaro's trial testimony and affidavit (the "Finocchiaro Affidavit"). Instead, in a single paragraph, the defendant, proceeding from an incorrect premise, argues, in sum, that Bank of America is not entitled to restitution to the extent it failed to recover losses by claiming funds left in other of the defendant's non-GateGuard accounts; and, further, that the Finocchiaro Affidavit is insufficient to establish a restitution amount and that the Court should hold a hearing.[1] The defendant concedes that "Professor Fraher's declaration does not specifically address restitution" but nonetheless argues that "it establishes that [Bank of America] may have waived its remedies to recover at least so much of its loss which remained in [the defendant's] other accounts and which it refunded even after the jury's verdict." (*Id.*). From that the defendant requests that the Court require a representative of Bank of America to testify on the issue of restitution.

The defendant cites not a single case in support of his claim that Bank of America had to recover its losses from his non-GateGuard accounts or waive restitution in those amounts. "[R]estitution attempts to compensate for loss by 'restoring [the victim] to a position he occupied before [the injurious] event." *United States v. Boccagna*, 450 F.3d 107, 119 (2d Cir. 2006) (internal citations and quotations omitted). In seeking to accomplish that goal, "[u]ncertainties with respect to the amount in question should be resolved in favor of the victim in accord with the statutory focus on making the victim whole." *United States v. Donaghy*, 570 F. Supp. 2d 411, 423 (E.D.N.Y. 2008), *aff'd sub nom. United States v. Battista*, 575 F.3d 226 (2d Cir. 2009) (internal citations omitted). Here, there is no ambiguity: Bank of America cannot recoup its loss. The Government's Restitution-Forfeiture Letter set out, in detail, the background, applicable law, and

---

[1] While the defendant purports to challenge forfeiture in this case, his May 14th letter does not address the propriety of the Government's forfeiture calculation, and solely attacks the restitution numbers.

documentation supporting the Government's request for restitution and forfeiture, including the Finocchiaro Affidavit. Finocchiaro accurately testified at trial about Bank of America's ability to recoup certain losses (*see* Restitution-Forfeiture Letter at 2-3; *see also* Tr. 234-36); between trial and the initial sentencing proceeding on December 1, 2020, Finocchiaro was told, mistakenly, that a portion of Bank of America's total loss—approximately $13,477.37—was offset by funds in one of the defendant's accounts, when that was not in fact the case (*see* Restitution-Forfeiture Letter at 4-5, Ex. 1); and, ultimately, the only change to Bank of America's total loss amount was to reduce it by the value of fees in one account, $647.85, resulting in a revised total loss amount of $259,340.32 (*id.*). Indeed, even if Bank of America theoretically *could* have recovered funds from the defendant's non-GateGuard accounts, it is indisputable those funds were returned to the defendant and they now are not recoverable. (*See* Finocchiaro Aff. ¶ 7). The factual record was clear at trial, and is clear now, that Bank of America cannot recover its losses.

To the extent the defendant offers a reason to seek live testimony from Finocchiaro, it is speculative at best. Sworn affidavits, like the Finocchiaro Affidavit, are sufficient to establish restitution and forfeiture. *See United States v. Kinney*, 684 F. App'x 73, 75-76 (2d Cir. 2017) (collecting cases); *United States v. Grabsky*, 330 F. App'x 259, 263 (2d Cir. 2009) (collecting cases). Indeed, Finocchiaro's affidavit is further supported by her uncontested trial testimony. (*See, e.g.*, Restitution-Forfeiture Letter at 2-3). In the face of this well-established law, the defendant makes the extraordinary assertion, based on one out-of-district case, that if Bank of America "declines to appear subject to cross-examination to assert its right to any restitution ... [Bank of America] should be deemed to have waived restitution." (May 14 Letter at 7). The defendant's reliance on *United States v. South* is misplaced. 2013 U.S. Dist. LEXIS 116656, at *3-4 (D. Montana July 12, 2013). In *South*, after an initial restitution hearing, the district court found there was insufficient information to make a ruling on restitution, reserved judgment, and referred the matter to a magistrate judge for a hearing on restitution. The bank representative, who had testified at the initial hearing, did not testify at the second restitution hearing—referred for further inquiry on that specific issue—and the government there argued that the Court should order restitution based on the representative's prior testimony and related documentation submitted by the bank. (*Id.* at *4). The court rejected that argument and found restitution was not warranted.

Here, the bank representative, Finocchario, testified at trial and prior to sentencing submitted a sworn affidavit and updated documentation relating to a discrete question about restitution. The defendant suggests, without factual or legal support, that hearing on restitution (he makes no mention of forfeiture) is required. The record, through Finocchiaro's trial testimony, the Finocchiaro Affidavit, and supporting documentation, is clear, and the Government respectfully submits that the Court should order restitution and forfeiture in the amounts requested by the Government.

**B.      Bail Pending Appeal**

The defendant dedicates a single paragraph of his April 28 Letter to the issue of bail pending appeal. (*See* April 28 Letter at 15). In it, he "incorporate[s] by reference" his earlier post-verdict motions that "establish that Mr. Teman should be granted bail pending appeal" and asserts that the Second Circuit "should have an opportunity to determine whether the facts of this case establish a federal fraud or sufficient evidence thereof." (*Id.*). A jury did the former, and this Court addressed the latter in its June 5 Order & Opinion. Hoping the Second Circuit will reach a

A-2239

different result is not grounds for bail pending appeal, and the defendant offers no legal or factual basis to meet the relevant legal standard.

1.      Applicable Law

Title 18, United States Code, Section 3143(b) provides that a district court "shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal ... be detained" unless certain conditions are met.  18 U.S.C. § 3143(b).  The Second Circuit has summarized those conditions as follows:

> (1) that the defendant is not likely to flee or pose a danger to the safety of any other person or the community if released; (2) that the appeal is not for the purpose of delay; (3) that the appeal raises a substantial question of law or fact; and (4) that if the substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial on all counts on which imprisonment has been imposed.

*United States v. Aiyer*, No. 18 CR. 333 (JGK), 2020 WL 6683078 (S.D.N.Y. Nov. 12, 2020) (citing *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985).  A "substantial question" is "one of more substance than would be necessary to a finding that it was not frivolous.  It is a close question or one that very well could be decided the other way."  *Id.*; *see also*, *United States v. Rittweger*, No. 02-CR-122, 2005 WL 3200901, at *1 (S.D.N.Y. Nov. 30, 2005).

2.      Discussion

The defendant cannot meet the high bar to establish he is entitled to bail pending appeal.  Even assuming *arguendo* that the defendant is not a flight risk or danger to others and that a forthcoming appeal would not be for the purpose of delay, bail pending appeal would not be appropriate because such an appeal would not raise a substantial question of law or fact.  The defendant raised a host of arguments in his post-trial motions.  (*See* Dkt. No. 111).  He moved for a judgment of acquittal under Rule 29(c) or, in the alternative, for a new trial under Rule 33.  Then, when his post-trial motions were pending, the defendant filed a second Rule 33 motion.  (*See* Dkt. No. 118).  Neither of those motions raised a substantial question of law or fact and on June 5, 2020, this Court denied all of the defendant's post-trial motions.  (*See* Dkt. No. 138, the "June 5 Opinion & Order").

The defendant's most recent effort fares no better.  Any arguments relating to restitution and forfeiture would not rise to the level of a "substantial question," and, even if they did and were decided in the defendant's favor, would not be likely to result in reversal or an order for a new trial on all counts on which imprisonment has been imposed, to the extent the Court imposes such a sentence.  Accordingly, the Government respectfully submits that the defendant does not meet the standard for bail pending appeal.

4

**C.    Motion for "Vacatur of Conviction" or a New Trial[2]**

      1.    <u>Applicable Law</u>

          a.    <u>Rule 33</u>

Rule 33 "motions for a new trial are disfavored in the Second Circuit." *United States* v. *Gambino*, 59 F.3d 353, 364 (2d Cir. 1995). "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33 . . . ." *United States* v. *McCourty*, 562 F.3d 458, 475 (2d Cir. 2009). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *United States* v. *Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (citation and internal quotation marks omitted). Granting a new trial "must be done sparingly and in the most extraordinary circumstances." *United States v. Archer*, 977 F.3d 181, 187 (2d Cir. 2020) (internal quotations omitted). "[A] district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand." *Id.* at 188. In *Archer*, the Second Circuit explained further:

> We stress that, under this standard, a district court may not 'reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable.' To the contrary, absent a situation in which the evidence was 'patently incredible or defie[d] physical realities,' or where an evidentiary or instructional error compromised the reliability of the verdict, a district court must 'defer to the jury's resolution of conflicting evidence.' And, as it must do under Rule 29, a district court faced with a Rule 33 motion must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis.

---

[2] The defendant's April 28 and May 14 Letters assert that the above-referenced case should be "dismissed." (*See* April 28 Letter at 12, 13-15; May 14 Letter at 5). In his April 28 Letter, the defendant argues that the case should be dismissed because (i) Finocchario's testimony was improperly noticed expert, not fact, testimony; and (ii) Bank of America did not "invoke its equitable remedies" and instead "returned the positive balances" in certain of the defendant's accounts to those accounts after his conviction. (April 28 Letter at 12, 13-15). The May 14 Letter grounds its request for "dismissal of this case" in purported "insufficiency of the evidence" and "because the record suggests deliberate prosecutorial misconduct. These arguments, and others like them, were the subject of this Court's lengthy June 5 Order & Opinion, which denied all of the defendant's post-trial motions, and explicitly rejected the defendant's allegations of prosecutorial misconduct. (*See* June 5 Order & Opinion at 101 ("Accordingly, there was no *Brady, Giglio*, or Jencks Act violation warranting a new trial.")). The June 5 Order & Opinion also considered, and rejected, the defendant's arguments that the evidence was insufficient to sustain a conviction. To the extent the defendant now is making a second Rule 29 motion for a judgment of acquittal, that motion has already largely been rejected; and any newly raised arguments are wholly without merit and do not approach the high standard for a judgment of acquittal under Rule 29 (*see* June 5 Order & Opinion at 14-16). Accordingly, the Government interprets the defendant's motion as one for a new trial and addresses that argument above.

*Id.* at 188-89.L 6807833, at *4 (quoting *United States* v. *Canova*, 412 F.3d 331, 349 (2d Cir. 2005)).

> b.    Fact Testimony

Relevant "fact testimony" is admissible "so long as the witness has personal knowledge." *United States v. Cuti*, 720 F.3d 453, 457 (2d Cir. 2013) (citing Fed. R. Evid. 602); *see also id.* at 458-59 (fact testimony includes what a witness "thinks he knows from personal perception," as well as "the fact of what he did not know and how, if he had known that independently established fact, it would have affected his conduct or behavior" (quotation marks omitted)).  For example, in *United States v. Marsh*, 568 F. App'x 15 (2d Cir. 2014), the Second Circuit affirmed a ruling by the district court allowing a witness to testify, pursuant to Rule 602, about his training in cellphone extractions and the extraction he performed in that case.  *Id.* at 16-17.

A lay witness's testimony "in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  A rational perception is one involving firsthand knowledge or observation.  *See United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992).  Opinion testimony based on knowledge gained through service in a particular position or role does not in itself transform such testimony into expert testimony.  *See Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 81 (3d Cir. 2009) ("When a lay witness has particularized knowledge by virtue of her experience, she may testify–even if the subject matter is specialized or technical–because the testimony is based upon a layperson's personal knowledge rather than on specialized knowledge within the scope of Rule 702.").

For example, in *United States v. Yanotti*, 541 F.3d 112 (2d Cir. 2008), the Second Circuit held that lay testimony under Rule 701 was appropriate where the witness's testimony is "the product of 'reasoning processes familiar to the average person in everyday life,' and not 'scientific, technical, or other specialized knowledge.'"  *Id.* at 126 (quoting *United States v. Garcia*, 413 F.3d 201, 216-17 (2d Cir. 2005)).  In that case, the witness sought to testify about loansharking and the court noted that "[w]hile we do not profess that loansharking is an activity about which the average person has knowledge, we find that the opinion [the witness] reached from his own loansharking experience derived from a reasoning process familiar to average persons."  *Id.*  Likewise, an officer of a business can provide lay opinion testimony about financial aspects of business without expert qualification because it derives from "particularized knowledge that the witness has by virtue of his or position in the business" and does not arise from "experience, training or specialized knowledge within the realm of an expert."  Fed. R. Evid. 701 Advisory Committee Notes (2000).

> 2.    Factual Background

The Government's Restitution-Forfeiture letter recounted the relevant pre-trial disclosures of 3500 material, Finocchiaro's trial testimony, and, in the Finocchiaro Affidavit, the post-trial determination of the restitution amount.  Prior to trial, the Government produced 3500 materials for Finocchiaro that, as set forth in the Restitution-Forfeiture Letter, indicated that Bank of America was "unable to offset the loss" from the defendant's fraud in the GateGuard Account by seizing funds in his other accounts.  (*See* Forfeiture-Restitution Letter at 3-4, n.1; *see also* 3503-

6

18).   Bank of America had made this clear through its actions even before trial, having mailed checks to the defendant representing the positive balances in his non-GateGuard accounts; demonstrating concretely that the Bank did not view these funds as recoverable.   (*See* Forfeiture-Restitution Letter at 3; Tr. at 234).   Finocchario's trial testimony was consistent with the relevant 3500 materials, confirming that the defendant's non-GateGuard accounts had different tax identification numbers and that Bank of America was not able to recover funds from those (three) accounts.   (*See* Forfeiture-Restitution Letter at 3; Tr. 234-36).   The back-and-forth after trial has been well-covered.   As set forth in the Finocchiaro Affidavit, in or about November 2020 Finocchiaro was incorrectly advised by another Bank of America employee the Bank was able to offset its loss in the GateGuard Account with approximately $13,477.37 from another of the defendant's account, before later learning that was incorrect.   (*See* Finocchiaro Aff. ¶ 7).   In short, Bank of America's position *ex ante* has been its position *ex post*, with the exception of approximately $647.85 in removal fees reducing its total loss amount from $259,988.17 to $259,340.32.

3.      Discussion

This is the defendant's third Rule 33 motion, and his second to make unfounded accusations of prosecutorial misconduct.   The defendant cites no authority for making yet another Rule 33 argument at this stage.   To the extent such a motion were proper, the defendant's arguments are meritless and/or already have been rejected by this Court.   The record does not "suggest[] deliberate prosecutorial misconduct," there was no "treachery" by the Government, and the Government need not "invent unicorns." (May 14 Letter at 5-7).   Finocchiaro's testimony was previewed before trial in 3500 material, accurate at trial, and the misapprehension resulting in the defendant's latest round of briefing and accusations was corrected and resulted in $647.85 change to Bank of America's loss amount in the defendant's favor.   The Government's argument in summation about Bank of America's loss demonstrating his criminal intent was not "false and misleading" (May 14 Letter at 1); rather, it was a clear inference supported by significant evidence introduced at trial.   The defendant's arguments are meritless and they do not come close to warranting a new trial.

*First*, Finocchiaro's trial testimony was, and remains, accurate.   The defendant argues that the Government "hid the ball" or even deliberately misrepresented the status of the defendant's personal account at BOA in the trial testimony.   That is wholly inaccurate.   *Before trial*, Bank of America disbursed funds back to the defendant, but the checks were returned undeliverable (Finocchiaro Aff. ¶ 3); at the time of trial, Bank of America held those funds; and, following trial, Bank of America returned funds it held in the defendant's non-GateGuard accounts to the defendant (Finocchiaro Aff. ¶ 5).   The defendant's arguments about restitution and misconduct flow from a miscommunication prior to the December 1, 2020 sentencing date, described herein and in the Forfeiture-Restitution Letter, that has since been corrected.   The Finocchiaro Affidavit could not be clearer on this point:

> In or about November 2020, I was notified by another Bank of America employee that the bank was able to offset its loss in the GateGuard Account with the funds in the Ari Teman Account totaling $13,477.37.   However, it has since been confirmed an official item was created and sent to Mr. Teman totaling $13,477.37 and the funds are not available for offset.

(Finocchiaro Aff. ¶ 7). The defendant relies on the affidavit of Richard M. Fraher (the "Fraher Declaration"), appended to the May 14 Letter, in support of its argument—flatly contradicted by trial testimony and a sworn affidavit—that Bank of America had the ability to recover funds from the defendant's accounts. But the Fraher Declaration actually supports the view that Bank of America could *not* offset funds. The Fraher Declaration states, in part, that "Bank of America's right to set off extended no further than the account of GateGuard." (Fraher Decl. ¶ 16). Put differently, the Fraher Declaration suggests that, beyond the GateGuard Account, Bank of America had no ability to set off and/or recover from the defendant's other accounts. This was demonstrated quite clearly by Bank of America, *both prior to trial and after the defendant's conviction*, sending him funds held in other of his accounts. (*See* Finocchiaro Aff. ¶¶ 4, 5). On the point that Teman argues is critical—whether Bank of America was able to recoup its losses—the Fraher Declaration is equivocal at most. Fraher first notes that Finocchiaro's testimony about "Bank of America's inability to recover funds by set off from other accounts" is correct. (Fraher Decl. ¶ 16). However, he then says that Finocchiaro's testimony was not correct because "as a general matter, under applicable law and generally accepted banking practices, Bank of America had means to recover funds from the other accounts even if it had no right to set off." (Fraher Decl. ¶ 19). Fraher adds that Bank of America had a right to recover funds from outside the GateGuard Account because the bank could simply seize the funds and initiate a costly legal action or, more strikingly, it could have "simply seized and kept the funds and risked that the negatively impacted accountholders might take legal action to recover the funds from the bank." (Fraher Decl. ¶ 26; *see also id.* ¶ 27 (noting that in such a legal action, the bank "might have to respond to equitable defenses")).

In essence, the Fraher Declaration simultaneously suggests that (i) Bank of America had no right to "set off" except against the GateGuard Account, and (ii) actually, Bank of America had means to recover anyway, then risked being sued for that recovery.[3] The accurate explanation is much simpler: Bank of America recovered what they could, and lost the $259,340.32 they could not.

*Second*, the defendant's accusation that the Government intentionally elicited false testimony from Finocchiaro is contradicted by the record. Finocchiaro's testimony was consistent with 3500 materials produced prior to trial which, in substance, reflected that Bank of America could not recover funds transferred outside the GateGuard Account because the other accounts had different tax identification numbers, *i.e.*, they belonged to different individuals or a corporate entity. First, notes from an interview with Finocchiaro stated, in relevant part, "BOA can't do right of recourse if transferred. If funds came into acct A, then transferred to acct B, held by same entity, they (BOA) has right of recourse. But here, [GateGuard] + [Friend or Fraud] had different tax ID." (See 3503-09 at 1). Second, the Government produced an email sent by Finocchiaro, in which she writes that Bank of America is, "unable to offset the loss with the funds in hold harmless as they were sent from different TAX ID's." (See 3503-18). This was not trial by ambush. Bank of America's limited ability to recoup lost funds was: disclosed in 3500 material produced in advance of trial; the subject of testimony at trial; and explained, in simple and straightforward terms, by the Finocchiaro Affidavit. The Fraher Declaration, despite its many legal conclusions, does not discredit Finocchiaro's testimony or the Government's arguments in summation, let alone

---

[3] The Fraher Declaration then proceeds to opine on how to prove criminal intent (*see, e.g.*, ¶¶ 20-23) before returning to the topic of "remotely created checks," (*see, e.g.*, ¶¶ 28-33) expert testimony about which the Court precluded prior to trial (*see* Jan. 10, 2020 Tr. at 32-37).

push this into the realm of testimony that is false or *intentionally* false. The defendant received relevant 3500 materials before trial and heard Finocchiaro's trial testimony without objection. His claim to have been apprised only now of the issue is nonsensical and should not be credited.

*Third*, Finocchiaro's testimony, for the reasons set forth here and as litigated prior to trial, was proper fact testimony derived from a reasoning process familiar to the average person. Finocchiaro's trial testimony was based on her firsthand knowledge and was helpful to determining a fact in issue, *i.e.*, the loss suffered by Bank of America and its ability to recoup any portion of that loss. Moreover, although the subject matter may be interpreted as "specialized or technical," Finocchiaro's testimony was based on her personal knowledge and not her expertise in, for example, banking law. *See Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d at 81. Moreover, Finocchiaro was subject to cross-examination and the defendant did not object to her testimony.

*Fourth*, even assuming Finocchiaro's testimony was improper expert opinion testimony, there was no harm to the defendant. The defendant makes much of the fact that the Government argued the loss to Bank of America was, "perhaps the most obvious proof" of the defendant's criminal intent. (May 14 Letter at 1; *see also* Tr. 1042-43). He argues that "[s]tripped of the government's 'most obvious' incriminating inference, and considering the government's other inferences in context, its case against Mr. Teman is reduced to a claim that he knew that he was not entitled to the deposited funds." (May 14 Letter at 4). That is flatly contradicted by even a cursory review of the trial transcript. In summation, before the point about "perhaps the most obvious proof" in rebuttal, the Government listed the top eight reasons the trial evidence demonstrated the defendant's guilt, including that the customers never gave permission for the defendant to issue the checks; the defendant never invoiced customers; and the appearance of the checks themselves. (*See* Tr. 976-95). The evidence underlying these reasons overwhelmingly established the defendant's guilt, without a mention of Bank of America's loss. For example, Elie Gabay testified that the defendant did not request permission to pay himself by issuing check's from Coney's bank accounts and that, if the defendant had, Gabay "would have said no." (Tr. 355-56). Other witnesses, Joseph Soleimani (*see* Tr. 568), Bonnie Soon-Osberger (*see* Tr. 430, 441), and Gina Hom (*see* Tr. 474-76), corroborated this assertion—that the defendant took their money without authorization. Further, as the Government argued in summation, in at least one instance the defendant continued issuing checks from customer accounts *after* the customer (Gabay) had contacted his bank and reversed the initial charges from the defendant. (Tr. 985-86). Tellingly, the defendant never invoiced the customers for these charges. (Tr. 987-88). In summation the Government also explained how the appearance of the defendant's fraudulent checks and the timing of certain of his deposits also established his criminal intent. (Tr. 990-93). And, of course, the Government described how the defendant moved the fraudulently obtained money around his accounts, before the Bank could freeze them or return the funds to their owners, the defendant's customers. (Tr. 993-94). These arguments, and the evidence underlying them, clearly established the defendant's criminal intent. The loss to Bank of America was not the centerpiece of this argument, nor was it critical to the conclusion.[4]

---

[4] To say nothing of the damning messages the defendant exchanged with his attorney, in which the attorney warns the defendant that his "just depos[iting] checks from [the customers]" was a "bad idea ... Because they are likely to call police. And you will be arrested. And have a criminal

The Government's rebuttal focused principally on why the defendant had not established a good faith defense. (Tr. 1036-41). Only after that, and following the extensive summary in closing of all the reasons establishing the defendant's guilt, the Government stated that "perhaps the most obvious proof here of criminal intent" is Bank of America's $260,000 loss, before citing again to the eight reasons detailed in closing. (Tr. 1042-44). The defendant appears to read this transcript citation ("perhaps the most obvious …") to the Government's rebuttal in conjunction with a portion of the Government's summation. (*See* May 14 Letter at 1 ("As the government put it to the jury, among other similar arguments, *"perhaps the most obvious proof here of criminal intent* is that there's a $260,000 hole right now at Bank of America [T1042-43 (emphasis added)] … [Mr. Teman] knew the moment he deposited these checks … and the moment he moved the money out of his account … that Bank of America couldn't get it back." T993.")). In any event, the defendant's movement of the funds both evidenced his fraudulent intent—he transferred the money from his GateGuard account to other of his accounts before Bank of America could return it to the customers—and, ultimately, in doing so rendered those funds unrecoverable to the Bank. The defendant moved his stolen money around so it would not be returned to its rightful owners. That is a clear, straightforward argument was *corroborated*, not undermined, by the fact that Bank of America also was unable to recover those funds to make itself whole. Even if Bank of America had been able to recover more to offset its losses in the GateGuard Account, the Government would have made the same arguments relating to loss even if the Bank "only" had a deficit of $150,000—an amount the defendant does not contest—instead of $260,000. In addition, as set forth above, this was far from the Government's only proof of criminal intent, and was not essential to demonstrating the defendant's guilt. The defendant erroneously asserts that the Government's case "was significantly predicated on false premise," referring to Bank of America's loss, and that the Government's arguments were, "false and misleading." (May 14 Letter at 1). The only false premise is the one the defendant has conjured up: that Bank of America could have recovered more of the loss the defendant's fraud caused it and that had it done so there would have been no crime.

In the end, the defendant's arguments make very little sense. His request for a new trial rests on a series of leaps in logic proceeding from his own false premise. The argument can be distilled to the following: Bank of America could have recovered more of the loss the defendant caused than it did. From there, the defendant attempts to argue that the Government has engaged in misconduct to a level that demands a new trial. To be clear, there was nothing surprising or inaccurate about the Government's theory, Finocchiaro's testimony, or the Government's arguments in summation.

---

case to deal with. And then you can start explaining about your contract and 'not breaking any laws'[.]" (GX 702; *see also* GX 704, 728, 729).

A-2246

**D.      Conclusion**

For the reasons set forth above, the Government respectfully submits that the Court should impose restitution and forfeiture as requested in the Restitution-Forfeiture Letter; deny bail pending appeal; and reject the defendant's most recent, untimely request for a new trial.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By: _____/s/_____
        Kedar S. Bhatia
        Jacob H. Gutwillig
        Assistant United States Attorneys
        (212) 637-2465 / 2215

Andrew J. Frisch
Partner

212-344-5400
afrisch@schlamstone.com

**SCHLAM STONE & DOLAN LLP**

26 Broadway, New York, NY 10004
Main: 212 344-5400   Fax: 212 344-7677
schlamstone.com

June 14, 2021

The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
New York, New York 10007

*Re: United States v. Ari Teman, 19-CR-696 (PAE)*

Dear Judge Engelmayer:

On June 10, 2021, upon reviewing the government's response to Mr. Teman's motion to vacate his conviction and dismiss this case, defense counsel and an associate began working on a motion for the Court's recusal, subject to the associate's supporting work. We now make that motion. If the Court does not grant recusal or dismiss this case, we urge your Honor to reconsider its denial of our application to submit a reply in further support of Mr. Teman's motion if only to permit us to preserve all of his arguments should appellate review be necessary.

Cases involving a Judge's indirect financial interest typically trigger the reasoning of *United States v. Ravich*, 421 F.2d 1196 (2d Cir. 1970), the case cited by the Court in its Order of May 5, 2021. *See* Docket No. 220. The government's response to Mr. Teman's motion shows that this case is not typical.

Defense counsel have tread carefully in raising issues underlying Mr. Teman's pending motion. As previously explained, we submitted a comprehensive letter to the government in the first instance so that the assigned prosecutor and his supervisors could vet the issue internally before we filed anything alleging misconduct on the public docket. While the inference of misconduct seemed warranted, we were reluctant to act precipitously. Likewise, the Court's indirect financial interest in the Bank of America ("BOA") did not warrant the motion made here absent more.

The issue in this case is no longer just a Judge with an indirect financial interest in a bank which may or may not be entitled to restitution. Based on the government's submission [Docket No. 225], the following facts are now undisputed:

> -The government knew at trial that BOA had already decided to retain funds in Mr. Teman's BOA personal account, but did not disclose that fact to Mr. Teman while simultaneously pressing the inference that Mr. Teman's transfer of deposited funds was intended to defraud BOA and leave it holding the bag;

-It appears that BOA chose to send a representative to testify at Mr. Teman's trial who had not been told that BOA had already retained funds in Mr. Teman's BOA personal account [*see* Docket No. 215-5];

-In responding to Mr. Teman's argument that the government, both during and after trial, deliberately hid the ball about its knowledge of the state of Mr. Teman's BOA personal account at the time of trial, it did not provide an affidavit from BOA (1) explaining why its chosen representative was not apprised of all the relevant facts before she testified at trial; (2) why it has equivocated about whether to return or retain at least some of Mr. Teman's funds; or (3) refuting Professor Fraher's declaration that BOA had a right to retain Mr. Teman's funds all along not to mention after the jury found Mr. Teman guilty; and

-Any argument that BOA ultimately elected to defer to an order of restitution (1) is not supported by any affidavit from BOA explaining why it is relying on the Court rather than its own available remedies; and (2) is otherwise undermined by BOA's equivocation about whether and to what extent to retain or return Mr. Teman's funds.

For these reasons, the record raises issues that distinguish *Ravich*. The question in this case is whether BOA has been or remains a passive or active participant in what at best is a lack of the type of transparency required in a federal criminal case or, at worst, a violation of the principles of *Brady v. Maryland*, 373 U.S. 83 (1963), or a fraud on the Court. We do not raise these issues lightly; here, as before, we tread carefully. But the record warrants an inference of either deliberate deception or nonchalance in directly addressing the key underlying facts.

The record as it stands does not permit an innocent interpretation or even a finding of some variety of harmlessness; at most, the record is silent. BOA did not itself bring this case, an important distinction noted in *Ravich*. But nor is BOA a mere bystander where "[t]he result could make no difference to the bank or its shareholders." *Ravich*, 421 F.2d at 1205. It could make a significant difference if BOA in fact has been or continues to be complicit in hiding the truth in a federal criminal case which alleges that BOA is a victim.

BOA is at the heart of atypical issues teed up by Mr. Teman's motion, as is now indisputably demonstrated by the absence of answers from BOA in the government's response. This context puts the reasoning of *Ravich* in a different light. *Ravich* "was decided under the more subjective standard which prevailed before the 1974 amendments [to 28 U.S.C. § 455];" the Third Circuit has questioned and disagreed with *Ravich*'s holding that a judge's financial interest in the victim of a crime does not require disqualification. *United States v. Nobel*, 696 F.2d 231, 235 (3d Cir. 1982). The Second Circuit has declined to adopt a "per se rule requiring recusal in every instance where a judge has an interest in the victim of a crime," finding that recusal is required (in a typical case) only where the judge's interest in the victim or the amount of restitution that the victim may recover is substantial. *United States v. Lauersen*, 348 F.3d 329, 336 (2d Cir. 2003), *vacated on other grounds* 543 U.S. 1097. But this case is not typical because BOA's conduct and state of mind are at the heart of questions raised in Mr. Teman's motion. BOA's status here is more akin to that of a party than the

A-2246.3

typical corporate victim potentially entitled to restitution.  *See* 28 USC 455(b)(4) (when a party is concerned, any interest—substantial or not—requires recusal).

We do not want to run afoul of or be seen as attempting an end-run around the Court's order denying our application to reply.  *See* Docket No. 229.  We have more to say if only to assure that we leave no doubt that our arguments are preserved for appellate review.  For now, we respectfully move for reassignment of this case in light of the government's response to Mr. Teman's motion and otherwise for reconsideration of the Court's denial of a reply.

<div style="text-align:center">

Respectfully submitted,

/s/ Andrew J. Frisch
/s/ Jolene LaVigne-Albert
Schlam Stone & Dolan LLP

/s/ Susan G. Kellman
25 Eighth Avenue
Brooklyn, New York 11217

*Counsel to Ari Teman*

</div>

cc:  U.S. Attorney's Office

3

A-2246.4

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 29, 2021

**BY CM/ECF**
The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

Re:  *United States v. Ari Teman*, S2 19 Cr. 696 (PAE)

Dear Judge Engelmayer:

The Government respectfully writes in opposition to Ari Teman's ("Teman" or the "defendant") letter dated June 21, 2021 (Dkt. No. 233, the "June 21 Letter") seeking the Court's recusal from the above-referenced matter. The defendant's bases for recusal are without merit and, for the reasons set forth below, the defendant's motion should be denied.

**A.  Background**

On January 29, 2020, a jury convicted the defendant on all counts of Indictment S2 19 Cr. 696 (PAE). Since that time, as described in the Government's letter dated June 9, 2021 (Dkt. No. 225, the "June 9 Letter"), there has been extensive post-trial litigation, including concerning restitution. On May 5, 2021, after the defense put at issue whether Bank of America would be entitled to restitution, the Court issued an order noting, in part, that "the Court's family owns stock in Berkshire Hathaway, Inc., which is a beneficial owner of more than 10% of Bank of America's outstanding common stock" and that this did not, in the Court's judgment, result in a circumstance in which the Court's "impartiality might reasonably be questioned," so as to require recusal. (*See* Dkt. No. 220, the "May 5 Order") (citing *United States v. Ravich*, 421 F.2d 1196, 1205 (2d Cir. 1970). The Court indicated that, if any party held a different view, counsel would be free to advocate accordingly. (*See id.*; *see also* Dkt. No. 231). The defendant made such a motion for recusal in his June 21 Letter.

Case 21-1920, Document 88, 05/25/2022, 3321506, Page67 of 306

**B. The Defendant's Motion for the Court's Recusal Should be Denied**

    1.  <u>Applicable Law</u>

Title 28, United States Code, Section 455(a) requires a district judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Further, a judge must disqualify himself when he or she has "a personal bias or prejudice concerning a party." 28 U.S.C. § 455(b)(1). The district judge whose partiality has been asserted may nevertheless decide the motion for recusal: "[d]iscretion is confided in the district judge in the first instance to determine whether to disqualify himself." *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1312 (2d Cir. 1988).

Where a motion for recusal has been timely made, the defendant's burden on the merits is substantial. *See Lamborn* v. *Dittmer*, 726 F. Supp. 510, 514 (S.D.N.Y. 1989). Recusal under Section 455(a) is only required when "an objective, disinterested observer fully informed of the underlying facts, [would] entertain significant doubt that justice would be done absent recusal." *United States* v. *Lovaglia*, 954 F.2d 811, 815 (2d Cir. 1992). "Section 455(a) does not require that [the district court] accept all allegations by the moving party as true." *Lamborn*, 726 F. Supp. at 517. On the contrary, "the grounds asserted in a recusal motion must be scrutinized with care." *In re Aguinda*, 241 F.3d 194, 201 (2d Cir. 2001). "The trial judge must carefully weigh the policy of promoting public confidence in the judiciary against the possibility that those questioning his impartiality might be seeking to avoid the adverse consequences of his presiding over their case." *Drexel*, 861 F.2d at 1312.

In order to show a sufficiently substantial doubt about the Court's impartiality to warrant recusal, the defendant must show that the Court has demonstrated "such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky* v. *United States*, 510 U.S. 540, 555 (1994). Recusal is not appropriate where the circumstances giving rise to the purported appearance of impropriety are "remote, contingent, indirect or speculative." *Lovaglia*, 954 F.2d at 815. The Court, furthermore, has no discretion to recuse itself unless the defendant has satisfied his heavy burden. *See Aguinda*, 241 F.3d at 201 (2d Cir. 2001) ("Where the standards governing disqualification are not met, disqualification is not optional; rather, it is prohibited.") (citing *Drexel*, 861 F.2d at 1312 ("A judge is as much obliged not to recuse himself when it is not called for as he is obliged to when it is.")); *see also Nat'l Auto Brokers Corp.* v. *Gen. Motors Corp.,* 572 F.2d 953, 958 (2d Cir. 1978) ("[A] judge has an affirmative duty … not to disqualify himself unnecessarily, particularly where the request for disqualification was not made at the threshold of the litigation and the judge has acquired a valuable background of experience.") (internal citations, quotation marks omitted).

    2.  <u>Discussion</u>

The defendant does not come close to meeting his "heavy burden." Rather, his motion for recusal effectively functions as a reprisal for his failed arguments about the Government's supposed non-disclosure of Bank of America's ability to cover its losses caused by the defendant from one of his accounts. (*See* June 9 Letter at 5-10). The defendant continues to misstate the factual record on that point, which is well-established by the Government's pre-trial production of 3500 materials, the trial testimony of Bank of America Vice-President and Senior Fraud

Investigator Karen Finocchario ("Finocchiaro"), and Finocchiaro's post-trial affidavit. (*See* June 9 Letter at 2-3). Somehow, the defendant argues, all of this results in an "appearance of conflict [that] favors the Court's recusal." (June 21 Letter at 1).

The single paragraph the defendant dedicates to engaging with the relevant legal standard begins by acknowledging that, absent "atypical circumstances," a judge's "modest indirect financial interest in a non-party does not require recusal." (June 9 Letter at 1). The one in-district case the defendant cites, *Stansell v. Revolutionary Armed Forces of Colombia*, 16-MC-405 (SDNY), is neither analogous nor applicable. In *Stansell*, a miscellaneous civil matter involving the enforcement of a foreign judgment, Judge Carter disclosed a financial interest in JPMorgan Chase Bank and his spouse's position as in-house counsel at BNY Mellon, and, after specifically requesting that the parties address possible recusal under Section 455(b)(4), reassigned the case to a different District Judge. *See Stansell*, 16-MC-405, Dkt. Nos. 173, 177, 181, 183; *see also* 28 U.S.C. § 455(b)(4) (providing for recusal where a judge "knows that he, individually or as a fiduciary, or his spouse … has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding"). Here, the Court does not have a financial holding in Bank of America, much less a household member or spouse who is employed by Bank of America. Rather, the Court's family owns stock in Berkshire Hathaway, a massive, publicly-traded, multinational conglomerate holding company with hundreds of billions of dollars in assets. Berkshire Hathaway shares are held by banks, mutual funds, and thousands of individuals who travel each year to its annual shareholders meeting. The Court's holding here is the very definition of an indirect interest, and "[w]here a case … involves remote, contingent, indirect, or speculative interests, disqualification is not required." *Lovaglia*, 954 F.2d at 815; *see also, King v. United States*, 576 13 F.2d 432 (2d Cir. 1978). The other, out-of-district cases the defendant cites similarly are not on point. Also unavailing is his citation to *dicta* in *United States v. Nobel*, 696 F.2d 231, 235 (3d Cir. 1982), an out-of-circuit case that reaches a different conclusion than *Ravich*, the controlling Second Circuit precedent.

The defendant offers no other basis under the relevant statute and caselaw supporting the Court's recusal. Rather, he attempts to use this as another opportunity to re-litigate issues relating to restitution, Finocchiaro's trial testimony, and his unfounded accusations of prosecutorial misconduct. In short, the defendant has failed, once again, to address the relevant question and instead advanced an off-base, meritless legal argument.

A-2246.7

**C. Conclusion**

For the reasons set forth above, the Government respectfully submits that the Court should deny the defendant's motion for recusal and proceed to sentencing.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By: _____/s/_____
Kedar S. Bhatia
Jacob H. Gutwillig
Assistant United States Attorneys
(212) 637-2465 / 2215

4

A-2247

1

L79GtemC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                          19 Cr. 696 (PAE)

ARI TEMAN,

                                 Conference
              Defendant.

------------------------------x

                               New York, N.Y.
                               July 9, 2021
                               12:30 p.m.

Before:

               HON. PAUL A. ENGELMAYER,

                               District Judge

                    APPEARANCES

AUDREY STRAUSS
     United States Attorney for the
     Southern District of New York
JACOB GUTWILLIG
     Assistant United States Attorney

SUSAN G. KELLMAN
ANDREW J. FRISCH
     Attorneys for Defendant

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-2248

2

L79GtemC

1          (In open court)

2          THE DEPUTY CLERK:  United States v.  Teman.

3          Counsel, please state your appearances for the record.

4          MR. GUTWILLIG:  Good afternoon, your Honor.  Jacob

5     Gutwillig for the government.

6          THE COURT:  Good afternoon.

7          MS. KELLMAN:  Good afternoon, your Honor.  Susan

8     Kellman and Andrew Frisch for Mr. Teman.

9          THE COURT:  Good afternoon, Ms. Kellman.  Good

10    afternoon, Mr. Frisch.  Good afternoon, Mr. Teman.  And good

11    afternoon as well to our court reporter.  Thank you, as always,

12    for your service.  And thank you to anybody who is taking

13    advantage of the phone access today.

14          First of all, good afternoon, counsel.  It's very good

15    to see everybody again.  It's nice to see people again without

16    being covered by masks.  So good afternoon to you, Mr. Teman.

17    Good afternoon, Ms. Kellman.  Good afternoon, Mr. Frisch.  And

18    good afternoon to you, of course, Mr. Gutwillig.

19          I convened this conference because there are by now a

20    number of issues that have piled up that need to be addressed

21    before sentencing.  The purpose of this conference is for me to

22    review those with you and to resolve on the record those open

23    issues that require resolution.

24          There are, by my count, five issues to take up; three

25    in the nature of housekeeping and two in the nature of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

L79GtemC

1  resolving pending motions.  And after I go through them, I'll

2  check with counsel whether there are any other issues that need

3  to be taken up.

4          For your planning purposes, I will not be issuing a

5  written decision on the issues that I'm going to cover today.

6  I'm merely going to issue a bottom line order setting out the

7  bottom line ruling.  So if the content of anything I say today

8  is important to you, you will need to order the transcript.

9          The first item is a housekeeping item.  I want to

10  explain on the record the snafu that led to my chambers issuing

11  the errant scheduling order at Docket 229.

12          As background, new defense counsel, Ms. Kellman and

13  Mr. Frisch, entered the case after Mr. Teman discharged his

14  immediately preceding counsel, from the law firm of Sher

15  Tremonte LLC, on the then-scheduled sentencing date, which was

16  December 1, 2020.  Before sentencing, I had issued a lengthy

17  decision denying Mr. Teman's post-trial motions made under

18  Rules 29 and 33.  That's at Dkt. 138.

19          After entering the case, new counsel indicated that

20  they wished to challenge the conviction on an additional

21  ground.  It related to the evidence received and the arguments

22  made by the government at trial regarding Bank of America's

23  ability to use funds in Mr. Teman's personal and other

24  corporate bank accounts to cover some of the losses the bank

25  experienced in Mr. Teman's GateGuard account from its having

4

L79GtemC

1   allowed Mr. Teman to deposit checks there which had not been

2   authorized by the payors.  The payors were three separate sets

3   of GateGuard's customers.  I authorized that motion, and the

4   defense filed it.

5        Originally, I had not authorized a reply in further

6   support of that motion.  However, after reviewing the

7   government's opposition submission and after receiving the

8   defense's application for an opportunity to reply, I granted

9   that application.  The memo endorsement granting that

10  application is at Docket 227, which issued on Thursday,

11  June 10.  The due date set in that memo endorsement errantly

12  says "May 17" rather than "June 17."  That reflects that I and

13  my staff were then in the middle of a consuming and challenging

14  jury trial at the time that I issued the memo endorsement.

15  Ms. Kellman is quite familiar with the case that was on trial,

16  as she previously represented the co-defendant.  And so alas,

17  our proofreading fell short of our normal standards.  But in

18  context, I'm sure it was obvious to all that the deadline I set

19  on June 10 for the defense reply was June 17.

20        The next thing I knew, I received the defense's letter

21  at Docket 230.  It was filed on Monday morning, June 14.  The

22  defense's letter reported that the Court had denied the

23  application for a right to reply.  And in a 180-degree turn

24  from the position the defense had taken just four weeks

25  earlier, the defense's letter now argued that the Court should

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-2251

5

L79GtemC

1    recuse.

2         It was news to me that my chambers had denied, as

3    opposed to having granted, the right to reply. I immediately

4    accessed ECF and saw the order at Docket 229 issued on Friday,

5    June 11. It indeed stated that the order at Docket 227 was

6    vacated and that the request for an opportunity to reply was

7    denied. I was horrified to see that, as I had never intended

8    to order any such thing and it was 100 percent contrary to the

9    order I issued granting the opportunity to reply.

10         I asked Mr. Smallman what had happened. I know that

11   he has fallen on his sword in a private email to counsel and

12   explained the circumstances. But I am making a record of what

13   happened so that the inconsistent orders are explained,

14   including for the benefit of any reviewing court.

15         As Mr. Smallman explained to you, during the recent

16   trial that he and I had, he had asked how I wished to rule on a

17   request by a defendant in a different criminal case. The

18   request was for the appointment of counsel to handle a second

19   successive compassionate release motion where I had denied the

20   initial request. I communicated to Mr. Smallman that that

21   request was to be denied. I authorized him, while I was on the

22   bench, to prepare and stamp sign an order to that effect.

23   Mr. Smallman erroneously conflated that request with the

24   defense request in Mr. Teman's case, which had been made

25   roughly contemporaneously. Such things happen during the press

A-2252

6

L79GtemC

1  of trial.  On that basis, he prepared and stamp signed the

2  order at Docket 229.

3       When I called to Mr. Smallman's attention that I had

4  never authorized the retraction of the opportunity for

5  Ms. Kellman and Mr. Frisch to reply, Mr. Smallman was as

6  mortified as I was.  Missteps like that for him are about as

7  common as full solar eclipses, as we all know.

8       That same morning, Monday, June 14, I immediately

9  issued the corrective order at Docket 231.  It apologized for

10  the mixed signals, restored the defense's right to reply, and

11  extended the due date for the reply to Friday, June 18.  And

12  Mr. Smallman wrote counsel privately that morning to explain.

13  I later extended the due date again, at the defense's request,

14  to Monday, June 21.

15       In any event, that's what happened.  I wanted to put

16  on the record that explanation.  I again apologize to defense

17  counsel for whatever confusion or consternation or anger the

18  order at Docket 229 caused.  I can well understand why it did.

19  The buck stops in my chambers with me; I should have read the

20  order before it went out; and I sincerely regret that goof.

21       That ends my discussion of the first issue.

22       The second item is substantive.  I am going to resolve

23  the defense's motion for my recusal.  The recusal motion is

24  based on the ownership by my family of stock in Berkshire

25  Hathaway, Inc.  As relevant here, Berkshire Hathaway is a

A-2253

L79GtemC

1    beneficial owner of 10 percent or more of the stock of Bank of

2    America, Inc.  And Bank of America is the bank that was exposed

3    to a risk of loss by the bank and wire fraud scheme found by

4    the jury.  It is entitled to restitution, by virtue of its

5    having cleared the unauthorized checks that Mr. Teman prepared

6    and drew on his customers' accounts.

7         I have disclosed my family's ownership of stock in

8    Berkshire Hathaway every year in my publicly filed financial

9    disclosure forms.  And immediately after the amount of

10   restitution that Bank of America was owed emerged as a

11   potential issue in dispute, I issued an order on the docket of

12   this case that disclosed my family's ownership of that stock.

13   That is the order at Docket 220, issued on May 5, 2021.  The

14   order noted that the recusal issue presented was governed by

15   28 U.S.C. § 455(a).  The order reported my considered judgment

16   that recusal is not required.  I cited in support the Second

17   Circuit's decision in *United States v. Ravich,* 421 F.2d 1196

18   (2d Cir. 1970), which so held in a case where the district

19   judge held stock in the entity entitled to restitution.  I

20   invited counsel to move for recusal if they disagreed.

21        As an aside, I should note that my family's ownership

22   of Berkshire Hathaway stock appeared on the docket long before

23   then.  It was noted in a letter emailed to my chambers on

24   June 1, 2020, from an unidentified person -- perhaps

25   Mr. Teman -- but the authorship was never established, posing

A-2254

L79GtemC

1   as a journalist by the name of "Jake Green."  The "Jake Green"

2   letter raised 23 questions, all in apparent support of

3   Mr. Teman.  These questions challenged the integrity of the

4   prosecutors; the integrity of the three separate customers of

5   Mr. Teman, who had been called by the prosecutors as trial

6   witnesses and who each denied authorizing Mr. Teman to draw

7   checks on their accounts in the amounts at issue; the integrity

8   of an alternate juror; and the integrity of the Court.  My

9   order at Docket 137 attached the "Jake Green" letter as an

10  exhibit.

11          Returning to the chronology relating to recusal, the

12  defense initially took the position that the Court was not

13  required to recuse.  In its letter of May 14, 2021, which is at

14  Docket 222, the defense stated that it agreed with the Court's

15  reading of *Ravich*.  To be sure, the defense noted that it was

16  unaware of a case in which a bank had equivocated about its

17  ability -- before entry of an order of restitution -- to take

18  unilateral action to reduce its losses.  That referred to the

19  question of whether Bank of America, on its own initiative,

20  could seize the $13,477.37 balance in Mr. Teman's personal bank

21  account and apply that $13,477.37 to the shortfall of just

22  under $260,000 that Mr. Teman's deposit of the unauthorized

23  checks in the corporate GateGuard account had left.  This, the

24  defense stated in its May 14 letter, raised "questions about

25  its status as a victim."  I'll address that issue later.

A-2255

9

L79GtemC

1    Nonetheless, as to recusal, the defense, in its May 14 letter,

2    concluded by stating that the defense agreed with the Court

3    that the issue of whether to recuse was left to the Court's

4    good judgment.

5         A month later, the defense did an about-face.  That

6    was in its letter of June 14 at Docket 230 that I discussed

7    earlier.  This was the letter that the defense submitted after

8    the Court's erroneous, and I'm sure to counsel seemingly

9    inexplicable, retraction of the defense's right to submit a

10   reply in support of its motion for vacatur.  Given the timing

11   of this change of position, the recusal motion certainly

12   appears to have been prompted by the Court's mistaken order

13   abruptly denying the right to reply, which until the Court

14   explained the snafu later on June 14, no doubt must have come

15   across to the defense as arbitrary, if not petulant.  The

16   defense expanded on its arguments for recusal in the reply that

17   I authorized.  It was filed on June 21, at Docket 233.  The

18   Government submitted an opposition on June 29.  That is at

19   Docket 237.

20        At the outset, I want to set out the legal standards

21   governing this motion.  All parties agree that this does not

22   raise an issue of mandatory recusal under 28 U.S.C.

23   § 455(b)(4).  That statute applies to situations in which a

24   judge has a financial interest in a party.  Under Advisory

25   Opinion 57 of the Committee on Codes of Conduct of the Judicial

A-2256

L79GtemC

1    Conference, a judge has a financial interest in a party when he

2    or she owns stock in a corporation that has a 10 percent or

3    greater beneficial interest in a party.  On that basis, since

4    August 2019, when it was disclosed that Berkshire Hathaway's

5    stake in Bank of America had come to exceed 10 percent, I have

6    recused myself, and I have not hesitated to recuse myself, from

7    all cases in which Bank of America is a party.  These have

8    included pending cases to which the Court had devoted

9    substantial time.  I'd direct your attention to the *Interest*

10   *Rate Swaps Antitrust Litigation MDL,* 16 MD 2704.  In that case,

11   Bank of America is a party.  Notwithstanding having supervised

12   the MDL for three years, I recused myself on September 6, 2019,

13   promptly after Berkshire's stake in Bank of America crossed the

14   10 percent threshold.  My recusal is reflected in the orders at

15   Docket 842 and 844 in that litigation.

16          Bank of America, however, is not a party to this case.

17   The parties are the United States of America and Ari Teman.

18   Section 455(b)(4), by its plain language, therefore does not

19   apply.  And the Second Circuit has so recognized in *Ravich,*

20   421 F.2d at 1205, which involved the similarly worded

21   predecessor statute.  In upholding the denial of a recusal

22   motion there, based on the Court's stockholding in a victim

23   bank which was not a party, the Circuit stated:  "This was not

24   an action by the Franklin National Bank but a criminal

25   prosecution by the United States."  And I note that the

A-2257

11

L79GtemC

1    defense, in pursuing recusal here, does not contend that

2    § 455(b)(4) applies.

3         The motion here instead arises under 28 U.S.C.

4    § 455(a).  It requires disqualification in any proceeding where

5    the Court's "impartiality might reasonably be questioned."

6    That is the same standard applied in *Ravich*.

7         The standards as to § 455(a) are familiar.  Recusal

8    motions are committed to the district court's discretion.

9    *Apple v. Jewish Hosp. & Med. Ctr.,* 829 F.2d 326, 333 (2d Cir.

10   1987).  A district court applying § 455(a) is governed by

11   standards of objective reasonableness.  The test, the Second

12   Circuit has stated, is whether "an objective, disinterested

13   observer fully informed of the underlying facts, [would]

14   entertain significant doubt that justice would be done absent

15   recusal." *Diamondstone v. Macaluso,* 148 F.3d 113, 121 (2d Cir.

16   1998) (quoting *United States v. Lovaglia,* 954 F.2d 811, 815 (2d

17   Cir. 1992)).  Recusal is usually warranted when a judge has a

18   direct personal or fiduciary interest in the outcome of the

19   case.  See *Liljeberg v. Health Services Acquisition Corp.,* 486

20   U.S. 847, 859-60 (1988); see also *Chase Manhattan Bank v.

21   Affiliated FM Ins. Co.,* 343 F.3d 120, 128 (2d Cir. 2003).  But,

22   as the Second Circuit has repeatedly noted, "[d]isqualification

23   is not required on the basis of remote, contingent, indirect or

24   speculative interests." *Diamondstone,* 148 F.3d at 121 (quoting

25   *United States v. Thompson,* 76 F.3d 442, 451 (2d Cir. 1996));

**A-2258**

L79GtemC

1  see also *In re Drexel Burnham Lambert Inc.,* 861 F.2d 1307, 1313

2  (2d Cir.1988), cert. denied, 490 U.S. 1102 (1989); see also

3  *DeLuca v. Long Island Lighting Co.,* 862 F.2d 427, 428-29 (2d

4  Cir. 1988) (collecting cases).

5       The burden is on the party moving for recusal to make

6  the required showing.  And § 455(a) does not require the

7  district court to accept all allegations by the moving party as

8  true.  See *Lamborn v. Dittmer,* 726 F. Supp. 510, 514, 517

9  (S.D.N.Y. 1989).  Rather, as the Second Circuit has held, "the

10  grounds asserted in a recusal motion must be scrutinized with

11  care." *In re Aguinda,* 241 F.3d 194, 201 (2d Cir. 2001).  And

12  where the moving party has not made a showing sufficient to

13  satisfy § 455(a), a district judge is not to recuse himself or

14  herself unnecessarily.  See id.; see also *Drexel,* 861 F.2d at

15  1313.

16       The Second Circuit reviews a district court's decision

17  to deny a recusal motion for abuse of discretion only,

18  *LoCascio v. United States,* 473 F.3d 493, 495 (2d Cir. 2007),

19  and will rarely disturb a district court's decision not to

20  recuse itself.  *ISC Holding AG v. Nobel Biocare Fin. AG,*

21  688 F.3d 98, 107 (2d Cir. 2012).

22       I have closely considered the recusal motion made in

23  this case.  I have done so with due respect for the fact that

24  the request -- whether client- or counsel-driven -- has been

25  made by counsel whom the Court holds in great esteem.  With

A-2259

13

L79GtemC

1  respect, however, I do not find any basis here on which to find

2  that the Court's impartiality might reasonably be questioned by

3  an objective disinterested observer fully apprised of the

4  relevant facts.

5          First, to the extent that the Court will be called

6  upon at sentencing to set a restitution figure for Bank of

7  America, that determination is entirely mathematical.  The

8  issue is the amount of the loss that the bank absorbed as a

9  result of the fraud found by the jury.  The mathematical

10  process is simple.  The Court must first determine the sum

11  total of the unauthorized checks that the defendant's conduct

12  caused to clear his business account.  As an objective

13  disinterested observer would appreciate, that exercise is

14  mundane and mechanical.  It does not turn on issues of

15  credibility or judgment.  It requires totaling up the checks

16  drawn on the three client accounts that cleared the GateGuard

17  account.  The Court must then subtract the money recovered from

18  the GateGuard account by Bank of America.  That is all there is

19  to the restitution calculation.  It does not require any more

20  than that.

21          And I note that, although there have been a few dips

22  and turns in the road, the sum total, the math as to the bank's

23  loss, measured by the shortfall in the GateGuard account, is

24  today not in any dispute whatsoever.  The presentence report

25  originally calculated a loss of $259,888.17.  The government

A-2260

L79GtemC

1   agreed with that figure.  See Dkt. 174.  So did Mr. Teman.  He

2   did not dispute the PSR's calculation, either to the probation

3   department as reflected in the presentence report or in his

4   sentencing submission, which is at Docket 145, and which I

5   might add was well done and very powerful.  Mr. Teman in fact

6   stated that he was prepared to pay that sum in advance of

7   sentencing.  See Dkt. 176.  As the government's November 30,

8   2020 letter to the Court demonstrated, prior to trial, the

9   Rule 3500 material it supplied to the defense had chronicled

10  mathematically how the government arrived at that net loss

11  figure.

12          Now, the day before the scheduled sentencing, the

13  government submitted a revised and slightly lower loss and

14  restitution figure, to wit, $245,862.95.  The government's

15  November 30 letters reporting this are at Dockets 174 and 177.

16  After sentencing was adjourned, the Court directed the

17  government to submit a letter explaining its restitution and

18  forfeiture calculations in more detail.  The government's

19  letter, as commissioned by the Court, was filed on April 23,

20  2021 and is at Docket 215.  The government explains that the

21  somewhat lower restitution figure, which the government sought

22  on November 30, was attributable to two things:

23          First, the bank no longer was counting as part of its

24  loss $647.85 in fees that it had charged to the GateGuard

25  account.  Subtracting that figure brought the restitution

A-2261

L79GtemC

1   figure to $259,340.32.

2        Second, in late November 2020, the in-house

3   investigator whom it had called as a witness at trial, Karen

4   Finocchiaro, had notified the government that a colleague had

5   notified her that the bank had been able to offset its total

6   loss by the $13,477.37 that remained in Mr. Teman's personal

7   account.  Subtracting that led to the restitution figure the

8   government sought on November 30, of $245,862.95.  In fact,

9   that report to Ms. Finocchiaro proved to be incorrect.  As the

10  government explained in the April 23 letter, the bank had not

11  applied the amount in Mr. Teman's personal account against the

12  loss in the GateGuard account.  And later, in February 2021,

13  the bank had sent Mr. Teman a check for the $13,477.37 balance

14  in the personal account, and Mr. Teman had deposited that

15  check.

16       Therefore, the bank's net loss and the proper

17  restitution figure was $259,340.32.  That deducts from the

18  undisputed figure in the presentence report the $647.85 in

19  fees, period, and nothing further.

20       Critically, there is today no dispute that that is the

21  bank's net loss.  The defense does not argue otherwise.  It is

22  a matter of simple arithmetic.  Whatever dispute there is about

23  whether the bank earlier could have resorted to self-help to

24  apply the funds in Mr. Teman's personal bank account towards

25  the loss is irrelevant to the math, because it is undisputed

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L79GtemC

1    that the bank did not do that and no longer can.  Restitution

2    is mandatory here by statute.  Any judge would have to find

3    $259,340.32 as the restitution figure or be reversed on that

4    point for plain mathematical error.  I further note that there

5    is no authority -- and the defense has cited none -- for the

6    notion that it has floated that a bank that does not maximally

7    utilize its own remedies to collect funds from a defendant has

8    waived its statutory right to restitution.

9            Further, to the extent that by the time of sentencing

10   Mr. Teman has chosen to pay the bank any sum towards the

11   restitution figure of $259,340.32 -- as he had earlier stated

12   he intended to do -- there is no reason to expect that the fact

13   or amount of such a payment towards restitution will be

14   disputed.  The Court will, on request, make a record at

15   sentencing of any such payment.  That will assure that it is

16   credited towards the restitution figure.

17           The bottom line as to recusal is that an objective

18   disinterested observer apprised of these facts would not

19   reasonably question the Court's ability impartially to carry

20   out its duty to enter a restitution order.  Whatever subjective

21   judgments might enter into a restitution calculation in a case

22   involving subtlety, nuance, complexity, or judgment, there is

23   nothing complicated here.  The exercise involves undisputed

24   simple arithmetic.  The defense has not conjured any scenario

25   under which the Court's determination as to restitution would

L79GtemC

1    be other than rote math.

2         I note that in *United States v. Lauerson,* 348 F.3d 329

3    (2d Cir. 2003), the Second Circuit specifically rejected the

4    argument that recusal is required under § 455(a) if the judge

5    or his family has an interest in a nonparty crime victim

6    entitled to restitution.  Instead, the circuit adopted the

7    following test:  "We believe that recusal is required only

8    where the extent of the judge's interest in the crime victim is

9    so substantial, or the amount that the victim might recover as

10   restitution is so substantial, that an objective observer would

11   have a reasonable basis to doubt the judge's impartiality."

12   Id. at 337-38.

13        That test is not met here.  The Court and its family

14   do not hold any stock in Bank of America.  Nor does the Court

15   or its family have any other type of direct relationship to

16   Bank of America.  No member of the Court's family, for example,

17   is employed by Bank of America.

18        The Court's family instead owns stock in Berkshire

19   Hathaway, which holds a stake of slightly over 10 percent in

20   Bank of America.  Berkshire Hathaway, however, is a massive,

21   publicly traded, multinational conglomerate with hundreds of

22   billions of dollars in a wide and diverse array of assets.

23   Berkshire Hathaway's holdings are functionally akin to those of

24   a diversified mutual fund.  The Court's interest in Bank of

25   America here is thus the embodiment of a remote and indirect

A-2264

L79GtemC

1    interest.

2         And as I noted before, the Court's task here -- to the

3    extent that it may bear on the fortunes of Bank of America --

4    involves a rote mathematical exercise whose inputs and bottom

5    line are not factually disputed.  I find that an objective

6    observer apprised of all these facts would not entertain

7    significant doubt whether justice will be done by my continuing

8    service.

9         Furthermore, as a reasonable observer would also

10   appreciate, the modest size of the restitution award that any

11   judge would be required to enter does not have any capacity to

12   alter Bank of America's fortunes or its stock price, let alone

13   those of Berkshire Hathaway.

14        Counsel, I have thought carefully about this.  I

15   respect the defense's right to make this motion.  But I

16   emphatically reject that § 455(a) mandates recusal here, as

17   indeed the defense itself initially expressly acknowledged.

18   There is nothing about the fact that a judge's family owns

19   stock in a company whose varied assets include a slightly over

20   10 percent stake in Bank of America that would reasonably cause

21   a judge's impartiality to be questioned in entering, as is

22   mandatory, the restitution award here.  That would be so even

23   if there were a bona fide factual dispute about the precise

24   amount of the shortfall experienced by Bank of America.  It is

25   all the more clear where the calculation is not in dispute.

**A-2265**

L79GtemC

1        Now, there is a second dimension to the recusal

2   motion.  Presumably because the defense had previously

3   acknowledged that the Court's recusal was not required by its

4   duty to implement restitution, when the defense shifted gear on

5   June 11 to now seek recusal -- presumably agitated by the

6   Court's denial of the right to reply -- it made a new argument.

7   It argues that the defense's motion to vacate Mr. Teman's

8   conviction calls into question the integrity of Bank of America

9   itself.

10        Specifically, the defense suggests that the one Bank

11   of America witness who testified at trial, Karen Finocchiaro,

12   may have been disingenuous, insofar as she attested to her

13   understanding that the bank did not have the authority to apply

14   funds towards the deficit caused by the clearing of the

15   unauthorized checks in his GateGuard account.  In fact, the

16   defense posits, the bank may have had some authority to do so,

17   at least as to the $13,000 or so in Mr. Teman's personal

18   account.  On this basis, the defense declares Ms. Finocchiaro,

19   and derivatively Bank of America, may be "complicit in hiding

20   the truth in a federal criminal case."  Therefore, the defense

21   states, the "conduct and state of mind" of Bank of America

22   itself "are at the heart of questions raised in Mr. Teman's

23   motion" to vacate presenting a different basis for recusal.

24   Docket 230 at Page 2.

25        As to this argument, the legal precepts that the Court

L79GtemC

1    must view the recusal question from the perspective of an

2    objective observer fully informed about the relevant facts --

3    meaning here the trial record -- and without credulously

4    accepting factual claims made by the moving party, come very

5    much into play.

6            If the task before the Court genuinely implicated Bank

7    of America's integrity or its possible complicity in a scheme

8    to obstruct justice, as the defense imagines, there of course

9    would be a substantial argument for recusal.  But the Court is

10   not required to take that claim at face value.

11           I find the defense argument that this case involves

12   complicity by Ms. Finocchiaro and through her Bank of America

13   to be completely and utterly contrived.  Instead, this claim

14   and the defense's characterization of its motion for vacatur as

15   implicating the bank's integrity is transparently being made at

16   this point to support the defense's changed position on

17   recusal.  I note that the defense's motion to vacate the

18   conviction was made before the Court back on April 28.  And

19   according to the defense, it had investigated this motion at

20   length beforehand, and it had fronted the motion in discussions

21   with the prosecution.  And yet on May 14, the defense agreed

22   that recusal was not required.  It was not until June 14, in

23   the wake of the Court's errant order of June 11 at Docket 229

24   that briefly retracted the defense right to file a reply, that

25   the defense reformulated its motion as implicating the bank's

A-2267

L79GtemC

1    integrity and on that basis sought the Court's recusal.

2         I understand and respect the argument in the defense

3    motion for vacatur that the government engaged in misconduct.

4    The defense argues that the government elicited testimony from

5    Ms. Finocchiaro that was expert in nature, despite her being a

6    lay witness, and that the government made an improper statement

7    in summation that Mr. Teman's fraudulent intent could be

8    inferred from his transfers of funds out of the GateGuard

9    account into accounts of his that the bank could not reach.

10   I'll address those arguments with care later when I address the

11   motion to vacate.

12        But the defense's 11th-hour suggestion that

13   Ms. Finocchiaro or the bank did something corrupt here is

14   completely without foundation.  That would be immediately

15   apparent from an observer who sat through the trial, which did

16   not include present defense counsel.

17        The content of Ms. Finocchiaro's testimony was as

18   advertised in the 3500 material.  It was unobjected to at

19   trial.  Indeed, her testimony was close to a complete nonevent

20   at trial.  As trial counsel were well aware -- and as new

21   defense counsel will surely become aware, if they are not

22   already, based on a close review of the trial record -- the

23   disputed issue at trial instead pitted Mr. Teman against his

24   three sets of customers.  It did not pit him against the bank.

25   The issue was whether the customers were credible in each

A-2268

L79GtemC

1    claiming not to have authorized Mr. Teman to draw the large

2    sums he did against their accounts for purported amounts due

3    his companies, which they denied were due.  The bank was merely

4    the recipient of those checks.  The central issues at trial

5    were whether the checks to pay those purported debts were

6    unauthorized, and, if so, whether Mr. Teman acted with intent

7    to defraud in representing to the bank that he had the

8    customers' authorization.

9          Bank of America generally and Ms. Finocchiaro

10    specifically did not have any evidence to offer about that.

11    Ms. Finocchiaro was instead an investigator whose role

12    concerned events after the checks' presentation.  As the trial

13    transcript reflects, she testified about mechanical matters

14    involving the clearance and charge-back processes at the bank.

15    She also testified about matters bearing on venue.

16          At the very most, as the government points out,

17    Ms. Finocchiaro's testimony contained what at one point after

18    trial briefly loomed as a potential, albeit minor, factual

19    error.  At trial, she testified that the bank could not apply

20    funds from Mr. Teman's other accounts to cover the shortfall in

21    his corporate GateGuard account.  After trial, shortly before

22    the sentencing hearing scheduled for December 1, however, she

23    told the government, in connection with its submission on

24    restitution, that she had been told that the bank had, after

25    trial, been able to offset $13,477.37 of its loss by applying

A-2269

L79GtemC

1    that balance in Mr. Teman's personal account towards the

2    GateGuard deficit.  However, that ultimately proved factually

3    incorrect.  And the undisputed evidence today is that funds

4    were returned to Mr. Teman and deposited by him so as not to be

5    recoverable today by the bank, regardless of any authority it

6    may or may not have once had to tap his personal account.

7         There is no factual basis, zero, nada for the

8    defense's theory that Ms. Finocchiaro may have done something

9    underhanded, corrupt, or dishonest, or hid the truth, in

10   connection with the investigation or trial.  There is no

11   factual basis for the defense's overheated suggestion that

12   Ms. Finocchiaro's supervisors at the bank sent her forward to

13   deceive the Court and jury to the effect that it lacked power

14   unilaterally to seize $13,477.37 from Mr. Teman's personal bank

15   account.  There is no factual basis for the defense's

16   conspiracy theory that Ms. Finocchiaro colluded with the United

17   States Attorney's office for the Southern District of New York

18   to present such a falsehood to the jury.  The suggestion

19   borders on the defamatory.

20        And the conspiracy within or beyond the bank that the

21   defense imagines to conceal the bank's ability to seize the

22   funds in Mr. Teman's personal account would not have had any

23   logical or coherent purpose.  Even had the bank had that

24   authority and failed to use it, Mr. Teman would still have owed

25   the bank over $245,000.  And even if the bank had the authority

A-2270

24

L79GtemC

1   to seize the money in Mr. Teman's non-GateGuard corporate

2   accounts -- a point as to which the defense does not claim a

3   conspiracy by Ms. Finocchiaro or the bank to conceal --

4   Mr. Teman would still have owed the bank some $150,000.

5   Assuming that Bank of America was as invested in the

6   government's ability to prove its case against Mr. Teman as the

7   defense imagines, evidence that the bank had the ability to

8   seize the $13,000 or so in Mr. Teman's personal bank account

9   would not have moved the needle one bit at trial.

10          The defense, in pursuing recusal, appears to imagine a

11  circumstance in which a court would have good cause to

12  commission a factual hearing into Ms. Finocchiaro's or Bank of

13  America's integrity.  On the record before the Court there is

14  no conceivable basis whatsoever for this bid.  And there is no

15  charter for undertaking such an evidentiary hearing.  The claim

16  is frivolous.  It is one thing to argue that the prosecution

17  erred in its pretrial description of testimony or its closing

18  argument.  It is quite another, counsel, to conjure a fanciful

19  Oliver Stone like scenario in which the bank, whose role

20  consisted of clearing the checks at issue and having its

21  custodial witness attest at trial to the clearing and

22  charge-back process did something conniving and corrupt to

23  secure the defendant's conviction.

24          An objective observer fully apprised of the record in

25  this case would not treat as even remotely serious the defense

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-2271

L79GtemC

1  theory of misconduct and/or conspiracy by Ms. Finocchiaro and

2  her employer, the bank.

3       The defense's extension of its theory of prosecutorial

4  error to now suggest complicity and corruption by the bank is

5  instead, with respect, a transparent attempt to jerry-rig the

6  Court's removal from the case.  I will not permit that.

7  §455(a) does not require a Court to remove itself based on

8  baseless claims by counsel for which there is no factual

9  predicate.  On the contrary, the case law is that a judge

10  should resist strategic but baseless ploys to secure his or her

11  removal.

12       Here, I note that the defense does not claim that the

13  Court was at any earlier point in this case required to recuse.

14  Indeed, as I said, the defense took the opposite position a

15  month ago.  Its claim is that recusal is instead now required

16  by the defense's post-conviction motion insofar as that motion

17  implicates the bank's reputational interests and interest in

18  not being exposed as complicit in misconduct.  But a defendant

19  cannot fabricate a bogus claim of corporate misconduct and on

20  that basis secure the removal of the judge who presided over

21  trial and all other proceedings in the case and is deeply

22  familiar with it.  And a system that enabled that would lead to

23  madness.  Here, a reasonable and fully informed objective

24  observer would put aside the aspect of the defense's post-trial

25  motion that imagines corruption by the bank and would not have

26

L79GtemC

1   any reason to question the Court's ability to be impartial in

2   resolving the balance of the defense's post-trial motion, which

3   claims prosecutorial error or misconduct.

4          I therefore deny the motion to recuse based on

5   § 455(a).

6          Now, before leaving the issue of recusal, I want to

7   add this. I note that no counsel has claimed that the Court is

8   or has been partial, biased, or prejudiced toward any party.

9   Had any of those been true, of course, that would have supplied

10  an independent basis for recusal under 28 U.S.C. § 455(b)(1).

11         I am glad and unsurprised that no such claim has been

12  made. I take very, very seriously my obligation to do my job

13  with rigor and objectivity. I have been on the bench for

14  nearly 10 years. With the possible exception of a pro se

15  litigant or two, I do not believe I have once -- before the

16  motion in this case made on June 14 -- had a party seek my

17  recusal. And I try to be rigorous about ethical matters. From

18  time to time, I will recuse on my own. I do so either because

19  a statute so requires, as in the *Interest Rate Swaps MDL,* or

20  because the nature or extent of my association with a lawyer or

21  law firm, and/or a party is such that good judgment counsels

22  recusal in the interest of appearance.

23         I also try to be fulsome in disclosing associations I

24  have with counsel or the parties. That is to vest counsel with

25  full information in case somebody wishes to pursue recusal. I

A-2273

27

L79GtemC

1   have done that in this case, including in making the disclosure

2   I made at the December 1 hearing regarding my limited dealings

3   with Mr. Biale of the Sher Tremonte firm.  I will have another

4   such disclosure to make in a few minutes with respect to one of

5   the defense counsel who has newly appeared.

6           The bottom line is that I try to be punctilious in my

7   stewardship of cases, including this one.  I take pride in

8   resolving the issues presented to me with impartiality and

9   rigor and letting the chips fall where they may.

10          I assume here that in choosing to make this motion,

11  Mr. Teman -- or conceivably his counsel -- made the judgment

12  that his interest would be better served with a different

13  judge.  Conceivably, Mr. Teman viewed with disfavor this

14  Court's having denied his post-trial motions under Rules 29 and

15  33 or this Court's statement at the December 1 hearing that it

16  did not then perceive any substantial appellate issues within

17  the meaning of *United States v. Randell,* 761 F.2d 122 (2d Cir.

18  1985), so as to support release on bail pending appeal.  Or

19  conceivably, the view is that a judge who did not have

20  firsthand familiarity with the trial evidence, including

21  evidence that cast Mr. Teman in an unflattering light, such as

22  his communications indicating that he would exploit the

23  religious observance of his Orthodox Jewish customers in timing

24  his deposits of remotely created checks, would assign less

25  weight to the offense and more weight to mitigating factors

L79GtemC

1   related to Mr. Teman personally.

2            To that, I offer only this.  A fair reading of the

3   pretrial and trial record is that the Court has been rigorous

4   with respect to both sides.  I have indeed appraised with care

5   the defense's pretrial, trial, and post-trial arguments.  But I

6   have also been rigorous with the government.

7            Among many examples, I found a speedy trial act

8   violation by the prosecution requiring the pretrial dismissal

9   of a count.  I told the Government in no uncertain terms that I

10  viewed Counts Five and Six of the superseding indictment as

11  unusually ill-conceived, which led the government to

12  voluntarily dismiss those counts on the eve of trial.  As

13  Mr. Gutwillig surely recalls, I was tough on him at early

14  pretrial conferences when I perceived the government's level of

15  preparedness and analysis to be short of my expectations of

16  counsel.  And as Mr. Bhatia surely recalls, I was tough on him

17  for needlessly making factual filings relating to restitution

18  and forfeiture within 24 hours of the December 1 sentencing

19  hearing.  And after the jury returned the guilty verdict, as

20  I'm sure Mr. Teman recalls, I denied the government's

21  application for remand.  Given what happened with public health

22  in the fifteen months since, that was quite a consequential

23  ruling.

24           More broadly, as the pretrial, trial and post-trial

25  record reflects, I have been rigorous in attempting to assure

L79GtemC

1   that Mr. Teman's rights have been protected throughout this

2   proceeding.  These included at our most recent hearing, back on

3   December 1, by raising the Curcio issue with respect to

4   Mr. Biale that somehow had been missed by counsel on both

5   sides.  At that hearing, I also invited defense counsel to

6   liberally seek adjournment of the sentencing to assure that

7   Mr. Teman would not face potential incarceration during the

8   peak of the pandemic, before vaccinations took hold.

9          And defense counsel, as to sentencing in particular,

10  you would be making a bad mistake to assume that the Court at

11  sentencing would give short shrift to mitigating circumstances

12  relating to Mr. Teman.  I try at every sentencing to give

13  careful attention to the defendant's history and

14  characteristics.  Defense counsel have had cases with me and

15  know this well.  In this case, I was prepared for sentencing

16  back on December 1 and I know well the sentencing record.  For

17  now, it suffices for me to say that there are deeply impressive

18  aspects of Mr. Teman's life, including his charitable deeds,

19  and deeply mitigating aspects of his struggles, as reported to

20  the Court by, among others, his parents.  If counsel believe I

21  would not give appropriate weight to mitigating considerations

22  such as these, you do not know me.

23          That ends my discussion of the second issue, the

24  defense's recusal motion.

25          Third, I want to put on the record a disclosure with

L79GtemC

1    respect to Ms. Kellman now that she has entered the case.  This

2    is really for the Government's benefit -- in an excess of

3    caution -- akin to the disclosure I made on December 1 about

4    Mr. Biale.

5         Ms. Kellman and I have not worked or socialized

6    together.  However, on March 2 of this year, 2021, I wrote and

7    submitted a lengthy letter to the Honorable Judge Carl E.

8    Stewart, in his capacity as the head of the awards committee of

9    the American Inns of Court.  My letter nominated and supported

10   the nomination of Ms. Kellman for the American Inns of Court

11   Professionalism Award.  It is essentially a lifetime

12   achievement award honoring exceptional professionalism.

13        I submitted the letter on my own behalf, but also in

14   coordination with the then-Chief Judge of this District.  She

15   was aware of my esteem for Ms. Kellman based on, among others,

16   a 12-week trial before me back in 2014.  She wanted to make

17   sure that the Southern District had weighed in in support of

18   Ms. Kellman via the judge -- me -- who had the greatest

19   familiarity with her work.  I was delighted to do that.

20        I do not want to make Ms. Kellman blush or to take up

21   too much with this point, so I will read only a few excerpts of

22   the letter.  But these should suffice to give counsel its

23   flavor.  I am sharing these on the premise that the letter

24   either is already public or, if my words are heeded by the

25   awards committee, as they should, that it one day will be.

L79GtemC

1        "I am in my 10th year on the bench in the Southern

2    District of New York.  Ms. Kellman has appeared before me

3    often.  Most dramatically during a 12-week, 3-defendant,

4    5-murder gang racketeering trial in fall 2014, but also in a

5    high-profile terrorism case and a difficult sex-trafficking

6    case.  I have not had a better trial lawyer appear before me.

7    And she is in that small circle of lawyers whose appearances I

8    look forward to most, because I know she always brings her

9    best, which means fierce advocacy, intense preparation, and

10    profound wisdom, leavened by humor, warmth, decency and

11    perspective.

12        "Outside the trial context, Ms. Kellman shows a

13    dedication to clients that is exceptional even by the standards

14    of this district.  She aspires to understand deeply her

15    client's journey.  And her detailed, thoughtful, empirical

16    sentencing submissions show the depth and subtlety of her

17    knowledge of them.  Her task, there and in her oral

18    presentations, is to communicate that understanding, not by

19    pontificating or hectoring, but by transmitting facts and

20    context in a credible manner that engages the listener at a

21    deep level.

22        "On a personal level, I wish I knew Ms. Kellman

23    better.  The judicial role is limiting in that way.  But I have

24    seen enough to know that her character and integrity are

25    sterling.  I see her at CLE panels and similar events hungry,

A-2278

L79GtemC

1   deep into her career, to learn: whether about individual

2   judges' approaches towards sentencing, about best practices for

3   representing juveniles faced with motions for transfer to adult

4   prosecution, or anything else to enhance her representations.

5   I know too that her reputation in the legal community is

6   first-rate.  She is universally regarded as a star of the New

7   York City defense bar, not just for her courtroom skills, but

8   for her dedication and decency and honor.  She is, in sum, a

9   mensch.

10          "I strongly commend Ms. Kellman to you for the

11  American Inns of Court Professionalism Award.  It is richly

12  deserved."

13          Therein end the excerpts.  The balance of the letter

14  is in accord.  So, Mr. Teman, you are in good hands.

15          Government, I am confident that my having outed myself

16  in writing as a member of the Kellman fan club does not in any

17  way prevent me from being fair in this case.  Nonetheless,

18  there it is, in the interest of full disclosure, I put that

19  disclosure out there.

20          Government, may I safely assume that you do not oppose

21  my continued service on this case?

22          MR. GUTWILLIG:  Of course not.

23          THE COURT:  Ms. Kellman, for the record, you can move

24  for my recusal all you want.  I still stand by what I wrote

25  about you.

A-2279

L79GtemC

1      Let's move to the fourth issue, which is also in the

2   nature of housekeeping.

3      At the December 1, 2020 hearing, after the issue about

4   Mr. Biale arose, Mr. Teman spoke at some length.  One thing he

5   raised were *Brady* issues.  I've resolved *Brady* claims raised by

6   the defense both in the initial round of post-trial motions

7   that I decided in the decision issued on June 5, 2020, and by

8   an order I issued after Mr. Biale raised *Brady* issues in the

9   weeks before the December 1 hearing.  But putting *Brady* issues

10  aside, Mr. Teman also protested the fact that, as he put it,

11  "my defense counsel was married to the opposing team," citing

12  Docket 182 at Page 36.  And he expressed concern that

13  privileged information he provided to his counsel had been

14  shared with the government, or as he put it, "funneled to

15  people we've accused over and over of cheating."  Id. at 32.

16      I want to follow up on that.  As I pointed out at the

17  December 1 hearing, Mr. Biale was first retained after trial,

18  and indeed after the defense's post-trial motions had been

19  filed, so whatever concerns Mr. Teman has about his then

20  counsel being married to a colleague of Mr. Bhatia's, it could

21  not have affected the trial.  Nonetheless, defense counsel, as

22  to the post-trial period, your client has made a claim of

23  prosecutorial misconduct along the lines that there was a spy

24  in the defense camp sharing information with the government.  I

25  want to make sure that before we proceed to sentencing, which

A-2280

34

L79GtemC

1   we will imminently, there is full record as to this.  If there

2   is a claim to be raised along these lines, I want it raised

3   now, not in a later § 2255 petition.  So is that form of

4   prosecutorial and defense misconduct claim that the defense

5   intends to pursue?  Is there any request for any fact finding

6   as to this allegation by Mr. Teman?

7            MS. KELLMAN:  Your Honor, I think it's something

8   Mr. Frisch and I would like to discuss.  If you want an answer,

9   we would like a brief recess.

10           THE COURT:  I was in fact going to take a recess right

11  now because we have been at this for a long time and the final

12  portion of my ruling is the lengthiest on the motion to vacate.

13  Why don't we take a ten-minute recess.  I think I have an

14  expectation of what the answer to this question is likely to

15  be.  I'm simply trying to address it now so that we don't have

16  an unresolved motion out there for 2255.

17           MS. KELLMAN:  I understand.

18           THE COURT:  See you then.

19           MS. KELLMAN:  Thank you, Judge.

20           (Recess)

21           THE COURT:  We have taken a brief adjournment.

22  Counsel have had time with their client.  Ms. Kellman,

23  Mr. Frisch, are you pursuing the claim of misconduct based on

24  the theory that Mr. Biale was a spy in the defense camp?

25           MS. KELLMAN:  Your Honor, I think that is something

**A-2281**

L79GtemC

1    that I know that our client is very concerned about. And there

2    are a number of facts that haven't been put on the record,

3    because we didn't need to be putting them on the record, and

4    then things that we have to put on the record at the moment,

5    but there are a number of disclosures that he believes were

6    made in a way that should have been pursued and were not

7    pursued. I will say one of the things that causes the concern

8    as much as it does is, apparently, the GateGuard equipment has

9    been used by NYPD and continues to be used by NYPD in

10   investigations that are apparently being led by Margaret

11   Graham, and those are things we have not had an opportunity to

12   look into.

13          THE COURT: Ms. Kellman, the salient point I think

14   here is the matter of the calendar, which is that unless

15   there's something that I'm missing here, the Sher Tremonte firm

16   was involved in this case, including the representation of your

17   client, for a period of time after trial and after the denial

18   of the post-trial motions. They essentially made a *Brady*

19   motion that I denied and they submitted top-flight sentencing

20   submissions, I believe, in conjunction with trial counsel,

21   period, full stop. The issue is whether there's any

22   consequence to whatever your concern is here. Is there some

23   way that Mr. Teman's interests in connection with the

24   prosecution and sentencing in this case are adversely affected?

25          MS. KELLMAN: I think, Judge, we did raise in our

A-2282

L79GtemC

1  papers with respect to the main issue here, and that is

2  Mr. Bhatia's role as between the bank investigator and his --

3         THE COURT:  Sorry, we're going to get to the vacatur

4  motion in a bit.  I'm focusing you on -- and I really need you

5  to be objective and not simply make any accusation your client

6  makes -- okay?

7         MS. KELLMAN:  Understood, Judge.

8         THE COURT:  I need you to be rigorous and objective

9  here.  Let's start with the conviction.  Is there some

10 nonfrivolous claim that the fact that Mr. Biale is married to

11 Ms. Graham affected the conviction in this case?  As a matter

12 of timing, I do not --

13        MS. KELLMAN:  No.

14        THE COURT:  It could not have been, right.

15        Is there some theory in which information that the

16 government has brought to bear at sentencing -- because the

17 letter seems to have tracked the trial record and commented on

18 the defense sentencing submission, nothing more than that -- is

19 there some way in which the government's sentencing advocacy

20 can credibly be argued to be affected by the marital

21 relationship between Mr. Biale and Ms. Graham?

22        MS. KELLMAN:  No.

23        THE COURT:  Is there anything that was unsaid in the

24 defense sentencing submission that you contend was unsaid

25 because of something about that relationship?  I read that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-2283

L79GtemC

1    sentencing submission, by the way, as largely the work of the

2    superb trial lawyers Mr. Teman had.  Is there something about

3    that that was corrupted?

4            MS. KELLMAN:  No, your Honor.

5            THE COURT:  So give me something that is concrete,

6    given that the next task in this case is sentencing, that was

7    affected by the relationship between Mr. Biale and Ms. Graham.

8    Otherwise, I am led to think that they are just the latest --

9    and you and Mr. Frisch will eventually join the list -- of

10   people whom your client attacks because things don't go well.

11   And sooner or later, a judge has to critically analyze the

12   question and ask is there any there there?  So is there any

13   there there?

14           MS. KELLMAN:  As I said, before we took the break,

15   Judge, it's a serious question.  And Mr. Frisch and I view it

16   as a very serious question, and not one we think we feel

17   comfortable answering without having some opportunity --

18           THE COURT:  It's only been eight months.

19           MS. KELLMAN:  And we focused on many, many things, as

20   your Honor can see.  We practically digested the record to a

21   point where I'm ready to give it back.  We have looked at every

22   aspect.  We haven't really taken this aspect to the extent that

23   we needed to.  I think we did raise with the Court, to the

24   extent that we thought appropriate, misconduct by the

25   government, government counsel.

A-2284

L79GtemC

1          THE COURT:  We're going to get to that.  But none of

2     that -- keep in mind -- literally none of that has anything to

3     do with the sentencing, period.  That is all a claim of trial

4     conduct.  I'm going to get to that in a few minutes.  But you

5     have not said anything about what the government allegedly did

6     in this case, let alone did to prejudice Mr. Teman, after

7     Mr. Biale was retained.  And so cause and effect, here.  I

8     mean, Mr. Teman may be upset that Mr. Biale and his law partner

9     didn't disclose his marital relationship to Ms. Graham, that

10    should have been disclosed, an obvious Curcio issue.  The

11    government should have caught it too, because Ms. Bhatia

12    acknowledged the awareness that Ms. Graham is married to

13    Mr. Biale.  But it looks like it was a failure to disclose on

14    both sides with zero consequence, given that Mr. Teman fired

15    Mr. Biale and his firm on the spot.  And I'm simply trying to

16    avoid this coming up in the inevitable 2255 by asking you here

17    and now if there's any there there.  Why don't we do this, by

18    the end of Monday, if you intend to pursue this in any way, I

19    want a sworn declaration from counsel concretely identifying

20    what in the defense's view has been corrupted by the brief

21    journey that Mr. Biale had as the lawyer for Mr. Teman while

22    married to Ms. Graham.

23          MS. KELLMAN:  Very good.

24          THE COURT:  I don't know that we can go any farther

25    than that.  We're going to move very soon thereafter to

**A-2285**

L79GtemC

1    sentencing.  So you need to focus on that now.  If it isn't

2    obvious, I will just state that, on the one hand, I respect

3    Mr. Teman's frustration of having retained an attorney who

4    didn't make that disclosure and the frustration with the

5    government for not having caught the Curcio issue either, at

6    the same time, it is utterly opaque to me what consequence any

7    of that turned out to have.

8                MS. KELLMAN:  Understood.

9                THE COURT:  So let's move then to the fifth and final

10   topic.  And it is Mr. Teman's most recent motion under Rule 33

11   for vacatur of his conviction or a new trial.  In its lengthy

12   decision issued on June 5, 2020, at Docket 138, the Court

13   denied Mr. Teman's first two rounds of motions under Rule 33.

14   Mr. Teman's third such motion implicates two areas of conduct

15   at trial, both relating to Bank of America's ability to cover

16   its losses in the GateGuard account by drawing from other

17   accounts associated with Mr. Teman.

18               The first area of conduct is the government's having

19   elicited testimony from Ms. Finocchiaro at trial regarding Bank

20   of America's inability to cover its losses.  The second is the

21   government's comment in rebuttal summation about what

22   Mr. Teman's transfer of funds out of the GateGuard account,

23   promptly after their deposit, says about whether he had

24   fraudulent intent.

25               I will address those in order.  At the outset, I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-2286

L79GtemC

1    incorporate by reference the governing standards under Rule 33.

2    These are set out on Page 16 of the decision at Docket 138 and

3    at Pages 5-6 of the government's opposition letter at

4    Docket 225.  In brief, the defendant bears the burden on a

5    Rule 33 motion.  To prevail, such a motion must establish that

6    allowing the verdict to stand would be a "manifest injustice."

7    Granting a new trial under Rule 33 is to be done sparingly and

8    under the most extraordinary circumstances.

9            Now, as to the trial testimony of Ms. Finocchiaro, in

10   the pertinent part, at Pages 234-236, she attested to the

11   "charge-back process" that the bank used after determining that

12   the checks had not been authorized.  She attested that the bank

13   was obliged to return the proceeds of the fraudulent checks

14   from the GateGuard account back to the originating banks.  The

15   29 unauthorized checks deposited into Mr. Teman's GateGuard

16   account had totaled $330,000.  In the charge-back process, the

17   bank drew the remaining available funds from the GateGuard

18   account, but these left the account with a negative balance of

19   just about $260,000.  And that's how much the bank still owed

20   the originating banks: $260,000.  The bank used its money to

21   repay that balance.

22           Ms. Finocchiaro explained the limits on the bank's

23   ability to offset its losses by drawing from other accounts

24   associated with Mr. Teman.  She testified that the bank did not

25   have the right to offset its losses by transferring funds from

A-2287

L79GtemC

1   another bank account where that account had a different tax

2   identification number from the account that had a negative

3   balance.  She testified:  "We do not have the right to offset

4   when the tax identification number is different from one entity

5   to the other."  She added:  "We cannot offset our loss when it

6   is a different tax identification number."  Because Mr. Teman's

7   corporate accounts, known as Friend of Fraud and Touchless

8   Labs, and his personal account had different tax ID numbers

9   from the GateGuard account, she testified, the bank had not

10  been able to take the funds in those accounts and apply them to

11  the deficit in the GateGuard account.  She testified that

12  checks for the balances in those three accounts had been mailed

13  to Mr. Teman.  She testified that the checks initially came

14  back uncashed.  Although not part of the trial testimony, we

15  learned later, it is undisputed that after trial, in

16  February 2020, checks for the balances in these accounts were

17  again sent to Mr. Teman.  This time, they were cashed.

18          So Ms. Finocchiaro's testimony presents several

19  issues, which emerged over the course of the defense's letters

20  in support of its latest Rule 33 motion.

21          The first issue presented is whether there was notice

22  of this testimony given to the defense.  The answer is that

23  there clearly was such notice.  The 3500 material for

24  Ms. Finocchiaro chronicled how the bank's net loss of

25  $259,988.17 had been tabulated.  The 3500 material also stated,

L79GtemC

1    without qualification, that the bank had been "unable to

2    recover the loss" in the GateGuard account by seizing funds in

3    Mr. Teman's other accounts.  This was independently clear from

4    the fact that the bank, prior to trial, had mailed checks to

5    Mr. Teman for the balances in all these accounts, the personal

6    account as well as the corporate accounts.  It is clear that

7    this testimony came as no surprise to Mr. Teman's trial

8    counsel.  Throughout trial, they were enterprising and

9    energetic and excellent.  They did not, however, object to

10   Ms. Finocchiaro's testimony along these lines.  Nor did they

11   claim that any part of it was a surprise.

12          The second issue presented is whether

13   Ms. Finocchiaro's testimony was inaccurate as to one distinct

14   factual point, and, relatedly, whether there was a *Brady*

15   violation to the extent that the government did not disclose

16   its purported awareness of this purported inaccuracy.

17   Specifically, Mr. Teman's new counsel urge that, contrary to

18   Ms. Finocchiaro's trial testimony, at the time of trial, the

19   bank may have then believed it could apply the $13,477.37 in

20   Mr. Teman's personal account toward the net loss caused by the

21   fraudulent deposit of funds into the GateGuard account.  If so,

22   the net loss to the bank would have been a bit north of

23   $246,000, as opposed to a bit north of $259,000, as presented

24   at trial.

25          In its final letter, at Docket 233, the defense

L79GtemC

1  declares that the bank may have believed at the time of trial

2  that it could reach the balance in the personal account.  For

3  this proposition, the defense notes two things.  The first is

4  that, some ten months later, on November 30, 2020, the day

5  before the initially scheduled sentencing, Ms. Finocchiaro told

6  the government that a colleague had recently told her that the

7  bank had in fact applied the funds in Mr. Teman's personal

8  account to the loss in the GateGuard account.  That of course

9  proved inaccurate.  The records of the bank show that there is

10  no evidence that the bank ever did so.  Ms. Finocchiaro's

11  having related this inaccuracy in late November to the

12  government does not say anything about her state of mind or

13  knowledge as of the time of trial.  And she -- not some unnamed

14  other employee at the bank -- was the trial witness.  She was

15  the investigator assigned to Mr. Teman's case.  There is no

16  indication whatsoever that she believed anything other than

17  that to which she testified, let alone that the government was

18  aware at the time of trial of any such contrary belief on her

19  part.  Nor, for whatever relevance it might have, is there any

20  indication that any other person at the bank, as of the time of

21  trial, believed that the bank could apply the funds in

22  Mr. Teman's personal account to its loss.  On the contrary, the

23  undisputed facts are instead that the bank had not done so and

24  that the bank instead, both before and after trial, sent the

25  balance in the personal account by check to Mr. Teman, along

A-2290

44

L79GtemC

1   with the balances in the corporate accounts.

2          The second argument the defense makes is that the

3   formulations in the government's letters and Ms. Finocchiaro's

4   post-trial affidavit subtly suggest that all along, the bank

5   and the government realized that the bank could reach the

6   personal account, yet hid this fact from the defense, the

7   Court, and the jury.  In this vein, for example, the defense

8   notes the statement in Ms. Finocchiaro's affidavit to the

9   effect that the bank "is" unable to offset its losses.  As an

10  aside, I would note, the defense is arguing about what the

11  meaning of "is" is.  From this prose, the defense derives the

12  negative implication that earlier she believed that the bank

13  had been able to do so.  Otherwise, the defense posits,

14  Ms. Finocchiaro, if a grammatic perfectionist, should have

15  said, instead of "is," "is and was" or words to that effect.

16         This is far too slender a reed on to which to hang the

17  defense's heavy accusations which are against Ms. Finocchiaro

18  for knowingly misleading the Court and against the government

19  for complicity in her false testimony.  The evidence the

20  defense recites does not come remotely close to sustaining that

21  weight.  Again, there is literally no evidence that

22  Ms. Finocchiaro had the view at the time of her testimony that

23  the bank could reach the funds in the personal account.  There

24  is no evidence that others at the bank held a different view at

25  the time of trial, let alone that Ms. Finocchiaro was aware of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-2291

L79GtemC

1    this.  And there is no evidence that the bank at any time,

2    before or even after trial, so much as tried to apply the funds

3    in the Teman personal account to its loss in the GateGuard

4    account.  Tellingly, in making this argument, the defense does

5    not contend that the tax ID number for the GateGuard account

6    was the same as the tax ID number on Mr. Teman's personal

7    account.  And that, according to Ms. Finocchiaro's unimpeached

8    testimony, was the criterion on which its inability to seize

9    the funds in the personal account turned.  Tellingly, too, in

10    contravention of what the defense imagines, both before and

11    after trial, the bank -- as I mentioned several times -- far

12    from trying to tap the balance of the personal account, twice

13    sent the money in that account and the corporate accounts back

14    to Mr. Teman.

15        Now, the defense's letter on this point has an

16    extended digression into *Brady.*  It notes that the Court, in

17    compliance with new Federal Rule of Criminal Procedure 5(f)

18    adopted in late October 2020, put on the record its required

19    admonition to the government about its obligations under *Brady*

20    and its progeny.  And by the way, I did that, as required in

21    every case.  The defense letter notes that there have been

22    *Brady* violations claimed or found in several other cases in

23    this District.

24        This rhetoric is all fine and good.  This court takes

25    *Brady* very seriously, as well as my colleagues.  But more is

L79GtemC

1   needed to show a *Brady* violation than citing the standard and

2   noting findings of noncompliance in isolated other cases.   In

3   the cases on which the defense relies, the district courts were

4   presented with concrete evidence in support of the claimed

5   violation, such as, in the case before Judge Nathan, the late

6   production during trial of a document in the government's

7   custody but withheld that the defense contended was

8   exculpatory.   There is nothing of that sort here.   And this is

9   not by any means the first claim that Mr. Teman has made of a

10  *Brady* violation in this case or, for that matter, of a broad

11  ranging conspiracy to undermine his interests.   Mr. Teman has

12  repeatedly made such claims through both prior sets of lawyers.

13  The previous claims had to do with Mr. Teman's true antagonists

14  in the case, which were not the bank, but his three sets of

15  customers.   These independent sets of customers attested that

16  they had not authorized the fees he took for himself via the 29

17  checks, a number of which vastly outstripped the aggregate

18  charges the customer had paid for GateGuard's services.   They

19  also attested that they had not authorized Mr. Teman to write

20  remote checks on their accounts for these amounts.   The Court

21  reviewed with care Mr. Teman's *Brady* claims as to those

22  customers.   The Court even reviewed, at the defense's request,

23  materials *in camera*.   The Court did not find any *Brady*

24  violation, period.   I have closely reviewed Mr. Teman's latest

25  round of *Brady* allegations, this time positing that the

L79GtemC

1  government hid evidence relating to the bank's intention or

2  ability to cover some of its losses by seizing the

3  approximately $13,000 balance in his personal account.  With

4  respect, I do not find any credible basis for claiming that any

5  such evidence existed or was withheld from the defense.

6       I note as well that even if there had been a *Brady*

7  violation along these lines -- and I find no credible basis on

8  which to claim one -- it would have been harmless.  Whether or

9  not the bank had the authority to cover $13,000 of its loss,

10 and whether or not it used its authority to its full extent,

11 has nothing to do with whether the bank was defrauded.  The

12 wire and bank frauds alleged and found by the jury involved

13 Mr. Teman's presentation to the bank for clearance of 29

14 customer checks on the false pretense that the customer had

15 authorized checks to Mr. Teman's company, GateGuard, in these

16 sums.  The fraud was over and done once the checks were

17 submitted by Mr. Teman and cleared by the bank.  How the bank

18 responded afterwards does not speak to any element of the

19 offense with which Mr. Teman was charged.  Whether the bank was

20 vigorous or passive in researching or pursuing its post-offense

21 remedies is irrelevant as to these elements.  A bank that is

22 indolent or ignorant in how it attempts to cover its losses

23 after the fact is equally a victim of an unauthorized check

24 fraud scheme as a bank that vigorously pursues all avenues of

25 relief.

L79GtemC

1          Furthermore, even if the bank's ability after the fact

2    to tap the $13,000 balance in Mr. Teman's personal account were

3    germane to an element of the offense, a hypothetical *Brady*

4    violation entailing not producing evidence that the bank had

5    believed it could recover from this account would be

6    immaterial.  The object of the fraud here, as alleged and

7    established, was to gain $330,000, which was the sum total of

8    checks presented on the false premises that they had been

9    customer-authorized.  Between the checks that were stopped and

10   the balance in the GateGuard account that the bank was able to

11   reach, the bank was left with a loss of just under $260,000.

12   On the defense's *Brady* theory, the bank could and should have

13   reduced that loss to $246,000 plus by taking the balance of the

14   personal account.  In other words, the defense posits, the

15   bank, by utilizing this supposed remedy, could have trimmed its

16   actual loss by -- drum roll, please -- five percent, inasmuch

17   as $13,000 is five percent of $260,000.  There is no coherent

18   theory on which this would have made any difference whatsoever

19   to the jury at trial.  Even if there had been an error or Brady

20   violation along these lines, it would have been totally

21   harmless.

22          The defense's final argument as to Ms. Finocchiaro's

23   testimony is that, to the extent she testified to the bank's

24   ability to recover money, it was in part expert testimony.  The

25   standard as to this claim comes from Federal Rule of Evidence

A-2295

L79GtemC

1    701, which sets the parameters of lay opinion testimony.  Such

2    testimony is permissible if it is rationally related to the

3    witness' perception, helpful to clearly understanding the

4    witness' testimony or to determining a fact at issue, and not

5    based on "scientific, technical or other specialized knowledge

6    within the scope of Rule 702."  Under Second Circuit case law,

7    a rational perception is one involving firsthand knowledge or

8    observation and can include opinion testimony gained through

9    service in a particular position.  See, for example, *United*

10   *States v. Rea,* 958 F.2d 1206, 1215 (2d Cir. 1992); *United*

11   *States v. Yannotti,* 541 F.3d 112, 126 (2d Cir. 2008), and the

12   other cases cited on Page 6 of the government's opposition at

13   Docket 225.  And the Court here had explicitly limited

14   Ms. Finocchiaro to lay testimony.

15         Of the various arguments the defense has made in this

16   latest round of post-trial motions, this is the only one that

17   comes even remotely close.  That is because, in one snippet of

18   her testimony, Ms. Finocchiaro used language that could be said

19   to describe what the bank's legal rights were.  The government

20   asked her, toward the end of its sequence of questions:  "If an

21   individual has three accounts at the bank, for example, and

22   there was a charge-back from one, could the bank try to use the

23   funds in the other account to pay for it?"  Ms. Finocchiaro's

24   answer was: "So we do not have the right to offset when the tax

25   identification number is different from one entity to the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-2296

L79GtemC

1     other."

2          Now the defense was on notice of the substance of this

3     forthcoming testimony from the 3500 material.  It did not

4     object to the testimony before or after it was given.  Nor did

5     defense counsel, on cross-examination, challenge this

6     testimony.  Any error in receiving this unobjected to testimony

7     would be subject to plain error review.  On consideration, I do

8     not find error.  Notwithstanding the formulation that

9     Ms. Finocchiaro used, in response to the government's question,

10    as to what the bank's "rights" were, her testimony was

11    ultimately not about the law.  She did not attempt to parse or

12    analyze the law.  Instead, in context, she was drawing upon her

13    firsthand experience as a fraud investigator in describing

14    whether, in this situation, the bank in practice can recover

15    some of its loss by looking to another account.  This testimony

16    that it could not where the tax ID numbers were different was

17    based on her personal experience.  It was clearly within the

18    scope of that experience.  It was from that that she testified

19    that the bank is unable to reclaim or set off funds from

20    another account where the tax identification number of two

21    accounts were different.  This is what she does for a living.

22    She investigates and responds to fraud.  It was not error, and

23    certainly not plain error, to receive this testimony as

24    permissible lay opinion testimony based on the witness'

25    professional experience.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L79GtemC

1          In any event, any error in receiving this testimony

2     was harmless.  And that is so for at least three reasons.

3          First, again, the offense conduct by Mr. Teman was

4     complete by the time the bank did or did not act to reclaim its

5     money.  Mr. Teman's post-offense conduct in moving funds out of

6     the GateGuard account and out of the bank before the bank had

7     intervened to prevent these funds from moving was fair game for

8     comment by counsel to the extent these actions shed light on

9     whether Mr. Teman had the required intent to defraud.  But the

10    bank's pursuit of its remedies after the scheme was complete,

11    or the bank's perceptions of the remedies that it had and did

12    not have, did not bear on the elements of the bank and wire

13    fraud offenses with which Mr. Teman was charged.  Indeed, as an

14    aside, with the benefit of hindsight the defense arguably could

15    have objected on relevance grounds to Ms. Finocchiaro's

16    testimony about the bank's post-offense inability to reclaim

17    the funds.  But no such objection was made to this line of

18    inquiry.  The limited testimony received in this line was not

19    prejudicial.  And the defense, even now, does not pursue any

20    such claim that allowing questions in this area was plain

21    error.

22         Second, by all accounts, even had the bank been able

23    to take all of the funds in all of the other accounts

24    associated with Mr. Teman and apply them to its losses, the

25    bank still would have been left with a sizable deficit of about

L79GtemC

1    $150,000.  There was no credible argument available to

2    Mr. Teman that, had Ms. Finocchiaro not given this testimony,

3    and had the jury been allowed to assume that the bank could

4    have seized all funds in all his other accounts, the jury could

5    have found that the bank had been made whole.  The bank's

6    ultimate loss, net of recovery, under the scenario most

7    favorable to Mr. Teman would still have been about $150,000.

8    Such a loss would have amply supported the verdict.  The

9    elements of the charged offenses and the verdict did not turn

10   at all on the amount of money sought or obtained.

11          Third, even assuming that the aspect of

12   Ms. Finocchiaro's testimony about the bank's lack of ability to

13   recover funds from a different account was improper expert

14   testimony as to the law -- testimony of which again the defense

15   had pretrial notice and to which it did not object -- the

16   defense has not shown that testimony was wrong.  In that vein,

17   I have reviewed the declaration of Richard Fraher, a banking

18   law expert whom new defense counsel consulted after trial.  The

19   defense hyped this declaration as the fulcrum of its latest

20   Rule 33 claim.

21          In fact, the Fraher declaration explicitly supports

22   Ms. Finocchiaro's testimony.  Mr. Fraher states:  "Bank of

23   America's right to set off extended no further than the account

24   of GateGuard."  See Docket 221-2, the Fraher declaration, 16.

25   That is what Ms. Finocchiaro testified to.  And Mr. Fraher's

L79GtemC

1  statement that the bank did not have a right of set off is

2  consistent with the actions of the bank, both before and after

3  trial.  The bank applied the balance in the GateGuard account

4  to its losses from clearing the bad checks, but it did not use

5  the funds in any other accounts of Mr. Teman, whether business

6  or personal, to set off the losses in that account.  It sent

7  these, both before and after trial, to Mr. Teman for him to

8  deposit.  And Mr. Fraher states that his analysis "accords with

9  Ms. Finocchiaro's testimony specifically about Bank of

10  America's inability to recover funds by set off from other

11  accounts."  Id. Paragraph 16.

12          To be sure, Mr. Fraher took issue with

13  Ms. Finocchiaro's testimony insofar as he read her testimony to

14  convey that the bank did not have other means to attempt to be

15  made whole.  The bank, Mr. Fraher observes, could have

16  sequestered and frozen those accounts and commenced a lawsuit

17  against Mr. Teman.  Had the seizure withstood challenge and had

18  the bank thereafter brought suit and obtained a legal judgment

19  in court against Mr. Teman, Mr. Fraher opines the bank could

20  then have sought an order allowing it to apply those frozen

21  funds to the judgment.  See id. at Paragraph 19.

22          No disrespect to Mr. Fraher, but that is a statement

23  of the obvious.  Of course a party can bring a lawsuit.  And if

24  the suit succeeds, a court can order that specified assets of

25  the judgment debtor be used to help satisfy the judgment.

A-2300

L79GtemC

1    However, that is not inconsistent at all with Ms. Finocchiaro's

2    trial testimony.  The line of questioning in response to which

3    Ms. Finocchiaro testified was directed to the bank's right, on

4    its own authority, to use the customer's other accounts as a

5    set off.  The government inquired whether the bank would be

6    able to, and I quote, "draw funds from those other accounts" to

7    recovers its losses.  She said no, where the tax ID numbers on

8    the accounts were different from the account where the fraud

9    loss occurred.  Nothing in her testimony remotely speaks to

10   whether the bank separately had the right to initiate a lawsuit

11   against Mr. Teman to get its money back.  In suggesting

12   otherwise, Mr. Fraher is attacking a straw man.

13   Ms. Finocchiaro did not testify that the bank could not sue

14   Mr. Teman.  And once that feature of the Fraher declaration is

15   put aside, the Fraher declaration turns out to be Exhibit A for

16   the government.  It confirms the limits to the bank's authority

17   to set off, which is all that the disputed part of her

18   testimony addressed.

19          So, for all these reasons, I do not find any error,

20   let alone plain error, in the receipt of Ms. Finocchiaro's

21   testimony at trial.

22          Now, the defense's final argument is that an aspect of

23   the government's rebuttal summation constituted prosecutorial

24   misconduct.  In that portion, AUSA Bhatia stated that the fact

25   that Bank of America had been left with a large loss was proof

A-2301

L79GtemC

1    of Mr. Teman's intent to defraud.  He stated:  "And I submit

2    that perhaps the most obvious proof here of criminal intent is

3    that there's a $260,000 hole right now at Bank of America.

4    There's $260,000, more than a quarter million dollars, missing.

5    Someone else had to pay for that.  Bank of America had to pay

6    for that.  The defendant stole from his own customers and left

7    Bank of America holding the bag."  Docket 188 at Page 1042.  In

8    a similar vein, AUSA Bhatia argued, both in the main summation

9    and in the rebuttal summation, that Mr. Teman's prompt transfer

10   after deposit of funds out of the GateGuard account into other

11   accounts of the bank or out of the bank altogether were proof

12   of his criminal intent.  Id. at Page 993 and Page 1009.

13          Both aspects of this argument, the Court holds, were

14   proper.

15          First, it was fair argument to state that the fact

16   that Bank of America experienced a large loss reflected

17   Mr. Teman's intent to defraud.  Mr. Teman presented $330,000 in

18   checks drawn on the accounts of three customers -- who I might

19   add were completely independent of one another -- when the

20   customers learned of these checks, they each told the bank the

21   checks were unauthorized.  But by then, money had left not only

22   the GateGuard account, but the bank.  That left the bank with a

23   loss.  It was ultimately $260,000, according to the trial

24   testimony.  And had the bank been able to set off its loss by

25   drawing on Mr. Teman's other accounts, the loss, again, still

L79GtemC

1    would have been about $150,000.

2         The precise dollar amount does not matter.  Either

3    way, the inference of fraud is forceful and fair comment.

4    Mr. Teman could not benefit monetarily from the presentation to

5    the bank of 29 unauthorized checks without someone

6    correspondingly getting hurt.  This is a zero sum game.

7    Because the bank had to make the payees on the checks whole, it

8    was the bank, as opposed to Mr. Teman's customers, which was

9    left with a loss, or as AUSA Bhatia put it, "holding the bag."

10   That consequence was predictable.  A person in Mr. Teman's

11   shoes could not credibly claim to expect to reap the benefit of

12   depositing unauthorized checks to a bank without leaving

13   someone, such as the bank, correspondingly thousands of dollars

14   worse off.  It was fair for the government to argue that

15   Mr. Teman, the beneficiary of the bad checks scheme, knew how

16   much his bank victim stood unjustifiably to lose, and that his

17   decision to plow ahead in the face of this knowledge bespoke

18   his intent to defraud the bank of money.

19        Second, it was fair argument that Mr. Teman's prompt

20   transfers out of the GateGuard account upon depositing the

21   unauthorized checks evinced his fraudulent intent.  Mr. Teman,

22   after all, had effectively announced to one of his religiously

23   observant customers that he intended to move quickly to foil

24   any attempt to block the deposits.  Mr. Teman stated that he

25   would deposit checks on the eve of Passover when the customer

A-2303

L79GtemC

1  would be disabled from learning about the deposits and acting

2  to promptly stop them.  Particularly, in light of this

3  evidence, it was fair comment to argue that Mr. Teman's

4  decision to move funds quickly out of the GateGuard account

5  after they had cleared was strategic and canny and that it

6  bespoke an intention on his part to assure that he got away

7  with the deposits that he knew were improper.

8          The defense argues that this argument was improper

9  because it drew upon Ms. Finocchiaro's supposedly expert and

10 thus assertedly improper testimony about the bank's inability

11 to set out off funds in Mr. Teman's other corporate and

12 personal accounts.  I find that argument unpersuasive.  I have

13 held that that testimony was not expert testimony and that its

14 admission was not error, let alone plain error.  Beyond that,

15 the government did not sync its argument to Ms. Finocchiaro's

16 testimony.  It did not argue that Mr. Teman was aware in real

17 time of her later testimony that that the bank could not set

18 off its loss by tapping funds in other accounts.  It did not

19 argue that Mr. Teman had any enhanced knowledge of how banks

20 work and what their authority is or isn't after an unauthorized

21 check is deposited.  The government's point in summation was

22 merely a commonsense one.  It is that, by its nature, moving

23 money from the depository account to another account stands to

24 make it harder -- all things equal -- for the money to be

25 reclaimed.  And, the government noted, Mr. Teman had engaged in

L79GtemC

1   a flurry of movements of money right after the checks had been

2   deposited.  That was fair argument.  It is also, I might add,

3   quite a familiar argument in fraud cases.  In such cases, the

4   government often argues that a defendant's movement or prompt

5   disposition of illegally gotten gains is evidence of his

6   awareness that these funds did not belong to him.  That is a

7   fair inference to urge in argument.

8           To be sure, as the defense argues, there was an

9   alternative, benign inference that could be drawn.  It was that

10  Mr. Teman had legitimate expenses to pay and that his practice

11  in paying his expenses had been sometimes to transfer funds

12  from the GateGuard to other accounts.  The defense was at

13  liberty to make that argument.  And because Mr. Bhatia made

14  this argument in his main summation as well as his rebuttal,

15  there was every opportunity for the defense to make this point

16  in summation.

17          Now, understandably, in the defense summation,

18  Mr. Gelfand instead concentrated on Mr. Teman's dealings with

19  his customers and why these did not evince intent to defraud.

20  But the counter-argument as the purpose served by moving money

21  out of the GateGuard account was there to be made.  The account

22  records were in evidence.

23          That said, there was good strategic reason for trial

24  counsel not to make that argument.  As Mr. Teman's memorable

25  texts with his lawyer Mr. Reinitz reflected, Mr. Teman had

A-2305

59

L79GtemC

1    recently found himself short of money and he had debts to pay.

2    Mr. Teman's exchange with Mr. Reinitz suggests that Mr. Teman's

3    pressing financial obligations were the motive for embarking on

4    the audacious process -- which the jury found to be bank and

5    wire fraud -- of writing, without authorization of the

6    customers, outsized checks on their accounts and presenting

7    them to the bank to be authorized.  Had the defense chosen to

8    argue that Mr. Teman frequently paid his and his companies'

9    bills by moving money from the GateGuard account to others,

10   that might have invited the government to hammer home that

11   Mr. Teman's motive in fabricating the checks was his inability

12   to cover urgent expenses.  Regardless, the point is that with

13   or without Ms. Finocchiaro's testimony this was fair argument

14   by the prosecution.

15          Finally, I would note that, although I do not find any

16   misconduct or error with respect to the government's

17   summations, any error would have been completely harmless.

18   Again, as the transcript reflects, the trial and the parties'

19   closing arguments focused on the dispute between Mr. Teman and

20   his three sets of customers as to whether the 29 checks

21   totaling $330,000 were authorized.  Although the bank was left

22   "holding the bag" for the loss, the bank was really a bit

23   player at trial.  The critical factual issue involved whether

24   the customers had authorized those checks and, if not, whether

25   Mr. Teman had acted with intent to defraud in negotiating them

A-2306

60

L79GtemC

1    on the premise that they were customer authorized.  All three

2    customers denied authorizing those amounts.  Independent of

3    their testimony, there was strong evidence corroborating it.

4    And Mr. Teman's memorable text exchanges with his attorney,

5    which are quoted at length in the Court's post-trial decision,

6    were probative evidence, too, of his intent.  The government's

7    unobjected to commentary in summation about the speed with

8    which Mr. Teman had moved money into other accounts or out of

9    the bank was secondary at best.  Having presided over the trial

10    and paying close attention then and after to the evidence

11    presented at it, I am quite confident that, even if this aspect

12    of the government's closing was error, it was harmless.

13         For all these reasons, I deny the defense's motion for

14    vacatur of the conviction and for a new trial.

15         Now, counsel, that ends the five matters I had listed

16    to take up with you.  From my perspective, I can now set for

17    the third time a sentencing date.  Unlike the December 1 and

18    June 24 sentencing dates, which got overtaken respectively by

19    Mr. Teman's discharge of the Sher Tremonte firm and then by his

20    motion for this court's recusal, I expect the date to stick.  I

21    have a handful of dates available next week and the week after.

22    The sentencing record has been complete since December 1.

23    Before I set a prompt sentencing date, counsel, other than the

24    defense's letter about Mr. Biale and Ms. Graham declaration due

25    on Monday, are there any other open issues I need to address?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-2307

L79GtemC

1        MS. KELLMAN:  Judge, just one thing, with respect to

2    the Monday deadline, my client doesn't travel back to Florida

3    until Sunday night and he believes that he has documents that

4    are on his computer there that would be helpful to us, and he

5    doesn't know that he can organize that and get it together so

6    that we would have it.

7        THE COURT:  Any proffer to what these supposed

8    documents are?

9        MS. KELLMAN:  I can't at this point, Judge.

10        THE COURT:  Why don't you speak to your client.

11        THE DEFENDANT:  I can --

12        THE COURT:  Mr. Teman, you should speak through your

13    counsel.  It's not in your interest to do otherwise.

14        MS. KELLMAN:  It's beyond my --

15        THE COURT:  I'll give you until 5:00 o'clock on

16    Tuesday, Ms. Kellman.  That's out of respect for you.

17        MS. KELLMAN:  Thank you, Judge.

18        THE COURT:  Look, the next issue is sentencing.

19    Ms. Kellman, let me ask you this, it's time to proceed forward

20    to sentencing.  This has been hanging out here for a very long

21    time.  It turns out to have benefited Mr. Teman --

22    notwithstanding his stated preference to be sentenced on

23    December 1 -- given the state of the pandemic that all of this

24    is happening at a time when thankfully the public health

25    situation has abated, whether or not he's vaccinated, he has

A-2308

62

L79GtemC

1  had the opportunity to be so, but now it's time to move

2  forward.

3      Is there any material new information in Mr. Teman's

4  life that you would like to bring to my attention to top off

5  the record?  We're done with other sentencing stuff.  The

6  sentencing record is complete.  But I'm mindful that there's

7  been a passage of time, perhaps there's something new to

8  report.

9      MS. KELLMAN:  Two things, your Honor.  The first thing

10  is my client has been involved in a number of local charitable

11  situations, and in fact has been working very hard at the

12  building collapse in Miami with his organization J Corp., and

13  he's been coordinating that.

14      THE COURT:  And I was very impressed, by the way, by

15  what I learned about J Corp. from the initial round of

16  sentencing submissions.

17      MS. KELLMAN:  So he has been working on that, together

18  with the Israeli military, so we would like to get some

19  documentation to that effect and get that to the Court.  I

20  don't think we need much time to do that, but we would like to

21  do that.

22      THE COURT:  Sure.

23      MS. KELLMAN:  Additionally, Judge, Mr. Frisch and I

24  have both read the previous sentencing submissions -- and I

25  mean no disrespect to my client -- in our exchanges to him and

A-2309

63

L79GtemC

1  our work with him, it was interesting to us or amazing,

2  actually, that no one had sought to look at and to have a

3  psychological profile done of this young man.

4        THE COURT:  Have you commissioned that?

5        MS. KELLMAN:  I have spoken with several doctors.  And

6  I have doctors who could be available on short notice.  They

7  are aware of the situation.

8        THE COURT:  When were you retained?

9        MS. KELLMAN:  When was I retained?  Some time in

10  December.

11        THE COURT:  Shortly after April 1?

12        MS. KELLMAN:  Yes.

13        THE COURT:  I mean, the idea of making the request is

14  one thing.  It's another thing to wait until July 9th to tell

15  me you have not yet commissioned that report.

16        MS. KELLMAN:  I thought I was going to win today.

17        THE COURT:  Look, I mean, the problem here is that I

18  have been giving long leash after long leash after long leash

19  to your predecessors and now especially to you and Mr. Frisch.

20  I mean, we have had two rounds of Rule 33 motions, which I

21  patiently considered, allowed, responded to.  Sua sponte,

22  rather than moving responding to bail pending appeal, my

23  request for a letter to that effect, you chose to make another

24  Rule 33 motion, I allowed that, have now carefully responded to

25  it.  It's time to move on.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L79GtemC

1     You can have until the end of next week to supplement

2    your sentencing submissions in any way you would like.  But it

3    seems to me, under the circumstances, there's plenty about

4    Mr. Teman's mental health that has been chronicled in varying

5    degrees in the existing sentencing submissions.  If there is

6    more you would like to bring to bear from a provider or

7    somebody who has treated him, that's fine.  But you've been in

8    the case for three months and had every opportunity to retain

9    somebody.  Indeed, I'll go further than that, I probably

10    shouldn't even give you until next week, given that sentencing

11    was supposed to be on June 24th.  The only reason I put it over

12    was because you asked for my recusal, and I needed, as a matter

13    of good order, to resolve that.  Consider yourself lucky to

14    have to the end of next week.  But since we had a firm

15    sentencing otherwise, you had no business not retaining

16    whatever this supposed expert or person would be when

17    sentencing was due on June 24th.  Is there a reason at that

18    point you hadn't?

19     MS. KELLMAN:  Well, as I said, we have thrown

20    ourselves into this post-trial litigation and it has been all

21    consuming.

22     THE COURT:  You have two titans of the defense bar,

23    either one of whom could have made a phone call to retain the

24    expert.  That dog is not hunting.  Honestly, I mean, with all

25    due respect, we've got to move this on here.  And sentencing

A-2311

65

L79GtemC

1    was scheduled in December, that was on your predecessors.  But

2    once you took over -- sorry, you were retained, I think I said

3    April, you were retained in December; right?

4              MS. KELLMAN:  Yes, your Honor.

5              THE COURT:  You have been on the case for seven

6    months, six and a half months, and we had a sentencing

7    scheduled for June 24.

8              MS. KELLMAN:  Understood, Judge.  I just want to put

9    something else on the record.

10             THE COURT:  And Mr. Smallman points out that notice of

11   appearances were filed on January 27th, although I had been

12   hearing from you and Mr. Frisch from some weeks before, it was

13   simply a matter of squaring things away.

14             MS. KELLMAN:  That's correct, Judge.

15             I'm going to jump ahead in just a minute, if I may,

16   which is my trial schedule --

17             THE COURT:  You have two lawyers here.  Sentencing

18   will be the week after next.  I am happy not to do sentencing

19   next week so you can top up the sentencing record by next

20   Friday, but it's time.

21             MS. KELLMAN:  I know that the trial that I was just

22   enlisted to do on Friday will be over by midweek, the middle of

23   the last week of July, so if we could possibly have the

24   sentencing --

25             THE COURT:  I've got a bunch of dates in July.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-2312

L79GtemC

1          MS. KELLMAN:  I'm before Judge Roth and I just found

2     out about it days ago.  But Judge Roth has represented to me

3     the trial should end by the middle of the week in the last week

4     of July, if we could possibly do it that Friday.

5          THE COURT:  The last date I have available is

6     July 28th at 1:00 p.m., I have a bunch of dates between next

7     Tuesday -- which would have been fine, but for your request to

8     top up the sentencing record -- and July 28th, I have a host of

9     dates available in that.

10          MS. KELLMAN:  You have July 28th?

11          THE COURT:  I have July 28th at 1:00 p.m.

12          Let me confirm that somebody from the government will

13     be there.

14          MR. GUTWILLIG:  Yes, Judge.

15          THE COURT:  Today is July 9th, by July 16th, defense,

16     you are authorized to submit supplemental sentencing

17     submission.  For avoidance of doubt, because I want my

18     directives to be followed, what I mean by that is you are at

19     liberty to address two things; one is new information since the

20     date of the original sentencing submission -- and I'm very

21     eager to hear about charitable activities by Mr. Teman -- and

22     number two is you are at liberty to submit materials bearing on

23     his mental health, which is what I take it you're talking

24     about.  That's due on July 16th.

25          Government, while I'm not requiring you to respond,

L79GtemC

1  because your submission is already in, to the extent that you

2  would like to have a letter commenting on what the defense has

3  submitted or speaking to those issues, I'll give you a few days

4  to submit a response, because the government under the original

5  set schedule set long ago was due to make its sentencing

6  submission after the defense.  And if the defense is

7  leapfrogging by supplementing the records, it's fair that you

8  have a right to comment.  If the defense's submission is due

9  Friday the 16th, I'll give you as long as the 23rd for your

10  response, if you need that.  Do you even need that?

11          MR. GUTWILLIG:  No, your Honor.

12          THE COURT:  How about the 21st, then?

13          MR. GUTWILLIG:  Yes, your Honor.

14          THE COURT:  I'll issue an order to that effect.

15          But Ms. Kellman, enough, it's time to move to

16  sentencing.

17          MS. KELLMAN:  I hear you, Judge.

18          THE COURT:  I'll issue an order to that effect.  But

19  sentencing in all events will be July the 28th at 1:00 p.m.,

20  Ms. Kellman, I hope you can make it.  I expect you will.

21  Mr. Frisch will be there if you cannot be.

22          MS. KELLMAN:  My understanding is the trial should be

23  finished.

24          THE COURT:  With that, let me go around the horn to

25  see if there's any other business we need to take up.

A-2314

68

L79GtemC

1        Government?

2        MR. GUTWILLIG:  No, your Honor.

3        THE COURT:  Defense?

4        MS. KELLMAN:  No.  Thank you, Judge.

5        THE COURT:  I recognize that my tone at points today

6   has been firm, as I have tried to clinically analyze the issues

7   put before me.  As they say in the Godfather, it's not

8   personal, it's business.  Thank you.  We stand adjourned.

9        (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LAW OFFICES OF SUSAN G. KELLMAN
25 EIGHTH AVENUE • BROOKLYN, NEW YORK 11217
(718) 783-8200 • FAX (718) 783-8226 • SGK@KELLMANESQ.COM
FELLOW, AMERICAN COLLEGE OF TRIAL LAWYERS

July 16, 2021

Hon. Paul A. Engelmayer
U.S. District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Re:   U.S. v. Ari Teman
19 Cr. 696 (PAE)

Dear Judge Engelmayer:

Thank you for the opportunity to supplement the sentencing submission previously filed on behalf of our client Ari Teman.

By this submission, we hope to be able to share with your Honor another side of our client. A young man who is generous to a fault and a person who has made a difference in this world – in many very positive ways – and we trust that your Honor will factor his good works into your sentencing equation, and help to dilute many of the impressions that your Honor may have gleaned from the case.

Your Honor has already received many letters that speak to Mr. Teman's good deeds and commitment to community service; however, in this submission we hope to be able to share some additional insights and Mr. Teman's own words with the Court.

**Ari Teman's Shaky Start: Childhood**

Ari Teman has described his childhood to counsel as both a blessing and challenging. He describes his parents as great people who really care, not only about their own children, but about their community, their people, and their countries – the United States and Israel. More than just words, his parents showed up – they took action to right wrongs and they taught their two children that standing up for what you believe is an important part of defining who you are as a person. Ari and his parents were estranged for some time; but they have mended their fences. Ari explains that he is very proud of his parents because they are the kind of people who help others – not only when they were asked – but before anyone had to ask. He explained that if he has done anything right in his life, it is to model their behavior in a way that would make them proud.

1



Young Ari smiling for the camera in his Cub Scouts uniform.

Ari explained that as a youngster, his Dad sent him to the Cub Scouts to learn to serve his community and his country; but he did more than that – his Dad became a den leader and later a pack leader. He worshiped his father, who worked incredibly long hours building technology for banks. In the evenings and on the weekends, his Dad would prepare lessons and materials that would help his community's young men and women be more self-sufficient and better able to serve others. Ari attended synagogue with his Dad on a regular basis and recalls watching his father, who was a skilled carpenter, help to make repairs in the synagogue, often late as night, after a long day's work. As a youngster, he remembers trying to help his Dad build mounts for the Torah scrolls, which are still in use decades later. As the congregation grew, Ari remembers accompanying his Dad in the evenings, as he helped to build an extension, as the synagogue expand to serve additional members of their extended community. He learned from his father, who donated his technical and his woodworking skills to youth programs, charities and synagogues. He recalls, even today, that as a young child, his father helped men with debilitating illnesses like ALS capture a few more connected months of life through technology. It is with great pride that he explained that his Dad always stood up for the underdog. Ari explained this has taught both Ari and his sister the value of doing the right thing, even in the face of adversity.

Ari is equally proud of his mother, Suzan, who he describes as an artist and a fighter. She made sure that the kids had art classes, and she hovered near as Ari and his sister did their homework; what he remembers most about his mother, however, is that she would fight for what was right. If a teacher was abusive to students, Suzan Teman was the mom to come in and try to help – sometimes the fighter and always the peacemaker. Ari posits that perhaps this was his mother's way of combating the demons that haunted her. As a child, Ari explained that his mother lived with an abusive stepdad who beat her younger siblings and her mother. Ari says

2

that his mother's mission in life has always been to never let anyone slide if they were hurting others. Critically, cruelty – even in the form of sibling rivalry – was strictly prohibited in the Teman family and in their extended circle of friends. He describes his mother as loving – but tough. He offers, with pride, that he thinks his parents were great teachers and great role models for him and his sister.

Ari also shared that he was terribly abused by his peers in elementary and high school – "relentlessly bullied" on the school bus, walking into school, in the classrooms, at lunch, recess, and gym class. He described how the other kids would gang up on him in the bathroom and how the older kids often hit him with broomsticks. Kids read essays about his big ears, his dandruff and his goofy mannerisms while, as Ari recalls it, teachers sat silently. Even now these memories bring him to tears as he recalls the whole class laughing at him. These memories remain vivid, even today, and he relates how his teachers all looked the other way and let the other students torment him.

When we asked him to share his memories of this time for us he wrote:

> I developed stomach conditions from the anxiety that lasted for years. My bowels would churn so much from fear in the morning that I could not get off the toilet, and I remember once my Dad dragging me to the bus. Of course, this anxiety, and likely a dose of mild Aspergers, only attracted more bullying. School, and synagogue youth groups, were not a place to see friends, they were where I got beaten up, physically and emotionally. This went on through high school, where as a freshman, a senior pulled a knife on me and threatened to stick it up my ass (they were less culturally sensitive back then), and when I complained to the principal about my fear of being stabbed the boy was disciplined, but his friends spent the next year pushing me down flights of stairs and bullying me in the hallways.

He continues by offering that there were actually some good parts of high school:

> I learned to play the drums and had a band. High School is when I started my website building business. I got internships and summer jobs, with the      help of my Dad's friends, building intranets for various organizations. I became quite expert in web development and learned a great deal from some of the best in the business about project management and presentation.

3



Ari with his parents, the rabbi, and his wife, when he awarded "Alumni of the Year".

## Brandeis University

Ari explained that his life began to take a more positive turn once he started school at Brandeis. He began to make friends and handle social situations with less clumsiness – as his high school guidance counselors had predicted. At Brandeis he was able to build a small but solid circle of close friends, many of whom remain his friends today. There, he played in bands and the university orchestra. He learned that as he got older "being smart was not something for which you were bullied, but respected."

While he was raised in the "modern orthodox" tradition at Brandeis, he began a spiritual journey, becoming less traditionally religious at times, and more at others. Ultimately, he explains that he became closer with "[his] people".

Ari's father's skills in woodworking and technology and his mother's artistic talents, which they had shared generously with their children, enhanced his college life. Ari explained that he became close with the new Chabad Rabbi on campus, and helped the young congregation build their first Chabad House. He recalls gathering other students and supplies at Home Depot and finishing the basement so the Rabbi's infant son (now an adult) would not breathe in the fiberglass insulation when he played. Ari also helped to build the Chabad's first online Shabbat dinner system (something now taken for granted) and their annual Sukkah – which was described by the Boston Globe as the largest in the Boston area. One of his contribution, one that his Rabbi is still proud of – was something referred to as the "triple sinks". To speed up the hand washing ritual that precedes the breaking of bread, Ari designed a sink with three faucets that he welded together in the art studio. Then, the 150 students who regularly attended the Chadad's Shabbat dinner could wash their hands before breaking bread much faster than just using the one kitchen sink. Ari shared: "When I'm in Boston and stop by for a visit, the Rabbi tells students I'm 'the triple sink creator' – it's an odd form of (non) celebrity."

Ari is proud that his parents' fighting spirit also came out in him. When one umbrella religious organization at Brandeis wanted to shut down Chabad's services, Ari explained that he joined with a friend, who is now a constitutional law attorney in Chicago, and together they fought to keep the campus open for all religious expression, helping to dispel rumors and quash

4

misunderstandings. He also started a newspaper at Brandies called, "The Indi", and made the news in the local Boston Globe satellite paper for paying students for their work, and for using an online platform to collect, organize and publish articles, something also taken for granted today. When the school-funded paper tried to shut us down, he explained that he reached out to a legend a few towns over, Professor Alan Dershowitz, and he and his "FIRE" organization made clear to Brandeis that they should leave us alone. That, he shares, is how he knows "The Professor".

### Ari Founds the Volunteer Organization JCorps

After college, Ari founded JCorps.  He came up with the idea in the middle of the night, and the next day, he registered a domain, set up a website, and messaged a friend saying, "I have a genius idea!" He laughed as he recalls his friend's response – which was "No way!" But with just $300 for the website and a bunch of tee shirts, he built what became a seven-city international volunteer organization that has led thousands of young Jewish adults to volunteer in children's hospitals, senior centers, soup kitchens, animal shelters, parks, and more.



Ari (in a black t-shirt) with a group of volunteers for the organization JCorps, founded by Ari.

To build JCorps, Ari explained that he used the same technology he had taught himself (with the help of his Dad) to manage volunteers, and track performance, in order to create what he hoped would be the most reliable volunteer network. He explained further, that it was important that if he used the name "JCorps", the Jewish "Social Volunteering™" network, that he could present to people as honest and reliable because. In describing the birth of JCorps, Ari explained:

Every volunteer would get a verification email with a section titled "Your Word," which explained that JCorps "exists as a conversation", that we only exist because we keep our word to the organizations we help that we will show up,  and we can only do that if the volunteers keep their word to us. We took this seriously. Young adults who were called into work last-minute would send me emails, "Dear Mr. Teman…" to apologize for being unreliable.

A-2320

This, he explained, would "crack [him] up" – that anyone would call me "Mister" – because, at the time, he was 24 and "Mr. Teman" had always been his father!



Ari with children during a JCorps volunteering mission.

Looking back at JCorps, Ari says:

> This is and will likely remain the greatest thing I have ever done. Not because of the accolades, the awards, or the press, but because it showed me the power and thrill of igniting in someone the realization that everyone can make a difference in someone's life, even through the smallest acts of kindness.

Ari remembers a volunteer who wrote that she had been depressed because she felt that men were nice to her only because of her looks – not a problem that he claims he could relate to! She explained that she would never forget how during one volunteering event, she put a tray of food down in front of an elderly woman at a soup kitchen, and had a conversation with her. She recalls that the elderly woman cheered up, and this young volunteer felt meaningful as she had not felt before in her life. Ari proudly shares that his young woman became a regular volunteer and team leader, and she met her husband at a JCorps event. This, he explained, happened a lot – that there are quite a few JCorps marriages, and a lot of JCorps babies.



Photos from JCorps events, including an event at a children's hospital, with Ari, JCorps volunteers, and community members.





### JCorps Leads Ari to The White House And Beyond

Ari cannot keep a straight face when he shares what he calls his "White House" story. One day, during the early stages of his stand-up comedy career, he was waiting to meet Wally Collins, a comedian and a one-time warm-up act for David Letterman. Ari hoped Collins would give him some professional advice. Then, his phone rang. The caller ID said only "202". He answered – and the conversation went as follows:

Q:   Is this Ari Teman?
A:   Yes.
Q:   This is Danielle, from the White House.
A:   The White House?
Q:   Yes, "The White House."
A:   Sure…"In Washington, D.C."?

And, as if she had heard the dumbest question of her life, she replied, "Yeah, that one." Ari explained that he had no time for the call because he was meeting a fellow comedian for lunch. He had assumed that the call likely came from a bar called "The White House" who

wanted to offer him a law paying gig. In fact, as he later learned, he had accidentally blown off *THE* White House.

 

Ari at the Comedy Club (left) and the Laugh Factory (right).

Astonishingly, the White House called back shortly thereafter. The representative explained to Ari: "The President and Mrs. Obama would like to congratulate you on your founding JCorps. My team would like to get your input on young adult volunteering, but I am calling because the President and First Lady would like to invite you to the White House Hanukkah Party. Are you available?" Ari immediately replied that he would, of course, clear his calendar. Ari made it to Washington D.C., where he was honored to meet President Obama and shake his hand. He recalls with some embarrassment that he told a joke to President Obama, who cracked up, and then reached over the rope that separated them and gave him a bear hug. Ari fondly recalls eating potato latkes and mini-jelly donuts under a painting of Abe Lincoln that night, and he felt truly honored.



Ari being greeted by President Barack Obama at the White House Hannukah Party.

8

Ari also met Senator Joe
Liberman at the White House
Hannukah party.  Ari was honored
to discovery that Senator
Liberman knew JCorps.



JCorps expanded to Israel and Canada, as Team Leaders moved and wanted to replicate JCorps' good works in their new cities, to do as their tag line announced, "Make Friends. Make a Difference."




A newspaper article that discusses the founding of JCorps
and its activities in Jerusalem.

Ari explains that the most-rewarding times of JCorps were the moments he spent with kids in hospitals, teaching them how to draw a car, or whatever they wanted to draw. He explained that the kids got to pick the colors, and the shapes, and for a moment during their difficult days, they got to feel a bit of power, a bit of control, and for once it was them calling the shots and not the nurses, doctors, or parents. Ari has been haunted much of his life with depression, and he explains that those hours he spent in hospitals volunteering reminded him that it was best to use his time to worry about others instead of himself.

9

As Your Honor will see later in this submission, Ari continues his work as a JCorps volunteer, now with the Surfside community. He hopes Your Honor will allow him to continue that vital work.

**12gurus Charity**

From running JCorps, Ari thought that many nonprofits could benefit from running more like a business by tracking metrics, investing in improving skills, and investing in marketing. He explained that he wanted to help other nonprofits run more like startup companies, and share best practices, so he founded "NextGen: Charity", which later morphed into "12gurus: Charity". Your Honor can see testimonials and video of the talks at: 12gurusCharity.com



A screenshot of a video of a talk organized by Ari's organization, 12gurus Charity.

As part of this effort, Ari invited speakers from the top organizations, and best- selling authors, to present 18-minute, TED-style talks, backed by media and design, rented a theater, and filmed everything in four-camera HD. The director of filming for this project was the photo editor of his Brandeis newspaper, who became one of his best friends, and has since become an award-winning documentary filmmaker. Ari explains, with pride, that the video ended up on the TED homepage as "Best of the Web", and millions of people have watched their content. Speakers included leaders from the following nonprofits: Water, DoSomething, DressForSuccess, Michael J Fox Foundation, KIPP Schools, Acumen Fund, DonorsChoose, and others. Audiences came from large foundations and organizations like the Bill & Melinda Gates Foundation, UNICEF, Schusterman, Chabad, Big Brothers Big Sisters, and all the way to small, upstart nonprofits.

Ari hasn't held a conference for a few years, but hopes to restart it once this dark chapter of his life is behind him and he still keeps the videos online at 12gurusCharity.com so charities can benefit, and people continue to watch and share them.

**12gurus Charity Health Conferences**

A friend of Ari's who was in medical school at NYU, loved the conferences, and wanted to expand the concept to the health care sector. Ari and his friend launched a medical conference at

https://12gurusHealth.com. The head of NYU's Clinical Medicine Department, and a professor at UNC who was published over 400 times, became chairs of the initiative and speakers from the Mayo Clinic, Harvard, Yale, Michigan, MIT, Columbia, IBM Watson participated. They gave tickets to those who could not afford them, such as medical and nursing students, and they refused to take money to put anyone on stage (although participants could, of course, rent a booth in the trade show). Ari reports that participants said it was like nothing they had ever seen or done before. I encourage Your Honor to watch the testimonial and other videos of the talks on the website, as they speak for themselves.

Though his future is currently in limbo, Ari has been planning another conference with the UAE, and has lined up top physicians, researchers, and experts from Israel to share their ideas with their new peace partners, including:

     

   

### Ari's Health Issues and His PTSD Related to Involuntary Confinement

At the same time that he was running these conferences, and JCorps, and doing stand-up, Ari became ill. At first, it seemed to be fatigue and he assumed it was his schedule or his diet. But the fatigue became crippling and he was often unable to get out of bed. Beginning in September 2009 and for six months, Ari was seen by a medical practice which turned out poorly for Ari. He ended up in an involuntary psychiatric commitment which was deeply traumatizing for him. In October 2012, after multiple doctors tried and failed to help Ari, he went to the Cornell psychiatric ER. Since the impetus of Ari's difficulties seemed to stem from his near total inability to sleep, the doctors there determined that taking care of his sleep issues had to be addressed first. Ari explained that the treatment he received at Weill Cornell was near miraculous. The sleep studies showed that he wasn't getting REM sleep due to a breathing

disorder. A test at NYU's sleep lab confirmed that he stopped breathing 27 times per hour and got only 5-6% REM sleep, when the healthy range is 20-25%.

Ari eventually learned that his sleeping problems were a function of a number of problems with his airways. After considerable research, Ari found a highly rated specialized surgeon in Thousand Oaks, CA. That surgeon performed an 11-hour surgery and rebuilt his airways. Ari reports that he has since been able to sleep without sedatives.

Ari reports that he continues to experience episodes from the crippling effects of PTSD – a result of the abuse he suffered from the involuntary psychiatric commitment. Ari has been in treatment for these issues, and while he is the first to recognize that he is not entirely cured, "by any means – as your Honor has seen – with regrets", he continues to work on his coping skills. Ari confesses that he still "suffers tremendously" from this episode. Counsel shares this information with the Court with the hope that it will help Your Honor understand the terror that attends the notion of incarceration.

## Hurricane Sandy and JCorps

Ari recalled the moment he walked out of that Cornell ER, and the rain was pouring down, because Hurricane Sandy was headed to New York. He shared that he curled into his bed with the sedatives prescribed for him at the hospital, and when he woke up, there was no power in New York City. He grabbed his laptop, reached out to Rabbi Levi, went to his home, camped out on his floor and sent out a blast asking JCorps volunteers to sign up because help was desperately needed. A day after leaving a psychiatric ER, Ari was energized by the needs of others – he immediately began organizing volunteers, tracking tasks, and making sure they could meet the needs of as many people as possible.

Within a matter of hours, he had assembled 120 volunteers and organized them throughout the downtown area. Ari explained that they helped over the next week carrying water and food up hundreds of flights of stairs to elderly New Yorkers who were unable to evacuate. JCorps ended up covering much of the subsidized housing from the West Village all the way to the Lower East Side, where many older Jewish people were pleading for help. Ari explained that by charging cell phones in vehicles, he, the local rabbis, and other community leaders were able to communicate about which buildings had people in trouble.

Volunteers would bike or walk because roads downtown were blocked, lights were not functioning, and of course there was flooding from the storm. Other times they would hop into someone's car to get close enough to the next spot to walk. Somehow it worked out. Because the group of JCorps volunteers were nimble, they would sometimes beat the National Guard to a spot and distribute water and food before the National Guard arrived. Ari ran the entire operation from his laptop and cellphone wherever he could find electrical power. Ari explains that this was one of the greatest challenges and experiences of his life. After living through debilitating, torturous illness, he felt useful again.

## Ari's Continued Struggles

Ari could not work for months while he was recovering from surgery. He still needed to find a way to pay rent, and he did so by subletting his own apartment on Airbnb, while he slept on various friends' sofas. It took Ari a long time to completely recover from his surgery. He notably had issues with his short-term memory for a long time. After a dispute with Airbnb, Ari could not get a lease in New York and he was homeless for quite some time, while he was still struggling mentally. Ari was able to enter into some short-term sublets, temporary rooms and low-grade hotels. Since he was not yet working anything near full time, he often rented a desk at a the co-working space WeWork, and slept under his rented desk.

Through his continued struggles, Ari nevertheless worked on several business ventures. One of Ari's most recent ventures involves the use of UVC light to kill viruses like COVID-19, which he hopes to be able to commercialize.



Ari during an interview with the Today show, talking about a business venture.

**Ari's Struggles in Isolation**

Ari has gone through struggles in his life. But these past 15 months have been the most difficult in his life. He has been isolated 20 hours per day for much of the last 15 months. His mental health is as fragile as it has been, and he knows he puts an unfair burden on those close to him, including his girlfriend. He is constantly anxious, and still struggles with sleep deprivation. Ari has a long history of health problems, as discussed above, but as he says, his arrest in this case has "thrown [him] completely off kilter."

A-2328

Ari's main companion for the past 15 months has been a small Australian Shepherd. As he tells it: "she looks at me as if I need to get my life together, and she is not wrong."





Ari has tried to soothe his anxiety through art during his isolation on home confinement. These are some of the many canvases he has painted.







## Ari's Jewish Service and the Jewish Community

Jewish faith and the Jewish community is a big part of Ari's beliefs, culture and identity. Ari's parents are observant, as are many of his friends. Ari himself still attends Jewish services when his curfew allows, and he keeps kosher. He maintains very strong ties with the Jewish community.  As an example, when Israel was being attacked by rockets years ago, Ari flew to Israel and brought along his friend Danny Cohen, a Comedy Cellar comedian, and they performed for people in bomb shelters throughout Israel.



Ari performing stand-up comedy at an Iron Dome command base in Israel.

Ari has maintained a very close relationship with the Chabad Lubavitch movement, as Rabbi Lipskar's letter (submitted earlier) related. Indeed, Ari was invited to speak at the

International Conference, Kinnus HaShluchim, on how to get young adults involved in volunteering. Ari was also invited, on multiple occasions, to the Chabad's annual banquet. Ari has spoken, performed, and coached at hundreds synagogues, Chabad Houses, Jewish day schools, community centers, and AISH centers.

### Ari's Volunteering With The Recovery Efforts of The Surfside Condo Collapse in Miami

When the tragedy of the collapse of a condo building in Surfside happened, Ari rushed immediately to help.  Amid the chaos, organizers were struggling to organize volunteers, and were overwhelmed with emails, calls, and direct messages. Ari used his experience with JCorps to set up VolunteerSurfside.org and helped organizations direct requests there, and find skilled volunteers as needed.

For example, it was Ari's database that found the chef who prepared the nighttime meals for the first responders. As a further example, Ari introduced the United Hatzalah of Israel psychotrauma team to the Miami Dade Fire Department, and walked the Fire liaison to meet the IDF interview team.  Ari brought networking cables, chargers, batteries and hubs to power cellular telephones, provide cellular signal and WiFi internet. Ari also came up with the idea of identifying missing people using the data from Amazon on packages they would send to the condo, which he understands law enforcement was able to use.

Ari reports that the most rewarding, yet incredibly difficult thing he was asked to do was to help interview families and survivors to collect clues that might help recover a relative, or to share the good news that someone was not in the building at the time of the collapse.  Ari received a letter from the mayor of Bal Harbour village for his efforts, which reads:

A-2331

## BAL HARBOUR
- VILLAGE -

**GABRIEL GROISMAN**
**MAYOR**

July 16, 2021

Ari Teman
Miami Beach, FL
E: ari@jcorps.org

Dear Ari,

Thank you for your help with our community's efforts in responding to the Surfside Champlain Towers Tragedy. You spent day after day in the family reunification center volunteering in many ways to help the families of those lost in the tragedy as they awaited the ultimate news. Your work did not go unnoticed, as I saw you, on the ground, getting work done to assist in the mission of helping the families in various capacities. Thank you again and I wish you the best of luck in all your future endeavors.

Sincerely,

Mayor Gabriel Groisman

As Ari got more involved, he became a liaison between the different organizations, and ended up helping the survivors and families with all sorts of needs, from helping a father track down a trauma therapist so his daughter would eat, to getting food and supplies for the soldiers and volunteers, to getting a tent over the security checkpoint so families would not get rained on while the police checked them in, to a myriad of other random tasks.

Ari was asked to interact with Chabad, who was running the largest synagogue in the area, "The Shul". Ari was able to help them get a table and get set up for families to walk over and get help. Because he had to be home by a certain time, Ari continued his work through the night on WhatsApp – helping families and other organizations interface with them and with brokers to help find replacement homes, funding and supplies. Ari designed a form for the survivors to fill out listing any immediate needs – from housing to pet supplies, to therapy, because, again, he saw the system was a mess, and that organizing a database is something that he is quite expert at doing.

Even the relief effort at Surfside has come to rely on Ari and his final thought to your Honor is not about himself – but about others:

17

I really do hope Your Honor will allow me to remain free to help them. Many of the organizations have already left Surfside, and the news media are on to the next big thing. These people still do not have homes, funding, even equipment to do their jobs, and it will take months to get them back on their feet, and they will also need consistent voices to speak with to work through the trauma -- something I have known and experienced in a different form, firsthand. I have helped at Surfside and will continue to help if your Honor will allow it. Might I suggest a sentence of community service – I could do so much good at Surfside, where they seriously need an organizational person. Doesn't that make more sense than having me waste away at a federal prison facility. I hope that your Honor will consider the needs of these people – and my need to help others.

A-2333

L7SsTEMs

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                          19 CR 696 (PAE)

5  ARI TEMAN,

6              Defendant.

7  ------------------------------x

8                                      New York, N.Y.
                                       July 28, 2021
9                                      1:30 p.m.

10
   Before:
11
                   HON. PAUL A. ENGELMAYER,
12
                                       District Judge
13

14                      APPEARANCES

15 AUDREY STRAUSS
        United States Attorney for the
16      Southern District of New York
   KEDAR S. BHATIA
17 JACOB GUTWILLIG
        Assistant United States Attorneys
18
   SUSAN G. KELLMAN
19 ANDREW J. FRISCH
        Attorneys for Defendant
20
   ALSO PRESENT:
21 DANIEL ALESSANDRINO, NYPD Detective

22

23

24

25

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

A-2334

2

L7SsTEMs

 1            (Case called)

 2            THE DEPUTY CLERK:  Counsel, please state your

 3    appearance for the record.

 4            MR. BHATIA:  Good afternoon, your Honor.  Kedar Bhatia

 5    for the United States, joining as well is AUSA Jacob Gutwillig

 6    and NYPD Detective Daniel Alessandrino.

 7            THE COURT:  All right.  Good afternoon, Mr. Bhatia.

 8    Good afternoon, Mr. Gutwillig.  And good afternoon, Detective

 9    Alessandrino.

10            For the defense?

11            MS. KELLMAN:  Good afternoon, your Honor.  Susan

12    Kellman for Ari Teman, and I'm joined at counsel table by Andy

13    Frisch.

14            THE COURT:  All right.  Good afternoon, Ms. Kellman.

15    Good afternoon, Mr. Frisch.  Good afternoon, of course, to you,

16    Mr. Teman.

17            THE DEFENDANT:  Good afternoon, your Honor.

18            THE COURT:  One moment.

19            Mr. Smallman is just enabling the public to dial-in.

20    We'll stay mum until he has confirmed that the line is open.

21            All right.  Mr. Smallman has confirmed that the phone

22    line is open, so I've just taken the appearances of counsel and

23    Mr. Teman.

24            I want to as well thank, as always, our court reporter

25    and I want to welcome those who are auditing the conference by

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L7SsTEMs

1    phone.

2        All right.  We're here today to impose sentence in the

3    case of United States v. Ari Teman.  On January 29, 2020,

4    following a jury trial, Mr. Teman was convicted on four counts:

5    Two counts of mail fraud and two counts of wire fraud.

6        In preparation for today's proceeding, I reviewed a

7    great deal of materials.  I have refreshed my memory, of

8    course, as to the trial record.  I've also reviewed the court's

9    lengthy post-trial decision in June 2020, resolving Mr. Teman's

10   various Rule 29 and Rule 33 motions, docketed at docket 138.

11        The 13-month period between then and today's

12   sentencing has been an unusually active one on the docket.

13   I'm going to review now the voluminous materials submitted in

14   connection, first of all, with the originally scheduled

15   sentencing which was to be on December 1 of last year.

16   Specifically as to materials submitted either in connection

17   with that sentencing or contemporaneous with the sentencing

18   process, I reviewed the following materials submitted before

19   the original sentencing date.

20        Counsel, keep track here because, at the end, I'm

21   going to ask you to confirm that you have received all this and

22   that you have reviewed it and that there is nothing else.

23        So I've reviewed the presentence report dated

24   April 23, 2020, including its representation and addendum.

25   I've reviewed the defense's original sentencing submission

A-2336

4

L7SsTEMs

1    dated July 7, 2020, and the numerous exhibits to that

2    submission.  They include a number of letters in support of

3    Mr. Teman.  They also include medical records.  I've also

4    reviewed the government's sentencing submission dated July 14,

5    2020.  I've also reviewed the series of letters from counsel

6    relating to the issue raised by then incoming counsel for

7    Mr. Teman, the Sher Tremonte firm, related to the government's

8    obligations under Brady v. Maryland.  Those letters and the

9    court's orders on this subject are docketed beginning at docket

10   156 and culminated in the court's order at docket 165.  I have

11   also reviewed a series of letters from counsel in response to

12   the court's order at docket 168, offering to adjourn sentencing

13   in light of the state at the time of the COVID-19 pandemic.

14   These include the letters at dockets 167, 169, and 170.  I've

15   reviewed the docket, the defense letter at docket 169, insofar

16   as it also attached a very moving letter from Mr. Teman's

17   parents.

18           I have reviewed the defense's submission at docket

19   173, attaching a waiver form signed by Mr. Teman and his then

20   counsel consenting at the time to an in-person -- to the waiver

21   of an in-person sentencing proceeding.  And finally, on

22   November 30 of last year, in the 24 hours before the sentencing

23   proceeding that was to then occur, I received, in rapid

24   succession, three submissions relating to the forfeiture and

25   restitution.  The government's letter at docket 174 attaching a

**A-2337**

L7SsTEMs

1    proposed preliminary ordinary of forfeiture, the defense's

2    letter at docket 176, and the government's letter reply at

3    docket 177.  That brings me to the sentencing hearing that got

4    started but didn't go much further than all that on December 1

5    of last year.

6         I read the transcript of that proceeding culminated in

7    Mr. Teman's termination of the Sher Tremonte firm.  Since then,

8    I've received and reviewed the following materials:

9         There were numerous submissions relating to

10   Mr. Teman's representation, which again culminated in the

11   withdrawal of the Sher Tremonte firm, the withdrawal of

12   Mr. Teman's trial counsel, and the appearance of Ms. Kellman

13   and Mr. Frisch.  These include the entries between dockets 181

14   and 196 at dockets 199 and 200 and between dockets 204 and 208.

15   There were also submissions relating to an escrow account held

16   for Mr. Teman to enable him to pay restitution prior to

17   sentencing.  These are at dockets 197 and 198.  I've also

18   received the submissions made after my order at docket 202 on

19   January 28 of this year, submissions from counsel as to

20   forfeiture and restitution, and as to whether there are any

21   legal issues in this case that satisfied the standard for bail

22   pending appeal.

23        Specifically, I received a series of letters from the

24   defense seeking additional time for these submissions, which,

25   of course, I granted.  These are at dockets 209 to 214 and 216

A-2338

6

L7SsTEMs

1    to 217.  As to the substance of all this, I've reviewed the

2    government's submission at docket 215 regarding restitution and

3    forfeiture, the defense submissions at dockets 218, 219, 221

4    and 222, and addressed restitution and forfeiture, and also

5    moved to dismiss based on issues relating to the trial

6    testimony of Karen Finocchiaro and the government's summation,

7    and alternatively identified these issues as questions

8    supporting a bail pending appeal.

9        I reviewed my order in response at docket 220, the

10   government's request for additional time at docket 223, and my

11   order at docket 224 granting additional time.  I've reviewed

12   the government's response as to these issues at docket 225.

13   I've reviewed a host of communications relating to the

14   defense's request for the right to file a reply.  They are at

15   dockets 226, 227, 229, 231, 232, 234.  I've reviewed the

16   defense's reply at docket 233 and the defense letter seeking my

17   recusal at docket 235.

18       I reviewed my recent scheduling orders relating to

19   these matters at docket 228, 238, 239, I reviewed a lengthy

20   bench ruling I issued this July 9, among other things, denying

21   defense's motion to dismiss and for recusal.  That conference

22   is reflected on the docket at docket 240, which also scheduled

23   today's hearing.  I've reviewed the defense's supplemental

24   sentencing submissions, which are filed at dockets 242 and 243.

25       Finally, yesterday, I received an additional

A-2339

L7SsTEMs

1  sentencing submission from the defense, docketed at docket 250,

2  which attached a letter from a survivor of the collapse of the

3  tower in Surfside, Florida, attesting to Mr. Teman's

4  contributions to the relief effort.

5       I can't imagine I have left everything out, but for

6  avoidance of doubt, I have also carefully reviewed the entire

7  post-trial docket in this case.

8       Have the parties received each of these submissions

9  and has anything else been submitted, government?

10      MR. BHATIA:  Your Honor, I think that is actually the

11 full list, except there was a submission from this morning by

12 the defense regarding the payment of restitution.

13      THE COURT:  Yes, quite right.  I'm sorry.  Thank you

14 for mentioning that.

15      I did get that this morning.  That is the letter from

16 the defense.

17      Ms. Kellman, that's the letter from the defense this

18 morning that I received that sets out that a certain amount of

19 funds, in effect, being held in escrow towards the payment of

20 restitution to be paid out on certain conditions subsequent?

21      MS. KELLMAN:  Correct, your Honor.

22      THE COURT:  With that, have you received all the

23 submissions I listed and anything else I've left out?

24      MS. KELLMAN:  I believe, as far as I can tell, we've

25 received everything.  I know, your Honor, that Mr. Gelfand,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-2340

8

L7SsTEMs

1    trial counsel, had submitted a number of sealed submissions to

2    your Honor.

3            THE COURT:  Medical-related.

4            MS. KELLMAN:  I just want to be clear, they are

5    medical-related.

6            THE COURT:  I didn't reference that.  For clarity, I

7    did receive that document.

8            MS. KELLMAN:  I wanted to be clear on that.

9            Thank you, Judge.

10           THE COURT:  Having taken care of that, Ms. Kellman,

11   have you read the presentence report?

12           MS. KELLMAN:  Yes, your Honor, I have.

13           THE COURT:  Have you discussed it with your client?

14           MS. KELLMAN:  Yes, your Honor, I have.

15           THE COURT:  Mr. Teman, have you read the presentence

16   report?

17           THE DEFENDANT:  Yes, your Honor.

18           THE COURT:  Have you discussed it with your counsel?

19           THE DEFENDANT:  Yes, your Honor.

20           THE COURT:  Have you had an opportunity to go over

21   with counsel any errors in the report or anything else that

22   should be taken up with the court?

23           THE DEFENDANT:  I believe so, your Honor.

24           THE COURT:  All right.  Government, have you reviewed

25   the presentence report?

A-2341

9

L7SsTEMs

1          MR. BHATIA:  I have, your Honor, and we do have some

2     changes.

3          THE COURT:  We'll get to those things.  I'll begin

4     with factual accuracy and put aside the sentencing guidelines.

5          The first question I have is whether there are any

6     objections to the report regarding its factual accuracy.

7          Mr. Bhatia, I will note, by the way, that from the

8     PSR, that earlier defense counsel had objected to a draft of

9     the presentence report.  Not as to any facts, but as to a

10    guideline adjustment for sophisticated means, which the

11    probation department proceeded to remove from the final

12    presentence report.

13         For now, again, just focusing on factual accuracy, the

14    presentence report doesn't indicate that there are any from

15    either side.  Neither side's sentencing submission identified

16    any, and for Heaven sake, the PSR has been out there for 15

17    months.  But if anyone has any factual changes, here is your

18    opportunity to alert me to them.

19         Mr. Bhatia, do you have some?

20         MR. BHATIA:  Yes, your Honor.

21         These are actually related to the loss and restitution

22    amounts --

23         THE COURT:  Go ahead.

24         MR. BHATIA:  -- that have since been discussed.

25         In paragraph 22 and 32, there are references to the

L7SsTEMs

1   intended loss of $330,000.  We have checked the numbers, gone

2   back and checked the trial exhibits.  It is 333,000.

3           THE COURT:  Because it was 36,000 the first time

4   around and 297 the second time around.

5           MR. BHATIA:  That's right.

6           THE COURT:  All right.  I've reviewed that as well,

7   because I noticed, as you saw from my recent order, some

8   inconsistencies about 330,000 versus 333,000.

9           You're asking that I change the intended loss to 333?

10          MR. BHATIA:  That's right, and there are references to

11  that in paragraph 22 and 32.

12          THE COURT:  All right.  Defense, while I appreciate

13  that you are not in any sense conceding your client's guilt, do

14  you agree, Ms. Kellman, the sum total of the checks at issue

15  add up to that?

16          MS. KELLMAN:  Yes, your Honor.

17          THE COURT:  I will then make the change in each of

18  those paragraphs to 333.

19          Mr. Bhatia, anything further?

20          MR. BHATIA:  The other one, there were references to

21  the loss to the bank and, of course, that is to the subject of

22  extensive -- there are references to loss to the bank and, of

23  course, the fees were subtracted from that number.  The PSR

24  reflects the old number and the correct number for loss to the

25  bank is what is in the restitution order, and that is

A-2343

L7SsTEMs

1    $259,340.32.

2         THE COURT:  When you say loss, you don't mean it in a

3    guideline sentence, you mean it in the out-of-pocket today

4    loss?

5         MR. BHATIA:  Restitution out of pocket.

6         THE COURT:  What parts of the presentence report

7    needed to be modified to bring the out-of-pocket loss into

8    accuracy?

9         MR. BHATIA:  In paragraph 25 and 92.

10        THE COURT:  All right.

11        MR. BHATIA:  That's it, your Honor.

12        THE COURT:  All right.  One moment.

13        (Pause)

14        Ms. Kellman, again, recognizing that the defense is

15   not conceding guilt, do you agree that, just as a matter of the

16   mathematics, that is the amount that the bank has not been made

17   whole?

18        MS. KELLMAN:  Correct, your Honor.

19        THE COURT:  Then I will make those changes.

20        Anything else from the government?

21        MR. BHATIA:  Nothing else.

22        THE COURT:  All right.  Defense, any factual accuracy

23   from you?

24        MS. KELLMAN:  No, your Honor.

25        THE COURT:  All right.  Hearing no objection, save as

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L7SsTEMs

1    to the mathematical ones that government counsel has rightly

2    drawn my attention to, I will adopt the factual recitation set

3    forth in the presentence report as likely amended just now, the

4    report will be made a part of the record in this matter, and it

5    will be placed under seal.  In the event an appeal is taken,

6    counsel on appeal may have access to the sealed report without

7    further application to the court.

8          I believe, counsel, you have all publicly filed your

9    sentencing submissions save, as Ms. Kellman points out,

10   dimensions such as medical that are properly redacted or

11   maintained under seal.

12         But with that, just to confirm, has each side

13   otherwise publicly filed their sentencing submissions?

14         MR. BHATIA:  We have, your Honor.

15         MS. KELLMAN:  Yes, your Honor.

16         THE COURT:  All right.  Turning next to the sentencing

17   guidelines.

18         The court, of course, is no longer required to follow

19   the sentencing guidelines, but I am required at the threshold

20   to consider the applicable guidelines in imposing sentence.  To

21   do so, it is necessary that the court accurately calculate the

22   guideline sentencing range.

23         Here, the PSR calculates a total offense level of 19.

24   That's seven for the base offense level and 12 for the loss of

25   between 250 and $550,000.  It doesn't calculate any other

A-2345

L7SsTEMs

1   adjustments upward or downward.  It calculates a criminal

2   history category of I., yielding an advisory guidelines range

3   of between 30 and 37 months' imprisonment.

4           Government, do you object to those calculations?

5           MR. BHATIA:  We do not.

6           THE COURT:  Defense?

7           MS. KELLMAN:  We do not, your Honor.

8           THE COURT:  Then I, too, find that the PSR is correct,

9   actually, rather straightforward application of the guidelines,

10  for whatever they are worth in this case.  And so I will adopt

11  the presentence reports calculation of the offense level,

12  criminal history, and guidelines range.

13          All right.  The next subject I need to cover is

14  departures, which to say in the narrow framework of the

15  sentencing guidelines, neither side has indicated it is seeking

16  a departure from the guidelines, although I recognize the

17  defense is seeking a downward variance under the much more

18  flexible standards that apply to variances.

19          Just for the record, does any party contend that an

20  upward or downward departure within the guidelines framework is

21  merited here?

22          MR. BHATIA:  We don't believe there should be a

23  variance.

24          MS. KELLMAN:  No, your Honor.

25          THE COURT:  I agree.

A-2346

L7SsTEMs

1        I don't think, having reviewed the presentence report

2   and the parties' submissions and knowing the case well, I don't

3   find that a departure is available as a matter of law.

4   Obviously, that does not bear on whether a variance in either

5   direction is merited, and substantial arguments have been made

6   by the defense for one.

7        Having taken care of at length all those

8   preliminaries, does the government wish to be heard with

9   respect to sentencing?

10       MR. BHATIA:  Yes, your Honor.

11       The defendant in this case orchestrated a fraud on his

12  customers and the bank to steal, that is steal, more than

13  $300,000, specifically $333,000.  This was not a business

14  dispute.  This was not a misunderstanding.  This was not mere

15  cleverness.  This was fraud and this was theft.  It was

16  planned.  He did it once, and then he did it again.

17       The evidence at this week-long trial showed that the

18  defendant knew better.  He threatened lawsuits.  He threatened

19  and then, in fact, did place a lien on one of his customers.

20  He threatened foreclosure and he threatened referral to a

21  collection agency.

22       And, of course, we know how the story ends.  The

23  defendant deposited these checks that he drafted, purporting to

24  be from his customers, and he stole their money, leaving his

25  bank to cover for his fraud.  He never invoiced them.  He never

L7SsTEMs

1   told the bank to call the check with the customers.  He told

2   the bank to check with him.

3         And I think the most incriminating evidence that we

4   saw might have, in fact, come from the defense.  It was the

5   text messages at play where Mr. Teman checked with his lawyer.

6         "So what do you think about this?"  And his lawyer

7   said, "Bad idea.  It is a federal crime.  You'll be arrested

8   for this."

9         This was not a business dispute.  If you look at

10   Teman's own words, you see that.  In an e-mail to Joseph

11   Soleimani, he wrote, "I hate everything about chasing assholes

12   to pay."  Then we also cited a number of instances in our

13   sentencing submission where he further threatened and verbally

14   abused his victims.  In this case, at the time, his customers.

15         He called one of the employers an idiot, accused

16   Soleimani of lying to them, wasting months of his time, and

17   pretending that he was his friend, but instead was actually

18   trying to take his money.  Even during this trial, in fact,

19   rather a week before trial, Mr. Teman posted publicly on social

20   media that Mr. Soleimani was a scumbag slumlord who lied to the

21   police and was named the number seven worst landlord in New

22   York City.  He added #karma, and that he might sleep better

23   tonight knowing that Soleimani might have been publicly

24   embarrassed.  That's the defendant.  That's the way the

25   defendant treated his customers.  That's the way the defendant

16

L7SsTEMs

1  treated the witnesses in his pending trial.

2         Ultimately, for all of these reasons, we believe a

3  guidelines range is appropriate.  And in reaching that

4  conclusion, I thought:  What about the heartland of cases where

5  there is a check fraud with $333,000 in loss?  How does this

6  case play into the heartland of those cases?

7         Here, I think there are a number of aggravating

8  factors.  First, it is the defendant's behavior towards his

9  customers and his witnesses.  Those are the ones I just

10 mentioned.  There is the total lack of remorse.  The defendant,

11 through the extensive briefing in this case, has blamed just

12 about everyone else for what happened here, just about everyone

13 else for the fact that he knew what was right, and instead, he

14 stole the money.

15        For all those reasons, we don't think that this case

16 is actually much lower than the heartland of those cases.  We

17 think it is actually very serious, and all the aggravating

18 factors point towards a substantial term of imprisonment.

19        THE COURT:  All right.  Several questions for you.

20        Thank you, Mr. Bhatia.

21        Look, the shaping question as to the guidelines is the

22 usual one as to the guidelines, which is why they capture a

23 useful truth here.  The particular problem with the guidelines

24 that is not particular to Mr. Teman is just that the guidelines

25 essentially attempt to capture the bell curve of sentencing

L7SsTEMs

1  from the 1980s.  They are supposed to be amended to reflect

2  sentencing practices since.  To the extent they capture what

3  people tended to do in heartland fraud cases, it is what people

4  tended to do during the 1980s, we have had 30, 40 years since

5  then.  Numerous judges, including yours truly, have freed up,

6  by Booker, done what we think is reasonable under the

7  circumstances, which much more often than not results in a

8  below guidelines and often a materially below guidelines

9  sentence.

10        So the question is not whether this case is reasonably

11  representative of cases for which this guideline has been used,

12  but what useful value the guidelines recommendation that it has

13  here has given that it is somewhat out of date.  Sentencing

14  commission hasn't been able to meet and amend the guidelines

15  for the longest time because of sclerosis of the appointment

16  process.  So guidelines are somewhat anachronistic.

17        Help me with that.

18        MR. BHATIA:  We believe there is still a helpful

19  benchmark in evaluating the general culpability of the

20  defendant's scheme.  I understand, your Honor.  I think there

21  are a number of cases where judges would sentence outside the

22  guidelines.  We still think it is a helpful barometer, at least

23  a helpful starting point, in evaluating the equities.

24        THE COURT:  It appears to me, impressionistically

25  admittedly, that on this guideline, what people have, in fact,

A-2350

18

L7SsTEMs

1  been doing in the years since, in the last decade, let's say,

2  since I've been on the bench and particularly alert to

3  sentencing patterns has, by and large, for cases that fit this

4  guideline, imposed more often than not or as often below

5  guidelines and very rarely above guidelines.

6      I take it I can consider that as well as bearing on

7  the persuasiveness of the particular guideline recommendation?

8      MR. BHATIA:  That is certainly right.  I don't want to

9  speak on the statistics.  Anecdotally, that might well be

10  right.

11      THE COURT:  Couple of other things.

12      Let's focus on restitution for a moment.  You had a

13  restitution order at docket 215-1.  The presentence report has

14  a much more detailed set of mechanics for the payment of

15  restitution.  I want to get this right just once.

16      What are the government's views, in effect, as to

17  whether or not the mechanics that are set out in the

18  presentence report, including the percentage of income and the

19  like, whether that ought to be part of a restitution order?

20      MR. BHATIA:  I can speak to the incremental payments

21  or the lump sum.

22      In Mr. Teman's sentencing submission, he had almost

23  boasted that at sentencing, he was able to fully pay back the

24  victim in this case.  We put in our draft restitution order he

25  would pay it in a lump sum.

A-2351

L7SsTEMs

1          THE COURT:  And he has stated that in today's letter,

2     that if the conviction is ultimately upheld, the lawyers who

3     hold money in escrow for him will fully pay.

4          MR. BHATIA:  That's right.

5          THE COURT:  So I guess the question is:  What makes

6     that enforceable?

7          If one could count on that being enforceable, I

8     suppose we don't need to worry about percentages of income?

9          MR. BHATIA:  Sure.

10         THE COURT:  Is that what you're saying, essentially?

11         If I can secure a defense commitment that the money

12    that is held in escrow will be paid towards restitution, period

13    full stop, after a finally appealed judgment is affirmed,

14    assuming it is, then there is no need to worry about the

15    percentage aspect.

16         MR. BHATIA:  So we do oppose that proposal, but we

17    have another proposal that might achieve a similar end.  That

18    is for the defendant to make restitution payment to the Clerk

19    of Court.  However, this court can order the clerk not to make

20    disbursements to the victim until a further order of the court,

21    which would be if Mr. Teman's sentence is affirmed.

22         So in this scenario, Mr. Teman would make payments to

23    the Clerk of Court, and then this court, the clerk wouldn't

24    disperse those funds until this court orders the clerk to make

25    those payments.

L7SsTEMs

1          THE COURT:  Otherwise, I'm chasing lawyers and hoping

2     they are obedient.

3          MR. BHATIA:  I think that is right.  I'm certainly not

4     impugning any lawyers.  We just don't know the various parties

5     in this case, and I would hate for there to be litigation down

6     the road about those things.

7          THE COURT:  Assuming that either your approach is

8     adopted or that I acquire confidence that the lawyers will pay

9     up promptly upon final affirmance, there is no need for a more

10    detailed restitution order; that's your point?

11         MR. BHATIA:  That's right.

12         THE COURT:  All right.  It may be, depending on the

13    colloquy we have on this, that I have the government, post

14    sentencing, to submit an informed restitution order in

15    consultation with the defense.

16         MR. BHATIA:  And we will do that and we don't have an

17    objection to the monthly payment structure outlined by the

18    probation office.  We had just -- I thought Mr. Teman wanted to

19    pay it at sentencing and get credit for that.  If that is true,

20    great; if it's not, great.

21         THE COURT:  Helpful.

22         Now restitution and forfeiture, the amount, first of

23    all, I think we agreed is $330,000.  The legal basis I think

24    you've set out in your papers.

25         Here is the question.  I think the government is

A-2353

21

L7SsTEMs

1  making an elective decision here to pursue mandatory forfeiture

2  on top of restitution, correct?

3          In the sense that you charged forfeiture in the

4  indictment, you're allowed to do that.  In many cases, the

5  government does not do so on top of restitution, you've done so

6  here.

7          MR. BHATIA:  First, your Honor, I think you may have

8  misspoken and said the restitution was 330,000.

9          THE COURT:  333.

10          MR. BHATIA:  The forfeiture, that's right.

11          THE COURT:  The forfeiture is 333.

12          MR. BHATIA:  Forfeiture is 333.

13          THE COURT:  The restitution is the 259 number we

14  talked about earlier?

15          MR. BHATIA:  That's right.

16          THE COURT:  The question is, just to confirm, you are

17  seeking restitution, in effect, of the proceeds of the offense,

18  which are the $333,000, you're seeking that forfeiture on top

19  of the restitution award?

20          MR. BHATIA:  We are.

21          THE COURT:  The question then just is why?

22          In other words, there are cases where you do that, you

23  saw that in the case immediately beforehand involving a lawyer.

24  But in many cases, the government doesn't do that.  I'm curious

25  why the government has chosen to pursue that here.

A-2354

22

L7SsTEMs

1          MR. BHATIA:  Sure.

2          So in our view, restitution is mandatory, in that it

3   still leaves open your next question, which is why is it sought

4   in some cases and not in others.

5          THE COURT:  Forfeiture.

6          MR. BHATIA:  Forfeiture.

7          We have spoken, I have spoken with the forfeiture

8   coordinator in our office, and the view of the office is that

9   forfeiture is mandatory and should be sought when there is an

10  applicable statute and there are facts that would allow for

11  forfeiture.  Money was obtained.  It is the view of the office

12  that forfeiture is mandatory under the statute and that

13  forfeiture should be sought where applicable.

14         THE COURT:  In this particular case, forfeiture, in

15  effect, results in the defendant taking leave not only of the

16  ill-gotten gains in the form of restitution, because the bank

17  took about $70,000 and the restitution would be another

18  approximately 260, which will get you to 333, in effect,

19  doubling it up, taking forfeiture on top of that.  Putting

20  aside the legal availability of it, there is the question of

21  why.

22         MR. BHATIA:  Sure.  Again, I'll start and end with the

23  fact that, in our view, the statute requires it.  It is really

24  a discretionary --

25         THE COURT:  The statutes also requires mandatory

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-2355

23

L7SsTEMs

1    minimum sentences for gun cases and the government comes off it

2    all the time.  And I will represent to you, as one who sees a

3    pretty good cross-section of cases, that it is a fairly random

4    outcome generator as to whether the government, in cases like

5    this, pursues forfeiture on top of restitution.

6         I'm trying to figure out if there is a method to the

7    madness.

8         MR. BHATIA:  So I can give you reasons that we think

9    that they are not duplicative.  So, for example, restitution,

10   of course, is paid to the victim and can be paid in

11   installments.  Forfeiture, rather, if the defendant has the

12   assets, can be forfeited immediately so that defendant doesn't,

13   in effect, get the benefit of a long-term restitution plan.

14   There are reasons --

15        THE COURT:  There is no doubt here that the

16   defendant's not getting the benefit of a long-term restitution

17   plan.  We know, and we can count on what Ms. Kellman and

18   Mr. Frisch wrote, that the money for restitution has been set

19   aside.  He's not getting any benefit of that.

20        So it's a legal fiction that he is somehow benefiting

21   from the deferral of the payment of restitution until, let us

22   say, a final affirmance.

23        There is a distraction to all this.  I mean, the

24   answer appears to be because you can, but I am not

25   understanding what the value is except that it is another way

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-2356

24

L7SsTEMs

1   you want to punish Mr. Teman.

2          That is fine.  Forfeiture is a form of punishment, but

3   if so, say it.

4          MR. BHATIA:  There is a statutory basis, a statutory

5   purpose of forfeiture, which is punitive.  That differs from

6   restitution, of course, which is to repay the victims.

7          But, your Honor, I think you might have referenced in

8   your order from Monday why do we seek it in some cases but not

9   perhaps in cases that don't go to trial.  I can tell you, your

10  Honor, we are absolutely not seeking this here as a trial

11  penalty.

12         THE COURT:  I appreciate that you indicted the case

13  with a forfeiture provision.  You didn't know at the time

14  whether he would plead or not.  That being said, there are

15  cooperating witnesses, for example, where the information

16  includes a forfeiture provision and somehow at sentencing the

17  government doesn't move for the forfeiture.

18         Again, I haven't attempted a statistical cross-section

19  of cases, but I do note that the application of this is

20  inconsistent, and I can definitely say that in the context of

21  many cooperators where it was equally statutorily available, it

22  wind up not being sought.

23         That may say something about the government's approach

24  with respect to cooperators and the interest of having

25  something look optically strong in front of the jury and caring

L7SsTEMs

1   less at the time of sentencing, which is a problem.  But I'm

2   trying to understand if there is a method to the madness.

3       In other words, it is easy to say Mr. Teman should be

4   punished.  We wanted this to be part of the punishment.  The

5   statute makes it mandatory.  The harder problem is looking at

6   the shape of the hole and seeing the random outcomes on this

7   particular issue as it presents to me.

8       MR. BHATIA:  I understand, your Honor.  I can't speak

9   to the particulars of other cases.  I can say what our office

10  policy is, and I don't know the particulars of those cases.

11      THE COURT:  Let me then ask as a broader matter.  You

12  should bring this back to the office.  Just because the office

13  has a legal right to do it isn't a fully satisfactory answer to

14  a judge who is asking that there be some consistency in how it

15  happens.  Otherwise, it presents to me as a somewhat random

16  outcome generator on that.

17      That being said, do you agree, if the court imposes

18  forfeiture here, as does appear to be statutorily mandatory,

19  although I'll hear from the defense, that is a form of

20  punishment insofar as a critical 3553(a) factor here is just

21  punishment.  The government is asking Mr. Teman be punished by

22  having $333,000 forfeited.  It follows that incrementally less

23  other punishment is needed to get to a just punishment.

24      You've got to take the good with the bitter and sweet,

25  don't you?

A-2358

L7SsTEMs

1          MR. BHATIA:  Yes, your Honor.

2          The short answer is, I do think that the court can

3     consider all the factors, including the amount of forfeiture,

4     the amount of restitution, in crafting the overall sentence,

5     and that it all sort of baked into 3553(a).

6          THE COURT:  OK.  Next question for you, as for the

7     forfeiture order, the draft you gave me at docket 215-2, but in

8     any event, I'm not sure whether it has the correct amount in it

9     or not.

10          Are you comfortable with that as --

11          Here it is.  I've got the preliminary order of

12     forfeiture and money judgment at docket 215-2.  It has the

13     correct dollar amounts.

14          Are there any changes that the government believes are

15     needed with respect to that order?

16          MR. BHATIA:  No, your Honor.

17          THE COURT:  OK.  All right.

18          Next question are victims.  Bank of America appears to

19     have been fully noticed of this proceeding.  They sought

20     restitution.

21          Did they ask to be heard in any other way?

22          MR. BHATIA:  No, your Honor.

23          Also, the victims testified at trial.  Mr. Teman's

24     counterparties, we let them know they had the opportunity to be

25     heard at sentencing, and they said they didn't want to be

A-2359

L7SsTEMs

1  heard.  I do understand that some of them might have called in

2  on the public line.

3          THE COURT:  I'm happy for them to be auditing.  The

4  question is whether any of them communicated an intention to be

5  heard?

6          MR. BHATIA:  They did not.

7          THE COURT:  All right.  OK.  With that, I don't have

8  any other questions for the government.

9          I'll next ask whether defense counsel wishes to be

10  heard.

11          Ms. Kellman, will you be taking the lead?

12          MS. KELLMAN:  We have assigned each other different

13  pieces.

14          THE COURT:  OK.  May I ask, just for orderliness, I

15  would love to take care of the restitution and forfeiture

16  pieces first, and happy to hear a more holistic presentation.

17          MS. KELLMAN:  I've got forfeiture.  He's got

18  restitution.

19          THE COURT:  Why don't you take forfeiture.

20          I guess, Ms. Kellman, the issue is fully appreciating

21  the policy that I was engaging with Mr. Bhatia on.  It doesn't

22  appear as if I have any discretion as to the forfeiture matter

23  here, although I do have discretion in formulating the just

24  sentence to take into account the existence of forfeiture in

25  the case.

L7SsTEMs

1          Is that wrong?

2          MS. KELLMAN:  Well, I think logically it offends,

3     because if the government takes the position that it is

4     mandatory in some cases, but they don't apply it in other

5     cases, then --

6          THE COURT:  Well, it is mandatory if pursued.  It is a

7     little bit, like, right, the consecutive firearms count.  It is

8     mandatory if you charge it and established, but if they don't

9     charge it, even if the defendant admits the facts, you know,

10    under Apprendi and that line of cases, it doesn't apply.

11         It is the same concept here.  If they choose to apply

12    it, a court's hands are tied if the facts are established.  I'm

13    asking that question.

14         MS. KELLMAN:  I think, your Honor, to quote the court,

15    it seemed to me that your Honor felt, and I agree 100 percent,

16    that this is a case where there is no pot.  There is one pot.

17    It is a restitution pot.  And I think the court, the government

18    was singing the same song.

19         In other words, if you want restitution, he's worked

20    at getting the restitution.  There is no other pot.

21         THE COURT:  No, no, no.  Look, I agree with you that,

22    in terms of what he obtained from the offense, it is a legal

23    fiction that he has twice $333,000.  He got the $333,000 once.

24    The bank took 70 of it and 260 are now going to be paid towards

25    restitution, and the money to support a forfeiture judgment

L7SsTEMs

1 would have to come from somewhere.

2     Factually, I don't think anyone is disputing that.
3 But that is frequently the case we have forfeiture, that it is
4 on top of the restitution. I'm asking you really a law
5 question, which is when they pursue it on facts that have been
6 found as this, I think my hands are tied. I think it is
7 mandatory, but the statute says repeatedly shall.

8     MS. KELLMAN: It seems to me, Judge, this is my own
9 question back to the court, and I suppose which is then, what's
10 the difference between a fine and a forfeiture?

11     THE COURT: The answer is that's a really good reason
12 not to impose a fine. I mean, much as it is also a very good
13 reason to offset some portion of what otherwise would be the
14 just punishment.

15     You've got to look at this holistically, and I think
16 Mr. Bhatia conceded that. The question is whether taking this
17 step by step, I think I'm obliged to enter the forfeiture order
18 here.

19     Is there a reason in law as opposed to policy why I'm
20 not?

21     MS. KELLMAN: Well, I think, your Honor, if we look at
22 all of the factors of 3553 and the punishment is going to be
23 essentially double on the financial side, then I hope it would
24 have an impact your Honor's thinking.

25     THE COURT: And it would and it will. I'm asking you

A-2362

30

L7SsTEMs

1    a discrete point.  Last chance.

2           Any legal basis on which to not enter the forfeiture

3    order here?  It appears, to me, mandatory.  It is one of those

4    matters where it was a matter of executive discretion, given

5    that the facts support it, I need to apply the statute which

6    says repeatedly shall.

7           MS. KELLMAN:  I guess, your Honor, what still troubles

8    me is the notion that there is nothing to forfeit.  In other

9    words --

10          THE COURT:  That is what happens in substitute assets

11   cases all the time or where there is not as specific res,

12   r-e-s, but it is the sum proceeds.  That is a different legally

13   available form of forfeiture.

14          MS. KELLMAN:  What I was thinking about, in an insider

15   trading case where the money grows so that there is, it's not

16   what the person originally took, or misrepresented, but it grew

17   to a certain extent so that money should be forfeited because

18   that is part of the crime.

19          In fact, the statute says, derived from or traceable

20   to.  It seems to me that if the money, if there is money that

21   is derived from, as there is in the forfeiture aspect of it,

22   then it has to be repaid.

23          But what this person, what Mr. Teman would have to do

24   is go out and get money that he doesn't have that is not

25   derived from or traceable to the crime, as in an insider

L7SsTEMs

1  trading case and, therefore, it seems to me that it doesn't

2  really satisfy the language in the statute.

3         THE COURT:  Government, let me just ask you.  Come

4  back on the "derived from or traceable to" language.

5         MR. BHATIA:  We think that the funds were derived from

6  because they were taken into Mr. Teman's bank account.  At that

7  point, the forfeiture --

8         MS. KELLMAN:  I'm sorry, Judge.  I'm having difficulty

9  hearing him.  Sorry to interrupt.

10         MR. BHATIA:  -- the forfeiture statute is satisfied

11  because the defendant obtained those funds, whether he later

12  spent them or kept them or kept them in his bank account, he

13  obtained the fund and, therefore, the forfeiture statute is

14  satisfied.

15         THE COURT:  Yes.  I mean, Ms. Kellman, with respect,

16  I think as much of a legal fiction as we have here, I think the

17  government is right as a matter of the statute here.

18         That being said, decisions have consequences, and the

19  fact that Mr. Teman will be on the hook if I enter the

20  forfeiture order for a forfeiture on top of restitution has a

21  bearing on just punishment.

22         I take it you don't have any case law at this point?

23         MS. KELLMAN:  I think that's right, Judge.

24         THE COURT:  The problem is a statutorily mandatory

25  term.

L7SsTEMs

1        OK.  Mr. Frisch, before we move to more holistic

2   issues, with restitution, first of all, I very much valued the

3   letter today.  Quite helpful.

4        Move the mic closer to you.

5        The issue is the proposal Mr. Bhatia makes.  One way

6   or the other, you're both basically saying that, in the event

7   that I make a determination that the appellate process run its

8   course has been denied or whatnot and the verdict stands, that

9   the money would then be turned over either by the collection of

10  several lawyers who are holding pieces of the pot or by the

11  Clerk of Court being directed to remit the money.

12       Mr. Bhatia's proposal has a great deal of logic to it,

13  because I deal with the Clerk of Court all day long, and I

14  don't have to go chase down three separate law firms in

15  offsetting, you know, amounts of money.  There is a bit of a

16  discount that needs to be made because a little extra is being

17  held.

18       You can trust me not to order that the money be

19  dispatched from the Clerk of Court unless and until I've given

20  everyone notice and comment and it is unavoidable that the case

21  has reached the end of the road.

22       What's wrong with Mr. Bhatia's seemingly sensible

23  proposal?

24       MR. FRISCH:  To the extent that it is a sensible

25  proposal, it is something I want to discuss with the depositors

A-2365

L7SsTEMs

1    first before taking a position.  It ultimately might be that we

2    agree to it, but I don't feel, since I have an obligation, some

3    sort of fiduciary obligation, to the depositors as well as to

4    the other two lawyers, that I speak to it without first

5    consulting them.

6           THE COURT:  That is fair.  I mean, that is fair.

7           The government's proposal wasn't articulated

8    beforehand.  That being said, I will tell you, Mr. Frisch, that

9    in speaking to them, please convey to them that the only

10   functional difference between the two approaches is the

11   incremental hassle on the court and the theoretical, but

12   theoretical only, risk that there could be some mess-up

13   exemplified by the immediately preceding sentencing in what

14   happened to the money in the escrow account.

15          It simply is a lot cleaner if one payment has been

16   made to the Clerk of Court, and you can count on me, or if I'm

17   no longer here, a successor, to order the funds be paid to the

18   victim only when and if, you know, cert has been denied or

19   however else the end of the road is measured.

20          MR. FRISCH:  I understand.

21          THE COURT:  Is there any functional argument against

22   that?

23          MR. FRISCH:  I don't want to speak -- I don't want to

24   take a position of any sort until I hear from the depositors.

25          THE COURT:  Without limiting you, can you think of any

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L7SsTEMs

1   argument against that?

2          MR. FRISCH:  Independent of my obligation to the

3   depositors, no.

4          THE COURT:  OK.  All right.  Do you agree that the

5   dollar amount for restitution is $259,340.32?

6          MR. FRISCH:  I do.

7          THE COURT:  So let me suggest this:  Rather than

8   engaging at length about what is really a bit of a side issue

9   as to mechanics, please convey to the three depositors or the

10  lawyers who have the money that the court's very strong

11  inclination is to order -- please convey to them that my very

12  strong inclination is to direct that the money be paid to the

13  Clerk of Court, and I would be asking government and defense

14  counsel to work together on a restitution order that adopts

15  language that makes it clear that it is up to the court and

16  only on the defined conditions subsequent to order its release.

17         MR. FRISCH:  I will do so, and I will convey that.

18         I want the court to know, with regard to the letter I

19  filed this morning, which I believe is docket 251, the two

20  lawyers referenced therein, Mr. Kirschenbaum and Mr. Lieberman

21  have both been provided a copy of the letter and both expressly

22  agreed to the terms.  I want your Honor to know that.

23         With that said, I'll convey what your Honor noted.

24         THE COURT:  That being said, with no disrespect to

25  them, restitution is for me to order.  You've represented to me

A-2367

35

L7SsTEMs

1   that this money is being held on Mr. Teman's behalf.  I'm

2   hopeful that we don't have to get somewhere non-consensually.

3        But I'm telling you that it seems to make a lot more

4   sense if it is being held solely for the payment of

5   restitution, and you're asking me to treat these lawyers' word

6   as good.  It makes just as much sense, if not more, for it to

7   be paid into the Clerk of Court, and anything else gives rise

8   to doubt about whether this Mr. Kirschenbaum or the other

9   people are actually at risk of not paying that money over.

10        MR. FRISCH:  I understand your point, your Honor.

11        THE COURT:  You understand what I mean.

12        May I ask, out of curiosity, why the components of the

13   restitution sum are broken out into three parts as is has been

14   done?

15        MR. FRISCH:  I think it is simply a preference of the

16   depositors as to whose escrow account the money was held in.

17        THE COURT:  What do you mean the depositors?

18        MR. FRISCH:  The people, there are a total of, I

19   believe, five different people who have loaned money to

20   Mr. Teman for this purpose.  Two of them have counsel and

21   decided to deposit the money in that lawyer's escrow account.

22   The other three sent it to me.

23        THE COURT:  Then I need to be even more clear with

24   you.  If this isn't Mr. Teman's money and it is somebody who is

25   loaning it to him, I am beyond uncomfortable with the idea of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L7SsTEMs

1    some lawyer chosen by the lender holding onto the money.

2    Because if the lender has a rift with Mr. Teman, or Mr. Teman,

3    whatever conditions on Mr. Teman's repayment aren't met or some

4    other circumstance happened, that lender is then going to be

5    reaching out to the lawyer or may ask for the money back.

6         At that point, I'm at the mercy of the lawyers'

7    decision-making, which may be faithful to the seemingly

8    categorical promise you've made to me that it will be held

9    until I order its release, or the lawyer may feel because that

10   person is a source of business affection or whatnot, some

11   incentive to release the money.

12        I'm not going to be in the business of chasing three

13   lawyers.  That's not my job.  The money, if Mr. Teman is

14   seeking credit for having assembled money for restitution, it

15   needs to be available in a way in which there isn't any rigors

16   to my having to go get it or any risk to my ability to secure

17   it.

18        Please speak to those people and let's get a letter to

19   the court, let's say, by next Monday letting me know their

20   views about this and the defense's view about it.  Understand

21   that the odds are extremely high that I'm going to order that

22   it simply be deposited into the registry of the Clerk of Court.

23        THE COURT:  You're asking for Mr. Teman to get credit

24   for making efforts to amass the restitution, which some

25   defendants don't do.  I'm receptive to that, but we've got to

L7SsTEMs

1    put the money where the mouth is, quite literally.

2          MR. FRISCH:  I understand, Judge.

3          THE COURT:  Having taken care of restitution and

4    forfeiture, anything further on either of those subjects from

5    the defense?

6          MS. KELLMAN:  No, nothing.  Thank you, Judge.

7          THE COURT:  Then the floor is yours more broadly.

8          Go ahead.

9          MS. KELLMAN:  Thank you, Judge.

10          Judge, before we start, I wanted to acknowledge that

11    Mr. Teman's parents are in Israel.  They are on the line, and

12    they wanted to wish the court well this morning and that they

13    are listening in.

14          THE COURT:  Let me just say this.  I'll have more to

15    say about this letter.  I found Mr. Teman's parents' letter

16    quite moving and very revealing, and I want to thank them for

17    participating in the way they did by submitting the letter, and

18    I'm glad they are listening today.

19          Most of all, as a parent and a son, I'm glad that

20    Mr. Teman's parents and he appear to be in a better place now.

21          MS. KELLMAN:  Thank you, Judge.

22          Your Honor, this is really an unusual case, and one of

23    the reasons I think it is unusual is the defendant himself,

24    Mr. Teman, is an unusual fellow.  I think he's a fellow that is

25    not without his issues, as many of the submissions that your

L7SsTEMs

1   Honor has, both medical submissions, those from his parents,

2   and even the most recent one that we put in.  He's a young man

3   with a number of emotional problems.  We tried in our

4   submission to sort of trace them back to his parents to a time

5   when he was young and bullied, and he's grown in that respect

6   and seemed to have come into his own, as many people do in

7   college.  I'm still waiting for that day to come, but some day.

8            THE COURT:  You're referring to your offspring or

9   yourself?

10           MS. KELLMAN:  Myself.  My kids are much more mature

11   than I am.  That's so weird, right?  But yes.

12           But, in college, he seemed to have -- I don't want to

13   be facetious -- but grown into his ears.  He said that as a

14   young man, his ears were a big part of his problem, and they

15   tended to result in a lot of teasing and caused him a lot of --

16   he was bullied and it caused him a lot of anxiety.

17           When he got to college, he seemed to come into

18   himself.  And one of the ways that he did, one of the things he

19   credits for that, I think, is his connection in the Chabad

20   community, which is very accepting and very loving, very

21   supporting community, supportive community, and he began to

22   have confidence in himself.

23           There is a story in one of the most recent submissions

24   about a sink that he devised where he pulled apart plumbing and

25   he put the sink back together so that people could wash their

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L7SsTEMs

1   hands -- more people could wash their hands at the same time

2   before breaking bread.  And this became a very big thing at the

3   Chabad house on Friday evenings because people could eat more

4   quickly.

5           So this day, even telling me the story, his face

6   was -- he was so proud of this little thing because it made

7   people happy, and it made him happy that people were looking at

8   him in a way that caused him to feel respected as opposed to

9   bullied.

10          You know, the government sees him as a greedy

11  fraudster.  And yet, how incongruous is the extent to which he

12  has really dedicated so much of his life since college, during

13  college and since college consistently.  Not, you know, how

14  many white-collar clients I've stood beside who have done all

15  these good works since they got indicted.  You know, well, he's

16  gotten involved in this and he's gotten involved in that.

17          This is Mr. Teman's life.  He has always, since

18  college, during college, and since then, made charitable work a

19  part of his life.  Perhaps -- and I'm not a shrink -- but

20  perhaps it is his own way of healing himself.  Perhaps it is

21  the recognition that he needs to feel good about himself.  But

22  in doing that, it doesn't detract from the fact that he is

23  helping so many people, and that his instinct, when there is

24  problem, is to figure out how to help people.

25          In the submission that we submitted with the

A-2372

40

L7SsTEMs

1    photographs, one of the things he says is that when he got out

2    of this hospital where he was not getting the best treatment

3    for a psychological problem, for psychological problems,

4    Hurricane Sandy was just approaching New York.  And as upset as

5    he was years later, which he continued to be this upset years

6    later, and the trauma that he felt in that particular

7    surrounding, he immediately went to his apartment and started

8    reaching out to people to see who he could get to help, because

9    there were going to be old people not going to be able to get

10   downstairs because the electric was out.  Older people weren't

11   going to be able to get foot.  Handicapped people not able to

12   take care of themselves.

13          He immediately went to his community, starting

14   reaching out to his minions, pun intended, and be able to amass

15   dozens and dozens and ultimately hundreds of people who were

16   willing to get out in the street and make sure that people on

17   the Lower East Side had food and were able to be heard because

18   they had no electric and they had no way to communicate.

19          He did that instinctively.  That is what he does.  He

20   sees a problem and he tries to solve it.  Whether it is a sink

21   at the Chabad house or people who might potentially really have

22   problems because there is a storm coming and not going to be

23   able to get food and not going to be able to have electricity.

24          In the few hours that he has out every day -- he's

25   been on house arrest now with a bracelet for 18 months.  During

A-2373

41

L7SsTEMs

1    that time, I mean, during that time, at least since the

2    building collapsed in Miami, every minute that he's out of the

3    house, he's at that facility bringing people together.  And

4    when I say bringing people together, from what I understand

5    from the work he does, he's the computer geek, if you will, and

6    he can get the Israeli defense forces, the Israeli emergency

7    services people there, he can connect them with the fire

8    department, with the local sheriff's department, with the

9    governor's often, with the mayor's office.

10           He had the idea -- which I think nobody had thought

11   of; I wouldn't have even thought of it -- to reach out to

12   Amazon and to ask Amazon, still trying to find survivors or

13   find out who wasn't there at the time and that was a big

14   difficulty too, reached out to Amazon and was asking them if

15   they could provide information as to a list of people who got

16   packages delivered, who didn't get packages delivered, and do

17   they have different addresses at the time of the collapse, so

18   that they would be able to discern who might not have been home

19   at the time.

20           These were all efforts that he undertook.  And because

21   he does it all on his computer, he can do it at the scene,

22   which he did for the few hours a day that he was out, and he

23   could also do it at home.  So his efforts never stopped.  And

24   just from the pictures that we have submitted to the court and

25   the letter from the one mayor that we submitted, there were so

A-2374

42

L7SsTEMs

1    many other text messages and WhatsApps that, frankly, I had

2    difficulty reading or transferring to the court, but they were

3    endless.

4          And they were endless, because they said what the one

5    woman, came in the form of a letter that came to your Honor,

6    was from Mr. Longobardi, I think his name is.  He was a

7    survivor, and he explains how he felt the building shaking, had

8    two young children and his wife there, and they ran towards the

9    exit.  And they saw the staircase collapsing as they were

10   standing there, ran another direction, found the staircase,

11   made their way out.  And what happened?  They had nothing.

12   They didn't have a piece of paper.  They had nothing that was

13   part of their home.

14         People like Ari Teman were there to talk to them, to

15   get them services, to say you have this service, you have that

16   service, let's pull these services together.  He put together

17   an operation like I've never heard of before.  He was

18   coordinating U.S. Senator's offices with the governor's office,

19   with three different mayors' offices, and that was his life's

20   work that I think kept him sane.  As I said, I think in his own

21   way, it is his own treatment.  But he was able to amass not

22   10 people, 20 people, hundreds of his minions, of his JCorps

23   people, and more because he wasn't limited to just JCorps, but

24   he had the Israeli military, fire department.  Everybody wanted

25   to help.

A-2375

L7SsTEMs

1    Nobody knew how to coordinate all the helping.  He was

2    the computer in the middle of the whole thing, trying as best

3    he could to coordinate efforts, the efforts that wouldn't be --

4    there were times when people needed phones.  They didn't have

5    phones.  They didn't have tablets.  They didn't have computers.

6    They had no way to communicate to their families up north if

7    they were well.  He made sure that he reached out to Verizon,

8    he reached out to B&H, from B&H, the camera store.  He was able

9    to get them to donate computers and tablets.  He reached out to

10   Verizon and was able to get phones out into the street so

11   quickly.

12    I so remember the day after September 11 when my

13   office was down at Ground Zero and there was no way to

14   communicate.  None of our phones worked.  We couldn't tell

15   people that we were fine.  We could when we went home, but at

16   the time, it was just we had nothing.  To have somebody weeks

17   later, when the Verizon people were walking around the street

18   saying, Do you need a phone?  Do you need a phone?  He was on

19   the scene every day, when it was his only time out of house

20   arrest.  He could have been swimming, he could have been

21   surfing, could have been biking.

22    He committed himself 100 percent to making sure that

23   there was a mechanism by which everybody could reasonably,

24   hopefully, feel that there was going to be a tomorrow for them,

25   that they were going to be able to connect with the world, they

L7SsTEMs

1   were going to be able to get the food they needed.  You need

2   food, your organization needs food, here are people cook.  Your

3   organization needs phones, here are people giving out the

4   phones.  Through his computer skills, he was able to coordinate

5   all of that.

6           I hope that my submission has communicated that to

7   your Honor.  One of the things that struck me, when he was

8   talking about his efforts back in college with JCorps, was the

9   notion that it wasn't just about trying to help people or

10  trying to enlist other people to help people, but it was about

11  making it fun and making it rewarding so that more people would

12  want to help.

13          You know, I put in a little vignette for your Honor in

14  one of my submissions about the White House calling Mr. Teman.

15  And the reception said, This is the White House calling.  And

16  he said, Yeah, yeah.  I have an important date.  I can't talk

17  to you now.  He hung up.  I asked him about that.  He said he

18  hung up because he was having a very important luncheon with

19  one of David Letterman's comedians, and he was at the time

20  trying his hand --

21          THE COURT:  I understood he didn't think that it was

22  really the White House.

23          MS. KELLMAN:  He thought it was a comic store, some

24  other comedy club called the White House.

25          When the woman called back, it really was the White

A-2377

45

L7SsTEMs

1  House.  He said, I'm sorry.  Sorry, I just thought blah, blah,

2  blah.  She said, We get a lot of that.

3       So, but President Obama was reaching out to him as a

4  representative of JCorps, as the founder of JCorps, to

5  recognize his good works and the breadth of his good works.

6  JCorps started small, as a college operation, but it grew

7  quickly into being a few states.  And now it is throughout the

8  United States and Canada and Israel.

9       When you consider the number of people involved in

10  this organization, these organizations, or this expanding

11  organization that's been put together by this young man, it is

12  quite astounding to me.  I have, you know, a busy day in my

13  world.  I try my hardest to help beyond my means.  And, you

14  know, in the last year and a half, when we don't have to be

15  here, when we didn't have to be here -- you know, I give blood

16  every six weeks.  I mean, I'm sure that helped some people.

17  When you consider that with the kinds of extraordinary, and I

18  would say heroic efforts, and they are really selfless.  The

19  only thing he gets out of it is getting it done.

20       And maybe it makes him feel good inside, but whether

21  that is his motivation or not, what he has accomplished is

22  astounding.  I don't know anybody else who really has done

23  something like that and continues to do it under the worst

24  possible circumstances now, if you think you might be going to

25  jail, and maybe you better just sew your wild oats and get out

A-2378

46

L7SsTEMs

1    there and have a good time.  And he didn't do it.  He dedicated

2    himself to trying to help people.  And I think it is -- I think

3    it is astounding, and I think it is something that is so worth

4    considering when you balance -- sentencing is meant to be

5    punishment.  And God knows $333,000 in forfeiture is going to

6    be one heck of a punishment for a comedian on the one hand.

7            On the other hand, how much better is our community

8    served and his community served by a sentence that doesn't

9    involve jail and a sentence that gives him the opportunity to

10   give back to his to continue to give back to his community.

11           One of the things he said to me, Am I not going to get

12   credit for community service because I already do it?  I don't

13   think you ever get punished for community service.  The reality

14   is here, to put him in jail and take him away from being able

15   to continue his good works seems absurd in a way.  And it also,

16   in the time of COVID, seems cruel, because his underlying

17   health conditions, I think your Honor knows about his nasal

18   conditions, his respiratory conditions, he also has a back

19   condition that I think your Honor has a letter from his doctor

20   about.  This is not the time when somebody with respiratory

21   difficulties should be in jail.

22           And I will tell your Honor, and this is -- I know you

23   know how I feel about the MDC and the MCC, but I can't tell

24   you -- I went there last week, the MDC, and not a single guard

25   is wearing a mask.  They brag about not getting vaccinated.

A-2379

L7SsTEMs

1    The inmates, when they come down to see me, say that they had

2    to borrow a mask.  One mask for the entire unit.  Nobody wears

3    a mask.  And now with this new variant going around -- by the

4    way, there were vaccines available.  I have three clients who

5    got one vaccine in April, and not the Johnson & Johnson.

6            THE COURT:  I take it Mr. Teman has been vaccinated?

7            MS. KELLMAN:  He has been vaccinated, your Honor.

8            With the delta variant coming along, and even if he is

9    vaccinated, there are these other variants developing that can

10   make him sick as well.

11           He did bad.  Ultimately, the Court of Appeals says he

12   did bad.  I mean, the jury certainly said he violated the law.

13   He is in a position now, he's borrowed money.  He is going to

14   have to pay back every penny of it, to pay back the people who

15   he hurt, which actually here is the Bank of America, which,

16   understood, he still has to pay them back.  He'll have a

17   potentially mandatory $333,000 obligation hanging over his

18   head.

19           To put him in jail on top of that, and to make it in a

20   way so that he can't even earn money, if he needs to pay the

21   money back, he can't work, and he can't do the work that he

22   loves to do, which is the work that helps people.  It makes no

23   sense to me.

24           I understand that, you know, that sentencing is about

25   punishment, and I get that.  Of course I get that.  But there

L7SsTEMs

1    is a punishment in making somebody pay three -- somebody who

2    doesn't have the money -- pay $333,000.  And there is a

3    tremendous amount to be gained by allowing someone like him to

4    continue to do the community service that he does.  And if your

5    Honor were to factor in or come up with a proposal that

6    permitted him, for example, to continue to be under house

7    arrest -- he'll kill me for saying that, he's really enjoying

8    that, not that he should, it is meant to be punishment.  He has

9    been under house arrest for 18 months.

10         If the house arrest were to continue, perhaps not the

11   festivities, so he can continue to work and do the good, good

12   deeds that he does, I would submit to your Honor that that was

13   a much more productive way to punish somebody by keeping him at

14   home, unless they are doing good.  It seems to me, it just

15   makes more sense, especially now he's going to need to be

16   working too because he needs to raise $333,000, which will take

17   a standup comedian some period of time.

18         I hope your Honor, thinking about the guideline, you

19   know, 3553(a) factors and, of course, the court wants to send a

20   general message, general deterrence, no doubt.  But there is

21   the specific deterrence as to this defendant, and I don't think

22   he'll jaywalk ever again.  The punishment here is you're going

23   to have to stay home unless you're out there doing something

24   good, and that seems to me to be a tremendous way to recognize

25   the importance of punishment, and the importance -- together

A-2381

L7SsTEMs

1  with the importance of giving something back.

2         There aren't that many people who can give back, to

3  give back or able to give back.  And he is able to do that, and

4  he's been doing it, notwithstanding the conditions that he's

5  been under.  And he did it for two decades, a decade and a

6  half, before he got into any trouble at all.  It is who he is.

7         And he explained to me, when we were talking

8  yesterday, Judge, about what kinds of things he might say to

9  your Honor.  One of the things that he spoke about was he grew

10  up in New Jersey, in a small town in New Jersey.  I think

11  everything is small in New Jersey, but whatever.  And he

12  remembers visiting a friend in the hospital.  He said while he

13  was visiting the friend, it was early in the afternoon on

14  Shabbat, Friday afternoon, and in walked a dozen or more men

15  who had walked miles to come and spend the hours before that

16  both with this individual because they didn't want him to be

17  alone on Shabbat.

18         He comes from a community that gives back.  He was

19  taught to give back as a child.  It is important to him, it is

20  important to his parents, and it's been important to him his

21  entire life.  And so for that, Judge, I would urge you to

22  consider a sentence that involves punishment, which is a

23  forfeiture punishment, which is house arrest or home detention,

24  or whatever it is that it is called after sentencing, as a

25  sentencing punishment, but couple that with the kind of

L7SsTEMs

1    community service.  I would say, if you fix a number of

2    community service hours, he'll do twice as many or three times

3    as many, because it is what he does.

4        We should recognize that, because when you balance, as

5    Booker say, we need to balance sentencing criteria.  The good

6    that he's done versus the bad that he's done.  I never suggest

7    that if, ultimately, the case against him -- and I think your

8    Honor knows that we have a very fundamental difference about

9    what kind of a situation factually this crime is -- and

10   ultimately that will be decided by the Court of Appeals.

11       So I don't want to belabor that here, but I think

12   certainly during the pendency of an appeal, that a non-jail

13   sentence, where he is permitted to continue to do the good

14   works that he does, is what I would ask your Honor to consider.

15       THE COURT:  All right.  Thank you.  Thank you for a

16   superb sentencing submission.

17       Ms. Kellman, just a handful of questions.

18       Just a few discrete points from the PSR I needed some

19   help understanding.  The presentence report refers to more than

20   $7 million in assets on his financial statement, but then

21   disregards them.

22       What is that a reference to?

23       MS. KELLMAN:  Then disregards --

24       THE COURT:  Disregards them as it relates to his net

25   worth.  I don't understand what that was.

A-2383

51

L7SsTEMs

1          MS. KELLMAN:  Can I have just a minute, Judge?

2          THE COURT:  Go ahead.

3          (Pause)

4          MS. KELLMAN:  Your Honor, can you tell me what page

5     that is on?

6          THE COURT:  One second.  I'll find it.

7          MS. KELLMAN:  We believe it's a typo.

8          MR. BHATIA:  Your Honor, it's on page 12.

9          THE COURT:  Yes.  Business contracts, four contracts

10    value $7,367,000, but then it washes away as to the value.  I

11    just didn't understand what that was.

12         MS. KELLMAN:  Yes.

13         My understanding, Judge, is that this is the estimated

14    money that if he were to win the lawsuits that he has pending

15    in the Southern District of New York -- he has several civil

16    lawsuits pending against some of the people who were involved

17    in this case -- if he were to win those lawsuits -- I'm sorry.

18    Not against people in this case, but he does have several

19    lawsuits pending in the Southern District of New York in

20    connection with businesses that he has operated.

21         THE COURT:  It requires an assumption that he wins the

22    lawsuits?

23         MS. KELLMAN:  Exactly.

24         THE COURT:  Forgive me.  Forgive me one moment.  I

25    think I'm going to reference this by paragraph number.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-2384

L7SsTEMs

1           MS. KELLMAN:  When you said $7 million, he had a

2      guitar.

3           THE COURT:  Can I ask you just, I'll be discrete, to

4      turn now to paragraph 56, please.

5           MS. KELLMAN:  Yes.

6           THE COURT:  Ms. Kellman, I'll put it, without leaving

7      other people's names out of it, there is a reference here to

8      orders of protection for people born one in the 1950s, one in

9      the 1980s.

10          What is that about?

11          MS. KELLMAN:  If I can just have a minute, Judge?

12          (Pause)

13          Your Honor, as I understand it, with respect to the

14     first situation, my client explains that he didn't even know --

15     this is a relative, and he didn't know about that particular

16     thing.  It was never served on him.  He didn't know about that

17     protective order until he read it in the PSR.  Maybe it was

18     filed somewhere.  It was never served on him.

19          The second one had to do with an old girlfriend who

20     was concerned that he was going to say things about her after

21     they broke up in his comedy act.  So this was served on him to

22     make sure that she -- he wouldn't sign a non-disclosure.  This

23     was served on him.  He couldn't make jokes about her.

24          THE COURT:  I'm treating those as a nonissue, but

25     thank you.

A-2385

L7SsTEMs

1           MS. KELLMAN:  Yes.

2           THE COURT:  May I ask you just to jump ahead.  I

3    invited the defense to make a suggestion about bail pending

4    appeal and in response came the motion to dismiss.

5    Understanding that that issue is something that you are

6    reserving as a potential issue for appeal, is there some other

7    substantial question of fact within the meaning of

8    3143(b)(1)(B) that you would identify for me?

9           MS. KELLMAN:  Your Honor, with respect to bail pending

10   appeal, I think substantively, on the law, I think that bail

11   pending appeal here is appropriate.  The cases are legioned, to

12   the extent that they say that unless the issue viewed by the

13   court to be frivolous, that the presumption is in favor of bail

14   pending appeal.  And the statute itself says that defendant

15   shall be released pending appeal if, one, he shows by clearing

16   and convincing evidence he is not likely to flee or pose a

17   danger to the community.

18           He hasn't fled.

19           THE COURT:  I'm not asking about that.  The fine

20   provision under the Randall decision, that basically makes a

21   close question, the court doesn't need to certify his or her

22   own error, but it needs to be a close question.

23           Define for me what the close legal questions would be

24   that would result in adequate or no jail sentence.

25           MS. KELLMAN:  Your Honor, I think the issues that we

A-2386

54

L7SsTEMs

1    had, I think the primary issue would be the issue that we raise

2    the --

3              THE COURT:  Involving the bank?

4              MS. KELLMAN:  Exactly.

5              In other words, we felt, particularly the declaration

6    that was filed in our motion by the banking expert, we thought

7    very clearly delineated the issues.  We thought it was

8    interesting that the government, or not so interesting, that

9    the government did not respond with a comparable expert.  I

10   thought that spoke volumes.

11             To bring this expert, criticized the government's

12   investigative witness who, in our view, gave legal opinions

13   which we contend she wasn't competent to give.

14             THE COURT:  Putting aside re-litigating that issue,

15   you know my views about that from the bench ruling, are there

16   any other issues that would support or qualify under Randall?

17             MS. KELLMAN:  I think there is a constructive

18   amendment issue which I think is also a serious issue here and

19   not at all frivolous.  I think those are two of the strongest

20   arguments.

21             And I'm reminded, your Honor, Mr. Frisch and I years

22   ago were before Judge Gleeson on the Mahaffy case and legal

23   argument in that case on that issue went on for almost three

24   hours.  And Judge Gleeson, I've known him many, many years,

25   I've never seen him so sure that he was right, that there was

L7SsTEMs

1  no way to see the other side of the issue.  And yet he did give

2  all of the defendants in this case bail pending appeal.  And

3  when we got to the Court of Appeals, as your Honor knows, they

4  took a very different position.

5          We are all wrong sometimes, and I think that

6  constructive amendment here and the issues raised by

7  Mr. Fraher's declaration raised serious and substantial issues,

8  not frivolous issues at all.

9          THE COURT:  All right.  Thank you.

10          Mr. Teman, do you wish to make a statement?

11          THE DEFENDANT:  Yes.  Yes, your Honor.

12          THE COURT:  Great.  Just whether you're standing or

13  sitting, speak into the mic.

14          THE DEFENDANT:  Yes, your Honor.

15          MS. KELLMAN:  This is when being tall is not that

16  impressive.

17          THE DEFENDANT:  Maybe I'll just sit, for the sake...

18          THE COURT:  As you are able.  Whatever works for you,

19  just speak into the mic.

20          THE DEFENDANT:  Thank you, your Honor.

21          Your Honor, I do not know what will happen to me

22  today, and perhaps it's true of us all, as tragedies like

23  Surfside remind us all too brutally.  But I have learned a

24  great deal from this experience.  One hard lesson I've learned,

25  which I've shared with my friends, over the past two years is

A-2388

L7SsTEMs

1    that who you interact with, the qualities of the people you

2    engage with and work with on a daily basis is the most

3    important thing.

4        I spent the first three decades of my life surrounded

5    by my family and community that genuinely cares about helping

6    others.  A community that shows up.  And then, as comedians

7    would say, Ms. Kellman stole my act.  The story of them showing

8    up on Shabbat, walking hours in the heat.  Teaneck is a small

9    town, but hours of walking doesn't feel small.  And when you're

10    surrounded by a community, you take it for granted.  Maybe this

11    foolish exile of mine in this past two years and mistakes I've

12    made have helped me realize how remarkable that the community

13    is normal really is.

14        In Surfside, I was reacquainted again with people in a

15    community that cares.  Not only the local Jewish community and

16    the Israeli defense forces team, but people from all over.

17    People from all over the world and all backgrounds.  People

18    love to knock Florida, and we earn it at times.  But I got to

19    see in a hotel where cameras and press were not allowed, that

20    the senators and the governor and the local politicians -- your

21    Honor has a letter from Mayor Grossman -- and so many

22    volunteers and officers and teams, when nobody could even take

23    a picture of what they are doing or brag about it, there was no

24    press, they were genuinely listening and sitting with people

25    and acting to help.  Giving up weeks of their time.

A-2389

L7SsTEMs

1          And because I was surrounded by and working with these

2    people, we were able to do incredible good, and it continues.

3    Yesterday, I got news that some of the work we've done over the

4    last couple of weeks has come to fruition.  When laptops and

5    tablets from B&H, which we got people from the community and

6    the shul -- it is called the shul in Belle Harbor, it is a big

7    synagogue -- helped to raise money and arrange for the

8    survivors.  And over the past two weeks, I have been

9    interacting with the survivors over WhatsApp, and it would take

10   two minutes for them to tell you about the kind of MacBook they

11   had, and then they would send photos of the family that they

12   lost or talk to me about things that they were going through.

13   In an odd way, facing this was grateful that it was a

14   meaningful and important distraction.

15          And I'm still working with Rabbi Lipskar and his team

16   to get the laptops and the tablets to survivors, now that they

17   no longer have their Red Cross funded hotel.  And from those

18   calls -- and I'm still helping survivors find housing and other

19   necessities -- a mother told me that her 15-year-old daughter

20   was having a very difficult time.  And a friend of mine said

21   that his wife who owns a salon wanted to help the survivors.

22   So we arranged a spa day for the mother and the daughter.  And

23   it's a small thing, but maybe it helps them get through the

24   day, and maybe that is all they need to get through the next

25   month.

A-2390

58

L7SsTEMs

1      The father mentioned that he lost his bicycle, him and

2  his son, and I love to bike.  And I want to thank my probation

3  officers, Officer Zoria and Officer Delesdernier, and your

4  Honor, who was very kind to open my hours when the doctor

5  requested and allowed me to cycle.  And, in fact, I would cycle

6  past this building frequently.  Actually, I should be in better

7  shape given the number of times I've been on the bicycle.  But

8  it's why this building, why I had to go to it, because these

9  were my neighbors.

10      So I'm reaching out to the local bike shops and trying

11  to help them find these bicycles.  Because of COVID and

12  everybody finding a love for cycling, bicycles are in scarce

13  supply.  One owner of a bike company even said he would love to

14  give them the bike, he doesn't have the parts.  We are still

15  working on that.

16      I digress for a second to point out that my Bubbee and

17  Zaydee -- I don't have to translate for your Honor, but I guess

18  for the record, my grandma and my grandpa -- helped to start

19  the shul, the synagogue, that is helping this community, the

20  one that helped me do this laptop project.  And I was even in

21  the shul when it was a tiny storefront, when I was six years

22  old.  I was a kid from the small town of Teaneck, New Jersey,

23  and I was very confused why we were going to a store on Shabbat

24  for my cousin's bar mitzvah, and it is now this colossal

25  organization.

A-2391

L7SsTEMs

1       It has been a very difficult week for me, obviously,

2  for two different reasons.  It was nice to feel a little bit

3  that I was continuing my Bubbee's work and her life's

4  dedication to helping the community.  And I hope that she would

5  be proud of me.  And I know my mom and dad are listening today,

6  and I feel so bad that they have to listen to this.  Not this

7  part, but -- and my girlfriend and so many people around the

8  world who have been so kind.

9       What I think this incident in Surfside highlights,

10  your Honor, so well is that whom we associate with is what

11  brings out the best or the worst in us.  Your Honor has the

12  choice to have me continue to associate with these helpers in a

13  community that needs my help or to be locked up, where I can do

14  no good.

15       I hope your Honor sees that continuing to be around

16  helpers, volunteers, the Rabbis, the families who are, even

17  though they are suffering, they don't hesitate to help each

18  other, the local mayors who took off their day jobs for work,

19  that this is far more rehabilitative and productive than being

20  locked in a prison could be.

21       One of my favorite lines from a TED talk, and I've

22  watched it many times thinking I would be so close to it, it is

23  by Bryan Stevenson, a famous attorney for children who have

24  been accused of horrible deeds.  And the line is, We are not

25  the best or worst thing we have done.  We are not the best or

L7SsTEMs

1  worst thing we have done.

2       I am deeply flawed person, and I have made many

3  mistakes and said many things which I regret.  And I've

4  e-mailed them and written them too.  I have failed to take care

5  of my health, and especially my mental health at times, and it

6  has caught up with me and it has hurt others.  And, your Honor,

7  I'm sorry for those things which I have said and written in

8  anger and really in fear, because I have incredible fears that

9  I need to continue working on.  I am working on them.  It's

10 difficult, given where the fears are coming from, but I'm still

11 working on them.

12      I have been blessed with life, and it's my

13 responsibility to take care of it, to get help.  I am getting

14 it, your Honor.  But I am not the worst things I have said or

15 done.  I am not the best things at all times either.  But when

16 I am around people who help, people who care -- and your Honor

17 has many letters from them -- then I am the best version of

18 myself.  In fact, I am inspired to become a better person and

19 to work hard at that goal.

20      This past month, the best of me has come out and

21 grown.  If I continue to help these survivors and these

22 families and they continue to seek my help, which at a time of

23 great stress and perhaps feelings of worthlessness and regret,

24 it's quite a privilege and quite a reminder of Attorney

25 Stevenson's great line.

A-2393

L7SsTEMs

1        So I hope your Honor let's me keep helping these

2    people and to continue to expand my volunteering in JCorps back

3    to where it was.  But not only because of them, but because the

4    best way to make me a better person, to fix my flaws, to guide

5    me on the right path is to surround me with these people.

6        As your Honor has just heard, I've done all that I can

7    to raise the money needed for restitution.  I hope your Honor

8    will agree that the best way for me to correct my behavior, in

9    addition to continuing therapy as recommended by my doctor and

10   the PSR, and to continue building and being coached in coping

11   skills, and hopefully COVID restrictions allowing being with my

12   family, is to continue to work daily with these people who

13   help, who care, who are driven by deep universal values.  I

14   hope that your Honor will allow me to keep helping people and

15   not perish in an institution.

16       I understand from the press, the recent *Daily News*

17   article, and from your Honor's own statements, that your

18   Honor's goal is to be compassionate and fair and not subject

19   people to unnecessary trauma that comes from incarceration

20   generally, and now with COVID.  Ms. Kellman just elaborated,

21   and others have even more.  Of course, your Honor has sealed

22   documents as to my history with confinement and I the deathly

23   fear that comes with it.

24       I believe that volunteering is a powerful way to help

25   many people who are lost, who, perhaps, let business matters or

A-2394

L7SsTEMs

1    fears or family issues or whatever consume them to find

2    themselves, to return to finding their values and being guided

3    by their values.  Perhaps, and I hope, this case can be one

4    small example of compassionate and effective ways to make

5    corrections.  I am not as wise or as educated as your Honor,

6    but I know that nothing has corrected my direction in life and

7    inspired me to cling to our precious Jewish values as much as

8    helping others and being around those who help others.

9         I beg your Honor to allow me to continue, if your

10   Honor does not confine me and allows me to keep helping people,

11   who for some reason need my help.  And Ms. Kellman called me

12   the computer, but inadvertently for some reason I've found that

13   it is actually just the inability to say, well, why can't we

14   get this done now.  Impulsivity, as your Honor knows, has

15   gotten me into trouble at times.  But in the middle of a

16   crisis, it seems to be somehow why not walk up to Senator Scott

17   with an ankle monitor on and ask him to help with Amazon.

18        Your Honor, not only will I continue to work in

19   Surfside, but I will grow JCorps and get more young adults

20   involved in volunteering and in seeing the value of service.

21   We are even working on a video platform so that they can

22   volunteer with seniors and people in hospitals even during this

23   endless cycle of lockdowns and variants and all sorts of

24   restrictions online, but designed so that nobody is one on one

25   with vulnerable people or minors.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-2395

L7SsTEMs

1          I do not diminish the gravity of the accusations as

2    against me and, of course, my lawyers have counseled me not to

3    discuss the case because I do not wish to prejudice my appeal.

4    But I can provide much good and value to the community through

5    this volunteering, instead of having PTSD attacks and

6    flashbacks of abuse if I am caged in prison.  And those images

7    and the anticipation of that for the last nearly two years,

8    your Honor has seen the effect, so has the Mt. Sinai Emergency

9    Room, a few times.

10          Again, I am sorry for things that I have written and

11    that I've stated, and I'm doing what I can to gain coping

12    skills.  And the FDA has done a favor with ketamine IVs

13    becoming popular as well.  I hope your Honor will help me to

14    serve my community and others as my sentence.  But I promise

15    that no matter how long your Honor dictates, even if you were

16    to say I'm free to go today, that I will impose upon myself a

17    life sentence of serving the community so that I do not again

18    lose track of my values.  I'm surrounded by these wonderful

19    people who keep me on track.

20          I have learned my lesson, your Honor.  I've learned

21    many lessons.  Without volunteering, without helping others on

22    a regular basis, you can quickly lose track and then you can't

23    even help yourself.  Please, your Honor, allow me to stay on

24    track and continue to work alongside these helpers.

25          Thank you.

L7SsTEMs

1          THE COURT:  All right.  Thank you, Mr. Teman.

2          All right.  Counsel, it's three o'clock.  I'm going to

3    take a 20-minute recess while I reflect on what I've just

4    heard.

5          I'll see you in 20 minutes to impose sentence.

6          MS. KELLMAN:  Thank you, Judge.

7          (Recess)

8          THE COURT:  Welcome back, counsel.

9          Is there any reason why sentence should not now be

10   imposed?

11         MR. BHATIA:  No, your Honor.

12         MS. KELLMAN:  No, your Honor.

13         THE COURT:  All right.  As I have stated, the

14   guidelines range that applies to this case is between 30 and

15   37 months' imprisonment.  Under the Supreme Court's decision in

16   Booker and the cases that have followed it, the guidelines

17   range, of course, is only one factor that a court must consider

18   in deciding the just and appropriate sentence.  The court is

19   also required to consider the other factors set forth in the

20   sentencing statute, Title 18, United States Code, Section

21   3553(a).

22         These factors include the nature and circumstances of

23   the offense and the history and characteristics of the

24   defendant; the need for the sentence imposed to reflect the

25   seriousness of the offense, to promote respect for the law, and

L7SsTEMs

1   to provide just punishment for the offense; and the need for

2   the sentence imposed to afford adequate deterrence to criminal

3   conduct; the need for the sentence imposed to protect the

4   public from further crimes of the defendant; and the need for

5   the sentence imposed to provide the defendant with needed

6   educational or vocational training, medical care, or other

7   correctional treatment in the most effective manner.

8          The court is also required to avoid unwarranted

9   sentence disparities among defendants with similar records who

10  have been found guilty of similar conduct.  Above all, the

11  court is required to impose a sentence sufficient but not

12  greater than necessary to comply with the purposes set out

13  above.

14         I find that the sentence I'm about to pronounce is

15  sufficient but not greater than necessary to satisfy all the

16  purposes of sentencing that I have just summarized and that are

17  reflected in the sentencing statute.

18         Mr. Teman, I am extremely well familiar with your

19  case.  I presided over pretrial proceedings, I presided over

20  the trial, I presided over post-trial motion practice.  I have

21  very closely reviewed the parties' sentencing submissions, all

22  of which I found thoughtful and helpful.  I particularly

23  closely studied the defense submissions, including the very

24  thoughtful recent submissions by Ms. Kellman and Mr. Frisch,

25  and the portions of them and the presentence report addressing

A-2398

66

L7SsTEMs

1   your background and your story.

2           I also closely studied the letter that your parents

3   submitted shortly before the originally scheduled sentencing.

4   all of those educated me as to your journey, which, of course,

5   was not part of the trial record and which is virtually

6   invisible in the context of the trial.

7           I found a great deal to admire about you.  You have

8   genuine and delightful worthy contributions to our world, and

9   that may, of course, the decision to commit the crimes for

10  which you are being sentenced, which stand out as clearly

11  anomalous in your life's journey, all the more puzzling and

12  needless and regrettable.  I'm really sorry that we're here.  I

13  know you are too.

14          I also came to appreciate some of the challenges you

15  have faced, some of medical nature, some relating to mental

16  health, and some of an interpersonal nature relating to your

17  dealings with others.

18          I've given a lot of thought and attention to the

19  appropriate sentence in this case in light of the Section

20  3553(a) factors and the appropriate purposes of sentencing as

21  reflected in the statute.  The following are my thoughts.  This

22  is going to take a little while.  And as a guide to you as you

23  follow along, I'm going to address at the outset the factors

24  relating to the crimes of which you have been committed.  I'm

25  then going to turn to factors relating to your personal history

L7SsTEMs

1   and contributions and characteristics.  In other words, the bad

2   stuff, the aggravating facts come first, finance the mitigating

3   good stuff comes later.  I have this in perspective, just

4   giving you a user's guide.

5       Under Section 3553(a), one set of factors I'm to

6   consider takes account of the seriousness of your offense, the

7   need for the sentence imposed to reflect just punishment, and

8   the need for the sentence imposed to promote respect for the

9   law.  In other words, the sentence must fit the crime.  That

10  factor, the need for the sentence to represent just punishment,

11  is important here.

12      There are at least four aspects of the scheme here,

13  whether it is called bank or wire fraud, that you carried out

14  that make it serious in my judgment.  First of all, you took

15  and attempted to take a significant amount of money.  You

16  carried off a fraud scheme which deprived the bank victim here

17  of little over $259,000, and would have deprived the bank of

18  $330,000, had the bank's internal review and stop payment

19  directives not prevented you from transferring the balance of

20  the funds out of the GateGuard account.  That is close to a

21  third of a million dollars.  It is not a small amount.

22      Second, your scheme took a fair amount of time and

23  effort.  Many fraud or theft cases I see involve a single act

24  or two in a narrow time span.  Sometimes well under a single

25  day, an hour.  Yours spanned about a month and it consisted

L7SsTEMs

1   really of two waves of negotiating bogus checks.  In each you

2   attempted to get banks to clear checks on other's accounts that

3   you had created without the account holder's permission.  And

4   I'm speaking here describing what the verdict reflects.

5         In total, you drew 29 checks on the accounts of three

6   separate customers or customer groups in the amounts

7   essentially escalating over time, apparently as your personal

8   financial needs grew, creating those checks and the markings on

9   them, which were described to give the illusion of regularity

10  and customer consent, had to take time and aforethought.

11        Now, I agree with the presentence report that the

12  sophisticated means of just punishment under the sentencing

13  guidelines for whatever value it has does not fit here.  But

14  that doesn't mean that anyone could do what you did or that

15  what you did could be done on impulse.  It took some effort and

16  some canniness and some planning and deliberation and

17  aforethought in fashioning the checks as you did, with

18  different checks keyed to different customer accounts.

19  Ultimately, the checks looked authentic enough to result in

20  most of them clearing for enough time to allow you to make

21  withdrawals against them.  Bottom line is that the amount of

22  time and effort and planning and aforethought in which you

23  engaged makes the scheme more serious.

24        Third, you engaged in the scheme with eyes open to its

25  criminal nature.  You knew your clients hadn't authorized you

L7SsTEMs

1    to draw checks on their accounts in those amounts.  They deny

2    owing the fees that you claim to be imposing, including fees

3    which outstrip by orders of magnitude the entire cost they paid

4    for GateGuard security system, and there wasn't any signed

5    agreement in which they acceded to those fees, and there is

6    nothing in the trial record that reflected their ascent to the

7    relevant part of the terms of conditions that even authorized

8    the creation of remote checks.

9            Your attorney, Ariel Reinitz, even without knowing

10   large amounts of the facts here, including the size of the fees

11   you proposed to unilaterally impose on your clients, he

12   literally told you in writing that you would likely be arrested

13   if you wrote unauthorized checked on their accounts.  He told

14   you that before you wrote the first two checks in March, and he

15   hammered home that advice to you after the bank had put a hold

16   on those first two checks.  He wrote you, and I'm quoting, "I

17   don't know all the ins and outs, but this sounds like a bad

18   idea."  He further wrote that, "if you are hitting their

19   accounts out of the blue, I expect this will become a criminal

20   matter sooner or later."

21           Yet you persisted and you escalated.  Ignoring this

22   warning, the next month you manufactured and deposited another

23   27 checks.  You had a high-priced corporate counsel, a big firm

24   New York lawyer telling you, Don't do this, it's a crime,

25   you'll go to jail, and yet you persist.  I cannot begin to tell

A-2402

L7SsTEMs

1    you how unusual that is.  To be sure, in the usual white collar

2    crime case that comes before me for sentencing, whether for

3    fraud or theft or false statements, the defendant knows

4    perfectly well that his or her conduct was illegal.  Although

5    sometimes the defendant tried to rationalize himself or herself

6    why that was OK.

7        This is the first case I've had where the trial record

8    showed that the defendant went ahead in the face of a lawyer

9    repeatedly telling him in a series of memorable warning

10   messages, in essence, You can't do that, you'll get arrested.

11   Your insistence on going ahead in the face of those explicit

12   warnings makes your crime more troubling.

13       As an aside, as to Mr. Reinitz, I found the notion

14   that you pursued a trial that his communications with you

15   somehow supported an advice of counsel defense to be so

16   incorrect and unpersuasive as to be nearly delusional.  That

17   was the argument the defense made in opening, although by the

18   time of summation, it was played down, and for good reason.

19       Given the text messages between you and Mr. Reinitz

20   that, perhaps, the defense had not expected to come to light,

21   but which were received in evidence on cross-examination,

22   Mr. Reinitz's testimony wound up being effective for the

23   prosecution, and the jury's verdict necessarily rejected any

24   such defense.

25       Your communications with Mr. Reinitz fell very far

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L7SsTEMs

1    short of supporting such a defense for all the reasons I

2    covered in the post-trial decision.  You hadn't told your

3    lawyer vitally important facts.  These included that you were

4    planning to create and negotiate more than $300,000 in checks

5    without customer permission.  They included that the ostensive

6    basis for the checks were a host of supervised, quote-unquote,

7    fees you knew that the customers would dispute and which it did

8    not have a factual predicate, such as a signed agreement, in

9    which they had assented to such fees.  Mr. Reinitz didn't tell

10   you, Yes, you can.  He said, No, you can't, and you did so

11   repeatedly in writing.

12           Fourth, and finally, your offense is serious because

13   of the way you treated GateGuard's customers, your customers.

14   As a financial matter, the bank ultimately was left holding the

15   bag here.  It absorbed the loss and removed the debit from the

16   customer's accounts.  But along the way on a very real and

17   human level, your scheme also exposed your customers, who were

18   a small co-op board and two landlords, to the risk of

19   meaningful financial loss.  It was their accounts after all on

20   which you drew the unauthorized checks.  And in your

21   communications with the customers, you were threatening and

22   callous.  You blamed them for questioning the quality of your

23   security system product.  You called one of them an idiot.  You

24   threatened to put a lien or liens on their buildings.  You

25   threatened to sue the individual of Ms. Soon-Osberger's co-op

L7SsTEMs

1   board.  You threatened to remove successor security devices put

2   in by a different company.  You threatened to report one of the

3   landlords to the New York Attorney General.

4          As you yourself admitted, you timed the deposit of

5   certain checks for when you knew that your religiously

6   observant customer would be observing Passover and thus not

7   reachable.  You were explicit about that in your e-mails.  You

8   took advantage of other people's religious faith, their

9   devotion to Judaism and timed your scheme around it.  You also

10  threatened massive retaliation against customers for disputing

11  the quality of your company's goods and services.

12         Reading the correspondence with the customers, it is

13  difficult to avoid the consumption that you developed in a

14  disproportionate rage, a vendetta, an animus towards these

15  three customers, essentially, because they were dissatisfied

16  with your product and your work.  Whether that led you to

17  target them as opposed to other customers with the fraudulent

18  check scheme is something only you know, but there is a

19  convenient full and retributive quality to the scheme here and

20  communications that is frankly distressing.  The customer is

21  not always right and you are under no obligation to agree with

22  their complaints about your customer's product.  But the level

23  of venom, hate, and zeal to retaliate that you displayed toward

24  them is distressing.  I would note that the venom, that venom

25  and lack of proportion appears to persist well after trial.

A-2405

73

L7SsTEMs

1          As an aside, one of the character letters I received

2    as an attack in the original defense sentencing memo, the first

3    letter, in fact, from a friend who was with you the night of

4    the verdict made what appeared possibly to be a swipe at the

5    customers who testified in your case.  He described your shock

6    at the verdict.  He wrote that he wished you had long ago

7    stopped doing business with "real estate sharks."  He added,

8    "While Ari may have made a mistake, he is no thief.  The prime

9    mistake was having too good a man trying to disrupt an industry

10   filled with greedy, shabby, infamous landlords."

11         I do not hold this letter against you.  It makes no

12   difference in the sentence that I will impose.  The author is

13   entitled to his opinions.  But as a matter of setting the

14   record straight, that is not at all what this trial was about.

15   If you, Mr. Teman, conveyed anything like that to your friend

16   or today believe what your friend wrote as an explanation for

17   the jury's verdict, I would be sorry to see that the angry

18   sense of entitlement and the lack of self-awareness that

19   pervaded your dealings with these customers in the course of

20   the events at issue did not later dissipate.

21         The trial evidence showed that there were, indeed,

22   business disputes between you and each of the three customers

23   who denied authorizing the checks you wrote on their accounts.

24   One of them, I would note, Bonnie Soon-Osberger, who is not at

25   all a participant in the real estate industry.  She was a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L7SsTEMs

1    resident of a small building who had the unfortunate assignment

2    at being the member of her small co-op board tasked with

3    interacting with you as a service provider.

4          The trial evidence showed that it was you, not your

5    three customers, who responded to the business dispute not by

6    discussion or mediation or even litigation.  But by resorting

7    to self-help by fabricating unauthorized checks drawn on three

8    separate customer's accounts, totaling some $333,000.

9          For all these reasons, the interest of just punishment

10   and the promotion of respect for the law reflected in that

11   portion of Section 3553(a) warranted a meaningful sentence

12   here, viewed in isolation, a sentence consistent or not too far

13   off from the range recommended by the sentencing guidelines.

14         Under Section 3553(a), I'm also to consider the

15   interest in what is called general deterrence.  It refers to

16   the need for the sentence imposed to send a message to other

17   people, that is sufficient to deter them from engaging in

18   similar crimes.  That interest is present here too.

19         My colleagues and I see lots of fraud cases, including

20   frauds by unscrupulous proprietors seeking to take illegal

21   advantage of customers.  It is important that the sentence

22   imposed in these cases taken as a whole be sufficient to convey

23   the message that this nature, if detected, will result in

24   meaningful punishment.  So don't do it.

25         That said, the scholarship in the area of general

A-2407

75

L7SsTEMs

1    deterrence generally holds that beyond a certain point it is

2    the likelihood of punishment and sometimes the speed of

3    detection more than the length of the sentence that is the most

4    effective general deterrent.

5         So while this factor in my judgment points to some

6    prison component of the sentence, unlike the factor of just

7    punishment, doesn't really speak to what sentence and doesn't

8    require a guideline sentence to be accomplished.

9         Under Section 3553(a), I also have to consider what is

10   called specific deterrence, and that refers to the need for the

11   sentence I impose to accept a message to the specific defendant

12   before me, meaning here you, Mr. Teman, that is sufficient to

13   deter him from committing future crimes.  In one very important

14   sense, this factor is way less present here than in many cases

15   I have.  That is because this is your first offense.  And your

16   history beforehand, far from involving crime, reflects gainful

17   employment and entrepreneurship and engaged in laudable

18   citizenship.  Your good moments far outweighs your bad ones.

19        In cases where a defendant has previously been

20   prosecuted and sentenced and, nonetheless, goes ahead and

21   commits a new crime, I often conclude that a longer sentence is

22   needed because the first sentence has not served as an

23   effective wake-up call.  In the case of a first offender like

24   you, whose record is otherwise law-abiding and productive,

25   however, it is easier to imagine the defendant's brush with the

L7SsTEMs

1 criminal justice system would get his attention and scare him

2 away from any future criminal schemes.  I see you nodding.  So

3 from the perspective of this being a first offense, a shorter

4 sentence could well be effective.

5   There are, however, unfairness factors that suggest

6 some need for specific deterrence in your case, notwithstanding

7 that this was a first offense.  Although you had no criminal

8 record, you had the explicit guidance of your own lawyer

9 telling you that you would be arrested and prosecuted.  I would

10 venture the blunt advice like that in writing would have

11 deferred most would-be white collar crime offenders, yet you

12 went full speed ahead.

13   Your second round of fraud with unauthorized checks,

14 which came after Mr. Reinitz's warnings contained more than ten

15 times as many checks as you had passed before him.  Because

16 Mr. Reintez's strong admonition to you didn't stay your hand

17 and they really could not have been much stronger, something

18 more is needed.  There would seem to be a need for a sentence

19 here to be meaningful enough to get your attention in a way

20 that might this time stick.

21   I note, as well, that you continued to blame, it

22 appears, your customers for this prosecution.  You had every

23 right to go to trial and put the government to its proof, and

24 you're entitled to confess your innocence as long as and as

25 loud as you can.  Blaming for this prosecution your three

A-2409

77

L7SsTEMs

1    customers, I would remind you, unrelated entities that didn't

2    conspire together to cook up false accusations against you is

3    concerning.  It calls into question, Mr. Teman, whether you

4    have a firm grip on business reality.  Business disputes

5    happen.  If you continue to be in customer-facing lines of

6    work, they will happen again.  Your insistence on blaming your

7    victims calls into question whether you might respond to a

8    future business dispute by, again, escalating to the point

9    where you cross a legal red line.

10            I would note that you were a fully grown adult of age

11   37 when you committed these crimes.  Many defendants before me

12   committed crimes such as gang crimes or drug dealing in their

13   late teens or early 20s.  Defense counsel know this well.

14   They've been before me in cases like that.  Their counsel will

15   generally argue that their clients are still maturing and are

16   apt to grow out of their adolescent recklessness.  As defense

17   counsel know from cases they have handled before me, that

18   argument is one I often find persuasive.

19            That argument, however, isn't available to you.  You

20   committed these crimes well into your adulthood as a fully

21   grown man.  Many defendants also point to a lack of youthful

22   guidance or ready opportunities to navigate and advance in

23   society by lawful means.  That argument also isn't available to

24   you.  You grew up in a loving and supportive household, you had

25   a terrific education, including a degree from a first class

L7SsTEMs

1    college, Brandeis.  You had formidable gifts.  You are as
2    articulate and creative and enterprising and entrepreneurial as
3    any defendant I can remember.  You had significant business and
4    charitable experience under your belt.  And you had, as the
5    letters on your behalf make overwhelmingly clear, many
6    potential mentors and sources of guidance to turn to.  I'll put
7    it this way.  You had advantages that conservatively 95 percent
8    of the defendants in cases in this district would dream to
9    have.  You had lawful options and you knew better.
10          Finally, under Section 3553(a), I have to consider the
11   interest of public protection or incapacitation.  That refers
12   to the benefit that the free public gets from your being in
13   federal prison where, by definition, you can't commit crimes
14   and endanger them.  That factor is not present here in a very
15   important sense.  You haven't done or said anything that
16   presents a risk of violence or physical harm, but as that
17   possibility of an economic crime, a business crime such as the
18   offenses here, this factor is present to a degree, albeit a
19   modest one.  The record does not inspire complete confidence
20   that once you're done serving your sentence, you will not take
21   liberties with other people's money, particularly if you feel
22   yourself provoked to anger by them.  You certainly have not
23   done anything to acknowledge your wrongdoing here.
24          Instead, as I said, you blamed this prosecution at
25   various points on your victims, on the prosecution team, on

A-2411

L7SsTEMs

1    unnamed others in the United States Attorney's office, on the

2    law enforcement witnesses, one of whom from the NYPD, you

3    lashed out as fat and greasy, on the court, on your most recent

4    set of counsel from the Sher Tremonte firm, who you accused of

5    conspiring to rig your prosecution with the U.S. Attorney's

6    office, and most recently on the custodial witness called by

7    the bank, at which you deposited, unsought by the bank, the

8    unauthorized checks.

9         In blaming others for your predicament, you have not

10   only shown no remorse, you have known no signs, zero of the

11   self-examination and self-awareness that is a key to future

12   self-restraint.  The anguished letter you wrote to the court

13   prior to trial, which is sealed, counsel have all seen it, also

14   blamed everyone but you for your current circumstances.  In

15   light of your tendency to blame others and not look with any

16   clarity or objectivity at your own conduct, a judge cannot want

17   competent that if, again, you found yourself in tough economic

18   circumstances and you were again presented with an opportunity

19   to help yourself to someone else's money, whether a customer or

20   a business partner or someone or something else, you would

21   again attempt to rationalize baseless grounds on which you are

22   entitled to take it for yourself and do so.

23        From the perspective of this 3553(a) factors, to the

24   extent that there is a limited risk of recidivism, it follows

25   that at least while you are there custody, you are effectively

L7SsTEMs

1    disabled from getting into other's people money.

2           So far I now considered the bad stuff.  I considered

3    the 3553(a) factors that, by their nature, often tend to favor

4    a substantial sentence and to a varying degree they do in your

5    case, particularly the first set of factors relating to the

6    interest of just punishment.

7           But your counsel, past and present, have made

8    arguments that other factors favor a lower sentence, and in

9    particular, counsel have focused on the provision under

10   Section 3553(a) that instructs a court to consider a

11   defendant's history and characteristics, and there are indeed

12   significant aspects of your history and your character that I

13   find profoundly mitigating.

14          First, although the PSR reports that you had a good

15   childhood with an intact family growing up in suburban

16   New jersey.  Your journey has not been without bumps, as your

17   parents' powerful letter underscores.  You were bullied as a

18   youngster, you have had treatment for depression and anxiety,

19   you continue to struggle with mental health issues, and you had

20   significant surgery for nasal issues, which in turn had

21   complications.

22          For reasons that the record does not make clear, you

23   had a longstanding rift or feud with your parents and your

24   sister that appear to have mended, at least with your parents,

25   only after your conviction and with sentencing approaching.  As

L7SsTEMs

1  to your parents' letter that I received shortly before the

2  December 1 hearing, you appear at that point to have been out

3  of touch with them for years.

4       Mr. Teman, I cannot tend to grasp the turbulence and

5  currents afoot your complicated life, from the PSR, from your

6  counsel's commission and from the anguished letter you wrote to

7  the court before trial.  It is apparent that you suffer from a

8  more abnormal degree of inner turmoil.  The letter you wrote

9  before trial was particularly anguishing to read it, suggested

10 a great degree of inner turbulence.  Although that turbulence

11 can never justify ruses to take other people's money, I can

12 understand how they can interfere with your self-control.  The

13 mental health issues that counsel have drawn to my attention

14 and which your parents' powerfully describe, in which are

15 corroborated from the letters from mental health professionals

16 that were attached to the defense sentencing submission, all

17 that I regard as mitigant and help assure you get the treatment

18 you need.  I'll order while you are in prison the BOP furnish

19 you with access to mental health and anger management programs

20 that are available.  I will further make participation in such

21 programs a condition of the term of supervised release that

22 will follow.

23      Second, the letters that your counsel submitted in

24 connection with what I found to be a series of thoughtful and

25 very perceptive sentencing submissions showed me and

A-2414

L7SsTEMs

1   dramatically a different side of you.  They are from friends

2   and family and coworkers, including charitable ventures.  The

3   letters were very much consistent with a portrait you painted a

4   little while ago today of yourself in the moving account that

5   you gave me of what it is that inspires you.

6          In particular, they review you to be a man who is

7   deeply passionately supported charitable caused.  Yours are, in

8   some cases, a defendant points to monetary contribution to

9   charity.  Yours are in a different and far more impressive

10  character, Mr. Teman.  The letters reflect that going back to

11  days as a college student and continuing to the present, you

12  have given to causes that you support your time, your creative

13  and energy and your insight, your enthusiasm, and sometimes

14  your company's security services product.  Yours is impressive

15  philanthropy.  In that vein, I found the recent sentencing

16  submission by Ms. Kellman and Mr. Frisch to be particularly

17  moving, and I want to thank the two of you for stepping in and

18  doing a wonderful job on Mr. Teman's behalf.

19         It substantiated a long good works on your part.

20  These extend, as I said, from your time at Brandeis to your

21  founding of the volunteer organization JCorps.  Under your

22  leadership, JCorps has stepped up on numerous occasions to do

23  good during the past decade and more, including during

24  Hurricane Sandy, very recently during the recovery efforts

25  following the Surfside condo collapse in Miami.  You have

A-2415

L7SsTEMs

1    rightly been lauded for these good works.  The letters I

2    received on your behalf chronicle such works, and they also

3    reflect a person capable of deep connection and friendship, who

4    has been there for friends at times of need.

5         I want to review with you now excerpts of some of the

6    letters that caught my eye.  For those listening at home, I

7    will only be able to read short excerpts of the subset of

8    letters.  I hope that everyone who wrote knows that I read in

9    detail all of the letters.  It is mere economy that leads me to

10   excerpt these.

11        Your parents write, "We're writing to you before his

12   sentencing in the hope that we can shed light for you on a

13   wonderful son, who we have seen struggle throughout his

14   lifestyle, dedicate himself to caring for others, and doing

15   good work.  Ari has given us great joy as parents but also a

16   great deal of stress.  Our Ari has, for the last few days,

17   faced one of the great challenges of his life, as we assure you

18   appreciate if you're a father.  It pains us to see our son in

19   pain."  They go on to write at the end, "Even in Ari's darkest,

20   most stressful times, however, he has devoted his time to

21   giving to others and helping others.  He has continued in the

22   last years to excel in both his community service and business

23   endeavors while under house arrest.  Since his trial, Ari

24   painted portraits of people he respects and gifted the art to

25   friends.  He has hosted small comedy shows before the pandemic.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-2416

84

L7SsTEMs

1  He has continued to provide excellent service to the many

2  customers of GateGuard, answering their calls, and ensuring

3  their devices remain working.  We see a glimmer of hope that

4  even on the edge of wanting to end his life, Ari still picks up

5  the phone, keeps his contracts going and gives his customers

6  the dedicated service they deserve."  The letter goes on and on

7  in a similar vein.

8       Dr. Rami Cohen, a physician and entrepreneur who has

9  worked with you, says, "Ari is a big thinker, driven to

10  innovate.  Sometimes for the sake of making the world a better

11  place and sometimes just for the sake of the innovation itself.

12  He's also a helper who jumps to assist without being asked and

13  who is always available to friends and fellow entrepreneurs.

14  He is full of love and kindness.  Ari loves ideas, he loves

15  creating things, he loves helping others achieve their goals.

16  These are his passion, and he is almost always active in them.

17  He always says at the bottom of every e-mail in the end of

18  conversations, please let me know how I can be helpful, any

19  acts.  Ari does not respond to requests for help, he looks to

20  help."  The letter goes on from there.

21       From Juhan Sonin, a colleague and friend of yours,

22  he's a straight shooter.  Funny, sharp, and motivated concerned

23  for his fellow humans, clear through his work, and his newest

24  venture to eradicate COVID-19 from frontline workers.

25       From Jeffrey Katz, a college friend of yours, "He is

L7SsTEMs

 1   always the first one to try to make someone smile with some

 2   humor or solve a problem, someone or the world is having big

 3   other small.  I always felt Ari would some day stumble upon

 4   some kind of innovation or concept.  He will build truly make

 5   the world a better place on a large scale.  He then describes

 6   JCorps and goes on to write, through all these tremendous

 7   contribution to society, he has always been true to himself

 8   with his combination of human arrest in begin think, brought a

 9   honesty and deep desire to make the world a better place."

10           From Oliver Josephs, a volunteer in JCorps.  "I want

11   to stress how much of a rare and valuable gift Ari is to the

12   Jewish community.  Ari was and remains always available to help

13   and encourage and cheer on his volunteers.  Then he begins to

14   develop the point."

15           From Thomas Arias, who has known you for several

16   years, describes how you helped him through some hardships he

17   was experiencing.  During the time I worked for Mr. Teman, I

18   had the privilege of getting to know the man.  He was never

19   anything than helpful came to helping me get back on strike

20   that in my life because of Ari's help, I have a full-time job

21   and I'm back in good relations with my family members.

22           David Yusef (phonetic), who describes you as a

23   customer, says, "As far as Ari, the man himself, I have come to

24   consider him a friend.  His advice and business ventures has

25   been a great help to me personally.  Through this hard time in

A-2418

L7SsTEMs

1   his life, not only shown me his strength of character by

2   continuing to run his business in an honorable manner, but also

3   to make sure that no matter what, that the customers that have

4   his equipment are continuing to be."

5       Malcolm Clare, a high school friend, "Ari," he writes,

6   "has a love and passion for bringing diverse people together so

7   that they can become friends, date, and not feel alone in the

8   city where many people do.  While attending some of his events,

9   I've been impressed by how much effort he makes to ensure that

10   everyone feels welcome and at home."

11       From Avi Ganz, who runs a nonprofit that you have

12   assisted.  He describes how you helped perform at a fund-raiser

13   for his not-for-profit.  "About a year and a half ago, I

14   suddenly got a sense of Ari.  It was his cousin's birthday and

15   he needed my help to get a pony delivered to our house in

16   Israel, and you did that."  And it, he describes, is an example

17   of your big heart and concern for others, not to mention your

18   ability to get stuff done.

19       From Rabbi Lipskar, "Ari is sometimes misunderstood,

20   as he is a comedian by nature.  Those who get to know him, know

21   he has a heart of gold and will always help anyone in need

22   however he can.  In April of last year when the terrible

23   shooting at the Chabad building occurred, Ari reached out to me

24   about expanding his help to the Chabad house and then offered

25   up 100 team and devices for free around the country."

A-2419

L7SsTEMs

1        From Jonathan Luman, a college friend, "He was one of

2   the first people to reach out to me when my father died in

3   2003.  He was by my side for hours upon hours when I sat shiva

4   for my father on campus the seven days after his funeral."

5        From Talia Reese, a friend who knows you through the

6   New York comedy scene.  "I always enjoyed having Ari around,

7   since he was kind and supportive to me and the other comics and

8   was genuinely interested in comedy and life in general.  We

9   have hilarious conversations.  The comedy world can be very cut

10  throat, so I am very happy to have Ari as a friend."  She

11  describes you as compassionate.  Finally, and most recently,

12  there is the letter from Paolo Longboardi, a survivor of the

13  Surfside condo collapse who you assisted in recent days.  "Ari

14  Teman stepped up repeatedly and was one of the most active

15  volunteers making this easier.  I hope your Honor will allow

16  him to continue."  He describes concretely what you did, how

17  you would come up to people and encourage them, how you would

18  sit with them and ask about their needs.  "It was like speaking

19  with a reassuring friend.  Ari remained calm and caring and

20  helped us continue.  He would search for answers, including

21  helping people who lost their devices.  Ari continues to make

22  this very difficult period in our lives much easier.  I met him

23  only a month ago.  Since then, I've been impressed by his care

24  and generosity for others."

25        These are, to say the least, impressive testimonials.

L7SsTEMs

1    On the day that a person is sentenced, it is appropriate that

2    they be considered in light of the totality of their life's

3    experience, good as well as the bad.  I will do so today.

4          Please know, Mr. Teman, that your impressive history

5    of good works was in your favor today.  I agree with the Bryan

6    Stevenson quote that you shared with me.  None of us is the

7    best or the worst thing we've said or done.  The good that you

8    have done is very important here in helping me form an overall

9    assessment of your history and characteristics.  You have a

10   deep instinct to help people and to figure out, I might add,

11   creative and inclusive ways to build teams to do so.  That

12   weighs heavily in your favor today.

13         Third, as your earlier counsel emphasized at the time

14   of sentencing was scheduled for December 1, there is the matter

15   of COVID-19.  At that time, vaccination had not yet begun and

16   there was no clear sense when they would be widely available.

17   Had sentencing occurred December 1, with surrender not long

18   thereafter, the pandemic would have supplied a compelling basis

19   for a materially lower sentence.

20         As I noted at various sentencings during the height of

21   the pandemic, a defendant serving a sentence takes on the risk

22   of contracting the virus while in prison would have, in

23   practice, reduced access to quality healthcare and likely

24   encounter restrictions on movement within the facility and on

25   access to programs and on visits from friends and family and

A-2421

89

L7SsTEMs

1      counsel.

2           Based on the risk presented by COVID, this court

3      temporarily released certain offenders who were awaiting trial

4      into the custody of others.  The court also ordered the early

5      release of many offenders under the compassionate release

6      statute, particularly where the offender was at high risk of

7      contracting or dying, severely suffering from COVID.  And

8      relevant here in many cases, the court has imposed lower

9      sentences to reflect the extra rigor of time in custody during

10     the pandemic, whether that custody had been served before the

11     sentencing date or was destined to follow.

12          Public health conditions in our nation and federal

13     prisons are way better than they were last December 1.

14     Vaccinations are readily available within our federal prisons.

15     You, Mr. Teman, I'm glad to hear have been vaccinated.

16     Nonetheless, COVID is still a relevant factor.  We have not

17     fully emerged from the pandemic.  We are not back to normal

18     yet.  We may not be for some time, and the surging delta

19     variant is concerning.

20          Prior counsel notes and corroborates that you have had

21     respiratory surgery and complications that potentially put you

22     at higher risk for COVID-19.  Government's rejoinder is correct

23     that the risks of catching COVID-19 within federal correctional

24     institutions is dramatically reduced not only because of

25     vaccinations, but also because of the protocols that over time

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-2422

90

L7SsTEMs

1    have been put in place.  Still in all, I have no doubt that

2    your time in prison will be harder than it would have been

3    pre-COVID heightened restrictions on movement, and visits are

4    likely to persist for some time, and there are intangible costs

5    to incarceration during this unusual time.

6          A person at liberty can organize his or her life to

7    reduce the risks of catching COVID-19.  Incarcerated persons do

8    not have that control.  Even if the statistical incidents of

9    COVID at our FCI facilities is vastly lower than it was

10   earlier, it is not zero.  It cannot be assumed to soon reach

11   zero, and a person incarcerated in a federal correctional

12   institution can reasonably worry about contracting the disease.

13         A day in prison even during the back end of the

14   pandemic remains harder than a day in prison under ordinary

15   times, and that suggests imposition, all things being equal, of

16   a somewhat shorter sentence than would otherwise be imposed.  I

17   view the fact of the ongoing pandemic and its uncertain course

18   and its likely impact on the nature of your confinement as

19   mitigating to a degree today, albeit not nearly so much as

20   would have been the case back in December.

21         Of course, as counsel is well aware, the defendant

22   after being sentenced retains the right to move later during

23   the course of serving that sentence under the compassionate

24   release statute.  If the COVID risk to you, Mr. Teman, proves

25   materially greater than presently anticipate, for example, if

L7SsTEMs

1    variants of the pandemic looms as a new danger again, which you

2    are unprotected, or if there are material adverse developments

3    to your health, the option of moving for such relief is

4    present, and I would entertain such an application, as I have

5    in other cases.

6         In the end, the issue for the court is the length of

7    the sentence to impose.  The defense has argued for a sentence

8    of time served, meaning the five days that you, Mr. Teman, were

9    in custody upon your arrest in July 2019.  For all the reasons

10   I've covered, that argument, I'm sorry to say, is a nonstarter.

11   This was a significant crime for all the reasons I've covered.

12   And various 3553(a) factors primarily, but not exclusively, the

13   need for just punishment require a materially longer sentence

14   than that.  A sentence of time served, in my judgment, would

15   disrespect the gravity of the offense here, fail to promote

16   respect for the law, and to serve the interests in specific and

17   general deterrence.

18        As to the government's argument for a guideline

19   sentence, I considered seriously whether such a sentence was

20   required here.  There is a nonfrivolous argument that it is.

21   Were it not for the factors personal to you, the mitigating

22   factors I covered a while ago, I expect that I would impose a

23   sentence somewhat below, but not that far afield from the

24   guidelines range, largely for the reasons relating to the

25   gravity of the offense that I covered earlier.  The mitigating

A-2424

92

L7SsTEMs

1  factors matter and they are weighty hear.  They include your

2  lack of any prior criminal history, your mental health history,

3  your heightened vulnerabilities, your impressive experience of

4  charitable and good works, the great good that you can do for

5  our world when you're at liberty, and the fact that you will be

6  serving the start of your prison sentence under some degree of

7  an overhang of COVID.  I will, therefore, impose a sentence

8  that is well below the bottom of the guidelines range, and I

9  might add, below what I expected to impose when I first came to

10  court today.  These factors justify a significant downward

11  variance.  Thank your lawyers.

12          In determining the just punishment, I have also

13  considered the fact that, per the government's elective

14  decision to pursue forfeiture under a statute that, when

15  invoked and pursued and charged by the government, mandates a

16  court to enter a forfeiture order, Mr. Teman, you will be

17  ordered on top of restitution to forfeit the sum total that you

18  obtained by virtue of the fraud here.  That is a form of

19  punishment.  It is, therefore, part of the overall punishment

20  here.  As such, it has a bearing on the length of the prison

21  sentence needed to achieve, all in, a just punishment, but no

22  more than the minimum sentence needed, all in, to represent a

23  just punishment.  Had the government not pursued this course

24  and had there not been a forfeiture component to today's

25  sentence, the prison component of the sentence I impose today

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-2425

L7SsTEMs

1   would have been slightly longer.

2        I've also considered your worthy efforts to amass the

3   funds for restitution so that it can be paid promptly upon the

4   final disposition of this case.  That is to your favor.  Not

5   every defendant does that.  I have also considered that for the

6   past 18 months since trial, you have lived under a degree of

7   restrictions, and I'm not counting the ones caused by COVID.

8   The whole world has been under a degree of house arrest.  I'm

9   talking just the restrictions attended to the post-trial bail

10  conditions that I set.  That is also relevant.

11       I have given careful thought in the specific sentence

12  I find reasonable here.  I find that no lesser sentence than

13  the one I'm about to impose would fairly respect the 3553(a)

14  factors considered in totality.

15       I'm now going to state the sentence I intend to

16  impose.  The attorneys will have a final opportunity to make

17  legal objections before the sentence is finally imposed.

18       Mr. Teman, would you please rise.

19       After assessing the particular facts of this case, the

20  factors under 3553(a), including the sentencing guidelines, it

21  is the judgment of the court that you are to serve a sentence

22  of one year and one day in prison in the custody of the Bureau

23  of Prisons, to be followed by a period of three years'

24  supervised release.  Ms. Kellman and Mr. Frisch will explain

25  this to you.  The reason for the one day is not arbitrariness.

A-2426

94

L7SsTEMs

1    It is because that is the minimum sentence to which the Bureau

2    of Prisons will consider a defendant for good behavior, and

3    good behavior in prison can earn somebody up to 15 percent off.

4    If I were to impose a sentence of one year, you would not be

5    eligible for any of that.  That is why that day is added.

6         I impose the same sentence on each count, the terms to

7    run concurrently.  As to the term of imprisonment, I will

8    recommend to the Bureau of Prisons that it enable you to

9    participate in any mental health program and anger management

10   program for which you are eligible.  As to supervised release,

11   forgive me, the standard conditions of supervised release shall

12   apply.

13        In addition, you shall be subject to the following

14   mandatory conditions:

15        You shall not commit another federal, state, or local

16   crime;

17        You shall not illegally possess a controlled

18   substance;

19        You shall not possess a firearm or destructive device;

20        You must cooperate in the collection of DNA as

21   directed by the probation department.

22        I'm adopting here verbatim everything that appears

23   under mandatory conditions.  I'll save everybody a bunch of

24   time by not reading it aloud.  And you must also meet the

25   special conditions that are set out on page 21 of the

A-2427

95

L7SsTEMs

1    presence report.  And in brief, again, I'm going to

2    reproduce these verbatim.

3          But just in short, you need to provide the probation

4    department with access to any requested financial information.

5    This is particularly important insofar as there is a

6    restitution and a forfeiture component to the sentence.  You

7    must not incur any credit charges or open additional lines of

8    credit without the probation department's approval.  You must

9    participate in an outpatient mental health treatment program

10   approved by the probation department and so forth.

11         Again, I'm repeating this verbatim.  I'm also going to

12   impose the requirement that you perform, over the course of the

13   three years of supervised release, 300 hours of community

14   service approved by the probation department.  Truly this is

15   awarding ice in the winter because it seems to me rather

16   obvious you would do that anyway.  I think it is worth part of

17   the punishment appointment, to the extent you come to rue the

18   conduct that underlies your criminal conviction.  Hopefully you

19   will also appreciate the act of performing community service

20   under the supervision of the court as a way of giving back.

21         I'm required to impose, and do impose, a mandatory

22   special assessment of $400.  That's $100 per count.  It shall

23   be due immediately.

24         Now, as to restitution, I'm going to direct you to

25   make restitution to Bank of America in the amount of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

96

L7SsTEMs

1    $259,340.32.  However, I'm going to give counsel two weeks, I

2    think we can get this done before then, to provide me -- I'll

3    ask the government to be the authors of this -- with an order

4    implementing the restitution award.  I am deliberately giving

5    Mr. Teman credit, counsel, for his having amassed the funds

6    with which to pay restitution.  I, therefore, expect that

7    defense counsel will corral whoever needs to be corralled here,

8    so as to be able to consent to an order that orders the payment

9    of the restitution funds into the registry of the Clerk of

10   Court.

11         I think I've made myself clear.  Mr. Teman is getting

12   credit for that.  I'm assuming you'll now carry the ball over

13   the goal line.

14         MS. KELLMAN:  Yes, your Honor.

15         THE COURT:  In any event, I would like an order,

16   government counsel, in two weeks that enables that.  Today is

17   the 28th.  That is August 11.

18         It is my hope, therefore, that the order, because the

19   money will be submitted to the Clerk of Court, there won't be a

20   need for the detailed schedule as to percentages of income and

21   the like.  In the event that unexpectedly something falls

22   through, which it won't, I would, of course, need then to

23   revise the restitution order to cover the eventuality that

24   restitution remained unpaid after the ferments, which is the

25   relevant trigger here under the conviction.

L7SsTEMs

1          All right.  With respect to forfeiture, Ms. Kellman,

2     with appreciation from the policy argument that you made, I do

3     believe, for the reasons set out in the government's sentencing

4     letter, docket, I think, 215 that forfeiture is mandatory here.

5     I think the text of the statute deprives me of any discretion,

6     and the facts support that the dollar amount at $333,000 was,

7     in fact, the object of the scheme and received by Mr. Teman.

8     Therefore, I'm obliged to order that.  Please know the sentence

9     would have been somewhat longer had there not been a forfeiture

10    component.  So there is sweet as well as the bitter with the

11    fact that I'm awarding that.

12          In any event, I'm going to issue, I think, all

13    concerned agree that once it is agreed that I have to issue a

14    forfeiture order, that the one that the government complied at

15    docket 215 is correct.

16          Ms. Kellman, I take it you don't have another problem

17    with the format of that?

18          MS. KELLMAN:  Not with the format.

19          THE COURT:  Then I'll simply issue that order in the

20    next day.

21          I'm not going to impose a fine.  Putting aside whether

22    Mr. Teman realistically could pay the fine anytime soon, the

23    forfeiture order imposes a daunting additional financial demand

24    for him.  There is no need for a fine as additional punishment.

25          Does any counsel know of any legal reason why this

L7SsTEMs

1   sentence shall not be imposed as stated?

2           MR. BHATIA:  We do not.

3           MS. KELLMAN:  No, your Honor.

4           THE COURT:  The sentence as stated is imposed.

5           Government, any open counts?

6           MR. BHATIA:  There are, and we seek to dismiss them.

7           THE COURT:  What are they?

8           MR. BHATIA:  I believe there was -- this is the first

9   or second superseding indictment.

10          THE COURT:  We already dismissed Counts Five and Six.

11          MR. BHATIA:  Five and Six from the second.

12          THE COURT:  Those were dismissed earlier.

13          It is the underlying indictments, right?

14          MR. BHATIA:  That's correct.

15          THE COURT:  OK.  Defense counsel, you agree with that?

16          MS. KELLMAN:  Yes, your Honor.

17          THE COURT:  Those are all dismissed.

18          All right.  Mr. Teman, to the extent you haven't given

19  up your right to appeal by something you've done, I don't think

20  you've done anything to limit your right to appeal, you have

21  the right to appeal your conviction and your sentence.  If

22  you're unable to pay for the cost of an appeal, you may apply

23  for leave to appeal *in forma pauperis*.  Also, the notice of

24  appeal must filed within 14 days of the judgment of conviction.

25          You can be seated.

A-2431

L7SsTEMs

1        I think that leaves us then to the issue of bail

2   pending appeal.  Let me just guide us through that.

3        Government, is there any issue here about risk of

4   flight or danger to the community?

5        MR. BHATIA:  Your Honor, the only thing I would say is

6   the danger to the community would be the danger of financial

7   crimes that you've previously discussed.  But aside from that,

8   there is not a risk of flight.

9        THE COURT:  All right.  In other words, you don't

10  perceive a risk of flight if the current bail conditions were

11  in place?

12       MR. BHATIA:  I should specify, with the current bail

13  conditions, we don't think there is an additional --

14       THE COURT:  Does the government believe there is a

15  danger to the community presented by Mr. Teman's release

16  pending appeal?

17       MR. BHATIA:  No.

18       THE COURT:  All right.  So the issue here turns on

19  whether the Randall standard, the substantial question

20  standard, is met.

21       One moment.

22       Defense, this is really on you now.  Ms. Kellman, I'm

23  open to persuasion.  I need to be persuaded.

24       MS. KELLMAN:  Mahaffy didn't do it, my Mahaffy

25  argument?

A-2432

L7SsTEMs

1    THE COURT:  Judge Gleeson, who I have great respect

2  for, got a bail pending appeal question wrong is bracing.  I

3  got that.  So you sensitized me to the fact that I could

4  misread this.  I do need to find an issue I can genuinely say

5  there is a colorable question consistent with <u>Randall</u> lost on

6  issue.

7    The two issues you flagged for me are the issue

8  of whether the government erred in eliciting from

9  Ms. Finocchiaro's testimony about the bank's ability to reach

10  the $13,000 in his personal account and whether Mr. Bhatia

11  erred in his summation, from the way you had put it,

12  attributing implicitly to Mr. Teman's awareness that the bank

13  would have difficulty reaching money in a different account

14  and, therefore, using that as a barometer of his intent.

15    I think I pretty comprehensively, you may disagree

16  with it, but autopsied that one in my decision of July 9.  I'm

17  just not buying that there was no error, let alone harmless

18  error.  As to the issue of reaching the $13,000 in the personal

19  account, it's five percent of the fraud.  It doesn't really

20  make a difference here.  And I'm recapitulating what I said in

21  the July 9 opinion.  That is what the Court of Appeals should

22  look to if this becomes a relevant discussion point.

23    But I didn't find any error in Mr. Bhatia's summation.

24  He didn't say that Mr. Teman was aware of what Ms. Finocchiaro

25  would later say, and the evidence of fraudulent intent rested

A-2433

L7SsTEMs

1  on so many other things in this case, that the fact that he

2  moved money to other accounts promptly wasn't a big deal within

3  it.

4          In any event, as a matter of just lay logic, a

5  defendant's moving of money from one account to another shortly

6  after receiving ill-gotten gains, regardless of his knowledge

7  of the bank's internal processes or ability to get at it, would

8  always be fair argument from which a jury could infer

9  consciousness of guilt.

10          I'm having difficulty with that one.  If there is some

11  other take on that you haven't shared with me, that's fine.

12  I'm having difficulty seeing that as a plausible winner.

13          MS. KELLMAN:  I just want to make sure that you have

14  the facts of Mahaffy correctly.  It was Judge Gleeson's belief

15  that there was no way the defendants would prevail, but,

16  nonetheless, he granted bail.

17          THE COURT:  I appreciate --

18          Wait.  He felt there is no way the defense would

19  prevail?

20          MS. KELLMAN:  He was very certain that they wouldn't.

21          THE COURT:  And granted bail pending appeal?

22          MS. KELLMAN:  Correct.  And he turned out to be wrong.

23          THE COURT:  He turned out to be wrong about what?

24          MS. KELLMAN:  About the merits of the case, that Brady

25  had been withheld, and it was a very real argument.  And he did

L7SsTEMs

1    not view it as a very real argument.

2         THE COURT:  No, I appreciate it.  But what you're

3    saying there is that Judge Gleeson granted bail pending appeal

4    viewing the appellate issue of no substance and turned out the

5    appellate issue had substance?

6         MS. KELLMAN:  Correct.

7         THE COURT:  If your point is that a judge wiser than

8    me could wrongly diminish an appellate argument, got it.  But

9    you still have to give me something that I can latch onto as

10   more plausible than I think the one you've given me or explain

11   to me why that is a better argument.

12        MS. KELLMAN:  I think, your Honor, I think the bail

13   format to the extent it is certainly relevant, I know it is not

14   the piece that you're looking at, but we've satisfied at least

15   the two prongs.  He is not a danger to the community.

16        I think that those factoring as well, and if the

17   Randall standard is really the issue, frivolous or not, I would

18   argue to the court that I know your Honor doesn't agree with

19   it, but we did have an expert who was viewed as one of the top

20   banking people in the country.  And I found it --

21        THE COURT:  But he didn't even commit on the issue in

22   question, and his opinion that a bank would be able to reach

23   the money in the personal account, you know, it is a plain

24   error issue because trial counsel didn't offer that.  It is

25   just what some professor says or some bank or government

L7SsTEMs

1    official who's now turned to scholar says.

2         The relevant point is, even if that fact had been

3    before the jury, what possible difference would it have made?

4         MS. KELLMAN:  In our view, if that factor had been

5    before the jury, that the bank had remedies, if the bank -- if

6    the testimony is that the bank has no remedies, then there is

7    more of an inference --

8         THE COURT:  She didn't say the bank couldn't file a

9    lawsuit.  She certainly didn't say that, and that's basically

10   the remedy he identified.  What was interesting was he didn't

11   say in the declaration that you gave to me from him, that the

12   bank could resort to the sort of self-help that is in question,

13   i.e. an account with a different tax ID number and take the

14   money.  That is all she was testifying about.

15        With respect to your expert, perhaps not unlike the

16   advice of counsel defense, it does a lot less work than it's

17   advertised to.

18        MS. KELLMAN:  I think that certainly one of our other

19   arguments, Judge, and I think the defense that was offered, the

20   advice of counsel defense that was offered, it seems to me,

21   should never have been offered, given the facts.

22        THE COURT:  You're arguing ineffective assistance?

23        MS. KELLMAN:  Correct.

24        THE COURT:  That's a new one.  Develop that for me.

25        MS. KELLMAN:  Seems to me, if your argument is advice

A-2436

L7SsTEMs

1  of counsel, that the defendant relied on counsel.  And then,

2  again, this is a separate connected issue.  Putting one of his

3  lawyers on the stand to testify that he warned him that this

4  could be criminal, it seems to me that that by itself defines

5  ineffective assistance and does and certainly should --

6            THE COURT:  In other words, the item would be that

7  Mr. Teman would have done better at trial had his counsel not

8  opened the door to Mr. Reneitz and the text messages, and that

9  there is a substantial argument on appeal that there is

10  ineffective assistance?

11            MS. KELLMAN:  Yes, your Honor.

12            And then there is the constructive amendment argument.

13            THE COURT:  The constructive amendment argument we

14  talked about --

15            MS. KELLMAN:  Stop.  I can manage, and also, just

16  little control.

17            THE COURT:  You ought a special condition.  Listen to

18  Ms. Kellman.

19            The constructive amendment is the clause in the to wit

20  clause that described the checks as counterfeit.

21            MS. KELLMAN:  Yes, Judge.

22            THE COURT:  Looking at the grand jury transcript,

23  there is nothing to suggest that -- you know, this is from the

24  post-trial opinion -- there is nothing to suggest that the

25  grand jury was instructed otherwise or that a technical

L7SsTEMs

1   definition of counterfeit was intended here.  Counterfeit very

2   clearly in the context of this case, and I speak with knowledge

3   of the grand jury proceedings --

4           MS. KELLMAN:  Understood.

5           THE COURT:  -- meant unauthorized, and that was the

6   entire theory under which the government validly pursued the

7   case.  And, by the way, if you operate on the assumption that

8   the check was unauthorized, since Mr. Teman created the check,

9   you're basically there even under a more boutique definition of

10  counterfeit.

11          MS. KELLMAN:  But, again --

12          MR. FRISCH:  Can I have one moment?

13          THE COURT:  What you introduce is an interesting idea

14  of ineffective assistance.

15          Go ahead.  Consult with counsel.

16          MS. KELLMAN:  Thank you, Judge.

17          (Pause)

18          THE COURT:  Mr. Frisch, you'll need a microphone.  I

19  want to make sure there is one voice at the defense table.

20          Go ahead.

21          MR. FRISCH:  Ms. Kellman passed the baton to me.

22          THE COURT:  That's because you need to speak into the

23  mic, though.

24          If you want to sit down, that's fine.

25          MR. FRISCH:  That's even better.

L7SsTEMs

1      So, look, there is an extent to which these arguments,

2  the lawyers make arguments like the prior counsel made in the

3  motions to dismiss, and then we made a motion to dismiss.  And

4  these arguments, in our view, as an initial matter, are not

5  typical arguments.  Your Honor has rejected them.  There is a

6  difference of opinion.  As Ms. Kellman puts it, plainly not

7  frivolous.

8      We think the Second Circuit under the Second Circuit

9  standard, these are the types of arguments that justify bail

10  pending appeal.  It is difficult to sit or stand before the

11  judge who ruled against you and say, Judge, you're really wrong

12  about this, but we've made our arguments and I think there is

13  room for alternative views.

14      THE COURT:  Here is the Circuit's gloss from <u>Randall</u>,

15  and it's got two sentences which are in some tension from each

16  other.  The first helps you decipher it.  The substantial

17  question, the Circuit writes, is one of more substance than

18  would be necessary to a finding that it was not frivolous.

19  That helps you.

20      Here comes the second sentence.  It is a close

21  question or one that very well could be decided the other way.

22  That is what I'm applying here, and you need to clear that bar.

23      MR. FRISCH:  So what I started, what I just said was

24  my way of introduction to what I am about to say.  Because, in

25  our view, we've been doing this for a long time.  We like to

L7SsTEMs

1    pride ourself on not making frivolous arguments under any

2    circumstance to a federal judge.

3            I see this case very differently.

4            THE COURT:  A different standard for the state court.

5            MS. KELLMAN:  We don't go to state court.

6            MR. FRISCH:  We don't do state court work.

7            Here is the way that we see this issue, and this is

8    why it is so troubling to us and why, frankly, we very strongly

9    disagree with your Honor, most respectfully.

10            Mr. Bhatia thought this was important.  He thought it

11    was material.  He thought it might affect the way the jury

12    looked at the case because he deceived your Honor and deceived

13    multiple defense lawyers.  And in deceiving your Honor, he did

14    it in multiple submissions.

15            We had occasion, in preparing today, to review the

16    government's sentencing submission.  If you take what he said

17    about the bank's right to offset or the bank's right to

18    recover, which are simply branches of the same tree.  His

19    sentencing submission is deceptive.  It is as if he knows what

20    the truth is about the bank's right of offset or the bank's

21    right of recovery, but is not being transparent with the court

22    in that submission.

23            THE COURT:  May I ask you -- look, Mr. Frisch, I'm

24    really more interested in hearing about the ineffective

25    assistance theory.  The fraud is over and done with once the

L7SsTEMs

1    bank -- Mr. Teman presents the unauthorized check.  The only

2    way in which any of this evidence bears at all on guilt here is

3    through the theory that Mr. Teman's moving of money, after it

4    hit the GateGuard account into a different account of his was,

5    according to the government argument in summation, indicia of

6    intent to defraud.

7          To begin with, with or without anything from

8    Ms. Finocchiaro, that is an obvious argument any government

9    prosecutor would make, period full stop.  Mr. Bhatia did not

10   attribute that to Ms. Finocchiaro in particular, and certainly

11   didn't attribute that to Mr. Teman any knowledge of what

12   Ms. Finocchiaro had said.

13         Number one, and in any event, the evidence in the case

14   was so strong about intent to defraud.  Remember, there is no

15   evidence here that the customers saw the payment terms that

16   even authorized the remote checks.  Mr. Teman didn't testify

17   Mr. Reinitz was not a personal firsthand witness.  You've just

18   got him creating checks for fees that there is no evidence that

19   the customers authorized that vastly outstrip the amount they

20   paid for the whole product.

21         So the problem here is yes, the point that Mr. Bhatia

22   made was a part of the summation.  It was that Mr. Teman's

23   moving of money around reflected an attempt to keep the money

24   ahead of the bank, but I don't see where there is anything

25   erroneous about that argument.  It would have been made anyway,

**A-2441**

L7SsTEMs

1    let alone material.

2          MR. FRISCH:  Your Honor, a few things to say in

3    response to that, one of which is there is an exculpatory fact

4    that Mr. Bhatia has not denied that he knew that he did not

5    disclose and, in fact, affirmatively concealed it.  That is

6    number one.

7          Number two, that is the status of the personal account

8    at the time of trial, and it is not just what Karen -- forgive

9    me -- what Karen testified to or what he argued.  He

10   specifically, to the extent that there is a way of exculpating

11   Mr. Bhatia, if you will, as to the way the testimony was

12   elicited when this issue came up after the unusual submission,

13   what we consider unusual on November 30, and going forward, he

14   simply deceived Mr. Beale and Ms. Kellman, and there is a

15   reason why he did it.  It sheds light on the fact that he

16   deliberately withheld the exculpating fact during the course of

17   trial, not just as to $13,000, but as to what the rights of

18   offset and recovery were.

19         Now, if you consider that in light of the following

20   two things, arguably, I say this hypothetically, not

21   necessarily to prejudice Mr. Teman on appeal, there is evidence

22   of intent with regard -- evidence of intent to defraud with

23   regard to the customers.  But they lost no money.  The

24   charge-backs were honored.

25         Now you have inferences of fraud with regard to the

A-2442

110

L7SsTEMs

1    bank.  With regard to the bank, the inferences are not so

2    plentiful.

3            THE COURT:  No, sorry.  Mr. Frisch, loser argument?

4            Candor.  The theory of the banks, the false statement

5    of the bank was that the checks were not authorized by the

6    customer.  That was the sum and substance of the prosecution's

7    theory, full stop.  There was overwhelming evidence.  You had

8    three people who didn't know each other -- one of them is

9    Ms. Soon-Osberger, who has got nothing to do with the real

10   estate industry -- each independently coming forward and

11   saying, We didn't authorize this.  He is hitting our accounts,

12   like the lawyer said, out of the blue.  That was the false --

13   that what the *actus reus* of the fraud, the false reputation of

14   authorization, period full stop.  Everything else is background

15   noise.  That's the signal.

16           MR. FRISCH:  I disagree.  I want to make two points.

17   Maybe three, if I get that far.

18           The first of which is indented, quote, wonderful.  We

19   indented it, the Supreme Court didn't.  That wonderful quote in

20   Kyles, where you really have to -- when the government does not

21   disclose an exculpating fact, it prevents the defense from

22   putting their defense in the right context.  To paraphrase the

23   Supreme Court, it makes the prosecution's case seem more strong

24   than it really was.  Had the defense lawyers at trial known

25   that the bank was equivocating what to do or had they known --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-2443

111

L7SsTEMs

1        THE COURT:  Mr. Frisch, though, having read the

2   materials you submitted, it is simply baloney that the bank --

3   that the testimony was inaccurate.  I mean, the testimony at

4   trial was the bank says, We can only reach accounts that have a

5   different tax ID number.  The only evidence you have got that

6   goes the other way is Richard --

7        MR. FRISCH:  Fraher.

8        THE COURT:  -- right -- who basically doesn't dispute

9   that, but more or less says the bank can sue.

10        Please, let me be as clear as I can.  This is as close

11   to a frivolous issue as I can think of.  I really don't buy it.

12   I said it out at about 30 pages on the record last time.  If I

13   have hadn't hinted strongly enough, Ms. Kellman identified a

14   potential Randall issue.  Listen to the hint.

15        MS. KELLMAN:  Which is why she is trying to speak now.

16        MR. FRISCH:  I understand.

17        THE COURT:  No.  Tell the Court of Appeals.  I've made

18   a record.

19        MR. FRISCH:  Fair enough.

20        THE COURT:  Look, Ms. Kellman, Randall explained to me

21   why, just articulating a little more, why there is an arguable

22   ineffective assistance of counsel.

23        MS. KELLMAN:  You know, that is me, your Honor.  Seems

24   to be blatant, if you will, and I say that because if you open

25   on -- if the theory of your case is advice of counsel, and you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-2444

112

L7SsTEMs

1   then decide to put on a corporate lawyer who knows about

2   business transactions, who testifies that he knows about

3   business transactions, and then it turns out that he not once,

4   but twice cautioned the defendant against this kind of

5   activity, and you've made a decision, you've obviously --

6   either you're ineffective because you haven't talked to him

7   before you put him on the stand or you're ineffective because

8   you didn't know what he was going to say on the stand.

9           It just seems to me that -- or you've never practiced

10  criminal law before.  I just don't understand how you would

11  open that way.

12          THE COURT:  Your theory is that if the lawyer's oral

13  testimony was helpful to Mr. Teman as to the oral

14  communications, defense counsel needed, should have known, that

15  the text messages would come sailing in, and if they didn't

16  know it beforehand, they could have adjourned the trial for the

17  day, make sure there was that reciprocal discovery, there was

18  an opportunity to take a deep breath, and decide.  Because they

19  hadn't opened before the jury not to do that, and yet they

20  sailed ahead.

21          Is that the point?

22          MS. KELLMAN:  Yes, your Honor.

23          THE COURT:  Mr. Bhatia, what's the government's

24  comeback on ineffective assistance?

25          MR. BHATIA:  First, what I'll note is, this was never

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-2445

113

L7SsTEMs

1  raised before.  And this court has given the parties, in

2  effect, insisted that the parties focus on specific issues in

3  post-trial briefing.  One of the issues was bail pending

4  appeal.

5       We addressed this and said we don't find any of these

6  to be salient issues.  The defense was given an opportunity to

7  brief bail pending appeal, and instead took that as an

8  opportunity to argue about withholding of evidence and Brady

9  issues, and Ms. Finocchiaro did have this opportunity.  This

10  was such --

11       THE COURT:  OK.  I appreciate that, but I'm giving

12  them a mulligan.

13       Let's deal with it on the merits.

14       MR. BHATIA:  On the merits, this was within the band

15  of, as far as we know, the band of professional decision-

16  making.  In our view, the proof here was quite damning.  The

17  defense put on whatever defense they decided to make.  We don't

18  really have any reason to believe right now, just based on the

19  assertion now after the fact, that it might have been better

20  without those, that this is a likely to prevail ineffective

21  assistance claim or even a colorable one.

22       Right now it is just the assertion after the fact,

23  once sentencing has already taken place, that trial might have

24  gone better with a different defense, and that is all there

25  really is right now.

L7SsTEMs

1          THE COURT:  Thank you.

2          All right.  Counsel, I had a front row seat on the

3     trial.  Were the issue presented to me, and I'm taking it as

4     having been presented right now, of a claim of ineffective

5     assistance, I would reject it.  The Strickland standard is what

6     dictates ineffective assistance, and both on the conduct prong

7     and the prejudice prong, I find clearly that this is, in my

8     opinion, a loser of an argument of ineffective assistance.

9          Mr. Gelfand and Mr. DiRuzzo, far from being effective,

10    were excellent and superior lawyers.  Mr. Gelfand's advocacy,

11    which I think I complimented at the end of the trial, was

12    actually quite special.  It was really an eye opener.  The

13    ability he had to make something out of very little throughout

14    the trial, and I was quite impressed throughout by the

15    lawyering both pretrial and trial.

16         Still, viewing the performance as a whole, I think

17    defense counsel did a superb job, far from falling below a

18    professional level of competence.  They were at the very high

19    end of things.

20         Furthermore, even isolating the specific issue with

21    respect to the testimony of the lawyer, whose name was --

22         MS. KELLMAN:  Reinitz.

23         THE COURT:  -- Reinitz, I think that was clearly

24    within the realm of a debatable professional judgment.

25         In retrospect, it looks pretty bad because the text

A-2447

115

L7SsTEMs

1    messages are so memorable and so damaging.  However, one has to

2    keep in mind the alternative world.  If Reinitz doesn't

3    testify, the defense has literally nothing.  There is no

4    evidence that the customers saw, for example, any of the terms,

5    the link that they were in place at the relevant time, that

6    would have even authorized remotely created checks, let alone

7    checks in the dollar amounts at issue.

8        So, Mr. Teman was looking at a lopsided route without

9    Reinitz's testimony.  Reinitz at least gave the defense

10    something.  Reinitz gave oral testimony that he told Mr. Teman,

11    in effect, notwithstanding the text messages, something about

12    this or that, at least the creation of remote checks was legal.

13    I think the jury rather obviously rejected that and found the

14    written text messages to be far more dispositive and found it

15    relevant that Reinitz never ever memorialized that purported

16    advice, and the other elements of advice of counsel weren't met

17    either.

18        In other words, in a world of very few options, where

19    you had frankly a between-the-eyes bank and wire fraud here, I

20    understand why the defense went with Mr. Reinitz and hoped that

21    a reputable Wall Street lawyer, who at least was prepared to

22    give oral testimony that, if credited, would have been helpful

23    to Mr. Teman, might have saved the day.  I understand why, in

24    the light of day, with all of us quoting the text messages, it

25    looks differently.  But in realtime, it was absolutely a

L7SsTEMs

1   debatable determination.

2          I don't find prejudice.  Here is why I don't find

3   prejudice.  If you eliminate the counsel testimony and the

4   defense case, in effect, from the trial, there is nothing left

5   there.  You've got all customers saying we didn't authorize

6   this.  You have no contractual basis to argue that they had.

7   The cross-examination, although vigorous and effective and

8   exposing some inconsistencies and the like of the customers,

9   did no damage on the fundamental issue of whether they had

10  consented two remote checks in general or to the specific fees

11  at all.  It was destined to be a government verdict without

12  something to change things.

13         So I'm treating the defense as having right now made

14  a motion to set aside the verdict on account of ineffective

15  assistance and I am rejecting it.  I find that neither prong of

16  ineffective assistance is met, and I feel that very clearly.

17         However, here is the however.  This is a genuinely

18  unusual problem.  What is unusual about it is the ineffective

19  assistance claim here is anchored in calling a lawyer and where

20  essentially the lawyer's oral testimony is arguably impeached

21  by the written text messages.  Given the dramatic, memorable

22  turns of phrase in the text messages, although I would

23  certainly not in any way, shape, or form find ineffective

24  assistance, indeed it is insulting to two lawyers who were

25  profoundly effective and I would be happy to have in my

L7SsTEMs

1    courtroom any day, I can understand why, in the language of

2    Randall, it is "fairly debatable."  See Randall 716 F.2d 122,

3    125, that somebody else might view the ineffective assistance

4    claim differently.  Conceivably, another judge could look at

5    the decision to call a lawyer, knowing that those text messages

6    would sail in, as beneath a standard of professional competence

7    and producing error.

8         For the record, I'm speaking to the Second Circuit,

9    I'm not buying that.  I think there was extremely effective

10   assistance here.  The professional decision was absolutely

11   debatable, absolutely justifiable, and completely non-

12   prejudicial.  But it is a novel, unusual problem that I've

13   never seen before, and I think it fairly qualifies as a

14   substantial question under Randall.

15        For none of the reasons defense counsel flagged at the

16   beginning, but for the one that Ms. Kellman saved the day with

17   for that 15 minutes ago, I'm going to grant bail pending appeal

18   here.  I find there is that one issue that qualifies.

19        MS. KELLMAN:  Thank you, Judge.

20        THE COURT:  I'm mindful that ineffective assistance

21   issues, however, are supposed to be litigated in the district

22   court first.  They are not supposed to be raised in the Court

23   of Appeals first.  That way you get a remand for it.  That's

24   why I'm taking the trouble now of treating you as having made

25   the motion, which I am denying, so that we have a clear record

A-2450

118

L7SsTEMs

1   and so that we don't wind up with sort of an endless echo

2   chamber remand.  That way you have a fully crystalized motion

3   and denial.

4           MS. KELLMAN:  I appreciate that, Judge.

5           THE COURT:  Are you OK with that?

6           Have you said what you had to say to crystalize the

7   issue and preserve it?

8           MS. KELLMAN:  I understand what your Honor is saying.

9   I will say that Judge Raggi reminded me of this many of times.

10          THE COURT:  Right.  So --

11          MS. KELLMAN:  Can I say one other thing, Judge?

12          THE COURT:  Yes.

13          MS. KELLMAN:  I understand we should shut up.  I think

14  we're winning.

15          THE COURT:  Because anything you say will be rebutted

16  on some other issue, as you know.

17          MS. KELLMAN:  No, it's the same issue.  As a defense

18  lawyer, who has a few trials under her belt.  I would say, I

19  mean, Strickland requires a strategic -- you know, the court to

20  find a strategic basis for what has occurred.  Your Honor has

21  pointed out, well, it may well be that they felt it was

22  important to put this corporate lawyer on the stand and have

23  him testify this way.

24          My view of it is that the ineffectiveness comes up

25  because I don't think that any lawyer would have put him on the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L7SsTEMs

1    stand if they knew about the text messages.

2         THE COURT:  But they did know, and because I deferred

3    the trial from a Monday to a Tuesday, and they indicated they

4    had seen the text messages.  And remember, it was the defense

5    counsel who produced it.  So they had the text messages in

6    hand.  They had a last clear chance not to make an advice of

7    counsel defense.  They decided instead to produce the text

8    messages and go ahead and open on advice of counsel and then

9    pursue it.

10        So with complete knowledge as to what the text

11   messages were, they proceeded.  There was no lack of diligence

12   because the waiver didn't occur until they opened.  And by that

13   time, they had already produced the text messages.  I do think,

14   as I said, that it is in the realm of a justifiable decision

15   because the jury could have looked at Mr. Reinitz and said,

16   Yeah, the text messages say all that, but he is telling us that

17   he orally advised Mr. Teman that you can do this.

18        I don't think the jury credited Mr. Reinitz, and I

19   think there was good reason not to.  But if the jury was

20   inclined to take somebody who was well-credentialed and

21   presented like a lawyer at a professional firm and believed

22   what he said, that was something they could have latched onto,

23   in a case presenting the defense with an extremely high degree

24   of difficulty to try to get an affirmance.

25        So I'm not buying --

A-2452

120

L7SsTEMs

1        MS. KELLMAN:  I'll settle for that.

2        THE COURT:  -- and I was there.

3        MS. KELLMAN:  I'll settle for you've ruled and denied.

4        THE COURT:  Look, I will, in a truly close call, grant

5   bail pending appeal finding the Randall standard met based

6   solely on the claim, which I deny here of ineffective

7   assistance of counsel.

8        With that, government, are you OK with the current

9   bail conditions remaining in place?

10       There is no reason, with my having made that finding,

11  to tighten any bail conditions with Mr. Teman.

12       MR. BHATIA:  No, your Honor.  Pending bail conditions

13  are fine.

14       THE COURT:  Mr. Teman, unless the government appeals

15  what I've just done, you will be released on conditions until

16  an appeal is resolved.  If the appeal is resolved not to your

17  satisfaction, you'll be back before me soon for me to set a

18  surrender date.

19       Here is what I need to say to you.  Your conditions of

20  release continue up until such a time as I direct you to report

21  to serve your sentence and you do so report, so you need to

22  abide by those conditions.  If you fail to appear or if you

23  fail to comply with the conditions of bail, you can be

24  remanded.  The government will surely ask me to find that

25  you're a risk of flight and/or danger to the community.

A-2453

121

L7SsTEMs

1          Do you understand all the obligations, all the current

2     bail conditions remain in place?

3          THE DEFENDANT:  Yes, your Honor.

4          THE COURT:  Please take that very seriously.  I don't

5     want to have to be here with the government making that

6     argument.  I would rather this run its way to appeal and see

7     what happens there.

8          Understood?

9          THE DEFENDANT:  Yes, your Honor.

10          THE COURT:  All right.  Anything further from the

11     government?

12          MR. BHATIA:  Nothing further from the government.

13          THE COURT:  Anything from the defense?

14          MS. KELLMAN:  Just one minute, Judge.

15          THE COURT:  Yes.

16          (Counsel confers with defendant)

17          MS. KELLMAN:  Your Honor, I'm just wondering if your

18     Honor would consider, considering the work that Mr. Teman is

19     doing and the travel back and forth to Surfside, he wants to

20     continue to do the work.

21          Would your Honor consider a curfew or like maybe

22     nine a.m. to nine p.m.?

23          THE COURT:  I'm actually receptive to a good argument.

24     Since this is late in the day and I have had no chance to think

25     about it, may I suggest, reach out to the pretrial services

L7SsTEMs

1   officer with a concrete proposal, reach out to the government,

2   put it in writing.  I'm not unreasonable.

3          MS. KELLMAN:  Very good.

4          THE COURT:  Look, government, let me suggest this.

5   You have a right, of course, to appeal the denial of bail

6   pending appeal.  It's your right to do that.  I don't begrudge

7   you on any decision you make.

8          I would just point out the following.  Even if bail

9   pending appeal were denied, I would certainly be listening to

10  defense's application to defer the surrender databased on COVID

11  and Mr. Teman's vulnerability to it.  I can't say that I would

12  necessarily be able to do that indefinitely, but it is a

13  substantial argument, and it is a tool in my toolbox to delay

14  surrender on account of his condition.

15         So feel free to appeal, and I invite you to do so if

16  you want to.  Be mindful when you come back, I will then

17  doubtless be presented, if I'm overturned on that, with an

18  argument from defense to defer the date some because Mr. Teman

19  has heightened vulnerabilities.  Depending on where we are in

20  COVID at the time, that might have some real traction.  Just

21  saying.

22         All right.  Look, with that, before we adjourn,

23  Mr. Teman, let me say this to you.

24         I learned a lot about you during the sentencing phase.

25  Putting entirely aside what I learned about the crime, there is

L7SsTEMs

1  a huge amount to admire about.  While I expect I will see you

2  again, because I think the verdict will be affirmed and we will

3  come in to set a surrender date, if for some reason events play

4  out that is done on paper or whatnot, I want to tell you that I

5  admire the other things you've done in your life, putting aside

6  the crime here.

7        It is immensely laudable, and in all those other ways,

8  you're a real credit to our world.  And I hope whatever other

9  message you take away from this experience, I hope the obvious

10  pride you are exhibiting today in all the contributions you

11  have made fuels you to double down and triple down on all that,

12  because I wish everyone in the world was like that.

13        MS. KELLMAN:  Say "thank you, Judge."

14        THE DEFENDANT:  Thank you, your Honor.

15        And it's a strange thing to thank somebody who has

16  just sentenced you to a year and a day, although thank you for

17  the day.

18        When I was told to start getting sentencing letters

19  and I started getting them in -- for the record, I don't really

20  remember the shark one, and I apologize for that one -- I had

21  this sensation of it's like you're reading your eulogy.

22        THE COURT:  It's like Tom Sawyer.

23        THE DEFENDANT:  Or it's like being at your own

24  funeral.

25        THE COURT:  Yes.

A-2456

L7SsTEMs

1      THE DEFENDANT:  And that's an odd, but maybe, you

2   know, weird thing to ask your friend to write a sentencing

3   letter, if you haven't been accused.  So I thank you for that

4   opportunity.

5      And your Honor touched on something which is very

6   true, which is as a result of the traumas and the things I

7   experienced about eight years ago or so, time gets tricky with

8   COVID.  I had major trust issues and I stopped speaking with my

9   family.  And because of this, maybe your Honor kept me on the

10  fire a little bit longer than I could handle myself, and with

11  the encouragement of friends, I reconnected with my family.

12  And regardless of how this turns out, and I'm sure your Honor

13  is aware, I hope our side wins, but that is a win.

14      And I hope I don't go to prison for many reasons, but

15  if I had to trade a year in prison for the reconnection with my

16  parents and the hundreds of people who have from all across the

17  political and religious spectrum who stood up for me, I would.

18  I'm not saying I wouldn't do it again.  I wouldn't reoffend.

19  But I'm grateful for that, your Honor, and thank you.

20      THE COURT:  Well, I'm delighted to hear you

21  reconnected with your parents.  Speaking with the benefit of

22  one who is most a generation older than you, I would trade

23  anything for time with by deceased parents.  So when people are

24  detached from their parents and they are still alive, I regard

25  that as tragic.  So I was glad to see that you were able to

A-2457

125

L7SsTEMs

1    reconnect with yours.  It is something to say, you won't always

2    have it.

3            Thank you.  We stand adjourned.

4            MS. KELLMAN:  Thank you, your Honor.

5                          *   *   *

A-2458

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/3/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------- x

UNITED STATES OF AMERICA

      - v -

ARI TEMAN,

          Defendant.

-------------------------------------------------- x

**NOTICE OF APPEAL**
19 CR 696 (PAE)

      Notice is hereby given that Defendant Ari Teman appeals in the above-captioned

case to the United States Court of Appeals for the Second Circuit from each part and all of a

judgment dated and entered July 29, 2021, including sentence.

Dated: August 2, 2021

           /s/ Andrew J. Frisch
           Schlam Stone & Dolan LLP
           26 Broadway
           New York, New York 10004
           (212) 344-5400
           afrisch@schlamstone.com

           *Attorney for Ari Teman*

cc:  United States Attorney

A-2459

Ari B. Teman

March 3, 2022
Adar I 30, 5782

The Honorable Paul A. Engelmayer
District Judge
Southern District of New York
40 Foley Square,
New York, NY

**Re:   Motion to be provided sealed transcript of in-Chambers hearing relating to ex parte call with SDNY, & to provide identities of anyone with-whom Your Honor spoke ex parte, for the purpose of the appeal.**

Your Honor,

Defendant has sought from Southern District Court Reporters the sealed portions of the transcript relating to a hearing held in Your Honor's Chambers. Ms. Christine Siwik at that office has kindly informed me that I must seek permission from the Court to receive this copy. My incoming appellate counsel needs this transcript. Defendant therefore seeks this permission herein.

As a reminder to Your Honor, it was at an in-Chambers conference before trial that Your Honor disclosed you had made an *ex parte* call to an unnamed supervisor(s) in the United States Attorney's Office for the Southern District of New York (heretofore "SDNY") to encourage them to give AUSA Gutwillig extra help.

Ms. Sitwik has confirmed the possession of this sealed transcript and directed me to seek permission from Your Honor to be provided it. (I am willing to pay their fee. I am not seeking it for free.)

For the record, Defendant made multiple attempts to seek this transcript from the Government amicably and avoid wasting the Court's time. Mr. Bhatia made multiple misrepresentations in email, providing transcripts far outside this event's date and topic, and then upon being presented with the exact date, providing only a partial transcript without noting the sealed portion was not included or noted, and then directed the defendant to the Court Reporters. Mr. Gutwillig, who was present at the in-Chambers conference is notably silent and/or absent whenever his answers would self-incriminate. These young men are of the same team responsible for *US v Pizzaro, US v Nejad, and US v Ahuja,* surely. Of course, they conspired to

A-2460

hide the Biale-Graham-Engelmayer conflict and eavesdropping set up together with AUSA Graham, where they *admit* they knew they were required to disclose the conflict and chose not to do so. So, there is no question Mr. Bhatia and Mr. Gutwillig are willfully obstructing justice.

Regardless, the defendant respectfully motions for an order directing the court reporters to provide any and all sealed transcripts to the defendant. Defendant will pay the fees, this is only a request for the transcripts to be allowed to be provided.

Defendant also request a list of all individuals who joined the call to the extent any individuals are not identified in the transcript. If Your Honor had any other *ex parte* communications with other individuals, such AUSA Margaret Graham, whether directly or indirectly (through Mr. Biale for example), connected to his case, Defendant requests that you identify the date and duration of the calls and the identity of the parties on the call.

Defendant believes the ex parte communications referred to above are consistent with evidence of judicial bias that deprived him of a fair trial. Among other matters, Your Honor later disclosed that Your Honor and Your Honor's family held and continues to hold approximately $1,000,000 in stock in Berkshire Hathaway -- whose second largest holding is Bank of America, and three of whose top ten holdings are bank stocks -- creating at the least an appearance of bias in a prosecution aligned with banking interests generally and those of Bank of America specifically.

Respectfully, legal experts have noted publicly and privately that these young men must feel confident they can continue to cheat justice under the watch of Your Honor because Your Honor chooses to ignore exculpatory evidence (as in Dkt. No. 284 and Dkt. No. 29) most likely because they incriminate Your Honor's mentee Mr. Biale and his wife AUSA Graham, and Your Honor's investment, Bank of America.

Defendant respectfully requests a rapid response to this letter, as it affects his appeal, for which the Court of Appeals has granted a final extension to April 25, 2022.

Defendant was assisted in drafting this letter by an attorney who intends to file an appearance in CA2 on his behalf.

Respectfully submitted,

A-2461

Ari Teman
Defendant, Pro Se

A-2462

## Ari B. Teman

---

**April 12, 2022**
Nissan 11, 5782

The Honorable Paul A. Engelmayer
District Judge
Southern District of New York
40 Foley Square,
New York, NY

**Re:    Motion for rapid reply regarding the Motion at Document 310  on or before April 19, 2022.**

Your Honor,

Defendant respectfully reiterates that he requests a rapid response to his letter motion of March 3, 2022 at Docket Number 310, as it affects his appeal, for which the Court of Appeals has granted a final extension to April 25, 2022.  **The Court should please rule and answer the questions therein on or before April 19, 2022.**

Defendant also corrects an error in Dkt 310 and notes.  Based on the Court's disclosure of its holdings in Berkshire Hathaway upon your Honor's confirmation as a District Court judge, it would appear that the the Court's holding in Berkshire Hathaway nears $20M, which means the Court's holding in Bank of America (which makes up 12% of Berkshire Hathaway) is over $2M.

Defendant was assisted in drafting this letter by an attorney who intends to file an appearance in CA2 on his behalf.

Respectfully submitted,

Ari Teman
Defendant, Pro Se

A-2463

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| -v- | 19-CR-696 (PAE) |
| ARI TEMAN, | ORDER |
| Defendant. | |

PAUL A. ENGELMAYER, District Judge:

The Court has received letters dated March 3 and April 12, 2022 from *pro se* defendant Ari Teman, seeking certain information or documents that he suggests are relevant to his pending appeal before the United States Court of Appeals for the Second Circuit. *See* Dkts. 310–11. In each letter, Mr. Teman states that an attorney, whom he does not identify, will soon appear on his behalf in the Second Circuit, and implies that the materials that he seeks are germane to that attorney's preparation of the appeal.

In the event that a request is made to this Court by an attorney who has appeared on Mr. Teman's behalf in the Second Circuit, the Court will promptly address such a request. In light, however, of Mr. Teman's filing history in this case—in which he has made repeated vexatious claims of conspiratorial misconduct by his trial, sentencing, and appellate, counsel; the Government; trial witnesses, and the Court, *see* Dkt. 304—the Court declines to respond to his request.

A-2464

SO ORDERED.

_Paul A. Engelmayer_
PAUL A. ENGELMAYER
United States District Judge

Dated: April 13, 2022
       New York, New York

A-2465

Ari B. Teman

_____

**April 13, 2022**
Nissan 12, 5782

The Honorable Paul A. Engelmayer
District Judge
Southern District of New York
40 Foley Square,
New York, NY

**Re:  Dkt 312; Motion for rapid reply regarding the Motion at Document 310  on or before April 19, 2022.**

**Motion for Recusal.**

Your Honor,

Defendant attaches the letter from counsel representing him in CA2 in response to Your Honor's order at Dkt. No 312.

Respectfully, it is no conspiracy that Your Honor and/or his immediate family holds millions of dollars in Berkshire Hathaway and Bank of America *and that Your Honor failed to disclose this until over a year after trial*, and it is no conspiracy that Your Honor and his close personal friends Noam Biale and AUSA Graham *failed to disclose their conflict for nearly half a year -- and that Biale and the Government admit this was intentional.* These are not conspiracies and they both have had material impacts on my case in terms of the financial costs, time under home confinement, and destruction of my life. Defendant notes that Your Honor's order is therefore clearly prejudicial and biased and motions for Your Honor to recuse immediately for this and all the previous reasons yet unanswered that Your Honor has been motioned to recuse.

Respectfully submitted,

Ari Teman
Defendant, Pro Se

A-2466

A-2467

**Eden P. Quainton**
**Quainton Law, PLLC**

2 Park Avenue, 20 <sup>th</sup> Floor
New York, NY 10016

245 Nassau St.
Princeton, NJ 08540

Telephone (212) 419-0575, (609) 356-0526
Cell: (202) 360-6296
Email equainton@gmail.com

April 13, 2022

**VIA ECF**

Honorable Paul A. Englemayer
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:     *United States v. Ari Teman, 20-1920*

Dear Judge Englemayer,

I represent Ari Teman in the above-captioned appeal before the Court of Appeals for the

Second Circuit. A copy of my Notice of Appearance in the appeal is attached as Exhibit A

hereto. Mr. Teman has indicated that there are a certain number of sealed transcripts from the

trial court proceedings that may bear on issues of judicial bias and/or recusal. I would

respectfully request that your Honor authorize the release of these transcripts to me as soon as

possible so that I can assess their relevance.

In addition, I would respectfully request that your Honor disclose the Court's total

Berkshire Hathaway holdings. Bank of America was the only alleged economic victim in Mr.

Teman's trial and constitutes nearly 15% of the Berkshire Hathaway portfolio. According to

public reports, your Honor disclosed holdings of $5.2 million in Berkshire Hathaway stock in

2011.

https://legaltimes.typepad.com/blt/2011/02/new-york-judicial-nominees-report-income.html.

Berkshire Hathaway's value has increased substantially since 2011 and the Court's most recent

A-2468

available financial disclosure lists Berkshire Hathaway holdings in a range of $5-$25 million.

https://www.courtlistener.com/person/997/disclosure/29788/paul-adam-engelmayer/. The Court's

interest in Bank of America thus appears significant.

I thank your Honor for your courtesies in this matter.

Respectfully submitted,

_____

Eden P. Quainton

cc: All counsel of record (via ECF)

2

**A-2469**

NOTICE OF APPEARANCE FOR SUBSTITUTE, ADDITIONAL, OR AMICUS COUNSEL

Short Title: United States of America v. Teman                          Docket No.: 21-1920

Substitute, Additional, or Amicus Counsel's Contact Information is as follows:

Name: Eden P. Quainton

Firm: Quainton Law, PLLC

Address: 2 Park Ave., 20th Floor, New York, New York 10016

Telephone: 212-419-00575                          Fax: 212-376-5699

E-mail: equainton@gmail.com

Appearance for: Ari Teman
                          (party/designation)

Select One:

[✓] Substitute counsel (replacing lead counsel: Alan Lewis/Carter, Ledyard & Millburn, LLP )
                          (name/firm)

[✓] Substitute counsel (replacing other counsel: Nathaniel Z. Marmur/Law Offices of Nathaniel Z.Marmur, PLLC )
                          (name/firm)

[ ] Additional counsel (co-counsel with: _____ )
                          (name/firm)

[ ] Amicus (in support of: _____ )
                          (party/designation)

### CERTIFICATION

I certify that:

[✓] I am admitted to practice in this Court and, if required by Interim Local Rule 46.1(a)(2), have renewed

my admission on _____                                                                 OR

[ ] I applied for admission on _____ .

Signature of Counsel: _____

Type or Print Name: Eden P. Quainton

A-2470

Ari B. Teman

**April 14, 2022**
Nissan 13, 5782

The Honorable Paul A. Engelmayer
District Judge
Southern District of New York
40 Foley Square,
New York, NY

**Re:   Motion for resentencing due to dead baby, 19 months in 20-hr solitary confinement**;
**Motion to Recuse due to Your Honor's failure to disclose Biale/Graham conflict;**

Your Honor,

Defendant respectfully requests that the Court resentence the defendant to time served, counting the 19 months in 20-hour-a-day Defendant spent in solitary confinement, in place of the year-plus-one day sentence the Court has already given.

Defendant's reason for raising this issue now is that my former girlfriend told me that she had felt obligated to terminate the life of a child I and my girlfriend had conceived, after the baby had hands, feet, and a head, because she feared she would have to raise it alone while I was imprisoned, and she was stuck across the planet during COVID lockdowns. Here is that baby (Mother's name redacted):



A-2471

I have nightmares frequently about being unable to save or hold my child. It is incredibly painful to think about and I am reminded of it often. I cannot imagine any worse punishment.

That relationship lasted quite some time after this but did not survive my 19 months in 20-hour-a-day near solitary confinement -- mostly because neither did my sanity or my health. I was forced to endure serious illness and surgery and months of recovery alone, as well.

Further, I respectfully request that the Court credit me with 10 months based on the amount of time sentencing was delayed due to the conflict violation of Mr. Noam Biale (and AUSA Graham and AUSA Bhatia). The betrayal of my trust by Mr. Biale, who not only allowed his wife AUSA Graham to gain access to my post-trial strategy, which gave the prosecution an unfair advantage and undermined all my subsequent arguments, but also misrepresented that he had sought exculpatory evidence from the Mercer shareholders–who had in fact reviewed the GateGuard payment terms, had been expressly notified of GateGuard's right to cover payment defaults by RCC and had *voted to approve the GateGuard Terms*, thus vitiating a conviction that could have been based on a ***single*** $18,000 check that I completely covered following the improper chargeback.

I respectfully request that your Honor reconsider my time served and the punishment resulting from a lost child and allow me to start life anew and build a new family without the threat of prison and a year or more of delays with appeals and/or Rule 33 Motions.

With $259,000 restitution to Bank of America, which the jury could have found was not the victim of any fraud, since it could have convicted on the basis of a single $18,000 check that was charged back and then paid by me, and in consideration of post-sentencing discovery submitted to the Court of collusion by witnesses (DOC 284 at 7) and evidence that I had indeed warned the witnesses that amounts owed were subject to collection via remote checks, any debt has surely been fully paid, and then some. I respectfully request that your Honor modify my sentence to "time served" and allow me to rebuild my life.

However, because the request herein involves crediting me time (10 months) based on the disclosure violation of Mr. Biale and Ms. Graham, Your Honor's close personal friends, and Your Honor, defendant again motions for recusal so that this motion may be considered by a judge who is not close personal friends of Biale and Graham and who did personally also violate his own disclosure violation in regard to that conflict.

Respectfully submitted,

A-2472

Ari Teman
Defendant, Pro Se

A-2473

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-v-

ARI TEMAN,

Defendant.

19 Cr. 696 (PAE)

ORDER

PAUL A. ENGELMAYER, District Judge:

The Court has received a letter from appellate counsel for defendant Ari Teman, dated

April 13, 2022, requesting two categories of material. *See* Dkt. 313-1. The Court responds to

those requests as follows.

**1.    Sealed transcripts**

Appellate counsel states that "Mr. Teman has indicated that there are a certain number of

sealed transcripts from the trial court proceedings that may bear on issues of judicial bias and/or

recusal. I would respectfully request that your Honor authorize the release of these transcripts to

me as soon as possible so that I can assess their relevance." *Id.* at 1.

The Court encourages appellate counsel to review the docket sheet in this case. It

reflects, in fact, the existence of only two sealed transcripts. Both are for proceedings that Mr.

Teman attended in their entirety. Counsel is encouraged to judge for himself whether these

transcripts support Mr. Teman's claims of judicial bias, or instead reflect appropriate solicitude

for his interests.

The first is the transcript of Mr. Teman's sentencing, held on July 28, 2021. Dkt. 276.

The Court orders this transcript unsealed, as a review of the transcript does not reveal any basis

for it to be maintained under seal. The transcript reflects, *inter alia*, that: (1) the Court imposed a

A-2474

term of imprisonment of 12 months and one day, below the advisory guidelines range of 30–37 months' imprisonment, a sentence within which both the Government and the Presentence Report urged; and (2) granted Mr. Teman bail pending appeal, over the Government's objection.[1]

The second is the transcript of an emergency telephone conference held on December 12, 2019, between the Court, counsel, Mr. Teman, and representatives of Pretrial Services from this District and the Southern District of Florida. That conference was urgently convened by the Court after a handwritten note was received from Mr. Teman titled "Good-bye, a Suicide Note," and otherwise indicating an intention to take his life. The transcript reflects the Court's urgent efforts to assure that mental health professionals and appropriate care were available to Mr. Teman. The Court ordered that the transcript of that conference be sealed, because it addressed confidential personal and medical information. Those considerations support the continued sealing of that transcript. *See also* Dkt. 87 at 27 (transcript of January 10, 2020 pretrial conference, at which the Court addressed, and indicated its intention to grant in pertinent measure, Mr. Teman's motion *in limine* to exclude any reference at trial to the content of his "anguished typewritten note" that was the impetus for the December 12, 2019 conference). For avoidance of doubt, however, the Court hereby authorizes the Southern District of New York court reporters to make the transcript of the December 12, 2019 telephonic conference in this case available upon request to Mr. Teman and his appellate counsel, Eden P. Quinton, Esq.[2]

The Court is unaware of any other sealed transcripts in this case. The other sealed filings in this case do not appear relevant to appellate counsel's letter, as they involve the following

---

[1] The Court has since authorized Mr. Teman to travel extensively while on bail pending appeal, including to Australia, so as to enable him to be gainfully employed. Dkt. 302.

[2] The transcript reflects the Court's order that it be accessible to the counsel then representing Mr. Teman. *See* 12/12/19 Tr. at 19.

2

A-2475

materials: Mr. Teman's arrest warrant, Dkt. 2; the presentence report, Dkts. 123, 257; and medical documents, Dkt. 149.

**2.     The Court's holdings in Berkshire Hathaway**

Appellate counsel also requests disclosure of the Court's present holdings in Berkshire Hathaway, Inc.  For the Court's year-end holdings in Berkshire Hathaway for the years 2011 through 2020, the Court directs appellate counsel to the Court's annual financial disclosures, which are publicly available.  The Court's financial disclosure for the year ending December 31, 2021 has not been prepared; the annual filing deadline is May 15, 2022.  However, insofar as the deadline for filing Mr. Teman's appellate brief falls before that date, the Court notifies appellate counsel that, as to its year-end holdings in Berkshire Hathaway, its financial disclosures for the year ending December 31, 2021 will be consistent with those for the year ending December 31, 2020.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: April 15, 2022
       New York, New York

3

A-2476

# Ari B. Teman

---

**April 20, 2022**
Nissan 19, 5782
Chol Hamoed, Passover

The Honorable Paul A. Engelmayer
District Judge
Southern District of New York
40 Foley Square,
New York, NY

**RE: Emergency Motion to Unseal January 10, 2020 Transcript.**

    Your Honor recently authorized the release to me of a sealed portion of the transcript

from the January 10, 2020 proceedings. I have reviewed the transcript with my appellate counsel

and he concurs with me that the transcript contains material relevant to issues of recusal and bias

that we are pursuing on appeal.

    **I am herewith filing an emergency motion for your Honor to unseal the transcript**

**so that I can freely refer to its contents in my brief on appeal (and in any trial court**

**proceedings).**

    **Mr. Bhatia has confirmed that the Government does not object to the unsealing of**

**these five (5) pages of sealed transcript from January 10, 2020.**

    As your Honor knows, the primary subject of discussion during the sealed portion of the

hearing concerned my mental health and as the party whose interests were allegedly being

protected by the sealing, I should be free to request the unsealing of the transcript.

A-2477

The only portion of the transcript that does not concern my mental health relates to an *ex parte* call your Honor previously made. I believe this call is relevant to arguments we are making on appeal and do not believe any of the reasons for sealing a transcript apply to this portion of the record.

As the Second Circuit has stated:

> Under both the common law and the First Amendment, there is a strong presumption of public access to judicial documents, including the transcript of the plea proceeding      and the district court's November 8, 2018 sealing order. In light of this strong First       Amendment presumption, continued sealing of the documents may be justified only      with specific, on-the-record findings that sealing is necessary to preserve higher values    and only if the sealing order[s] [are] narrowly tailored to achieve that aim.
> *In re New York Times*, 799 F. App'x 62, 65 (2d Cir. 2020).

The Second Circuit has identified some of the "higher values" that justify continue sealing of a record, none of which apply here. *See Brown v. Maxwell*, 929 F.3d 41, 47 and Note 13 (2d Cir. 2019)("the right of an accused to fundamental fairness in the jury selection process," *Press-Enter. Co. v. Superior Court of California, Riverside Cty.*, 464 U.S. 501, 510 (1984); the protection of attorney-client privilege, *Lugosch*, 435 F.3d at 125; "the danger of impairing law enforcement or judicial efficiency," *SEC. v. TheStreet.Com*, 273 F.3d 222, 232 (2d Cir. 2001); and "the privacy interest of those who resist disclosure" *id.)*.

Because the deadline for perfecting my appeal is April 25, 2022, I respectfully request that your Honor immediately order the unsealing of the sealed portion of the April 25, 2022 transcript.[1]

My appellate counsel assisted me in the drafting of this motion.

*Respectfully,*

---

[1] Counsel filed a motion for a 30-day extension yesterday, but we have not yet obtained a ruling on that motion.

A-2478

*Ari Teman*
Defendant, pro se

A-2479

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-v-                                    19-CR-696 (PAE)

ARI TEMAN,                                    ORDER

Defendant.

---

PAUL A. ENGELMAYER, District Judge:

The Court has received a letter dated today from *pro se* defendant Ari Teman

asking the Court to unseal portions of the trial transcript.  The Court responds as follows:

1.      Mr. Teman states that the Court "recently authorized the release to me of a sealed

portion of the transcript from the January 10, 2020 proceedings."  That date is incorrect.  The

Court's order of April 15, 2022, Dkt. 315, authorized the unsealing of the transcript of Mr.

Teman's sentencing, held on July 28, 2021, Dkt. 276, and authorized the unsealing, for Mr.

Teman and his appellate counsel only, of the transcript of an emergency telephonic conference

held on December 12, 2019.  The Court's April 15, 2022 order did not address the conference

held on January 10, 2020, other than to note that, during that conference, the Court resolved a

motion *in limine* with respect to the "anguished typewritten note" that had been the impetus for

the emergency conference held on December 12, 2019.  *See* Dkt. 315 at 2.

2.      The Court has reviewed the transcript of the January 10, 2020 conference.  *See*

Dkt. 87.  The 90-page transcript of that conference appears to be entirely *unsealed*.  Mr. Teman

and his appellate counsel should already have full access via ECF to that transcript; if they are

not, the Court hereby orders that they be given access to it.  The Court is unaware of any sealed

portion of the January 10, 2020 conference and the transcript of that conference, and the ECF

A-2480

entries accessible to the Court do not reveal any sealed portion of the conference.  However, the Court notes that Mr. Teman's letter of today states that AUSA Kedar Bhatia has "confirmed that the Government does not object to the unsealing of these (5) pages of sealed transcript from January 10, 2020."  If so, and if the Court's memory and docket review on this point are mistaken, the Court would be happy promptly to review any such sealed pages to confirm whether they may be unsealed.  The Court directs AUSA Bhatia to file a letter on the docket of this case indicating whether he is in fact aware of any sealed portion of the transcript from the January 10, 2020 conference.  If so, AUSA Bhatia is to furnish the Court's chambers forthwith a copy of the sealed pages.

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: April 20, 2022
       New York, New York

A-2481

# Ari B. Teman

---

**April 21, 2022**
Nissan 20, 5782
Chol Hamoed, Passover

The Honorable Paul A. Engelmayer
District Judge
Southern District of New York
40 Foley Square,
New York, NY

**Re:**   **January 10th Sealed Transcript Pages Emailed to Bhatia and Chambers**

Your Honor,

Per Your Honor's order (Dkt 317), I have emailed a copy of the five (5) sealed pages to Mr. Bhatia and Chambers as I do not know how to file a sealed document via ECF and want to be sure you get it before the end of today as tonight ends Chol Hamoed, the period during Passover during which use of electronic devices is permitted, as Your Honor knows.

I reiterate my request that you immediately unseal these five pages, and that you identify by name all individuals who were on the ex parte call Your Honor discloses in the transcript.

Respectfully submitted,

Ari Teman
Defendant, Pro Se

A-2482



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 21, 2022

**BY CM/ECF**
The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

  Re: *United States v. Ari Teman*, S2 19 Cr. 696 (PAE)

Dear Judge Engelmayer:

  The Government respectfully submits this letter in response to the Court's Order, dated April 21, 2022, requesting an unsealed transcript from January 10, 2020. Dkt. No. 317.

  On April 19, 2022, defendant Ari Teman emailed the undersigned counsel to ask for information related to a page from a sealed transcript dated January 10, 2020. The Government subsequently requested the transcript from Southern District Reporters; was notified that it was available in hardcopy; and received it in hardcopy yesterday, April 20, 2022. Given that the transcript is sealed, the Government will transmit it to chambers via email.

       Respectfully submitted,

       DAMIAN WILLIAMS
       United States Attorney for the
       Southern District of New York

     By:  /s/       
       Kedar S. Bhatia
       Assistant United States Attorney
       (212) 637-2465

Cc:  Defendant Ari Teman

A-2483

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-v-

ARI TEMAN,

                    Defendant.

19-CR-696 (PAE)

ORDER

PAUL A. ENGELMAYER, District Judge:

In response to the Court's recent order, Dkt. 317, the Court has been furnished with a five-page transcript of a sealed conference that took place in the Court's robing room immediately prior to the January 10, 2020 conference. This sealed conference has not been reflected on the docket. The Court has reviewed the transcript and does not believe it merits continued sealing. The Court accordingly orders unsealed these five pages. For avoidance of doubt, Mr. Teman is at liberty to include this transcript in the joint appendix for his upcoming appeal.

SO ORDERED.

*Paul A. Engelmayer*

PAUL A. ENGELMAYER
United States District Judge

Dated: April 21, 2022
     New York, New York