# 21-1920-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

ARI TEMAN, AKA Sealed Defendant 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR DEFENDANT-APPELLANT

EDEN QUAINTON
QUAINTON LAW
*Attorneys for Defendant-Appellant*
2 Park Avenue, 20th Floor
New York, New York 10169
(212) 419-0575

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................ iii

PRELIMINARY STATEMENT ......................................................... 1

LEGAL ARGUMENT ....................................................................... 1

I. THE GOVERNMENT HAS FAILED TO ESTABLISH
VENUE IN THE SOUTHERN DISTRICT OF NEW YORK ............. 1

    A. The Crime of Bank Fraud Effected Through Allegedly
Illegitimate Checks is Complete Upon Deposit ........................ 1

    B. It Was Not Reasonably Foreseeable that Any Fraud
Review Would Occur in New York ........................................... 3

    C. There was No Competent Evidence that Teman's
Mobile Deposits Were Made in New York ............................... 4

II. THE GOVERNMENT FAILS TO ESTABLISH THAT THE
TRIAL COURT DID NOT CONSTRUCTIVELY AMEND
THE INDICTMENT ....................................................................... 7

III. TEMAN'S TRIAL COUNSEL RENDERED INEFFECTIVE
COUNSEL ...................................................................................... 12

    A. Teman's Ineffective Counsel Claim is Ripe for Judicial
Review ..................................................................................... 12

    B. Counsel's Decision to Call Reinitz Was a Catastrophic
Error ........................................................................................ 12

IV. JUDGE ENGLEMAYER SHOULD HAVE RECUSED
HIMSELF ...................................................................................... 18

V. JUDGE ENGLEMAYER EXHIBITED IMPERMISSIBLE
BIAS AGAINST TEMAN ............................................................. 24

    A. Judge Englemayer Falsely Claimed that Teman
"Explicitly" "Admitted" He Timed His RCC Deposits
to Exploit the Religious Practices of His Customers ................ 24

    B. Counsel's Failure to Object to Judge Englemayer's Ex
Parte Call Does Not Bar Teman's Challenge ........................... 26

i

C.    The Failure to Conduct a Timely *Curcio* Hearing Caused Significant Prejudice ......................................................30

VI.    THE GOVERNMENT FAILED TO PROVIDE PERSUASIVE JUSTIFICATION FOR ITS MISCONDUCT ...........32

A.    The Government Failed to Disclose the Presence of a Potential Conflict Requiring a *Curcio* Hearing .......................32

B.    The Government Inflamed the Jury with False and Misleading Statements About Teman's Religion .....................33

VII.    THE FAILURE TO REQUIRE A SPECIAL VERDICT FORM VIOLATED TEMAN'S CORE CONSTITUTIONAL RIGHTS ...............................................................................................36

CONCLUSION .............................................................................................41

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Bains v. Cambra*,
204 F.3d 964 (9th Cir. 2000) ...............................................................34

*Beer v. United States*,
696 F.3d 1174 (Fed. Cir. 2012) ...........................................................29

*Berger v. United States*,
295 U.S. 78 (1935).................................................................................33

*Berkson v. Gogo LLC*,
97 F. Supp. 3d 359 (E.D.N.Y. 2015) ............................................ 16, 17

*Blakely v. Washington*,
542 U.S. 296 (2004).......................................................................... 38, 39

*Caidor v. Onondaga Cnty.*,
517 F.3d 601 (2d Cir. 2008) ................................................................29

*Chapman v. California*,
386 U.S. 18 (1967)........................................................................... 30, 33

*Freeman v. Class*,
95 F.3d 639 (8th Cir. 1996) ..................................................................15

*Hirsch v. Citibank, N.A.*,
542 Fed.Appx. 35 (2d Cir. 2013).........................................................16

*Holloway v. Arkansas*,
435 U.S. 475 (1978)...............................................................................30

*Hughes v. Bowers*,
711 F. Supp. 1574 (N.D. Ga. 1989), *aff'd*, 896 F.2d 558 (11th Cir. 1990)... 32, 33

*In re Cendant Corp.*,
260 F.3d 183 (3d Cir. 2001) .................................................................25

*In re Comverse Tech., Inc. Sec. Litig.*,
543 F. Supp. 2d 134 (E.D.N.Y. 2008) .................................................19

*In re Grand Jury Subpoena of Ali*,
No. M 11-188 (RPP), 1999 WL 595665 (S.D.N.Y. Aug. 6, 1999).....................29

*Johnson v. Paul*,
   No. 17-CV-3654 (KMK), 2018 WL 2305657
   (S.D.N.Y. May 21, 2018).........................................................................35

*Leucadia, Inc. v. Applied Extrusion Techs., Inc.*,
   998 F.2d 157 (3d Cir. 1993) ..................................................................25

*Liteky v. United States*,
   510 U.S. 540 (1994)................................................................................26

*Meyer v. Uber Techs., Inc.*,
   868 F.3d 66 (2d Cir. 2017) .....................................................................17

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000) .....................................................................19

*Schnabel v. Trilegiant Corp.*,
   697 F.3d 110 (2d Cir. 2012) ...................................................................16

*Sparman v. Edwards*,
   154 F.3d 51 (2d Cir. 1998) .....................................................................12

*Spriggs v. United States*,
   703 F. App'x 888 (11th Cir. 2017) .........................................................15

*Strickland v. Washington*,
   466 U.S. 668 (1984)................................................................................15

*U.S. v. Aulet*,
   618 F.2d 182 (2d Cir. 1980) ...................................................................12

*U.S. v. Kidd*,
   394 F. Supp 357 (S.D.N.Y. 2019) ......................................................4, 5

*United States v. Agrawal*,
   726 F.3d 235(2d Cir. 2013) ......................................................................9

*United States v. Aiello*,
   864 F.2d 257 (2d Cir.1988) ....................................................................36

*United States v. Booker*,
   543 U.S. 220 (2005).........................................................................38, 39

*United States v. Brinkworth*,
   68 F.3d 633 (2d Cir. 1995) ..........................................................27, 28, 29

*United States v. Cabrera*,
  222 F.3d 590 (9th Cir. 2000) .................................................................34

*United States v. Crisci*,
  273 F.3d 235 (2d Cir. 2001) ...................................................................2

*United States v. Curcio*,
  680 F.2d 888- (2d Cir. 1982) ................................................. 30, 31, 32

*United States v. D'Amelio*,
  683 F.3d 412 (2d Cir. 2012) ...................................................................9

*United States v. Domres*,
  142 F.2d 477 (7th Cir. 1944) ................................................................27

*United States v. Fairchild*,
  69 F.3d 536 (5th Cir. 1995) ...................................................................2

*United States v. Fruchter*,
  411 F.3d 377 (2d Cir. 2005) ............................................................ 38, 39

*United States v. Geninez*,
  280 F. App'x 47 (2d Cir. 2008) ....................................................... 21-22

*United States v. Goodale*,
  530 F. App'x 338 (5th Cir. 2013) ...........................................................2

*United States v. Greenidge*,
  495 F.3d 85 (3d Cir. 2007) .....................................................................2

*United States v. Grey*,
  422 F.2d 1043 (6th Cir. 1970) ..............................................................34

*United States v. Gushlak*,
  728 F.3d 184 (2d Cir. 2013) .................................................................38

*United States v. Heller*,
  785 F.2d 1524 (11th Cir. 1986) ............................................................34

*United States v. Hood*,
  920 F.3d 87 (1st Cir. 2019).....................................................................5

*United States v. Jenkins*,
  No. 18 CR 181, 2019 WL 1568154 (N.D. Ga. Apr. 11, 2019) ............5

*United States v. Kelley*,
  712 F.2d 884 (1st Cir. 1983)................................................................26

*United States v. Kidd*,
    394 F. Supp. 3d 357 (S.D.N.Y. 2019) ...............................................4, 5

*United States v. Lauersen*,
    348 F.3d 329 (2d Cir. 2003) ....................................................... 22, 23

*United States v. Matos*,
    905 F.2d 30 (2d Cir. 1990) ................................................................12

*United States v. Milstein*,
    401 F.3d 53 (2d Cir.2005) ................................................................10

*United States v. Mollica*,
    849 F.2d 723 (2d Cir. 1988) ..............................................................11

*United States v. Ravich*,
    421 F.2d 1196 (2d Cir. 1970) .............................................. 21, 22, 23

*United States v. Sindona*,
    636 F.2d 792 (2d Cir. 1980) ...............................................................1

*United States v. Swanson*,
    360 F.3d 1155 (10th Cir. 2004) ..........................................................2

*United States v. Thomas*,
    315 F. App'x 828 (11th Cir. 2009) ....................................................1

*United States v. Walsh*,
    700 F.2d 846 (2d Cir.), *cert. denied,* 464 U.S. 825 (1983) .................27

*United States v. Wozniak*,
    126 F.3d 105 (2d Cir. 1997) ..............................................................10

*United States v. Young*,
    952 F.2d 1252 (10th Cir.1991) ...........................................................2

**Statutes & Other Authorities:**

28 U.S.C. § 455 ....................................................................... 21, 26

28 U.S.C. § 455(a) ................................................................... 26, 27

28 U.S.C. § 455(d)(4)(i) ............................................................ 18, 20

28 U.S.C. § 994(j) ............................................................................40

1 J. Bishop, *Criminal Procedure* § 87 (2d ed. 1872)..............................39

vi

ABA Standards for Criminal Justice 3–1.2 (3d ed. 1993)........................................32

ABA Standards for Criminal Justice 3–1.2(c) (3d ed. 1993) ...................................33

Fed. R. Evid. 201(b).................................................................................................19

Jessica Lile, *Internet Privacy Regulations and the Carpenter Decision*,
   87 UMKC L. Rev. 777 (2019).............................................................................5

Juliet M. Moringiello, *Signals, Assent and Internet Contracting*,
   57 Rutgers L. Rev. 1307 (2005) ........................................................................17

Nancy S. Kim, *Wrap Contracts: Foundations and Ramifications* (2013) ..............17

Richard H. Fallon, Jr., *A Theory of Judicial Candor*,
   117 Colum. L. Rev. 2265 (2017) ......................................................................25

Tom Lininger, *Green Ethics for Judges*,
   86 Geo. Wash. L. Rev. 711 (2018) ...................................................................25

United States Sentencing Commission, Sentencing Guidelines Manual,
   §2B1.1(b); Ch. 5, Part A...................................................................................39

United States Sentencing Commission, Sentencing Guidelines Manual,
   § 5C1.1, comment 4..........................................................................................40

**PRELIMINARY STATEMENT**

The Government's wooden responding brief ("GBr.") does little more than regurgitate abstract legal principles or inapposite case law, and provides little, if any, helpful analysis of the issues raised by Defendant Ari Teman. When Teman's appeal is considered with close attention to the facts and the law, it becomes clear the Teman's conviction must be reversed.

**LEGAL ARGUMENT**

I.    **THE GOVERNMENT HAS FAILED TO ESTABLISH VENUE IN THE SOUTHERN DISTRICT OF NEW YORK.**

A.    **The Crime of Bank Fraud Effected Through Allegedly Illegitimate Checks is Complete Upon Deposit.**

In attempting to argue that Teman's alleged crime was complete only after the fraud review of the RCC's in question and the release of funds to Teman, the Government cites inapposite cases that deal with elaborate schemes, such as the multi-year, multi-jurisdictional fraud perpetrated by Michele Sindona in *United States v. Sindona*, 636 F.2d 792 (2d Cir. 1980). GBr. at 16-17. But Teman is charged with a far simpler crime of depositing counterfeit checks, a crime courts uniformly hold to be complete upon deposit. Incredibly, in its venue analysis, not a single case brought forward by the Government is a counterfeit or forged check case, which leaves it tilting at windmills in the face of overwhelming authority against it. *United States v. Thomas*, 315 F. App'x 828, 838 (11th Cir. 2009)("we

1

agree that bank fraud was complete at the time that checks were deposited into the

bank accounts with the intent to eventually withdraw the funds for personal use.");

*United States v. Fairchild*, 69 F.3d 536 (5th Cir. 1995)

(Fairchild's fraud was complete when he deposited the fraudulent checks into

the bank accounts); *United States v. Crisci*, 273 F.3d 235, 240 (2d Cir. 2001)(bank

fraud satisfied on showing of risk that the forged checks would be "presented" to a

bank for payment); *United States v. Swanson*, 360 F.3d 1155, 1161 (10th Cir.

2004) (eventual presentation of the stolen and forged checks to the drawee banks,

which exposes the banks to a potential risk of loss"); *United States v. Goodale*, 530

F. App'x 338, 343 (5th Cir. 2013) ("presentation" of forged checks exposes banks

to a potential risk of loss); *United States v. Young,* 952 F.2d 1252, 1257 (10th

Cir.1991) (holding that the government's proof that "the bank was put at potential

risk by the scheme to defraud" was sufficient to support a finding that the

defendant knowingly executed a scheme to defraud a bank); *see also United States*

*v. Greenidge*, 495 F.3d 85, 101 (3d Cir. 2007) (conspiracy to

commit bank fraud was complete when the stolen and altered check was

deposited).

Indeed, *the Government's own case undermines its venue theory*. Three of

the checks deposited in April drawn on the account of 518 W. 205 LLC totaling

$33,000 were returned uncashed because the drawee's account had been closed.

Appellant's Brief (hereafter, "Br.") at 11, 21; GBr. at 6. Yet the Government claims Teman has committed bank fraud by depositing these checks even though no funds were ever received by Teman. A-121; GBr. at 6. Obviously, with respect to these checks, the Government's own theory is that the alleged crime was complete upon deposit.

## B. It Was Not Reasonably Foreseeable that Any Fraud Review Would Occur in New York.

The Government argues repeatedly that because the RCC's deposited by Teman were drawn on New York banks with NYC addresses with whom he had done business in Manhattan, this means it was foreseeable that any fraud review would occur in New York. GBr. at 19-20. This is nonsense. It is widely known that many large commercial banks based in New York have outsourced their fraud review functions offshore for cost savings. Br. at 36 and Note 24. More to the point, Teman's most significant commercial counterparties in the alleged scheme charged by the Government were the ABJ entities controlled by Joseph Soleimani and his brother. Br. 20-21. The RCC's for the ABJ entities were drawn on JP Morgan accounts in Manhattan. *Id.* But the fraud review for these entities occurred in Texas and Ohio, not in New York. Br. 29 and Note 18; Br. 36 and Note 24. If the fraud review for the vast majority of the checks at issue (24 ABJ checks for a total of approximately $260,000) was subject to fraud review outside of New York,

it can hardly be reasonably foreseeable that a small minority of the checks (5 checks for a total of $69,000) would be subject to fraud review in New York.

### C. There was No Competent Evidence that Teman's Mobile Deposits Were Made in New York.

The Government argues that because a government fact witness testified that a spreadsheet showed online banking deposits were made in Manhattan, this Court is required to sustain the jury's finding that Teman was in New York when he made the deposits in question. GBr. at 21-22. On close inspection, this argument fails.

The government witness, Karen Finocchiario, testified to the contents of a "microscopically small" spreadsheet the Court recognized the jury could hardly see. A-339. The spreadsheet, identified as GX-113 was never able to be produced to the jury in the jury room, Br. 22 and Note 14, and was submitted to this Court in CD-Rom form. *Id.* Column E of the "Device" Tab in the spreadsheet lists IP addresses and column P of the Device tab lists a corresponding physical address. A-1675.1. For the mobile deposits at issue here, column E shows an IP address that corresponds to a New York, New York location shown in column P.

But it is well-known that an IP address does ***not*** correspond to a user's physical location, a position the Government itself has taken in the Southern District. *See United States v. Kidd*, 394 F. Supp. 3d 357, 359–60 (S.D.N.Y. 2019). Unlike Cell Site Location Information ("CSLI") which provides precise tracking of

4

a mobile user's location by the connection of her phone to cell phone towers, "IP address data . . . does not itself convey any [user] location information." *United States v. Hood*, 920 F.3d 87 (1st Cir. 2019). The IP address is simply the point at which data sent from a device (fixed or mobile) connects to the Internet. "IP address information merely shows the location at which a device accesses the internet during a specific session. It does not follow that person around. Indeed, it does not even identify the user, just the location of internet access." *U.S. v. Kidd*, 394 F. Supp at 363 (quoting *United States v. Jenkins*, No. 18 CR 181, 2019 WL 1568154, at *1 (N.D. Ga. Apr. 11, 2019). A cell phone connects to the closest physical cell tower and data from the phone is then routed through the carrier's network of towers until the data reaches an Internet node, with a discrete address, and is sent through the Internet to the recipient's device in a reverse process. *See* Jessica Lile, *Internet Privacy Regulations and the Carpenter Decision*, 87 UMKC L. Rev. 777, 795–96 (2019). The location information carried by an IP address is not an esoteric point, but a crucial one for law enforcement, including the government in the Southern District. *United States v. Kidd*, 394 F. Supp. 3d at 359–60.

The key point here is that, without analysis of a cellular access provider's physical infrastructure *it is impossible* to correlate a user's location and the cellular network's Internet access point. It is not more likely than not; it is *unknown*.

5

Teman could have been in the Bronx, Queens, Brooklyn or even New Jersey, with his carrier routing data to a node in Manhattan. This is not a preponderance of the evidence issue; one cannot say, based on the data on GX-113, that it is more likely than not that Teman was physically in New York City simply because the data he sent through a cellular network connected to the Internet in New York City. One cannot say *anything* about the relationship between the two data points (Column E and P) *without more information* that was not provided. Ms. Finocchiaro, as a bank record keeper was obviously incompetent to provide expert cellular network testimony necessary to address the issue. Indeed, her testimony was very narrowly directed at the "location at which at on-line banking log-in occurs," A-340, which properly interpreted means the point at which data sent from a user's cell phone connects to the Internet, not the physical location of the sender or her device.[1]

As a result of the foregoing there was no basis for venue in New York and the matter must be remanded for one or more trials in the proper venues.

---

[1] The Government's remaining theory, that the withdrawal of $4,000 weeks after the deposit of the last of the checks can support venue for the entire prosecution, also fails. First, as Judge Englemayer rightly pointed out, any alleged fraud scheme, even on the most expansive possible conception of "execution," was complete well before the $4,000 withdrawal occurred. A-1995-96. Second, under no theory could the withdrawal provide venue for Counts I and III. Finally, the withdrawal did not reduce funds available to cover BOA's alleged loss but was part of a pool of funds that were ultimately placed in a "hold harmless" account. Br. at 23.

## II. THE GOVERNMENT FAILS TO ESTABLISH THAT THE TRIAL COURT DID NOT CONSTRUCTIVELY AMEND THE INDICTMENT.

The Government argues, for the first time on appeal, that there was no constructive amendment because they were permitted to prove, consistently with the indictment, that the Teman RCC's were ***both*** "counterfeit" ***and*** "unauthorized." GBr. at 25. But this argument does not make sense and, in fact, highlights a core issue underlying the bar on constructive amendments. Judge Englemayer unambiguously ruled that whether the checks were "counterfeit" in a technical sense was ***irrelevant*** to the charges and prevented Teman from introducing evidence that the checks were ***not*** "counterfeit." A-137.39-40. Judge Englemayer believed, and let the Government proceed on the theory that, there is a "vernacular" or "lay" meaning of "counterfeit" that can be conflated with the notion of "unauthorized." A-137.41. This is not only counter-intuitive but also wrong. The "vernacular" meaning of counterfeit is "forged." Br. at 42. No amount of "authorization" can make a "forgery" genuine. Moreover, the Government admitted it had not provided a definition of "counterfeit," whether in the "lay" or technical sense, to the grand jury. A-137.43. Nonetheless, Judge Englemayer made clear that, for him, "counterfeit" and "unauthorized" were synonyms. *See* A-1023; A-137.38. Thus, because for Judge Englemayer "counterfeiting" ***means*** "unauthorized," the Government's argument that it could prove "counterfeiting"

7

**_and_** "unauthorized" (*i.e.*, that counterfeiting means something other than, and in addition to, unauthorized) demonstrates that the indictment was constructively amended in such a way by Judge Englemayer that even the government no longer understood what its own indictment meant.[2]

The Government fares no better with its "to wit" argument. The Government argues that if the "core of criminality" is set out in the indictment, the Government is not bound by the "illustrative" provisions of the "to wit" clause. GBr. at 24. However, the Government fails to address Teman's argument that where the "to wit" clause contained *the only detail* alleged in the indictment, the "to wit" clause which contains the specific charge *is* the *entire* "core of criminality". *See* Br. 40-41. Likewise, the Government does not offer any persuasive authority to counter the proposition that once an indictment *does* specify the means by which the alleged crime was committed, a conviction may rest only upon those means and not any others. Br. 42.

Instead, the Government serves up a trio of cases that are easily distinguishable. In *Bastian*, GBr. at 26, the Court reviewed the defendant's constructive amendment argument under a plain error standard because the defendant failed to raise the argument in the trial court. *Bastian*, 770 F.3d at 221-23. Thus, the Court affirmed the conviction even though it held that the fact that

---

[2] This was clearly not a "carefully crafted indictment." *See infra* at 11.

the plea allocution differed from the allegations in the indictment as to the type of gun possessed, the date, and the purpose for which the gun was possessed "raised concerns about fair notice and double jeopardy that the constructive amendment doctrine seeks to avoid." *Id.* at 223.

In *United States v. D'Amelio*, 683 F.3d 412, 416 (2d Cir. 2012)*, GBr. *at 26,* the "to wit" clause specified that the defendant had "used a computer and the Internet" to solicit an underage minor. *See D'Amelio,* 683 F.3d at 414. However, at trial the government introduced evidence of conversations over the internet *and* the telephone. *Id.* Thus, although the defendant was convicted based in part on evidence regarding his use of the telephone – a detail not specifically alleged in the indictment – he was also convicted based on his use of the internet, a detail which was specifically alleged in the indictment. Here, Teman was charged *only* with fraud through the use of "counterfeit checks", but the jury could convict him based on a finding *only* that the checks were unauthorized, not that the checks were unauthorized *and* counterfeit, in the way the charged and uncharged details were combined *D'Amelio*. *See supra* at 7.

In *United States v. Agrawal*, 726 F.3d 235, 261(2d Cir. 2013), GBr. at 26, the general provisions of the indictment listed 17 specific means of stealing trade secrets and the "to wit" clause repeated one of these and added two more. Argawal was convicted of conduct that came within the 19 identified terms. *Id.* This has no

9

application to an indictment that includes generic language in the body of the indictment and then adds a single, specific means of carrying out the criminal conduct, which is then amended to have a "vernacular" meaning not evident on the face of the indictment.

More pertinent are *United States v. Milstein,* 401 F.3d 53, 64 (2d Cir.2005) and *United States v. Wozniak,* 126 F.3d 105 (2d Cir.1997). In *Milstein*, the defendant was charged with forging product packaging but was convicted of adulterating the contents of the package. *Id.* On those facts, which parallel the manner in which Teman was charged with counterfeiting (or forging) checks but convicted of unauthorized conduct, the Court held a constructive amendment had occurred. *Milstein*, 401 F.3d at 64-65.

In *Wozniak*, the various counts of the indictment alleged offenses relating to cocaine and methamphetamines, whereas the evidence at trial related "mostly" to use and distribution of marijuana. *Id.* at 106-107. Had the indictment remained at a high level of generality charging offenses relating to "controlled substances," the defendant could have been convicted of conduct involving either cocaine or marijuana. *Id.* at 110. Yet, because the indictment charged offenses related to specific controlled substances and the Government proof related to an unnamed substance, this Court vacated the defendant's conviction on all counts. *Wozniak*, 126 F.3d at 111.

10

This Court has previously admonished that "[i]n light of the current broad range of conduct covered by the federal fraud statutes, it is critical that courts vigilantly enforce the Fifth Amendment requirement that a person be tried only on the charges contained in the indictment returned by the grand jury," and that "[i]n order to avoid amending an indictment in violation of the Fifth Amendment, the government in fraud cases should think through the nature of the crime it wishes to allege and then spell out the offense in a carefully crafted indictment." *United States v. Mollica*, 849 F.2d 723, 729 (2d Cir. 1988) (quotation omitted).

Had the Government not specified "counterfeiting" as the specific means of violating the bank fraud statute, it could conceivably have obtained a valid conviction on the basis of evidence of the deposit of "unauthorized" checks. But once the government decided to charge "counterfeiting" it was required to meet its proof as to that element. Judge Englemayer's sleight of hand, that attempts to amend the indictment *sub silencio* by making "counterfeiting" simply a "vernacular" synonym for "unauthorized," does not even persuade the Government, which maintains counterfeiting and unauthorized are distinct concepts. By writing out counterfeiting from the indictment when counterfeiting was the ***only*** particular kind of conduct alleged to constitute bank fraud, the court constructively amended the indictment and Teman's conviction must be reversed.

11

### III. TEMAN'S TRIAL COUNSEL RENDERED INEFFECTIVE COUNSEL.

#### A. Teman's Ineffective Counsel Claim is Ripe for Judicial Review.

The Government argues that there is an insufficient factual record for the review of Teman's ineffective assistance claim, citing *Sparman v. Edwards*, 154 F.3d 51, 52 (2d Cir. 1998) and *United States v. Matos*, 905 F.2d 30, 32-34 (2d Cir. 1990). The Government's arguments are misplaced. It is true that, "[g]enerally, a claim for ineffective assistance must be made in the first instance to the district court in order that there be a full factual record on review." *Matos,* 905 F.2d at 32. However, "this Court may decide such a claim, even when it is raised for the first time on appeal, when its resolution is 'beyond any doubt' or to do so would be in the interest of justice." *Id*. (citing *U.S. v. Aulet,* 618 F.2d 182, 186. (2d Cir. 1980). In *Aulet*, the Court reached the question of ineffective assistance on direct appeal because the issue was "beyond any doubt" and to remand for further fact-finding would be a "waste of judicial resources." *Aulet*, 618 F.2d at 186. So, too, here.

#### B. Counsel's Decision to Call Reinitz Was a Catastrophic Error.

The Government accuses Teman of "hyperbole" in asserting that counsel's decision to call Reinitz was a disastrous error. GBr. at 31. On the contrary, disastrous may be an understatement.

Without Reinitz' testimony, Teman faced a threadbare Government case that most likely would have failed to secure a unanimous verdict beyond a reasonable

12

doubt. The Government's rambling, incoherent case failed to introduce the online terms and conditions that should have been part of its affirmative burden.[3] The Government failed to secure the testimony of critical witnesses its own exhibits indicated would have known whether the RCC's were authorized or would have been responsible for authorizing the instruments: Michael Haas, one of the owners of 518 W. 204 LLC who paid an invoice expressly acknowledging the application of GateGuard terms and conditions, *see* Br. at 7-8, but provided a false affidavit saying he was unfamiliar with GateGuard and failed to appear at trial, Br. at 49-50; Jacqueline Monzon, who was an authorized signatory for Crystal Real Estate Management, Br. at 15-16, the property management company for 18 Mercer Equity Inc., who approved GateGuard's invoices that stated the invoices were subject to the Company's online terms and conditions, and who knew that third parties required an indemnification to violate the Contract's device removal fee provisions, Br. at 15; and Benjamin Soleimani, one of the two owners of ABJ, who

---

[3] The online click-wrap terms and conditions that Teman's customers referred to as the "Contract", Br. at 15, authorized the use of RCC's. Br. at 5, 7,49. The Court instructed the jury that RCC's were a valid legal device. A-154. Given that the Court had written out of the indictment the specific charge that the RCC's were "counterfeit," the only issue at trial – as narrowed by Judge Englemayer – was whether the use of the RCC's by Teman was explicitly or implicitly authorized, and whether Teman had a good faith belief in the legality of conduct. Applicable on-line contract law and the evidence in the Government's case, summarized in Appellant's opening brief at 7-20 and 48-49, strongly suggest the answer to both questions was a clear yes. *See infra* at 16-17.

pleaded with Teman not to shut down the GateGuard services. Br. at 18. The

Government relied on evidence that was incomprehensible to the jury (such as the

Government's GX 113, the "microscopic," multi-tab Excel spreadsheet set forth at

A-1657.1). Perhaps most importantly, the Government failed to establish any *mens*

*rea* on the part of Teman, resorting to religious smears when the evidence clearly

showed that Teman acted at all times in the sincere belief that GateGuard's terms

and conditions permitted the use of RCCs and that his clients had authorized their

use. *See* Br. at 49-50; *infra* at 17.

The Reinitz testimony overshadowed all of this and exploded in the middle

of the defense case like a laser guided missile. Even though Reinitz was no doubt

using hyperbole to try to dissuade his client from taking a course of action he

thought was a "bad idea" from a commercial perspective, and even though the core

of his advice exonerated Teman ("ok invoicing and collections is fine," Br. at 20)

Reinitz' words were devastating.

Gone were the flaws in the government's case, gone were the gaps in its

evidence, gone the central theme that the case was just a commercial dispute

dressed up as criminal trial: when Reinitz was heard reading back his own words

that "I expect ***this will be a criminal matter***," that Defendants were "likely to call

***the police***" and that "you ***will be arrested***," the defense case was essentially over.

Calling Reinitz, despite the positive elements of his testimony, guaranteed that the

words "criminal," "police," "arrested" coming from the mouth of Teman's own lawyer would sear themselves into the jury's memory and constitute an insurmountable obstacle.

This was not some contingent, unforeseeable occurrence counsel could not have predicted. Rather, any second-year law student would have known that soliciting what positive testimony there was from Reinitz would open the door to cross-examination and admission of devastatingly incriminating testimony—an unpardonable error. *See Freeman v. Class*, 95 F.3d 639, 643 (8th Cir. 1996) (counsel's introduction of evidence that his client was guilty of stealing an automobile was "almost incredible" and undermined the "reasonable probability that, absent this error, the jury would have had reasonable doubt respecting the defendant's guilt"). Merely failing to challenge the admission of damaging evidence has been held to constitute ineffective assistance. *Spriggs v. United States*, 703 F. App'x 888 (11th Cir. 2017). But affirmatively acting to permit the introduction not of marginally harmful evidence but testimony that would undermine the core of the defense case and leave an indelible negative mark on the minds of the jurors falls below any reasonable standard of competent assistance.

Contrary to the government's position, the enormity of counsel's blunder is not the product of the "distorting effect of hindsight." GBr. at 29 (quoting *Strickland v. Washington*, 466 U.S. 668, 689 (1984). Nor was it "within the range

of reasonable professional assistance." *Id.* It was a colossal, avoidable mistake that

virtually guaranteed a conviction, an error no reasonable lawyer would ever repeat

on remand. The Government's citations to Judge Englemayer's transparent

attempts to protect the verdict only highlight remarkable blind spots in the district

court's view of the case. Judge Englemayer sought to rehabilitate Reinitz, who

according to the district court, "at least gave the defense something," GBr. at 32,

and went out of his way to praise as "superb," *id.*, the lawyers he had accused of

"blowing their credibility" with him, A-182, and chastised for failing "lawyering

101," A-884. In claiming that Reinitz "at least gave the defense something," Judge

Englemeyar painted an inaccurate picture of the defense case. According to Judge

Englemayer,

> There is no evidence that the customers saw, for example, any of the
> terms, the link that they were in place at the relevant time, that would
> have even authorized remotely created checks, let alone checks in the
> dollar amounts at issue. GBr. at 33.

This is not correct, as Teman has shown in detail in his opening brief. Br. at 7-20.

A party's willful blindness to online terms and conditions does not prevent these

terms from having binding contractual force. *Hirsch v. Citibank, N.A.,* 542

Fed.Appx. 35, 37 (2d Cir.2013). It is black letter law that, "an offeree is still bound

by the provision[s] if he or she is on *inquiry* notice of the term[s]. *Berkson v. Gogo

LLC*, 97 F. Supp. 3d 359, 394 (E.D.N.Y. 2015) (quoting *Schnabel v. Trilegiant

Corp.,* 697 F.3d 110, 119, 126–27 (2d Cir.2012). "Inquiry notice is actual notice of

16

circumstances sufficient to put a prudent man upon inquiry." *Berkson* 97 F. Supp. 3d at 395. This Court has held that browsewrap agreements that do not require an affirmative manifestation of assent are still valid if existence of the terms is reasonably communicated to the user. *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 76 (2d Cir. 2017). *See also* Juliet M. Moringiello, *Signals, Assent and Internet Contracting*, 57 Rutgers L. Rev. 1307, 1318 (2005) ("[B]rowse-wrap encompasses all terms presented by a web site that do not solicit an explicit manifestation of assent."). Moreover, on-line contract doctrine permits the updating of terms and conditions with binding force as of the date of the initial contract and there is no question that an updated version of the payment terms permitting RCC's *was* produced by the defense. *See* Nancy S. Kim, *Wrap Contracts: Foundations and Ramifications* 109-111 (2013). That Teman took seriously on-line contract doctrine does not make him a criminal.

Teman's good faith belief was supported by his inclusion of the words "Draw Per Contract" and the telephone number at which he could be contacted in the event of any issues. A person bent on committing fraud would hardly alert the bank to the existence of a contract justifying the checks and open himself to questioning before any amounts were drawn.[4]

---

[4] Inexplicably, it does not appear that anyone at BOA or the other banks involved thought to contact Teman before clearing the funds to his account.

None of these arguments were realistically possible once the jury saw texts from Teman's own lawyer – albeit concluding "ok invoicing and collections" – with the giant red flags, "***criminal***," "***police***," "***arrest***." There was no conceivable benefit to any testimony Reinitz could give that could possibly weaken the explosive force of his toxic text messages. The decision to take a course of action that guaranteed the admission of the damning texts and their exploitation to maximum effect by the prosecution transcended any possible sound strategy and stands as a testament to utter incompetence. Looked at calmly from this Court's perspective, the ineffective assistance of Teman's counsel in permitting the introduction of deadly evidence is beyond doubt. It would truly constitute a waste of judicial resources to engage in further fact-finding on such a cut and dried issue.

## IV.   JUDGE ENGLEMAYER SHOULD HAVE RECUSED HIMSELF.

In arguing that Judge Englemayer properly exercised his discretion in not recusing himself despite holding a $2,000,000 beneficial ownership in the only crime victim in the case, the Government makes two basic points. First, the Government cites to 28 U.S.C. § 455(d)(4)(i) for the proposition that "[o]wnership in a mutual or common investment fund that holds securities is not a 'financial interest' in such securities unless the judge participates in the management of the fund." GBr. at 38-39. Second, the Government asserts that a small percentage ownership in a crime victim, regardless of the value of the ownership interests,

18

does not constitute a substantial enough interest to require recusal. GBr. 39-40. Neither point is convincing.

With respect to the first point, Berkshire Hathaway, the vehicle through which Judge Englemayer owns his indirect interest in Bank of America, is not a "mutual fund" or a "common investment fund." The Government's contention to the contrary is a frivolous point easily disputed through publicly available information. Berkshire Hathaway is a holding company with subsidiaries engaged in numerous diverse business activities, including insurance, rail transportation and energy, that also has significant cash and equity holdings. *See* https://www.berkshirehathaway.com/2021ar/202110-k.pdf at K-1, K-70.[5] Approximately $440 billion of Berkshire Hathaway's assets are held in cash and marketable equity securities. https://www.berkshirehathaway.com/2021ar/202110-k.pdf. at K-40. Equity securities make up nearly 40% of the Company's total assets of close to $1 trillion. https://www.berkshirehathaway.com/2021ar/202110-k.pdf. at K-70. Berkshire Hathaway's equity holdings are concentrated in four companies, Apple Inc, Bank of America, American Express and Coca-Cola.

---

[5] The Court can take judicial notice of public filings with the Securities and Exchange Commission. *See* Fed.R.Evid. 201(b); *Rothman v. Gregor*, 220 F.3d 81, 88, 92 (2d Cir. 2000); *In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 153 (E.D.N.Y. 2008).

https://www.berkshirehathaway.com/2021ar/202110-k.pdf. at K-84 and Note 4.

Judge Englemayer himself knew perfectly well that his ownership in Berkshire

Hathaway was not somehow exempt from ethical rules surrounding judicial

financial interests. Shortly before the Teman trial began, Judge Englemayer had

recused himself from presiding over an important antitrust trial in which Bank of

America was one of the parties on the grounds that Berkshire Hathaway had

exceeded a 10% threshold ownership in Bank of America. *See In re Interest Swaps*

*Antitrust Litigation*, 16-MD-2704, Dkt 844; Br. 52 and Note 30. In recusing

himself from *In re Interest Swaps*, Judge Englemayer made no mention of 28

U.S.C. § 455(d)(4)(i). Judge Englemayer stated that he had consulted with the

Committee on Codes of Conduct of the Judicial Conference of the United States

and had concluded that because BOA had crossed the 10% threshold in the

Berkshire Hathaway portfolio, his "impartiality in supervising the case could

otherwise reasonably be questioned." A-58. No "mutual fund" or "common

investment fund" exception came to his defense.

The only question is thus whether Judge Englemayer's indirect interest in

Bank of America, sufficient to trigger his recusal in a civil case in which Bank of

America was one of dozens of parties, was substantial enough to call for his

recusal in a criminal case in which Bank of America was the only crime victim.

As a threshold matter, it should be clear that, from the public's perspective, separate from the technical rules that may be applicable, the appearance of impropriety and prejudice is at least as great in a criminal case in which the judge has an economic interest in a victim as in a civil case in which the judge has an identical interest. Judge Englemayer himself acknowledged that his indirect ownership of BOA stock would cause his "impartiality" to be "reasonably" "questioned." Judge Englemayer does not make a technical argument about the unfortunate application of technical recusal rules in civil cases; rather, he concedes that the ownership interest is substantively problematic and requires his recusal to avoid the reasonable questioning of his impartiality.

In order to convince this Court that Judge Englemayer's interest is not substantial, the Government proposes a share ownership test. According to the Government, if the judge owns a very small percentage of a company's equity interest (directly or indirectly), such ownership would not qualify as "substantial" for recusal purposes in a criminal case regardless of the dollar amount involved. GBr. at 37-39. In *United States v. Ravich*, 421 F.2d 1196, 1205 (2d Cir. 1970), the trial judge held 325 shares of stock in Franklin National Bank worth between $10,000 and $15,000 and representing .0072% of the bank's 5,391,527 shares, a percentage so small the trial judge declined to disqualify himself, considering  he did not have a 'substantial interest' in the case under 28 U.S.C. § 455. In *United*

21

*States v. Geninez*, 280 F. App'x 47, 49 (2d Cir. 2008) and *United States v. Lauersen*, 348 F.3d 329, 335-38 (2d Cir. 2003) the district courts likewise did not recuse where the share ownership interests were .00009 and .000091 percent, respectively. The Government concludes that the beneficial percentage ownership of Bank of America owned by Judge Englemayer (.00075 per cent) is so small that following *Ravich*, *Geminez* and *Lauernsen*, the Court should uphold Judge Englemayer's decision not to recuse.

But the government's proposed share ownership rule would lead to absurd results and should not be adopted. If Judge Englemayer held .00075 percent of the shares of Tesla, this would be worth $5.25 million. If he held the same percentage of Apple shares, this would be worth over $16 million. It would be impossible to maintain with a straight face to an average American earning $50,000 a year that beneficial ownership of $16 million in shares is an insubstantial sum.

Moreover, the substantiality of the interest needs to be evaluated in context. Repeatedly, throughout the trial, the prosecution and the court stressed the substantial amount of money involved in Teman's allegedly unauthorized use of RCCs. A-1114 ("more than a quarter of a million dollars"); A-1180 ("there's $260,000 – more than a quarter million dollars – missing"). Judge Englemayer endorsed this view that a quarter of a million dollars was a very substantial amount. A-2310 ("quarter of a million dollars" constituted a "large loss"); A-2399

22

("close to a third of a million dollars" is "a significant amount of money)." It is not credible to argue that $260,000 is a substantial sum warranting the imposition of jail time when looked at from the point of view of an alleged crime victim, while $2,000,000 is insubstantial from the point of view of the judge tasked with ruling impartially in the case.[6]

On the contrary, Judge Englemayer's interest is more than 130 times as valuable as Judge Friendly's in *Ravich* and more than 150 times as valuable as Judge Newman's in *Lauersen*. Ultimately, this is not a difficult call. In a world in which the judge was meeting out punishment, including jail time, based on the notion that a quarter of a million dollars is a "significant" amount of money, it violates the Code of Judicial Conduct to conclude an amount nearly 10 times greater is insubstantial. Public confidence in the judiciary would suffer a serious blow if such a clear double standard were to stand.

---

[6] As noted, Judge Englemayer does not really believe that his indirect ownership of BOA is immaterial. On the contrary, he concedes that it would lead to a reasonable questioning of his impartiality. *See supra* at 22. From BOA's point of view, the principle that the United States Justice Department will devote its resources to prosecuting chargeback issues – a $31 billion problem the banking sector would much rather not have to litigate in civil cases – is very important indeed.

23

**V.    JUDGE ENGLEMAYER EXHIBITED IMPERMISSIBLE BIAS AGAINST TEMAN.**

   **A.    Judge Englemayer Falsely Claimed that Teman "Explicitly" "Admitted" He Timed His RCC Deposits to Exploit the Religious Practices of His Customers.**

   Perhaps not surprisingly, given the seriousness of the issues raised by Judge Englemayer's alleged religious bias against Teman, the Government largely ignores the issue in its reply. The Government asserts that Teman does not identify any "error or improper conduct;" makes the false claim that depositing checks on the Friday before Passover somehow gave Teman a "head start" in his alleged fraud; states that Judge Englemayer's comments about Teman reflected a view formed during trial; and then, without a hint of self-awareness, quotes from Judge Englemayer's comments as though placing a capstone on its refutation of improper conduct. GBr. 41-43.

   Yet these comments go to the heart of the problem. According to Judge Englemayer, Teman "admitted" that he timed his check deposits for when he knew his religiously observant customers would be observing Passover and would not be reachable. *Id.* But Teman *never made such an admission*. Had he made the admission it would likely have been damning, but *no such admission, or anything remotely close to it, exists anywhere in the record*. Judge Englemayer then doubles down and states that Teman "*was explicit*" in his emails about timing his RCC

24

deposits to exploit the religious practices of his customers. GBr. at 42. Again, there is *nothing in the entire record* of the case to support this assertion. This was not a momentary lapse on a tangential issue, but a fundamental misstatement repeated over and over. See Br. at 67 ("Mr. Teman ***stated*** *that he would deposit checks on the eve of Passover when the customer would be disabled from learning about the deposits. . .**evidence**. . .which bespoke an intention to assure that he got away with the deposits that he knew were improper).* Yet the statement referred to by Judge Englemayer *does not exist* and cannot be evidence.

Like litigants, judges are held to the highest standards of candor, and few would disagree that judges have a duty to avoid making deliberately misleading or false statements and to take reasonable steps to avoid foreseeable and likely misapprehension. *See* Richard H. Fallon, Jr., *A Theory of Judicial Candor*, 117 Colum. L. Rev. 2265, 2297 (2017); *see also In re Cendant Corp.*, 260 F.3d 183, 192 (3d Cir. 2001) (stressing the importance of assuring that judges perform their duties in "an honest and informed manner") (quoting *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 998 F.2d 157, 161 (3d Cir. 1993). Judges who deliberately falsify evidence are doubtlessly very rare. But Judges are not immune from mischaracterizing facts or even misstating them. *See, e.g.*, Tom Lininger, *Green Ethics for Judges*, 86 Geo. Wash. L. Rev. 711, 736 (2018) ("The potential for judicial bias suggests a potential for judges to mischaracterize fact").

Because they are so rare, outright misstatements or false descriptions of the record strongly suggest the presence of bias or some other disqualifying prejudice that would explain the judicial lapse. Misstatements of the record cannot be explained by reference to a benign principle that would justify them. Judge Englemayer's misstatements go to a core basis for a finding of criminal intent and surely bring into question the impartiality of the judge in the mind of a reasonable person. Section 455(a) of Title 28 of the United States Code requires a federal judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." *Liteky v. United States*, 510 U.S. 540, 541 (1994). "The proper test ... is whether the charge of lack of impartiality is grounded on facts that would create a reasonable doubt concerning the judge's impartiality, not in the mind of the judge himself or even necessarily in the mind of the litigant filing the motion under 28 U.S.C. § 455, but rather in the mind of the reasonable man." *United States v. Kelley*, 712 F.2d 884, 890 (1st Cir. 1983). A judge who points to statements, admissions, and emails that *do not exist* as *evidence* of fraud, raises precisely such a doubt.

**B.    Counsel's Failure to Object to Judge Englemayer's *Ex Parte* Call Does Not Bar Teman's Challenge.**

The Government does not provide any justification for Judge Englemayer's *ex parte* call to the United States Attorney's Office requesting "adequate supervision" of the United States attorneys prosecuting Teman. Such an *ex parte*

26

call violates a core principle of due process, namely, that "a defendant is entitled to be tried by an impartial and fair judge, who shall maintain his role of judge and not assume that of prosecutor." *United States v. Domres*, 142 F.2d 477, 479 (7th Cir. 1944). *Ex parte* communications between the trial judge and the prosecution team "should not be conducted except in extraordinary circumstances." *United States v. Walsh,* 700 F.2d 846, 858 (2d Cir.), *cert. denied,* 464 U.S. 825 (1983). See Br. at 63-64. By, in effect, calling in reinforcements to make sure the Government was adequately staffed to secure a conviction, Judge Englemayer improperly put his finger on the scale for the prosecution.

The Government does not substantively contest this proposition, other than in the most general terms. GBr. at 45. Rather, the Government relies almost entirely on a waiver theory, citing *United States v. Brinkworth*, 68 F.3d 633, 639 (2d Cir. 1995). But *Brinkworth* involved a situation in which hearsay rumors about the defendant's affair with the judge's wife and the judge's resulting animus against the defendant had been "prevalent in the community" and known to Brinkworth for years. *Id.* The Court concluded that in light of Brinkworth's long involvement in this case and knowledge of the rumor, his § 455(a) motion, conveniently filed soon after the district court refused to make a pre-plea commitment to sentencing, was untimely. *Id.*

The facts here could not be more different than those in *Brinkworth*. Judge Englemayer casually notified counsel of his actions after the fact in his robing room where counsel were less likely to be on guard for objectionable conduct and the topic of the conference was Teman's mental health, who was under the care of multiple health providers, including a mental health care provider and a sleep specialist. *See* A-137.2-A-137.3. The court then sealed the record and kept even the existence of the sealed transcript off the docket, making it impossible for any post-trial counsel reviewing the docket to know of the existence of the call. Judge Englemayer himself appears to have forgotten about the transcript. A-2479-2480. With no trace of the conference on the case docket, Teman's post-trial counsel had no basis to assert or even suspect that the Court had engaged in impermissible *ex parte* contact with the U.S. Attorneys' Office for the Southern District of New York. It was only after multiple motions by Teman and his current appellate counsel, in March and April of this year, A-2549-2568; Judge Englemayer's rejection of Teman's request for the sealed transcript because of Teman's "vexatious claims of conspiratorial misconduct," A-2463; the court's denial of the existence of the transcript, A-2473-74; and the refusal of Judge Englemayer to even consider Teman's request, A-2573, that the sealed transcript was located, disclosed, unsealed and filed on the public docket. A-2479-2483. Under these circumstances, where the *ex parte* communication was only reported after the fact

28

in an offhand manner during an unrelated discussion and then erased from the docket altogether, the waiver principle articulated in *Brinkworth* does not apply and this Court is free to exercise its discretion to reach the merits under *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 603 (2d Cir. 2008). The Court has "exercised this discretion where necessary to avoid a manifest injustice or where the argument presents a question of law and there is no need for additional fact-finding." *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 603 (2d Cir. 2008).

On consideration of the merits, the Court should hold that a request by a trial judge from for additional "supervision" of line attorneys from the prosecutors' office responsible for the matter constitutes impermissible favoritism to the interests of the Government and undermines the proper functioning of the adversarial system under the aegis of a neutral, impartial judge beholden neither to the defense nor the prosecution.[7]

---

[7] To excuse the *ex parte* communication, the Court would either need to announce a rule that a trial judge must inform the superiors of all attorneys appearing before him or her, whether prosecutors, public defenders or private attorneys, whenever the appearing attorneys seem to require additional "supervision," or concede that only the Government attorneys are entitled to this solicitude, which renders the judiciary an extension of the prosecution, an approach antithetical to the American constitutional order. *See Beer v. United States*, 696 F.3d 1174, 1176 (Fed. Cir. 2012) ("[t]he Constitution erects our government on three foundational corner stones—one of which is an independent judiciary"); *In re Grand Jury Subpoena of Ali*, No. M 11-188 (RPP), 1999 WL 595665, at *5 (S.D.N.Y. Aug. 6, 1999) ("the judiciary in this country is independent of the prosecution").

### C. The Failure to Conduct a Timely *Curcio* Hearing Caused Significant Prejudice.

"A criminal defendant has an absolute right under the Sixth Amendment to be represented by an attorney who has no conflict of interest." *Holloway v. Arkansas*, 435 U.S. 475 (1978). Indeed, the assistance of counsel is among those "constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *Id.* (quoting *Chapman v. California,* 386 U.S. 18, 23 (1967). "Accordingly, when a defendant is deprived of the presence and assistance of his attorney, either throughout the prosecution or during a critical stage" of a trial, reversal is automatic. *Holloway*, 435 U.S. at 489. To ensure that a criminal defendant's right to conflict-free counsel is protected, this Court has outlined procedures that must be followed before any substantive decisions are taken while the defendant is represented by conflicted counsel. *United States v. Curcio*, 680 F.2d 888-890 (2d Cir. 1982). So important are the interests protected by the rule that no decisions may be taken until a *Curcio* hearing has been held.

In addressing the conflict raised by Teman's representation by an attorney married to an assistant U.S. Attorney in the office seeking to put Teman in prison, the Government proceeds as though there had been "no harm, no foul" and the Court had promptly called a halt to the proceedings until Teman could either waive his right to separate counsel or seek substitute counsel. GBr. at 47 ("Judge Englemayer did exactly what Teman says was required."). Not so.

30

Judge Englemayer recalls that he received a childbirth announcement from Noam Biale, an attorney he considered to be his mentee and at whose apartment he sat shiva the previous year,[8] shortly before Biale entered an appearance in the case as one of Teman's new post-trial counsel. A-22; A-2133. Biale's wife was a friend and former colleague of Judge Englemayer's with whom he had worked "closely." A-2133. As a result, as soon as Judge Englemayer saw the name of Noam Biale on the Court docket, a name that was fresh in his memory because of the recent childbirth announcement and that involved multiple personal and possibly familial associations, he should have immediately halted the proceedings and put in place the *Curcio* procedures to protect Teman's Sixth Amendment rights. Instead, Judge Englemayer proceeded to consider and rule on a motion prepared by the conflicted counsel *before* raising the *Curcio* issue with the Government, defense counsel or Mr. Teman. A-2109.

Thus, even though Judge Englemayer was on notice that Teman was being represented by an attorney "literally married to the prosecution" and that all Teman's communications, strategic thoughts and tactical considerations were at risk of being compromised, particularly in the middle of the then-raging pandemic

---

[8] Shiva is the seven-day period of mourning observed for the deceased in Judaism. "Sitting shiva" refers to the mourning process of certain close relatives of the deceased. https://www.chabad.org/library/article_cdo/aid/281586/jewish/Who-Sits-Shiva-and-Mourns-for-Whom.htm. Judge Englemayer's language implies a close relationship with the deceased relative of Biale or his wife.

31

when both government and private firm attorneys were working from home, Judge

Englemayer let this situation fester for four weeks before raising the issue with

Teman at the December 1, 2022 conference. A-2116, 2133. This is not "exactly

what Teman" wanted or anything close to what *Curcio* requires.

## VI. THE GOVERNMENT FAILED TO PROVIDE PERSUASIVE JUSTIFICATION FOR ITS MISCONDUCT.

### A. The Government Failed to Disclose the Presence of a Potential Conflict Requiring a *Curcio* Hearing.

In the hearing at which Judge Englemayer raised the *Curcio* issue discussed

above, the Government admitted it had known of the potential conflict involving

Biale and his wife before Biale entered an appearance. A-2108.7. In fact, Biale had

been working with Teman since the summer, which Biale's wife would obviously

have known. A-2141. The U.S. Attorneys' Office would have had potential access,

through Biale and his wife, to Teman's communications, reflections, thoughts,

ideas and tactics for possibly as long as six months before the conflict was first

raised. Such a delay in bringing a critical constitutional issue bearing on core Sixth

Amendment rights to the attention of the Court does not comport with a

prosecutor's duty as "an administrator of justice, an advocate, and an officer of the

court." *Hughes v. Bowers*, 711 F. Supp. 1574, 1584 (N.D. Ga. 1989), *aff'd*, 896

F.2d 558 (11th Cir. 1990) (quoting ABA Standards for Criminal Justice 3–1.2(b)

(3d ed.1993). As the Supreme Court has explained, "[t]he United States Attorney is

the representative ... of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States,* 295 U.S. 78, 88, (1935); *see also* ABA Standards for Criminal Justice 3–1.2(c) ("The duty of the prosecutor is to seek justice, not merely to convict."). In these circumstances, where Teman's entire post-trial strategy was potentially compromised, the burden is on the Government to explain its conduct. "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 25 (1967). As a trial court has cogently explained:

> [Once an] actual conflict of interest arose . . . the special prosecutor had a duty to disclose the policy but had a conflicting interest to conceal it. He chose to conceal it. By any standard, this deliberate, affirmative concealment from the court and the defense of important evidence constitutes a serious act of misbehavior which disregarded the rights of the defendant. The special prosecutor abdicated his duty to seek justice rather than conviction, and [defendant's] trial was rendered fundamentally unfair.

*Bowers*, 711 F. Supp. at 1584.

## B. The Government Inflamed the Jury with False and Misleading Statements About Teman's Religion.

The Government's cavalier attitude in attempting to play to the jury's potential religious prejudices and seeking to inflame the jury against Teman on religious grounds only becomes more disturbing the more the Government

33

attempts to minimize its conduct. *United States v. Grey*, 422 F.2d 1043, 1046 (6th Cir. 1970) (stating that appeals to prejudices are "foul blows" not tolerated by the United States courts ); *United States v. Heller*, 785 F.2d 1524, 1527 (11th Cir. 1986) (stating that appeal to a jury's racial and religious prejudices "prevents the impartial decision-making that both the Sixth Amendment and fundamental fair play require."); *Bains v. Cambra*, 204 F.3d 964, 974 n. 5 (9th Cir. 2000) (stating that, "although perhaps to a lesser extent" than racial or ethnic-based arguments, "religion-based prosecutorial arguments also are prohibited under clearly established federal law"); *United States v. Cabrera*, 222 F.3d 590, 594 (9th Cir.2000) ("Appeals to racial, ethnic, or religious prejudice during the course of a trial violate a defendant's Fifth Amendment right to a fair trial.").

The Government contended, in essence, that by depositing certain checks on the day before Passover, Teman was deliberately seeking to defraud Jewish clients who observed the Passover holiday. A-992-93. The implication was that, as a Jew taking advantage of fellow Jews, Teman had committed a particularly opprobrious act establishing criminal *mens rea*. This injects prejudice and negative stereotypes about Jews and projects them onto Teman. Such arguments would be extremely distasteful – to say the least – under the best of circumstances. But the government's claims are factually incorrect, which demonstrates that the purpose of the comments is to inflame the jury on religious grounds, not to provide fair

argument to assist the jury in reaching its decision. Contrary to the Government's claims, there was simply no "head start" to be gained by depositing checks during the day on Friday before Passover began. That Friday was a normal working day and the next business day was an "intermediate" day on which even very observant Jews are not prohibited from using electronic devices, driving, checking bank accounts, and taking action to avoid financial loss.[9] The Government thus deliberately mislead the jury with the false assertion that that Teman timed his allegedly fraudulent activity "to coincide with the beginning of Passover, *when he knew certain customers would not be checking their bank accounts.*" GBr. at 49 (emphasis added).

The notion that there was some evil scheme to pull one over on fellow Jews celebrating one of the year's most important holidays lacks any foundation in reality and only served to inject impermissible prejudice into the jury's deliberations. Moreover, given the confusing nature of the Government's presentation of the evidence on the real issues for the jury – whether the clients had approved the on-line Terms and Conditions and whether Teman had acted in the reasonable good faith belief that he was exercising a legitimate contractual right –

---

[9] https://www.chabad.org/library/article_cdo/aid/1000452/jewish/Chol-Hamoed.htm. The Court can take judicial notice of undisputed matters of Jewish religious practice. *See Johnson v. Paul*, No. 17-CV-3654 (KMK), 2018 WL 2305657, at *1 (S.D.N.Y. May 21, 2018).

distorting the facts to play on the jury's emotions and misusing religion to tarnish Teman's character no doubt had an outsized effect on the jury in the deliberation room and constitutes the kind of misconduct that calls for reversal and remand.[10]

## VII. THE FAILURE TO REQUIRE A SPECIAL VERDICT FORM VIOLATED TEMAN'S CORE CONSTITUTIONAL RIGHTS.

In its reply brief, the Government fails to address the radical flaw at the heart of the case: because of the combination of different customer narratives within each count, the jury could have agreed on only a single $18,000 cashed check and still convicted *on all four counts*, with wildly disproportionate monetary damages and unwarranted jail time. Br. 79-84. According to the Government, Teman's claim is untimely and must be rejected for that reason. GBr. at 52 (citing *United States v. Aiello*, 864 F.2d 257, 265 (2d Cir.1988). But the issue in *Aiello* was not timeliness standing alone, but the fact that plaintiff had originally opposed special interrogatories and attempted to switch its position in the middle of jury deliberation, more an estoppel than a timeliness issue. *Aiello*, 864 F.2d at 265. Nothing remotely comparable occurred here and the Government acknowledges that Teman's claim is reviewable. GBr. at 52. Even under the most stringent standard of appellate review, the error below is so serious, and implicates such

---

[10] That Judge Englemayer endorsed this approach does not justify or excuse it, but rather points up a blind spot in Judge Englemayer's view of Teman that also prevented him from receiving a fair trial. *See supra* at 23-26.

fundamental constitutional concerns, that this Court must reverse Teman's conviction.

In attempting to protect the jury's verdict, the Government reiterates that unanimity as to a particular customer was required for conviction on a particular count. GBr. at 53. This ducks the issue. The problem was that the jury could have agreed unanimously on one customer narrative *within* a count but not on another, with radically different outcomes in terms of potential victim harm and appropriate punishment.

Counts I and III consisted of 24 ABJ (Soleimani) checks cashed for $260,000 (Br. 16-21) and three uncashed Coney/518 W. 204 (Gabay) checks for $33,000 (Br. 11, 21). Counts II and IV consisted of one 18 Mercer (Soon-Osberger) check for $18,000 (Br. 11-16) and one Coney/518 W. 204 check for $18,000 (Br. 6-11). By combining the ABJ checks for which BOA suffered a $260,000 chargeback with the Coney checks that were *never* cashed (and *cannot* have caused BOA harm), the prosecution made it possible for the jury to convict on *all* counts based solely on a *single* customer relationship (Coney/Gabay, present in all four counts) that allegedly caused BOA total economic harm of $18,000. *All four counts and the entire trial* may have boiled down to nothing more than agreement by the jury that bank fraud existed with respect to *a single customer and $18,000 in damages*. A-83-84. For this, Teman was sentenced to restitution of

37

$264,000, forfeiture of $330,000 and a year in jail. This result is so disproportionate to any possible aim of the criminal justice system, so utterly shocking and unjust, that reversal and remand are necessary.

Rather than providing the Court with helpful analysis, the Government attempts to confuse the issue with inapposite, poorly applied, precedent. *United States v. Gushlak*, 728 F.3d 184, 195 (2d Cir. 2013), cited by the Government on p. 54 of its brief, does *not* stand for the proposition that in a count involving different customer relationships a court can apply a preponderance of the evidence standard to one customer relationship if the jury has found unanimity with respect to another. *Gushlak* simply says that when the jury is unanimous as to guilt on all counts, and all relationships within a count, the Court can calculate individual victims' losses based on a preponderance of the evidence (with factors such as time of purchase and sale of securities weighing in the balance). This is eminently sensible and unrelated to the issue in the Teman case.

*United States v. Fruchter*, 411 F.3d 377, 380-84 (2d Cir. 2005) only addresses *forfeiture* in the RICO context and expressly distinguishes *United States v. Booker,* 543 U.S. 220 (2005) and *Blakely v. Washington,* 542 U.S. 296 (2004) that remain applicable to incarceration and restitution. *Booker* and *Blakely* broadly hold that any fact that increases the punishment imposed on a defendant must be found by a jury beyond a reasonable doubt. *Fruchter*, 411 F.3d at 382 (2d Cir.

2005). As the Supreme Court has said, "[w]hen a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts which the law makes essential to the punishment, and the judge exceeds his proper authority." *Blakely*, 542 U.S. at 304 (citing 1 J. Bishop, *Criminal Procedure* § 87, p. 55 (2d ed. 1872)). Because it is possible that the jury only agreed beyond a reasonable doubt on conduct involving total harm of $18,000, restitution of $260,000 based on this determination is unconstitutional under *Booker* and *Blakely*.

With respect to jail time, the Sentencing Guidelines for bank fraud provide for a base offense level of 7 and an enhancement of 4 if the economic loss is greater than $15,000 and less than $40,000, resulting in a total Zone B level for a non-violent first-time offender of 11 and a range of 8-14 months in prison. United States Sentencing Commission, Sentencing Guidelines Manual, available at https://www.ussc.gov/guidelines/2021-guidelines-manual-annotated (the "Sentencing Guidelines"), §2B1.1(b); Ch. 5, Part A. However, Judge Englemayer calculated Teman's jail sentence of one year based on a Guidelines level of 19 and an incarceration range of 30 and 37 months, applying the loss calculation from the ABJ checks as to which no certainty of jury agreement existed. A-2345. Had Judge Englemayer started from a significantly lower offense level, he would likely have imposed no jail time at all. The Sentencing Guidelines themselves call on judges to

consider a sentence other than imprisonment for offenses in the Zone A or B range. Sentencing Guidelines, § 5C1.1, comment 4. *See also* 28 U.S.C. § 994(j).[11]

Ultimately, none of the cases cited by the Government can get around the fundamental flaw in the charging and instructing decisions that arises when different customer narratives are grouped together in a single count and the jury is permitted to convict on the entire count based on only one of the different narratives. Br. 79-84. Such a conviction offends the fundamental Constitutional rights of the accused.

---

[11] A drug analogy may help sharpen the issue. Suppose the Government charges a defendant with sales of a controlled substance to A and B and combines the two alleged sales in a single count. The Government produces evidence at trial that the defendant has allegedly sold an ounce of marijuana to A and 100 grams of fentanyl to B. The court requires the jury to agree unanimously that all the elements of illegal trafficking of a controlled substance are met as to A *or* B, but there are no special interrogatories or special verdict form. The jury returns a guilty verdict. It is impossible to know whether the jury has agreed as to A or B, but the court sentences the defendant, a second-time non-violent offender, based on the sale to B, which carries an offense level of 24, as opposed to the sale to A, which carries an offense level of 6. The sentencing guidelines indicate a range of 1 to 7 months imprisonment for the sale to A and 57-71 months for the sale to B. The judge sentences the defendant to five years imprisonment. Teman submits that the result would violate the defendant's sixth amendment jury trial rights, fifth amendment due process rights and eighth amendment proportionality rights.

## <u>CONCLUSION</u>

For the reasons set forth above, Teman's conviction must be reversed.

Respectfully submitted,

New York, New York
October 14, 2022

QUAINTON LAW, PLLC
By:*/s/ Eden P. Quainton*
Eden P. Quainton
2 Park Ave., 20th Fl.
New York, NY 10016
Telephone: 212-419-0575
equainton@gmail.com
*Attorney for Appellant Ari Teman*

41

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(I), and the word limit of Fed. R. App. P. 32(a)(7)(A), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 9,961 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.